pricing tactics and money, obtaining agreements with contractors to exclude Plaintiffs from the relevant market, and to monopolize the relevant market. The Defendants' illegal actions have had the intent and effect of reducing and eliminating competition between the Defendants and their signatory contractors with the Plaintiffs.

## THE PARTIES

2.      Plaintiff American Steel Erectors, Inc. (hereinafter referred to as "ASE"), is a corporation organized and existing under the laws of the State of New Hampshire since 1982 with an office and place of business at 328 Sawmill Road, Greenfield, New Hampshire. At all relevant times Plaintiff ASE has been engaged in the business of erection and installation of steel products on various construction projects in the Relevant Market as defined in paragraph 29. Plaintiff ASE employs approximately 50 people and is not a signatory to a collective bargaining agreement with Defendant Local 7. ASE seeks to compete in the entire Relevant Market.

3.      Plaintiff Ajax Construction Co., Inc. (hereinafter referred to as "AJAX"), is a corporation organized and existing under the laws of the State of Rhode Island since 1974 and employs approximately 50 people with an office and place of business at 2833 Victory Highway, Harrisville, Rhode Island. At all relevant times Plaintiff AJAX has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. Plaintiff AJAX is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

4.      Plaintiff American Aerial Services, Inc. (hereinafter referred to as "AMERICAN AERIAL"), is a corporation organized and existing under the laws of the State of Maine with an office and place of business at 33 Allen Avenue Extension, Falmouth,

2

Maine, since 1997. At all relevant times Plaintiff AMERICAN AERIAL has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. Plaintiff AMERICAN AERIAL employs approximately 20 people. Plaintiff AMERICAN AERIAL is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

5.      Plaintiff Bedford Ironworks, Inc. (hereinafter referred to as "BEDFORD"), is a corporation organized and existing under the laws of the State of New Hampshire since 1985 with an office and place of business at 30 Rundlett Hill Road, Bedford, New Hampshire. At all relevant times Plaintiff BEDFORD has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 20 people. Plaintiff Bedford Ironworks is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

6.      Plaintiff D.F.M., Industries, Inc. (hereinafter referred to as "D.F.M."), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts since 1993 with an office and place of business at 54 South Street, Suite 1, Wrentham, Massachusetts. At all relevant times Plaintiff D.F.M. has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 40 people. Plaintiff D.F.M. Industries is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

7.      Plaintiff Independent Welding (hereinafter referred to as "INDEPENDENT WELDING"), is the business and trade name of Ronald Beauregard with an office and place

3

of business since 2003 at 4 Campground Road, Sterling, Massachusetts. At all relevant times Plaintiff INDEPENDENT WELDING has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 20 people. Plaintiff Independent Welding is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

8.    Upon information and belief Defendant Local Union No. 7 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 7") is a labor organization within the meaning of the Labor Act (29 U.S.C. §151 *et seq.*). Defendant Charles Wright ("Wright"), is Business Agent/Industry Analyst and former President of Local 7. Wright and Local 7 each transact business in this jurisdiction with principal places of business at 195 Old Colony Avenue, South Boston, Massachusetts 02127. Paul DiPietro, John Hurley, James Coyle, Edwin Wright, and James Brown, at all relevant times herein have been agents of Local 7, and are authorized to act for and on behalf Local 7. Defendant Local 7 is the largest Ironworkers Local Union operating in the Relevant Market.

9.    Upon information and belief, the Defendant Steel Erection and Ornamental Iron Industry Advancement Fund (hereinafter "Job Target Fund"), located at 195 Old Colony Avenue, South Boston, Massachusetts 02127, is an entity created by the Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA"), Local 7, and other employer associations, that have collected money from employees of signatory employers in the Relevant Market and made agreements in order to issue payments to contractors with whom Local 7 has collective bargaining agreements or to whom Local 7 agrees to make payments to.

4

10.     Defendants Local 7, Wright, and the Steel Erection and Ornamental Iron Industry Advancement Fund and its members, in conspiracy with the co-conspirators identified below and other unnamed co-conspirators, entered into agreements in restraint of trade to limit the Relevant Market to Local 7 Contractors and to continue to maintain the monopoly of Local 7 Contractors in the Relevant Market.

## JURISDICTION AND VENUE

11.     Original jurisdiction as to the matters alleged herein is based on 28 U.S.C. §1331 (federal question), 28 U.S.C. § 1337 (civil action arising under an act of Congress regulating commerce or protecting commerce against restraints or monopolies), 28 U.S.C. §§2201 through 2202 (federal declaratory judgment act), 15 U.S.C. § 15 (antitrust), and 15 U.S.C. § 26 (injunctive relief).  Original jurisdiction also lies with this Court based on 29 U.S.C. § 187(a) of the Labor Management Relations Act (as amended) which provides a damage remedy for unfair labor practices in the nature of secondary boycotts and illegal primary activity which include threats to enter into agreements prohibited by Section 8(e) of the Labor Act, 29 U.S.C. § 158(e), which is an analog to the agreements in restraint of trade prohibited under the Sherman Act.  Plaintiffs claim tortious interference with contract and with economic relations arising under the laws of the Commonwealth of Massachusetts, State of Maine, State of New Hampshire, and the State of Rhode Island, and Mass. Gen. L. c. 93A, which claims are properly before this Court under 28 U.S.C. § 1367 (supplemental jurisdiction).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 insofar as a substantial portion of the Defendants reside and/or conduct business within the District.

## NATURE OF TRADE AND COMMERCE

13.    During the last four years, substantial quantities of material, tools and equipment used in the erection, fabrication, and installation of steel, including but not limited to precast iron and steel, have been sold and shipped to contractors such as Plaintiffs from suppliers in various states other than the Commonwealth of Massachusetts, including but not limited to the States of Maine, New Hampshire, and Rhode Island.

14.    Plaintiffs are engaged in interstate commerce and in an industry affecting interstate commerce within the meanings of §1 and §2 of the Sherman Act and §187 of the Labor Act in the erection and installation of steel metal products for building and construction projects in New England utilizing products, supplies and equipment coming from outside the Commonwealth of Massachusetts. The general business activities of the Defendants also have a substantial effect upon interstate commerce.

## NATURE OF THE CASE

15.    The claims set forth herein arise under 15 U.S.C. §1 and §2, commonly known as the Sherman Act and 15 U.S.C. §§15 and 26, commonly known as the Clayton Act. Plaintiffs seek to obtain injunctive relief, damages and costs, including reasonable attorneys' fees and expert witness fees, by reason of Defendants' violation of law.  Plaintiffs also seek damages and costs pursuant to 29 U.S.C. §187(a) commonly known as the Labor Act (as amended) (hereinafter "Labor Act"), for tortious interference with performance of contract, for tortious interference with economic relations, and for violation of Mass. Gen. L. c. 93A.

## CO-CONSPIRATORS

16.    Upon information and belief, co-conspirator Construction Welding Services Corp. (Construction Welding"), is a Massachusetts Corporation with an office and place of

business located at 279 Redemption Rock Trail, Sterling, MA 01514. Construction Welding

is a contractor engaged in the business of providing steel erection and fabrication services on

various construction projects located throughout the Boston metropolitan area. It is signatory

to a collective bargaining agreement with Local 7 negotiated through its multiemployer

bargaining representative BTEA and performs work in the Greater Boston area. Construction

Welding had a collective bargaining agreement with Local 7 during all relevant times.

17.    Upon information and belief, co-conspirator FAMM Steel, Inc. ("FAMM

Steel"), Rindge, New Hampshire, is a New Hampshire corporation with an office and place of

business located at 97 Hunt Hill Road, Rindge, New Hampshire. FAMM Steel is a contractor

engaged in the business of fabricating steel on various construction projects located

throughout the New England area. FAMM Steel has no collective bargaining agreement with

Local 7.

18.    Upon information and belief, co-conspirator Canatal Industries, Inc.

("Canatal") is a Canadian company with an office and place of business located at 2885

Boulevard Frontenac East, Thetford Mines, Quebec, Canada G6G 6P6. Canatal is a

contractor engaged in the business of fabricating and erecting steel on various construction

projects located throughout the New England area. Canatal has agreements with Local 7.

19.    Upon information and belief, co-conspirator CAPCO Steel Corp., ("CAPCO")

is a steel fabricator with an office and place of business located at 33 Acorn Street,

Providence, Rhode Island. CAPCO is a contractor engaged in the business of fabricating

steel on various construction projects located throughout the New England area. CAPCO is a

member of BTEA with a collective bargaining agreement with Local 7.

20.    Upon information and belief, co-conspirator Universal Steel Erectors, Inc.

("Universal Steel"), is a corporation with a principal place of business at 65 Tibbets Hill Road, Goffstown, New Hampshire and is a contractor engaged in the design and erection of steel structures, is signatory to a collective bargaining agreement with Local 7 negotiated through its multi-employer bargaining representative BTEA, and performs work in the Relevant Market.

21.     Upon information and belief, co-conspirator Arctic Construction, Inc., ("Arctic"), is a corporation with a principal place of business at Falmouth, Maine, and is a contractor engaged in the design and erection of steel structures, is signatory to a collective bargaining agreement with Local 496 negotiated through its multi-employer bargaining representative, and performs work in the Relevant Market.

22.     Upon information and belief, there are other co-conspirator members of the BTEA—which is a corporation organized and existing under the laws of the Commonwealth of Massachusetts that has its principal offices at 1400 Hancock Street, Quincy, Massachusetts 02169.  BTEA is a multi-employer bargaining entity which engages in collective bargaining with Local 7 on behalf of its member steel erector companies.

23.     Co-conspirator Local Union No. 37 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 37") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et seq., with an office at 845 Waterman Avenue East, Providence, Rhode Island and transacts business within this jurisdiction.

24.     Co-conspirator Local Union No. 57 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 57") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et seq., with an office at 6 Winter Street, Worcester, Massachusetts. and transacts business within this jurisdiction.

25.     Co-conspirator Local Union No. 357 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 357") has been a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.*, with an office in Chicopee Falls, Massachusetts, and transacts business within this jurisdiction. All its assets were transferred to Local 7 on November 28, 2003.

26.     Co-conspirator Local Union No. 474 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 474") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.*, with an office at 1671 Brown Avenue, Manchester, New Hampshire and transacts business within this jurisdiction.

27.     Co-conspirator Local Union No. 496 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 496") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.*, with an office on Hinckley Road, Clinton, Maine and transacts business within this jurisdiction.

## DEFINITIONS

28.     As used in this Complaint the following terms have the following meanings assigned to them in the paragraphs set forth below.

29.     The "Relevant Market" is defined as the erecting of structural metal and steel on buildings and structures, erecting prestressed and precast concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine—an area proximate to the City of Boston.

30.    "Structural steel erection" is defined as Relevant Market work engaged in by contractors that are signatory to union collective bargaining agreements and those that are open-shop and not-signatory to an agreement with an employee representative. The actual Relevant Market which Plaintiffs are able to compete in only encompasses the open-shop jobs within the Relevant Market.

31.    "Local 7 Contractor" is a steel erector signatory to a collective bargaining agreement with Local 7 or an agreement to abide by an area collective bargaining agreement.

32.    "Non-Local 7 Contractor" is a steel erector who has a collective bargaining agreement with a union other than Local 7 or one of its co-conspirators or is not a signatory to a collective bargaining agreement with any labor organization.

33.    "Non-Labor businesses" are developers, building owners, building management, general contractors, and fabricating contractors, such as co-conspirators Construction Welding, FAMM Steel, CAPCO, Canatal Industries, Inc., and Arctic, who enter into contracts with Non-Labor Businesses for the building and/or erection of steel structures which they in turn contract out to Local Contractors or Non-Local 7 Contractors for the design, manufacture or installation of this work. These Non-Labor businesses either have no collective bargaining agreement with Local 7 or have no employees who perform the structural steel erection work, but rather subcontract out such services.

34.    "Job Target Fund" or "Industry Advancement Fund" refers to a job subsidy program financed by contributions from hourly wages provided for in the collective bargaining agreement Local 7 entered into with BTEA and other contractor associations on behalf of the Local 7 Contractors. Local 7 has entered into agreements with Non-Union Businesses, and with whom it has no collective bargaining agreement and over whose

10

employees Local 7 has not asserted jurisdiction, to grant subsidy funds to induce Non-Labor

Businesses, and to refrain from engaging Plaintiffs and other Non-Local 7 Contractors and

instead engage only Local 7 Contractors. These subsidies are allegedly available only to steel

contractors who are parties to the collective bargaining agreement with Local 7 and are

intended to assist those employers in meeting the competition from non-union structural steel

erectors. In fact, Defendant Local 7 has unlawfully administered the program so as to use the

job target funds not only as a threat, to deny Job Target Funds to Non-Labor businesses who

engage Non-Local 7 Contractors such as Plaintiffs, or to reward Non-Labor businesses who

use only Local 7 Contractors, but also in derogation of the federal Davis-Bacon Act and

federal regulations, by conspiring to collect employee wages from employers and returning

employee wages to employers as contributions directly from union controlled bank accounts.

35.    "Stripping" is a practice whereby Local 7 and its agents, in agreement and

through a conspiracy with Local 7 Contractors, have with improper motive or method induced

employees of Plaintiffs and other Non-Local 7 Contractors to leave and to seek placement and

work with Local 7 Contractors in order to severely curb the ability of Plaintiffs and other

Non-Local 7 Contractors to carry on their businesses. By the patterns and practices described

herein Plaintiffs and other Non-Local 7 Contractors are barred from the Relevant Market

therein, thereby lessening the financial ability of the Plaintiffs and other Non-Local 7

Contractors to retain their employees, further reducing the ability of Plaintiffs and other Non-

Local 7 Contractors to compete in the Relevant Market.

## FACTUAL ALLEGATIONS

36.    The construction industry is a labor intensive industry in which a large portion

of the cost is labor (approximately 50%). Generally, the portion of the cost attributable to

structural steel labor services in the case of union contractors in the area is uniform and fixed as agreed upon by the Local 7 contractors and the Defendants. In the case of open-shop contractors, the cost attributable to structural steel labor services is variable and subject to competitive forces and (in the absence of predatory pricing tactics) is almost always less expensive than the rates set by Local 7 contractors.

37.    Over seventy per-cent (70%) of structural steel erection performed in the Relevant Market is performed by union contractors who are signatories to collective bargaining agreements (or 8(f) pre-hire agreements) with the BTEA, other contractor associations, Ironworkers Local Unions and affiliated members. These agreements contain an express agreement that the Non-Labor businesses will work only with other structural steel contractors and subcontractors who are union-signatories. In contrast, only fifteen (15) per cent of the construction industry nationwide is so organized.

38.    There is no requirement in law or otherwise that only contractors signatory to an agreement with Local 7 or one of the union co-conspirators may do steel and structural steel erecting work in the Relevant Market, including federal and state government funded projects.

39.    Local 7 falsely asserts that Plaintiffs and non-Local 7 contractors have no right to do structural steel erecting work in the Relevant Market.

40.    Plaintiffs' principal businesses are installing steel building frames on new building sites and performing precast steel installation work for private sector and public sector construction projects. Plaintiffs are usually a subcontractor to a steel fabricator which is in turn typically a subcontractor to a general contractor or project developer.

41.    Plaintiffs receive jobs from Non-Labor businesses who request that Plaintiffs

submit bids to them. Plaintiffs depend almost entirely on requests from these Non-Labor businesses to perform their work.

42.     Plaintiffs have an excellent reputation in the industry as fast, efficient and accurate structural steel erection contractors capable of handling large steel erection jobs.

43.     Since approximately 1999, total structural steel erection construction spending on an annualized basis in the Relevant Market was in excess of $200,000,000 per year. Of that total, however, more than half can be accounted for by the Boston Central Artery and Harbor Tunnel project (also known as the "Big Dig"), which was subject to a project labor agreement and therefore was undertaken as a union-shop job. After adjusting for the Boston Central Artery and Harbor Tunnel Project and other union-shop projects, the Relevant Market in which Plaintiffs are able to compete has been less than $60,000,000 per year during the relevant time period.

44.     The structural steel erection contracting market in the Relevant Market is dominated by union signatory contractors who only employ workers belonging to the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, which represents greater than 70% of the dollar volume of available work. All of the local offices of the Iron Workers Union in the relevant geographic market are controlled by the Local Union 7 office. Due to the unity of labor sourcing (as evidenced by area agreements and contracts executed by Local 7), the union contractors in the Relevant Market in combination with Local 7 are able to act in concert to exercise control on the remaining 30% of the market in which Plaintiffs compete to increase their market power on that remaining portion of the Relevant Market.

45.     Within the Relevant Market, Plaintiffs, along with other independent nonunion

competitors, compete against the concerted efforts of Local 7 and signatory union contractors. Defendant Local 7 uses money obtained from the Job Target Fund to engage in a pattern and practice of unreasonable restraint of trade.

46.     Between 2000 and 2003, Local 7 collected more than $12,000,000 from the union contractors working on the Boston Central Artery and Harbor Tunnel Project and other union-shop and federal and state government projects which Plaintiffs were excluded from bidding on. During that time, Local 7 used approximately $6,000,000 of the Job Target Fund money collected on the Boston Central Artery and Harbor Tunnel Project and other union-shop jobs to conspire with union signatory contractors to systematically exclude Plaintiffs and the other nonunion contractors from other projects in the Relevant Market and have continued to collect and spend money to do so.

47.     Defendants' Job Target Fund money further reduces Plaintiffs' opportunity to compete in the Relevant Market by enabling union signatory contractors to factor in below cost labor and equipment prices and thereafter to conspire with contractors, developers, and fabricators to reduce union signatory contractor bids below bid prices submitted by the Plaintiffs to said contractors, developers, and fabricators. This drives the long-term average costs of the non-signatory contracts and Plaintiffs upward with the intent of driving Plaintiffs out of the Relevant Market.

48.     Defendants have effectively barred Plaintiffs and all other Non-Local 7 Contractors from any work in Suffolk County and surrounding areas which constitutes approximately 70% (seventy per cent) of the work in the Relevant Market although Plaintiffs and other Non-Local 7 Contractors have asked their contractor customers for the opportunity to perform the jobs, and are ready, willing and able to perform a substantial percentage of

14

them. Defendants' successful methods in the Relevant Market have enabled them to effectively exclude Plaintiffs from at least 70% of the market.

49.   The almost total exclusion of competition from Suffolk County and surrounding areas in the Relevant Market is the result of the pattern and practices of the Defendants in unreasonable restraint of trade respecting those jobs in the geographical area of the Relevant Market.  Plaintiffs have been left with more numerous jobs of shorter duration, more widely distributed and less visible jobs in the Relevant Market, over which Defendants have not been able to achieve the same measure of monopolistic control as they have over larger jobs in the Relevant Market.  But through unlawful picketing and threats of picketing, surveillance, discriminatory denials or granting of "job targeting" subsidies, Local 7 has coerced and conspired with various non-union contractors united in an effort to keep Plaintiff and other Non-Local 7 Contractors from performing jobs in the entire geographical area of the Relevant Market.  Plaintiffs have not been able to obtain those larger jobs.  Other Non-Local 7 Contractors have likewise been unable to do so.

50.   The greater profitability of such larger jobs coupled with the greater ability of Local 7 to organize its disruption accounts for the unwillingness of customers to use Plaintiffs and other Non-Local 7 Contractors.  Such jobs are rarely awarded to Plaintiffs and other Non-Local 7 Contractors.

51.   The result of Defendants efforts will be to eliminate competition from non-union signatory contractors and increase Local 7's and their signatory contractors' market power in the Relevant Market such that they can price projects at a level that affords them monopoly profits.

52.   These acts demonstrate that Defendants have wielded their market power to

15

acquire and secure exclusive dealing arrangements. These actions show Defendants have used and maintained their market power to foreclose further competition in the Relevant Market by exclusionary means.

53.    Plaintiffs' contractor customers in the Relevant Market are willing to deviate from the strict terms of their agreements with Local 7 by awarding some smaller jobs to Plaintiffs, provided that when Plaintiffs are thrown off the jobs at Local 7's insistence, Plaintiffs will not sue for breach of contract.

54.    Numerous Non-Local 7 Contractors have had practically the identical experience as Plaintiffs which include experiences described below, resulting in suppression of competition in the Relevant Market.

55.    Local 7 contractors have agreed to make hourly contributions to the Defendant Job Target Fund based upon each hour of wages earned by employees on projects, including projects covered by 40 U.S.C. §3141 *et seq.*, formerly known as the Davis-Bacon Act, 42 U.S.C. § 276a, and Local 7 has agreed to assign a portion of those contributions from funds earned on federal prevailing wage projects to other employers, to subsidize projects for BTEA members to compete on projects where Plaintiffs and other Non-Local 7 Contractors have submitted bids. The Davis-Bacon Act is a federal statute requiring the payment of prevailing wages and benefits to employees on projects over $2,000.00.

56.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant Market from Non-Labor businesses and customers and have been and are ready, willing and able to perform such jobs. Upon information and belief there are other Non-Local 7 Contractors who are also desirous of and ready, willing, and able to perform such jobs and who are also barred or denied from the Relevant Market as a result of the anti-competitive

conspiracy of Defendants and the co-conspirators described herein.

57.    Defendants have collected money from employee wages and, in contravention of federal law, have illegally turned over this money to employers. Defendant Local 7 has paid money directly to employers from its own funds to its co-conspirators.

58.    Defendant Local 7 and other building trade unions have entered into conspiracies and agreements in restraint of trade and in violation of law—including the Sherman Act §1 and §2 and §8(b)(4)(A), §8(b)(4)(B) and §8(e) of the Labor Act. Local 7 and other building trade unions have conspired and entered into agreements with the other Defendants and various co-conspirators including Non-Labor Businesses in order to eliminate Plaintiffs and other similarly situated structural steel erectors who are not signatories to a collective bargaining agreement with Local 7 (defined herein as "Non-Local 7 Contractors") from full access to the Relevant Market by engaging in the following conduct:

    a.    Local 7 has engaged in threats and coercion the object of which is to obtain agreements prohibited by §8(e) of the Labor Act. Local 7 has conspired with and entered into agreements in restraint of trade with Non-Labor Businesses and other persons that are in violation of the Sherman Act Sections 1 and 2 and Sections 8(b)(4)(A), 8(b)(4)(B) and 8(e) of the Labor Act by virtue of threats of localized and wide spread picketing, surveillance, work stoppages, and actual picketing or stopping the work at job sites where Plaintiff or other Non-Local 7 Contractors are working in order to compel developers, building owners, building management, general contractors, and other persons to refrain or cease doing business or change the way they do business with Plaintiff or other Non-Local 7 Contractors.

    b.    Local 7 has conspired with and entered into agreements with Non-

Labor businesses fabricating contractors, with whom it has no collective bargaining agreement and over whose employees Local 7 has not asserted jurisdiction, to grant subsidy money, known as "job target money," to induce these Non-Labor businesses to refrain from engaging Plaintiffs and other Non-Local 7 Contractors, and instead engage contractors which either have a collective bargaining agreement with Local 7 and Iron Worker Local Unions under Local 7's control or have signed a prehire agreement with Local 7 and Iron Worker Local Unions under Local 7's control (hereinafter "Local 7 Contractors").

    c. Local 7 has conspired with the BTEA and contractors with whom it has a collective bargaining agreements to pool job target money funds from federal prevailing wage projects covered by the Davis-Bacon Act, 40 U.S.C. §3141 *et seq.*, which statute requires the direct crediting and payment of wages and benefits to employees working on federal jobsites at a level not below the prevailing wage rate established by the United States Department of Labor and on information and belief has spent such money collected from employers which should have been credited to employees in violation of the Davis Bacon Act, 40 U.S.C. §3142a, the Copeland Anti-Kickback Act, 18 U.S.C. §874, and 29 C.F.R. Part 3.

    d. Local 7 has withheld Job Target Funds from Non-Labor businesses with whom they have no collective bargaining agreement and over whose employees Local 7 has not asserted jurisdiction, to compel them to enter into agreements to terminate business relations with Plaintiffs or other Non-Local 7 Contractors and not to engage them in the future.

    e. Local 7 has conspired with and entered into agreements with Local 7 Contractors in violation of Sherman Act §1 and §2 to threaten Non-Labor businesses with

picketing and/or work stoppages in violation of Sherman Act §1 and §2 and §8(b)(4)(A), §8(b)(4)(B) and §8(e) of the Labor Act on all of the contractor's jobs if the Non-Labor businesses do not terminate contracts with Plaintiffs and other Non-Local 7 Contractors and refrain from engaging them in the future.

       f.    Local 7 has conspired with other building and construction trade unions including Local Union Nos. 37, 57, 357, 474, and 496, International Association of Bridge Structural, Ornamental & Reinforcing Iron Workers, AFL-CIO, to prevent Plaintiff and other Non Local 7 Contractors from performing or being engaged on a project that Local 7 seeks to prevent Plaintiffs and other Non-Local 7 Contractors from performing.

       g.    Local 7, through conspiracy and agreement with BTEA by and among its members, and other unnamed co-conspirators has induced the employees of Plaintiffs and other Non-Local 7 Contractors to leave their employ and go to work for Local 7 Contractors while engaging in the anti-competitive conspiracies described herein which deprive Plaintiffs and other Non-Local 7 Contractors from access to the more profitable Relevant Market, thereby depriving Plaintiffs and other Non-Local 7 Contractors of the financial ability to retain their employees, all in furtherance of the conspiracy to create and maintain an enclave in the Relevant Market limited to Local 7 Contractors.

## THE PATTERN AND PRACTICE OF AGREEMENTS
## IN RESTRAINT OF TRADE

    59.    Because of the conduct of Local 7 and other co-conspirators in restraint of trade, Non-Labor businesses routinely preclude Plaintiffs and other Non-Local 7 Contractors from bidding on and performing jobs in the Relevant Market.

    60.    However, on many occasions, Non-Labor businesses benefit from the conspiracy by engaging in the practice of using the significantly lower price on a job it

receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7

Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate

downwards the price for the same job from a Local 7 Contractor.  Rather, they often use

Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to

induce job target subsidies.

**Local 7's Attempt to Exclude All Non-Local 7 Contractors**
**And Enlistment of Other Iron Worker Unions in the Conspiracy**

61.     To broaden the impact of picketing or a work stoppage, Local 7 has conspired

with other trade unions to eliminate all Non-Union Contractors from competition.  In other

words, Local 7 has conspired to eliminate competition from contractors like Plaintiffs who do

not have union contracts with an Iron Workers local union.

62.     Local 7 has used its job target money to successfully exclude Non-Local 7

Contractors from projects such as the work on the Carroll School in Peabody, Massachusetts,

the North Brookfield Junior/Senior High School in North Brookfield, Massachusetts in 2002,

the 405 Cochituate Road Project in Natick, Massachusetts in 2002, the John Elliot

Elementary School in Needham, Massachusetts in 2002, and the Thomas Carroll School

Project in 2002, in Peabody, Massachusetts in 2002, and other projects.

63.     Local 7 and its affiliated unions have also engaged in pretextual area standards

picketing and prohibited "top down" organizing, where the Union uses economic weapons to

force recognition from employers regardless of the wishes of their employees.

64.     Employees of ASE have voted against representation by Local 7.

65.     Employees of D.F.M. have voted against representation by Local 7.

66.     During the period beginning in October 2000, the Defendants, acting

individually and in concert with each other, and each authorizing and ratifying the acts of

20

their employees, officers, and agents, in furtherance of their objectives to establish an all-union, anticompetitive enclave in the Relevant Market area, as set forth in the Counts of the Complaint, have threatened Local 7 contractors, non-Local 7 contractors, and other persons engaged in commerce. The object of such conduct was to obtain agreements in restraint of trade in violation of Section 8(e) of the Labor Act, 29 U.S.C. § 158(e), whereby certain persons would agree not to do business or to change the way they do business with Plaintiffs or other non-Local 7 contractors. This has been a practice of long standing between the Defendants. As evidence of this objective, Plaintiffs cite the following illustrative examples of certain coerced agreements not to do business with Plaintiffs and other related conduct in furtherance of Defendants' intent to create an anticompetitive enclave:

### The Catholic Medical Center Project

67.    In 2002, a new hospital wing at the Catholic Medical Center in Manchester, New Hampshire was under construction. Harvey Construction was the general contract. AMERICAN AERIAL, ASE and BEDFORD IRON bid on this project.

68.    Harvey Construction through Canatal Industries, Inc. notified Plaintiff AMERICAN AERIAL that it was the low bidder to install the steel structure work. The steel erection contract had a total value in excess of $240,000.00.

69.    On or about February 27, 2003, Plaintiffs AMERICAN AERIAL was removed as the steel erector on the Catholic Medical Center project and was replaced by Universal Steel, a Local 7 contractor and who received job target money to underbid AMERICAN AERIAL.

### The Fox 25 Project

70.    In the Fall of 2002, Plaintiff D.F.M. was awarded a contract to build a Fox

Television Station addition in Dedham, Massachusetts, by Cape & Island Steel, Inc. On or about February 24, 2003, the day before construction was to begin, agents of Defendant Local 7 contacted the project manager Jim Gage for Cape & Island Steel, Inc. demanding that Plaintiff D.F.M. be removed.

71. Plaintiff D.F.M. Industries' employees began working at the Fox 25 Project in accordance with its contract. Cape & Island Steel, Inc.'s President John J. Paulding was then told by Edwin Wright, a Business Agent from Local 7, that if Cape & Island Steel, Inc. did not remove Plaintiff D.F.M. Industries from the project, that would be a "big mistake" and Local 7 would set up a picket line and induce other building trade union members to walk off the job.

72. When Paulding objected, Wright informed Paulding that if Paulding did not remove Plaintiff D.F.M. Industries from the project he would contact the other Building Trades Unions to pressure him by putting up a picket line. A purpose of the picketing threat was to coerce and restrain Paulding to enter into an 8(e) agreement in restraint of trade.

73. On June 19, 2003, Wright went to the job site and disrupted the job by making threatening statements to Plaintiff's employees and supervisors of physical harm. D.F.M. Industries' equipment on the jobsite was damaged.

74. The general contractor Bond Brothers told Cape & Island Steel, Inc. that he had to make this union problem go away. Subsequently, the Cape & Island Steel, Inc. Project Manager informed D.F.M. Industries that he would terminate Plaintiff's contract before D.F.M. Industries' job was finished and Cape & Island Steel, Inc. would not give the next phase of the job to Plaintiffs D.F.M. Industries.

75. Plaintiff D.F.M. Industries was removed from the job.

22

76.    The agreement of John Paulding and Local 7 to remove Plaintiff D.F.M. Industries from the job is a restraint of trade and Plaintiff has been damaged thereby.

### The Tamarisk House Project

77.    D.F.M. Industries had a contract dated August 1, 2002, with Metro West Steel, Wrentham, MA, to erect an assisted living home in Warwick, Rhode Island in 2002, being managed by O. Alhborg & Sons, Inc., Cranston, RI.

78.    At a meeting with managers and supervisors from O. Alhborg & Sons, Inc., D.F.M. was informed on Wednesday August 28, 2002, to begin steel erection the following Tuesday, September 3, 2002.

79.    On Friday, August 29, 2002., D.F.M. Industries, was informed by project manager Dino Cauteruccio of Metro West Steel that O. Ahlborg & Sons, Inc. had been contacted by representatives from Local 37, that Metro West Steel was rescinding its contract with D.F.M. Industries, and that the contract was then being awarded to Griffin Steel, a Local 7 Contractor.

### Danvers Stop & Shop Project

80.    On November 8, 2002, steel fabricator Jay Steel solicited bids for the construction of a Stop & Shop grocery store in Danvers, Massachusetts. Plaintiff ASE submitted a bid on January 14, 2003.

81.    ASE was informed by a representative of Jay Steel that the Local 7 had provided job targeting money to the erector used by Jay Steel which undercut ASE's bid.

### Stop & Shop Warehouse Project

82.    On March 23, 2003, AJAX was solicited by M & S Steel of Garett, Indiana, to submit a bid to erect the structural steel for the Stop & Shop Warehouse project in Freetown,

Massachusetts. Plaintiffs AJAX and D.F.M. also submitted bids on the project.

83.    Subsequently, agents of Local 7 contacted M & S Steel and informed it that job target money was available to it if it awarded the project to a Local 7 contractor.

84.    H & B Welding, a Local 7 Contractor, was then awarded the contract with the use of job target money.

*Portland Jet Port Project*

85.    On April 22, 2004, AMERICAN AERIAL submitted a bid of $92,000.00 to general contractor Ledgewood, Inc. for the erection of hangers in Portland, Maine.

86.    AMERICAN AERIAL was informed by Mark Harris of Arctic Construction, Inc., Falmouth, Maine, a Local 7 Contractor, that it had been provided job target funds. Subsequently, Local 496 agent John Evans admitted that job target money had been provided to enable Arctic Construction, Inc. to submit a lower bid on the project.

*University of Southern Maine Science Research Wing Project*

87.    On May 21, 2004, AMERICAN AERIAL submitted a bid of $92,500.00 to general contractor Pizzagalli Construction Company for the construction of new science research wing for the University of Southern Maine in Portland, Maine. AMERICAN AERIAL was informed it was the second low bidder.

88.    The project was then awarded to Arctic Construction, Inc., a Local 7 Contractor, who Local 496 agent John Evans admitted had been provided job target money to submit a bid lower than AMERICAN AERIAL on the project.

*Cardi's Furniture Project*

89.    In 2002, AJAX submitted a bid for the steel erection of a Cardi's Furniture store in North Attleboro, Massachusetts to FAMM Steel, Inc. AJAX was informed by

FAMM that it was awarded the contract.

90.    AJAX was subsequently informed by FAMM that Local 7 had authorized the payment of job target money on the project and then awarded the contract to Griffin Iron, a Local 7 Contractor, who on information and belief received the Job Target money.

91.    Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed to pay AJAX $5,000.00 to break its service contract on the job.

### O. Alhborg Headquarters Project

92.    O. Alhborg and Sons sought bids for the steel erection of their O. Ahlborg and Sons Headquarter's office in Cranston, Rhode Island, to begin in October 2001.

93.    Plaintiffs D.F.M. and AJAX submitted bids for the work with a value of $45,000.00.  AJAX was awarded the job.

94.    The day before work was to begin, the project was awarded to Griffin Steel who on information and belief received Job Target money from Defendant.

### Walmart Brewer Project

95.    In 2002, a Wal-Mart store was to be erected in Brewer, Maine.  On August 6, 2002, Plaintiff AMERICAN AERIAL submitted a bid to Universal Welding to perform the structural erection of the building in the amount of $259,600.00.

96.    Industrial Enterprises, a union contractor was awarded the contract with a bid of $160,000.00 for which it received job target money.

### Yarmouth High School Project

97.    In 2002, the steel erection for a new Yarmouth High School in Yarmouth, Maine was awarded to steel fabricator Mandate Erectors & Welding, Ltd.  Mandate Erectors

& Welding, LTD solicited bids for the erection of the steel frame.

98.    On April 8, 2002, Plaintiff AMERICAN AERIAL submitted a bid of $339,900.00 to Mandate Erectors & Welding, LTD.  A union contractor with Job Target Funds, CTI, New Hampshire, was awarded the bid at $200,000.00.

### North Brookfield High School Project

99.    A Junior/Senior High School building project was constructed in North Brookfield, Massachusetts.  Plaintiffs were unable to bid on the project when it was learned that Union contractor Construction Welding Services Corporation received job target money from Local 7.

### Walker Brook Crossing

100.    On December 12, 2002, Mandate Erectors & Welding, Ltd. solicited bids for the steel erection portion of a Home Depot in Reading, Massachusetts known as Walkers Brook Crossing.  On January 17, 2003, Plaintiffs AMERICAN AERIAL, ASE and AJAX submitted bids to perform the work

101.    ASE and AJAX were informed by a representative of Mandate Erectors & Welding, Ltd. that Local 7 had provided job targeting money to a Local 7 contractor.  The project manager, then awarded the contract to CAPCO Steel, Inc., a Local 7 Contractor.

### Stryker Biotech

102.    On May 30, 2003, fabricator Supermetal solicited bids for the steel erection portion of the construction in West Lebanon, New Hampshire known as Stryker Biotech.  On June 25, 2003, ASE submitted a bid to perform the work.

103.    ASE was informed by a representative of Supermetal that Local 7 had provided job targeting money to CAPCO, and the contract was being awarded to CAPCO

Steel Corp., a Local 7 contractor

### *Long View Place*

104.    On June 2, 2003, General Steel Fabricators, Inc. and Mandate Erectors & Welding, Ltd. solicited bids for the steel erection portion of the construction of an apartment community in Waltham, Massachusetts known as Long View Place.  Plaintiffs ASE and AJAX submitted bids.

105.    ASE was informed that it had submitted the low bid on the project.

106.    ASE was then informed by a representative General Steel Fabricators, Inc. that Local 7 had provided job targeting money to a Local 7 Contractor, and contract was awarded the contract to Beauce Atlas, a Local 7 contractor.

### *Mart Parking Complex*

107.    In the Fall of 2003, FAMM Steel, Inc. issued a public bid for the steel erection and building of a parking garage complex in Fitchburg, Massachusetts.  Plaintiffs AJAX, ASE, INDEPENDENT WELDING, and BEDFORD submitted bids.

108.    Subsequent to submitting the bids, INDEPENDENT WELDING was told by Allen Hodges, a representative of FAMM Steel, Inc. that a union company, Universal Steel had received job target money on the project.  Universal Steel was awarded the contract.

### *The 405 Cochituate Road Project*

109.    In October 2002, a construction project in Natick, Massachusetts at 405 Cochituate Road was to begin.  Ocean Steel was the steel fabricator.  Plaintiff D.F.M. Inc. submitted a bid on this project, as well as Green Mountain, a non-Local 7 contractor.

110.    Agents of Local 7 contacted Construction Welding to have it outbid the non-Local 7 contractors on the project.

111.    On or about October 8, 2002, co-conspirator Construction Welding obtained job target funds from Local 7.  With those funds, Construction Welding was awarded the project for the steel erection portion of the 405 Cochituate Road Project.

*Jordan's Furniture Distribution Warehouse Project*

112.    In 2002, AJAX submitted a bid for building this project in Taunton, Massachusetts.

113.    On information and belief, the project was awarded to James F. Sterns Co., Inc., Hingham, MA, a Local 7 Contractor who received job target money.

*Stone Harbor Condominiums*

114.    On August 8, 2003, AJAX submitted a bid to Jay Steel on this project in Bristol, Rhode Island and was informed it was the low bidder.

115.    On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor who received job target money.

*Whole Foods Grocery Project*

116.    In the Spring of 2004, AJAX submitted a bid on this project in Hingham, Massachusetts to Jay Steel and was informed it had submitted the lowest bid.

117.    On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor Daniel Koury Construction, Inc., Warwick, Rhode island, who received job target money.

*Showcase Cinemas*

118.    On August 19, 2003, AJAX submitted a bid to fabricator Beauce Atlas on this project in Millbury, Massachusetts and was informed it had submitted the lowest bid.

119.    Two weeks later, the work was taken away from AJAX and awarded to a

28

Local 7 Contractor who received job target money.

### Archstone Apartments

120.    On June 11, 2003, AJAX had received a written purchase order from Mandate Erectors for this building project in Watertown, Massachusetts.

121.    AJAX had invested a substantial amount of preparation time and costs in preparing the project.

122.    Two weeks before the scheduled start date, AJAX was informed that the project was being taken away from it and being awarded to Interstate Steel Erectors, a Local 7 contractor.

123.    Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed broke its service contract with AJAX.

### Stop & Shop Store Project

124.    On March 23, 2004, AJAX submitted a bid for the construction of a Stop & Shop grocery store in Halifax, Massachusetts to Jay Steel.  AJAX was informed by the fabricator Jay Steel that it had been awarded the project.

125.    One week before the start date, AJAX was informed that the project was being assigned to H B Welding, Inc., Pawtucket, RI, a Local 7 Contractor.

### Necco Project

126.    In 2001, AJAX submitted bids for the erection of a warehouse building for NECCO in Revere, Massachusetts to Cives Steel, Augusta, Maine.  AJAX was informed that it was the low bidder by the final fabricators on the project.

127.    One week after meeting with the general contractor and fabricators on the jobsite, AJAX was informed that the project was being awarded to CAPCO, Providence, RI, a

Local 7 Contractor.

### Shaw's Supermarket Project

128.    On June 10, 2004, INDEPENDENT WELDING submitted a bid for the erection of a Shaw's Supermarket in Worcester, Massachusetts, to the fabricator Bennington Iron Works.  Plaintiffs AJAX, AMERICAN AERIAL and D.F.M. also submitted bids. INDEPENDENT WELDING was informed that it was awarded the contract.

129.    On June 23, 2004, INDEPENDENT WELDING was informed that union agents had contacted the general contractor CM & B, Lynnfield, MA, and that job target money was made available

130.    On July 15, 2004, INDEPENDENT WELDING was informed that the project was being taken away from it and awarded to a Local 7 Contractor.

### Bowdoin College Project

131.    In August 2004, AMERICAN AERIAL submitted a bid for the erection of a new dormitory wing at Bowdoin College in Brunswick, Maine, to the fabricator Advance Resources and Construction Enterprises, Inc. ("ARC"), Kingfield, Maine.  AMERICAN AERIAL was informed that it had been awarded the contract.  AMERICAN AERIAL attended a jobsite meeting for sequencing the job, jobsite requirements, and was told it was the steel erector.  The job was to begin the week of November 22, 2004.

132.    On November 15, 2004, AMERICAN AERIAL was informed by ARC that it had received new pricing from Arctic Construction, a Local 7 contractor, and was meeting with Arctic to finalize a new contract that was substantially lower.  AMERICAN AERIAL was removed from the project.

### Brickworks-Buildings 3 & 4 Project

133.    On October 8, 2004, D.F.M. submitted a bid for the erection of two buildings in Cambridge, Massachusetts to Capone Iron Corporation, Rowley, Massachusetts.

134.    On September 28, 2004, Bel-Lin Corporation, Randolph, Massachusetts, submitted a bid on the project to Capone Iron Works in the amount of $136,000.00. Plaintiff D.F.M. was awarded the contract on October 8, 2004.

135.    On or about November 18, 2004, Local 7 negotiated a new bid for the project with its union signatory erector Bel-Lin Corporation. The Union agreed to contribute $12,000.00 of job target money to the contractor and Bel-Lin Corporation agreed to further lower its prior bid by $9,000.00 as a "good guy discount" to Capone Iron Works.

136.    On or about November 18, 2004, defendant Local 7 wrote Capone Iron Works by agent Edwin Wright, on behalf of itself and Bel-Lin Corporation, and offered to cut Capone Iron Works' prior bid by $21,000.00 as a concession and for market recovery.

137.    On November 29, 2004, D.F.M. was informed by Capone Iron Works project manager J. Robert Chipman that the Union had provided him a new bid price on the project for Bel-Lin Corporation and therefore D.F.M. would not be permitted to perform on the contract with Capone Iron Works.

### *22 Fore Street*

138.    "22 Fore Street" is the name of a project in Portland, Maine that was awarded to AMERICAN AERIAL. Agents of Local 7 offered fabricator Advance Resource Construction $20,000.00 if it would not use AMERICAN AERIAL's services.

### *Hilton Garden Inn*

139.    On information and belief, on a Hilton Garden Inn construction project being erected by AMERICAN AERIAL in Freeport Maine in 2004, Walter Kilbrethm an agent of

31

Local 496 offered to pay job target money to ARC.

140.    The acts and agreements set forth above were a part of a pattern and practice of obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts as alleged below.

141.    The aforesaid unlawful combinations and conspiracies in restraint of trade and to monopolize trade consist of a continuing agreement, shared purpose, understanding, and concert of action among the defendants and the various non-labor co-conspirators named above.

### *The Misuse of Job Target Agreements.*

142.    Although the job targeting subsidy program purports to be a lawful program limited to those employers who have a collective bargaining agreement with Local 7 which are challenged by non-union competition, the program is administered unlawfully inconsistent with state and federal prevailing wage laws and in restraint of trade. In fact, Local 7 also negotiates Target Agreements directly with Non-Labor businesses, which have no collective bargaining agreements with Local 7 and have no employees over whom Local 7 has asserted jurisdiction in order to secure agreements in violation of Section 8(e) of the Labor Act. Job Target Funds or subsidies are given as a reward at the request of Contractors who have agreed to hire only Local 7 Contractors and are withheld from other Non-Labor businesses as a punishment for hiring Plaintiffs or other Non-Local 7 Contractors.

143.    For example, Defendant Charles Wright contacted the President of Construction Welding on numerous occasions in 2002 including the projects identified above, that it would provide Construction Welding job target funds in order to prevent Non-Local 7 contractors from obtaining work.

144.    Ultimately, as a result of Wright's direct negotiations with Construction Welding President Susan Beauregard, structural steel erection jobs were targeted by Local 7 resulting in an award of projects to Construction Welding for a lower price than the Plaintiffs and other Non-Local 7 contractors would or did submit bids on.

### *Participation in The Conspiracy*

145.    Construction Welding, Universal Steel, and other Local 7 contractors in the Relevant Market were awarded jobs as steel erector on numerous projects in which the Union provided job target money.

146.    The acts and agreements set forth above were a part of a pattern and practice obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts as alleged below.

### *A Pattern and Practice of "Stripping" by Local 7 and BTEA Members*

147.    Local 7, in agreement and conspiring with BTEA and other employer associations and their members, has stripped Plaintiffs and other Non-Local 7 Contractors of a substantial number of their employees by inducing them to take jobs with Local 7 Contractors, provide them jobs with signatory employers, and bypass the Union's hiring hall. This practice severely curbs the competitive ability of Plaintiffs and other Non-Local Contractors to carry on their businesses in conjunction with the agreements described herein. Plaintiffs and other Non-Local 7 Contractors are barred from the Relevant Market, thereby lessening the financial ability of the Plaintiffs and other Non-Local Contractors shops to retain their employees, and further reducing the ability of Plaintiffs and other Non-Local 7 Contractors to compete in the Relevant Market.

148.    Charles Wright, Paul DiPietro, John Hurley, James Coyle, Edwin Wright, and

James Brown, and Chado Torres, union organizers for Local 7, have continuously from approximately 1999 to the present attempted to convince employees of Plaintiffs to leave and accept jobs with Local 7 Contractors. Employees that have left have asked other employees of Plaintiffs also to leave.

149.    On the Wrentham Elementary School project in Wrentham, MA, covered by the Massachusetts prevailing wage law, in August 2002, Local 7 business agent Charles Wright had a conversation with Glen Pisani, one of D.F.M.'s principals, in which he admitted Local 7's efforts to "strip" Plaintiffs's workers and place them with Local 7 Contractors stating that "what we are trying to do right now is we are trying to control the industry" by removing Plaintiffs ability to compete in the market. Wright also stated to Glen Pisani that Plaintiffs are not the only Non-Local 7 Contractors from which he is stripping the men to place with Local 7 Contractors.

150.    BTEA and its Local 7 Contractor members entered into agreements with Local 7 to immediately accept employment of Plaintiffs' men "stripped" by Local 7 as part of the conspiracy between BTEA, employer association members, and Local 7 and as part of the pattern and practice to diminish Plaintiffs' and other Non-Local 7 Contractors' ability to compete in the Relevant Market or even to work outside of the Relevant Market on jobs which are not as profitable as those in the Relevant Market.

151.    On the Deerfield Academy job in Deerfield, MA, between January and April 2004, agents of Local 7 regularly successfully stripped workers from BEDFORD IRON and placed those workers directly in employment with Local 7 contractors.

152.    The acts and agreements set forth above were a part of a pattern and practice of obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors

34

have been damaged by these and similar acts as alleged below.

153.    The foregoing acts in restraint of trade have had the result of suppressing competition for steel erection work in the Relevant Market. The injury to competition has had the effect of raising the cost of construction in the Greater Boston area and the Relevant Market, and increasing the cost of commercial real estate in the area.

### A Pattern and Practice of Surveillance, Intimidation, and Efforts to Obtain Illegal Agreements

154.    On jobsites located at Wrentham Elementary School, Wrentham, MA, Wareham Public Safety, Wrentham, MA, New England Technical, Warwick, RI, Tobey Hospital, Wrentham, MA, Highland 1300, Woonsocket, RI, Tweeter, Warwick, RI, Dick's Sporting Goods, Warwick, RI, Deerfield Academy, Deerfield, MA, Central Falls Credit Union, and other locations, Local 7 and its co-conspirators agreed to station observers with cameras and video recorders in an effort to induce contractors to cease doing business with the Plaintiffs. Local 7 has also used this practice to initiate sham complaints to federal and state administrative authorities.

155.    On these jobsites named above, Local 7 and its coconspirators have induced secondary picketing, threats to persons and property, the destruction of property, and economic boycotts to induce Plaintiffs to either enter into contracts with it or to cease steel erection activity in the Relevant Market.

156.    Local 7 also engaged in sham picketing of Plaintiffs at jobsites identified above with the purpose of coercing non-union fabricators, developers, and construction managers with whom they do not have collective bargaining relationships to agree to subcontractor agreements or to use only Local 7 subcontractors.

### FIRST CLAIM FOR RELIEF

**(Violation of the Sherman Antitrust Act-Monopoly)**

157.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "166" inclusive, with the same force and effect as though same were fully set forth at length herein.

158.    From at least as early as July 1999, and continuing to date, Defendants and their coconspirators have entered into contracts, agreements, combinations, and/or conspiracies in unreasonable restraint of interstate trade and commerce within the relevant product and geographic market, all in violation of §1 and §2 of the Sherman Act.

159.    The Defendants have conspired, combined and agreed with the aforesaid Non-Labor businesses to monopolize and/or willfully maintain their monopoly in the Relevant Market.

160.    Defendant, Local 7, its agent Charles Wright, acting within the scope of his agency and/or for the benefit of Local 7, together with the BTEA acting in concert with its members and Local 7, and other multiemployer associations controlled by their members and other Ironworker Local Unions, sought and obtained agreements from Non-Labor businesses fabricating contractors, including but not limited to Construction Welding, CAPCO, Canatal, Universal Steel, and Cape & Island Steel, Inc.  The terms of these anticompetitive agreements, which are also in violation of §8(e) of the Labor Act, are as follows:

a.      Local 7 shall refrain from picketing, and

b.      Local 7 shall subsidize jobs from compensation credited to employees paid on federal prevailing wage projects to these Non-Labor businesses through the use of Job Target Agreements to partially defray the difference in bids between Local 7 Contractors and Plaintiffs or

similarly situated Non-Local 7 Contractors.

c.    In exchange the Local 7 Contractors agree that they shall not

utilize Plaintiffs or Non-Local 7 Contractors on certain projects

within the Relevant Market as defined herein.

161.    Local 7 and Local 7 Contractors, in conjunction with the patterns and practices

to enter into agreements in restraint of trade and/or to monopolize the Relevant Market,

compel the stripping of key employees from Plaintiffs and other Non-Local 7 Contractors and

the assignment of such employees to work for Local 7 Contractors, for the sole and exclusive

purpose of injuring and destroying competition by Non-Local 7 Contractors.

162.    The effect of the conspiracy to maintain or willfully maintain monopoly power

has been:

a.    to and continues to be, escalation of cost to consumers in connection with

structural steel erection, deterioration of quality, and restriction of output.

b.    denied work on contracts that they would have been awarded absent the illegal

conspiracy.

c.    denied work on contracts that they would have been awarded absent the illegal

conspiracy.

d.    caused to suffer unnecessary and unproductive costs.

e.    hampered in their ability to market their services and expand their presence in

the Relevant Market.

f.    the aforesaid combinations and conspiracies in restraint of and in

monopolization of trade consist of policing and obtaining agreements,

understandings and a concerted action between Defendants and their co-

37

conspirators the substantial terms of which are to lessen competition and
maintain the monopoly position Local 7 and its Local 7 Contractor members
enjoy in the Relevant Market as follows:

i.      to restrain, hinder and impair the trade and business of Plaintiffs and
other similarly situated Non-Local 7 Contractors who design, manufacture and install steel
erection on buildings in the Relevant Market.

ii.      to eliminate, exclude or cause a substantial diminution in the business
of Non-Labor businesses with Plaintiffs and other Non-Local 7 Contractors or requiring
agreements with them to contain burdensome and unfair terms for any jobs and especially the
jobs in the Relevant Market thereby restraining competition and maintaining a monopoly for
the coconspiring Local 7, BTEA, and its Local 7 Contractor members who are also co-
conspirators in the use of Job Target Agreements, stripping and threats of picketing as a
mechanism to maintain and obtain there restrictive agreements.

iii.     To force Non-Labor businesses to enter into agreements in restraint of
trade and in violation of Sections 8(b)(4)(A), 8(b)(4)(B) and 8(e) of the Labor Act by
pressuring such Non-Labor businesses fabricating contractor to enter into these restrictive
agreements under which they refuse to do business or change the way they do business with
Plaintiffs and other Non-Local 7 Contractor and thereby conspire with Local 7 and Local 7
Contractors to maintain the monopoly in structural steel erection, design, manufacture for
buildings in the Relevant Market having a not insubstantial effect on interstate commerce.

iv.     To carry out the terms of these agreements in restraint of trade limiting
the market to Local 7 Contractors to perform structural steel erection and installation except
for that small portion allowed to Non-Local 7 Contractors, under coerced agreements with

38

Non-Labor businesses containing burdensome and unfair terms for Plaintiffs and other Non-Local 7 Contractors with Local 7 and its Local 7 Contractor members and/or in various, combinations to give Defendants exclusive control as to which persons may engage in the installation of structural steel erection work in the Relevant Market in restraint of trade under Section 8(e) of the Labor Act and Sections 1 and 2 of the Sherman Act.

163.    Over the last four (4) years, Plaintiffs have requested the jobs in the Relevant Market from Non-Labor businesses and have been ready, willing and able to perform such jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are also desirous of and ready willing and able to perform such jobs and who are also barred from the Relevant Market as a result of the anti-competitive conspiracy described herein.

164.    The acts and agreements set forth above were in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts. Plaintiffs actual damages are continuing but are believed to be in excess of $5,000.000.00.

## SECOND CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act-Boycott)

165.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in paragraphs of the complaint numbered "1" through "174" inclusive, with the same force and effect as though same were fully set forth at length herein.

166.    Commencing at least as early as July of 1996, at a date presently unknown, and continuing to date, Local 7 in conjunction with BTEA and Local 7 Contractors have conspired and agreed among and between themselves to threaten Non-Labor businesses that Local 7 contractors who fail to perform their subcontracts on unrelated jobs unless the Non-Labor businesses refrain from using Non-Local 7 Contractors, or use them only in jobs Local 7 approves, to threaten to and actually strip key employees of Plaintiffs and other Non-Local

7 Contractors for the purpose of making such contractors non-competitive and unreliable; to conspire with Local 7 to threaten job site slow down or disruptions or picketing and actual slow down, disruption and picketing and to allocate Target Agreements to compliant prime contractors all in violation of Sections 1 and 2 of the Sherman Act.

167.    The effect of the conspiracy to boycott Plaintiffs will fully maintain market power to force Non-Labor businesses who have no collective bargaining agreement with Local 7 and over whose employees Local 7 asserts no jurisdiction to enter into agreements in restraint of trade and in violation of §8(b)(4)(A), §8(b)(4)(B) and 8(e) of the Labor Act b) pressuring Non-Labor businesses to enter into these restrictive agreements under which they refuse to do business or change the way they do business with Plaintiffs and other Non-Local 7 Contractors and thereby conspire with Local 7 and BTEA and Local 7 Contractors to maintain the monopoly in structural steel erection design, manufacture and installation in commercial building, in the Relevant Market having a substantial effect on interstate commerce.

168.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant Market from them and have been ready, willing and able to perform such jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are also desirous of and ready willing and able to perform such jobs and who are also barred from the Relevant Market as a result of the anti-competitive conspiracy described herein.

169.    The acts and agreements set forth above were in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts. Plaintiffs's damages are continuing but believed to be in excess of $5,000,000.00.

### THIRD CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act-Horizontal Monopoly)

170.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "179" inclusive, with the same force and effect as though same were fully set forth at length herein.

171.    Local 7 and BTEA (acting as agent of and under the control of its horizontally aligned Local 7 Contractor members) have agreed to exclude Plaintiffs and other similarly situated contractors from structural steel erection jobs especially those within the Relevant Market. The means agreed upon include commitment of job target subsidies to Non-Labor businesses who refrain from using Plaintiffs and other Non-Local 7 Contractors and other threats of job site slow down or picketing against those businesses who do not agree to refuse to hire Plaintiffs and other Non-Local 7 Contractors in contravention of Section 8(e), Section 8(b)(4)(A), Section 8(b)(4)(B) of the Labor Act and in restraint of trade; and stripping of key employees of Plaintiffs and others to injure and destroy their ability to compete in the market place all in violation of Section 1 and 2 of the Sherman Act.

172.    The effect of the conspiracy to refrain from using Plaintiffs and other Non-Local 7 Contractors and to willfully maintain monopoly power has been the following:

a.      the escalation of cost to consumers, deterioration of quality, and restriction of output.

b.      the aforesaid combinations and conspiracies in restraint of and monopolization of trade consist of policing and obtaining agreements, understandings and a concert of action among Defendants and their co-conspirators the substantial terms of which are to lessen competition in the performance of structural steel erection work and generally increase the 70% monopoly position Local 7 and BTEA and its members enjoy

41

in the relevant geographic and product market to restrain hinder and

impair the trade and business of Plaintiffs and other Non-Local 2

Contractors which design, manufacture and install structural steel

erection work in commercial building in the Relevant Market.

173.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant

Market from its contractor customers and have been ready, willing and able to perform such

jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are

also desirous of and ready willing and able to perform such jobs and who are also barred from

the Relevant Market as a result of the anti-competitive conspiracy described herein.

174.    The acts and agreements set forth above were in restraint of trade and

Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts.

Plaintiffs damage are continuing but believed to be in excess of $5,000,000.00.

## FOURTH CLAIM FOR RELIEF
### (Violation of Labor Management Relations Act)

175.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in

the paragraphs of the complaint numbered "1" through "184" inclusive, with the same force

and effect as though same were fully set forth at length herein.

176.    Plaintiffs in the alternative and additionally claim a violation under 29 U.S.C.

Section 187(a) and (b) which states:

"(a) It shall be unlawful, for the purpose of this Section only, in

an industry or activity affecting commerce, for any labor

organization to engage in any activity or conduct defined as an

unfair labor practice in Section 158(b)(4) of this title."

"(b) whoever shall be injured in his business or property by reason of

42

any violation of subsection (a) of this section may sue therefore in any

District Court of the United States subject to the limitation and

provisions of Section 185 of this title without respect to the amount in

controversy or any other court having jurisdiction of the parties and

shall recover the damages by him sustained and cost of this suit."

This Section provides a damage remedy for certain secondary and primary activity engaged in by labor organizations.

177.    Since on or about July 1999 Local 7 has violated §8(B)(4)(ii)(A) and (B) of the Labor Act, 29 U.S.C. §§ 158(b)(4)(ii)(A) & (B), by engaging in threats of picketing and other restraint and coercion against Plaintiffs and against other contractors to obtain agreements prohibited by §8(e) of the Labor Act, 29 U.S.C. § 158(e), and where an object is to cause Non-Labor businesses to change the way they do business with Plaintiffs or other Non-Local 7 Contractors or cease doing business with Plaintiffs and other Non-Local 7 Contractors and give the business instead to Local 7 Contractors.

### FIFTH CLAIM FOR RELIEF
### (Interference with Performance of Contract)

178.    Plaintiffs repeats, reallege and reiterates each and every allegation contained in paragraphs of the complaint numbered "1" through "187" inclusive, with the same force and effect as though same were fully set forth at length herein.

179.    This action is brought under the tort law of the states of Massachusetts, Maine, New Hampshire, and Rhode Island.

180.    Since on or about January 1, 1995 and continuing to date Defendants Local 7, BTEA, other Local 7 agents members and others similarly situated, Charles Wright, and the Job Target Fund and each of its labor and management trustees in their official capacities

43

acting in concert, have interfered with the performance of Plaintiffs' contracts with Non-Labor businesses causing said Non-Labor businesses not to perform their contracts with Plaintiffs.

181.    By the above acts and activities, Local 7 and the aforementioned Local 7 contractors have in combination with each other and with Local 7 and with Charles Wright, its agent in the service of his agency, Job Target Fund, its agents acting in the service of their agency, tortiously interfered with the performance of Plaintiffs' contracts.

182.    Plaintiffs damages are continuing and are believed to be in excess of $5,000,000.00.

## SIXTH CLAIM FOR RELIEF
### (Interference with Economic Relations)

183.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "192" inclusive, with the same force and effect as though same were fully set forth at length herein.

184.    This action is brought under the tort law of the states of Massachusetts, Maine, New Hampshire, and Rhode Island.

185.    The wanton, intentional conduct, set forth above, of the Defendants, committed without justification or excuse, has:

        a.    Intentionally interfered with the economic relations of the Plaintiffs in their businesses;

        b.    Intentionally interfered with the economic relations of the Plaintiffs in their contractual relations.

186.    As a direct and proximate result of the foregoing illegal conduct, including violence, threats, coercion, and destruction of property engaged in by the Defendants,

Plaintiffs have been and continue to be injured in their business and property in substantial amounts not yet ascertained with particularity, in that they have been:

      a.    Deprived of the fundamental constitutional right of the opportunity to contract;

      b.    Forced to expend large sums of money to protect and repair equipment;

      c.    Caused to lose sales and business.

187.    As a result, Plaintiffs are entitled to recover:

      a.    All damages sustained by reason of the unlawful acts complained of herein;

      b.    Applicable exemplary and punitive damages.

188.    As a result of the aforesaid unlawful conduct by Defendants jointly and severally, Plaintiffs have suffered and continue to suffer substantial damages to their businesses and properties in an exact amount which is not known at this time but believed to be in excess of $5,000,000.00.

### SEVENTH CLAIM FOR RELIEF
### (Violation of Mass. Gen. L. c. 93A)

189.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "198" inclusive, with the same force and effect as through same were fully set forth at length herein.

190.    The Defendants' actions against the Plaintiffs violate Mass. Gen. L. c. 93A, §§ 2 and 11. The parties are engaged in trade or commerce within the Commonwealth of Massachusetts.

191.    The acts in question were willful, occurred primarily and substantially in Massachusetts, resulted in a loss of money by the Plaintiffs, and were an unfair method of

competition and/or a deceptive acts or practice under Mass. Gen. L. c. 93A, §§ 2 and 11.

192.    As a result of the aforesaid unlawful conduct by Defendants jointly and severally, Plaintiffs have suffered and continue to suffer substantial damages and loss of property to their businesses and properties in an exact amount which is not known at this time, but believed to be in excess of $5,000,000. Plaintiffs also request double or treble damages, attorneys' fees, litigation costs, and equitable relief.

WHEREFORE, Plaintiffs demand judgment on the complaint as follows:

1.    On the First, Second and Third Claims for relief:

a.    judgment against Defendants and in favor of Plaintiffs for treble the damages determined to have been sustained by it which are to be proved at trial together with cost of suit including pre-judgment interest and reasonable attorneys fees.

b.    judgment enjoining the Defendants from continuing the acts, conduct and conspiracies here and before alleged; and a declaration that Defendant's unlawful acts are in violation of §1 and § 2 of the Sherman Act.

2.    On the Fourth Claim for Relief: judgment in an amount to be proved at trial together with its cost of suit, interest and reasonable attorneys fees, together with punitive damages in an amount to be determined at trial.

3.    On the Fifth Claim for Relief, damages to be proved at trial and costs against Local 7 including pre and post judgment interest and costs.

4.    On the Sixth Claim for Relief, damages to be proved at trial but believed to be no less than $10,000,000.00 and costs against Local 7 including pre and post judgment interest and costs.

5.    On the Seventh Claim for Relief, damages to be proved at trial but believed to

be no less than $10,000,000.00 and costs against Local 7 including pre and post judgment interest, treble damages, attorneys' fees, and costs.

6.    Preliminary and permanent injunctive relief enjoining Local 7, the Defendants, their officers, agents, members, employees, and all persons acting in concert with Defendants, from the commission of the following acts, and ordering Defendants to specifically and unequivocally instruct and order their officers, agents, members, employees, attorneys, and all persons acting in concert with Defendants to cease and desist from the following acts:

a.    Directly or indirectly, agreeing to take money that was contributed as wages and benefits paid by any employer engaged in public works subject to the federal Davis-Bacon or other federal and state prevailing wage law sand contributing it to an employer.

b.    Causing directly or indirectly any unsolicited offer of employment to be presented to any agent or employee of Plaintiffs;

c.    Causing directly or indirectly the recording, by voice or video, of any kind of work done on a jobsite by Plaintiffs or their employees;

d.    Placing, maintaining or stationing any pickets or persons in excess of two (2) within ten (10) feet of any entrance to a worksite where one of the Plaintiffs is erecting steel;

e.    Obstructing, blocking, hindering or in any manner slowing, the ingress or egress of Plaintiffs' customers, employees, suppliers and others seeking to do business with Plaintiffs on work sites where one of the Plaintiffs is erecting steel;

f.    Threatening physical violence to the person or property of customers, suppliers, or employees of Plaintiffs, or other persons seeking to do business with Plaintiffs or invitees of Plaintiffs;

g.    Threatening and/or committing acts of intimidation, destruction or removal of

47

property, physical violence and/or harassment of Plaintiffs, their officers, agents, employees, customers, suppliers, tenants or others desiring to do business with or perform work for Plaintiffs; and

h.    Following Plaintiffs' officers, agents, employees, customers, suppliers, or others desiring to do business with, or perform work for Plaintiffs in motor vehicles in a menacing and/or threatening manner.

7.    The appointment of a Trustee to marshal the remaining assets of the Job Target Fund trust account with the direction and purpose of compensating parties injured by the misuse of money of said Fund.

8.    Treble damages.

9.    Applicable exemplary and punitive damages.

10.    Attorneys' fees and costs of suit.

11.    On all the claims for relief, such other and further relief as may appear necessary and appropriate.

TRIAL BY JURY IS DEMANDED IN THE ABOVE-ENTITLED CAUSE ON ALL COUNTS SO TRIABLE

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC., and
RONALD BEAUREGARD d/b/a
INDEPENDENT WELDING

By their attorneys,

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN, CHANDLER & MILLER LLP
99 High Street
Boston, MA  02110
(617) 542-6789

Of counsel:
(Motion for admission
*pro hac vice* to be filed)

Michael E. Avakian, Esq.
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, VA 22151
(703) 321-9181

Dated: December 2, 2004

49

RECEIPT # _60484_
AMOUNT $___150___
SUMMONS ISSUED___Y-3___
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK.___M_____
DATE_____12-2-04_____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN STEEL ERECTORS, INC., )
AJAX CONSTRUCTION CO., INC., )
AMERICAN AERIAL SERVICES, INC., )
BEDFORD IRONWORKS, INC., )
D.F.M. INDUSTRIES, INC., and )
RONALD BEAUREGARD d/b/a )
INDEPENDENT WELDING, )
)
       Plaintiffs, )
)
       v. )
)
LOCAL UNION NO. 7, INTERNATIONAL )
ASSOCIATION OF BRIDGE, )
STRUCTURAL, ORNAMENTAL & )
REINFORCING IRON WORKERS, )
)
CHARLES WRIGHT, and )
)
STEEL ERECTION AND ORNAMENTAL )
IRON INDUSTRY ADVANCEMENT FUND )
)
       Defendants. )

**04  12536 RGS**

MAGISTRATE JUDGE _____

## COMPLAINT

Plaintiffs, American Steel Erectors, Inc., Ajax Construction Co., Inc., American

Aerial Services, Inc., Bedford Ironworks, Inc., D.F.M., Inc., and Independent Welding,

(hereinafter "Plaintiffs"), complain of the Defendants as follows:

## INTRODUCTION

1.     This case is filed by six open-shop steel erection companies to seek redress for

an illegal, on-going conspiracy among the Defendants and their co-conspirators in violation of

the federal Sherman Antitrust Act, federal Labor Management Relations Act ("Labor Act"),

and other federal and state laws. The object of the conspiracy is the abuse and acquisition of

monopoly market power in the structural steel erection industry by using illegal predatory

pricing tactics and money, obtaining agreements with contractors to exclude Plaintiffs from

the relevant market, and to monopolize the relevant market. The Defendants' illegal actions

have had the intent and effect of reducing and eliminating competition between the

Defendants and their signatory contractors with the Plaintiffs.

## THE PARTIES

2.     Plaintiff American Steel Erectors, Inc. (hereinafter referred to as "ASE"), is a

corporation organized and existing under the laws of the State of New Hampshire since 1982

with an office and place of business at 328 Sawmill Road, Greenfield, New Hampshire. At

all relevant times Plaintiff ASE has been engaged in the business of erection and installation

of steel products on various construction projects in the Relevant Market as defined in

paragraph 29. Plaintiff ASE employs approximately 50 people and is not a signatory to a

collective bargaining agreement with Defendant Local 7. ASE seeks to compete in the entire

Relevant Market.

3.     Plaintiff Ajax Construction Co., Inc. (hereinafter referred to as "AJAX"), is a

corporation organized and existing under the laws of the State of Rhode Island since 1974 and

employs approximately 50 people with an office and place of business at 2833 Victory

Highway, Harrisville, Rhode Island. At all relevant times Plaintiff AJAX has been engaged

in the business of the erection and installation of steel products on various construction

projects in the Relevant Market. Plaintiff AJAX is not a signatory to a collective bargaining

agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

4.     Plaintiff American Aerial Services, Inc. (hereinafter referred to as

"AMERICAN AERIAL"), is a corporation organized and existing under the laws of the State

of Maine with an office and place of business at 33 Allen Avenue Extension, Falmouth,

2

Maine, since 1997. At all relevant times Plaintiff AMERICAN AERIAL has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. Plaintiff AMERICAN AERIAL employs approximately 20 people. Plaintiff AMERICAN AERIAL is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

5.      Plaintiff Bedford Ironworks, Inc. (hereinafter referred to as "BEDFORD"), is a corporation organized and existing under the laws of the State of New Hampshire since 1985 with an office and place of business at 30 Rundlett Hill Road, Bedford, New Hampshire. At all relevant times Plaintiff BEDFORD has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 20 people. Plaintiff Bedford Ironworks is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

6.      Plaintiff D.F.M., Industries, Inc. (hereinafter referred to as "D.F.M."), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts since 1993 with an office and place of business at 54 South Street, Suite 1, Wrentham, Massachusetts. At all relevant times Plaintiff D.F.M. has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 40 people. Plaintiff D.F.M. Industries is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

7.      Plaintiff Independent Welding (hereinafter referred to as "INDEPENDENT WELDING"), is the business and trade name of Ronald Beauregard with an office and place

3

of business since 2003 at 4 Campground Road, Sterling, Massachusetts. At all relevant times Plaintiff INDEPENDENT WELDING has been engaged in the business of the erection and installation of steel products on various construction projects in the Relevant Market. It employs approximately 20 people. Plaintiff Independent Welding is not a signatory to a collective bargaining agreement with Defendant Local 7. It seeks to compete in the entire Relevant Market.

8.    Upon information and belief Defendant Local Union No. 7 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 7") is a labor organization within the meaning of the Labor Act (29 U.S.C. §151 *et seq.*). Defendant Charles Wright ("Wright"), is Business Agent/Industry Analyst and former President of Local 7. Wright and Local 7 each transact business in this jurisdiction with principal places of business at 195 Old Colony Avenue, South Boston, Massachusetts 02127. Paul DiPietro, John Hurley, James Coyle, Edwin Wright, and James Brown, at all relevant times herein have been agents of Local 7, and are authorized to act for and on behalf Local 7. Defendant Local 7 is the largest Ironworkers Local Union operating in the Relevant Market.

9.    Upon information and belief, the Defendant Steel Erection and Ornamental Iron Industry Advancement Fund (hereinafter "Job Target Fund"), located at 195 Old Colony Avenue, South Boston, Massachusetts 02127, is an entity created by the Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA"), Local 7, and other employer associations, that have collected money from employees of signatory employers in the Relevant Market and made agreements in order to issue payments to contractors with whom Local 7 has collective bargaining agreements or to whom Local 7 agrees to make payments to.

4

10.    Defendants Local 7, Wright, and the Steel Erection and Ornamental Iron

Industry Advancement Fund and its members, in conspiracy with the co-conspirators

identified below and other unnamed co-conspirators, entered into agreements in restraint of

trade to limit the Relevant Market to Local 7 Contractors and to continue to maintain the

monopoly of Local 7 Contractors in the Relevant Market.

## JURISDICTION AND VENUE

11.    Original jurisdiction as to the matters alleged herein is based on 28 U.S.C.

§1331 (federal question), 28 U.S.C. § 1337 (civil action arising under an act of Congress

regulating commerce or protecting commerce against restraints or monopolies), 28 U.S.C.

§§2201 through 2202 (federal declaratory judgment act), 15 U.S.C. § 15 (antitrust), and 15

U.S.C. § 26 (injunctive relief). Original jurisdiction also lies with this Court based on 29

U.S.C. § 187(a) of the Labor Management Relations Act (as amended) which provides a

damage remedy for unfair labor practices in the nature of secondary boycotts and illegal

primary activity which include threats to enter into agreements prohibited by Section 8(e) of

the Labor Act, 29 U.S.C. § 158(e), which is an analog to the agreements in restraint of trade

prohibited under the Sherman Act. Plaintiffs claim tortious interference with contract and

with economic relations arising under the laws of the Commonwealth of Massachusetts, State

of Maine, State of New Hampshire, and the State of Rhode Island, and Mass. Gen. L. c. 93A,

which claims are properly before this Court under 28 U.S.C. § 1367 (supplemental

jurisdiction).

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §

22 insofar as a substantial portion of the Defendants reside and/or conduct business within the

District.

## NATURE OF TRADE AND COMMERCE

13.    During the last four years, substantial quantities of material, tools and equipment used in the erection, fabrication, and installation of steel, including but not limited to precast iron and steel, have been sold and shipped to contractors such as Plaintiffs from suppliers in various states other than the Commonwealth of Massachusetts, including but not limited to the States of Maine, New Hampshire, and Rhode Island.

14.    Plaintiffs are engaged in interstate commerce and in an industry affecting interstate commerce within the meanings of §1 and §2 of the Sherman Act and §187 of the Labor Act in the erection and installation of steel metal products for building and construction projects in New England utilizing products, supplies and equipment coming from outside the Commonwealth of Massachusetts. The general business activities of the Defendants also have a substantial effect upon interstate commerce.

## NATURE OF THE CASE

15.    The claims set forth herein arise under 15 U.S.C. §1 and §2, commonly known as the Sherman Act and 15 U.S.C. §§15 and 26, commonly known as the Clayton Act. Plaintiffs seek to obtain injunctive relief, damages and costs, including reasonable attorneys' fees and expert witness fees, by reason of Defendants' violation of law.  Plaintiffs also seek damages and costs pursuant to 29 U.S.C. §187(a) commonly known as the Labor Act (as amended) (hereinafter "Labor Act"), for tortious interference with performance of contract, for tortious interference with economic relations, and for violation of Mass. Gen. L. c. 93A.

## CO-CONSPIRATORS

16.    Upon information and belief, co-conspirator Construction Welding Services Corp. (Construction Welding"), is a Massachusetts Corporation with an office and place of

6

business located at 279 Redemption Rock Trail, Sterling, MA 01514. Construction Welding

is a contractor engaged in the business of providing steel erection and fabrication services on

various construction projects located throughout the Boston metropolitan area. It is signatory

to a collective bargaining agreement with Local 7 negotiated through its multiemployer

bargaining representative BTEA and performs work in the Greater Boston area. Construction

Welding had a collective bargaining agreement with Local 7 during all relevant times.

17.     Upon information and belief, co-conspirator FAMM Steel, Inc. ("FAMM

Steel"), Rindge, New Hampshire, is a New Hampshire corporation with an office and place of

business located at 97 Hunt Hill Road, Rindge, New Hampshire. FAMM Steel is a contractor

engaged in the business of fabricating steel on various construction projects located

throughout the New England area. FAMM Steel has no collective bargaining agreement with

Local 7.

18.     Upon information and belief, co-conspirator Canatal Industries, Inc.

("Canatal") is a Canadian company with an office and place of business located at 2885

Boulevard Frontenac East, Thetford Mines, Quebec, Canada G6G 6P6. Canatal is a

contractor engaged in the business of fabricating and erecting steel on various construction

projects located throughout the New England area. Canatal has agreements with Local 7.

19.     Upon information and belief, co-conspirator CAPCO Steel Corp., ("CAPCO")

is a steel fabricator with an office and place of business located at 33 Acorn Street,

Providence, Rhode Island. CAPCO is a contractor engaged in the business of fabricating

steel on various construction projects located throughout the New England area. CAPCO is a

member of BTEA with a collective bargaining agreement with Local 7.

20.     Upon information and belief, co-conspirator Universal Steel Erectors, Inc.

7

("Universal Steel"), is a corporation with a principal place of business at 65 Tibbets Hill

Road, Goffstown, New Hampshire and is a contractor engaged in the design and erection of

steel structures, is signatory to a collective bargaining agreement with Local 7 negotiated

through its multi-employer bargaining representative BTEA, and performs work in the

Relevant Market.

     21.     Upon information and belief, co-conspirator Arctic Construction, Inc.,

("Arctic"), is a corporation with a principal place of business at Falmouth, Maine, and is a

contractor engaged in the design and erection of steel structures, is signatory to a collective

bargaining agreement with Local 496 negotiated through its multi-employer bargaining

representative, and performs work in the Relevant Market.

     22.     Upon information and belief, there are other co-conspirator members of the

BTEA—which is a corporation organized and existing under the laws of the Commonwealth

of Massachusetts that has its principal offices at 1400 Hancock Street, Quincy, Massachusetts

02169. BTEA is a multi-employer bargaining entity which engages in collective bargaining

with Local 7 on behalf of its member steel erector companies.

     23.     Co-conspirator Local Union No. 37 of the International Association of Bridge,

Structural, Ornamental & Reinforcing Iron Workers ("Local 37") is a labor organization

within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.,* with an office at 845 Waterman

Avenue East, Providence, Rhode Island and transacts business within this jurisdiction.

     24.     Co-conspirator Local Union No. 57 of the International Association of Bridge,

Structural, Ornamental & Reinforcing Iron Workers ("Local 57") is a labor organization

within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.,* with an office at 6 Winter Street,

Worcester, Massachusetts. and transacts business within this jurisdiction.

25.    Co-conspirator Local Union No. 357 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 357") has been a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.,* with an office in Chicopee Falls, Massachusetts, and transacts business within this jurisdiction.  All its assets were transferred to Local 7 on November 28, 2003.

26.    Co-conspirator Local Union No. 474 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 474") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.,* with an office at 1671 Brown Avenue, Manchester, New Hampshire and transacts business within this jurisdiction.

27.    Co-conspirator Local Union No. 496 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 496") is a labor organization within the meaning of the Labor Act, 9 U.S.C. §151 et *seq.,* with an office on Hinckley Road, Clinton, Maine and transacts business within this jurisdiction.

## DEFINITIONS

28.    As used in this Complaint the following terms have the following meanings assigned to them in the paragraphs set forth below.

29.    The "Relevant Market" is defined as the erecting of structural metal and steel on buildings and structures, erecting prestressed and precast concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine—an area proximate to the City of Boston.

9

30.    "Structural steel erection" is defined as Relevant Market work engaged in by contractors that are signatory to union collective bargaining agreements and those that are open-shop and not-signatory to an agreement with an employee representative. The actual Relevant Market which Plaintiffs are able to compete in only encompasses the open-shop jobs within the Relevant Market.

31.    "Local 7 Contractor" is a steel erector signatory to a collective bargaining agreement with Local 7 or an agreement to abide by an area collective bargaining agreement.

32.    "Non-Local 7 Contractor" is a steel erector who has a collective bargaining agreement with a union other than Local 7 or one of its co-conspirators or is not a signatory to a collective bargaining agreement with any labor organization.

33.    "Non-Labor businesses" are developers, building owners, building management, general contractors, and fabricating contractors, such as co-conspirators Construction Welding, FAMM Steel, CAPCO, Canatal Industries, Inc., and Arctic, who enter into contracts with Non-Labor Businesses for the building and/or erection of steel structures which they in turn contract out to Local Contractors or Non-Local 7 Contractors for the design, manufacture or installation of this work. These Non-Labor businesses either have no collective bargaining agreement with Local 7 or have no employees who perform the structural steel erection work, but rather subcontract out such services.

34.    "Job Target Fund" or "Industry Advancement Fund" refers to a job subsidy program financed by contributions from hourly wages provided for in the collective bargaining agreement Local 7 entered into with BTEA and other contractor associations on behalf of the Local 7 Contractors. Local 7 has entered into agreements with Non-Union Businesses, and with whom it has no collective bargaining agreement and over whose

10

employees Local 7 has not asserted jurisdiction, to grant subsidy funds to induce Non-Labor

Businesses, and to refrain from engaging Plaintiffs and other Non-Local 7 Contractors and

instead engage only Local 7 Contractors. These subsidies are allegedly available only to steel

contractors who are parties to the collective bargaining agreement with Local 7 and are

intended to assist those employers in meeting the competition from non-union structural steel

erectors. In fact, Defendant Local 7 has unlawfully administered the program so as to use the

job target funds not only as a threat, to deny Job Target Funds to Non-Labor businesses who

engage Non-Local 7 Contractors such as Plaintiffs, or to reward Non-Labor businesses who

use only Local 7 Contractors, but also in derogation of the federal Davis-Bacon Act and

federal regulations, by conspiring to collect employee wages from employers and returning

employee wages to employers as contributions directly from union controlled bank accounts.

  35. "Stripping" is a practice whereby Local 7 and its agents, in agreement and

through a conspiracy with Local 7 Contractors, have with improper motive or method induced

employees of Plaintiffs and other Non-Local 7 Contractors to leave and to seek placement and

work with Local 7 Contractors in order to severely curb the ability of Plaintiffs and other

Non-Local 7 Contractors to carry on their businesses. By the patterns and practices described

herein Plaintiffs and other Non-Local 7 Contractors are barred from the Relevant Market

therein, thereby lessening the financial ability of the Plaintiffs and other Non-Local 7

Contractors to retain their employees, further reducing the ability of Plaintiffs and other Non-

Local 7 Contractors to compete in the Relevant Market.

## FACTUAL ALLEGATIONS

  36. The construction industry is a labor intensive industry in which a large portion

of the cost is labor (approximately 50%). Generally, the portion of the cost attributable to

structural steel labor services in the case of union contractors in the area is uniform and fixed as agreed upon by the Local 7 contractors and the Defendants. In the case of open-shop contractors, the cost attributable to structural steel labor services is variable and subject to competitive forces and (in the absence of predatory pricing tactics) is almost always less expensive than the rates set by Local 7 contractors.

37.    Over seventy per-cent (70%) of structural steel erection performed in the Relevant Market is performed by union contractors who are signatories to collective bargaining agreements (or 8(f) pre-hire agreements) with the BTEA, other contractor associations, Ironworkers Local Unions and affiliated members. These agreements contain an express agreement that the Non-Labor businesses will work only with other structural steel contractors and subcontractors who are union-signatories. In contrast, only fifteen (15) per cent of the construction industry nationwide is so organized.

38.    There is no requirement in law or otherwise that only contractors signatory to an agreement with Local 7 or one of the union co-conspirators may do steel and structural steel erecting work in the Relevant Market, including federal and state government funded projects.

39.    Local 7 falsely asserts that Plaintiffs and non-Local 7 contractors have no right to do structural steel erecting work in the Relevant Market.

40.    Plaintiffs' principal businesses are installing steel building frames on new building sites and performing precast steel installation work for private sector and public sector construction projects. Plaintiffs are usually a subcontractor to a steel fabricator which is in turn typically a subcontractor to a general contractor or project developer.

41.    Plaintiffs receive jobs from Non-Labor businesses who request that Plaintiffs

submit bids to them. Plaintiffs depend almost entirely on requests from these Non-Labor businesses to perform their work.

42.    Plaintiffs have an excellent reputation in the industry as fast, efficient and accurate structural steel erection contractors capable of handling large steel erection jobs.

43.    Since approximately 1999, total structural steel erection construction spending on an annualized basis in the Relevant Market was in excess of $200,000,000 per year. Of that total, however, more than half can be accounted for by the Boston Central Artery and Harbor Tunnel project (also known as the "Big Dig"), which was subject to a project labor agreement and therefore was undertaken as a union-shop job. After adjusting for the Boston Central Artery and Harbor Tunnel Project and other union-shop projects, the Relevant Market in which Plaintiffs are able to compete has been less than $60,000,000 per year during the relevant time period.

44.    The structural steel erection contracting market in the Relevant Market is dominated by union signatory contractors who only employ workers belonging to the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, which represents greater than 70% of the dollar volume of available work. All of the local offices of the Iron Workers Union in the relevant geographic market are controlled by the Local Union 7 office. Due to the unity of labor sourcing (as evidenced by area agreements and contracts executed by Local 7), the union contractors in the Relevant Market in combination with Local 7 are able to act in concert to exercise control on the remaining 30% of the market in which Plaintiffs compete to increase their market power on that remaining portion of the Relevant Market.

45.    Within the Relevant Market, Plaintiffs, along with other independent nonunion

competitors, compete against the concerted efforts of Local 7 and signatory union contractors. Defendant Local 7 uses money obtained from the Job Target Fund to engage in a pattern and practice of unreasonable restraint of trade.

46.     Between 2000 and 2003, Local 7 collected more than $12,000,000 from the union contractors working on the Boston Central Artery and Harbor Tunnel Project and other union-shop and federal and state government projects which Plaintiffs were excluded from bidding on. During that time, Local 7 used approximately $6,000,000 of the Job Target Fund money collected on the Boston Central Artery and Harbor Tunnel Project and other union-shop jobs to conspire with union signatory contractors to systematically exclude Plaintiffs and the other nonunion contractors from other projects in the Relevant Market and have continued to collect and spend money to do so.

47.     Defendants' Job Target Fund money further reduces Plaintiffs' opportunity to compete in the Relevant Market by enabling union signatory contractors to factor in below cost labor and equipment prices and thereafter to conspire with contractors, developers, and fabricators to reduce union signatory contractor bids below bid prices submitted by the Plaintiffs to said contractors, developers, and fabricators. This drives the long-term average costs of the non-signatory contracts and Plaintiffs upward with the intent of driving Plaintiffs out of the Relevant Market.

48.     Defendants have effectively barred Plaintiffs and all other Non-Local 7 Contractors from any work in Suffolk County and surrounding areas which constitutes approximately 70% (seventy per cent) of the work in the Relevant Market although Plaintiffs and other Non-Local 7 Contractors have asked their contractor customers for the opportunity to perform the jobs, and are ready, willing and able to perform a substantial percentage of

14

them. Defendants' successful methods in the Relevant Market have enabled them to effectively exclude Plaintiffs from at least 70% of the market.

49.    The almost total exclusion of competition from Suffolk County and surrounding areas in the Relevant Market is the result of the pattern and practices of the Defendants in unreasonable restraint of trade respecting those jobs in the geographical area of the Relevant Market. Plaintiffs have been left with more numerous jobs of shorter duration, more widely distributed and less visible jobs in the Relevant Market, over which Defendants have not been able to achieve the same measure of monopolistic control as they have over larger jobs in the Relevant Market. But through unlawful picketing and threats of picketing, surveillance, discriminatory denials or granting of "job targeting" subsidies, Local 7 has coerced and conspired with various non-union contractors united in an effort to keep Plaintiff and other Non-Local 7 Contractors from performing jobs in the entire geographical area of the Relevant Market. Plaintiffs have not been able to obtain those larger jobs. Other Non-Local 7 Contractors have likewise been unable to do so.

50.    The greater profitability of such larger jobs coupled with the greater ability of Local 7 to organize its disruption accounts for the unwillingness of customers to use Plaintiffs and other Non-Local 7 Contractors. Such jobs are rarely awarded to Plaintiffs and other Non-Local 7 Contractors.

51.    The result of Defendants efforts will be to eliminate competition from non-union signatory contractors and increase Local 7's and their signatory contractors' market power in the Relevant Market such that they can price projects at a level that affords them monopoly profits.

52.    These acts demonstrate that Defendants have wielded their market power to

15

acquire and secure exclusive dealing arrangements. These actions show Defendants have

used and maintained their market power to foreclose further competition in the Relevant

Market by exclusionary means.

53.    Plaintiffs' contractor customers in the Relevant Market are willing to deviate

from the strict terms of their agreements with Local 7 by awarding some smaller jobs to

Plaintiffs, provided that when Plaintiffs are thrown off the jobs at Local 7's insistence,

Plaintiffs will not sue for breach of contract.

54.    Numerous Non-Local 7 Contractors have had practically the identical

experience as Plaintiffs which include experiences described below, resulting in suppression

of competition in the Relevant Market.

55.    Local 7 contractors have agreed to make hourly contributions to the Defendant

Job Target Fund based upon each hour of wages earned by employees on projects, including

projects covered by 40 U.S.C. §3141 *et seq.*, formerly known as the Davis-Bacon Act, 42

U.S.C. § 276a, and Local 7 has agreed to assign a portion of those contributions from funds

earned on federal prevailing wage projects to other employers, to subsidize projects for BTEA

members to compete on projects where Plaintiffs and other Non-Local 7 Contractors have

submitted bids. The Davis-Bacon Act is a federal statute requiring the payment of prevailing

wages and benefits to employees on projects over $2,000.00.

56.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant

Market from Non-Labor businesses and customers and have been and are ready, willing and

able to perform such jobs. Upon information and belief there are other Non-Local 7

Contractors who are also desirous of and ready, willing, and able to perform such jobs and

who are also barred or denied from the Relevant Market as a result of the anti-competitive

conspiracy of Defendants and the co-conspirators described herein.

57.     Defendants have collected money from employee wages and, in contravention of federal law, have illegally turned over this money to employers. Defendant Local 7 has paid money directly to employers from its own funds to its co-conspirators.

58.     Defendant Local 7 and other building trade unions have entered into conspiracies and agreements in restraint of trade and in violation of law—including the Sherman Act §1 and §2 and §8(b)(4)(A), §8(b)(4)(B) and §8(e) of the Labor Act. Local 7 and other building trade unions have conspired and entered into agreements with the other Defendants and various co-conspirators including Non-Labor Businesses in order to eliminate Plaintiffs and other similarly situated structural steel erectors who are not signatories to a collective bargaining agreement with Local 7 (defined herein as "Non-Local 7 Contractors") from full access to the Relevant Market by engaging in the following conduct:

         a.     Local 7 has engaged in threats and coercion the object of which is to obtain agreements prohibited by §8(e) of the Labor Act. Local 7 has conspired with and entered into agreements in restraint of trade with Non-Labor Businesses and other persons that are in violation of the Sherman Act Sections 1 and 2 and Sections 8(b)(4)(A), 8(b)(4)(B) and 8(e) of the Labor Act by virtue of threats of localized and wide spread picketing, surveillance, work stoppages, and actual picketing or stopping the work at job sites where Plaintiff or other Non-Local 7 Contractors are working in order to compel developers, building owners, building management, general contractors, and other persons to refrain or cease doing business or change the way they do business with Plaintiff or other Non-Local 7 Contractors.

         b.     Local 7 has conspired with and entered into agreements with Non-

Labor businesses fabricating contractors, with whom it has no collective bargaining agreement and over whose employees Local 7 has not asserted jurisdiction, to grant subsidy money, known as "job target money," to induce these Non-Labor businesses to refrain from engaging Plaintiffs and other Non-Local 7 Contractors, and instead engage contractors which either have a collective bargaining agreement with Local 7 and Iron Worker Local Unions under Local 7's control or have signed a prehire agreement with Local 7 and Iron Worker Local Unions under Local 7's control (hereinafter "Local 7 Contractors").

        c.     Local 7 has conspired with the BTEA and contractors with whom it has a collective bargaining agreements to pool job target money funds from federal prevailing wage projects covered by the Davis-Bacon Act, 40 U.S.C. §3141 *et seq.*, which statute requires the direct crediting and payment of wages and benefits to employees working on federal jobsites at a level not below the prevailing wage rate established by the United States Department of Labor and on information and belief has spent such money collected from employers which should have been credited to employees in violation of the Davis Bacon Act, 40 U.S.C. §3142a, the Copeland Anti-Kickback Act, 18 U.S.C. §874, and 29 C.F.R. Part 3.

        d.     Local 7 has withheld Job Target Funds from Non-Labor businesses with whom they have no collective bargaining agreement and over whose employees Local 7 has not asserted jurisdiction, to compel them to enter into agreements to terminate business relations with Plaintiffs or other Non-Local 7 Contractors and not to engage them in the future.

        e.     Local 7 has conspired with and entered into agreements with Local 7 Contractors in violation of Sherman Act §1 and §2 to threaten Non-Labor businesses with

picketing and/or work stoppages in violation of Sherman Act §1 and §2 and §8(b)(4)(A), §8(b)(4)(B) and §8(e) of the Labor Act on all of the contractor's jobs if the Non-Labor businesses do not terminate contracts with Plaintiffs and other Non-Local 7 Contractors and refrain from engaging them in the future.

        f.    Local 7 has conspired with other building and construction trade unions including Local Union Nos. 37, 57, 357, 474, and 496, International Association of Bridge Structural, Ornamental & Reinforcing Iron Workers, AFL-CIO, to prevent Plaintiff and other Non Local 7 Contractors from performing or being engaged on a project that Local 7 seeks to prevent Plaintiffs and other Non-Local 7 Contractors from performing.

        g.    Local 7, through conspiracy and agreement with BTEA by and among its members, and other unnamed co-conspirators has induced the employees of Plaintiffs and other Non-Local 7 Contractors to leave their employ and go to work for Local 7 Contractors while engaging in the anti-competitive conspiracies described herein which deprive Plaintiffs and other Non-Local 7 Contractors from access to the more profitable Relevant Market, thereby depriving Plaintiffs and other Non-Local 7 Contractors of the financial ability to retain their employees, all in furtherance of the conspiracy to create and maintain an enclave in the Relevant Market limited to Local 7 Contractors.

## THE PATTERN AND PRACTICE OF AGREEMENTS
## IN RESTRAINT OF TRADE

59.    Because of the conduct of Local 7 and other co-conspirators in restraint of trade, Non-Labor businesses routinely preclude Plaintiffs and other Non-Local 7 Contractors from bidding on and performing jobs in the Relevant Market.

60.    However, on many occasions, Non-Labor businesses benefit from the conspiracy by engaging in the practice of using the significantly lower price on a job it

receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7

Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate

downwards the price for the same job from a Local 7 Contractor. Rather, they often use

Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to

induce job target subsidies.

### Local 7's Attempt to Exclude All Non-Local 7 Contractors And Enlistment of Other Iron Worker Unions in the Conspiracy

61.    To broaden the impact of picketing or a work stoppage, Local 7 has conspired

with other trade unions to eliminate all Non-Union Contractors from competition. In other

words, Local 7 has conspired to eliminate competition from contractors like Plaintiffs who do

not have union contracts with an Iron Workers local union.

62.    Local 7 has used its job target money to successfully exclude Non-Local 7

Contractors from projects such as the work on the Carroll School in Peabody, Massachusetts,

the North Brookfield Junior/Senior High School in North Brookfield, Massachusetts in 2002,

the 405 Cochituate Road Project in Natick, Massachusetts in 2002, the John Elliot

Elementary School in Needham, Massachusetts in 2002, and the Thomas Carroll School

Project in 2002, in Peabody, Massachusetts in 2002, and other projects.

63.    Local 7 and its affiliated unions have also engaged in pretextual area standards

picketing and prohibited "top down" organizing, where the Union uses economic weapons to

force recognition from employers regardless of the wishes of their employees.

64.    Employees of ASE have voted against representation by Local 7.

65.    Employees of D.F.M. have voted against representation by Local 7.

66.    During the period beginning in October 2000, the Defendants, acting

individually and in concert with each other, and each authorizing and ratifying the acts of

20

their employees, officers, and agents, in furtherance of their objectives to establish an all-union, anticompetitive enclave in the Relevant Market area, as set forth in the Counts of the Complaint, have threatened Local 7 contractors, non-Local 7 contractors, and other persons engaged in commerce. The object of such conduct was to obtain agreements in restraint of trade in violation of Section 8(e) of the Labor Act, 29 U.S.C. § 158(e), whereby certain persons would agree not to do business or to change the way they do business with Plaintiffs or other non-Local 7 contractors. This has been a practice of long standing between the Defendants. As evidence of this objective, Plaintiffs cite the following illustrative examples of certain coerced agreements not to do business with Plaintiffs and other related conduct in furtherance of Defendants' intent to create an anticompetitive enclave:

### *The Catholic Medical Center Project*

67.    In 2002, a new hospital wing at the Catholic Medical Center in Manchester, New Hampshire was under construction. Harvey Construction was the general contract. AMERICAN AERIAL, ASE and BEDFORD IRON bid on this project.

68.    Harvey Construction through Canatal Industries, Inc. notified Plaintiff AMERICAN AERIAL that it was the low bidder to install the steel structure work. The steel erection contract had a total value in excess of $240,000.00.

69.    On or about February 27, 2003, Plaintiffs AMERICAN AERIAL was removed as the steel erector on the Catholic Medical Center project and was replaced by Universal Steel, a Local 7 contractor and who received job target money to underbid AMERICAN AERIAL.

### *The Fox 25 Project*

70.    In the Fall of 2002, Plaintiff D.F.M. was awarded a contract to build a Fox

Television Station addition in Dedham, Massachusetts, by Cape & Island Steel, Inc. On or

about February 24, 2003, the day before construction was to begin, agents of Defendant Local

7 contacted the project manager Jim Gage for Cape & Island Steel, Inc. demanding that

Plaintiff D.F.M. be removed.

71.    Plaintiff D.F.M. Industries' employees began working at the Fox 25 Project in

accordance with its contract. Cape & Island Steel, Inc.'s President John J. Paulding was then

told by Edwin Wright, a Business Agent from Local 7, that if Cape & Island Steel, Inc. did

not remove Plaintiff D.F.M. Industries from the project, that would be a "big mistake" and

Local 7 would set up a picket line and induce other building trade union members to walk off

the job.

72.    When Paulding objected, Wright informed Paulding that if Paulding did not

remove Plaintiff D.F.M. Industries from the project he would contact the other Building

Trades Unions to pressure him by putting  up a picket line.  A purpose of the picketing threat

was to coerce and restrain Paulding to enter into an 8(e) agreement in restraint of trade.

73.    On June 19, 2003, Wright went to the job site and disrupted the job by making

threatening statements to Plaintiff's employees and supervisors of physical harm.  D.F.M.

Industries' equipment on the jobsite was damaged.

74.    The general contractor Bond Brothers told Cape & Island Steel, Inc. that he

had to make this union problem go away.  Subsequently, the Cape & Island Steel, Inc. Project

Manager informed D.F.M. Industries that he would terminate Plaintiff's contract before

D.F.M. Industries' job was finished and Cape & Island Steel, Inc. would not give the next

phase of the job to Plaintiffs D.F.M. Industries.

75.    Plaintiff D.F.M. Industries was removed from the job.

22

76.    The agreement of John Paulding and Local 7 to remove Plaintiff D.F.M. Industries from the job is a restraint of trade and Plaintiff has been damaged thereby.

### The Tamarisk House Project

77.    D.F.M. Industries had a contract dated August 1, 2002, with Metro West Steel, Wrentham, MA, to erect an assisted living home in Warwick, Rhode Island in 2002, being managed by O. Alhborg & Sons, Inc., Cranston, RI.

78.    At a meeting with managers and supervisors from O. Alhborg & Sons, Inc., D.F.M. was informed on Wednesday August 28, 2002, to begin steel erection the following Tuesday, September 3, 2002.

79.    On Friday, August 29, 2002., D.F.M. Industries, was informed by project manager Dino Cauteruccio of Metro West Steel that O. Ahlborg & Sons, Inc. had been contacted by representatives from Local 37, that Metro West Steel was rescinding its contract with D.F.M. Industries, and that the contract was then being awarded to Griffin Steel, a Local 7 Contractor.

### Danvers Stop & Shop Project

80.    On November 8, 2002, steel fabricator Jay Steel solicited bids for the construction of a Stop & Shop grocery store in Danvers, Massachusetts. Plaintiff ASE submitted a bid on January 14, 2003.

81.    ASE was informed by a representative of Jay Steel that the Local 7 had provided job targeting money to the erector used by Jay Steel which undercut ASE's bid.

### Stop & Shop Warehouse Project

82.    On March 23, 2003, AJAX was solicited by M & S Steel of Garett, Indiana, to submit a bid to erect the structural steel for the Stop & Shop Warehouse project in Freetown,

23

Massachusetts. Plaintiffs AJAX and D.F.M. also submitted bids on the project.

83.     Subsequently, agents of Local 7 contacted M & S Steel and informed it that job target money was available to it if it awarded the project to a Local 7 contractor.

84.     H & B Welding, a Local 7 Contractor, was then awarded the contract with the use of job target money.

### Portland Jet Port Project

85.     On April 22, 2004, AMERICAN AERIAL submitted a bid of $92,000.00 to general contractor Ledgewood, Inc. for the erection of hangers in Portland, Maine.

86.     AMERICAN AERIAL was informed by Mark Harris of Arctic Construction, Inc., Falmouth, Maine, a Local 7 Contractor, that it had been provided job target funds. Subsequently, Local 496 agent John Evans admitted that job target money had been provided to enable Arctic Construction, Inc. to submit a lower bid on the project.

### University of Southern Maine Science Research Wing Project

87.     On May 21, 2004, AMERICAN AERIAL submitted a bid of $92,500.00 to general contractor Pizzagalli Construction Company for the construction of new science research wing for the University of Southern Maine in Portland, Maine. AMERICAN AERIAL was informed it was the second low bidder.

88.     The project was then awarded to Arctic Construction, Inc., a Local 7 Contractor, who Local 496 agent John Evans admitted had been provided job target money to submit a bid lower than AMERICAN AERIAL on the project.

### Cardi's Furniture Project

89.     In 2002, AJAX submitted a bid for the steel erection of a Cardi's Furniture store in North Attleboro, Massachusetts to FAMM Steel, Inc. AJAX was informed by

FAMM that it was awarded the contract.

90.    AJAX was subsequently informed by FAMM that Local 7 had authorized the payment of job target money on the project and then awarded the contract to Griffin Iron, a Local 7 Contractor, who on information and belief received the Job Target money.

91.    Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed to pay AJAX $5,000.00 to break its service contract on the job.

### O. Alhborg Headquarters Project

92.    O. Alhborg and Sons sought bids for the steel erection of their O. Ahlborg and Sons Headquarter's office in Cranston, Rhode Island, to begin in October 2001.

93.    Plaintiffs D.F.M. and AJAX submitted bids for the work with a value of $45,000.00.  AJAX was awarded the job.

94.    The day before work was to begin, the project was awarded to Griffin Steel who on information and belief received Job Target money from Defendant.

### Walmart Brewer Project

95.    In 2002, a Wal-Mart store was to be erected in Brewer, Maine.  On August 6, 2002, Plaintiff AMERICAN AERIAL submitted a bid to Universal Welding to perform the structural erection of the building in the amount of $259,600.00.

96.    Industrial Enterprises, a union contractor was awarded the contract with a bid of $160,000.00 for which it received job target money.

### Yarmouth High School Project

97.    In 2002, the steel erection for a new Yarmouth High School in Yarmouth, Maine was awarded to steel fabricator Mandate Erectors & Welding, Ltd.  Mandate Erectors

& Welding, LTD solicited bids for the erection of the steel frame.

98.    On April 8, 2002, Plaintiff AMERICAN AERIAL submitted a bid of

$339,900.00 to Mandate Erectors & Welding, LTD.   A union contractor with Job Target

Funds, CTI, New Hampshire, was awarded the bid at $200,000.00.

### *North Brookfield High School Project*

99.    A Junior/Senior High School building project was constructed in North

Brookfield, Massachusetts.  Plaintiffs were unable to bid on the project when it was learned

that Union contractor Construction Welding Services Corporation received job target money

from Local 7.

### *Walker Brook Crossing*

100.    On December 12, 2002, Mandate Erectors & Welding, Ltd. solicited bids for

the steel erection portion of a Home Depot in Reading, Massachusetts known as Walkers

Brook Crossing.  On January 17, 2003, Plaintiffs AMERICAN AERIAL, ASE and AJAX

submitted bids to perform the work

101.    ASE and AJAX were informed by a representative of Mandate Erectors &

Welding, Ltd. that Local 7 had provided job targeting money to a Local 7 contractor.  The

project manager, then awarded the contract to CAPCO Steel, Inc., a Local 7 Contractor.

### *Stryker Biotech*

102.    On May 30, 2003, fabricator Supermetal solicited bids for the steel erection

portion of the construction in West Lebanon, New Hampshire known as Stryker Biotech.  On

June 25, 2003, ASE submitted a bid to perform the work.

103.    ASE was informed by a representative of Supermetal that Local 7 had

provided job targeting money to CAPCO, and the contract was being awarded to CAPCO

Steel Corp., a Local 7 contractor

### Long View Place

104.     On June 2, 2003, General Steel Fabricators, Inc. and Mandate Erectors & Welding, Ltd. solicited bids for the steel erection portion of the construction of an apartment community in Waltham, Massachusetts known as Long View Place.  Plaintiffs ASE and AJAX submitted bids.

105.     ASE was informed that it had submitted the low bid on the project.

106.     ASE was then informed by a representative General Steel Fabricators, Inc. that Local 7 had provided job targeting money to a Local 7 Contractor, and contract was awarded the contract to Beauce Atlas, a Local 7 contractor.

### Mart Parking Complex

107.     In the Fall of 2003, FAMM Steel, Inc. issued a public bid for the steel erection and building of a parking garage complex in Fitchburg, Massachusetts.  Plaintiffs AJAX, ASE, INDEPENDENT WELDING, and BEDFORD submitted bids.

108.     Subsequent to submitting the bids, INDEPENDENT WELDING was told by Allen Hodges, a representative of FAMM Steel, Inc. that a union company, Universal Steel had received job target money on the project.  Universal Steel was awarded the contract.

### The 405 Cochituate Road Project

109.     In October 2002, a construction project in Natick, Massachusetts at 405 Cochituate Road was to begin.  Ocean Steel was the steel fabricator.  Plaintiff D.F.M. Inc. submitted a bid on this project, as well as Green Mountain, a non-Local 7 contractor.

110.     Agents of Local 7 contacted Construction Welding to have it outbid the non-Local 7 contractors on the project.

111.    On or about October 8, 2002, co-conspirator Construction Welding obtained job target funds from Local 7. With those funds, Construction Welding was awarded the project for the steel erection portion of the 405 Cochituate Road Project.

### Jordan's Furniture Distribution Warehouse Project

112.    In 2002, AJAX submitted a bid for building this project in Taunton, Massachusetts.

113.    On information and belief, the project was awarded to James F. Sterns Co., Inc., Hingham, MA, a Local 7 Contractor who received job target money.

### Stone Harbor Condominiums

114.    On August 8, 2003, AJAX submitted a bid to Jay Steel on this project in Bristol, Rhode Island and was informed it was the low bidder.

115.    On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor who received job target money.

### Whole Foods Grocery Project

116.    In the Spring of 2004, AJAX submitted a bid on this project in Hingham, Massachusetts to Jay Steel and was informed it had submitted the lowest bid.

117.    On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor Daniel Koury Construction, Inc., Warwick, Rhode island, who received job target money.

### Showcase Cinemas

118.    On August 19, 2003, AJAX submitted a bid to fabricator Beauce Atlas on this project in Millbury, Massachusetts and was informed it had submitted the lowest bid.

119.    Two weeks later, the work was taken away from AJAX and awarded to a

Local 7 Contractor who received job target money.

### *Archstone Apartments*

120.    On June 11, 2003, AJAX had received a written purchase order from Mandate Erectors for this building project in Watertown, Massachusetts.

121.    AJAX had invested a substantial amount of preparation time and costs in preparing the project.

122.    Two weeks before the scheduled start date, AJAX was informed that the project was being taken away from it and being awarded to Interstate Steel Erectors, a Local 7 contractor.

123.    Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed broke its service contract with AJAX.

### *Stop & Shop Store Project*

124.    On March 23, 2004, AJAX submitted a bid for the construction of a Stop & Shop grocery store in Halifax, Massachusetts to Jay Steel. AJAX was informed by the fabricator Jay Steel that it had been awarded the project.

125.    One week before the start date, AJAX was informed that the project was being assigned to H B Welding, Inc., Pawtucket, RI, a Local 7 Contractor.

### *Necco Project*

126.    In 2001, AJAX submitted bids for the erection of a warehouse building for NECCO in Revere, Massachusetts to Cives Steel, Augusta, Maine. AJAX was informed that it was the low bidder by the final fabricators on the project.

127.    One week after meeting with the general contractor and fabricators on the jobsite, AJAX was informed that the project was being awarded to CAPCO, Providence, RI, a

29

Local 7 Contractor.

### Shaw's Supermarket Project

128.    On June 10, 2004, INDEPENDENT WELDING submitted a bid for the erection of a Shaw's Supermarket in Worcester, Massachusetts, to the fabricator Bennington Iron Works.  Plaintiffs AJAX, AMERICAN AERIAL and D.F.M. also submitted bids. INDEPENDENT WELDING was informed that it was awarded the contract.

129.    On June 23, 2004, INDEPENDENT WELDING was informed that union agents had contacted the general contractor CM & B, Lynnfield, MA, and that job target money was made available

130.    On July 15, 2004, INDEPENDENT WELDING was informed that the project was being taken away from it and awarded to a Local 7 Contractor.

### Bowdoin College Project

131.    In August 2004, AMERICAN AERIAL submitted a bid for the erection of a new dormitory wing at Bowdoin College in Brunswick, Maine, to the fabricator Advance Resources and Construction Enterprises, Inc. ("ARC"), Kingfield, Maine.  AMERICAN AERIAL was informed that it had been awarded the contract.  AMERICAN AERIAL attended a jobsite meeting for sequencing the job, jobsite requirements, and was told it was the steel erector.  The job was to begin the week of November 22, 2004.

132.    On November 15, 2004, AMERICAN AERIAL was informed by ARC that it had received new pricing from Arctic Construction, a Local 7 contractor, and was meeting with Arctic to finalize a new contract that was substantially lower.  AMERICAN AERIAL was removed from the project.

### Brickworks-Buildings 3 & 4 Project

133.   On October 8, 2004, D.F.M. submitted a bid for the erection of two buildings in Cambridge, Massachusetts to Capone Iron Corporation, Rowley, Massachusetts.

134.   On September 28, 2004, Bel-Lin Corporation, Randolph, Massachusetts, submitted a bid on the project to Capone Iron Works in the amount of $136,000.00. Plaintiff D.F.M. was awarded the contract on October 8, 2004.

135.   On or about November 18, 2004, Local 7 negotiated a new bid for the project with its union signatory erector Bel-Lin Corporation. The Union agreed to contribute $12,000.00 of job target money to the contractor and Bel-Lin Corporation agreed to further lower its prior bid by $9,000.00 as a "good guy discount" to Capone Iron Works.

136.   On or about November 18, 2004, defendant Local 7 wrote Capone Iron Works by agent Edwin Wright, on behalf of itself and Bel-Lin Corporation, and offered to cut Capone Iron Works' prior bid by $21,000.00 as a concession and for market recovery.

137.   On November 29, 2004, D.F.M. was informed by Capone Iron Works project manager J. Robert Chipman that the Union had provided him a new bid price on the project for Bel-Lin Corporation and therefore D.F.M. would not be permitted to perform on the contract with Capone Iron Works.

### *22 Fore Street*

138.   "22 Fore Street" is the name of a project in Portland, Maine that was awarded to AMERICAN AERIAL. Agents of Local 7 offered fabricator Advance Resource Construction $20,000.00 if it would not use AMERICAN AERIAL's services.

### *Hilton Garden Inn*

139.   On information and belief, on a Hilton Garden Inn construction project being erected by AMERICAN AERIAL in Freeport Maine in 2004, Walter Kilbrethm an agent of

31

Local 496 offered to pay job target money to ARC.

140.    The acts and agreements set forth above were a part of a pattern and practice of obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts as alleged below.

141.    The aforesaid unlawful combinations and conspiracies in restraint of trade and to monopolize trade consist of a continuing agreement, shared purpose, understanding, and concert of action among the defendants and the various non-labor co-conspirators named above.

### *The Misuse of Job Target Agreements.*

142.    Although the job targeting subsidy program purports to be a lawful program limited to those employers who have a collective bargaining agreement with Local 7 which are challenged by non-union competition, the program is administered unlawfully inconsistent with state and federal prevailing wage laws and in restraint of trade. In fact, Local 7 also negotiates Target Agreements directly with Non-Labor businesses, which have no collective bargaining agreements with Local 7 and have no employees over whom Local 7 has asserted jurisdiction in order to secure agreements in violation of Section 8(e) of the Labor Act. Job Target Funds or subsidies are given as a reward at the request of Contractors who have agreed to hire only Local 7 Contractors and are withheld from other Non-Labor businesses as a punishment for hiring Plaintiffs or other Non-Local 7 Contractors.

143.    For example, Defendant Charles Wright contacted the President of Construction Welding on numerous occasions in 2002 including the projects identified above, that it would provide Construction Welding job target funds in order to prevent Non-Local 7 contractors from obtaining work.

32

144.    Ultimately, as a result of Wright's direct negotiations with Construction Welding President Susan Beauregard, structural steel erection jobs were targeted by Local 7 resulting in an award of projects to Construction Welding for a lower price than the Plaintiffs and other Non-Local 7 contractors would or did submit bids on.

### *Participation in The Conspiracy*

145.    Construction Welding, Universal Steel, and other Local 7 contractors in the Relevant Market were awarded jobs as steel erector on numerous projects in which the Union provided job target money.

146.    The acts and agreements set forth above were a part of a pattern and practice obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts as alleged below.

### *A Pattern and Practice of "Stripping" by Local 7 and BTEA Members*

147.    Local 7, in agreement and conspiring with BTEA and other employer associations and their members, has stripped Plaintiffs and other Non-Local 7 Contractors of a substantial number of their employees by inducing them to take jobs with Local 7 Contractors, provide them jobs with signatory employers, and bypass the Union's hiring hall. This practice severely curbs the competitive ability of Plaintiffs and other Non-Local Contractors to carry on their businesses in conjunction with the agreements described herein. Plaintiffs and other Non-Local 7 Contractors are barred from the Relevant Market, thereby lessening the financial ability of the Plaintiffs and other Non-Local Contractors shops to retain their employees, and further reducing the ability of Plaintiffs and other Non-Local 7 Contractors to compete in the Relevant Market.

148.    Charles Wright, Paul DiPietro, John Hurley, James Coyle, Edwin Wright, and

33

James Brown, and Chado Torres, union organizers for Local 7, have continuously from approximately 1999 to the present attempted to convince employees of Plaintiffs to leave and accept jobs with Local 7 Contractors. Employees that have left have asked other employees of Plaintiffs also to leave.

149.    On the Wrentham Elementary School project in Wrentham, MA, covered by the Massachusetts prevailing wage law, in August 2002, Local 7 business agent Charles Wright had a conversation with Glen Pisani, one of D.F.M.'s principals, in which he admitted Local 7's efforts to "strip" Plaintiffs's workers and place them with Local 7 Contractors stating that "what we are trying to do right now is we are trying to control the industry" by removing Plaintiffs ability to compete in the market. Wright also stated to Glen Pisani that Plaintiffs are not the only Non-Local 7 Contractors from which he is stripping the men to place with Local 7 Contractors.

150.    BTEA and its Local 7 Contractor members entered into agreements with Local 7 to immediately accept employment of Plaintiffs' men "stripped" by Local 7 as part of the conspiracy between BTEA, employer association members, and Local 7 and as part of the pattern and practice to diminish Plaintiffs' and other Non-Local 7 Contractors' ability to compete in the Relevant Market or even to work outside of the Relevant Market on jobs which are not as profitable as those in the Relevant Market.

151.    On the Deerfield Academy job in Deerfield, MA, between January and April 2004, agents of Local 7 regularly successfully stripped workers from BEDFORD IRON and placed those workers directly in employment with Local 7 contractors.

152.    The acts and agreements set forth above were a part of a pattern and practice of obtaining agreements in restraint of trade and Plaintiffs and other Non-Local 7 Contractors

34

have been damaged by these and similar acts as alleged below.

153.    The foregoing acts in restraint of trade have had the result of suppressing competition for steel erection work in the Relevant Market. The injury to competition has had the effect of raising the cost of construction in the Greater Boston area and the Relevant Market, and increasing the cost of commercial real estate in the area.

### *A Pattern and Practice of Surveillance, Intimidation, and Efforts to Obtain Illegal Agreements*

154.    On jobsites located at Wrentham Elementary School, Wrentham, MA, Wareham Public Safety, Wrentham, MA, New England Technical, Warwick, RI, Tobey Hospital, Wrentham, MA, Highland 1300, Woonsocket, RI, Tweeter, Warwick, RI, Dick's Sporting Goods, Warwick, RI, Deerfield Academy, Deerfield, MA, Central Falls Credit Union, and other locations, Local 7 and its co-conspirators agreed to station observers with cameras and video recorders in an effort to induce contractors to cease doing business with the Plaintiffs. Local 7 has also used this practice to initiate sham complaints to federal and state administrative authorities.

155.    On these jobsites named above, Local 7 and its coconspirators have induced secondary picketing, threats to persons and property, the destruction of property, and economic boycotts to induce Plaintiffs to either enter into contracts with it or to cease steel erection activity in the Relevant Market.

156.    Local 7 also engaged in sham picketing of Plaintiffs at jobsites identified above with the purpose of coercing non-union fabricators, developers, and construction managers with whom they do not have collective bargaining relationships to agree to subcontractor agreements or to use only Local 7 subcontractors.

**FIRST CLAIM FOR RELIEF**

35

**(Violation of the Sherman Antitrust Act-Monopoly)**

157.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "166" inclusive, with the same force and effect as though same were fully set forth at length herein.

158.    From at least as early as July 1999, and continuing to date, Defendants and their coconspirators have entered into contracts, agreements, combinations, and/or conspiracies in unreasonable restraint of interstate trade and commerce within the relevant product and geographic market, all in violation of §1 and §2 of the Sherman Act.

159.    The Defendants have conspired, combined and agreed with the aforesaid Non-Labor businesses to monopolize and/or willfully maintain their monopoly in the Relevant Market.

160.    Defendant, Local 7, its agent Charles Wright, acting within the scope of his agency and/or for the benefit of Local 7, together with the BTEA acting in concert with its members and Local 7, and other multiemployer associations controlled by their members and other Ironworker Local Unions, sought and obtained agreements from Non-Labor businesses fabricating contractors, including but not limited to Construction Welding, CAPCO, Canatal, Universal Steel, and Cape & Island Steel, Inc. The terms of these anticompetitive agreements, which are also in violation of §8(e) of the Labor Act, are as follows:

    a.    Local 7 shall refrain from picketing, and

    b.    Local 7 shall subsidize jobs from compensation credited to employees paid on federal prevailing wage projects to these Non-Labor businesses through the use of Job Target Agreements to partially defray the difference in bids between Local 7 Contractors and Plaintiffs or

similarly situated Non-Local 7 Contractors.

c.     In exchange the Local 7 Contractors agree that they shall not
       utilize Plaintiffs or Non-Local 7 Contractors on certain projects
       within the Relevant Market as defined herein.

161.    Local 7 and Local 7 Contractors, in conjunction with the patterns and practices
to enter into agreements in restraint of trade and/or to monopolize the Relevant Market,
compel the stripping of key employees from Plaintiffs and other Non-Local 7 Contractors and
the assignment of such employees to work for Local 7 Contractors, for the sole and exclusive
purpose of injuring and destroying competition by Non-Local 7 Contractors.

162.    The effect of the conspiracy to maintain or willfully maintain monopoly power
has been:

a.     to and continues to be, escalation of cost to consumers in connection with
       structural steel erection, deterioration of quality, and restriction of output.

b.     denied work on contracts that they would have been awarded absent the illegal
       conspiracy.

c.     denied work on contracts that they would have been awarded absent the illegal
       conspiracy.

d.     caused to suffer unnecessary and unproductive costs.

e.     hampered in their ability to market their services and expand their presence in
       the Relevant Market.

f.     the aforesaid combinations and conspiracies in restraint of and in
       monopolization of trade consist of policing and obtaining agreements,
       understandings and a concerted action between Defendants and their co-

conspirators the substantial terms of which are to lessen competition and maintain the monopoly position Local 7 and its Local 7 Contractor members enjoy in the Relevant Market as follows:

      i.     to restrain, hinder and impair the trade and business of Plaintiffs and other similarly situated Non-Local 7 Contractors who design, manufacture and install steel erection on buildings in the Relevant Market.

      ii.     to eliminate, exclude or cause a substantial diminution in the business of Non-Labor businesses with Plaintiffs and other Non-Local 7 Contractors or requiring agreements with them to contain burdensome and unfair terms for any jobs and especially the jobs in the Relevant Market thereby restraining competition and maintaining a monopoly for the coconspiring Local 7, BTEA, and its Local 7 Contractor members who are also co-conspirators in the use of Job Target Agreements, stripping and threats of picketing as a mechanism to maintain and obtain there restrictive agreements.

      iii.     To force Non-Labor businesses to enter into agreements in restraint of trade and in violation of Sections 8(b)(4)(A), 8(b)(4)(B) and 8(e) of the Labor Act by pressuring such Non-Labor businesses fabricating contractor to enter into these restrictive agreements under which they refuse to do business or change the way they do business with Plaintiffs and other Non-Local 7 Contractor and thereby conspire with Local 7 and Local 7 Contractors to maintain the monopoly in structural steel erection, design, manufacture for buildings in the Relevant Market having a not insubstantial effect on interstate commerce.

      iv.     To carry out the terms of these agreements in restraint of trade limiting the market to Local 7 Contractors to perform structural steel erection and installation except for that small portion allowed to Non-Local 7 Contractors, under coerced agreements with

Non-Labor businesses containing burdensome and unfair terms for Plaintiffs and other Non-Local 7 Contractors with Local 7 and its Local 7 Contractor members and/or in various, combinations to give Defendants exclusive control as to which persons may engage in the installation of structural steel erection work in the Relevant Market in restraint of trade under Section 8(e) of the Labor Act and Sections 1 and 2 of the Sherman Act.

163.    Over the last four (4) years, Plaintiffs have requested the jobs in the Relevant Market from Non-Labor businesses and have been ready, willing and able to perform such jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are also desirous of and ready willing and able to perform such jobs and who are also barred from the Relevant Market as a result of the anti-competitive conspiracy described herein.

164.    The acts and agreements set forth above were in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts. Plaintiffs actual damages are continuing but are believed to be in excess of $5,000.000.00.

## SECOND CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act-Boycott)

165.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in paragraphs of the complaint numbered "1" through "174" inclusive, with the same force and effect as though same were fully set forth at length herein.

166.    Commencing at least as early as July of 1996, at a date presently unknown, and continuing to date, Local 7 in conjunction with BTEA and Local 7 Contractors have conspired and agreed among and between themselves to threaten Non-Labor businesses that Local 7 contractors who fail to perform their subcontracts on unrelated jobs unless the Non-Labor businesses refrain from using Non-Local 7 Contractors, or use them only in jobs Local 7 approves, to threaten to and actually strip key employees of Plaintiffs and other Non-Local

7 Contractors for the purpose of making such contractors non-competitive and unreliable; to conspire with Local 7 to threaten job site slow down or disruptions or picketing and actual slow down, disruption and picketing and to allocate Target Agreements to compliant prime contractors all in violation of Sections 1 and 2 of the Sherman Act.

167.    The effect of the conspiracy to boycott Plaintiffs will fully maintain market power to force Non-Labor businesses who have no collective bargaining agreement with Local 7 and over whose employees Local 7 asserts no jurisdiction to enter into agreements in restraint of trade and in violation of §8(b)(4)(A), §8(b)(4)(B) and 8(e) of the Labor Act b) pressuring Non-Labor businesses to enter into these restrictive agreements under which they refuse to do business or change the way they do business with Plaintiffs and other Non-Local 7 Contractors and thereby conspire with Local 7 and BTEA and Local 7 Contractors to maintain the monopoly in structural steel erection design, manufacture and installation in commercial building, in the Relevant Market having a substantial effect on interstate commerce.

168.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant Market from them and have been ready, willing and able to perform such jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are also desirous of and ready willing and able to perform such jobs and who are also barred from the Relevant Market as a result of the anti-competitive conspiracy described herein.

169.    The acts and agreements set forth above were in restraint of trade and Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts. Plaintiffs's damages are continuing but believed to be in excess of $5,000,000.00.

### THIRD CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act-Horizontal Monopoly)

40

170.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "179" inclusive, with the same force and effect as though same were fully set forth at length herein.

171.    Local 7 and BTEA (acting as agent of and under the control of its horizontally aligned Local 7 Contractor members) have agreed to exclude Plaintiffs and other similarly situated contractors from structural steel erection jobs especially those within the Relevant Market. The means agreed upon include commitment of job target subsidies to Non-Labor businesses who refrain from using Plaintiffs and other Non-Local 7 Contractors and other threats of job site slow down or picketing against those businesses who do not agree to refuse to hire Plaintiffs and other Non-Local 7 Contractors in contravention of Section 8(e), Section 8(b)(4)(A), Section 8(b)(4)(B) of the Labor Act and in restraint of trade; and stripping of key employees of Plaintiffs and others to injure and destroy their ability to compete in the market place all in violation of Section 1 and 2 of the Sherman Act.

172.    The effect of the conspiracy to refrain from using Plaintiffs and other Non-Local 7 Contractors and to willfully maintain monopoly power has been the following:

a.    the escalation of cost to consumers, deterioration of quality, and restriction of output.

b.    the aforesaid combinations and conspiracies in restraint of and monopolization of trade consist of policing and obtaining agreements, understandings and a concert of action among Defendants and their co-conspirators the substantial terms of which are to lessen competition in the performance of structural steel erection work and generally increase the 70% monopoly position Local 7 and BTEA and its members enjoy

41

in the relevant geographic and product market to restrain hinder and

impair the trade and business of Plaintiffs and other Non-Local 2

Contractors which design, manufacture and install structural steel

erection work in commercial building in the Relevant Market.

173.    Over the last four (4) years Plaintiffs have requested jobs in the Relevant

Market from its contractor customers and have been ready, willing and able to perform such

jobs. Upon information and belief there are numerous other Non-Local 7 Contractors who are

also desirous of and ready willing and able to perform such jobs and who are also barred from

the Relevant Market as a result of the anti-competitive conspiracy described herein.

174.    The acts and agreements set forth above were in restraint of trade and

Plaintiffs and other Non-Local 7 Contractors have been damaged by these and similar acts.

Plaintiffs damage are continuing but believed to be in excess of $5,000,000.00.

## FOURTH CLAIM FOR RELIEF
### (Violation of Labor Management Relations Act)

175.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in

the paragraphs of the complaint numbered "1" through "184" inclusive, with the same force

and effect as though same were fully set forth at length herein.

176.    Plaintiffs in the alternative and additionally claim a violation under 29 U.S.C.

Section 187(a) and (b) which states:

"(a) It shall be unlawful, for the purpose of this Section only, in

an industry or activity affecting commerce, for any labor

organization to engage in any activity or conduct defined as an

unfair labor practice in Section 158(b)(4) of this title."

"(b) whoever shall be injured in his business or property by reason of

42

> any violation of subsection (a) of this section may sue therefore in any
>
> District Court of the United States subject to the limitation and
>
> provisions of Section 185 of this title without respect to the amount in
>
> controversy or any other court having jurisdiction of the parties and
>
> shall recover the damages by him sustained and cost of this suit."

This Section provides a damage remedy for certain secondary and primary activity engaged in by labor organizations.

177.    Since on or about July 1999 Local 7 has violated §8(B)(4)(ii)(A) and (B) of the Labor Act, 29 U.S.C. §§ 158(b)(4)(ii)(A) & (B), by engaging in threats of picketing and other restraint and coercion against Plaintiffs and against other contractors to obtain agreements prohibited by §8(e) of the Labor Act, 29 U.S.C. § 158(e), and where an object is to cause Non-Labor businesses to change the way they do business with Plaintiffs or other Non-Local 7 Contractors or cease doing business with Plaintiffs and other Non-Local 7 Contractors and give the business instead to Local 7 Contractors.

### FIFTH CLAIM FOR RELIEF
### (Interference with Performance of Contract)

178.    Plaintiffs repeats, realleges and reiterates each and every allegation contained in paragraphs of the complaint numbered "1" through "187" inclusive, with the same force and effect as though same were fully set forth at length herein.

179.    This action is brought under the tort law of the states of Massachusetts, Maine, New Hampshire, and Rhode Island.

180.    Since on or about January 1, 1995 and continuing to date Defendants Local 7, BTEA, other Local 7 agents members and others similarly situated, Charles Wright, and the Job Target Fund and each of its labor and management trustees in their official capacities

43

acting in concert, have interfered with the performance of Plaintiffs' contracts with Non-

Labor businesses causing said Non-Labor businesses not to perform their contracts with

Plaintiffs.

181.    By the above acts and activities, Local 7 and the aforementioned Local 7

contractors have in combination with each other and with Local 7 and with Charles Wright,

its agent in the service of his agency, Job Target Fund, its agents acting in the service of their

agency, tortiously interfered with the performance of Plaintiffs' contracts.

182.    Plaintiffs damages are continuing and are believed to be in excess of

$5,000,000.00.

## SIXTH CLAIM FOR RELIEF
### (Interference with Economic Relations)

183.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in

the paragraphs of the complaint numbered "1" through "192" inclusive, with the same force

and effect as though same were fully set forth at length herein.

184.    This action is brought under the tort law of the states of Massachusetts, Maine,

New Hampshire, and Rhode Island.

185.    The wanton, intentional conduct, set forth above, of the Defendants,

committed without justification or excuse, has:

> a.    Intentionally interfered with the economic relations of the Plaintiffs in
>
> their businesses;
>
> b.    Intentionally interfered with the economic relations of the Plaintiffs in
>
> their contractual relations.

186.    As a direct and proximate result of the foregoing illegal conduct, including

violence, threats, coercion, and destruction of property engaged in by the Defendants,

Plaintiffs have been and continue to be injured in their business and property in substantial amounts not yet ascertained with particularity, in that they have been:

    a.    Deprived of the fundamental constitutional right of the opportunity to contract;

    b.    Forced to expend large sums of money to protect and repair equipment;

    c.    Caused to lose sales and business.

187.    As a result, Plaintiffs are entitled to recover:

    a.    All damages sustained by reason of the unlawful acts complained of herein;

    b.    Applicable exemplary and punitive damages.

188.    As a result of the aforesaid unlawful conduct by Defendants jointly and severally, Plaintiffs have suffered and continue to suffer substantial damages to their businesses and properties in an exact amount which is not known at this time but believed to be in excess of $5,000.000.00.

## SEVENTH CLAIM FOR RELIEF
### (Violation of Mass. Gen. L. c. 93A)

189.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the paragraphs of the complaint numbered "1" through "198" inclusive, with the same force and effect as through same were fully set forth at length herein.

190.    The Defendants' actions against the Plaintiffs violate Mass. Gen. L. c. 93A, §§ 2 and 11. The parties are engaged in trade or commerce within the Commonwealth of Massachusetts.

191.    The acts in question were willful, occurred primarily and substantially in Massachusetts, resulted in a loss of money by the Plaintiffs, and were an unfair method of

competition and/or a deceptive acts or practice under Mass. Gen. L. c. 93A, §§ 2 and 11.

192.    As a result of the aforesaid unlawful conduct by Defendants jointly and severally, Plaintiffs have suffered and continue to suffer substantial damages and loss of property to their businesses and properties in an exact amount which is not known at this time, but believed to be in excess of $5,000,000. Plaintiffs also request double or treble damages, attorneys' fees, litigation costs, and equitable relief.

WHEREFORE, Plaintiffs demand judgment on the complaint as follows:

1.    On the First, Second and Third Claims for relief:

    a.    judgment against Defendants and in favor of Plaintiffs for treble the damages determined to have been sustained by it which are to be proved at trial together with cost of suit including pre-judgment interest and reasonable attorneys fees.

    b.    judgment enjoining the Defendants from continuing the acts, conduct and conspiracies here and before alleged; and a declaration that Defendant's unlawful acts are in violation of §1 and § 2 of the Sherman Act.

2.    On the Fourth Claim for Relief: judgment in an amount to be proved at trial together with its cost of suit, interest and reasonable attorneys fees, together with punitive damages in an amount to be determined at trial.

3.    On the Fifth Claim for Relief, damages to be proved at trial and costs against Local 7 including pre and post judgment interest and costs.

4.    On the Sixth Claim for Relief, damages to be proved at trial but believed to be no less than $10,000,000.00 and costs against Local 7 including pre and post judgment interest and costs.

5.    On the Seventh Claim for Relief, damages to be proved at trial but believed to

be no less than $10,000,000.00 and costs against Local 7 including pre and post judgment interest, treble damages, attorneys' fees, and costs.

6.    Preliminary and permanent injunctive relief enjoining Local 7, the Defendants, their officers, agents, members, employees, and all persons acting in concert with Defendants, from the commission of the following acts, and ordering Defendants to specifically and unequivocally instruct and order their officers, agents, members, employees, attorneys, and all persons acting in concert with Defendants to cease and desist from the following acts:

a.    Directly or indirectly, agreeing to take money that was contributed as wages and benefits paid by any employer engaged in public works subject to the federal Davis-Bacon or other federal and state prevailing wage law sand contributing it to an employer.

b.    Causing directly or indirectly any unsolicited offer of employment to be presented to any agent or employee of Plaintiffs;

c.    Causing directly or indirectly the recording, by voice or video, of any kind of work done on a jobsite by Plaintiffs or their employees;

d.    Placing, maintaining or stationing any pickets or persons in excess of two (2) within ten (10) feet of any entrance to a worksite where one of the Plaintiffs is erecting steel;

e.    Obstructing, blocking, hindering or in any manner slowing, the ingress or egress of Plaintiffs' customers, employees, suppliers and others seeking to do business with Plaintiffs on work sites where one of the Plaintiffs is erecting steel;

f.    Threatening physical violence to the person or property of customers, suppliers, or employees of Plaintiffs, or other persons seeking to do business with Plaintiffs or invitees of Plaintiffs;

g.    Threatening and/or committing acts of intimidation, destruction or removal of

47

property, physical violence and/or harassment of Plaintiffs, their officers, agents, employees, customers, suppliers, tenants or others desiring to do business with or perform work for Plaintiffs; and

    h.    Following Plaintiffs' officers, agents, employees, customers, suppliers, or others desiring to do business with, or perform work for Plaintiffs in motor vehicles in a menacing and/or threatening manner.

    7.    The appointment of a Trustee to marshal the remaining assets of the Job Target Fund trust account with the direction and purpose of compensating parties injured by the misuse of money of said Fund.

    8.    Treble damages.

    9.    Applicable exemplary and punitive damages.

    10.    Attorneys' fees and costs of suit.

    11.    On all the claims for relief, such other and further relief as may appear necessary and appropriate.

TRIAL BY JURY IS DEMANDED IN THE ABOVE-ENTITLED CAUSE ON ALL COUNTS SO TRIABLE

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC., and
RONALD BEAUREGARD d/b/a
INDEPENDENT WELDING

By their attorneys,

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN, CHANDLER & MILLER LLP
99 High Street
Boston, MA  02110
(617) 542-6789

Of counsel:
(Motion for admission
*pro hac vice* to be filed)

Michael E. Avakian, Esq.
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, VA 22151
(703) 321-9181

Dated: December 2, 2004

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

American Steel Erectors, Inc - Hillsborough, NH
AJAX Construction Co., Inc.,
Bedford Ironworks, Inc.,

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

D.F.M., Inc., Norfolk County, MA
Independent Welding Worcester County, MA

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA  02110    (617) 542-6789

## DEFENDANTS

Local 7, Int'l Assn. of Iron Workers
Charles Wright
Industry Advancement Fund

County of Residence of First Listed    Suffolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

04 cv 12536 RGS

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1 U.S. Government
      Plaintiff

☒ 3 Federal Question
      (U.S. Government Not a Party)

☐ 2 U.S. Government
      Defendant

☐ 4 Diversity
      (Indicate Citizenship of Parties
      in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| Student Loans | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| (Excl. Veterans) | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405 (g)) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

Appeal to
District

☒ 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

☐ 5 Transferred from
      another district
      (specify)

☐ 6 Multidistrict
      Litigation

☐ 7 Judge from
      Magistrate
      Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. Section 15 (Sherman Antitrust Act). Action for damages and injunctive relief
for establishment of conspiracy in restraint of trade.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
      UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY   none

(See
instructions):

JUDGE

DOCKET NUMBER

DATE
12/2/04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____