# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————————
)
AMERICAN STEEL ERECTORS, INC., et al. )
)
     Plaintiffs,             )
)
     v.                 )
)
LOCAL UNION NO. 7, INTERNATIONAL )
ASSOCIATION OF BRIDGE, )    Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL & )
REINFORCING IRON WORKERS, and )
)
CHARLES WRIGHT, and )
)
STEEL ERECTION AND ORNAMENTAL )
IRON INDUSTRY ADVANCEMENT FUND, )
)
     Defendants.      )
———————————————————————————)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## IRON WORKERS LOCAL 7'S MOTION TO DISMISS
## COUNTS V-VII OF PLAINTIFFS' COMPLAINT

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant Iron

Workers Local 7 ("Local 7," the "Union" or "Defendant") submits this Memorandum of Law in

Support of its Motion to Dismiss Counts V-VII of Plaintiffs' Complaint for lack of subject

matter jurisdiction. The Motion to Dismiss and this supporting Memorandum of Law seek

dismissal of Plaintiffs' state law claims.[1]

---

[1] There are substantial arguments that the federal claims should be dismissed as well. For example, the Defendants will assert that this action is barred by the Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 187, statutes of limitations, and the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. Given the deference given to Plaintiffs under the liberal pleading standard governing motions to dismiss, however, Local 7 has deferred consideration to a focused Rule 56 motion, which it will file at a later date.

## I.      **INTRODUCTION**

This is a suit brought by Plaintiffs American Steel Erectors, Inc., Ajax Construction Co.,

Inc., American Aerial Services, Inc., Bedford Ironworks, Inc., D.F.M. Industries, Inc., and

Ronald Beauregard d/b/a Independent Welding under the Sherman Antitrust Act, 15 U.S.C. §§ 1,

2 and the LMRA.  Plaintiffs also assert three pendent state claims.  Plaintiffs are non-union

contractors in the steel erection industry.  Plaintiffs seek to recover compensatory damages,

treble damages, punitive damages, attorneys' fees and costs, and injunctive relief from

Defendant because unionized workers assisted their employers in winning bids for construction

projects that Plaintiffs claim they would have otherwise successfully bid.

Three of Plaintiffs' seven claims are state law claims, two of which are brought under the

laws of four different states – Massachusetts, Maine, New Hampshire, and Rhode Island.  These

state claims are (1) Interference with Performance of Contract (Count V), (2) Interference with

Economic Relations (Count VI), and (3) Violation of Mass. G.L. c. 93A (Count VII).  These

claims should be dismissed for lack subject matter jurisdiction on the grounds that they are

preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq., as amended by the

LMRA.  In the alternative, the Court should decline to exercise supplemental jurisdiction over

the state law claims.

## II.     **SUMMARY OF ALLEGED FACTS**

The suit challenges the efforts of Local 7 members in assisting their employers in

winning contract bids in the steel erection industry.  Plaintiffs compete for these contract bids, in

part, by paying employees less than union contractors, thereby creating cost advantages for

Plaintiffs.  In an attempt to "level the playing field" with regard employee wages and benefits,

Local 7 members use some of their dues money for employers who are signatory to collective

bargaining agreements with Local 7 and who are bidding on jobs. Plaintiffs' Complaint, which incorporates all alleged job targeting conduct by reference in each claim, alleges that this action violates the Davis-Bacon Act, federal antitrust laws, federal labor law, and four states' laws. Plaintiffs also allege that other Local 7 conduct, such as "stripping" employees of non-union contractors, applying secondary pressure on other companies, "top-down organizing," picketing, and work stoppages, similarly violates federal antitrust, federal labor law, and four states' laws.

## III.   ARGUMENT

### A.   STANDARD OF REVIEW

In determining whether it has subject matter jurisdiction over the state claims, the Court treats well-pleaded facts in the Complaint as true and takes all reasonable inferences in favor of Plaintiffs. Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994). However, the Court should "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." Royal v. Leader Edge Prods., Inc., 833 F.2d 1, 1 (1st Cir. 1987) (quotations and citation omitted). Plaintiffs, as the party invoking the jurisdiction of the Court, carry the burden of establishing jurisdiction. Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993); Mulvihill v. Spalding Sports Worldwide, Inc., 184 F. Supp. 2d 99, 102 (D. Mass. 2002) (citing O'Toole v. Arlington Trust Co., 681 F.2d 94, 98 (1st Cir. 1982)).

### B.   THREE TYPES OF FEDERAL PREEMPTION DEPRIVE THIS COURT OF JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS.

This Court lacks subject matter jurisdiction over Plaintiffs' state law claims because they are preempted by the NLRA. Three types of preemption come into play in this suit. First, the Plaintiffs claims are preempted because the conduct the Plaintiffs challenge is *actually* protected by the NLRA. In that instance, the claims are preempted by the "direct operation" of the

3

Supremacy Clause.  Brown v. Hotel and Restaurant Employees and Bartenders Int'l Union, 468

U.S. 491, 501 (1984) (discussing NLRA preemption under the Supremacy Clause).  Second,

under the Garmon preemption doctrine, activity that is *arguably* protected or *arguably* prohibited

by Sections 7 or 8 of the NLRA is preempted.  Garmon, 359 U.S. at 245.  The third type of

preemption is the Machinists preemption.  See Machinists v. Wisconsin Employment Relations

Comm'n, 427 U.S. 132, 140, 147-48 (1976))  See also the Machinists preemption doctrine,

"proscribes state regulation and state-law causes of action concerning conduct that Congress

intended to be unregulated, conduct that was to remain a part of the self-help remedies left to the

combatants in labor disputes."  Belknap, Inc. v. Hale, 463 U.S. 491, 498-99 (1983) (summarizing

the preemption doctrines under the NLRA).   Garmon at 245 (citing Machinists, 427 U.S. at 170,

147-48).  All three doctrines apply here.

### 1.     Conduct That is *Actually* Protected is Preempted 'As a Matter of Substantive Right.'

State law claims are preempted when they are based upon conduct that is *actually*

protected by the Section 7 of the NLRA.  The Supreme Court has clearly articulated that states

are prohibited by the Supremacy Clause from regulating conduct that is actually protected by the

NLRA.  Brown, 468 U.S. at 501; Garmon at 244.  In relevant part, the Supremacy Clause

provides that "the laws of the United States which shall be made in [p]ursuance [of the

Constitution] . . . shall be the supreme Law of the Land."  U.S. Const., Art. VI, c. 2.  Thus, if a

state regulates conduct that is actually protected by the NLRA, preemption follows "as a matter

of substantive right."  Brown at 502.  As the Supreme Court in Garmon explained:

> When it is clear or may be fairly assumed that the activities which a State purports
> to regulate are protected by [Section] 7 of the [NLRA], or constitute an unfair
> labor practice under [Section] 8, due regard for the federal enactment requires that
> state jurisdiction must yield.  To leave the States free to regulate conduct so
> plainly within the central aim of federal regulation involves too great a danger of

conflict between power asserted by Congress and requirements imposed by state law.

At 244 (emphasis supplied).  Thus, once it is determined that the conduct is actually protected by the NLRA, no further analysis is required.  Id.

> **2.    Conduct that is *Arguably Protected or Prohibited* is Preempted and Left to the NLRB's Jurisdiction.**

Even if the challenged conduct is not *actually* protected by the NLRA, conduct that is *arguably* protected by the NLRA or *arguably* prohibited by the NLRA is preempted under Garmon.

Under the Garmon preemption doctrine, the NLRA preempts the jurisdiction of state (or federal) courts to regulate conduct that is meant to be regulated by the NLRB.  Garmon, 359 U.S. at 244-45, Chalk Servs., Inc. v. Massachusetts Comm'n Against Discrimination, 70 F.3d 1361, 1361 (1st Cir. 1995), cert. denied, 518 U.S. 1005 (1996).  As the Supreme Court in Garmon explained:

> At times it has not been clear whether the particular activity regulated by the [s]tates was governed by [Section] 7 or [Section] 8 or was, perhaps, outside of both these sections.  But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the [NLRA] that these determinations be left in the first instance to the [NLRB].  What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board.

Garmon at 244-45.[2]  As the First Circuit further explained, "[t]his administrative scheme was designed to avoid the danger of conflicting or incompatible adjudications such as would inevitably result from having multiple forums, with their diverse procedures, entertain claims

---

[2]   While the NLRB is vested to hear and decide claims arising under the NLRA, Congress has vested the federal courts with jurisdiction to hear and decide particular NLRA-based claims, such as secondary boycott damage claims.  See Connell Constr. Co., Inc. v. Plumbers and Steamfitters Local, 421 U.S. 616, 634 (1975) (Section 10(l) of the NLRA provides injunctive relief and Section 303 of the LMRA provides for recovery of actual damages in district courts for unfair labor practices involving secondary activity under Section 8(b)(4) of the NLRA).

under the NLRA."  Chaulk Servs. Inc., 70 F.3d at 1364.

The First Circuit recognizes only three narrow exceptions to the Garmon preemption doctrine where conduct is *arguably protected or prohibited*:  (1) "where Congress has expressly carved out an exception to the NLRB's primary jurisdiction," (2) where "the regulated activity touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction,' courts 'could not infer that Congress had deprived the States of the power to act,'" and (3) where "the regulated activity is merely a peripheral or collateral concern of the labor laws."  Tamburello v. Comm-Tract Corp., 67 F.3d 973, 977 (1st Cir. 1995), cert. denied, 517 U.S. 1222 (1996) (quoting Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters, 436 U.S. 180, 195 (1978)) (citations omitted).[3]  In cases where the underlying conduct is *arguably prohibited* by the NLRA, [t]he critical inquiry . . . is . . . whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not presented to the Labor Board."  Sears, 436 U.S. at 197.  Thus, two elements must be met in order to apply the second, so-called "local interests" exception with respect to *arguably prohibited* activity:  (1) the state must have a significant interest in protecting the public from the challenged conduct, and (2) the controversy which could be presented to the court must differ from that which could have been presented to the NLRB.  Tamburello, 67 F.2d at 980 (citing Sears, 436 U.S. at 196-97); Chaulk at 1366; Fiori v. Truck Drivers Union Local 170, 130 F. Supp. 2d 150, 156 (D. Mass. 2001).  The second and third exceptions essentially require the balancing of "the [s]tate's interest in controlling or remedying the effects of the conduct . . . against both the interference with the [NLRB's] ability to adjudicate controversies committed to it by the Act, and the risk that the [s]tate will sanction conduct that the [NLRA]

---

[3]  Again, none of these exceptions apply where the conduct is actually protected by the NLRA.  Brown, 468 U.S. at 501.

protects."  Belknap, 463 U.S. at 498-99 (citing Farmer v. Carpenters 430 U.S. 290, 297 (1977),

Sears, 436 U.S. at 200).  In Sears, the Supreme Court expressed concern about applying the

Garmon preemption to *arguably protected* conduct where the aggrieved party has not had a

reasonable opportunity to either invoke the NRLB's jurisdiction or induce the party invoking

preemption on protected grounds to do so.  Id. at 201; Local Union No. 12004 v. Massachusetts

Comm'n Against Discrimination, 377 F.3d 64, 80 (2004); Chaulk at 1366 n.4.  However, the

Supreme Court expressly stated that such a failure is not necessarily dispositive of the

preemption question.  Sears at 203 ("[T]he acceptability of the 'arguable protection' as a

justification for preemption in a given class of cases is, at least in part, a function of the strength

of the argument that [Section] 7 does in fact protect the disputed conduct.").

### 3.    Conduct Intended to be Left to the 'Free Play of Economic Forces' is Preempted.

The Machinists preemption doctrine prohibits state and municipal regulation of areas that

have been left by Congress "'to be controlled by the free play of economic forces.'"  Machinists,

supra; see also International Paper Co. v. Town of Jay, 928 F.2d 480, 483 (1st Cir. 1991) ("[T]he

policy of Congress, implicit in the NLRA, [is] to leave certain unregulated self-help weapons in

a labor dispute, such as lockouts, strikes, and the hiring of replacement workers, to the 'free play

of economic forces'") (quoting Machinists, 427 U.S. at 140)).  As the Supreme Court in

Machinists explained:

> that a particular activity might be protected by federal law not only when it fell
> within [Section] 7, but also when it was an activity that Congress intended to be
> unrestricted by any governmental power to regulate because it was among the
> permissible weapons in reserve, . . . actual exercise [of which] on occasion by the
> parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts
> have recognized.

<u>Machinists</u>, 427 U.S. at 141.  The crucial inquiry to be made under the <u>Machinists</u> preemption

doctrine is "[w]hether the exercise of plenary state authority to curtail or entirely prohibit self-

help would frustrate the effective implementation of the [NLRA's] processes."  <u>Golden State</u>

<u>Transit Corp. v. City of Los Angeles</u>, 475 U.S. 608, 615 (1986); <u>see</u> <u>International Paper Co.</u>, 928

F.2d at 483.

 The application of each of these types of federal preemption to the state law claims are

set forth below.

  **C. THE STATE LAW CLAIMS AGAINST DEFENDANT
   ARE PREEMPTED BECAUSE THEY ALLEGE CONDUCT THAT IS
   EITHER ACTUALLY PROTECTED BY THE NLRA, OR ARGUABLY
   PROTECTED OR PROHIBITED BY THE NLRA.**

   **1. Federal Law Fully Preempts State Regulation of the
    Conduct Underlying All of Plaintiffs' State Law Claims.**

 Application of preemption principles requires an identification of the specific categories

of conduct allegedly perpetrated by the Defendants in supposed violation of state law.  The state

counts encompass the full array of Local 7's efforts to secure work for its members, and the

allegations broadly overlap the federal claims.  In pleading their state claims, Plaintiffs simply

incorporate by reference all allegations supporting their federal claims, and then attach

conclusions that state laws were violated.

 In Count V (Interference with Performance of Contract), Plaintiffs reallege the

allegations numbered 1-187 and further allege that "[b]y the above acts and activities

[Defendants]. . . tortiously interfered with the performance of Plaintiffs' contracts," pursuant to

the laws of four states.  Compl. ¶¶ 178, 181.  In Count VI (Interference with Economic

Relations), Plaintiffs reallege the allegations numbered 1-192 and further allege that "[t]he

wanton, intentional conduct, set forth above, of the Defendants, committed without justification

or excuse, has:  a. Intentionally interfered with the economic relations of the Plaintiffs' in their
businesses; b. Intentionally interfered with the economic relations of the Plaintiffs in their
contractual relations," pursuant to the same states' laws.  Compl. ¶¶ 183, 185, <u>see</u> Compl. ¶ 186.
In Count VII (Violation of Mass. G.L. c. 93A), Plaintiffs reallege paragraphs 1-198 and allege
that the acts were willful, that they occurred primarily in Massachusetts and that they were unfair
and/or deceptive under Mass. G.L. c.93A.  Compl. ¶¶189-192.  Even prior to their bulk repetition
as state law claims, review of the 177 paragraphs comprising Plaintiffs' federal claims reveals
that various strands of alleged conduct (such as economic pressure, secondary appeals, job
targeting, threats to picket, and persuasion of higher-tier companies to utilize union subcontracts)
are repeated and cross-referenced in various other catch-all paragraphs regarding other items
among the same categories.  When fully distilled, however, Plaintiffs' Complaint focuses on or
mentions six categories of conduct, which they allege violate the four states' laws:

> (a) Applying secondary pressure on other companies and "top-down organizing"
> (<u>See</u> Compl. ¶ 63);

> (b) Job targeting (<u>See</u> Compl. ¶¶ 46-49, 55, 57, 58b and c, 60, 62, 67-69, 80-96, 99-123,
> 128-146);

> (c) Picketing, threats to picket, "sham" picketing, "wide-spread" picketing, slow downs,
> threats to slow down, work stoppages at worksites of both non-union employers and
> other building trades (<u>See</u> Comp. ¶¶  58a and e, 166 );

> (d) "Stripping" employees (<u>See</u> Compl. ¶¶ 147-153);

> (e) Surveillance and videotaping at jobsites (<u>See</u> Compl. ¶¶ 154); and

> (f) Violence (<u>See</u> Compl. ¶¶ 73, 154).

State regulation of the alleged conduct is fully preempted because the preemption doctrines
apply to *each and every* element of the conduct.[4]  Moreover, although analyzing each segment of

---

[4] The Union recognizes allegations of violence are more heavily scrutinized, but the same result obtains in
this case for reasons described below.

conduct is useful in demonstrating preemption, the main point should not be lost.  That is, the

entire course of conduct alleged has been deemed to be thoroughly regulated by federal law,

including the LMRA, federal antitrust statutes, and even the Davis-Bacon Act.

The application of the preemption doctrine to each category of conduct is addressed

below.

        a.      <u>Secondary Boycotts, Pressing Non-Local 7 Companies to Utilize</u>
                  <u>Local 7 Contractors, and "Top-Down Organizing"</u>

The most prominent threads woven throughout the Complaint are allegations that the

Union obtained work for its members by pressuring "secondary" or "neutral" companies and

then obtaining "agreements" for companies to retain subcontractors who employ Local 7

members, rather than retaining the Plaintiffs (who are Local 7's "primary" disputants).[5]  That is,

accepting all allegations as true, the Union approached companies with which it had no contract,

job by job, and persuaded them to use contractors who employ its members.  The Union

persuaded these secondaries using both "pressure" tactics (such as threatened picketing or

withholding of targeting subsidies) and incentives, such as targeting subsidies.  These allegations

about secondary tactics overlap broadly with all the other alleged categories of Union conduct

(such as job targeting overtures involving secondary parties, and threats of picketing involving

secondary parties).

Overall, Plaintiffs characterize most of the Union's efforts to secure work as supposedly

illicit "top-down organizing," that is, organizing by persuading general contractors to hire union

subcontractors, rather than pursuing NLRB elections among the primary's employees.  The

election process is more common outside the construction industry.  Governing federal law,

---

[5] In labor law terms, the Plaintiffs are in many circumstances the "primary" employers, because the Union quarrels with their wage and benefit levels and working conditions.  Other companies are "secondary" because they may be deemed "neutral".

however, simply does not deem "top-down organizing" either unlawful or improper. Congress specifically permitted "top-down organizing" in the construction industry. Woelke & Romero Framing v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . . pressure is implicit in the construction industry proviso" to Section 8(e) of the NLRA).[6] Congress permitted "top-down organizing" the construction industry because it recognized that organizing on multiple, short-term job sites with multiple subcontractors would be impossible otherwise.

In keeping with the general prevalence of "top down organizing," it became clear within a few years of the 1959 amendments that the NLRA allows unions to direct a wide variety of appeals at secondary companies, and even pressures. It is an intricate roadmap of prohibited and protected conduct, and a federal one. For example, the NLRA does not prevent a union in a dispute with a "primary employer" from overtly pressing managers of secondary companies to cease doing business with the primary, as long as the union does not invite a work stoppage among the secondary's employees or engage in other conduct that qualifies as "coercion or restraint" under subsection 8(b)(4)(i) or (ii) of the Act. NLRB v. Servette, Inc., 377 U.S. 46 (1964). The federal scheme also allows a union to use pressure tactics that include consumer boycotts and extremely harsh publicity directed against secondary employers, with an overtly "cease doing business purpose," because such types of non-picketing, non-strike activity are deemed outside the scope of § 8(b)(4)(i) or (ii) "restraint or coercion." DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council, 485 U.S. 568 (1988). In the aftermath of Servette and DeBartolo, appellate courts have carefully delineated how these federal standards apply to a broad range of appeals and pressure tactics directed at secondary companies. See,

---

[6] In Woelke, the Supreme Court acknowledged it might be true, as petitioning employers pointed out in their unsuccessful claim, that the use of union signatory subcontracting clauses might "give a particular union a monopoly position in a labor market," but that did not render unlawful this element of a union's "top down organizing" efforts. Id. at n.15.

e.g., Storer Communications, Inc. v. National Assoc. of Broadcast Employees and Technicians, 854 F.2d 144 (6th Cir. 1988) (Section 8(b)(4)(B) did not prohibit phone calls and visits to secondary advertisers threatening to handbill for consumer boycotts of the advertisers, followed by actual handbilling, to pressure the advertisers to cease dealing with the primary employer).

Local 7 reserves claims that its contact with secondary employers were made without engaging in any variety of Section 8(b)(4)(i) or (ii) conduct and the outreaches were "actually protected" by the NLRA. These would include, for example, any picketing directed at primary employers, or "threats" of DeBartolo–type publicity directed at secondaries (but without picketing or strikes). The Court need not reach the "actually protected" issue if it finds the broad collection of "secondary contacts" with "Non-Labor parties" are preempted based on the "arguably prohibited" prong of Garmon or other bases.

Under Garmon standards it is also clear that all Plaintiffs allegations concerning Local 7's outreach to secondary parties, fall within the category of "conduct arguably prohibited" by the NLRA, given that Plaintiffs themselves reallege the entire array of secondary contact allegations in their Count IV, claiming the full array of conduct violates federal secondary boycott prohibitions.[7]  Whether or not they prevail on that Section 303 LMRA claim, they cannot litigate under parallel state law what amounts to the same controversy, regarding the outreach to secondary parties, whether the claims are packaged as state antitrust law, common law or "unfair practices."

As for antitrust law, the Supreme Court made clear in Connell Constr. Co. v. Plumbers and Steamfitters, 421 U.S. 616, 636-37 (1975) that such claims are fully preempted when asserted in labor-connected disputes:

--------------------------------------------------

> In this area, the accommodation between federal labor and antitrust policy is delicate . . . . Because employee organization is central to federal labor policy and regulation of organizational procedures is comprehensive, federal law does not admit the use of state antitrust law to regulate union activity that is closely related to organizational goals.

Id. at 636-37.[8] Because "the governing factor is the risk of conflict with the NLRA or federal labor policy" (Id. at 637), the same preemption result obtained when state common law, rather than antitrust law, was asserted by an employer to recover damages for lost contracts, after the union engaged in picketing that on some occasions violated the NLRA's secondary boycott prohibitions, and on some occasions did not, but on all occasions appeared to violate state common law.  Teamsters Local 20 v. Morton, 377 U.S. 252 (1964). Given the intricate ground rules of Sections 8(b)(4) and 8(e), the disputes in that case regarding Local 20's secondary conduct (including the *unlawful* secondary picketing) gave rise to complete preemption of state claims:

> It is the respondent's contention, however, that since the petitioner union's peaceful conduct was neither arguably protected under [Section] 7 nor arguably prohibited under [Section] 8 of the National Labor Relations Act, as amended, the trial court was free to award damages on the basis of state law for injuries caused by this conduct. But even though it may be assumed that at least some of the secondary activity here involved was neither protected nor prohibited, it is still necessary to determine whether by enacting [Section]303, 'Congress occupied this field and closed it to state regulation.

Id. at 258.  The plaintiffs could not press state claims for secondary conduct the NLRA did not prohibit, nor add state law remedies for conduct that might violate both state and federal law.[9]

---

[8] Connell found federal antitrust and secondary boycott violations because the union had pressured a secondary company to sign a written, across-the-board commitment that it would never deal with non-union contractors, and the Court focused on the fact that the company's general commitment was "not restricted to a particular jobsite."  Id at 635.

[9] In dismissing even the federal claims on matters not involving work stoppages, but admittedly involving outreach to a secondary ("neutral") employer, the Court noted:

On the same basis, Plaintiffs in this case cannot press state claims for the broad array of secondary pressures the Union allegedly used to obtain work for unionized contractors.

Whatever the intricate ground rules that comprise NLRA secondary boycott law (including some intersection with federal antitrust law), it is clear that entire body of law is secondary boycott law is reserved by Congress as federally regulated.

b.    Job Targeting

Plaintiffs' state claims based on Defendants' use of a job targeting program are preempted by direct operation of the Supremacy Clause because such conduct is actually protected by the NLRA.  In the alternative, the conduct is at least arguably protected by the NLRA; Machinists preemption applies as well.

The NLRB has unequivocally held that utilization of job targeting programs is actually protected activity under Section 7 of the NLRA.  Manno Elec., Inc., 321 NLRB 278, 278, 298 (1996), enf'd per curiam mem. 127 F.3d 34 (5th Cir. 1997).  Manno involved a non-union contractor that initiated a lawsuit in state court under state prevailing wage and anti-kickback claims against a union contractor for accepting job targeting funds.  Id. at 285.  In Manno, the NLRB upheld an administrative law judge's ("ALJ's") finding that the use of job targeting programs is protected activity under Section 7 of the NLRA.  321 NLRB at 278, 298.  The ALJ found that "[t]he objectives of the 'job targeting program' are to protect employees' jobs and

---

In this case, the petitioner's request to Launder's management to cease doing business with the respondent was not proscribed by the Act. '(A) union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.'  Local 1976, United Brotherhood of Carpenters, etc. v. National Labor Relations Board, supra, 357 U.S. at 99, 78 S.Ct. at 1016.  This weapon of self-help, permitted by federal law, formed an integral part of the petitioner's effort to achieve its bargaining goals during negotiations with the respondent.

Id. at 259.

wage scales.  These objectives are protected by Section 7."  Id. at 298.  Accordingly, it was held that state lawsuits that attack such programs are preempted.  Id. at 278, 298.

The Supreme Court of Ohio in J.A. Croson Co. v. J.A. Guy, Inc., relied on the NLRB's holding in Manno in finding Ohio's prevailing wage statutes and regulation were preempted by the NLRA to the extent that they interfered with the federally protected use of job targeting programs.  691 N.E.2d 355, 355 (Ohio 1998), cert. denied, 525 U.S. 871 (1998).  As the court explained, "[b]ecause the NLRB has held that job targeting is actually protected by the NLRA, there is no room for state regulation infringing that conduct."  Id. at 355 (citing Associated Builders & Contractors) (emphasis in original).

The NLRB in Associated Builders and Contractors, Inc., Golden Gate Chapter applied Manno in affirming the ALJ's decision that a state lawsuit aimed at prohibiting job targeting programs on state public works projects was actually protected and preempted.  331 NLRB 132, 132 n.1, 137 (2000), modified in non-relevant part, 333 NLRB 955 (2001).  Associated Builders and Contractors concerned an employer that operated a trade association comprised of non-union employers that brought a state lawsuit against union locals representing employees in the electrical trade, claiming that locals' job targeting program was an "unlawful, unfair and fraudulent business act or practice" in violation of the California Business & Professions Code. Id. at 133 n.1.  In adopting the ALJ's findings, the NLRB held that the employer's "maintenance of its lawsuit constitutes an interference with conduct that is actually protected by [Section] 7." Id.

Thus, in accordance to well-established NLRB law, the job targeting conduct about which Plaintiffs complain is actually protected under the NLRA and therefore preempted by direct operation of the Supremacy Clause.  No further analysis should be required.  To the extent,

however, that Plaintiffs have generally alleged that the job targeting here involves Davis-Bacon projects (see Compl. ¶¶ 55, 58(c)) in a manner that would affect the NLRB's view of "protectedness," the alleged job targeting conduct is at least "arguably protected" under the NLRA, bringing the Garmon preemption into play.

Citing Manno and Associated Builders and Contractors, the NLRB in Can-Am Plumbing, Inc. once again affirmed an ALJ's finding that a union's use of a job targeting program was actually protected and preempted by Section 7 of the NLRA.  335 NLRB 1217, 1217 (2001).  In Can-Am, a non-union employer filed a state lawsuit claiming that a union employer violated state laws regarding unfair trade practices, prevailing wage levels, and employer kickbacks relating to a union's job targeting program.  Id. at 1219; see also Can-Am Plumbing, Inc. v. N.L.R.B., 321 F.3d 145, 147 (D.C. Cir. 2003).  Can-Am alleged that the non-union employer's lower bid on a private construction project resulted from an illegal arrangement between the non-union employer and a union whereby the non-union employer received job targeting funds from the union for the project.  Can-Am, 335 NLRB at 1219.  The union, in turn, filed an NLRB charge against Can-Am, claiming that Can-Am's state lawsuit violated Section 8(a)(1) of the NLRA, in part, because the state claims were preempted by the NLRA.  Id.  The NLRB affirmed the ALJ's finding of preemption despite the fact that 2-3 percent of the job targeting funds came from federal or state prevailing wage jobs, concluding, in part, that the amount was de minimis. Can-Am Plumbing, 321 F.3d at 153.  The NLRB noted that its "recent holding in Kingston Constructors, 332 NLRB 1492 (2000) that unions may not lawfully exact dues from employees working on Davis-Bacon projects to support job targeting programs, does not require a different result."  Id.  Accordingly, it held that Can-Am violated the NLRA by bringing a preempted claim attempting to stop the union's (protected) job targeting.  Id.

16

The D.C. Circuit Court of Appeals reviewed of the NLRB's <u>Can-Am</u> decision in <u>Can-Am Plumbing, Inc. v. N.L.R.B.</u>, 321 F.3d 145, 147 (D.C. Cir. 2003), and criticized the NLRB's failure to explain its conclusion regarding the member funds derived from Davis-Bacon projects. In relevant part, the D.C. Circuit in <u>Can-Am</u> questioned the NLRB's failure to explain why the <u>de minimis</u> amount of Davis-Bacon monies in the job targeting program was insufficient to preclude preemption. <u>Id.</u> at 153. As the D.C. Circuit explained, "[w]hile the Board then did not treat the existence of such moneys in the [job targeting program] as wholly irrelevant, neither did it explain why the Davis-Bacon moneys did not affect the JTP's legality or why the [u]nion's conduct in that regard was excusable." <u>Id.</u> Accordingly, the D.C. Circuit reversed the NLRB decision and remanded the case to the NLRB, directing the NLRB to justify its holding.[10] <u>Id.</u> at 153-54. In so doing, the D.C. Circuit stated that "the Board on review may yet determine that the [job targeting program] is protected under [S]ection 7." <u>Id.</u> at 154. With this holding, the D.C. Circuit did not foreclose the possibility that Davis-Bacon money legally can go into a job targeting project. The D.C. Circuit also notably left it to the jurisdiction of the NLRB to determine just how much Davis-Bacon money could go into the program and remain protected so long as it justified its decision. Thus, following the D.C. Circuit's holding, any alleged job targeting conduct here that purportedly involves Davis-Bacon monies is at least arguably protected by the NLRA.

Viewing the Complaint in the light most favorable to Plaintiffs, the job targeting conduct is arguably prohibited as well. Plaintiffs expressly make this claim in Paragraph 142 and Count IV (Violation of LMRA) of their Complaint. <u>See</u> Compl. ¶¶ 142, 175-77. Realleging all of the conduct in the Complaint, including job targeting conduct, Plaintiffs claim that Defendant

_____

[10] To the Defendant's knowledge, the NLRB has accepted this case on remand and, as of the date of this filing, has not yet decided the case.

violated Section 8(B)(4)(ii)(A) & (B) of the NLRA "by engaging in threats of picketing and other restraint and coercion against Plaintiffs and against other contractors to obtain agreements prohibited by [Section] 8(e) of the Labor Act, 29 U.S.C. § 158(e)[.]"  Compl. ¶¶ 175, 177. Moreover, the job targeting conduct alleged by Plaintiffs, which they claim violates the NLRA, is the same conduct upon which they state claims are predicated, precluding Plaintiffs from successfully invoking Garmon's "local interests" exception.  In addition, courts regularly hold that state claims like those involved in this case are preempted where, as here, the alleged conduct arguably violates Section 8(b)(4) or Section 8(e) of the NLRA.  See Connell, 421 U.S. at 635-37 (holding that state antitrust claims arising out of a labor dispute are preempted); Intercity Maintenance Co. v. Local 254, Serv. Employees Int'l Union, AFL-CIO, 241 F.3d 82, 89 (1st Cir. 2001), cert. denied 534 U.S. 818 (2001) (holding that "[s]tate tort claims are generally preempted by the LMRA").  The Garmon exceptions do not apply.  See Tamburello at 977.

c.     Various Types of Picketing, Work Stoppages, Slow Downs

Plaintiffs make a cornucopia of picketing (i.e., actual picketing, threats to picket, "sham" picketing, "wide-spread" picketing) and work stoppage (actual work stoppage, slow down, threat to slow down) allegations the resolution of which Congress clearly intended to be left to the province of the NLRB.

Plaintiffs' picketing and work stoppage allegations concern Defendant's supposed conduct at various project sites of secondary employers.  Plaintiffs have incorporated these allegations into their Section 303 claim.  The allegations are therefore arguably prohibited by the NLRA.  Work stoppage activity at a secondary employer, for example, is garden variety Section 8(b)(4)(i) activity, 29 U.S.C. § 158(b)(4)(i).  The same can be said for slow downs or threats of slow down.  Picketing activity, including wide-spread picketing, at a secondary employer can be

either garden variety Section 8(b)(4)(i) activity, to the extent that Plaintiffs' are claiming this activity is associated with a work stoppage, or Section 8(b)(4)(ii) activity.  Furthermore Plaintiffs' allegations of "sham" picketing appear to be nothing more that a threat to picket, which, at worst, is treated no differently than picketing and is therefore also arguably prohibited activity.  See Pye v. Teamsters Local Union No. 122, 61 F.3d 1013, 1024 (1st Cir. 1995) (a wide variety of activity falls within the "conceptual ambit" of Section 8(b)(4)(ii)).  Moreover, the controversy regarding the alleged picketing and work stoppage violations that would be presented to the Court would be no different from what would be presented to the NLRB; accordingly, the Garmon "local interests" exception would not be implicated.  It is incontrovertible that such secondary activity is not "merely a peripheral concern of labor laws." Tamburello at 977.

Courts have consistently held that such secondary picketing activity is within the purview of the NLRA and, thus, Garmon preempted.  See e.g., Garmon at 245-46 (state law claims for injunctive relief and damages alleging arguably protected or prohibited picketing were preempted because of the "danger of state interference with national policy"); Hattiesburg Bldg. and Trades Council v. Broome, 377 U.S. 126, 127 (1964) (holding that state court had no jurisdiction to issue an injunction against picketing at secondary employer, which was arguably an unfair labor practice under the NLRA); Cranshaw Constr. of New England, L.P. v. International Ass'n of Bridge, Structural and Ornamental Ironworkers, AFL-CIO, Local No. 7, 891 F. Supp. 666, 675 (D. Mass. 1985) (state law claims involving non-violent picketing were preempted where the conduct was arguably prohibited by Section 8(b)(4)(i)-(ii)).[11]  The Garmon exceptions do not apply.  See Tamburello at 977.

---

[11]  In Cranshaw, the court did not, however, preempt a state trespass claim seeking remedy for property damage and two assault and battery claims (stemming from two separate spitting incidents).  891 F. Supp. at 675;

d.     "Stripping"

Plaintiffs allege that Local 7 "induced" employees of nonunion contractors to take jobs with Local 7 contractors, a practice referred to as "stripping." See Compl. ¶ 147. "Stripping" concerns arguably protected or prohibited activity and is preempted.

Assisting employees in joining a labor organization is at least arguably, if not actually, protected by Section 7 of the NLRA. In pertinent part, Section 7 of the NLRA provides employees "the right to self-organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. Thus, to the extent that Plaintiffs allege that Local 7 has encouraged individuals to work for Union companies, the Union's conduct is protected. To the extent that "stripping" allegations mean that employees stopped working for Plaintiffs, this conduct is arguably protected by Section 7 of the NLRA as well. The law is clear that employees cannot be discriminated against by their current employers for engaging in union activity or by their future employers for their prior union activities. Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), makes it "an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" See N.L.R.B. v. Transportation Mgmt. Corp., 462 U.S. 393 (1983) (an employer violates Section 8(a)(3) if it discharges employees because of their union activity); Town and Country Elec., Inc. v. N.L.R.B., 106 F.3d 816 (1997) (an employer violates Section 8(a)(3) of the NLRA if it

see also discussion of violence generally, infra. The Cranshaw court was clear that it was applying state law in order to remedy the damage caused by the violent acts. Id. Cranshaw, while involving Local 7, is factually distinct from the instant case. In Cranshaw, the events underlying the lawsuit took place over ten (10) years ago during a week-long secondary protest. This case involves conduct spanning a 4-9 year period, with just one conclusory allegation (Paragraph 73) of threats of violence and damage to property. Unlike Cranshaw, the case at bar involves predominantly federal antitrust and labor law issues, while Cranshaw concerned only Section 303 secondary boycott damages and state claims related to the same underlying conduct.

discriminatorily refuses to consider for hire or refuse to hire applicants because of prior union activities).

Plaintiffs themselves assert, by apparently making stripping a part of their Section 303 claim, that the stripping alleged here is arguably prohibited by Section 8(b)(4) of the NLRA. See Compl. ¶¶ 175-77. Limbach v. Sheet Metal Workers, 949 F. 2d 1241 (3d Cir. 1991) (discussing circumstances where inducing employees to quit violates §8(b)(4)). The Plaintiffs also suggest that stripping is coercive. International Bhd. of Electrical Workers, Local 48, AFL-CIO, 2004 WL 1447745, at 6 (NLRB June 23, 2004) (discussing whether preferential job referrals violate Section 8(b)). While the Union disagrees with this characterization, the fact remains that choosing whether to join a union and choosing whether to work for a nonunion employer go to the heart of Section 7. Given that the controversy surrounding stripping in the underlying state claim would be no different than that that would be presented to the NLRB or in the Section 303 claim, Plaintiffs cannot rightly claim Garmon "local interests" exception.

### e.   Surveillance and Videotaping Jobsites

Plaintiffs allege in one paragraph that the Union has repeatedly stationed observers with cameras and video recorders at jobsites in order to induce secondary employers to cease doing business with Plaintiffs and then "used this practice to initiate sham complaints to federal and state administrative authorities." Compl. ¶ 154.

At the outset, the conduct is preempted under Garmon because it is arguably prohibited by the secondary boycott provisions of the LMRA. This is clear both on the face of Complaint Paragraph 154, which styles the surveillance as conduct aimed at pressuring secondaries, as well as in Count IV, which repeats and incorporates this paragraph into the broad conclusions claiming Section 8(b)(4) violations. This claim therefore falls under the same preemption

analysis set forth in Section "a" above regarding the generalized and broad based allegations of secondary conduct.

The preemption result is even clearer for this particular category of secondary tactics. These alleged state law transgressions not only *could be* adjudicated as federal claims (and certainly *will be* in Count IV); recent history reveals that one example of this controversy already *has been* resolved at the National Labor Relations Board. Plaintiff Ajax Construction brought its claims about surveillance and jobsite videotaping to the Board in early 2004. The Union asks the Court to take judicial notice of three documents docketed in NLRB Case No. 1-CB-10239, and appended hereto as Attachment A under the cover certification of the NLRB's Regional Director for its First Region.

In January 2004 Plaintiff Ajax filed an unfair labor practice charge alleging that Local 7 and its agents had been violating Section 8(b)(1)(A) of the LMRA by coercing and restraining Ajax employees, since December 8, 2003, in manner not specified on the face of the Charge. The NLRB's Regional Director issued a letter on April 29, 2004 declaring that the Charge had been carefully investigated and was being dismissed in its entirety. The dismissal letter stated:

> Your charge alleges that the Union restrained and coerced employees of Ajax Construction Co., Inc. by videotaping Ajax employees and their automobile license plates while they were working at the Derby shops jobsite in Hingham, Massachusetts. The investigation, however, did not reveal evidence sufficient to establish that the Union's conduct violated Section 8(b)(1)(A) of the Act. Rather, it appears from the investigation that the Union was engaged in this videotaping in order to monitor a reserved gate system that had been established at the jobsite because of a labor dispute, and which it asserts had, on occasion, not been honored, as well as to document any safety issues it might have observed involving the Employer, and to determine whether any of its members employed on the jobsite were failing to adhere to the Union's constitution and by-laws. Moreover, the investigation indicated that the videotaping was unaccompanied by any other actions that could reasonably have caused employees to believe that the Union would act adversely towards them or their employment. The Board has held that the photographing of employees and the recording of license plate

numbers is not, by itself, violative of Section 8(b)(1)(A) of the Act.  <u>Interstate Cigar Co.</u>, 256 NLRB 496, 500-501 (1981).

Plaintiff then appealed to the Office of the General Counsel of the Board.  By letter of July 19, 2004, appended hereto, the General Counsel's office rejected the Appeal.  That ended the NLRB matter.

The Supreme Court has confirmed that <u>Garmon</u> preemption claims are particularly persuasive when disputes have been subject to prior NLRB proceedings, including General Counsel investigations and decisions to dismiss charges.

> Despite the Regional Director's determination, and the Board's undoubted jurisdiction to decide the issue had a complaint issued, [Charging Party] Jones sought to relitigate the question in the state courts. The risk of interference with the Board's jurisdiction is thus obvious and substantial.

<u>Local 926, International Union of Operating Engineers v. Jones</u>, 460 U.S. 669, 683 (1983).

Plaintiffs may argue that they brought some of their controversy to the Board regarding surveillance (and videotaping for sham complaints), but other episodes affecting other Plaintiffs could be and should be adjudicated in this case.  First, of course, they still may be, but under the umbrella of the four federal counts, particularly their own LMRA Count.  Second, the past visit to the NLRB is compelling in showing Plaintiffs have the *ability* to bring to the NLRB any such repeat conduct.  On this point the Union claims preemption of this "surveillance-sham complaint" allegation under both the "arguably prohibited" prong of <u>Garmon</u> and the "actually" and "arguably protected" standards as well. That is, the Regional Director's dismissal letter reveals not only reasons why Plaintiff's debatable violations were rejected but also suggests the precise reasons why the Union's conduct is protected union activity.  <u>See</u> <u>Courmier v. Simplex Technologies</u>, 1999 WL 28120 (D. N.H. 1999) (monitoring safety and registering safety complaints is concerted protected activity).  In this type of situation, the employer-plaintiff

claiming a right to present a state law claim in federal court must show why the plaintiff does *not* have "a reasonable opportunity either to invoke the NLRB's jurisdiction itself or to induce his adversary to do so." Sears, supra, at 202-03. Here, of course, the 2004 NLRB case demonstrates not only that one round of the surveillance controversy was actually processed at the Board, but also that Plaintiffs had the clear *opportunity* to bring this controversy to the Board. If they failed to do so, it may be because they would be concerned the results will be equally disappointing to them, at the federal agency charged with enforcing uniform federal standards.

Based on these principles, federal courts have rejected claims that "only one of the incidents" now alleged as a state claim was actually resolved at the NLRB, if it seems likely that other incidents could have been brought there, even incidents of a slightly different quality. Courmier v. Simplex Technologies, Inc., supra (preemption of all state claims where plaintiff had already filed a charge at the NLRB).

f.    Violence

Plaintiffs do not assert a separate state law claim alleging violence or destructive acts. Compare Cranshaw, supra. Instead, Plaintiffs allege isolated and conclusory allegations of violence in support of their contract and Section 93A claims. These allegations are preempted under Garmon.

Even if this Court were to find that they are not preempted, it should exercise its discretion and to decline pendent jurisdiction of Plaintiffs' state claims. These isolated allegations fail to meet federal standards requiring specificity of proof of union approval or acquiescence.  Moreover, the peculiar right of the states to provide compensate for violent conduct must be balanced against considerations of comity, fairness, and the likelihood of juror confusion.

24

Here, Plaintiffs make only one allegation of actual violence and threats of physical harm. See Compl. ¶ 73 ("On June 12, 2003 [Edwin] Wright went to the job site and disrupted the job by making threatening statements to Plaintiff's [D.F.M. Industries'] employees and supervisors of physical harm. D.F.M. Industries' equipment on the jobsite was damaged.").[12] This lone allegation concerned one plaintiff and one project, on just one day in a Complaint that concerns six plaintiffs, three defendants, twelve (12) co-conspirators, twenty-nine (29) projects, and a time span of at least 4-9 years. Otherwise, Plaintiffs generally allege without any factual support that "[o]n these jobsites named above, Local 7 and its coconspirators have induced secondary picketing, threats to person and property, the destruction of property[.]" See Compl. ¶ 155. There is no allegation anywhere in the Complaint that the Union ratified, condoned, or authorized any of the conduct alleged

Alleged threats of physical harm are arguably prohibited by Section 8(b)(1)(A) of the NLRA. See Local Union No. 12004, 377 F.3d at 79 (citing N.L.R.B. v. Union Nacional de Trabajadores, 540 F.2d 1, 6-7 (1st Cir. 1976)). Moreover, alleged damage to property is arguably prohibited by Section 8(b)(4) of the NLRA. Accordingly, Garmon preemption is implicated.

It is well-settled law that in order to sidestep the Garmon preemption under the "local interests" exception, only "conduct marked by violence and imminent threats to the public order" is sufficient. Garmon at 247 (emphasis supplied) ("compelling state interest in the maintenance of domestic peace"). There is no indication from the face of the Complaint that the threats of physical harm were "imminent." In fact, the allegations are fairly stale. The only remaining allegation is of property destruction by unknown and unnamed individuals contained in

---

[12] This allegation is not directed at any conduct by Defendant Charles Wright.

Paragraph 73 of the Complaint.  Neither of these allegations suffices as a matter of pleading,

since there is no allegation that the Union actually authorized, condoned or ratified the conduct.

See Cranshaw, supra at 675 (finding that Local 7 was not liable for the unlawful acts of officers

or members, absent demonstration of "clear proof" of actual authorization or actual ratification).

See also discussion, below, regarding pendant jurisdiction.

>    **C.    THE COURT SHOULD DECLINE TO EXERCISE
>           SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS'
>           STATE LAW CLAIMS.**

If the court finds that the state law claims are preempted, it need not reach the issue of

supplemental jurisdiction.  In the Union's view, the only factual allegations which could

arguably be subject to state regulation are those pertaining to threats or destruction of property.

This Court has discretion to dismiss them nonetheless

Plaintiffs anchor their state law claims on 28 U.S.C. §1367.  "Supplemental jurisdiction"

is the currently fashionable term, embraced by Congress in drafting 28 U.S.C. § 1367, that now

blankets both "pendent jurisdiction" and its close relative, "ancillary jurisdiction."  Rodriguez v.

Doral Mortg. Corp.  57 F.3d 1168, 1175 (1st Cir. 1995).  In enacting section 1367, Congress

essentially codified the rationale articulated in United Mine Workers v. Gibbs, 383 U.S. 715

(1966).  Id.

In Gibbs the plaintiff, as here, asserted a federal labor claim under 29 U.S.C. §303 and

state law claims for interference with contract and interference with economic relations.  The

U.S. District Court for the Eastern District of Tennessee took jurisdiction over the §303 claim

and asserted pendent jurisdiction over the state claims.  Plaintiff Gibbs also demanded a jury on

all counts.  The evidence showed a labor dispute, a nine month picket line and acts of violence

on the first two days of the picket line.  The jury awarded damages on the state claim but not the

federal claim.  Judgment entered on the jury verdict and the Sixth Circuit affirmed.  The

Supreme Court reversed.

To be sure, the Supreme Court recognized that when state and federal claims derive from

a common nucleus of fact and when the federal claim is substantial "there is power in federal

courts to hear the whole".  383 U.S. at 725.[13]  The Court made clear however that "pendent

jurisdiction is a doctrine of discretion, not of plaintiff's right."  Id. at 726.  The justification for

pendent jurisdiction lies in considerations of judicial economy, convenience and fairness to the

litigants.  Importantly, for our purposes, the Court noted:

> Finally, there may be reasons independent of jurisdictional considerations,
> such as the likelihood of jury confusion in treating divergent legal theories
> of relief, that would justify separating state and federal claims for trial . . . .
> If so, jurisdiction should be refused.

Id. at 727 (emphasis supplied).

The only reason the state claim, in Gibbs, was not preempted was because plaintiff

alleged injury as a consequence of violence.  The Court recognized the "right of States to deal

with violence and threats of violence appearing in labor disputes" but at the same time agreed

that the permissible scope of state remedies is "strictly confined to the direct consequences of

such conduct, and does not include consequences resulting from associated peaceful picketing or

other union activity."  Id. at 729.

To demonstrate the thin reed on which plaintiffs base their state law claims one need only

review their forty-nine (49)-page, one-hundred-ninety-two (192)-paragraph Complaint.  The

single allegation of anything approaching violent conduct is contained in Paragraph 73:

---

[13] The Court's ultimate resolution of the pendent jurisdiction question left the matter to the District Court.
"We thus conclude that although it may be that the District Court might, in its sound discretion, have dismissed the
state claim, the circumstances show no error in refusing to do so."  Gibbs, 383 U.S. at 729.

On June 19, 2003, Wright went to the job site and disrupted the job by making threatening statements to Plaintiff's[14] employees and supervisors of physical harm. D.F.M. Industries' equipment on the jobsite was damaged.

Six plaintiffs have joined together to amass all the projects they claim to have lost as a consequence of Local 7's "market power" and one of them directly alleges a threat of physical harm by a Local 7 agent and damage to property. This comparatively insignificant allegation apparently supports the following conclusory allegation of state law harm:

186. As a direct and proximate result of the foregoing illegal conduct, including violence, threats, coercion, and destruction of property engaged in by the Defendants, Plaintiffs have been and continue to be injured in their business and property in substantial amounts not yet ascertained with particularity . . .

In addition Plaintiffs' generalized allegations of intimidation, threats of harm and destruction of property undergird their prayer for injunctive relief. This relief, unavailable under the Norris LaGuardia Act, see 29 U.S.C. §101 et seq., apparently rests on the equitable relief provision of Mass. G.L. c. 93A §11.

The statute, 28 U.S.C. §1367(a), requires that the state claims be "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Here plaintiffs look for the best of both worlds. They seek to escape preemption by asserting narrow allegations of violence in the context of a large federal case in which the evidence relating to this aspect of the state claim will be minimal in relation to the evidence on the federal claims. As important as the states' interest in policing violent conduct undoubtedly is, this case involves other interests, peculiarly and substantially federal, so as to render the state claims unrelated to the federal claims. Title 28, Section 1367(a) of the United States Code does not require the court to exercise supplemental jurisdiction over these state claims. Gibbs.

---

[14] Here, the allegation clearly refers to D.F.M. Industries.

Even if the Court finds the allegations of violence associated with the state law claims are sufficiently related under Section 1367(a), it should decline plaintiffs' invitation to exercise supplemental jurisdiction over the three state law claims.  Gibbs at 725.  The narrow claims over which the State could arguably retain a right to provide relief are, on the face of this Complaint, so separate and distinguishable from the overwhelming federal claims that the exercise of supplemental jurisdiction will be both inefficient and unfair.  Precisely because the federal labor and antitrust questions presented by this case are so important to Defendant Local 7, it should not be called upon to defend three state law claims under the laws of four separate states particularly where, as here, only a single allegation in a voluminous complaint can conceivably be relied on to support any state interest so "deeply rooted in local feeling and responsibility" as to warrant deference to state sovereignty.

District Courts are afforded "broad discretion" when making decisions regarding supplemental jurisdiction.  Che v. MBTA, 342 F.3d 31, 37 (1st Cir. 2003).  The totality of the circumstances, including such issues as "comity, judicial economy, convenience, fairness and the like" must be examined.  Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir.1996).  Not only will generalized allegations of conspiracy and violence confuse the jury and prejudice the Defendants, see Gibbs at 733-35, but the standard of proof for state law liability under Section 6 of Norris LaGuardia differs significantly from the agency standard that applies to the Section 303 claim.[15]  See Cranshaw, supra (entering judgment for union in state law claim

---

[15]  "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. §106. The purpose and effect of this provision was to "relieve organizations * * * and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member * * * actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration." Carpenters v. United States, 330 U.S. 395, 403 (1947).  This heightened standard of proof of responsibility applies to the state law claims but not

upon application of Norris LaGuardia Standard).  There are compelling reasons of comity, fairness and judicial economy to decline to exercise supplemental jurisdiction over a state law claim (or claims) for damage resulting from violent acts to persons or property of one (or more) plaintiffs in a lawsuit arising under federal labor and antitrust law.[16]  The Court should decline supplemental jurisdiction under 28 U.S.C. §1367(d).

### D.     MACHINISTS PREEMPTION FORECLOSES CLAIMS REGARDING 'STRIPPING' AND JOB TARGETING

In the alternative, conduct which is not protected and not prohibited is left to the "economic warfare" of the parties.  Machinists, supra.  Plaintiffs may claim some particular quality of Local 7's job targeting or "stripping" activity is unprotected.  See NLRB v. Interstate Builders, 351 F.3d 1020 (10th Cir. 2003) (discussing, in dicta, whether inducing employees to quit is unprotected).  Even if that were persuasive, state law would not fill the void.  The free play of economic forces must be permitted.  Machinists, (unprotected partial strike not subject to state regulation). Stripping, for example, if not actually protected, would be closely akin to withholding labor in a strike, and that has been subject to Machinists preemption even when the strike is somehow illicit and loses its Section 7 protection.  Similarly, even if job targeting loses its protected stakes for some reason, see Can Am, supra, the Union's use of dues to support Union employers still exists as an "economic weapon" for use by the Union amidst the free play of economic forces.

---

to the Section 303 claim.  Gibbs at 736 ("Plainly, [Section] 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under [Section] 303 to which the section does not apply").

[16] Defendant Local 7 does not contend that allegations of violence may not be introduced in support of the federal claims.  Rather recovery under state law is preempted.  If it is not, then state law claims should be had in a proceeding separate from this one.

IV.    **CONCLUSION**

For the foregoing reasons, Defendant Local 7 respectfully requests that Counts V-VII of the Complaint be dismissed with prejudice.

Respectfully submitted,

LOCAL UNION NO. 7,
INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly (BBO #267000)
Burton E. Rosenthal (BBO #429220)
Stephanie R. Pratt (BBO #6551058)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208

/s/Mickey Long
Mickey Long (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229

Dated: February 1, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of foregoing Memorandum of Law in Support of Defendant Iron Workers Local 7's Motion to Dismiss Counts V-VII of Plaintiffs' Complaint was served upon Michael E. Avakian, Esq., Smetana & Avakian, 5211 Port Royal Road, Suite 103, Springfield, VA  22151; Carol Chandler, Esq. and Geoffrey R. Bok, Esq., Stoneman, Chandler & Miller LLP, 99 High Street, Boston, MA 02110 and Mickey Long, Esq., Ironworkers Local 7, 193 Old Colony Avenue, South Boston, MA 02127 via first class mail, postage prepaid, this 1st day of February, 2005.

/s/ Burton E. Rosenthal
Burton E. Rosenthal

**NATIONAL LABOR RELATIONS BOARD**
**FIRST REGION**

Re:     Ajax Construction (Charging Party) and Intern. Assoc. of Bridge, Structural,
        Ornamental and Reinforcing Iron Workers, Local 7 (Charged Party)
        **Case No. 1-CB-10239**

**CERTIFICATION**

The undersigned Regional Director of Region One of the National Labor
Relations Board hereby certifies the following as authentic and accurate copies of
items docketed in NLRB Case No. 1-CB-10239:

(1) Charge Against Labor Organization (1/30/04).

(2) Letter of Dismissal (4/29/04).

(3) Letter denying Appeal (7/19/04).

Verified this 28th day of January 2005.

Rosemary Pye, Regional Director
NLRB Region One
10 Causeway Street, Room 601
Boston, MA 02222-1072

JAN-27-04  15:05   FROM-K&S   410/2734341

INTERNET
FORM NLRB-508
(6-90)

FORM EXEMPT UNDER 44 U S C. 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATION
OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>1-CB-10239 | Date Filed<br>1/30/04 |

INSTRUCTIONS: File an original and 4 copies of this charge and an additional copy for each organization, each local, and each individual named in Item 1 with the NLRB Regional Director of the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a. Name | b. Union Representative to contact |
|---|---|
| International Ass'n of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, Local 7 | Charles Wright, President |

| c. Telephone No. | d. Address (street, city, state and ZIP code) |
|---|---|
| 617-268-4777 | 195 Old Colony Avenue<br>South Boston, MA 02127 |

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) (1)(A) _____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Since on or about December 8, 2003, and at all times thereafter, the above-named labor organization, by its officers, agents, and representatives, has interfered with, restrained, and coerced employees of Ajax Construction Co., Inc., in the exercise of rights guaranteed in Section 7 of the Act.

| 3. Name of Employer | 4. Telephone No. |
|---|---|
| Ajax Construction Co., Inc. | 401-765-6500 |

| 5. Location of plant involved (street, city, state and ZIP code) | 6. Employer representative to contact |
|---|---|
| Derby Shops construction site, Derby Street near Route 24, Hingham, MA 02043 | Frank L. Kollman, 410-727-4300 |

| 7. Type of establishment (factory, mine, wholesaler, etc.) | 8. Identify principal product or service | 9. Number of workers employed |
|---|---|---|
| Steel erection contractor | Steel erection | Approximately 65 |

10. Full name of party filing charge
Ajax Construction Co., Inc.

| 11. Address of party filing charge (street, city, state and ZIP code) | 12. Telephone No. |
|---|---|
| 2833 Victory Highway<br>Harrisville, RI 02830 | 401-765-6500 |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By _____ (signature of representative or person making charge)     _____ (title or office, if any)

Address  2833 VICTORY HWY. HARRISVILLE, RI 02830   401-765-6500   1/28/04
                                    (Telephone No.)         (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U. S. CODE, TITLE 18, SECTION 1001)**

*U.S. GPO: 2000-464-840/29074



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
Region 1  Boston, Massachusetts
10 Causeway Street, 6th Floor
Boston, MA 02222-1072
(617) 565-6700

April 29, 2004

Kollman & Saucier, P. A.
Mr. Frank L. Kollman, Esquire
Mr. Thomas A. Bowden
20 South Charles Street, 8th Floor
Sun Life Building
Baltimore, MD   21201

Re:  International Association of Bridge, Structural,
     Ornamental and Reinforcing Iron Workers,
     Local 7, AFL-CIO
     (Ajax Construction Company, Inc.)
     Case  1-CB-10239

Dear Mr. Kollman and Mr. Bowden:

The Region has carefully investigated and considered your charge against Ironworkers Local 7 alleging violations under Section 8 of the National Labor Relations Act.

Decision to Dismiss:  Based on that investigation, I have concluded that further proceedings are not warranted, and I am dismissing your charge for the following reasons:

Your charge alleges that the Union restrained and coerced employees of Ajax Construction Co., Inc. by videotaping Ajax employees and their automobile license plates while they were working at the Derby Shops jobsite in Hingham, Massachusetts. The investigation, however, did not reveal evidence sufficient to establish that the Union's conduct violated Section 8(b)(1)(A) of the Act. Rather, it appears from the investigation that the Union was engaged in this videotaping in order to monitor a reserved gate system that had been established at the jobsite because of a labor dispute, and which it asserts had, on occasion, not been honored, as well as to document any safety issues it might have observed involving the Employer, and to determine whether any of its members employed on the jobsite were failing to adhere to the Union's constitution and by-laws. Moreover, the investigation indicated that the videotaping was unaccompanied by any other actions that could reasonably have caused employees to believe that the Union would act adversely towards them or their employment. The Board has held that the photographing of employees and the recording of license plate numbers is not, by itself, violative of Section 8(b)(1)(A) of the Act.  Interstate Cigar Co., 256 NLRB 496, 500-501 (1981).

Your Right to Appeal:  The National Labor Relations Board Rules and Regulations permit you to obtain a review of this action by filing an appeal with the General Counsel of the

National Labor Relations Board. If you wish to file an appeal, your attention is directed to the following:

Appeal Due Date: The appeal **must** be received by the General Counsel in Washington, D.C. by the close of business at 5 p.m. on May 13, 2004. However, if you mail the appeal, it will be considered timely if it is postmarked no later than one day before the due date. The appeal MAY NOT be filed by facsimile transmission.

Extension of Time to File Appeal: If you provide a good reason, the General Counsel may grant you an extension of time to file the appeal. You may file a request for an extension of time by mail or by facsimile transmission. The fax number is (202) 273-4283. Any request for an extension of time **must** be received by the appeal due date indicated above. A copy of any request for extension of time should be sent to me.

Appeal Contents: The appeal must contain a complete statement setting forth the facts and the reasons why you believe the decision to dismiss the charge is incorrect.

Address for Appeal: The appeal should be sent to the General Counsel of the National Labor Relations Board, Office of Appeals, 1099 14th Street, N.W., Washington, D.C. 20570. You should send a copy of the appeal to me. At the time you send the appeal to the General Counsel, please complete the enclosed Notice of Appeal Form (NLRB-4767) and send one copy of the form to each of the parties whose names and addresses are listed below. Mailing the notice form to the parties does not relieve you of the obligation to file the appeal itself with the General Counsel and to send a copy of the appeal to me by the due date.

Very truly yours,

/s/ Rosemary Pye

Rosemary Pye
Regional Director

cc: See Attachment

General Counsel, Office of Appeals

International Association of Bridge,
Structural, Ornamental and Reinforcing
Iron Workers, Local 7, AFL-CIO
Mr. Charles Wright, President
195 Old Colony Avenue
South Boston, MA   02127

Mickey Long, Esquire
193 Old Colony Avenue
South Boston, MA   02127

Ajax Construction Company, Inc.
2833 Victory Highway
Harrisville, RI   02830


h:\r01com\dismissals\1-cb-10239 ironworkers (ajax).doc



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**
OFFICE OF THE GENERAL COUNSEL
Washington, D.C.   20570

July 19, 2004

Re: International Association of Bridge,
Structural, Ornamental and Reinforcing Iron
Workers, Local 7, AFL-CIO
(Ajax Construction Company, Inc.)
Case No. 1-CB-10239-1

Thomas A. Bowden, Esq.
Kollman & Saucier, P.A.
20 South Charles Street, 8th Floor
Sun Life Building
Baltimore, MD  21201

Dear Mr. Bowden:

Your appeal from the Regional Director's refusal to issue complaint has been carefully
considered.

The appeal is denied.  Under all of the circumstances of this matter, and for the reasons set forth
by the Regional Director in her letter of April 29, 2004, it could not be established that Local 7
violated the National Labor Relations Act, as alleged, by videotaping employees while they were
on a jobsite.  Furthermore, nothing raised on appeal warrants a conclusion contrary to that of the
Regional Director.  Accordingly, further proceedings herein were unwarranted.

Sincerely,

Arthur F. Rosenfeld
General Counsel

By _____
Yvonne T. Dixon, Director
Office of Appeals

cc:   Director, Region 1

Mr. Charles Wright
International Association of Bridge,
Structural, Ornamental and Reinforcing
Iron Workers, Local 7, AFL-CIO
195 Old Colony Avenue
South Boston, MA  02127

Ajax Construction Company, Inc.
2833 Victory Highway
Harrisville, RI  02830

Case No. 1-CB-10239-1                                      -2

    Mickey Long, Esq.           Frank L. Kollman, Esq.
    193 Old Colony Avenue     Kollman & Saucier, P.A.
    South Boston, MA  02127    20 South Charles Street, 8th Floor
                              Sun Life Building
                              Baltimore, MD  21201

tm