## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,<br>    Plaintiffs,<br><br>    v.<br><br>LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS, *et al.,*<br><br>    Defendants. | Case No. 04-cv-12536-RGS |

### PLAINTIFFS' RESPONSE TO DEFENDANT IRON WORKERS LOCAL 7'S MOTION TO DISMISS COUNTS V-VII OF PLAINTIFFS' COMPLAINT

Defendant Iron Workers Local 7 ("Local 7" or "Union") has moved the Court to dismiss Counts V-VII of Plaintiffs' Complaint.  The Court should deny the Motion for the reasons set forth below.

### INTRODUCTION

This case is brought against Local 7 for violations of the Sherman Antitrust Act, the National Labor Relations Act, and state torts.  The Complaint in this action contains a detailed description of Defendants' restraint of trade and monopolization of the steel erection industry in an area proximate to the City of Boston.  Complaint ¶ 29.  Through a number of techniques described in detail in the Complaint, Local 7 and the other Defendants and co-conspirators have acted to restrain competition in the relevant market and have monopolized the steel erection industry.  The Complaint contains factually based allegations of all the necessary elements of a complaint pursuant to the Sherman Act, 15 U.S.C. §1 and § 2.

Defendant chooses not to contest the Court's jurisdiction under the federal Sherman Act and the National Labor Relations Act in its Motion.  Rather, it claims here that the state law torts

are preempted under a number of theories, all of which are inapplicable in the circumstances of this case as shown below.

## STANDARD OF REVIEW

Defendant Local 7's Motion to Dismiss makes no reference to Rule 12 or the bases for the Motion, whereas its Memorandum identifies Fed. R. Civ. Proc. 12(b)(1) (lack of jurisdiction over the subject matter).  It does not challenge the "sufficiency of the complaint on [Plaintiffs'] federal claims."  Mem. at 2 n.1.

In recognizing the limitation of its own motion, Local 7 cannot attack the jurisdictional allegations that also involve the merits of Plaintiffs' case.  A court's task in determining the sufficiency of a complaint is 'necessarily a limited one." Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 62 (2d Cir. 1997), *quoting* Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

On a motion to dismiss under Rule 12(b)(1), the Court is to "accept as true the complaint's well-pleaded factual allegations, Viqueira v. First Bank, 140 F.3d 12, 15 (1st Cir. 1998), "drawing all reasonable inferences in favor of plaintiff."  Id. at 16.

A dismissal under Rule 12(b)(1) should only occur where the grounds set forth are "so attenuated and unsubstantial as to be absolutely devoid of merit."  Baker v. Carr, 369 U.S. 186, 199 (1962).

And, if the information available to the Court shows the Court actually has jurisdiction over the contested claims, it may deny the motion to dismiss and allow an amendment of the pleading to correct any deficiencies.  5A Wright & Miller Federal Practice & Procedure §1350 at 223 (1990).

Each point made by Defendant is addressed seriatim below.

A.     **LABOR UNIONS ARE NOT EXEMPT FROM LIABILITY UNDER THE SHERMAN ACT.**

Defendant Local 7, although asserting generalized federal statutory bars to jurisdiction, correctly eschews claims at this juncture that it is immune from antitrust liability, since no immunity exists.  Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975).  Local 7, however, is plainly wrong in claiming the existence of a broad antitrust exemption applicable to it in all circumstances.

In UMW v. Pennington, 381 U.S. 657, 668 (1965), the Supreme Court ruled that the Sherman Act provides no statutory exemption to labor unions.  There a cabal of employers and the union agreed to impose ruinous economic labor-contract terms on third party employers.  In deciding that an implied antitrust exemption did not shelter this conduct, Justice White more narrowly crafted the exemption.  He looked to national labor policy, as expressed in the National Labor Relations Act, to determine if anything in that Act conflicted with a conclusion that conduct of the union was a proper subject for antitrust scrutiny.

Justice White recognized that the union's agreement with businesses was contrary to the union's self interest in being free to act during negotiations and at the same time it furthered the employers' interest of eliminating competition.  Id.  "Thus, the relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws."  Id. at 669.

The exemption was examined again in Connell Constr. Co. v. Plumbers and Pipefitters, Local No. 100, 381 U.S. 657 (1975).  There the plaintiff executed an agreement with the union to utilize only signatory subcontractors, i.e, "[t]he union's sole objective was to compel the general contractors to agree that in letting subcontracts for mechanical work they would deal only with firms

that were parties to the union's current collective-bargaining agreement."  421 U.S. at 618-19.

Given the fact that the union did not represent any of the employees of the plaintiff, the Court

quickly concluded that the restraint acted directly on the commercial market and was outside of the

exemption:

> The agreements with Connell and other general contractors indiscriminately
> excluded nonunion subcontractors from a portion of the market, even if their
> competitive advantages were not derived from substandard wages and working
> conditions but rather from more efficient operating methods.  Curtailment of
> competition based on efficiency is neither a goal of federal labor policy nor a
> necessary effect of the elimination of competition among workers.  Moreover,
> competition based on efficiency is a positive value that the antitrust laws strive to
> protect.

Connell, 421 U.S. at 623.

"Thus, it is clear that contractual provisions prohibiting contracts with nonunion firms,

entered into outside the collective bargaining context, and coercive concerted activities aimed at

obtaining such agreements, remain subject to antitrust scrutiny under the Sherman Act."  Altemose

Constr. Co. v. Building & Constr. Trades Council, 751 F.2d 653, 661 (3d Cir. 1985).

In the case at bar, there are allegations of a combination with third parties: developers,

contractors, etc., either through coercion or through receipt of target monies; allegations that such

agreements as exist were not the product of *bona fide* arms length negotiations; of agreements with

signatory contractors to impose the terms of the Local 150 agreement upon third parties; of coerced

recognition; of stripping agreements between and among the union and signatory contractors; and,

of course, of the targeting agreement and its implementation.   There can be no question but that this

conduct falls outside the exemption.  Again, however, it is not necessary to reach this issue at the

present time.

The other federal statutory Count here is 29 U.S.C. §187(b).  Section 303 of the Statute

explicitly provides jurisdiction in the federal courts to remedy violations of Section 8(b)(4) of

the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 158(b)(4).  The Fourth Claim for

Relief specifically sets forth a violation of Section 303 of the LMRA, 29 U.S.C. §

158(b)(4)(ii)(A) & (B) for violation of Section 8(e) of the LMRA.  Complaint ¶ 177.

Consequently, the Court's jurisdiction over the allegations set forth in the Complaint are

sound.

### B.    DEFENDANT'S CONDUCT SOUGHT TO BE RESTRAINED IS NOT SUBJECT TO NLRA PREEMPTION.

The Union contends that it was Congress' intent to shelter unions from the police powers

of the state.   Even it lacks the temerity to assert, however, to this Court, that rioting, mayhem,

arson, threats, violence, etc., are beyond the pale of this Court's authority because committed by

a union business representative.

Here, Plaintiffs have sufficiently alleged existing contracts and interference by wrongful

means based on both economic pressure—a creation and continuation of an unlawful restraint of

trade and course of conduct which is not for the purpose of the advancement of a competitive

interest.  Local 7's involvement is identified in detail.  And, in situations identified at ¶ 149 & ¶

160, show the Union clearly had knowledge Plaintiff had a contract to perform the work, which

had been interfered with and breached, and a very reasonable inference from the factual

allegations, suffered damages.

Of course, the issue presented is Garmon preemption.  San Diego Building Trades v.

Garmon, 359 U.S. 236, 245 (1959).  Typically, preemption applies if conduct is arguably

protected by or is arguably unlawful under the LMRA.  However, this formulation does not

eschew or vitiate the police powers of the state

Local 7 claims that three types of preemption apply to this lawsuit, including asserting

that Plaintiffs' claims address conduct actually protected by the LMRA.  It is incorrect.

The Supreme Court, in Garmon, permitted state regulation of violence, threats of violence or coercion because: "compelling state interest in the scheme of our federalism, in the maintenance of domestic peace, is not overridden in the absence of clearly expressed congressional directive." Garmon, supra note 21 at 247. International Union UAW v. Russell, 356 U.S. 634 (1958). See also Altemose Constr. Co. v. Building & Constr Trades Council, 296 A.2d 504(1972), cert den'd, 411 U.S. 932 (1973), Adolph Coors v. Sickler, 608 F. Supp. 1417 (C.D. Cal. 1985). The Supreme Court has also held that intentional infliction of emotional distress is not preempted, even though the underlying conduct also constituted an unfair labor practice. Farmer v. Carpenters Local 25, 430 U.S. 290 (1977). This long string of cases overwhelming dictates that preemption does not apply.

Garmon originated as an injunction with a request for damages against a union. 359 U.S. at 297. There, the Unions picketed peacefully and attempted to persuade customers to cease dealing with the Plaintiffs. The National Labor Board declined to assert jurisdiction. Id. at 238. The state tort for which damages were awarded was based on California's own state unfair labor practice law. Id. at 239. The assumption was that the unions' activities were unfair labor practices. Id at 245.

That was the error upon which the Supreme Court made the statement: "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Id. Hence, the Court's concern with a State's interference with the federal regulatory scheme was explained.

The Court's articulation of the reason behind the preemption of California's unfair labor practice tort, did not direct a complete preemption doctrine. In fact, the Court recognized that "It may be that an award of damages in a particular situation will not, in fact, conflict with the active

assertion of federal authority.  The same may be true of the incidence of a particular state injunction." Id. at 247.

Garmon was subsequently explained and modified by the Supreme Court in Sears Roebuck & Co. v. San Diego County District of Carpenters, 436 U.S. 180 (1978).  In Sears, two union business agents attempted to force the manager of the local Sears store to use the union hiring hall or to sign a contract.  Neither was accepted, whereupon the union set up picket lines on privately owned sidewalks and a parking area near the store.  Sears obtained an injunction prohibiting the union from trespassing, however, the Supreme Court of California "concluded that the picketing was arguably protected by § 7 of the Act, 29 U.S.C., 157, because it was intended to secure work for Union members and to publicize Sears' undercutting of the prevailing area standards for employment of carpenters." Id. at 184.

The question the Supreme Court was confronted with on petition for writ of *certiorari*, was whether the NLRA "deprives a state court of the power to entertain an action by an employer to enforce state trespass laws against picketing which is arguably -but not definitely - prohibited or protected by federal law." Id. at 182.  It reviewed the preemption doctrine, again holding that "the Court has refused to apply Garmon guidelines in a literal, mechanical fashion. This *refusal* demonstrates that 'the decision to pre-empt...state court jurisdiction over a given class of cases *must depend upon the nature of the particular interests being asserted* and the effect upon the administration of national labor policies' of permitting the state court to proceed," id. at 188-89 (emphasis added), when appropriate considerations exist.

The key question presented in a given situation will be whether state jurisdiction to provide relief runs a "realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." Id. at 198.  "The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one

7

of general application, but whether the controversy presented to the state court is identical to (as in Garner [v. Teamsters, 346 U.S. 485]) or different from (as in Farmer [v. United Bhd. of Carpenters, 430 U.S. 290 (1977)]) that which could have been, but was not, presented to the Labor Board." Id. In the case at bar, the Board has not exerted jurisdiction over Defendants' alleged activities.

Therefore, resolution of the issue of preemption here goes not to the subject matter involved, but to whether the remedy the Board and the state court may apply are identical: "The conflict lies in remedies . . . [w]hen two separate remedies are brought to bear on the same activity, a conflict is imminent," id. at 192 (quoting Garner v. Teamsters, 346 U.S. 488, 498-99 (1953), or involves relief "brought to bear on precisely the same conduct." Id. at 194 (quoting Weber v. Anheuser Busch, Inc., 348 U.S. 468, 479 (1955) (reversing Missouri Supreme Court where it had enjoined all union picketing, rather than just picketing that endangered life and limb).

But the Supreme Court in Sears, ruled that even if it were to assume that the union`s "strike" was protected by Section 7 of the Labor Act, 29 U.S.C. § 157, "permitting state courts to evaluate the merits of an argument that certain trespassory activity is protected does not create an unacceptable risk of interference with conduct which the Board, and a court reviewing the Board`s decision would find protected." Id. at 205 (emphasis added).

> Whatever risk of an erroneous state-court adjudication does exist *is outweighed* by the anomalous consequence of a rule which would deny the employer access to any forum in which to litigate either the trespass issue or the protection issue in those cases in which the disputed conduct is least likely to be protected by § 7.

Id. at 206-07 (emphasis added).

In Farmer, supra, the plaintiff sought the recovery of damages for the tort of intentional infliction of emotional distress due to the union's outrageous hiring hall operations. The Board

had previously provided some relief to the plaintiff in an unfair labor practice proceeding.  The

California Supreme Court had held that the complaint on these same grounds for compensatory

and punitive relief was preempted.  The Supreme Court of the United States disagreed.

> Viewed, however, in light of the discrete concerns of the federal
> scheme and the state tort law, that potential for interference is
> insufficient to counterbalance the legitimate and substantial
> interest of the State in protecting its citizens....Whether the
> statements or conduct of the respondents also caused Hill severe
> emotional distress and *physical injury would play no role in the
> Board's disposition of the case, and the Board could not award
> Hill damages for pain, suffering, or medical expenses. Conversely,
> the state-court tort action can be adjudicated without resolution of
> the "merits" of the underlying labor dispute.*

Farmer, 430 U.S. at 304 (emphasis added).

    The Supreme Court further explained that, "[n]othing in the federal labor statutes protects

or immunizes, from state action, violence or the threat of violence in a labor dispute,  ...and thus

there is no risk that state damages actions will interfere with the exercise of rights protected by

the N.L.R.A."  (Citations omitted).  Hence, "the historic state interest in 'such traditionally local

matters as public safety and order and the use of streets and highways'" reaches the highest level

of public concern.  Id.

    If, as the California Court suggested, the Carpenters' picketing might have also been

unlawful recognitional picketing which the Labor Board might have found, it is still not

preempted when the conduct,

> "touches" interests so deeply rooted in local feeling and
> responsibility that, in the absence of compelling congressional
> direction, we could not infer that Congress had deprived the States
> of the power to act."  San Diego Building Trades Council v.
> Garmon, 359 U.S., at 244, 79 S. Ct. at 779.  See Construction
> Workers v. Laburnum Constr. Corp., 347 U.S. 656, 74 S. Ct. 833,
> 98 L.Ed. 1025 (threats of violence); Youngdahl v. Rainfair, Inc..
> 355 U.S. 131, 78 S. Ct. 206, 2 L.Ed.2d 151 (violence); Automobile
> Workers v. Russell, 356 U.S. 634, 78 S. Ct. 932, 2 L.Ed.2d 1030
> (violence); Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct.

> 657, 15 L.Ed.2d 582 (libel); <u>Farmer v. Carpenters</u>, 430 U.S. 290,
> 97 S.Ct. 1056, 51 L.Ed.2d 338 (intentional infliction of mental
> distress).

<u>Sears</u>, 436 U.S. at 195.

In <u>Linn v. United Plant Guard Workers, Local 114</u>, 383 U.S. 53, 66 (1966), a case rejecting the preemption of the state tort of malicious defamation, the Supreme Court noted that there is no incongruity in an injured party requesting both relief before the Board to restrain coercive union activities and a judicial action to afford relief to reputation and business: "it may be expected that the injured party will request both administrative and judicial relief."

Accordingly, the Supreme Court in <u>Linn</u> rejected the proposition that its earlier <u>Garmon</u> decision "compelled a dismissal on preemption grounds." 383 U.S. at 55. The Board "looks only to the coercive or misleading nature of the statements rather than their defamatory quality" and lacks concern for personal injuries, it provides no "redress to the maligned party, [which] vitiates the ordinary arguments for pre-emption." <u>Linn</u>, 383 U.S. at 63-64.

In <u>Linn</u>, the Supreme Court thoroughly explained why it found the torts of libel and slander not preempted by the Labor Board`s jurisdiction. First, the state has a "deeply rooted" interest in redressing malicious libel. 383 U.S. at 62. Second, malicious libel enjoys no constitutional protection. 383 U.S. at 63. Third, "[t]he malicious publication of libelous statements <u>does not in itself constitute an unfair labor practice</u>." 383 U.S. at 63 (emphasis added). Fourth, "[t]he Board can award no damages, impose no penalty, or give any other relief to the defamed individual," <u>id.</u>, and fifth, "[j]udicial condemnation of the alleged attack on Linn`s character would reflect no judgment upon the objectives of the union." <u>Id.</u> at 64.

The compelling reason for the Supreme Court's decision, completely unaddressed in the Defendant's brief, is that the state court will not address the same issues as the Board might review, because the jurisdiction of the Board <u>requires</u> that the unlawfulness of the acts be for

coercive purposes specified in the Act.[1]

The Board,

> looks only to the coercive or misleading nature of the statements
> rather than their defamatory quality.  The injury that the statement
> might cause to an individual`s reputation -- whether he be an
> employer or union official -- has no relevance to the Board's
> function.

Linn, 383 U.S. at 63.

It is true that state torts based on peaceful union activities may be preempted,[2] Local 20,

Teamsters v. Morton, 377 U.S. 252 (1964), but more recently in Gibbs, 383 U.S. at 730, the

Supreme Court "read our prior decisions as only allowing 'the states to grant compensation for

consequences, as defined by the traditional law of torts, of conduct marked by violence and

imminent threats to public order.'"  In the instant case, the allegations here reveal that agents of

Local 7 damaged the Plaintiffs' property, threatened the business and employees of Plaintiffs,

other suppliers and their employees.

There is no question but that the state claims of interference with performance of

contract, economic relations, and trade arise out of a common nucleus of operative facts, the

quintessential basis for supplemental jurisdiction over the state claims.  Gibbs, 383 U.S. at 725.

In Mobile Mechanical Contractors Assn. v. Carlough, et al., 664 F.2d 481, 489 (5th Cir.

1981), the Fifth Circuit cited UAW v. Russell, 356 U.S. 634 (1958), to reaffirm that the state tort

---

[1] The operative language of section 158(b) of the National Labor Relations Act, 29 U.S.C. §
158(b), only prohibits coercive activities:
> It shall be an unfair labor practice for a labor organization or its agents --
> (1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the
> purposes of collective bargaining or the adjustment of grievances . . .
> (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting
> commerce, where in either case an object thereof is [forcing recognition or inducing the refusal of
> service].

[2] In Linn, the union activities and picketing permitted to be enjoined were peaceful, although
defamatory.

of wrongful interference with a lawful business relationship was not preempted in the situation

of union-stranger employer setting.  See Linn, 383 U.S. at 62 (reaffirming vitality of state

jurisdiction of tortious conduct under UAW v. Russell); Amoco Oil Co. v. Local 99, IBEW, 536

F. Supp. 1203, 1222 (D.RI. 1982).  Since there is no bargaining relationship of the Defendant

Union with Plaintiffs in the present case, there is no preemptive interest of the federal statute.

See Allis-Chalmers v. Lueck, 471 U.S. 202, 213 (1985) (preemption if the state tort does not

"exist independently of private agreements"); Falls Stamp & Welding Co. v. Automobile

Workers Region II, 744 F.2d 521 (6th Cir. 1984).

        In Prater v. United Mine Workers of America, Districts 20 & 23, 793 F.2d 1201 (11th

Cir. 1986), the Eleventh Circuit confirmed a jury award of damages under Section 303 of the

LMRA and the state tort of interference with economic relations to the Plaintiff companies.  On

the Unions' appeal and claim of preemption of the state tort award to Oakman Mining Company,

the Court found that under § 303, 793 F.2d at 1212,

> plaintiffs were permitted to recover damages they sought for lost sales and
> business and for damage to their equipment and facilities.  Under the state count
> plaintiffs there also sought damages for interference with the employment-
> relationship between plaintiff corporations and their employees.  The jury could
> make a larger award under the state counts representing damages for the
> interference with plaintiff corporations' business relationships, i.e., the state torts.

        The appellate court found several simple truths involving the ability of even individual

employees as plaintiffs in the same lawsuit under Gibbs:

> Defendant unions are already in federal court under § 303, and the same issues of
> fact will be raised for the state and federal claims; considerations of judicial
> economy, convenience, and fairness to the litigants counsel a trial of both federal
> and state claims before the same tribunal.  Finally, the state claims are closely tied
> to the federal policy of protecting neutral employers and their employees against
> secondary boycotts.

Prater, 793 F.2d at 1208.

        The Supreme Court has more recently stated that "We are reluctant to infer preemption...

'Consideration under the Supremacy Clause starts with the basic \assumption that Congress did not intend to displace state law.'" Building Trades Council v. Associated Builders & Contractors, Inc., 507 U.S. 218, 224 (1993) (citations omitted).

Here, there will not be dual recoveries under the federal and state claims to Plaintiffs, but the states' significant interests in maintaining the peace and protecting property (damage to property by agents of Local 7 is alleged here) are furthered in a case like the one at bar. Certainly, Congress was well aware that its provision of a federal remedy would enable supplemental jurisdiction in the federal courts for pendent state claims.

Moreover, the state tort claims that allege union conduct outside the Labor Act's provisos are not preempted. In Galveston Linehandler v. Longshoremen's, Local # 20, 140 F. Supp.2d 741, 747 (S.D. Tex. 2001), state torts of interference with contract and business relations was held not preempted when the Union used illegal tactics to benefit a third party union. To suggest that there is no jurisdiction for the three state torts alleged in the case at bar is incorrect and at best, premature.

### C.    THE CONDUCT ALLEGED IN THE INSTANT CASE IS NOT ARGUABLY PROTECTED OR PROHIBITED BY THE LABOR ACT.

The Union claims that the conduct alleged here is arguably protected by the NLRB and on that ground, the state torts are preempted. Mem. at 5. Noticeably, not a single case is presented claiming that the federal secondary boycott claim under Section 303 of the Labor Act is preempted by the Labor Act (and with it, its corollary torts). Even the First Circuit's considerations made in Chaulk Serv., Inc. v. Massachusetts Comm. Against Discrimination, 70 F.3d 1361 (1st Cir. 1995), do not disturb the usual analysis whether the proposed state claim interferes with the jurisdiction or remedies of the National Labor Relations Board.

Indeed, in that case, after Plaintiff filed a charge that led to issuance of a formal NLRB

Complaint and then NLRB settlement of the case, a new sexual discrimination claim was filed under state law. Id. At 1363. Hence, the Court was faced with a case where the Board had in fact exercised its jurisdiction in a matter involving sex discrimination under federal law. The district court did not rule on the preemption matter, but the First Circuit did.

The First Circuit found that preemption of the discrimination claim was desirable in order to achieve Congress' objectives of a unified scheme of labor relations. Having established the NLRB as "a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience," id. at 1364, the Court found the Garmon rule was intended to prevent interference between the Board and state regulations.

As Defendant Union recognizes, Mem. at 6, there are exceptions to the NLRB's primary jurisdiction, viz., if the matter is of peripheral concern to federal labor policy, if it touches interests "deeply rooted in local feeling and responsibility," or if the judiciary has created an exception for it, such as the duty of fair representation. Id. at 1364-65 & n.2. See Tamburello v. Comm-Tract Corp., 67 F.3d 973, 977 (1st Cir. 1995).

Although Local 7 delves further into the policy aspects involved with the preemption doctrine with cases such as Fiori v. Truck Drivers Union Local 170, 130 F. Supp.2d 150 (D. Mass. 2001) (Gorton, J.), and Local Union No. 12004 v. Massachusetts Comm. Against Discrimination, 377 F.2d 64, 80 (1st Cir. 2004), none involve the question at hand of hearing pendant state torts when valid federal claims are presented. But, Local 7's recitation of the Machinists style of preemption, that is, all sides in a labor dispute are to have unregulated self-help weapons available to them, is to assert that doctrine should trump here. See Machinists v. Wisconsin Employ. Relations Comm, 427 U.S. 132, 140 (1976).

However, that case still doesn't help the Union's argument because there is no showing that Plaintiffs' interference torts interfere with any self-help economic weapons. Those "self-

help" weapons refer to conduct that the Labor Board regulates, such as strikes and lockouts. Golden State Transit v. City of Los Angeles, 475 U.S. 608 614 (1986).

"Whether state-law claims are preempted under Garmon is determined not by the identity of the party against whom the claims are asserted but rather by the issues that those claims require a court to adjudicate." Richardson v. Kruchko & Fries, 966 F.2d 153, 156 (4th Cir. 1992). Since the Defendant has not demonstrated how each and every allegation of conduct in the Complaint is subject to NLRB jurisdiction, preemption is inapplicable.

Nothing in this caselaw directly applies to situations where the litigants have no contract or any other form of business relationship. In fact, the Supreme Court has noted that "In some areas of labor relations that the NLRA left unregulated, we have concluded that Congress contemplated state regulation." Golden State, 475 U.S. at 617. The key theme then in all these cases of Machinists preemption is a concern that there might be interference with the bargaining process—an issue not involved in the instant case.

In Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988), the Supreme Court reversed the court`s decision that a private employee suit for retaliatory discharge is not preempted under federal law—even in the face of working under a collective bargaining agreement. In reversing the Seventh Circuit, the Supreme Court carefully showed how the interest of the state was grounded in Illinois caselaw. The Court explained that "preemption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a state may provide to workers *when adjudication of those rights does not depend upon the interpretation of such agreements*." Id. at 409 (emphasis added).

Consequently, where federal law is not used to resolve the question arising under state law, the cause of action is not preempted. Moreover, there is no issue present in this case

requiring any resolution interfering with the structure of the Labor Act contemplated by Congress.  This Court would have to strain very hard to reach that result here with the benefit of Linn's identification of the significance of creating a remedy vacuum.[3]

Plaintiffs' claims for relief here are distinguishable from any unfair labor practice charge they could have filed with the Board as the Linn case shows.  Therefore, their claims are not preempted.

### D.     SINCE THE 1959 DECISION IN GARMON, THE SUPREME COURT HAS REPEATEDLY REDEFINED THE DOCTRINE OF PREEMPTION BY NARROWING ITS APPLICATION.

In Motor Coach Employees v. Lockridge, 403 U.S. 274, 297 (1971), the Supreme Court was adamant that the preemption doctrine is to be applied "not without exception," but, "[t]hose same considerations that underlie Garmon have led the Court to permit the exercise of judicial power over conduct arguably protected or prohibited by the Act where Congress has affirmatively indicated such power should exist."  However, "this Court cannot, in spite of the force of the policies Garmon seeks to promote, conscientiously presume that Congress meant to intrude so deeply into areas traditionally left to local law, e.g., Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657 15 L.Ed 2d 582 (1966); International Union, United Automobile Workers, etc., v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed 2d 1030 (1958)."  Id.

The Supreme Court again reinforced the point in Farmer v. United Bhd. of Carpenters, 430 U.S. 290, 296-97 (1977), stating, "[w]e have refused to apply the preemption doctrine to activity that otherwise would fall within the scope of Garmon if that activity was a merely peripheral concern of the Labor Management Relations Act . . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional

---

[3]Whether or not the plaintiff can prove its case under the law is a different matter.  That burden involves a question of fact which at this juncture is not at issue.

direction, we could not infer that Congress had deprived the states of the power to act.  Id., at 243-244, 79 S.Ct. at 779.  See, e.g., Linn [ ] (malicious libel); Automobile Workers v. Russell [ ] (mass picketing and threats of violence); Machinists v. Gonzales [ ] (wrongful expulsion from union membership)."  (citations omitted).

However, because Local 7's conduct is not protected by federal labor law, it does not mean that the federal statute can provide Plaintiffs with full relief.  That statute does not provide for punitive damages or injunctive relief.  Teamsters v. Morton, 377 U.S. 252 (1964); Sinclair Refining Co. v. Atkinson, 370 U.S. 195 (1962).

First, section 303, 29 U.S.C. § 186, provides a cause of action to any person injured by a violation of section 8(b) of the Act.  Second, jurisdiction is concurrent in the state and federal courts, Teamsters v. Morton, supra.  Moreover, a cause is judicially actionable even though it is remediable in an NLRB proceeding, Farmer v. United Bhd. of Carpenters, 430 U.S. 290 (1977), or is pending before the NLRB,[4] Lewis Food Co. v. Los Angeles Meat &Provision Drivers` Union, 159 F.Supp. 763 (D.Ca. 1958), and even if the Board refuses to proceed, Aircraft & Engine Maintenance, etc. v. Oolite Concrete Co., 341 F.2d 210 (5th Cir. 1965), cert. denied, 382 U.S. 972 (1965).

Of course, in the proceeding which might engender relief under § 303, state causes of action such as interference with prospective economic advantage arising out of the same operative facts are added to the federal claim.  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

In Farmer v. United Bhd. of Carpenters and Joiners, 430 U.S. 290, 298 (1977), the Court

---

[4]Board relief might possibly preclude Local 7 from engaging in secondary activity, but it would not consider other unlawful activity.  The Board would provide no remedy or damages incurred by Plaintiffs.  National Union of Hospital Employees, 345 N.L.R.B. 105 (1979); Scott v. Moore, 680 F.2d 979, 996 n.13 (5th Cir. 1982) (enbanc).

observed that "[u]nder a formalistic application of <u>Garmon</u>, the libel suit [in <u>Linn</u>] could have been pre-empted."  But,

> the Court reasoned that there was little risk that the state cause of
> action would interfere with effective administration of national
> labor policy.  The Board's §8 unfair labor practice proceeding
> would focus only on whether the <u>statements were misleading or
> coercive; whether the statements also were defamatory would be of
> no relevance to the Board`s performance of its functions</u>.  <u>Id</u>. at 63,
> 86 S.Ct., at 663.

<u>Farmer</u>, 430 U.S. at 298 (emphasis added).

      **E.**     **DEFENDANT'S CLAIM THAT FEDERAL AND/OR STATE
REGULATION OF CONDUCT ALLEGED IN THE COMPLAINT IS
PREEMPTED AS TO EACH AND EVERY ELEMENT OF THE
<u>ALLEGED CONDUCT IS INSUPPORTABLE</u>.**

     Local 7 makes a variety of claims that its activities are protected by the preemption doctrine as applied to "top-down organizing," job targeting, work stoppages, stripping, surveillance and videotaping, and violence.  Mem. At 9.  As demonstrated below, each of the averments are meritless.

      **1.**     **Secondary Boycotts Employing "Top-Down Organizing" Techniques <u>Violate
Federal Law as Set Forth in the Complaint</u>.**

     In <u>Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100</u>, 421 U.S. 616, 622 (1975), the Supreme Court held that prehire agreements which limit subcontracting of construction work to only union subcontractors are not protected under Section 8 of the LMRA, and these are federal antitrust violations.  In the case at bar, Plaintiffs complain that Local 7 has employed these same techniques.

     Indeed, one of the major aims of Congress in passing the Landrum-Griffin amendments to the Taft-Hartley Act was to limit "top-down" organizing campaigns that forced employers to recognize a union regardless of the wishes of their employees.  <u>See</u> II <u>Legislative History of the LMRDA</u> 1175-76, 1191-92, 1523 (1959).  The Court in <u>Connell</u> recognized the potential for

abuse if Section 8(e) of the LMRA were permitted and enforced through coercive tactics,

regardless of the wishes of employees.  The Court stated:

> These careful limits on the economic pressure unions may use in aid of their
> organizational campaigns would be undermined seriously if the proviso to §8(e)
> were construed to allow unions to seek subcontracting agreements at large, from
> any general contractor vulnerable to picketing.  Absent a clear indication that
> Congress intended to leave such a glaring loophole in its restriction on "top-
> down" organizing...we think its [§8(e)] authorization extends only to agreements
> in the context of collective bargaining relationships and in light of Congressional
> references to the <u>Denver Building Trades</u> problem, possibly to common-situs
> relationships on particular jobsites as well.

421 U.S. at 633.

The "touchstone" of a Section 8(e) agreement or its maintenance is that it is addressed to

the labor relations of the employer "vis-a-vis his own employees."  <u>National Woodwork Mfrs.</u>

<u>Assn. v. NLRB</u>, 386 U.S. 612, 644-45 (1967).

And, with regard to prehire agreements permitted under Section 8(f) of the LMRA, It has

been emphasized that "no element of coercion was to be admitted into the narrow exception

being established to the majority principle."  <u>NLRB v. Iron Workers, Local 103</u>, 434 U.S. 335

349 n.10 (1978).  An employer may not coerce its employees into a collective bargaining

relationship, even for the purpose of avoiding economic injury, 29 U.S.C. §158(a)(1).

In remarks made on the floor of the Senate, Senator John F. Kennedy stated:

> It was not the intention of the committee to require by [§8(f)] the
> making of prehire agreements, but rather *to permit* them, nor was it
> the intention of the committee to authorize a labor organization to
> strike, picket, or otherwise coerce an employer to sign a prehire
> agreement where the majority status of the union had not been
> established.  The purpose of this section is to permit voluntary
> prehire agreements.

104 *Cong Rec.* 11308 (July 16, 1958) (emphasis added).

Hence, it is an unfair labor practice under Section 8(a)(4) of the LMRA for a labor union

to engage in activities that induce "persons to refuse to perform any services where an object is

to force one employer to cease doing business with another employer *to recognize a labor union* as the representative of his employees." Texas Distrib., Inc. v. Local 100, 598 F.2d 393, 398 (5th Cir. 1979) (emphasis added).

 In Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645 (1982), the Court confronted a situation in which a general contractor and union had entered into a collective bargaining agreement containing a subcontractors clause and the question was whether the union could picket to enforce the clause.  In these limited circumstances, the Court held that the construction industry proviso to §8(e) shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective bargaining relationship.  The "top down" organization (union pressure directed at the employer rather than the worker) that had been condemned in Connell was deemed tolerable if it flowed as a natural consequence from a voluntary collective bargaining agreement.  However, Woelke-Romero clearly confirmed the Connell conclusion that "the proviso did not exempt subcontracting agreements that were not sought or obtained in the context of a collective bargaining relationship, even though they were covered by the plain language of the statute."  456 U.S. at 653.

However, despite the Defendant's attempt to force the facts at bar into the Woelke-Romero doctrine, the state of the record does not permit the conclusion that Defendants and Plaintiffs ever had a collective bargaining relationship.  The entire thrust of the Union's picketing and pressure of Plaintiffs and other non-union contractors was not to represent their employees, but, rather, to force non-union contractors off jobs, replace them with union contractors, and secure subcontracting agreements for all future projects or force the contractors out of business.

The instant case, unlike Woelke-Romero, obviously does not involve a traditional Section 9(a) collective bargaining relationship or picketing to obtain a subcontracting clause in a

preexisting bargaining relationship.  This case involves concerted, repeated, diverse and often violent efforts directed at the pure "top down" organization of stranger employers.  It does not involve visits and phone calls or handbills designed to pressure third parties in a dispute with primary employers, such as Plaintiffs, as in <u>Storer Comm., Inc. v. National Assn. of Broadcast Empoyees and Technicians</u>, 854 F.2d 144, 146 (6th Cir. 1988).

Contrary to the standards for reviewing a motion to dismiss, Local 7 "claims that its contact with secondary employers" was for reasons protected by Section 8(b)(4).  Mem. at 12.  As set forth in the complaint, *e.g.,* paragraphs 58 a.-g., Plaintiffs have alleged work stoppages, wide spread picketing, and other forms of illegal activities directed at them and their customers which are not protected by the labor law.

Direct appeals to secondary employers who are customers or suppliers of the primary employer are not protected.  <u>Int'l Union of Electrical Workers v. NLRB</u>, 366 U.S. 667 (1961).  Work stoppages and requests to "cooperate" with the union directed at customers and employees are not protected.  <u>NLRB v. Int'l Bhd. of Teamsters</u>, 298 F.2d 105 (2d Cir. 1967).

Although there is an illustrative claim that Local 7 had an interest in employee organization, Mem. at. 13, the Union has affirmatively disavowed such interests and Plaintiffs in this lawsuit are not attempting to adjust or disestablish Local 7's organizational activities.

This case is unlike <u>Teamsters Local 20 v. Morton</u>, 377 U.S. 252 (1964), where the union made a bare request to a neutral employer to cease doing business with a struck employer where the statement did not contain threats.[5]  Yet, the Supreme Court affirmed the damage award under

---

[5]In <u>Morton</u>, 377 U.S. at 255-56, a lawsuit was filed under Section 303 of the LMRA and state common law secondary boycott for a strike which "had at all times been free of any violence."  <u>See</u> <u>Morton v. Local 20, Teamsters</u>, 200 F. Supp. 653, 661 (N.D. Ohio 1961).  The Supreme Court affirmed the award of damages under Section 303, but found the punitive award preempted in that the evidence only showed peaceful activity without threats or coercion.  377 U.S. at 260, 261.

Section 303.

Vague threats of "trouble" or reprisals stated by its agents are sufficient. <u>Abreen Corp. v. Laborers' Int'l Union</u>, 709 F.2d 748, 752, 756 (1st Cir. 1983) (site "would never finish nonunion"; Section 303 claim affirmed); <u>Wells v. NLRB</u>, 361 F.2d 737, 740 (6th Cir. 1966) (job will be stopped); <u>IBEW Local 5</u>, 164 N.L.R.B. 455 (1967) ("trouble"); <u>NLRB v. Carpenters</u>, 462 F.2d 1321 (9th Cir. 1972) (things would get "kind of rough"). The "publicity proviso" to Section 8(b)(4) exempts secondary boycotts intended to inform the public that the primary employer's product is distributed by the secondary employer. <u>Edward J. De Bartolo Corp. v. NLRB</u>, 458 U.S. 568 (1988). The Complaint sets forth the former (threats) and shows that the latter (noncoercive pressure) is not evidenced here.

For these reasons, Plaintiffs have pled a valid secondary boycott action against Defendants. Nothing in federal antitrust or labor law displaces all state law causes of action that arise in the coercive, threatening, and violent environment under which Local 7 operates in the relevant market or prevent a Section 303 recovery.

**2.    The Union's Job Targeting Plan Operates in Violation of Federal Law and Is Not Protected by Any Labor Law.**

Local 7 further claims that its job targeting program is protected activity under Section 7 of the National Labor Relations Act. Mem. at 14. The facts set forth in the Complaint and the admissions herein demonstrate that the "Fund" may conceptually be a protected activity, but that it operates as an illegal entity under the law. The argument that the "Fund" is protected is without merit.

First, the U.S. Department of Labor Wage and Appeals Board in two 1991 decisions in <u>Building & Construction Trades Dept.</u>, Case No. 90-02, 1991 DOL Wage App. Bd. LEXIS 39 (June 13, 1991) and <u>Building & Construction Trades Dept.</u>, 1991 DOL Wage App. Bd. LEXIS

59 (October 9, 1991), held that job target programs were unlawful if the source of the funds were derived at all from wages earned on federal construction projects. The Board further found that 1) workers are entitled to receive prevailing wages on federal projects, 2) public funds should not be used to subsidize private sector construction projects, and 3) because there was no guarantee that an employee's wages would *vest* in a direct and traceable benefit to each individual employee from a job target fund deduction, the union's extraction of wages was impermissible under the Davis-Bacon Act.

Specifically, the Wage and Appeals Board found that since employee wage deductions into Job Targeting Programs did not qualify as deductible "dues" under the Act and because the funds were not vested "to the exclusive benefit of the particular employee whose work led to the plan contribution," the Job Target Plan violated the Davis-Bacon Act and 29 C.F.R. 5.26.[6]

The United States Court of Appeals for the District of Columbia Circuit affirmed the U.S. Department of Labor's Wage and Appeals Board interpretation of the Davis-Bacon Act in Building & Construction Trades Dept. v. Reich, 40 F.3d 1275 (D.C. Cir. 1994). In addition, the Ninth Circuit came to the same conclusion in International Bhd. of Electrical Workers v. Brock, 68 F.3d 1194 (9th Cir. 1995).

As Local 7 identifies and states its "Fund's" protection, it claims the National Labor Relations Board has held that the Union's creation and funding of job targeting programs was "protected activity" under Section 7 of the National Labor Relations Act, 29 U.S.C. §157. In Manno Electric, Inc., 321 N.L.R.B. 278, 298 (1996), the Board found that attempts by non-union employers to stop the creation of such funds, violated *union rights* under the Labor Act. Also

---

[6]29 C.F.R. § 5.26 states: "The trust or fund must be set up in such a way that in no event will the contractor or subcontractor be able to recapture any of the contributions paid in or any way divert the funds to his own use or benefit."

ABC, Golden Gate Chapter, 331 N.L.R.B. No. 5 (2000).  The Labor Board further held that

unions have a right to collect market recovery "dues" from employees on non-Davis-Bacon Act

projects.  IBEW, Local 28 (Kingston Constructors), 332 N.L.R.B. No. 161 (2000).

Then came Can-Am Plumbing, Inc., 335 N.L.R.B. No. 93 (2001).  There, the Board

found an employer's lawsuit to stop *competitor employers* from receiving market recovery

money derived *from federal and state prevailing wage projects* because their receipt undermined

the contract bidding process, also adversely effected union rights to bargain for these funds and

therefore the non-union employer's lawsuit violated the Labor Act.  The Board decided that the

mere fact that the Union's job target money was comprised of money extracted from employees

on prevailing wage projects was irrelevant to the union's lawful purpose for establishing these

funds. The Labor Board then enjoined the employer from suing its competitor for the receipt of

job target money on these prevailing wage projects, as the Board had been doing in a series of

prior cases.

On petition for review, in Can-Am Plumbing, Inc. v. NLRB, 321 F.3d 145 (D.C. Cir

2003), a unanimous panel of the United States Court of Appeals for the District of Columbia

Circuit emphatically *disagreed* with the Labor Board and found that an employer's state court

anticompetition case was *not* preempted under federal law or jeopardized the jurisdiction of the

Labor Board.  The Court held that the Board had *no expertise* under the Labor Act to review the

Davis-Bacon Act and the Copeland Anti-Kickback Act.  The Court found that the Board's

construction of the Labor Act was faulty on its permissive view of the Union's funding

mechanism, its erroneous view of federal policy against wage kickbacks, and of the employer's

injury.[7]  It reversed and remanded the case back to the Board.[8]

Concurrently litigated with Can-Am Plumbing, Inc., was the Ohio case of J.A. Croson
Co. v. J.A. Guy, Inc., 691 N.E.2d 355 (Ohio 1998), cert. den'd, 522 U.S. 871 (1998), where the
Ohio Supreme Court had held that union job target funding was protected by the NLRA.

While the state court litigation was pending against it, J.A. Guy, Inc. and the Union filed
unfair labor practice charges with the National Labor Relations Board that led to a hearing on
whether the employer's lawsuit violated the Labor Act.  On June 27, 2003, Chief NLRB
Administrative Law Judge Robert A. Giannasi issued a decision recommending dismissal of the
administrative complaint based on the D.C. Circuit's Can-Am Plumbing decision.  Copy
attached.  He found the employer's lawsuit *not* preempted by the Labor Act.

First, Judge Giannasi found that the J.A. Croson decision was of limited value because it
predated the Board's decision in Kingston, supra, and as set forth in Can-Am Plumbing, both the
federal and state governments share similar public policy concerns where wages are used for
purposes "inimical to public policy."  ALJD at 10.  Consequently, the uniform federal scheme
under the Davis-Bacon Act made the preemption inapplicable to similar state laws for the same
reasons and so he recommended dismissal of the complaint.

As the case affects the situation at bar here, Judge Giannasi answered the question
whether "job targeting deductions on state prevailing wage projects" should be "***unprotected, as***

---

[7]These programs illegal distort and subvert the marketplace.  IBEW v. Brock, 68 F.3d at 1201.

[8]The Copeland Anti-Kickback Act, 8 U.S.C. § 875, and the Anti-Kickback Act, 41 U.S.C. § 51, both criminal statutes, were enacted to ensure that prevailing wages remain in the pockets of employees and no such money earned by employees was ever to return to the benefit of employers.  The U.S. Department of Labor has enacted enforcement regulations at 29 C.F.R. Part 3.  See e.g., 29 C.F.R § 5.10(b).

*they are on federal projects*." ALJD at 10 ll. 38-40.[9]  Here, Plaintiffs alleged that the job target

funds are implemented and operated in violation of federal law and implicitly under state law.  It

is inconceivable that the Board could rule on remand that a state claim to stop collection and

expenditure of money extracted in part from Davis-Bacon funds or on state prevailing wage

projects is preempted.

Finally, the Plaintiffs' here claim that the secondary pressures relating to the illegal job

target fund are admittedly derived and funded from union member dues from federal prevailing

wage projects and are therefore conduits for illegal funnelling of money to union signatory

contractors under settled federal caselaw, is amply demonstrated in the Complaint.[10]  The Court

may also take judicial notice that the Union admittedly paid employers millions of dollars

collected from employee wages as "dues," directly out of its own union bank accounts.  In 2001,

2002, 2003 and 2004, the Union paid its signatory contractors $793,375.00, $1,525,769.00,

$1,657,330.00 and $2,885,091.00, respectively for a total of $6,861,565.00, to undermine the

---

[9]The Labor Board subsequently consolidated the remand from the D.C. Circuit Decision in <u>Cam-Am Plumbing, Inc.</u> with Chief Judge Giannasi's Decision in <u>J.A. Croson</u> and invited *amici* briefs "to fully address the job targeting issues that are raised in the two cases."  Copy of Notice attached.

[10]In Defendants' Motion in Opposition to the *Pro Hac Vice* Motion, they repeatedly admit that the source of Local 7's job target money was funded from employee dues:

> "The unionized workers, members of Iron Workers Local 7 ('Local 7' or the 'Union') have decided to use some of their dues money to 'level the playing field' regarding wages and benefits for employers who are signatory to collective bargaining agreements with Local 7 and who are bidding on jobs."  <u>Union Defendants' Amended Opposition to Motion for Admission Pro Hac Vice</u> at 1-2 (Jan. 11, 2005).

> "The primary act with which these union members have been charged is using the money they earn - their dues - to assist their employers...to win bids."  <u>Union Defendants Surreply in Opposition to Motion for Admission Pro Hac Vice</u> at 7 (Feb. 4, 2005).

bids made by Plaintiffs and other non-union steel erection contractors in the relevant market.[11]

As alleged in the Complaint, Complaint ¶¶ 57, 142, Defendant Local 7 has taken

employee wages and illegally diverted it back to union signatory employers.  Local 7 received

money from employee wages earned on federal prevailing wage projects such as the Boston

Central Arthur and Harbor Tunnel project, Complaint ¶ 46, in direct contravention of Wage

Appeal Board decisions under the Davis-Bacon Act.  Its activity appears also to be a *prima facie*

violation of Section 302(a) of the Labor Act, 29 U.S.C. § 186(a) (employers and unions are

forbidden from transferring any thing of value between themselves) and a criminal act, 29 U.S.C.

§ 186(d).

Under the circumstances and facts set forth in the Complaint, the job targeting payments

and funding strategy of Local 7 are neither protected under the Labor Act (or any other federal

law) nor free from regulation of those activities under state law within the strong local interest

and public policy exceptions set forth in Garmon.  As such, the conduct of job target collection

and disbursement employed by Local 7 is ***not*** regulated by the LMRA (Can-Am Plumbing, Inc.)

and the use of those funds to tortiously interfere with the marketplace is therefore not preempted.

See Intercity Maintenance Co. v. Local 254, SEIU, 62 F. Supp.2d 483, 500 (D. R.I. 1999).

### 3.     Coercive Picketing, Threats, Work Stoppages, and Slow Downs Are Not Protected Activity under the Labor Act.

Defendant claims that the allegations relating to picketing, work stoppages, slow downs,

and sham picketing incorporated in the Plaintiffs' Section 303 claim amount to "garden variety"

Section 8(b)(4)(i) activity.  Mem. at 18.  Damage to property and violence are the surest ways to

---

[11]The Court may take "judicial notice of matters of public record" contained on U.S. Government internet websites.  Laborers' Pension Fund v. Blackmore Sewer Constr. Inc., 298 F.3d 600, 607 (7th Cir. 2002).  Local 7's financial statements are located on the United States Department of Labor's website at: http://www.dol-union-reports.gov/olmsWeb/servlet/ LMReportList?FileNumber=33092.  Its file number is 033-092.

remove preemption in a given situation under the state's interest exemption in maintaining the peace. <u>Intercity Maintenance</u>, 62 F. Supp.2d at 501  These activities are alleged in Plaintiffs' Complaint ¶¶ 155 & 186 as "sham picketing."  As alleged in Complaint ¶ 156, the union's picketing with a secondary object is usually remedied/uncovered by referring to the Labor Board's <u>Moore Dry Dock</u> criteria.[12]  <u>See</u> <u>Helgesen v. Iron Workers, Local 498</u>, 548 F.2d 175, 182 (7th Cir. 1977).

Local 7 makes the argument that its picketing, whether proper or a sham, is arguably prohibited activity and therefore preempted.  Mem. at 19.  Relying on <u>Pye v. Teamsters Local Union No. 2</u>, 61 F.3d 1013 (1st Cir. 1995), Local 7 suggests that even a union's innovative efforts to circumvent Section 8(b)(4) do not escape the Labor Board's jurisdiction and therefore preemption of the state claims based on the picketing activity apply to the allegations here.

<u>Pye</u> does not stand for that proposition.  The case does affirm that "a 'union's 'object' may be inferred from its acts..., and particularized evidence of subjective intent is not essential for proof of a violation."  <u>Id</u> at 1022.  But, nothing in the opinion addresses preemption because it would be inapplicable with the NLRB suing for an injunction as a plaintiff under Section 10(l) of the Labor Act, 29 U.S.C. § 160(l), granting jurisdiction to hear the Agency's case.

Of further note is Local 7's reference to <u>Cranshaw Constr. of New England, L.P. v. Iron Workers, Local 7</u>, 891 F. Supp. 666 (D. Mass. 1995) (Lasker, J.).  In that case, Local 7 engaged in ambulatory picketing and tortious activity that led to a Section 303 lawsuit accompanied by state tort claims.  After trial, the Court found that the union had violated the <u>Moore Dry Dock</u>

---

[12]In <u>Sailors' Union of the Pacific (Moore Dry Dock)</u>, 92 N.L.R.B. 547 (1995), the Board set forth four criteria for finding violative picketing: whether the picketing is limited to when the primary employer is present, whether the primary employer is engaged in business on the site, whether the picketing occurs near the site, and whether the picketing discloses the dispute is only with the primary employer.

standards and was liable under Section 303.

A variety of torts were asserted in the case. Because no violent activity was proven, the tort of interference with contractual relations and trespass were held preempted, 891 F. Supp. at 674, and tortious damage to equipment, assault and battery were held not preempted, id. at 675.

At this juncture in the beginning of the case, Plaintiffs have plead destructive and violent acts which are sufficient allegations for the state claims to withstand dismissal. They are entitled to prove their case and if they cannot, then the Court at a later time may dismiss them. See Crenshaw, supra. The time is not now.

### 4.    Stripping Employees from Plaintiffs Is Not Protected Activity.

Local 7 also asserts that stripping of the employees of Plaintiffs is arguably protected or prohibited activity and therefore relief is preempted. Mem. at 20.

As the Complaint alleges, Local 7 works in concert with its signatory contractors to strip key employees of Plaintiffs to place them on staff with union contract signatory employers. Stripping will not work unless a signatory contractor will immediately employ the dislodged employee. Thus, stripping requires the active participation of the union and its signatory employers. As such, the Clayton Act exemption for unilateral conduct by unions is wholly inapplicable. Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 808 (1945) (unions cannot engage in "employer-help"); United Mine Workers v. Pennington, 381 U.S. 657, 668 (1965).

In Clinton Corn Processing Co., 194 N.L.R.B. 184, 185-86 (1971), the Board squarely held that inducing employees to quit is not protected activity under the Labor Act: "the Respondent barred Smith from its premises only because of his unprotected conduct inducing Respondent's employees to quit"....[this] "did not violate Section 8(a)(1) of the Act." Also Technicolor Gov't Serv., Inc., 276 N.L.R.B. 383, 389 & n.7 (1985) ("solicitation to quit[] would

remove the Act's protection."); <u>Boeing Airplane Co. v. NLRB</u>, 238 F.2d 188, 194-95 (9th Cir. 1956) (employee seeking to place other employees with work at competitors was unprotected activity).

Local 7's resort to arguing only a generalized preemption argument regarding stripping, inasmuch as it relies on the nondiscrimination rights set out in Section 8(a)(3) of the Labor Act, 29 U.S.C. § 158(a), *i.e.*, an employer cannot discriminate among union and non-union supporters, does not support its argument. This is not an employee discharge case or a union salting case alleging the discrimination of union member employees as occurred in <u>Town & Country Elec., Inc. v. NLRB</u>, 516 U.S. 85 (1995). This case is not about choosing to be in or out of a union. As alleged in paragraphs 64 and 65 of the Complaint, the employees of two Plaintiffs have voted not to be associated with Local 7.

Consequently, by Plaintiffs' assertion that stripping is part of the Section 8(b)(4) claim—to which the Defendant Local 7 has not moved to dismiss, Local 7 asserts the matter must be arguably prohibited by the labor law and therefore preempted. Local 7 reads too much into the numbered allegations in the Complaint. Plaintiffs pled a course of conduct not protected by the federal antitrust and labor laws and also in violation of state law. If stripping is not protected conduct under the Labor Law (because it is akin to an interference tort as the caselaw above shows) then an employer should be able to assert it as an independent and non-preempted tort. Of course, damages on the federal and state claims may be duplicative, but there can only be a single recovery for discrete damages.

### 5.    Surveillance and Videotaping Jobsites in the Circumstances Alleged Is <u>Not Protected Activity</u>.

It is asserted that the allegation of stationing observers and videotaping Plaintiffs' employees to initiate sham complaints to federal and state authorities is preempted under

Garmon. Mem. at 21. Local 7 claims these allegations are preempted because the subject matter is arguably covered in the Section 8(b)(4) allegations of the Complaint.

Although Local 7's prediction that the surveillance claims will be litigated in pursuit of Plaintiffs' Section 8(b)(4) violation (or the antitrust violations), it believes that this is a matter which the NLRB has jurisdiction over. Local 7 attaches a letter issued by the local Director of the NLRB Region wherein she dismissed a charge by Plaintiff AJAX that Local 7 had unlawfully been videotaping in violation of "Section 8(b)(1)(A) of the Act." The taping and recording of license plate numbers, it was asserted, was not a violation of that Section of the Act. No mention of Section 8(b)(4) is asserted or mentioned in the letter.

As set forth in paragraph 154 of the Complaint "Local 7 and its co-conspirators agreed to station observers with cameras and video recorders in an effort to induce contractors to cease doing business with the Plaintiffs. Local 7 has also used this practice to initiate sham complaints to federal and state administrative authorities."

Because AJAX is alleged by Local 7 to have brought one small portion of this claim to the Board's attention and the Board found that the activity did not "by itself" violate Section 8(b)(1)(A) of the Act, does not lead to the assumption that the Board would find the "sham" activity alleged in the Complaint to be  "arguably prohibited" or "protected" under the Act. AJAX's charge was: "Since on or about December 8, 2003, and at all times thereafter, the above labor organizations, by its officers, agents, and representatives, has interfered with, restrained, and coerced employees of AJAX Construction Co., Inc., in the exercise of rights guaranteed in Section 7 of the Act." There is no mention of interference with customers or administrative agencies in this charge

In any event, the Board never got a chance to rule on the matter since it was administratively dismissed by the Regional Director's office —the prosecutor. It would be very

strange for this Court to suggest that the tactics here might be protected activity when the Supreme Court in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961), held that if lobbying of government "is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor," it is not protected activity.  See BE&K Constr. Co. v. NLRB, 536 U.S. 516, 525-26 (2002) (disapproving Labor Board's jurisdiction to find an employer antitrust and labor lawsuit against a competitor's sham activities violative of the Labor Act).

Moreover, the Region 1 letter does not assert that the Board would ever take jurisdiction of a charge that videotaping leading to sham administrative complaints violates the Labor Act. From Plaintiffs' perspective the Region's letter demonstrates that the Board will *not* assert jurisdiction of the claims made in the Complaint.  AJAX can be said to have tested the waters to assure that the Board would not exercise jurisdiction of the matter now at hand.

While the Union asserts that monitoring of workplaces for filing safety and other endless complaints against Plaintiffs might be protected activity of an employer in a unionized workplace, the activity is alleged in the instant Complaint to be for the purpose of interfering with Plaintiffs' business and for filing sham complaints against Plaintiffs.  Under the facts of this case, and not the "facts" upon which Defendants would like the Court to view the Complaint in, the activity is not protected by the Labor Law.  No case is shown to support its position.

Plaintiffs are entitled to seek relief both under the federal as well as the state law counts.

### 6.    Violence Alleged in the Complaint Is Not Protected Activity.

The Defendant Union claims that the property damage and violence claims are isolated, conclusory allegations, and therefore are preempted.  Mem. at 24.  Clearly, claims of violence and property damage are not preempted under Garmon as set forth in Russell.  Violence and property destruction are quintessential reasons for not applying the preemption doctrine because

32

they involve "compelling state interest in the maintenance of domestic peace." United Mine Workers v. Gibbs, 383 U.S. 715, 721 (1966).

The remaining argument that this Court should find a way not to hear Plaintiffs' pendent state claims because their allegations do not specify union approval and acquiescence of the activities or they might be cause for future juror confusion, Mem. at 24, are not legitimate objections to this Court's jurisdiction or the interest in judicial economy and claim splitting between federal and state courts if Defendant's argument were to be accepted.

Local 7 admits that paragraph 155 alleges a factual basis for violence and destruction that Plaintiffs believe can be proven at this time and Plaintiffs submit that other incidents of violence may also be proven. Local 7 further alleges "[t]here is no allegation anywhere in the Complaint that the Union ratified, condoned, or authorized any of the conduct alleged." Mem. at 25.

Unfortunately for Defendant's argument, Plaintiffs did allege the acts alleged in the Complaint were authorized and ratified by the Union in paragraph 66 of the Complaint:

> During the period beginning in October 2000, *the Defendants, acting individually and in concert with each other, and each authorizing and ratifying the acts of their employees, officers, and agents, in furtherance of their objectives* to establish an all-union, anticompetitive enclave in the Relevant Market area, as set forth in the Counts of the Complaint, have threatened Local 7 contractors, non-Local 7 contractors, and other persons engaged in commerce.
> Of course, alleged threats of physical harm might be an unfair labor practice, but that

does not mean the action is not tortious and remediable under state law. The Board might be able to obtain some form of injunctive relief for the coercive effect of the "threats," but providing an economic remedy "has no relevance to the Board's function. The Board can award no damages, impose no penalty, or give any other relief to the defamed individual." Linn v. Plant Guard Workers, 383 U.S. at 63. "On the contrary, state remedies have been designed to compensate the victim and enable him to vindicate his reputation. The Board's lack of concern with the "personal" injury caused by malicious libel, together with its inability to provide redress

to the maligned party, vitiates the ordinary arguments for pre-emption."  383 U.S. at 64.

Here, the merits of the Plaintiffs' damage claims can be ascertained without any examination of whether a labor dispute exists as well.  The caselaw does not require a person be injured in fact; the destruction of property or threat of violence is sufficient to lift the preemption veil.  See Prater v. UMWA, supra.[13]

## F.    THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION

Local 7 argues that if the Court finds the state claims are not preempted, that it should dismiss them in any event.  It does not even quote the terms for the statutory provision for 28 U.S.C. § 1367, which indeed does provide a jurisdictional basis for hearing the case and all the claims as a whole.  The statute provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction *that they form part of the same case or controversy* under Article III of the United States Constitution."  Local 7 does not argue the provisos in subsection (c) apply.

In the instant case, Plaintiffs alleged jurisdiction under the Sherman Antitrust Act, the Labor Act, and state law.  See Complaint ¶ 11.  This Court clearly has original jurisdiction over the federal claims.  The statute provides if the Court has jurisdiction over federal claims, then it "shall have supplemental jurisdiction over all other claims."  These are the three state torts.  "Shall" is the language of congressional directive.  United States v. Chavez, 627 F.2d 953, 954-55 (9th Cir. 1980).

The tort of interference with Performance of Contracts, Interference with Economic

---

[13]Local 7 relies heavily on Cranshaw for its preemption arguments.  Again, Cranshaw was a ruling on preemption *after trial*.  Here, the question today is the Court's jurisdiction to consider the state claims, not whether Plaintiffs have proven them within the four corners of the Complaint without further discovery and proofs.  Cranshaw supports permitting Plaintiffs to prove their case.  When the jurisdictional issue requires a ruling on the merits, a motion to dismiss should be denied.  Jones-Booker v. United States, 16 F. Supp.2d 52, 58 (D. Mass. 1998).

Relations, and violation of Mass Gen, L. c. 93A are not novel or complex and do not predominate over the antitrust causes of action in the case.[14]  The Union concedes jurisdiction under the federal claims (and especially 29 U.S.C. § 187) by not seeking to dismiss Counts I-IV "at this time."  And, there are no compelling reasons not to hear the state causes of action that include common factual allegations stemming from the federal counts.  Supplemental jurisdiction adheres.

Local 7 also refers to the statute as if it did not exist in light of Gibbs.  In that case, predating the statute, a Section 303 claim and state tort claims were asserted of conspiracy, boycott, and intentional interference with employment and contract.  After trial, the court found that the Section 303 claim was "not cognizable."  383 U.S. at 721.

Clearly, one would expect to try all claims arising from a "common nucleus of operative fact" in one case so long as the federal court has the power to hear the whole case as the Gibbs Court observed.  Id. at 725.  In Gibbs, the Court found *no error* in the trial court's acceptance of the pendent claims because the complaint alleged injury from violence.  Since the record did not show clear proof the union caused violence action, the state matters were unilaterally found to be preempted.  Id. at 742.

But, this is not the Defendant's argument.  It alleges that because only D.F.M. seems to claim jobsite damage, it appears to the Union a "comparatively insignificant allegation" to support the harm that occurred.  Mem. at 28.  Why the Union finds it necessary to minimize the factual allegation does detract from the fact that Plaintiffs' pleading of harm is adequate, understandable, and is included and identified as one tool in the Union's quiver to enforce its scheme to control the steel erection market.

---

[14]Defendant has not claimed that Plaintiffs failed to allege the appropriate elements of any of the state tort causes of action, such as that a contract was breached.

Local 7 further argues that the Plaintiff's "generalized allegations" cannot support relief under the Norris LaGuardia Act. Mem. at 28. The anti-injunctive provisions of Norris-LaGuardia do not prohibit injunctive relief when an antitrust violation is found. Columbia River Packers Ass'n v. Hinton, 315 U.S. 143 (1942).[15]

Thus it is clear that federal courts do have jurisdiction to allow labor dispute injunctions, providing the substantive and procedural rules are observed in 29 U.S.C. § 104.

While the Act does not define "unlawful acts," it is clear it refers and applies to acts of violence or threat thereof, which the executive arm of government is authorized to regulate. Carter v. Herrin Motor Freight Lines, Inc., 131 F.2d 557, 562 (5th Cir. 1942); Wilson and Co. v. Birl, 105 F.2d 948, 952 (3d Cir. 1939). See also J.B. Michael & Co. v. Iron Workers Local, 173 F.Supp. 319, 326 (W.D. Ky. 1959) (intimidation, coercion, violence, and threats of property destruction).

Congress' purpose for the Norris-LaGuardia Act "intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or plant or a place of business should be lawful;" and not "that [activity], short of fraud, breach of the peace, violence, or conduct otherwise unlawful...." New Negro Alliance v. Grocery Co., 303 U.S. 552, 562 (1938).

At this juncture, it is clear that federal courts may issue injunctions against unions if the standards are met. The Court has the authority under federal law to do so—it does not need to rely upon the equitable relief provision in Massachusetts chapter 93A to do so.

In a motion to dismiss, the Court is only looking to see if it has jurisdiction to act.

---

[15] In Connell, the Court had "no occasion . . . to consider whether the Norris-LaGuardia Act forbids such an injunction where the specific agreement sought by the union is illegal. . . . " 421 U.S. at 637 n. 19.

Plaintiff is not making a request for the Court to issue an injunction at this time.

Section 1367 requires the exercise of supplemental jurisdiction in these circumstances, despite Local 7's claim that exercise of supplemental jurisdiction "will be both inefficient and fair," Mem. at 29. Local 7 doesn't even try to explain how so or how splitting the case by remanding part to state court is efficient and fair (or that the Union would not advance a claim splitting defense or other jurisdictional defenses). Here, in one case in one court all the claims can be heard and handled.

Che v. MBTA, 342 F.3d 31 (1st Cir. 2003), is distinguishable. There, the plaintiff had two discrimination lawsuits pending in state court when the federal lawsuit with state torts were filed. In light of the similarity in witnesses and claims in the three suits, the First Circuit agreed that the district court's releasing the state claims was not an abuse of discretion. Here, there is only one case against the Defendants pending.

The standard of review for the state law claims the jury might consider will not be confusing. Many federal courts have tried cases with juries for violation of federal antitrust, labor and state law. The fact that there might be differing standards of proof is commonplace. If the jury "gets away" then the Court may exercise restraint at the appropriate time.

Finally, the Union argues that Machinists preemption forecloses the stripping and job targeting claims. As set forth previously, the Union's illegal activities as alleged by Plaintiffs are not protected under the Labor Act. Defendant does not show how in the circumstances of the allegations in the Complaint it is shielded from liability under the D.C. Circuit's decision in Can-Am Plumbing, Inc.

An employer may sue to enjoin a competitor's receipt of job target funds if the Union does not have the protection of Section 7 for collection of the funds. Can-Am Plumbing, Inc. How can Local 7 claim it can still receive and spend dues money obtained illegally from

employee wages to give back to employers from Davis-Bacon projects, such as the "Big Dig" as set forth in paragraph 46 of the Complaint with impunity?  The lack of an answer speaks volumes.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that Local 7's Motion to Dismiss Counts V-VII of the Complaint be denied.

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC., and
RONALD BEAUREGARD d/b/a
INDEPENDENT WELDING

By their attorneys,

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN, CHANDLER & MILLER LLP
99 High Street
Boston, MA  02110
(617) 542-6789


/s/ Michael E. Avakian
Michael E. Avakian
SNETANA & AVAKIAN
3211 Port Royal Road, Suite 103
Springfield, VA 22151
703-321-9181
703-321-9325 - Fax
(Admitted *Pro Hac Vice*)

Dated: March 14, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiffs' Response to Defendant Iron Workers Local 7's Motion to Dismiss Counts V-VII of Plaintiffs' Complaint was served, via email and U.S. Mail, on this the 14th day of March 2005, to the counsel of record in the above styled case named below:

> Paul F. Kelly
> Segal, Roitman & Coleman
> 11 Beacon Street
> Boston, MA 02108
> pkelly@segalroitman.com

<u>/s/ Michael E. Avakian</u>
Michael E. Avakian

JD–69–03
Columbus, OH

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

J.A. CROSON COMPANY

     and                                                   Case 9–CA–35163–1

J.A. GUY, INC.

     and                                                   Case 9–CA–35163–2

UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING
AND PIPEFITTING INDUSTRY OF THE
UNITED STATES AND CANADA, LOCAL 189,
AFL–CIO

*Earl L. Ledford, Esq.,*
  for the General Counsel.
*Ronald L. Mason, Esq.,*
  *(Mason Law Firm LPA),*
  of Dublin, Ohio,
  for the Respondent J.A. Croson Company.
*Felix C. Wade, Esq.,*
  *(Schottenstein, Zox and Dunn),*
  of Columbus, Ohio,
  for the Charging Party J.A. Guy, Inc.
*N. Victor Goodman, Esq.,*
  *(Benesch, Friedlander, Coplan & Arnoff),*
  of Columbus, Ohio,
  for the Charging Party Union.

DECISION

Statement of the Case

     ROBERT A. GIANNASI, Administrative Law Judge.   This case is before me on a stipulation by all parties that waives a hearing and asks for a decision by a judge under Section 102.35(a)(9) of the Board's Rules and Regulations.  On May 16, 2003, I granted the General Counsel's motion, on behalf of all parties, to accept the stipulation, which provides that the stipulation, attached exhibits, charges, complaints and answers constitute the entire record.  The General Counsel's consolidated complaint alleges that, by filing and pursuing state administrative charges and a lawsuit relating to

JD–69–03

Charging Party Union's job targeting program, Respondent violated Section 8(a)(1) of the Act.  The Respondent answered, denying the essential allegations in the complaint. The parties subsequently entered into a stipulation and, on June 16, 1999, filed a motion to transfer the case to the Board.  On March 2, 2000, the Board granted the motion and accepted the stipulation.  On September 26, 2002, however, the Board, noting what it considered a relevant intervening Supreme Court decision, *BE&K Construction Co. v. NLRB,* 122 S. Ct. 2390 (2002), issued an order rescinding its prior acceptance of the stipulation and remanding the case for a hearing before an administrative law judge.  The parties then submitted the case to me, as mentioned above, and, on June 19, 2003, I received briefs from the General Counsel and the Respondent.  Based on my consideration of the briefs, the stipulation, exhibits, and the entire record, I make the following

5

10

Findings of Fact

15

I.  Jurisdiction

Respondent, a mechanical contractor in the construction industry, is located in Columbus, Ohio.  At all material times, it was and is an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.  The Charging Party Union is a labor organization within the meaning of Section 2(5) of the Act.

20

II.  The Alleged Unfair Labor Practice

25

A.  The Facts

During the period June 1, 1989, through May 31, 1992, the Charging Party Union was signatory to a collective bargaining agreement with the Mechanical Contractors Association of Central Ohio, Inc. (hereafter the Association).  At all material times, Charging Party Guy was an employer member of the Association.  Under the dues checkoff provision of that agreement, Guy was required to withhold 2% from the gross wages of its employees as a "Market Recovery Assessment" for placement in the Union's Industry Advancement Fund or job targeting program.[1]  The Union uses the money collected under that program to subsidize member employers who bid on jobs in competition with nonunion employers, enabling union contractors to submit competitive bids.

30

35

40

In February 1990, Respondent and Guy submitted bids for the construction of a new county jail for Pickaway County, Ohio.  The contract for the construction of the jail was awarded to Guy.  In November 1991, Respondent and Guy submitted bids for the construction of a new water softening system for Pickaway County.  That contract was also awarded to Guy.  Prior to the bidding on the jail project, the Union agreed to "target" the job.  As a result, the Union informed union contractors bidding on the job that it would pay the successful bidder $9 per employee-hour worked by union members

45

50

[1] The 2% Market Recovery Assessment deduction is "in addition to [the] 1¾% regular check-off dues." Exhibit A, p. 42.

2

JD–69–03

on the project.  Guy's low bid on the jail project was accomplished by use of the subsidy provided by the Union's job targeting program.  The water softening project was not targeted by the Union and therefore Guy did not receive a subsidy for that job.  It is uncontested, however, that, in accordance with the relevant provisions of the Association agreement, Guy deducted the 2% Market Recovery Assessment from the gross wages of all of its employees who worked on both jobs.[2]

On January 30, 1992, Respondent filed charges with the Ohio Department of Industrial Relations, alleging that the contractually required deduction by Guy for the Union's job targeting program from employees who worked on the jail and water softening system violated Ohio's prevailing wage statute and applicable regulations.  On March 11, 1993, the Department issued a determination that Guy had violated the prevailing wage law.

On June 15, 1993, Respondent filed a complaint in the Pickaway County, Ohio, Court of Common Pleas (Case 93CI-94), alleging that Guy unlawfully deducted money from employees' wages on the public projects mentioned above, in order to fund the Union's job targeting program, in violation of Ohio's prevailing wage statute and an Ohio regulation prohibiting "special assessments."  More specifically, the complaint alleged that since the publicly funded projects were prevailing wage jobs, under the Ohio statute and applicable regulations, Guy was required to make full payment of the prevailing wage to employees, and was prohibited from making any deductions for the Union's job targeting program.  Utilizing the applicable remedial provisions of the statute and its regulations, the Respondent sought an injunction prohibiting the unlawful deductions and a reimbursement to Guy's employees of twice the difference between the prevailing wage and the amounts paid to the employees.

On July 21, 1993, Guy filed a third-party complaint in Case 93CI-94, over Respondent's objection, naming the Union a party to the lawsuit.  Respondent thereafter filed a motion to strike the third-party complaint and the Union and Guy filed oppositions to the Respondent's motion.  On November 5, 1993, the common pleas court denied the motion to strike.

Thereafter, Guy and the Union filed motions for summary judgment, asserting that the Respondent's lawsuit was preempted by federal labor laws.  Respondent filed an opposition to those motions as well as its own cross-motion for summary judgment.  On March 27, 1995, the common pleas court denied Respondent's motion for summary judgment and granted the motions filed by Guy and the Union, finding that the lawsuit was preempted by the National Labor Relations Act.[3]  After a timely filed appeal, on October 4, 1996, the Court of Appeals of Ohio, Fourth Appellate District of Pickaway

---

[2] The above description of the job targeting program and its operation is taken from the exhibits submitted along with the stipulation of the parties, including, in particular, the decision of the Ohio Supreme Court, which is discussed more fully below.

[3] The stipulation mistakenly refers to this ruling as Exhibit T.  In fact the ruling appears as Exhibit P.

JD–69–03

County, issued a decision reversing the lower court, finding, inter alia, that the lawsuit was not preempted.

5        On January 29, 1998, the Ohio Supreme Court accepted discretionary appeals by Guy and the Union, and, on April 8, 1998, the Ohio Supreme Court reversed the court of appeals, finding that the Respondent's lawsuit was preempted by the National Labor Relations Act, under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Citing *Manno Electric*, 321 NLRB 278 (1996), enfd. mem., 127 F.3d 34 (5th Cir.
10      1997), the Court concluded: "Because the NLRB has held that job targeting is *actually* protected by the NLRA, there is no room for state regulation infringing that conduct." The Court rejected as "unpersuasive" the assertion that "*Manno* is distinguishable because it did not involve a challenge brought under a state's prevailing wage law," citing a decision of an NLRB administrative law judge,[4] and commenting that, in *Manno*,
15      the Board "did not limit its holding to the facts of the case before it." *Croson Co. v. Guy, Inc.,* 81 Ohio St. 3d 346, 355 (1998), cert. denied, 525 U.S. 871 (1998).

        Based on separate charges filed by Guy and the Union on July 30, 1997, the General Counsel issued an initial consolidated complaint against the Respondent on
20      January 12, 1999. An amended consolidated complaint was issued on April 2, 1999, and a further amendment correcting an erroneous date was issued 3 days later.[5] The complaint alleged that the Respondent's legal proceedings relating to the job targeting program were "pre-empted by federal law, lacked a reasonable basis in fact and law and were retaliatory in their inception and prosecution." Respondent filed timely
25      answers denying the allegations and raised ten affirmative defenses. In its brief to me (G.C. Br. p. 16), the General Counsel appears to have abandoned the complaint theory that the Respondent's legal proceedings lacked a reasonable basis in fact and law and were retaliatory,[6] urging only the theory that the legal proceedings were preempted by
30      federal law under footnote 5 of *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 737(1983).[7]

─────────────

35      [4] The citation was to Administrative Law Judge Clifford Anderson's July 1, 1997, decision in *Associated Builders and Contractor's, Inc.* That decision was reviewed by the Board almost 3 years later; the Board's decision is reported at 331 NLRB 132 (2000). A more detailed discussion of the case appears below.

        [5] I grant the General Counsel's unopposed motion to accept formal documents. Those documents, designated Exhibit V(1) through V(12), are hereby made part of the record in this
40      case.

        [6] The General Counsel held the processing of the charges in abeyance for over a year, until the conclusion of the state lawsuit. The General Counsel was apparently focusing on the since-abandoned theory that the lawsuit was unlawful because it lacked a reasonable basis in fact or law and was retaliatory. Under Board law before the Supreme Court's decision in *BE&K, supra*,
45      a lawsuit was deemed to have no reasonable basis in law or fact if it was ultimately dismissed.

        [7] In footnote 5, the Supreme Court pointed out that the case before it involved a lawsuit "that the federal law would not bar except for its alleged retaliatory motivation." The Court added:
            We are not dealing with a suit that is claimed to be beyond the jurisdiction of the state courts because of federal-law preemption, or a suit that has an objective that is illegal under
50          federal law. Petitioner concedes that the Board may enjoin these latter types of suits. . . . Nor could it be successfully argued otherwise, for we have upheld Board orders enjoining
                                                                                            Continued

4

JD–69–03

B. Discussion and Analysis

1. Prior Board decisions on job targeting

5       The lead Board case involving state lawsuits challenging union job targeting programs is *Manno Electric, supra*, 321 NLRB 278. *Manno* involved a state lawsuit that, inter alia, broadly attacked the union's job targeting program as an unfair trade practice, which wrongfully and intentionally damaged the nonunion employer who brought the suit. With Member Cohen concurring separately, the Board (321 NLRB 278 and fn. 4)

10 summarily adopted the relevant findings of the administrative law judge. The judge found that the union's job targeting program was protected under the Act, since its objective was "to protect employees' jobs and wage scales"; and that, by "instituting and pressing the lawsuit . . . for a recovery grounded on matters preempted by the Act, the

15 [r]espondents violated Section 8(a)(1) of the Act." 321 NLRB at 297-298. In finding the lawsuit preempted and violative of the Act, the judge discussed footnote 5 of *Bill Johnson's, supra,* 461 U.S. at 737 and the Board's decision in *Loehmann's Plaza*, 305 NLRB 663 (1991). *Ibid.* [8]

20       In *Associated Builders and Contractors, Inc.*, 331 NLRB 132 (2000), the Board again applied the *Manno* rationale to find unlawful the filing and maintenance of a state lawsuit, which was deemed similarly preempted. [9] In that case, the respondent had filed a state lawsuit, alleging that each of the charging party unions' job targeting programs was an "unlawful, unfair and fraudulent business act or practice," under the California

25 Business and Professions Code. The lawsuit sought to preclude application of the programs on state public work projects and asked for the disgorgement of all money deducted from employees' wages for the job training programs and other relief. In finding the state lawsuit preempted, and thus violative of Section 8(a)(1) of the Act, the

30 administrative law judge applied *Manno* as a broad holding that job targeting programs are protected under the Act. Concluding that *Manno* was binding on him as current law, the judge deferred to the Board any argument that *Manno* should be limited to private projects. 331 NLRB at 138. He also found a violation based on the General Counsel's

35 alternative theory that the lawsuit was preempted and unlawful under the Board's decision in *Loehmann's Plaza*, *supra*, 305 NLRB 663. [10]

---

40       unions from prosecuting court suits for enforcement of fines that could not lawfully be imposed under the Act . . . [citations omitted] and this Court has concluded that, at the Board's request, a District Court may enjoin enforcement of a state-court injunction 'where [the Board's] federal power pre-empts the field,' [citing *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144, (1971)]." *Id.* at 737 fn. 5.

      [8] A more detailed discussion of *Loehmann's Plaza* follows later in this decision.

      [9] The decision was vacated in part not relevant here, pursuant to a settlement. 333 NLRB

45 No. 116 (2001).

      [10] As indicated in the judge's decision (331 NLRB at 133-134), the state lawsuit was removed to the federal courts, and, after its removal, the Ninth Circuit held that the lawsuit was not preempted by Section 301 of the Act. See *Associated Builders & Contractors v. Electrical Workers Local 302,* 109 F.3d 1353 (9th Cir. 1997). At the time of the judge's decision, the

50 lawsuit was "in the process of moving from the [f]ederal [c]ircuit [c]ourt to the district court and on to the [s]tate [s]uperior [c]ourt." 331 NLRB at 134.

In affirming the judge, the Board did not specifically discuss the application of *Manno* to state public works projects. A majority of the Board stated, in a footnote, that it was adopting the judge's finding of a Section 8(a)(1) violation "solely on the ground" that the job targeting program was concerted, protected activity and, under *Manno*, maintenance of the lawsuit "constitute[d] an interference with conduct that is actually protected by Sec. 7." In the absence of exceptions, the Board also adopted the judge's finding that the violation dated from the issuance of the Board's *Manno* decision. 331 NLRB at 132 fn. 1.[11]

Some 7 months after the Board's decision in *Associated Builders*, the Board issued another decision involving job targeting programs as they applied to projects under the Davis-Bacon Act, a federal prevailing wage law. *IBEW Local 48 (Kingston Constructors, Inc.),* 332 NLRB No. 161 (2000). The Board there held that a union violates Section 8(b)(1)(A) by threatening to have employees fired for not making job targeting payments, which the Board characterized as "MRP [market recovery program] dues," that were "owing from their employment on Davis-Bacon projects." 332 NLRB No. 161, at slip op. 10.[12] The Board reaffirmed the general rule in *Manno* that job targeting programs are "not inconsistent with public policy and are affirmatively protected by Section 7." Thus, it concluded that, since collecting job targeting payments from employees "under a union security agreement on non-Davis-Bacon jobs is not inimical to public policy," the union could properly enforce the collection of those payments as a condition of employment on those jobs. Slip op. 5. As to Davis-Bacon jobs, however, the Board found to the contrary. Without independently analyzing the impact of the Davis-Bacon Act on job targeting programs, it deferred, as "a matter of comity" to rulings of the Labor Department and holdings of two federal circuit courts that deductions for job targeting payments are not legitimate deductions under the Davis-Bacon Act. Accordingly, the Board concluded that any attempt to enforce collection of such payments would be "inimical to public policy." Slip op. 9; see also slip op. 10.

Next came *Can-Am Plumbing, Inc.,* 335 NLRB No. 93 (2001). In that case, the Board was faced with the question whether *Manno* applied where some of the money collected under the job targeting program came from Davis-Bacon and state prevailing wage jobs and the state lawsuit "broadly attack[ed] the entire job targeting program." 335 NLRB No. 93, at slip op. 1. The state lawsuit, which was stayed pending completion of the Board proceedings, alleged that a union employer's acceptance of money from the job targeting program constituted an unlawful kickback scheme or, alternatively, violated California's prevailing wage statute governing public works. The nonunion employer who instituted the lawsuit sought to enjoin acceptance of money

---

[11] In that same footnote, Member Hurtgen found a violation not under *Manno*, but under the Board's decision in *Loehmann's Plaza,* 305 NLRB 663 (1991). He therefore found that the violation dated from the issuance of the complaint.

[12] As the Board stated, the Davis-Bacon Act requires employers to pay employees the full amount of advertised prevailing wage rates, although applicable regulations permit deductions to pay regular union initiation fees and membership dues, not including fines or special assessments. 332 NLRB No. 161, slip op. 7.

JD–69–03

under the job targeting program and further asked for "actual and punitive damages, restitution and disgorgement."  335 NLRB No. 93 at slip op. 4.

5      The Board in *Can-Am* did not specifically address the state prevailing wage statute or its impact on the job targeting program, focusing instead on the *Kingston Constructors* holding that "unions may not lawfully exact dues from employees working on Davis-Bacon projects to support job targeting programs."  The Board held that *Kingston Constructors* did not affect *Can-Am,* because there was no evidence that the
10    union employer involved in the state lawsuit had ever worked on a Davis-Bacon project, and, in any event, "at most only 2 to 3 percent of the funds collected for the Union's job targeting program came from Federal or State prevailing wage jobs, and those moneys are not directly traceable to [the union employer]."  335 NLRB No. 93, at slip op. 1. Concluding that the job targeting program was therefore protected under the Act, the
15    Board held that the state lawsuit "which broadly attacks the entire job targeting program" was preempted by federal law and thus violated Section 8(a)(1) of the Act, citing *Manno* and *Associated Builders.*  335 NLRB No. 93 at slip op. 1 and fn. 3.

20      On review, the Court of Appeals recognized the Board's authority to enjoin state lawsuits that are preempted by federal law or that have an objective that is illegal under federal law, citing footnote 5 of *Bill Johnson's Restaurants, supra*, 461 U.S. at 737, which the Court found was left undisturbed by the Supreme Court's decision in *BE&K, supra,* 122 S. Ct. 2390.  *Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 150-151 (D.C.
25    Cir. 2003). The Court was not ready, however, to accept the Board's conclusion that the state lawsuit in *Can-Am* was preempted because it was directed against conduct protected by Section 7 of the Act.  Rather, the Court found inadequate the Board's justification for rejecting Can-Am's contention that the union's job targeting program was not protected because it included dues from Davis-Bacon projects.  The Court stated:
30    "While the Board . . . did not treat the existence of [Davis-Bacon] moneys in the JTP [job targeting program] as wholly irrelevant, neither did it explain why the Davis-Bacon moneys did not affect the JTP's legality or why the [u]nion's conduct in that regard was excusable."  321 F.3d at 153.  Accordingly, the Court remanded the matter to the Board
35    for further analysis.

2. Relevant preemption principles

40      The Supreme Court in *Garmon, supra,* 359 U.S. 236, established two guidelines for federal preemption of conduct allegedly protected under the Act.  Under the first guideline, when a state purports to regulate conduct that is clearly protected by the Act, state jurisdiction must yield.  359 U.S. at 244.  The Court explained that to leave the states free to regulate conduct so plainly within the central aim of federal regulation would involve "too great a danger of conflict between power asserted by Congress and
45    requirements imposed by state law.  *Id.* at 244.  Under the second guideline, even if activity is only arguably protected by the Act, the states "must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245.  The Supreme Court subsequently
50    qualified the second guideline to permit state regulation in cases involving arguably protected conduct, "when the party who could have presented the protection issue to the Board has not done so and the other party to the dispute has no acceptable means

JD–69–03

of doing so," provided the exercise of state jurisdiction would not "create a significant risk of misinterpretation of federal law and the consequent prohibition of protected conduct." *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 202-203 (1978).

5

### 3. Filing or maintaining a preempted lawsuit
in violation of Section 8(a)(1) of the Act

10      Addressing the legality of a lawsuit to enjoin peaceful picketing or handbilling on employer premises, the Board stated the following rule, in light of the Supreme Court's decision in *Sears*: "(1) where arguably protected activity is involved, preemption does not occur in the absence of Board involvement in the matter, and (2) upon the Board's involvement, a lawsuit directed at arguably protected activity is preempted by Federal labor law." *Loehmann's Plaza,* 305 NLRB 663, 669 (1991), reversed on other grounds, 15 316 NLRB 109, 114 (1995).  Board involvement occurs upon issuance of a complaint alleging that the lawsuit interfered with protected activity.  305 NLRB at 670 and 316 NLRB at 114.  But if the Board ultimately determines that the conduct in question is unprotected, the lawsuit to enjoin it will not be held to violate Section 8(a)(1) of the Act. 316 NLRB at 114.

20

     The Board has cited *Loehmann's Plaza* in cases involving lawsuits challenging aspects of job targeting programs.  Since the Board found the job targeting programs clearly or actually protected, however, it dated federal preemption and interference with 25 protected activity from filing or maintenance of the lawsuits.  *Associated Builders, supra,* 331 NLRB 132 at fn. 1 (in absence of exception to prospective application of *Manno Electric*, Board majority dated violation from maintenance of lawsuit after *Manno*; Member Hurtgen would have held violation did not occur until issuance of complaint, citing *Loehmann's Plaza*); *Can-Am, supra,* 335 NLRB No. 93, slip op. 1 fn. 3 (lawsuit 30 clearly preempted and violative of Section 8(a)(1) from time it was filed).

### 4. Issues in this case

35      The General Counsel contends: (1) the Board has already determined, in *Manno* and *Associated Builders,* that job targeting programs are clearly protected by Section 7 of the Act; and (2) the Ohio Supreme Court has therefore correctly determined that federal law preempts Respondent's state lawsuit challenging the job targeting deductions at issue in this case.  It follows, according to the General Counsel, that 40 Respondent's preempted lawsuit violated Section 8(a)(1) of the Act, consistent with footnote 5 of *Bill Johnson's, supra*, 461 U.S. at 737.

45      As discussed below, in my view, Respondent's lawsuit challenged job targeting deductions that were *arguably,* rather than *clearly*, protected by the Act.  If the Board agrees with that view, it could conclude, in accordance with *Loehmann's Plaza* and the discussion below, that Respondent's lawsuit did not violate Section 8(a)(1) of the Act because the lawsuit was concluded before complaint issued in this case.  Alternatively, the Board may wish to address whether Respondent violated Section 8(a)(1) by 50 challenging job targeting deductions from wages on two public projects, under Ohio's prevailing wage law, in light of the Board's decision in *Kingston* that such deductions on federal Davis-Bacon projects are inimical to public policy.  I do not believe it would be

appropriate for me to address that issue of first impression concerning Board policy. Nor do I believe that the Board needs to reach it in this case, which involves state proceedings initiated in 1992 and concluded in 1998.

5

> ### 5. Respondent's lawsuit was narrowly addressed to conduct that was arguably, rather than clearly, protected by the Act

10

As shown, Respondent's lawsuit challenged only job targeting deductions from employees' wages on two publicly funded projects, under Ohio's prevailing wage law. By contrast, the Board's lead decision in *Manno Electric, supra,* 321 NLRB 278, involved a broadly framed attack on a union job targeting program. Although the Board, in *Manno,* did not explicitly state whether any of the job targeting funds derived from public works projects, "the decision suggests that all of the projects involved were on

15

private sites, such as banks and department stores; the complaint did not allege that any of the money originated from public projects."[13] In that context, the Board adopted the administrative law judge's conclusion that the lawsuit's broad attack was preempted because job targeting programs are generally protected under the Act, as their objective is "to protect employees' jobs and wage scales." 321 NLRB at 297-298.

20

The Board's subsequent decision in *Kingston Constructors, supra*, 332 NLRB No. 161, slip op. at 7-10, demonstrates that the holding of general protection for job targeting programs in *Manno* is not to be read without exception. Rather, the Board, in

25

*Kingston,* concluded that requiring payment of job targeting dues, as a condition of employment on Davis-Bacon projects, would be "inimical to public policy." *Id.* at slip op. 9. In reaching that conclusion, the Board deferred, as a matter of comity, to federal decisions holding collections of job targeting dues on federal projects unlawful under the Davis-Bacon Act. *Id.* at slip op. 9-10. As shown below, different considerations apply in

30

determining whether the collection of job targeting payments on public projects, contrary to state prevailing wage laws, is also inimical to public policy and therefore unprotected. Nonetheless, that is an arguable question.

35

Contrary to the General Counsel's position, that question is not answered by the Board's decision in *Associated Builders* or the Ohio Supreme Court's holding in *Croson v. Guy* that the Respondent's lawsuit was preempted. Both decisions predated *Kingston* and both treated the Board's decision in *Manno* as dispositive, without any discussion of the issues presented by applying *Manno* to block enforcement of

40

prevailing wage laws on public projects. *Associated Builders, supra*, 331 NLRB at 132 fn. 1 and 138; *Croson v. Guy, supra*, 81 Ohio St. 3d at 352-356. *Kingston* is relevant here, even though it postdated completion of Respondent's lawsuit. Whether a lawsuit challenged protected activity and therefore violated Section 8(a)(1) is to be determined under the law as it stands when the issue ultimately comes before the Board. See

45

*Loehmann's Plaza, supra*, 316 NLRB at 114, discussed above.[14]

---

[13] *Can-Am Plumbing, Inc. v. NLRB, supra,* 321 F.3d at 152.

50

[14] The Ohio Supreme Court's holding does not, of course, act as a limitation on the Board's authority to determine the issues presented in this case. On the contrary, deference to the Board's broad authority to determine those issues was the guiding principle that led the Ohio

Continued

JD–69–03

Several factors favor like treatment for federal and state prevailing wage laws in the determination whether job targeting payments in violation of those laws are inimical to public policy or unprotected. The phrasing and purposes of federal and state prevailing wage laws and regulations are similar. Compare discussion in *Kingston*, 332 NLRB No. 161 at slip op. 7-10, and *Building and Const. Trades Dept. v. Reich*, 40 F.3d 1275, 1279 (D.C. Cir. 1994), with *Croson v. Guy, supra*, 81 Ohio St. 3d at 349-350. States have traditionally regulated the wages paid on their public projects. Cf. *California Labor Standards Enforcement v. Dillingham Construction*, 519 U.S. 316, 330-331, 334 (1997) (noting traditional state regulation of wages and apprenticeship standards on public works and finding no preemption under ERISA, given the "paucity of indication" of any Congressional intent to preempt). The holding of no preemption in *Dillingham* is, of course, not dispositive of the underlying preemption issue here, under a different federal statute with very different policy considerations. See *Associated Builders, supra*, 331 NLRB at 138. But the recognition of traditional state regulation of wages on public projects is nonetheless relevant.

Moreover, the concerted needs served by job targeting programs—to protect employees' jobs and wage scales—are diminished on prevailing wage projects. There, the objective of "leveling the playing field"[15] is to some extent achieved by the guarantee of the same prevailing wage for all. As the Ohio Supreme Court observed: "[T]he primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private construction sector." *Croson v. Guy, supra,* 81 Ohio St. 3d at 349 (internal citation omitted).

Nor is it a sufficient answer to say that job targeting programs generally serve the concerted objective of protecting wages and jobs. *Kingston* and *Can-Am* demonstrate that those generally protected objectives will not override prevailing wage regulation in all circumstances. *Kingston, supra*, 332 NLRB No. 161, at slip op. 5, 7-10; *Can-Am Plumbing, supra*, 335 NLRB No. 93 at slip op. 1, remanded in *Can-Am Plumbing v. NLRB, supra*, 321 F.3d at 152-154. It is also significant, in this respect, that the narrow focus of Respondent's lawsuit leaves the Union's job targeting program intact insofar as it involves private rather than public projects.

The above considerations could support a conclusion that job targeting deductions on state prevailing wage projects are unprotected, as they are on federal projects. There are, however, significant considerations on the other side. The strong policy of uniform national regulation, under the Act, may outweigh factors supporting state regulation. *Garmon, supra*, 359 U.S. at 242-244. It is clear that Congress, in enacting the NLRA, intended no "patchwork quilt" of regulation. *NLRB v. Natural Gas of Hawkins County*, 402 U.S. 600, 603-604 (1971), quoting from *NLRB v. Randolph Electric Membership Corp.*, 343 F.2d 60, 62-63 (4th Cir. 1965). Rather, Congress sought to avoid the "diversities and conflicts likely to arise from a variety of local

---

Supreme Court to conclude that Respondent's state lawsuit was preempted.
     [15] *Can-Am Plumbing v. NLRB, supra*, 321 F.3d at 151.

JD–69–03

procedures and attitudes towards labor controversies." *Garmon, supra*, 359 U.S. at 243, quoting from *Garner v. Teamsters Union*, 346 U.S. 485, 490-491(1953).

5    Accordingly, deferring to federal decisions under another uniform federal statute, the Davis-Bacon Act, is sharply distinguishable from allowing prevailing wage laws in the various states to limit otherwise protected conduct under the Act. But the conflicting considerations in this case are not automatically or clearly resolved by reference to past Board decisions. In short, the underlying protected activity and preemption issues here 10   are arguable. And since Respondent's state lawsuit was concluded before complaint issued in this case, it did not violate Section 8(a)(1). *Loehmann's Plaza, supra*, 305 NLRB at 669-671, and 316 NLRB at 114.[16]

Conclusion of Law

15   The General Counsel has failed to show that Respondent violated Section 8(a)(1) of the Act by filing a state lawsuit that was preempted by the Act.

20   On these findings of fact and conclusion of law, and on the entire record, I issue the following recommended[17]

ORDER

25   The complaint is dismissed in its entirety.

Dated, Washington, D.C. June 27, 2003.

30

_____
Robert A. Giannasi
Administrative Law Judge

35

_____

[16] The private parties may find it unsatisfactory for the complaint in this case to be dismissed without resolution of the underlying protected activity question. The parties have waited over ten years for a definitive answer and the issue may be a source of recurring conflict between 40   them. But the passage of time, intervening Board and court decisions, and the conclusion of the state lawsuit may have altered the landscape for the parties. Those changed circumstances could lead the Union to reexamine the wisdom of collecting job targeting payments on prevailing wage projects, whether state or federal. See *Can-Am Plumbing v. NLRB, supra,* 321 F.3d at 154 ("On remand, additional evidence may show that the Union stopped withholding Davis-45   Bacon dues at the time . . . [the union contractor] submitted its bid on the . . . project, or, indeed, long before that time.") Such a reexamination could also lead to voluntary resolution of the matter, obviating the need for further litigation in this area.

[17] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 50   102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

NOT INCLUDED
IN BOUND VOLUMES

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

J.A. CROSON COMPANY

     and                                      Case 9-CA-35163-1

J.A. GUY, INC.

     and                                      Case 9-CA-35163-2

UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING
AND PIPEFITTING INDUSTRY OF THE
UNITED STATES AND CANADA, LOCAL 189,
AFL-CIO

CAN-AM PLUMBING, INC.

     and                                      Case 32-CA-16097

UNITED ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE PLUMBING
AND PIPEFITTING INDUSTRY OF THE
UNITED STATES AND CANADA, LOCAL 342,
AFL-CIO

     and

L.J. KRUSE CO.
(Party in Interest)

     and

U.A. 342 JOINT LABOR-MANAGEMENT
COOPERATION COMMITTEE, INC.
(Party in Interest)

NOTICE AND INVITATION TO FILE BRIEFS

J.A. Croson Company, Cases 9-CA-35163-1-2 was transferred to the Board following the issuance of the administrative law judge's decision (JD-69-03) on June 27, 2003.  The Board's decision in Can-Am Plumbing, Inc., 335 NLRB No. 93, was remanded to the Board by the United States Court of Appeals for the District of Columbia Circuit, 321 F.3d 145 (DC Cir., 2003), on February 28, 2003.  In each of these cases, the parties have filed briefs and/or statements of position and some amicus briefs have also been filed.

Additional interested amici are invited to file briefs with the Board in Washington, D.C. on or before January 20, 2004, addressing the job targeting issues raised in these cases.  No extensions of time will be granted for the filing of these briefs, which shall not exceed 50 pages in length.  The parties may file responses to these briefs on or before February 3, 2004.[1]  No extensions of time will be granted for filing responses.  No other responsive briefs will be accepted.

The Board has included these two cases in a single notice inviting the filing of briefs in order to afford the opportunity to other interested amici to fully address the job targeting issues that are raised by these two cases.  The Board, however, has not consolidated these cases for decision.  Accordingly, although one brief should be filed addressing both cases, eight copies of the brief should be submitted for each case (16 copies total).

Dated, Washington, D.C., December 22, 2003

By direction of the Board:

Lester A. Heltzer
Executive Secretary

---

[1] The due date for responses to the amicus brief filed in J.A. Croson Company, 9-CA-34163-1-2, by National Electrical Contractors Association and the International Brotherhood of Electrical Workers, AFL-CIO remains January 16, 2004.