UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12536-RGS

AMERICAN STEEL ERECTORS, INC., ET AL.

v.

LOCAL UNION NO. 7,
INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

MEMORANDUM AND ORDER
ON MOTION OF DEFENDANT LOCAL 7 TO DISMISS

February 6, 2006

STEARNS, D.J.

On December 2, 2004, six nonunion steel erector companies – American Steel Erectors, Inc., Ajax Construction Company, Inc., American Aerial Services, Inc., Bedford Ironworks, Inc., D.F.M. Industries, Inc., and Ronald Beauregard d/b/a Independent Welding – brought this Complaint against Local Union No. 7 (Local 7) of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, and its former President and current Business Agent and Analyst, Charles Wright.[1]  Plaintiffs allege that Local 7 conspired with the Building Trades Employers' Association of Boston and Eastern Massachusetts, several named and unnamed union construction companies, and various union entities, to injure or destroy the business of steel erector companies that refuse to employ members of Local 7.

---

[1] Plaintiffs also named the Steel Erection and Ornamental Iron Industry Advancement Fund as a defendant, but dismissed the Fund from the suit on March 29, 2005.

Plaintiffs allege that Local 7 requires its members to contribute to a "Job Target" or "Industry Advancement Fund" (Fund). The ostensible purpose of the Fund is to compensate unionized employers who are placed at a competitive disadvantage because of the higher wages paid to union workers.  According to plaintiffs, money from the Fund is funneled to nonunion companies who are willing to hire Local 7 members, despite the absence of a collective bargaining agreement (CBA) .  Nonunion employers who receive money from the Fund refuse to hire plaintiffs' workers for fear of losing the subsidy in retaliation.  Plaintiffs contend that the subsidy scheme is but one of Local 7's unfair labor practices.

The Complaint alleges that coercive activity on the part of Local 7 violates the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 (Counts I, II and III) and the National Labor Relations Act (NLRA), 29 U.S.C. § 187 (Count IV).  Plaintiffs also assert state-law claims of tortious interference with advantageous contractual and economic relations (Counts V and VI), and violation of the Massachusetts Fair Business Practices Act, G.L., c. 93A (Count VII).[2]

On February 1, 2005, Wright moved to dismiss himself from the Complaint, arguing that a union official cannot be sued for money damages in his individual capacity for labor-related activity.  Simultaneously, Local 7 moved to dismiss the state-law claims, arguing that they are preempted by the NLRA, 29 U.S.C. §§ 151-169.  On June 9, 2005, the court

---

[2]According to ¶¶ 11, 179, and 184 of the Complaint, the common-law claims are brought under "the laws of the Commonwealth of Massachusetts, State of Maine, State of New Hampshire, and the State of Rhode Island," but no specific reference is made to any state law other than Massachusetts Chapter 93A.

heard argument on the motions. On June 10, 2005, the court allowed Wright's motion to dismiss, citing Montplaisir v. Leighton, 875 F.2d 1, 4 (1st Cir. 1989) ("The [Supreme] Court has long held that 'union agents' are not personally liable to third parties for acts performed on the union's behalf in the collective bargaining process."). What remains is Local 7's companion motion to dismiss.

Local 7 argues that federal labor law preemption bars plaintiffs' state-law claims. Under the Supremacy Clause, Congress has the authority to preempt state law. Because the authority is permissive in nature, preemption is found only where (1) Congress has made an express declaration of its intent to displace state law, (2) where state law is in actual conflict with federal law, or (3) where Congress has made clear its preference that federal law "occupy the field." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-373 (2000).

There are two distinct theories of federal labor law preemption, both of which are asserted by Local 7. Under San Diego Building and Trades Council v. Garmon, 359 U.S. 236 (1959), a State is prohibited from regulating conduct that is not only in actual conflict with federal law, but also conduct that is arguably protected or prohibited the NLRA. If a State attempts to regulate conduct protected by the NLRA, preemption follows "as a matter of substantive right." Brown v. Hotel and Restaurant Employees, 468 U.S. 491, 503 (1984). As the Supreme Court explained in Garmon:

> [w]hen it is clear or may be fairly assumed that the activities which a State purports to regulate are protected by [Section] 7 of the [NLRA], or constitute an unfair labor practice under [Section] 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation

3

> involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.

<u>Id.</u> at 244. Section 7 of the NLRA identifies three protected areas of labor-related activity in which a State is not permitted to intrude: (1) the decision of employees to form, join, or assist a labor union; (2) collective bargaining; and (3) concerted activity undertaken by employees for mutual aid or protection. 29 U.S.C. § 157. The NLRA also prohibits employers and unions from engaging in unfair labor practices. Under section 8(a) of the NLRA, employers are prohibited from interfering with employees' exercise of their section 7 rights, while under section 8(b) unions have a reciprocal obligation to respect the section 7 rights of employers.

The goal of <u>Garmon</u> preemption is to preserve the primary jurisdiction of the National Labor Relations Board (NLRB) to interpret and enforce the NLRA. Again, as the Court explained in <u>Garmon</u>:

> At times it has not been clear whether the particular activity regulated by the States was governed by [Section] 7 or [Section] 8 or was, perhaps, outside of both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the [NLRA] that these determinations be left in the first instance to the [NLRB]. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board.

<u>Garmon</u>, 359 U.S. at 244-245. "This administrative scheme was designed to avoid the danger of conflicting or incompatible adjudications such as would inevitably result from having multiple forums, with their diverse procedures, entertain claims under the NLRA." <u>Chaulk Servs. Inc. v. MCAD</u>, 70 F.3d 1361, 1364 (1st Cir. 1995).

Under the second theory of preemption, States may not regulate conduct that is

4

outside of the NLRA's zone of protection if it involves activity that Congress intended "'to be controlled by the free play of economic forces.'" Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 147-148 (1976). "If Garmon finds its theoretical foundation in the notion of the [NLRB's] primary jurisdiction, then the Machinists preemption finds its roots in the theory of field occupation." Stephen F. Befort, At the Cutting Edge of Labor Law Preemption: A Critique of Chamber of Commerce v. Lockyer, 20 Lab. Law 107, 113 (2004). As the Supreme Court explained:

> [t]hat a particular activity might be 'protected' by federal law not only when it fell within [Section] 7, but also when it was an activity that Congress intended to be 'unrestricted by *any* governmental power to regulate' because it was among the 'permissible weapons in reserve, . . . actual exercise [of which] on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.'

Machinists, 427 U.S. at 141, quoting NLRB v. Ins. Agents Int'l Union, 361 U.S. 477, 488-489 (1960). States, in other words, must refrain from any attempt to go beyond the bounds of the NLRA in limiting the power of employers and unions to use lawful economic coercion as a weapon in labor disputes. Indeed, the resort to lawful economic weapons is "part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." Insurance Agents, 361 U.S. at 489. In applying Machinists, "[w]hether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate the effective implementation of the [NLRA's] processes.'" Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 615 (1986), quoting Machinists, 427 U.S. at 147-148. "Courts tend to invoke a Machinists analysis most frequently when confronted

5

with state laws that have an arguably regulatory effect on the self-help weapons available to the parties in a labor dispute." Befort, 20 Lab. Law at 114.

There are three exceptions to federal labor law preemption: (1) "where Congress has expressly carved out an exception to the NLRB's primary jurisdiction;" (2) where "the regulated activity touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction,' courts 'could not infer that Congress had deprived the States of the power to act;'" and (3) where "the regulated activity is merely a peripheral or collateral concern of the labor laws." Tamburello v. Comm-Tract Corp., 67 F.3d 973, 977 (1st Cir. 1995), quoting in part Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters, 436 U.S. 180, 195 (1978).[3] The second and third exceptions require the balancing of "the [S]tate's interest in controlling or remedying the effects of the conduct . . . against both the interference with the [NLRB's] ability to adjudicate controversies committed to it by the Act, . . . and the risk that the [S]tate will sanction conduct that the [NLRA] protects." Belknap v. Hale, 463 U.S. 491, 498-99 (1983).

In considering any of the three exceptions, a court must first determine whether the allegations set out in the state-law claims touch upon matters that would give rise to a claim under the NLRA. Here plaintiffs' state-law claims incorporate by reference all of the allegations set out in the federal anti-trust and unfair labor practices claims of the Complaint. Plaintiffs, in other words, allege that Local 7's conduct simultaneously violates

---

[3]In cases where the underlying conduct is arguably prohibited by the NLRA, "[t]he critical inquiry . . . is . . . whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the [NLRB]." Sears, 436 U.S. at 197.

both state and federal law. Thus, the only remaining issue is whether any of the conduct alleged falls within the "deeply rooted in local feeling" or "peripheral concern" exceptions to federal labor law preemption.[4]

Plaintiffs make a largely rhetorical argument that Local 7's conduct implicates the "historic state interest in 'such traditionally local matters as public safety and order and the use of the streets and highways.'" Farmer v. United Bhd. of Carpenters, 430 U.S. 290, 299 (1977). Plaintiffs refer the court to cases in which claims involving rioting, mayhem, arson, malicious libel, and intentional infliction of emotion distress were found to survive preemption because the remedies offered under state law were not only available at common law, but are separate and distinct from those available from the NLRB.[5] See Wisconsin Dept. of Indus., Labor and Human Relations v. Gould, Inc., 475 U.S. 282, 291 (1986).

While the court agrees with plaintiffs' general description of the applicable law, the factual allegations of the Complaint do not implicate conduct "touch[ing] interests so deeply rooted in local feelings and responsibility," that State regulation would be expected. Garmon, 359 U.S. at 243-244. The gravamen of the Complaint is that Local 7 uses economic weapons to coerce nonunion employers into hiring union workers - an allegation

---

[4]While plaintiffs' Memorandum discusses at length the legal basis for the federal claims, it does not in any substantive sense dispute Local 7's contention that the conduct alleged is conduct arguably prohibited or protected by the NLRA.

[5]The usual context in which preemption is not found is one in which the State is seeking to prosecute criminal conduct incidental to a labor dispute, as for example, when picketing at a job site becomes violent and results in personal injury. See Sears, 436 U.S. at 219-220; Commonwealth v. Noffke, 376 Mass. 127, 130-134 (1978). See also Belfort, 20 Lab. Law at 112.

that lies at the heart of the regulatory province of the NLRB. The Complaint cites repeated instances of Union 7's alleged "top-down organizing," job targeting, threats to picket, "sham" picketing, "wide-spread" picketing, work slow downs, threatened slow downs, work stoppages, and the "stripping" of non-union employees. This are quintessential examples of the types of conduct that are committed by the NLRA to the primary jurisdictional oversight of the NLRB.

In an attempt to capture an exception to federal labor law preemption, the Complaint alleges that Local 7 members frequently videotape work at nonunion job sites as a means of gathering evidence to lodge complaints with federal and state authorities against nonunion employers. Whether the complaints are "sham" (as plaintiffs allege) or not, such videotaping is a classical example of the type of lawful coercive activity that the Taft-Hartley Act permits.[6] The Complaint also alleges that Local 7 members "engage in violence." No factual content is offered for the allegation other than a reference to disruptive conduct at a single job site. The Complaint does not describe a violent act with any specificity or indicate whether a Local 7 member or official was involved. Paragraph 73 of the Complaint is illustrative. It states that:

> [o]n June 19, 2003, [Edwin] Wright went to the [Fox 25] job site and disrupted the job by making threatening statements to Plaintiff's employees and supervisors of physical harm. [Plaintiff's] equipment on the jobsite was damaged.

The generic allegations of violent conduct set out in the Complaint are insufficient to trigger any exception to the preemption doctrine.

---

[6]Videotaping of public activity for the purposes of petitioning governmental authorities would seem to be activity protected by the First Amendment.

## ORDER

For the foregoing reasons, Local 7's motion to dismiss the state-law claims is ALLOWED.

                                      SO ORDERED.

                                      /s/ Richard G. Stearns

                                      _____
                                      UNITED STATES DISTRICT JUDGE