UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
AMERICAN STEEL ERECTORS, INC., et al. )
                                    )
        Plaintiffs,                 )
                                    )
    v.                              )
                                    )
LOCAL UNION NO. 7, INTERNATIONAL    )
ASSOCIATION OF BRIDGE,              )   Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &            )
REINFORCING IRON WORKERS,           )
                                    )
        Defendant.                  )
_____)

**STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANT IRON WORKERS LOCAL 7'S MOTION FOR
SUMMARY JUDGMENT ON COUNTS I-III OF PLAINTIFFS' COMPLAINT**

Pursuant to Local Rule 56.1, Defendant Iron Workers Local 7 ("Local 7" or the "Union") hereby states the material facts of record as to which Local 7 contends there is no genuine issue to be tried. Because Local 7 presents four arguments why summary judgment is appropriate on Counts I-III, the Statement of Undisputed Material Facts ("Undisputed Facts") is drafted in four parts to reflect those arguments:

    **A. Plaintiffs Cannot Establish An Anti-Trust Injury**

    1. ***Structural steel erection is a labor-intensive industry, in which a large portion of the cost is labor.*** Affidavit of John F. Hurley ("Hurley Aff.") ¶ 6[1] ("Steel erection is a labor intensive portion of the industry. A steel erection contractor basically needs good credit and a supply of good labor. Typically, steel erection contractors rent cranes and hire labor."); Plaintiffs' Complaint ("Compl.") ¶ 36 ("The construction industry is a labor intensive industry in

---

[1] All affidavits referenced herein are attached to the Appendix of Affidavits in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment, filed herewith.

which a large portion of the cost is labor (approximately 50%)").

2. ***Plaintiffs compete in the structural steel erection industry, in part, by paying lower labor costs.***  Hurley Aff. ¶ 6 ("Non-union steel erection contractors such as Plaintiffs pay substantially lower wage and benefit rates than union contractors such as Local 7's signatory contractors."); Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union contractors such as Plaintiffs], the cost attributable to structural steel labor services is variable and subject to competitive forces and . . . is almost always less expensive than the rates set by Local 7 contractors.").

3. ***Local 7's use of job targeting funds assists Local 7 signatory contractors who might be at a competitive disadvantage because of collectively bargained labor costs to compete with non-union and union contractors.***  Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program[.] The purposes of job targeting were twofold. First, to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms with regard to wages and benefits appeared an obstacle to competing against non-union competition."); Hurley Aff. ¶ 23 ("Job targeting provided relief from the constraints of Local 7's collective bargaining agreement's terms regarding wages and costs of benefits, particularly designed to reduce wage and benefit rate differentials for Local 7 contractors seeking to obtain work on a particular job."); Hurley Aff. ¶ 24 ("[The job targeting program] was also used to promote the employment of Local 7 members rather than other unionized trades' employers, i.e., union competition. Other trade unions regularly compete with iron workers for certain work. Occasionally, job targeting money was used to attempt to secure work for Local 7 members when its signatory contractors were competing against contractors signed to other union agreements."); Compl. ¶ 34 ("These [job targeting] subsidies are allegedly

available only to steel contractors who are parties to the collective bargaining agreement with Local 7 and are intended to assist those employers in meeting the competition from non-union structural steel erectors."); Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union contractors such as Plaintiffs], the cost attributable to structural steel labor services is variable and subject to competitive forces and (in the absence of predatory pricing tactics [*inter alia*, Local 7's job targeting program]) is almost always less expensive than the rates set by Local 7 contractors.").

4. ***Job targeting funds reduce the labor costs of Local 7 signatory contractors on a particular job.*** Hurley Aff. ¶ 26 ("Local 7 regularly provided its signatory contractors with job targeting funds for the very reason that Local 7 did not maintain agreements with higher tier employers who controlled the work and, in the absence of a job targeting funds, the union signatory contractor might lose the job to a contractor with a lower wage and benefits package."); Compl. ¶ 60 ("[O]n many occasions, Non-Labor businesses benefit . . . by engaging in the practice of using the significantly lower price on a job it receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate downwards the price for the same job from a Local 7 Contractor. Rather, they often use Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to induce job target subsidies."); Compl. ¶ 34 ("These [job targeting] subsidies are allegedly available only to steel contractors who are parties to the collective bargaining agreement with Local 7 and are intended to assist those employers in meeting the competition from non-union structural steel erectors.").

5. ***Fabricators and general contractors gain advantage from the availability of job targeting funds by obtaining structural steel erection at lower costs***. Hurley Aff. ¶ 7 ("In the

3

construction industry, a general contractor generally solicits prices for the combined work of steel fabrication and erection, which may be referred to as the "fabrication-erection package." Fabricators produce the steel. Steel erectors assemble it. When a fabricator obtains work (that is, the fabrication-erection package) from a general contractor, the fabricator will either erect the steel or subcontract out the steel erection. Most fabricators subcontract the erection work. As a result, although some Local 7 steel erection contractors also fabricate, most of them do not. These erectors generally work as subcontractors to fabricators."); Compl. ¶ 40 ("Plaintiffs are usually a subcontractor to a steel fabricator which is in turn typically a subcontractor to a general contractor of a project developer."); Hurley Aff. ¶ 23 ("Job targeting provided relief from the constraints of Local 7's collective bargaining agreement's terms regarding wages and costs of benefits, particularly designed to reduce wage and benefit rate differentials for Local 7 contractors seeking to obtain work on a particular job."); Compl. ¶ 60 ("[O]n many occasions, Non-Labor businesses benefit from the [alleged] conspiracy by engaging in the practice of using the significantly lower price on a job it receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate downwards the price for the same job from a Local 7 Contractor. Rather, they often use Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to induce job target subsidies.").

  6. ***There are few barriers to entry into the structural steel erection industry.*** Hurley Aff. ¶ 6 ("Steel erection is a labor intensive portion of the industry. A steel erection contractor basically needs good credit and a supply of skilled labor. There are few barriers to entry in this portion of the industry."); Compl. ¶ 36 ("The construction industry is a labor intensive industry in which a large portion of the cost is labor (approximately 50%).").

7. ***There are currently over 150 firms that do structural steel erection work in the locations at issue here.*** Hurley Aff. ¶ 8 ("Work performed by Local 7 members arises out of projects involving several layers of commercial entities, including owners, developers, general contractors, fabricators, and steel erection contractors. To my knowledge, competition exists at all of these levels. General contractors compete for projects from owners and developers. Fabricators compete with each other for subcontracts from general contractors. In addition, the fabricators at times compete directly with steel erection contractors, including both Plaintiffs and union signatory steel erection contractors on occasions when the steel erection contractors themselves bid for the full fabrication-erection package, expecting to subcontract the fabrication work."); Hurley Aff. ¶ 9 ("The locals in the Iron Workers District Council of New England work with over 230 contractors who have signed collective bargaining agreements. I would estimate that approximately 70% of them compete for structural steel erection work. These contractors secure work through business and personal relationships they have developed with particular contractors, through direct negotiations, competitive bidding, associations with developers, and many other factors. Often contractors solicit "bids" that lead to further solicitations, modifications of prior bids and, as a practical matter, a negotiated price."); Compl. ¶¶ 2-7 (naming Plaintiffs who do structural steel erection work in the Relevant Market).

8. ***Plaintiffs have not been excluded from bidding on public sector project labor agreement jobs, which have been the largest construction projects undertaken in the Greater Boston area and New England in the last twenty (20) years.*** Affidavit of Joseph W. Nigro ("Nigro Aff.") ¶ 3 ("In the last twenty (20) years the largest [construction projects undertaken] in the Greater Boston area, and indeed in New England, have been public sector projects in Massachusetts that have been governed by project labor agreements ("PLAs.")"); Nigro Aff. ¶

5

("While the PLAs and bid specifications for the largest public sector projects in Massachusetts in the last twenty (20) years have required that all contractors and subcontractors must abide by the terms of a PLA as a condition of performing work on the particular PLA jobsite, these public sector PLAs guarantee that all contractors and subcontractors, union and non-union alike, have the same rights to bid for and be awarded work on that project."); Nigro Aff. ¶ 11 ("I am not aware that Plaintiffs in this case attempted to obtain any steel erection work on any significant portion of the work on these very large public jobs in the last ten years, either by public bidding or by negotiation to perform subcontracts for successful bidders, despite the open access provisions of the PLAs[.]"); Nigro Aff. ¶ 8 Tab A, Decision of Judge Garsh in Utility Contractors Assoc. of New England, Inc. v. Commissioners of the Mass. Dept. of Public Works, No. 90-3035, 1996 WL 106983, at *13 n.15. (Mass. Super. March 12, 1996) ("As of September, 1995, 55 construction projects have been let on the [Big Dig] Project.  A total of 296 bids were received with respect to those contracts, including 13 bids by non-union contractors on 10 of those contractors.  Of those 13 non-union bids, only 2 were low bidders, and one of those was withdrawn.  There are at least 28 non-union subcontractors working on the Project under the terms of the Project Labor Agreement."); Compl. ¶ 38 ("There is no requirement in law or otherwise that only contractors signatory to an agreement with Local 7 or one of the union co-conspirators may do steel and structural steel erecting work in the Relevant Market, including federal and state government funded projects."); Compl. ¶ 43 ("Since approximately 1999, total structural steel erection construction spending on an annualized basis in the relevant market was in excess of $200,000,000 per year.  Of that total, however, more than half can be accounted for by the Boston Central Artery and Harbor Tunnel project (also known as the 'Big Dig'), which was subject to a project labor agreement[.]").

B.  **The Job Targeting Program Falls Within the Non-Statutory Labor Exemption**

1.  *Local 7 members voted to pool portions of their own wages for the job targeting fund and authorized the Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") employers to deduct dues for the fund from their paychecks to be forwarded to Local 7.*  Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program . . . .  The job targeting program was funded out of the dues of Local 7 members."); Hurley Aff. ¶ 21 ("During the period when I was President of Local 7, the membership considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest.  The membership rejected this idea.  Instead, the membership voted to permanently fund the job targeting program with dues."); Gunning Aff. ¶ 4 ("The BTEA's and Local 7's collective bargaining agreement at Section 9 provides, inter alia, that employees who sign check-off authorizations will be subject to a working dues deduction .85 for every hour worked, designated for the Local 7's Market Recovery Program, which I understand is also called a job targeting program[.]"); Gunning Aff. ¶ 5 ("Neither the BTEA nor its employer members were involved in the establishment of the job targeting program or in Local 7's decision to use a dues deduction to fund the program.  The establishment of the program and the decision to use dues monies and deductions (and the particular amounts) were arrived at by Local 7 on its own, prior to its asking that it be referred to in its collective bargaining agreement with BTEA in the agreement dated November 1, 1993 to September 15, 1997."); Compl. ¶ 4 ("Job Target Fund" or "Industry Advancement Fund" refers to a job subsidy program financed by contributions from hourly wages provided for in the collective bargaining agreement Local 7 entered into with BTEA and other contractor associations on behalf of Local 7 Contractors.").

2. ***Job targeting funds reduce the labor costs of Local 7 signatory contractors on a particular job***.  <u>See</u> Undisputed Facts, ¶ A4.

3. ***Job targeting funds are awarded on a job-by-job basis.***  Hurley Aff. ¶ 19 ("On many occasions, Local 7 approached non-signatory erectors, fabricators and developers or owners about obtaining an individual job for its members or for signatory contractors, in part, because Local 7 did not have any prior agreements that would otherwise prevent jobs from being awarded non-union.  Local 7's job-by-job solicitations were oftentimes successful, and oftentimes unsuccessful, and were always limited to the particular job at hand."); James Coyle Affidavit ("Coyle Aff.") ¶ 10 ("On many occasions, Local 7 approached non-signatory erectors, fabricators and developers or owners about obtaining an individual job for its members or for signatory contractors, in part, because Local 7 did not have any prior agreements that would otherwise prevent jobs from being awarded non-union.  Local 7's job-by-job solicitations were oftentimes successful, and oftentimes unsuccessful, and were always limited to the particular job at hand."); Coyle ¶ 11 ("Local 7 regularly provided its signatory contractors with job targeting funds for the very reason that Local 7 did not maintain agreements with higher tier employers who controlled the work and, in the absence of a job targeting fund, the union signatory contractor might lose the job to a contractor with a lower wage and benefits package.  On jobs where this succeeded in obtaining the work, the use of job targeting funds for the individual job did not result in any agreement between Local 7 and the owners, general contractors, developers or fabricators that would prevent those companies from using non-Local 7 signatory steel erectors on any future job, or even a subsequently bid portion of the job.  In numerous cases, where Local 7 won part of a steel erection job on a particular jobsite, it later lost a subsequent steel erection job on the same jobsite.  Local 7's job targeting program was always maintained

8

and administered by Local 7. No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program. The targeted jobs were always selected by Local 7. The decision whether to target and the amount of money provided was always determined exclusively by Local 7. Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else."); Compl. ¶¶ 67-139 (alleging twenty-five or more separate instances in which Local 7 allegedly sought and obtained work for its members by appealing to various fabricators and developers using job targeting funds).

C. **Local 7's Job Targeting Program and Other Organizing Activities Are Exempted by the Statutory Labor Exemption**

1. *Local 7's job targeting program helps to secure work at labor wage and benefit standards for Local 7 members in geographical locations where non-union competition is strongest and helps to fund the Union's monitoring of regulatory cheating in the structural steel erection industry.* Hurley Aff. ¶ 20 ("The purposes of the job targeting program were twofold. First, to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms with regard to wages and benefits appeared an obstacle to competing against non-union competition. Second, to monitor the steel erection industry to help eliminate extensive statutory and regulatory cheating in the non-union sector of the industry, thereby creating a more lawful level playing field for the environment in which Local 7 members work."); Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union contractors such as Plaintiffs], the cost attributable to structural steel labor services is variable and subject to competitive forces and . . . is almost always less expensive than the rates set by Local 7 contractors."); Compl. ¶ 60 ("[O]n many occasions, Non-Labor businesses benefit from the [alleged] conspiracy by engaging in the practice of using the significantly lower price on a

9

job it receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate downwards the price for the same job from a Local 7 Contractor.  Rather, they often use Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to induce job target subsidies."); Compl. ¶ 34 ("These [job targeting] subsidies are allegedly available only to steel contractors who are parties to the collective bargaining agreement with Local 7 and are intended to assist those employers in meeting the competition from non-union structural steel erectors.").

      2. *Local 7 unilaterally established the job targeting program.*  Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program."); Hurley Aff. ¶ 21 ("During the period when I was President of Local 7, the membership considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest.  The membership rejected this idea.  Instead, the membership voted to permanently fund the job targeting program with dues . . . . No employer ever took part in the establishment of the job targeting program.").

      3. *Local 7 unilaterally administers the job targeting program.*  Hurley Aff. ¶ 22 ("Initially, the job targeting program was administered by the three business agents because Local 7 did not have a business manager at the time.  When I was elected business manager in 1997, I became responsible for overseeing the job targeting program.  As business manager, I met regularly with the business agents to discuss the merits of each job for purposes of job targeting.  I also met regularly with Local 7's financial secretary-treasurer to oversee the solvency of the job targeting fund and to ensure that monies were only paid after all obligations were met by the applicable contractors.  As business manager, I maintained the unequivocal right

to make the final decision on any job targeted.  Since 1997, business agents have requested approval of target fund allocations from the business manager."); Hurley Aff. ¶ 28 ("Local 7's job targeting program was always maintained and administered by Local 7.  No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program.  The targeted jobs were always selected by Local 7.  The decision whether to target and the amount of money provided was always determined exclusively by Local 7.  Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else."); Coyle Aff. ¶ 11 ("Local 7's job targeting program was always maintained and administered by Local 7.  No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program.  The targeted jobs were always selected by Local 7.  The decision whether to target and the amount of money provided was always determined exclusively by Local 7.  Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else.").

    4. *Local 7 members voted to pool portions of their own wages for the job targeting fund and authorized the BTEA employers to deduct dues for the fund from their paychecks to be forwarded to Local 7.*  <u>See</u> Undisputed Facts, ¶ B1.

    5**.** *Local 7's organizing activities were undertaken for the purpose of protecting its members' area standards and to obtain work.*  Hurley Aff. ¶ 13 ("Local 7's primary focus during the time I was an officer for the Union was to organize employees who worked in the trade and to help them maintain and improve conditions of their unionized employment in accord with the Local 7 collective bargaining agreement and obtain work for them to perform under

11

labor contract standards."); Hurley Aff. ¶ 14 ("Local 7's organizing efforts included picketing, hand billing, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families. These organizing efforts, whether directed against non-union steel erectors or secondary parties, were based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work. These organizing efforts were not based on agreements with any employers."); Hurley Aff. ¶ 15 ("Local 7's organizing during that time also included persuading non-union workers of the educational benefits of its apprenticeship program and the economic benefits of a decent hourly wage rate, health insurance for their families, and pension benefits for their retirement."); Hurley Aff. ¶ 16 ("From time to time, Local 7 assisted non-union iron workers who had been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors. Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at the significantly higher wage and benefit levels of the union contract. None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall."); Coyle Aff. ¶ 4 ("Local 7's primary focus for the past twenty (20) years has been to organize employees who work in the trade and obtain work for them to perform under labor contract standards."); Coyle; Aff. ¶ 5 ("Local 7's organizing efforts have included picketing, handbilling, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families. These organizing efforts, whether

directed against non-union steel erectors or secondary parties, have been based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any employers."); Coyle Aff. ¶ 6 ("Local 7's organizing efforts also included persuading non-union workers of the educational benefits of its apprenticeship program and the economic benefits of a decent hourly wage rate, health insurance for their families, and pension benefits for their retirement."); Coyle Aff. ¶ 7 ("From time to time, Local 7 assisted non-union iron workers who have been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at significantly higher wage and benefit levels of the union contract.  None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall.").

      6.  ***Local 7's organizing activities were done unilaterally and not pursuant to any agreements with employers or any other non-labor groups.***  Hurley Aff. ¶ 14 ("Local 7's organizing efforts included picketing, hand billing, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, were based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any

employers."); Hurley Aff. ¶ 16 ("From time to time, Local 7 assisted non-union iron workers who had been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at the significantly higher wage and benefit levels of the union contract.  None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall."); Coyle Aff. ¶ 5 ("Local 7's organizing efforts have included picketing, handbilling, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any employers."); Coyle Aff. ¶ 7 ("From time to time, Local 7 assisted non-union iron workers who have been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at significantly higher wage and benefit levels of the union contract.  None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall.").

7. ***In an effort to level the playing field, Local 7 has monitored jobsites in order to identify and potentially expose employers who are not complying with regulatory standards.*** Hurley Aff. ¶ 29 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards. The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming employed under the wage and benefits levels of Local 7's collective bargaining agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law."); Coyle Aff. ¶ 13 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards. The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming employed under the wage and benefits levels of Local 7's collective bargaining agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law.").

8. ***Local 7's monitoring activities were not done pursuant to any agreement with a non-labor group.*** Hurley Aff. ¶ 29 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards."); Coyle Aff. ¶ 13 ("During the time in

15

which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards.").

>   D. **Plaintiffs Cannot Establish an Unreasonable Restraint of Trade or Monopoly Power, Which Are Necessary To Sustain Its Sherman Act Claims.**

1.  *Job targeting funds reduce the labor costs of Local 7 signatory contractors on a particular job*. See Undisputed Facts, ¶ A4.

2.  *Local 7 members voted to pool portions of their own wages for the job targeting fund and authorized the BTEA employers to deduct dues for the fund from their paychecks to be forwarded to Local 7.* See Undisputed Facts, ¶ B1.

3.  *Over 150 firms compete with one another for structural steel erection work in the locations at issue here.* Hurley Aff. ¶ 8 ("Work performed by Local 7 members arises out of projects involving several layers of commercial entities, including owners, developers, general contractors, fabricators, and steel erection contractors. To my knowledge, competition exists at all of these levels. General contractors compete for projects from owners and developers. Fabricators compete with each other for subcontracts from general contractors. In addition, the fabricators at times compete directly with steel erection contractors, including both Plaintiffs and union signatory steel erection contractors on occasions when the steel erection contractors themselves bid for the full fabrication-erection package, expecting to subcontract the fabrication work."); Hurley Aff. ¶ 9 ("The locals in the Iron Workers District Council of New England work with over 230 contractors who have signed collective bargaining agreements. I would estimate that approximately 70% of them compete for structural steel erection work. These contractors secure work through business and personal relationships they have developed with particular contractors, through direct negotiations, competitive bidding, associations with developers, and

16

many other factors.  Often contractors solicit "bids" that lead to further solicitations, modifications of prior bids and, as a practical matter, a negotiated price.").

    4.  ***Plaintiffs have not been excluded from bidding on public sector project labor agreement jobs, which have been the largest construction projects undertaken in the Greater Boston area and in New England in the last twenty (20) years.***  See Undisputed Facts, ¶ A8.

    5.  ***Fabricators and general contractors gain advantage from the availability of job targeting funds by obtaining structural steel erection at lower costs***.  See Undisputed Facts, ¶ A5.

    6.  ***Job targeting funds are awarded on a job-by-job basis.***  See Undisputed Facts, ¶ B3.

    Respectfully submitted,

    LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

    By its attorneys,

    /s/Paul F. Kelly
    Paul F. Kelly, Esq. (BBO #267000)
    Burton E. Rosenthal, Esq. (BBO #429220)
    Indira Talwani, Esq. (BBO # 645577)
    Stephanie R. Pratt, Esq. (BBO #655108)
    SEGAL, ROITMAN & COLEMAN
    11 Beacon Street
    Boston, MA 02108
    (617) 742-0208

    /s/Mickey Long
    Mickey Long, Esq. (BBO #634388)
    193 Old Colony Avenue
    Box E-1
    South Boston, MA 02127
    (617) 269-0229

Dated: March 20, 2006

## **CERTIFICATE OF SERVICE**

      I hereby certify that this Memorandum of Law In Support of Defendant Iron Workers Local 7's Motion for Summary Judgment On Counts I-III of Plaintiffs' Complaint filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 20, 2006.

                                        /s/ Paul F. Kelly
                                        Paul F. Kelly, Esq.