# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

AMERICAN STEEL ERECTORS, INC., et al. )

Plaintiffs, )

v. )

LOCAL UNION NO. 7, INTERNATIONAL )
ASSOCIATION OF BRIDGE, )    Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL & )
REINFORCING IRON WORKERS, )

Defendant. )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT IRON WORKERS LOCAL 7'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I-III OF PLAINTIFFS' COMPLAINT

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208

Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................ 2

    A.  The Parties ...................................................................................... 2

    B.  The Structural Steel Erection Industry ....................................... 2

    C.  Local 7's Organizing and Job Targeting Activities ................... 3

    D.  The Big Dig and Other Public Works Projects .......................... 5

    E.  Allegations of Stripping ............................................................... 6

ARGUMENT .................................................................................................... 6

I.   SUMMARY JUDGMENT STANDARD ................................................ 6

II.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON
    PLAINTIFFS' ANTI-TRUST CLAIMS ................................................ 8

    A.  Plaintiffs Cannot Establish An Anti-trust Injury ....................... 8

        1.  The Requirement of an Anti-trust Injury ............................... 8

        2.  Plaintiffs Have Suffered No Anti-trust Injury ...................... 8

            a.  Plaintiffs' Loss of Work to Local 7 Signatory Contractors
               Is Not an Anti-trust Injury ..................................................... 10

            b.  Plaintiffs Cannot Establish Predatory Pricing ....................... 12

    B.  Local 7's Job Targeting Program Is Shielded by the
        Non-Statutory Labor Exemption ............................................... 17

        1.  The Non-Statutory Labor Exemption to the Anti-trust Laws ............. 18

        2.  Local 7's Job Targeting Program Falls Within the Non-Statutory
            Labor Exemption .................................................................... 21

            a.  The Collection of Dues by Signatory Contractors Is
               Exempt From the Anti-trust Laws Under the Non-
               Statutory Exemption ............................................................... 21

            b.  Local 7's Job Targeting Payments to Its Signatory
                Contractors Fall Within the Non-Statutory Labor
               Exemption ............................................................................... 23

            c.  Any Payment of Job Targeting Funds to Fabricators
                And General Contractors Is Also Within the Non-Statutory
               Labor Exemption .................................................................... 25

    C.

**Local 7's Job Targeting Program and Other Organizing
Activities Are Exempted by the Statutory Labor Exemption**....................28

    1.   The Statutory Labor Exemption to the Anti-trust Laws .....................28

    2.   The Job Targeting Program Falls Within the Statutory
        Labor Exemption ........................................................................31

    3.   Other Alleged Conduct Is Shielded by the Statutory
        Labor Exemption ........................................................................34

          a.   Secondary Pressure, Secondary Boycotts, and "Top-Down
              Organizing".............................................................34

          b.   Surveillance and Videotaping.................................37

          c.   Stripping...................................................38

          d.   Violence .................................................39

**D.**  **Plaintiffs Cannot Establish An Unreasonable Restraint of Trade
Or Monopoly Power, Which Are Necessary To Sustain Its
Sherman Act Claims** ........................................................................40

    1.   Section 1 of the Sherman Act ...................................................40

          a.   The Requirement of an Unreasonable Restraint of Trade .......40

          b.   Alleged Restraints of Trade Involving
              Signatory Contractors ..............................................43

          c.   Alleged Restraints of Trade Involving
              Fabricators and Developers......................................45

    2.   Section 2 of the Sherman Act and the Requirement
        of Monopoly Power ....................................................................47

**CONCLUSION** ..........................................................................................51

## TABLE OF AUTHORITIES

*CASES*                                                                    Page

A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396 (1989) .....................15

Ackerman-Chillingworth v. Pacific Elect. Contractor Ass'n, 579 F.2d 484
 (9th Cir. 1978) ............................................................................................43

Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48 (1st Cir. 1998) .................42

AD/SAT v. Associated Press, 920 F. Supp.1287 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216
 (2d Cir. 1999) .............................................................................................16

ADVO, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191 (1995) ............................15

Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368
 (1st Cir. 1981), International Longshoremen's Ass'n, AFL-CIO v.
 Allied Int'l, Inc., 456 U.S. 212 (1982) ................................................................31, 43

Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
 325 U.S. 797 (1945) ...................................................................... 9, 11, 17

American Tobacco Co. v. United States, 328 U.S. 781 (1946) ...................................... 48

Apex Hosiery Co. v. Leader, 310 U.S. 469, (1940) ................................................. passim

Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050 (6th Cir.),
 *cert. denied*, 469 U.S. 1036 (1984) ...........................................................16

Associated Builders and Contractors, Inc., Golden Gate Chapter,
 331 NLRB 132 (2000) ...............................................................................23

Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water
 Resources Auth., No. 90-10576-MA,1990 WL 86360,
 (D. Mass. April 11, 1990), *rev'd on other grounds*, 935 F.2d 345
 (1st Cir. 1991), *rev'd sub nom.*, Boston Harbor, 507 U.S. 218.............................50, 51

Associated Gen. Contractors of Cal., Inc. v. California State Council
 of Carpenters, 459 U.S. 519 (1983) ............................................................10

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) .........................10, 16

Augusta News Co. v. Hudson News Co., 269 F.3d 41 (1st Cir. 2001) ............................42

Berman Enter., Inc. v. Local 333, United Marine Div.,
 Int'l Longshoremen's Ass'n, 644 F.2d 930 (2d Cir.), *cert. denied*,
 454 U.S. 965 (1981) ..................................................................................43

Blue Shield of Va. v. McCready, 457 U.S. 465 (1982) .................................................10

Boston Shipping Ass'n, Inc. v. Federal Maritime Comm'n, 706 F.2d 1231
 (1st Cir. 1983) ............................................................................................20

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
 509 U.S. 209 (1993) .................................................................................. passim

Brown Shoe Co. v. United States, 370 U.S. 294 (1962) .................................................. 9

Brown v. Pro Football, Inc., 518 U.S. 231 (1996) ...................................18, 20, 21, 24, 28

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) .........................9, 10

Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders
    and Contractors of Mass./R.I. 507 U.S. 218 (1993) ..............................................50, 51

Burns v. State Police Ass'n. of Mass., 230 F.3d 8 (1st Cir. 2000) ...................................7

Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104 (1986)..................................... passim

California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ...................37

C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41 (1st Cir. 1998) ...................................13

Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union,
    AFL-CIO, 362 F.2d 322 (5th Cir. 1966) ...............................................................31, 37

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...............................................................7

Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n,
    961 F.2d 667 (1992) ....................................................................................................12

Clarett v. National Football League, 369 F.3d 124 (2d Cir. 2004), cert. denied,
    125 S.Ct. 1728 (2005) ..........................................................................................18, 21

Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100,
    421 U.S. 616 (1975) ............................................................................................. passim

Department of Labor and Indus. v. Boston Water and Sewer Comm'n,
    18 Mass. App. Ct. G21 (1984)....................................................................................49

Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921) ...........................................29

Eastern Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n Inc.,
    357 F.3d 1 (1st Cir. 2004) .............................................................................................9

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.
    Trades Council, 485 U.S. 568 (1988) ........................................................................36

Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238
    (7th Cir. 1996), cert. denied, 519 U.S. 1056 (1997) ...................................................27

Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309,
    1997 WL 311498, (D. Md. 1997) aff'd, 133 F.3d 914 (Table), cert. denied,
    525 U.S. 825 (1998) (4th Cir.)....................................................................................24

Hunt v. Crumboch, 325 U.S. 821 (1945) ..............................................................9, 38, 39

Intercontinental Container Transp. Corp. v. New York Shipping Ass'n,
    426 F.2d 884 (2d Cir. 1970) .......................................................................................32

Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), cert. denied,
    488 U.S. 889 (1998) ..............................................................................................35, 36

J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655 (Ohio), cert. denied,
    525 U.S. 871 (1998) ....................................................................................................23

James Cape & Sons Co. v. PCC Constr. Co., No. 05-C-269, 2005 WL 2176965 ...........12

J. & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62 (D.Me. 1999) ..............................15

Larry v. Muko, Inc. v. Southwestern Pa. Bldg. and Constr. Council, 670 F.2d 421
(3rd Cir. 1982), *cert. denied*, 459 U.S. 916 (1982) ....................................143

Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen
of North Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676 (1965)..............18, 20, 22, 23

Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180
(8th Cir. 1997) ................................................................................ 24

Loewe v. Lawlor, 208 U.S. 274 (1908) ..........................................................28

Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582
(8th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988) ....................................15

Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), *cert. denied*,
488 U.S. 889 (1988) ........................................................................35

Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed,*
434 U.S. 801 (1977) ........................................................................43

Manno Elec., 321 NLRB 278 (1996), *enf'd per curiam mem.*, 127 F.2d 34
(Table) (5th Cir. 1997) ...........................................................23, 32, 33

Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., 01-548, 2002
WL 334394, (D. Minn. Feb. 27, 2002) ..................................................22

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ........... 13, 14, 15

Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council,
675 F.2d 881 (7th Cir. 1982) ............................................................31

Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and
Prof'l Publs., Inc., 63 F.3d 1540(10th Cir. 1995), *cert. denied*, 516 U.S.
1044 (1996) ...............................................................................15

National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612 (1967) ............................30

Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.,
472 U.S. 284 (1985) ......................................................................42

N.L.R.B. v. Servette, Inc., 377 U.S. 46 (1964) ..............................................36

N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, Chauffeurs,
Warehousemen and Helpers of Am., AFL No. 103, 353 U.S. 87 (1957)..............19, 20

Parmelee Transp.Co. v. Keeshin, 292 F.2d 794 (7th Cir.), *cert. denied*,
368 U.S. 944 (1961) ......................................................................47

Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81 F.3d 858 (9th Cir. 1996)......24

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, (9th Cir.), *cert. denied*,
516 U.S. 987 (1995) ......................................................................14

Reed Brothers, Inc. v. Monsanto Co., 525 F.2d 486 (8th Cir. 1975), *cert. denied*,
423 U.S. 1055 (1976) ....................................................................46

Scranton Constr. Co. v. Litton Indus. Leasing Corp., 494 F.2d 778 (5th Cir. 1974),
  *cert. denied*, 419 U.S. 1105 (1975) ...................................................................47

Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440
  (3d. Cir. 1978) ...............................................................................................46, 47

Standard Oil Co. of N.J. v. United States, 221 U.S. 1 (1911).................................8, 40, 41

State Oil Co. v. Khan, 522 U.S. 3 (1997) ..................................................................41, 43

Storer Communications, Inc. v. National Ass'n of Broadcast Employees
  and Technicians, 854 F.2d 144 (6th Cir. 1988) .........................................................36

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57
  (1st Cir. 2004) ...............................................................................................41, 42

Texaco Puerto Rico, Inc. v. Medina, 834 F.2d 242 (1st Cir. 1987) ....................................7

Tigard Elec., Inc. v. National Elec. Contractors Ass'n, 790 F. Supp. 1498 (1992) ....11, 12

Times-Picayune Publishing Co. v. United States,  345 U.S. 594 (1953) ..........................46

United Food and Commercial Workers Union, Local 1036 v. N.L.R.B.
  307 F.3d 760 (9th Cir.), *cert. denied*, 537 U.S. 1024 ..........................................33, 37

United Mine Workers v. Pennington, 381 U.S. 657 (1965)  .................................11, 19, 20

United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945) ...........................48

United States v. Binghamton Constr. Co., 347 U.S. 171 (1954)  .....................................22

United States v. Grinnell Corp., 384 U.S. 563 (1966)  .....................................................48

United States v. Hutcheson, 312 U.S. 219 (1941)  .................................................... passim

Utility Contractors Ass'n of New England, Inc. v. Commissioners of Mass.
  Dep't of Public Works, No. Civ. A. 90-3035, 1996 WL 106983,
  (Mass. Super. March 12, 1996 ......................................................................................50

Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP,
  540 U.S. 398 (2004) .....................................................................................................48

Ward v. Massachusetts Health Research Inst., 209 F.3d 29 (1st Cir. 2000) .......................7

White v. Hearst Corp., 669 F.2d 14 (1st Cir. 1982) ...........................................................7

Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645 (1982) ...............................35

Woodworking Mfg.. Ass'n. v. N.L.R.B., 386 U.S. 612 (1967) ..........................32, 33, 37

## RULES and STATUTES

Fed. R. Civ. Proc. 12(b) .....................................................................................................7

Fed. R. Civ. Proc. 56 ......................................................................................................1, 7


15 U.S.C. § 1 .......................................................................................... passim

15 U.S.C. § 2 ................................................................................................ passim

15 U.S.C. § 13(a) ....................................................................................13

15 U.S.C. § 17 ..........................................................................17, 28, 29, 39

15 U.S.C. § 18 ..........................................................................................10

29 U.S.C. § 52 ....................................................................................28, 29

29 U.S.C. § 101 ..................................................................................28, 39

29 U.S.C. § 102 ........................................................................................30

29 U.S.C. § 113(c) ....................................................................................30

29 U.S.C. § 152(9) ....................................................................................30

29 U.S.C. § 157 ........................................................................................38

29 U.S.C. § 158(b)(4) .........................................................................36, 38

29 U.S.C. § 158(e) ....................................................................................35

29 U.S.C. § 158(f) ..............................................................................35, 36

29 U.S.C. § 159 ........................................................................................35

29 U.S.C. § 187..........................................................................................1

## INTRODUCTION

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendant Iron Workers Local 7 ("Local 7" or the "Union") submits this Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiffs' federal anti-trust claims, Counts I – III of the Complaint.[1]

Plaintiffs, non-union contractors in the structural steel erection industry, challenge, under anti-trust laws, the legitimacy of union job targeting programs. Structural steel erection is a labor intensive portion of the construction industry, and Plaintiffs compete against union signatory contractors in this market by undercutting wages and benefits. In order to stave off a "race to the bottom," Local 7 has responded by establishing a job targeting program that helps signatory contractors compete while maintaining higher negotiated wages and benefits.

Job targeting programs have withstood challenges under anti-trust laws in every Circuit court that has considered them. Generally, courts have concluded that the job targeting programs are exempt from anti-trust laws under what is known as the non-statutory labor exemption. Plaintiffs here attempt to plead around these decisions by alleging that the restraints involve unlawful conduct as well as conspiracies with businesses with whom Local 7 does not have a collective bargaining agreement. But these attempts misunderstand three fundamental underpinnings of the anti-trust laws and the labor exemptions: first, that anti-trust laws are designed to protect *business competition*, not individual competitors; second, that unions may enter into agreements with businesses, including multi-employer groups, to restrain competition based on wages and terms and conditions of employment; and finally, that unlawful actions that are not themselves unreasonable restraints of trade, while perhaps cognizable under some other

---

[1] The Union is not herein seeking summary judgment on Plaintiffs' Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 187, claim (Count IV). Rather, by separate motion, it is seeking judgment on the pleadings or in the alternative summary judgment on the job targeting claims in Count IV. Plaintiffs' state-law claims, Counts V-VII of the Complaint, were dismissed by this Court by Order entered February 6, 2006.

law or in some other forum, are not anti-trust violations.

Applying these principles of law to the undisputed material facts, Local 7 is entitled to judgment on Plaintiffs' anti-trust claims.

## STATEMENT OF FACTS

A.  The Parties

Plaintiffs are non-union contractors structural steel erection industry.  Complaint ("Compl.") ¶ 1.  Local 7 represents iron workers employed by companies with whom it maintains a multi-employer collective bargaining agreement.  John F. Hurley Affidavit ("Hurley Aff.")[2] ¶ 4; Thomas J. Gunning Affidavit ("Gunning Aff.") ¶ 3. The Building Trades Employers' Association ("BTEA"), an alleged co-conspirator, is a multi-employer bargaining unit that collectively bargains with Local 7 on behalf of its member companies.  Gunning Aff. ¶ 1, 3.

B.  The Structural Steel Erection Industry

Work in the structural steel erection industry involves several layers of business entities, such as owners, developers, general contractors, fabricators, and structural steel erection contractors.  Competition for jobs exists at each of these levels.  General contractors compete for projects from owners and developers.  Fabricators compete with each other for subcontracts from general contractors, generally for the combined work of steel fabrication and erection.  Finally, in the geographical area covered by Local 7 and its alleged co-conspirator unions, over 150 structural steel erection contractors (and some fabricators) compete with each other for structural steel erection subcontracts from fabricators.  Hurley Aff. ¶¶ 7-9.

Structural steel erection is a labor intensive portion of the construction industry.  Basically, a structural steel erection contractor needs only good credit and a supply of skilled

---

[2]  All affidavits referenced herein are attached to the Appendix of Affidavits in Support of Defendant Iron Workers Local 7's Motion for Summary Judgment, filed herewith.

labor.  Typically, structural steel erection contractors rent cranes and hire labor.  Because of these factors, there are very few barriers to entry in this portion of the industry.  Non-union structural steel erection contractors, such as Plaintiffs, enjoy substantially lower labor costs than union contractors.  Hurley Aff. ¶ 6; Compl. ¶ 36.

    C.  <u>Local 7's Organizing and Job Targeting Activities</u>

Local 7's primary focus for the past twenty years has been organizing iron workers and obtaining work for them under labor contract standards.  James Coyle Affidavit ("Coyle Aff.") ¶ 4; Hurley ¶ 13.  Local 7's organizing efforts have included picketing and handbilling, including publicizing that contractors paying iron workers below union scale undermine the economic standards of their members and their members' families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on the Union's own objectives to protect members' area standards and to obtain work.  Local 7's efforts have also included persuading non-union workers of the benefits of Local 7's apprenticeship program and of a decent hourly wage rate and benefits.  Hurley Aff. ¶¶ 13-15; Coyle Aff. ¶¶ 5-7.

At all times relevant, Local 7 maintained collective bargaining agreements with steel erection companies and some fabricators who employ Local 7 members that contained "union signatory subcontracting clauses," requiring that further subcontracts of jobsite work be granted to Local 7 signatory contractors.  With the exception of these collectively bargained clauses, Local 7 did not enter into any agreements with other non-signatory companies limiting with whom those companies might do business on future jobs.  Hurley Aff. ¶ 18; Coyle Aff. ¶ 9.  Because it did not maintain such agreements with non-signatory companies, Local 7 sometimes approached non-signatory companies and asked them to award a particular job to a Local 7 signatory contractor.  These job-by-job appeals were not always successful.  Hurley Aff. ¶ 18-19;

Coyle Aff. ¶ 9-10.

Thus, prior to 1991, Local 7 created a job targeting program.  The program had the dual purposes of securing work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms concerning wages and benefits were an obstacle to competing against non-union competition and monitoring the structural steel erection industry to help eliminate extensive regulatory cheating in the non-union sector of the industry, thereby creating a more level playing field for Local 7 signatory contractors.  Hurley Aff. ¶¶ 20, 24, 29; Coyle Aff. ¶¶ 11, 13.  Occasionally the target fund was used to attempt to secure work for Local 7 members when its signatory contractors were competing against contractors signed to other union agreements.  Hurley Aff. ¶ 24.

In or around 1992, Local 7's membership unilaterally considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest because of the differential in wage and benefit rates.  The members rejected this idea. Instead, they voted to permanently fund the job targeting program with dues from union members.  Hurley Aff. ¶ 21.  The Union later asked that the dues deduction be referred to in its collective bargaining agreement with BTEA, dated November 1, 1993 to September 15, 1997.  In the current collective bargaining agreement between Local 7 and the BTEA, the dues deduction is included in § 9 as follows:  "It is agreed that the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid."  Attached to Gunning Aff., Tab A.  This reference in the collective bargaining agreement did not in any way change Local 7's complete control over the administration of the job targeting program.  Gunning Aff. ¶¶ 4-6.

At no time has the BTEA or any other employer been involved in the administration of

Local 7's job targeting program.  Local 7 alone decides which jobs to target based on information gathered from business agents and employers and the amount of the job targeting funds to use on a particular job.  Hurley Aff. ¶¶23, 25, 26, 28; Coyle Aff. ¶ 11; Gunning Aff. 5-6.

The granting of job targeting funds does not result in any agreement between Local 7 and non-signatory companies preventing those companies from using union signatory contractors on any future job, or even a subsequently bid portion of the job.  In some cases, where Local 7 signatory contractors won part of a structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job on that same jobsite.  Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.  In other cases, where Local 7 signatory contractors won the complete structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job with the same fabricator or developer on another jobsite.  Indeed, Local 7 oftentimes even failed in later, separate efforts to obtain future work from the very same fabricators or general contractors that Plaintiffs allege in their Complaint were involved in specific instances in which Local 7 or its signatory contractors succeeded in using job targeting funds.  Hurley Aff. ¶ 27; Coyle Aff. ¶ 12.

D.  The Big Dig and Other Public Works Projects

By far the largest projects in structural steel erection market in the Boston area in the last twenty (20) years have been the Big Dig and other public works projects, such as the Boston Harbor project and the Logan Airport project, which have been developed under project labor agreements ("PLAs") collectively bargained between project managers and local building trades union councils (of which Local 7 is one of the constituent craft unions).  Joseph W. Nigro, Jr. Affidavit ("Nigro Aff.") ¶ 3; Hurley Aff. ¶ 10; Coyle Aff. ¶ 8.  The PLAs and bid specifications on all of the large public works jobs during these years specified that all contractors and subcontractors at all tiers, both union signatory and non-signatory, have been eligible to

participate in all bidding for work on the project, as long as they agreed to abide by the PLA for all construction work on that particular project. The PLA on each such large public job served as an umbrella agreement that established standardized terms on certain issues for that particular job, such as no strike clauses and uniform work rules, but in other respects simply incorporated by reference the area contracts for relevant crafts, including Local 7's contract covering structural steel erection work. The terms of each PLA explicitly overrode terms of the subsidiary craft contract on all subjects covered by the PLA. On the Big Dig job referred to by Plaintiffs in their Complaint (Compl. ¶ 43), for example, the PLA stated that other contractors and subcontractors were allowed to execute the PLA for purposes of work on that project and no such contractors were required to sign any other labor agreements as a condition of working on the project. Thus, non-union contractors were allowed to bid so long as they signed onto the PLA and subsidiary contracts for that job. Nigro Aff. ¶¶ 3-11.

E.   Allegations of Stripping

Occasionally, Local 7 assists non-union iron workers who have been unsuccessful in organizing non-union employers or who want to work for union employers find employment with Local 7 signatory contractors. This activity, however, is not based on any agreement with BTEA or its employer members to give job placement priority to non-union employees, and is not a common Union activity. Local 7 does not have a hiring hall arrangement in its contract with BTEA. Hurley Aff. ¶¶ 16-17; Coyle Aff. ¶¶ 7-8.[3]

**ARGUMENT**

## I.  **SUMMARY JUDGMENT STANDARD**

A moving party is entitled to summary judgment if it can "show that there is no genuine

---

[3] In addition, while there was a hiring hall on the large public works projects during the time period alleged in Plaintiffs' Complaint, there would have been no occasion to bypass the hiring hall, as the projects during that time period were at full employment. Hurley Aff. ¶¶ 16-17; Coyle Aff. ¶¶ 7-8.

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may show the absence of an issued of material fact by showing that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). When a motion is made and supported, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. Id. at 324. Thus the nonmoving party must identify "specific facts, in suitable evidentiary form, that establish the presence of a genuine issue for trial." Ward v. Massachusetts Health Research Inst., 209 F.3d 29, 32 (1st Cir. 2000) (citation and quotations omitted). "The opposing party may not rely on conclusory allegations and unsupported speculation[.]" Burns v. State Police Ass'n. of Mass., 230 F.3d 8, 9 (1st Cir. 2000). No higher standard is to be applied before granting summary judgment in anti-trust cases. Texaco Puerto Rico, Inc. v. Medina, 834 F.2d 242, 247 (1st Cir. 1987); White v. Hearst Corp., 669 F.2d 14, 17 (1st Cir. 1982).

Summary judgment may be brought by a defendant at any time after the commencement of an action. See Fed. R. Civ. P. 56(b) (defendant can file a Rule 56 motion at anytime, while a Plaintiff must wait twenty (20) days after the commencement of an action or after service of a motion for summary judgment by the adverse party); see also Fed. R. Civ. P. 12(b) (motion to dismiss presenting "matters outside the pleading . . . shall be treated as one for summary judgment and disposed of as provided in Rule 56").

## II.   THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' ANTI-TRUST CLAIMS

Plaintiffs' claims under the Sherman Act, 15 U.S.C. §§ 1 and 2, are labeled monopolization (Count 1), boycott (Count II), and horizontal monopoly (Count III). Regardless of the label, Local 7 is entitled to summary judgment. As demonstrated in Part A, Plaintiffs cannot establish an anti-trust injury, a necessary requirement for any anti-trust claim. Part B

7

demonstrates further that Local 7's job targeting activities are shielded by the non-statutory labor

exemption, even assuming, *arguendo*, that Plaintiffs can establish that Local 7 conspired with

non-labor parties.  Part C shows that Plaintiffs cannot establish any business conspiracy and,

thus, Local 7's job targeting and other organizing activities fall within the statutory labor

exemption.  Part D demonstrates finally that (a) Local 7's job targeting and other activities are

not "unreasonable restraints" prohibited by § 1 of the Sherman Act and that (b) Local 7 does not

have monopoly power, which is required to maintain a monopolization claim under § 2 of the

Sherman Act.

     **A.**  **<u>Plaintiffs Cannot Establish An Anti-trust Injury.</u>**

     The undisputed facts demonstrate that Plaintiffs cannot establish a general injury to

competition in the structural steel erection industry and, thus, Plaintiffs lack standing to bring

their anti-trust claims.

             1.  <u>The Requirement of an Anti-trust Injury</u>

     The Supreme Court has explained that the main cause that led to the enactment of the

Sherman Act:

> was the thought that it was required by the economic condition of the times; that
> is, the vast accumulation of wealth in the hands of corporations and individuals,
> the enormous development of corporate organization, the facility for combination
> which such organizations afforded, the fact that the facility was being used, and
> that combinations known as trusts were being multiplied, and the widespread
> impression that their power had been and would be exerted to oppress individuals
> and injure the public generally.

<u>Standard Oil Co. of N.J. v. United States</u>, 221 U.S. 1, 50 (1911).[4]  Thus, "[t]he end sought was

the prevention of restraints to free competition in business and commercial transactions which

---

[4]  <u>See</u> <u>also</u> <u>id.</u> at 83 (Harlan, J., concurring in part and dissenting in part) (In 1890, "[t]he nation had been rid of
human slavery . . . but the conviction was universal that the country was in real danger from another kind of slavery
sought to be fastened on the American people; namely, the slavery that would result from aggregations of capital in
the hands of a few individuals and corporations controlling, for their own profit and advantage exclusively, the
entire business of the country, including the production and sale of the necessaries of life.").

tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers of consumers of goods and services . . ." and "the act was designed to prevent restraints of trade which had a significant effect on such competition."  Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, n.15 (1940); see also Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 809 (1945) ("The primary objective of the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly.").

Because the critical concern was the effect of the economic conditions on the public generally, "[i]t is axiomatic that the anti-trust laws were passed for the protection of competition, not competitors."  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)); see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (same); Eastern Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n Inc., 357 F.3d 1, 4 (1st Cir. 2004) ("[A]ntitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition.").  Thus, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'"  Brooke Group Ltd., 509 U.S. at 225 (quoting Hunt v. Crumboch, 325 U.S. 821, 826 (1945)).

In a series of cases beginning with Brunswick Corp., the Supreme Court formalized the requirement that in all anti-trust cases a private plaintiff must prove

> antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

370 U.S. at 489.[5]  As the Court explained in <u>Atlantic Richfield Co. v. USA Petroleum Co.</u> ("<u>ARCO</u>"), anti-trust injury, an essential element of *every* private anti-trust case, "ensures that a plaintiff can recover only if loss stems from a competition-reducing aspect or effect of the defendant's behavior." 495 U.S. 328, 344 (1990); <u>see also</u> <u>Associated Gen. Contractors of Cal., Inc.</u>, 459 U.S. at 538; <u>Brunswick Corp.</u>, 429 U.S. at 489.

>    2.  <u>Plaintiffs Have Suffered No Anti-trust Injury</u>

>    >    a.  Plaintiffs' Loss of Work to Local 7 Signatory Contractors Is Not an Anti-trust Injury

While Plaintiffs may indeed have lost particular jobs because of the job targeting program, Plaintiffs cannot establish that their loss stems from "a competition-*reducing* aspect or effect of the defendant's behavior."  <u>ARCO</u>, 495 U.S. at 344 (emphasis in original).

The essence of Plaintiffs' allegations is that they were financially injured by losing work to Local 7 signatory contractors.  <u>See</u> <u>e.g.</u> Compl. ¶ 49 (Local 7 has engaged in various activities in an effort to "keep Plaintiff[s] and other Non-Local 7 Contractors from performing jobs in the . . . Relevant Market"); <u>id.</u> ¶ 51 (the effect of Local 7's activities "will be to eliminate competition from non-union signatory contractors").  Regardless of whether Plaintiffs can establish an injury to themselves as competitors, however, they cannot establish the required injury to competition simply because they may have lost work.

Plaintiffs baldly allege that the use of the job targeting funds will somehow result in "the escalation of cost to consumers, deterioration of quality, and restriction of output."  <u>See</u> <u>id.</u> ¶¶

---

[5]  <u>Brunswick Corp.</u> was brought under § 7 of the Clayton Act, 15 U.S.C. § 18.  In <u>Blue Shield of Va. v. McCready</u>, 457 U.S. 465 (1982), the anti-trust injury requirement was applied to a claim brought under § 1 of the Sherman Act. In <u>Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters</u>, the Court placed the requirement of anti-trust injury in a context of judicial policies.  459 U.S. 519, 545 (1983).  In <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, the Court emphasized that a showing of anti-trust injury is a necessary, but not always sufficient, showing for anti-trust standing, and "that a showing of loss or damage due merely *to increased competition* does not constitute such injury." 479 U.S. 104, 110 n.5, 116, 122 (1986) (emphasis supplied).

162(a), 172(a). The undisputed facts establish here instead that Local 7's use of job targeting funds increases, rather than decreases, competition. Structural steel erection is a labor-intensive industry, and Plaintiffs seek to compete in the industry by paying their employees lower wages and benefits and using this cost-saving to underbid signatory firms. Statement of Undisputed Material Facts In Support of Defendant Iron Workers Local 7's Motion For Summary Judgment ("Undisputed Facts") ¶¶ A1, A2. Local 7's job targeting program allows signatory contractors who might otherwise be at a competitive disadvantage because of the collectively bargained labor costs to compete with non-union contractors. Undisputed Facts ¶¶ A3, A4. On a job where job targeting funds are available, the customer is benefited by both the lower costs and the greater competition. Undisputed Facts ¶ A5.[6] If a party's actions increase competition (and even decreases prices), then there can be no anti-trust injury.

Other bidding cases have reached a similar conclusion. In Tigard Elec., Inc. v. National Elec. Contractors Ass'n, 790 F. Supp. 1498 (D.Or. 1992), plaintiffs claimed that a job targeting program resulted in their inability to compete effectively on various jobs, and that they thus suffered an injury to their businesses or property. The court granted defendants' motion to dismiss, holding that plaintiffs had not alleged an injury to competition. Id. at 1505. As the court explained, "[p]laintiffs are essentially complaining not that *competition* is being injured, but that they, as *competitors*, are being injured because defendants' cooperation allows defendants to compete too successfully. Allegations that plaintiffs have lost income because of exclusion from a market are insufficient." Id. at 1503 (emphasis in original).[7]

---

[6] Indeed, Plaintiffs themselves allege that on numerous occasions a customer will "benefit from the [alleged] conspiracy by engaging in the practice of using the significantly lower price on a job it received from Plaintiffs . . . to negotiate downwards the price for the same job from a [signatory] contractor." Compl. ¶ 60.

[7] Notably, in opposing defendants' motion, the plaintiffs in Tigard relied heavily on Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797 (1945), United Mine Workers v. Pennington, 381 U.S. 657, 663 (1965), and Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 634 (1975). As the Tigard court explained, Plaintiffs' reliance on these cases concerning the non-statutory exemption was

In <u>James Cape & Sons Co. v. PCC Constr. Co.</u>, No. 05-C-269, 2005 WL 2176965 (E.D. Wis. Sept. 6, 2005), the defendants were engaged in a scheme to undercut the plaintiff's bid through criminal conduct. The plaintiff alleged that it had lost multi-million dollar public and private construction contracts as a result of the criminal scheme. <u>Id.</u>, at *1. The defendants pointed out that their "bid-rigging activities actually *increased*, rather than restricted, competition, albeit in an illegal manner." <u>Id.</u>, at *2 (emphasis in original). The court noted that "the antitrust injury doctrine 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.'" <u>Id.</u>, at *1 (quoting <u>Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n</u>, 961 F.2d 667, 670 (7th Cir. 1992)). It then concluded that even though the consumer ended up paying a lower, not higher, price *as a result of the criminal activity*, the anti-trust laws are not meant to punish behavior (even criminal behavior) that actually benefits the ultimate consumer. <u>Id.</u>, at *2.

Just as in these bidding cases, regardless of any injury to the Plaintiffs' own businesses caused by the job targeting program, no injury to competition has occurred here.

### b. Plaintiffs Cannot Establish Predatory Pricing

Plaintiffs' allegation of "predatory pricing" (<u>see</u> <u>e.g.</u> Compl. ¶ 1 (complaining of "illegal predatory pricing tactics")) also does not provide the necessary anti-trust injury because the undisputed facts show that Plaintiffs cannot establish that any pricing practice here was "predatory."

A plaintiff "seeking to establish competitive injury resulting from a rival's low prices must prove [as a prerequisite] that the prices complained of are below an appropriate measure of its rival's costs." <u>Brooke Group Ltd.</u>, 509 U.S. at 222; <u>see</u> <u>also</u> <u>Cargill, Inc. v. Monfort of Colo.,</u>

---

misplaced in this context, as "these cases do not dispense with the requirement that antitrust plaintiffs allege antitrust injuries." 790 F. Supp. at 1504.

Inc., 479 U.S. 104, 117 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 8 (1986); C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41, 45 (1st Cir. 1998).[8]  Thus, "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting."  Brooke Group Ltd., 509 U.S. at 223.

It is axiomatic that Local 7 could agree to a collective bargaining agreement with lower labor costs and thereby lower the signatory contractors' costs, and that a bid reflecting those lower costs would not be "below cost" or "predatory."  Local 7 similarly could offer the signatory job targeting funds effectively resulting in lower costs on a particular project, and the signatory's bid reflecting those lower costs would also not be "below cost" or "predatory." Local 7's willingness to provide signatories with what amounts to labor cost concessions (Undisputed Facts ¶¶ 3, 4) does not permit a conclusion that these signatories have engaged in "below cost" pricing.

Nor can Plaintiffs establish that the prices were predatory on the grounds that the targeting funds were unavailable to them.  First, "a company that prices its own product or service at or above its own costs does not violate the Sherman Act merely because its costs, and thus its prices, are lower than a rival's costs."  C.B. Trucking, Inc., 137 F.3d at 45 (quotations and citation omitted).  Second, Plaintiffs can make no showing that such funds, which effectively provide a reduced labor cost, would not be available to them if, in the first instance, they had entered into a collective bargaining agreement with Local 7.  Undisputed Facts ¶ 3.

That a predatory pricing analysis makes no sense here is also evident from the second

_____

[8] This prerequisite is the same whether the claim is brought under the Sherman Act (at issue here) or under the Robinson-Patman Act, 15 U.S.C. § 13(a), at issue in Brooke Group Ltd., 509 U.S. at  223.

prerequisite for such a claim under the Sherman Act, namely, "a demonstration that the competitor had . . . a dangerous probability[] of recouping its investment in below-cost prices." Brooke Group Ltd, 509 U.S. at 224; see also Matsushita, 475 U.S. at 588-89 ("For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered."). "Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." Brooke Group Ltd., 509 U.S. at 224. Here, the signatory contractors have no "investment" to recoup because their bids were not below their costs; rather, their low bids simply reflected lower costs, resulting in lower aggregate prices in the market.

Assuming *arguendo* that Plaintiffs could show "below-cost" bidding by Local 7 signatory contractors whenever job targeting funds are provided, Plaintiffs still cannot make the necessary showing of a "dangerous probability of recoupment" because of both the market structure and low barriers of entry in the structural steel erection industry. Quite simply, if a Local 7 signatory contractor raises its bids on subsequent projects in order to recoup for the losses it allegedly suffered on a targeted job, there is simply no reason to conclude that other contractors will not underbid it on those later jobs.

First, lack of market power of the firm allegedly engaging in predatory pricing, or even of the firms allegedly colluding together, and the highly competitive nature of the industry will make recoupment infeasible. See Brooke Group Ltd., 509 U.S. at 226 (recoupment unlikely where the "market is highly diffuse and competitive"); Cargill, Inc.., 479 U.S. at 119 n.15 (1986); Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995) (plaintiff failed to show at summary judgment that defendant had the market

power to raise prices or restrict output for predatory pricing to be successful).  There are

currently over 150 firms – including both signatory and non-signatory contractors – competing

for structural steel erection work in the locations at issue here.  Undisputed Facts ¶ 7.  Although

Plaintiffs claim that they were barred from a majority of the work in the Relevant Market based

on the existence of PLAs, this claim is simply untrue.  See Discussion regarding PLAs in Section

D of this Brief; see also Undisputed Facts ¶ 8.

Second, recoupment is unlikely where "new entry is easy."  Brooke Group Ltd., 509 U.S.

at 226; see also Matsushita, 475 U.S. at 591 n.15  (barriers to entry are key factors in determining

whether recoupment is feasible); Cargill Inc., 479 U.S. at 119 n. 15 (same); ADVO, Inc. v.

Philadelphia Newspapers, Inc., 51 F.3d 1191, 1200-02 (3d Cir. 1995) (low barriers to entering

business prevents recoupment, thus fails to injure competition and produces no anti-trust injury);

A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1403 (7th Cir. 1989)

("Persistent entry and expansion by other firms at the same time ensures that recoupment cannot

occur."); Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 597

(8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988) ("[I]f entry barriers to new firms are not

significant, the elimination of the competitor may not significantly affect competition as a whole,

because a new firm or firms easily can enter the market to take the place of the old one.  In such

cases, competitive pressure from potential market entrants may still exist, and the departure of

the defendant's sole competitor does not necessarily mean that competition is threatened.");

Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publs., Inc., 63

F.3d 1540, 1549 (10th Cir. 1995), cert. denied, 516 U.S. 1044 (1996) (sufficient evidence of

"high entry barriers and other structural factors" is necessary to create triable issue of dangerous

probability of recoupment); J. & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62, 68 (D.Me.

1999) (because there were no significant barriers into the retail gasoline market, the defendant

would be unable to maintain supra competitive retail prices); <u>AD/SAT v. Associated Press</u>, 920

F. Supp. 1287, 1303 (S.D.N.Y. 1996) ("[T]he barriers of entry into this market are low, which

provides further evidence that AP's predatory pricing scheme could not succeed, as monopoly

prices would result in new competitors entering the market."), *aff'd*, 181 F.3d 216 (2d Cir. 1999).

Barriers to entry for new structural steel erectors are notably few.  Undisputed Facts ¶ A6.

Typically, steel erection contractors rent cranes and hire labor, and thus a steel erection

contractor basically only needs good credit and a supply of skilled labor.  <u>Id.</u>

 Plaintiffs may argue that Local 7 and its signatory contractors have at least engaged in a

conspiracy in restraint of trade to fix prices and that even if such price fixing does not involve

predatory pricing it is unlawful under the anti-trust laws and thus provides the necessary anti-

trust injury.  The Supreme Court, however, has rejected this very contention, explaining that:

> [a]ntitrust injury does not arise for purposes of [the remedial provision making
> treble damages available] until a private party is adversely affected by an
> *anticompetitive* aspect of the defendant's conduct . . . ; in the context of pricing
> practices, only predatory pricing has the requisite anticompetitive effect. . . .  Low
> prices benefit consumers regardless of how those prices are set, and so long as
> they are above predatory levels, they do not threaten competition.  Hence, they
> cannot give rise to antitrust injury.

<u>ARCO</u>, 495 U.S. at 339 (citations and footnotes omitted) (emphasis in original); <u>see</u> <u>also</u> <u>id.</u> at

339-41 ("When prices are not predatory, any losses flowing from them cannot be said to stem

from an *anticompetitive* aspect of the defendant's conduct.") (emphasis in original); <u>Cargill, Inc.</u>,

479 U.S. at 116 ("'[I]t is in the interest of competition to permit dominant firms to engage in

vigorous competition, including price competition.'") (quoting <u>Arthur S. Langenderfer, Inc. v.</u>

<u>S.E. Johnson Co.</u>, 729 F.2d 1050, 1057 (6th Cir.), *cert. denied*, 469 U.S. 1036 (1984)).

 Finally, Plaintiffs may attempt to argue that it is not Local 7 signatory contractors who

have engaged in predatory pricing by accepting the job targeting funds, but rather Local 7 for

providing these funds.  This argument would require Plaintiffs to argue that the predatory pricing

involved Local 7's pricing of its members labor below some appropriate measure of cost.  This

argument, however, is foreclosed by § 6 of the Clayton Act in 1914, 15 U.S.C. § 17, which for

purposes of the anti-trust laws, including the Sherman Act, declares that "[t]he labor of a human

being is not a commodity or article of commerce."

**B.  <u>Local 7's Job Targeting Program Is Shielded by the Non-Statutory Labor
Exemption.</u>**

Even if anti-trust injury was not a requirement, Plaintiffs' attack on the job targeting

program would nevertheless fail.  Where federal anti-trust law seeks "to preserve business

competition and to proscribe business monopoly" (<u>Allen Bradley Co. v. Local Union No. 3, Int'l

Bhd. of Elec. Workers</u>, U.S. 797, 809 (1945)), federal labor law seeks "to preserve the rights of

labor to organize to better its conditions through the agency of collective bargaining" (<u>id.</u> at 806)

and allows the elimination of "that part of such competition which is based on differences in

labor standards."  <u>Apex Hosiery Co. v. Leader,</u> 310 U.S.469, 503 (1940); <u>see</u> <u>also</u> National Labor

Relations Act ("NLRA"), 29 U.S.C. § 151 (addressing the "inequality of bargaining power"

between employees and employers that "tends to aggravate recurrent business depressions, by

depressing wage rates . . . and by preventing the stabilization of competitive wage rates and

working conditions within and between industries").  To reconcile these polar purposes,

Congress and the courts developed two sets of labor exemptions that free parties from any

inquiry as to whether the restraint is unreasonable under the anti-trust laws.  The statutory labor

exemption exempts from anti-trust law all union conduct when the union has not combined with

businesses and acts in its self-interest and is addressed herein in Part C.  The non-statutory labor

exemption exempts most union-business combinations (and even some business-business

17

combinations) directed primarily to the terms and conditions of employment. Assuming *arguendo* that Plaintiffs' allegation of a broad conspiracy between all potential co-conspirators involved in the alleged job targeting is true, the job targeting program is still immunized by the non-statutory labor exemption to the anti-trust laws.

        1.   The Non-Statutory Labor Exemption to the Anti-trust Laws

When Congress passed the Wagner Act in 1935 to protect workers' right to unionize, it was "common knowledge" that labor organizations sought to eliminate competition on the basis of wages and other labor standards through industry-wide bargaining. Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen of North Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 712 (1965) (Goldberg, J., concurring). It became clear to the Supreme Court that even where such bargaining resulted in an agreement with a group of employers affecting competition, such restraints were not necessarily restraints of trade or commerce under the Sherman Act. As the Supreme Court explained in Apex Hosiery:

> [S]uccessful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods…*an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this affect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.*

310 U.S. at 503-04 (citations omitted) (emphasis supplied). Thus, the judiciary developed a non-statutory labor exemption to the anti-trust laws that can be invoked when labor and non-labor entities combine. Brown v. Pro Football, Inc., 518 U.S. 231, 236 (1996) (citations omitted).

"The Supreme Court has never delineated the precise boundaries of the [non-statutory] labor exemption" (Clarett v. National Football League, 369 F.3d 124, 131 (2d Cir. 2004), *cert. denied*, 125 S.Ct. 1728 (2005)), but has recognized that the non-statutory labor exemption is a

necessary reconciliation of federal labor policy and federal anti-trust laws.  See Jewel Tea, 381 U.S. at 690 n.5 (application of the non-statutory labor exemption is determined by balancing the "interests of union members" against "its relative impact on the product market"); Connell Constr. Co. v. Plumbers and Steamfitters Local Union. No. 100, 421 U.S. 616, 622 (1975) ("[A] proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from anti-trust sanctions.").

For example, the non-statutory labor exemption protects agreements between unions and individual employers that relate to wages, hours or other working conditions and that arise out of the context of a collective bargaining agreement even though such agreements may restrict competition among those employers over subjects covered by the agreements.  See United Mine Workers v. Pennington, 381 U.S. 657, 664 (1965) (labor law contemplates agreements on wages between unions and individual employers).

The exemption also protects agreements between unions and multiple employers, again, that relate to wages and other terms and conditions of employment arising out of the context of a collective bargaining agreement.  Id. at 664 (labor law contemplates agreements between unions and employers in a multi-bargaining unit).  As the Supreme Court noted in N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL No. 103:

> [a]t the time of the debates on the Taft Hartley Amendments [to the Wagner Act], proposals were made to limit or outlaw multi-employer bargaining.  These proposals failed of enactment.  They were met with a storm of protest that their adoption would tend to weaken and not strengthen the process of collective bargaining and would conflict with the national labor policy of promoting industrial peace through effective collective bargaining.

353 U.S. 87, 95 (1957).  The fact that most, or even all,[9] employers agree to the same wages and

other terms and conditions of employment does not restrain trade for Sherman Act purposes.  See

Brown, 518 U.S. at 240 ("Multiemployer bargaining itself is a well-established, important,

pervasive method of collective bargaining, offering advantages to both management and labor").

　　　　Finally, the non-statutory labor exemption applies to conduct that grows out of or is

directly related "to the lawful operation of the bargaining process," even if such conduct does not

arise out of a collective bargaining agreement. Brown, 517 U.S. at 250.[10] As the Court explained:

> Petitioners claim that the implicit exemption applies only to labor-management
> *agreements* -- a limitation that they deduce from case-law language, see, e.g.,
> Connell, 421 U.S., at 622, 95 S.Ct., at 1835 (exemption for "some union-
> employer agreements ") (emphasis added), and from a proposed principle -- that
> the exemption must rest upon labor-management consent.  The language,
> however, reflects only the fact that the cases previously before the Court involved
> collective-bargaining agreements, see id., at 619-620, 95 S.Ct., at 1833-1834;
> Pennington, 381 U.S., at 660, 85 S.Ct., at 1588; Jewel Tea, *supra*, at 679-680, 85
> S.Ct., at 1596-1597; the language does not reflect the exemption's rationale, see
> 50 F.2d, at 1050.  Nor do we see how an exemption limited by petitioners'
> principle of labor-management consent could work.  One cannot mean the
> principle literally -- that the exemption applies only to understandings embodied
> in a collective-bargaining agreement -- for the collective-bargaining process may
> take place before the making of any agreement or after an agreement has expired.

Id. at 243.  Instead, this exemption applies "where needed to make the collective-bargaining

process work."  Id. at 234.  Accordingly, Brown extended the non-statutory labor exemption's

reach to multi-employer group's post-impasse implementation of terms rather than to terms

contained in a collective bargaining agreement.  Id. at 250.  In doing so, the Court noted that

permitting anti-trust liability would call into question substantial labor conduct, including multi-

---

[9] See Boston Shipping Ass'n, Inc. v. Federal Maritime Comm'n, 706 F.2d 1231, 1233 (1st Cir. 1983) ("BSA, the complaining party in the dispute before us, is a multiemployer bargaining association which represents management in all longshore collective bargaining affecting the Port of Boston. Its members -- twenty-five commercial firms which include contracting stevedores and deep water carriers plus the Massachusetts Port Authority -- own or operate virtually all of the facilities in the port that are used regularly in foreign and intercoastal trade.").

[10] Notably, the conduct at issue in Brown was employer conduct.  As discussed further below, union conduct undertaken alone and in the union's own interest is outside of the scrutiny of the anti-trust laws under the statutory labor exemption.

employer bargaining, that federal labor policy encourages.  Id. at 237-42.[11]

The Brown Court also recognized the National Labor Relations Board's ("NLRB's") statutory responsibility for policing the collective bargaining process.  Id. at 240-42.  As the Court explained, "[l]abor law permits employees, after impasse, to engage in considerable joint behavior, including joint lockouts and replacement hiring."  Id. at 245.  Bringing an attack against this joint-employer behavior would "ask antitrust courts to decide the lawfulness of activities intimately related to the bargaining process."  Id.  "The labor laws give the [NLRB], not antitrust courts, primary responsibility for policing the collective-bargaining process."  Id. at 242.  The Court further noted that one of Congress's objectives in implementing the labor laws "was to take away from antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy."  Id.

2.  Local 7's Job Targeting Program Falls Within the Non-Statutory Labor Exemption

Plaintiffs complain of an alleged restraint of trade based on Local 7's pooling of membership dues for its job targeting funds and the payment of such funds to Union signatory contractors and fabricators and developers.  Assuming these allegations to be true, each aspect of the job targeting program is exempt from any anti-trust scrutiny.

a.  The Collection of Dues by Signatory Contractors is Exempt From the Anti-trust Laws Under the Non-Statutory Exemption

The undisputed facts demonstrate that the BTEA's only involvement in the pooling of job targeting funds is the ministerial deduction of dues for the fund from Local 7 member paychecks,

---

[11]  The non-statutory labor exemption may also apply to agreements made without any union-employer negotiations, before the parties even contemplated a collective bargaining agreement.  See Clarett, 369 F.3d at 126-27, 143 (holding that rule adopted long before collective bargaining commenced fell within the scope of the non-statutory labor exemption and emphasizing the importance of multi-employer bargaining); id. at 143 ("The disruptions to federal labor policy that would be occasioned by [plaintiff's] antitrust suit…would not vindicate any of the antitrust policies that the Supreme Court has said may warrant the withholding of the non-statutory exemption.").

as referenced in the BTEA's and Local 7's collective bargaining agreement.  Undisputed Facts ¶ B1.  Plaintiffs' erroneously assert that this pooling of funds violates federal anti-trust law.  However, these funds belong, in the first instance, to the Union members as part of their wages.  See id.  Local 7 members voted to pool portions of their own wages for the job targeting fund and authorized the BTEA employers to deduct dues for the fund to be forwarded to the Union.  See id.  Even if the pooling of members' own wages is somehow considered a restraint of trade, a dues deduction provision is an ordinary part of a negotiated collective bargaining agreement concerning terms and conditions of employment, falling squarely within the non-statutory labor exemption.  See Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring).

Nor does the purported violation of the Davis-Bacon Act take the dues deduction arrangement out of the non-statutory labor exemption.  The alleged illegality – that workers who elect to forward their dues will not have received the full wages that they are owed on Davis-Bacon Act projects – is unrelated to the bargaining process, and therefore has no bearing on the reconciliation of labor and anti-trust laws.

Moreover, Plaintiffs have no private right of action to sue under the Davis-Bacon Act.  See, e.g., United States v. Binghamton Constr. Co., 347 U.S. 171, 176-77 (1954) ("The [Davis-Bacon] Act itself confers no litigable rights on a bidder for a Government construction contract.  The language of the Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects.") (footnote omitted); see also Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., 01-548, 2002 WL 334394, at *4 (D. Minn. Feb. 27, 2002) (in an anti-trust case regarding a job targeting program and alleged Davis-Bacon Act violations, court held that plaintiff lacked standing to assert a claim for declaratory judgment based upon the

Davis-Bacon Act).  The anti-trust laws -- with their treble damages -- do not allow a party to dress up some other alleged illegality as an anti-trust claim in order to avoid a standing problem.  See Brooke Group Ltd., 509 U.S. at 225.  Accordingly, this Court should resist Plaintiffs' attempts to bootstrap the Davis-Bacon allegations to its anti-trust claims.

> b.  Local 7's Job Targeting Payments to Its Signatory Contractors
>     Fall Within the Non-Statutory Labor Exemption

The undisputed facts establish that Local 7's payment of job targeting funds to signatory contractors also falls squarely within the scope of the non-statutory labor exemption.  The effect of the payment of funds to signatory contractors is to lessen the signatory contractor's labor costs for the particular job.  Undisputed Facts ¶ B2.  A union clearly can negotiate different (even lower) wage rates with different employers, and a job targeting award serves exactly that purpose.  See Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring).

Moreover, the NLRB has repeatedly found that union job targeting programs are protected by federal labor law.  See, e.g., Manno Elec., 321 NLRB 278, 282, 298 (1996), (affirming an administrative law judge ("ALJ") finding that "[t]he objectives of the 'job targeting program' are to protect employees' jobs and wage scales.  These objectives are protected by Section 7 [of the NLRA]"), enf'd per curiam mem., 127 F.2d 34 (Table) (5th Cir. 1997); Associated Builders and Contractors, Inc., Golden Gate Chapter, 331 NLRB 132, 132 n.1, 137 (2000) ("the Charging Parties' job targeting program is concerted, protected activity"), modified in non-relevant part, 333 NLRB 955 (2001); J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655, 663 (Ohio), cert. denied, 525 U.S. 871 (1998) (holding that Ohio's prevailing wage statutes and regulations were preempted by the NLRA to the extent that they interfered with the federally protected use of job targeting programs), cert. denied, 525 U.S. 871 (1998).  Just as in Manno, one of Local 7's job targeting objectives is to protect iron workers' jobs and wage and benefit

23

scales.  Hurley Aff. ¶ 20.  Thus, this Court should defer to the NLRB's position that such

programs are protected by § 7 of the NLRA.  See Brown, 518 U.S. at 242.

Although the First Circuit has not yet addressed an anti-trust challenge to a job targeting

program, the two circuit courts that have issued published opinions have held that job targeting

programs were insulated from federal anti-trust laws by the non-statutory labor exemption.  See

Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81 F.3d 858, 863 (9th Cir. 1996) ("A

subsidy program that targets some jobs for more competitive wage components of signatory

contractor bids, and does not bar nonunion bidders from the bidding on the same jobs, is in

harmony with the policies of both the labor and antitrust laws."); Local Union 257, Int'l Bhd. of

Elec. Workers v. Sebastian Elec., 121 F.3d 1180, 1186 (8th Cir. 1997) (holding that a target fund

financed by union members that provides partial reimbursement for wages paid to members

where the employer is a signatory to a collective bargaining agreement is protected from anti-

trust liability by the non-statutory exemption).  A third circuit court has affirmed without opinion

a district court decision reaching the same result.  Grinnell Corp. v. Road Sprinkler Fitters Local

Union No. 669, No. 94-3309, 1997 WL 311498, at *2, 12 (D. Md. 1997) (upholding a union's

job targeting program, in which the union and a contractor "would negotiate concessionary rate

agreements on a project-by-project basis in a particular geographical area in order that the

particular employer might be able to compete with lower cost, nonunion contractors"), aff'd, 133

F.3d 914 (4th Cir.) (Table) (unpublished decision), cert. denied, 525 U.S. 825 (1998).

As in those three cases, the non-statutory labor exemption clearly exempts Local 7's

payment of job targeting funds to signatory contractors because such conduct concerns, as

Plaintiffs themselves admit, wage rates and other labor costs, which are mandatory subjects of

bargaining, and involve parties in a collective bargaining relationship.  Compl. ¶ 36; see

Undisputed Facts ¶ 2.

    c.  Any Payment of Job Targeting Funds to Fabricators and General
        Contractors Is Also Within the Non-Statutory Labor Exemption

Plaintiffs' allege in their Complaint that Local 7 repeatedly approached fabricators or

general contractors with which it had no contract, and persuaded them (with offers to provide, or

threats to withhold, job targeting funds), job by job, to use subcontractors who employ Local 7

members. Compl. ¶¶ 67-139 (alleging over twenty-five separate incidents in which the Union

allegedly sought and obtained work for its members by appealing to various fabricators and

developers using job targeting funds). Taking these allegations as true for purposes of summary

judgment only, such conduct still falls within the non-statutory labor exemption.

Plaintiffs may argue that under Connell Constr. Co. v. Plumbers and Steamfitters Local

Union No. 100, 421 U.S. 616 (1975), the non-statutory labor exemption does not protect this

conduct. Yet, the contention that Local 7's job targeting program is somehow akin to the

agreements involved in Connell does not withstand scrutiny. In Connell, the Supreme Court

found an agreement between a union and a general contractor with whom it did not maintain a

collective bargaining agreement illegal under § 8(e) and unprotected by the non-statutory labor

exemption, where (1) the agreement required the contractor to deal only with the union signatory

contractors on *all of its jobs*, (2) the union maintained similar agreements with other non-

signatory general contractors, and (3) the union also was a party to a multi-employer bargaining

agreement with an employer association comprised of numerous contractors, and that agreement

included a "most favored nation" clause, whereby the union agreed that should it grant a more

favorable contract to a non-association contractor, it would extend the same terms to all other

signatory contractors.  421 U.S. at 619-21, 633, 635. [12]  In analyzing the anti-competitive effects

of the union's agreement with Connell and other general contractors with whom it did not

maintain a collective bargaining agreement, the Supreme Court held that these agreements

"indiscriminately excluded nonunion subcontractors from a portion of the market, even if their

competitive advantages were not derived from substandard wages and working conditions[.]"  Id.

at 623.  Moreover, as a result of these agreements, the union had obtained control over

subcontract work that "could result in significant adverse effects on the market and on consumers

– effects unrelated to the union's legitimate goals of organizing workers and standardizing

working conditions."  Id. at 624.  The union's absolute control over all the work subcontracted

by these general contractors coupled with the "most favored nation" clause in its agreement with

the association were indicia that the union was no longer functioning independently.  Connell

thus stands for the proposition that the non-statutory labor exemption will not apply when unions

combine with non-labor groups to engage in activity that potentially has substantial anti-

competitive effects outside of wages and other terms and conditions of employment.

       Here, the undisputed facts establish that Local 7's agreements, if any, with fabricators or

developers were not of the Connell type.  Local 7 awarded job targeting funds on a job-by-job

basis.  Undisputed Facts ¶ 3.  These job-by-job payments, as demonstrated by Plaintiffs'

numerous allegations of job targeting payments for dozens of specific projects, did not result in

generalized agreements with non-signatory companies prohibiting them from working with non-

union contractors on all future jobs.[13]  Compl. ¶¶ 67-139.  At most, these alleged payments, if

any, represent Local 7's hat-in-hand method of organizing job-by-job.  To the extent that Local 7

---

[12]  The Connell Court did not answer the penultimate question of whether the union's conduct did, in fact, violate
the federal anti-trust laws.  421 U.S. at 637.
[13]  Local 7 does not herein admit Plaintiffs' allegations concerning the Union's alleged twenty-nine (29) appeals for
work.  Nonetheless, even taking the allegations as true for purposes of summary judgment, there is no genuine
dispute of material fact that would preclude summary judgment on the anti-trust counts.

may have made these job-by-job appeals to fabricators and general contractors, as Plaintiffs

allege, it did so precisely because it maintained no generalized agreement with these non-labor

groups.  Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.

The difference between the generalized agreements in <u>Connell</u> and successful job-by-job

appeals is apparent.[14]  Unlike across-the-board agreements, the successful job-by-job appeals, as

alleged here, do not have the "potential for restraining competition in the business market in

ways" that anti-trust laws condemn.  <u>Id.</u> at 635.  A successful appeal to buy one hot dog from one

vendor at a ball game is simply not an agreement to refrain from buying any other vendor's hot

dog, that day or in the future.  Plaintiffs frankly "want[] to use the Sherman Act….as a source of

compensation from [Local 7] whose labor-law maneuvers have turned its books from black to

red.  That is not a function of the antitrust laws."  <u>Ehredt Underground, Inc. v. Commonwealth</u>

<u>Edison Co.</u>, 90 F.3d 238, 241 (7th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997).

Lastly, the Supreme Court in <u>Connell</u> highlighted its well-established principle "that

labor policy requires tolerance for the lessening of business competition based on differences in

wages and working conditions."  <u>Id.</u> at 622.  It concluded that it is only when a restraint on the

business market "has substantial anticompetitive effects," which do "not follow naturally from

the elimination of competition over wages and working conditions" that anti-trust policies are

contravened "to a degree not justified by congressional labor policy," that labor conduct will not

be immunized from anti-trust scrutiny.  <u>Id.</u> at 625, 635.  Unlike in <u>Connell</u>, which involved

generalized agreements outside of mandatory subjects of bargaining, it is undisputed that the so-

called agreements at issue here concern only labor costs, which fall squarely within the

mandatory subjects of bargaining.  Undisputed Facts ¶ B2.  As the Supreme Court subsequently

---

[14] The <u>Connell</u> Court specifically noted that "[t]he primary effect of the [multi-employer agreement] seems to have
been to inhibit the union from offering any other employer a more favorable contract",  (421 U.S. at 624, n. 1),
whereas the effect of the job targeting agreement here is to allow just that.

made clear in <u>Brown</u>, "the case for applying the [non-statutory labor] exemption is strongest where a restraint on competition operates primarily in the labor market and has no anti-competitive effect on the product market."  518 U.S at 1051.  That is the case here.

**C.  <u>Local 7's Job Targeting Program and Other Organizing Activities Are Exempted by the Statutory Labor Exemption.</u>**

The undisputed facts show that no business conspiracy exists between Local 7 and non-groups; instead, Local 7's job targeting program, and its other organizing activities are exempted by the statutory labor exemption.

### 1.  <u>The Statutory Labor Exemption to the Anti-trust Laws</u>

The statutory labor exemption is rooted in §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, which amended the Sherman Act, and the Norris LaGuardia Act, 29 U.S.C. § 102, et seq.  Congress enacted these statutes to respond to early judicial application of the anti-trust laws to labor activities.  In the now infamous <u>Danbury Hatters</u> case, the Supreme Court held that a union-led nationwide, secondary boycott was a conspiracy within the meaning of the Sherman Act.  <u>Loewe v. Lawlor</u>, 208 U.S. 274 (1908).  The Court acknowledged that "the congressional debates show that the statute had its origin in the evils of massed capital," but nonetheless concluded that the Sherman Act as adopted "made no distinction between classes," and that the alleged conspiracy was subject to the Act.  <u>Id.</u> at 301 (quotations and citation omitted).  Responding to what it considered a result incongruent with Congressional intent, Congress passed the Clayton Act in 1914.  Section 6 of the Act boldly declares that:

> *The labor of a human being is not a commodity or article of commerce*.  Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; *nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies*

> *in restraint of trade, under the antitrust laws.*

15 U.S.C. § 17 (emphasis supplied). As the Supreme Court explained, since the enactment of §

6, "it would seem plain that restraints on the sale of the employee's services to the employer,

however[] much they curtail the competition among employees, are not in themselves

combinations or conspiracies in restraint of trade or commerce under the Sherman Act." Apex

Hosiery Co. v. Leader, 310 U.S. 469, 503 (1940). In addition, § 20 of the Clayton Act prohibits

the issuance of injunctions against certain union activities, including injunctions that would:

"prohibit any person . . . from terminating any relation of employment, or from ceasing to

perform any work . . . , or from . . . persuading others by peaceful means so to do" and provides

further that such activities are not "violations of any law of the United States." 29 U.S.C. § 52.

Despite this clear Congressional intent, the Supreme Court narrowly interpreted Clayton

Act in Duplex Printing Press Co. v. Deering, limiting its protection to those parties in a dispute

concerning "terms and conditions of employment" who stand in a "proximate relation" to the

dispute and holding that § 20 of the Clayton Act authorized courts to enjoin the conduct of

unions under the anti-trust laws. 254 U.S. 443, 470-74 (1921). Congress repudiated Duplex,

when it passed the Norris-LaGuardia Act in 1932, declaring the "public policy of the United

States" as follows:

> [w]hereas under prevailing economic conditions, developed with the aid of
> governmental authority for the owners of property to organize in the corporate
> and other forms of ownership association, the individual unorganized worker is
> commonly helpless to exercise actual liberty of contract and to protect his
> freedom of labor, and thereby to obtain acceptable terms and conditions of
> employment, wherefore, though he should be free to decline to associate with his
> fellows, it is necessary that he have full freedom of association, self-organization,
> and designation of representatives of his own choosing, to negotiate the terms and
> conditions of his employment, and the he shall be free from the interference,
> restraint, or coercion of employers of labor, or their agents, in the designation of
> such representatives or in self-organization or in other concerted activities for the
> purpose of collective bargaining or other mutual aid or protection.

29 U.S.C. § 102.  Congress also broadly defined "labor dispute" as:

> [a]ny controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c).[15]

In United States v. Hutcheson, 312 U.S. 219, 232 (1941), the Supreme Court held that the Clayton Act and the Norris-LaGuardia Act combined to form the statutory labor exemption to anti-trust laws.  The Court established the following two-part test for determining whether labor union activity is immune from anti-trust scrutiny under this exemption:  (1) Did the union act in its self-interest? (2) Did the union combine with non-labor groups?  Id.  The Court articulated the broad scope of the statutory labor exemption as follows:

> So long as a union acts in its self-interest and does not combine with non-labor groups, *the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.*

312 U.S. at 232 (footnote omitted) (emphasis supplied).

In Hutcheson and subsequent decisions, the Supreme Court also made clear that economic pressure directed by the union and its members alone against a neutral, secondary employer was excluded from anti-trust review by the statutory labor exemption.  Hutcheson, 312 U.S. at 231 ("the allowable area of union activity was not to be restricted, as it had been in the Duplex case, to an immediate employer-employee relation"); National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 623 (1967) ("Congress abolished, for purposes of labor immunity, the

---

[15]  Congress adopted an almost identical definition of a labor dispute when it enacted the Wagner Act in 1935.  29 U.S.C. § 152(9) ("The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.").

distinction between primary activity between the immediate disputants and secondary activity in which the employer disputants and the members of the union do not stand in the proximate relation of employer and employee.") (quotations and citations omitted);

Nor did Congress narrow the broad statutory exemption from anti-trust law when it enacted the LMRA in 1947 to address business concerns regarding secondary activity. To the contrary, as the Supreme Court explained in Connell Constr. Co. Inc. v. Plumbers and Steamfitters Local Union No. 100, "Congress rejected attempts to regulate secondary activities by repealing the anti-trust exemptions in the Clayton and Norris-LaGuardia Acts, and created special remedies under labor laws instead." 421 U.S. 616, 634 (1975) (citing legislative history); see also id. at 642 (Stewart, J., dissenting) ("The Senate . . . refused to adopt the House's removal of antitrust immunity for prohibited secondary activity") (citing legislative history).

Although "the test to determine if a union's actions are in its 'self-interest' has not been precisely formulated, the principle . . . is that activities are in the self-interest of a labor organization if they bear a reasonable relationship to a legitimate union interest." Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368, 1380 (1st Cir. 1981), aff'd, International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc., 456 U.S. 212 (1982); see Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union, AFL-CIO, 362 F.2d 322, 328 (5th Cir. 1966) (negative publicity by union was within the scope of traditional union objectives and did not violate anti-trust law). The plaintiff in an anti-trust case involving a union defendant bears the burden of proving that the statutory labor exemption does not apply. See Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council, 675 F.2d 881, 886 (7th Cir. 1982).

     2.  The Job Targeting Program Falls Within the Statutory Labor Exemption

31

The undisputed facts show that the job targeting program is not a labor-management initiative; it is a program established and maintained exclusively by Local 7 in its self-interest. Such conduct is shielded from anti-trust scrutiny under the statutory labor exemption.

The job targeting program fits squarely within the <u>Hutcheson</u> two-part test for the application of the statutory labor exemption. With respect to the first prong of the test, Local 7's job targeting program serves two legitimate, self-interested purposes. First, Local 7's job targeting program helps to secure work at labor standards for Local 7 members in geographical locations where non-union competition is strongest. Undisputed Facts ¶ C1. Such an objective is clearly in Local 7's legitimate, self-interest. Non-union contractors, such as Plaintiffs, admittedly enjoy substantially lower labor costs than union structural steel erection contractors, such as Local 7 signatory contractors. <u>See</u> Compl. ¶ 36. This reality often places non-union contractors at a substantial competitive advantage over union contractors, such as Local 7 signatory contractors, in obtaining jobs. Job targeting funds are used to provide relief from the constraints of the collectively bargained labor standards on jobs targeted by Local 7, without which Local 7 signatory contractors would be hard-pressed to competitively bid. Providing job targeting funds for the purpose of acquiring jobs, while protecting labor standards that its members would not otherwise enjoy, is a legitimate, self-interest objective of a labor organization. <u>See</u> <u>Apex</u>, 310 U.S. at 503 (the elimination of competition over wages and working conditions is a legitimate union goal); <u>see</u> <u>also</u> <u>Woodworking Mfg.. Ass'n. v. N.L.R.B.</u>, 386 U.S. 612, 639 (1967) (preservation of union work is a legitimate union interest); <u>Intercontinental Container Transp. Corp. v. New York Shipping Ass'n</u>, 426 F.2d 884, 887 (2d Cir. 1970) ("The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern . . . . Union activity having as its object the preservation of jobs for

32

union members is not violative of the anti-trust laws." (citations omitted)); Manno Elec., Inc.,
321 NLRB 278, 298 (1996) (use of a job targeting program to "maintain the union wage scale . .
. and obtain work for its members" is a legitimate union interest), *enf'd per curiam mem.,* 127
F.2d 34 (Table) (5th Cir. 1997).

Second, Local 7's job targeting program serves to reduce regulatory cheating in the
structural steel erection industry by funding the Union's monitoring efforts.  Undisputed Facts ¶
C1.  Monitoring the structural steel erection industry is in Local 7's legitimate self-interest
because it, too, helps create a more level playing field for its contractors, ultimately providing
Local 7 opportunities to obtain additional work for its members.  Again, securing work for union
members is a legitimate, self-interested objective of labor organizations.  See Woodworking
Mfg., 386 U.S. at 639; see also United Food and Commercial Workers Union, Local 1036 v.
N.L.R.B. ("UCFWU"), 307 F.3d 760, 768 (9th Cir.), *cert. denied*, 537 U.S. 1024 (it is the role of
unions to organize workers and promote the use of union labor).

With respect to the second prong of the Hutcheson test, Local 7 unilaterally established
the job targeting program sometime prior to 1991.  Undisputed Facts ¶ C2.  When, in or around
1992, Local 7 members voted to permanently fund the program through dues deductions from
their own wages so that they could attempt to obtain more work at union labor standards, they
did so unilaterally, without employer involvement.  See id.  Local 7 also unilaterally administers
the job targeting program, including determining which jobs to target, to whom it pays job
targeting funds, and how much to pay.  See id. ¶ C3.

Plaintiffs erroneously assert that Local 7's so-called combination with BTEA in pooling
the targeting funds takes away the unilateral quality of the program's administration.  As
addressed earlier, the BTEA employers' only involvement in the pooling of funds is the

ministerial function of deducting dues from the paychecks of union members who have authorized these deductions from their own paychecks to be forwarded to their own union in accordance with federal labor law.  Undisputed Facts ¶ C4.  This ministerial function does not change the basic fact that this is money belonging to Local 7 members that they have decided, through a vote, to pool for job targeting purposes.  See id.  If the mere remission of dues as a source of union funds could eliminate the unilateral quality of the Union's actions, and, resultantly, the statutory labor exemption, then virtually any activity in which a union engages apparently "unilaterally," would no longer be considered unilateral where employer-deducted dues are used.  Such a result would be inimical to the purpose of the statutory exemption to the federal anti-trust laws, which was established to protect the integrity of federal labor laws.

Nor does the purported violation of the Davis-Bacon Act take the dues deduction arrangement out of the statutory labor exemption.  Unlawfulness is not a consideration at all under the statutory exemption.  Unquestionably, both the "licit and illicit" are protected. Hutcheson, 312 U.S. at 232.

### 3.   Other Alleged Conduct Is Shielded by the Statutory Labor Exemption

In an attempt to bolster their unsubstantial anti-trust claims, Plaintiffs next claim that other alleged Union conduct, such as picketing, surveillance and videotaping, stripping, and violence, removes Local 7's statutory immunity.  Those acts, even taken as true for purposes of summary judgment, do not forfeit Local 7's right to be shielded from the statutory labor exemption.  The undisputed facts establish that Local 7's organizing activities during the relevant time period were in Local 7's legitimate, self-interest and conducted unilaterally.

#### a.   Secondary Pressure, Secondary Boycotts, and 'Top-Down Organizing'

Plaintiffs characterize the remainder of Local 7's efforts to obtain work for its members

as illicit "top-down organizing" by using direct pressure (e.g., picketing) and threats (e.g., to picket, or to withhold job targeting funds) in order to persuade employers to use contractors employing Local 7 members.  This conduct is also alleged in Plaintiffs' LMRA claim.[16]  Local 7's alleged "top-down organizing" conduct, however, was unilateral and in the Union's self-interest, and is therefore exempted from the antitrust laws by the statutory labor exemption.

Organizing employees in the construction industry is difficult because of the job-by-job nature of the industry, the number of parties such as developers, general contractors, subcontractors, and employees, involved in each job, and the ambulatory nature of the industry. It is difficult, if not impossible, for workers to go through the lengthy card-signing and election process that is required in non-construction industry settings.  "Top-down organizing" allows a union to organize workers by persuading general contractors to hire union subcontractors, rather than by pursuing NLRB elections among the primary's employees.  This type of conduct is permitted and highly regulated by the federal labor laws.  For example, the NLRA condoned top-down organizing in § 8(f), 29 U.S.C. 158(f) (authorizing construction industry employers and unions to enter into so-called "prehire" agreements setting the terms and conditions of employment for workers hired by the signatory employer without the union's majority status first having been established under § 9 of the Act, 29 U.S.C. § 159) and in the construction industry proviso to § 8(e), 29 U.S.C. 158(e) (setting forth an exception from § 8(e)'s prohibition against "hot cargo" agreements that require an employer to refrain from doing business with any person not agreeing to be bound by a pre-hire agreement); see also Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . . pressure is implicit in the construction industry proviso" to § 8(e) of the NLRA); Iron Workers Local 3 v. N.L.R.B., 843

---

[16]  While Local 7 denies the allegations of illicit secondary conduct, including as it relates to purported "top-down organizing" activities, it does not herein substantively address Plaintiffs' LMRA claim.  See footnote 1, *supra*.

F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889 (1988) (confirming validity of construction labor contracts without showings of majority status under § 8(f) of the NLRA).

Commensurate with the widespread use of "top-down organizing," the NLRA permits unions to direct a wide variety of appeals and pressures at secondary employers.  In the construction industry this includes certain types of non-picketing, non-strike pressure on such secondary employers to retain unionized contractors.  See e.g., N.L.R.B. v. Servette, Inc., 377 U.S. 46, 54 (1964) (a union may pressure managers of secondary companies to cease doing business with the primary employer as long as the union does not invite a work stoppage among the secondary's rank-and-file employees or engage in other conduct that qualifies as "coercion or restraint" under § 8(b)(4)(i) or (ii) of the NLRA, 29 U.S.C. § 158(b)(4)(i), (ii)); Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 578 (1988) (a construction union may use pressure tactics such as consumer boycotts and extremely harsh publicity directed against secondary employers with an overtly "cease doing business purpose" because such types of non-picketing, non-strike activities are not deemed "restraint or coercion" under § 8(b)(4)(i) or (ii) of the NLRA); Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, 854 F.2d 144, 146 (6th Cir. 1988) (§ 8(b)(4)(B) of the NLRA did not prohibit a union's phone calls and visits to "neutral" advertisers, threatening to handbill for consumer boycotts of the advertisers, followed by actual handbilling, to pressure the advertisers to cease dealing with the primary employer).

With this backdrop of permissible secondary activity, Local 7 denies it engaged in unlawful top-down organizing.  Yet, even if Local 7's organizing activities were unlawful, its conduct would nevertheless fall within the scope of the statutory labor exemption's protection as long as that conduct was in the Union's self-interest and unilateral.  See Hutcheson, 312 U.S. at

232.  First, Local 7's picketing and publicity activities were for the purpose of obtaining work for its members at labor standards.  Undisputed Facts ¶ C5.  This objective is in the Union's legitimate, self-interest.  See Woodworking Mfg., 386 U.S. at 639.  Second, these activities were done unilaterally and not pursuant to any agreements with any other non-labor groups. Undisputed Facts ¶ C6.  Such activities are shielded from the federal anti-trust laws.  See, e.g., Cedar Crest Hats, Inc. v. United Hatters, Cap and Millinery Workers Int'l Union, AFL-CIO, 362 F.2d 322, 326-37 (5th Cir. 1966) (union's unilateral threats to distribute leaflets urging customers to buy only union-made hats if retailers continued to sell non-union goods is not anti-trust violation).

### b.   Surveillance and Videotaping

Plaintiffs also allege that Local 7 placed observers with surveillance equipment at jobsites in order to induce secondary employers to cease doing business with Plaintiffs and to initiate "sham" complaints at various state and federal agencies.  As with the other secondary conduct, this conduct is alleged to have violated both § 8(b)(4) and federal anti-trust law.

To the extent that Local 7 engaged in videotaping at employer jobsites, it did so unilaterally and in its own and in its legitimate, self-interest.  In an effort to level the playing field, Local 7 has monitored job sites in order to identify and potentially expose employers who are not complying with regulatory standards.  Undisputed Facts ¶ C7.  Such conduct is permitted by federal labor law.  See Woodworking Mfg., 386 U.S. at 639; see also UCFWU, 307 F.3d at 768. [17]  Moreover, Local 7's surveillance was conducted without any agreement with a non-labor group.  Undisputed Facts ¶ C8.

---

[17]  Plaintiffs do not appear to allege that Local 7's supposed initiation of complaints violates the anti-trust laws.  The so-called Noerr-Pennington Doctrine precludes anti-trust liability for efforts to influence the exercise of government power, even if it is for the purpose of gaining an anti-competitive advantage.  See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972) (applies to courts and administrative agencies). To the extent that they claim Local 7 initated sham complaints, Local 7 denies the allegation.

c.   Stripping

Plaintiffs also assert that Local 7 stripped employees from Plaintiffs, bypassed the Union

hiring hall, and placed them with Local 7 signatory contractors in contravention of § 8(b)(4) of

the NLRA and federal anti-trust laws.

To the extent that Local 7 may have periodically assisted non-union employees in

obtaining employment with Local 7 signatory contractors, it did so unilaterally and in its own

interest.  Local 7 maintains no agreements with employers to strip employees from non-union

signatories in order to place them with union signatories.  Undisputed Facts ¶ C5.  Moreover, to

the limited extent that Local 7 has assisted employees in finding employment on union jobs, the

Union has done so in order to assist employees join a labor organization.  Undisputed Facts ¶

C6.[18]  Assisting employees to join a labor organization is one of the fundamental protections of §

7 of the NLRA and is thus, a legitimate objective of labor organizations.  See 29 U.S.C. § 157

("Employees shall have the right to self-organization, to form, join, or assist labor organizations,

to bargain collectively through representatives of their own choosing, and to engage in other

concerted activities for the purpose of collective bargaining or other mutual aid or

protection[.]").

As the Supreme Court held, "[i]t is not a violation of the Sherman Act for laborers in

combination to refuse to work.  They can sell or not sell their labor as they please, and upon such

terms and conditions as they choose, without infringing the Anti-trust laws."  Hunt v. Crumboch,

325 U.S. 821, 824 (1945).  Moreover, "[a] worker is privileged under congressional enactments,

---

[18]  Plaintiffs further maintain that Local 7 bypassed its hiring hall in placing these stripped employees.  Local 7,
however, does not maintain a hiring hall arrangement in its collective bargaining agreement with BTEA.  See Hurley
Aff. ¶ 17; Coyle Aff. ¶ 8 .  Moreover, to the extent that Plaintiffs are alleging that Local 7 bypassed the union hiring
hall on the large PLAs, there was full employment on those public works jobs during the time period alleged in the
Complaint.  See id.  Accordingly, there would not have been an occasion to bypass the union hiring hall on those
jobs.

acting either alone or in concert with his fellow workers, to accept, refuse to accept, or to terminate a relationship of employment, and his labor is not to be treated as 'a commodity or article of commerce.'" Id. (citing Clayton Act, 15 U.S.C. § 17, Norris-LaGuardia Act, 29 U.S.C § 101 *et seq.*, and caselaw). Hunt involved a union's refusal to admit a company's employees to membership and to refuse to sell its members' services to that company. The union's conduct ultimately put the company out of the business, and the company brought this anti-trust suit, alleging that the "refusal to accept employment was due to personal antagonism against the (company) arising out of the killing of a union man." Id. at 824. The Supreme Court held, however, that the statutory labor exemption accorded employees "an absolute right . . . to work or cease working according to their own judgments[.]" Id. at 824, 825 n.1. Thus, Local 7's placement of non-union employees with union employers falls within the statutory exemption.

### d. Violence

Finally, in a last ditch effort to take Local 7's conduct outside of the scope of the statutory labor exemption, Plaintiffs maintain that Local 7's "top-down organizing" and other secondary activities included violence and threats of violence.

Plaintiffs make just one specific allegation of actual violence and threats of physical harm (Compl. ¶ 73) in a Complaint that includes over twenty-five projects and spans a time period of 4 to 9 years. Moreover, there is no allegation anywhere in the Complaint that the Union ratified, condoned, or authorized any of the so-called violent conduct alleged. Yet, taking the alleged facts in a light most favorable to Plaintiffs, violent conduct attendant to a union's organizing and/or secondary activity does not automatically take away a union's statutory labor exemption.

The seminal labor anti-trust case involving violence is Apex Hoisery Co. v. Leader, 310 U.S. 469, 513 (1940). In Apex, the union called for a sit-down strike after the company refused

to accede to its demand for a closed job.  Id. at 482.  The strike became violent, with strikers

"willfully wreck[ing] machinery of great value…and [doing] extensive damage to other property

and equipment of the company," resulting in the cessation of production for several months.  Id.

In holding that the union did not violate § 1 of the Sherman Act, the Supreme Court explained:

> The Sherman Act is concerned with the character of the prohibited restraints and
> with their affect on inter-state commerce.  *It draws no distinction between the
> restraints affected by violence and those achieved by peaceful but often times
> quite as effective means.  Restraints not within the Act, when achieved by peaceful
> means, are not brought within its sweep merely because, without other
> differences, they are attended by violence.*

Id. at 513 (emphasis supplied).  Thus, Plaintiffs allegations of violence, even if true, do not

suffice to take Local 7's conduct out of the statutory labor exemption.

### D.  Plaintiffs Cannot Establish an Unreasonable Restraint of Trade or Monopoly Power, Which Are Necessary To Sustain Its Sherman Act Claims.

Even if antitrust standing requirements and the labor exemptions did not apply to this

case, Local 7 would still be entitled to summary judgment on the antitrust claims.  Plaintiffs

cannot establish that the combinations and agreements at issue unreasonably restrain trade, a

requirement for a claim under § 1 of the Sherman Act.  Nor can Plaintiffs establish a

monopolization claim under § 2 of the Sherman Act, as they cannot establish that Local 7

maintains market power in the Relevant Market.

#### 1.  Section 1 of the Sherman Act

##### a.  The Requirement of an Unreasonable Restraint of Trade

Section 1 of the Sherman Act declares illegal "[e]very contract, combination…or

conspiracy…in restraint of trade or commerce."  15 U.S.C. § 1.  In the seminal case of Standard

Oil Co. of N.J. v. United States, the Supreme Court acknowledged that this language was "broad

enough to embrace every conceivable contract or combination which could be made concerning

trade or commerce[.]" 221 U.S. at 60. The Court concluded, however, that "the provision necessarily called for the exercise of judgment," and that the "standard of reason" applied at the common law was to be used, "guided by the established law and by the plain duty to enforce the prohibitions of the act and thus the public policy which its restrictions were obviously enacted to subserve." Id. at 60-62; see also State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) ("[T]his Court has long recognized that Congress intended to outlaw only unreasonable restraints.").

Because only unreasonable restraints on trade or commerce are prohibited under the Act, "most antitrust claims are analyzed under a 'rule of reason[.]'" Id.; see also id. at 22 ("[T]he majority of commercial arrangements subject to the antitrust laws [] should be evaluated under the rule of reason[.]"). Under the "rule of reason," the fact finder must determine, based on a number of factors, whether the challenged business practice imposes an unreasonable restraint on competition. Id. at 10. More specifically, it is required "that the alleged agreement involved the exercise of power in the relevant economic market, that this exercise had anti-competitive consequences, and those detriments outweighed efficiencies or other economic benefits." Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004).

The Supreme Court has held that a few types of restraints are to be analyzed instead under a "per se" rule, which allows this calculus to be bypassed, not because of any lessening of the requirement that the restraint be unreasonable, but because the type of restraints on trade or commerce "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit [.]" State Oil Co., 522 U.S. at 10. While "per se" treatment may thus be "appropriate [o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it," the Court has been reluctant "to adopt *per se* rules with regard to 'restraints imposed in the context of business relationships

where the economic impact of certain practices is not immediately obvious.'" <u>Id.</u> (quotations and citations omitted).  The proper inquiry for the Court in establishing a "per se" rule thus is not whether the restraint "'is ever illegal, but whether it is *always* illegal.'" <u>Id.</u> at 12 (emphasis in original) (quotations and citation omitted).

Moreover, although Plaintiff attempts to shoehorn the case into a "per se" analysis by using labels of "boycott" and "price fixing,"  "flinging around terms like 'cartel' or 'boycott' do not convert a rule of reason claim into a per se one." <u>Addamax Corp. v. Open Software Found., Inc.,</u> 152 F.3d 48, 52 (1st Cir. 1998)   Labels alone are not particularly helpful. <u>See</u> <u>generally</u> <u>Augusta News Co. v. Hudson News Co.,</u> 269 F.3d 41, 47 (1st Cir. 2001) ("The categorical descriptions of *per se* offenses are quite misleading for anyone not well versed in antitrust[.]").

Some boycotts falls within the category of "per se" violations, while other do not.  Indeed, as the Supreme Court has acknowledged, "'there is more confusion about the scope and operation of the per se rule against group boycotts than in reference to any other aspect of the per se doctrine.'" <u>Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.,</u> 472 U.S. 284, 294 (1985) (quoting L. Sullivan, Law of Antitrust 229-30 (1977)); <u>see</u> <u>also</u> <u>Stop & Shop</u>, 373 F.3d at 61 ("Sometimes group boycotts are called per se violations, but the label here is only minimally useful since many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason[.]").  Similarly, some price-fixing agreements are condemned "per se" (horizontal agreements regarding competing products that are not part of a legitimate joint venture), while ones that do not meet these requirements are not. <u>Augusta News Co.,</u> 269 F.3d at 47.

Instead, per se rules may only be used "for conduct that fits squarely within the ever narrowing per se niche." <u>Addamax Corp.</u> 152 F.3d at 51-52 (quotation and citations omitted).

Notably, the majority of anti-trust cases that involve labor conduct are analyzed using the "rule of reason" approach.  See, e.g., Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368, 1380 (1st Cir. 1981) (refusing to apply "per se" rule to union boycott), aff'd on other grounds, International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc., 456 U.S. 212 (1982); Berman Enter., Inc. v. Local 333, United Marine Div., Int'l Longshoremen's Ass'n, 644 F.2d 930, 936-37 (2d Cir.), cert. denied, 454 U.S. 965 (1981) (concluding without discussion that the "rule of reason" would be applicable to alleged group boycott); Larry v. Muko, Inc. v. Southwestern Pa. Bldg. and Constr. Council, 670 F.2d 421, 426-27 (3rd Cir. 1982), cert. denied, 459 U.S. 916 (1982) (refusing to apply "per se" rule to group boycott); Mackey v. National Football League, 543 F.2d 606, 612-13 (8th Cir. 1976), cert. dismissed, 434 U.S. 801 (1977) (refusing to apply "per se" rule to group boycott and refusal to deal); Ackerman-Chillingworth v. Pacific Elect. Contractor Ass'n, 579 F.2d 484, 490 n.4 (9th Cir. 1978) ("in the absence of any of the competitive injury as wrought by the classic-type boycotts traditionally considered as lawful per se, the district court properly rejected application of the per se rule").

    b.  Alleged Restraints of Trade Involving the Signatory Contractors

   While Plaintiffs may seek to litigate this case as a "per se" restraint for which it need not establish any party's market power, no such "per se" rule applies to this case.  Plaintiff cannot contend that the Supreme Court's "experience with a particular kind of restraint" – here the alleged restraint caused by the payment of target funds to the signatory contractors – has enabled "the Court to predict with confidence that the rule of reason will condemn it."  State Oil Co., 522 U.S. at 10.  Nor does the alleged conduct fit squarely within any recognized per se category. Indeed, the nature of the alleged restraint is not even clear.  To the extent Plaintiffs are complaining that Local 7 has granted job targeting funds to its signatory contractors, the

signatory contractors already have a collective bargaining agreement with Local 7, and the target funds simply grants the union signatory contractor some *relief* from the agreement's labor costs on a particular job. Undisputed Facts ¶ D1.

To the extent that Plaintiffs are complaining of unlawful restraints by its competitors, the signatory contractors, in the nature of a "boycott" or "price fixing," these labels are not helpful. Since neither the signatory contractors nor Local 7 is in a position to award the projects themselves, neither is in a position to boycott Plaintiffs. With regard to alleged "price fixing," no prices – other than collectively bargained wages, benefits and dues deductions permissible under the non-statutory labor exemptions – are set, and thus no "price fixing" has occurred.

Applying the Rule of Reason, Plaintiffs cannot make the necessary showing of Local 7 or its alleged co-conspirators' market power. Local 7 itself does not exercise any market power in the market for structural steel erection because Local 7 is not a business competitor, but only a labor organization. Undisputed Facts ¶ D1. Nor is there any evidence to suggest that the individual Union signatory contractors who are the recipients of the job targeting funds individually exercise substantial market power, and indeed, Plaintiffs do not appear to make that claim. Nor is there any basis for aggregating the market power, if any, of the Union signatory contractors. These employers have not joined together with Local 7 in any combination beyond the ministerial act of forwarding the dues to the Union, and thus their market share is not relevant to the question of the restraint, if any, imposed by the awarding of target funds to an individual employer for a particular project. Undisputed Facts ¶ D2. Moreover, and perhaps most importantly, the Union signatory contractors *continue to compete against each other*, and thus, to speak of their "combined market power" would be inaccurate. Undisputed Facts ¶ D3.

Plaintiffs attempt not only to aggregate the market share, but they also incorrectly claim

that they were barred from a majority of the work in the Relevant Market based on the existence of PLAs. The PLAs, however, did not bar non-union contractors from submitting bids on these projects. <u>See</u> the discussion below regarding Plaintiffs' § 2 Sherman Act; <u>see also</u> Undisputed Facts ¶ D4.

Plaintiffs' claim also falters because they cannot show that the practices in question adversely affected competition in that market, and that, on balance, the adverse effect on competition outweighed the competitive benefits. Indeed, Plaintiffs themselves acknowledge that fabricators and developers have used the job targeting program as a way to obtain lower priced bids, and that the program has allowed signatory contractors to compete against them. Compl. ¶ 60; <u>see also</u> Undisputed Facts ¶ D5. Competition, from the appropriate vantage point of the consumer rather than the competitor, has been advanced not curtailed: the job targeting program has resulted in lower, not higher, costs to the consumer, and more, not fewer, contractors bidding on the work. <u>See id.</u>

In sum, Plaintiffs cannot establish an unreasonable restraint of trade caused by the alleged conspiracy with signatory contractors.

c.    Alleged Restraints of Trade Involving Fabricators and Developers

Here, too, the undisputed facts demonstrate that Plaintiffs can establish no per se restraint. Indeed, the vertical arrangement at issue – alleged job targeting funds to fabricators or developers for particular projects in return for the fabricator or developer's award of the particular project to a union-signatory contractor -- is a price cut rather than a restraint of competition -- and certainly does not qualify for any "per se" treatment. Plaintiffs may also be attempting to characterize the arrangement as an ongoing agreement providing for exclusive dealings with signatory contractors. Not only is there no evidence supporting such an ongoing

45

agreement (indeed, Plaintiffs' listings of project by project awards illustrates the individual

nature of the job targeting program (Undisputed Facts ¶ D6)), but a claim of exclusive dealings

in any event is evaluated under the "rule of reason," and not as a "per se" violation.

Applying the "rule of reason" to the vertical arrangement between Local 7 and the

fabricator or developer illustrates the total lack of merit of Plaintiffs' anti-trust claims. There is

no restraint on competition (viewed appropriately from the vantage of the consumer) and instead,

the effect of the arrangement is that the fabricator or developer obtains the services of the

contractor it wishes to deal with at a lower price. Undisputed Facts ¶ D5.

The court's decision in Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440

(3d. Cir. 1978), is instructive on this point. In that case, the defendant had secretly agreed with

another company, in advance of bidding, to give that company the opportunity to match the

highest bid received in the bidding process, and to award the contract to that company if it

matched the highest bid. The court rejected each label offered by plaintiffs in attempting to

bring this arrangement within the per se restraints recognized by the Supreme Court. Id. at 446-

47 (rejecting labels of "price fixing," "group boycott" and "sham bidding"). Analyzing the case

under the rule of reason, the court explained that plaintiffs had shown no undue restraint on

commerce where plaintiffs could show no negative effect of the combination on prices, quantity

or quality in the relevant market. Id. at 447. The court emphasized further that the defendant

was free to choose the parties with whom to deal, so long as its conduct had no market control or

monopolistic purpose or effect. Id. (citing Times-Picayune Publishing Co. v. United States, 345

U.S. 594 (1953) and Reed Brothers, Inc. v. Monsanto Co., 525 F.2d 486 (8th Cir. 1975), cert.

denied, 423 U.S. 1055 (1976)). Similarly here, where Plaintiffs can make no showing that the

fabricators and developers have neither market control nor monopolistic purpose or effect in

awarding the bids to Local 7 signatory contractors, the fabricators and developers decisions

selections cannot violate the anti-trust laws.  As the <u>Sitkin Smelting</u> court concluded:

> Conduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law.  [T]he use of conventional antitrust language . . . will not extend the reach of the Sherman Act to wrongs not germane to that act . . . . The antitrust laws were never meant to be a panacea for all wrongs[.]
>
> "[T]he Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else." . . . . [T]he Sherman Act cannot proscribe all unseemly business practices. The manipulation of the bids of businessmen, as evidenced in the case at bar, was clearly reprehensible. Nonetheless, the Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace.

<u>Id</u>. at 447-48 (citations omitted); <u>see</u> <u>also</u> <u>Parmelee Transp.Co. v. Keeshin</u>, 292 F.2d 794, 804

(7th Cir.), <i>cert. denied</i>, 368 U.S. 944 (1961) ("The awarding of a contract, which the awarding

parties have a right to award on any basis they choose to one rather than to another competitor

for the contract, is no more within the scope of the Sherman Act than is the sit-down strike of the

Apex case.  Each of these courses of conduct restrains trade in a sense. Neither constitutes a

restraint of trade within the meaning of the Sherman Act, however.  To hold otherwise would

render the Sherman Act a lowest responsible bidder statute, which was plainly not the intent of

Congress."); <u>Scranton Constr. Co. v. Litton Indus. Leasing Corp.</u>, 494 F.2d 778, 783 (5th Cir.

1974), <i>cert. denied</i>, 419 U.S. 1105 (1975) ("The Sherman Act is neither a lowest-responsible-

bidder statute nor a panacea for all business affronts which seem to fit nowhere else").

> 2.   <u>Section 2 of the Sherman Act and the Requirement of Monopoly Power</u>

Plaintiffs claim that Local 7 has taken various actions "to maintain and/or willfully

maintain their monopoly in the Relevant Market" in violation of § 2 of the Sherman Act.

Compl., ¶¶ 158, 162, 167, 172.  These allegations fail, however, for the basic reason that neither

Local 7 nor the purported co-conspirators have monopoly power in the Relevant Market.

Section 2 of the Act provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony[.]  15 U.S.C. § 2.  It is settled law that an essential element of a § 2 claim for monopoly of trade or commerce is "the possession of monopoly power in the relevant market." Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 407 (2004); United States v. Grinnell Corp., 384 U.S. 563, 570 (1966).  Monopoly power is "'the power to control prices or exclude competition.'"  Grinnell Corp., 384 U.S. at 571 (quoting American Tobacco Co. v. United States, 328 U.S. 781, 797 (1946)).  The existence of such power "ordinarily may be inferred from the predominant share of the market," but the percentage share of the market considered as predominant is exceedingly high.  See id. at 566 (87%); American Tobacco Co., 328 U.S. at 781 (2/3 of entire domestic field of cigarettes and over 80% of the field of comparable cigarettes); United States v. Aluminum Co. of Am., 148 F.2d 416, 429 (2d Cir. 1945) (90% of market).

Local 7 accepts for purposes of this summary judgment motion only that the Relevant Market is the market for structural steel erection as defined by the scope and geography set forth in Plaintiffs' Complaint,[19] and moreover, that spending for steel erection in that market has been in excess of $200,000,000 per year since 1999, as Plaintiffs allege.  Id. ¶ 43.  Local 7 challenges, however, Plaintiffs' contention that they have been precluded from the outset from competing on

---

[19] The Complaint defines the "Relevant Market" "as the erecting of structural metal and steel on buildings and structures, erecting prestressed and precise concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine[.]"  Id. ¶ 29.

70% of the work.  See id. ¶¶ 30, 43.  The primary basis for Plaintiffs' allegation that they have

been barred from 70% of the market is their underlying claim that "more than half [of total

spending in structural steel erection construction during the relevant period] can be accounted for

by the Boston Central Artery and Harbor Tunnel project (also known as the 'Big Dig') which

was subject to a project labor agreement *and therefore was undertaken as a union-shop job.*"  Id.

¶ 43 (emphasis supplied).

It is undisputed that although the work on the Big Dig and other of the very largest public

sector projects over the past twenty years in Massachusetts have been subject to PLAs, requiring

that all contractors and subcontractors must abide by terms and conditions of employment set

forth therein, the PLAs have also guaranteed that that all contractors and subcontractors, union

and non-union alike, have the same rights to bid for and be awarded work on the projects.

Undisputed Facts ¶ D4.  The PLAs did not impose union-only bidding requirements excluding

bidders because they employed non-union workers or failed to sign union contracts for any of

their jobsites.  Instead, Plaintiffs had every right to bid on this work.  No contractor is favored

under a PLA, although a non-union contractor is required to be bound by the same terms and

conditions under which a union contractor already operates.  See Department of Labor and Indus.

v. Boston Water and Sewer Comm'n, 18 Mass. App. Ct. 621, 626 (1984) ("equal footing"

principle should not be confused with certain advantages that a bidder may possess in meeting

the bid specifications on the profit).  Neither is there a requirement that any contractor become

unionized to participate in the project.  Contractors are required to sign the PLA to work on the

project, but the PLA has no application or force outside the project, and non-union contractors

are free to operate on their own terms on other jobs.  That Plaintiffs may have chosen not to bid

does not establish that they were excluded from the bidding process.  As the Supreme Court

noted in Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders and

Contractors of Mass./R.I. ("Boston Harbor"), 507 U.S. 218, 231 (1993), "contractors who do not

normally enter such agreements are faced with a choice.  They may alter their usual mode of

operation to secure the business opportunity at hand, or seek business from purchases whose

perceived needs do not include a Project Labor Agreement."  507 U.S. at 231.  In a

Massachusetts state court case unsuccessfully challenging bid specifications on the Big Dig,

which required successful bidders, including contractors and subcontractors to sign on to the

PLA, Judge Garsh noted that non-union contractors had bid on the project and that non-union

subcontractors were working on the project as of spring of 1996.  Utility Contractors Ass'n of

New England, Inc. v. Commissioners of Mass. Dep't of Public Works, No. Civ. A. 90-3035,

1996 WL 106983, at *6 (Mass. Super. March 12, 1996).[20]

Plaintiffs' claim that they are barred from 70% of the market in large part because of

PLAs is particularly disingenuous in light of the earlier Supreme Court litigation on these

projects.  In 1990, the Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.

("ABC"), an organization representing non-union construction-industry employers,[21] brought

suit challenging the PLA on the Boston Harbor project on various claims, including § 1 of the

Sherman Act claim, alleging a conspiracy to reduce competition.  Boston Harbor, 507 U.S. at

223.  The District Court rejected each of the ABC's claims.  Relevant to the Sherman Act claim,

the Court found that "[a]ll contractors are invited to bid on the same terms.  No contractor is

favored under the bid procedures," and, moreover, that "the plaintiff contractors have not been

---

[20]  ("To date, fifty-five construction contracts . . . have been awarded on the Project.  A total of two hundred ninety-six bids were received with respect to those fifty-five contracts, including thirteen bids by non-union contractors on ten of those contractors.  With respect to only two of those thirteen bids, however, was the non-union contractor actually the low bidder (and one of those two withdrew its bid).  There are at least twenty-eight non-union subcontractors working on the Project.") (footnote omitted).
[21]  Lead plaintiff American Steel Erectors boasts membership in the ABC on its website.  See http://www.aseasf.com/aboutus.htm  (accessed Jan. 22, 2006).

excluded from bidding.  They simply have refused to bid on any contract[.]"  <u>Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water Resources Auth.</u>, No. 90-10576-MA, 1990 WL 86360, at * 3 (D. Mass. April 11, 1990), *rev'd on other grounds*, 935 F.2d 345 (1st Cir. 1991), *rev'd sub nom.*, <u>Boston Harbor</u>, 507 U.S. 218.  Thus, although the Sherman Act claim was not dispositive in the case, the one court that considered the claim found it meritless.

In the intervening fifteen (15) years since the District Court issued its decision, Plaintiffs here apparently have chosen simply not to bid on this work.  <u>See</u> Compl. ¶ 43 (Plaintiffs have competed only in one-third of the Relevant Market); <u>see</u> <u>also</u> Nigro Aff. ¶ 11 (To Mr. Nigro's knowledge, Plaintiffs have not attempted to obtain steel erection work on any significant portion of the work on the very large public jobs in the last ten (10) years, while other non-union contractors have successfully bid or negotiated to perform contracts on the Big Dig during this time period).

Having chosen not to participate in a substantially large portion of the market, Plaintiffs cannot now point to a purported "exclusion" from that portion of the market as evidence of the alleged monopoly power of the many different contractors who did bid on the work.

## <u>CONCLUSION</u>

For the foregoing reasons, Local 7 respectfully requests that summary judgment on Counts I-III be granted in its favor and that the federal anti-trust claims in the case be dismissed with prejudice.

51

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208

/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229

Dated: March 20, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this Memorandum of Law In Support of Defendant Iron Workers
Local 7's Motion for Summary Judgment On Counts I-III of Plaintiffs' Complaint filed through
the ECF system will be sent electronically to the registered participants as identified on the
Notice of Electronic Filing on March 20, 2006.

/s/ Paul F. Kelly
Paul F. Kelly, Esq.