UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>LOCAL UNION NO. 7, INTERNATIONAL )<br>ASSOCIATION OF BRIDGE, )<br>STRUCTURAL, ORNAMENTAL & )<br>REINFORCING IRON WORKERS )<br>)<br>Defendant. )<br>) | Case No. 1:04-cv-12536-RGS |

**MEMORANDUM IN SUPPORT OF DEFENDANT IRON WORKERS
LOCAL 7's MOTION FOR JUDGMENT ON THE PLEADINGS
OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT ON
JOB TARGETING CLAIMS IN COUNT IV OF THE COMPLAINT**

LOCAL UNION NO. 7,
INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208

Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**……………………………………………………………….. iii

**INTRODUCTION**…………………………………………………………………………… 1

**STATEMENT OF FACTS**………………………………………………………………….. 3

**ARGUMENT**…………………………………………………………………………………. 3

   I.   **SUMMARY JUDGMENT STANDARD**……………………………………………. 4

   II.   **THE LMRA DOES NOT PREVENT CONSTRUCTION UNIONS FROM AGGRESSIVELY SEEKING WORK FOR MEMBERS, DEALING WITH 'SECONDARY EMPLOYERS' OR 'TOP-DOWN ORGANIZING'**…………………………………………………………………... 4

   III.   **THE UNION'S GRANTS OF JOB TARGETING FUNDS AND ALLEGED DISCRIMINATORY DENIALS OF FUNDS DID NOT THREATEN, COERCE OR RESTRAIN ANY EMPLOYER WITHIN THE MEANING OF §8(b)(4)(ii) OF THE ACT**……………………………….. 6

   IV.   **THE UNION'S GRANTS OF JOB TARGETING FUNDS WERE IN FURTHERANCE OF A PROHIBITED 'CEASE DOING BUSINESS' OBJECTIVE UNDER §8(b)(4)(B)**……………………………………………… 11

   V.   **THE UNION'S GRANTS OF JOB TARGETING FUNDS FOR JOBS EMPLOYING UNION MEMBERS DID NOT CONSTITUTE PROHIBITED AGREEMENTS TO 'CEASE DOING BUSINESS' UNDER §8(e) OF THE ACT**………………………………………………… 13

   VI.   **CONCLUSION**…………………………………………………………………... 16

TABLE OF AUTHORITIES

*FEDERAL CASES*                                                                                             Page

Allied Mechanical Servs., Inc. v. Local 337 of the United Association
    of Journeyman and Apprentices of the Plumbing and Pipe
    Fitting Indus., 1999 U.S. Dist. LEXIS 4654 (D.W.Mich. 1999),
    *aff'd*, 221 F.3d 1333 (TABLE)(6th Cir. 2000) ……………………... 12,14

Connell Constr. Co. v. Plumbers and Steamfitters Local
    Union No. 100, 421 U.S. 616 (1975) …………………………....…14,15

DeBartolo Corp. v. Florida Golf Coast Buldg.
    and Constr. Trades Council, 485 U.S. 568 (1988)……………………… 8,11

George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) ………………………….. 11

Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669,
    No. 94-3309, 1997 WL 311498, at *2, 12(D. Md. 1997),
    *Aff'd*, 133 F.3d 914 (4th Cir.) (Table) (unpublished decision)
    *cert. denied,* 525 U.S. 825 (1998)…………………………………... 10,11,12

Iron Workers Local 3 v. N.L.R.B.,
    843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889 (1988)……………… 5

Local 1976, United Bhd. of Carpenters v. NLRB, 357 US 93 (1958)…………… 8

NLRB v. Servette, Inc., 377 U.S. 46 (1964) …………………………………….. 9

Storer Communications, Inc. v. National Ass'n of Broadcast
    Employees and Technicians, 854 F.2d 144 (6th Cir. 1988) ……….. 7,9,11

Woelke & Romero Framing v. N.L.R.B., 456 U.S. 645 (1982) ……….................. 6


*STATUTES*

Fed. R. Civ. P. 12(c) …………………………………………………………….. 1
Fed. R. Civ. P. 56 …………………………………………………………….... 1
29 U.S.C. §§ 158(b)(4)(ii)(A)(B)……………………………………….. passim
29 U.S.C. §§ 158(e)……………………………………………………. passim
29 U.S.C. 158(f) ………………………………………………………………. 6

## INTRODUCTION

Pursuant to Rules 12(c) and 56 of the Federal Rules of Civil Procedure, Defendant Iron Workers Local 7 ("Local 7" or the "Union") submits this Memorandum of Law in Support of its Motion for Judgment on the Pleadings or in the Alternative for Partial Summary Judgment on Job Targeting Claims in Count IV of the Complaint. The Motion and this supporting Memorandum seek judgment on the pleadings or partial summary judgment on Plaintiffs' claims in Count IV that Local 7 violated Section 8(b)(4)(ii)(A) and (B) and Section 8(e) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 158(b)(4)(ii)(A) and (B) and 158(e), when Local 7 engaged in job target fund activity, because the Complaint's allegations do not make out a violation regarding job targeting when looked at in a light most favorable to Plaintiffs, and in the alternative no genuine issue of material fact exists to indicate Local 7's operation of a job target fund violated the LMRA, so that Local 7 is entitled to judgment as a matter of law regarding all job targeting payment activity alleged in Count IV

The Union is not currently seeking judgment on the pleadings or summary judgment on the remainder of Count IV insofar as it alleges LMRA-violative conduct *other* than job targeting, such as the "threats of picketing" referred to directly in Count IV, paragraph 177 of the Complaint. Earlier paragraphs of the Complaint, which are incorporated by reference into Count IV, also allude to picketing activity, at least on a conclusory basis in paragraphs 49, 58(a), 61, 155-6, 162(f)(ii), 166 and 171, and alleging a single specific occurrence of a threat to picket in paragraphs 71-3. Additional facts may be needed to challenge these picketing claims specified in Count IV, so they are not included in this Motion.

1

Count IV does not contain any specific mention of job targeting when it refers in paragraph 177 of Plaintiffs' Complaint ("Compl.") to "other restraint and coercion", but Plaintiffs may nonetheless be alleging that job targeting fund activity is included in the Count IV claims when they incorporate by reference all earlier paragraphs, many of which recount specific episodes of "job targeting" or "job target money" being awarded. For purposes of this Motion only, Defendant accepts the terms "job targeting" and "job target fund" as referring to a "job subsidy program" that Plaintiffs refer to in their definitional paragraph 34. Such job targeting activity is the thrust of dozens of paragraphs in the Complaint (i.e., pars. 34, 49, 62, 69 and 81-146). These include allegations of the Union making numerous offers of targeting contributions, often successfully obtaining work, as well as Union "promises" to offer funds, along with alleged "threats" to withhold them. Local 7 argues below that grants of job targeting funds (or "discriminatory denials of funds") as a matter of law do not constitute "threats, restraint or coercion" under Section 8(b)(4)(ii) [either (A) or (B) ], and these grants and denials do not involve a "cease doing business" objective under Section 8(b)(4)(B)[1]. 29

---

[1] Violations of Section 8(b)(4)(i)(ii)(A) and (B) [as well as (C) and (D), not alleged by Plaintiffs here] require that a union have engaged in "(i) or (ii)" *conduct* for any of the *prohibited purposes* set forth in subparagraphs (A)-(D). These Sections provide in relevant part as follows:

> 8(b). It shall be an unfair labor practice for a labor organization or its agents--
>
> \* \* \*
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any person . . . to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--   \* \* \*
>
> (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

2

U.S.C. §§ 158(b)(4)(ii)(A) and (B). Nor does the operation of a job targeting program amount to any "agreement to cease doing business" under Section 8(e) of the LMRA.[2] 29 U.S.C. §§ 158(e). Overall, if the job targeting claims in Count IV are legally deficient, and if Counts I-III are also fully without merit as argued in Local 7's separate motion for summary judgment, then judgment is warranted for Local 7 regarding the entire "job targeting" core of the lengthy Complaint.[3]

## STATEMENT OF FACTS

Local 7 incorporates herein the Statement of Facts in its Memorandum of Law in Support of its Motion for Summary Judgment of Counts I-III of Plaintiffs' Complaint.

## ARGUMENT

---

> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

29 U.S.C. §§ 158(b)(4)(ii)(A) and (B).
[2] Section 8(e) provides:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work[.] 29 U.S.C. § 158(e).

[3] Plaintiffs' state-law claims, regarding job targeting and all other conduct, were dismissed by this Court on Motion of Defendant Local 7 to Dismiss Counts V-VII of Plaintiffs' Complaint, entered by Order dated February 6, 2006. The Court had previously dismissed claims against the individual defendant. Plaintiffs voluntarily dismissed claims against the Industry Advancement Fund and the claims filed by Plaintiff Ronald Beauregard.

3

I. **SUMMARY JUDGMENT STANDARD**

Local 7 incorporates herein the explanation of the Summary Judgment Standard set forth in its Memorandum of Law in Support of its Motion for Partial Summary Judgment of Counts I-III of Plaintiffs' Complaint.

II. **THE LMRA DOES NOT PREVENT CONSTRUCTION UNIONS FROM AGGRESSIVELY SEEKING WORK FOR MEMBERS, DEALING WITH 'SECONDARY EMPLOYERS' OR 'TOP-DOWN ORGANIZING'**

Plaintiffs' generally allege in their Complaint that the Union obtained work for its members by pressuring fabricators or developers and then obtaining "agreements" from those companies to retain subcontractors who employ Local 7 members, rather than retaining the Plaintiffs. That is, accepting all facts in a light most favorable to Plaintiffs, the Union and other local union "co-conspirators" (herein "the unions") directly or indirectly approached fabricators or other companies with whom they had no contract, on a job-by-job basis, at dozens of sites recounted in the Complaint, and persuaded them to use contractors who employed union members. On other jobs the Complaint simply alleges the unions gave targeting money to the signatory, which then obtained the work. Compl. ¶¶ 69 and 81-146. The unions offered the prospect of job targeting funds to persuade these parties to have the union contractors perform the job rather than the Plaintiffs. On the other hand, as the Plaintiffs also allege, on "many occasions" the secondary parties (fabricators or developers) apparently were able to utilize credible threats that they were ready and willing to retain Plaintiffs or other non-union contractors, as a means of pressuring union contractors to lower their prices by obtaining more job targeting funds. See Compl, ¶ 60.

4

Overall, Plaintiffs characterize most of the Union's efforts to secure work at labor contract standards as supposedly illicit "top-down organizing," that is, organizing by persuading contractors to hire union subcontractors and union workers, often under "pre-hire labor contracts" negotiated before a job is staffed, rather than pursuing National Labor Relations Board ("NLRB") elections among employees of non-union subcontractors. For example, the Complaint recites that employees in two of the Plaintiffs' workforces voted against unionization and then alleges that Local 7 engaged in "prohibited 'top down organizing'". Compl. ¶¶ 63-65. As a legal reality, however, top-down organizing is generally permitted by the LMRA in the particular setting of the construction industry. Bottom-up organizing, involving NLRB elections common in the industrial and service sectors, would be extremely difficult among employees in the construction industry because of the job-by-job, transitory nature of the work as well as the number of parties involved in each job, such as developers, general contractors, subcontractors and multiple crafts of employees. Because of the ambulatory nature of the industry, it is difficult, if not impossible, for workers to go through lengthy card-signing and NLRB election processes that are often required in non-construction settings. "Top-down organizing" allows a union to organize workers by persuading general contractors to hire union subcontractors who may sign "pre-hire" labor contracts before the subcontractor starts work. For example, the LMRA specifically condones top-down organizing in its Section 8(f). 29 U.S.C. 158(f) (authorizing construction industry employers and unions to enter into "prehire" agreements setting terms of employment for all workers hired by the signatory employer without the union's establishing majority status under section 9 of the Act). Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d

Cir.), *cert. denied*, 488 U.S. 889 (1988). Top down organizing is also condoned in the construction industry proviso to Section 8(e), 29 U.S.C. 158(e) (setting forth the construction industry exception to §8(e)'s prohibition against "hot cargo agreements" that may preclude employers from doing business with non-union employers). See Woelke & Romero Framing v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . . pressure is implicit in the construction industry proviso" to § 8(e) of the NLRA).

### III. THE UNION'S GRANTS OF JOB TARGETING FUNDS AND ALLEGED DISCRIMINATORY DENIALS OF FUNDS DID NOT THREATEN, COERCE OR RESTRAIN ANY EMPLOYER WITHIN THE MEANING OF § 8(B)(4)(ii) OF THE ACT

Local 7's job targeting program, which necessarily involved selective grants of targeting monies and some decisions not to grant monies, did not constitute "restraint or coercion" under § 8(b)(4)(ii), notwithstanding the general allegation in Plaintiffs' Complaint (¶ 177). Nor did the Local 7's job targeting activity "threaten, coerce or restrain any person" as the terms of that subsection [(ii)] have been narrowly interpreted in the past.

Violations of § 8(b)(4)(ii)(A) or (B) require legal ingredients that include some type of "(i) or (ii) conduct" coupled with a "prohibited objective" under (A) or (B). The first subsection [(A)] refers to the prohibited objective of forcing an employer to enter into an agreement prohibited by section 8(e) of the Act. The second [(B)] denotes the prohibited objective of forcing one employer to cease doing business with another. That is, when a union has a direct dispute with *one* employer ("the primary employer"), section 8(b)(4)(i)(ii)(B) prohibits striking, picketing or similar pressure tactics for influencing any *other* employer (the "secondary" or "neutral") to cease doing business with the primary employer. Most notably, however, for purposes of either subsection (A)

6

or (B), there is no violation of 8(b)(4) (A) or (B) unless the union has engaged in some conduct that falls within "(i) or (ii)". <u>Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians</u>, 854 F.2d 144, 146 (6th Cir. 1988) (§8(b)(4)(ii)(B) did not prohibit a union's phone calls and visits to advertisers threatening to handbill for consumer boycotts of the advertisers, followed by actual handbilling, to pressure them to cease dealing with the union's primary disputant).

In Count IV of their Complaint, Plaintiffs do not even allude to Local 7 instigating any work stoppage within the contours of subsection (i). Compl. ¶ 177. They refer only to Local 7 violating § 8(b)(4)(ii)(A) and (B) and "engaging in threats of picketing and other restraint and coercion." On the face of Plaintiff's Complaint, however, and as a matter of undisputed fact, Local 7's alleged job targeting conduct cannot be categorized as threats, restraint or coercion under subsection (ii), whether or not the Union allegedly approached secondary parties such as fabricators or developers and harbored a purpose to limit their business with Plaintiffs on a job, and whether or not the Union was supposedly seeking "section 8(e) agreements." Job targeting funds reduced the labor costs of Local 7 signatory contractors on a particular job. Undisputed Facts ¶ 1. Local 7 simply awarded job targeting funds on a job-by-job basis. Undisputed Facts ¶ 2. Any such payments represented Local 7's hat-in-hand method of obtaining work, job-by-job. To the extent that Local 7 may have made these job-by-job appeals to fabricators and general contractors, as Plaintiffs allege, the Union did so precisely because it maintained no generalized agreement with these non-labor groups and it wished to make the union workforce more competitive. Hurley Aff. ¶ 26; Coyle Aff. ¶

7

11. That economic concession hardly amounted to "threats, restraint or coercion" against any employer.

In drafting § 8(b)(4), Congress did not create a "sweeping prohibition" on all forms of secondary boycotts or secondary pressure. Local 1976, United Bhd. of Carpenters v. N.L.R.B., 357 US 93, 98 (1958). Section 8(b)(4) did not impinge on the use of economic and non-economic pressure by a union directed at an employer with whom it has a primary dispute. Rather, the subsection "describes and condemns specific Union conduct directed to specific objectives." Id. A long series of Supreme Court and appellate cases emphasize the potential breadth and bite of Union pressures directed at secondary employers (such as higher tier contractors, developers or customers) which fall outside the proscriptions of § 8(b)(4)(ii) conduct. The seminal case in recent decades involved union handbilling to promote consumer boycotts of a shopping mall (admittedly a secondary, neutral employer) to pressure the neutrals to cease doing business with the subcontractor who was the union's primary disputant. DeBartolo Corp. v. Florida Golf Coast Buldg. and Constr. Trades Council, 485 U.S. 568 (1988). As the Supreme Court noted:

> The case turns on whether handbilling such as involved here must be held to "threaten, coerce, or restrain any person" to cease to doing business with another within the meaning of § 8(b)(4)(ii)(B). We note first that "induce[ing] are encourage[ing]" employees of the secondary employer to strike is proscribed by § 8(b)(4)(i). But more than mere persuasion is necessary to prove a violation of §8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints. Those words, we have said, are "nonspecific, indeed vague," and should be interpreted with "caution" and not given a "broad sweep," [internal citation omitted]; and in applying § 8(b)(1)(A) they were not to be construed to reach peaceful recognitional picketing. Neither is there any necessity to construe such language to reach the handbills involved in this case. There is no suggestion that the leaflets had any coercive effect on customers of the mall. There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall.

8

Id. at 578. Significantly, the Court noted that it had previously found:

> untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer is "coercion" within the meaning of § 8(b)(4) even though, if the appeal succeeded, the retailer would lose revenue.

Id. at 579 (emphasis in original).

Over twenty years earlier, the Supreme Court decided other pressures directed through secondary parties fell outside the proscriptions of "(i) and (ii) conduct." In NLRB v. Servette, Inc., 377 U.S. 46 (1964), a union approached managers of a secondary company and persuaded them to cease doing business with the union's primary disputant. The union's conduct was deemed outside the proscriptions of subsection (i), and lawful, because there was no work stoppage among rank and file workers; rather, there was only voluntary action by the secondary's managers who acceded to the union's request, and there was no "threat, coercion or restraint." That is, there was surely a secondary objective to enmesh a neutral employer under subsection (B), but no proscribed conduct under subsection (i) or (ii).

> Finally, the warnings that handbills would be distributed in front of noncooperating stores are not prohibited as 'threats' within subsection (ii). The statutory protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself protected.

Id. at 57. See also Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, *supra*, at 146 (allowing union boycotts of advertisers to pressure them to cease dealing with the primary employer). Thus, the Supreme Court and lower courts have declared that a wide variety of appeals and harsh pressures directed at secondary employers are not violative of the NLRA, and those tools remain available to

9

construction unions when they seek a commitment for a new jobsite to be covered by a "pre-hire" union contract under Section 8(f). 29 U.S.C. 158(f).

Two federal trial courts have scrutinized union job targeting programs under standards of section 8(b)(4)(ii)(A) and (B), and both found the targeting activities lawful, with appellate approval. With respect to categories of "(i)(ii) conduct", the first case found job targeting activity outside §8 (b)(4)(ii) proscriptions. In Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309, 1997 WL 311498, at *2, 12 (D. Md. 1997), aff'd, 133 F.3d 914 (4th Cir.) (Table) (unpublished decision), cert. denied, 525 U.S. 825 (1998), the plaintiff contractor alleged Sherman Act violations (Count I) and also LMRA violations under § 8(b)(4)(ii)(A) (Count II) -- after the union engaged in pressure tactics to bring Grinnell to an agreement.[4] In that case, the alleged proscribed object under 8(b)(4)(ii)(A) was forcing Grinnell to designate a particular bargaining representative. The Court dismissed that plaintiff's LMRA claim under its Count Two, finding no proscribed conduct under subsection (ii) by virtue of any job targeting conduct:

> Moreover, the withdrawal of targeting did not constitute coercion but was a lawful bargaining strategy employed by the Union. Grinnell had been a principal user of targeting during the period of time when it had been permitted by the Union to participate in the program. The Union hoped that, by exercising its right to deny targeting to Grinnell it could persuade this employer to accede to other demands which the Union was making during the bargaining sessions . . . When Grinnell decided not to accept these proposals, it remained excluded from targeting. In the absence of proof of coercion or threats, defendant's conduct did not constitute an unfair labor practice.

Id., at *14. In that case, of course, the allegations were that the union refused to give the subcontractor (Grinnell) targeting monies, which would have allowed it to lower its prices to general contractors. Plaintiffs here allege that the Union has at times contacted

10

fabricators about getting work on a job, and often contributed target money that helped a union signatory subcontractor obtain such jobs. Plaintiffs allege one job after another where a union signatory obtained a job only after receiving a commitment of target money from Local 7 or "co-conspirator" unions. See, e.g., Compl. ¶¶ 81, 86, 88, 94, 96 and 98. In those circumstances, and accepting Plaintiffs own allegations as true, the Union's payment of a job targeting contribution to the signatory subcontractor was not somehow converted to § 8(b)(4)(ii) conduct merely because the Union had contacts with the fabricator (a "secondary employer") about the targeting. The lesson of Grinnell, *supra*, is that grants and denials of targeting contributions do not amount to "coercion", and appellate cases from Servette to DeBartolo to Storer Broadcasting confirm that more harsh pressure tactics, even when directed at secondary employers, need not constitute "(ii)" conduct. See also, George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) (threats that union members will not patronize a secondary employer are not "(ii) conduct").

If grants and denials of targeting contributions do not constitute § 8(b)(4)(ii) conduct, then Local 7's job targeting activities could not have violated either § 8(b)(4)(ii)(A) or (B), however the Plaintiffs may characterize the Union's objectives.

## IV. THE UNION'S GRANTS OF JOB TARGETING FUNDS WERE NOT IN FURTHERANCE OF A PROHIBITED 'CEASE DOING BUSINESS' OBJECTIVE UNDER §8(b)(4)(B)

There is no authority for the proposition that selectively granting targeting contributions to some companies amounts to an effort to have companies "cease doing business" with other companies involved at the jobsite.

---

[4] There was also a claim under § 8(b)(4)(ii)(B) (Grinnell's Count IV), but it focused on picketing.

11

In addition to Grinnell's ruling on § 8(b)(4)(ii) *conduct*, a second job targeting claim litigated under § 8(b)(4) rejected the claim of a "cease doing business" *objective* under 8(b)(4)(B). In Allied Mechanical Servs., Inc. v. Local 337 of the United Association of Journeyman and Apprentices of the Plumbing and Pipe Fitting Indus., 1999 U.S. Dist. LEXIS 4654 (D.W.Mich. 1999), *aff'd*, 221 F.3d 1333 (TABLE)(6th Cir. 2000), Allied claimed it should have been eligible to participate in a job targeting program but was excluded and therefore lost out in bidding episodes after UA Locals 337 and 357 "threatened, coerced, or otherwise restrained" another local union from providing Allied with job targeting funds, all in alleged violation of § 8(b)(4)(i)(ii)(B) of the LMRA. The District Court dismissed these claims, with subsequent appellate court approval. That Complaint, dismissed on the pleadings pre-discovery, alleged that the local union defendants "restrained customers at jobs such as Red Cross, Kalamazoo Chamber of Commerce and/or the YMCA Sherman Lake projects from doing business with [plaintiff]." The Court looked at the complaint as a whole. Although in that case it found no direct allegations of unions dealing with Allied's customers, the Court found that selective denials of targeting funds simply did not give rise to a proscribed objective under §8(b)(4)(B):

> Allied also argues that the unions' actions had an indirect secondary objective because they caused Allied's potential customers to give their work to other contractors; according to Allied, withholding targeting funds is a form of economic coercion because it makes Allied's services more expensive for the customers. *However, even assuming that the denial of targeting funds to Allied made it more difficult for Allied to successfully bid on a project, such an objective is not prohibited by 8(b)(4)....* Thus, even if Allied's customers could not afford to acquire its services on projects for which the unions denied Allied targeted funds, such an objective is not prohibited. "Some disruption of business relationships is the necessary consequence of the purest form of primary activity. These foreseeable disruptions are, however, clearly protected."

Id. at 29 (internal citation omitted) (emphasis supplied).

In the face of these holdings, that selective granting and denials of targeting funds are outside the boundaries of 8(b)(4)(ii) prohibited conduct and 8(b)(4)(B) prohibited objectives, Plaintiffs cannot support a claim that Local 7's granting and withholding targeting monies constitutes an unlawful secondary boycott. That is, even if Local 7 allegedly enticed any fabricators or higher tier employers during the Union's efforts to obtain work, with the incentive that job targeting funds could be provided to signatory subcontractors (who could then reduce their prices), such approaches to secondaries did not amount to a "cease doing business" objective.

### V. THE UNION'S GRANTS OF JOB TARGETING FUNDS FOR JOBS EMPLOYING UNION MEMBERS DID NOT CONSTITUTE PROHIBITED AGREEMENTS TO 'CEASE DOING BUSINESS' UNDER § 8(e) OF THE ACT

On its face, Count IV and paragraph 177 allege violations of Section 8(b)(4)(ii)(A) and (B), where the subsection (A) violation is the application of supposed restraint or coercion for the prohibited objective of forcing an employer to enter into an agreement prohibited by section 8(e). That was the alleged *objective*. It is not clear that Count IV alleges that job targeting actually yielded the outcome of an agreement to cease doing business, as an independent violation of section 8(e). If that is alleged, it fails on the pleadings and as a matter of undisputed fact.

On the pleadings, the Complaint allegations may be viewed in a light most favorable to Plaintiffs, but it is the entirety of their Complaint that should be scrutinized. They allege in their Complaint that Local 7 repeatedly approached fabricators or general contractors with whom it had no contract, and persuaded them *job by job* (with offers to provide, or threats to withhold, job targeting funds) to use subcontractors who employed

13

Local 7 members. Compl. ¶¶ 69, 81-139 (alleging over twenty-five (25) separate incidents in which the Union allegedly sought and obtained work for its members by appealing to various fabricators and developers using job targeting funds, or simply by making target funds available to signatory contractors). Taking these allegations as true, they cannot establish any generalized agreement to have the fabricators and developers "cease doing business" with Plaintiffs. The fabricator's acceptance of the benefits of job targeting, even indirectly (as a lower cost), and its retaining a union signatory on the targeted job, does not constitute a "cease doing business" *agreement* any more than the Union's offers (and withholdings) of target fund contributions constitutes a "cease doing business" *objective* under Section 8(b)(4)(B). See <u>Allied Mechanical Servs., Inc. v. Local 337 of the United Association of Journeyman and Apprentices of the Plumbing and Pipe Fitting Indus.</u>, supra, at 29 (". . . even if Allied's customers could not afford to acquire its services on projects for which the unions denied Allied targeted funds, such an objective is not prohibited.") Winning a job for a signatory subcontractor does not automatically create a Section 8(e) "agreement" for the fabricator to "cease doing business" with other subcontractors. As we have argued on the antitrust matters, a successful appeal to buy one hot dog from one vendor at a ball game is simply not an unlawful agreement to refrain from buying any other vendor's hot dog, that day or in the future.

As with the antitrust debate, Plaintiffs may argue that <u>Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100</u>, 421 U.S. 616 (1975), establishes that any "agreement" with a non-signatory fabricator constitutes an 8(e) violation. Yet, the contention that Local 7's job targeting program is somehow akin to the agreements

14

involved in Connell does not withstand scrutiny. In Connell, the agreement between a union and a general contractor with whom it did not maintain a collective bargaining agreement was illegal under § 8(e) because the agreement required the contractor to deal only with union signatory subcontractors on *all of its jobs*. 421 U.S. at 619-21, 633, 635. Here, in contrast, the Union's job-by-job solicitations of work and offers of payments, as demonstrated by Plaintiffs' own allegations of job targeting payments for dozens of individual projects, did not result in generalized agreements with non-signatory companies prohibiting them from working with non-union contractors on all future jobs.[5] Compl. ¶¶ 67-139. Moreover, Plaintiffs' Complaint itself alleges that, on "many occasions", the secondary parties (fabricators or developers) apparently were able to utilize credible threats that they were perfectly capable of retaining Plaintiffs or other non-union contractors, as a means of pressuring union contractors to lower their prices by obtaining more job targeting funds. See Compl, ¶ 60. Those tactics by fabricators, alleged by Plaintiffs, could not have been utilized if there were generalized agreements preventing the fabricators from retaining Plaintiffs.

Beyond the pleadings, undisputed facts establish that Local 7's agreements, if any, with fabricators or developers were not of the Connell type. Job targeting funds reduced the labor costs of Local 7 signatory contractors on a particular job. Undisputed Facts ¶ 1. Local 7 awarded job targeting funds on a job-by-job basis. Undisputed Facts ¶ 2. At most, these alleged payments represented Local 7's hat-in-hand method of obtaining work, job-by-job. To the extent that Local 7 may have made these job-by-job appeals to fabricators and general contractors, as Plaintiffs allege, it did so precisely

---

[5] Local 7 does not herein admit Plaintiffs' allegations concerning the Union's alleged twenty-nine (29) appeals for work. Nonetheless, even taking the allegations as true for current purposes, there is no genuine

because it maintained no generalized agreement with these non-labor groups. Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.

It is therefore clear as a matter of law that Local 7's grants and denials of job targeting funds did not violate Section 8(e) of the LMRA to the extent that claim may be alleged in Count IV.

## VI.  CONCLUSION

On the basis of the above authority, and the admitted and undisputed facts, Local 7 hereby requests that partial summary judgment be granted in its favor on Count IV with regard to the alleged job target fund activity.

Respectfully submitted,

LOCAL UNION NO. 7,
INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

---

dispute of material fact that would preclude summary judgment on the job targeting claims in Count IV.

16

/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

Dated: March 20, 2006

**CERTIFICATE OF SERVICE**

    I hereby certify that this Memorandum of Law In Support of Defendant Iron Workers Local 7's Motion for Judgment on the Pleadings or in the Alternative for Partial Summary Judgment on Job Targeting Claims in Count IV of the Complaint filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 20, 2006.

/s/ Paul F. Kelly
Paul F. Kelly, Esq.

L:/Paul Kelly/4829/04528/SJ/ Count IV/ Memo in Supp Partial SJ Count IV

17