# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
AMERICAN STEEL ERECTORS, INC., et al.  )
)
       Plaintiffs,       )
)
       v.       )
)
LOCAL UNION NO. 7, INTERNATIONAL   )
ASSOCIATION OF BRIDGE,     )   Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &    )
REINFORCING IRON WORKERS,    )
)
       Defendant.     )
_____)

## APPENDIX OF AFFIDAVITS IN SUPPORT
## OF DEFENDANT IRON WORKERS LOCAL 7'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Defendant Iron Workers Local 7 respectfully submits the following Affidavits in support

of its Motion for Partial Summary Judgment (arranged herein in alphabetical order):

Exhibit 1   AFFIDAVIT OF JAMES COYLE IN SUPPORT OF DEFENDANT IRON
WORKERS LOCAL 7'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 2   AFFIDAVIT OF THOMAS J. GUNNING IN SUPPORT OF DEFENDANT IRON
WORKERS LOCAL 7'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 3   AFFIDAVIT OF JOHN F. HURLEY IN SUPPORT OF DEFENDANT IRON
WORKERS LOCAL 7'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 4   AFFIDAVIT OF JOSEPH W. NIGRO, JR. IN SUPPORT OF DEFENDANT IRON
WORKERS LOCAL 7'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208

/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229

Dated: March 20, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this Appendix of Affidavits In Support Of Defendant Iron Workers
Local 7's Motion for Partial Summary Judgment filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
on March 20, 2006.

/s/__Paul F. Kelly _____
Paul F. Kelly, Esq.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 1:04-cv-12536-RGS |
| LOCAL UNION NO. 7, INTERNATIONAL ) | |
| ASSOCIATION OF BRIDGE, ) | |
| STRUCTURAL, ORNAMENTAL & ) | |
| REINFORCING IRON WORKERS, and ) | |
| CHARLES WRIGHT, and ) | |
| STEEL ERECTION AND ORNAMENTAL ) | |
| IRON INDUSTRY ADVANCEMENT FUND, ) | |
| Defendants. ) | |

## AFFIDAVIT OF JAMES COYLE IN SUPPORT OF
## DEFENDANT IRON WORKERS LOCAL 7'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.    Affiant's Background Information

1.    My name is James Coyle. I am currently Secretary-Treasurer/General Agent of the Building and Construction Trades Council of the Metropolitan District ("the Council"). I have held this position from April 4, 2005 to the present. I am writing this Affidavit in support of Local 7's Motion for Partial Summary Judgment.

2.    The Council is comprised of local building trades unions that represent employees in various construction crafts in Eastern Massachusetts and nearby areas. Iron Workers Local Union No. 7 has been included among the Council's members throughout my tenure as an officer of the Council.

3.      I have been a member of Local Union No. 7, International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO since June, 1973. I attended and graduated from the Iron Workers Apprenticeship Program in May, 1976. I continually worked on all phases of the iron worker industry, including reinforcing, structural steel, and pre-cast erection. During this period, I worked as a Journeyman Iron Worker and have also held the positions of Foremen, General Foremen, and Job Steward on many different projects. In June, 1997, I was elected to the full-time position of Business Agent, and served in that capacity until January, 2002. I served as Business Manager for Local Union No. 7 from January, 2002 through on or about April 3, 2005.

**B.      Local 7's Organizing and Job Targeting Efforts**

4.      Local 7's primary focus for the past twenty (20) years has been to organize employees who work in the trade and obtain work for them to perform under labor contract standards.

5.      Local 7's organizing efforts have included picketing, handbilling, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families. These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work. These organizing efforts were not based on agreements with any employers.

6.      Local 7's organizing efforts also included persuading non-union workers of the educational benefits of its apprenticeship program and the economic benefits of a

decent hourly wage rate, health insurance for their families, and pension benefits for their retirement.

7.    From time to time, Local 7 assisted non-union iron workers who have been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors. Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at significantly higher wage and benefit levels of the union contract. None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall.

8.    I am aware that the Plaintiffs in this case have alleged that Local 7 has maintained agreements with BTEA and other employer associations and their members to strip non-union employers of employees by providing them with jobs with Local 7 contractors and, in so doing, in some fashion bypass a Local 7 hiring hall. Local 7, however, has not maintained a hiring hall arrangement in its contracts with BTEA, nor in contracts with any other employer association. To the extent that the Plaintiffs are alleging that Local 7 found any priority placements for so-called stripped employees on the large projects with project labor agreements ("PLAs") (such as the Big Dig, the Boston Harbor, the Logan Airport reconstruction, and the South Boston Convention Center projects), where Local 7 was contractually required by the PLAs to refer available job applicants, there was full employment for Local 7 members during the time periods when those projects have been active. Indeed, contractors who bid for and obtained work

3

on those large PLA projects found it necessary to employ many hundreds of iron workers from out of state.

9.    Local 7's collective bargaining agreements with signatory steel erectors, including some fabricators that also perform erection work, contained "union signatory subcontracting clauses." These clauses required that subcontracts of jobsite work be granted to other signatories. With the exception of those collectively bargained clauses, covering construction industry employers who employ workers in its trade, Local 7 did not enter into any written agreements with other companies limiting with whom those companies might do business on future jobs or preventing them from dealing with Plaintiffs on future jobs. Likewise, Local 7 did not enter into any non-written agreements with owners, developers, general contractors, fabricators or other higher-tier companies limiting with whom those companies might do business on future jobs or preventing them from dealing with Plaintiffs on future jobs.

10.    On many occasions, Local 7 approached non-signatory erectors, fabricators and developers or owners about obtaining an individual job for its members or for signatory contractors, in part, because Local 7 did not have any prior agreements that would otherwise prevent jobs from being awarded non-union. Local 7's job-by-job solicitations were oftentimes successful, and oftentimes unsuccessful, and were always limited to the particular job at hand.

11.    Local 7 regularly provided its signatory contractors with job targeting funds for the very reason that Local 7 did not maintain agreements with higher tier employers who controlled the work and, in the absence of a job targeting fund, the union signatory contractor might lose the job to a contractor with a lower wage and benefits package. On

4

jobs where this succeeded in obtaining the work, the use of job targeting funds for the individual job did not result in any agreement between Local 7 and the owners, general contractors, developers or fabricators that would prevent those companies from using non-Local 7 signatory steel erectors on any future job, or even a subsequently bid portion of the job. In numerous cases, where Local 7 won part of a steel erection job on a particular jobsite, it later lost a subsequent steel erection job on the same jobsite. Local 7's job targeting program was always maintained and administered by Local 7. No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program. The targeted jobs were always selected by Local 7. The decision whether to target and the amount of money provided was always determined exclusively by Local 7. Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else.

12. Because Local 7 maintained no generalized agreements with the owners, general contractors, developers or fabricators from whom it solicited work on a job-by-job basis, Local 7 and its signatory contractors also failed in some of their efforts to obtain individual jobs from those entities. In fact, Local 7 and its contractors oftentimes failed in later, separate efforts to obtain future jobs from the very same developers or higher tier contractors that Plaintiffs allege in pages 21-32 of their Complaint as specific instances in which Local 7 or its signatory contractors succeeded in using targeting money to provide relief from the standard terms regarding wages and benefit levels of Local 7's collective bargaining agreement so that members might become employed on a specific project. In fact, the overwhelming majority of fabricators listed in Plaintiffs'

Complaint regularly give out work non-union.  With specific regard to some of the large jobs and most active owners and developers listed in the Complaint, such as Shaw's Supermarkets, Stop & Shop and Wal-Mart, non-union steel erectors were very often used to build Shaw's Supermarkets, Stop & Shops and Wal-Marts at locations not listed in the Complaint.

**C.**    **Surveillance and Regulatory Activity**

13.    During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards.  The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming employed under the wage and benefits levels of Local 7's collective bargaining agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

_____14 th_____ DAY OF _FEBRUARY_

James Coyle

6

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing Affidavit of James Coyle in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment was served upon Michael E. Avakian, Esq., Smetana & Avakian, 5211 Port Royal Road, Suite 103, Springfield, VA  22151; Carol Chandler, Esq. and Geoffrey R. Bok, Esq., Stoneman, Chandler & Miller LLP, 99 High Street, Boston, MA  02110 and Mickey Long, Esq., Ironworkers Local 7, 193 Old Colony Avenue, South Boston, MA 02127 via first class mail, postage prepaid, this _____ day of _____, 2006.

_____
Paul F. Kelly

PFK/4829/ASE/Pleadings/Coyle Affidavit (final).doc

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:04-cv-12536-RGS |
| ) | |
| LOCAL UNION NO. 7, INTERNATIONAL ) | |
| ASSOCIATION OF BRIDGE, ) | |
| STRUCTURAL, ORNAMENTAL & ) | |
| REINFORCING IRON WORKERS, and ) | |
| ) | |
| CHARLES WRIGHT, and ) | |
| ) | |
| STEEL ERECTION AND ORNAMENTAL ) | |
| IRON INDUSTRY ADVANCEMENT FUND, ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF THOMAS J. GUNNING IN SUPPORT OF DEFENDANT IRON WORKERS LOCAL 7'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      My name is Thomas J. Gunning.  I am currently employed as Executive

Director for the Building Trades Employers' Association of Boston and Eastern

Massachusetts ("BTEA").  I have held that position for ten (10) years.  Prior to becoming

Executive Director of the BTEA, I served as Director of Government Relations for the

BTEA for eight years.  I am writing this Affidavit in support of Local 7's Motion for

Partial Summary Judgment.

2.      The BTEA is located at 1400 Hancock Street in Quincy, Massachusetts

02169.

3.     The BTEA is a multi-employer organization that, among other activities, serves as labor relations representative for union signatory steel erection and iron work contractors who are members of BTEA. As such we engage in collective bargaining with Local 7 and become involved in various contract administration matters. The BTEA and Local 7 are currently parties to a collective bargaining agreement, effective September 16, 2000 through September 16, 2006.

4.     The BTEA's and Local 7's collective bargaining agreement at Section 9 provides, inter alia, that employees who sign check-off authorizations will be subject to a working dues deduction .85 for every hour worked, designated for the Local 7's Market Recovery Program, which I understand is also called a job targeting program. This provision is attached hereto at Tab A.

5.     Neither the BTEA nor its employer members were involved in the establishment of the job targeting program or in Local 7's decision to use a dues deduction to fund the program. The establishment of the program and the decision to use dues monies and deductions (and the particular amounts) were arrived at by Local 7 on its own, prior to its asking that it be referred to in its collective bargaining agreement with BTEA in the agreement dated November 1, 1993 to September 15, 1997.

6.     Neither the BTEA nor its employer members have ever been involved in the administration of the job targeting program, including the disbursement of target funds from the Union to signatory contractors bidding for jobs nor any other operations of the program. For example, neither the BTEA nor its member employers have ever been involved in deciding how job targeting funds were used, in selecting which jobs to target or in ascertaining the amount of a job targeting subsidy. The inclusion of the dues

2

deduction provision in the parties' collective bargaining agreement did not detract from or alter Local 7's sole discretion in administering and operating the job targeting program. Rather, it was always understood that Local 7 had the exclusive rights to determine amounts paid into that fund and could have changed those amounts unilaterally without notifying the BTEA. The articulation of the amounts in the collective bargaining agreement was only a convenience for members of Local 7 to know how much was intended to target fund allocations.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

Jan  9    DAY OF  2006                 .


_____
Thomas J. Gunning


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing Affidavit of Thomas J. Gunning in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment was served upon Michael E. Avakian, Esq., Smetana & Avakian, 5211 Port Royal Road, Suite 103, Springfield, VA 22151; Carol Chandler, Esq. and Geoffrey R. Bok, Esq., Stoneman, Chandler & Miller LLP, 99 High Street, Boston, MA 02110 and Mickey Long, Esq., Ironworkers Local 7, 193 Old Colony Avenue, South Boston, MA 02127 via first class mail, postage prepaid, this __20__ day of __MARCH__.

_____
Paul F. Kelly


PFK/4829/ASE/Pleadings/Gunning Affidavit (final).doc

# EXHIBIT A

amended. (b) Allow the Employer to deduct said contributions as an ordinary and necessary business expense. (c) Not be used to provide legal services against the Union, the Associations, the Fund or the Employer (including repre sentation in Unemployment and Workers' Compensation cases).

There shall be a total of six (6) Trustees to constitute the Board of Trustees to administer the Fund. Said Trustees to be appointed are as follows: Three (3) Trustees shall be appointed by the Union; one (I) Trustee shall be appointed by the Labor Relations Division of the Associated General Contractors of Massachusetts, Inc. (AGC); one (1) Trustee shall be appointed by the Building Trades Employers' Assoctation of Boston and Eastern Massachusetts, Inc. (BTEA); one (I) Trustee shall be appointed by the Steel Erectors Associalion of the BTEA. Representatives on the Board of Trustees shall at all times be equally divided among Union and Associations. The appointing parties shall also have the power to remove their respective Trustees appointed by them and to fill vacancies on the Board of Trustees.

## Working Dues Deduction

SECTION 9. It is agreed that the Employer shall deduct the amount shown in Article V, Section 1. Wages—from net wages after taxes, for each and every hour paid to all employees covered by or receiving benefits provided for in this Agreement for all jobs falling within the jurisdiction of this Agreement. All such deductions shall be reported weekly. The form for this purpose is to be furnished by the Union.

It is agreed the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid.

21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:04-cv-12536-RGS |
| ) | |
| LOCAL UNION NO. 7, INTERNATIONAL ) | |
| ASSOCIATION OF BRIDGE, ) | |
| STRUCTURAL, ORNAMENTAL & ) | |
| REINFORCING IRON WORKERS, and ) | |
| ) | |
| CHARLES WRIGHT, and ) | |
| ) | |
| STEEL ERECTION AND ORNAMENTAL ) | |
| IRON INDUSTRY ADVANCEMENT FUND, ) | |
| ) | |
| Defendants. ) | |

---

**AFFIDAVIT OF JOHN F. HURLEY IN SUPPORT OF
DEFENDANT IRON WORKERS LOCAL 7'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

A.    **Affiant's Background Information**

1.    My name is John F. Hurley.  I am currently employed as General Vice

President of the International Association of Bridge, Structural, Ornamental and

Reinforcing Iron Workers, AFL-CIO.  I also serve as President of the New England

District Council of Iron Workers.  I have held these positions since May of 2005 and June

of 2002, respectively.  I am writing this Affidavit in support of Local 7's Motion for

Partial Summary Judgment.

2.    I have been a member of Local 7 since 1974.  I worked for three years as

an apprentice and for sixteen (16) years as a journeyman iron worker.  I have worked on

all phases of the iron workers' trade, including structural steel, finish work, reinforcing

steel, crane rigging, precast concrete, crane erection and dismantling and miscellaneous metals.

3.      I have held various elected offices in Local 7.  I served as vice president from 1987 to 1988; recording secretary from 1988 to 1991; president from 1991 to 1993; business agent from 1993 to 1997; and business manager from 1997 to 2001.

**B.      Iron Workers, Local 7**

4.      Local 7 is a labor organization with its offices in South Boston, Massachusetts.  It is an affiliated local union of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO (herein the "Iron Workers").  Local 7 has historically represented iron workers in the northeastern part of Massachusetts with geographical jurisdiction inside of Route 495, north from Plymouth, Massachusetts and east from Pepperell, Massachusetts.  In 1994 Iron Workers Local 351 (with jurisdiction over Lawrence and Lowell) merged with Local 7.  More recently Iron Workers Local 357 (with geographical jurisdiction of the Springfield, Massachusetts area) also merged with Local 7.  Most recently, Iron Workers Local 57, which covered Worcester County, merged with Local 7.  Today Local 7's territorial jurisdiction includes approximately 300 of the 351 cities and towns in Massachusetts.

5.      One other local union affiliated with the Iron Workers represent employees in Massachusetts.  Iron Workers Local 37 represents iron workers in Southeastern Massachusetts, including the Cape and Islands and in the State of Rhode Island.  Iron Workers Local 474 represents iron workers in New Hampshire and Vermont.  Iron Workers Local 496 represents iron workers in Maine.  Each of the bargaining areas establishes an hourly rate for journeyman iron workers and for foremen.

2

The hourly rate package includes wages and benefits. I have attached hereto at Tab A, a schedule of hourly rates prevailing in the geographical areas of Local 7 and the other Locals I have mentioned between 1998 and present. As Tab A demonstrates, the market price of labor in Local 7's trade varies from area to area.

**C.    The Steel Erection Business**

6.    Steel erection is a labor intensive portion of the industry. A steel erection contractor basically needs good credit and a supply of skilled labor. Typically, steel erection contractors rent cranes and hire labor. There are few barriers to entry in this portion of the industry. Non-union steel erection contractors such as the Plaintiffs pay substantially lower wage and benefit rates than union contractors such as Local 7's signatory contractors.

7.    In the construction industry, a general contractor generally solicits prices for the combined work of steel fabrication and erection, which may be referred to as the "fabrication-erection package." Fabricators produce the steel. Steel erectors assemble it. When a fabricator obtains work (that is, the fabrication-erection package) from a general contractor, the fabricator will either erect the steel or subcontract out the steel erection. Most fabricators subcontract the erection work. As a result, although some Local 7 steel erection contractors also fabricate, most of them do not. These erectors generally work as subcontractors to fabricators.

8.    Work performed by Local 7 members arises out of projects involving several layers of commercial entities, including owners, developers, general contractors, fabricators, and steel erection contractors. To my knowledge, competition exists at all of these levels. General contractors compete for projects from owners and developers.

3

Fabricators compete with each other for subcontracts from general contractors. In addition, the fabricators at times compete directly with steel erection contractors, including both Plaintiffs and union signatory steel erection contractors on occasions when the steel erection contractors themselves bid for the full fabrication-erection package, expecting to subcontract the fabrication work.

9.    The locals in the Iron Workers District Council of New England work with over 230 contractors who have signed collective bargaining agreements. I would estimate that approximately 70% of them compete for structural steel erection work. These contractors secure work through business and personal relationships they have developed with particular contractors, through direct negotiations, competitive bidding, associations with developers, and many other factors. Often contractors solicit "bids" that lead to further solicitations, modifications of prior bids and, as a practical matter, a negotiated price.

10.    The structural steel erection contractors control the decision whether to compete for work or not. In fact, some structural steel erection contractors confine their activities to particular geographic regions or to particular types of jobs. By far, the largest projects in the steel erection market in the last ten (10) years have been the Big Dig and other public works projects, such as the Boston Harbor project, the South Boston Convention Center project, and the Logan Airport project, which have been developed under project labor agreements ("PLAs") collectively bargained between project managers and local building trades union councils. Local 7 is one of the constituent craft unions of the Building and Construction Trades Council of the Metropolitan District,

4

which was involved in these negotiations for the PLAs governing the Big Dig, Harbor, Convention, and Airport projects.

11.    I am not aware that Plaintiffs in this case bid on or negotiated for any significant portion of the work on these very large public jobs, although they were eligible to do so according to the terms of the PLAs without regard to their failure to sign union contracts for their other jobs.

12.    At times, I reached out to encourage non-union contractor bids on public projects because their work on the particular project would comply with prevailing wages and union contract standards. This might serve to educate parts of their workforce regarding the benefits of working under union standards and might also persuade management that they could operate profitably as a union signatory.

**D.    Local 7's Organizing Efforts**

13.    Local 7's primary focus during the time I was an officer for the Union was to organize employees who worked in the trade and to help them maintain and improve conditions of their unionized employment in accord with the Local 7 collective bargaining agreement and obtain work for them to perform under labor contract standards.

14.    Local 7's organizing efforts included picketing, hand billing, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families. These organizing efforts, whether directed against non-union steel erectors or secondary parties, were based on Local 7's own objectives to protect its members' wage and benefit levels,

and to help members maintain and improve employment opportunities and obtain work. These organizing efforts were not based on agreements with any employers.

15.    Local 7's organizing during that time also included persuading non-union workers of the educational benefits of its apprenticeship program and the economic benefits of a decent hourly wage rate, health insurance for their families, and pension benefits for their retirement.

16.    From time to time, Local 7 assisted non-union iron workers who had been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors. Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at the significantly higher wage and benefit levels of the union contract. None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall.

17.    I am aware that Plaintiffs in this case have alleged that Local 7 has maintained agreements with BTEA and other employer associations and their members to strip non-union employers of employees by providing them with jobs with Local 7 contractors and, in so doing, in some fashion bypass a Local 7 hiring hall. During the time I was an officer with Local 7, however, the Union did not maintain a hiring hall arrangement in its contracts with BTEA, nor in contracts with any other employer association. To the extent that Plaintiffs are alleging that Local 7 found any priority placements for so-called stripped employees on the large projects with PLAs, such as the

Big Dig and the Boston Harbor project, where Local 7 was contractually required by the PLAs to refer available job applicants, there was full employment for Local 7 members during the time periods when those projects were active. Indeed, contractors who bid for and obtained work on those large PLA projects found it necessary to employ many hundreds of iron workers from out of state.

18.     Local 7's collective bargaining agreements with signatory steel erectors, including some fabricators that also perform erection work, contained in "union signatory subcontracting clauses." These clauses required that subcontracts of jobsite work be granted to other signatories. With the exception of those collectively bargained clauses, covering construction industry employers who employ workers in its trade, Local 7 did not enter into any written agreements with other companies limiting with whom those companies might do business on future jobs or preventing them from dealing with Plaintiffs on future jobs. Likewise, Local 7 did not enter into any non-written agreements with owners, developers, general contractors, fabricators or other higher-tier companies limiting with whom those companies might do business on future jobs or preventing them from dealing with Plaintiffs on future jobs.

19.     On many occasions, Local 7 approached non-signatory erectors, fabricators and developers or owners about obtaining an individual job for its members or for signatory contractors, in part, because Local 7 did not have any prior agreements that would otherwise prevent jobs from being awarded non-union. Local 7's job-by-job solicitations were oftentimes successful, and oftentimes unsuccessful, and were always limited to the particular job at hand.

### E.    Local 7's Job Targeting Program

20.    Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program. The purposes of the job targeting program were twofold. First, to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms with regard to wages and benefits appeared an obstacle to competing against non-union competition. Second, to monitor the steel erection industry to help eliminate extensive statutory and regulatory cheating in the non-union sector of the industry, thereby creating a more lawful level playing field for the environment in which Local 7 members work. The job targeting program was funded out of the dues of Local 7 members.

21.    During the period when I was President of Local 7, the membership considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest. The membership rejected this idea. Instead, the membership voted to permanently fund the job targeting program with dues. A copy of the 1992 Resolution and a letter approving the Resolution are attached hereto as Tab B. No employer ever took part in the establishment of the job targeting program.

22.    Initially, the job targeting program was administered by the three business agents because Local 7 did not have a business manager at the time. When I was elected business manager in 1997, I became responsible for overseeing the job targeting program. As business manager, I met regularly with the business agents to discuss the merits of each job for purposes of job targeting. I also met regularly with Local 7's financial secretary-treasurer to oversee the solvency of the job targeting fund and to ensure that monies were only paid after all obligations were met by the applicable contractors. As

business manager, I maintained the unequivocal right to make the final decision on any

job targeted. Since 1997, business agents have requested approval of target fund

allocations from the business manager.

23.    Job targeting provided relief from the constraints of Local 7's collective

bargaining agreement's terms regarding wages and costs of benefits, particularly

designed to reduce wage and benefit rate differentials for Local 7 contractors seeking to

obtain work on a particular job. Information about a particular job was sometimes

gathered from business agents, employers and construction publications. Once Local 7

made the decision to target a particular job, I sent a "blast fax" to all Local 7 signatory

contractors. This document served as a Project Alert, notifying Local 7 signatory

contractors interested in pursuing a particular job that Local 7 was open to providing

relief from the existing collective bargaining agreement's terms regarding wages and

benefits on that particular job, and they should contact the applicable business agent if

they were bidding on that project. The monies committed for targeted jobs were usually

calculated on a per hour rate based on information obtained from business agents and

from contractors who were interested in bidding the job.

24.    The job targeting program was commonly used to improve the likelihood

of Local 7 members being employed on the targeted project in accord with the Local 7

collective bargaining agreement, rather than having the work done by non-union iron

workers employed by non-union companies. It was also used to promote the employment

of Local 7 members rather than other unionized trades' employers, i.e., union

competition. Other trade unions regularly compete with iron workers for certain work.

Occasionally, job targeting money was used to attempt to secure work for Local 7

members when its signatory contractors were competing against contractors signed to other union agreements.

25.    Job targeting money was conditioned upon the employer paying wages and benefits in full as required by the collective bargaining agreement. The money was routinely disbursed to Local 7 signatory contractors as reimbursements after the work had been performed and the contractors had paid the contractual wages and benefits for a job, or a portion thereof.

26.    Local 7 regularly provided its signatory contractors with job targeting funds for the very reason that Local 7 did not maintain agreements with higher tier employers who controlled the work and, in the absence of a job targeting funds, the union signatory contractor might lose the job to a contractor with a lower wage and benefits package. On jobs where this succeeded in obtaining the work, the use of job targeting funds for the individual job did not result in any agreement between Local 7 and the owners, general contractors, developers or fabricators that would prevent those companies from using non-Local 7 signatory steel erectors on any future job, or even on a subsequently bid portion of the project in question. In some cases, where Local 7 won part of a steel erection job on a particular jobsite, it later lost a subsequent steel erection job on the same jobsite.

27.    Because Local 7 maintained no generalized agreements with the owners, general contractors, developers or fabricators from whom it solicited work on a job-by-job basis, Local 7 and its signatory contractors often failed in their efforts to obtain individual jobs from those entities. In fact, Local 7 and its contractors oftentimes failed in later, separate efforts to obtain future jobs from the very same developers or higher tier

contractors that Plaintiffs allege in pages 21-32 of their Complaint as specific instances in which Local 7 or its signatory contractors succeeded in using targeting money to provide relief from the standard terms regarding wages and benefit levels of Local 7's collective bargaining agreement so that members might become employed on a specific project. In fact, the overwhelming majority of fabricators listed in Plaintiffs' Complaint regularly give out work non-union. With specific regard to some of the large jobs and most active owners and developers listed in the Complaint, such as Shaw's Supermarkets, Stop & Shop and Wal-Mart, non-union steel erectors were very often used to build Shaw's Supermarkets, Stop & Shops and Wal-Marts at locations not listed in the Complaint.

28.    Local 7's job targeting program was always maintained and administered by Local 7. No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program. The targeted jobs were always selected by Local 7. The decision whether to target and the amount of money provided was always determined exclusively by Local 7. Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else.

**F.    Surveillance and Regulatory Activity**

29.    During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards. The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming

employed under the wage and benefits levels of Local 7's collective bargaining agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _14_ DAY OF _February_

John F. Hurley

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing Affidavit of John F. Hurley in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment was served upon Michael E. Avakian, Esq., Smetana & Avakian, 5211 Port Royal Road, Suite 103, Springfield, VA 22151; Carol Chandler, Esq. and Geoffrey R. Bok, Esq., Stoneman, Chandler & Miller LLP, 99 High Street, Boston, MA 02110 and Mickey Long, Esq., Iron Workers Local 7, 193 Old Colony Avenue, South Boston, MA 02127 via first class mail, postage prepaid, this _20_ day of _March_, 2006.

Paul F. Kelly

L:\PKelly\4829\ASE\SJ\Hurley Affidavit Final.doc

12

**EXHIBIT A**

## LOCAL 7-BOSTON

| | EFF DATE 9/16/98-3/15/99 | EFF DATE 3/16/99-9/15/99 | EFF DATE 9/16/99-3/15/00 | EFF DATE 3/16/00-9/15/00 | EFF DATE 9/16/00-3/15/01 | EFF DATE 3/16/01-9/15/01 | EFF DATE 9/16/01-3/15/02 | EFF DATE 3/16/02-9/15/02 | EFF DATE 9/16/02-3/15/03 | EFF DATE 3/16/03-9/15/03 | EFF DATE 9/16/03-3/15/04 | EFF DATE 3/16/04-9/15/04 | EFF DATE 9/16/04-3/15/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JW | $37.63 | $38.38 | $39.53 | $40.28 | $41.08 | $41.88 | $42.73 | $43.73 | $44.73 | $45.88 | $46.63 | $47.78 | |
| FOREMEN | $38.58 | $39.13 | $39.63 | $40.28 | $41.53 | $42.33 | $43.63 | $44.48 | | | $46.73 | $47.68 | $48.78 |

## LOCAL 7-LAWRENCE

| | EFF DATE 9/16/98-3/15/99 | EFF DATE 3/16/99-9/15/99 | EFF DATE 9/16/99-3/15/00 | EFF DATE 3/16/00-9/15/00 | EFF DATE 9/16/00-3/15/01 | EFF DATE 3/16/01-9/15/01 | EFF DATE 9/16/01-3/15/02 | EFF DATE 3/16/02-9/15/02 | EFF DATE 9/16/02-3/15/03 | EFF DATE 3/16/03-9/15/03 | EFF DATE 9/16/03-3/15/04 | EFF DATE 3/16/04-9/15/04 | EFF DATE 9/16/04-3/15/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JW | $33.42 | $33.97 | $34.47 | $35.12 | $35.67 | $36.67 | $37.47 | $38.32 | | $40.32 | $41.27 | $42.22 | $43.37 |
| FOREMEN | $34.17 | $34.72 | $35.22 | $35.97 | $37.12 | $37.92 | $39.54 | $40.07 | | $41.32 | $42.32 | $43.27 | $45.37 |

## LOCAL 7-SPRINGFIELD

| | EFF DATE 6/30/03-12/28/03 | EFF DATE 12/29/03-7/5/04 | EFF DATE 7/6/04-1/5/05 | EFF DATE 1/6/05-1/5/06 |
|---|---|---|---|---|
| JW | $39.54 | $40.69 | $41.69 | $42.69 |
| FOREMEN | $41.54 | $42.69 | $43.69 | $44.69 |
| G. FOREMEN | $42.54 | $43.69 | $44.69 | |

## LOCAL 387-SPRINGFIELD

| | EFF DATE 1/1/99-6/30/99 | EFF DATE 7/5/99-6/30/00 | EFF DATE 7/1/00-12/31/00 | EFF DATE 1/1/01-6/30/01 | EFF DATE 7/2/01-12/31/01 | EFF DATE 12/31/01-6/30/02 | EFF DATE 7/1/02-12/29/02 | EFF DATE 12/30/02-6/29/03 |
|---|---|---|---|---|---|---|---|---|
| JW | $32.49 | $33.64 | $34.24 | $34.79 | $35.85 | $36.54 | $37.59 | $38.54 |
| FOREMEN | $33.49 | $34.14 | $35.14 | $35.74 | $36.29 | $37.20 | $38.29 | $39.54 | $40.54 |
| G. FOREMEN | $34.99 | $36.14 | $36.74 | $37.29 | $38.60 | $39.29 | $40.54 | $41.54 |

## LOCAL 496-MAINE

| | EFF DATE 9/16/98-9/15/99 | EFF DATE 9/16/99-9/15/01 | EFF DATE 9/16/00-9/15/01 | EFF DATE 9/16/01-3/15/02 | EFF DATE 3/16/02-9/15/02 | EFF DATE 6/1/01-6/30/01 | EFF DATE 9/16/03-10/20/04 | EFF DATE 10/21/04-10/21/05 |
|---|---|---|---|---|---|---|---|---|
| JW | $29.80 | $30.90 | $32.00 | $32.95 | $33.45 | $34.45 | $35.45 | $36.50 |
| FOREMEN | $31.30 | $32.40 | $33.50 | $34.45 | $34.95 | $35.45 | $35.96 | $36.60 | $38.10 |

## LOCAL 474-NH/VT

| | EFF DATE 1/09-12/99 | EFF DATE 1/00-5/00 | EFF DATE 6/00-9/15/00 | EFF DATE 9/16/00-5/31/01 | EFF DATE 6/1/01-9/15/01 | EFF DATE 9/16/01-9/15/02 | EFF DATE 9/16/02-3/15/03 | EFF DATE 3/16/03-9/15/03 | EFF DATE 9/16/03-3/15/04 | EFF DATE 3/16/04-9/15/04 | EFF DATE 9/16/04-9/15/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JW | $27.85 | $28.52 | $29.07 | $29.84 | $30.32 | $30.87 | $31.62 | $32.17 | $33.68 |
| FOREMEN | $28.35 | $28.87 | $29.52 | $30.07 | $30.84 | $31.32 | $31.87 | $32.62 | $33.17 | $33.92 | $34.68 |

## LOCAL 37-RI

| | EFF DATE 5/31/98-10/99 | EFF DATE 1/4/99-1/2/00 | EFF DATE 1/3/00-12/31/00 | EFF DATE 1/1/01-5/26/01 | EFF DATE 5/27/01-12/29/01 | EFF DATE 12/30/01-6/1/02 | EFF DATE 6/2/02-1/4/03 | EFF DATE 1/5/03-5/31/03 | EFF DATE 6/1/03-1/04/04 | EFF DATE 1/4/04-5/29/04 | EFF DATE 5/30/04-8/29/04 | EFF DATE 8/30/04-5/29/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JW | $33.93 | $34.83 | $35.73 | $36.63 | $37.38 | $38.23 | $38.88 | $39.83 | $40.58 | $41.63 | $42.08 |
| FOREMEN | $35.18 | $36.08 | $36.98 | $37.88 | $38.68 | $39.73 | $40.48 | $41.33 | $42.08 | $43.13 | $43.58 |

## LOCAL 57-WORCESTER

| | EFF DATE 11/1/98-4/30/99 | EFF DATE 5/1/99-11/1/99 | EFF DATE 11/1/99-4/30/00 | EFF DATE 11/1/00-4/30/01 | EFF DATE 5/1/01-10/31/01 | EFF DATE 11/1/01-4/30/02 | EFF DATE 11/1/02-10/31/03 | EFF DATE 5/1/03-10/31/03 | EFF DATE 5/1/04-10/31/04 | EFF DATE 11/1/04-4/30/05 | EFF DATE 11/1/04-4/30/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JW | $37.58 | $38.08 | $39.38 | $40.03 | $41.28 | $42.08 | $42.46 | $43.38 | $44.43 | $45.38 | $46.33 | $47.48 |
| FOREMEN | $38.33 | $38.83 | $40.03 | $41.28 | $42.08 | $42.98 | $44.23 | $45.48 | $46.43 | $47.38 | $48.33 | $49.48 |

# EXHIBIT B

International Association of

# Bridge, Structural and Ornamental Iron Workers

**JAKE WEST**
GENERAL PRESIDENT

**JUEL D. DRAKE**
GENERAL PRESIDENT EMERITUS

**LeROY E. WORLEY**
GENERAL SECRETARY

**JAMES E. COLE**
GENERAL TREASURER

*APPROVED*

*NEIL*

Affiliated with AFL-CIO

SUITE 400
1750 NEW YORK AVE. N.W.
WASHINGTON, D.C. 20006
202 383-4800

April 21, 1992

Mr. Paul DiPietro, FST
Iron Workers Local Union No. 7
35 Travis Street, P.O. Box 210
Allston, MA  02134

Dear Sir and Brother:

Your letter of March 27, 1992 to which was attached copy of a Resolution presented to the membership of Local Union No. 7, Boston, Massachusetts, which Resolution amends Article VIII of the Local Union By-Laws by adding a new section, to be known as Section 14, Target Fund, which shall read as follows:

> **"Section 14.  Target Fund.**
>
> A Target Fund shall be permanently funded with a dues check off."

has been presented to the General Executive Board for consideration and action thereon.

The General Executive Board noted this Resolution was acted upon and adopted by the membership of the local union in accordance with the provisions of the International Constitution and, after careful consideration and deliberation, has decided to approve the Resolution as set forth above.

Fraternally yours,

GENERAL EXECUTIVE BOARD

General Secretary

LEW:mo
cc:  General Organizer Joseph Quilty

## RESOLUTION

Whereas:    The Target Fund has proven to be an effective tool for competing with the non-union; and

Whereas:    The Target Account need permanent funding to be effective;

Therefore Be It Resolved:  That a Target Fund be permanently funded with a dues check off.


Respectfully submitted,

Robert E. Banks
Book #867572

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| LOCAL UNION NO. 7, INTERNATIONAL ) | |
| ASSOCIATION OF BRIDGE, ) | |
| STRUCTURAL, ORNAMENTAL & ) | Case No. 1:04-CV-12536-RGS |
| REINFORCING IRON WORKERS, and ) | |
| ) | |
| CHARLES WRIGHT, and ) | |
| ) | |
| STEEL ERECTION AND ORNAMENTAL ) | |
| IRON INDUSTRY ADVANCEMENT FUND, ) | |
| ) | |
| Defendants. ) | |

**AFFIDAVIT OF JOSEPH W. NIGRO, JR. IN SUPPORT OF
DEFENDANT IRON WORKERS LOCAL 7'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

A.    **Affiant's Background Information**

1.    My name is Joseph W. Nigro, Jr.  I am currently retired as Secretary-

Treasurer/General Agent of the Building and Construction Trades Council of the

Metropolitan District ("the Council").  I held that position from January, 1986 to March

31, 2005.  I am writing this Affidavit in support of Local 7's Motion for Partial Summary

Judgment.

2.    The Council is comprised of local building trades unions that represent employees in various construction crafts in Eastern Massachusetts and nearby areas. Iron Workers Local Union No. 7 was included among the Council's members throughout my tenure as an officer of the Council.

**B.    Project Labor Agreements**

3.    In my capacity as Secretary-Treasurer/General Agent of the Council, I supervised the negotiation and administration of collective bargaining agreements covering many of the largest construction projects undertaken in the Greater Boston area. In the last twenty (20) years the largest of those projects in the Greater Boston area, and indeed in New England, have been public sector projects in Massachusetts that have been governed by project labor agreements ("PLAs").

4.    Project labor agreements are a form of collective bargaining agreement negotiated by private and public sector developers through their general contractors and project managers, who typically negotiate the PLAs with area building trades councils. For large public sector construction projects involving multiple construction trades, the PLAs include union commitments that there will be no work stoppages of any sort over the many years of the work, and they establish more stable and uniform terms and conditions of employment for the multiple trades. That is, project labor agreements typically standardize the work rules of various contractors and subcontractors (and their workforces), provide for a system of resolving jurisdictional disputes between trades, establish a grievance arbitration procedure for the particular project, and prohibit all strikes, picketing, work stoppages, and lockouts for the entire duration of the projects. Such terms minimize the prospect of labor disputes and delays.

2

5.     While the PLAs and bid specifications for the largest public sector projects in Massachusetts in the last twenty (20) years have required that all contractors and subcontractors must abide by the terms of a PLA as a condition of performing work on the particular PLA jobsite, these public sector PLAs guarantee that all contractors and subcontractors, union and non-union alike, have the same rights to bid for and be awarded work on that project. This was true for the PLAs covering four of the largest public works projects that were active in the Greater Boston area during the time period I understand is covered by the Plaintiffs' Complaint, from 1995 through 2004. That is, over the last ten (10) years, four of the largest projects in the area were the Boston Harbor clean up, the Big Dig (apparently referred to in Plaintiffs' Complaint and otherwise called the "Central Artery (I-93)/Tunnel (I-90) Project"), the Logan Airport reconstruction, and the South Boston Convention Center projects. During my tenure, I played a leading role for the Council in negotiating and administering all four of those PLAs on behalf of the Council. All four of those projects involved substantial steel erection and other iron work.

6.     In keeping with the pattern I described above, each of the PLAs governing those four large projects served as an umbrella agreement that established standardized terms on particular issues for that particular job, such as no strike clauses and uniform work rules. Each particular trade's own labor contract with the multi-employer association in the area was incorporated by reference and applied to that trade's work on the PLA site, including Local 7's contract covering steel erection work, but the individual trade's area contract terms were effective only on the issues not addressed by the PLA.

That is, any term set forth in the PLA overrode any contrary terms that might be contained in the subsidiary craft's area contract (including Local 7's area contract).

7.    Each of the PLAs covering the four large projects referenced above specified that all contractors and subcontractors at all tiers were eligible to participate in bidding for work on the project (without regard to their status as union signatories or non-signatories on their other projects), as long as they agreed to abide by the PLA for their work on the PLA project. Thus, these PLAs did not impose a union-only bidding requirement that excluded bidders because they employed non-union workers or failed to sign union contracts for any of their jobsites. For lower tier subcontractors, who might wish to bid or negotiate to perform subcontracts for successful public bidders, the PLA provided that contractors and subcontractors working on the project could not be required to sign other labor agreements as a condition of working on the PLA project.

8.    Such open access rules were established by standards set in the so-called Boston Harbor case, Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Mass/RI, 507 U.S. 218 (1993), litigated to the Supreme Court, and the so-called Big Dig case, Utility Contractors Assoc. of New England, Inc. v. Commissioners of Mass. Dep't of Public Works ("UCANE"), No. Civ. A. 90-3035, 1996 WL 106383 (Mass. Super. 1996) (not reported) (attached hereto at Tab A), litigated in Massachusetts state court.

9.    Specifically on the Big Dig project, for example, the PLA stated that all contractors (including "subcontractors of whatever tier") were allowed to execute the PLA for purposes of work on that project and no such contractors were required to sign any *other* labor agreements as a condition of working on the project. This meant that

4

non-union contractors were allowed to bid on Big Dig work so long as they signed on to the PLA for their work on that particular project. Attached hereto at Tab B is the portion of the Big Dig PLA that contains the open access language, specifying that no contractor (or subcontractor) could be required to be signatory to any other labor agreement. The same open access element was in place for the Boston Harbor, Logan Airport, and Convention Center projects. Attached hereto at Tabs C-E are the portions of the Boston Harbor, Logan Airport, Convention Center projects' PLAs, in order, which also contain open access language.

10.    Pursuant to the terms I described above regarding PLA coverage of construction work in general, it is my understanding with respect to steel erection work on the Big Dig, the Harbor, the Airport, and the Convention projects, the open access provisions of the PLAs would have expressly overridden any oral or written agreements between Local 7 and any employer on the site (including any prior agreements that potentially required "union signatory subcontracting"). To my knowledge, the issue did not even arise regarding steel erection work, and I was not aware that Local 7 had collective bargaining agreements with any of the Big Dig general contractors that might otherwise have required those general contractors to retain only union signatory steel erectors. Accordingly, any non-union company engaged in steel erection or iron work could have bid or negotiated to do work on the Big Dig project, as they could have on the Harbor, Airport, and Convention Center projects as well.

11.    I am not aware that Plaintiffs in this case attempted to obtain steel erection work on any significant portion of the work on these very large public jobs in the last ten years, either by public bidding or by negotiating to perform subcontracts for successful

bidders, despite the open access provisions of the PLAs I described above. In contrast, in other construction trades many non-union companies did successfully bid or negotiate to perform contracts and subcontracts on the Big Dig. As Judge Garsch noted in the litigation during the Big Dig Project, when fifty-five (55) major general contracts had been bid for work valued over $1.8 billion, there had already been thirteen (13) bids by non-union contractors on ten (10) of those large contracts, and at least twenty-eight (28) non-union subcontractors were already working on the project at some tier. The lower tier contractors in those other trades (including non-union companies) did not have to submit a public bid for project work when they functioned as subcontractors to the successful bidders, but they nonetheless were fully eligible to obtain work, and they had to agree to become bound by the PLA for that particular project.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _19th_ DAY OF _Dec. 2005_.

_____
Joseph W. Nigro, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing Affidavit of Joseph W. Nigro, Jr. in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment was served upon Michael E. Avakian, Esq., Smetana & Avakian, 5211 Port Royal Road, Suite 103, Springfield, VA 22151; Carol Chandler, Esq. and Geoffrey R. Bok, Esq., Stoneman, Chandler & Miller LLP, 99 High Street, Boston, MA 02110 and Mickey Long, Esq., Ironworkers Local 7, 193 Old Colony Avenue, South Boston, MA 02127 via first class mail, postage prepaid, this _20_ day of _March, 2006_.

_____
Paul F. Kelly

PFK/4829/ASE/SJ/Affidavit Nigro

6

# EXHIBIT A

Westlaw.

Not Reported in N.E.2d                                                                 Page 1

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

**H**

Superior Court of Massachusetts.
UTILITY CONTRACTORS ASSOCIATION OF
NEW ENGLAND, INC., Plaintiff
v.
COMMISSIONERS OF THE MASSACHUSETTS
DEPARTMENT OF PUBLIC WORKS, [FN1]
Defendants

FN1. By St.1991, c. 552, the Department
of Public Works was renamed the
"Massachusetts Highway Department."

**No. CIV. A. 90-3035.**

March 12, 1996.

GARSH, J.

MEMORANDUM OF DECISION AND ORDER
*1 This case involves the authority of the
defendants, the Commissioners of the
Massachusetts Highway Department ("MHD"), to
issue certain bid specifications for work on the
Central Artery/Third Harbor Tunnel Project
("Project"). The plaintiff, Utility Contractors
Association of New England, Inc. ("UCANE"),
seeks invalidation of a bid specification issued by
MHD which includes a provision requiring all
successful bidders, including contractors and
subcontractors, to execute a project labor agreement
as a condition of the bid award ("Project Labor
Agreement").

UCANE asserts that MHD lacks authority under
Massachusetts law to require the Project Labor
Agreement and attacks the bid specification on
numerous statutory and constitutional grounds.
The parties have filed cross motions for summary
judgment. For the reasons set forth below,
UCANE's motion for summary judgment is
*DENIED,* and MHD's cross motion for summary
judgment is *ALLOWED.*

BACKGROUND
I. Procedural History

In June 1990, UCANE commenced this action
seeking declaratory and injunctive relief against
MHD to prevent it from issuing bid specification
7.40. That bid specification requires successful
bidders for work on the Project to become
signatories to a project labor agreement negotiated
by Bechtel Corporation/Parsons Brinckerhoff
Quade & Douglas, Inc. ("BPB"), the construction
manager for the Project, with the Building and
Construction Trades Council of the Metropolitan
District and twenty-four individual affiliated local
unions engaged in the building and construction
trades in Eastern Massachusetts (collectively, the
"Unions"). A project labor agreement is generally
defined as a collective bargaining agreement
negotiated by either the owner or its general
contractor with unions to govern the terms and
conditions of employment of workers employed on
a particular project. On August 2, 1990, this court
(Todd, J.) denied UCANE's request for a
preliminary injunction.

UCANE appealed the denial of its motion for a
preliminary injunction. While the appeal was
pending, the United States Court of Appeals for the
First Circuit addressed federal issues involving a
virtually identical bid specification issued by the
Massachusetts Water Resources Authority
("MWRA"). That bid specification required
contractors working on the Boston Harbor Cleanup
Project to execute a project labor agreement
negotiated by MWRA's project manager. On
October 24, 1990, the First Circuit held that the
MWRA's bid specification was preempted by the
National Labor Relations Act and enjoined its use.
*Associated Builders and Contractors of
Massachusetts/Rhode Island, Inc. v. Massachusetts
Water Resources Authority,* 935 F.2d 345, 360 (1st
Cir.1991).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 2

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

In reaction to the decision of the First Circuit, MHD announced that it would not issue the disputed bid specification. The Appeals Court then dismissed as moot UCANE's appeal. *Utility Contractors Association of New England, Inc. v. Department of Public Works,* 29 Mass.App.Ct. 726, 729 (1991). On September 18, 1992, MHD made execution of the project labor agreement voluntary for contractors on the Project, pending United States Supreme Court review of the First Circuit's decision.

**\*2** The United States Supreme Court reversed the First Circuit's decision on the MWRA bid specification, holding that the bid specification did not violate federal labor law. *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.,* 507 U.S. 218, 233 (1993). MHD responded by re-issuing the bid specification requiring compliance with the Project Labor Agreement.

II. Undisputed Facts

The following material, undisputed facts are gleaned from the affidavits and other materials filed in connection with the cross motions for summary judgment:

The Central Artery/Third Harbor Tunnel Project is designed to increase capacity, reduce congestion, and improve traffic flow and safety. This multi-year, multi-billion dollar Project is one of the most ambitious and complicated construction projects ever undertaken in this country, and it is the largest public works project ever attempted in New England. The Project involves major improvements to, and expansion of, two interconnecting interstate highway systems, construction of a new eight-to-ten-lane underground expressway, and construction of a new four-lane tunnel under Boston Harbor connecting the Massachusetts Turnpike and the Logan Airport road system. Adding to its complexity is the fact that three-quarters of the construction on the Project will take place underground in densely populated, urban areas. Construction will also take place in or

around already congested existing mass transit systems that cannot be taken out of service for any extended period of time during the construction.

The major features of the Project are (a) an intricate new highway interchange where Interstate 93 (the "Central Artery") and Interstate 90 (the "Massachusetts Turnpike") converge, (b) a 3.3 mile widened and depressed Central Artery running through downtown Boston to replace the existing elevated Central Artery highway structure, and (c) a 3.7 mile extension of the Massachusetts Turnpike from the Central Artery to Boston Harbor, including a new Third Harbor Tunnel to Logan International Airport ("Logan") and a new highway interchange at Logan running north from the tunnel to Route 1A.

Traffic congestion in Greater Boston has reached unacceptable levels. Studies performed for MHD revealed that the traffic problem in Greater Boston was so severe that it threatened the region's continued economic growth and ultimately would result in widespread traffic congestion for up to fourteen hours per day. Without the Project, the Central Artery, which now carries double the traffic volume for which it was designed, would have had to be reconstructed soon. The Project's construction schedule recognizes the urgency of that situation. Successful completion of the Project will enhance the quality of life in the metropolitan area and is important to the continued vitality of Boston as a major center of commerce.

**\*3** MHD currently estimates that the Project will take more than eight years to construct Project and that it will require the awarding of at least forty-five general construction contracts and the execution of an indeterminate number of subcontracts, assumed in excess of one hundred. MHD estimates the Project will require the employment of thousands of construction workers.

Based on the unprecedented complexity and scope of the Project, BPB's plans include numerous measures designed to reduce disruption and public inconvenience. Despite these measures, the Project's construction will have a discernible impact on existing transportation systems, traffic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 3

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

conditions, and vehicular and pedestrian access to areas in and around downtown Boston. Therefore, BPB developed a "fast track" schedule for the Project that involves construction of some portions of the Project while other portions are still under design. This approach will keep construction moving as fast as possible, thereby limiting the negative affect of construction on the community and the impact of inflation on costs.

The Third Harbor Tunnel opened for certain commercial vehicles on December 15, 1995. Based upon current estimates, the rest of the Project will not be completed before the year 2004.

UCANE is a non-profit corporation that represents union and non-union contractors, who are principally engaged in public construction for the Commonwealth of Massachusetts and other New England states, as well as materialmen, suppliers and associate members who assist those engaged in public construction in Massachusetts. Some UCANE members are pre-qualified to work on public construction projects for the Commonwealth of Massachusetts and MHD. UCANE members are presently performing contracts on the Central Artery/Third Harbor Tunnel Project and are currently bidding on the Project.

MHD is a body politic of the Commonwealth of Massachusetts whose duties and responsibilities are carried out by a Commission. The members of the Commission are appointed by the Governor. MHD's responsibilities include pre-qualifying contractors who intend to bid on public works projects and advertising and awarding contracts for the construction of highways and related public works projects. On or about February, 1984, MHD invited interested parties to submit Expressions of Interest and a Statement of Qualifications for the purpose of serving as the Prime Construction Management Consultant ("PCMC") on the first phase of the Project. The PCMC chosen for phase one would be given primary responsibility for managing, coordinating and reviewing basic Project design contracts. If the PCMC's performance were deemed satisfactory during the first phase, MHD promised to negotiate the second phase with the same consultant. In the second phase, the PCMC's duties expand to include the management, technical coordination, and responsibility for total Project review and evaluation of the proposed final design contracts for the Project.

\*4 BPB is a joint venture of Bechtel Corporation and Parsons Brinckerhoff, Quade & Douglas, Inc. Bechtel Corporation's recent experience includes construction management responsibility on the Bay Area Rapid Transportation System ("BART") in San Francisco, the Washington Metropolitan Area Transit Authority subway system in Washington, D.C., and the J.F.K. International Airport Expansion project in New York. Parsons Brinckerhoff's experience includes work on the Atlanta Subway System and the Seattle Bus Tunnel Project.

On December 3, 1985, following a competitive procurement process, MHD retained BPB to serve as the PCMC on the Project. Through a series of successive contracts, MHD has given BPB overall management responsibility for the planning, design, administration, and construction of the Project. Included within its construction management responsibilities is the duty to advise the MHD on labor relations issues and problems associated with the Project and to implement policies and decisions that are calculated to enhance the timely, efficient, and economical completion of the Project. The contracts between MHD and BPB provide that BPB, as the PCMC, shall act as the MHD's representative and/or advisor at MHD's request and subject to MHD's general direction.

Union contractors are employers in the construction industry who recognize a craft or trade union as the exclusive bargaining representative of a majority of their employees in a particular trade or craft. Non-union or merit shop contractors do not recognize craft or trade unions.

The inherent complexity of the likely labor situation caused MHD to have BPB analyze the labor environment of the Project and make a recommendation about how best to maintain labor harmony on the Project. BPB considered it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 4

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

essential to have uniform, efficient ways of handling jurisdictional assignments and jurisdictional disputes arising on the Project. On projects of this size and scope, it is common for different construction trades unions to claim exclusive jurisdiction over the same type of work. Disputes resulting from these conflicting claims can lead to work stoppages or other delays. BPB recommended to MHD that BPB negotiate a project labor agreement with the Building and Construction Trades Council of the Boston Metropolitan District and the Building and Construction Trades Department of the AFL-CIO (collectively, "the Union"). The Building and Construction Trades Council of the Boston Metropolitan District is a labor organization affiliated with the Building and Construction Trades Department of the AFL-CIO.
Chief among MHD's reasons for approving negotiation of a project labor agreement was the promise of an omnibus "no-strike" clause that would virtually eliminate the risk of delay due to labor disputes. Having procedures for resolving jurisdictional and other types of labor-management disputes was also important to MHD because they too minimize the potential for delay and disruption. In addition, MHD viewed the standardization of work rules and practices as extremely beneficial due to the flexibility gained by standardization and cost savings estimated by BPB.

**\*5** In October and November of 1989, BPB negotiated with the Union. These negotiations closely followed the conclusion of negotiations between Kaiser Engineers, Inc. and the Union for a similar agreement on the Boston Harbor Cleanup project, and many of the provisions of these two agreements are identical, with different provisions negotiated where necessary to accommodate the special needs and requirements of each particular project. The proposed Project Labor Agreement was subject to approval by MHD. The Agreement states, in part, that it is the policy of MHD that all Project construction shall only be contracted to those contractors who agree to execute and be bound by the Project Labor Agreement. In a memorandum dated October 5, 1990, William Twomey, then Director of the Project, recommended that MHD's Board of Commissioners

incorporate the Project Labor Agreement into construction specifications for the Project. On October 10, 1990, MHD approved the Project Labor Agreement.

The Project Labor Agreement requires, among other things, that all Project contractors and subcontractors recognize the Union as the exclusive collective bargaining representative for their craft employees working on facilities within the scope of the Project Labor Agreement, utilize union hiring halls as the primary source of labor, and contribute to labor-management health and welfare funds and pension plans. The agreement also includes a comprehensive no-strike clause; it specifically covers jurisdictional disputes and includes a mechanism for resolving these disputes. The agreement contains a section on wages and benefits, and it establishes a standard work day and includes specific provisions on overtime, shifts, holidays, and reporting pay.

MHD Commissioners authorized promulgation of a bid specification requiring all successful responsible and eligible bidders and their subcontractors to execute the Project Labor Agreement as a condition of a Project contract award, and such a specification was issued. MHD was concerned about potential strikes and resulting delays and the effect that conflicts among the various collective bargaining agreements could have on labor harmony. Added to this equation was the diversity, and resulting conflicts, that MHD believed could be expected from the differing practices of various non-union contractors on the Project.

In May, 1991, BPB, on behalf of the MHD, entered into an interim agreement with the Unions which suspended the disputed bid specification and allowed successful bidders to execute the Project Labor Agreement on a voluntary basis. Thereafter, MHD issued a revised bid specification. Then, in April of 1993, following the Supreme Court's opinion in *Building and Construction Trades Council of the Metropolitan District,* 507 U.S. at 218, MHD re-issued bid specification 7.40 (the "Bid Specification"). It provides, as follows:
    A collective bargaining agreement has been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

executed in conjunction with the CA/T project by and between Bechtel/Parsons Brinckerhoff (Management Consultant) and the Building and Construction Trades Council of the Metropolitan District and its affiliated local unions and the Building and Construction Trades Department, AFL-CIO and its affiliated international unions and their local unions. This labor agreement has been developed to promote labor harmony on the Project, and in the interests of such harmony, each successful bidder and any and all levels of subcontractors on condition of being awarded a contract or subcontract on or after March 24, 1993 agree to become signatory and be bound by the provisions of that collective bargaining agreement in the same manner as any other provisions of this contract. Notwithstanding the preceding sentence, no such contractor or subcontractor shall be required to sign or comply with, the collective bargaining agreement prior to May 24, 1993.

*6 To date, fifty-five construction contracts worth $1,840,047,269 have been awarded on the Project. A total of two hundred ninety-six bids were received with respect to those fifty-five contracts, including thirteen bids by non-union contractors on ten of those contracts. With respect to only two of those thirteen bids, however, was the non-union contractor actually the low bidder (and one of those two withdrew its bid). [FN2] There are at least twenty-eight non-union subcontractors working on the Project. These subcontractors did not have to directly submit a bid for Project work because they are subcontractors of a successful bidder, but they nonetheless had to agree to become bound by the terms of the Project Labor Agreement.

> FN2. Seventy-five per cent of Boston area construction is performed by unionized contractors. On other MHD road construction projects that have not been bid with a project labor agreement, unionized contractors have been the successful bidders for substantially all heavy highway work.

One of the most successful bidders on the Project

has been Modern Continental Construction Co., Inc. ("Modern"), a unionized member of UCANE. Modern, either individually or in joint venture with another contractor, has bid on twenty-nine contracts and has been successful on nine of them. Modern is the largest recipient of work on the Project, with combined contracts valued at $446,906,849. At least fifteen other UCANE members have received Project work as either a prime contractor or subcontractor, including three who were successful bidders for Project work.

During the period from December 5, 1990 to May 24, 1993, when there was no mandatory Project Labor Agreement in effect, non-union and union contractors who did not voluntarily sign the Project Labor Agreement performed work on the Project without disruption by unions. Prior to this Project, MHD had never required a contractor to execute a project labor agreement as a condition of the award of a public works contract.

DISCUSSION

Summary judgment shall be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). Where both parties have moved for summary judgment and "in essence there is no real dispute as to the salient facts or if only a question of law is involved," summary judgment shall be granted to the party entitled to judgment as a matter of law. *Cassesso,* 390 Mass. at 422.

That pre-hire project labor agreements on state public construction projects are permissible under federal law is settled. *Building and Construction Trades Council of the Metropolitan District,* 507 U.S. at 233. Federal law does not prohibit a state authority, such as MHD, acting in its proprietary capacity, from issuing bid specifications that require pre-hire project labor agreements providing for, among other things, union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls. *Id.* at 230.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                          Page 6

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

The United States Supreme Court addressed the validity of project labor agreements on public works projects under federal law only. This case represents the extension of that inquiry under the laws of Massachusetts. UCANE claims that MHD's actions were unlawful under a host of state statutory and constitutional provisions. UCANE does not, however, contend that, if MHD acted within the scope of properly delegated authority, its decision to require the Project Labor Agreement was arbitrary, capricious, or in bad faith.

I. Usurpation of Legislative Power

**\*7** UCANE alleges that MHD lacks statutory authority to require bidders to sign a project labor agreement. UCANE claims that, because there was no such authority, MHD, by promulgating the Bid Specification requiring adherence to the Project Labor Agreement, unconstitutionally usurped the legislative law-making function in violation of Article 30 of the Declaration of Rights of the Massachusetts Constitution. [FN3]

> FN3. Article 30 of the Declaration of Rights provides:
> In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.

MHD derives its power to require the Project Labor Agreement from G.L. c. 16, § 5(a) and G.L. c. 30, § 39 M. Chapter 16, § 5(a) is a general grant of authority to MHD "to approve all contracts, including specifications, made by the department, and any changes, alterations, amendments, or modifications thereof." The competitive bidding laws, with which MHD must comply, require awarding authorities, such as MHD, to award contracts to the "lowest responsible and eligible bidder ..." G.L. c. 30, § 39M. The phrase "lowest

responsible and eligible bidder," in turn, incorporates the requirement that the bidder be "able to furnish labor that can work in harmony with all other elements of labor employed or to be employed in the work." G.L. c. 30, § 39M(c). [FN4] Additionally, the statute provides that "the awarding authority may reject any and all bids if it is in the public interest to do so." G.L. c. 30, § 39M(a).

> FN4. G.L. c. 39M(c) provides, in part:
> The term "lowest responsible and eligible bidder' shall mean the bidder (1) whose bid is the lowest of those bidders possessing the skill, ability and integrity necessary for the faithful performance of the work; (2) who shall certify that he is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed in the work ...
> See also G.L. c. 149, § 44A(1).

The legislature thus has clearly expressed labor harmony and the public interest as a goal and objective for public works projects. The legislature also has granted the awarding authority power and discretion, taking the public interest into account, to determine bid specifications and to reject bids. Cf. *Modern Continental Construction Co., Inc. v. Massachusetts Port Authority,* 369 Mass. 825, 829 (1976) (agency's decision, based upon consideration of "labor harmony," not to award contract will not be overturned absent evidence of bad faith or arbitrary, capricious, or illegal action). [FN5]

> FN5. UCANE does not argue that there is no reasonable relation between the Project Labor Agreement and the purpose of labor harmony, or that the Project Labor Agreement is not conducive to labor harmony. Indeed, the record is replete with evidence that the Project Labor Agreement effectuates labor harmony and acts to promote the timely, efficient, and economical completion of the Project.
> To be sustained, agency action must be reasonably related to the purposes of the enabling legislation. *Worcester Sand &*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                 Page 7

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

*Gravel Co. v. Board of Fire Prevention Regulations,* 400 Mass 464, 466 (1987).

Powers granted by a legislature need not be expressly stated. Rather, they "include those necessarily or reasonably implied." *Grocery Manufacturers of America, Inc. v. Department of Public Health,* 379 Mass. 70, 75 (1979); *Commonwealth v. Cerveny,* 373 Mass. 345, 354 (1977) ("An agency's powers are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words."). [FN6] Although the governing statutory provisions do not use the term "project labor agreement," the necessary and inevitable implication of those provisions is that MHD has discretion to effectuate public interest and labor harmony through issuance of bid specifications requiring a project labor agreement. Cf. *Massachusetts Hospital Ass'n, Inc. v. Department of Medical Security,* 412 Mass. 340, 342 (1992). Indeed, there are a plethora of requirements imposed on public construction projects which do not have explicit statutory authorization, but that are within the purview of a contracting authority's general powers. [FN7] See generally *Gil-Bern Construction Corp. v. Brockton,* 353 Mass. 503, 504-505 (1968) (bidders required to submit network analysis of construction progress schedule with proposal); *Builders Realty Corp. of Massachusetts v. Newton,* 348 Mass. 65, 67 (1964)(no reason awarding authority could not require that a duplicate of bid be filed with city comptroller); *Peabody Construction. Co., Inc. v. Boston,* 28 Mass.App.Ct. 100, 104 (1989)(set-aside requirement for qualified minority and women business enterprises). Non-statutory bid requirements are within the discretion of the awarding authority to impose and to enforce. *Id.* See also *Gil-Bern Construction Corp.,* 353 Mass. at 505 ("Minor or formal deviations from [bid specification] requirements do not compel rejection of the bid ... although the bid may be rejected if the awarding authority so chooses.").

> FN7. According to MHD, the specifications required for the hundreds of contracts already awarded on the Central Artery Project run into the tens of thousands of pages.

**\*8** The Bid Specification, reasonably related as it is to the statutory purposes, was within MHD's discretion to issue. The legislature has chosen not to micro-manage bid specifications. Nothing in the statutory scheme suggests that the legislature reserved to itself the right to determine, on a project by project basis, the desirability of a project labor agreement. Consequently, by issuing the Bid Specification, MHD did not usurp legislative prerogative in violation of Article 30 of the Massachusetts Declaration of Rights.

II. Delegation of Power

If MHD did not usurp legislative power, then, according to UCANE, the legislature improperly delegated power to MHD. Although the legislature may not delegate its general power to make laws, *Opinion of the Justices,* 393 Mass. 1209, 1219 (1984), it may adopt a policy and "delegate to a board or officer the working out of the details of that policy." *Massachusetts Bay Transportation Authority v. Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 544 (1965) (citations omitted) (constitutionally adequate statutory guidance to public authority for its decision in the making of contracts of assistance).

Whether a particular delegation of legislative power is proper is a matter of degree. *Construction Industries of Massachusetts v. Commissioner of Labor and Industries,* 406 Mass. 162, 171 (1989). In order to make that determination, the following three-part analysis is applied: "(1) Did the legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the [MHD] is to develop the standards, sufficient guidance to enable [it] to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?" *Id.,* quoting *Chelmsford Trailer Park, Inc. v. Chelmsford,* 393 Mass. 186, 190 (1984).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

*Policy*

The competitive bidding laws explicitly pronounce the fundamental legislative policy decision that "public interest" and "labor harmony" are essential to public construction projects and relevant to determining bidder eligibility. These are not hollow directives. The legislature did not delegate to the awarding authority the power to determine policy; rather, it articulated a policy and left it to the awarding authority to implement that policy.

*Standards*

Where "the policy and the purpose of the legislature are clearly expressed, the absence of detailed standards in the legislation itself will not necessarily render the legislation invalid as an unlawful delegation of legislative authority." *Chelmsford Trailer Park, Inc.,* 393 Mass. at 190. In deriving standards an agency may look both to the statute's express provisions as well as to its reasonable implications. "The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required." *Id.,* quoting *Massachusetts Bay Transportation Authority,* 348 Mass. at 544.

*9 Even though there are no explicit statutory standards with respect to project labor agreements, the legislative policy articulated in sections 39M(a) and 39M(c) of the competitive bidding laws furnishes in itself a large measure of guidance. It has already been established that, in securing labor for a project, the awarding authority may take into account the labor harmony policy. [FN8] *Modern Continental Construction Co., Inc.,* 369 Mass. at 828 (labor harmony is an appropriate factor in determining whether to accept bid). The standards implicit in the competitive bidding law policy of "public interest" and "labor harmony" are sufficient to ensure that MHD would not be permitted to act, under the guise of labor harmony, to accomplish something that was not, in fact, rationally related to promotion of labor harmony. Faced with the "public interest" and "labor harmony" provisions, a court can determine whether the MHD has been arbitrary or capricious or whether it has acted in bad

faith. See *Chelmsford,* 393 Mass. at 190.

FN8. In determining bidder eligibility, a public awarding authority, such as MHD, may properly take into account specifications not required by the bidding statutes. E.g., *Peabody Construction Co., Inc. v. Boston,* 28 Mass.App.Ct. 100, 104 (1989) (awarding authority has discretion to accept or reject bidder based on compliance with non-statutory bid specification set by awarding authority); *Builders Realty Corp. of Mass. v. Newton,* 348 Mass. 64, 67 (1964) (awarding authority may reject lowest responsible bid that does not conform to awarding authority's specifications).

A project labor agreement may not be appropriate for every public works project, and MHD does not contend that it may require one capriciously without taking into account the size, complexity, timing, or anticipated duration of the particular project. "It would have been difficult, if not impossible," for the legislature to have specified in the bidding statutes under what precise circumstances such an agreement may be required. *Burnham v. Board of Appeal of Gloucester,* 333 Mass. 114, 118 (1955) (standards adequate where only express requirement was to consider "the effects upon the neighborhood and City at large"). [FN9] The principles for guiding the awarding authority have been stated "with as much certainty as the nature of the subject matter reasonably permits." *Building Comm'r of Medford v. C. & H. Co.,* 319 Mass. 273, 281- 282 (1946) (citations omitted). In determining whether a bidder is qualified, an awarding authority may consider the credibility of threats to labor harmony as well as the consequences of delay. *Modern Continental Construction Co., Inc.,* 369 Mass. at 828-829. The greater the scope of a public works project in size and complexity, the greater the need for correspondingly tighter measures to ensure labor harmony, such as standardized working terms and conditions. As the record establishes, the Project involves thousands of manual employees in two dozen trades working side by side, and as many as ninety-six separate local labor agreements among

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                    Page 9

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

the various building and trades unions in the Boston area will expire and be due for renewal and renegotiation over the life of the Project. The potential for labor strife is significant. Moreover, due to the interdependencies and integration of different work elements, a delay on even a small section of the construction could have a costly domino effect. Not even UCANE contends that MHD's decision to require, on this Project, a project labor agreement that supersedes and reconciles conflicting provisions of local contracts was irrational, arbitrary, or capricious. [FN10]

> FN9. See generally *Capuano, Inc. v. School Building Committee,* 330 Mass. 494, 496 (1953) (determination of who is lowest responsible and eligible bidder delegated to building committee and, in the absence of illegal or arbitrary action, that decision cannot be controverted); *Slocum v. Medford,* 302 Mass. 251, 254 (1939) (duty of the awarding authority to exercise, in good faith, "deliberative judgment as to which bidder would best serve the public interest"); *Stretch v. Timilty,* 309 Mass. 267, 270-271 (1941) ("choice as to the means to be employed to correct unfortunate conditions in the [police] department involves the exercise of discretion ... committed by statute to the police commissioner); *Liggett Drug Co., Inc. v. License Commissioners,* 296 Mass. 41, 50 (1936) (specification of "public good" as standard for measuring number of licenses is adequate).

> FN10. During one hearing, in response to the court's confirming that UCANE is not claiming that it was arbitrary, on the facts of this case, for MHD to have decided to require a project labor agreement, counsel for UCANE responded: "absolutely not."

*Safeguards*

**\*10** Procedures for judicial review are necessary to guarantee that MHD acted in accordance with the standards and policy adopted by the legislature.

*Risk Management Foundation of the Harvard Medical Institutions, Inc. v. Commissioner of Insurance,* 407 Mass. 498, 506 (1990). Bidders and potential bidders are so protected.

UCANE complains that the Project Labor Agreement forecloses the right of contractors to avail themselves of judicial review because it requires compulsory arbitration of disputes. Nothing in the Project Labor Agreement, however, forecloses UCANE from judicial review of whether MHD's decision to require a project labor agreement as part of the bid specifications is beyond the authority of the MHD, or whether, in the circumstances of a particular project, requiring a project labor agreement would be arbitrary or capricious. Bidders have standing to challenge in court the compliance of an awarding authority with the requirements of the bidding statutes. *Modern Continental Construction Co., Inc. v. Lowell,* 391 Mass. 829, 835-836 (1984). Additionally, under the provisions of G.L. c. 149, § 44H, the Commissioner of the Department of Labor and Industries has the power to investigate the facts to determine if there has been a violation of G.L. c. 149, §§ 44A through 44H, or of G.L. c. 30, § 39M and, if a violation is found, to institute and prosecute proceedings in the Superior Court to restrain an award of a contract. *Doric Building Associates v. Department of Labor and Industries,* 27 Mass.App.Ct. 1175, 1177 (1989). These adjudicative and administrative review processes provide the requisite safeguards to ensure that the MHD does not abuse its discretion.

Accordingly, the bidding statutes do not impermissibly delegate legislative power to an awarding authority.

III. Delegation to Private Party

UCANE alleges next that MHD unlawfully delegated legislative authority to BPB by authorizing BPB to negotiate the Project Labor Agreement on its behalf. Although BPB played a major role in negotiating the Project Labor Agreement, MHD did not transfer its authority to BPB. MHD retained final authority to approve the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

Project Labor Agreement and to implement it through the bid specification process. It was MHD, not BPB, that issued the Bid Specification.

*Corning Glass Works v. Ann & Hope, Inc. of Danvers,* 363 Mass. 409, 424 (1973), upon which UCANE relies, does not require a contrary result. Central to the decision in *Corning Glass Works* that a price fixing statute improperly delegated legislative power to private parties were the facts that no public official participated in the price-setting process, nor was there any policy or standard to govern the setting of prices by manufacturers, nor opportunity for judicial review of the prices fixed by the manufacturer. *Id.* at 423. MHD, by contrast, retained sole authority to approve the Project Labor Agreement. Moreover, MHD, not a private party, issued the Bid Specification. There is nothing improper with MHD exercising its power to set bid specifications by reference to the Project Labor Agreement negotiated by BPB. See *Construction Industries of Massachusetts v. Commissioner of Labor and Industries,* 406 Mass. at 172-173 (no improper delegation to private parties where substantive measures were established by reference to private bargaining agreement). Furthermore, there are proper safeguards to prevent the arbitrary exercise of any delegated authority. *Id.*

*11 Thus, MHD did not improperly delegate its power to BPD.

IV. Chapter 150E

General Laws chapter 150E controls collective bargaining between a public employer and public employees. UCANE contends that this statute restricts MHD from negotiating or authorizing negotiation of a collective bargaining agreement. Because the workers on this Project are private, not public, employees, however, chapter 150E is inapplicable.

Chapter 150E is a statute of limited applicability, the scope of which is controlled by the definitions contained in the statute itself. *Massachusetts Probation Ass'n v. Commissioner of Administration,*

370 Mass. 651, 658 (1976). "Public employee" is defined to include only those employees who are employed by a "public employer." [FN11] Chapter 150E does not apply to private companies or to workers employed in the private sector.

> FN11. G.L. c. 150E, § 1 defines "public employer" as:
> the Commonwealth acting through the commissioner of administration, or any county, city, town, district, or other political subdivision acting through its chief executive officer, and any individual who is designated to represent one of these employers and act in its interest in dealing with public employees....

Whether or not BPB was acting as an agent of the MHD in negotiating the Project Labor Agreement is, therefore, not material. [FN12] The workers on the Project, who are the subject of the Project Labor Agreement, are employed by private companies, not by the MHD. UCANE does not dispute that Project workers will be employed by private contractors, not by MHD, and that workers will not receive government paychecks, will not be enrolled in the Commonwealth's retirement system, and will not be subject to the labor contracts between MHD and its own employees. Indeed, UCANE concedes that Project workers are employed by private contractors, repeatedly referring to the workers as "private sector employees." The Project Labor Agreement does not transform BPB into a "public employer." While MHD obviously, under certain conditions, is a "public employer," it did not function as a "public employer" in connection with the Project Labor Agreement. In that capacity, it acted like a private buyer of services, conditioning its purchasing upon the "sellers" agreeing to a project labor agreement. See *Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority,* 935 F.2d at 355, n. 17 ("[T]he relationship between the construction workers and the MWRA is a contracting, not an employment, relationship."), reversed on other grounds sub nom. *Building and Construction Trades Council of the Metropolitan District,* 507 U.S. at 231 ("the State, in any event, is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

acting not as an employer but as a purchaser" when it issues a bid specification requiring a project labor agreement). Chapter 150E does not govern a collective bargaining agreement that, by its express terms, does not apply to employees of MHD itself.

> FN12. The Contract for State Highway Work between MHD and BPB states that "the Management Consultant shall be deemed to be acting as the Department's agent in its dealings with third parties in connection with this Agreement," and that "[t]he Management Consultant shall act as the Department's representative and/or advisor at its request and subject to its general direction in accordance with this agreement." However, it also provides that "the Management Consultant shall have no real or implied authority to bind the Department in contract or by declaration or admission...." The title page of the Project Labor Agreement states that it is "By and Between Bechtel/Parsons Brinckerhoff on behalf of the Massachusetts Department of Public Works." On the other hand, Article II, Section 4 of that Agreement states that it "shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party." MHD is not a signatory. Moreover, Article II, Section 7 of the Project Labor Agreement specifies that "[n]one of the provisions of the Agreement shall apply to the Massachusetts Department of Public Works."

V. The Prevailing Wage Rate Law

The Prevailing Wage Rate Law, G.L. c. 149, §§ 26-44, establishes minimum wage and benefit levels to be paid on state construction projects. UCANE complains that the Project Labor Agreement violates that law in several ways.

First, UCANE argues that MHD has usurped the function of the Commissioner of Labor and

Industries to determine wages on public works projects. Where wage rates have been established by local collective bargaining agreements in the private construction industry between organized labor and employers, the Commissioner of Labor and Industries sets the prevailing rates based on those rates. [FN13] See *Construction Industries of Massachusetts*, 406 Mass. at 173. Contrary to the plaintiff's claims, this statutory scheme supports the use of a Project Labor Agreement, such as the one required in this case. The Project Labor Agreement does not intrude on the Commissioner's domain; rather, it is just the type of agreement the statute envisions the Commissioner will use to set wage rates. *Id.* The Project Labor Agreement incorporates the same wages that would otherwise be set by the Commissioner.

> FN13. G.L. c. 149, § 26 provides:
> The rate per hour of the wages paid to ... laborers in the construction of public works shall be not less than the rate or rates of wages to be determined by the commissioner as herein provided; provided ... that if, in any of the towns where the works are to be constructed, a wage rate or wage rates have been established in certain trades and occupations by collective agreements or understandings in the private construction industry between organized labor and employees, the rate or rates to be paid on said works shall be not less than the rates so established....

**\*12** Next, UCANE argues that the Project Labor Agreement creates an illegal union preference by requiring successful bidders to use union hiring halls as the primary source of labor. The Prevailing Wage Rate Law creates preferences only in favor of citizens of the Commonwealth, United States citizens, and veterans for work on public works projects. G.L. c. 149, § 26. Requiring the utilization of union hiring halls does not create a union preference. Unions have an obligation under federal law to make employee referrals without regard to a worker's union status. *Local 357, International Brotherhood of Teamsters,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

*Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board,* 365 U.S. 667, 675-76 (1961) (union hiring hall provisions not unlawful under federal law unless they in fact result in discriminations against non-union workers). UCANE has made no allegations that any workers were denied referrals because they were not unionized. Moreover, article III, section 3 of the Project Labor Agreement prevents the union hiring hall referral system from discriminating against non-union workers:

> Such job referral system must be operated in a non-discriminatory manner and in full compliance with federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or other aspects or obligations of union membership, policies or requirements....

If a union hiring hall is unable to supply qualified labor within forty-eight hours, the contractor may secure labor from any source, and the contractor retains the right to determine the competency of the referred labor and to "reject any applicant referred by the local union...." The Agreement is further supplemented by an employment review board to handle any discrimination claims that might arise out of the operation of the union hiring halls. The Project Labor Agreement not only remains neutral with respect to hiring union or non-union workers, but it also takes affirmative steps to ensure that labor referrals are made on a non-discriminatory basis.

Finally, UCANE contends that the Project Labor Agreement upsets the statutory arrangement for non-union workers to receive cash equivalents in lieu of participation in union health and pension plans. [FN14] G.L. c. 149, § 27. UCANE lacks standing to assert this claim. "To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury." *Slama v. Attorney General,* 384 Mass. 620, 624 (1981). UCANE or its individual members must be able to demonstrate that they have (or will) suffer a legally cognizable injury by virtue of G.L. c. 149, § 17. *Animal Legal Defense Fund, Inc., v. Fisheries*

*and Wildlife Board,* 416 Mass. 635, 638 (1993). UCANE is not an impacted employee or an association of employees; rather, it is an association of contractors, and neither it nor any of its members has suffered any cognizable injury under G.L. c. 149, § 17. See *Animal Legal Defense Fund, Inc.,* 416 Mass. at 638. Furthermore, it is "neither difficult nor impossible" for an allegedly aggrieved worker to assert a claim. *Slama,* 384 Mass. at 624.

> FN14. Employers' payments to health and welfare plans, pension plans, and other supplemental benefits under collective bargaining agreements are included in the prevailing rate established by the Commissioner of Labor and Industries. G.L. c. 149, § 26. The Project Labor Agreement does not change this statutory arrangement. Under the Prevailing Wage Rate law, an employee is entitled to an equivalent payment only when his employer does not make payments to health and welfare plans, pension plans, and other supplemental benefits. G.L. c. 149, § 27. Under the Project Labor Agreement employers agree to make payments to such supplemental benefit plans.

**\*13** For all these reasons, the Bid Specification does not violate the Prevailing Wage Rate Law.

VI. Fair Competitive Bid Law

UCANE also alleges violations of the bidding laws on the grounds that the Project Labor Agreement is a "union-only requirement." G.L. c. 30, § 39M would bar the automatic exclusion of any bidder on the sole ground that the bidder employs non-union workers. *Modern Continental Construction Co., Inc.,* 369 Mass. at 829. While UCANE is correct that "unionism" may not be a pre-requisite to eligibility, its factual premise is wrong.

As noted above, the Project Labor Agreement does not create a preference in favor of unionized workers. Indeed, the Agreement expressly forbids

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

discrimination in the union hall referral process on the basis of union affiliation or lack thereof. "So long as bidders have the opportunity to bid in the same way, on the same information, and to bear the same risk of rejection, fairness and equality are preserved." *Department of Labor and Industries v. Boston Water and Sewer Comm'n,* 18 Mass.App.Ct. 621, 626 (1984). The Project Labor Agreement applies equally to union and non-union contractors; both may bid on the Project on the same terms. No contractor is favored under the Project Labor Agreement, although a non-union contractor is required to be bound by the same terms and conditions under which a union contractor already operates. See *Department of Labor and Industries,* 18 Mass.App.Ct. at 626 ("equal footing" principle should not be confused with certain advantages that a bidder may possess in meeting the bid specifications on the Project). Neither is there a requirement that any contractor become unionized to participate in the Project. Contractors are required to sign the Project Labor Agreement to work on the Project, but the Project Labor Agreement has no application or force outside of this Project, and non-union contractors are free to operate on their own terms on any other jobs.

UCANE has offered no evidence to suggest that the Project Labor Agreement has barred a single contractor from submitting a bid. Both unionized and non-union contractors had bid on and received work on the Project. [FN15] One of the goals in the negotiations leading to the Project Labor Agreement was to ensure that non-union companies would have the right to bid on and obtain work on the Project. That one or more non-union contractors may have elected not to submit a bid does not establish that the Project Labor Agreement excludes them from the bidding process. See *Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority,* No. 90-10576 (D.Mass. Apr. 11, 1990), 1990 U.S. Dist. Lexis 9839, at *14-15 (substantially identical MWRA project labor agreement held not to violate the public bidding statutes of Massachusetts); *State ex rel. Associated Builders and Contractors Central Ohio Chapter v. Jefferson County Board of*

*Commissioners,* No. 94-J-49 (Ohio Ct.App. Aug. 31, 1995), 1995 Ohio App. Lexis 3899 (project labor agreement that does not require any contractor to become a "union" employer, that does not distinguish between entities employing union labor and those employing non-union labor, and that applies only to work on the project does not violate state's competitive bidding statutes), *app. dismissed,* 74 Ohio St.3d 1499, 659 N.E.2d 314 (1996); *New York State Chapter Inc. Associated General Contractors of America v. New York State Thruway Authority,* 620 N.Y.S.2d 855, 857 (App.Div.1994) (in absence of evidence that project labor agreement requirement precludes nonunion contractors from bidding on project, and where it was imposed for reasons which are in the public interest, requiring such an agreement does not violate state's competitive bidding statute), *leave to appeal granted,* 631 N.Y.S.2d 607 (1995). [FN16] But see *Tormee Construction, Inc. v. Mercer County Improvement Authority,* 143 N.J. 143, 669 A.2d 1369, No. A-55-95, slip. op. at 7 (N.J.Sup.Ct. Feb. 6, 1996) (specifications that required contractors to enter into a project labor agreement inconsistent with public bidding statutes where project labor was restricted to two unions). [FN17]

> FN15. As of September, 1995, 55 construction contracts have been let on the Project. A total of 296 bids were received with respect to those contracts, including 13 bids by non-union contractors on 10 of those contracts. Of those 13 non-union bids, only 2 were low bidders, and one of those was withdrawn. There are at least 28 non-union subcontractors working on the Project under the terms of the Project Labor Agreement. Unionized contractors perform 75% of the large construction work in the Boston area, and on other road construction projects that have been bid without a project labor agreement, unionized contractors have been the successful low bidders for substantially all heavy highway work. As contract size increases, so does the likelihood that the successful bidder will be a unionized contractor. The nature and size of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                 Page 14

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

contracts to be awarded makes it likely that the vast majority of Project construction will be performed by unionized contractors, with or without a project labor agreement.

FN16. See also *General Building Contractors v. Dormitory Authority,* 620 N.Y.S.2d 859, 860 (App.Div.1994), *leave to appeal granted,* 631 N.Y.S.2d 607 (1995); *Rondout Electric Inc. v. County of Orange,* No. 5975/95 (N.Y.Sup.Ct. Dec. 22, 1995).

FN17. The Court did not find that the bidding statues prohibited any type of project labor agreement no matter how complex the project. Indeed, it observed that a projects such as the Tappan Zee Bridge "exemplifies the exceptional circumstances that could justify recourse to a PLA." *Tormee Construction, Inc., supra,* slip op. at 8-9.

**\*14** If bidders find the conditions of the Project Labor Agreement unacceptable, they may choose not to bid on the Project and instead seize other opportunities created by the lack of available contractors due to the Central Artery Project. See *Building and Construction Trades Council of the Metropolitan District,* 507 U.S. at 231 ("Confronted with [a required project labor agreement], those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement.").

The Project Labor Agreement does not depart from the statutory scheme. Bids are still awarded without regard to the bidder's union status. "Statutory bidding procedures are designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally." *Phipps Products Corp. v. Massachusetts Bay Transportation Authority,* 387 Mass. 687,

691-692 (1982). The Supreme Judicial Court has already determined that labor harmony is an appropriate factor for an awarding authority to consider in determining whether it is the public interest to reject bids. *Modern Continental Construction Co.,* 369 Mass. at 829. In that case, the awarding authority on a public construction project voted to reject the lowest bid because it had received a letter from a local union threatening to picket if that bidder were selected for the project. *Id.* at 826. Addressing the competitive bid laws, the court found the rejection properly within the Authority's power and affirmed the trial court's ruling that "the requirement that a bidder be able to work 'in harmony' is 'not satisfied merely by a bidder's unilateral declaration that he can do so.' " *Id.* at 829. In awarding contracts, a public entity may determine for itself the "credibility of the threat [to labor harmony] and the consequences that would flow from its execution." *Id.* Like *Modern Continental,* this case does not present a situation in which, in the name of labor harmony, a public authority has limited bidding solely to unionized firms. *Id.* The mere fact that MHD considered labor harmony as a factor in determining whether it was in the public interest to reject a category of bids ---- those unwilling to agree to the Project Labor Agreement ---- as opposed to whether it was in the public interest to reject a particular bid is not a critical distinction.

In sum, the public bidding statutes do not prohibit any bid specification for a public construction project that requires successful bidders to execute a project labor agreement.

VII. Bidder Pre-qualification

UCANE lacks standing to challenge the Bid Specification on the grounds that the Project Labor Agreement violates the pre-qualification provisions of G.L. c. 29, § 8B and G.L. c. 149, § 44D. A bidder has standing to challenge the compliance of the awarding authority with the requirements of those sections. *Modern Continental Construction Co., Inc.,* 391 Mass. at 836 n. 9, *Quincy Ornamental Iron Works, Inc., v. Findlen,* 353 Mass. 85, 87 (1967)). UCANE is not a bidder on a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                Page 15

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

contract for work on the Project, and it does not allege that it or any of its members has suffered an injury under this section. See *Animal Legal Defense Fund, Inc.,* 416 Mass. at 638.

**\*15** Even if UCANE were to have standing, its claim would fail. Under G.L. c. 30, § 39M(c), bidders must become pre-qualified pursuant to G.L. c. 29, § 8B, which requires anyone bidding on a MHD project to file a statement of qualifications that is then used to determine the class and amount of work the bidder is qualified to perform. G.L. c. 149, § 44D sets forth a similar plan for pre-qualification of general bidders for construction work on public buildings. These statutes merely address a contractor's financial and operational ability to perform the work required. They do not excuse a bidder from meeting the published bid specifications. The pre-qualification requirement is but one of the elements of being deemed a "lowest responsible and eligible bidder" under G.L. c. 30, § 39M(c). The Bid Specification does not offend, but stands in addition to, the pre-qualification provisions.

VIII. Filed Sub-Bid Law

The Bid Specification is also consistent with the Filed Sub-Bid Law, G.L. c. 149, § 44F. Each sub-bidder is required to certify "that it is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work." G.L. c. 149, § 44F(2). For the same reasons that MHD may impose a Project Labor Agreement on all successful bidders in accord with the analogous labor harmony provision in G.L. c. 30, § 39M(c), it may do so with respect to sub-bidders.

*Rudolph v. City Manager,* 341 Mass. 31 (1960), relied on by UCANE, does not require a different result. The Court there stated that "the power of the awarding authority to require the rejection of a subbid, which is in all formal aspects satisfactory ... may be exercised only for lack of competence of the rejected bidder." *Id.* at 35. Where a sub-bid does not meet a project's bid specifications, however, it cannot be deemed satisfactory "in all formal

aspects."

IX. Due Process

UCANE challenges the constitutionality of the bid specification as violative of its members' interest "in the enjoyment of their life, liberty and property, including the right to engage in a lawful occupation." To invoke the protection of due process for "property," the alleged property interest "must rise to the level of an entitlement." *Opinion of the Justices,* 401 Mass. 1211, 1229 (1987). A person " 'must have more than a unilateral expectation of it.' " *Take Five Vending, Ltd. v. Provincetown,* 415 Mass. 741, 747 (1993), quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972).

The interest of a bidder does not amount to a constitutionally protected property interest; such a person does not have more than a "unilateral expectation" of receiving a public works contract. *Associated Builders & Contractors, Inc. v. Seward,* 965 F.2d 492, 299 (9th Cir.1992) ("wishful bidders" have no constitutionally protected property interest in public works project), *cert. denied,* 113 S.Ct. 1577 (1993); *Smith & Wesson, Div. of Bangor Punta Corp. v. United States,* 782 F.2d 1074, 1081 (1st Cir.1986) (" [a]ward procedures are not designed to establish private entitlements to public contracts but to produce the best possible contracts for the government). [FN18]

> FN18. *Three Rivers Cablevision, Inc. v. Pittsburgh,* 502 F.Supp. 1118, 1131 (W.D.Pa.1980), by contrast, recognizes "a property interest of relatively narrow dimension ... that interest [is] the right of the lowest responsible bidder *in full compliance with the specifications* to be awarded the contract once the [awarding authority] in fact decided to make an award." (emphasis supplied). UCANE asserts a right on behalf of bidders who do not want to comply with the specifications.

**\*16** Even if there were a constitutionally protected property right at stake, the Bid Specification would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 16

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

survive constitutional scrutiny. State action that does not implicate either fundamental rights or a suspect class is reviewed under the rational basis test, the lowest level of judicial scrutiny. *Take Five Vending, Ltd. v. Provincetown,* 415 Mass. at 748. The "right to ... pursue one's business" is not a fundamental right, *Commonwealth v. Henry's Drywall Co.,* 366 Mass. 539, 542 (1974), and no suspect class is involved here. See also *Marshfield Family Skateland, Inc. v. Marshfield,* 389 Mass. 436, 445 (1983).

The Bid Specification is rationally related to the promotion of general welfare, and the means chosen to effectuate MHD's purpose is reasonable. Cf. *Take Five Vending, Ltd. v. Provincetown,* 415 Mass. at 748; *Consolidated Cigar Corp. v. Department of Public Health,* 372 Mass. 844, 855 (1977). There is no evidence that the Bid Specification, in light of the specific circumstances of this particular project, is arbitrary or irrational. The Project is one of unprecedented complexity and scope requiring the participation and coordination of thousands of construction workers employed by scores of different employers. "There is no reason to expect" the unique features of the construction industry, which have led to authorizing the use of project labor agreements, "to depend upon the public or private nature of the entity purchasing contacting services.... There is no question but that [MHD] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Building and Construction Trades Council of the Metropolitan District,* 508 U.S. at 232. The Project Labor Agreement is a rational way to achieve that goal. Moreover, the Bid Specification operates equally upon all persons who wish to receive contracts to do work on the Project. The bidding process is equally open to union and non-union contractors and subcontractors. There is no arbitrary discrimination between different classes of citizens. *Zayre Corp. v. Attorney General,* 372 Mass. 423, 445 (1977). Under these circumstances, the Bid Specification easily passes the rational basis test. See *Minnesota Chapter of Associated Builders and Contractors, Inc. v. St. Louis,* 825 F.Supp. 238, 244 (D.Minn.1993) (poor

likelihood of success on merits of claim that requiring project labor agreement violates substantive due process).

X. Massachusetts Civil Rights Act

The Massachusetts Civil Rights Act protects against "any person or persons, whether or not acting under color of law [who] interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the Constitution or laws of the Commonwealth." G.L. c. 12, § 11H. UCANE contends that MHD violated this statute by coercing bidders into signing the Project Labor Agreement as a condition to receiving a contract for work on the Project.

\*17 This argument attempts to place under the protective umbrella of the Civil Rights Act the statutory and constitutional claims made by UCANE that this court already has rejected. Furthermore, the record gives rise to no inference that MHD engaged in threatening, intimidating, or coercive behavior within the meaning of the Civil Rights Act.

A "direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." *Longval v. Commissioner of Correction,* 404 Mass. 325, 333 (1989). See also *Nicholas B. v. School Committee of Worcester,* 412 Mass. 20, 24 (1992); *Layne v. Superintendent,* 406 Mass. 156, 158 (1989) ; *Pheasant Ridge Associates Ltd. Partnership v. Burlington,* 399 Mass. 771, 781, (1987). The Bid Specification simply involves direct action against the members of UCANE, which, "by itself," did not amount to a violation of the Civil Rights Act. UCANE does not allege "direct action that also includes threats against, or intimidation or coercion of, a particular individual or individuals." *Planned Parenthood League v. Blake,* 417 Mass. 467, 473 (1994). Only under such circumstances can liability under the Civil Rights Act be established, and then only if such threats, intimidation, or coercion interfered with that individual's exercise or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 17

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

enjoyment of rights secured by law. *Id.* However the words "threats, intimidation, or coercion" are defined, those words are not elastic enough to encompass including a non-statutory requirement in a bid specification for a public works contract. *Id.* at 474. *Utility Contractors Association of New England Inc.,* 29 Mass.App.Ct. at 732 (MHD's announced bid specification "does not in itself demonstrate threatening, intimidating, or coercive activity within the meaning of the MCRA") (dictum). Compare *Bally v. Northeastern University,* 403 Mass. 713, 719-20 (no violation of the Civil Rights Act where student was excluded from intercollegiate sports for refusing to take urinalysis test without individualized threat or threat of serious harm) with *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 95 (1987) (potential threats to the physical safety of the audience and symphony players). Thus, MHD did not violate the Civil Rights Act by issuing the Bid Specification.

XI. Administrative Procedures Act

UCANE's final contention is that MHD has adopted a regulation without a public hearing in violation of the Administrative Procedures Act, G.L. c. 30A, § 2. General Laws chapter 30A, § 1(5) defines a "regulation" as a "requirement of general application." [FN19] Bid specifications generally are highly specific in application to a single project; although some specifications may be the same or repeated from project to project, MHD sets its specifications on each project separately, tailoring them to the needs of that project. The Bid Specification at issue is no different. It applies only to the Project and not to every project in which MHD is the awarding authority. The Bid Specification is not a "regulation" for the purposes of G.L. c. 30A, § 1(5). *Construction Industries,* 406 Mass. at 170 (wage rates on specific projects, rather than industry wide, not "regulations" under G.L. c. 30A, § 1(5)); *Associated Industries of Massachusetts v. Commissioner of Insurance,* 356 Mass. 279, 284 (1969) (approval of rates does not constitute regulations of general application). Consequently, the requirements of the Administrative Procedures Act do not apply. [FN20]

FN19. G.L. c. 30A, § 1(5) in its entirety reads:
'Regulation' includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the enforce or administered by it, but does not include (a) advisory rulings issued under section eight; or (b) regulations concerning only the internal management or discipline of the adopting agency or any other agency, and not substantially affecting the rights of or the procedures available to the public or that portion of the public affected by the agency's activities; or (d) regulations relating to the use of public works, including streets and highways, when the substance of such regulation is indicated to the public by means of signs or signals; or (e) decisions issued in adjudicatory proceedings.

FN20. UCANE did receive notice of the proposed Project Labor Agreement and, prior to issuance of the Bid Specification, UCANE met with MHD to discuss its opposition to the Project Labor Agreement.

CONCLUSION
*18 MHD had the authority to issue the Bid Specification. It exercised its authority consistent with the laws and constitution of the Commonwealth. [FN21]

FN21. It is not necessary to rule upon the additional argument made by amicus curiae Building and Construction Trades Council of the Metropolitan District, AFL-CIO that a blanket state law prohibition upon the use of project labor agreements on public construction projects would be preempted by the National Labor Relations Act since this court rejects UCANE's arguments that Massachusetts law contains such a per se prohibition. See *Chamber of Commerce v. Reich,* ---

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

**(Cite as: 1996 WL 106983 (Mass.Super.))**

Page 18

F.3d ---, No. 95- 5242, slip. op. at 27-28 (D.C.Cir. Feb. 2, 1996).

ORDER

For the reasons set forth above, the plaintiff's Motion for Summary Judgment is *DENIED,* and the defendant's Motion for Summary Judgment is *GRANTED.*

Not Reported in N.E.2d, 5 Mass.L.Rptr. 17, 1996 WL 106983 (Mass.Super.), 153 L.R.R.M. (BNA) 2297

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Central Artery (I-93)/Tunnel (I-90)
Project Labor Agreement

Agreement

This Project Labor Agreement (hereinafter, the "Agreement") is entered into this, _____ day of _____, 1989 by and between Bechtel/Parsons Brinckerhoff its successors or assigns, and the Building and Construction Trades Department, AFL-CIO (hereinafter, the "Department"), on behalf of its affiliated Local Unions, each acting in its own behalf and on behalf of its respective affiliates and members (hereinafter, collectively called the "Union" or "Unions"), with respect to the construction of the Central Artery (I-93)/Tunnel (I-90) Project as defined herein.

It is understood by the parties to this Agreement that it is the policy of the Massachusetts Department of Public Works (hereinafter, the MDPW) that the construction work covered by this Agreement shall be contracted to Contractors who agree to execute and be bound by the terms of this Agreement. Therefore, the Unions agree that other contractors may execute the Agreement for the purpose of covering that work. The Bechtel/Parsons Brinkerhoff shall monitor compliance with this Agreement by all Contractors who through their execution of this Agreement, together with their subcontractors, have become bound hereto.

The term "Contractor" shall include all Contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement. Where specific reference to Bechtel/Parsons Brinckerhoff alone is intended, the term "Bechtel/Parsons Brinckerhoff" is used.

The Union and the Bechtel/Parsons Brinckerhoff and all signatory Contractors agree to abide by the terms and conditions contained in this Agreement with respect to the administration of the Agreement by the Bechtel/Parsons Brinckerhoff. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor party is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a contractor and a Union party which is not explicitly set forth in this Agreement shall be binding on any other party unless endorsed in writing by the Bechtel/Parsons Brinckerhoff.

1

# EXHIBIT C

tractors who through their execution of this Agreement, together with their subcontractors, have become bound hereto.

The term "Contractor" shall include all Contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement, including Kaiser Engineers, Inc. when it performs construction work within the scope of this Agreement. Where specific reference to Kaiser Engineers, Inc. alone is intended, the term "Project Contractor" is used.

The Union and the Project Contractor and all signatory Contractors agree to abide by the terms and conditions contained in this Agreement with respect to the administration of the Agreement by the Project Contractor and the performance of the construction by the Contractor of the Project. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor party is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in this Agreement shall be binding on any other party unless endorsed in writing by the Project Contractor.

# ARTICLE I
# PURPOSE

The Boston Harbor Project, an undertaking of the Massachusetts Water Resources Authority, is the largest public works project in the history of New England. The goal of the Project is to provide effective sewage disposal for the people of Massachusetts.

# EXHIBIT D

# LOGAN INTERNATIONAL AIRPORT TERMINAL AREA CONSTRUCTION

## LABOR AGREEMENT

This Construction Labor Agreement (hereinafter, "Agreement") is entered into this 17th day of June, 1993 by and between O'Brien-Kreitzberg & Associates, Inc. (hereinafter, "Projects Coordinator"), its successors or assigns, on behalf of itself and /any and all current and future Projects Coordinators and signatory Contractors and the Building and Construction Trades Department, AFL-CIO (hereinafter, "Department") on behalf of its affiliated International Unions and their Local Unions, and the Building and Construction Trades Council of the Metropolitan District (hereinafter, "Council"), (hereinafter, collectively "Unions") with respect to Terminal area construction work described more fully below to be undertaken at Logan International Airport (hereinafter, "Airport").

It is understood by the parties to this Agreement that it is the policy of the Massachusetts Port Authority (hereinafter, "Owner") that the construction work covered by this Agreement shall be contracted to Contractors who agree to execute and be bound by the terms of this Agreement through the Letter of Assent attached as Exhibit B. Therefore, the Unions agree that other Contractors performing construction work at the Airport may execute the Letter of Assent for the purpose of covering that work. The Projects Coordinator shall monitor compliance with this Agreement by all Contractors who, together with their subcontractors, have become bound hereto through their execution of this Agreement or the Letter of Assent.

The term "Contractor" shall include all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement, including O'Brien-Kreitzberg when it performs construction work within the scope of this Agreement, all of whom shall sign the Letter of Assent and thereby be bound to this Agreement. Where specific reference to O'Brien-Kreitzberg alone is intended, the term "Projects Coordinator" is used.

The Unions, the Projects Coordinator and all signatory Contractors agree to abide by the terms and conditions contained in this Agreement. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a Contractor and a Union party which is not explicitly set forth in this Agreement or the Exhibit A's (which are the Local Collective Bargaining Agreements of the signatory Unions) shall be binding on any other party unless endorsed in writing by the Projects Coordinator.

LT000069

# EXHIBIT E

## Boston Convention and Exhibition Center
## Project Labor Agreement

### Agreement

This Project Labor Agreement (the "Agreement") is entered into this 14th day of January, 2000 by and between Clark/Huber, Hunt & Nichols/Berry, a Joint Venture (the "Construction Manager"), its successors or assigns, and the Building and Construction Trades Department, AFL-CIO (the Department"), and its affiliated International Unions and their Local Unions and the Building and Construction Trades Council of the Metropolitan District (the "Council") and its affiliated Local Unions (the Department, the Council, and the International and local unions are referred, to herein, collectively, as the "Union" or "Unions") with respect to the construction work on the Boston Convention and Exhibition Center Project (the "Project") undertaken by the Massachusetts Convention Center Authority (the "Authority").

The term "Contractor" shall include all contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement, including the Construction Manager when it performs construction work within the scope of this Agreement. Where specific reference to the Construction Manager alone is intended, the term "Construction Manager" is used.

It is understood by the parties to this Agreement that Chapter 152 of the Massachusetts Acts of 1997 ("Chapter 152") requires that all construction employees employed in the construction of the Project be paid a wage rate in accordance with a project labor agreement that includes certain provisions for resolving disputes, mutually agreeable uniform work rules and schedules and an obligation not to strike with respect to work on the site. It is therefore, the policy of the Authority that the work covered by this Agreement (the "Construction Work") as defined herein shall be contracted only to contractors who agree to execute and be bound by the terms of this Agreement through the Letter of Assent attached as Exhibit B, and the Construction Manager agrees that it shall execute agreements for construction work only with Contractors that have executed the Letter of Assent and shall require such Contractors to require their subcontractors of whatever tier to execute the Letter of Assent. The Construction Manager shall monitor compliance with this Agreement by all Contractors. The Authority may construct or contract with developers or other parties who may construct facilities in addition to the Project on the Site during the duration of this Agreement. It is the policy of the Authority that any such additional construction shall be awarded only to contractors and subcontractors of whatever tier that agree to execute a Project Labor Agreement. The Unions agree to execute a Project Labor Agreement for such additional construction.

This Agreement, with the Exhibit A Agreements as defined herein and incorporated by reference, represents the complete understanding of the parties. It is understood and agreed that no Contractor will be obligated to sign any other local area or national

agreement or any other labor-related agreement in order to undertake performance of the construction work described herein as long as it has executed the Letter of Assent. No practice, understanding or agreement between a Contractor and a Union which is not explicitly set forth in this Agreement shall be binding on any other party unless endorsed in writing by the Construction Manager.

ARTICLE I

**PURPOSE**

The Project is a large building project that is important to the economic future of the citizens of the City of Boston (the "City") and the Commonwealth of Massachusetts. It is critical that the project be completed in a timely manner because the activities that will be undertaken in the completed Boston Convention and Exhibition Center must be booked before the completion of construction.

It is therefore essential that the Construction Work be performed in an efficient and economical manner in order to secure optimum productivity and to eliminate delay in the completion of the Construction Work. In recognition of the special needs of this Project and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the parties agree to establish binding methods for the settlement of all misunderstandings, disputes or grievances which may arise during the construction of the Boston Convention and Exhibition Center rather than the use of strikes, slowdowns, or any other disruption or interruption of work, or lockouts.

The Authority, as required by Chapter 152, will undertake the construction of the Project by entering into an agreement with the Construction Manager and, if elected by the Authority, agreements with other Contractors. The Construction Manager will enter into contracts with the various trade and other contractors in accordance with Chapter 152. The Authority has entered into a contract with Tishman Construction Company (the "Owner's Representative") to provide services relating to the program management and assistance with oversight of the construction of the Project.

The Boston Redevelopment Authority has completed the M.G.L. c.30 environmental review process, as required by Chapter 152. The Authority must also complete the review process set forth in Article 80B-3 of the Boston Zoning Code. The Massachusetts Secretary of Environmental Affairs will issue a finding under M.G.L. c.30, §61. The finding under §61, the Article 80B-3 process, and the environmental review process will result in certain Mitigation Measures regarding the construction of the Project, including the preparation of a construction management plan (the "Construction Management Plan"). (All of the required construction mitigation measures are referred to herein collectively as the "Mitigation Measures").