# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
AMERICAN STEEL ERECTORS, INC., et al.  )
)
       Plaintiffs,          )
)
       v.               )
)
LOCAL UNION NO. 7, INTERNATIONAL  )
ASSOCIATION OF BRIDGE,         )   Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &      )
REINFORCING IRON WORKERS,    )
)
       Defendant.        )
_____)

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT

      Pursuant to Local Rule 56.1, Defendant Iron Workers Local 7 ("Local 7" or the "Union")

hereby states the material facts of record as to which Local 7 contends there is no genuine issue

to be tried:

      1.   ***Local 7's job targeting program helps to secure work at labor wage and benefit***

***standards for Local 7 members in geographical locations where non-union competition is***

***strongest and helps to fund the Union's monitoring of regulatory cheating in the structural***

***steel erection industry.***  John F. Hurley Affidavit ("Hurley Aff.")[1] ¶ 20 ("The purposes of the job

targeting program were twofold.  First, to secure work for Local 7 members in geographical

areas where Local 7's standard collective bargaining agreement terms with regard to wages and

benefits appeared an obstacle to competing against non-union competition.  Second, to monitor

the steel erection industry to help eliminate extensive statutory and regulatory cheating in the

---

[1] All affidavits referenced herein are attached to the Appendix of Affidavits in Support of Defendant Iron Workers Local 7's Motion for Partial Summary Judgment, filed with Local 7's original Motion for Summary Judgment on Counts I-III, on March 20, 2006, and docketed by the clerk as Document Number 53.

non-union sector of the industry, thereby creating a more lawful level playing field for the

environment in which Local 7 members work."); Plaintiffs' Complaint ("Compl.") ¶ 36 ("In the

case of open-shop contractors [i.e., non-union contractors such as Plaintiffs], the cost attributable

to structural steel labor services is variable and subject to competitive forces and (in the absence

of predatory pricing tactics [i.e., Local 7's job targeting program]) is almost always less

expensive than the rates set by Local 7 contractors."); Ajax Construction Company Deposition

Transcript ("Ajax Dep. Tr.")[2] p. 109 (The "pricing tactics" referred to by Plaintiffs in Complaint

Paragraph 26 is the use of job target fund money to assist a union contractor.); Compl. ¶ 60

("[O]n many occasions, Non-Labor businesses benefit from the [alleged] conspiracy by engaging

in the practice of using the significantly lower price on a job it receives from Plaintiffs on which

job it does not intend to use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements

with Local 7 and/or Local 7 contractors, to negotiate downwards the price for the same job from

a Local 7 Contractor.  Rather, they often use Plaintiffs and other Non-Local Contractors only to

lower the Local 7 Contractor price to induce job target subsidies."); Compl. ¶ 34 ("These [job

targeting] subsidies are allegedly available only to steel contractors who are parties to the

collective bargaining agreement with Local 7 and are intended to assist those employers in

meeting the competition from non-union structural steel erectors."); Ajax Dep. Tr. pp. 169-70 (In

this case, Ajax is complaining that its advantage of lower labor costs is removed when the Union

puts money on the table); Ajax Dep. Tr. p. 167 (The primary basis on which steel erectors

compete with one another is their labor costs.); American Steel Erectors, Inc. Deposition

---

[2] Relevant excerpts of deposition transcripts are included in the Supplemental Appendix in Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment, filed herewith.  Plaintiff Ajax Construction Company, was deposed on July 11, 2006, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and designated its President, Donald Morel, to testify on its behalf.  Ajax Dep. Tr. pp. 1, 6.

Transcript ("ASE Dep. Tr.")[3] p. 135-36 (Steel erection costs are more than fifty percent (50%) for labor and steel erection is labor intensive.).

2.  ***Local 7 unilaterally established the job targeting program.***  Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program."); Hurley Aff. ¶ 21 ("During the period when I was President of Local 7, the membership considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest.  The membership rejected this idea.  Instead, the membership voted to permanently fund the job targeting program with dues . . . . No employer ever took part in the establishment of the job targeting program."); Thomas J. Gunning Affidavit ("Gunning Aff.") ¶ 5 ("Neither the BTEA nor its employer members were involved in the establishment of the job targeting program or in Local 7's decision to use a dues deduction to fund the program.  The establishment of the program and the decision to use dues monies and deductions (and the particular amounts) were arrived at by Local 7 on its own, prior to its asking that it be referred to in its collective bargaining agreement with BTEA in the agreement dated November 1, 1993 to September 15, 1997.").

3.  ***Local 7 members voted to pool portions of their own wages for the job targeting fund and authorized the Building Trades Employers' Association of Boston and Eastern Massachusetts ("BTEA") employers to deduct dues for the fund from Local 7 members' paychecks to be forwarded to Local 7.***  Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program."); Hurley Aff. ¶ 21 ("During the period when I was President of Local 7, the membership considered whether it should reduce the wage rate when working in geographical areas where

---

[3] Plaintiff American Steel Erectors, Inc., was deposed on July 13, 2006, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and designated Raymond Cilley to testify on its behalf.  ASE Dep. Tr. pp. 1, 5.

non-union competition was strongest.  The membership rejected this idea.  Instead, the

membership voted to permanently fund the job targeting program with dues . . . . No employer

ever took part in the establishment of the job targeting program.")

4.  ***The dues deducted by BTEA contractors and forwarded to Local 7 are deducted***

***from employees' after-tax wages.***  Current Collective Bargaining Agreement  between Local 7

and the BTEA, Attached to Gunning Aff., Tab A., §9 ("It is agreed that the Working Dues

Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and

.03 for the Political Action League will be withheld out of *net pay* for each and every hour

paid.") (emphasis added).

5.  ***Local 7 unilaterally administers the job targeting program.***  Hurley Aff. ¶ 22

("Initially, the job targeting program was administered by the three business agents because

Local 7 did not have a business manager at the time.  When I was elected business manager in

1997, I became responsible for overseeing the job targeting program.  As business manager, I

met regularly with the business agents to discuss the merits of each job for purposes of job

targeting.  I also met regularly with Local 7's financial secretary-treasurer to oversee the

solvency of the job targeting fund and to ensure that monies were only paid after all obligations

were met by the applicable contractors.  As business manager, I maintained the unequivocal right

to make the final decision on any job targeted.  Since 1997, business agents have requested

approval of target fund allocations from the business manager."); Hurley Aff. ¶ 28 ("Local 7's

job targeting program was always maintained and administered by Local 7.  No employers were

involved in the administration of the program, including the disbursement of funds or other

operations of the program.  The targeted jobs were always selected by Local 7.  The decision

whether to target and the amount of money provided was always determined exclusively by

Local 7. Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else."); James Coyle Affidavit ("Coyle Aff.") ¶ 11 ("Local 7's job targeting program was always maintained and administered by Local 7. No employers were involved in the administration of the program, including the disbursement of funds or other operations of the program. The targeted jobs were always selected by Local 7. The decision whether to target and the amount of money provided was always determined exclusively by Local 7. Information about a particular job was gathered from both business agents and employers, but the decision to target and the amount of any money was always been made by Local 7 and no one else."); Gunning Aff. ¶ 6 ("Neither the BTEA nor its employer members have ever been involved in the administration of the job targeting program, including the disbursement of target funds from the Union to signatory contractors bidding for jobs nor any other operations of the program. For example, neither the BTEA nor its member employers have ever been involved in deciding how job targeting funds were used, in selecting which jobs to target or in ascertaining the amount of a job targeting subsidy. The inclusion of the dues deduction provision in the parties' collective bargaining agreement did not detract from or alter Local 7's sole discretion in administering and operating the job targeting program. Rather, it was always understood that Local 7 had the exclusive rights to determine amounts paid into that fund and could have changed those amounts unilaterally without notifying the BTEA. The articulation of the amounts in the collective bargaining agreement was only a convenience for members of Local 7 to know how much was intended to target fund allocations.").

6. ***Structural steel erection is a labor-intensive industry, in which a large portion of the cost is labor.*** Hurley Aff. ¶ 6 ("Steel erection is a labor intensive portion of the industry. A

steel erection contractor basically needs good credit and a supply of good labor.  Typically, steel

erection contractors rent cranes and hire labor."); Compl. ¶ 36 ("The construction industry is a

labor intensive industry in which a large portion of the cost is labor (approximately 50%)"); Ajax

Dep. Tr. p. 59 (Separating out the crane cost, "most of [the cost] is labor and expendable tools.");

Ajax Dep. Tr.. p. 167 (The primary basis on which steel erectors compete with one another is

their labor costs.); ASE Dep. Tr. pp. 135-36 (Labor costs make up a large portion of steel

erection costs than the construction industry generally); DFM Industries Deposition Transcript

("DFM Dep. Tr.")[4] p. 17 (In order to be a steel erector, you need workers, cranes, trucks,

knowledge, tools, torches, and insurance.).

    7.  ***Plaintiffs compete in the structural steel erection industry, in part, by paying lower***

***labor costs.***  Hurley Aff. ¶ 6 ("Non-union steel erection contractors such as Plaintiffs pay

substantially lower wage and benefit rates than union contractors such as Local 7's signatory

contractors."); Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union contractors

such as Plaintiffs], the cost attributable to structural steel labor services is variable and subject to

competitive forces (in the absence of predatory pricing tactics [i.e., Local 7's job targeting

program]) and is almost always less expensive than the rates set by Local 7 contractors."); Ajax

Dep. Tr. p. 107 (The sentence above in Complaint Paragraph 36 "means open shop labor rates

are less than Local 7[.]"); Ajax Dep. Tr. p. 109 (The "pricing tactics" referred to by Plaintiffs in

Complaint Paragraph 26 is the use of job target fund money to assist a union contractor.); Ajax

Dep. Tr. pp. 108-09 (It is correct that normally, a union contractor with higher labor costs is

going to be at a competitive disadvantage when bidding against Ajax because his labor costs are

higher.)**;** Ajax Dep. Tr. pp. 169-70 (In this case, Ajax is complaining that its advantage of lower

---

[4] DFM Industries, Inc., was deposed on July 6, 2006, pursuant to Rule 30(b)(6) of the Federal Rules of Civil
Procedure, and designated Glen Pisani, its owner and President, to testify on its behalf.  DFM Dep. Tr. pp. 1, 4.

labor costs is removed when the Union puts money on the table.); Ajax Dep. Tr. 130-31 ("If we're awarded the job with the low bidder and all of the sudden a union contractor steals the job a day or a week before it's going, chances are somehow they got money to compete and steal the job away" "exactly" because their costs are higher than Ajax's); Ajax Dep. Tr. pp. 145-46 (In a normal playing field, a union contractor's price would be substantially higher than Ajax's price because the union contractor's costs are substantially higher.); Ajax Dep. Tr. p. 167 (The primary basis on which steel erectors compete with one another is their labor costs.); DFM Dep. Tr. pp. 94-97 (Griffin Steel, a union contractor, could not meet D.F.M.'s price for work on the Tamarisk House without a subsidy because his labor costs are so much higher); ASE Dep. Tr. pp. 139-140 (American Steel Erectors' labor costs are almost always less on private jobs than the rates set by signatory contractors).

8.  ***Local 7's use of job targeting funds assists Local 7 signatory contractors who might be at a competitive disadvantage because of collectively bargained labor costs to compete with non-union and union contractors.*** Hurley Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program[.] The purposes of job targeting were twofold. First, to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms with regard to wages and benefits appeared an obstacle to competing against non-union competition."); Hurley Aff. ¶ 23 ("Job targeting provided relief from the constraints of Local 7's collective bargaining agreement's terms regarding wages and costs of benefits, particularly designed to reduce wage and benefit rate differentials for Local 7 contractors seeking to obtain work on a particular job."); Hurley Aff. ¶ 24 ("[The job targeting program] was also used to promote the employment of Local 7 members rather than other unionized trades' employers, i.e., union competition. Other trade unions regularly compete with

iron workers for certain work.  Occasionally, job targeting money was used to attempt to secure

work for Local 7 members when its signatory contractors were competing against contractors

signed to other union agreements."); Compl. ¶ 34 ("These [job targeting] subsidies are allegedly

available only to steel contractors who are parties to the collective bargaining agreement with

Local 7 and are intended to assist those employers in meeting the competition from non-union

structural steel erectors."); Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union

contractors such as Plaintiffs], the cost attributable to structural steel labor services is variable

and subject to competitive forces and (in the absence of predatory pricing tactics [i.e., Local 7's

job targeting program]) is almost always less expensive than the rates set by Local 7

contractors."); Ajax Dep. Tr. p. 109 (The "pricing tactics" referred to by Plaintiffs in Complaint

Paragraph 26 is the use of job target fund money to assist a union contractor.); Ajax Dep. Tr. pp.

169-70 (In this case, Ajax is complaining that its advantage of lower labor costs is removed

when the Union puts money on the table.); Ajax Dep. Tr. pp. 130-31 ("If we're awarded the job

with the low bidder and all of the sudden a union contractor steals the job a day or a week before

it's going, chances are somehow they got money to compete and steal the job away" "exactly"

because their costs are higher than Ajax's); Ajax Dep. Tr. pp. 145-46 (In a normal playing field,

a union contractor's price would be substantially higher than Ajax's price because the union

contractor's costs are substantially higher.); Ajax Dep. Tr. p. 167 (The primary basis on which

steel erectors compete with one another is their labor costs.).

9. ***In the absence of an agreement, the custom in the steel erection industry is to
award work based, in large measure, on price.***  Ajax Dep. Tr. pp. 130-31 ("If we're awarded the

job with the low bidder and all of the sudden a union contractor steals the job a day or a week

before it's going, chances are somehow they got money to compete and steal the job away"

"exactly" because their costs are higher than Ajax's); Bedford Iron Works Deposition Transcript ("BIW Dep. Tr.")[5] p. 56 ("[T]he lowest number" wins the bid "unless someone has got a favorite[.]"); AAS Dep. Tr. pp. 65-66 ("The marketplace is very competitive.  If your price is five grand cheaper, it's five grand cheaper. It's competitive bidding.").

10. ***Job targeting funds effectively reduce the labor costs of Local 7 signatory contractors on a particular job.***  Hurley Aff. ¶ 26 ("Local 7 regularly provided its signatory contractors with job targeting funds for the very reason that Local 7 did not maintain agreements with higher tier employers who controlled the work and, in the absence of a job targeting funds, the union signatory contractor might lose the job to a contractor with a lower wage and benefits package."); Compl. ¶ 60 ("[O]n many occasions, Non-Labor businesses benefit . . . by engaging in the practice of using the significantly lower price on a job it receives from Plaintiffs on which job it does not intend to use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements with Local 7 and/or Local 7 contractors, to negotiate downwards the price for the same job from a Local 7 Contractor.  Rather, they often use Plaintiffs and other Non-Local Contractors only to lower the Local 7 Contractor price to induce job target subsidies."); Compl. ¶ 34 ("These [job targeting] subsidies are allegedly available only to steel contractors who are parties to the collective bargaining agreement with Local 7 and are intended to assist those employers in meeting the competition from non-union structural steel erectors."); Compl. ¶ 36 ("In the case of open-shop contractors, the cost attributable to structural steel labor services is variable and subject to competitive forces and (in the absence of predatory pricing tactics [i.e., job targeting]) is almost always less expensive than the rates set by Local 7 contractors."); Ajax Dep. Tr. p. 109 (The "pricing tactics" referred to by Plaintiffs in Complaint Paragraph 26 is the use of job target

---

[5] Bedford Iron Works, was deposed on July 11, 2006, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and designated Michael P. Guillemette, its co-owner, to testify on its behalf.  BIW Dep. Tr. pp. 1, 6.

fund money to assist a union contractor.); Ajax Dep. Tr. pp. 145-46 (In a normal playing field, a union contractor's price would be substantially higher than Ajax's price because the union contractor's costs are substantially higher.); Ajax Dep. Tr. pp. 130-31 ("If we're awarded the job with the low bidder and all of the sudden a union contractor steals the job a day or a week before it's going, chances are somehow they got money to compete and steal the job away" "exactly" because their costs are higher than Ajax's.).

11. ***There is no evidence of signatory contractors pricing below their own costs on jobs involving target funds.*** Ajax Dep. Tr. p. 169 (Ajax is not claiming that signatory contractors lost money on these jobs. They were compensated.); AAS Dep. Tr. p. 264 (American Aerial Services has no knowledge of any signatory contractors bidding below their costs on jobs involving target funds).

11. ***There are few barriers to entry into the structural steel erection industry.*** Hurley Aff. ¶ 6 ("Steel erection is a labor intensive portion of the industry. A steel erection contractor basically needs good credit and a supply of skilled labor. There are few barriers to entry in this portion of the industry."); Compl. ¶ 36 ("The construction industry is a labor intensive industry in which a large portion of the cost is labor (approximately 50%)."); Ajax Dep. Tr. p. 59 (Separating out the crane cost, "most of [the cost] is labor and expendable tools."); Ajax Dep. Tr. p. 167 (The primary basis on which steel erectors compete with one another is their labor costs.); DFM Dep. Tr. p. 17 (In order to be a steel erector, you need workers, cranes, trucks, knowledge, tools, torches, and insurance.); DFM Dep. Tr. pp. 7-11 (D.F.M. was started using a $30,000 workers compensation settlement, and leasing 12 cranes and trucks); DFM Dep. Tr. 109 (A lot of companies like Buckner, a company based in North Carolina, go all over the country.).

12. ***There are currently over 150 firms that do structural steel erection work in the locations at issue here.*** Hurley Aff. ¶ 8 ("Work performed by Local 7 members arises out of projects involving several layers of commercial entities, including owners, developers, general contractors, fabricators, and steel erection contractors. To my knowledge, competition exists at all of these levels. General contractors compete for projects from owners and developers. Fabricators compete with each other for subcontracts from general contractors. In addition, the fabricators at times compete directly with steel erection contractors, including both Plaintiffs and union signatory steel erection contractors on occasions when the steel erection contractors themselves bid for the full fabrication-erection package, expecting to subcontract the fabrication work."); Hurley Aff. ¶ 9 ("The locals in the Iron Workers District Council of New England work with over 230 contractors who have signed collective bargaining agreements. I would estimate that approximately 70% of them compete for structural steel erection work. These contractors secure work through business and personal relationships they have developed with particular contractors, through direct negotiations, competitive bidding, associations with developers, and many other factors. Often contractors solicit "bids" that lead to further solicitations, modifications of prior bids and, as a practical matter, a negotiated price."); Compl. ¶¶ 2-7 (naming Plaintiffs who do structural steel erection work in the Relevant Market); ASE Dep. Tr. p. 126 (There are 8 or 9 steel erectors in New Hampshire.); DFM Dep. Tr. p. 109 (a lot of companies like Buckner, a company based in North Carolina, go all over the country).

13. ***There are many fabricators and general contractors that contract out structural steel erection work in the locations at issue here.*** DFM Dep. Tr. p. 24 (Fabricators self-select the erectors that they want to get prices from by sending erectors drawings.); DFM Dep. Tr. p. 24 (More than twenty (20) fabricators send D.F.M. drawings on a regular basis.). American Aerial

Services, Inc. Deposition Transcript ("AAS Dep. Tr.")[6] pp. 103-07 (Identifying more than

twenty (20) fabricators to whom American Aerial Services, Inc. generally bids, noting that

"[t]here is others, I don't recall the names.... I can probably take an hour [to name them all].").

14. ***Fabricators and general contractors gain advantage from the availability of job***

***targeting funds by obtaining structural steel erection at lower costs.***  Hurley Aff. ¶ 7 ("In the

construction industry, a general contractor generally solicits prices for the combined work of

steel fabrication and erection, which may be referred to as the "fabrication-erection package."

Fabricators produce the steel.  Steel erectors assemble it.  When a fabricator obtains work (that

is, the fabrication-erection package) from a general contractor, the fabricator will either erect the

steel or subcontract out the steel erection. Most fabricators subcontract the erection work.  As a

result, although some Local 7 steel erection contractors also fabricate, most of them do not.

These erectors generally work as subcontractors to fabricators."); Compl. ¶ 40 ("Plaintiffs are

usually a subcontractor to a steel fabricator which is in turn typically a subcontractor to a general

contractor of a project developer."); Hurley Aff. ¶ 23 ("Job targeting provided relief from the

constraints of Local 7's collective bargaining agreement's terms regarding wages and costs of

benefits, particularly designed to reduce wage and benefit rate differentials for Local 7

contractors seeking to obtain work on a particular job."); Compl. ¶ 60 ("[O]n many occasions,

Non-Labor businesses benefit from the [alleged] conspiracy by engaging in the practice of using

the significantly lower price on a job it receives from Plaintiffs on which job it does not intend to

use Plaintiffs or any Non-Local 7 Contractor, to enter into agreements with Local 7 and/or Local

7 contractors, to negotiate downwards the price for the same job from a Local 7 Contractor.

Rather, they often use Plaintiffs and other Non-Local Contractors only to lower the Local 7

---

[6] Plaintiff American Aerial Services, Inc., was deposed on July 24, 2006, pursuant to Rule 30(b)(6) of the Federal
Rules of Civil Procedure, and designated James Read, its President, to testify on its behalf.  AAS Dep. Tr. pp. 1, 7.

Contractor price to induce job target subsidies."); Ajax Dep. Tr. p. 167 ("[T]he customer is not

being hurt" by getting the lowest possible price[.]").

15.    ***Local 7 does not maintain generalized agreements with fabricators, general***

***contractors or other higher tiered companies not to do business with Plaintiffs or other non-***

***union steel erection companies.***  Hurley Aff. ¶ 26 ("Local 7 regularly provided its signatory

contractors with job targeting funds for the very reason that Local 7 did not maintain agreements

with higher tier employers who controlled the work and, in the absence of a job targeting funds,

the union signatory contractor might lose the job to a contractor with a lower wage and benefits

package.  On jobs where this succeeded in obtaining the work, the use of job targeting funds for

the individual job did not result in any agreement between Local 7 and the owners, general

contractors, developers or fabricators that would prevent those companies from using non-Local

7 signatory steel erectors on any future job, or even on a subsequently bid portion of the project

in question.  In some cases, where Local 7 won part of a steel erection job on a particular jobsite,

it later lost a subsequent steel erection job on the same jobsite."); Coyle Aff. ¶ 12 (same); Hurley

Aff. ¶ 27 ("Because Local 7 maintained no generalized agreements with the owners, general

contractors, developers or fabricators from whom it solicited work on a job-by-job basis, Local 7

and its signatory contractors often failed in their efforts to obtain individual jobs from those

entities.  In fact, Local 7 and its contractors oftentimes failed in later, separate efforts to obtain

future jobs from the very same developers or higher tier contractors that Plaintiffs allege in pages

21-32 of their Complaint as specific instances in which Local 7 or its signatory contractors

succeeded in using targeting money to provide relief from the standard terms regarding wages

and benefit levels of Local 7's collective bargaining agreement so that members might become

employed on a specific project.  In fact, the overwhelming majority of fabricators listed in

Plaintiffs' Complaint regularly give out work non-union.  With specific regard to some of the

large jobs and most active owners and developers listed in the Complaint, such as Shaw's

Supermarkets, Stop & Shop and Wal-Mart, non-union steel erectors were very often used to

build Shaw's Supermarkets, Stop & Shops and Wal-Marts at locations not listed in the

Complaint."); Coyle Aff. ¶ 12 (same); Compl. ¶¶ 67-139 (alleging over twenty-five (25) separate

incidents in which the Union allegedly sought and obtained work for its members by appealing

to various fabricators and developers using job targeting funds); Ajax Dep. Tr. p. 94 (In

reference to Paragraph 18 of the Complaint that states, "Canatal has agreements with Local 7",

Ajax does not know what agreements fabricator Canatal has with Local 7, but knows "they use

union erectors and open shop erectors"); Ajax Dep. Tr.  p. 202 (Ajax is not aware of any

agreement Local 7 has with anybody not to give Ajax work for a period of six months.); Ajax

Dep. Tr. p. 202 ("I don't think it's an ongoing agreement that says every single job.  I don't

know of such an agreement."); DFM Dep. Tr. p. 108 (DFM Industries does not know if there is

anybody that does not do business with DFM because of some agreement they have with the

Union.); DFM Dep. Tr. p. 141 (DFM Industries is not aware of any agreement that Local 7 has

with any of the fabricators on a project in which DFM bid and a Local 7 contractor who provided

job targeting funds.); DFM Dep. Tr. p. 143 (DFM Industries is not aware if fabricators have

exclusive arrangements with erectors.); ASE Dep. Tr. pp. 134-35 (In reference to Paragraph 18

of the Complaint that states, "Canatal has agreements with Local 7," he cannot describe the

nature of the agreements that Canatal has with Local 7.); AAS Dep. Tr. p. 109 ("I do not know of

any agreement that systematically says that [fabricators] will not use American Aerial Services

as the direction of Local 7."); see also see Plaintiffs' Response to Defendant Iron Workers Local

7's First Request for Answers to Interrogatories, Answer to Interrogatory 8 (refusing on various

grounds to answer Defendant's Interrogatory asking Plaintiff to "[i]dentify each and every agreement between Defendant and any other person or business, whereby that person or business agreed not to award business to Plaintiffs or other non-Local 7 signatory contractors for: a. a time period of six months or more; and b. a time period of less than six months", and asserting that the information is obtainable through depositions, and is derivable from the thousands of pages made available for Local 7's review).

16. ***Plaintiffs have not been excluded from bidding on public sector project labor agreement jobs, which have been the largest construction projects undertaken in the Greater Boston area and New England in the last twenty (20) years.*** Affidavit of Joseph W. Nigro ("Nigro Aff.") ¶ 3 ("In the last twenty (20) years the largest [construction projects undertaken] in the Greater Boston area, and indeed in New England, have been public sector projects in Massachusetts that have been governed by project labor agreements ("PLAs.")"); Nigro Aff. ¶ 5 ("While the PLAs and bid specifications for the largest public sector projects in Massachusetts in the last twenty (20) years have required that all contractors and subcontractors must abide by the terms of a PLA as a condition of performing work on the particular PLA jobsite, these public sector PLAs guarantee that all contractors and subcontractors, union and non-union alike, have the same rights to bid for and be awarded work on that project."); Nigro Aff. ¶ 11 ("I am not aware that Plaintiffs in this case attempted to obtain any steel erection work on any significant portion of the work on these very large public jobs in the last ten years, either by public bidding or by negotiation to perform subcontracts for successful bidders, despite the open access provisions of the PLAs[.]"); Nigro Aff. ¶ 8 Tab A, Decision of Judge Garsh in Utility Contractors Assoc. of New England, Inc. v. Commissioners of the Mass. Dept. of Public Works, No. 90-3035, 1996 WL 106983, at *13 n.15. (Mass. Super. March 12, 1996) ("As of September,

1995, 55 construction projects have been let on the [Big Dig] Project. A total of 296 bids were received with respect to those contracts, including 13 bids by non-union contractors on 10 of those contractors. Of those 13 non-union bids, only 2 were low bidders, and one of those was withdrawn. There are at least 28 non-union subcontractors working on the Project under the terms of the Project Labor Agreement."); Compl. ¶ 38 ("There is no requirement in law or otherwise that only contractors signatory to an agreement with Local 7 or one of the union co-conspirators may do steel and structural steel erecting work in the Relevant Market, including federal and state government funded projects."); Compl. ¶ 43 ("Since approximately 1999, total structural steel erection construction spending on an annualized basis in the relevant market was in excess of $200,000,000 per year. Of that total, however, more than half can be accounted for by the Boston Central Artery and Harbor Tunnel project (also known as the 'Big Dig'), which was subject to a project labor agreement[.]"); Ajax Dep. Tr. p. 86 (Ajax is not aware of any legal obstacle to bidding on a job covered by a PLA.); DFM Dep. Tr. p. 49 (Canadian companies will send DFM Industries drawings for jobs covered by PLAs in the geographic areas where Plaintiffs do business, "[s]o I guess they have asked me to bid them, and it's kind of a waste of my time. I don't want to sign an agreement with a union, so I don't want to bid the job. It's not where I want to go."); DFM Dep. Tr. p. 49 (DFM Industries was sent drawings on a project for a school in Milton that was covered by a PLA.); DFM Dep. Tr. p. 49 ("There was work in Fall River or New Bedford, which I think was supposedly covered under a PLA."); DFM Dep. Tr. p. 123 (You do not have to be union to bid on a PLA job; you just have to agree to whatever the PLA says.); ASE Dep. Tr. p. 62 (American Steel Erectors, Inc. has a commitment to providing as much work as possible close to the homes of its workers, most of whom work in New Hampshire.).

17. ***Plaintiffs have chosen not to bid on the large PLAs.*** Hurley Aff. ¶ 11 ("I am not

aware that Plaintiffs in this case bid on or negotiated for any significant portion of the work on these very large public jobs, although they were eligible to do so according to the terms of the PLAs without regard to their failure to sign union contracts for their other jobs.") ; Nigro Aff. ¶ 11 ("I am not aware that Plaintiffs in this case attempted to obtain steel erection work on any significant portion of the work on these very large public jobs in the last ten years, either by public bidding or by negotiating to perform subcontracts for successful bidders, despite the open access provisions of the PLAs I described above.  In contrast, in other construction trades many non-union companies did successfully bid or negotiate to perform contracts and subcontracts on the Big Dig."); Ajax Dep. Tr. pp. 80-87 (Ajax chosen not to bid on jobs covered by a PLA; Ajax estimators have determined that the likelihood of Ajax being awarded a job covered by a PLA does not warrant the time to figure the job.); DFM Dep. Tr. p. 47 (D.F.M. Industries has never bid a job that was covered by a PLA.); DFM Dep. Tr. p. 49 (Some fabricators will send DFM Industries drawings for PLA projects, "[s]o I guess they have asked me to bid them, and it's kind of a waste of my time.  I don't want to sign an agreement with a union, so I don't want to bid the job.  It's not where I want to go."); DFM Dep. Tr. pp. 123-24 (D.F.M. Industries has never bid on a PLA job and has no desire to do so "at the present time."); BIW Dep. Tr. p. 23 "[Bedford Iron Works] do any jobs, small jobs anywhere from [$]6,000 to then bigger jobs are sometimes [$]100,000.  In the past, a couple years ago, we did a job that was [$]500,000.  That's the last big one I'll ever do.  They are not profitable."); BIW Dep. Tr. pp. 25-27, 71-78 (Bedford Iron Works confines itself primarily to New Hampshire.); AAS Dep. Tr. p. 78-80 (American Aerial Services has never bid on a PLA that he "know[s] of.").

18. ***Since the job targeting program's inception, sometime prior to 1991, three of the five Plaintiffs entered the steel erection market in the locations at issue in this case***.  Hurley

Aff. ¶ 20 ("Sometime prior to 1991, Local 7 established a job targeting program, otherwise

known as the Market Recover Program."); DFM Dep. Tr. pp. 7-11 (DFM was started in 1993)**;**

AAS Dep. Tr. p. 7 (American Aerial Services was started in 1997); BIW Dep. Tr. p. 5 (Bedford

Iron Works was started about five years ago).

19. ***The gross income of Plaintiffs American Steel Erectors, Inc., American Aerial***

***Services, Inc., D.F.M. Industries, Inc., and Ajax Construction Company has substantially***

***increased during the time period alleged in this Complaint, from 1999 to the present.***  In the

event that this general fact is disputed, Defendant will seek leave to file under seal supporting

documents such as tax returns that have been designated by Plaintiffs as confidential.  See also

DFM Dep. Tr. p. 54 ("[D.F.M.'s work force] increased in the past, I think last year.  In the last

year I've added 20 employees, with opportunities to continue to grow.  We are very fortunate

finding a good labor force and good young people that want to work.").

20. ***Plaintiffs have been unable to identify non-union steel erectors who have been put***

***out of business by Local 7's job targeting program***.  Plaintiffs' Answers to Interrogatory 18

(identifying four companies (Superior Steel, Inc., of  Burlington, Vermont, Construction

Welding Services, Inc. of Sterling, Massachusetts, B&B Welding, Inc. of Sterling, Massachusetts

and FAMM Steel, Inc. of New Hampshire) as businesses allegedly driven out of the "relevant

market as a result of Defendant's alleged conduct); ASE Dep. Tr. pp. 95-96 (believes that

Superior Steel was a union contractor); Compl., ¶¶ 16, 111 (Construction Welding Services, Inc.

is a signatory contractor who received job targeting funds); ASE Dep. Tr. p. 96 (B & B Welding

and Construction Welding Services are both the same individual); Compl. ¶ 107(Famm Steel,

Inc. was a fabricator, not an erector).

21. ***Local 7's organizing activities were undertaken for the purpose of protecting its
members' area standards and to obtain work.*** Hurley Aff. ¶ 13 ("Local 7's primary focus
during the time I was an officer for the Union was to organize employees who worked in the
trade and to help them maintain and improve conditions of their unionized employment in accord
with the Local 7 collective bargaining agreement and obtain work for them to perform under
labor contract standards."); Hurley Aff. ¶ 14 ("Local 7's organizing efforts included picketing,
hand billing, and other publicity, including publicizing that contractors who employ iron workers
below union scale undermine the economic standards of our members and their families.  These
organizing efforts, whether directed against non-union steel erectors or secondary parties, were
based on Local 7's own objectives to protect its members' wage and benefit levels, and to help
members maintain and improve employment opportunities and obtain work.  These organizing
efforts were not based on agreements with any employers."); Hurley Aff. ¶ 15 ("Local 7's
organizing during that time also included persuading non-union workers of the educational
benefits of its apprenticeship program and the economic benefits of a decent hourly wage rate,
health insurance for their families, and pension benefits for their retirement."); Hurley Aff. ¶ 16
("From time to time, Local 7 assisted non-union iron workers who had been unsuccessful in
organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also
periodically assisted other employees of non-union employers who wanted to work for union
employers in finding employment with union employers, often at the significantly higher wage
and benefit levels of the union contract.  None of these efforts were undertaken based upon any
agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts
("BTEA") or any other employer association or their members to give job placement priority to
the previously non-union employees by bypassing a hiring hall."); Coyle Aff. ¶ 4 ("Local 7's

primary focus for the past twenty (20) years has been to organize employees who work in the trade and obtain work for them to perform under labor contract standards."); Coyle; Aff. ¶ 5 ("Local 7's organizing efforts have included picketing, handbilling, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any employers."); Coyle Aff. ¶ 6 ("Local 7's organizing efforts also included persuading non-union workers of the educational benefits of its apprenticeship program and the economic benefits of a decent hourly wage rate, health insurance for their families, and pension benefits for their retirement."); Coyle Aff. ¶ 7 ("From time to time, Local 7 assisted non-union iron workers who have been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at significantly higher wage and benefit levels of the union contract. None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall.").

22. ***Local 7's organizing activities were done unilaterally and not pursuant to any agreements with employers or any other non-labor groups.***  Hurley Aff. ¶ 14 ("Local 7's organizing efforts included picketing, hand billing, and other publicity, including publicizing that

contractors who employ iron workers below union scale undermine the economic standards of our members and their families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, were based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any employers."); Hurley Aff. ¶ 16 ("From time to time, Local 7 assisted non-union iron workers who had been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding employment with union employers, often at the significantly higher wage and benefit levels of the union contract.  None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall."); Coyle Aff. ¶ 5 ("Local 7's organizing efforts have included picketing, handbilling, and other publicity, including publicizing that contractors who employ iron workers below union scale undermine the economic standards of our members and their families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on Local 7's own objectives to protect its members' wage and benefit levels, and to help members maintain and improve employment opportunities and obtain work.  These organizing efforts were not based on agreements with any employers."); Coyle Aff. ¶ 7 ("From time to time, Local 7 assisted non-union iron workers who have been unsuccessful in organizing non-union employers in finding employment with Local 7 contractors.  Local 7 also periodically assisted other employees of non-union employers who wanted to work for union employers in finding

employment with union employers, often at significantly higher wage and benefit levels of the union contract. None of these efforts were undertaken based upon any agreements with Building Trades Employers' Association of Boston and Eastern, Massachusetts ("BTEA") or any other employer association or their members to give job placement priority to the previously non-union employees by bypassing a hiring hall."); AAS Dep. Tr. p. 268 ("I do not believe my erecting competitors have sat down and conspired to take my workers.").

23. ***In an effort to level the playing field, Local 7 has monitored jobsites in order to identify and potentially expose employers who are not complying with regulatory standards.*** Hurley Aff. ¶ 29 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards. The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming employed under the wage and benefits levels of Local 7's collective bargaining agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law."); Coyle Aff. ¶ 13 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards. The goal of this monitoring and regulatory activity was to help eliminate unlawful employment related conduct on construction sites, thereby creating an increased likelihood of members becoming employed under the wage and benefits levels of Local 7's collective bargaining

agreement by leveling the playing field for union signatories who were following the agreement and complying with applicable law.").

24. ***Local 7's monitoring activities were not done pursuant to any agreement with a non-labor group.*** Hurley Aff. ¶ 29 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards."); Coyle Aff. ¶ 13 ("During the time in which I was an officer of the Union, Local 7 at times, engaged research and jobsite monitoring of employers in an effort to discover and potentially expose employers who are not in compliance with regulatory standards, and thereby to increase compliance with those standards.").

25. ***There were no damages to D.F.M. on the Fox 25 job.*** DFM Dep. Tr. pp. 87-88, 170, 190-91 (describing what happened on the Fox 25 job).

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

Dated: August 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this Statement of Undisputed Material Facts in Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on August 1, 2006.

/s/ Paul F. Kelly
Paul F. Kelly, Esq.