**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
AMERICAN STEEL ERECTORS, INC., et al.   )
                                        )
      Plaintiffs,                    )
                                        )
      v.                             )
                                        )
LOCAL UNION NO. 7, INTERNATIONAL        )
ASSOCIATION OF BRIDGE,                  )    Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &                )
REINFORCING IRON WORKERS,               )
                                        )
      Defendant.                     )
_____)

**SUPPLEMENTAL APPENDIX IN SUPPORT OF DEFENDANT IRON WORKERS
LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT**

      Defendant Iron Workers Local 7 respectfully submits in support of its Amended Motion

for Summary Judgment the following excerpts of deposition transcripts (arranged herein in

alphabetical order) and Plaintiffs' Response to Defendant Iron Workers Local 7's First Request

for Answers to Interrogatories:

        Exhibit 1   EXCERPTS FROM AJAX CONSTRUCTION COMPANY DEPOSITION
                 TRANSCRIPT (ENTITLED "DEPOSITION OF DONALD MOREL")

        Exhibit 2   EXCERPTS FROM AMERICAN AERIAL SERVICES, INC. DEPOSITION
                 TRANSCRIPT

        Exhibit 3   EXCERPTS FROM AMERICAN STEEL ERECTORS, INC. DEPOSITION
                 TRANSCRIPT

        Exhibit 4   EXCERPTS FROM BEDFORD IRON WORKS DEPOSITION
                 TRANSCRIPT

        Exhibit 5    EXCERPTS FROM D.F.M. INDUSTRIES, INC. DEPOSITION
                 TRANSCRIPT

Exhibit 6    PLAINTIFFS' RESPONSE TO DEFENDANT IRON WORKERS LOCAL 7'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

Dated:  August 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this Supplemental Appendix In Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 1, 2006.

/s/   Paul F. Kelly
Paul F. Kelly, Esq.

1

**VOLUME**: I
**PAGES**: 1-265
**EXHIBITS**: 27-58

2

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

4

5

Case No. 1:04-cv-12536-RGS

6

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

7

AMERICAN STEEL ERECTORS, INC.,         *
et als,                                 *

8

        Plaintiffs,                      *
                                        *

9

vs.                                     *
                                        *

10

LOCAL UNION NO. 7,                      *
INTERNATIONAL ASSOCIATION OF            *

11

BRIDGE STRUCTURAL, ORNAMENTAL &         *
REINFORCING IRONWORKERS,                *

12

        Defendants.                      *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

13

14

    **DEPOSITION OF DONALD MOREL**, a witness
called on behalf of the Defendants, taken

15

pursuant to Rule 30(b)(6) of the Federal Rules
of Civil Procedure, before Darlene Caiazzo

16

Sousa, Registered Professional Reporter and
Notary Public in and for the Commonwealth of

17

Massachusetts, at the law offices of Segal,
Roitman & Coleman, 11 Beacon Street, Boston,

18

Massachusetts, on Tuesday, July 11, 2006,
commencing at 9:55 a.m.

19

20

21

22

PATRICIA BOWEN
124 Downing Drive

23

Attleboro, Massachusetts  02703
(508) 222-9403

24

3

1                          **I N D E X**

2

3    Deponent:  **DONALD MOREL**

4

5

6                                          **P A G E**

7    Examination by Mr. Kelly              6, 243

8    Examination by Mr. Avakian            228

9

10                      **E X H I B I T S**

11

12      **NO.    DESCRIPTION**                    **PAGE**

13       27   Articles of Incorporation,
             AX02485                              8
14
         28   Bid No. 0111-10, AX003054           22
15
         29   Application for Surrender of
16            Authority to do Business,
             AX02489                              45
17
         30   Statement of Change of Registered
18            Office or Registered Agent, or
             Both, By Corporation, AX002492      68
19
         31   Bid No. 0603-24, AX000616          76
20
         32   Handwritten Document, AX003053     132
21
         33   Bid No. 0111-10, AX003050          134
22
         34   Bid No. 0306-14, No Bates Number   141
23
         35   Purchase Order, Mandate Erectors,
24            AX002942                            148

1     Q.    Where was FAMM Steel from?

2     A.    Rindge, New Hampshire, and also Cape

3   and Islands who are out of business.

4     Q.    Now, there are some names that I've

5   run across that you didn't mention so let me

6   ask you.  Capone, for example?

7     A.    Capone is another one.

8     Q.    Is that a regular customer?

9     A.    Yeah.  I was just -- I mean, there is

10  a lot of them.  We have lots of regular

11  customers.

12    Q.    I understand.

13    A.    We also have some brokers we work for

14  who are not fabricators, so these names --

15    Q.    Who are the brokers?

16    A.    Jay Steel, Northeast Steel.  We worked

17  in the past for Metro West.  I'm not sure where

18  they fit in, whether brokers or fabricate some

19  of their own things.

20    Q.    Now, the fabricators actually make the

21  steel that you subsequently pick and erect,

22  correct?

23    A.    They buy the steel.  They fabricate it

24  to size and specs, and they send it to the job

1    site for us to erect.

2         Q.    When you say they buy the steel --

3         A.    They purchase the steel from the raw

4    material from somewhere and they make the piece

5    to the right size, the number of holes and

6    whatever needs to be welded in the shop to it.

7         Q.    That's what the fabricator does?

8         A.    Correct.

9         Q.    Okay.  Explain how the broker fits

10   into the industry.

11        A.    A broker will bid to the GC.  He will

12   get fabrication prices and erection prices, put

13   his own package together and give that to a

14   general contractor, and then we would be

15   working for the broker.

16        Q.    So the broker might solicit erection

17   bids from you and also solicit fabrication bids

18   from fabricators?

19        A.    Correct.

20        Q.    By labeling Jay Steel, for example, a

21   broker, are you saying that he doesn't

22   fabricate his own steel?

23        A.    He does not.

24        Q.    He does not.  Any fabrication that Jay

1    don't work a lot for them.

2        Q.    You don't work a lot for them because

3    you don't bid to them?

4        A.    We bid to them.

5        Q.    But you don't successfully bid to them

6    I guess?

7        A.    Not very often.  They may have

8    preferential people they use.

9        Q.    Let me mention a couple of other

10   names.  Beauce Atlas, is that a fabricator?

11       A.    They're a fabricator out of Canada,

12   and we have not successfully ever landed a job

13   with them that we actually performed the work.

14   They've given us work and then taken it away.

15       Q.    Superior, do you know who Superior is?

16       A.    There's a couple of different

17   Superiors.  There's one that does primarily

18   miscellaneous metals I think out of somewhere

19   in Boston.  And then there's -- I think there's

20   one up in New Hampshire.

21       Q.    Have you done work for either of them?

22       A.    Not that I can remember.  I know Ben

23   may have done some work for them.

24       Q.    Quinn Brothers?

42

they are.  But they're a pretty big fabricator.

Q.    Now, does Ajax do work in Maine?

A.    Yes.

Q.    Do you do work in New Hampshire?

A.    Yes.

Q.    And do you do work in Vermont?

A.    We haven't in a long time.  I don't remember working in Vermont like in years, but we have worked in those other states within the past five or six years.

Q.    Isn't it true that sometime after you took over you filed some papers in Maine to stop doing business in Maine?

A.    What it is is if we're not actively seeking work or bidding particular jobs in Maine at the time, if we have enough work in -- next to our office, we won't actively chase work in Maine because of the logistics of going to Maine.  We've done jobs in Portland, Maine. We've been out to Syracuse, New York.  We go all over New England, wherever the work is.

Q.    This is what I was referring to.  I'd like you to take a look at it.

A.    Yeah.  If we're not actively working

```
 1   in the state for a year or two, it's a lot of

 2   paperwork to keep filing with like the state of

 3   Maine.  But if we get a job, my comptroller

 4   will file the papers to go work up in Maine.

 5        Q.   I've just shown you a document.  Can

 6   you tell me what that is?

 7        A.   Surrender authority to do business in

 8   Maine.

 9        Q.   That's a document that Ajax filed?

10        A.   It was probably after the last job we

11   did in Maine, secretary of state.

12        Q.   Let me see if I understand.  Ajax is a

13   Rhode Island corporation, correct?

14        A.   Yes.

15        Q.   And as a Rhode Island corporation,

16   Ajax is a foreign corporation in Massachusetts?

17        A.   And every other state, I believe --

18        Q.   And every other site?

19        A.   -- that we work in?

20        Q.   Other than Rhode Island?

21        A.   Correct.

22        Q.   Right?

23        A.   Connecticut, Mass., New Hampshire.

24        Q.   And Ajax files annual reports at least
```

44

1  in each of the states that it does business in,

2  does it not?

3      A.   Correct.

4      Q.   And if at some point you wish to no

5  longer file annual reports, you'd file a

6  document like the one I just showed you?

7      A.   Correct.

8      Q.   And so when you file an application,

9  what does it say, to surrender authority to do

10  business?

11     A.   Yes.

12     Q.   You're notifying the State of Maine

13  that you no longer want to do business in

14  Maine?

15     A.   Not that we don't want to, that we

16  don't have any jobs up there, any upcoming.

17  We're usually booked our work from anywhere

18  from six months to a year out.  If we don't

19  have work in Maine and we're working primarily

20  in Rhode Island, Connecticut, Massachusetts,

21  New Hampshire, Maine is a little hike for us.

22  So unless one of our fabricators comes to us

23  and says, We really need you to do this job,

24  we'd like you to quote it, we're not actively

45

1   chasing work in Maine, but we will go to Maine.

2       Q.    Okay.  But if you don't want to file

3   an annual report in Maine, all you have to do

4   is file this form and you're relieved of that

5   responsibility?

6       A.    Right.

7       Q.    You did that in March of 2003?

8       A.    Yes.

9       Q.    And if you get a job in Maine and you

10  want to go back in business in Maine, it's a

11  fairly simple thing to file another form?

12      A.    Yes, it is.

13      Q.    And my question is:  Have you done

14  that since March of 2003?

15      A.    No.

16      Q.    So as far as your status in Maine is,

17  it's in accordance with this document?

18      A.    Correct.

19      Q.    Thanks.

20          MR. KELLY:  I'd like that to be marked

21  as the next exhibit.

22          (Exhibit No. 29, Application for

23  Surrender of Authority to do Business,  AX02489

24  so marked)

1    equipment?

2        A.    Yes.

3        Q.    Correct.  And so if you're in the

4    crane rental business, you have a fairly large

5    capital expense and you have comparatively

6    small labor costs?

7        A.    Yes.

8        Q.    Right?  The steel erection business is

9    a little bit different if we separate out steel

10   erection from crane operation or crane rental

11   or even from fabrication in that steel erection

12   is fairly labor intensive, is it not?

13       A.    Yes, it is.

14       Q.    If you separate out at least for the

15   purposes of this question, the crane cost, most

16   of what you have left in your steel erection

17   bid is labor, is it not?

18       A.    Most of it is labor and expendable

19   tools.

20       Q.    What percentage of Ajax's work is

21   precast?

22       A.    It changes from year to year.  Some

23   years we don't do any, and other years we do

24   three or four or five or more.

80

         A.   Yes.

         Q.   So do I understand correctly that
based on whatever it is that Jay Durand has
told you, Ajax does not bid on project labor
agreement jobs?

         A.   From my recollection of how things
happen is Jay will be bidding a job.  And if
it's a big job, it will be for several
fabricators.  And then he'll get a phone call
that there's a PLA on the job, and he'll throw
the thing in the basket and get disgusted
because we're not successful.  And generally
it's the same thing as bidding jobs that we
know we can't get because of target funds.  I
mean, you throw your hands up and walk away.

         Q.   You throw your hands up and walk away
because it's covered by a project labor
agreement?

         A.   Yeah.  We've never ever been
successful in landing a job that was covered by
a PLA and never asked to sign one.

         Q.   But that's different.  That's
different from you've never bid one.

         A.   I don't know if we've ever bid one

1   right through the end to where the quote is in

2   and then we find out.  I'm not sure if we've

3   ever got to that point.

4        Q.   Well, let me just ask you if I'm

5   following you.  I'm looking at Exhibit 31, and

6   you indicated that Exhibit 31 was an example of

7   a ballpark price.  And so when you say, I don't

8   know if we ever got to one when the final bid

9   was in, you're not talking about something like

10  that?

11       A.   No.  That would be an actual bid where

12  we have a price on the job and we give it to

13  our customer and then find out after the fact

14  that there's a -- we usually find out

15  beforehand, before we get to that point that

16  there's a project agreement on the job and they

17  have to use union employers only on the

18  project.

19       Q.   Before you issue any bid whatsoever,

20  you find that out?

21       A.   Normally.

22       Q.   Normally you do?

23       A.   Yeah.  Because the people we work for

24  also use union erectors.

82

Q.    The fabricators?

A.    Yeah.  They go in that direction once they know that it's going to be a labor agreement on the job, and we're an open shop erector.  So they go to their union erectors.

Q.    Well, I guess that's my question.  Is it your testimony that the fabricators select which erectors they want to submit bids on certain jobs?

A.    I'm not sure if that's totally correct because I don't have firsthand knowledge of that.  I'm just guessing at how it transpires within the bidding operation of the company.

Q.    Okay.  What you're telling me is that on a job that was covered by a PLA, it has never gotten to the point where you submitted a bid?

A.    Not to my knowledge.  It's possible that it was brought out after the fact but none come to mind.

Q.    Do you understand that jobs that are covered by a project labor agreement have a wage scale that is higher than the Ajax wage scale?

A.    That's probably right.

Q.    And a prevailing wage job similarly has required wage rates that are higher than Ajax's wage rates?

A.    Yes.  But we're allowed to bid on prevailing wage projects because we can pay our people the prevailing wage.

Q.    On that job?

A.    On that job.

Q.    Right.  But you don't have to pay it on every job?

A.    Correct.

Q.    It's only on jobs that are covered by the statute?

A.    Correct.

Q.    Okay.  Now, you understand that you are not permitted to submit a bid on a project labor agreement job?

A.    I don't know if we're permitted to or not, but we haven't been successful.  And I don't know if it ever got to that point where we've bid the job and then we just never hear anything on it.

Q.    Well, you do understand that if you

1    don't bid the job you can't be successful,

2    correct?

3        A.    Right.

4        Q.    Okay.  And you also understand that

5    you have never submitted a bid on a project

6    labor agreement job; isn't that also true?

7        A.    To my recollection, but I don't have

8    firsthand knowledge of every single bid that

9    goes out of that company.  I have people that

10   work for me that are very capable, and when I'm

11   not around, they handle these situations.  So

12   if I could refer to Jay Durand and ask him

13   specifically did we ever get to that point,

14   maybe he could tell me.

15       Q.    To your knowledge, but you are the

16   representative of Ajax, are you not, for the

17   purpose of this deposition?

18       A.    Correct.

19       Q.    Okay.  To the best of your knowledge,

20   you have never submitted a bid on a job that

21   was covered by a project labor agreement?

22       A.    Not to my knowledge.

23       Q.    Okay.  And you understand that in

24   order to be successful on any job, you need to

1   submit a bid?

2       A.    Pretty much.

3       Q.    The reason that you have not submitted

4   a bid on a project labor agreement, is it

5   because you don't believe you're eligible to

6   bid?

7       A.    I think what happens over the years is

8   my estimators, whoever they may be, are sick of

9   spinning their wheels on projects that we're

10  not usually in consideration for.  And if we

11  have other work to bid, whether it's prevailing

12  wage or not, we would bid those jobs that we're

13  more likely to be successful on than a job that

14  has to have a union contractor, period.  We can

15  do prevailing wage work.  We can't do PLA work

16  unless we sign on with the union organization

17  to do the job.  That's my understanding.

18      Q.    When you talk about spinning your

19  wheels, you're talking about doing the work

20  that is necessary to formulate a bid?

21      A.    Yes.

22      Q.    Right?

23      A.    Yes.

24      Q.    Okay.  And your estimators have

1    determined that the likelihood of you being

2    awarded a PLA job does not warrant the time to

3    figure the job; is that correct?

4         A.    Yes.

5         Q.    But you are aware of no legal obstacle

6    to you doing that?

7         A.    Okay.

8         Q.    Is that true?

9         A.    Yes.

10        Q.    If you did that and you were the low

11   bidder, you understand that you could get that

12   job, but you'd have to sign on to the PLA?

13        A.    Okay, yes.

14        Q.    Do you understand that?

15        A.    Yes.

16        Q.    And that may not be something you want

17   to do, but there's nothing to prevent you from

18   doing that.  Do you understand that?

19        A.    Okay.  Yes, I understand.

20        Q.    Isn't it fair to say that the decision

21   to bid or not to bid a project labor agreement

22   job is a decision that rests with Ajax?

23        A.    I say yes and no to that.  I still --

24   the fabricators that we work for have other

1    avenues that they chase on those type of jobs,

2    and that's just been my recollection of the

3    history of how these things have come out to

4    play.

5        Q.    Do you know whether Jay Steel has ever

6    participated in the bid process on a project

7    labor agreement job?

8        A.    I don't know.

9        Q.    Is it accurate that Ajax employs

10   approximately 50 employees?

11       A.    It varies from 40 to 60 at any given

12   time, up to 70 sometimes.  That's counting shop

13   and office and field.

14       Q.    How many office employees does Ajax

15   have?

16       A.    We have several part-time people,

17   three part-time people and three full-time

18   people in the office.

19       Q.    So six total?

20       A.    Six in the office.

21       Q.    How about shop employees?

22       A.    Shop is about five.

23       Q.    What do the shop employees do?

24       A.    Maintain equipment, move equipment

94

1    A.    He called me one time looking to see

2  if -- I guess he was out of work, looking for

3  some work.

4    Q.    I'd like to direct your attention to

5  paragraph 18 on page seven.  Paragraph 18

6  refers to a company called Canatal.  Are you

7  familiar with that company?

8    A.    Yes.

9    Q.    Is Canatal one of your customers?

10    A.    Yes.

11    Q.    The last sentence of paragraph 18

12  says, "Canatal has agreements with Local 7."

13  Can you tell me what agreements Canatal has

14  with Local 7?

15    A.    I don't know specifically what

16  agreements they have.

17    Q.    Do you know generally what agreements

18  they have?

19    A.    No.  I know they use union erectors

20  and open shop erectors.

21    Q.    So to say that Canatal has agreements

22  with Local 7 means that Canatal works with

23  union erectors?

24    A.    That would be my guess.

1    there, then the cost is going to go down, isn't

2    it?

3        A.    It's happened in years past.

4        Q.    And conversely when the number of

5    available workers shrinks, then the cost goes

6    up; isn't that right?

7        A.    I would think so.

8        Q.    And that's what this sentence is

9    referring to?

10       A.    It's my guess as to what it means.    I

11   didn't write it.

12       Q.    There's a parenthetical right after

13   that.  And if we ignore the parenthetical for

14   the moment, the sentence reads, "The cost

15   attributable to structural steel labor services

16   is variable and subject to competitive forces

17   and is almost always less expensive than the

18   rates set by Local 7 contractors."

19       A.    Okay.

20       Q.    Do you understand what that sentence

21   means?

22       A.    It means open shop labor rates are

23   less than Local 7.

24       Q.    Even given the variability of the

108

1    labor cost for open shop and the supply and

2    demand factors, open shop costs are going to be

3    less than union costs?

4        A.   Historically they have been.

5        Q.   All right.  Now take a look at the

6    parenthetical.  "In the absence of predatory

7    pricing tactics."  What do you understand that

8    means?

9        A.   Well, the jobs that we price and we

10   are not successful on there seems to be a

11   reason if it's won by the Local 7 contractor

12   above and beyond an open shop contractor.  And

13   my understanding of that is that they are using

14   pricing tactics to either compete with the open

15   shop and beat the open shop, and that's what I

16   think this means.

17       Q.   Let me see if I understand that

18   answer.  Normally, a union contractor with

19   higher labor costs is going to be at a

20   competitive disadvantage when bidding against

21   you?

22       A.   Okay.

23       Q.   Is that correct?

24       A.   Yes.

1    Q.    Because his labor costs are higher

2    than yours are?

3    A.    Right.

4    Q.    Right?

5    A.    Yes.

6    Q.    Okay.  The pricing tactics to which

7    you refer are the use of target fund money to

8    assist a union contractor?

9    A.    Yes.

10    Q.    Do you know what the word "predatory"

11    means?

12    A.    Large.

13    Q.    So is the amount of the subsidy that

14    controls whether it is a particular job is

15    priced in a predatory manner or not; is that

16    your understanding?

17    A.    Yes.

18    MR. AVAKIAN:  Is this a good time to

19    break for lunch?

20    MR. KELLY:  It may be.  Sure.

21    (Lunch Recess 12:30-1:30)

22    BY MR. KELLY:

23    Q.    Mr. Morel, we were looking at the

24    complaint when we broke for lunch.  And I want

125

1        A.    Yes.

2        Q.    But you don't know that for a fact, do

3    you?

4        A.    No.   I don't see the bid.

5        Q.    You don't know what they bid?

6        A.    No.

7        Q.    Is HB Welding a Local 37 contractor?

8        A.    I think they're a Rhode Island

9    company, yeah.   I don't know which local they

10   belong to.   Builders Resource is Rhode Island,

11   and they belong to Local 7, I believe.

12       Q.    But I'm interested in HB Welding

13   because this says that HB Welding is a Local 7

14   contractor, and my understanding was that they

15   weren't.   Is it your understanding that they

16   are?

17       A.    I don't know if they're Local 7 or 37.

18       Q.    All right.   Directing your attention

19   to the Cardi's Furniture job, that's on

20   paragraph 89 at the bottom?

21       A.    Yes.

22       Q.    I think you referred to FAMM Steel as

23   one of the fabricators to which you --

24       A.    They were the fabricator that had the

1   job.

2       Q.    Do you know if anyone other than Ajax

3   bid to FAMM Steel on that job?

4       A.    I don't know.

5       Q.    Did Ajax sue or otherwise press a

6   claim against FAMM Steel on that job?

7       A.    No.   When we were notified by FAMM

8   Steel that we would not able to perform our

9   contract because we did -- I believe they had

10  issued us or they were about to issue us a

11  contract.   We had a verbal contract.

12          They had given us the job, and then we

13  were informed that we could no longer do the

14  job, that Local 7 had to do the job.   So then

15  Ron Cardi actually called me personally and

16  told me that between pressures from the union

17  and/or threats, that he had to take the job

18  from us or instruct FAMM to take the job away.

19  And he was willing to compensate us $5,000 to

20  do that.

21          And we stressed our disapproval of

22  that, and we were going to push it further.

23  But we had done some other work for Cardi, and

24  he asked us to take this and walk away because

1    he didn't want the aggravation that the union

2    was going to create for him if he didn't give

3    it to them.

4         Q.    Do you know what the pressure was?

5    Did he tell you what the pressure was that

6    Local 7 was putting on Cardi?

7         A.    They don't usually get into the

8    specifics.  Every now and then a contractor

9    will, but he didn't explain the threats.

10        Q.    He didn't tell you?

11        A.    No.

12        Q.    Did he tell you that there was job

13   target money involved?

14        A.    I believe a representative from FAMM

15   may have told Jay.  I don't think that -- I

16   don't know where the $5,000 came from.

17        Q.    I thought you just said the $5,000

18   came from Ron Cardi?

19        A.    Well, he said that he would instruct

20   FAMM to give that to us, but I don't know where

21   it came from, if it was out of his pocket or I

22   don't know.

23        Q.    Now, from FAMM Steel you understood

24   there was job target money on that job?

129

1      A.   Informational picketing is not

2  illegal.

3      Q.   All right.  I'm going to direct your

4  attention to paragraph 92, the Ahlborg

5  headquarters in Cranston.

6      A.   Yes.

7      Q.   Paragraph 93 says that you and DFM

8  submitted bids for the work with a value of

9  $45,000?

10      A.   Okay.

11      Q.   Does that mean you bid $45,000?

12      A.   Yes.

13      Q.   Does that also mean that DFM bid

14  $45,000?

15      A.   I don't know what his price was.  That

16  was our price, and we were awarded the job at

17  that price.

18      Q.   And in that case were you bidding

19  directly to the general contractor or were you

20  bidding to a fabricator?

21      A.   I believe we were bidding to Metro

22  West which is a fabricator.

23      Q.   So Metro West awarded the job to Ajax?

24      A.   Yes.

1    Q.   Do you know how much Griffin Steel

2    bid?

3    A.   No.

4    Q.   Do you know whether they bid -- what

5    they bid in relationship to $45,000?

6    A.   No.

7    Q.   Do you know whether Griffin got target

8    money for that job, Ahlborg headquarters?

9    A.   I don't recall specifically if they

10   definitely got target money or not.  We're told

11   a day before or a couple of days -- I think

12   this one was like the next day -- that we're

13   off the job.  Whether they used target money to

14   get down to the price or not, we got to assume

15   they did.  I mean, that's what Dino from Metro

16   West I think is the one that called us and told

17   us that we were no longer on the job.

18   Q.   But your assumption is that if you get

19   taken off the job at the last minute, target

20   money was used if a union contractor --

21   A.   If we're awarded the job with the low

22   bidder and all of a sudden a union contractor

23   steals the job a day or a week before it's

24   going, chances are somehow they got money to

131

1    compete and steal the job away.

2        Q.    Chances are because their costs are

3    higher than yours?

4        A.    Exactly.

5        Q.    And don't you do the same thing the

6    last minute, change your bid in order to steal

7    a job from somebody else?

8        A.    Not usually.  Normally the fabricators

9    are pretty reputable and come to the two low

10   bidders and ask everyone to take a second look,

11   and it's not the same.  It's not -- once a

12   contract is awarded, we don't get asked to go

13   in and go cheaper.

14       Q.    Let me show you a document here.  Do

15   you remember Jay Steel -- I forget what job it

16   was -- telling you we needed to lower our price

17   to beat Stateline?

18       A.    I don't recall that.

19       Q.    You don't.  Let me show you a document

20   that has got pretty neat handwriting actually.

21   That's not yours, is it?

22       A.    No.

23       Q.    Whose is that, Jay Durand?

24       A.    It looks like Jay.  That's Jay

145

1    to James Stearns?

2         A.    It must have been phone calls that we

3    got or made after we didn't get the job.

4         Q.    Well, you don't know if you were low

5    on that job, do you?

6         A.    We don't know.

7         Q.    The only thing you know about that

8    job --

9         A.    Is we bid it.

10        Q.    -- is that you bid it?

11        A.    Yeah.

12        Q.    And you believe that the union

13   contractor got it because of target funds?

14        A.    Right.

15        Q.    Right?

16        A.    Yes.

17        Q.    And that's all you know about it?

18        A.    Yes.

19        Q.    So what the union contractor's bid was

20   in relation to yours --

21        A.    We don't usually find that out.

22        Q.    Now, let's assume that there is a

23   natural delta between your cost because you

24   have lower labor costs than Stearns' costs

1    because he has higher labor costs.

2        A.    Okay.

3        Q.    And let's further assume that the

4    union on this Jordan's job targeted the job for

5    exactly that amount.

6        A.    Okay.

7        Q.    We don't know what the amount is but

8    there's some amount, all right, and it brings

9    his price right down equal to yours.  And at

10    that point the contractor or the fabricator

11    says, I might as well go with Stearns.

12        A.    Could be.

13        Q.    Right?

14        A.    Yeah.

15        Q.    Now, I'm trying to figure out the

16    allegation we talked about earlier which was

17    predatory pricing, and you said it meant large.

18    Does it matter how much that difference was if

19    Stearns' price and your price are exactly the

20    same?

21        A.    It normally wouldn't be exactly the

22    same.  It would be substantially higher in a

23    normal playing field.

24        Q.    In a normal playing field it would be

147

1    substantially higher because his costs are

2    substantially higher?

3        A.    Right.

4        Q.    Right?

5        A.    Yeah.

6        Q.    And so what is unlawful, if I

7    understand it, is for the union to provide the

8    difference?

9        A.    Okay.

10       Q.    Is that right?

11       A.    Yes.

12       Q.    That's what you understand is going on

13   here?

14       A.    That's what this is all about, yes.

15       Q.    I'd like to direct your attention to

16   paragraph 120.   This is Archstone Apartments.

17       A.    Okay.

18       Q.    Now, the allegation is that Ajax

19   received a written purchase order from Mandate

20   on June 11, 2003.   Do you see that?

21       A.    Yes.

22       Q.    Were you able to locate that?

23       A.    No, I don't have that one.

24       Q.    Let me show you a document which bears

1     a number of 2942, and it appears to be a

2     purchase order from Mandate to you.

3          A.    Okay.

4          Q.    Do you recognize that 20 Watertown

5     Street as the Archstone Apartments?

6          A.    Yes.

7          Q.    So is this document the written

8     purchase order that's referred to in paragraph

9     120?

10         A.    Yes.

11               MR. KELLY:  I'd ask that be marked.

12               (Exhibit No. 35, Purchase Order,

13    Mandate Erectors, AX002942 so marked)

14         Q.    Do you know who Neil is?

15         A.    He's -- I believe he's an estimator

16    with Mandate.

17         Q.    Now, the purchase order that is marked

18    as 35 is dated what, June 23, '03?

19         A.    Yes.

20         Q.    Do you know where the June 11 date

21    came from in paragraph 120?

22         A.    No.  Maybe that was the verbal date,

23    and the purchase order followed.

24         Q.    Let me show you a document that does

149

bear the date June 11, '03 and it has some

handwriting on it.

    A.   Okay.

    Q.   Do you know what relationship Suffolk

Construction had to that job?

    A.   Neil must have asked him to break out

a different erection number.

    Q.   Who must have?

    A.   Neil from Mandate.

    Q.   Must have asked Jay?

    A.   He must have had to break out the

erection for Suffolk maybe, and he may have

asked him to protect him on the number.

    Q.   Suffolk being what, the general

contractor?

    A.   Yeah.

    Q.   But apart from the handwriting on that

particular document, it is a bid for the

Archstone work at $160,000, right?

    A.   Correct.

    Q.   The handwriting says what, something

about the bid is only to fool Suffolk?

    A.   Yeah, schedule of values.

    Q.   All right.  I'm going to show you

1    another document also on this job and also it's

2    the same date and it's got a different price.

3        A.    Okay.  This is the bid on the job.

4        Q.    That's the bid on the job?

5        A.    This is the bid on the job.

6        Q.    169,200 something?

7        A.    Right.

8        MR. KELLY:  I'd like to mark the 160

9    bid as the next Exhibit 36 and then the 169 bid

10   as Exhibit 37.

11       (Exhibit No. 36, Bid No. 0206-9,

12   AX002914 so marked)

13       (Exhibit No. 37, Bid No. 0206-9,

14   AX002911 so marked)

15       Q.    Now, you wound up getting the job for

16   160, didn't you?

17       A.    It looks like he gave us a purchase

18   order for 160.  He may have made some kind of

19   sideline deal with Jay.  I don't know why it's

20   like that.

21       Q.    You mean a sideline deal that will

22   take care of the other 9,000 off the books?

23       A.    No, maybe in a change order or

24   something like that.

1    Q.   All right.

2    A.   A lot of times these fabricators don't

3    issue us purchase orders, and they give us the

4    job verbally, okay, you got the job.  And then

5    we wait and we wait and we wait, and we don't

6    get the purchase order.  So then Jay will end

7    up chasing them for the purchase order and

8    maybe and they grab the quote that they were

9    showing a break out for Suffolk and he wrote it

10   for that amount.  I don't know the

11   circumstance.

12   Q.   This stamp on the bottom of Exhibit 35

13   indicates that the --

14   A.   It came in the mail that date.

15   Q.   It came into your office on

16   September 15, even though it may have been

17   prepared on June 23?

18   A.   Yeah, that's the date that it came in.

19   August 3.  I think it was August 3.

20   Q.   What was August 3?

21   A.   I don't know what Mandate is using for

22   dates on there.  I know what date we got it in

23   the mail.  He may have prepared it on one of

24   these dates, and then we didn't get it until

152

then.

Q.    Now, there's an allegation in paragraph 121 that Ajax invested a substantial amount of preparation time and cost in preparing the project.

A.    Job site visits.

Q.    And that would be when, prior to submitting your bid or after you submitted the bit?

A.    I don't know.  Sometimes we have to visit a job site before we bid it to check that we have crane access but not always.

Q.    Well, there are a number of jobs that are alleged in this complaint, okay, and there's a number of bids that are alleged to have been made in good faith and then switched at the last minute to somebody else.  There are very few allegations such as this one, and I'm wondering what it was about this Archstone job that prompted you to allege that you had invested a substantial amount of preparation time in preparing that project?

A.    Because of where the job is located and the site visits that were required most

 1    probably.

 2         Q.    There were more site visits required

 3    on this particular job than other jobs?

 4         A.    In Watertown it's probably a tighter

 5    district.  I wasn't firsthand to that so I

 6    don't know, but I'm just assuming that that's

 7    what happened with that one.

 8         Q.    Are there records of the amount of

 9    time and the site visits and so forth that you

10    maintain?

11         A.    No.

12         Q.    So in order to determine what the

13    substantial amount of preparation time and

14    costs that were involved in the Archstone

15    apartments, what would somebody have to do in

16    order to find out what it was?

17         A.    Generally, when we get that far down

18    the road, a job is taken away last minute;

19    there's more preparation than if they take the

20    job away right away before we -- we don't have

21    estimating costs.

22         Q.    When was the scheduled start date?

23         A.    I don't remember.

24         Q.    How do you know that it was two weeks

154

1  before the start date?

2      A.   Probably Jay in the office would have

3  remembered that.

4      Q.   Did Jay in the office provide

5  information for this complaint?

6      A.   He's the estimator for the company.

7      Q.   I understand that.  You said that

8  earlier.  My question is:  Did he provide

9  information for this complaint?

10     A.   Yes, some of the jobs.

11     Q.   In order to find out the answers to

12 these questions about the Archstone job, we

13 would have to talk to Jay in the office?

14     A.   Probably, yes.

15     Q.   But you, sitting here today, don't

16 know what the basis is for the allegations in

17 paragraph 121 other than what you've said so

18 far?

19     A.   Right.

20     Q.   What is -- the fabricator was Mandate?

21 What do you understand the illegal pressure was

22 that was on Mandate on the Archstone apartments

23 job?

24     A.   Probably the typical union pressures

1    that affect the GC and roll down the fabricator

2    to us.  I don't think Mandate was pressured

3    themselves.  It's usually the general

4    contractor that tells them that they need to

5    use a union contractor.

6        Q.    You may be referring here to

7    informational picketing?

8        A.    Yeah, probably.

9        Q.    Now, Mandate is a regular customer of

10   yours, isn't it?

11       A.    Yes.

12       Q.    You didn't sue Mandate for the costs

13   that you incurred?

14       A.    No, we didn't sue anyone.

15       Q.    But if I understand what was going on

16   here, the idea of this Exhibit 36 was to

17   convince Suffolk that the prices were

18   sufficiently reasonable to get awarded the

19   contract?

20       A.    I don't know that that's a specific

21   reason for that.

22       Q.    But that's generally what drives the

23   contract?

24       A.    Schedule values.  Generally that's

1    what drives it, yeah.

2        Q.    And as a general rule, the lower the

3    price the happier the customer?

4        A.    I would think.

5        Q.    Right?

6        A.    Yeah.

7        Q.    Isn't that how it works?

8        A.    Yeah.

9        Q.    The lower the price, the fewer

10   competitors at that price?

11       A.    It's a fair statement.

12       Q.    Right?

13       A.    Right.

14       Q.    How about the Halifax Stop & Shop,

15   were you able to find the bid for that?

16       A.    I think so.

17       Q.    All right.  What you've handed me

18   appears to be a three-page bid for the Halifax

19   Stop & Shop with a bid date of June 18, 2004?

20       A.    Yes.

21       Q.    Did you ever receive a purchase order

22   or contract for this job?

23       A.    I don't think so.

24       Q.    So what you did -- what you got was a

```
 1        A.    They do fair amount size work like we
 2   do.
 3        Q.    Daniel Koury is about the same size as
 4   you?
 5        A.    I'd be guessing but I would say so.
 6        Q.    How about Interstate Steel Erectors?
 7        A.    I don't know how big he is.
 8        Q.    Could be bigger than you, could be
 9   smaller than you?
10        A.    Correct.
11        Q.    Would you agree with me that one of
12   the results of the competitive bidding process
13   is that the customer gets the lowest price?
14        A.    Yes.
15        Q.    Would you also agree with me that the
16   primary basis on which steel erectors compete
17   with one another is their labor costs?
18        A.    Yes.
19        Q.    Now, can you tell me how the process
20   is hurt if the customer gets the lowest
21   possible price?
22        A.    The process is hurt?
23        Q.    Yeah.  The competitive process?
24        A.    Well, the customer is not being hurt.
```

1  because the customer gets the lowest price?

2      A.    Right.

3      Q.    Isn't that right?

4      A.    Yes.

5      Q.    Do you know if any of those union

6  steel erectors on any of these jobs, if they

7  actually lost money?

8      A.    I would have no way of knowing that.

9      Q.    Okay.  Isn't it true that you're not

10  claiming that they lost money?

11      A.    Right.

12      Q.    You're alleging that the union lost

13  money because it gave money to the union steel

14  erectors?

15      A.    Yes.

16      Q.    Right?

17      A.    Yes.

18      Q.    The union steel erector wasn't hurt in

19  that process, was he?  He didn't bid below his

20  cost, did he?

21      A.    No.  He was compensated.

22      Q.    Isn't what you're complaining about in

23  this case, precisely that your advantage of

24  lower labor costs is removed when the union

1    puts money on the table?

2       A.    Yes.

3       Q.    That's what you're complaining about?

4       A.    Yes.

5       Q.    Right?  Now, do you remember answering

6    some interrogatories?  I think we've got an

7    exhibit that was -- I'm going to show you what

8    we marked Exhibit 2.  This was at Glenn

9    Pisani's deposition, and there's a verification

10   document at the end.  I just want you to take a

11   look at that and verify that's your signature.

12      A.    Yes.

13      Q.    Now, did you participate in the

14   drafting of the answers to these

15   interrogatories, Mr. Morel?

16      A.    With Mike.

17      Q.    And in preparation of the answers to

18   these interrogatories, did you consult with

19   anybody other than the lawyer?

20      A.    No.

21      Q.    Now, take a look at answer to No. 4 or

22   question No. 4 and answer No. 4 on page two.

23   You're not involved in the erection of erecting

24   metal building exteriors, are you?

1    give you work for a period of six months?

2         A.    Not specifically.

3         Q.    You're not aware of such an agreement?

4         A.    No.

5         Q.    It's divided in two parts that

6    question just because we're trying to figure

7    out if there's an agreement for more than six

8    months or for less than six months.  Are you

9    aware of any agreement that Local 7 has with

10   any of your customers to preclude you from work

11   for any period of time?

12        A.    I don't think it's an ongoing

13   agreement that says every single job.  I don't

14   know of such an agreement.  They could be out

15   there.  Certain contractors we never get work

16   from for one reason or another.  I don't know

17   Gilbane for one.  I mean, I don't know what

18   agreements they have.  Some of them are

19   signatory with the operating engineers, Suffolk

20   may be a signatory with one and GC with

21   another.  So I don't know which ones are

22   signatory with the union where they get all the

23   work and we don't per se.

24        Q.    Do you know if Gilbane has an

263

**C E R T I F I C A T E**

**COMMONWEALTH OF MASSACHUSETTS**

**COUNTY OF MIDDLESEX ss.**

I, Darlene Caiazzo Sousa, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript of the deposition of **DONALD MOREL**, having been duly sworn, on **Tuesday, July 11, 2006,** is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this _____14th_____ day of _____July_____, 2006.

_____
Darlene Caiazzo Sousa, RPR
Notary Public

My commission expires:   November 15, 2007

VOLUME:  I
PAGES:   1-200
EXHIBITS 97-133

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,       *
                                      *
v.                                    *
                                      *
LOCAL UNION NO. 7, INTERNATIONAL      *
ASSOCIATION OF BRIDGE,                *
STRUCTURAL, ORNAMENTAL &              *
REINFORCING IRON WORKERS,             *
                    Defendant.        *
*****************************************

        30(B)(6) DEPOSITION OF AMERICAN AERIAL

SERVICES, INC., a witness called on behalf of the

Defendant, taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the

Commonwealth of Massachusetts at the law

offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Friday, July 14, 2006, commencing at 9:00 a.m.


                    PATRICIA BOWEN
                   124 Downing Drive
            Attleboro, Massachusetts 02703
                    (508) 222-9403

I N D E X

WITNESS:    JAMES READ

EXAMINATION

Ms. Talwani  6, 294

Mr. Avakian  281

| NO. | Exhibit | PAGE |
|-----|---------|------|
| 97 | 6/29/06 Attachment to Interrogatories.. | 15 |
| 98 | Renotice of Deposition................. | 16 |
| 99 | Aerial's 1999 Tax Returns.............. | 52 |
| 100 | Aerial's 2000 Tax Returns.............. | 52 |
| 101 | Aerial's 2001 Tax Returns.............. | 52 |
| 102 | Aerial's 2002 Tax Returns.............. | 52 |
| 103 | Aerial's 2003 Tax Returns.............. | 52 |
| 104 | Aerial's 2005 Tax Returns.............. | 52 |
| 105 | 2/25/03 Fax........................... | 72 |
| 106 | 2/23/01 Bid........................... | 75 |
| 107 | 2/15/06 Bid........................... | 76 |
| 108 | 11/29/04 Letter....................... | 80 |
| 109 | Invitation to Bid..................... | 80 |
| 110 | 8/16/01 Bid........................... | 82 |
| 111 | 5/25/00 Bid........................... | 85 |
| 112 | Invitation to Bid..................... | 86 |

1      Q.    So you know from that prior experience

2    and from attending this the basic rules.  I'll try

3    not to talk over you and you try not to talk over

4    me.  Okay?

5      A.    Yes.

6      Q.    And you have to answer audibly.  If you

7    nod your head, she can't get it down.

8      A.    Yes.

9           MS. TALWANI:  And same stipulations as

10          before?

11          MR. AVAKIAN:  Yes.

12          MS. TALWANI:  Objections except as to

13          form and motions to strike are held, and I

14          guess we waived notary was the other.

15          MR. AVAKIAN:  Yes, we can waive it.

16      Q.    And you're here as a person identified by

17    the Plaintiff, American Aerial Services, in response

18    to a deposition notice to them, correct?

19      A.    Yes.

20      Q.    And what's your relationship with

21    American Aerial Services?

22      A.    President.

23      Q.    And how long have you held that position?

24      A.    Since 1997.

1      A.      I've had violent acts committed against

2  American Aerial Services.

3      Q.      Is that part of why you have brought

4  Local 7 into court?

5      A.      That is not the reason I have brought

6  Local 7 into court.

7      Q.      Are those facts on which you are relying

8  in seeking a claim against Local 7?

9      A.      I have not used that as a basis of any

10 claim.

11     Q.      Okay.  So as far as this case is

12 concerned, there are no allegations by American

13 Aerial against Local 7 for any acts of violence, is

14 that correct?

15     A.      That's correct.

16     Q.      Do you have any allegations of unlawful

17 picketing that make up any part of your complaint

18 here against Local 7?

19     A.      No.  Let me expand upon that briefly.  We

20 have had Local 7 membership and, lack of better

21 term, "management" at our sites, on sidewalks.  I do

22 not believe it constitutes picketing, but we have

23 had them very visibly on our job sites.

24     Q.      Is it your position that something about

1    co-conspirators.

2        Q.    Can you --

3        A.    -- I'm answering that.  Allow me to

4    answer it.  Has contacted -- rather my phrase is

5    co-conspirators, and has encouraged them or not to

6    give jobs or to give jobs to preferential union

7    contractors.  Such call was made to Canatal.  I have

8    received phone calls from John Evans stating that he

9    will put me out of business.  I've had those same

10   conversations with Jay Hurley.  I have had a, again,

11   I'm not sure I'm using the term properly,

12   "co-conspirator," stated to an employee of mine that

13   I better watch out or I'll be hurt.  Those types of

14   actions, samples of those actions, I'm aware of

15   those actions.

16       Q.    I can't defend this lawsuit just based on

17   samples, so could you please continue and give me

18   all of the examples.

19       A.    I've had an employee run off the road by

20   a member of Local 7 with another vehicle, which is

21   considered a deadly weapon.  We made a phone call to

22   the Kingston Police Department.  And I was told that

23   he is either the captain or the chief of police's

24   son, and they will not take any action.

1    I have had members of Local 7 surround me and

2    intimidate me by invasion of my space.

3    I have had Local 7 membership and New Hampshire

4    membership attend a job site in New Hampshire and

5    create an altercation with the parking lot security

6    and their attempts to view and impact our job site.

7    Those are the only cases I can recall at this time.

8    Q.    Okay.

9    A.    I'm going to rephrase that.   Another

10    item.   In 1998, our crane was sabotaged in Nashua,

11    New Hampshire at which time our company was

12    receiving a great deal of union activity.   We don't

13    know who sabotaged the crane.   The damage done to it

14    was determined by a Local 4 crane operator that we

15    had in our employment.   And the morning he

16    identified the sabotage, he called all the employees

17    off the building and pointed out to them that this

18    particular sabotage would of had a catastrophic

19    effect on the crane, and there would have been death

20    involved.   I cannot prove who sabotaged the crane.

21    That's all I can recall at this time.

22    Q.    Have there been threats of localized and

23    widespread picketing that you are aware of?

24    A.    Understand the definition of picketing,

1    A.    I do not.

2    Q.    Who made the report?

3    A.    The police did.

4    Q.    And was any employee of American Aerial

5    involved in this altercation?

6    A.    No.

7    Q.    Was an employee of American Aerial --

8    Were you a witness to this event?

9    A.    No.

10    Q.    Who did you hear about it from?

11    A.    From the superintendent of the project,

12    from Pro Con.

13    Q.    And was the super of the project a

14    witness?

15    A.    I don't know that.

16    Q.    And you didn't ask for a copy of the

17    police report?

18    A.    I did not.

19    Q.    I take it this didn't effect the job that

20    you and your crew were doing?

21    A.    I believe it does affect my crew.

22    Q.    Well, did it effect the job, did it take

23    them longer to do the work?

24    A.    I believe it caused them to slow down

1    because they -- One, they hear about these things.

2    They talk about it they feel they are being watched.

3    They see the risk of violence.  I believe it has an

4    impact on the productivity of my crew.

5        Q.    So you're suing for loss of productivity?

6        A.    The suit, the majority of the damages,

7    the damages from what I understand this suit, are

8    based upon lost revenue, lost profit which are a

9    result of the use of target funds.

10       Q.    But as to this allegation, I had asked

11   you if you were seeking a remedy here.  Is the

12   remedy you're seeking, lost productivity?

13       A.    I am not seeking any financial remedy for

14   that act.

15       Q.    Are you seeking any other kind of remedy

16   for that act?

17           MR. AVAKIAN:  Objection.  I think the

18           complaint states what the request for remedies

19           are.

20           MS. TALWANI:  Objection.  Are you

21           instructing him not to answer?

22           MR. AVAKIAN:  No.  He can answer.

23           MS. TALWANI:  We have had very amiable

24           depositions here, but it is very clearly the

1    market, we also, Maine is different than

2    Massachusetts which did not come up in the

3    deposition I did sit in on.  General contractors are

4    more active in soliciting bids directly from

5    erectors than in Massachusetts, New Hampshire, Rhode

6    Island.  It's more common to bid equally to general

7    contractors.

8        Q.    I appreciate that distinction.  Okay.  So

9    in Maine when you learn about a project, you would

10   generally contact both the general and the

11   fabricators to find out whether the general wants to

12   receive a bid directly or to bid to the various

13   fabricators?

14       A.    That is our goal.

15       Q.    And in terms of preferred, having a

16   preferred relationship, are there some fabricators

17   or generals who you have a closer working

18   relationship, that you're the person they would

19   think of first, as far as you know?

20       A.    I'll answer this way:  We don't receive

21   preferential treatment.  If the prices are equal,

22   would we get the nod to do the project.  If dollar

23   for dollar we were the same, the answer is yes,

24   there are some cases where we may be successful.

66

1    Yet, I don't believe we receive any

2  preferential treatment outside of the bidding arena.

3  If a fabricator has a project that is his project,

4  he did not bid it, he designed, built, and did not

5  bid that to the marketplace, would I get a call from

6  some fabricators to install that, that might happen.

7  It's so infrequent, though, it doesn't register.  We

8  bid a large amount of projects.

9    Q.    Okay.  But it must be the case, and this

10  goes partially to what you said about prices are

11  equal, it must be the case that in the market people

12  have a reputation?

13    A.    Yes.

14    Q.    So if you say you're going to do this job

15  for $100,000, and the next guy says he's going to do

16  the job for $100,000, you might have more

17  credibility about your number, for example?

18    A.    Yes.  But the odds of having a price so

19  similar, that we would be successful is highly

20  unlikely.  The marketplace is very competitive.  If

21  your price is five grand cheaper, it's five grand

22  cheaper.  It's competitive bidding.

23    Q.    All right.  There are some fabricators

24  who will invite, specifically invite bids, correct?

78

1    A.    They don't note it for most cases.  We

2  receive an invitation and sometimes it will be

3  marked.  Well, actually, They will have a spot that

4  says union or non-union.  I take it as meaning, I'm

5  a non-union bidder to them.

6    Q.    You don't take that to mean that you

7  can't bid it, they just want to know?

8    A.    Right, what I am.

9    Q.    Do you know sometimes that a job is

10  prevailing wage before you bid it?

11    A.    We hope to know that before we bid it.

12    Q.    And that would hopefully be in the

13  invitations to bid or the initial information

14  provided to you by the fabricator?

15    A.    Yes.

16    Q.    And you bid prevailing wage jobs,

17  correct?

18    A.    Yes.

19    Q.    Have you ever bid a project labor

20  agreement job?

21    A.    Not that I know of.

22    Q.    And do you have an understanding as to

23  whether you are permitted to bid a project labor

24  agreement job?

79

1   A.  I believe the answer is, yes, we can bid

2 them. I just don't know of any.

3   Q.  You've chosen, you can bid them and

4 you've chosen not to?

5   A.  That's incorrect. I don't know. I said

6 earlier, I don't know if I have bid jobs that have

7 had that opportunity. I don't know whether they

8 have a labor agreement.

9   Q.  You just bid everything and if it

10 happened to have a project labor agreement, that

11 wouldn't stop you from bidding it?

12   A.  I've never been told that this is a PLA

13 on a particular job. No one has introduced that

14 aspect into the bidding process with me.

15   Q.  So you have never, to your recollection,

16 learned of a project, and then learned that it was a

17 project labor agreement project?

18   A.  I can't think of instances to do with the

19 ironworkers, no, I can't.

20   Q.  Is it fair to say that there aren't many

21 project labor agreements in Maine?

22   A.  That's probably a very fair statement.

23   Q.  And it's probably fair to say there are

24 not too many project labor agreements, the same

1    question, for New Hampshire?

2        A.    I don't think so.  I suspect not.

3        Q.    And that's where you do the bulk of your

4    work?

5        A.    Yes.

6            MS. TALWANI:  Mark this.

7            (Exhibit Nos. 108 and 109 marked.)

8        Q.    Okay.  Showing you a document that the

9    court reporter has marked as Exhibit 108, and it

10   appears to consider a dispute that I'm truly

11   actually not particular interested in.  But I want

12   to ask you about a sentence in the letter, so I need

13   you to identify this document first.  So can you

14   tell me if this is this a letter from your files?

15       A.    Yes.

16       Q.    And is this a letter that you received

17   from a general or a fabricator?

18       A.    A fabricator.

19       Q.    And in the first sentence there is a

20   reference using the word "preferred."  Do you see

21   that?

22       A.    Yes, I do.

23       Q.    Do you have an understanding what's meant

24   there?

1    Q.    Could you read what it says?

2    A.    Randy, I would prefer not to erect this

3  project on the 128 beltway.  It will cost us in both

4  man power and equipment.

5    Q.    So you submitted a bid, but at the same

6  time, you told him you were not interested in the

7  job?

8    A.    It could have been a lot of reasons.  But

9  I submitted a bid.  I would have done the bid if

10  they had accepted it.

11    Q.    So when you say you submit bids, you also

12  include submitting bids that you prefer not to do,

13  and you let them know that you would prefer not to

14  do it?

15    A.    Exception, not the rule.  We bid 4, 5

16  jobs a day sometimes, and we have been in business

17  since 1997.  We don't have a lot of examples.

18    Q.    Is it your testimony that you have bid

19  jobs in Massachusetts at this same -- Strike that.

20    You're currently bidding all the jobs that you

21  can see in Massachusetts, correct?

22    A.    That is our goal to bid all that we can.

23    Q.    And that's what your current practice is,

24  correct?

1    where you will work directly for the general, and

2    the general will have the fabricator separated?

3         A.    No and yes.  The fabricator may want to

4    sell a package to the general contractor, and the

5    general contractor may want to save the mark up on

6    the steel erecting services, so they may elect to

7    contract directly with the steel erector.

8         Q.    At one of these other depositions I

9    learned about brokers.  Is that a concept with which

10   you're familiar where there is somebody that's

11   neither the steel erector or the fabricator putting

12   the package together?

13        A.    Yes.

14        Q.    Do you bid to brokers?

15        A.    Yes.

16        Q.    I asked you about the competitors you

17   had.  Can you tell me who the fabricators are to

18   whom you generally bid?

19        A.    I can't.  I don't recall all of them.  I

20   can probably take a hour.

21        Q.    Well, if you could start with sort of the

22   big ones first, the big ones in terms of who you bid

23   to very often?

24        A.    Canatal Industries, Tri-Max, Precision

1    Welding, Megquier & Jones, Structural Systems,

2    Mandate, Capone, Norgate, McBrady, Superior, Ocean,

3    Novel, Bennington, Isaacson, Breton, Super Metal,

4    Sturo Metals, S-T-U-R-O, Shawmut.   There is others.

5    I don't recall the names.

6         Q.    And have you at some point or another

7    done work for each one of these fabricators?

8         A.    I don't know if I've done work for all

9    the ones I've mentioned, no.

10        Q.    I'll go down the list.   Canatal?

11        A.    Yes.

12        Q.    Tri-Max?

13        A.    Yes.

14        Q.    Precision?

15        A.    Yes.

16        Q.    Megquier & Jones?

17        A.    Yes.

18        Q.    Structural Systems?

19        A.    Yes.

20        Q.    Mandate?

21        A.    Yes.

22        Q.    Capone?

23        A.    Yes.

24        Q.    Norgate?

1      A.    Back up to Capone.  I don't recall if I

2    have done work for Capone.

3      Q.    Norgate?

4      A.    Yes.

5      Q.    McBrady?

6      A.    Yes.

7      Q.    Superior?

8      A.    Yes.

9      Q.    Ocean?

10     A.    Back up to Superior, maybe not.  I don't

11   recall.

12     Q.    Ocean?

13     A.    Yes.

14     Q.    Novel?

15     A.    Yes.

16     Q.    Bennington?

17     A.    Yes.

18     Q.    Isaacson?

19     A.    Yes.

20     Q.    Breton?

21     A.    Yes.

22     Q.    Super Metal?

23     A.    I don't recall.

24     Q.    Sturo?

```
1          A.    Yes.

2          Q.    Shawmut?

3          A.    Yes.  I have others if want me to give

4     other names.

5          Q.    Sure.

6          A.    Blouin.

7          Q.    Have you done work for Blouin?

8          A.    Yes.

9          Q.    Ledgewood?

10         A.    General contractor.

11         Q.    Any other fabricators?

12         A.    I'm sure I'll come up with some. The list

13    is not inclusive.

14         Q.    There are a lot?

15         A.    There are a lot.

16         Q.    You're probably submitting 5 bids a day?

17         A.    3 to 5 a day.

18         Q.    3 to 5 projects a day, not 3 to 5 bids?

19         A.    No, projects, not individual bids,

20    projects.

21         Q.    And on the 3 to 5 projects, you might

22    submit, 5 to 10 to 15 bids?

23         A.    Yes.

24         Q.    On the generals, Ledgewood?
```

1   A.  Yes.

2   Q.  Who else?

3   A.  Okay.  I'll start in New Hampshire,

4 MacMillan.

5   Q.  You've bid to them?

6   A.  Yes.

7   Q.  And you have done work for them?

8   A.  Yes.  Hutter, H-U-T-T-E-R, Pro Con.  In

9 Maine, Allied/Cook, HP Cummings, Payton

10 Construction.  I'm mean, there is just so many of

11 them, in 10 years, 9 years, I don't have all the

12 names.

13   Q.  Have you done work for Hutter?

14   A.  Yes.

15   Q.  For Pro Con?

16   A.  Yes.

17   Q.  For Allied/Cook?

18   A.  Yes.

19   Q.  For HP Cummings?

20   A.  Yes.

21   Q.  And for Payton Construction?

22   A.  Yes.

23   Q.  Do any of the fabricators, to your

24 knowledge, do any of the fabricators have an

1   after bid day and change their bid amount, thereby

2   rendering me no longer low bidder.

3       So does that constitute an agreement, some sort

4   of meeting of the minds takes place there.  So I

5   don't know the legal implications, but a layperson

6   would say that they came up with an agreement to

7   allow that union contractor to do the job.

8       Q.    Okay.  I'm putting aside, and I'm not

9   worrying about the legal description or anything of

10  that sort.  I'm putting aside the single project or

11  several occasions of different single projects that

12  we are going to talk about later.  And what I'm

13  asking you about is whether you believe there is a,

14  call it, a meeting of minds, an agreement, an

15  arrangement whereby Local 7 has with these

16  fabricators, whereby they are agreeing not to use

17  you systematically on a particular job?

18      A.    No.  I do not know of any agreement that

19  systematically says that they will not use American

20  Aerial Services at the direction of Local 7.

21      Q.    And the same question with regard to the

22  general contractors to whom you bid?

23      A.    There have been cases where our bids have

24  not been considered because of the location of the

1    the fabricator had actually received the price from

2    the erector instead of putting out their own price.

3    There could be a number of reasons.

4         Q.    When you say "shopping around," what do

5    you mean?

6         A.    Well, shopping is a term that we use when

7    a fabricator or a general contractor solicits bids

8    after bid day.

9         Q.    And in your experience, does that

10   sometimes happen?

11        A.    Yes.

12        Q.    And when that happens, the fabricator

13   essentially has the information as to what some of

14   the players will do the work for, and they can use

15   that information to try to get a lower price from

16   someone else?  Is that what you understand happens?

17        A.    Yes.

18        Q.    Is there ever sort of a, what you might

19   feel a more legitimate reason for shopping around?

20   For example, if I was a fabricator who had a good

21   reputation with you, and I was happy with your work,

22   and, you know, things had worked out on the last

23   job, and I get the bids, and you're very close to

24   the next number, is there any sort of, in your view,

1    you can claim that they are going in and setting

2    prices by which they are losing money, correct?

3        A.    We have had two erectors or multiple

4    erectors, and I can think of two that have gone out

5    of business that had been signatories.  One is the

6    job in Yarmouth, Maine.  The other is in Brewer,

7    Maine.  Those are the markets I've done more work

8    in, I am familiar with.  And that's a very high rate

9    of failure in my marketplace.

10        Q.    What's the name of the other company, the

11    one in Brewer?

12        A.    Industrial Enterprises.

13        Q.    Do you know whether they primarily did

14    work in Maine?

15        A.    They did.

16        Q.    Do you know if they were Local 7

17    contractors?

18        A.    I do not know whether they are part of

19    Local 7 or under the umbrella of Local 7.

20        Q.    Well, do you know whether they are

21    signatories with a Local 7 contract?

22        A.    I don't know if they are signatories or

23    had a job specific agreement.

24        Q.    Do you know that they have any agreement

1    unlawful.

2        Q.    It's business.  Do you have any knowledge

3    of an agreement between your competitors to take

4    your men away?  And I mean, between them, not

5    between them and some other entity?

6        A.    I don't understand what may constitute an

7    agreement.  Do I believe that my competitors have

8    sat down, being the erectors, have sat down and

9    conspired, the erectors have conspired with each

10    other to target the American Aerial Services?  I do

11    not believe my erecting competitors have sat down

12    and conspired to take my workers.

13        Q.    And you know of no facts that would

14    support an allegation that your competitors have sat

15    down and reached an agreement to steal your

16    employees?

17        A.    I have had John Evans, Parquet, out of

18    New Hampshire, and others tell me that they will

19    take my employees.  And do they have an agreement or

20    an understanding with those that they will place

21    those employees with, I don't know.

22        Q.    Well, putting aside the question of

23    whether the union might have an agreement with a

24    particular employer, that I'm going to get you some

COMMONWEALTH OF MASSACHUSETTS
Bristol, ss.


        I, PATRICIA BOWEN, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on the
14th day of July, 2006, at the offices of
Segal, Roitman & Coleman, 11 Beacon Street, Boston,
Massachusetts, the following
named person, to wit:  JAMES READ
who was by me duly sworn to testify to the truth
and nothing but the truth as to his knowledge
touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination
was reduced to writing by me; and that the
statement is a true record of the testimony given
by the witness, to the best of my knowledge and
ability.

        I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.

        WITNESS MY HAND this 20th day of July,
2006.


                              Patricia Bowen
                              Notary Public


My Commission Expires
February 2, 2012

        The foregoing certification of this
transcript does not apply to any reproduction of
the same in any respect unless under the direct
control and/or direction of the certifying reporter.

VOLUME:  I
PAGES:   1-184
EXHIBITS:  59-96

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
AMERICAN STEEL ERECTORS, INC.,et als. \*
                    Plaintiffs,          \*
                                         \*
v.                                       \*
                                         \*
LOCAL UNION NO. 7, INTERNATIONAL         \*
ASSOCIATION OF BRIDGE,                   \*
STRUCTURAL, ORNAMENTAL &                 \*
REINFORCING IRON WORKERS,                \*
                    Defendant.           \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

30(b)(6) DEPOSITION OF AMERICAN STEEL

ERECTORS INC., a witness called on behalf of the

Defendants, taken pursuant to Rule 30(b)(6)

of the Federal Rules of Civil Procedure,

before Patricia Bowen, Professional Shorthand

Reporter and Notary Public in and for

the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Thursday, July 13, 2006, commencing at 9:52 a.m.


PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts 02703
(508) 222-9403

```
                    I N D E X

WITNESS:      RAYMOND CILLEY

            DIRECT    CROSS    REDIRECT    RECROSS

Mr. Kelly    5                    176

Mr. Avakian            172
```

| No. | Exhibit | PAGE |
|---|---|---|
| 59 | Certificate of Registered Trade Name.... | 28 |
| 60 | Application Certificate of Authority.... | 28 |
| 61 | 3/6/06 Letter........................... | 28 |
| 62 | Corporation Annual Report............... | 28 |
| 63 | 3/6/06 Invoice.......................... | 28 |
| 64 | 10/31/01 Financial Report............... | 46 |
| 65 | 10/31/02 Financial Report............... | 46 |
| 66 | 10/31/03 Financial Report............... | 46 |
| 67 | 10/31/04 Financial Report............... | 46 |
| 68 | 10/31/05 Financial Report............... | 46 |
| 69 | The Loft Saratoga Springs Document...... | 46 |
| 70 | American Steel Employee Notice.......... | 46 |
| 71 | 5/14 Handwritten Note................... | 46 |
| 72 | Handwritten Note........................ | 46 |
| 73 | Spruce Camp Documents................... | 46 |
| 74 | 6/9/05 Letter........................... | 46 |
| 75 | International Association Wage Rates.... | 46 |

1                          * * *

2              RAYMOND CILLEY, a witness called for

3         examination by counsel, having been

4         satisfactorily identified and duly sworn,

5         testified as follows:

6                          * * *

7                    DIRECT EXAMINATION

8         Q.    Would you state your full name for the

9    record, sir?

10        A.    Raymond Cilley.

11        Q.    C-I-L-L-E-Y?

12        A.    Correct.

13        Q.    Have you ever had the opportunity of

14   being a witness at a deposition before today?

15        A.    Yes, I have.

16        Q.    And what context have you been a

17   deposition witness?

18        A.    In what context, as relating to job site

19   accidents probably.

20        Q.    How many times have you been a witness

21   before today?

22        A.    Just once or twice.

23        Q.    Okay.  The ground rules you've probably

24   been over before.  But, basically, you and I should

1      Q.     And to wage and benefit package

2  comparable with the New Hampshire area, correct?

3      A.     Yeah, within our market.

4      Q.     Right.  And a commitment to provide as

5  much work as possible close to your home, correct?

6      A.     Correct.

7      Q.     And the homes that you're referring to,

8  are the homes of your workers?

9      A.     Correct.

10     Q.     And they live in New Hampshire?

11     A.     Most of them do, yes.

12     Q.     And your employees actually prefer to

13  work close to home, don't they?

14     A.     Yes.

15     Q.     And as we saw with the Saratoga Job,

16  sometimes it's more difficult and more expensive to

17  do work away from home?

18     A.     Correct.

19     Q.     We marked another document.  This one is

20  Exhibit 73.  And it refers to a job in Vermont.  If

21  I'm not mistaken it's a 2006 job.  I would like you

22  to take a look at it.  It's a 3 page document.  Have

23  you looked at the 3 pages, Exhibit 73?

24     A.     Yes.

72

1    A.    No, not necessarily.

2    Q.    Does that happen sometimes?

3    A.    Yes.

4    Q.    And when that does happen, you are more

5    than likely to give that fabricator a lower price

6    than the other ones?

7    A.    Yes.

8    Q.    Using this Auburn Elementary School Job

9    as an example, you received a set of drawings from

10   Canatal?

11   A.    Yes.

12   Q.    And they ask you to take a look at them

13   and bid them?

14   A.    Yes.

15   Q.    And this is something, I take it, your

16   estimator does quite frequently?

17   A.    Yes.

18   Q.    Is it common for you to be solicited for

19   jobs?

20   A.    Yes.

21   Q.    By fabricators?

22   A.    Yes.

23   Q.    Is it also common for you to be solicited

24   by general contractors?

1    A.    Not as common.  It does happen, but not

2  very common.

3    Q.    And when you're solicited by a general

4  contractor, is that generally because you had a

5  positive experience with that general contractor in

6  the past?

7    A.    Mostly likely that would be the reason.

8    Q.    Do some general contractors like to price

9  separately the fabrication and erection?

10    A.    A small percentage, do.

11    Q.    A small percentage of general

12  contractors?

13    A.    Correct.

14    Q.    Do they tend to be large general

15  contractors?

16    A.    Yes.

17    Q.    Now, when you learn of a job, either

18  because somebody like Canatal solicits you, do you

19  make it your business to find out who the other

20  fabricators are that are bidding that job?

21    A.    We try to, yes.

22    Q.    And the reason you do that is because

23  generally the fabricator has not yet been awarded

24  the contract?

1    A.    Correct.

2    Q.    Is that more common in your experience

3  than the other, where it's just a number without an

4  identified erector?

5    A.    On the larger projects, they do look to

6  have the erector named.

7    Q.    How long in your experience does it take

8  for the general, after the fabricator submits his

9  bid to the general, how long does it take for the

10  general to award the contract?

11    A.    That varies on every job.  I couldn't say

12  for sure.  Some you may get a confirmation within a

13  couple of days, and other times, it may be a month,

14  two months.

15    Q.    But you want to figure out whether you

16  are likely to be successful on a particular job in

17  order to plan your work load, isn't that right?

18    A.    Yes.

19    Q.    So that's one of the reasons why you

20  would want to find out from the fabricator whether

21  they carried you or not?

22    A.    One of the reasons.

23    Q.    What are the other reasons?

24    A.    So they won't go shopping your number.

1  Q.    What does that mean?

2  A.    That means that, if you use this one for

3  an example, this bid date is June 16.  We did our

4  work.  We got our estimate together.  We got our

5  price in.  If somebody else didn't have their price

6  in, then they should be eliminated from the job.

7  And that in 3 weeks from now, you can't give it to

8  someone else who didn't bid it on bid day.

9  Q.    But what you're saying is that the bid

10 date ought to be same for everybody?

11 A.    Correct.

12 Q.    And you ought to be held to it, that

13 would seem fair, correct?

14 A.    Correct.

15 Q.    Are you aware of fabricators giving

16 different bid dates to different erectors?

17 A.    No.

18 Q.    So assuming that everybody's bid date was

19 June 16th, and you submitted your bid, what are you

20 trying to avoid, when you say, I want to prevent the

21 fabricator from shopping my bid.

22 A.    That he's not going to say, today your

23 price is good, and then come back and say, I got a

24 lower price a week after, and say, okay, I've got a

80

1  better price now.  If you want to do the job, you've

2  got to drop your price, 10,000 or whatever.

3     Q.    Does he ever tell you, you've got a good

4  price today?

5     A.    Yeah.

6     Q.    So when you send your price into Canatal,

7  let's say you sent Canatal a price 152,000 on bid

8  day, do you then have a conversation with him as to

9  whether that is a good price or not?

10    A.    We would try to follow-up within a day or

11 so to see whether or not he used our number or not.

12    Q.    So that's a conversation you say you have

13 regularly in order to prevent him from shopping your

14 price?

15    A.    Yes.

16    Q.    If he carried your price, and he tells

17 you he carried your price, he's less likely to be

18 able to shop it?

19    A.    Right.

20    Q.    Do you find the fabricators will give you

21 that information when you ask them?

22    A.    Most of them will.

23    Q.    And if they tell you they didn't carry

24 your price, is that the end of the project for you?

1    A.    Right.

2    Q.    Why do you say that?

3    A.    Well, I know they have done work together

4  in the past.  So I would assume that it's somebody

5  else, not Isaacson.  It's only an assumption.

6    Q.    Do you know who Superior Steel Erectors

7  are?

8    A.    Superior Steel Erectors?

9    Q.    Yeah.

10    A.    No.  Superior Steel Fabricators.

11    Q.    Superior Steel Fabricators is a company

12  that's located in Brookline, New Hampshire, is it

13  not?

14    A.    Correct.

15    Q.    I'm talking about a Superior Steel out of

16  Burlington, Vermont.  Are you familiar with them?

17    A.    No, not really.

18    Q.    Can you tell me -- This lawsuit involves

19  a number of different plaintiffs, and you're one of

20  them.  Can you tell me what it was that Local 7 did

21  to you, to American Steel, to cause you to

22  participate in this lawsuit?

23    A.    What they did to me?

24    Q.    To American Steel.

1    A.    I would say provided target fund money

2   which took away some projects that we would have had

3   a better shot of getting had they not been

4   subsidizing the job.

5    Q.    Is there anything else, apart from the

6   targeting jobs and subsidizing, is there anything

7   else that Local 7 did that causes you to be a

8   plaintiff in this case?

9    A.    No.

10    Q.    Now, did you review some answers to

11   interrogatories in this case?

12    A.    I may have.

13    Q.    I'll show you, I think it's the second to

14   last page of something we have already marked as

15   Exhibit 2.  Do you see that?

16    A.    Yeah.

17    Q.    And that's a verification saying you've

18   read the answers?

19    A.    Yes.

20    Q.    All right.  There is a question that we

21   asked in the interrogatories, and we asked you to

22   identify by name and address every person or

23   business that has been driven out of the relevant

24   market by the conduct of Local 7.  And the answer

1      Q.    Did he do any in New Hampshire that

2  you're aware of?

3      A.    Yes.

4      Q.    Which New Hampshire jobs did he do?

5      A.    He did a parking garage in Lebanon, New

6  Hampshire for MacMillan.

7      Q.    Lebanon is right on the Vermont/New

8  Hampshire border, is it not?

9      A.    Yes.

10     Q.    Did he do any, that were interior New

11 Hampshire?

12     A.    Not that I'm aware of.

13     Q.    Do you know whether there were any jobs

14 that were targeted by Local 7 that Mr. Mayo's

15 company lost out on?

16     A.    I'm not aware of them.

17     Q.    Do you have any idea what the

18 relationship might be between Mr. Mayo going out of

19 business and Local 7?

20     A.    Do I have any idea?  I don't know the

21 circumstances.  I think he was organized and went

22 union, and there was something that fell apart

23 there.  I don't know what it was.

24     Q.    He was a union contractor?

1    A.    I believe so.

2    Q.    Can you tell me why you would have

3    identified Superior Steel as being a company that

4    was driven out of the market by Local 7?

5    A.    Because it's my understanding that that

6    was the case.

7    Q.    That what was the case?

8    A.    That is was because of Local 7 that he

9    was put out of business.

10    Q.    And what was it that Local 7 did with

11    respect?

12    A.    I don't know all the particulars.

13    Q.    What's the basis of you saying that,

14    somebody told you?

15    A.    Ted Mayo.

16    Q.    What did he tell you?

17    A.    I didn't get the particulars from him.

18    Q.    What did Mr. Mayo say to you that caused

19    you to say that Local 7 drove him out of the market?

20    A.    He called me at one point to ask if I was

21    interested in buying some of his rigging and

22    erection equipment.  He said that he was being put

23    out of business by Local 7, and he was selling his

24    equipment.

1    does both fab and erect?

2        A.    The Canadian fabricators don't typically

3    bring their labor in to compete against us.

4        Q.    Is Novel a New England company?

5        A.    Greenland.

6        Q.    New Hampshire?

7        A.    Yes.

8        Q.    All right.  I'm going to show you another

9    document.  I'm not sure exactly what it is.  It

10   looks like a 2003.  It's for a job in Westbrook,

11   Maine.  And I'm going to ask you if it accurately

12   represents or demonstrates the fact that you bid to

13   eight different fabricators for prices that were

14   $65,000 apart.

15       A.    (Witness reviewing document.)  Yeah.

16       Q.    And the first page of that document is,

17   again, a copy of one of the covers of your files?

18       A.    Okay, yes.

19       Q.    And inside, the rest of the documents,

20   are they bid sheets that correspond to the

21   information that is on the cover?

22       A.    It says proposal, yes.  It's our

23   proposal.

24       Q.    And there were different proposals

1     A.    Yes.

2     Q.    Because he's not limited in having to

3 move his cranes or crews, he can broker a job in any

4 state in the union?

5     A.    Correct.

6     Q.    And where have you worked for Jay Steel?

7     A.    I couldn't tell you exactly, but I would

8 say New Hampshire, Massachusetts.  Probably just

9 those two states.

10     Q.    Do you know who State Line is?

11     A.    Yes.

12     Q.    Who is State Line?

13     A.    A steel erector from Nashua.

14     Q.    So another New Hampshire steel erector?

15     A.    Yes.

16     Q.    How many New Hampshire steel erectors are

17 there?

18     A.    I don't know, maybe 8, 8 or 9.

19     Q.    Where would you go to find out

20 information like that, do you know?

21     A.    No.  I don't know where there is one

22 particular spot you could find them all.  There is

23 different associations that would have a record of

24 them, if they are members.

134

1       Q.    And that was the year in which that

2  merger was completed, correct?

3       A.    Yes.

4            MR. KELLY:  So we have marked as Exhibit

5       82 the 2005 return.  And I guess I would ask

6       that we mark the 2000 through 2004 returns as

7       Exhibits 83 through 86.

8            (Exhibit Nos. 83 through 87 marked.)

9  BY MR. KELLY:

10      Q.    And for the record the 1997 Economic

11 Census Data Sheet that we talked about earlier, we

12 marked as Exhibit No. 81.

13      I now want to turn your attention, Mr. Cilley,

14 to the complaint that was filed in this case.  Have

15 you had an opportunity to review that document

16 before now?

17      A.    Yes.

18      Q.    I want to ask you some questions about

19 that.  There is an allegation in Paragraph 18 on

20 page 7, the last sentence of Paragraph 18 says,

21 "Canatal has agreements with Local 7."  Do you see

22 that?

23      A.    Yes.

24      Q.    Can you tell me what the nature of the

135

1    agreements that Canatal has with Local 7 are?

2         A.    No, I can't.

3         Q.    Do you have any idea what that sentence

4    refers to?

5         A.    Well, I can't say for sure, no.

6         Q.    I'd like to direct your attention to the

7    top of page 12 which is paragraph, which is a part

8    of Paragraph 36.  It actually starts on page 11.

9    And I would like you to take a look at that

10   paragraph.  Let's go back to page 11.  First of all,

11   would you agree with the proposition that 50 percent

12   of the cost in the construction industry is labor?

13        A.    I don't have any reason not to, I guess.

14        Q.    Is the steel erection portion of the

15   construction industry different from the

16   construction industry as a whole with respect to the

17   proportion that is attributable to labor?

18        A.    Labor is higher for erectors.

19        Q.    For a steel erector, labor is more than

20   50 percent of the cost?

21        A.    Right.

22        Q.    Whether it's 50 percent or not for the

23   construction industry, generally, do you know?

24        A.    I would say no.

1    Q.    You would say it's higher or lower than

2    50 percent?

3    A.    It's hard for me to say.  I'm just

4    thinking construction industry includes materials,

5    and erectors don't include consumables.

6    Q.    All right.  The steel erection portion of

7    the industry is labor intensive, you would agree

8    with that?

9    A.    Yeah.

10    Q.    All right.  I'd like to direct your

11    attention to the last sentence of that paragraph.

12    American Steel is an open-shop contractor, is it

13    not?

14    A.    Yes.

15    Q.    And is your labor cost variable?

16    A.    Labor cost variable?

17    Q.    Is your labor cost variable?

18    A.    Yes.

19    Q.    The cost attributable to structural steel

20    labor services is variable.  I'm just asking if that

21    characterizes your labor cost?

22    A.    It can vary, yes.

23    Q.    Does it vary?

24    A.    Yeah.

1   A.   Correct.

2   Q.   Is that what you understand competitive

3   forces means, the labor cost of your competitors?

4   A.   Yes.

5   Q.   Is the availability of labor itself a

6   competitive factor?

7   A.   Yes.

8   Q.   So if there are a lot of iron workers who

9   are idle because work has been slow, that may have

10  an impact on your labor costs?

11  A.   I don't follow that.

12  Q.   One of your co-plaintiffs testified that

13  what this meant was that supply and demands for

14  labor.  The greater supply, the less of an upward

15  pressure on wages and the less of a supply, the

16  greater the pressure on wages?

17  A.   I would agree with that.

18  Q.   It's a different sense of competitive

19  force than the one you used.  I just wondered if

20  that is a factor for you?

21  A.   I would agree with that as well.

22  Q.   All right.  But would you also agree that

23  your labor costs are almost always less expensive

24  than the rates set by Local 7 contractors?

1        A.      On private work, yes.

2        Q.      And there is a parenthetical in that

3   second to last line.  Can you tell me what that

4   parenthetical means?

5        A.      In the absence of predatory pricing

6   tactics.

7        Q.      Yes?

8        A.      That's the use of target funds.

9        Q.      The use of target funds?

10       A.      To subsidize erectors.

11       Q.      That's a predatory pricing tactic?

12       A.      Yes.

13       Q.      Why do you say that it's a predatory

14   pricing tactic?

15       A.      I think it's a pretty good description of

16   what it is.

17       Q.      What does the word "predatory" mean?

18       A.      Actual definition?  Preying over

19   something with an unfair advantage.

20       Q.      If a union contractor's costs were

21   $50,000 more than yours, for example, and the union

22   subsidized that contractor to the tune of $50,000,

23   would that be a predatory pricing tactic?

24       A.      Yes.

COMMONWEALTH OF MASSACHUSETTS
Bristol, ss.


I, PATRICIA BOWEN, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on the
13th day of July, 2006, at the offices of
Segal, Roitman & Coleman, 11 Beacon Street, Boston,
Massachusetts, the following
named person, to wit: RAYMOND CILLEY
who was by me duly sworn to testify to the truth
and nothing but the truth as to her knowledge
touching and concerning the matters in
controversy in this cause; that she was thereupon
examined upon her oath and said examination
was reduced to writing by me; and that the
statement is a true record of the testimony given
by the witness, to the best of my knowledge and
ability.

I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.

WITNESS MY HAND this 17th day of July,
2006.


Patricia Bowen
Notary Public

My Commission Expires
February 2, 2012

The foregoing certification of this
transcript does not apply to any reproduction of
the same in any respect unless under the direct
control and/or direction of the certifying reporter.



PB EXHIBIT 76
ASF
7/13/06

Riverfront Plaza
Westbrook, Me

4-24

# CONFIDENTIAL

* ISSI
* MAS
eff
✗ CREDITRIAL
✓ GIVES
* A MARIATE
Mc BERY
✗ Precision
Novel)
TOSCO
* General
Additional Materials

$275,000   1-207-622-2151
$275,000   1-506-544-8515
$340,000   1-207-883-0026
$340,000   (1-207-854-9494)
— NO BID
$310,000 1-506-632-7689
$275,000 1-518-785-6790

$275,000 752-4237
$275,000 1-207-767-2117

003668

```
                                VOLUME:   I
                                PAGES:  1-132
                                EXHIBITS:  18-26
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


*******************************************

AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,         *
                                        *
v.                                      *
                                        *
LOCAL UNION NO. 7, INTERNATIONAL        *
ASSOCIATION OF BRIDGE,                  *
STRUCTURAL, ORNAMENTAL &                *
REINFORCING IRON WORKERS,               *
                    Defendant.          *
*******************************************

30(b)(6) DEPOSITION OF BEDFORD IRONWORKS,

INC., a witness called on behalf of the Defendant,

taken pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Friday, July 7, 2006, commencing at 11:00 a.m.


PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts 02703
(508) 222-9403

I N D E X

WITNESS:    MICHAEL GUILLEMETTE

DIRECT    CROSS    REDIRECT    RECROSS

Ms. Talwani  4

Mr. Avakian            125

No.   Exhibit                                        PAGE

18   4/7/03 Bedford Proposal.................  59

19   FAMM Steel Inc., Bid Calendar...........  96

20   11/7/02 Bedford Proposal............... 106

21   Bedford Profit & Loss.................. 108

22   1120S 2001 Tax Return.................. 117

23   1120S 2002 Tax Return.................. 117

24   1120S 2003 Tax Return.................. 117

25   1120S 2004 Tax Return.................. 117

26   1120S 2005 Tax Return.................. 117

(Exhibits retained by Ms. Talwani.)

1  series of questions, and the court reporter will be

2  taking down what is said here?

3      A.    Yes.

4      Q.    You have to respond verbally or she can't

5  take it down.  And we have to be careful not to

6  speak over each other?

7      A.    Okay.

8      Q.    If you don't understand anything that I

9  ask you, please, ask me to clarify or I'll assume

10  that you understand my question.

11      A.    All right.

12      Q.    You just mentioned Advanced Welding was

13  your prior company.  Am a correct, your current

14  company is Bedford Ironworks?

15      A.    Yes, it is.

16      Q.    And how long has Bedford been in

17  existence?

18      A.    It's going on about 5 years now.

19      Q.    The complaint says it was incorporated in

20  1985, that's not correct?

21      A.    Bedford Iron, no.  That was Advanced

22  Welding, I think.  Not '85.  I wasn't even on my own

23  back then.  Advanced Welding wasn't until '93, '94.

24      Q.    Advanced Welding was the predecessor

1    company to Bedford Ironworks?

2         A.    Yes.

3         Q.    And who owns Bedford Ironworks?

4         A.    Myself and William Carrier.

5         Q.    He's your partner?

6         A.    Yes.

7         Q.    And were you both equal partners in

8    Advanced Welding?

9         A.    Yes.

10        Q.    Advanced Welding is Advanced Welding and

11   Steel Erectors Inc.?

12        A.    Yes.

13        Q.    And when Advanced Welding and Steel

14   Erectors ceased its business, that's when Bedford

15   Ironworks started its business?

16        A.    Right.  We bought the assets.  We got

17   into a financial IRS debt, and the only way we could

18   get our assets back was to buy them.

19        Q.    Getting right where I don't know how any

20   of this works.  Can you explain that?

21             MR. AVAKIAN:  Let me object.  This is a

22        30(b)(6) of Bedford Ironworks, not Advanced

23        Welding and Steel Erectors.

24             MS. TALWANI:  Well, you have the witness

1    testifying and ultimately --

2         MR. AVAKIAN:   -- Yeah, I know.  But the

3    30(b)(6) requests information about Bedford

4    Ironworks, and so I think it's going a little

5    off track in terms of what the 30(b)(6)

6    deposition is asking testimony about.  So he

7    can testify about things that Bedford Ironworks

8    knows.

9         MS. TALWANI:  I think that you've

10    produced him as a witness, and I can certainly

11    inquire of him both about things that go to

12    Bedford Ironworks' business, and certainly

13    their purchasing of the assets of Advanced

14    Welding, I can ask those questions.

15         MR. AVAKIAN:  I've indicated I think

16    where you're going is beyond the scope of what

17    Bedford Ironworks might know.

18         MS. TALWANI:  When we get to where I'm

19    going, why don't you make your objection.

20    Q.    But right now, you explained to me that

21    Bedford Ironworks purchased Advanced Welding's

22    assets.  And I didn't understand the transaction

23    that you were describing, and so I'm asking to you

24    describe that further?

1    said to you or to Advanced Welding.  I'm asking what

2    happened, what the traction was?

3         A.    What we did was, we purchased it.  Mike

4    and Bill purchased it back from the IRS.  That's how

5    Bedford Ironworks started.

6         Q.    And you incorporated a new corporation?

7         A.    Yes.

8         Q.    And therefore, this new corporation --

9    Well, was the business -- The two of you were both

10   owners of Bedford Ironworks, and you were both

11   owners of Advanced Ironworks, correct?

12        A.    Yes.

13        Q.    Where is Bedford Ironworks located?

14        A.    30 Rundlett Hill Road, R-U-N-D-L-E-T-T

15   Hill Road in Bedford, New Hampshire.

16        Q.    How long have you been there?

17        A.    2 and a half years.

18        Q.    And who owns that property?

19        A.    Paul Toolin, T-O-O-L-I-N.

20        Q.    And do you lease the property from Paul

21   Toolin?

22        A.    I do.

23        Q.    And prior to moving to 30 Rundlett Hill

24   Road, where was Bedford Ironworks located?

1    be honest with you, I don't know what the percentage

2    would be but we do that.  I don't know if that

3    answers your question.

4         Q.    Well, it's a start.  If you're talking

5    about a big job that you might get, how big are we

6    talking?

7         A.    Well, I used to do bigger jobs, and they

8    are not profitable for me, so we do smaller jobs.

9    Do you want money-wise?  Is that what you're looking

10   at?

11        Q.    That's a number.  I understand money.

12        A.    Okay.

13        Q.    You could give me tonnage or square feet,

14   but that doesn't mean anything to me.

15        A.    We do any jobs, small jobs anywhere from

16   6,000 to then bigger jobs are sometimes 100,000.  In

17   the past, a couple years ago, we did a job that was

18   500,000.  That's the last big one I'll ever do.

19   They are not profitable.

20        Q.    Which one is that?

21        A.    You have it down there I'm sure.

22   Deerfield.  It was just not profitable for me.

23   Sometimes we make money.  Sometimes we don't.  That

24   was one of the ones I didn't.  I don't know how much

1    doing subcontracting work for erectors?

2         A.    All right.  If I do 10 percent in my

3    shop, and I might do 10 percent being a sub to other

4    erectors, and this miscellaneous stuff for other

5    people.  But I mean more and more of the 80 percent

6    would be my steel erection, I would guess.

7         If you break it out that way.  Without ever

8    sitting down and figuring it out, it could be

9    changed from year-to-year.  If I have a slow year, I

10   might do a heck of a lot more work for subs.  I may

11   have a year where I'm just busy, busy, busy and

12   doing small projects of my own.

13        Q.    And when you just started out saying 10

14   percent in the shop, that's, again, the

15   miscellaneous iron fabricating?

16        A.    Yeah.

17        Q.    Where do you work, what locations?

18        A.    Right now all New Hampshire.

19        Q.    Throughout New Hampshire?

20        A.    Throughout New Hampshire right now.

21        Q.    Do you bid on work in Massachusetts?

22        A.    Not right know, at the moment.  As a

23   matter of fact, I got rid of my insurance for

24   Massachusetts because I figured in 2006 I had enough

1    work to work in New Hampshire, so I didn't need any

2    work in Massachusetts.

3        Q.    Did you do any work in Massachusetts in

4    2005?

5        A.    Very little, just a couple of little

6    projects.  I had to finish one which was the

7    Deerfield.  I was finishing and was going back to

8    finish a metal deck over there.  Then I just did one

9    little job over in Natick.  It was just a little

10   shopping mall, 9,000 square feet, so real small

11   stuff.  I think, that's all I did in Massachusetts.

12   One thing at Withe.  I did some welding at Withe, no

13   erecting.  Withe in Andover.  It was nothing but

14   welding.  It was fitting up and installing stainless

15   steel in there.

16       Q.    So Withe is --

17       A.    That's the name of the job, actually.

18       Q.    Withe, That's in Andover, Massachusetts.

19       A.    Yeah.  That's about all I did last year,

20   if I even had any more in Massachusetts.  We are

21   concentrating more in New Hampshire, lately so.

22       Q.    How about 2004?

23       A.    We probably did a little more.  I think

24   that's when they were doing that Deerfield job where

1    I lost my butt.  I lost everything.  Well, I didn't

2    lose everything, but it hurt me.  It was a tough job

3    for us.

4        Q.    And 2003?

5        A.    I probably worked in Massachusetts.  Back

6    then in 2002 and 3 in those years, I was bidding a

7    lot.  I wasn't afraid to go anywhere, but as I got

8    more into it, I realized where my guys were most

9    happiest.  The reason I travel, is when I need to

10   make money.  I need to get jobs to survive.

11       Q.    And 2002.  You incorporated in 2000 or

12   2001?

13       A.    I think it was 2001.

14       Q.    That was Massachusetts I asked you about.

15   How about Rhode Island, do you do any work in Rhode

16   Island?

17       A.    No.

18       Q.    Maine?

19       A.    One job, I think, I've done in the last 3

20   years maybe.  And very minuet, maybe 15,000 worth of

21   work.

22       Q.    Vermont?

23       A.    One job, I think.  Two jobs in the last

24   probably 5 years and they were just really nothing

34

 1    and I'll call the fabricator and say, Are you

 2    bidding this job?

 3         And they will say, yeah.

 4         I'll say, I'm going to send you a price, okay?

 5         Q.    And how, just in terms of the bids that

 6    you submit, can you break that down for me, of how

 7    many come because you're invited to bid and how many

 8    because you're pursuing opportunities?

 9         A.    I'll pursue, for instance, say I did 10 a

10    week, I'll pursue one out of the 10.  If I hear

11    about it word-of-mouth, but a lot of them, they do

12    come right to you.

13         Q.    And of the bids that you submit, can you

14    break down what percent of the time you were

15    submitting bids sort of in the cold call kind of way

16    versus somebody asking you to bid on it?

17         A.    I don't understand the question.

18         Q.    Well, I understood you to answer that out

19    of the 10 opportunities you hear about, you might

20    bid on one?

21         A.    No, that's not right.  Out of 10

22    opportunities, one that I had to chase down myself

23    to get.

24         Q.    I see.

1    could bite me if I need another job in between, and

2    it just happened to me this year, so I don't do

3    that.

4        Q.    What is the rough mark up, 5 to 10

5    percent?

6        A.    Of jobs that I get after I bid?  I might

7    get one out of 15, so whatever percentage you want

8    to figure that out.

9        Q.    No.  I do want to ask you that question.

10   But I'm trying to get sort of a rough percentage on

11   the, if this is a job that's being bid at $100,000,

12   are you trying to work in $10,000 profit, $20,000

13   profit, $5,000 profit?

14       A.    I don't try to work anything in, and

15   other than my formula and whatever it is at the end

16   is what I have.  Like I said, the way I know how I

17   did at the end of the year.  If we did a million

18   dollars, and if we did $150,000 profit, well, I made

19   15 percent there.  That's my calculation at the end.

20   That's when I find out what I really did.

21       I don't know per job that I'm going to make a

22   bundle on this one.  I don't know sometimes.  It's

23   just so unpredictable.  That's why that Deerfield

24   Job, I told you, I think I lost all that money.  I

1    don't really know.  The guys morale went down.  It

2    was far away from home.  It was taking them twice as

3    long.  It was incredible.  You just don't know if

4    you're going to make money on certain jobs.  Even

5    going into it, you might think, I'll do pretty good.

6    I'll make 2 grand on it or I might make 10.  All of

7    a sudden, you look, you lost 2.

8        So there is really -- Construction for me and

9    doing this is a guessing game sometimes.  You just

10   try to do your best and be on top of it.  It's not

11   so much guessing.

12       Q.   So if you bid a job at $50,000, and you

13   got it, you don't know, as you sit here right now,

14   whether you're going to make a $10,000 profit off it

15   or take a $10,000 loss?

16       A.   Or I might make $20,000 on it.  It just

17   depends on how it goes when you're out there.  And

18   if it's misfabricated, and you get one of those

19   fabricators that is so cheap, and he cuts you -- You

20   have to fix things, you're under contract.  You

21   don't have to fix it, but you want to get the job

22   done so you can get your money.  Say, at the end, he

23   doesn't want to sign your slip, or he says I'll pay

24   half, Mike, for the time you've got into it.

47

1    lot of money.  I think we were there for not even a

2    week.

3         Q.    Is there a reason you don't bid them?

4         A.    I used to do them all the time, but it's

5    tough with the rate, sometimes.  I don't have a

6    credit line, so I work out of my pocket, and

7    sometimes it gets tough to make that payroll.  I

8    don't have any help, and sometimes the guys get very

9    comfortable at that rate.

10        Q.    How many guys do you have working for

11   you?

12        A.    I'm not sure.  I think it's 8 right now,

13   7 or 8.

14        Q.    Is that pretty much, has that been a

15   constant number?

16        A.    No, probably a couple of years ago I had

17   20.  But now what I have done after I lost all the

18   money, that year which ran into two years, I ended

19   up telling myself, I'm going to keep it more

20   manageable.

21        Q.    You had 20 when you were doing the

22   Deerfield Job?

23        A.    Yeah, in and around there.  I would say

24   15, 20.

1   got anything.  My numbers aren't low enough for him.

2       Q.    Putting aside whatever happens with

3   target funds or any other union pressure or other

4   issues that you've alleged in the complaint, just in

5   the market when you're bidding or some of your

6   co-plaintiffs are bidding, what do you understand to

7   be the factors on who gets the job?

8       A.    The lowest number.  That's my -- Well, it

9   should be.

10      Q.    Is it always the lowest number?

11      A.    I mean, unless someone has got a

12  favorite, I don't know.  But I've always been told

13  well, you weren't low on that, Mike, so you didn't

14  get the job.

15      Q.    You know how you were just describing

16  with the fabricator that they might have a certain

17  reputation to you, so you might think their

18  prices -- Do the fabricators, in your experience,

19  let's say two people are only a small difference

20  apart, that they might take one that they just work

21  with a lot?

22      A.    That's something you would have to ask

23  them because a lot of times I would be real close on

24  a bid.  If I say, hey, did I get the job?

1    them as long as they were in the business?

2        A.    Yeah.

3        Q.    How about CAPCO?

4        A.    No.  I have never worked for them.

5        Q.    Never?

6        A.    No.

7              MS. TALWANI:  This might be a good time

8        to take a short break.

9              MR. AVAKIAN:  We can take a break.

10             (Brief break.)

11   BY MS. TALWANI:

12       Q.    I want to ask you a little bit about the

13   Deerfield Project?

14       A.    Yeah.

15       Q.    So you said it was roughly $500,000?

16       A.    Yes.

17       Q.    And that's the largest project that

18   Bedford Iron has done?

19       A.    Yes.

20       Q.    What's the next largest?

21       A.    I don't know.  $200,000, I would say

22   right around there.

23       Q.    What was that?

24       A.    I think that one was Merrimack County

1    will hire their people on an hourly rate?

2        A.    Or vice-versa.  Usually, it's the other

3    way around, they will hire me.

4        Q.    On an hourly basis?

5        A.    Yes.

6        Q.    How often does that happen?

7        A.    We talked about it earlier, just a small

8    percentage, 10 percent a year, maybe not with just

9    them.  It could be anybody.  With them, I don't have

10   an exact amount.

11       Q.    Who else besides ASE do you work for,

12   what other erectors?

13       A.    For Jim before, from Aerial.  I think

14   that's it.

15       Q.    So just those two plaintiffs in this

16   case, but no others?

17       A.    Yeah, that I can recollect.

18       Q.    And I wanted to just go back a little bit

19   to when you started Bedford.  How much did you pay

20   for the assets of Advanced Welding?

21       A.    I don't remember.  It wasn't a lot.  It

22   was -- I don't know if it was 18 or 30,000.  I don't

23   remember.  It was right around there.

24       Q.    Between 18 and 30,000?

1      A.    No.  But I heard about that through

2 Canatal.  I didn't bid on it.

3      Q.    Why not?

4      A.    I don't know why.  I might have been,

5 might have been anything.

6      Q.    Cardi's Furniture in North Attleboro,

7 Massachusetts, fabricating was FAMM Steel.  Did you

8 bid on that one?

9      A.    They probably sent me a solicitation, but

10 I didn't bid on it.

11      Q.    Why not?

12      A.    I don't know why.  Might have been at the

13 time too far.  I don't know.

14      Q.    The O. Alhborg Headquarters Project, did

15 you bid on that one?

16      A.    No.

17      Q.    Why not?

18      A.    I'll just use the same answer every time.

19 I was probably busy or didn't need the work, just

20 working in New Hampshire.

21      Q.    Walmart Brewer Project in Brewer, Maine,

22 did you bid on that?

23      A.    No.

24      Q.    Why not?

1      A.    I was probably busy at the time.

2      Q.    The Yarmouth High School in Yarmouth,

3  Maine in 2002, did you bid on that?

4      A.    I don't know if I bid on that.  No, I

5  didn't bid on that.  I probably was busy.

6      Q.    The North Brookfield High School Project

7  in North Brookfield, Massachusetts, did you bid on

8  that?

9      A.    No.

10     Q.    Why not?

11     A.    Probably busy.

12     Q.    The Walker Brook Crossing Project in

13  Reading, Massachusetts, did you bid on that?

14     A.    I heard about that one; but, no, I didn't

15  bid it.

16     Q.    Why not?

17     A.    I probably was busy.

18     Q.    Now, the Stryker Biotech, West Lebanon,

19  New Hampshire did you bid on that?

20     A.    I didn't bid on that.  I think it was

21  Isaacson solicited me on that one.  I forget who it

22  was, but I didn't bid it.  And I don't know why I

23  didn't bid it.  Maybe I was just too busy, and I

24  didn't bid it because I do work all over New

73

1    Hampshire.   It had to be a busy thing.

2         Q.    Long View Place in Waltham,

3    Massachusetts, did you bid that?

4         A.    Heard about that; but, again, I must have

5    been busy.

6         Q.    Okay.  The Mart Parking Complex, did you

7    bid that?

8         A.    That one I did.  And you know I had to

9    take a bit to think about that one because two years

10   ago we talked about it.  It came up.  Some of my

11   bids I do while I'm on the road, and what I do is I

12   just call them in, and if I don't hear back from it,

13   I just get ahead of it.  I'm almost sure I bid it

14   with FAMM only.

15        Q.    So you have no paper documents for that?

16        A.    Nothing on that, to prove that I did

17   that.

18        Q.    And do you understand that two of your

19   co-plaintiffs also bid on it, Ajax and ASE?

20        A.    I do now in the complaint, yes.

21        Q.    And that a former co-plaintiff

22   Independent Welding also bid on this?

23        A.    I do know that, yeah.

24        Q.    And do you have any reason to believe

1    that you were the low bid of the four of you?

2        A.    No, if I was, I would have got a call

3    back from them.

4        Q.    So you would believe the opposite, that

5    you were not the low bid?

6        A.    I was not the low bid in that one, no.

7        Q.    The 405 Cochituate Road Project in

8    Natick, Massachusetts, Ocean Steel was the

9    fabricator, did you bid on that one?

10       A.    I'm not familiar with that one, no.

11       Q.    Jordan's Furniture distribution Warehouse

12   Project, did you bid on that one?

13       A.    I heard about it, but didn't bid it, and

14   I don't have a reason why.  I don't remember.  But I

15   have heard about it.

16       Q.    Stone Harbor Condominiums in Bristol,

17   Rhode Island?

18       A.    No.  I've never heard of it.

19       Q.    And you don't bid on Rhode Island jobs?

20       A.    I don't go to Rhode Island.  Well, I

21   actually shouldn't say that.  I've been to

22   Connecticut before, you know, and I will travel if

23   the money is right, if somebody can guarantee me

24   something.  But no one approached me on that Rhode

1    Island job, so I don't know about it.

2         Q.    If someone would guarantee you, for

3    example, if they hire you on an hourly, you would do

4    it?

5         A.    Either that or they say, Mike, give me a

6    price on this.  I guarantee you are going to make

7    money.  I would give them a price if I knew I would

8    make money on it.  I would travel, but no one is

9    going to guarantee me anything.

10        Q.    I was going to say, has anyone ever said

11   that to you?

12        A.    No.  But I'm just saying, you know, I'll

13   work in Massachusetts, again, no problem, I just --

14   If I know I'm going to make some money, I'm there.

15        Q.    But at any rate, you did not bid the

16   Stone Harbor job?

17        A.    No, I didn't.

18        Q.    How about the Whole Foods Grocery Project

19   in Hingham, Massachusetts?

20        A.    I heard about that.  Again, I don't know

21   why I didn't bid it.

22        Q.    But you didn't.

23        A.    I didn't bid it.

24        Q.    Showcase Cinemas in Millbury,

1    Massachusetts?

2        A.    That one sounds familiar.  I don't recall

3    seeing it in any bids.  But I recall the job.  I

4    recall bidding another Showcase Cinema, but I don't

5    know if I bid that one.  But I did bid the other

6    one, I thought.

7        Q.    The Archstone Apartments in Watertown,

8    did you bid that?

9        A.    I didn't bid that.

10       Q.    Why not?

11       A.    I didn't know about it.

12       Q.    Stop & Shop Store Project in Halifax,

13   Massachusetts?

14       A.    I think I heard about that one.  I don't

15   know if I heard about it from Capone.  I thought I

16   heard about it.  I might have been busy.  I usually

17   like that type of building.

18       Q.    Necco Project?

19       A.    Never heard of it.

20       Q.    That's in Revere, Massachusetts?

21       A.    Doesn't sound familiar.

22       Q.    Shaw's Supermarket Project in Worcester,

23   Massachusetts?

24       A.    Heard about that.  Was asked to bid that

1    with CM & B.   I was busy at the time, so I didn't do

2    it.

3        Q.    Bowdoin College in Brunswick, Maine?

4        A.    No, never heard of it.

5        Q.    The Brickworks project in Rowley,

6    Massachusetts?

7        A.    I don't know if I heard about that from

8    Capone.   But I don't remember bidding it.   I might

9    have been busy at the time.   A lot of times, I'll

10   tell them if I'm busy, like I said earlier, I'll ask

11   them when it's going to go.

12       Q.    22 Fore Street in Maine?

13       A.    Didn't hear about that.

14       Q.    And the Hilton Garden Inn in Freeport,

15   Maine.

16       A.    I heard about that.   I had been to other

17   Hiltons.   I don't know why I didn't bid that one,

18   but I didn't bid it.

19       Q.    Have you seen the list of target fund

20   projects that was floating around here at the

21   deposition yesterday?

22       A.    I did.   I breezed through it.

23       Q.    And as you looked through that list, did

24   you find any other jobs that you had bid on, that

78

1    Bedford Ironworks had bid on?

2        A.    Well, I think I need to go through the

3    list longer.  I just took a quick glance at it since

4    we got it last week.  And I didn't sit down and

5    really analyze and see if I did bid any of those.

6    Like I said, I went through it real quick.  And I

7    recognized a few jobs, but until I can sit down and

8    really look at it, I can't let you know.

9        Q.    As you sit here today, are there any jobs

10   that you were aware of which you were the low

11   bidder, but you believe you lost the job because of

12   target funds involved?

13       A.    As I sit here today, no.

14       Q.    You currently have 8 employees?

15       A.    Yes.

16       Q.    What do they do?

17       A.    A little of everything, I guess.

18       Q.    That's 8 including all the office people?

19       A.    Yes.  My wife is the office person.  I

20   think maybe there is 9 with her.  I don't know.

21       Q.    Everyone other than your wife does a

22   little bit of everything?

23       A.    Little bit of everything.  They might be

24   fabing one day.  They might be in the field the next

1    employee?

2        A.    He might have been.

3        Q.    Did he leave before or after he started

4    working for Bedford Ironworks?

5        A.    I don't know what happened with that.

6        Q.    What about Roland Dube?

7        A.    He worked for me at Bedford Iron.

8        Q.    Did he also work for you at Advanced

9    Welding?

10        A.    In the past he had, way in the past.

11        Q.    Then he had left and come back?

12        A.    Yeah.

13        Q.    Gone to work for someone else?

14        A.    Yes.

15        Q.    And how about Brian Meu?

16        A.    No.   He went back into investing.

17        Q.    Was he working for you at Bedford

18    Ironworks or Advanced Welding or both?

19        A.    That's a good question.   I don't know.

20        Q.    If you could look at Paragraph 151 of the

21    complaint which has been marked as Exhibit 1?

22        A.    (Witness reviewing document.)   Yes.

23        Q.    Can you tell me all facts that you know

24    to support the allegation in that paragraph?

1    A.    I think there was two guys.  There was

2 Benjamin Brudeur and Phillip, I forget his last

3 name -- Eldridge.

4    Q.    And what happened, to your knowledge,

5 with Benjamin and Phillip?

6    A.    Well, I wasn't on-site every day, but my

7 business partner was.

8    Q.    So whatever you are about tell us now,

9 you don't have firsthand knowledge?

10    A.    Right.  I got it from my business

11 partner, Bill.  Every day that Local 7 was on-site,

12 filming, pretty much every day, at lunch time they

13 would go visit our guys at the parking lot and just

14 talk to them and try to see if they would join the

15 union.  Eventually, Bill gave me call and said, two

16 guys quit, and that they were trying out the union.

17 That is to the best of my knowledge for that

18 allegation.

19    Q.    And that's all you know about that?

20    A.    That's all I know.

21    Q.    And in your view, there is something

22 wrong in that?

23    A.    Well, I don't go do it to them and try to

24 steal their good men.  So I think that's something

1    wrong.  If you want to do it, do it on other times.

2    I mean, I know it's their legal right to do whatever

3    they are doing as far as talking to my men on lunch

4    hours.  But to me, I think that's ethically wrong.

5         Q.    Ethically, but not legally?

6         A.    Well, I kind of probably shouldn't have

7    said it that way.  I keep hearing it's legal from

8    everybody.  I don't know if it's legal or not, but I

9    just think it's ethically wrong.

10        Q.    And I think there is a total of five

11   people, but it's not clear which are Bedford and

12   which are Advanced Welding.  But starting with

13   Bedford, that's Local 7 business agents that were

14   speaking with them?

15        A.    Yes.  I think that's who it was.

16        Q.    That's your understanding?

17        A.    To my knowledge, yes.

18        Q.    How about with Roland?

19        A.    I don't know if it was the Manchester

20   local.  I think it was that one, 4-something.  I

21   don't know what it is.

22        Q.    And Brandon Holler?

23        A.    Same, Manchester.

24        Q.    And Brian Meu?

1  little bit different in the proposal, but the main

2  structure, how many picks and how many they can do

3  and all that stuff.

4      Q.    You don't have a winter rate?

5      A.    No, winter -- I actually dropped down

6  picks on that job, and they still did double the

7  time.  No, I do have a winter rate.  I'm not that

8  much of an idiot, you know.

9      I know you guys think no one knows nothing

10  about the business.  I do know some things.  But

11  it's hard, you get a little nervous in here, and you

12  are trying to think.  But some jobs, I can't tell.

13  It's awfully close.

14      But that job, I thought about it, and I said,

15  we did have double the crane time, that means double

16  the man power time to put it up and that's where I

17  think the money went.  But that was after I had a

18  chance to actually think about it for a little bit.

19      Q.    I had another question for you about the

20  Deerfield job.  The two gentlemen that left,

21  Benjamin and Phillip?

22      A.    Yeah.

23      Q.    Did you replace them?

24      A.    I did not replaced them right away.  I

1    don't even know if I replaced them actually.  I

2    think we just tried to make due with what we had and

3    listened to the complaints, if there was any.  I

4    don't know if there was as far as the extra couple

5    guys on the site, but I don't recall.

6         Q.    So you got the job done -- Well, you're

7    saying you don't recall one way or the other?

8         A.    It was towards the end of the job, so I

9    don't know if I replaced them or not.

10         Q.    Do you know whether there was any cost

11    that you incurred because they weren't there?

12         A.    I don't know.

13         Q.    If you look at the next two pages of

14    Exhibit 21, that's your profit and loss statements

15    for 2002, is that correct?

16         A.    Yeah.

17         Q.    Again, looking at this, can you tell

18    whether you're pricing well or not?

19         A.    Yes.

20         Q.    And then the next two pages are 2003,

21    correct?

22         A.    Yes.

23         Q.    Again, looking at the bottom line on

24    that, can you tell whether you're pricing correctly

COMMONWEALTH OF MASSACHUSETTS
Bristol, ss.


  I, PATRICIA BOWEN, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on the
7th day of July, 2006, at the offices of
Segal, Roitman & Coleman, 11 Beacon Street,
Boston,Massachusetts, the following
named person, to wit:  MICHAEL GUILLEMETTE
who was by me duly sworn to testify to the truth
and nothing but the truth as to his knowledge
touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination
was reduced to writing by me; and that the
statement is a true record of the testimony given
by the witness, to the best of my knowledge and
ability.

  I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.

  WITNESS MY HAND this 12th day of July,
2006.

------------------
Patricia Bowen
Notary Public

My Commission Expires
February 2, 2012

  The foregoing certification of this
transcript does not apply to any reproduction of
the same in any respect unless under the direct
control and/or direction of the certifying reporter.

VOLUME:   I
PAGES:   1-206
EXHIBITS:   1-17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*****************************************

AMERICAN STEEL ERECTORS, INC.,et als.  *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendants.        *
*****************************************

          30(b)(6) DEPOSITION OF D.F.M. INDUSTRIES,

INC., called on behalf of the Defendants,

taken pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Thursday, July 6, 2006, commencing at 10:02 a.m.


PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts 02703
(508) 222-9403

```
 1                          *  *  *

 2              GLEN PISANI, a witness called for

 3         examination by counsel, having been

 4         satisfactorily identified and duly sworn,

 5         testified as follows:

 6                          *  *  *

 7                    DIRECT EXAMINATION

 8    BY MR. KELLY:

 9         Q.    Would you state your name for the record?

10         A.    Glen Pisani.

11         Q.    And by whom are you employed?

12         A.    D.F.M. Industries Incorporated

13         Q.    And what capacity are you employed by

14    D.F.M.?

15         A.    I'm the owner/president.

16         Q.    And D.F.M. Industries, you understand to

17    be a plaintiff in a lawsuit against Local 7?

18         A.    I do.

19         Q.    And as you know, I'm the attorney for

20    Local 7?

21         A.    Right.

22         Q.    The purpose of this deposition is for me

23    to ask you questions, and for you to give answers

24    responsive to those questions relevant to the
```

1      MR. AVAKIAN:  I think that's all right.

2      Q.    It is a fairly quick turnaround that we

3  are going to have.  But in any event, you will be

4  provided a copy of the transcript, and you will have

5  an opportunity to read it.

6      A.    Okay.

7      MR. KELLY:  We normally stipulate and if

8      you would like to, Michael, we can, that

9      objections except objections to form of the

10     question are reserved until the time of trial?

11     MR. AVAKIAN:  I'm trying to remember what

12     the standard objections are here, but those

13     would be fine with me.

14     MR. KELLY:  The idea is, if I can change

15     the form of my question and thus avoid

16     presenting that issue to the judge, object, and

17     I'll try and rephrase it.  But otherwise we

18     will let the judge decide.

19     MR. AVAKIAN:  That may happen during the

20     course of this deposition.  There might be some

21     compound sentences.  We just want the make sure

22     the answer is clear and it's not confusing.

23     Q.    All right.  How long have you been

24  employed by D.F.M.?

1        A.      Since 1993.

2        Q.      In what capacity have you worked for

3    D.F.M.?

4        A.      I started the business in '93.

5        Q.      What was your background before you

6    started the business in '93?

7        A.      My background, I had gone to Wentworth

8    Institute of Technology for 2 and a half years.  I

9    had worked summers for my uncle and my father in

10   construction.  That's basically where I learned the

11   trade, from my uncle and my dad.

12       Q.      And what are your uncle and dad's names?

13       A.      Leon Pisani is my father.  And Dennis

14   Pisani was my uncle.  They were iron workers for

15   many years.

16       Q.      And when you say you worked for them, did

17   they have construction companies?

18       A.      They did.

19       Q.      That you worked for?

20       A.      They did.

21       Q.      What were the names of those companies?

22       A.      My uncle Dennis had BADD Brothers,

23   B-A-D-D.  My father had a company called Stetson

24   Associates.  Stetson, like the hat.

1    Q.    And they were construction companies?

2    A.    They were steel erectors.

3    Q.    They were steel erectors?

4    A.    Correct.

5    Q.    And D.F.M. Industries, likewise, is a

6    steel erector?

7    A.    I am or we are.

8    Q.    Now, when you started the company in

9    1993, tell me what the company looked like?  Was it

10   located in Wrentham?

11   A.    It was located in Wrentham.  I was living

12   at home still, 35 Oxbow Drive.  And the company had

13   8 employees.  First job I did was a Home Depot in

14   Avon.  We were small.  I was green.  That's what we

15   looked like.

16   Q.    Who did you work for; who was the

17   contractor for whom you worked?

18   A.    I worked for Elwell Ironworks.  They were

19   out of Springfield.  The general contractor was

20   Dacon.  They were in Natick.  And there was the Home

21   Depot in Avon.  And I had to beg, borrow, and steal

22   for the job, and I got it and made it work.

23   Q.    Let's look at that job for a moment.  You

24   said Dacon was the general contractor?

1       A.      Yes.

2       Q.      And Elwell Ironworks was the fabricator?

3       A.      They were.

4       Q.      And is it typical in your industry that

5  the fabricator gets work from the general

6  contractor, and the fabricator then subs work to the

7  steel erector?

8       A.      Right.  They sell a package, a fab and

9  erect.

10      Q.      The general sells a fab and erect

11  package?

12      A.      The fabricator sells the fab and erect

13  package to the general.

14      Q.      I see.  So in that example, Elwell was

15  the fabricator?

16      A.      Correct.

17      Q.      Elwell said, I will both fabricate the

18  steel for the Home Depot and have it erected for you

19  for a price?

20      A.      Exactly.

21      Q.      And Dacon --

22      A.      -- bought that price.

23      Q.      Bought that price?

24      A.      Yes.

1     Q.    Now, you were a subcontractor then to

2  Elwell in that particular job?

3     A.    Right.

4     Q.    And you indicated you begged, borrowed,

5  and stole to get it.  How did you actually get the

6  job from Elwell?

7     A.    My father had a heart attack, and he

8  couldn't work.  He was very sick, and I had a

9  decision to make.  I saw -- My family, there was no

10  income, and he wasn't able to provide.  And I was

11  forced to start D.F.M. and tried to go out and get a

12  job.  And I used a contact book and called some

13  people that I knew and basically begged for the job.

14  They put faith in me to do it, and I was able to

15  complete the job.  That is what I had to do.

16     Q.    Did you bid to Elwell for the job?

17     A.    I did.

18     Q.    Do you know if anyone else did?

19     A.    I do not.

20     Q.    And prior to getting that job, I take it

21  you had no employees?

22     A.    I didn't.

23     Q.    So if I understand correctly, Elwell said

24  yes to your bid, and you put 8 people to work during

1      that job?

2           A.    Correct.

3           Q.    What did you have in terms of capital in

4      1993?

5           A.    I think, I had a settlement.  I had an

6      injury on a job.  I fell.  I was incapacitated for,

7      like, 2 years.  I broke my back, my wrists, my legs.

8           Q.    It was a fall?

9           A.    Yes, a fall on a job.  And what money I

10     got from Workers' Comp for scarring and whatnot that

11     I had on my body, the loss of function, I used to

12     start up D.F.M.  It was my only choice.  That's all

13     I could do.  It was money that I had received from

14     an accident that allowed me to start up my business.

15          Q.    Who was the employer that you were

16     working for at the time of your accident?

17          A.    Stetson Associates, my father.

18          Q.    Your dad's company?

19          A.    Yeah.

20          Q.    Now, in order to complete the Home Depot

21     job, the first job, was it necessary for D.F.M. to

22     procure equipment?

23          A.    It was.

24          Q.    And what kind of equipment to did you

1    Q.    You rent cranes?

2    A.    Yeah.

3    Q.    Now, in order to be a steel erector, it

4    is necessary to have a work force, to have

5    equipment, that you've mentioned, vehicles, cranes,

6    welding machine, and tools.  Is there anything else

7    that is necessary to get into the business of being

8    a steel erector?

9    A.    Knowledge.  Knowledge is important.  You

10   have to know how to erect steel.  If you refer to

11   tools, I'm sure there is other tools that I haven't

12   mentioned.  But it's all part of, just like a lawyer

13   need a pen, we need tools to weld.  There is

14   definitely items that we need.  There is torches.

15   There is -- I can get into a lot of little items.  I

16   don't know how important it is to mention them.  You

17   have insurance.  You have the necessities of things

18   that the government requires of you.  I have to

19   provide those items.

20   Q.    Does the government require insurance?

21   A.    Of course.

22   Q.    Is it also necessary to have a bonding

23   capacity?

24   A.    No.

1    what we call "a gingerbread type," little items that

2    aren't in the steel scope, the big structural steel

3    package.  It's a miscellaneous iron package, and a

4    lot of times people ask us to do that work.

5        Q.    Do most steel erection packages have a

6    miscellaneous portion?

7        A.    They do.  A lot of companies don't do

8    both.  Sometimes they just have a miscellaneous

9    steel contractor.  That's pretty much what they will

10   specialize in.  They are strictly erectors.  That's

11   what they do.

12           MR. AVAKIAN:  Paul, can we take a short

13       break?

14           MR. KELLY:  Sure.

15           (Brief break.)

16   BY MR. KELLY:

17       Q.    All right.  Having promised a minute ago

18   that we were going to talk about structural steel,

19   rather than miscellaneous, I now want to go there.

20       A.    Okay.

21       Q.    I want to find out how it is that you

22   find work for your company?

23       A.    Work comes to me.  I don't solicit work.

24   Fabricators send me drawings for projects.  You

23

1    know, a lot of times, more than one fabricator is

2    bidding the same project.  They call me up, and they

3    ask me if I want to price the job.  Sometimes they

4    don't call me at all; they just send me drawings and

5    give me a bid date.

6         Q.    And we are talking now about structural

7    steel?

8         A.    Yes.

9         Q.    And the fabricators, what I get from the

10   answer you just gave is:  The fabricators have not

11   yet got the job from the general when they send the

12   drawings to you?

13        A.    They haven't.  They are bidding the

14   project.

15        Q.    They are in the process of bidding to the

16   general?

17        A.    Correct.

18        Q.    And during that process, they ask you to

19   give them an erection price?

20        A.    They do.

21        Q.    So that they can go back to the general,

22   and say, I'll fabricate and erect it for whatever

23   the price is?

24        A.    Correct.

1      Q.    Is it your experience that these

2  fabricators just do the fabrication and sub out the

3  erection?

4      A.    Yes.

5      Q.    The fabricators that you work for, they

6  don't erect themselves?

7      A.    They don't.

8      Q.    And do I understand correctly that these

9  fabricators who may be bidding for the same job,

10  sort of self-select the erectors that they want to

11  get prices from?

12      A.    Yes.  I know that they give me drawings.

13  I'm sure that they send them to other people too, my

14  competition.  But I have a relationship with a

15  fabricator.  They will send me drawings or ask me if

16  I want to price a project.  That's my relationship.

17  That's how it works for me.

18      Q.    How many fabricators do that, send you

19  drawings on a regular basis?

20      A.    Give me a second.  Over 20.  There is a

21  lot.

22      Q.    There are a lot of fabricators?

23      A.    There are.

24      Q.    And there are a lot of fabricators that

1    A.    It is, yes, Mark Brenton.  Thanks.  See

2  you are helping me out.  There is a lot.

3    Q.    Yeah, there are a lot.

4    A.    Yeah.

5    Q.    All right.  So they send you drawings and

6  it may be drawings -- Do you remember what projects

7  somebody sent you drawings on that was covered by a

8  PLA?

9    A.    Yeah.  It was a school in Milton that was

10  sent to me.  There was work in Fall River or New

11  Bedford, which I think was supposedly covered under

12  a PLA, and there has been a brew-ha about it.  I

13  don't know if it got removed or not, but it came my

14  way, and I just didn't want to waste my time.

15    I'm a day late and a dollar short every day.  I

16  just didn't need to add that to my list and waste my

17  time, so I didn't price it.  I don't know names of

18  the schools per se.  Those stick out in my mind.

19    Q.    Did you understand that you were eligible

20  to price it?

21    A.    Yes.  I knew I was eligible, but it was

22  of my understanding that I would have to recognize

23  the union rules on that job, which I don't recognize

24  them.

1    Q.    You understand what a project labor

2  agreement means, is that there are certain

3  conditions of employment that apply to that project?

4    A.    Correct.

5    Q.    And you have a right to agree or not

6  agree to sign such an agreement?

7    A.    Correct.

8    Q.    Is there a typical size of a job that

9  your company does?

10   A.    No.  And I think that's one of my

11  feathers in my cap, and I pat myself on the back, is

12  that I've never turned away something that is too

13  small, too minuet, or too large.  We have the

14  capability of doing any project, large or small.  We

15  could be doing a million-dollar job.  And I could be

16  doing a $1500-job at the same time.

17       So we run a broad base.  You know, when times

18  get tough, maybe the smaller job is what keeps you

19  going.  You're not waiting for that big job.  There

20  is a lot of people waiting for the big job.  The

21  tendency is less money on it, a lot of competition

22  on it.  Whereas, a lot of guys are too big; they

23  would rather not deal with the small job.

24   Q.    Is it uncommon for you to have your

1      Q.    Because the structural members at the

2  bottom have to hold up the rest of the building?

3      A.    Correct.

4      Q.    All right.  You currently have in the

5  neighborhood of 40 employees?

6      A.    No, currently, 70 employees.

7      Q.    70 employees?

8      A.    Yes.

9      Q.    Is that increased in the recent past?

10     A.    It's increased in the past, I think, last

11  year.  In the last year I've added 20 employees,

12  with opportunities to continue to grow.  We are very

13  fortunate finding a good labor force and good young

14  people that want to work.

15     Q.    Is it a young labor force?

16     A.    Yes.  It's a young person's business,

17  really.  It's not easy.  It takes its toll on your

18  body.  You have to have some strength and agility

19  and stamina.

20     Q.    And you're talking about iron work?

21     A.    I am.

22     Q.    Iron workers as a classification?

23     A.    Correct.

24     Q.    How many of your 70 employees are iron

84

1    Q.    Are you familiar with that job?

2    A.    I am.

3    Q.    Who is the general contractor on that

4  job?

5    A.    Bond Brothers was the general.

6    Q.    And who is the fabricator?

7    A.    Cape & Island Steel.

8    Q.    Is Cape & Island Steel the fabricator

9  that you said was no longer in business?

10    A.    They might be in business in name.  They

11  are not fabricating any steel.  They are out of

12  business as far as I'm concerned.

13    Q.    As a fabricator?

14    A.    Correct.

15    Q.    And how did that job come about, do you

16  recall?

17    A.    That was a mess.  He was a union erector

18  on the site.

19    Q.    Before?

20    A.    Before I even showed up.  They had done

21  the majority of the project.  It was RAD Steel,

22  R-A-D, and they were on the job and had some type of

23  issues.  I don't know what they were.  But they

24  weren't on the job any longer.  I was approached by

1    Cape & Island Steel to go do work on the job.  They

2    gave me some drawings, and I gave them a price to

3    finish it.  There was some canopy work, roof work,

4    inside work to do.  They accepted my price.  We went

5    onto the job.  We were, the day we were out there,

6    the business agent came out.  And I don't know if it

7    was a Friday or what, but they gave the guys a piece

8    of his mind, scribbled some graffiti on a column on

9    the job, basically stating, referring, to my father

10   who was in Local 7 at one point in time in his life.

11   And my father being Leon, said, Ask Leon about his

12   pension, the one that you're not going to get.  So

13   he obviously knew it was Charlie who did that.  He

14   went into the trailer and said --

15        Q.     -- The "he" that you are referring to?

16        A.     Charlie Wright.

17        Q.     And you say Charlie Wright wrote that on

18   the column?

19        A.     Right.  He was out there.  I mean, you

20   don't have to be "Inspector Clueso" to figure out

21   who did it.

22        Q.     All right.  He didn't see it, but you

23   understand Charlie Wright --

24        A.     -- He was there.  Then he was gone.  And

1 then the writing was there.  He was the person who

2 was addressing the employees.  It was caught on

3 camera at Fox 25 anyways.  But he went into the

4 trailer and talked to the general contractor, Bond

5 Brothers, to the project manager and said, Listen,

6 get these guys out of here or else you are going to

7 have everyone walk off the site.

8   Q. Were you there for this conversation?

9   A. No.  That was told to me through Mike

10 Dumerus who was the project manager for Bond

11 Brothers.  We went back to work the next day and

12 they were picketing.  And we were told by Bond --

13 Actually by Cape & Islands superintendent on the

14 project or project manager, to leave to because they

15 were going to try to work this thing out.

16   I believe, I don't know the name, there was a

17 union erector, small outfit, that came in -- I had

18 gone out to the site to find out what was going on.

19 We were pulled off.  We were asked to leave.  We had

20 troubles.  We were gone for a couple of days, and

21 for one reason or another they wound up calling us

22 back to finish.

23   Q. Cape & Island did?

24   A. Yeah.  They said for whatever it is you

1    can go back and you can finish.  We were removed

2    from the project for -- It was a long time ago,

3    about a week, maybe.  It was gone and something

4    happened somewhere that was all hammered out and

5    then we were invited back to the job.

6         Q.    So you actually finished the job?

7         A.    We finished the job, yes.

8         Q.    Was there another union contractor there

9    when you went back?

10        A.    They were.  We had some stuff that was

11   damaged on the job, and we filed a police report.

12   It was all playground stuff that we didn't even

13   pursue.  We just wanted to get off the job, finish

14   it, and be done with it.

15        Q.    Did you file a police report or did Bond

16   Brothers?

17        A.    No, we did.

18        Q.    Didn't you tell the general or Cape &

19   Island that you were going to get out of there until

20   they could sort this out?

21        A.    Yeah, well, that was said.  After -- We

22   were brought back.  We were asked to leave.  We

23   left.  When we came back, we had some equipment that

24   was damaged.  We told them, You better figure out

1    who did this and sort out who is going to pay me to

2    my stuff.  They did and we went back.

3         Q.    So that was after you had been invited

4    back when that happened?

5         A.    Yes.

6         Q.    Now, did you file unfair labor practice

7    charges around whatever happened on that job?

8         A.    I don't think so.  I think we have only

9    done that once.

10         Q.    Now, do you know who John Paulding is?

11         A.    Yes.  He used to own Cape & Island?

12         Q.    Was he the guy that you did business with

13    when you got that job initially?

14         A.    No.  It was Jim Gage.

15         Q.    Is Jim Gage the fellow who you referred

16    to as the project manager?

17         A.    Of Cape & Island.

18         Q.    Did you give Jim Gage a price?

19         A.    I think I did.  I believe I did.

20         Q.    Did you get the contract on that job?

21         A.    I believe so, yes.

22         Q.    I mean a written subcontract?

23         A.    Yeah, we do for every job.

24         Q.    You do?

1    actually.

2          Q.    Is that a Vermont company?

3          A.    Yeah.

4          Q.    And the reason you don't price

5    Bennington?

6          A.    I just never have.

7          Q.    They don't ask you for a price and you

8    don't give it to them, is that correct?

9          A.    Right, correct.

10         Q.    Is there anybody out there who doesn't do

11   business with you because of some agreement they

12   have with the union?

13         A.    I wouldn't know.  It hasn't been -- No

14   one has told me that.

15         Q.    You talked about a contractor, I think,

16   you did business with the contractor in Framingham

17   that was from out of state, from the south some

18   place?

19         A.    Yes.

20         Q.    And this was a -- Was it Carolina?

21         A.    North Carolina.

22         Q.    So this is an erector, a steel erector

23   from North Carolina who came into Framingham to do

24   an erection job?

1      A.      Correct.

2      Q.      And do they bid in this area often?

3      A.      To some degree, I believe.  I mean, they

4  have done some work up this way, so I would assume

5  that they do.

6      Q.      Do you remember who the fabricator was?

7      A.      Isaacson Steel.  There is another one

8  from the list.

9      Q.      Yeah.  That's another one from the list.

10  We didn't mention that one earlier.  Are there other

11  out-of-state contractors like that -- What's the

12  name of that company, the Carolina company?

13      A.      Buckner Steel.

14      Q.      Are there other companies like Buckner?

15      A.      Yeah.  A lot of companies travel around.

16  They follow stores.  They follow a chain.  They go

17  all over the country.  It's not uncommon to see

18  companies like that.

19      Q.      Was that a retail store, that job in

20  Framingham?

21      A.      No.

22      Q.      You said what it was?

23      A.      Genzyme.

24      Q.      Do I understand it correctly that in

111

1    Q.    You said when you got into the business,

2  you got into the business essentially with a

3  Workers' Comp settlement?

4    A.    Right.

5    Q.    Right?

6    A.    Exactly.

7    Q.    How much was your Workers' Comp

8  settlement that went into the business?

9    A.    I think I was able to start it with like

10  $30,000.

11    Q.    Now, if you had $30,000, you would not

12  have been able to start a steel erection, right?

13        MS. TALWANI:   Fabrication.

14    Q.    You would not have been able to be a

15  fabricator with $30,000?

16    A.    Not of any substance.  I guess, I could

17  fabricate widgets.  I couldn't.

18    Q.    Right.  Are there, like, miscellaneous

19  fabrication shops, miscellaneous metal fabrication

20  shops?

21    A.    There are.

22    Q.    Make stairs and that sort of thing that

23  you were talking about earlier?

24    A.    Correct.

1      Q.    Some of them are union, some are

2    open-shop, some of them are prevailing rate, right?

3      A.    That's what it will say.  Union, "U",

4    "P", prevailing rate, open-shop.

5      Q.    Open-shop.

6      A.    If it says "P", I don't bid it.

7      Q.    And if it says "U", you don't bid it?

8      A.    I'm sorry, if it says "U", I don't bid

9    it.  Prevailing wage I do bid.  If it say open-shop,

10   I bid.  If it has a "U" next to it, I'm not going to

11   bid it.

12     Q.    And that's because you understand you've

13   got to be union in order to get on the job?

14     A.    Correct.

15     Q.    Do you understand that to be different

16   from a PLA job?

17     A.    I do.

18     Q.    Because a PLA job, you don't have to be

19   union to bid it?

20     A.    Correct.

21     Q.    You just have to agree to whatever the

22   agreement says?

23     A.    Exactly.

24     Q.    And you've never done that?

1          A.      Never.

2          Q.      You have no desire to?

3          A.      Not at the present time.

4          Q.      Let me show you another document which we

5    have marked as Exhibit 2.

6          A.      Okay.

7          Q.      Have you seen that document before?

8          A.      I have.

9          Q.      Have you read it?

10         A.      I have.

11         Q.      Is your signature somewhere at the end of

12   it?

13         A.      I believe so, yes.

14         Q.      I'm going to ask you a couple of

15   questions about that document.  The answer that you

16   give, I think it's in Answer No. 5, take a look at

17   Answer No. 5, if you would.

18         A.      (Witness reviewing document.)  Okay.

19         Q.      That is the same subject we were just

20   talking about, isn't it, if I have the right one.

21   Can you tell me what the --

22              MR. AVAKIAN:  Excuse me, were you asking

23        for Paragraph No. 5 or Page No. 5 --

24              MR. KELLY:  Interrogatory No. 5, I'm

1      Q.    You submit a number for erection.    He

2  submits a number for fabrication.    Actually, he

3  submits a number for fab and erect, correct?

4      A.    Correct.

5      Q.    Actually, you don't even know what that

6  number is, do you?

7      A.    No.

8      Q.    Does he share that number with you?

9      A.    No.

10      Q.    But those are the reasons in your

11  estimation as to why you might not have gotten the

12  job?

13      A.    Correct.

14      Q.    Because your fabricator didn't get it, or

15  you didn't win it with your own fabricator?

16      A.    Correct.

17      Q.    Are you aware of any agreement that Local

18  7 has with any of these fabricators?

19      A.    I'm not.

20      Q.    Would it be an accurate characterization

21  of your business, apart from, I think you said maybe

22  5 percent of the time, somebody will award you a job

23  without competitive bidding, that you bid for your

24  jobs, job-by-job without any guarantees?

1    stores earlier.  Like if somebody comes in and puts

2    up a Home Depot, does Home Depot use the same

3    fabricator for all of their stores?

4        A.    Sometimes.

5        Q.    But not necessarily the same erector?

6        A.    Not necessarily.

7        Q.    Do fabricators have exclusive

8    arrangements with erectors?

9        A.    Not that I'm aware of.

10        Q.    It would be a good deal if they did,

11    wouldn't it?

12        A.    Sure would.

13        Q.    But by and large, that's not your

14    experience?

15        A.    No, I mean, no.

16        Q.    Even fabricators that work with the same

17    handful of erectors, spread the work around, do they

18    not?

19        A.    To some degree, you don't see everybody

20    everyone putting their eggs all in one basket.  Some

21    of my best customers still have other people doing

22    their work.  I do the majority, but they definitely

23    shop around.

24        Q.    These jobs that are represented by what

1    A.    They are.

2    Q.    They have a contract with Local 37?

3    A.    I believe so.

4    Q.    So he's a Local 37 member?

5    A.    Correct.

6    Q.    And so the evidence that you have that

7    supports the allegations of Paragraph 150 is that's

8    what the union agents told your employees, and Billy

9    Z. went to work for HB Welding?

10    A.    Correct.

11    Q.    Anything else?

12    A.    No.

13    Q.    You have talked about monitoring and

14    surveillance in a couple of instances during the

15    course of today.  I think one was up in New

16    Hampshire and another one you just mentioned in

17    Wrentham.  At some point, did you complain about

18    that to the NLRB?

19    A.    I believe, I brought it up.  Apparently,

20    it's within their rights to film what they would

21    like to film.

22    Q.    Does this mean that your unfair labor

23    practice charge was not successful?

24    A.    I don't know if I ever filed one.  I

1      Q.      -- Have you seen a sham picket?

2      A.      I've had a couple on my jobs.

3      Q.      Have you?

4      A.      Yeah.

5      Q.      What is it that these signs say?

6      A.      That we don't have a contract with Local

7      7.

8      Q.      D.F.M. doesn't have a contract with Local

9      7?

10     A.      Right.  Now, some of them, I don't know

11     if this is consistent with sham, we don't meet

12     community standards. That's another one.  I don't

13     know if that's necessarily a sham.

14     Q.      But D.F.M. doesn't have a contract with

15     Local 7, that's a sham?

16     A.      That's an informational picket line, I

17     would assume.  It's all a sham to me.

18     Q.      I understand that.  How do you

19     distinguish between sham picketing and picketing

20     which is not sham picketing?

21     A.      If I was working on a job where someone

22     was breaking an agreement that they had with a

23     signatory contract, and I was working on it, I guess

24     the picketing, I would say, that was a valid picket.

1  I don't know.

2      Q.   A breach of contract picket is a valid

3  picket?

4      A.   I don't know.  They don't like me

5  working.  I get picketed all the time.  It's all a

6  sham, the sham picket.

7      Q.   It's a sham picket because they are

8  picketing you, and you don't want them to picket

9  you?

10      A.   They were picketing me because I'm not

11  union.

12      Q.   Correct.

13      A.   And there is no contract with them.  They

14  were just upset that I'm working and they are not,

15  so they will picket me.

16      Q.   And do you understand that they have the

17  right to do that?

18      A.   Sure they do, not for more than 30 days

19  in a row.

20      Q.   You learned that one when you filed your

21  unfair labor practice charge?

22      A.   Correct.

23      Q.   So recognitional picketing, at least, is

24  limited to 30 days?

1    A.    Correct.

2    Q.    D.F.M. refuses to recognize Local 7?

3    A.    Or whatever it says?

4    Q.    They can only do that for 30 days?

5    A.    Correct.

6    Q.    Is that sham picketing when you do that

7    for more than 30 days?

8    A.    I don't know.  Like I said, to me it's

9    all a sham.  They picket that I don't have a

10   contract, but they won't give me a vote.  If they

11   really care about the membership, why won't they

12   give them a vote.  They won't.  I don't know what

13   your definition of a sham is, but that sounds like a

14   sham to me.  Sounds like a lot of smoke and mirrors.

15   Q.    You think it is a condition of picketing

16   that the employees have to have a vote?

17   A.    If they were looking for me to turn my

18   company, unionize, it's up to my employees if they

19   want to do that.

20   Q.    When did you first meet your counsel in

21   this case?

22   MR. AVAKIAN:  In this case.  Objection.

23   A.    Objection.  I guess, I'm not going to

24   tell you that.

1     Q.    When did you first meet Mr. Avakian?

2     A.    It was September.

3     Q.    Of last year?

4     A.    Of 2002.

5     Q.    Of 2002.  And did he represent you in

6  cases other than this one?

7     A.    He did.

8     Q.    You've talk about a couple of unfair

9  labor practice charges that you were involved in.

10  Did Mr. Avakian represent you in those?

11     A.    He did.

12     Q.    In this case, you have a written fee

13  agreement?

14     MR. AVAKIAN:  Objection.  Direct the

15     deponent not to answer.

16     Q.    How much have you spent in attorneys'

17  fees on this case up until this point?

18     MR. AVAKIAN:  Objection.  I direct the

19     deponent not to answer.

20     Q.    Do you have an agreement with your

21  co-plaintiff's regarding apportionment of fees in

22  this case?

23     MR. AVAKIAN:  Objection.  I direct the

24     deponent not to answer.

1    understand what happened, did you?

2        A.    We did leave.

3        Q.    Did you?

4        A.    Yeah.

5        Q.    Now, after you wrote that letter, Exhibit

6    12, C & I wrote a letter to Bond Brothers, did they

7    not?

8        A.    I believe so.

9        Q.    And my question is:  Is Exhibit 13 a

10   letter that C & I wrote to Bond Brothers following

11   your letter?

12       A.    I remember this.

13       Q.    But that's the document that C & I sent

14   to Bond Brothers?

15       A.    Correct.

16       Q.    And you indicated earlier that it was

17   eventually resolved to your satisfaction?

18       A.    We wound up going back to finish the job,

19   right.

20       Q.    The Fox 25 job?

21       A.    Correct.

22       Q.    Did somebody take responsibility for the

23   damage to your equipment?

24       A.    They never did.

1    Q.    Did you get compensated for it?

2    A.    I don't recall.

3    Q.    Would you have records on that subject?

4    A.    I believe I would.  If we had been

5    compensated, we would have some record of it in the

6    file.  I don't believe we ever did.

7    Q.    Exhibit 14, do you recognize what that

8    document is?

9    A.    Yes, I do.

10    Q.    What is it?

11    A.    It is an accident we had on a project

12    with an employee of ours that was in a trade school.

13    Turned out to be not able to work with us, and it

14    was an unfortunate situation.  I had the trade

15    school actually approached me to try to place this

16    kid to work.  It was my understand that the position

17    that he filled was -- We met all the legal

18    obligations by hiring him, and the school kind of

19    threw me under the bus.  I didn't realize that he

20    wasn't available to work based on any of my jobs,

21    being 17.

22    Q.    And so there were child labor violations

23    in connection with your employment of this fellow?

24    A.    There were.

1    been requested of any fabricators to bid on any jobs

2    in Boston?

3        A.    No.

4        Q.    You indicated in your testimony that you

5    did not bid on projects with PLA's.  Can you

6    describe the reasons why you don't want to bid on a

7    PLA project?

8        A.    I'm not comfortable bidding a PLA.  When

9    I have my own employees, my own working atmosphere,

10   my guys can multitask.  They can do different jobs.

11   They can labor.  They can go pick up wood.  I don't

12   know.  On a PLA I'm going to have to use laborers,

13   for instance.  I'm going to have a to use a painter

14   to touch up paint where I could just have an iron

15   worker do it.

16       There is different rates.  It's just not -- I

17   don't know that world.  I'm open-shop.  We bid.  We

18   iron work.  I wouldn't even know how to price a job

19   that way.  I would be afraid of getting burnt.

20       Q.    Now, the Fox 25 Job, when you were

21   initially dismissed, if I can use that word, what

22   did you do with the men and equipment when you were

23   pulled off the job unexpectedly?

24       A.    I just replaced them on another project.

1     Q.    There were no downtime for any of the

2  men?

3     A.    No.

4     Q.    I'd like you to take a look at paragraph

5  109 through 111 in the complaint and I want to ask

6  you a question.

7     A.    (Witness reviewing document.)  Okay.

8     Q.    Now, those paragraphs deal with the 405

9  Cochituate Road Project?

10     A.    Correct.

11     Q.    And D.F.M. had been on that project?

12     A.    Correct.

13     Q.    Were you aware of the fact that a Local 7

14  contractor was able to beat your price and get the

15  work?

16     A.    I was made aware of that when I saw the

17  job target list.  I'm aware of it now.

18     Q.    Now, at the time of the complaint, were

19  you aware of that?

20     A.    I was.

21     MR. AVAKIAN:  I don't have any other

22     questions.

23             REDIRECT EXAMINATION

24

COMMONWEALTH OF MASSACHUSETTS
Bristol, ss.


         I, PATRICIA BOWEN, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on the
6th day of July, 2006, at the offices of
Segal, Roitman & Coleman, 11 Beacon Street, Boston,
Massachusetts, the following
named person, to wit:  GLEN PISANI
who was by me duly sworn to testify to the truth
and nothing but the truth as to his knowledge
touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination
was reduced to writing by me; and that the
statement is a true record of the testimony given
by the witness, to the best of my knowledge and
ability.

         I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.

         WITNESS MY HAND this 10th day of July,
2006.


                              _____
                              Patricia Bowen
                              Notary Public


My Commission Expires
February 2, 2012

         The foregoing certification of this
transcript does not apply to any reproduction of
the same in any respect unless under the direct
control and/or direction of the certifying reporter.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 04–cv-12536-RGS ) |
| LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS. | ) ) ) ) ) |
| Defendant. | ) ) |

## PLAINTIFFS' RESPONSE TO DEFENDANT IRON WORKERS LOCAL 7'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES

The Plaintiffs, by and through counsel of record, respond to the Second Interrogatories to Plaintiffs filed by the defendant, Local 7 ("Local 7"), as follows:

Plaintiffs object to the request for information within the attorney-client and work product privileges. Plaintiffs further object to the submission of more than twenty-five interrogatories in violation of the Local Rules and the Court's Order.

Without waiving these objections, Plaintiffs further respond as follows:

1.    Identify each person who provided information or otherwise consulted or assisted you in connection with providing answers to these interrogatories, including an identification of the specific interrogatories for which each person supplied information or consulted or assisted, the nature of any such consultation or assistance, and whether the information supplied was based on that person's own knowledge.

ANSWER:    Plaintiffs object to the interrogatory to the extent that it calls for a detailed recital of counsel's investigation of the case in order to compile the information responsive to each subpart of theses interrogatories in that such information is privileged as attorney work product and in that such an interrogatory is unreasonably burdensome. Without waiving such objection Plaintiffs state: Michael Guillemette, Donald Morel, Glen Pisani, Raymond Cilley, James Read,

and James Brown.

2.      Identify each document (and, where pertinent, the section, article or subparagraph thereof) you have used in preparing the answers to these interrogatories, including an identification of the specific interrogatories for which each document was used.

ANSWER:    Plaintiffs object to the interrogatory to the extent that it calls for a detailed recital of counsel's investigation of the case in order to compile the information responsive to each section and subpart of this and other interrogatories in that such information is privileged as attorney work product and in that such an interrogatory is unreasonably burdensome.

3.      State the period in time for which you claim damages from Defendant.

ANSWER      December 1, 1999 to through the conclusion of the instant case.

4.      Identify and describe the "relevant market," including product or services and geographic limitations (including by specific county, municipality, and other geographic location) for purposes of each of your anti-trust counts or claims.

ANSWER:    The "Relevant Market" is the erecting of structural metal and steel on buildings and structures, erecting prestressed and precast concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine—an area proximate to the City of Boston.

5.      With regard to the allegations contained in Paragraph 43 of your Complaint that "[s]ince approximately 1999, total structural steel erection construction spending on an annualized basis in the Relevant Market was in excess of $200,000,000 per year" and "[a]fter adjusting for the Boston Central Artery and Harbor Tunnel Project and other union-shop projects, the Relevant Market in which Plaintiffs are able to compete has been less than $60,000,000 per year during the relevant time period," please describe or state how these dollar figures were calculated, further identifying for each:

    a.      each and every act or omission to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) that forms any part of your information or understanding regarding the calculation; and
    b.      each and every fact, figure or document (and, where pertinent, the section,

article or subparagraph thereof) and each and every communication which forms any part of your information or understanding regarding the calculation.

ANSWER:    Plaintiffs object to the interrogatory to the extent that it calls for a detailed recital of counsel's investigation of the case in order to compile the information responsive to each subpart of this interrogatory in that such information is privileged as attorney work product and in that such an interrogatory is unreasonably burdensome. The specification information about acts and omissions are contained in the projects files produced by local 7 in response to Plaintiffs' First Request for Production of Documents and with the Local 7's First Response to Production of Documents to Local 7 at Defendant counsel's office. See Fed. R. Civ. P. 33(d). Plaintiffs have provided this information to Defendant and it is equally accessible to it. "Each fact, figure, and document" are in the possession of third parties with which Local 7 has entered into a combination or agreement, which Plaintiffs will provide for inspection once obtained. In further response, Plaintiffs state  The dollar volume of the relevant market were calculated using publicly available census data. Without waiving that objection, Plaintiffs show the following projects lost due to Local 7's unlawful activity, pending further discovery:

1.    *The Catholic Medical Center Project.*    In 2002, a new hospital wing at the Catholic Medical Center in Manchester, New Hampshire was under construction. Harvey Construction was the general contract. AMERICAN AERIAL, ASE and BEDFORD IRON bid on this project. Harvey Construction through Canatal Industries, Inc. notified Plaintiff AMERICAN AERIAL that it was the low bidder to install the steel structure work. The steel erection contract had a total value in excess of $240,000.00. On or about February 27, 2003, Plaintiffs AMERICAN AERIAL was removed as the steel erector on the Catholic Medical Center project and was replaced by Universal Steel, a Local 7 contractor and who received job target money to underbid AMERICAN AERIAL.

3

2.    *The Fox 25 Project.*   In the Fall of 2002, Plaintiff D.F.M. was awarded a

contract to build a Fox Television Station addition in Dedham, Massachusetts, by Cape & Island

Steel, Inc. On or about February 24, 2003, the day before construction was to begin, agents of

Defendant Local 7 contacted the project manager Jim Gage for Cape & Island Steel, Inc.

demanding that Plaintiff D.F.M. be removed. Plaintiff D.F.M. Industries' employees began

working at the Fox 25 Project in accordance with its contract. Cape & Island Steel, Inc.'s

President John J. Paulding was then told by Edwin Wright, a Business Agent from Local 7, that

if Cape & Island Steel, Inc. did not remove Plaintiff D.F.M. Industries from the project, that

would be a "big mistake" and Local 7 would set up a picket line and induce other building trade

union members to walk off the job. When Paulding objected, Wright informed Paulding that if

Paulding did not remove Plaintiff D.F.M. Industries from the project he would contact the other

Building Trades Unions to pressure him by putting up a picket line. A purpose of the picketing

threat was to coerce and restrain Paulding to enter into an 8(e) agreement in restraint of trade.

On June 19, 2003, Wright went to the job site and disrupted the job by making

threatening statements to Plaintiff's employees and supervisors of physical harm. D.F.M.

Industries' equipment on the jobsite was damaged.   The general contractor Bond Brothers told

Cape & Island Steel, Inc. that he had to make this union problem go away. Subsequently, the

Cape & Island Steel, Inc. Project Manager informed D.F.M. Industries that he would terminate

Plaintiff's contract before D.F.M. Industries' job was finished and Cape & Island Steel, Inc.

would not give the next phase of the job to Plaintiffs D.F.M. Industries.  Plaintiff D.F.M.

Industries was removed from the job. The agreement of John Paulding and Local 7 to remove

Plaintiff D.F.M. Industries from the job is a restraint of trade and Plaintiff has been damaged

thereby.

3.    *The Tamarisk House Project*  D.F.M. Industries had a contract dated August 1,

4

2002, with Metro West Steel, Wrentham, MA, to erect an assisted living home in Warwick, Rhode Island in 2002, being managed by O. Alhborg & Sons, Inc., Cranston, RI.   At a meeting with managers and supervisors from O. Alhborg & Sons, Inc., D.F.M. was informed on Wednesday August 28, 2002, to begin steel erection the following Tuesday, September 3, 2002. On Friday, August 29, 2002., D.F.M. Industries, was informed by project manager Dino Canteruccio of Metro West Steel that O. Ahlborg & Sons, Inc. had been contacted by representatives from Local 37, that Metro West Steel was rescinding its contract with D.F.M. Industries, and that the contract was then being awarded to Griffin Steel, a Local 7 Contractor.

4.     *Danvers Stop & Shop Project.*        On November 8, 2002, steel fabricator Jay Steel solicited bids for the construction of a Stop & Shop grocery store in Danvers, Massachusetts. Plaintiff ASE submitted a bid on January 14, 2003. ASE was informed by a representative of Jay Steel that the Local 7 had provided job targeting money to the erector used by Jay Steel which undercut ASE's bid.

5.     *Stop & Shop Warehouse Project.*        On March 23, 2003, AJAX was solicited by M & S Steel of Garett, Indiana, to submit a bid to erect the structural steel for the Stop & Shop Warehouse project in Freetown, Massachusetts. Plaintiffs AJAX and D.F.M. also submitted bids on the project. Subsequently, agents of Local 7 contacted M & S Steel and informed it that job target money was available to it if it awarded the project to a Local 7 contractor. H & B Welding, a Local 7 Contractor, was then awarded the contract with the use of job target money.

5.     *Portland Jet Port Project.*        On April 22, 2004, AMERICAN AERIAL submitted a bid of $92,000.00 to general contractor Ledgewood, Inc. for the erection of hangers in Portland, Maine.  AMERICAN AERIAL was informed by Mark Harris of Arctic Construction, Inc., Falmouth, Maine, a Local 7 Contractor, that it had been provided job target funds.  Subsequently, Local 496 agent John Evans admitted that job target money had been

provided to enable Arctic Construction, Inc. to submit a lower bid on the project.

6.    *University of Southern Maine Science Research Wing Project.*    On May 21, 2004, AMERICAN AERIAL submitted a bid of $92,500.00 to general contractor Pizzagalli Construction Company for the construction of new science research wing for the University of Southern Maine in Portland, Maine. AMERICAN AERIAL was informed it was the second low bidder. The project was then awarded to Arctic Construction, Inc., a Local 7 Contractor, who Local 496 agent John Evans admitted had been provided job target money to submit a bid lower than AMERICAN AERIAL on the project.

7.    *Cardi's Furniture Project.*    In 2002, AJAX submitted a bid for the steel erection of a Cardi's Furniture store in North Attleboro, Massachusetts to FAMM Steel, Inc. AJAX was informed by FAMM that it was awarded the contract. AJAX was subsequently informed by FAMM that Local 7 had authorized the payment of job target money on the project and then awarded the contract to Griffin Iron, a Local 7 Contractor, who on information and belief received the Job Target money. Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed to pay AJAX $5,000.00 to break its service contract on the job.

8.    *O. Ahlborg Headquarters Project.*    O. Ahlborg and Sons sought bids for the steel erection of their O. Ahlborg and Sons Headquarter's office in Cranston, Rhode Island, to begin in October 2001. Plaintiffs D.F.M. and AJAX submitted bids for the work with a value of $45,000.00. AJAX was awarded the job. The day before work was to begin, the project was awarded to Griffin Steel who on information and belief received Job Target money from Defendant.

9.    *Walmart Brewer Project.*    In 2002, a Wal-Mart store was to be erected in Brewer, Maine. On August 6, 2002, Plaintiff AMERICAN AERIAL submitted a bid to

6

Universal Welding to perform the structural erection of the building in the amount of $259,600.00. Industrial Enterprises, a union contractor was awarded the contract with a bid of $160,000.00 for which it received job target money.

10. *Yarmouth High School Project.*    In 2002, the steel erection for a new Yarmouth High School in Yarmouth, Maine was awarded to steel fabricator Mandate Erectors & Welding, Ltd. Mandate Erectors & Welding, LTD solicited bids for the erection of the steel frame. On April 8, 2002, Plaintiff AMERICAN AERIAL submitted a bid of $339,900.00 to Mandate Erectors & Welding, LTD. A union contractor with Job Target Funds, CTI, New Hampshire, was awarded the bid at $200,000.00.

11. *North Brookfield High School Project.*    A Junior/Senior High School building project was constructed in North Brookfield, Massachusetts. Plaintiffs were unable to bid on the project when it was learned that Union contractor Construction Welding Services Corporation received job target money from Local 7.

12. *Walker Brook Crossing.*    On December 12, 2002, Mandate Erectors & Welding, Ltd. solicited bids for the steel erection portion of a Home Depot in Reading, Massachusetts known as Walkers Brook Crossing. On January 17, 2003, Plaintiffs AMERICAN AERIAL, ASE and AJAX submitted bids to perform the work. ASE and AJAX were informed by a representative of Mandate Erectors & Welding, Ltd. that Local 7 had provided job targeting money to a Local 7 contractor. The project manager, then awarded the contract to CAPCO Steel, Inc., a Local 7 Contractor.

12. *Stryker Biotech.*    On May 30, 2003, fabricator Supermetal solicited bids for the steel erection portion of the construction in West Lebanon, New Hampshire known as Stryker Biotech. On June 25, 2003, ASE submitted a bid to perform the work. ASE was informed by a representative of Supermetal that Local 7 had provided job targeting money to

7

CAPCO, and the contract was being awarded to CAPCO Steel Corp., a Local 7 contractor.

13.    *Long View Place.*    On June 2, 2003, General Steel Fabricators, Inc. and Mandate Erectors & Welding, Ltd. solicited bids for the steel erection portion of the construction of an apartment community in Waltham, Massachusetts known as Long View Place. Plaintiffs ASE and AJAX submitted bids. ASE was informed that it had submitted the low bid on the project. ASE was then informed by a representative General Steel Fabricators, Inc. that Local 7 had provided job targeting money to a Local 7 Contractor, and contract was awarded the contract to Beauce Atlas, a Local 7 contractor.

14.    *Mart Parking Complex.*    In the Fall of 2003, FAMM Steel, Inc. issued a public bid for the steel erection and building of a parking garage complex in Fitchburg, Massachusetts. Plaintiffs AJAX, ASE, INDEPENDENT WELDING, and BEDFORD submitted bids. Subsequent to submitting the bids, INDEPENDENT WELDING was told by Allen Hodges, a representative of FAMM Steel, Inc. that a union company, Universal Steel  had received job target money on the project. Universal Steel was awarded the contract.

15.    *The 405 Cochituate Road Project.*    In October 2002, a construction project in Natick, Massachusetts at 405 Cochituate Road was to begin. Ocean Steel was the steel fabricator. Plaintiff D.F.M. Inc. submitted a bid on this project, as well as Green Mountain, a non-Local 7 contractor. Agents of Local 7 contacted Construction Welding to have it outbid the non-Local 7 contractors on the project. On or about October 8, 2002, co-conspirator Construction Welding obtained job target funds from Local 7. With those funds, Construction Welding was awarded the project for the steel erection portion of the 405 Cochituate Road Project.

16.    *Jordan's Furniture Distribution Warehouse Project.*    In 2002, AJAX submitted a bid for building this project in Taunton, Massachusetts. On information and belief,

the project was awarded to James F. Sterns Co., Inc., Hingham, MA, a Local 7 Contractor who received job target money.

17.    *Stone Harbor Condominiums.*    On August 8, 2003, AJAX submitted a bid to Jay Steel on this project in Bristol, Rhode Island and was informed it was the low bidder. On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor who received job target money.

18.    *Whole Foods Grocery Project.*    In the Spring of 2004, AJAX submitted a bid on this project in Hingham, Massachusetts to Jay Steel and was informed it had submitted the lowest bid. On information and belief, the work was taken away from AJAX and awarded to a Local 7 Contractor Daniel Koury Construction, Inc., Warwick, Rhode island, who received job target money.

19.    *Showcase Cinemas*    On August 19, 2003, AJAX submitted a bid to fabricator Beauce Atlas on this project in Millbury, Massachusetts and was informed it had submitted the lowest bid. Two weeks later, the work was taken away from AJAX and awarded to a Local 7 Contractor who received job target money.

20.    *Archstone Apartments.*    On June 11, 2003, AJAX had received a written purchase order from Mandate Erectors for this building project in Watertown, Massachusetts. AJAX had invested a substantial amount of preparation time and costs in preparing the project. Two weeks before the scheduled start date, AJAX was informed that the project was being taken away from it and being awarded to Interstate Steel Erectors, a Local 7 contractor. Due to the payment of job target money and other illegal pressure from Local 7 on the fabricator, the fabricator agreed broke its service contract with AJAX.

21.    *Stop & Shop Store Project.*    On March 23, 2004, AJAX submitted a bid for the construction of a Stop & Shop grocery store in Halifax, Massachusetts to Jay Steel. AJAX was

informed by the fabricator Jay Steel that it had been awarded the project. One week before the start date, AJAX was informed that the project was being assigned to H B Welding, Inc., Pawtucket, RI, a Local 7 Contractor.

22.    *Necco Project.*    In 2001, AJAX submitted bids for the erection of a warehouse building for NECCO in Revere, Massachusetts to Cives Steel, Augusta, Maine. AJAX was informed that it was the low bidder by the final fabricators on the project. One week after meeting with the general contractor and fabricators on the jobsite, AJAX was informed that the project was being awarded to CAPCO, Providence, RI, a Local 7 Contractor.

23.    *Bowdoin College Project.*    In August 2004, AMERICAN AERIAL submitted a bid for the erection of a new dormitory wing at Bowdoin College in Brunswick, Maine, to the fabricator Advance Resources and Construction Enterprises, Inc. ("ARC"), Kingfield, Maine. AMERICAN AERIAL was informed that it had been awarded the contract. AMERICAN AERIAL attended a jobsite meeting for sequencing the job, jobsite requirements, and was told it was the steel erector. The job was to begin the week of November 22, 2004. On November 15, 2004, AMERICAN AERIAL was informed by ARC that it had received new pricing from Arctic Construction, a Local 7 contractor, and was meeting with Arctic to finalize a new contract that was substantially lower. AMERICAN AERIAL was removed from the project.

24.    *Brickworks-Buildings 3 & 4 Project.* On October 8, 2004, D.F.M. submitted a bid for the erection of two buildings in Cambridge, Massachusetts to Capone Iron Corporation, Rowley, Massachusetts. On September 28, 2004, Bel-Lin Corporation, Randolph, Massachusetts, submitted a bid on the project to Capone Iron Works in the amount of $136,000.00. Plaintiff D.F.M. was awarded the contract on October 8, 2004. On or about November 18, 2004, Local 7 negotiated a new bid for the project with its union signatory erector Bel-Lin Corporation. The Union agreed to contribute $12,000.00 of job target money to the

contractor and Bel-Lin Corporation agreed to further lower its prior bid by $9,000.00 as a "good guy discount" to Capone Iron Works. On or about November 18, 2004, defendant Local 7 wrote Capone Iron Works by agent Edwin Wright, on behalf of itself and Bel-Lin Corporation, and offered to cut Capone Iron Works' prior bid by $21,000.00 as a concession and for market recovery. On November 29, 2004, D.F.M. was informed by Capone Iron Works project manager J. Robert Chipman that the Union had provided him a new bid price on the project for Bel-Lin Corporation and therefore D.F.M. would not be permitted to perform on the contract with Capone Iron Works.

     25     *22 Fore Street.*    "22 Fore Street" is the name of a project in Portland, Maine that was awarded to AMERICAN AERIAL. Agents of Local 7 offered fabricator Advance Resource Construction $20,000.00 if it would not use AMERICAN AERIAL's services.

     26.    *Hilton Garden Inn.*    On information and belief, on a Hilton Garden Inn construction project being erected by AMERICAN AERIAL in Freeport Maine in 2004, Walter Kilbrethm an agent of Local 496 offered to pay job target money to ARC.

    The answer to this interrogatory may also be amended upon review of Local 7's business records of jobsites where target funds have been paid.

6.    With reference to the allegation contained in Paragraph 1 of your Complaint that the alleged anti-trust violations had the "intent and effect of reducing and eliminating competition between the Defendants and their signatory contractors with the Plaintiffs":

    a.    identify and describe in detail all facts, acts or omissions to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved), documents (and, where pertinent, the section, article or subparagraph thereof) or communications, relied upon by you in support of such allegations;

    b.    identify all persons, including experts and expert witnesses, having knowledge thereof or an opinion thereon;

    c.    state whether you have an opinion or whether you have made any analysis, study or determination as to what the non-artificial and competitive level of prices for services in the relevant product or service market identified in response to Interrogatory 5 above should have been during the time period you identified in

response to Interrogatory 3 above and, if so:

(1)    state what you claim the alleged competitive price level was from the time period identified in response to Interrogatory 3 above; and

(2)    identify each document (and, where pertinent, the section, article or subparagraph thereof) relating or referring to each such analysis, study or determination; and identify each person who participated, assisted, contributed or was consulted with regard to each such analysis, study or determination, and describe in detail the nature and extent of such participation, assistance, contribution or consultation.

**ANSWER:**    Plaintiffs object to the term "anti-trust violations." If Defendant Local 7 intends the term to refer to jobs that the Plaintiffs bid upon in the steel construction and services market, then without waiving said objection, Plaintiffs state that Plaintiffs have produced all bid and project files to Defendant Local 7 that they have worked on and has been working on since December 1999. The information requested in this interrogatory is information equally available to Local 7 in the files produced in response to Plaintiffs' First Set of Interrogatories to Local 7. Plaintiffs further object to the identification of its experts and expert witnesses and will provide same in accordance with the Local Rules of the Court. Without waiving said objection, Plaintiffs state the bid and project files have project names, contact information, locations, bids, and scope of work information. All these materials have been produced previously to Local 150.

See FRCP 33(d).

7.    With reference to allegations contained in your Complaint that Defendant and its alleged co-conspirators engaged in combinations or conspiracies in restraint of trade:

a.    identify the type(s) of alleged monopolization (e.g., horizontal, vertical, boycott, predatory pricing) you are claiming; and

b.    identify and describe in detail each act or omission to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) or communication which you claim constitutes, embodies or was done in furtherance of the alleged combinations or conspiracies.

**ANSWER:**    Plaintiffs object to the terms " horizontal, vertical, boycott, predatory pricing." Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad,

12

burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Plaintiffs further object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding oral conversations and combinations and conspiracies. Without waiving said objections, Plaintiffs state the following: The investigation into this issue is continuing. To some extent, however, this information is derivable from the Plaintiffs project reports and letters from developers and contractors to and from Local 7 and/or to Plaintiffs, which are available for Local 7's review pursuant to Rule 33(d) and which Local 7 has scheduled review. See also Answer to Interrogatory No. 1 and Plaintiffs' Response to Local 7's First Request for Production of Documents.

8.    Identify each and every agreement between Defendant and any other person or business, whereby that person or business agreed not to award business to Plaintiffs or other non Local 7 signatory contractors for:

    a.    a time period of six months or more; and

    b.    a time period of less than six months.

ANSWER:    See Answer to Interrogatories 1 and 7 above. In further response, Plaintiffs refer Defendant Local 7 to the target fund files and the target fund contracts produced in response to Plaintiffs' First Request for Production of Documents.

9.    With reference to the allegations in your Complaint that Defendant and its alleged coconspirators entered into agreements in restraint of trade, identify each agreement in restraint of trade entered into by the Defendant and its alleged co-conspirators, including but not limited to the agreements identified in Paragraphs 62 and 67-139 of the Complaint, and for each such agreements and the agreements identified in Interrogatory 8 above, identify:

    a.    each person that you claim entered into the alleged agreement;

    b.    whether the alleged agreement was made orally or in writing and, if in writing, identify the written instrument;

    c.    what you claim are the terms or conditions of the alleged agreement, including but not limited to the specific job or jobs or project or projects involved in the agreement;

d.    the date you claim the alleged agreement was entered into;

e.    each person that you claim authorized or sanctioned participation in the agreement;

f.    each act or omission to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) or communication that you claim constitutes, embodies or was done in furtherance of the alleged agreements; and

g.    each document (and, where pertinent, the section, article or subparagraph thereof) that you claim constitutes, embodies, evidences or was prepared in furtherance of the alleged agreements.

ANSWER:    Plaintiffs object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Plaintiffs further object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations. Without waiving said objections, Plaintiffs state the following: The investigation into this issue is continuing. To some extent, however, this information is derivable from the Plaintiffs project reports and letters from fabricators and contractors to and from Local 7 and/or to Plaintiffs, which are available for Local 7's review pursuant to Rule 33(d) and which Local 7 has requested production of documents. See also Answer to Interrogatory Nos. 1 and 7 and Plaintiffs' Response to Local 7's First Request for Production of Documents.

10.    With reference to your allegation in Paragraph 47 of the Complaint and other parts of the Complaint that Defendant and/or its co-conspirators engaged in price-fixing:

a.    identify and describe in detail each act, omission to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved), communication or document (and, where pertinent, the section, article or subparagraph thereof) that you claim constitutes, embodies, evidences or was done in furtherance of the alleged price-fixing, and the methods of calculating or determining costs; and

b.    identify and describe each job or project where you claim the price was below cost, further identifying and describing in detail every act, omission to act (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved), communication or document (and, where pertinent, the section, article or subparagraph thereof) supporting that claim.

14

ANSWER:    The answer to this Interrogatory may be derived from the Plaintiffs' and Local 7's business records which have been produced. These materials are available to Local 7. See Rule 33(d). In further response, see Answer to Interrogatory Nos. 1, 8 & 9 hereto.

11.    Identify each steel erection project or job for which you submitted a bid, quote or estimate for steel erection work or services that was to be done during the time period you identified in response to Interrogatory 3 above, stating or identifying and describing in detail separately for each:

    a.    the bid amount;

    b.    a breakdown of your estimated costs at the time the bid, quote or estimate was made, including but not limited to wages, benefits and workers' compensation premiums, incorporated into the bid amount and the process used to calculate those costs;

    c.    your anticipated or expected profit at the time the bid, quote or estimate was made;

    d.    the type(s) of work or services to be performed;

    e.    the size of the work or services to be performed;

    f.    the location of the work or services to be performed;

    g.    the estimated number of person hours to be performed by employee classification;

    h.    the percent of the "relevant market," which you identified in response to Interrogatory 4 above, the work on this project involved during the time period of this work;

    I.    the fabricator or other contractor to whom the bid, quote or estimate was submitted;

    j.    the general contractor, developer and/or other higher tiered contractor(s) on the project or job;

    k.    whether you were awarded the job or project and, if not, the name and street address, if known, of the person or business who was awarded the job;

    l.    whether the project or job was governed by a project labor agreement; and

    m.    each and every act, communication or document (and, where pertinent, the section, article or subparagraph thereof) related or referring to any of the above.

ANSWER:    Plaintiffs object to the interrogatory in that the information sought is duplicative and obtainable from the depositions which has been recognized as the more appropriate method of discovering such details regarding such communications and documents obtained during discovery, including documents produced by Local 7 in response to Plaintiffs' First Request for Production of Documents, and including the third party business records yet to be obtained, which the Plaintiffs will make available for the inspection pursuant to Rule 33(d). Plaintiffs

further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Without waiving said objections, Plaintiffs state the following: see Answers to Interrogatories Nos. 1,7 & 8, facts set forth in the Complaint.

Plaintiffs objects to the remaining interrogatories under Fed. R. Civ. P. 33(a). Plaintiffs further objects to this interrogatory to the extent that it calls for a detailed recital of each person who has knowledge of "each and every act" which are contained in files produced by Plaintiffs and show information equally accessible to Local 7and supporting Plaintiffs' claims in that such an interrogatory is unreasonably burdensome, such a detailed recitation of the facts, knowledge and evidence is unreasonably cumulative and duplicative of prior discovery responses and prior depositions and is more appropriately obtainable from such depositions and documents.

12.    For each steel erection project or job you identified in response to Interrogatory 11 on which you have performed steel erection work or services from the time period you identified in response to Interrogatory 3 above, state:

    a.    the person or business with whom you contracted to perform the work or services;

    b.    the price and other terms or conditions upon which you agreed to perform work or services;

    c.    whether the price or terms or conditions upon which you agreed to perform work or services as identified in Interrogatory 12(b) above were modified after an agreement or contract for work had been reached and, for each instance, identify and describe in detail the nature of the modification, including the re-modification and post-modification price and/or term or condition.

    d.    a breakdown of your costs, including but not limited to, workers' compensation premiums, wages and benefits;

    e.    your profit;

    f.    the type(s) of work or services performed, if different from that described in response to Interrogatory 11(d);

    g.    the location of the work or services performed, if different from that described in response to Interrogatory 11(f);

    h.    the time period when the work or services were performed;

    I.    the number of person hours performed and the number of person hours performed by employee classification;

    j.    the percent of the "relevant market," which you identified in response to Interrogatory 4 above, the work on this project involved, if different from that described in response to Interrogatory 11(h); and

k.    each and every act, communication or document (and, where pertinent, the section, article or subparagraph thereof) related or referring to any of the above, not already described in response to Interrogatory 11(m).

ANSWER:    See Response to Interrogatory 11. Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine.

13.    Identify or state whether you contracted out any steel erection work or services during the time period identified in Interrogatory 3 above and, if so, identify each person or business to whom you contracted out the work or services, identifying and describing separately for each, and separately for each project or job:

    a.    the type of steel erection work or services that you contracted out;

    b.    the price and other terms or conditions upon which you agreed to contract out the work or services;

    c.    whether the price or terms or conditions upon which you agreed to contract out work or services as identified in Interrogatory 13(b) above were modified after an agreement or contract for work had been reached and, for each instance, identify and describe in detail the nature of the modification, including the re-modification and post-modification price and/or term or condition;

    d.    a breakdown of the costs incurred by person or business to whom you contracted the work, if known, including but not limited to, wages, benefits, and workers' compensation premiums;

    e.    your profit;

    f.    the type(s) of work or services performed;

    g.    the location of the work or services performed;

    h.    the time period when the work or services were performed;

    I.    the number of person hours performed and the number of person hours performed by employee classification;

    j.    the percent of the "relevant market" which you identified in response to Interrogatory 4 above, the work on this project involved;

    k.    the general contractor, developer and/or other higher tiered contractor on the project where the work or services were performed;

    l.    whether the project or job was governed by a project labor agreement; and

    m.    each and every act, communication or document (and, where pertinent, the section, article or subparagraph thereof) related or referring to any of the above.

ANSWER:    Plaintiffs object to the interrogatory in that the information sought is duplicative and obtainable from the depositions which has been recognized as the more appropriate method of discovering such details regarding such communications and documents obtained during discovery, including documents produced by Local 7 in response to Plaintiffs' First Request for

Production of Documents, and including the third party business records yet to be obtained, which the Plaintiffs will make available for the inspection pursuant to Rule 33(d). Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Without waiving said objections, Plaintiffs state the following: see Answers to Interrogatories Nos. 1, 7 & 8, facts set forth in the Complaint.

Plaintiffs objects to this interrogatory under Fed. R. Civ. P. 33(a). Plaintiffs further objects to this interrogatory to the extent that it calls for a detailed recital of each person who has knowledge of "each and every act" which are contained in files produced by Plaintiffs and show information equally accessible to Local 7 and supporting Plaintiffs' claims in that such an interrogatory is unreasonably burdensome, such a detailed recitation of the facts, knowledge and evidence is unreasonably cumulative and duplicative of prior discovery responses and prior depositions and is more appropriately obtainable from such depositions and documents.

14. State whether you claim that the price or any term or condition of any of your contracts, agreements or bids, estimates or quotes for the performance of steel erection work or services was discussed or communicated between any one or more representatives of Defendant and any one or more representatives of the alleged co-conspirators from the time period you identified in response to Interrogatory 3 above, and with regard to each such discussion:

    a.   state the date thereof;
    b.   identify each person who participated therein or overheard any part thereof;
    c.   identify the price and/or the term or condition of the contract, agreement or bid, quote or estimate that was discussed; and
    d.   state whether you claim any agreement was reached during or pursuant to such discussion, and, if so, describe the terms and substance of each such agreement and, if so, state the form and manner in which you claim each such agreement was carried out.

ANSWER: No discussions or communications occurred on contracts, agreements, bids, estimates, or quotes with any representatives of Defendants or alleged co-conspirators.

15. Identify and describe in detail each communication that you had with any purchaser (direct or indirect) of steel erection services during the time period identified in response to

Interrogatory 3 above, concerning the following matters:

    a.    evaluation of price for steel erection services, including but not limited to, similar prices, identical prices or different prices;

    b.    the purchasing practices of direct purchasers of steel erection services;

    c.    prices quoted or bid on steel erection services;

    d.    market or published price levels for steel erection services;

    e.    prices paid or to be paid for steel erection services;

    f.    specifications regarding steel erection services;

    g.    terms or conditions of sale of steel erection services;

    h.    the relative merits of different types of steel erection services;

    I.    any purported violation of any anti-trust law by any supplier of steel erection services, including, without limitation, the setting or fixing of prices;

    j.    evaluations of suppliers or potential suppliers of steel erection services; and

    k.    any recommendations for action with respect to similar prices, identical prices, different prices, the purpose of certain prices or any purported anti-trust violation by any suppler of steel erection services.

**ANSWER:**    Plaintiffs object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Plaintiffs further object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations. Without waiving said objections, Plaintiffs state the following: The investigation into this issue is continuing. To some extent, however, this information is derivable from the Plaintiffs project reports and letters from competitors, developers and contractors to and from Local 7 and/or to Plaintiffs, which are available for Local 7's review pursuant to Rule 33(d) and which Local 7 is reviewing. See also Answer to Interrogatory No. 1.

16.    Identify and describe in detail each and every communication that you had with any provider (direct or indirect) of steel erection services, including but not limited to the Plaintiffs during the time period identified in response to Interrogatory 3 above, concerning the following matters:

    a.    evaluation of price, including but not limited to, similar prices, identical prices or different prices for steel erection services;

    b.    purchasing practices of direct purchasers of steel erection services;

    c.    prices quoted or bid for steel erection services;

d.  market or published price levels for steel erection services;

e.  prices paid or to be paid for steel erection services;

f.  specifications regarding steel erection services;

g.  terms or conditions of sale of steel erection services;

h.  relative merits of different types of steel erection services;

l.  any purported violation of any anti-trust law by any supplier of steel erection services, including, without limitation, the setting or fixing of prices;

j.  evaluations of suppliers or potential suppliers of steel erection services;

k.  any recommendations for action with respect to similar prices, identical prices, different prices, the purpose of certain prices or any purported anti-trust violation by any supplier of steel erection services; and

l.  the Defendant and any of its alleged co-conspirators.

ANSWER: Plaintiffs adopt their answer to Interrogatory 15.

17.  Identify by name and address each person or business that has participated in the "relevant market," as you have defined them in response to Interrogatory 4, but has been prevented from being a vigorous competitor as a result of Defendant's alleged conduct during the time period you identified in response to Interrogatory 3, further identifying each and every act, document (and, where pertinent, the section, article or subparagraph thereof) or communication that form any part of Plaintiff's information or understanding regarding each such market participant.

ANSWER:  Plaintiffs object to the interrogatory in that the information sought is duplicative

and obtainable from the depositions and documents obtained during discovery, including the

third party business records yet to be obtained, which the Plaintiffs defendants will make

available for the inspection pursuant to Rule 33(d).  Plaintiffs further object to the Interrogatory

on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is

privileged, and/or protected by the attorney work product doctrine.  Plaintiffs further object to

the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is

obtainable from depositions, which has been recognized as the more appropriate method of

discovering such details regarding such oral conversations.  Without waiving said objections,

Plaintiffs state the following: see Answers to Interrogatories Nos. 2

18.  Identify by name and address each and every person or business that has been driven out of the "relevant market," as you have defined them in response to Interrogatory 4, as a result of Defendant's alleged conduct during the time period you identified in response to Interrogatory 3, further identifying each and every act, document (and, where pertinent, the section, article or

subparagraph thereof) or communication that form any part of Plaintiff's information or understanding regarding each such market participant.

ANSWER:     Plaintiffs object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations. Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Without waiving said objections, Plaintiffs state: Superior Steel, Inc., Burlington, Vermont, Construction Welding Services, Inc., Sterling, Massachusetts, B&B Welding, Inc., Sterling, Massachusetts, FAMM Steel, Inc, New Hampshire. Plaintiffs will supplement this Response as information is obtained through discovery.

19.     Identify each of your competitors for steel erection services during the time period you claimed in response to Interrogatory 3 above and give the dates during which the entity was a competitor, the type of steel services that were the subject of the competition, the prices charged for those services, and the geographical area involved.

ANSWER:     Plaintiffs object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Plaintiffs further object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations. Without waiving these objections, Plaintiffs refer Local 7 to those employers in the steel erection industry that are signatory to a contract with Local 7. In further response, Plaintiffs adopt their Answers to Interrogatories 5 & 18.

20.     With reference to the alleged combinations, conspiracies, agreements, or other conduct alleged in your Complaint, state whether you were injured in your business or property thereby, and, if so:

     a.     describe in detail how you were injured;

b.   identify the acts or conduct of Defendant and any alleged coconspirators that caused such injury;

c.   identify each type or element of injury claimed; and

d.   identify all persons, including consultants, experts and expert witnesses, having knowledge thereof or an opinion thereon.

ANSWER:    Plaintiffs object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. Plaintiffs further object to the interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations. Without waiving these objections, Plaintiffs refer to Plaintiffs' Answers to Interrogatories 5 & 18 and to Target Contracts reached by Local 7 with any person in the steel erection industry, which information Plaintiffs have requested in their First Production of Documents and is still pending discovery. In further response, The Plaintiffs object to the interrogatory in that it is not only duplicate, but it's actually four different interrogatories. Moreover, Plaintiffs object on the basis that the Federal Rules of Civil Procedure, the Local Rules of this Court, and the case management order entered in this case do not require the Plaintiffs to disclose trial or expert witnesses at this time. Without waiving said objection, the Plaintiffs refer Local 7 to all those persons identified in the documents exchanged and obtained during discovery, including, but not limited to Plaintiffs' and Defendant Local 7's Rule 26(a)(3) disclosures.

21.   With respect to the damages you allege in your Complaint:

a.   state the total amount of damages separately for each year of the period you identified in response to Interrogatory 3 above, show the method of computation, and identify all documents (and, where pertinent, the section, article or subparagraph thereof) referred to in the preparation of your answer;

b.   describe and itemize with particularity each and every element of damage and state the dollar amount assigned to each such element, but to the extent that you have not stated specific dollar amounts by which you claim you were damaged,

state the method, formula or theory by which you will compute your alleged damages; and

c.   identify each person with whom you have consulted or who in any way participated in the derivation, construction or creation of each such method, formula or theory by which you have computed or will compute your alleged damages.

ANSWER:   Plaintiffs discovery of Local 7's business records is incomplete. Upon completion

of discovery, Plaintiffs will supplement this Answer and provide this information to Defendant.

22.   Describe your business, including identifying or describing:

a.   if you are a corporation, the date and place of your incorporation and the nature of your business, including but not limited to the type of services and products you provide;

b.   if you are a partnership or a sole proprietorship, the date on which, and the place at which, you commenced business, and the nature of your business, including but not limited to the type of services and products you provide and the nature and types of your clients;

c.   addresses of your corporate or business headquarters and principal offices, as well as your other offices and places of business;

d.   all of your affiliates, past or present, including the name, type of legal form or organization, principal place of business, and nature of their business;

e.   all of your subsidiaries, past or present, including the name, type of legal form or organization, principal place of business, and the nature of their business;

f.   each person who owned, controlled, held in trust or voted an interest (legal, equitable or otherwise) in you, and with respect to each such person, from your incorporation or commencement of business to the time period identified in response to Interrogatory 3 above, stating in detail the nature of such ownership, control, trust or voting rights;

g.   the names, positions, and dates of service of all of your corporate officers, past or present, and also fully describe each such individual's position, authority or responsibility (direct or indirect) for the operations of the business;

h.   whether you, your assets or shares of your stocks were acquired by, merged with or consolidated with any other person and, if so, state or identify the date upon which the acquisition, merger or consolidation took place, whether the transaction was in acquisition, merger or consolidation, the person who effected the acquisition, merger or consolidation, the surviving entity; and all documents (and, where pertinent, the section, article or subparagraph thereof) that refer to or relate to the acquisition, merger or consolidation; and

I.   the organization and structure and the lines of authority among and between persons having authority to act for you for the time period identified in response to Interrogatory 3 above.

ANSWER:   Plaintiffs object to the interrogatory in that the information sought is duplicative

and obtainable from the depositions and documents obtained during discovery, including the business records to be obtained, which the Plaintiffs will make available for the inspection pursuant to Rule 33(d). Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine.

23.    With regard to your accounting methods and reports for the time period identified in response to Interrogatory 3 above:

    a.    state the beginning and ending dates of your accounting year for purposes of financial records and income tax returns;

    b.    identify each and every person who has performed any accounting services for you, including persons regularly employed by you (whether heretofore or now employed), as well as outside, independent consultants;

    c.    identify each audit, balance sheet, profit and loss statement, and other financial statement, analysis or projection of results of past or future operations, that has been prepared by you or on your behalf;

    d.    describe any changes made in the method of accounting or in the method of compiling your profit and loss figures for each accounting period;

    e.    state the dollar amount of net profit or loss for each month, fiscal year or other period for your operations as stated in your profit and loss statements for the accounting periods; and

    f.    state the financial results on a job-by-job basis, including contributions to net and gross profit measures.

ANSWER:    Plaintiffs object to the interrogatory in that the information sought is duplicative and obtainable from the depositions and documents obtained during discovery, including the business records to be obtained, which the Plaintiffs will make available for the inspection pursuant to Rule 33(d). Plaintiffs further object to the Interrogatory on the grounds that it is vague, overbroad, burdensome, and/or seeks information that is privileged, and/or protected by the attorney work product doctrine. In further response, Plaintiffs state that the Answer to these interrogatories are best provided by deposition, which the Defendant Local 7 has noticed.

24.    Identify each and every lawsuit in which you have been a party (including the case name, court, and case number) and each and every investigation or inquiry, formal or informal.

ANSWER:    Plaintiffs object to the Interrogatory on the grounds that it is vague, overbroad,

24

burdensome. Plaintiffs further object to this interrogatory on the grounds that it includes records to be produced to Local 7 pursuant to its First Request for Production of Documents, which the Plaintiffs will make available for the inspection pursuant to Rule 33(d).

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
~~BEDFORD IRONWORKS, INC.,~~
D.F.M. INDUSTRIES, INC., and

By their attorneys,

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN, CHANDLER & MILLER LLP
99 High Street
Boston, MA  02110
(617) 542-6789

Michael E. Avakian
SNETANA & AVAKIAN
3211 Port Royal Road, Suite 103
Springfield, VA 22151
703-321-9181
703-321-9325 - Fax
(Admitted *Pro Hac Vice*)

Dated: June 26, 2006

## CERTIFICATE OF SERVICE

I hereby certify that PLAINTIFFS' RESPONSE TO DEFENDANT IRON WORKERS LOCAL 7'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES was served, via facsimile and U.S. Mail, on this the 23d day of June 2006, to the counsel of record in the above styled case named below:

Paul F. Kelly
Segal, Roitman & Coleman
11 Beacon Street
Boston, MA 02108
pkelly@segalroitman.com
617-742-2187

Michael E. Avakian

26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.,*　　　　Plaintiffs,　　v.　　LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS.　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)　Case No. 04-cv-12536-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFICATION

I certify that I have read Plaintiffs' Response to Defendant Iron Workers Local 7's First Request for Answers to Interrogatories these Answers to Interrogatories relating to D.F.M., Inc. are correct to the best of my knowledge.

Glen Pisani

Sworn to and subscribed before me this 26 day of June 2006.

Notary Public Shanon Branco

My Commission expires: Dec 3, 2010

Shanon Branco
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 3, 2010

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN STEEL ERECTORS, INC.,
et al.,

        Plaintiffs,

        v.

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL &
REINFORCING IRON WORKERS.

        Defendant.

Case No. 04-cv-12536-RGS

## VERIFICATION

I certify that I have read Plaintiffs' Response to Defendant Iron Workers Local 7's First Request for Answers to Interrogatories these Answers to Interrogatories relating to AJAX Construction Co., Inc. are correct to the best of my knowledge.

Donald Morel

Sworn to and subscribed before me this 26 day of June 2006.

Nancy Keaton
Notary Public

My Commission expires: 4/21/10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN STEEL ERECTORS, INC.,
et al.,
    Plaintiffs,

  v.

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL &
REINFORCING IRON WORKERS.

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 04-cv-12536-RGS

## VERIFICATION

I certify that I have read Plaintiffs' Response to Defendant Iron Workers Local 7's First Request for Answers to Interrogatories these Answers to Interrogatories relating to American Steel Erectors, Inc. are correct to the best of my knowledge.

         _____
         Raymond Cilley

Sworn to and subscribed before me this 26 day of June 2006.

_____
Notary Public

My Commission expires: 4/6/2010

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS.<br><br>        Defendant. | )<br>)<br>)<br>)<br>)  Case No. 04-cv-12536-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFICATION

I certify that I have read Plaintiffs' Response to Defendant Iron Workers Local 7's First Request for Answers to Interrogatories these Answers to Interrogatories relating to Bedford Ironworks, Inc. are correct to the best of my knowledge.

_____, Pres.

Michael Guillemette

Sworn to and subscribed before me this _____ day of June 2006.

_____
Notary Public

My Commission expires:

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 04-cv-12536-RGS ) |
| LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS. | ) ) ) ) ) |
| Defendant. | ) ) ) |

## VERIFICATION

I certify that I have read Plaintiffs' Response to Defendant Iron Workers Local 7's First Request for Answers to Interrogatories relating to American Aerial Services, Inc. are correct to the best of my knowledge, except as to Answer to Interrogatory No. 5 ¶ 26, for which American Aerial Services, Inc. bid on the Hilton Garden Inn project only, Arctic Construction, Inc. was awarded the contract on the Hilton Garden Inn project, and Walter Kilbrethm is president of Advance Resource & Construction and he is not an agent of Local 496.

James Read

State of New Hampshire
County of Hillsborough

Sworn to and subscribed before me this 29th day of June 2006. *by James Read only.*

Kathryn A Nadeau
Notary Public

My Commission expires:

KATHRYN A. NADEAU, Notary Public
My Commission Expires June 26, 2007

## CERTIFICATE OF SERVICE

I hereby certify that the VERIFICATION of James Read was served, via U.S. Mail, on this the 29th day of June 2006, to the counsel of record in the above styled case named below:

Paul F. Kelly
Segal, Roitman & Coleman
11 Beacon Street
Boston, MA 02108
pkelly@segalroitman.com
617-742-2187

Michael E. Avakian