# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
)
AMERICAN STEEL ERECTORS, INC., et al.  )
)
        Plaintiffs,           )
)
        v.               )
)
LOCAL UNION NO. 7, INTERNATIONAL  )
ASSOCIATION OF BRIDGE,         )   Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &      )
REINFORCING IRON WORKERS,    )
)
        Defendant.        )
———————————————————————)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT

LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

By its attorneys,

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue, Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

August 1, 2006

## <u>TABLE OF CONTENTS</u>

**<u>TABLE OF AUTHORITIES</u>** ..................................................................... vi

**<u>INTRODUCTION</u>** ..........................................................................................1

**<u>STATEMENT OF FACTS</u>** ...........................................................................3

    A. <u>The Parties</u> ..........................................................................................3

    B. <u>The Structural Steel Erection Industry</u>..............................................4

    C. <u>Local 7's Organizing and Job Targeting Activities</u> ..........................6

    D. <u>The Big Dig and Other Public Works Projects</u>.................................9

    E. <u>Allegations of Other Illegal Pressure and Stripping</u> ......................10

        1. <u>Other Illegal Pressure</u>…………………………………….…..11

        2. <u>Stripping</u>………………………………………………...12

        3. <u>Surveillance and Sham Picketing</u>…………………………….13

**<u>ARGUMENT</u>** .............................................................................................14

**I. <u>SUMMARY JUDGMENT STANDARD</u>** ..........................................14

**II. <u>THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' ANTI-TRUST CLAIMS</u>**.............................................14

    **A. <u>Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims Concerning Local 7's Use of Job Targeting Funds</u>**.................14

        1. <u>Local 7's Job Targeting Program and Other Organizing Activities Are Exempted by the Statutory Labor Exemption</u>..............................16

            a. The Statutory Labor Exemption to the Antitrust Laws............16

            b. The Job Targeting Program Falls Within the Statutory Labor Exemption ....................................................20

            c. Other Alleged Conduct Is Shielded by the Statutory Labor Exemption ....................................................23

                1) Secondary Pressure, Secondary Boycotts, and 'Top-Down Organizing' ...............................23

                2) Surveillance and Videotaping......................................26

                3) Stripping ....................................................................27

                4) Violence......................................................................28

         2. <u>Local 7's Job Targeting Program Is Shielded by the Non-Statutory Labor Exemption</u> ...........................................29

            a. The Non-Statutory Labor Exemption to the

Antitrust Laws....................................................................29

b. Local 7's Job Targeting Program Falls Within the
Non-Statutory Labor Exemption...............................33

1) The Collection of Dues by Signatory Contractors
Is Exempt From the Antitrust Laws Under the
Non-Statutory Exemption ...............................33

2) Local 7's Job Targeting Payments to Its
Signatory Contractors Fall Within the
Non-Statutory Labor Exemption.....................35

3) Any Payment of Job Targeting Funds to
Fabricators and General Contractors Is Also
Within the Non-Statutory Labor Exemption...............37

3. Defendant Is Entitled to Summary Judgment Under the Antitrust
Laws on Plaintiffs' Claims Concerning Local 7's Use of Target
Funds To Secure Specific Jobs ..........................................40

a. Plaintiffs Cannot Establish That Either the Signatory
Contractors or Local 7 Engaged in Predatory Pricing ............40

1) Plaintiffs Cannot Establish 'Below-Cost'
Pricing ..........................................................40

2) Plaintiffs Cannot Demonstrate a Dangerous
Probability of Recoupment ...........................42

b. Plaintiffs Cannot State a Claim for Price Discrimination
Under the Robinson-Patman Act ...............................46

B. **Defendant Is Entitled to Summary Judgment on Plaintiffs'
Remaining Allegations Concerning Purported Restraints of Trade
in Violation of Section 1 of the Sherman Act** ........................47

1. Plaintiffs Cannot State an Antitrust Claim Based on Any
Alleged Loyalty Rebates or Exclusivity Agreements ...................47

2. Plaintiffs Cannot Establish a Claim Against Local 7 and Its Signatory
Contractors for Price-Fixing ................................................51

3. Plaintiffs Cannot State a Claim for Illegal Boycott ............................56

C. **Defendant Is Also Entitled to Summary Judgment on Plaintiffs'
Allegations of Monopolization and Attempted Monopolization
Under Section 2 of the Sherman Act** ....................................58

III. **DEFENDANT IS ALSO ENTITLED TO SUMMARY JUDGMENT
ON COUNT IV AS TO EACH PLAINTIFF'S CLAIM THAT LOCAL 7
VIOLATED THE LABOR MANAGEMENT RELATIONS ACT** ...............59

A. **Defendant Is Entitled to Summary Judgment on the Count IV
Claims of Plaintiff American Steel Erectors** ..........................60

1. Plaintiff American Steel Erectors Does Not Allege
   Any Violative Conduct Other Than Job Targeting............................60

2. Job Targeting Conduct Did Not Violate the LMRA...........................62

   a. The LMRA in General Does Not Prevent Construction
      Unions from Aggressively Seeking Work for Members .........62

   b. The Union's Grants of Job Targeting Funds and the
      Alleged Discriminatory Denials of Funds Did Not
      Threaten, Coerce, or Restrain Any Employer Within the
      Meaning of § 8(B)(4)(ii) of the LMRA ..................................63

   c. The Union's Grants of Job Targeting Funds Were Not In
      Furtherance of a Prohibited 'Cease Doing Business'
      Objective Under § 8(b)(4)(B) ..............................................68

   d. The Union's Grants of Job Targeting Funds Did Not
      Constitute Prohibited Agreements to 'Cease Doing
      Business' Under § 8(e) of the LMRA....................................70

B. **Defendant Is Entitled to Summary Judgment on the Count IV
   Claims of Plaintiff Bedford Iron Works**................................72

   1. The Union's Job Targeting Conduct Did Not Violate
      the LMRA ........................................................................72

   2. No Other Conduct Alleged by Plaintiff Bedford Iron Works Violated
      the LMRA ........................................................................73

C. **Defendant Is Entitled to Summary Judgment on the Count IV
   Claims of Plaintiff AJAX Construction Company**................74

   1. The Union's Job Targeting Conduct Did Not Violate
      the LMRA ........................................................................74

   2. No Other Conduct Alleged by Plaintiff AJAX Construction
      Company Violated the LMRA............................................74

D. **Defendant Is Entitled to Summary Judgment on the Count IV
   Claims of Plaintiff American Aerial Services**......................75

   1. The Union's Job Targeting Conduct Did Not Violate
      the LMRA ........................................................................75

   2. No Other Conduct Alleged by Plaintiff American Aerial
      Services Violated the LMRA.............................................75

E. **Defendant Is Entitled to Summary Judgment on the Count IV
   Claims of Plaintiff D.F.M. Industries**..................................76

   1. The Union's Job Targeting Conduct Did Not Violate
      the LMRA ........................................................................76

   2. No Other Conduct Alleged by Plaintiff D.F.M. Violated
      the LMRA ........................................................................76

iv

**<u>CONCLUSION</u>** ............................................................................................................79

# TABLE OF AUTHORITIES

*CASES*                                                                                    Page

A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396 (1989) ....................43

AD/SAT v. Associated Press, 920 F. Supp.1287 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216
    (2d Cir. 1999) ............................................................44

Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191 (1995) ..........................43, 46

Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368
    (1st Cir. 1981), International Longshoremen's Ass'n, AFL-CIO v.
    Allied Int'l, Inc., 456 U.S. 212 (1982) ......................................................20

Allied Mechanical Servs., Inc. v. Local 337 of the United Assoc.
    of Journeyman and Apprentices of the Plumbing and Pipe
    Fitting Indus., 1999 U.S. Dist. LEXIS 4654 (D.W. Mich. 1999),
    *aff'd*, 221 F.3d 1333 (TABLE)(6th Cir. 2000) …………………………….... 68, 69, 71

Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
    325 U.S. 797 (1945) ................................................................ 15, 53, 55

American Tobacco Co. v. United States, 328 U.S. 781 (1946) .........................................58

Apex Hosiery Co. v. Leader, 310 U.S. 469, (1940) ................................................. passim

Associated Builders and Contractors, Inc., Golden Gate Chapter,
    331 NLRB 132 (2000), *modified in non-relevant part*,
    333 NLRB 995 (2001) ........................................................................35

Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water
    Resources Auth., No. 90-10576-MA,1990 WL 86360,
    (D. Mass. April 11, 1990), *rev'd on other grounds*, 935 F.2d 345
    (1st Cir. 1991), *rev'd sub nom.*, Boston Harbor, 507 U.S. 218....................................50

Associated Gen. Contractors of Cal., Inc. v. California State Council
    of Carpenters, 459 U.S. 519 (1983) ...............................................................53, 54

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) ..............51, 52, 53, 54

Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,
    784 F.2d 1325 (7th Cir. 1986) ...................................................................46

Blue Shield of Va. v. McCready, 457 U.S. 465 (1982) ................................................53

Boston Shipping Ass'n, Inc. v. Federal Maritime Comm'n, 706 F.2d 1231
    (1st Cir. 1983) ..............................................................................31

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
    509 U.S. 209 (1993) ............................................................... passim

Brown v. Pro Football, Inc., 518 U.S. 231 (1996) ................................................ passim

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) .......................53, 54

Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders
    and Contractors of Mass./R.I. 507 U.S. 218 (1993) .............................................49, 50

Burns v. State Police Ass'n. of Mass., 230 F.3d 8 (1st Cir. 2000) ....................................14

Business Elecs. Corp. v. Sharp Elecs., 485 U.S. 717 (1988)...........................................51

Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104 (1986)..................................... passim

California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ...................26

C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41 (1st Cir. 1998) ...................................41

Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union,
    AFL-CIO, 362 F.2d 322 (5th Cir. 1966) ........................................................20, 25, 26

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...............................................................14

Clarett v. National Football League, 369 F.3d 124 (2d Cir. 2004), cert. denied,
    125 S.Ct. 1728 (2005) ...........................................................................................30, 32

Concord Boat v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000)..................................47

Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100,
    421 U.S. 616 (1975) ............................................................................................. passim

Department of Labor and Indus. v. Boston Water and Sewer Comm'n,
    18 Mass. App. Ct. 621 (1984)......................................................................................49

Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921) ...........................................18

Eastern Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n Inc.,
    357 F.3d 1 (1st Cir. 2004) ........................................................................................... 53

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.
    Trades Council, 485 U.S. 568 (1988) ..................................................................... passim

Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238
    (7th Cir. 1996), cert. denied, 519 U.S. 1056 (1997) ...................................................39

Federal Prescription Service v. Amalgamated Meat Cutters,
    527 F.2d 269 (8th Cir. 1976) .......................................................................................77

First Comics, Inc. v. World Color Press, Inc., 884 F.2d 1033 (7th Cir. 1989),
    cert. denied, 493 U.S. 1075 (1990)...............................................................................46

George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) ………………………….. 68

Gordon v. New York Stock Exchange, 498 F.2d 1303 (2d Cir. 1974)............................46

Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309,
    1997 WL 311498, (D. Md. 1997) aff'd, 133 F.3d 914 (4th Cir.) (Table), cert. denied,
    525 U.S. 825 (1998)............................................................................................. passim

Hunt v. Crumboch, 325 U.S. 821 (1945) ........................................................................28

Intercontinental Container Transp. Corp. v. New York Shipping Ass'n,
    426 F.2d 884 (2d Cir. 1970) ........................................................................................21

Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), *cert. denied,*
488 U.S. 889 (1998) ...........................................................................................24, 25, 63

J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655 (Ohio), *cert. denied,*
525 U.S. 871 (1998) ......................................................................................... 35

James Cape & Sons Co. v. PCC Constr. Co., No. 05-C-269, 2005 WL
2176965, *aff'd* 2006 WL 1751886 (7th Cir.) ...................................................55, 56

J & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62 (D.Me. 1999) ...............................44

Local 1976, United Bhd. of Carpenters v. NLRB, 357 US 93 (1958)...............................65

Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen
of North Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676 (1965)....................... passim

Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180
(8th Cir. 1997) ................................................................................................. 36

Loewe v. Lawlor, 208 U.S. 274 (1908) ...........................................................................16

Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582
(8th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988) ...........................................43, 44

Manno Elec., Inc., 321 NLRB 278 (1996), *enf'd per curiam mem.,* 127 F.2d 34
(Table) (5th Cir. 1997) ....................................................................................21, 35

Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., No. 01-548, 2002
WL 334394, (D. Minn. Feb. 27, 2002) .......................................................................34

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............... passim

Mead v. Retail Clerks Local 839, 523 F.2d 1371 (9th Cir. 1975) ....................................77

Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council,
675 F.2d 881 (7th Cir. 1982) .......................................................................................20

Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and
Prof'l Publs., Inc., 63 F.3d 1540 (10th Cir. 1995), *cert. denied*, 516 U.S.
1044 (1996) ................................................................................................................44

National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612 (1967) ...............................19

N.L.R.B. v. Friot & Vegetable Packers, 377 U.S. 58 (1964)...........................................16

N.L.R.B. v. International Longshoremen Ass'n, 473 U.S. 61 (1985) ..............................16

N.L.R.B. v. Servette, Inc., 377 U.S. 46 (1964) ........................................................ passim

N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, Chauffeurs,
Warehousemen and Helpers of Am., AFL No. 103, 353 U.S. 87 (1957)...................31

NYNEX v. Discon, 525 U.S. 128 (1998) .......................................................................56

Parmelee Transp.Co. v. Keeshin, 292 F.2d 794 (7th Cir.), *cert. denied,*
368 U.S. 944 (1961) ...........................................................................................57, 58

Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81 F.3d 858 (9th Cir. 1996)......36

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, (9th Cir.), *cert. denied*,
    516 U.S. 987 (1995) ...............................................................................43

Scranton Constr. Co. v. Litton Indus. Leasing Corp., 494 F.2d 778 (5th Cir. 1974),
    *cert. denied*, 419 U.S. 1105 (1975) .............................................................58

Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440
    (3d Cir. 1978) ...............................................................................56, 57

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993).................................59

Standard Oil Co. of N.J. v. United States, 221 U.S. 1 (1911)......................52, 58

Storer Communications, Inc. v. National Ass'n of Broadcast Employees
    and Technicians, 854 F.2d 144 (6th Cir. 1988) .........................25, 64, 66, 68

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57
    (1st Cir. 2004) .............................................................................48

Teamsters, Local 20 v. Morton, 377 U.S. 252 (1964) ......................................77

Texaco Puerto Rico, Inc. v. Medina, 834 F.2d 242 (1st Cir. 1987) ...................14

Tigard Elec., Inc. v. National Elec. Contractors Ass'n, 790 F. Supp. 1498 (1992) ..........55

Town of Concord v. Boston Edison Co., 676 F. Supp. 396 (D.Ma. 1988)......................46

United Food and Commercial Workers Union, Local 1036 v. N.L.R.B.
    307 F.3d 760 (9th Cir.), *cert. denied*, 537 U.S. 1024 (2002).................................22, 26

United Mine Workers v. Pennington, 381 U.S. 657 (1965) ........................................31, 55

United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945) .......................58, 59

United States v. Binghamton Constr. Co., 347 U.S. 171 (1954) ......................................34

United States v. Grinnell Corp., 384 U.S. 563 (1966) ......................................58

United States v. Hutcheson, 312 U.S. 219 (1941) .................................... passim

Utility Contractors Ass'n of New England, Inc. v. Commissioners of Mass.
    Dep't of Public Works, No. Civ. A. 90-3035, 1996 WL 106983,
    (Mass. Super. March 12, 1996)....................................................................50

Vegelahn v. Guntner, 167 Mass. 92, 108 (1896)................................................17

Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP,
    540 U.S. 398 (2004) .......................................................................58

Ward v. Massachusetts Health Research Inst., 209 F.3d 29 (1st Cir. 2000) .....................14

White v. Hearst Corp., 669 F.2d 14 (1st Cir. 1982) ........................................14

Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645 (1982) .........................24, 63

Woodworking Mfg.. Ass'n. v. N.L.R.B., 386 U.S. 612 (1967) ....................21, 22, 25, 26

*RULES and STATUTES*

Fed. R. Civ. Proc. 56 ................................................................................................1, 14


15 U.S.C. § 1 ............................................................................................... passim

15 U.S.C. § 2 ............................................................................................... passim

15 U.S.C. § 13 .................................................................................................46, 47

15 U.S.C. § 17 ............................................................................................... passim

15 U.S.C. § 18 .....................................................................................................53

29 U.S.C. § 52 .................................................................................................16, 17

29 U.S.C. § 101 ...................................................................................................28

29 U.S.C. § 102 .................................................................................................16, 18

29 U.S.C. § 113(c) ...............................................................................................18

29 U.S.C. § 151 ...................................................................................................15

29 U.S.C. § 152(9) ...............................................................................................18

29 U.S.C. § 157 ...................................................................................................27

29 U.S.C. § 158(b)(4) ..................................................................................... passim

29 U.S.C. § 158(b)(7) ...........................................................................................78

29 U.S.C. § 158(e) ......................................................................................... passim

29 U.S.C. § 158(f) ...........................................................................................24, 63

29 U.S.C. § 159 ...................................................................................................24

29 U.S.C. § 160(l) ...............................................................................................76

29 U.S.C. § 187...........................................................................................  passim

## <u>INTRODUCTION</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendant Iron Workers Local 7 ("Local 7" or the "Union") submits this Memorandum of Law in Support of its Amended Motion for Summary Judgment.[1]

Plaintiffs, non-union contractors in the structural steel erection industry, challenge, under antitrust laws, the legitimacy of union job targeting programs. Structural steel erection is a labor intensive portion of the construction industry, and Plaintiffs compete against union signatory contractors in this market by undercutting wages and benefits. In order to stave off a "race to the bottom," Local 7 has responded by establishing a job targeting program that helps signatory contractors compete while maintaining higher negotiated wages and benefits for Local 7 members. Plaintiffs challenge this program, asserting in essence, that the antitrust laws give them an absolute right to compete by undercutting wages and benefits.[2] They are mistaken.

---

[1] Plaintiffs' state-law claims, Counts V-VII of the Complaint, were dismissed by this Court by Order entered February 6, 2006. On March 20, 2006, prior to the commencement of discovery, the Union filed a Motion for Summary Judgment on Plaintiffs' federal antitrust claims, Counts I – III of the Complaint, and a Motion for Judgment on the Pleadings on the job targeting portions of Plaintiffs' claim under the Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 187, claim (Count IV). At the Scheduling Conference held on March 21, 2006, the Court directed counsel to file a joint recommendation for a discovery plan permitting a 150-day period of discovery in anticipation of all dispositive motions being joined at the expiration of discovery. On April 20, 2006, the Court adopted the parties Joint Submission, denied without prejudice the Union's Motion for Summary Judgment and Motion for Judgment on the Pleadings, and permitted the Union to amend these motions by August 1, 2006, with oppositions due on August 31, 2006. The Union's Amended Motion for Summary Judgment includes both the original Motion for Summary Judgment on the three antitrust counts, and in addition, based on the absence of any material factual dispute on Count IV as revealed during discovery, now also seeks Summary Judgment on all of Count IV as well.

[2] This is the gravamen of Plaintiffs' Complaint. Excerpts from their Rule 30(b)(6) depositions make the point clear:

> Q. Isn't that what you are complaining about in this case, precisely that your advantage of lower labor costs is removed when the union puts money on the table?
> A. Yes.
> Q. That's what you are complaining about?
> A. Yes.

Ajax Construction Company, Inc. Deposition Transcript ("Ajax Dep. Tr.") pp. 169-170.

> Q. Can you tell me—This lawsuit involves a number of different plaintiffs, and you are one of them. Can you tell me what it was that Local 7 did to you, to American Steel, to cause you to participate in this lawsuit?

Job targeting programs have withstood challenges under antitrust laws in every Circuit court that has considered them.  Generally, courts have concluded that the job targeting programs are exempt from antitrust laws under what is known as the non-statutory labor exemption. Plaintiffs here attempt to plead around these decisions by alleging that Local 7 has engaged in certain unlawful conduct and that the alleged restraints of trade involve conspiracies with businesses with which Local 7 does not have collective bargaining agreements.  But these attempts misunderstand three fundamental underpinnings of the antitrust laws and the labor exemptions:  first, that unions may enter into agreements with businesses, including multi-employer groups, to restrain competition based on wages and terms and conditions of employment, without violating the antitrust laws; second, that antitrust laws are designed to protect *business competition*, not individual competitors; and finally, that unlawful actions that are not themselves unreasonable restraints of trade, while perhaps cognizable under some other law or in some other forum, are not antitrust violations.  Accordingly, Local 7 is entitled to summary judgment on Plaintiffs' antitrust claims, Counts I – III of the Complaint.

Plaintiffs also seek to challenge the job targeting program under the Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 187, under the fundamental misconception that the LMRA prohibits construction unions from all forms of "top-down organizing".  That is clearly wrong.  Multiple sections of the statute, and a host of appellate decisions, leave construction

---

A.  What they did to me?
Q.  To American Steel.
A.  I would say provided target fund money which took away some projects
    that we would have had a better shot of getting had they not been
    subsidizing the job.
Q.  Is there anything else, apart from the targeting jobs and subsidizing, is there
    anything else that Local 7 did that causes you to be a plaintiff in this case?
A.  No.

American Steel Erectors, Inc. Deposition Transcript ("ASE Dep. Tr.") pp. 91-92.  Relevant excerpts from the Plaintiffs' depositions and their Answers to Interrogatories are attached to the Supplemental Appendix in Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment, filed herewith.

unions with wide latitude to pressure employers to obtain work for union members.   An LMRA claim requires Plaintiffs to establish that Local 7 engaged in unlawful "threats, restraint or coercion", either by allegedly forcing employers to enter into exclusionary "hot cargo" agreements or forcing secondary employers to cease doing business with Plaintiffs.  All of the courts that have scrutinized job targeting programs under LMRA standards, however, have ruled that grants and denials of job targeting funds do not amount to "restraint or coercion" as those terms should be narrowly construed or that they do not involve a "cease doing business" objective.  Beyond job targeting, the individual Plaintiffs claim only a handful of incidents that allegedly violate the LMRA based on any other types of union conduct.  Some of the Plaintiffs claim no other conduct, so their Count IV claims evaporate with the job targeting result.  A few of the Plaintiffs claim a handful of discrete incidents outside the realm of targeting, such as "stripping" employees to join union ranks or threats to picket, but each of the episodes either engendered no damage or falls outside the scope of the LMRA.  Accordingly, Local 7 is also entitled to judgment on Plaintiffs' LMRA claims.

## STATEMENT OF FACTS

### A.  The Parties

Defendant Local 7 represents iron workers employed by companies with whom it maintains a multi-employer collective bargaining agreement ("signatory contractors").  John F. Hurley Affidavit ("Hurley Aff.")[3] ¶ 4; Thomas J. Gunning Affidavit ("Gunning Aff.") ¶ 3. The Building Trades Employers' Association ("BTEA"), an alleged co-conspirator, is a multi-employer bargaining unit that collectively bargains with Local 7 on behalf of BTEA's member companies.  Gunning Aff. ¶ 1, 3.

---

[3]  All affidavits referenced herein are attached to the Appendix of Affidavits in Support of Defendant Iron Workers Local 7's [Original] Motion for Summary Judgment, filed on March 20, 2006, and docketed by the clerk as Document Number 53.

Plaintiffs are successful non-union contractors in the structural steel erection industry. Complaint ("Compl.") ¶ 1. Plaintiffs compete, and seek to continue competing, against signatory contractors[4] through lower labor costs. Ajax Dep. Tr. p. 167.

## B. <u>The Structural Steel Erection Industry</u>

Work in the structural steel erection industry involves several layers of business entities, including owners, developers, general contractors, fabricators, and structural steel erection contractors. Competition for jobs exists at each of these levels. General contractors compete for construction projects from owners and developers. Fabricators compete with each other for subcontracts from general contractors, generally for the combined work of steel fabrication and erection. Finally, structural steel erection contractors compete with each other for the structural steel erection work from fabricators. Hurley Aff. ¶¶ 7-9.

Steel fabricators supply the steel. Ajax Dep. Tr. pp. 34-35. Steel erectors assemble the structure. While a few fabricators also erect and some erectors also fabricate, generally the so-called "fab/erect" package is sold to general contractors by fabricators. DFM Industries, Inc. Deposition Transcript ("DFM Dep. Tr.") p. 9. Fabricators compete with one another by submitting prices for this package to the general contractor.

Typically fabricators will solicit steel erection prices in advance of the date the bid is due to the general contractor. DFM Dep. Tr. pp. 23-24. Steel erectors either respond to bid solicitations from fabricators or they submit unsolicited bids. DFM Dep. Tr. p. 22 ("Work comes to me. I don't solicit work. Fabricators send me drawings for projects"); Bedford Iron Works Transcript ("BIW Dep. Tr.") p. 34 (BIW "chases down" one in ten opportunities); ASE Dep. Tr. pp. 72-73 (common to be solicited by fabricators, and occasionally by general

---

[4] The terms "signatory contractors" and "union contractors", as used in this Memorandum refer to steel erection employers who have signed collective bargaining agreements with Local 7 and who employ union members at wage and benefit levels that are negotiated.

contractors).  This latter method, sometimes referred to as "chasing work" (Ajax Dep. Tr. pp. 42-45) is employed by erectors when a job is particularly desirable or when work is slow.  The fabricators collect steel erection prices from steel erector bidders.  Fabricators then submit a combined fab/erect price to the general contractor.  In the New England area some twenty-thirty (20-30) fabricators (DFM Dep. Tr. p. 24, American Aerial Services, Inc. Deposition Transcript ("AAS Dep. Tr.") pp. 103-07), and more than 150 steel erection contactors compete for work. Hurley Aff. ¶ 8.

The steel erection industry in New England is a job-by-job business where, in large measure, "price is king".  According to the president of Plaintiff American Aerial, "[t]he marketplace is very competitive.  If your price is five grand cheaper, it's five grand cheaper. It's competitive bidding".  AAS Dep. Tr. pp. 65-66.  The Plaintiff steel erectors bid jobs each and every day, on some days four or five jobs.  AAS Dep. Tr. p. 83.  Since the fabricators also compete for the jobs, steel erectors may submit bids to eight fabricators for job.  ASE Dep. Tr. p. 109.[5]  The erector with the lowest bid will generally be awarded the job from the fabricator.  On some jobs, particularly large jobs, the general contractor will reserve the right to accept or reject the steel erection contractors.  Alternatively the general contractor may separate the fabrication from the erection so that, on those jobs, the steel erection contractors bid directly to the general contractor.  ASE Dep. Tr. p. 73.  On some jobs the fabricator (or the general contractor) may engage in the questionable practice of "bid shopping" (i.e., taking the lowest bid and asking bidders and potential bidders whether they will re-bid so as to undercut the heretofore lowest bid).  AAS Dep. Tr. p. 115 ("Shopping is a term that we use when a fabricator or a general contractor solicits bids after bid day"); ASE Dep. Tr. pp. 78-80 (ASE calls fabricators shortly

---

[5] In the job referred to, American Steel Erectors bid the same job to eight different fabricators with prices ranging from $275,000 to $340,000.  See ASE Dep. Tr., Exhibit 76.

after bid day to minimize the possibility that fabricator will shop ASE's bid).  Although some fabricators have "preferred bidders" (Ajax Dep. Tr. p. 38) who may be awarded jobs even though another erector's bid is somewhat lower or who may be given an opportunity to match a lower bid, the general rule in steel erection is that "price is king" and for the most part, the job goes to the lowest bid.  AAS Dep. Tr. pp. 65-66.

Structural steel erection is a labor intensive portion of the construction industry.  ASE Dep. Tr. pp. 135-36.  Non-union structural steel erection contractors, such as Plaintiffs, enjoy substantially lower labor costs than union contractors, and seek to compete based on these lower costs.  Hurley Aff. ¶ 6; Compl. ¶ 36.  Labor costs, more than any other factor, drive steel erection prices.  Ajax Dep. Tr. p. 167.

There are very few barriers to entry in the steel erection industry.  Basically, a structural steel erection contractor needs only good credit and a supply of skilled labor.  Typically, structural steel erection contractors rent or own cranes and hire labor.  Owning a crane provides a competitive advantage but cranes are readily available for rent.  D.F.M., one of the plaintiff contractors, incorporated in 1993 capitalized with a $30,000 workers' compensation settlement. DFM Dep. Tr. pp. 6-7, 11, 111.  Bedford Iron Works, another Plaintiff, redeemed the assets of its predecessor by paying the IRS an amount between $18,000 and $30,000.  BIW Dep. Tr. pp. 6-7, 10, 64.

### C.  Local 7's Organizing and Job Targeting Activities

Local 7's primary focus for the past twenty (20) years has been organizing iron workers and obtaining work for them under labor contract standards.  James Coyle Affidavit ("Coyle Aff.") ¶ 4; Hurley ¶ 13.  Local 7's organizing efforts have included picketing and handbilling, including publicizing that contractors paying iron workers below union scale undermine the

economic standards of their members and their members' families.  These organizing efforts, whether directed against non-union steel erectors or secondary parties, have been based on the Union's own objectives to protect members' area standards and to obtain work.  Local 7's efforts have also included persuading non-union workers of the benefits of Local 7's apprenticeship program and of a decent hourly wage rate and benefits.  Hurley Aff. ¶¶ 13-15; Coyle Aff. ¶¶ 5-7.

At all times relevant, Local 7 maintained collective bargaining agreements with steel erection companies and some fabricators who employ Local 7 members that contained "union signatory subcontracting clauses," requiring that further subcontracts of jobsite work be granted to Local 7 signatory contractors.  With the exception of these collectively bargained clauses, Local 7 did not enter into any agreements with other non-signatory companies limiting with whom those companies might do business on future jobs.  Hurley Aff. ¶ 18; Coyle Aff. ¶ 9. Because it did not maintain such agreements with non-signatory companies, Local 7 sometimes approached non-signatory companies and asked them to award a particular job to a Local 7 signatory contractor.  These job-by-job appeals were not always successful.  Hurley Aff. ¶ 18-19; Coyle Aff. ¶ 9-10.

Thus, prior to 1991, Local 7 created a job targeting program.  The program had dual purposes.  First, it aimed to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms concerning wages and benefits were an obstacle to competing against non-union contractors.  Second, it funded a program of monitoring the steel erection industry to help eliminate extensive regulatory cheating in the non-union sector of the industry, thereby creating a more level playing field for Local 7 signatory contractors. Hurley Aff. ¶¶ 20, 24, 29; Coyle Aff. ¶¶ 11, 13.  Occasionally the target fund was used to attempt to secure work for Local 7 members when its signatory contractors were competing against

contractors signed to other union agreements.  Hurley Aff. ¶ 24.

In or around 1992, Local 7's membership considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest because of the differential in wage and benefit rates.  The members rejected this idea.  Instead, they voted to permanently fund the job targeting program with contributions from the wages of union members.  Hurley Aff. ¶ 21.  In this way the members could enjoy the same comparatively high wages and benefits while successfully competing with non-union competition.

The Union later asked that the dues deduction from members' wages be referred to in its collective bargaining agreement with BTEA, dated November 1, 1993 to September 15, 1997.  In the current collective bargaining agreement between Local 7 and the BTEA, the dues deduction is included in §9 as follows:  "It is agreed that the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid."  Attached to Gunning Aff., Tab A.  This reference in the collective bargaining agreement to withholding of net pay from employee wages did not in any way change Local 7's complete control over the administration of the job targeting program.  Gunning Aff. ¶¶ 4-6.  Neither does the fact that employers deduct working dues from union members' pays render the Local 7 general fund a jointly administered fund.  The ministerial act of deducting amounts from members' pay, as authorized by the members, is the extent of the employer involvement in the collection and distribution of the money.

At no time has the BTEA or any other employer been involved in the administration of Local 7's job targeting program.  Local 7 alone decides which jobs to target based on information gathered from business agents and employers.  Local 7 alone determines the amount

of the job targeting funds to use on a particular job.  Hurley Aff. ¶¶ 23, 25-26, 28; Coyle Aff. ¶ 11; Gunning Aff. ¶¶ 5-6.

The granting of job targeting funds does not result in, and is not conditioned upon, any agreement between Local 7 and any fabricator or general contractor preventing those companies from using non-union contractors on any future job, or even a subsequently bid portion of the job in question.  In some cases, where Local 7 signatory contractors won part of a structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job on that same jobsite.  Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.  In other cases, where Local 7 signatory contractors won the complete structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job with the same fabricator or developer on another jobsite.  Indeed, Local 7 oftentimes even failed in later, separate efforts to obtain future work from the very same fabricators or general contractors that Plaintiffs allege in their Complaint were involved in specific instances in which Local 7 or its signatory contractors succeeded in using job targeting funds.  Hurley Aff. ¶ 27; Coyle Aff. ¶ 12.

### D.  The Big Dig and Other Public Works Projects

By far the largest projects in structural steel erection market in the Boston area in the last twenty (20) years have been the Big Dig and other public works projects, such as the Boston Harbor project and the Logan Airport project, which have been developed under project labor agreements ("PLAs") collectively bargained between project managers and local building trades union councils (of which Local 7 is one of the constituent craft unions).  Joseph W. Nigro, Jr. Affidavit ("Nigro Aff.") ¶ 3; Hurley Aff. ¶ 10; Coyle Aff. ¶ 8.  The PLAs and bid specifications on all of the large public works jobs during these years specified that all contractors and subcontractors at all tiers, both union signatory and non-signatory, have been eligible to

9

participate in all bidding for work on the project, as long as they agreed to abide by the PLA for all construction work on that particular project.  The PLA on each such large public job served as an umbrella agreement that established standardized terms on certain issues for that particular job, such as no strike clauses and uniform work rules, but in other respects simply incorporated by reference the area contracts for relevant crafts, including Local 7's contract covering structural steel erection work.  The terms of each PLA explicitly overrode terms of the subsidiary craft contract on all subjects covered by the PLA.  On the Big Dig job referred to by Plaintiffs in their Complaint (Compl. ¶ 43), for example, the PLA stated that contractors and subcontractors were allowed to execute the PLA for purposes of work on that project and such contractors were not required to sign any other labor agreements as a condition of working on the project.  Thus, non-union contractors were allowed to bid so long as they signed onto the PLA for that job. Nigro Aff. ¶¶ 3-11.

Plaintiffs have chosen not to bid on any PLA work.  Ajax Dep. Tr. pp. 80-87; DFM Dep. Tr. pp. 49-50; AAS Dep. Tr. pp. 78-80.

### E.  Allegations of Other Illegal Pressure and Stripping

Plaintiffs have supplemented their primary claims with additional allegations, cast as either state law tort claims or labor law damage claims under §303, 29 U.S.C. §187.  The state court claims have been dismissed by Order dated February 6, 2006.

1.     <u>Other Illegal Pressure</u>[6]

A steel fabricator, Cape & Island Steel, asked D.F.M. to complete a job that a union steel erector had started at Fox 25 in Dedham.  According to Glen Pisani, president of D.F.M. the job was a "mess" and the contractor had "issues" but the union erector had done the majority of the project before D.F.M. showed up.  DFM Dep. Tr. p. 84.  On the first day D.F.M. was on the job, an agent of Local 7 (identified in the Complaint as *Edwin* Wright but in Mr. Pisani's deposition as *Charlie* Wright) threatened the general contractor with a general walkout if D.F.M. remained on the job.  Compare Compl. ¶ 73 with DFM Dep. Tr. p. 85.  On the second day of work, pickets appeared on the jobsite (DFM Dep. Tr. p. 86) and the general contractor removed D.F.M. from the job.  Id.; Compl. ¶ 75.  According to Pisani, "[w]e were gone for a couple of days and for one reason or the other they wound up calling us back to finish".  DFM Dep. Tr. p. 86.

When D.F.M. returned to the jobsite, some of its equipment was damaged.  Compl. ¶ 73[7]; DFM Dep. Tr. p. 87 ("When we came back we had some equipment that was damaged").  D.F.M. told the general contractor and the fabricator, "[y]ou better figure out who did this and

---

[6] Three projects alleged in the Complaint include allegations that something other than job targeting contributed to the loss of the particular job: 1) the Fox 25 jobsite, Compl. ¶¶ 2, 70-76) the Cardi's Furniture jobsite, Compl. ¶¶ 3, 89-91) the Archstone Apartments jobsite, Compl. ¶¶ 120-23. The Fox 25 jobsite includes specific allegation while the other two jobsites contain the following general allegation: "Due to the payment of job target money and other illegal pressure". Compl. ¶¶ 91, 123.  The facts contained in this section are taken as true solely for the purpose of the Amended Motion for Summary Judgment.

Plaintiffs were also asked in Defendant's Interrogatories to provide specifics regarding the conduct that injured them.  They were asked, (Q #20) "with reference to the alleged combinations, conspiracies, agreements, or other conduct alleged in your Complaint, state whether you were injured in your business or property thereby, and, if so"…(a) "describe in detail how you were injured" … and (b) "identify the acts or conduct of Defendant and any alleged co-conspirators that caused such injury".  In response to that Q #20, Plaintiffs cited back to Answers to earlier Interrogatories nos. 5 and 18, and stated that Interrogatory #20 was "unreasonably cumulative and duplicative and is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations."  This Interrogatory Answer, including the earlier Answer #5 incorporated by reference, once again did not identify non-targeting conduct causing a loss of work beyond the above-cited three episodes alleged in the Complaint.  See Pls.' Resp. to Def. Iron Workers Local 7's First Req. for Answers to Interrogs., Exh.6 of App. in Support of Def. Iron Workers Local 7's Amended Mot. for Summ. J.

[7] The Court, in its February 6, 2006 Order dismissing the state law claims commented, "[t]he Complaint does not describe a violent act with any specificity or indicate whether a Local 7 member or official was involved".  Feb. 6, 2006 Order at 4.

sort out who is going to pay me for my stuff". DFM Dep. Tr. pp. 87-88. Although no one was held responsible for the damage (DFM Dep. Tr. p. 170), D.F.M. returned and completed the job, losing no work in the process. Moreover it placed its 3 or 4 workers on other jobs for the days it was off the Fox jobsite. D.F.M. Dep. Tr. pp. 190-91.

Ajax alleged that it lost the Cardi's Furniture job and the Archstone Apartment job to a combination of target money and other illegal pressure on the fabricator. Compl. ¶¶ 91,123. When asked about the pressure, Don Morel, Ajax's president stated it was exerted on the developer, not the fabricator, on the Cardi job and that he did not know the nature of the pressure. Ajax Dep. Tr. pp. 125-27. He received compensation of $5,000 on the Cardi job, even though he performed no work under the "verbal contract". Id.

The Archstone Apartment job was similar to Cardi in that the Complaint alleged unspecified "pressure" contributed to the loss of the job. Ajax Dep. Tr. pp. 147-56. When asked the nature of the "illegal pressure", Morel referred to "typical union pressures" including "probably" informational picketing. Ajax Dep. Tr. pp. 154-55. He had previously conceded that "informational picketing is not illegal". Ajax Dep. Tr. p. 129.

2. Stripping

Occasionally, Local 7 assists iron workers who have not previously been members of Local 7 to find employment with Local 7 signatory contractors and become Local 7 members. This activity, however, is not based on any agreement with BTEA or its employer members to give job placement priority to non-union employees. Hurley Aff. ¶¶ 16-17; Coyle Aff. ¶¶ 7-8.

The Complaint specifically alleged that Local 7 "regularly successfully stripped workers from BEDFORD IRON" on the Deerfield Academy job. Compl. ¶ 151. The Deerfield Academy job, at $500,000, was by far the largest job Bedford had ever done. BIW Dep. Tr. p. 58.

12

Bedford employed 15-20 workers at the time.  BIW Dep. Tr. p. 47.  The job took longer than anticipated and the company lost money.  BIW Dep. Tr. pp. 43-44[8].  According to Michael Guillemette, Bedford's president, two Bedford workers left the Deerfield Academy jobsite and went to work for union contractors.  BIW Dep. Tr. pp. 89-91.  Bedford did not replace the two workers.  BIW Dep. Tr. pp. 114-15 ("I did not replace them right away.  I don't even know if I replaced them actually").  All Bedford knows is that "two guys quit and they were trying out the union".  BIW Dep. Tr. p. 90.  No agent of Local 7 or Local 7 contractor has been identified in connection with these allegations.

### 3.  Surveillance and Sham Picketing

The complaint generally alleges that Local 7 has engaged in surveillance of Plaintiff jobsites and that such surveillance is done pursuant to an agreement with co-conspirators.  Compl. ¶ 154.  When questioned about the practice D.F.M. president Pisani stated that he raised the issue but concluded it was lawful.  DFM Dep. Tr. p. 162 ("I believe, I brought it up.  Apparently, it's within their rights to film what they would like to film").  American Aerial's president alleged that members of Local 7 and the New Hampshire local attempted to view and impact and American Aerial jobsite in New Hampshire.  AAS Dep. Tr. p. 31.  No specific injury has been suffered as a result of the instances of surveillance.

The Complaint also alleges that Local 7 has engaged in "sham picketing".  Compl. ¶ 156.  D.F.M. president Pisani characterized sham picketing as "a bunch of guys holding signs that no one can really read".  DFM Dep. Tr. p. 164.  Questioned whether community standards picket line is a "sham" Mr. Pisani stated "[t]hat's an informational picket line, I would assume.  It's all a sham to me."  Id.  When pressed for the distinction between a sham and a valid picket line, Mr.

---

[8] The Deerfield job was difficult for the men and the company.  According to Mr. Guillemette, "[t]hat's why that Deerfield Job, I told you, I think I lost all that money.  I don't really know.  The guys morale went down.  It was far away from home.  It was taking them twice as long.  It was incredible".  BIW Dep. Tr. pp. 43-44.

Pisani conceded that when pickets are on his jobs it is all a sham.  DFM Dep. Tr. pp. 164-66.

## ARGUMENT

## I.        SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment if it can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party may show the absence of an issue of material fact by showing that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  When a motion is made and supported, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial.  Id. at 324.  Thus the nonmoving party must identify "specific facts, in suitable evidentiary form, that establish the presence of a genuine issue for trial."  Ward v. Massachusetts Health Research Inst., 209 F.3d 29, 32 (1st Cir. 2000) (citation and quotations omitted).  "The opposing party may not rely on conclusory allegations and unsupported speculation[.]"  Burns v. State Police Ass'n. of Mass., 230 F.3d 8, 9 (1st Cir. 2000).  No higher standard is to be applied before granting summary judgment in antitrust cases.  Texaco Puerto Rico, Inc. v. Medina, 834 F.2d 242, 247 (1st Cir. 1987); White v. Hearst Corp., 669 F.2d 14, 17 (1st Cir. 1982).

## II.       THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS.

### A.        Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims Concerning Local 7's Use of Job Targeting Funds.

Through the job targeting program, the Union has, in essence, tailored labor pricing to be more competitive where that competition is needed to get jobs, without undermining the legitimate union goal of achieving wage equity, at the highest possible rates, among members. This program is exempted from antitrust scrutiny by the statutory and non-statutory labor

exemptions, and in any case, does not violate the antitrust laws.

Where federal antitrust law seeks "to preserve business competition and to proscribe business monopoly" (Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, U.S. 797, 809 (1945)), federal labor law seeks "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining" (id. at 806) and allows the elimination of "that part of such competition which is based on differences in labor standards." Apex Hosiery Co. v. Leader, 310 U.S.469, 503 (1940); see also National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 (addressing the "inequality of bargaining power" between employees and employers that "tends to aggravate recurrent business depressions, by depressing wage rates . . . and by preventing the stabilization of competitive wage rates and working conditions within and between industries").  To reconcile these polar purposes, Congress and the courts developed two sets of labor exemptions that free parties from any inquiry as to whether the restraint is unreasonable under the antitrust laws.  The statutory labor exemption exempts from antitrust law all union conduct when the union has not combined with businesses and acts in its self-interest. As is addressed herein in Part A, the job targeting program, which is administered solely by Local 7, falls within this exemption.  The non-statutory labor exemption exempts most union-business combinations (and even some business-business combinations) directed primarily to the terms and conditions of employment.  Assuming *arguendo* that the signatory contractors' forwarding of a portion of its workers' pay to the Union, or the acceptance by the signatory contractors or fabricators of target funds for specific projects takes the conduct outside of the statutory exemption, the job targeting program is still immunized by the non-statutory labor exemption to the antitrust laws, as discussed herein in Part B.

Finally, even if the labor exemptions did not apply, the allegations concerning Local 7's

payments of job target funds to secure specific jobs fails to state an antitrust claim, as discussed herein in Part C.

       1.          <u>Local 7's Job Targeting Program and Other Organizing Activities Are Exempted by the Statutory Labor Exemption.</u>

The undisputed facts show that no antitrust business conspiracy exists between Local 7 and non-labor groups; instead, Local 7's job targeting program and its other organizing activities are exempt from antitrust scrutiny by the statutory labor exemption.

          a.         The Statutory Labor Exemption to the Antitrust Laws.

The statutory labor exemption is rooted in §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, which amended the Sherman Act, and in the Norris LaGuardia Act, 29 U.S.C. § 102, et seq. Congress enacted these statutes to respond to early judicial application of the antitrust laws to labor activities, including secondary activities.[9] In the now infamous <u>Danbury Hatters</u> case, the Supreme Court held that a union-led nationwide, secondary boycott was a conspiracy within the meaning of the Sherman Act. <u>Loewe v. Lawlor</u>, 208 U.S. 274 (1908). The Court acknowledged that "the congressional debates show that the statute had its origin in the evils of massed capital," but nonetheless concluded that the Sherman Act as adopted "made no distinction between classes," and that the alleged conspiracy was subject to the Act. <u>Id.</u> at 301 (quotations and citation omitted). Responding to what it considered a result

---

[9] Union conduct against employers concerning the terms and conditions of employment of the employers' own employees is primary activity. A picket line by Local 7 against one of the Plaintiff companies for failing to pay its workers union scale, for example, would be primary activity. Similar union pressure against businesses who do business with the employer on matters unrelated to the terms and conditions of the business' own employees is considered secondary pressure against a "neutral" in the dispute between the union and the primary. For example, pressure by Local 7 against a fabricator or general contractor who does business with the Plaintiffs but who does not employ ironworkers directly is secondary pressure. The primary-secondary distinction is significant for labor law purposes. <u>See</u> e.g. <u>Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades</u>, 485 U.S. 568 (1988) (secondary handbilling protected); <u>N.L.R.B. v. Friot & Vegetable Packers</u>, 377 U.S. 58 (1964) (primary picketing at a secondary site); <u>N.L.R.B. v. International Longshoremen Ass'n</u>, 473 U.S. 61 (1985) (work preservation rules serve primary objective). As explained in this section, however, Congress repeatedly rejected this distinction for purposes of antitrust law.

incongruent with Congressional intent, Congress passed the Clayton Act in 1914.  Section 6 of

the Act boldly declares that:

> [t]he labor of a human being is not a commodity or article of commerce.  Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; *nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.*

15 U.S.C. § 17 (emphasis supplied).  In the Clayton Act, Congress thus adopted the view of

Justice Holmes that combinations of workers were desirable counterparts to combinations of

capital.  Vegelahn v. Guntner, 167 Mass. 92, 108 (1896) (Holmes, J., dissenting) ("One of the

eternal conflicts out of which life is made up is that between the effort of every man to get the

most for his services, and that of society, disguised under the name of capital, to get his services

for the least possible return.  Combination on the one side is potent and powerful.  Combinations

on the other is necessary and desirable counterpart, if the battle is to be carried on in a fair and

equal way").  As the Supreme Court explained, since the enactment of § 6, "it would seem plain

that restraints on the sale of the employee's services to the employer, however[] much they

curtail the competition among employees, are not in themselves combinations or conspiracies in

restraint of trade or commerce under the Sherman Act."  Apex Hosiery Co. v. Leader, 310 U.S.

469, 503 (1940).  In addition, § 20 of the Clayton Act prohibits the issuance of injunctions

against certain union activities, including injunctions that would: "prohibit any person . . . from

terminating any relation of employment, or from ceasing to perform any work . . . , or from . . .

persuading others by peaceful means so to do" and provides further that such activities are not

"violations of any law of the United States."  29 U.S.C. § 52.

      Despite this clear Congressional intent, the Supreme Court narrowly interpreted Clayton

Act in <u>Duplex Printing Press Co. v. Deering</u>, limiting its protection to those parties in a dispute

concerning "terms and conditions of employment" who stand in a "proximate relation" to the

dispute and holding that § 20 of the Clayton Act authorized courts to enjoin the conduct of

unions under the anti-trust laws.  254 U.S. 443, 470-74 (1921).  Congress, in turn, repudiated

<u>Duplex</u>, when it passed the Norris-LaGuardia Act in 1932, declaring the "public policy of the

United States" as follows:

> [w]hereas under prevailing economic conditions, developed with the aid of
> governmental authority for the owners of property to organize in the corporate
> and other forms of ownership association, the individual unorganized worker is
> commonly helpless to exercise actual liberty of contract and to protect his
> freedom of labor, and thereby to obtain acceptable terms and conditions of
> employment, wherefore, though he should be free to decline to associate with his
> fellows, it is necessary that he have full freedom of association, self-organization,
> and designation of representatives of his own choosing, to negotiate the terms and
> conditions of his employment, and the he shall be free from the interference,
> restraint, or coercion of employers of labor, or their agents, in the designation of
> such representatives or in self-organization or in other concerted activities for the
> purpose of collective bargaining or other mutual aid or protection.

29 U.S.C. § 102.  Congress broadly defined "labor dispute" as:

> [a]ny controversy concerning terms or conditions of employment, or concerning
> the association or representation of persons in negotiating, fixing, maintaining,
> changing, or seeking to arrange terms or conditions of employment regardless of
> whether or not the disputants stand in the proximate relation of employer and
> employee.

29 U.S.C. § 113(c).[10]

In <u>United States v. Hutcheson</u>, 312 U.S. 219, 232 (1941), the Supreme Court held that the

Clayton Act and the Norris-LaGuardia Act combined to form the statutory labor exemption to

antitrust laws.  The Court established the following two-part test for determining whether labor

---

[10]  Congress adopted an almost identical definition of a labor dispute when it enacted the Wagner Act in 1935.  <u>See</u>
29 U.S.C. § 152(9) ("The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of
employment, or concerning the association or representation of persons in negotiating, fixing, maintaining,
changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the
proximate relation of employer and employee.").

union activity is immune from anti-trust scrutiny under this exemption: (1) Did the union act in

its self-interest? (2) Did the union combine with non-labor groups? Id. The Court articulated the

broad scope of the statutory labor exemption as follows:

> [s]o long as a union acts in its self-interest and does not combine with non-labor
> groups, *the licit and the illicit . . . are not to be distinguished by any judgment
> regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or
> unselfishness of the end of which the particular union activities are the means.*

312 U.S. at 232 (footnote omitted) (emphasis supplied).

In Hutcheson and subsequent decisions, the Supreme Court also made clear that

economic pressure directed by the union and its members alone against a neutral, secondary

employer was excluded from antitrust review by the statutory labor exemption. Hutcheson, 312

U.S. at 231 ("the allowable area of union activity was not to be restricted, as it had been in the

Duplex case, to an immediate employer-employee relation"); National Woodwork Mfrs. Ass'n v.

N.L.R.B., 386 U.S. 612, 623 (1967) ("Congress abolished, for purposes of labor immunity, the

distinction between primary activity between the immediate disputants and secondary activity in

which the employer disputants and the members of the union do not stand in the proximate

relation of employer and employee.") (quotations and citations omitted).

Moreover, Congress consciously chose not to narrow the broad statutory exemption from

the antitrust laws when it enacted the LMRA in 1947 to address business concerns regarding

secondary activity. As the Supreme Court explained in Connell Constr. Co. Inc. v. Plumbers and

Steamfitters Local Union No. 100, "Congress rejected attempts to regulate secondary activities

by repealing the antitrust exemptions in the Clayton and Norris-LaGuardia Acts, and created

special remedies under labor laws instead." 421 U.S. 616, 634 (1975) (citing legislative history);

see also id. at 642 (Stewart, J., dissenting) ("The Senate . . . refused to adopt the House's

removal of antitrust immunity for prohibited secondary activity") (citing legislative history).

19

Although "the test to determine if a union's actions are in its 'self-interest' has not been precisely formulated, the principle . . . is that activities are in the self-interest of a labor organization if they bear a reasonable relationship to a legitimate union interest." Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368, 1380 (1st Cir. 1981), aff'd, International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc., 456 U.S. 212 (1982); see Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union, AFL-CIO, 362 F.2d 322, 328 (5th Cir. 1966) (negative publicity by union was within the scope of traditional union objectives and did not violate antitrust law). The plaintiff in an antitrust case bears the burden of proving that the statutory labor exemption does not apply. See Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council, 675 F.2d 881, 886 (7th Cir. 1982).

> **b.**    The Job Targeting Program Falls Within the Statutory Labor Exemption.

The undisputed facts show that the job targeting program is not a labor-management initiative; it is a program established and maintained exclusively by Local 7 in its self-interest. Such conduct is shielded from antitrust scrutiny under the statutory labor exemption.

The job targeting program fits squarely within the Hutcheson two-part test for the application of the statutory labor exemption. With respect to the first prong of the test, Local 7's job targeting program serves two legitimate, self-interested purposes. First, Local 7's job targeting program helps to secure work at labor standards for Local 7 members in geographical locations where non-union competition is strongest. Statement of Undisputed Material Facts In Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment ("Undisputed Facts") ¶ 1. Such an objective is clearly in Local 7's legitimate, self-interest. It is undisputed that structural steel erection is a labor-intensive industry, in which a large portion of

20

the cost is labor.  Compl. ¶ 36 ("The construction industry is a labor intensive industry in which a large portion of the cost is labor[.]"); Undisputed Facts ¶ 6.  Moreover, non-union contractors, such as Plaintiffs, admittedly enjoy substantially lower labor costs than union structural steel erection contractors, such as Local 7 signatory contractors.  Compl. ¶ 36 ("In the case of open-shop contractors [i.e., non-union contractors such as Plaintiffs], the cost . . . is almost always less expensive than the rates set by Local 7 contractors."); see also Undisputed Facts ¶ 7.  This reality often places non-union contractors at a substantial competitive advantage over union contractors, such as Local 7 signatory contractors, in obtaining jobs.  Job targeting funds are used to provide relief from the constraints of the collectively bargained labor standards on jobs targeted by Local 7, without which Local 7 signatory contractors would be hard-pressed to competitively bid. Providing job targeting funds for the purpose of acquiring jobs while protecting labor standards that its members would not otherwise enjoy is a legitimate, self-interest objective of a labor organization.  See Apex, 310 U.S. at 503 (the elimination of competition over wages and working conditions is a legitimate union goal); see also Woodworking Mfg.. Ass'n. v. N.L.R.B., 386 U.S. 612, 639 (1967) (preservation of union work is a legitimate union interest); Intercontinental Container Transp. Corp. v. New York Shipping Ass'n, 426 F.2d 884, 887 (2d Cir. 1970) ("The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern . . . . Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws.") (citations omitted); Manno Elec., Inc., 321 NLRB 278, 298 (1996) (use of a job targeting program to "maintain the union wage scale . . . and obtain work for its members" is a legitimate union interest), enf'd per curiam mem., 127 F.2d 34 (Table) (5th Cir. 1997).

Second, Local 7's job targeting program serves to reduce regulatory cheating in the

structural steel erection industry by funding the Union's monitoring efforts.  Undisputed Facts ¶ 1.  Monitoring the structural steel erection industry is in Local 7's legitimate self-interest because it, too, helps create a more level playing field for its contractors, ultimately providing Local 7 opportunities to obtain additional work for its members.  Again, securing work for union members is a legitimate, self-interested objective of labor organizations.  See Woodworking Mfg., 386 U.S. at 639; see also United Food and Commercial Workers Union ("UCFWU"), Local 1036 v. N.L.R.B., 307 F.3d 760, 768 (9th Cir.), cert. denied, 537 U.S. 1024 (2002) (it is the role of unions to organize workers and promote the use of union labor).

With respect to the second prong of the Hutcheson test, Local 7 unilaterally established the job targeting program sometime prior to 1991.  Undisputed Facts ¶ 2, 3.  When, in or around 1992, Local 7 members voted to permanently fund the program through dues deductions from their own wages so that they could attempt to obtain more work at union labor standards, they did so unilaterally, without employer involvement.  Id.  Local 7 also unilaterally administers the job targeting program, including determining which jobs to target, to whom it pays job targeting funds, and the amount to fund.  Undisputed Facts ¶ 5.

Plaintiffs erroneously assert that Local 7's so-called combination with BTEA in pooling the targeting funds takes away the unilateral quality of the program's administration.  The BTEA employers' only involvement in the pooling of funds is the ministerial function of deducting dues from the after-tax wages of union members who have authorized these deductions from their own paychecks to be forwarded to their own union in accordance with federal labor law. Undisputed Facts ¶ 4.  This ministerial function does not change the basic fact that this is money belonging to Local 7 members that they have decided, through a vote, to pool for job targeting purposes.  See Undisputed Facts ¶ 3.  If the mere remission of dues as a source of union funds

could eliminate the unilateral quality of the Union's actions, and, resultantly, the statutory labor exemption, then virtually any activity in which a union engages apparently "unilaterally," would no longer be considered unilateral where employer-deducted dues are used.[11]  Such a result would be inimical to the purpose of the statutory labor exemption, which was established to immunize union initiatives from traditional "restraint of trade" analysis.

Nor does the purported violation of the Davis-Bacon Act take the dues deduction arrangement out of the statutory labor exemption.[12]  Unlawfulness is not a consideration at all under the statutory exemption.  Unquestionably, both the "licit and illicit" are protected.  Hutcheson, 312 U.S. at 232.

> c.    Other Alleged Conduct Is Shielded by the Statutory Labor Exemption.

In an attempt to bolster their unsubstantial antitrust claims, Plaintiffs next claim that other alleged Union conduct, such as picketing, surveillance and videotaping, stripping, and violence, removes Local 7's statutory immunity.  Those acts, even taken as true for purposes of summary judgment, do not forfeit Local 7's right to be shielded from the statutory labor exemption.  The undisputed facts establish that Local 7's activities during the relevant time period were in Local 7's legitimate self-interest and conducted unilaterally.

> 1)    Secondary Pressure, Secondary Boycotts, and 'Top-Down Organizing'

Plaintiffs characterize the remainder of Local 7's efforts to obtain work for its members

---

[11] For example, if a union chose to spend $3 million to build a union hall using union members' dues deducted by the employer with the employees' authorization, its decision to build the union hall would be no less unilateral than if it had collected the dues directly from the union members.

[12] The Davis-Bacon Act protects wage levels on federally funded jobs.  Plaintiffs suggest that because Local 7 members contribute 85 cents per hour from their after-tax pay on public as well private jobs, they run afoul of the Davis-Bacon Act.  There are two responses to this argument.  First, Plaintiffs lack standing to challenge the Davis-Bacon wages paid to Local 7 members.  See infra at Part B.2.a.  Second, Davis-Bacon protects workers from employer exploitation in the same way the statutory exemption protects union efforts to maintain negotiated wage rates.  As no worker has complained about his Davis-Bacon wages, Plaintiffs should not be heard to complain either.

as illicit "top-down organizing" by using direct pressure (e.g., picketing) and threats (e.g., to picket, or to withhold job targeting funds) in order to persuade employers to use contractors employing Local 7 members.  This conduct is also alleged in Plaintiffs' LMRA claim.  Local 7's alleged "top-down organizing" conduct, however, was unilateral and in the Union's self-interest, and is therefore exempted from the antitrust laws by the statutory labor exemption.

Organizing employees in the construction industry is difficult because of the job-by-job nature of the industry, the number of parties, such as developers, general contractors, subcontractors, and employees, involved in each job, and the ambulatory nature of the industry. It is difficult, if not impossible, for workers to go through the lengthy card-signing and election process that is required in non-construction industry settings.  "Top-down organizing" allows a union to organize workers by persuading general contractors to hire union subcontractors or by persuading an employer to agree that its employees may be represented by a union, rather than by pursuing NLRB elections among the employees.  This type of conduct is permitted and highly regulated by the federal labor laws.  For example, the NLRA condoned top-down organizing in § 8(f), 29 U.S.C. 158(f) (authorizing construction industry employers and unions to enter into so-called "prehire" agreements setting the terms and conditions of employment for workers hired by the signatory employer without the union's majority status first having been established under § 9 of the Act, 29 U.S.C. § 159) and in the construction industry proviso to § 8(e), 29 U.S.C. 158(e) (setting forth an exception from § 8(e)'s prohibition against "hot cargo" agreements so that employers may agree to refrain from doing business with any person not agreeing to be bound by a pre-hire agreement).  See also Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . . pressure is implicit in the construction industry proviso" to § 8(e) of the NLRA); Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), *cert. denied*, 488

U.S. 889 (1988) (confirming validity of construction labor contracts without showings of majority status under § 8(f) of the NLRA).

Commensurate with the widespread use of "top-down organizing" in the construction industry, the LMRA also permits unions to direct a wide variety of appeals and pressures at secondary (or "neutral") employers, despite prohibitions of §8(b)(4) of the Act.  In the construction industry this includes certain types of non-picketing, non-strike pressure on such secondary employers to retain unionized contractors.  See e.g., N.L.R.B. v. Servette, Inc., 377 U.S. 46, 54 (1964) (a union may pressure managers of secondary companies to cease doing business with the primary employer as long as the union does not invite a work stoppage among the secondary's rank-and-file employees or engage in other conduct that qualifies as "coercion or restraint" under § 8(b)(4)(i) or (ii) of the NLRA, 29 U.S.C. § 158(b)(4)(i), (ii)); Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 578 (1988) (a construction union may use pressure tactics such as consumer boycotts and extremely harsh publicity directed against secondary employers with an overtly "cease doing business purpose" because such types of non-picketing, non-strike activities are not deemed "restraint or coercion" under § 8(b)(4)(i) or (ii) of the NLRA); Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, 854 F.2d 144, 146 (6th Cir. 1988) (§ 8(b)(4)(B) of the NLRA did not prohibit a union's phone calls and visits to "neutral" advertisers, threatening to handbill for consumer boycotts of the advertisers, followed by actual handbilling, to pressure the advertisers to cease dealing with the primary employer).

With this backdrop of permissible secondary activity, Local 7 denies it engaged in unlawful organizing.  Yet, even if Local 7's organizing activities were unlawful, its conduct, including secondary activity, would nevertheless fall within the scope of the statutory labor

exemption's protection as long as that conduct was in the Union's self-interest and unilateral. See Hutcheson, 312 U.S. at 232. First, Local 7's picketing and publicity activities were for the purpose of obtaining work for its members at labor standards. Undisputed Facts ¶ 21. This objective is in the Union's legitimate, self-interest. See Woodworking Mfg., 386 U.S. at 639. Second, these activities were done unilaterally and not pursuant to any agreements with any other non-labor groups. Undisputed Facts ¶ 22. Such activities are shielded from the federal antitrust laws. See, e.g., Cedar Crest Hats, Inc. v. United Hatters, Cap and Millinery Workers Int'l Union, AFL-CIO, 362 F.2d 322, 326-37 (5th Cir. 1966) (union's unilateral threats to distribute leaflets urging customers to buy only union-made hats if retailers continued to sell non-union goods is not antitrust violation).

### 2) Surveillance and Videotaping

Plaintiffs also allege that Local 7 placed observers with surveillance equipment at jobsites in order to induce secondary employers to cease doing business with Plaintiffs and to initiate "sham" complaints at various state and federal agencies. As with the other secondary conduct, this conduct is alleged to have violated both § 8(b)(4) and federal antitrust law.

To the extent that Local 7 engaged in videotaping at employer jobsites, it did so unilaterally and in its legitimate, self-interest. In an effort to level the playing field, Local 7 has monitored job sites in order to identify and potentially expose employers who are not complying with regulatory standards. Undisputed Facts ¶ 23. Such conduct is permitted by federal labor law. See Woodworking Mfg., 386 U.S. at 639; see also UCFWU, 307 F.3d at 768. [13] Moreover,

---

[13] Plaintiffs do not appear to allege that Local 7's supposed initiation of complaints violates the antitrust laws. The so-called Noerr-Pennington Doctrine precludes antitrust liability for efforts to influence the exercise of government power, even if it is for the purpose of gaining an anti-competitive advantage. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972) (applies to courts and administrative agencies). To the extent that they claim Local 7 initiated sham complaints, Local 7 denies the allegation. Regardless, here there is no agreement between Local 7 and non-labor parties to conduct surveillance that would take the Union's conduct outside of the statutory labor exemption. Undisputed Facts ¶ 24.

Local 7's surveillance was conducted without any agreement with a non-labor group. Undisputed Facts ¶ 24.

### 3)    Stripping

Plaintiffs also assert that Local 7 stripped employees from Plaintiffs, bypassed the Union hiring hall, and placed them with Local 7 signatory contractors in contravention of § 8(b)(4) of the NLRA and federal antitrust laws.

To the extent that Local 7 may have periodically assisted non-union employees in obtaining employment with Local 7 signatory contractors, it did so unilaterally and in its own interest. Local 7 maintains no agreements with employers to strip employees from non-union signatories in order to place them with union signatories. Undisputed Facts ¶ 22. Moreover, to the limited extent that Local 7 has assisted employees in finding employment on union jobs, the Union has done so in order to assist employees join a labor organization. Undisputed Facts ¶ 22.[14] Assisting employees to join a labor organization is one of the fundamental protections of § 7 of the NLRA. See 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]").

The § 7 right of employees to join unions and to work for collectively bargained wages rates (and no less) is bedrock for workers. To challenge a union's appeal to a non-union worker as a violation of the non-union employer's "rights" under federal labor law clashes with a most fundamental right of all workers. To challenge the same appeal under antitrust laws is plainly

---

[14] Plaintiffs further maintain that Local 7 bypassed its hiring hall in placing these stripped employees. Local 7, however, does not maintain a hiring hall arrangement in its collective bargaining agreement with BTEA. See Hurley Aff. ¶ 17; Coyle Aff. ¶ 8. Moreover, to the extent that Plaintiffs are alleging that Local 7 bypassed the union hiring hall on the large PLAs, there was full employment on those public works jobs during the time period alleged in the Complaint. See id.

frivolous.  Quite simply, assisting employees to join a labor organization is a wholly proper and legitimate objective of labor organizations.

As the Supreme Court held, "[i]t is not a violation of the Sherman Act for laborers in combination to refuse to work.  They can sell or not sell their labor as they please, and upon such terms and conditions as they choose, without infringing the Anti-trust laws."  Hunt v. Crumboch, 325 U.S. 821, 824 (1945).  Moreover, "[a] worker is privileged under congressional enactments, acting either alone or in concert with his fellow workers, to accept, refuse to accept, or to terminate a relationship of employment, and his labor is not to be treated as 'a commodity or article of commerce.'"  Id. (citing Clayton Act, 15 U.S.C. § 17, Norris-LaGuardia Act, 29 U.S.C § 101 et seq., and caselaw).  Hunt involved a union's refusal to admit a company's employees to membership and to refuse to sell its members' services to that company.  The union's conduct ultimately put the company out of the business, and the company brought this anti-trust suit, alleging that the "refusal to accept employment was due to personal antagonism against the (company) arising out of the killing of a union man."  Id. at 824.  The Supreme Court held, however, that the statutory labor exemption accorded employees "an absolute right . . . to work or cease working according to their own judgments[.]"  Id. at 824, 825, n.1.  Thus, Local 7's placement of non-union employees with union employers falls within the statutory exemption.

4)     Violence

Finally, in a last ditch effort to take Local 7's conduct outside of the scope of the statutory labor exemption, Plaintiffs maintain that Local 7's "top-down organizing" and other secondary activities included violence and threats of violence.

Plaintiffs make just one specific allegation of actual violence and threats of physical harm (Compl. ¶ 73) in a Complaint that includes over twenty-five (25) projects and spans a time

28

period of 4 to 9 years. Moreover, there is no allegation anywhere in the Complaint that the Union ratified, condoned, or authorized any of the so-called violent conduct alleged. Yet, taking the alleged facts in a light most favorable to Plaintiffs, violent conduct attendant to a union's organizing and/or secondary activity does not automatically take away a union's statutory labor exemption.

The seminal labor antitrust case involving violence is <u>Apex Hoisery Co. v. Leader</u>, 310 U.S. 469, 513 (1940). In <u>Apex</u>, the union called for a sit-down strike after the company refused to accede to its demand for a closed job. <u>Id.</u> at 482. The strike became violent, with strikers "willfully wreck[ing] machinery of great value…and [doing] extensive damage to other property and equipment of the company," resulting in the cessation of production for several months. <u>Id.</u> In holding that the union did not violate § 1 of the Sherman Act, the Supreme Court explained:

> The Sherman Act is concerned with the character of the prohibited restraints and with their affect on inter-state commerce. *It draws no distinction between the restraints affected by violence and those achieved by peaceful but often times quite as effective means. Restraints not within the Act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence.*

<u>Id.</u> at 513 (emphasis supplied). Thus, Plaintiffs allegations of violence, even if true, do not suffice to take Local 7's conduct out of the statutory labor exemption.

        2.    <u>Local 7's Job Targeting Program Is Shielded by the Non-Statutory Labor Exemption.</u>

Even if somehow the job targeting program is not deemed exempt from federal antitrust laws under the statutory labor exemption, it is nonetheless exempt by the non-statutory labor exemption to the antitrust laws.

        a.    The Non-Statutory Labor Exemption to the Antitrust Laws

When Congress passed the Wagner Act in 1935 to protect workers' right to unionize, it

was "common knowledge" that labor organizations sought to eliminate competition on the basis

of wages and other labor standards through industry-wide bargaining.  Local Union No. 189,

Amalgamated Meat Cutters and Butcher Workmen of North Am., AFL-CIO v. Jewel Tea Co.,

381 U.S. 676, 712 (1965) (Goldberg, J., concurring).  It became clear to the Supreme Court that

even where such bargaining resulted in an agreement with *a group of employers* affecting

competition, such restraints were not necessarily restraints of trade or commerce under the

Sherman Act.  As the Supreme Court explained in Apex Hosiery:

> successful union activity, as for example consummation of a wage agreement with
> employers, may have some influence on price competition by eliminating that part
> of such competition which is based on differences in labor standards.  Since, in
> order to render a labor combination effective it must eliminate the competition
> from non-union made goods…*an elimination of price competition based on
> differences in labor standards is the objective of any national labor organization.
> But this affect on competition has not been considered to be the kind of
> curtailment of price competition prohibited by the Sherman Act.*

310 U.S. at 503-04 (citations omitted) (emphasis supplied).  Thus, the judiciary found in the

labor laws an implicit, or non-statutory, exemption to the antitrust laws that can be invoked a

union combines with non-labor entities.  Brown v. Pro Football, Inc., 518 U.S. 231, 236 (1996)

(citations omitted).

"The Supreme Court has never delineated the precise boundaries of the [non-statutory]

labor exemption" (Clarett v. National Football League, 369 F.3d 124, 131 (2d Cir. 2004), *cert.

denied*, 125 S.Ct. 1728 (2005)), but has recognized that the non-statutory labor exemption is a

necessary reconciliation of federal labor policy and federal antitrust laws.  See Jewel Tea, 381

U.S. at 690 n.5 (application of the non-statutory labor exemption is determined by balancing the

"interests of union members" against "its relative impact on the product market"); Connell, 421

U.S. at 622 ("[A] proper accommodation between the congressional policy favoring collective

bargaining under the NLRA and the congressional policy favoring free competition in business

markets requires that some union-employer agreements be accorded a limited nonstatutory

exemption from anti-trust sanctions.").

At its simplest, the non-statutory labor exemption protects agreements between unions

and individual employers that relate to wages, hours or other working conditions and that arise

out of the context of a collective bargaining agreement even though such agreements may restrict

competition among those employers over subjects covered by the agreements.  See United Mine

Workers v. Pennington, 381 U.S. 657, 664 (1965) (labor law contemplates agreements on wages

between unions and individual employers).

The exemption also protects broader agreements, between unions and multiple

employers, again, that relate to wages and other terms and conditions of employment arising out

of the context of a collective bargaining agreement.  Id. at 664 (labor law contemplates

agreements between unions and employers in a multi-bargaining unit).  As the Supreme Court

noted in N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, Chauffeurs,

Warehousemen and Helpers of Am., AFL No. 103:

> [a]t the time of the debates on the Taft Hartley Amendments [to the Wagner Act],
> proposals were made to limit or outlaw multi-employer bargaining.  These
> proposals failed of enactment.  They were met with a storm of protest that their
> adoption would tend to weaken and not strengthen the process of collective
> bargaining and would conflict with the national labor policy of promoting
> industrial peace through effective collective bargaining.

353 U.S. 87, 95 (1957).  The fact that most, or even all,[15] employers agree to the same wages and

other terms and conditions of employment does not restrain trade for Sherman Act purposes.  See

Brown, 518 U.S. at 240 ("Multiemployer bargaining itself is a well-established, important,

---

[15] See Boston Shipping Ass'n, Inc. v. Federal Maritime Comm'n, 706 F.2d 1231, 1233 (1st Cir. 1983) ("BSA, the complaining party in the dispute before us, is a multiemployer bargaining association which represents management in all longshore collective bargaining affecting the Port of Boston. Its members -- twenty-five commercial firms which include contracting stevedores and deep water carriers plus the Massachusetts Port Authority -- own or operate virtually all of the facilities in the port that are used regularly in foreign and intercoastal trade.").

pervasive method of collective bargaining, offering advantages to both management and labor.").

Finally, the non-statutory labor exemption applies to conduct that grows out of or is directly related "to the lawful operation of the bargaining process," even if such conduct does not arise out of a collective bargaining agreement.  Brown, 517 U.S. at 250.[16] As the Court explained:

> Petitioners claim that the implicit exemption applies only to labor-management *agreements* -- a limitation that they deduce from case-law language, see, e.g., Connell, 421 U.S., at 622, 95 S.Ct., at 1835 (exemption for "some union-employer agreements ") (emphasis added), and from a proposed principle -- that the exemption must rest upon labor-management consent.  The language, however, reflects only the fact that the cases previously before the Court involved collective-bargaining agreements, see id., at 619-620, 95 S.Ct., at 1833-1834; Pennington, 381 U.S., at 660, 85 S.Ct., at 1588; Jewel Tea, *supra*, at 679-680, 85 S.Ct., at 1596-1597; the language does not reflect the exemption's rationale, see 50 F.2d, at 1050.  Nor do we see how an exemption limited by petitioners' principle of labor-management consent could work.  One cannot mean the principle literally -- that the exemption applies only to understandings embodied in a collective-bargaining agreement -- for the collective-bargaining process may take place before the making of any agreement or after an agreement has expired.

Id. at 243.  Instead, this exemption applies "where needed to make the collective-bargaining process work."  Id. at 234.  Accordingly, Brown extended the non-statutory labor exemption's reach to multi-employer group's post-impasse implementation of terms rather than to terms contained in a collective bargaining agreement.  Id. at 250.  In so doing, the Court noted that permitting antitrust liability would call into question substantial labor conduct, including multi-employer bargaining, that federal labor policy encourages.  Id. at 237-42.[17]

The Brown Court also recognized the National Labor Relations Board's ("NLRB's")

---

[16]  Notably, the conduct at issue in Brown was employer conduct.  As discussed in the previous section, union conduct undertaken alone and in the union's own interest is outside of the scrutiny of the antitrust laws under the statutory labor exemption.

[17]  The non-statutory labor exemption may also apply to agreements made without any union-employer negotiations, before the parties even contemplated a collective bargaining agreement.  See Clarett, 369 F.3d at 126-27, 143 (holding that rule adopted long before collective bargaining commenced fell within the scope of the non-statutory labor exemption and emphasizing the importance of multi-employer bargaining); id. at 143 ("The disruptions to federal labor policy that would be occasioned by [plaintiff's] antitrust suit…would not vindicate any of the antitrust policies that the Supreme Court has said may warrant the withholding of the non-statutory exemption.").

statutory responsibility for policing the collective bargaining process.  Id. at 240-42.  As the

Court explained, "[l]abor law permits employees, after impasse, to engage in considerable joint

behavior, including joint lockouts and replacement hiring."  Id. at 245.  Bringing an attack

against this joint-employer behavior would "ask antitrust courts to decide the lawfulness of

activities intimately related to the bargaining process."  Id.  "The labor laws give the [NLRB],

not antitrust courts, primary responsibility for policing the collective-bargaining process."  Id. at

242.  The Court further noted that one of Congress's objectives in implementing the labor laws

"was to take away from antitrust courts the authority to determine, through application of the

antitrust laws, what is socially or economically desirable collective-bargaining policy."  Id.

> **b.** Local 7's Job Targeting Program Falls Within the Non-Statutory
> Labor Exemption.

Plaintiffs complain of an alleged restraint of trade based on Local 7's pooling of

membership dues for its job targeting funds and the payment of such funds to Union signatory

contractors and fabricators and developers.  Assuming these allegations to be true, each aspect of

the job targeting program is exempt from any antitrust scrutiny.

> **1)** The Collection of Dues by Signatory Contractors Is Exempt
> From the Antitrust Laws Under the Non-Statutory Labor
> Exemption.

The undisputed facts demonstrate that the BTEA's only involvement in the pooling of job

targeting funds is the ministerial deduction of dues for the fund from Local 7 member paychecks,

as referenced in the BTEA's and Local 7's collective bargaining agreement.  Undisputed Facts

¶¶ 2-5.  Plaintiffs' erroneously assert that this pooling of funds violates federal antitrust law.

However, these funds belong, in the first instance, to the Union members as part of their wages.

See id.  Local 7 members alone voted to pool portions of their own wages for the job targeting

fund and authorized the BTEA employers to deduct dues for the fund to be forwarded to the

Union.  See id.  Even if the pooling of members' own wages is somehow considered a restraint of trade, a dues deduction provision is an ordinary part of a negotiated collective bargaining agreement concerning terms and conditions of employment, falling squarely within the non-statutory labor exemption.  See Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring).

Nor does the purported violation of the Davis-Bacon Act take the dues deduction arrangement out of the non-statutory labor exemption.  The alleged illegality – that workers who elect to forward their dues will not have received the full wages that they are owed on Davis-Bacon Act projects – is unrelated to the bargaining process, and therefore has no bearing on the reconciliation of labor and antitrust laws.  Moreover, Plaintiffs have no private right of action to sue under the Davis-Bacon Act.  See, e.g., United States v. Binghamton Constr. Co., 347 U.S. 171, 176-77 (1954) ("The [Davis-Bacon] Act itself confers no litigable rights on a bidder for a Government construction contract.  The language of the Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects.") (footnote omitted); see also Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., No. 01-548, 2002 WL 334394, at *4 (D. Minn. Feb. 27, 2002) (in an antitrust case regarding a job targeting program and alleged Davis-Bacon Act violations, the court held that the plaintiff lacked standing to assert a claim for declaratory judgment based upon the Davis-Bacon Act).  The antitrust laws -- with their treble damages -- do not allow a party to dress up some other alleged illegality as an antitrust claim in order to avoid a standing problem.  See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993).  Accordingly, this Court should resist Plaintiffs' attempts to bootstrap the Davis-Bacon allegations to its antitrust claims.

34

> 2) Local 7's Job Targeting Payments to Its Signatory
> Contractors Fall Within the Non-Statutory Labor
> Exemption.

The undisputed facts establish that Local 7's payment of job targeting funds to signatory contractors also falls squarely within the scope of the non-statutory labor exemption. The effect of the payment of funds to signatory contractors is to lessen the signatory contractor's labor costs for the particular job. Undisputed Facts ¶ 8. A union clearly can negotiate different (even lower) wage rates with different employers, and a job targeting award serves exactly that purpose. See Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring).

Moreover, the NLRB has repeatedly found that union job targeting programs are protected by federal labor law. See, e.g., Manno Elec., 321 NLRB 278, 282, 298 (1996), (affirming an administrative law judge ("ALJ") finding that "[t]he objectives of the 'job targeting program' are to protect employees' jobs and wage scales. These objectives are protected by Section 7 [of the NLRA]"), enf'd per curiam mem., 127 F.2d 34 (Table) (5th Cir. 1997); Associated Builders and Contractors, Inc., Golden Gate Chapter, 331 NLRB 132, 132, n.1, 137 (2000) ("the Charging Parties' job targeting program is concerted, protected activity"), modified in non-relevant part, 333 NLRB 955 (2001); J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655, 663 (Ohio), cert. denied, 525 U.S. 871 (1998) (holding that Ohio's prevailing wage statutes and regulations were preempted by the NLRA to the extent that they interfered with the federally protected use of job targeting programs), cert. denied, 525 U.S. 871 (1998). Just as in Manno, one of Local 7's job targeting objectives is to protect iron workers' jobs and wage and benefit scales. Hurley Aff. ¶ 20. Thus, this Court should defer to the NLRB's position that such programs are protected by § 7 of the NLRA. See Brown, 518 U.S. at 242.

Although the First Circuit has not yet addressed an antitrust challenge to a job targeting program, the two circuit courts that have issued published opinions have held that job targeting programs were insulated from federal antitrust laws by the non-statutory labor exemption.  See Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81 F.3d 858, 863 (9th Cir. 1996) ("A subsidy program that targets some jobs for more competitive wage components of signatory contractor bids, and does not bar nonunion bidders from the bidding on the same jobs, is in harmony with the policies of both the labor and antitrust laws."); Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180, 1186 (8th Cir. 1997) (holding that a target fund financed by union members that provides partial reimbursement for wages paid to members where the employer is a signatory to a collective bargaining agreement is protected from anti-trust liability by the non-statutory exemption).  A third circuit court has affirmed without opinion a district court decision reaching the same result.  Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309, 1997 WL 311498, at *2, 12 (D. Md. 1997) (upholding a union's job targeting program, in which the union and a contractor "would negotiate concessionary rate agreements on a project-by-project basis in a particular geographical area in order that the particular employer might be able to compete with lower cost, nonunion contractors"), aff'd, 133 F.3d 914 (4th Cir.) (Table) (unpublished decision), cert. denied, 525 U.S. 825 (1998).

As in those three cases, the non-statutory labor exemption clearly exempts Local 7's payment of job targeting funds to signatory contractors because such conduct concerns, as Plaintiffs themselves admit, wage rates and other labor costs, which are mandatory subjects of bargaining, and involve parties in a collective bargaining relationship.  See Compl. ¶ 36 ("In the case of open-shop contractors, the cost attributable to structural steel  labor services is variable and subject to competitive forces and (in the absence of predatory pricing tactics, [i.e., the job

targeting program]), is almost always less expensive than the rates set by Local 7 contractors");

<u>see</u> Undisputed Facts ¶¶ 8, 10.

>   3)    Any Payment of Job Targeting Funds to Fabricators and
>          General Contractors Is Also Within the Non-Statutory
>          Labor Exemption.

Plaintiffs' allege in their Complaint that Local 7 repeatedly approached fabricators or

general contractors with which it had no contract, and persuaded them (with offers to provide, or

threats to withhold, job targeting funds), job by job, to use subcontractors who employ Local 7

members. Compl. ¶¶ 67-139 (alleging over twenty-five (25) separate incidents in which the

Union allegedly sought and obtained work for its members by appealing to various fabricators

and developers using job targeting funds). Taking these allegations as true for purposes of

summary judgment only, such conduct still falls within the non-statutory labor exemption.

Plaintiffs may argue that under <u>Connell</u>, *supra*, the non-statutory labor exemption does

not protect this conduct. Yet, the contention that Local 7's job targeting program is somehow

akin to the agreements involved in <u>Connell</u> does not withstand scrutiny. In <u>Connell</u>, the Supreme

Court found an agreement between a union and a general contractor with whom it did not

maintain a collective bargaining agreement illegal under § 8(e) and unprotected by the non-

statutory labor exemption, where (1) the agreement required the contractor to deal only with the

union signatory contractors on *all of its jobs*, (2) the union maintained similar agreements with

other non-signatory general contractors, and (3) the union also was a party to a multi-employer

bargaining agreement with an employer association comprised of numerous contractors, and that

agreement included a "most favored nation" clause, whereby the union agreed that should it

grant a more favorable contract to a non-association contractor, it would extend the same terms

to all other signatory contractors.  421 U.S. at 619-21, 633, 635.[18]  In analyzing the anti-competitive effects of the union's agreement with Connell and other general contractors with whom it did not maintain a collective bargaining agreement, the Supreme Court held that these agreements "indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions[.]"  Id. at 623.  Moreover, as a result of these agreements, the union had obtained control over subcontract work that "could result in significant adverse effects on the market and on consumers – effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions."  Id. at 624.  The union's absolute control over all the work subcontracted by these general contractors coupled with the "most favored nation" clause in its agreement with the association were indicia that the union was no longer functioning independently.  Connell thus stands for the proposition that the non-statutory labor exemption will not apply when unions combine with non-labor groups to engage in activity that potentially has substantial anti-competitive effects outside of wages and other terms and conditions of employment.

Here, the undisputed facts establish that Local 7's agreements, if any, with fabricators or developers were not of the Connell type.  Local 7 awarded job targeting funds on a job-by-job basis.  Undisputed Facts ¶¶ 10, 15; see Compl. ¶¶ 67-139 (Plaintiffs' job-by-job allegations).  These job-by-job payments, as demonstrated by Plaintiffs' numerous allegations of job targeting payments for dozens of specific projects, did not result in generalized agreements with non-signatory companies prohibiting them from working with non-union contractors on all future

---

[18]  The Connell Court did not answer the penultimate question of whether the union's conduct did, in fact, violate the federal anti-trust laws.  421 U.S. at 637.

jobs.[19]  At most, these alleged payments, if any, represent Local 7's hat-in-hand method of

organizing job-by-job.  To the extent that Local 7 may have made these job-by-job appeals to

fabricators and general contractors, as Plaintiffs allege, it did so precisely because it maintained

no generalized agreement with these non-labor groups.  Undisputed Facts ¶ 15.

    The difference between the generalized agreements in <u>Connell</u> and successful job-by-job

appeals is apparent.[20]  Unlike across-the-board agreements, the successful job-by-job appeals, as

alleged here, do not have the "potential for restraining competition in the business market in

ways" that antitrust laws condemn.  <u>Id.</u> at 635.  A successful appeal to an individual to buy one

hot dog from one vendor at a ball game is simply not an agreement that the individual will

refrain from buying any other vendor's hot dog that day or in the future.  Plaintiffs frankly

"want[] to use the Sherman Act….as a source of compensation from [Local 7] whose labor-law

maneuvers have turned its books from black to red.  That is not a function of the antitrust laws."

<u>Ehredt Underground, Inc. v. Commonwealth Edison Co.</u>, 90 F.3d 238, 241 (7th Cir. 1996), *cert.*

*denied*, 519 U.S. 1056 (1997).

    Lastly, the Supreme Court in <u>Connell</u> highlighted its well-established principle "that

labor policy requires tolerance for the lessening of business competition based on differences in

wages and working conditions."  <u>Id.</u> at 622.  It concluded that it is only when a restraint on the

business market "has substantial anticompetitive effects," which do "not follow naturally from

the elimination of competition over wages and working conditions" that antitrust policies are

contravened "to a degree not justified by congressional labor policy," that labor conduct will not

---

[19]  Local 7 does not herein admit Plaintiffs' allegations concerning the Union's alleged more than twenty-five (25) appeals for work.  Nonetheless, even taking the allegations as true for purposes of summary judgment, there is no genuine dispute of material fact that would preclude summary judgment on the antitrust counts.

[20]  The <u>Connell</u> Court specifically noted that "[t]he primary effect of the [multi-employer agreement] seems to have been to inhibit the union from offering any other employer a more favorable contract" (421 U.S. at 624, n. 1) whereas the effect of the job targeting agreement here is to allow just that.

be immunized from anti-trust scrutiny.  Id. at 625, 635.  Unlike in Connell, which involved

generalized agreements outside of mandatory subjects of bargaining, it is undisputed that the so-

called agreements at issue here concern only labor costs, which fall squarely within the

mandatory subjects of bargaining.  See Undisputed Facts ¶¶ 1, 8, 10.  As the Supreme Court

subsequently made clear in Brown, "*the case for applying the [non-statutory labor] exemption is

strongest where a restraint on competition operates primarily in the labor market* and has no

anti-competitive effect on the product market."  518 U.S. at 1051 (emphasis supplied).  That is

the clearly case here.

> 3.    Defendant Is Entitled to Summary Judgment Under the Antitrust Laws on
>        Plaintiffs' Claims Concerning Local 7's Use of Target Funds To Secure
>        Specific Jobs.

At the heart of Plaintiffs' Complaint are the allegations that on certain projects, Local 7

signatories, with the use of target funds, were able to underbid them.  As detailed above, the use

of these target funds on individual projects is clearly exempt from antitrust scrutiny under the

statutory and non-statutory labor exemptions.  Even if the exemptions did not apply, however,

Defendants would still be entitled to summary judgment under settled antitrust principles.

> a.    Plaintiffs Cannot Establish that Either the Signatory Contractors or
>        Local 7 Engaged in Predatory Pricing.

Plaintiffs' only explicit antitrust claim regarding the pricing of bids is the allegation that

Local 7 and its signatory contractors engaged in "illegal predatory pricing tactics."  Compl. ¶ 1.

Plaintiffs, however, cannot make out any of the elements of such a claim.

> 1)    Plaintiffs Cannot Establish 'Below-Cost' Pricing.

A plaintiff "seeking to establish competitive injury resulting from a rival's low prices

must prove [as a prerequisite] that the prices complained of are below an appropriate measure of

its rival's costs."  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222

(1993); see also Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 8 (1986); C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41, 45 (1st Cir. 1998). Anything less than a showing of "below-cost" pricing risks interference with legitimate competition. Thus, "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." Brooke Group Ltd., 509 U.S. at 223.

It is axiomatic that Local 7 could collectively bargain for lower labor costs and thereby lower the signatory contractors' costs. A bid reflecting those lower costs would not be neither "below cost" nor "predatory." Local 7 similarly could offer the signatory contractor job targeting funds on a particular project effectively resulting in lower costs on that project only, and the signatory's bid reflecting those lower costs would also be neither "below cost" nor "predatory." Local 7's willingness to provide signatories with what amounts to labor cost concessions (Undisputed Facts ¶¶ 8, 10) does not permit a conclusion that these signatories have engaged in "below-cost" pricing.

Nor can Plaintiffs establish that the signatory contractors' prices were predatory on the grounds that they resulted in bids that were lower than Plaintiffs' own costs. "[A] company that prices its own product or service at or above its own costs does not violate the Sherman Act merely because its costs, and thus its prices, are lower than a rival's costs." C.B. Trucking, Inc., 137 F.3d at 45 (quotations and citation omitted).

Finally, Plaintiffs may attempt to argue that it is not Local 7 signatory contractors who have engaged in predatory pricing by accepting the job targeting funds, but rather Local 7 for

41

providing those funds.  This argument would require Plaintiffs to argue that the antitrust laws

preclude Local 7's pricing of its members' labor below some appropriate measure of cost.  This

argument, however, is foreclosed by § 6 of the Clayton Act in 1914, 15 U.S.C. § 17, which for

purposes of the antitrust laws, including the Sherman Act, declares that "[t]he labor of a human

being is not a commodity or article of commerce."

> 2)     Plaintiffs Cannot Demonstrate a Dangerous Probability of
>         Recoupment.

"Recoupment [of losses] is the ultimate object of an unlawful predatory pricing scheme;

it is the means by which a predator profits from predation.  Without it, predatory pricing

produces lower aggregate prices in the market, and consumer welfare is enhanced."  Brooke

Group Ltd., 509 U.S. at 224.   Here, Plaintiffs cannot demonstrate that its "competitor had . . . a

dangerous probability[] of recouping its investment in below-cost prices."  Brooke Group Ltd,

509 U.S. at 224; see also Matsushita, 475 U.S. at 588-89 ("For the investment to be rational, the

[predator] must have a reasonable expectation of recovering, in the form of later monopoly

profits, more than the losses suffered.").  As explained above, Plaintiffs' competitors are not

pricing their services below their costs, and thus, they have no losses to recoup; rather, their low

bids simply reflected lower costs, resulting in lower aggregate prices in the market.

Assuming *arguendo* that Plaintiffs could show "below-cost" bidding by Local 7 signatory

contractors, Plaintiffs still cannot make the necessary showing of a "dangerous probability of

recoupment" because of both the market structure and low barriers of entry in the structural steel

erection industry.  Quite simply, if a Local 7 signatory contractor raises its bids on subsequent

projects in order to recoup for the losses it allegedly suffered on a targeted job, there is simply no

reason to conclude that other contractors will not underbid it on those later jobs.

First, lack of market power of the firm allegedly engaging in predatory pricing, or even of

the firms allegedly colluding together, and the highly competitive nature of the industry will make recoupment infeasible.  See Brooke Group Ltd., 509 U.S. at 226 (recoupment unlikely where the "market is highly diffuse and competitive"); Cargill, Inc., 479 U.S. at 119, n.15 (1986); Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995) (plaintiff failed to show at summary judgment that defendant had the market power to raise prices or restrict output for predatory pricing to be successful).  There are currently over 150 firms – including both signatory and non-signatory contractors – competing for structural steel erection work in the locations at issue here.  Undisputed Facts ¶ 12.

There is also no evidence to suggest that the individual Union signatory contractors who are the recipients of the job targeting funds individually exercise substantial market power, and indeed, Plaintiffs do not appear to make that claim.  Nor is there any basis for aggregating the market power, if any, of the Union signatory contractors.  It is undisputed that these signatory contractors *continue to compete against each other*, and thus, to speak of their "combined market power" would be inaccurate.  Undisputed Facts ¶¶ 12, 13.

Second, recoupment is unlikely where "new entry is easy."  Brooke Group Ltd., 509 U.S. at 226; see also Matsushita, 475 U.S. at 591 n.15  (barriers to entry are key factors in determining whether recoupment is feasible); Cargill Inc., 479 U.S. at 119 n. 15 (same); Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1200-02 (3d Cir. 1995) (low barriers to entering business prevents recoupment, thus fails to injure competition and produces no antitrust injury); A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1403 (7th Cir. 1989) ("Persistent entry and expansion by other firms at the same time ensures that recoupment cannot occur."); Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 597 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988) ("[I]f entry barriers to new firms are not

significant, the elimination of the competitor may not significantly affect competition as a whole, because a new firm or firms easily can enter the market to take the place of the old one.  In such cases, competitive pressure from potential market entrants may still exist, and the departure of the defendant's sole competitor does not necessarily mean that competition is threatened."); Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publs., Inc., 63 F.3d 1540, 1549 (10th Cir. 1995), *cert. denied*, 516 U.S. 1044 (1996) (sufficient evidence of "high entry barriers and other structural factors" is necessary to create triable issue of dangerous probability of recoupment); J & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62, 68 (D.Me. 1999) (because there were no significant barriers into the retail gasoline market, the defendant would be unable to maintain supra competitive retail prices); AD/SAT v. Associated Press, 920 F. Supp. 1287, 1303 (S.D.N.Y. 1996) ("[T]he barriers of entry into this market are low, which provides further evidence that AP's predatory pricing scheme could not succeed, as monopoly prices would result in new competitors entering the market."), *aff'd*, 181 F.3d 216 (2d Cir. 1999). Barriers to entry for new structural steel erectors are notably few.  Undisputed Facts ¶ 11. Typically, steel erection contractors rent cranes and hire labor, and thus a steel erection contractor basically only needs good credit and a supply of skilled labor.  Id.  No matter how successful Local 7 may be in organizing the steel erectors, low barriers to entry means that new non-union competition may arise at any time.

The Supreme Court addressed a predatory pricing conspiracy involving multiple firms in Matsushita.  It reviewed first the scheme in cases involving a single firm:

> the success of such schemes is inherently uncertain:  the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits.   The success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some

additional gain.   Absent some assurance that the hoped-for monopoly will materialize, and that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off."   Easterbrook, Predatory Strategies and Counterstrategies, 48 U. Chi. L. Rev. 263, 268 (1981).   For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful.   See, e.g., Bork, supra, at 149-155; Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 699 (1975); Easterbrook, *supra*;  Koller, The Myth of Predatory Pricing-An Empirical Study, *590 4 Antitrust Law & Econ. Rev. 105 (1971); McGee, Predatory Price Cutting: The Standard Oil (N.J.) Case, 1 J. Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J. Law & Econ., at 292-294.   See also Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 88 (CA2 1981) ("[N]owhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

475 U.S. at 589-90.  The Court noted that while these observations apply even to predatory pricing by a single firm seeking monopoly power, where a large number of firms is alleged to have engaged in predatory pricing, "[s]uch a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator":

The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeeds.   The necessary allocation is therefore difficult to accomplish.   Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for all buyers . . . .   If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Id. at 590.  The Court noted finally that in that case, the alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist.  Id. at 592.

In this case, there are over a hundred-and-fifty (150) competitors and extremely low barriers of entry.  Although Local 7's job targeting program has been in existence since 1992, it

has not foreclosed non-union competition.  Indeed, several of the Plaintiffs began operations

after 1992, and all of the Plaintiffs showed *greater* sales in the most recent tax year (2005), than

in 1999, when the purportedly wrongful actions began.  Plaintiffs have also been unable to

identify any non-union erectors who have been put out of business by the job targeting fund.

The Supreme Court has noted that "[i]n certain situations - for example, where the market

is highly diffuse and competitive, or where new entry is easy . . . - summary disposition of the

case is appropriate."  Brooke Group Ltd., 509 U.S. at 226 (citing *Cargill,* 479 U.S. at 119-120, n.

15).  Here, such a situation exists and summary judgment on Plaintiff's predatory pricing claim

is appropriate.

> b.    Plaintiffs Cannot State a Claim for Price Discrimination Under the
>       Robinson-Patman Act.

Alternatively, Plaintiffs appear to complain simply about price discrimination because

Local 7 targets specific jobs in which they have a special interest (i.e., traditionally open-shop

work).  The Robinson-Patman Act, 15 U.S.C. § 13, *et seq.*, does bar certain price discrimination.

The statute, however, is limited to discrimination in the sale of commodities.  15 U.S.C. § 13(a);

Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195, n.3 (3d Cir. 1995) (Robinson-

Patman Act applies only to commodities); Town of Concord v. Boston Edison Co., 676 F. Supp.

396, 397 (D.Ma. 1988) (same).  While Congress did not generally define "commodities" for

purposes of the Robinson-Patman Act leading to considerable litigation over whether certain

transactions are commodities or service,[21] it did specifically state that, for purposes of the

---

[21] See, e.g. First Comics, Inc. v. World Color Press, Inc., 884 F.2d 1033, 1042 (7th Cir. 1989), *cert. denied*, 493 U.S. 1075 (1990) (Robinson-Patman Act has no applicability to printing services); Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1340 (7th Cir. 1986) (Robinson-Patman Act has no applicability to medical services); Gordon v. New York Stock Exchange, 498 F.2d 1303, 1305, n.7 (2d Cir. 1974) (finding claim that stockbroker services are commodities under the Robinson-Patman Act essentially frivolous), *aff'd on other grounds*, 422 U.S. 659 (1975); Town of Concord, 676 F. Supp. at 397 (finding electricity is a commodity for purposes of the Robinson-Patman Act, but noting split in decisions regarding this question).

antitrust laws, labor is not a commodity. 15 U.S.C. § 17. Accordingly, the Robinson-Patman

Act does not apply here as perhaps Plaintiffs' Complaint implicitly concedes, by not mentioning

that Act by name.[22]

### B.     Defendant Is Entitled to Summary Judgment on Plaintiffs' Remaining Allegations Concerning Purported Restraints of Trade in Violation of Section 1 of the Sherman Act.

#### 1.     Plaintiffs Cannot State an Antitrust Claim Based on Any Alleged Loyalty Rebates or Exclusivity Agreements.

Plaintiffs appear also to be asserting that the Union entered into agreements with general

contractors or fabricators with whom it did not have a collective bargaining agreement pursuant

to which it would provide job targeting funds in return for the general contractor or fabricators

agreement to use union signatories exclusively.[23] The fundamental factual problem with this

allegation is that it simply is not true, and throughout discovery Plaintiffs have failed to identify

any such purported agreements. Undisputed Facts ¶ 15. Instead, Plaintiffs' own listings of

project-by-project awards illustrates that the job targeting program operates on a job-by-job basis

rather than as a tool to obtain exclusive agreements. Compl. ¶¶ 69, 81-139.

The claim is also legally flawed. Even if the union were giving job targeting fund rebates

to secure exclusivity with the general contractors or fabricators, that would not make out an

antitrust violation. Giving a discount to get exclusivity amounts to a loyalty rebate. A loyalty

rebate must result in a below-cost price to give rise to antitrust liability. See Concord Boat v.

Brunswick Corp., 207 F.3d 1039, 1061-62 (8th Cir. 2000). And as noted above, there is no

---

[22] Even if the Act did apply, it is a complete defense that price differences reflect good faith efforts to meet competition. 15 U.S.C. §13(b). Here the Plaintiffs themselves allege that the prices were dropped to meet the competition offered by its lower prices. Compl. ¶ 34 ("These [job targeting] subsidies are allegedly available only to steel contractors who are parties to the collective bargaining agreement with Local 7 and are intended to assist those employers in meeting the competition from non-union structural steel erectors."); Undisputed Facts ¶¶ 8, 10.

[23] To the extent that the claim is merely that the Union agreed to provide signatory contractors with job targeting funds, that claim amounts to no more than that the Union provided signatory contractors with relief from its collective bargaining agreement's labor costs on a particular job, and is clearly exempt from antitrust scrutiny under the non-statutory exemption, as discussed above at Section II.A.1.b.

evidence the job targeting fund rebates brought any price below costs for the signatory contractors or the Union.  Undisputed Facts ¶ 11.

Moreover, even if Plaintiffs could establish that the Union had entered into an agreement with a general contractor or fabricator in which it agreed to use Union signatories exclusively, no antitrust violation would exist in this market.  To make out a claim of exclusive dealing, a plaintiff must show that a substantial share of the market was foreclosed.  In this Circuit, a foreclosure of 30-40% of the market must be shown.  See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004).  Plaintiffs have identified no such agreements during the discovery process, and it certainly can make no showing now that any such agreements would foreclose them or anyone from a significant share of the market.

Local 7 accepts for purposes of this summary judgment motion only that the Relevant Market is the market for structural steel erection as defined by the scope and geography set forth in Plaintiffs' Complaint,[24] and moreover, that spending for steel erection in that market has been in excess of $200,000,000 per year since 1999, as Plaintiffs allege.  Compl. ¶ 43.  Local 7 challenges, however, Plaintiffs' contention that they have been precluded from the outset from competing on 70% of the work.  See id. ¶¶ 30, 43.  The primary basis for Plaintiffs' allegation that they have been barred from 70% of the market is their underlying claim that "more than half [of total spending in structural steel erection construction during the relevant period] can be accounted for by the Boston Central Artery and Harbor Tunnel project (also known as the 'Big Dig') which was subject to a project labor agreement *and therefore was undertaken as a union-*

---

[24] The Complaint defines the "Relevant Market" "as the erecting of structural metal and steel on buildings and structures, erecting prestressed and precise concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine[.]"  Id. ¶ 29.

*shop job.*" Id. ¶ 43 (emphasis supplied).

It is undisputed that although the work on the Big Dig and other of the very largest public sector projects over the past twenty years in Massachusetts have been subject to PLAs, requiring that all contractors and subcontractors must abide by terms and conditions of employment set forth therein, the PLAs have also guaranteed that that all contractors and subcontractors, union and non-union alike, have the same rights to bid for and be awarded work on the projects. Undisputed Facts ¶ 16. The PLAs did not impose union-only bidding requirements excluding bidders because they employed non-union workers or failed to sign union contracts for any of their jobsites. Instead, Plaintiffs had every right to bid on this work. No contractor is favored under a PLA, although a non-union contractor is required to be bound by the same terms and conditions under which a union contractor already operates. See Department of Labor and Indus. v. Boston Water and Sewer Comm'n, 18 Mass. App. Ct. 621, 626 (1984) ("equal footing" principle should not be confused with certain advantages that a bidder may possess in meeting the bid specifications on the project). Neither is there a requirement that any contractor become unionized to participate in the project. Contractors are required to sign the PLA to work on the project, but the PLA has no application or force outside the project, and non-union contractors are free to operate on their own terms on other jobs. That Plaintiffs may have chosen not to bid does not establish that they were excluded from the bidding process. As the Supreme Court noted in Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Mass./R.I. ("Boston Harbor"), 507 U.S. 218, 231 (1993), "contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchases whose perceived needs do not include a Project Labor Agreement." 507 U.S. at 231. In a

Massachusetts state court case unsuccessfully challenging bid specifications on the Big Dig,
which required successful bidders, including contractors and subcontractors to sign on to the
PLA, Judge Garsh noted that non-union contractors had bid on the project and that non-union
subcontractors were working on the project as of spring of 1996.  Utility Contractors Ass'n of
New England, Inc. v. Commissioners of Mass. Dep't of Public Works, No. Civ. A. 90-3035,
1996 WL 106983, at *6 (Mass. Super. March 12, 1996).[25]

       Plaintiffs' claim that they are barred from 70% of the market in large part because of
PLAs is particularly disingenuous in light of the earlier Supreme Court litigation on these
projects.  In 1990, the Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.
("ABC"), an organization representing non-union construction-industry employers,[26] brought
suit challenging the PLA on the Boston Harbor project on various claims, including § 1 of the
Sherman Act claim, alleging a conspiracy to reduce competition.  Boston Harbor, 507 U.S. at
223.  The District Court rejected each of the ABC's claims.  Relevant to the Sherman Act claim,
the Court found that "[a]ll contractors are invited to bid on the same terms.  No contractor is
favored under the bid procedures," and, moreover, that "the plaintiff contractors have not been
excluded from bidding.  They simply have refused to bid on any contract[.]"  Associated
Builders and Contractors of Mass./R.I. v. Massachusetts Water Resources Auth., No. 90-10576-
MA, 1990 WL 86360, at * 3 (D. Mass. April 11, 1990), rev'd on other grounds, 935 F.2d 345
(1st Cir. 1991), rev'd sub nom., Boston Harbor, 507 U.S. 218.  Thus, although the Sherman Act
claim was not dispositive in the case, Judge Mazzone considered the claim and found it

---

[25] ("To date, fifty-five construction contracts . . . have been awarded on the Project.  A total of two hundred ninety-
six bids were received with respect to those fifty-five contracts, including thirteen bids by non-union contractors on
ten of those contracts.  With respect to only two of those thirteen bids, however, was the non-union contractor
actually the low bidder (and one of those two withdrew its bid).  There are at least twenty-eight non-union
subcontractors working on the Project.") (footnote omitted).
[26] Lead plaintiff American Steel Erectors boasts membership in the ABC on its website.  See
http://www.aseasf.com/aboutus.htm (accessed Jan. 22, 2006).

meritless.

In the intervening sixteen (16) years since the District Court issued its decision, Plaintiffs here apparently have chosen simply not to bid on this work.  See Undisputed Facts ¶ 17.

Having chosen not to participate in a substantially large portion of the market, Plaintiffs cannot now point to a purported "exclusion" from that portion of the market as evidence of the alleged monopoly power of the many different contractors who did bid on the work.

>    2.    Plaintiffs Cannot Establish a Claim Against Local 7 and Its Signatory
>           Contractors for Price-Fixing

Although the Complaint is unclear, Plaintiffs also may be attempting to avoid the requirements for a predatory pricing claim by arguing that Local 7 and its signatory contractors have engaged in some sort of vertical agreement in restraint of trade to fix maximum prices on certain jobs and that even if such price fixing does not involve predatory pricing, it is an unlawful restraint of trade under §1 of the Sherman Act.[27]   While Defendant disputes Plaintiffs' characterization of the job targeting program as a matter of fact, Plaintiffs' critical problem, for purposes of summary judgment are matters of law, as Plaintiffs are unable to make the required showings for such a claim.  First, for the reasons set forth above, Plaintiffs cannot establish proof that they were foreclosed from a substantial share of the market, as described above.  Second, as set forth in this section, Plaintiffs cannot establish the required injury to competition.

Plaintiffs' alleged injury to their own businesses by the purported agreement to set lower maximum prices is insufficient to establish the injury to competition required for this claim.

Antitrust injury does not arise for purposes of [the remedial provision making

---

[27] While Plaintiffs seek to characterize the purported agreement between the Union and its signatories as a horizontal agreement, the Union, as a supplier of labor is at a different level in the chain of production than the signatories, and accordingly, any agreement between the Union and its signatories is a vertical agreement, rather than a horizontal agreement.  Business Elecs. Corp. v. Sharp Elecs., 485 U.S. 717, 730 (1988).  Restraints imposed by an agreement between competitors are denominated as horizontal restraints, while those imposed by agreement between firms at different levels of distribution are vertical restraints.

> treble damages available] until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct . . . ; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect. . . .  Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.  Hence, they cannot give rise to antitrust injury.

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339 (1990) (citations and footnotes omitted) (emphasis in original); see also id. at 339-41 ("When prices are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct.") (emphasis in original); Cargill, Inc., 479 U.S. at 116 ("'[I]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.'") (quoting Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050, 1057 (6th Cir.), *cert. denied*, 469 U.S. 1036 (1984)).

The Supreme Court has explained that the main cause that led to the enactment of the Sherman Act:

> was the thought that it was required by the economic condition of the times; that is, the vast accumulation of wealth in the hands of corporations and individuals, the enormous development of corporate organization, the facility for combination which such organizations afforded, the fact that the facility was being used, and that combinations known as trusts were being multiplied, and the widespread impression that their power had been and would be exerted to oppress individuals and injure the public generally.

Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 50 (1911).[28]  Thus, "[t]he end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers of consumers of goods and services . . ." and "the act was designed to prevent

---

[28] See also id. at 83 (Harlan, J., concurring in part and dissenting in part) (In 1890, "[t]he nation had been rid of human slavery . . . but the conviction was universal that the country was in real danger from another kind of slavery sought to be fastened on the American people; namely, the slavery that would result from aggregations of capital in the hands of a few individuals and corporations controlling, for their own profit and advantage exclusively, the entire business of the country, including the production and sale of the necessaries of life.").

restraints of trade which had a significant effect on such competition."  Apex Hosiery Co. v.

Leader, 310 U.S. 469, 493, n.15 (1940); see also Allen Bradley Co. v. Local Union No. 3, Int'l

Bhd. of Elec. Workers, 325 U.S. 797, 809 (1945) ("The primary objective of the Anti-trust

legislation has been to preserve business competition and to proscribe business monopoly.").

    Because the critical concern was the effect of the economic conditions on the public

generally, "[i]t is axiomatic that the anti-trust laws were passed for the protection of competition,

not competitors."  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224

(1993) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)); see also

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (same); Eastern Food

Servs. v. Pontifical Catholic Univ. Servs. Ass'n Inc., 357 F.3d 1, 4 (1st Cir. 2004) ("[A]ntitrust

claims are concerned not with wrongs directed against the private interest of an individual

business but with conduct that stifles competition.").  Thus, "[e]ven an act of pure malice by one

business competitor against another does not, without more, state a claim under the federal

antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford

remedies for all torts committed by or against persons engaged in interstate commerce.'"  Brooke

Group Ltd., 509 U.S. at 225 (quoting Hunt v. Crumboch, 325 U.S. 821, 826 (1945)).

    In a series of cases beginning with Brunswick Corp., the Supreme Court formalized the

requirement that in all antitrust cases a private plaintiff must prove:

> antitrust injury, which is to say injury of the type the antitrust laws were intended
> to prevent and that flows from that which makes defendants' acts unlawful.  The
> injury should reflect the anticompetitive effect either of the violation or of
> anticompetitive acts made possible by the violation.

370 U.S. at 489.[29]  As the Court explained in Atlantic Richfield Co. v. USA Petroleum Co.

---

[29]  Brunswick Corp. was brought under § 7 of the Clayton Act, 15 U.S.C. § 18.  In Blue Shield of Va. v. McCready,
457 U.S. 465 (1982), the antitrust injury requirement was applied to a claim brought under § 1 of the Sherman Act.
In Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters, the Court placed the

("ARCO"), antitrust injury, an essential element of *every* private antitrust case, "ensures that a plaintiff can recover only if loss stems from a competition-reducing aspect or effect of the defendant's behavior." 495 U.S. 328, 344 (1990); see also Associated Gen. Contractors of Cal., Inc., 459 U.S. at 538; Brunswick Corp., 429 U.S. at 489.

Thus, while Plaintiffs may indeed have lost particular jobs because of the job targeting program, Plaintiffs cannot establish that their loss stems from "a competition-*reducing* aspect or effect of the defendant's behavior."  ARCO, 495 U.S. at 344 (emphasis in original).

The essence of Plaintiffs' allegations is that they were financially injured by losing work to Local 7 signatory contractors.  See e.g. Compl. ¶ 49 (Local 7 has engaged in various activities in an effort to "keep Plaintiff[s] and other Non-Local 7 Contractors from performing jobs in the . . . Relevant Market"); id. ¶ 51 (the effect of Local 7's activities "will be to eliminate competition from non-union signatory contractors").  Regardless of whether Plaintiffs can establish an injury to themselves as competitors, however, they cannot establish the required injury to competition simply because they may have lost work.

Plaintiffs baldly allege that the use of the job targeting funds will somehow result in "the escalation of cost to consumers, deterioration of quality, and restriction of output."  See id. ¶¶ 162(a), 172(a).  The undisputed facts establish here instead that Local 7's use of job targeting funds increases, rather than decreases, competition.  Structural steel erection is a labor-intensive industry, and Plaintiffs seek to compete in the industry by paying their employees lower wages and benefits and using this cost-saving to underbid signatory firms.  Undisputed Facts, ¶¶ 6, 7. Local 7's job targeting program allows signatory contractors who suffer a competitive

---

requirement of antitrust injury in a context of judicial policies.  459 U.S. 519, 545 (1983).  In Cargill, Inc. v. Monfort of Colo., Inc., the Court emphasized that a showing of antitrust injury is a necessary, but not always sufficient, showing for antitrust standing, and "that a showing of loss or damage due merely *to increased competition* does not constitute such injury." 479 U.S. 104, 110 n.5, 116, 122 (1986) (emphasis supplied).

disadvantage because of the collectively bargained labor costs to compete with non-union contractors. Undisputed Facts ¶¶ 8, 10. On a job where job targeting funds are available, the customer is benefited by both the lower costs and the greater competition. Undisputed Facts ¶ 14.[30] If a party's action increases competition (and even decreases prices), then there can be no antitrust injury.

Other bidding cases have reached a similar conclusion. In <u>Tigard Elec., Inc. v. National Elec. Contractors Ass'n</u>, 790 F. Supp. 1498 (D.Or. 1992), plaintiffs claimed that a job targeting program resulted in their inability to compete effectively on various jobs, and that they thus suffered an injury to their businesses or property. The court granted defendants' motion to dismiss, holding that plaintiffs had not alleged an injury to competition. <u>Id.</u> at 1505. As the court explained, "[p]laintiffs are essentially complaining not that *competition* is being injured, but that they, as *competitors*, are being injured because defendants' cooperation allows defendants to compete too successfully. Allegations that plaintiffs have lost income because of exclusion from a market are insufficient." <u>Id.</u> at 1503 (emphasis in original).[31]

In <u>James Cape & Sons Co. v. PCC Constr. Co.</u>, No. 05-C-269, 2005 WL 2176965 (E.D. Wis. Sept. 6, 2005), *aff'd*, 2006 WL 1751886 (7th Cir.), the defendants were engaged in a scheme to undercut the plaintiff's bid through criminal conduct. The plaintiff alleged that it had lost multi-million dollar public and private construction contracts as a result of the criminal scheme. <u>Id.</u>, at *1. The defendants pointed out that their "bid-rigging activities actually

---

[30] Indeed, Plaintiffs themselves allege that on numerous occasions a customer will "benefit from the [alleged] conspiracy by engaging in the practice of using the significantly lower price on a job it received from Plaintiffs . . . to negotiate downwards the price for the same job from a [signatory] contractor." Compl. ¶ 60.

[31] Notably, in opposing defendants' motion, the plaintiffs in <u>Tigard</u> relied heavily on <u>Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers</u>, 325 U.S. 797 (1945), <u>United Mine Workers v. Pennington</u>, 381 U.S. 657, 663 (1965), and <u>Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100</u>, 421 U.S. 616, 634 (1975). As the <u>Tigard</u> court explained, Plaintiffs' reliance on these cases concerning the non-statutory exemption was misplaced in this context, as "these cases do not dispense with the requirement that antitrust plaintiffs allege antitrust injuries." 790 F. Supp. at 1504.

*increased*, rather than restricted, competition, albeit in an illegal manner." Id., at *2 (emphasis in original). The court noted that "the antitrust injury doctrine 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.'" Id., at *1 (quoting Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n, 961 F.2d 667, 670 (7th Cir. 1992)). It then concluded that the consumer ended up paying a lower, not higher, price *as a result of the criminal activity*, and that the antitrust laws are not meant to punish behavior (even criminal behavior) that actually benefits the ultimate consumer. Id., at *2.

Just as in these bidding cases, regardless of any injury to the Plaintiffs' own businesses caused by the job targeting program, no injury to competition has occurred here.

        3.        Plaintiffs Cannot State a Claim for an Illegal Boycott.

Finally, Plaintiffs appear to be claiming that giving job targeting fund rebates in exchange for the general contractor or fabricator hiring signatory contractors amounts to a per se illegal "boycott" of nonunion contractors under section 1 of the Sherman Act. But the Supreme Court has clearly held that a *vertical* agreement between a supplier and buyer that the buyer shall not deal with the supplier's rival does not state a claim of a per se illegal boycott. NYNEX v. Discon, 525 U.S. 128 (1998). Instead, it simply states a rule of reason claim alleging a vertical exclusionary agreement that has already been addressed above under loyalty rebates. As previously set forth, this claim necessarily fails where Plaintiffs are unable to show that they are foreclosed from a substantial share of the market.

Plaintiffs attempt to find some *per se* antitrust violation to characterize the bidding conduct to which it objects is similar to that of the plaintiff in Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440 (3d. Cir. 1978). The court's decision there is instructive. In that case, the defendant had secretly agreed with another company, in advance of bidding, to give

that company the opportunity to match the highest bid received in the bidding process, and to award the contract to that company if it matched the highest bid. The court rejected each label offered by plaintiffs in attempting to bring this arrangement within the per se restraints recognized by the Supreme Court. Id. at 446-47 (rejecting labels of "price fixing," "group boycott" and "sham bidding"). Analyzing the case under the rule of reason, the court explained that plaintiffs had shown no undue restraint on commerce where plaintiffs could show no negative effect of the combination on prices, quantity or quality in the relevant market. Id. at 447. The court emphasized further that the defendant was free to choose the parties with whom to deal, so long as its conduct had no market control or monopolistic purpose or effect. Id. (citing Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953) and Reed Brothers, Inc. v. Monsanto Co., 525 F.2d 486 (8th Cir. 1975), cert. denied, 423 U.S. 1055 (1976)). Similarly here, where Plaintiffs can make no showing that the fabricators and developers have either market control or monopolistic purpose or effect in awarding the bids to Local 7 signatory contractors, the fabricators and developers cannot violate the anti-trust laws. As the Sitkin Smelting court concluded:

> Conduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law. [T]he use of conventional antitrust language . . . will not extend the reach of the Sherman Act to wrongs not germane to that act . . . . The antitrust laws were never meant to be a panacea for all wrongs[.]
>
> "[T]he Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else." . . . . [T]he Sherman Act cannot proscribe all unseemly business practices. The manipulation of the bids of businessmen, as evidenced in the case at bar, was clearly reprehensible. Nonetheless, the Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace.

Id. at 447-48 (citations omitted); see also Parmelee Transp.Co. v. Keeshin, 292 F.2d 794, 804

(7th Cir.), *cert. denied*, 368 U.S. 944 (1961) ("The awarding of a contract, which the awarding parties have a right to award on any basis they choose to one rather than to another competitor for the contract, is no more within the scope of the Sherman Act than is the sit-down strike of the Apex case.  Each of these courses of conduct restrains trade in a sense. Neither constitutes a restraint of trade within the meaning of the Sherman Act, however.  To hold otherwise would render the Sherman Act a lowest responsible bidder statute, which was plainly not the intent of Congress."); Scranton Constr. Co. v. Litton Indus. Leasing Corp., 494 F.2d 778, 783 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105 (1975) ("The Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else").

### C.     Defendant Is Also Entitled to Summary Judgment on Plaintiffs' Allegations of Monopolization and Attempted Monopolization Under Section 2 of the Sherman Act.

Plaintiffs claim that Local 7 and its signatory contractors have taken various actions "to maintain and/or willfully maintain their monopoly in the Relevant Market" in violation of § 2 of the Sherman Act.  Compl., ¶¶ 158, 162, 167, 172.  It is settled law that an essential element of a § 2 claim for monopoly of trade or commerce is "the possession of monopoly power in the relevant market."  Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 407 (2004); United States v. Grinnell Corp., 384 U.S. 563, 570 (1966).  Monopoly power is "'the power to control prices or exclude competition.'"  Grinnell Corp., 384 U.S. at 571 (quoting American Tobacco Co. v. United States, 328 U.S. 781, 797 (1946)).  The existence of such power "ordinarily may be inferred from the predominant share of the market," but the percentage share of the market considered as predominant is exceedingly high.  See id. at 566 (87%); American Tobacco Co., 328 U.S. at 781 (2/3 of entire domestic field of cigarettes and over 80% of the field of comparable cigarettes); United States v. Aluminum Co. of Am., 148

F.2d 416, 429 (2d Cir. 1945) (90% of market).  As Plaintiffs cannot even meet Section 1

requirements, they certainly cannot demonstrate the higher percentage foreclosure required for a

Section 2 monopolization claim.

Likewise, to the extent that Plaintiffs are claiming attempted monopolization, they cannot

show a dangerous probability of achieving monopoly power (see Spectrum Sports, Inc. v.

McQuillan, 506 U.S. 447, 456 (1993)), and therefore cannot meet the requirements of an

attempted monopolization claim.

**III.    DEFENDANT IS ALSO ENTITLED TO SUMMARY JUDGMENT ON COUNT IV AS TO EACH PLAINTIFF'S CLAIM THAT LOCAL 7 VIOLATED THE LABOR MANAGEMENT RELATIONS  ACT.**

In Count IV of the Complaint, Plaintiffs incorporate by reference all prior allegations,

claiming that some or all of Local 7's conduct allegedly violating anti-trust laws also violated

Section 8(b)(4)(ii), both subsections (A) and (B), of the Labor Management Relations Act

("LMRA"), 29 U.S.C. §§ 158(b)(4)(ii)(A) and (B)[32].  By citing subsection (ii)(A), they allege the

---

[32] Violations of Section 8(b)(4)(ii)(A) and (B) [as well as Section 8(b)(4)(i)(A) and (B), not alleged by Plaintiffs here] require that a union have engaged in "(i) or (ii)" *conduct* for any of the *prohibited purposes* set forth in subparagraphs (A)-(B).  These Sections provide in relevant part as follows:

   8(b).  It shall be an unfair labor practice for a labor organization or its agents--

        * * *

        (4)(i) to engage in, or to induce or encourage any individual employed by any person . . . to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--    * * *

        (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

        (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That

59

Union restrained or coerced employers with the objective of obtaining exclusionary "hot cargo" agreements that would be prohibited by Section 8(e) of the LMRA, 29 U.S.C. § 158(e).  By citing subsection (ii)(B), they allege the Union restrained or coerced employers with the objective of forcing secondary ("neutral") employers to cease doing business with Plaintiffs. Beyond that, Plaintiffs may also be alleging that Section 8(e) violative agreements were actually obtained and entered into.[33]

The LMRA allegations in Count IV fail as a matter of law.  That is most evident by focusing on the Count IV claims of each plaintiff separately, because, while all the Plaintiffs may intend to claim job targeting as an LMRA violation, a few of the plaintiffs in discovery responses allude to different allegations of *other* misconduct, even if that misconduct is not specifically identified as an LMRA issue.

**A.**   **Defendant Is Entitled to Summary Judgment on the Count IV Claims of Plaintiff American Steel Erectors.**

1.   Plaintiff American Steel Erectors Does Not Allege Any Violative Conduct Other Than Job Targeting.

In the Complaint the only category of conduct specifically referenced as "restraint or coercion" under § 8(b)(4)(ii)(A) and (B) is "threats of picketing", not tied to any particular plaintiff's projects.  Count IV does not contain any specific mention of job targeting when it

---

nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]
29 U.S.C. §§ 158(b)(4)(A) and (B).

[33] Section 8(e) provides:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work[.]

29 U.S.C. § 158(e).

refers in paragraph 177 to "other restraint and coercion", but Plaintiffs may nonetheless be alleging that job target fund activity is included in the Count IV claims when they incorporate by reference all earlier paragraphs, many of which recount specific episodes of "job targeting" or "job target money" being awarded. The job targeting activity remains the thrust of dozens of paragraphs in the Complaint focused on antitrust claims (i.e., ¶¶ 34, 49, 62, 69, 81-146), including allegations of the Union making numerous offers of targeting contributions, often successfully obtaining work, as well as Union "promises" to offer funds, along with alleged "threats" to withhold them.

Plaintiff American Steel Erectors in discovery confirmed that job targeting (subsidizing jobs) comprised its only claims of union misconduct in this case. Its Answers to Interrogatories asking it to identify what conduct of Defendant injured American Steel Erectors, refers back to other answers describing job targeting episodes, and then further directs that the Answer should be obtained in depositions.[34] American Steel Erectors' deposition in turn included the clear acknowledgement, previewed at the outset of this Memorandum (n.2), that ASE's only claim of misconduct involved job targeting and subsidizing.[35]

---

[34] Pls.' Resp. to Def. Local 7's First Set of Interrogs., Answer to Interrog. 20.

[35] The full text, quoted at note 2, includes the following acknowledgements:

    R.  . . . Can you tell me what it was that Local 7 did to you, to American Steel, to cause you to participate in this lawsuit?

          * * * * * * * * * *

    B.  I would say provided target fund money which took away some projects that we would have had a better shot of getting had they not been subsidizing the job.

    R.  Is there anything else, apart from the targeting jobs and subsidizing, is there anything else that Local 7 did that causes you to be a plaintiff in this case?

    B.  No.

ASE Dep. Tr. pp. 91-92.

2.     <u>Job Targeting Conduct Did Not Violate the LMRA.</u>

a.     The LMRA in General Does Not Prevent Construction Unions from Aggressively Seeking Work for Members.

Plaintiffs allege in their Complaint that the Union obtained work for its members by pressuring fabricators or developers and then obtaining "agreements" from those companies to retain subcontractors who employ Local 7 members, rather than retaining the Plaintiffs. That is, accepting all facts in a light most favorable to each Plaintiff, the Union and other local union "co-conspirators" directly or indirectly approached fabricators or other companies with whom they had no contracts, on a job-by-job basis, at dozens of sites recounted in the Complaint, and persuaded them to use contractors who employed union members. On other jobs, the Complaint simply alleges the Unions gave targeting money to the signatory contractor, who then obtained the work. Compl. ¶¶ 69, 81-146. The Unions offered the prospect of job targeting funds to persuade these parties to have the union contractor perform the job rather than using the Plaintiffs. On the other hand, as the Plaintiffs also allege, on "many occasions" the secondary parties (fabricators or developers) apparently were able to utilize credible threats that they were ready and willing to retain Plaintiffs or other non-union contractors, as a means of pressuring union contractors to lower their prices by obtaining more job targeting funds from the Unions. <u>See</u> Compl ¶ 60.

Overall, Plaintiffs characterize most of the Union's efforts to secure work at labor contract standards as supposedly illicit "top-down organizing," that is, organizing by persuading *contractors* to hire union subcontractors and union workers, often under "pre-hire labor contracts" negotiated before a job is staffed, rather than pursuing National Labor Relations Board ("NLRB") elections among *employees* of non-union subcontractors. As a legal reality, however,

we pointed out above (with regard to the statutory anti-trust exemption) that top-down

organizing is generally permitted by the LMRA in the particular setting of the construction

industry.[36]  "Top-down organizing" allows a union to organize workers by persuading

contractors to hire union subcontractors and to sign "pre-hire" labor contracts before the

subcontractor starts work.  For example, the LMRA specifically condones top-down organizing

in its § 8(f) and its proviso to § 8(e).  See 29 U.S.C. § 158(f) (authorizing "prehire" labor

agreements) and 29 U.S.C. § 158(e) (setting forth the construction industry exception to § 8(e)'s

prohibition against "hot cargo agreements", so that construction employers may reach

agreements with a union to refrain from doing business with non-union employers).  See Iron

Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889 (1988) and

Woelke & Romero Framing v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . .

pressure is implicit in the construction industry proviso" to § 8(e) of the NLRA).

> b.    The Union's Grants Of Job Targeting Funds and the Alleged
> Discriminatory Denials Of Funds Did Not Threaten, Coerce or
> Restrain Any Employer Within the Meaning of § 8(b)(4)(ii) of the
> LMRA.

Local 7's job targeting program, which by definition involved selective grants of

targeting monies and some decisions not to grant monies, did not constitute "restraint or

coercion" under § 8(b)(4)(ii), notwithstanding the general allegation in Plaintiffs' Complaint (¶

177).  The terms "threaten, coerce or restrain" in subsection (ii) have been narrowly interpreted

by courts in the past.

Violations of § 8(b)(4)(ii)(A) or (B) require legal ingredients that include some type of

"(i) or (ii) conduct" coupled with a "prohibited objective" under (A) or (B).  The first subsection

[(A)] refers to the prohibited objective of forcing an employer to enter into an agreement

---

[36] The same argument is incorporated here by reference.  See Section II(A)(3)(a), supra.

prohibited by § 8(e) of the Act.  The second [(B)] denotes the prohibited objective of forcing one employer to cease doing business with another.  That is, when a union has a direct dispute with *one* employer ("the primary employer"), § 8(b)(4)(B) prohibits striking, picketing or similar pressure tactics for influencing any *other* employer (i.e. the "secondary" or "neutral") to cease doing business with the primary employer.  Most notably, however, for purposes of either subsection (A) or (B), there is no violation unless the union has engaged in some conduct that falls within "(4(i) or 4(ii)".  Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, *supra*, at 146 (Section 8(b)(4)(ii)(B) did not prohibit a union's calls and visits to advertisers threatening to handbill for consumer boycotts of the advertisers, followed by actual handbilling, to pressure the neutrals to cease dealing with the union's primary disputant, a broadcaster).

Subsection (i) is not an issue in Count IV, inasmuch as Plaintiffs do not plead any reference to that subsection. Compl. ¶ 177.  They cite § 8(b)(4)(ii)(A) and (B), and allude to obtaining Section 8(e) agreements as an alleged union objective.  Describing conduct, they allude only to Local 7 "engaging in threats of picketing and other restraint and coercion."  On the face of Plaintiff's Complaint, however, and as a matter of undisputed fact, Local 7's alleged job targeting *conduct* cannot be categorized as threats, restraint or coercion within the meaning of subsection (ii), whether or not the Union approached secondary parties such as fabricators or developers and harbored an *objective* to limit their business with Plaintiff and whether or not the Union was supposedly seeking "section 8(e) agreements."  A violation of § 8(b)(4), once again, requires both the proscribed objective and the "(ii) conduct".  Job targeting funds reduced the labor costs of Local 7 signatory contractors on a particular job.  Undisputed Facts ¶ 10.  In order to reduce those labor costs, Local 7 awarded job targeting funds on a job-by-job basis.

Undisputed Facts ¶¶ 10, 15.  Any such payments represented Local 7's hat-in-hand method of

obtaining work, job-by-job.  To the extent that Local 7 may have made these job-by-job appeals

to fabricators and general contractors, as Plaintiffs allege, the Union did so precisely because it

maintained no generalized agreement with these non-labor groups and it wished to make the

union workforce more competitive.  Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.  That economic

concession hardly amounted to "threats, restraint or coercion" against any employer.

In drafting § 8(b)(4), Congress did not create a "sweeping prohibition" on all forms of

secondary boycotts or secondary pressure.  Local 1976, United Bhd. of Carpenters v. N.L.R.B.,

357 US 93, 98 (1958).  The subsection "describes and condemns specific Union conduct directed

to specific objectives."  Id.  A long series of Supreme Court and appellate cases emphasize the

lawfulness and the potential breadth and bite of union pressures directed at secondary employers.

The seminal case in recent decades allows union handbilling to promote consumer boycotts of a

"secondary" shopping mall, pressure the mall to cease doing business with a subcontractor.

Edward J. DeBartolo Corp. v. Florida Golf Coast Buldg. and Constr. Trades Council, 485 U.S.

568 (1988):

> The case turns on whether handbilling such as involved here must be held to
> "threaten, coerce, or restrain any person" to cease to doing business with another
> within the meaning of § 8(b)(4)(ii)(B).  We note first that "induc[ing] or
> encourag[ing]" employees of the secondary employer to strike is proscribed by
> §8(b)(4)(i).  But more than mere persuasion is necessary to prove a violation of
> §8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints.
> Those words, we have said, are "nonspecific, indeed vague," and should be
> interpreted with "caution" and not given a "broad sweep" [internal citation
> omitted]; and in applying § 8(b)(1)(A) they were not to be construed to reach
> peaceful recognitional picketing.  Neither is there any necessity to construe such
> language to reach the handbills involved in this case.  There is no suggestion that
> the leaflets had any coercive effect on customers of the mall.  There was no
> violence, picketing, or patrolling and only an attempt to persuade customers not to
> shop in the mall.

Id. at 578.  Significantly, the Court noted that it had previously found:

untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer is "coercion" within the meaning of § 8(b)(4)(ii)(B) even though, if the appeal succeeded, the retailer would lose revenue.

Id. at 579 (emphasis in original).

Over twenty (20) years earlier, the Supreme Court decided other pressures directed through secondary parties fell outside the proscriptions of "(i) and (ii) conduct." In N.L.R.B. v. Servette, Inc., 377 U.S. 46 (1964), a union pressed managers of a secondary company to cease doing business with the union's primary disputant. The union's conduct was deemed outside the proscriptions of subsection (i), and therefore lawful, because there was no work stoppage. Rather, there was only voluntary action by the secondary's managers who acceded to the union's request, and there was no "threat, coercion or restraint." That is, there was surely a secondary *objective* to enmesh a neutral under subsection (B), but there was no proscribed *conduct* under subsection (i) or (ii).

Finally, the warnings that handbills would be distributed in front of noncooperating stores are not prohibited as 'threats' within subsection (ii). The statutory protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself protected.

Id. at 57. See also Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, *supra*, at 146 (allowing union boycotts of secondary advertisers to pressure the primary employer). Thus, courts have declared that a wide variety of appeals and harsh pressures directed at secondary employers do not violate the NLRA.

Two federal trial courts have scrutinized union job targeting programs under standards of § 8(b)(4)(ii)(A) and (B), and both found the targeting activities lawful, with appellate approval. With respect to categories of "(i) or (ii) conduct", the first case found job targeting activity outside §8 (b)(4)(ii) proscriptions. In Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309, 1997 WL 311498, at *2, 12 (D. Md. 1997), *aff'd*, 133 F.3d 914 (4th Cir.)

(Table) (unpublished decision), *cert. denied,* 525 U.S. 825 (1998),  the plaintiff contractor

alleged Sherman Act violations (Count I) and also LMRA violations under § 8(b)(4)(ii)(A)

(Count II) -- after the union engaged in pressure tactics to bring Grinnell to an agreement.[37]  In

that case the alleged proscribed object under § 8(b)(4)(ii)(A) was forcing Grinnell to designate a

particular bargaining representative.  The Court dismissed that plaintiff's LMRA claim under its

Count Two, finding no proscribed conduct under subsection (ii) by virtue of any job targeting

conduct:

> Moreover, the withdrawal of targeting did not constitute coercion but was a
> lawful bargaining strategy employed by the Union.  Grinnell had been a principal
> user of targeting during the period of time when it had been permitted by the
> Union to participate in the program. The Union hoped that, by exercising its right
> to deny targeting to Grinnell it could persuade this employer to accede to other
> demands which the Union was making during the bargaining sessions  . . . When
> Grinnell decided not to accept these proposals, it remained excluded from
> targeting.  In the absence of proof of coercion or threats, defendant's conduct did
> not constitute an unfair labor practice.

Id., at *14.  In that case, of course, the allegations were that the union refused to give the

subcontractor (Grinnell) targeting monies, which would have allowed it to lower its prices to

general contractors.  Plaintiffs here allege the Union has at times contacted fabricators about

getting work on a job, and often contributed target money that helped a union signatory

subcontractor obtain such jobs.  Plaintiffs allege one job after another where a union signatory

obtained a job only after receiving a commitment of target money from Local 7 or "co-

conspirator" unions.  See, e.g., Compl. ¶¶ 81, 86, 88, 94, 96, 98.  In those circumstances, and

accepting Plaintiffs own allegations as true, the Union's payment of a job targeting contribution

to the signatory subcontractor was not somehow converted to § 8(b)(4)(ii) conduct merely

because the Union had contacts with the fabricator (a "secondary employer") about the targeting.

The lesson of Grinnell, *supra*, is that grants and denials of targeting contributions do not amount

---

[37] There was also a claim under § 8(b)(4)(ii)(B) (Grinnell's Count IV), but it focused on picketing, not job targeting.

to "coercion", whether or not the union's objective is to enmesh a neutral, and appellate cases from Servette to DeBartolo to Storer Broadcasting confirm that more harsh pressure tactics need not constitute "(ii)" conduct, even when directed at secondary employers.  See also, George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) (threats that union members will not patronize a secondary employer are not "(ii) conduct").

If grants and denials of targeting contributions do not constitute § 8(b)(4)(ii) conduct, then Local 7's job targeting activities could not have violated either § 8(b)(4)(ii)(A) or (B), however the Plaintiffs may characterize the Union's objectives.

> c.   The Union's Grants of Job Targeting Funds Were Not In Furtherance of a Prohibited 'Cease Doing Business' Objective Under § 8(b)(4)(B).

There is no authority for the proposition that selectively granting targeting contributions to some companies amounts to an effort to have companies "cease doing business" with other companies involved at the jobsite.

In addition to Grinnell's ruling on § 8(b)(4)(ii) *conduct*, a second job targeting claim litigated under § 8(b)(4) rejected the claim of a "cease doing business" *objective* under 8(b)(4)(B).  In Allied Mechanical Servs., Inc. v. Local 337 of the United Assoc. of Journeyman and Apprentices of the Plumbing and Pipe Fitting Indus., 1999 U.S. Dist. LEXIS 4654 (D.W. Mich. 1999), *aff'd*, 221 F.3d 1333 (TABLE) (6th Cir. 2000), Allied claimed it should have been eligible to participate in a job targeting program but was excluded and lost out in bidding episodes after UA Locals 337 and 357 "threatened, coerced, or otherwise restrained" another union from providing Allied with job targeting funds, all in alleged violation of § 8(b)(4)(i)(ii)(B) of the LMRA.  The District Court dismissed these claims, with subsequent appellate court approval.  That Complaint, dismissed on the pleadings pre-discovery, alleged that

the local union defendants "restrained customers at jobs such as Red Cross, Kalamazoo Chamber of Commerce and/or the YMCA Sherman Lake projects from doing business with [plaintiff]." The Court looked at the complaint as a whole. Although in that case it found no direct allegations of unions dealing with Allied's customers, the Court found that selective denials of targeting funds simply did not give rise to a proscribed objective under § 8(b)(4)(B):

> Allied also argues that the unions' actions had an indirect secondary objective because they caused Allied's potential customers to give their work to other contractors; according to Allied, withholding targeting funds is a form of economic coercion because it makes Allied's services more expensive for the customers. *However, even assuming that the denial of targeting funds to Allied made it more difficult for Allied to successfully bid on a project, such an objective is not prohibited by 8(b)(4)....* Thus, even if Allied's customers could not afford to acquire its services on projects for which the unions denied Allied targeted funds, such an objective is not prohibited. "Some disruption of business relationships is the necessary consequence of the purest form of primary activity. These foreseeable disruptions are, however, clearly protected."

Id. at 29 (internal citation omitted) (emphasis supplied).

In the face of these holdings, that selective granting and denials of targeting funds are outside the boundaries of § 8(b)(4)(ii) prohibited conduct (Allied, supra) and § 8(b)(4)(B) prohibited objectives (Grinnell, *supra*), Plaintiff cannot support a claim that Local 7's granting and withholding target monies constitutes an unlawful secondary boycott. That is, even if Local 7 allegedly enticed any fabricators or higher tier employers during the Union's efforts to obtain work, with the incentive that job targeting funds could be provided to signatory subcontractors (who could then reduce their prices), those approaches to secondaries did not amount to a "cease doing business" objective.

        d.      The Union's Grants of Job Targeting Funds Did Not Constitute Prohibited Agreements to 'Cease Doing Business' Under § 8(e) of the LMRA.

On its face, Count IV and paragraph 177 allege violations of § 8(b)(4)(ii)(A) and (B), where the subsection (A) violation is the application of supposed restraint or coercion for the prohibited objective of forcing an employer to enter into an agreement prohibited by § 8(e).  That was the alleged *objective*.  It is not clear that Count IV alleges that job targeting actually yielded the *outcome* of an agreement to cease doing business, as an independent violation of § 8(e).  If that is alleged, however, it fails on the pleadings and as a matter of undisputed fact.  In any event, any independent violation of § 8(e) is not subject to a private cause of action for damages under § 303 of the LMRA. 29 U.S.C. § 187.

On the pleadings, the Complaint allegations may be viewed in a light most favorable to Plaintiffs, but it is the entirety of their Complaint that should be scrutinized.  The Complaint alleges that Local 7 repeatedly approached fabricators or general contractors with whom it had no contract, and persuaded them *job by job* (utilizing grants and denials of job targeting funds) to hire subcontractors who employed Local 7 members.  Compl. ¶¶ 69, 81-139 (alleging over twenty-five (25) separate incidents in which the Union allegedly sought and obtained work for its members by appealing to various fabricators and developers using job targeting funds, or simply by making target funds available to signatory contractors).  Taking these allegations as true, they cannot establish any generalized agreement to have the fabricators and developers "cease doing business" with Plaintiffs.  The fabricator's acceptance of the benefits of job targeting, even indirectly (as a lower cost), and its retaining a union signatory on the targeted job, does not constitute a "cease doing business" *agreement* any more than the Union's offers (and

70

withholdings) of target fund contributions constitutes a "cease doing business" *objective* under §

8(b)(4)(B).  See Allied Mechanical Servs., Inc. v. Local 337 of the United Assoc. of Journeyman

and Apprentices of the Plumbing and Pipe Fitting Indus., *supra*, at 29 (". . . even if Allied's

customers could not afford to acquire its services on projects for which the unions denied Allied

targeted funds, such an objective is not prohibited.")  Winning a job for a signatory subcontractor

does not automatically create a Section 8(e) "agreement" for the fabricator to "cease doing

business" with other subcontractors.  As we have argued on the antitrust matters, a successful

appeal to buy one hot dog from one vendor at a ball game is simply not an unlawful agreement to

refrain from buying any other vendor's hot dog.

　　　　As with the antitrust debate, Plaintiffs may argue that Connell Constr. Co. v. Plumbers

and Steamfitters Local Union No. 100, establishes that any "agreement" with a non-signatory

fabricator constitutes an § 8(e) violation.  Yet, the contention that Local 7's job targeting

program is somehow akin to the agreements involved in Connell does not withstand scrutiny.  In

Connell, the agreement between a union and a general contractor with whom it did not maintain

a collective bargaining agreement was illegal under § 8(e) because the agreement required the

contractor to deal only with union signatory subcontractors on *all of its jobs*.  421 U.S. 616, 619-

21, 633, 635 (1975).  Here, in contrast, the Union's job-by-job solicitations of work and offers of

payments, as demonstrated by Plaintiffs' own allegations of job targeting payments, for literally

dozens of individual projects, did not result in generalized agreements with non-signatory

companies prohibiting them from working with non-union contractors on all future jobs.[38]

Compl. ¶¶ 67-139.  Moreover, Plaintiffs' Complaint itself alleges that, on "many occasions", the

secondary parties (fabricators or developers) apparently were able to utilize credible threats that

---

[38]  Local 7 does not herein admit Plaintiffs' allegations concerning the Union's alleged more than twenty-five (25)
appeals for work.  Nonetheless, even taking the allegations as true for current purposes, there is no genuine dispute
of material fact that would preclude summary judgment on the job targeting claims in Count IV.

they were perfectly capable of retaining Plaintiffs or other non-union contractors, as a means of pressuring union contractors to lower their prices by obtaining more job targeting funds.  See Compl. ¶ 60.  Those bid-shopping tactics by fabricators, alleged by Plaintiffs themselves, simply could not have been utilized if there were generalized agreements in place preventing the fabricators from retaining Plaintiffs.

Beyond the pleadings, undisputed facts establish that Local 7's agreements, if any, with fabricators or developers were not of the Connell type.  Job targeting funds reduced the labor costs of Local 7 signatory contractors on a particular job.  Undisputed Facts ¶ 10.  Local 7 awarded job targeting funds on a job-by-job basis.  Undisputed Facts ¶ 10, 15.  At most, these alleged payments represented Local 7's hat-in-hand method of obtaining work, job-by-job.  To the extent that Local 7 may have made these job-by-job appeals to fabricators and general contractors, as Plaintiffs allege, it did so precisely because it maintained no generalized agreement with these non-labor groups.  Hurley Aff. ¶ 26; Coyle Aff. ¶ 11.

Even if Local 7's grants and denials of job targeting funds had violated § 8(e) of the LMRA, and that might be relevant to the claims under § 8(b)(4)(A), it is clear that Plaintiffs have no private right of action for damages on a § 8(e) violation itself, given the explicit terms of § 303 of the LMRA (referring only to § 8(b)(4)). 29 U.S.C. § 187.

**B.    Defendant Is Entitled to Summary Judgment on the Count IV Claims of Plaintiff Bedford Iron Works.**

1.    The Union's Job Targeting Conduct Did Not Violate the LMRA.

Insofar as this Plaintiff may also be alleging job targeting conduct as a violation of the LMRA, Local 7 incorporates herein the arguments set forth above in Section III, A, 2 of this Memorandum regarding Plaintiff American Steel Erectors.

### 2.     No Other Conduct Alleged by Plaintiff Bedford Iron Works Violated the LMRA.

Other than job targeting, the only conduct of Local 7 alleged as injuring Bedford Ironworks involves a claim that Local 7 "regularly successfully stripped workers from Bedford Iron" on the Deerfield Academy job.  Compl. ¶ 151.  In discovery, Bedford's president explained that two of the fifteen-twenty (15-20) workers employed by Bedford at the time left the Deerfield job site and went to work for union contractors.  All Bedford knew was that "two guys quit and they were trying out the union," and its president acknowledged that the workers' morale in general went down on this job.  It was far away from home.  BIW Dep. Tr. pp. 43-44, 47, 89-91.

There is simply no claim that the alleged stripping of Bedford workers (perhaps to obtain work with union contractors) involved any scintilla of secondary boycott activity.  The conduct was apparently directed at Bedford itself, not secondary or neutral employers.  Even if the allegations were true, and even if there were evidence that Local 7 agents referred the Bedford employees for union work, such primary pressure does not colorably create a § 8(b)(4) violation.

Another paragraph of the Complaint alleges that "Local 7, through conspiracy and agreement with BTEA…and other unnamed co-conspirators has induced the employees of Plaintiffs and other Non-Local 7 Contractors to leave their employ and go to work for Local 7 Contractors…thereby depriving [these employers] of the financial ability to retain their employees …."  Compl. ¶ 58g.  That allegation, similarly, does not allude to any scintilla of secondary pressure or colorable violation of § 8(B)(4)(ii)(A) or (B).  Nor does it suggest a § 8(e) violative agreement whereby any employer has agreed to cease doing business with the Plaintiffs by reason of "stripping".

As a result, the Union did not violate the LMRA by engaging in any non-targeting activity against Bedford.

C. **Defendant Is Entitled to Summary Judgment on the Count IV Claims of Plaintiff Ajax Construction Company.**

      1.      The Union's Job Targeting Conduct Did Not Violate the LMRA.

Insofar as this Plaintiff may also be alleging job targeting conduct as a violation of the LMRA, Local 7 incorporates herein the arguments set forth above in Section III, A, 2 of this Memorandum regarding Plaintiff American Steel Erectors.

      2.      No Other Conduct Alleged by Plaintiff Ajax Construction Company Violated the LMRA.

Beyond its job targeting allegations, Ajax alleged that it lost the Cardi's Furniture and Archstone Apartment jobs due to some combination of target money and other "illegal pressure" on the fabricator. Compl. ¶¶ 91 & 123. In his deposition, however, Ajax's president stated the pressure was on the developer, and Ajax did not know the nature of the pressure. Ajax Dep. Tr. pp. 125-27 (Cardi's). Regarding Archstone, Ajax was asked the nature of the "illegal pressure", and it responded identifying specifically only "informational picketing" as "probably" included, acknowledging it is not illegal. Ajax Dep. Tr. pp. 129, 147-56. The deposition testimony (and the Answer to Interrogatory #5) were the only information Ajax provided in response to Defendant's Interrogatories (Q #20) asking for specification of what conduct injured the Plaintiff. The Answer to Interrogatory #5, in turn, described the Cardi's and Archstone incidents (item nos. 7 & 20) but did not identify any aspect of union conduct other than job targeting that actually constituted the supposed "illegal pressure". Therefore, the "probable" "informational picketing" stands as Ajax's only specification or identification of conduct that injured Ajax, beyond targeting. Generic informational picketing, however, simply does not give rise to a § 8(b)(4)(A)(B) violation. If the picketing was directed at Ajax itself, it constituted primary picketing, expressly permissible under the proviso to § 8(b)(4)(B). 29 U.S.C. § 158(b)(4)(B)

("provided, that nothing contained in this clause (B), shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing").

Ajax in its deposition also contended that Local 7 "stripped" employees from the Plaintiff and apparently found work for them with union contractors. Defendant hereby incorporates by reference its arguments above regarding Bedford Ironworks, to the effect that finding work with union contractors is protected activity and does not give rise to any LMRA claim that the union applied illegal pressure to secondary employers.

**D.    Defendant Is Entitled to Summary Judgment on the Count IV Claims of Plaintiff American Aerial Services.**

1.    The Union's Job Targeting Conduct Did Not Violate the LMRA.

Insofar as this Plaintiff may also be alleging job targeting conduct as a violation of the LMRA, Local 7 incorporates herein the arguments set forth above in Section III, A, 2 of this Memorandum regarding Plaintiff American Steel Erectors.

2.    No Other Conduct Alleged by Plaintiff American Aerial Services Violated the LMRA.

Beyond job targeting, American Aerial in its deposition referred to a few incidents of pressure allegedly related to Local 7. First, American Aerial claimed that Local 7 "encouraged" fabricator Canatal to use union contractors. That claim does not give rise to an LMRA violation. Approaches to secondary employers' managers to request or press them to cease doing business with a primary employer, or to alter their business practices with a primary, simply do not give rise to Section 8(b)(4) violations in the absence of any "threats, coercion or restraint", as those terms are narrowly construed by the courts. DeBartolo Corp., 485 U.S. at 578. Urging the secondary's managers to refrain from doing business with the primary at some job site is neither

an inducement of a work stoppage under §8(b)(4)(i) nor restraint or coercion under 8(b)(4)(ii).

NLRB v. Servette, *supra*.

American Aerial also alluded in their deposition responses to union members attempting to monitor a job site in New Hampshire.  Notably, however, American Aerial made clear it was not seeking damages for that incident.  AAS Dep. Tr. pp. 31, 44-45.  In any event, even if surveillance of a job site were deemed "coercion or restraint", union conduct directed at American Aerial itself is directed against the primary employer, and it does not colorably raise a claim of secondary boycott activity.  American Aerial did not claim that a secondary employer was the target of the job site monitoring.  Similarly, they allude to an American Aerial employee allegedly being run off the road by a member of Local 7.  No agent of the union is identified.  AAS Dep. Tr. pp. 26, 30.  There is no claim that the alleged conduct, proper or improper, was directed at a secondary employer.  It does not give rise to a colorable secondary boycott claim.

      **E.**      **Defendant Is Entitled to Summary Judgment on the Count IV Claims of Plaintiff D.F.M. Industries.**

      1.      The Union's Job Targeting Conduct Did Not Violate the LMRA.

Insofar as this Plaintiff may also be alleging job targeting conduct as a violation of the LMRA, Local 7 incorporates herein the arguments set forth above in Section III, A, 2 of this Memorandum regarding Plaintiff ASE.

      2.      No Other Conduct Alleged by Plaintiff D.F.M. Violated the LMRA.

D.F.M. alleges that Local 7 engaged in secondary boycott conduct when it persuaded the fabricator or the general contractor to remove D.F.M. from the Fox 25 jobsite.

If Local 7's conduct violated the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), then D.F.M. might have obtained an administrative remedy, including potentially injunctive relief, see 29 U.S.C. § 160(l), at the NLRB, but it chose

not to pursue such a remedy.  D.F.M. elected to pursue a damage remedy under § 303.  As such,

D.F.M. must show injury in fact, not simply a lawful secondary appeal or even unlawful

secondary pressure.  Mead v. Retail Clerks Local 839, 523 F.2d 1371, 1376 (9th Cir. 1975) (in

addition to being within the class of persons protected by § 303, plaintiffs "must also show they

were 'injured in (their) business or property by reason of' the violation").  Section 303(b)

authorizes an award of damages only in the event of injury "by reason of any violation of

subsection (a)".  Teamsters, Local 20 v. Morton,  377 U.S. 252, 261 (1964).  Plaintiff's claim of

loss must be proximately caused by the secondary activity and its showing of damage must be

proven, not speculative or conjectural.  Federal Prescription Serv. v. Amalgamated Meat Cutters,

527 F2d 269, 280 (8th Cir. 1976).

On the Fox 25 job, D.F.M. was retained to finish a job started by another contractor.

Thereafter, even assuming that the delay of several days in its own commencement of the work

was the result of unlawful secondary conduct, D.F.M. incurred no business loss by the delay.

They were again retained, and they put their workers to work on another job in the interim,

before they returned about a week later to perform the work.  DFM Dep. Tr. pp. 86, 190-91.  The

secondary pressure, even if unlawful, produced no injury.

During the delay D.F.M.'s equipment was damaged.  As to the damaged equipment there

is no evidence that the Union was responsible for it.  Even if it were shown to be the

responsibility of Local 7, § 303 does not provide the mechanism for recovery of unlawful

primary, as opposed to secondary, conduct. D.F.M.'s president testified that he demanded

compensation for the damage as a condition of commencing work.  DFM Dep. Tr. pp. 87-88

("We were asked to leave.  We left.  When we came back, we had some equipment that was

damaged.  We told them, you better figure out who did this and sort out who is going to pay me

for my stuff. They did and we went back"). As no one ever figured out who was responsible, apparently "they" sorted out "who was going to pay me for my stuff". When he was later asked the question directly regarding compensation for the damaged equipment D.F.M.'s president responded, "I don't recall". DFM Dep. Tr. p. 171. D.F.M. has failed to show any injury as a result of unlawful secondary conduct.

In the Complaint (¶ 154) and in D.F.M.'s deposition, Plaintiff claims that Local 7 engaged in surveillance of job sites. D.F.M.'s president acknowledged in his deposition, however, that the monitoring was lawful and it was within the union's rights. DFM Dep. Tr. p. 162. D.F.M.'s deposition also addressed the Complaint's allegation that Local 7 engaged in "sham picketing". Compl. ¶ 156. D.F.M.'s president, when asked if a community standards picket line was a "sham", answered that he assumed that would be an informational picket line, and "it's all a sham to me." DFM Dep. Tr. p. 164. D.F.M. claimed that *any* pickets on its jobs were all a "sham". DFM Dep. Tr. pp. 164-66. As a legal reality, however, pickets directed at a primary employer are lawful under the terms of the primary picketing proviso to § 8(b)(4). 29 U.S.C. § 158(b)(4). D.F.M. also alluded in its deposition to Local 7 having picketed its job to obtain recognition, with a picket line lasting beyond 30 days. Although they contended that violated a different section of the LMRA, they did not allude to any secondary employer being coerced under § 8(b)(4). See 29 U.S.C. § 158(b)(7) (thirty (30)-day limits on recognitional picketing). They have not alleged in Count IV any violation of § 8(b)(7). That section does not give rise to a private right of action in any event. 29 U.S.C. § 187 (only § 8(b)(4) is actionable in a suit for damages).

The only non-targeting conduct of Local 7 that, as alleged by D.F.M., may have violated the LMRA -- the Fox 25 job that allegedly gave rise to a secondary boycott -- is non-actionable due to the lack of damages.

## CONCLUSION

For the foregoing reasons, Local 7 respectfully requests that summary judgment on all counts be granted in its favor and that all claims in the case be dismissed with prejudice.

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

/s/Paul F. Kelly
Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com


/s/Mickey Long
Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue
Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

Dated:  August 1, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Memorandum of Law In Support of Defendant Iron Workers Local 7's Motion for Summary Judgment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on August 1, 2006.

/s/ Paul F. Kelly
Paul F. Kelly, Esq.