**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
AMERICAN STEEL ERECTORS, INC., et al.  )
)
Plaintiffs,                            )
)
v.                                     )
)
LOCAL UNION NO. 7, INTERNATIONAL       )
ASSOCIATION OF BRIDGE,                 )    Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &               )
REINFORCING IRON WORKERS,              )
)
Defendant.                         )
_____)

<u>**AMENDED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**</u>
<u>**IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT**</u>

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue, Box E-1
South Boston, MA 02127
(617) 269-0229
August 31, 2006             mickeylong@gis.net

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

I.    INTRODUCTION ............................................................................1

II.   STATEMENT OF FACTS ..............................................................2

    A.   The Parties ..........................................................................2

    B.   The Structural Steel Erection Industry ............................2

    C.   Union Organizing and Job Targeting Activities ...............3

    D.   Large Public Works Projects ..............................................6

    E.   Allegations of Illegal Pressure and Stripping ..................7

III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON
    PLAINTIFFS' ANTITRUST CLAIMS .........................................9

    A.   Plaintiffs' Claims Concerning Local 7's Use of Job Targeting
    Funds ...................................................................................9

        1.   Local 7's Job Targeting Program and Other Organizing Activities
        Are Exempted from Antitrust Scrutiny by the Statutory Labor
        Exemption ...........................................................................9

            a.   The Statutory Labor Exemption to the Antitrust Laws ..............9

            b.   Local 7's Job Targeting Program and Other Organizing
            Activities Meet the First Prong of the Two-Part Test..............12

            c.   The Job Targeting Program and Other Organizing
            Activities Also Meet the Second Prong of the Two-Part
            Test........................................................................................15

            d.   Local 7's Purportedly Illegal Actions Do Not Affect the
            Statutory Labor Exemption from the Antitrust Laws ..............16

        2.   The Non-Statutory Labor Exemption Shields the Job Targeting
        Program ............................................................................17

            a.   The Non-Statutory Labor Exemption to the
            Antitrust Laws.......................................................................17

            b.   Local 7's Job Targeting Program Falls Within the
            Non-Statutory Labor Exemption..............................................19

                1)   The Collection of Dues by Signatory Contractors ......19

                2)   Job Targeting Payments to Signatory Contractors ......20

                3)   Payments, if Any, of Job Targeting Funds to
                Fabricators and General Contractors ..........................21

3. Plaintiffs' Antitrust Claims Concerning Local 7's Use of Target Funds To Secure Specific Jobs ............................................................23

    a. Predatory Pricing.................................................................................23

    b. Price Discrimination ...........................................................................26

**B. Local 7 Is Entitled to Summary Judgment on Plaintiffs' Remaining Allegations Under Section 1 of the Sherman Act**..................................26

1. Loyalty Rebates or Exclusivity Agreements ........................................26

2. Price-Fixing ............................................................................................29

3. Illegal Boycott........................................................................................31

**C. Local 7 Is Also Entitled to Summary Judgment on Plaintiffs' Monopolization Claims Under Section 2 of the Sherman Act** ............32

**IV. LOCAL 7 IS ALSO ENTITLED TO SUMMARY JUDGMENT ON COUNT IV** ................................................................................................33

  **A. The Job Targeting Program Does Not Violate the LMRA** ................33

1. Denials of Target Funds Do Not Constitute 'Threats, Coercion or Restraints' ...................................................33

2. Grants of Target Funds Were Also Not in Furtherance of a Prohibited Objective ...............................................34

  **B. No Other Conduct Alleged by Plaintiffs Violated the LRMA** ...........37

1. American Steel Erectors ......................................................................37

2. Bedford Iron Works .............................................................................37

3. Ajax Construction ................................................................................38

4. American Aerial Services ....................................................................38

5. D.F.M. Industries ................................................................................39

**V. CONCLUSION** ............................................................................................40

## TABLE OF AUTHORITIES

*CASES*                                                                          Page

A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396 (1989) ....................25

AD/SAT v. Associated Press, 920 F. Supp.1287 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216
    (2d Cir. 1999) ............................................................................25

Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191 (1995) ...........................25, 26

Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368
    (1st Cir. 1981), *aff'd*, International Longshoremen's Ass'n, AFL-CIO v.
    Allied Int'l, Inc., 456 U.S. 212 (1982) ........................................................12

Allied Mechanical Servs., Inc. v. Local 337 of the United Assoc.
    of Journeyman and Apprentices of the Plumbing and Pipe
    Fitting Indus., 1999 U.S. Dist. LEXIS 4654 (D.W. Mich. 1999),
    *aff'd*, 221 F.3d 1333 (TABLE)(6th Cir. 2000) ………………………….......... 34-35

Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
    325 U.S. 797 (1945) .................................................................... 11

American Tobacco Co. v. United States, 328 U.S. 781 (1946).........................................32

Apex Hosiery Co. v. Leader, 310 U.S. 469 (1940) .................................................. passim

Associated Builders and Contractors, Inc., Golden Gate Chapter,
    331 NLRB 132 (2000), *modified in non-relevant part*,
    333 NLRB 995 (2001) ....................................................................20

Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water
    Resources Auth., No. 90-10576-MA,1990 WL 86360,
    (D. Mass. April 11, 1990), *rev'd on other grounds*, 935 F.2d 345
    (1st Cir. 1991), *rev'd sub nom.*, Boston Harbor, 507 U.S. 218............................. 28-29

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) ...............................30

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
    509 U.S. 209 (1993) .................................................................... passim

Brown v. Pro Football, Inc., 518 U.S. 231 (1996) .................................................. passim

Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders
    and Contractors of Mass./R.I. 507 U.S. 218 (1993) ...................................28

Business Elecs. Corp. v. Sharp Elecs., 485 U.S. 717 (1988)..........................................29

Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104 (1986)..........................23, 24, 25, 30

California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ...................13

C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41 (1st Cir. 1998) ...........................23, 24

Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union,
    AFL-CIO, 362 F.2d 322 (5th Cir. 1966) ..................................................... 12, 15-16

Clarett v. National Football League, 369 F.3d 124 (2d Cir. 2004), *cert. denied*,
    125 S.Ct. 1728 (2005) .................................................................... 17, 18-19

Concord Boat v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000)...................................27

Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100,
    421 U.S. 616 (1975) ........................................................................... passim

Department of Labor and Indus. v. Boston Water and Sewer Comm'n,
    18 Mass. App. Ct. 621 (1984)...................................................................28

Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921) ............................................10

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.
    Trades Council, 485 U.S. 568 (1988) ...................................................... 10, 33, 34, 38

Federal Prescription Service v. Amalgamated Meat Cutters,
    527 F.2d 269 (8th Cir. 1976) ........................................................................39

George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) ………………………………….. 34

Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309,
    1997 WL 311498, (D. Md. 1997) *aff'd*, 133 F.3d 914 (4th Cir.) (Table), *cert. denied*,
    525 U.S. 825 (1998)......................................................................21, 32, 34

Hunt v. Crumboch, 325 U.S. 821 (1945) ...........................................................14

Intercontinental Container Transp. Corp. v. New York Shipping Ass'n,
    426 F.2d 884 (2d Cir. 1970) ............................................................................13

Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), *cert. denied*,
    488 U.S. 889 (1998) ......................................................................................36

J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655 (Ohio), *cert. denied*,
    525 U.S. 871 (1998) ................................................................................. 20-21

James Cape & Sons Co. v. PCC Constr. Co., No. 05-C-269, 2005 WL
    2176965, *aff'd* 2006 WL 1751886 (7th Cir.) ................................................ 30-31

J & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62 (D.Me. 1999) ...............................25

Local 1976, United Bhd. of Carpenters v. NLRB, 357 US 93 (1958)……………………33

Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen
    of North Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676 (1965)..............17, 18, 19, 20

Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180
    (8th Cir. 1997) ....................................................................................... 21

Loewe v. Lawlor, 208 U.S. 274 (1908) ...............................................................9

Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582
    (8th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988) ...............................................25

Manno Elec., Inc., 321 NLRB 278 (1996), *enf'd per curiam mem.,* 127 F.2d 34
    (Table) (5th Cir. 1997) ..................................................................13, 20, 21

Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., No. 01-548, 2002
   WL 334394, (D. Minn. Feb. 27, 2002) ........................................................................20

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ........... 23, 24, 25

Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council,
   675 F.2d 881 (7th Cir. 1982) ...................................................................................12

Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and
   Prof'l Publs., Inc., 63 F.3d 1540 (10th Cir. 1995), cert. denied, 516 U.S.
   1044 (1996) ..............................................................................................................25

N.L.R.B. v. Friot & Vegetable Packers, 377 U.S. 58 (1964)............................................10

N.L.R.B. v. International Longshoremen Ass'n, 473 U.S. 61 (1985) ...............................10

N.L.R.B. v. Servette, Inc., 377 U.S. 46 (1964) .....................................................33, 34, 38

NYNEX v. Discon, 525 U.S. 128 (1998) .........................................................................31

Parmelee Transp.Co. v. Keeshin, 292 F.2d 794 (7th Cir.), cert. denied,
   368 U.S. 944 (1961) ............................................................................................ 31-32

Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81 F.3d 858 (9th Cir. 1996)......21

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, (9th Cir.), cert. denied,
   516 U.S. 987 (1995) ..................................................................................................24

Scranton Constr. Co. v. Litton Indus. Leasing Corp., 494 F.2d 778 (5th Cir. 1974),
   cert. denied, 419 U.S. 1105 (1975) ...........................................................................32

Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440
   (3d Cir. 1978) ...........................................................................................................31

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993)...............................................32

Storer Communications, Inc. v. National Ass'n of Broadcast Employees
   and Technicians, 854 F.2d 144 (6th Cir. 1988) ...................................................33, 34

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57
   (1st Cir. 2004) ...........................................................................................................27

Teamsters, Local 20 v. Morton, 377 U.S. 252 (1964) ......................................................39

Tigard Elec., Inc. v. National Elec. Contractors Ass'n, 790 F. Supp. 1498 (1992) ..........30

Town of Concord v. Boston Edison Co., 676 F. Supp. 396 (D.Ma. 1988)........................26

United Food and Commercial Workers Union, Local 1036 v. N.L.R.B.
   307 F.3d 760 (9th Cir.), cert. denied, 537 U.S. 1024 (2002).......................................14

United Mine Workers v. Pennington, 381 U.S. 657 (1965) ..............................................18

United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945) .............................32

United States v. Binghamton Constr. Co., 347 U.S. 171 (1954) .....................................20

United States v. Hutcheson, 312 U.S. 219 (1941) .................................................. passim

Utility Contractors Ass'n of New England, Inc. v. Commissioners of Mass.
    Dep't of Public Works, No. Civ. A. 90-3035, 1996 WL 106983,
    (Mass. Super. March 12, 1996)...........................................................29

Vegelahn v. Guntner, 167 Mass. 92 (1896) ....................................................10

Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP,
    540 U.S. 398 (2004) ....................................................................32

Woelke & Romero Framing, Inc. v. N.L.R.B., 456 U.S. 645 (1982) ...............36

Woodworking Mfg.. Ass'n. v. N.L.R.B., 386 U.S. 612 (1967) ...................13, 14


*STATUTES*

15 U.S.C. § 13.........................................................................................26

15 U.S.C. § 17 ...............................................................................9-10, 24, 26

29 U.S.C. § 52 ..........................................................................................10

29 U.S.C. § 102 ........................................................................................11

29 U.S.C. § 113(c) ................................................................................. 10-11

29 U.S.C. § 151.........................................................................................11

29 U.S.C. § 157 ........................................................................................14

29 U.S.C. § 158(b)(4) ......................................................................... passim

29 U.S.C. § 158(b)(7) .................................................................................39

29 U.S.C. § 158(e) ..........................................................................35, 36, 37

29 U.S.C. § 158(f) .....................................................................................36

29 U.S.C. § 160(l) .....................................................................................39

29 U.S.C. § 187.............................................................................1, 37, 39

40 U.S.C. § 276...................................................................................16, 19-20

## I.  <u>INTRODUCTION</u>

Structural steel erection is a labor intensive portion of the construction industry, and non-union contractors compete against union contractors in this market by undercutting union wages and benefits.  In order to stave off a "race to the bottom," Local 7 established a job targeting program to help its signatory contractors compete while maintaining higher negotiated wages and benefits for its members.  Plaintiffs challenge this program[1] and assert that the antitrust laws give them an absolute right to compete by undercutting wages and benefits.  They are mistaken.

Plaintiffs attempt to plead around the numerous decisions upholding job targeting programs by alleging that the purported restraints of trade involve conspiracies with businesses with which Local 7 does not have collective bargaining agreements ("CBAs"), and that Local 7 has engaged in other unlawful conduct.  But these attempts misunderstand three fundamental underpinnings of antitrust laws and the labor exemptions:  first, that unions may enter into agreements with businesses, including multi-employer groups, to restrain competition based on terms and conditions of employment, without violating the antitrust laws; second, that antitrust laws are designed to protect *competition*, not individual competitors; and finally, that unlawful actions that are not themselves unreasonable restraints of trade, while perhaps cognizable in some other forum or under some other law, are not antitrust violations.

Plaintiffs also challenge the job targeting program under the Labor Management and Relations Act ("LMRA"), 29 U.S.C. §187.  This claim requires Plaintiffs to establish that Local 7 engaged in unlawful "threats, restraint or coercion," either by allegedly forcing employers to enter into exclusionary "hot cargo" agreements or forcing secondary employers to cease doing

---

[1]  Plaintiffs complain that their "advantage of lower labor costs is removed when the union puts money on the table" (Ajax Construction Company Deposition Transcript ("Ajax Dep. Tr.") pp. 169-70), and that Local 7 "provided target funds that took away some projects that [Plaintiffs] would have had a better shot of getting had [Local 7] not been subsidizing the job."  American Steel Erectors Deposition Transcript ("ASE Dep. Tr.") pp. 91-92.  Deposition Excerpts and Answers to Interrogatories are attached to the Supplemental Appendix in Support of Defendant's Amended Motion for Summary Judgment, filed on August 1, 2006, and docketed as Document Number 60.

business with Plaintiffs.  Grants and denials of job targeting funds, however, do not amount to "restraint or coercion," as those terms are narrowly construed and do not involve a "cease doing business" objective.  Some of the Plaintiffs claim no other conduct beyond the job targeting, so their LMRA claims evaporate with the job targeting result.  The remaining handful of non-job targeting incidents either caused no damage or fall outside the scope of the LMRA.

## II.    STATEMENT OF FACTS

   **A.  The Parties:**  Defendant Local 7 represents iron workers employed by companies with whom it maintains a CBA ("signatory contractors").  John F. Hurley Affidavit ("Hurley Aff.")[2] ¶ 4; Thomas J. Gunning Affidavit ("Gunning Aff.") ¶ 3. The Building Trades Employers' Association ("BTEA"), an alleged co-conspirator, is a multi-employer bargaining unit that collectively bargains with Local 7 on behalf of BTEA's member companies.  Gunning Aff. ¶ 1, 3.  Plaintiffs are successful non-union contractors in the structural steel erection industry. Complaint ("Compl.") ¶ 1.

   **B.  The Structural Steel Erection Industry**:  This industry involves multiple layers of business entities:  owners, developers, general contractors, fabricators, and steel erection contractors.  Competition for jobs exists at each of these levels.  General contractors compete for construction projects from owners and developers.  Fabricators, who supply the steel, compete for subcontracts from general contractors, generally for the combined work of steel fabrication and erection.  Finally, structural steel erection contractors, who assemble the structure, compete for work from fabricators.  Hurley Aff. ¶¶ 7-9.[3]  In New England, 20-30 fabricators (DFM Dep. Tr. p. 24; American Aerial Services, Inc. Deposition Transcript ("AAS Dep. Tr.") pp. 103-07),

---

[2]  All referenced affidavits are attached to the Appendix of Affidavits in Support of Defendant's [Original] Motion for Summary Judgment, filed on March 20, 2006, and docketed as Document Number 53.

[3]  While a few fabricators also erect and some erectors also fabricate, and on some occasions, the general contractor may separate the fabrication from the erection so that the erectors bid directly to the general contractor, generally the so-called "fab/erect" package is sold to general contractors by fabricators.  DFM Industries Deposition Transcript ("DFM Dep. Tr.") p. 9; ASE Dep. Tr. p. 73.

and 150 plus steel erection contactors compete for work.  Hurley Aff. ¶ 8.

The New England steel erection industry is a job-by-job business where, generally, "price is king."  As the American Aerial president stated, "[t]he marketplace is very competitive.  If your price is five grand cheaper, it's five grand cheaper. It's competitive bidding".  AAS Dep. Tr. pp. 65-66.[4]  On some jobs the fabricator or the general contractor may engage in the practice of "bid shopping" (i.e., taking the lowest bid and asking bidders and potential bidders whether they will re-bid or bid so as to undercut the heretofore lowest bid).[5]  Although some fabricators have "preferred bidders" (Ajax Dep. Tr. p. 38) who may be awarded jobs even though there was a lower bid or who may be given an opportunity to match a lower bid, and although on some jobs, the general contractor reserves the right to accept/reject the steel erection contractors (ASE Dep. Tr. p. 73), the general rule is that the job goes to the lowest bid.  AAS Dep. Tr. pp. 65-66.

Structural steel erection is labor intensive.  ASE Dep. Tr. pp. 135-36.  There are very few barriers to entry in becoming a structural steel erection contractor.  Basically, all that is needed is good credit and a supply of skilled labor.[6]  Labor costs, more than any other factor, drive steel erection prices.  Ajax Dep. Tr. p. 167.  Non-union steel erection contractors, such as Plaintiffs, enjoy substantially lower labor costs than signatory contractors, and compete based on these lower costs.  Hurley Aff. ¶ 6; Compl. ¶ 36.; Ajax Dep. Tr. p. 167.

**C.  <u>Union Organizing and Job Targeting Activities</u>:** Local 7's primary focus for the past

---

[4]  Plaintiffs bid jobs each and every day, on some days, 4 or 5 jobs.  AAS Dep. Tr. p. 83.  Since fabricators also compete for the jobs, steel erectors may submit bids to numerous fabricators for the same job. ASE Dep. Tr. p. 109. On one job, for example, American Steel Erectors bid the same job to eight different fabricators with prices ranging from $275,000 to $340,000.  <u>See</u> ASE Dep. Tr., Exh. 76.

[5]  <u>See</u> AAS Dep. Tr. p. 115 ("Shopping is a term that we use when a fabricator or a general contractor solicits bids after bid day"); ASE Dep. Tr. pp. 78-80 (ASE calls fabricators shortly after bid day to minimize the possibility that fabricator will shop its bid).

[6]  Typically, structural steel erection contractors use cranes for their work.  Cranes are readily available for rent, and very little initial capitalization is thus required.  <u>See e.g.</u> DFM Dep. Tr. pp. 6-7, 11, 111 (D.F.M. was capitalized with $30,000 workers' compensation settlement); BIW Dep. Tr. pp. 6-7, 10, 64 (Bedford Iron Works redeemed predecessor's assets from the IRS for between $18,000 and $30,000).

3

20 years has been organizing iron workers and obtaining work for them under labor contract standards. James Coyle Affidavit ("Coyle Aff.") ¶ 4-7; Hurley ¶ 13-15. Local 7's organizing efforts have included picketing and handbilling, such as publicizing that contractors paying iron workers below union scale undermine the economic standards of their members and their members' families. Local 7's efforts have also included persuading non-union workers of the benefits of the Union's apprenticeship program and of decent wages and benefits.

At all times relevant, Local 7 maintained CBAs with steel erection companies and some fabricators who employ Local 7 members that contained "union signatory subcontracting clauses," requiring that further subcontracts of jobsite work be granted to Local 7 signatory contractors. With the exception of these collectively bargained clauses, Local 7 did not enter into any agreements with other fabricators or with general contractors limiting with whom those companies might do business on future jobs. Hurley Aff. ¶ 18; Coyle Aff. ¶ 9. Because it did not maintain such agreements, Local 7 sometimes approached these companies, sometimes successfully and other times unsuccessfully, and asked them to award a particular job to a Local 7 signatory contractor. Hurley Aff. ¶ 18-19; Coyle Aff. ¶ 9-10.

Local 7 created its job targeting program prior to 1991 to serve two purposes: first, to secure work for Local 7 members in geographical areas where the CBA terms concerning wages and benefits were an obstacle to competing against non-union contractors; second, to fund a program of monitoring the steel erection industry aimed to help eliminate extensive regulatory cheating in the non-union sector of the industry, thereby creating a more level playing field for Union signatory contractors. Hurley Aff. ¶¶ 20, 24, 29; Coyle Aff. ¶¶ 11, 13. Occasionally, the program was used to attempt to secure work for Local 7 members when its signatory contractors were competing against contractors signed to other union agreements. Hurley Aff. ¶ 24.

In or around 1992, Local 7's membership rejected the idea that Local 7 should reduce the wage rate when working in geographical areas where non-union competition was strongest because of the differential in wage and benefit rates. Instead, the membership voted to permanently fund the job targeting program with contributions from their wages. Hurley Aff. ¶ 21. Thus, the members could enjoy the same comparatively high wages and benefits while successfully competing with non-union competition. Local 7 later asked that the dues deduction from members' wages be referenced in its CBA with BTEA, dated November 1, 1993. In the CBA between Local 7 and the BTEA entered into in 2000, the dues deduction is included in §9 as follows: "It is agreed that the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid." Gunning Aff., Tab A.

At no time has the BTEA or any other employer been involved in the administration of Local 7's job targeting program. Local 7 alone decides which jobs to target based on information gathered from business agents and employers. Local 7 alone determines the amount of the job targeting funds to use on a particular job, and has retained complete control over the administration of the job targeting program. Hurley Aff. ¶¶ 23, 25-26, 28; Coyle Aff. ¶ 11; Gunning Aff. ¶¶ 4-6. The ministerial act of deducting amounts from members' pay, as authorized by the members, is the extent of the employer's involvement.

The granting of job targeting funds does not result in, and is not conditioned upon, any agreement between Local 7 and any fabricator or general contractor preventing those companies from using non-union contractors on any future job, or even a subsequently bid portion of the same job. In some cases, where Local 7 signatory contractors won part of a structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job on that same

jobsite. Hurley Aff. ¶ 26; Coyle Aff. ¶ 11. In other cases, where Local 7 signatory contractors won the complete structural steel erection job on a particular jobsite, they later lost a subsequent steel erection job with the same fabricator or developer on another jobsite. Indeed, Local 7 oftentimes even failed in later, separate efforts to obtain future work from the same fabricators or general contractors that Plaintiffs allege in their Complaint as specific instances in which Local 7 purportedly succeeded in using job targeting funds. Hurley Aff. ¶ 27; Coyle Aff. ¶ 12.

**D. Large Public Works Projects:** By far the largest projects in the structural steel erection market in the Boston area in the last 20 years have been the Big Dig and other public works projects, such as the Boston Harbor project and the Logan Airport project, which have been developed under project labor agreements ("PLAs") collectively bargained between project managers and local building trades union councils (of which Local 7 is one of the constituent craft unions). Joseph W. Nigro, Jr. Affidavit ("Nigro Aff.") ¶ 3; Hurley Aff. ¶ 10; Coyle Aff. ¶ 8. The PLAs and bid specifications on all of these large public works jobs specified that all contractors and subcontractors at all tiers, both union signatory and non-signatory, were eligible to participate in all bidding for work on the project, as long as they agreed to abide by the PLA for all construction work on that particular project. The PLA on each such large public job served as an umbrella agreement that established standardized terms on certain issues for that particular job, such as no-strike clauses and uniform work rules, but in other respects simply incorporated by reference the area contracts for relevant crafts, including Local 7's contract covering structural steel erection work. The terms of each PLA explicitly overrode terms of the subsidiary craft contract on all subjects covered by the PLA. On the Big Dig job referred to by Plaintiffs in their Complaint (¶ 43), for example, the PLA stated that contractors and subcontractors were allowed to execute the PLA for purposes of work on that project and such

contractors were not required to sign any other labor agreements as a condition of working on the project. Thus, non-union contractors were allowed to bid on the Big Dig so long as they signed onto the PLA. Nigro Aff. ¶¶ 3-11. Plaintiffs have chosen not to bid on any PLA work. Ajax Dep. Tr. pp. 80-87; DFM Dep. Tr. pp. 49-50; AAS Dep. Tr. pp. 78-80.

 **E. Allegations of Illegal Pressure and Stripping**[7]: A steel fabricator, Cape & Island Steel, asked D.F.M. to complete a job that a union steel erector had started at Fox 25 in Dedham. DFM Dep. Tr. p. 84. On the first day D.F.M. was on the job, an agent of Local 7 purportedly threatened the general contractor with a general walkout if D.F.M. remained on the job. Compl. ¶ 73; DFM Dep. Tr. p. 85. On the second day of work, pickets appeared on the jobsite (DFM Dep. Tr. p. 86) and the general contractor removed D.F.M. from the job. Id.; Compl. ¶ 75. According to D.F.M. president Glen Pisani, "[w]e were gone for a couple of days and for one reason or the other they wound up calling us back to finish." DFM Dep. Tr. p. 86. When D.F.M. returned to the jobsite, some of its equipment was damaged. Compl. ¶ 73; DFM Dep. Tr. p. 87. D.F.M. told the general contractor and the fabricator, "[y]ou better figure out who did this and sort out who is going to pay me for my stuff." DFM Dep. Tr. pp. 87-88. D.F.M. returned and completed the job, losing no work in the process. Moreover it placed its 3 or 4 workers on other jobs for the days it was off the Fox jobsite. D.F.M. Dep. Tr. pp. 190-91.

 Ajax alleged that it lost the Cardi's Furniture and Archstone Apartment jobs to a

---

[7] The facts contained in this section are taken as true solely for the purpose of the Amended Motion for Summary Judgment. The Complaint includes allegations that something other than job targeting contributed to the loss of the particular job on just three instances: the Fox 25 jobsite, Compl. ¶¶ 2, 70-76; the Cardi's Furniture jobsite, Compl. ¶¶ 3, 89-91; and the Archstone Apartments jobsite, Compl. ¶¶ 120-23. The Fox 25 jobsite includes specific allegations detailed above while the other two jobsites contain the general allegation that the project was lost "[d]ue to the payment of job target money and other illegal pressure". Compl. ¶¶ 91, 123. Plaintiffs were also asked in Interrogatories to provide specifics regarding the conduct that injured them. Plaintiffs' response did not identify non-targeting conduct causing a loss of work beyond the above-cited three episodes alleged in the Complaint and asserted instead that the information "is obtainable from depositions, which has been recognized as the more appropriate method of discovering such details regarding such oral conversations." See Pls.' Resp. to Def. Iron Workers Local 7's First Req. for Answers to Interrogs. Responses to Interrogatories 5, 18, 20.

combination of target money and other illegal pressure on the fabricator. Compl. ¶¶ 91,123. At his deposition, Ajax president Don Morel stated that the pressure on the Cardi job was exerted on the developer, not the fabricator, and that he did not know the nature of the pressure. Ajax Dep. Tr. pp. 125-27. He received compensation of $5,000 from Cardi, the general contractor or the fabricator, even though he performed no work under the "verbal contract." Id. The Complaint also alleged unspecified "pressure" that contributed to the loss of the Archstone Apartment job. Ajax Dep. Tr. pp. 147-56. When asked the nature of the illegal pressure, Morel said "typical union pressures," including "probably," informational picketing, which he conceded was not illegal. Ajax Dep. Tr. pp. 129, 154-55.

Occasionally, Local 7 assists iron workers who have not previously been members of Local 7 to find employment with Local 7 signatory contractors and become Local 7 members. This activity, however, is not based on any agreement with BTEA or its employer members to give job placement priority to non-union employees. Hurley Aff. ¶¶ 16-17; Coyle Aff. ¶¶ 7-8.

The Complaint alleged that Local 7 "regularly successfully stripped workers from [Bedford Iron]" on the Deerfield Academy job. Compl. ¶ 151. Bedford employed 15-20 workers at the time. BIW Dep. Tr. p. 47. The job took longer than anticipated. BIW Dep. Tr. pp. 43-44. According to Bedford president Michael Guillemette, two Bedford workers left the Deerfield Academy jobsite and went to work for signatory contractors. BIW Dep. Tr. pp. 89-91. Guillemette does not know if he replaced the two workers; all he knows is that "two guys quit and they were trying out the union". BIW Dep. Tr. pp. 90; pp. 114-15. No Local 7 agent or signatory contractor has been identified in connection with these allegations.

The Complaint generally alleges that Local 7 has engaged in surveillance of Plaintiff jobsites and that such surveillance is done pursuant to an agreement with co-conspirators.

8

Compl. ¶ 154.  In deposition, American Aerial's president alleged that members of Local 7 and the New Hampshire local attempted to view and impact an American Aerial jobsite in New Hampshire.  AAS Dep. Tr. p. 31.  When questioned about the practice D.F.M. president Pisani stated that he raised the issue but concluded it was lawful.  DFM Dep. Tr. p. 162 ("I believe, I brought it up.  Apparently, it's within their rights to film what they would like to film").

The Complaint also alleges that Local 7 has engaged in "sham picketing".  Compl. ¶ 156. D.F.M. president Pisani characterized sham picketing as "a bunch of guys holding signs that no one can really read".  DFM Dep. Tr. p. 164.  Questioned whether community standards picket line is a "sham" Pisani stated, "[t]hat's an informational picket line, I would assume.  It's all a sham to me."  Id.  When pressed for the distinction between a sham and a valid picket line, Pisani asserted that when pickets are on his jobs it is all a sham.  DFM Dep. Tr. pp. 164-66.

## III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS.

### A.    Plaintiffs' Claims Concerning Local 7's Use of Job Targeting Funds.

Through the job targeting program, Local 7 has, in essence, tailored labor pricing to be more competitive where needed to get jobs, without undermining the legitimate union goal of achieving wage equity, at the highest possible rates, among members.  This program is exempted from antitrust scrutiny by the statutory and non-statutory labor exemptions, and in any case, does not violate the antitrust laws.

1.    Local 7's Job Targeting Program and Other Organizing Activities Are Exempted from Antitrust Scrutiny by the Statutory Labor Exemption.

a.    The Statutory Labor Exemption to the Antitrust Laws.

In 1908, the Supreme Court held in the now infamous Danbury Hatters case that a union-led nationwide boycott was a conspiracy under the Sherman Act.  Loewe v. Lawlor, 208 U.S. 274 (1908).  Finding this result incongruent with Congressional intent, Congress passed the Clayton Act in 1914, declaring at §6 that "[t]he labor of a human being is not a commodity or

article of commerce . . . nor shall [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C. §17 (emphasis supplied).[8]  Since the enactment of §6, "it would seem plain that restraints on the sale of the employee's services to the employer, however[] much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act."  Apex Hosiery Co. v. Leader, 310 U.S. 469, 503 (1940).  In addition, §20 of the Clayton Act prohibits the issuance of injunctions against certain union activities, including injunctions that would "prohibit any person . . . from terminating any relation of employment, or from ceasing to perform any work . . . , or from . . . persuading others by peaceful means so to do" and provides further that such activities are not "violations of any law of the United States."  29 U.S.C. §52.

The Supreme Court narrowly interpreted the Clayton Act in Duplex Printing Press Co. v. Deering, limiting its protection to those parties in a "proximate relation" to a dispute concerning "terms and conditions of employment" and holding that §20 of the Clayton Act authorized courts to enjoin the secondary conduct of unions under the antitrust laws.  254 U.S. 443, 470-74 (1921).[9]  Congress, in 1932, repudiated Duplex by passing the Norris-LaGuardia Act in which it

---

[8]  Congress thus adopted Justice Holmes' view that combinations of workers were desirable counterparts to combinations of capital.  Vegelahn v. Guntner, 167 Mass. 92, 108 (1896) (Holmes, J., dissenting) ("One of the eternal conflicts . . . is that between the effort of every man to get the most for his services, and that of society, disguised under the name of capital, to get his services for the least possible return.  Combination on the one side is patent and powerful.  Combinations on the other is necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way").

[9]  Union conduct against employers concerning the terms and conditions of employment of the employers' own employees is primary activity.  Thus, a picket line by Local 7 against one of the Plaintiffs for failing to pay its workers union scale would be primary activity.  Similar union pressure against businesses who do business with the employer on matters unrelated to the terms and conditions of the business' own employees is considered secondary pressure against a "neutral" in the dispute between the union and the primary.  Thus, pressure by Local 7 against a fabricator or other company who does business with the Plaintiffs but who does not directly employ iron workers is secondary pressure.  The primary-secondary distinction is significant for labor law purposes.  See e.g. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades, 485 U.S. 568 (1988) (secondary handbilling protected); N.L.R.B. v. Friot & Vegetable Packers, 377 U.S. 58 (1964) (primary picketing at a secondary site); N.L.R.B. v.

defined "labor dispute" broadly as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee."  29 U.S.C. §113(c).  It also declared the following "public policy of the United States":

> [w]hereas. . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

29 U.S.C. §102.  A few years later, Congress enacted the National Labor Relations Act ("NLRA"), 29 U.S.C. §151 *et seq.*, to further address the "inequality of bargaining power" between employees and employers that "tends to aggravate recurrent business depressions, by depressing wage rates . . . and by preventing the stabilization of competitive wage rates and working conditions."

Where federal antitrust law sought "to preserve business competition and to proscribe business monopoly" (Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, U.S. 797, 809 (1945)), federal labor law sought "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining" (id. at 806) and allowed the elimination of "that part of such competition which is based on differences in labor standards."  Apex Hosiery Co., supra, 310 U.S. at 503 (1940).  In United States v. Hutcheson, 312 U.S. 219, 232 (1941), the Supreme Court reconciled these purposes, holding that the Clayton Act and the

---

International Longshoremen Ass'n, 473 U.S. 61 (1985) (work preservation rules serve primary objective).  Congress repeatedly rejected this distinction for purposes of antitrust law.

Norris-LaGuardia Act together formed the statutory labor exemption to antitrust laws and established the following two-part test for determining whether labor union activity is immune from antitrust scrutiny under this exemption: (1) Did the union act in its self-interest? (2) Did the union combine with non-labor groups? The Court further emphasized that "the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U.S. at 232 (footnote omitted).

Although "the test to determine if a union's actions are in its 'self-interest' has not been precisely formulated, the principle . . . is that activities are in the self-interest of a labor organization if they bear a reasonable relationship to a legitimate union interest." Allied Int'l, Inc. v. International Longshoremen's Ass'n, AFL-CIO, 640 F.2d 1368, 1380 (1st Cir. 1981), aff'd, International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc., 456 U.S. 212 (1982); see Cedar Crest Hats, Inc. v. United Hatters Cap and Millinery Workers Int'l Union, AFL-CIO, 362 F.2d 322, 328 (5th Cir. 1966) (negative publicity by union was within the scope of traditional union objectives and did not violate antitrust law). The plaintiff bears the burden of proving that the statutory labor exemption does not apply. See Mid-American Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council, 675 F.2d 881, 886 (7th Cir. 1982).

> b. Local 7's Job Targeting Program and Other Organizing
> Activities Meet the First Prong of the Two-Part Test.

With respect to the first prong of the Hutcheson test, Local 7's job targeting program serves two legitimate, self-interested purposes. First, Local 7's job targeting program helps to secure work at labor standards for Local 7 members in geographical locations where non-union competition is strongest. Statement of Undisputed Material Facts In Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment ("Undisputed Facts") ¶ 1.

Structural steel erection is a labor-intensive industry, in which a large portion of the cost is labor. Undisputed Facts ¶ 6. Moreover, non-union structural steel contractors, such as Plaintiffs, admittedly enjoy substantially lower labor costs than union contractors, such as Local 7 signatory contractors. Undisputed Facts ¶ 7. This reality often places non-union contractors at a substantial competitive advantage over signatory contractors in obtaining jobs. Job targeting funds are used to provide relief from the constraints of the collectively bargained labor standards on jobs targeted by Local 7, without which Local 7 signatory contractors would be hard-pressed to competitively bid. Providing job targeting funds for the purpose of acquiring jobs while protecting labor standards that its members would not otherwise enjoy is a legitimate, self-interest objective of a labor organization. See Apex, 310 U.S. at 503 (the elimination of competition over wages and working conditions is a legitimate union goal); see also Woodworking Mfg. Ass'n. v. N.L.R.B., 386 U.S. 612, 639 (1967) (preservation of union work is a legitimate union interest); Intercontinental Container Transp. Corp. v. New York Shipping Ass'n, 426 F.2d 884, 887 (2d Cir. 1970) ("The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern . . . . Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws.") (citations omitted); Manno Elec., Inc., 321 NLRB 278, 298 (1996) (use of a job targeting program to "maintain the union wage scale . . . and obtain work for its members" is a legitimate union interest), enf'd per curiam mem., 127 F.2d 34 (Table) (5th Cir. 1997).

Second, Local 7's job targeting program serves to reduce regulatory cheating in the structural steel erection industry by funding Local 7's monitoring efforts. Undisputed Facts ¶ 1.[10] Monitoring the structural steel erection industry is in Local 7's legitimate self-interest

_____

[10] Plaintiffs do not specifically allege that Local 7's initiation of complaints violates the antitrust laws. The Noerr-Pennington doctrine precludes antitrust liability for efforts to influence the exercise of government power, even if

because, by identifying and exposing employers who are not complying with regulatory standards, it, too, helps create a more level playing field, ultimately providing Local 7 opportunities to obtain more work for its members.  See Woodworking Mfg., 386 U.S. at 639; see also United Food and Commercial Workers Union ("UCFWU"), Local 1036 v. N.L.R.B., 307 F.3d 760, 768 (9th Cir.), cert. denied, 537 U.S. 1024 (2002) (it is the union's role to organize workers and promote the use of union labor).

Local 7's non-job targeting organizing activities also meet the first part of the Hutcheson test.  Local 7's picketing and publicity activities were done for the permitted purpose of obtaining work for its members at labor standards.  Undisputed Facts ¶ 21.  In addition, to the limited extent that Local 7 has assisted workers in finding employment on union jobs, Local 7 has done so in order to assist workers join a labor organization.  Undisputed Facts ¶ 22. Assisting employees to join a labor organization is a fundamental protection of § 7 of the NLRA. See 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]").  "It is not a violation of the Sherman Act for laborers in combination to refuse to work.  They can sell or not sell their labor as they please, and upon such terms and conditions as they choose, without infringing the Anti-trust laws."  Hunt v. Crumboch, 325 U.S. 821, 824 (1945).  Moreover, "[a] worker is privileged under congressional enactments, acting either alone or in concert with his fellow workers, to accept, refuse to accept, or to terminate a relationship of employment, and his labor is not to be treated as 'a commodity or article of commerce.'"  Id.

---

they are for the purpose of gaining an anti-competitive advantage.  See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972).  In addition, there is no evidence that Local 7 initiated complaints in partnership with non-labor groups.  Undisputed Facts ¶ 24.

(quotations and citations omitted).[11]

            c.      The Job Targeting Program and Other Organizing Activity Also Meet the Second Prong of the Two-Part Test.

With respect to the second prong of the <u>Hutcheson</u> test, Local 7 unilaterally established the job targeting program sometime prior to 1991. Undisputed Facts ¶ 2, 3. When, in or around 1992, Local 7 members voted to permanently fund the program through dues deductions from their own wages so that they could attempt to obtain more work at union labor standards, they did so unilaterally, without employer involvement. <u>Id.</u> Local 7 also unilaterally administers *all* aspects of the job targeting program. Undisputed Facts ¶ 5.

Plaintiffs erroneously assert that Local 7's so-called combination with BTEA in pooling the targeting funds takes away the unilateral quality of the program's administration. The BTEA employers' only involvement in the pooling of funds is the ministerial function of deducting dues from the after-tax wages of union members who have authorized these deductions from their own paychecks to be forwarded to their own union in accordance with federal labor law. Undisputed Facts ¶ 4. This ministerial function does not change the basic fact that Local 7 members have decided, through a vote, to pool their own money for job targeting purposes. <u>See</u> Undisputed Facts ¶ 3. If the mere remission of dues as a source of union funds could eliminate the unilateral quality of Local 7's actions and, resultantly, the statutory labor exemption, then virtually any activity in which a union engages apparently "unilaterally," would no longer be considered unilateral where employer-deducted dues are used. Such a result would be inimical to the purpose of the statutory labor exemption, which was established to immunize union initiatives from traditional "restraint of trade" analysis.

---

[11]   <u>Hunt</u> involved a union's refusal to admit a company's employees to membership and to refuse to sell its members' services to that company, ultimately putting the company out of the business. The Supreme Court rejected the employer's antitrust suit, holding that the statutory labor exemption gave employees "an absolute right . . . to work or cease working according to their own judgments[.]" <u>Id.</u> at 824, 825 n.1.

Local 7's organizing activities and videotaping were also done unilaterally and not pursuant to any agreements with any other non-labor groups.  Undisputed Facts ¶ 22, ¶ 24.  Such activities are shielded from the federal antitrust laws.  See, e.g., Cedar Crest Hats, Inc., supra, 362 F.2d 322, 326-37 (5th Cir. 1966) (union's unilateral threats to distribute leaflets urging customers to buy only union-made hats if retailers continued to sell non-union goods is not antitrust violation).  Finally, to the extent that Local 7 may have periodically assisted non-union employees in obtaining employment with Local 7 signatory contractors, it did so unilaterally.  Local 7 maintains no agreements with employers to strip employees from non-union signatories in order to place them with union signatories.  Undisputed Facts ¶ 22.

> d.   Local 7's Purportedly Illegal Actions Do Not Affect the Statutory Labor Exemption from Antitrust Laws.

Plaintiffs allege that Local 7's job targeting and organizing activities are illegal under other laws, claiming that the dues deduction violates the Davis-Bacon Act, 40 U.S.C. §§ 276a et seq.[12] and that Local 7 engaged in violence[13] and in unlawful secondary activities.[14]  Assuming, arguendo, that members' after-tax contributions to the target program violate the Davis-Bacon Act or that Local 7 engaged in unlawful picketing or acts of violence, Plaintiffs still cannot meet their burden of establishing that the statutory labor exemption does not apply because, unquestionably, both "licit and illicit" conduct is protected.  Hutcheson, 312 U.S. at 232.

The seminal labor antitrust case involving violence is Apex Hoisery Co. v. Leader, 310 U.S. 469, 513 (1940), where the union held a sit-down strike after the company refused to accede to its demand for a closed job.  Id. at 482.  The strike became violent, with strikers damaging the

---

[12]  The Davis-Bacon Act protects wage levels paid by employers on federally funded jobs.
[13]  Plaintiffs make just one specific allegation of property damage (Compl. ¶ 73) in a Complaint that includes over 25 projects and spans a time period of 4-9 years, and even there, do not identify the alleged perpetrator of the damage.  Moreover, there is also no allegation in the Complaint that Local 7 ratified, condoned or authorized the alleged violence.
[14]  These allegations are discussed further below with regard to Plaintiffs' LMRA claim.

company's property extensively, resulting in the cessation of production for several months.  Id.

The Court held that the union did not violate the Sherman Act:

> The Sherman Act is concerned with the character of the prohibited restraints and with their affect on inter-state commerce.  It draws no distinction between the restraints affected by violence and those achieved by peaceful but often times quite as effective means.  Restraints not within the Act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence.

Id. at 513.  Thus, Plaintiffs' allegations of illegal conduct, even if true, would not suffice to take

Local 7's conduct out of the statutory labor exemption.

> 2.    The Non-Statutory Labor Exemption Shields the Job Targeting Program.

> a.    The Non-Statutory Labor Exemption to the Antitrust Laws.

When Congress passed the NLRA in 1935 to protect workers' right to unionize, it was

common knowledge that labor organizations sought to eliminate competition on the basis of

wages and other labor standards.  Local Union No. 189, Amalgamated Meat Cutters and Butcher

Workmen of North Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 712 (1965) (Goldberg, J.,

concurring).  When unions were successful in doing so through entering into agreements with

employers, they did not thereby violate the antitrust laws:

> [S]uccessful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. . . .  *But this affect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.*

Apex Hosiery, 310 U.S. at 503-04 (citations omitted) (emphasis supplied).  Thus, the judiciary

found an implicit exemption to the antitrust laws even where a union combines with non-labor

entities.  Brown v. Pro Football, Inc., 518 U.S. 231, 236 (1996) (citations omitted).

"The Supreme Court has never delineated the precise boundaries of the [non-statutory]

labor exemption" (Clarett v. National Football League, 369 F.3d 124, 131 (2d Cir. 2004), *cert.*

*denied*, 125 S.Ct. 1728 (2005)), but has recognized that it is a reconciliation of federal labor

policy with federal antitrust laws.  See Jewel Tea, 381 U.S. at 690 n.5 (application of the non-statutory labor exemption is determined by balancing the "interests of union members" against an agreement's "relative impact on the product market"); Connell Constr. Co. Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975) ("a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from anti-trust sanctions.").

The non-statutory labor exemption protects CBAs between a union and a single employer that relate to wages, hours or other working conditions.  It offers broader protection as well.  The non-statutory exemption also applies to agreements reached through multi-employer bargaining. See Brown, 518 U.S. at 240 ("Multiemployer bargaining itself is a well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor"); Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring) (unions sought to eliminate competition "through industry-wide collective bargaining"); United Mine Workers v. Pennington, 381 U.S. 657, 664 (1965) (labor law contemplates agreements between unions and employers in a multi-employer bargaining unit); Apex Hosiery, 310 U.S. at 503-04 (exemption applies to "a wage agreement with *employers*") (emphasis added).  The fact that most, or even all,[15] employers agree to the same wages and other terms and conditions of employment does not restrain trade for Sherman Act purposes.

Finally, the non-statutory labor exemption applies to conduct that grows out of or is directly related "to the lawful operation of the bargaining process," "where needed to make the

---

[15]    See Boston Shipping Ass'n, Inc. v. Federal Maritime Comm'n, 706 F.2d 1231, 1233 (1st Cir. 1983) ("the complaining party in the dispute . . . is a multiemployer bargaining association which represents management in all longshore collective bargaining affecting the Port of Boston. Its members -- twenty-five commercial firms . . . -- own or operate virtually all of the facilities in the port that are used regularly in foreign and intercoastal trade.").

collective-bargaining process work," even if such conduct does not arise directly out of a CBA. Brown, 517 U.S. at 234, 250 (addressing employers' post-impasse joint behavior); see also Clarett, 369 F.3d at 126-27, 143 (addressing rule adopted prior to commencement of collective bargaining). Holding otherwise, would "ask antitrust courts to decide the lawfulness of activities intimately related to the bargaining process", while one of Congress's objectives in implementing the labor laws "was to take away from antitrust courts the authority to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy." Brown, 517 U.S. at 242, 245. The Court specifically noted that the labor laws "give the National Labor Relations Board [("NLRB")], not antitrust courts, primary responsibility for policing the collective-bargaining process." Id. at 242.

> b.  Local 7's Job Targeting Program Also Falls Within the Non-Statutory Labor Exemption.

Plaintiffs complain of an alleged restraint of trade based on Local 7's pooling of membership dues for its job targeting funds and the payment of such funds to Union signatory contractors and to fabricators and developers. Even assuming these allegations to be true, each aspect of the job targeting program is exempt from any antitrust scrutiny.

1) The Collection of Dues by Signatory Contractors: The BTEA's only involvement in the pooling of job targeting funds is the ministerial deduction of dues from Local 7 member paychecks. Undisputed Facts ¶¶ 2-5. These funds belong, in the first instance, to the members as part of their wages and they alone voted to pool portions of their wages for the job targeting fund and authorized the BTEA employers to deduct the dues and forward them to Union. See id. A dues deduction provision is an ordinary part of a negotiated CBA, thus falling squarely within the non-statutory labor exemption. See Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring).

Nor does the purported violation of the Davis-Bacon Act take the dues deduction

arrangement out of the non-statutory labor exemption. The alleged illegality – that workers who elect to forward their dues will not have received the full wages that they are owed on Davis-Bacon Act projects – is unrelated to the bargaining process, and therefore has no bearing on the reconciliation of labor and antitrust laws. Moreover, while Plaintiffs may contend that any alleged illegality forecloses Local 7's reliance on the non-statutory exemption, this argument makes no sense where the purported illegality adds nothing to Plaintiffs' antitrust claim. Plaintiffs have no private right of action to sue under the Davis-Bacon Act,[16] and the antitrust laws (with their treble damages) do not allow a party to dress up some other alleged illegality as an antitrust claim in order to avoid a standing problem. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993).

    2) Job Targeting Payments to Signatory Contractors: Local 7's payment of job targeting funds to signatory contractors has the purpose and effect of lessening the signatory contractor's labor costs for the particular job. Undisputed Facts ¶ 8. A union clearly can negotiate different wage rates with different employers, (see Jewel Tea, 381 U.S. at 712 (Goldberg, J., concurring)), and a job targeting award serves exactly that purpose.

    Notably, the NLRB, with its primary responsibility for policing the collective bargaining process, has repeatedly found that job targeting programs are protected by federal labor law. See, e.g., Manno Elec., 321 NLRB 278, 282, 298 (1996), (affirming judge's finding that "[t]he objectives of the 'job targeting program' are to protect employees' jobs and wage scales. These objectives are protected by Section 7 [of the NLRA]"), enf'd per curiam mem., 127 F.2d 34

---

[16] See, e.g., United States v. Binghamton Constr. Co., 347 U.S. 171, 176-77 (1954) ("The [Davis-Bacon] Act itself confers no litigable rights on a bidder for a Government construction contract. The language of the Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects.") (footnote omitted); see also Mathiowetz Constr. Co. v. Minnesota Dept. of Transp., No. 01-548, 2002 WL 334394, at *4 (D. Minn. Feb. 27, 2002) (unsuccessful bidder lacked standing to assert Davis-Bacon claim in its challenge of a job targeting program).

(Table) (5th Cir. 1997); <u>Associated Builders and Contractors, Inc., Golden Gate Chapter</u>, 331 NLRB 132, 132, n.1, 137 (2000) ("the Charging Parties' job targeting program is concerted, protected activity"), *modified in non-relevant part*, 333 NLRB 955 (2001); <u>see also</u> <u>J.A. Croson Co. v. J.A. Guy, Inc.</u>, 691 N.E.2d 655, 663 (Ohio), *cert. denied*, 525 U.S. 871 (1998) (Ohio's prevailing wage statutes and regulations were preempted by the NLRA to the extent they interfered with the use of job targeting programs), *cert. denied*, 525 U.S. 871 (1998). Just as in <u>Manno</u>, one of Local 7's job targeting objectives is to protect iron workers' jobs and wage and benefit scales. Hurley Aff. ¶ 20. An antitrust court should defer to the NLRB's position that such programs are protected by the NLRA. <u>See</u> <u>Brown</u>, 518 U.S. at 242.

Courts that have considered job targeting programs have found them to be insulated from federal antitrust laws by the non-statutory labor exemption. <u>See</u> <u>Phoenix Elec. Co. v. National Elec. Contractors Ass'n.</u>, 81 F.3d 858, 863 (9th Cir. 1996) ("A subsidy program that targets some jobs for more competitive wage components of signatory contractor bids, and does not bar nonunion bidders from the bidding on the same jobs, is in harmony with the policies of both the labor and antitrust laws."); <u>Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec.</u>, 121 F.3d 1180, 1186 (8th Cir. 1997) (upholding target fund financed by union members that provides partial reimbursement for wages paid to members where the employer is a signatory to a CBA); <u>Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669</u>, No. 94-3309, 1997 WL 311498, at *2, 12 (D. Md. 1997) (upholding job targeting program where the union and a contractor "would negotiate concessionary rate agreements on a project-by-project basis in a particular geographical area in order that the particular employer might be able to compete with lower cost, nonunion contractors"), *aff'd*, 133 F.3d 914 (4th Cir.) (Table) (unpublished decision), *cert. denied,* 525 U.S. 825 (1998).

3) <u>Payments, if any, of Job Targeting Funds to Fabricators and General Contractors</u>:
Plaintiffs appear to be contending that Local 7's target payments fall outside of the labor
exemptions on the theory that they were made to fabricators and general contractors, rather than
to signatory employers. <u>See</u> <u>e.g.</u> Compl. ¶¶ 67-139. Local 7 strongly disputes the underlying
factual allegation that payments were repeatedly made to entities with whom it had no CBA, but
even taking this allegation as true for purposes of summary judgment, such conduct would still
fall within the non-statutory labor exemption.

In <u>Connell</u>, the Supreme Court held that an agreement between a union and a general
contractor whose employees the union did not represent was unprotected by the non-statutory
labor exemption, where the agreement required the general contractor to deal only with the union
signatory contractors on *all of its jobs,* and included requirements unrelated to terms and
conditions of employment. 421 U.S. at 619-21, 633, 635. The Court held that these agreements
"indiscriminately excluded nonunion subcontractors from a portion of the market, even if their
competitive advantages were not derived from substandard wages and working conditions[.]" <u>Id.</u>
at 623. As a result, the union had obtained control over subcontract work that "could result in
significant adverse effects on the market and on consumers – effects unrelated to the union's
legitimate goals of organizing workers and standardizing working conditions." <u>Id.</u> at 624.[17]

Here, the undisputed facts establish that Local 7's payments, if any, to fabricators or
developers were not part of any <u>Connell</u>-type generalized agreement prohibiting the fabricators
or developers from working with non-union contractors on future jobs. Local 7 awarded job
targeting funds on a job-by-job basis. Undisputed Facts ¶¶ 10, 15. Indeed, if there was a
generalized agreement, there would have been no need for the job-by-job targeting alleged by the

---

[17]  The <u>Connell</u> Court only addressed the question of whether the labor exemptions applied and did not answer the
further question of whether the union's conduct did, in fact, violate the antitrust laws. 421 U.S. at 637.

Plaintiffs.  See Compl. ¶¶ 67-139 (alleging over 25 separate incidents in which Local 7 allegedly sought and obtained work for its members by appealing to various fabricators and developers using job targeting funds).  At most, these alleged payments, if any, represent Local 7's hat-in-hand method of organizing job-by-job.  The difference between the generalized agreements in Connell and successful job-by-job appeals is apparent.  Where across-the-board agreements have the "potential for restraining competition in the business market in ways" that antitrust laws condemn (id. at 635), the job-by-job appeals do not.

Significantly, unlike in Connell, the so-called agreements at issue here attempt to address the anticompetitive effects of the CBA in the labor market.  See Undisputed Facts ¶¶ 1, 8, 10.  As the Supreme Court made clear in Brown, "*the case for applying the [non-statutory labor] exemption is strongest where a restraint on competition operates primarily in the labor market and has no anti-competitive effect on the product market.*"  518 U.S. at 1051 (emphasis supplied).

### 3.  Plaintiffs' Antitrust Claims Concerning Local 7's Use of Target Funds To Secure Specific Jobs.

As detailed above, the use of target funds on individual projects is exempt from antitrust scrutiny under the statutory and non-statutory labor exemptions.  Even if the exemptions did not apply, however, Local 7 is still entitled to summary judgment under antitrust law.

### a.  Predatory Pricing.

Plaintiffs' only explicit antitrust claim regarding the pricing of bids is that Local 7 and its signatory contractors engaged in "illegal predatory pricing tactics."  Compl. ¶ 1.  Plaintiffs, however, cannot make out any of the elements of such a claim.  A plaintiff "seeking to establish competitive injury resulting from a rival's low prices must prove [as a prerequisite] that the prices complained of are below an appropriate measure of its rival's costs."  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993); see Cargill, Inc. v. Monfort

23

of Colo., Inc., 479 U.S. 104, 117 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 585 n. 8 (1986); C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41, 45 (1st Cir. 1998).

Plaintiffs cannot make that showing here.  Where the signatory contractor's labor costs have

been reduced, its bid reflecting those reduced costs would not be below its costs.  This is true

whether the labor-cost reductions are the result of Local 7's across-the-board wage concessions

at the bargaining table or because of Local 7's award of target funds:  in either case, the

contractor is not bidding at a price below its own costs.  Nor can Plaintiffs establish that the

signatory contractors' prices were predatory on the grounds that they resulted in bids that were

lower than Plaintiffs' own costs.  "[A] company that prices its own product or service at or above

its own costs does not violate the Sherman Act merely because its costs, and thus its prices, are

lower than a rival's costs."  C.B. Trucking, Inc., 137 F.3d at 45 (quotations omitted).[18]

A plaintiff seeking to establish predatory pricing must also demonstrate that its "competitor

had . . . a dangerous probability[] of recouping its investment in below-cost prices" for, without

recoupment, "predatory pricing produces lower aggregate prices in the market, and consumer

welfare is enhanced."  Brooke Group Ltd., 509 U.S. at 224; see also Matsushita, 475 U.S. at 588-

89 ("For the investment to be rational, the [predator] must have a reasonable expectation of

recovering, in the form of later monopoly profits, more than the losses suffered.").  Assuming

arguendo that Plaintiffs could show "below-cost" bidding by Local 7 signatory contractors,

Plaintiffs still cannot make the necessary showing of a "dangerous probability of recoupment"

because of:  (1) the highly competitive nature of the industry; and (2) the low barriers of entry.

First, the highly competitive nature of the industry will make recoupment infeasible.  See

Brooke Group Ltd., 509 U.S. at 226 ; Cargill, Inc., 479 U.S. at 119, n.15 (1986); Rebel Oil Co. v.

---

[18]   Plaintiffs may attempt to argue that Local 7, rather than the signatory contractors, has engaged in predatory
pricing.  The antitrust laws, however, cannot dictate Local 7's pricing of its members' labor because, for antitrust
purposes, "[t]he labor of a human being is not a commodity or article of commerce."  15 U.S.C. §17.

Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995). There are currently over 150 companies competing for structural steel erection work in the locations at issue here. Undisputed Facts ¶ 12. While Plaintiffs seek to aggregate the market power of the signatory contractors, it is undisputed that these signatory contractors *continue to compete against each other*. Undisputed Facts ¶¶ 12, 13. A predatory pricing conspiracy between these signatory contractors would require that the conspirators allocate the losses to be sustained during the conspiracy's operation, and allocate any gains to be realized from its success, and in addition, to be effective, would require that none of the conspirators cheat to any substantial extent. Matsushita, 475 U.S. at 590. The Matsushita Court noted that in that case, the alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist. Id. at 592. Here, although Local 7's job targeting program has been in existence since before 1992, it has not foreclosed non-union competition. Indeed, several of the Plaintiffs began operations after 1992, and all of the Plaintiffs showed *greater* sales in the most recent tax year (2005), than in 1999, when the purportedly wrongful actions began. Undisputed Facts, ¶¶ 18-19. Plaintiffs have also been unable to identify any non-union steel erectors who have been put out of business by the job targeting. Undisputed Facts, ¶ 20.

Second, recoupment is unlikely where "new entry is easy." Brooke Group Ltd., 509 U.S. at 226; see also Matsushita, 475 U.S. at 591 n.15 (barriers to entry are key factors in determining whether recoupment is feasible); Cargill Inc., 479 U.S. at 119 n. 15 (same).[19] Barriers to entry

---

[19] See also Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1200-02 (3d Cir. 1995) (low barriers to entering business prevents recoupment, thus fails to injure competition and produces no antitrust injury); A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1403 (7th Cir. 1989) ("Persistent entry and expansion by other firms . . . ensures that recoupment cannot occur."); Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 597 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010 (1988) ("[I]f entry barriers to new firms are not significant, the elimination of the competitor may not significantly affect competition as a whole, because a new firm or firms easily can enter the market to take the place of the old one."); Multistate Legal Studies, Inc. v.

for new structural steel erectors are notably few.  Undisputed Facts ¶ 11.  Typically, steel erection contractors rent cranes and hire labor, and thus a steel erection contractor basically only needs good credit and a supply of skilled labor.  Id.  Thus no matter how successful the alleged predatory pricing scheme may be in eliminating competition, low barriers to entry mean that new competition may arise at any time.

"In certain situations - for example, where the market is highly diffuse and competitive, or where new entry is easy . . . - summary disposition of the case is appropriate."  Brooke Group Ltd., 509 U.S. at 226 (citing *Cargill,* 479 U.S. at 119-120, n. 15).  Here, where there are over a hundred-and-fifty (150) competitors and extremely low barriers of entry, summary judgment on Plaintiffs' predatory pricing claim is appropriate.

b.    Price Discrimination.

Alternatively, Plaintiffs appear to complain about price discrimination because Local 7 targets specific jobs in which it has a special interest.  The Robinson-Patman Act, 15 U.S.C. §13, *et seq.*, does bar certain price discrimination; however, it is limited to discrimination in the sale of commodities.  15 U.S.C §13(a); Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195, n.3 (3d Cir. 1995) (Act applies only to commodities); Town of Concord v. Boston Edison Co., 676 F. Supp. 396, 397 (D.Ma. 1988) (same).  For purposes of the antitrust laws, labor is not a commodity (15 U.S.C. §17); accordingly, the Robinson-Patman Act does not apply.[20]

---

Harcourt Brace Jovanovich Legal and Prof'l Publs., Inc., 63 F.3d 1540, 1549 (10th Cir. 1995), *cert. denied*, 516 U.S. 1044 (1996) (sufficient evidence of "high entry barriers and other structural factors" is necessary to create triable issue of dangerous probability of recoupment); J & S Oil, Inc. v. Irving Oil Corp., 63 F. Supp. 2d 62, 68 (D.Me. 1999) (because there were no significant barriers, the defendant would be unable to maintain supra competitive retail prices); AD/SAT v. Associated Press, 920 F. Supp. 1287, 1303 (S.D.N.Y. 1996) ("[T]he barriers of entry into this market are low, which provides further evidence that [the] predatory pricing scheme could not succeed, as monopoly prices would result in new competitors entering the market."), *aff'd*, 181 F.3d 216 (2d Cir. 1999).

[20]    Even if the Act did apply, it is a complete defense that price differences reflect good faith efforts to meet competition.  Id. §13(b).  Here Plaintiffs allege that prices were dropped to meet the competition offered by their lower prices.  Compl. ¶ 34 ("These [job targeting] subsidies are . . . intended to assist those employers in meeting the competition from non-union structural steel erectors."); Undisputed Facts ¶¶ 8, 10.

**B.**    **Local 7 Is Entitled to Summary Judgment on Plaintiffs' Remaining Allegations Under Section 1 of the Sherman Act.**

1.    Loyalty Rebates or Exclusivity Agreements.

Plaintiffs' assertion that Local 7 entered into agreements with general contractors or fabricators with whom it did not have a CBA pursuant to which it would provide job targeting funds in return for the general contractor or fabricators' agreement to use union signatories exclusively is flawed factually, as there is no evidence at all to support this claim. See Undisputed Facts ¶ 15.  It is also flawed as a matter of law.  First, giving a discount to get exclusivity amounts to a loyalty rebate, and a loyalty rebate must result in a below-cost price to give rise to antitrust liability.  See Concord Boat v. Brunswick Corp., 207 F.3d 1039, 1061-62 (8th Cir. 2000).  And as noted above, there is no evidence the job targeting fund rebates brought any price below costs for the signatory contractors or Local 7.  Undisputed Facts ¶ 11.

Second, to make out a claim of exclusive dealing, a plaintiff must show that a substantial share of the market was foreclosed.  In this Circuit, a foreclosure of 30-40% of the market must be shown.  See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004).  Plaintiffs have identified no such agreements during the discovery process, and it certainly can make no showing now that any such agreements with a fabricator or general contractor would foreclose anyone from a significant share of the market.

Local 7 accepts for purposes of this motion only that the Relevant Market is the market for structural steel erection as defined in Plaintiffs' Complaint,[21] and that spending for steel erection in that market has been in excess of $200,000,000 per year since 1999.  Compl. ¶ 43.  Local 7 challenges Plaintiffs' contention that they have been precluded from competing on 70% of the

---

[21]   The Complaint defines the "Relevant Market" as the erecting of structural metal and steel on buildings and structures (and related work) "on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine[.]"  Id. ¶ 29.

work because the work was subject to a project labor agreement ("PLA").  Id. ¶¶ 30, 43.

Although work on the Big Dig and other of the large public sector projects over the past 20 years in Massachusetts have been subject to PLAs requiring that all contractors and subcontractors abide by terms and conditions of employment set forth therein, the PLAs have also guaranteed that all contractors and subcontractors, union and non-union alike, have the same rights to bid for and be awarded work on the projects.  Undisputed Facts ¶ 16.  No contractor is favored under a PLA, although a non-union contractor is required to be bound by the same terms and conditions under which a union contractor already operates.  See Department of Labor and Indus. v. Boston Water and Sewer Comm'n, 18 Mass. App. Ct. 621, 626 (1984).  Neither is there a requirement that any contractor become unionized to participate in the project.  Contractors are required to sign the PLA to work on the project, but the PLA has no application or force outside the project, and non-union contractors are free to operate on their own terms on other jobs.  As the Supreme Court noted in Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Mass./R.I. ("Boston Harbor"), 507 U.S. 218, 231 (1993), "contractors who do not normally enter such agreements are faced with a choice.  They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA]."  507 U.S. at 231.

Plaintiffs' claim that non-union contractors are barred from the market in large part because of PLAs has been rejected in earlier litigation.  In 1990, the Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. ("ABC"), an organization representing non-union construction-industry employers, including Plaintiff American Steel Erectors,[22] brought suit challenging the PLA on the Boston Harbor project on various claims, including a claim under § 1 of the Sherman Act, alleging a conspiracy to reduce competition.  Boston Harbor, 507 U.S. at

---

[22] See http://www.aseasf.com/aboutus.htm (accessed Jan. 22, 2006).

223.  Judge Mazzone rejected each of the ABC's claims, including the Sherman Act claim. Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water Resources Auth., No. 90-10576-MA, 1990 WL 86360, at * 3 (D. Mass. April 11, 1990) ("the plaintiff contractors have not been excluded from bidding.  They simply have refused to bid on any contract[.]"), *rev'd on other grounds*, 935 F.2d 345 (1st Cir. 1991), *rev'd sub nom.*, Boston Harbor, 507 U.S. 218. Thus, although the Sherman Act claim was not ultimately dispositive in the case, the one court that considered the claim found it meritless.

In the intervening 16 years since the District Court issued its decision, Plaintiffs here apparently have chosen simply not to bid on this work.  See Undisputed Facts ¶ 17.[23]  Having chosen not to participate in a substantially large portion of the market, Plaintiffs cannot now point to a purported "exclusion" from that portion of the market as evidence of the alleged monopoly power of the many different contractors who did bid on the work.

2.    Price-Fixing.

Plaintiffs also suggest that Local 7 and its signatory contractors have engaged in price fixing.  While Plaintiffs characterize the purported agreement between Local 7 and its signatories as a horizontal agreement, Local 7, as a supplier of labor is at a different level in the chain of production than the signatories, and accordingly, any such agreement between Local 7 and its signatories is a vertical agreement, rather than a horizontal agreement.  Business Elecs. Corp. v. Sharp Elecs., 485 U.S. 717, 730 (1988).  Plaintiffs here are unable to make the required showings for such a claim.  First, for the reasons set forth above, Plaintiffs cannot establish proof that they were foreclosed from a substantial share of the market.  Second, as set forth in this section,

---

[23]  In a state court case challenging Big Dig bid specifications which required successful bidders and subcontractors to sign on to the PLA, Judge Garsh noted that non-union contractors had bid on the project and that non-union subcontractors were working on the project as of spring of 1996.  Utility Contractors Ass'n of New England, Inc. v. Commissioners of Mass. Dep't of Public Works, No. Civ. A. 90-3035, 1996 WL 106983, at *6 (Mass. Super. March 12, 1996).

Plaintiffs cannot establish the required injury to competition.

Plaintiffs' alleged injury to their own businesses by the purported agreement to set lower maximum prices is insufficient to establish the injury to competition required for this claim.

> Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct . . . ; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect. . . .  Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.

<u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 339 (1990) (citations and footnotes omitted) (emphasis in original); <u>see also</u> <u>Cargill, Inc.</u>, 479 U.S. at 116 ("'[I]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.'").  Thus, even if Plaintiffs lost particular jobs because of the job targeting program, Plaintiffs cannot establish that their loss stems from "a competition-*reducing* aspect or effect of the defendant's behavior."  <u>ARCO</u>, 495 U.S. at 344 (emphasis in original).

Plaintiffs allege that the use of the job targeting funds will result in "the escalation of cost to consumers, deterioration of quality, and restriction of output" (Compl. ¶¶ 162(a), 172(a)), but Local 7's use of job targeting funds actually increases, rather than decreases, competition. Local 7's job targeting program allows signatory contractors who suffer a competitive disadvantage because of the collectively bargained labor costs to compete with non-union contractors. Undisputed Facts ¶¶ 8, 10.  On a job where job targeting funds are available, the customer is benefited by both the lower costs and the greater competition.  Undisputed Facts ¶ 14.[24]  If a party's action increases competition (and even decreases prices), then there is no antitrust injury.

Other bidding cases have reached a similar conclusion.  See <u>Tigard Elec., Inc. v. National Elec. Contractors Ass'n</u>, 790 F. Supp. 1498, 1503 (D.Or. 1992) ("[p]laintiffs are essentially

---

[24]  Plaintiffs themselves allege that on numerous occasions a customer will "benefit from the [alleged] conspiracy by engaging in the practice of using the significantly lower price on a job it received from Plaintiffs . . . to negotiate downwards the price for the same job from a [signatory] contractor."  Compl. ¶ 60.

complaining not that *competition* is being injured, but that they, as *competitors*, are being injured . . . . Allegations that plaintiffs have lost income because of exclusion from a market are insufficient.") (emphasis in original); James Cape & Sons Co. v. PCC Constr. Co., No. 05-C-269, 2005 WL 2176965 (E.D. Wis. Sept. 6, 2005), *2 (no antitrust violation where criminal scheme resulted in the consumer paying a lower, not higher, price, as the antitrust laws are not meant to punish behavior (even criminal behavior) that actually benefits the ultimate consumer), *aff'd*, 2006 WL 1751886 (7th Cir.). Just as in these bidding cases, regardless of any injury to the Plaintiffs' businesses caused by the targeting program, no injury to competition has occurred.

>    3.    Illegal Boycott.

Finally, Plaintiffs appear to be claiming that giving job targeting fund rebates in exchange for the general contractor or fabricator hiring signatory contractors amounts to a per se illegal "boycott" of nonunion contractors under section 1 of the Sherman Act. But, the Supreme Court has clearly held that a *vertical* agreement between a supplier and buyer that the buyer shall not deal with the supplier's rival does not state a claim of a per se illegal boycott. NYNEX v. Discon, 525 U.S. 128 (1998). Instead, it simply states a rule of reason claim alleging a vertical exclusionary agreement that has already been addressed above under loyalty rebates. As previously set forth, this claim necessarily fails where Plaintiffs are unable to show that they are foreclosed from a substantial share of the market.

Other bidding cases have rejected similar attempts to find some *per se* antitrust violation to characterize the bidding conduct that a plaintiff finds objectionable. See e.g. Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440, 446-47 (3d. Cir. 1978) (defendant's agreement in advance of bidding to give a particular company the opportunity to match the highest bid received in the bidding process may have been reprehensible but could not be characterized as a per se restraint of "price fixing," "group boycott" and "sham bidding," and was not unlawful

where plaintiffs could show no negative effect of the combination on prices, quantity or quality in the relevant market); see also Parmelee Transp.Co. v. Keeshin, 292 F.2d 794, 804 (7th Cir.), cert. denied, 368 U.S. 944 (1961) ("The awarding of a contract, which the awarding parties have a right to award on any basis they choose to one rather than to another competitor for the contract, is no more within the scope of the Sherman Act than is the sit-down strike of the Apex case."); Scranton Constr. Co. v. Litton Indus. Leasing Corp., 494 F.2d 778, 783 (5th Cir. 1974), cert. denied, 419 U.S. 1105 (1975) ("The Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else").

   **C.   Local 7 Is Also Entitled to Summary Judgment on Plaintiffs' Monopolization Claims Under Section 2 of the Sherman Act.**

   Plaintiffs claim that Local 7 and its signatory contractors have taken various actions "to maintain and/or willfully maintain their monopoly in the Relevant Market" in violation of § 2 of the Sherman Act. Compl., ¶¶ 158, 162, 167, 172. It is settled law that an essential element of a § 2 monopoly claim is "the possession of monopoly power in the relevant market." Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 407 (2004); United States v. Grinnell Corp., 384 U.S. 563, 570 (1966). Monopoly power is "'the power to control prices or exclude competition.'" Grinnell Corp., 384 U.S. at 571 (quoting American Tobacco Co. v. United States, 328 U.S. 781, 797 (1946)). The existence of such power "ordinarily may be inferred from the predominant share of the market," but the percentage share of the market considered as predominant is exceedingly high. See id. at 566 (87%); American Tobacco Co., 328 U.S. at 781 (2/3 of entire domestic field of cigarettes and over 80% of the field of comparable cigarettes); United States v. Aluminum Co. of Am., 148 F.2d 416, 429 (2d Cir. 1945) (90% of market). As Plaintiffs cannot even meet Section 1 requirements, they certainly cannot demonstrate the higher percentage foreclosure required for a § 2 monopolization claim.

Likewise, to the extent that Plaintiffs are claiming attempted monopolization, they cannot show a dangerous probability of achieving monopoly power, which is required for an attempted monopolization claim.  See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

## IV.  LOCAL 7 IS ALSO ENTITLED TO JUDGMENT ON COUNT IV

In Count IV, Plaintiffs claim that some or all of Local 7's conduct allegedly violating antitrust laws also violated § 8(b)(4)(ii)(A) and (B) of the LMRA, 29 U.S.C. §§ 158(b)(4)(ii)(A), (B).  This claim fails as a matter of law.

### A.  The Job Targeting Program Does Not Violate the LMRA.

A claim under § 8(b)(4)(ii)(A) or (B) requires Plaintiffs to establish: (1) that Local 7 engaged in certain *conduct*, namely, threats, restraints or coercion within the meaning of 29 U.S.C. § 158(b)(4)(ii); and (2) that such conduct was engaged in for an improper purpose, within the meaning of subsections (A) or (B).  See e.g., Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, 854 F.2d 144, 146 (6th Cir. 1988).  With regard to the job targeting program, Plaintiffs can establish neither unlawful conduct nor improper purpose.

### 1.  Denials of Target Funds Do Not Constitute 'Threats, Coercion or Restraint.'

In drafting § 8(b)(4), Congress did not create a "sweeping prohibition" on all forms of secondary boycotts or pressure.  Local 1976, United Bhd. of Carpenters v. N.L.R.B., 357 US 93, 98 (1958).  The subsection "describes and condemns *specific* Union *conduct* directed to specific objectives."  Id. (emphasis supplied). A long series of Supreme Court and appellate cases emphasize the lawfulness and the potential breadth of union conduct other than the prohibited conduct, even where directed at secondary employers.  See e.g. Edward J. DeBartolo Corp. v. Florida Golf Coast Buldg. and Constr. Trades Council, 485 U.S. 568, 579 (1988) (allowing union handbilling to promote consumer boycotts of a "secondary" shopping mall to pressure the mall to cease doing business with a subcontractor, and finding "untenable the notion that *any* kind of

33

handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer is 'coercion' within the meaning of §8(b)(4)(ii)(B) even though, if the appeal succeeded, the retailer would lose revenue."); N.L.R.B. v. Servette, Inc., 377 U.S. 46, 57 (1964) (finding the union's request, unaccompanied by a work stoppage, to managers of a secondary company to cease doing business with the union's primary disputant, and warnings that handbills would be distributed in front of noncooperating stores, were not unlawful conduct); Storer Communications, 854 F.2d at 146 (allowing union boycotts of secondary advertisers to pressure the primary employer); George v. Letter Carriers, 185 F.3d 380 (5th Cir. 1999) (finding threats that union members will not patronize a secondary employer not "(ii) conduct").

In Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, No. 94-3309, 1997 WL 311498, (D. Md. 1997), *aff'd*, 133 F.3d 914 (4th Cir.) (Table) (unpublished decision), *cert. denied*, 525 U.S. 825 (1998), the court scrutinized a union's job targeting program under §8(b)(4)(ii)(A) and (B). The court concluded that the withdrawal of targeting funds did not constitute unlawful coercion. Id., at *2, 12, 14. The lesson of Grinnell is that grants and denials of targeting contributions do not amount to "coercion," whether or not the union's objective is to enmesh a neutral, and appellate cases from Servette to DeBartolo to Storer Communications confirm that more harsh pressure tactics need not constitute "(ii)" conduct, even when directed at secondary employers. If grants and denials of targeting contributions do not constitute § 8(b)(4)(ii) conduct, then Local 7's job targeting activities could not have violated either § 8(b)(4)(ii)(A) or (B), however the Plaintiffs may characterize Local 7's objectives.

### 2.    Grants of Target Funds Were Not In Furtherance of a Prohibited Objective.

By citing subsection (ii)(B), Plaintiffs' allege Local 7 engaged in the improper conduct with the objective of forcing secondary employers to cease doing business with Plaintiffs.   A similar contention was raised and rejected in Allied Mechanical Servs., Inc. v. Local 337 of the

<u>United Assoc. of Journeyman and Apprentices of the Plumbing and Pipe Fitting Indus.</u>, 1999 U.S. Dist. LEXIS 4654 (D.W. Mich. 1999), *aff'd*, 221 F.3d 1333 (TABLE) (6th Cir. 2000).  In that case, the plaintiff claimed it should have been eligible to participate in a job targeting program but was excluded and the customers were thereby restrained from doing business with plaintiff.  The district court rejected this claim, finding that even assuming that the denial of funds made it more difficult for the plaintiff to successfully bid on a project, such an objective is not prohibited by § 8(b)(4), but instead was the "'necessary consequence of the purest form of primary activity' [and] clearly protected.'"  <u>Id</u>. at 29 (internal citation omitted) (emphasis supplied).  Similarly here, even if Local 7 allegedly enticed any fabricators or higher tier employers during Local 7's efforts to obtain work, with the incentive that job targeting funds could be provided to signatory subcontractors (who could then reduce their prices), those approaches to secondaries did not amount to a prohibited "cease doing business" objective.

By citing subsection (ii)(A), Plaintiffs' also allege Local 7's prohibited objective in engaging in the allegedly improper conduct was obtaining exclusionary "hot cargo" agreements that would be prohibited by § 8(e) of the LMRA, 29 U.S.C. §158(e).  This allegation must be rejected for two separate reasons.  First, to the extent that Plaintiffs are alleging that Local 7 approached fabricators or other companies, on a job-by-job basis, at dozens of sites recounted in the Complaint, and persuaded them to use contractors who employed union members, or that Local 7 gave targeting money directly to the signatory contractor, who then obtained the work (Compl. ¶¶ 69, 81-146), there is no improper exclusionary agreement at issue.  While Plaintiffs characterize most of Local 7's efforts to secure work at labor contract standards as supposedly illicit "top-down organizing," that is, organizing by persuading *contractors* to hire union subcontractors and union workers, often under "pre-hire labor contracts" negotiated before a job

is staffed, rather than pursuing elections among *employees* of non-union subcontractors, top-down organizing is generally permitted by the LMRA in the particular setting of the construction industry.  The LMRA specifically condones top-down organizing in § 8(f) and in the proviso to § 8(e).  See 29 U.S.C. §158(f) (authorizing "prehire" labor agreements) and 29 U.S.C. § 158(e) (setting forth the construction industry exception to § 8(e)'s prohibition against "hot cargo agreements", so that construction employers may reach agreements with a union to refrain from doing business with non-union employers).  See Iron Workers Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889 (1988) and Woelke & Romero Framing v. N.L.R.B., 456 U.S. 645, 663 (1982) ("top down organizing . . . pressure is implicit in the construction industry proviso" to § 8(e) of the NLRA).

Second, to the extent that Plaintiffs are contending that Local 7 had an unlawful purpose of entering into broader agreements with fabricators or general contractors with whom it had no CBA which could be unlawful under § 8(e), there are simply no facts to support the claim.  See Undisputed Facts ¶ 10, 15 (Local 7 awarded job targeting funds on a job-by-job basis).   Indeed, Plaintiffs themselves allege that Local 7 repeatedly approached fabricators or general contractors with whom it had no contract, and persuaded them *job by job* (utilizing grants and denials of job targeting funds) to hire subcontractors who employed Local 7 members.  Compl. ¶¶ 69, 81-139 (alleging over 25 separate incidents in which Local 7 allegedly sought and obtained work for its members by appealing to various fabricators and developers using job targeting funds, or simply by making target funds available to signatory contractors).  Even taking these allegations as true, they cannot establish Local 7's objective to establish any such generalized hot cargo agreement.

Connell, supra, is thus inapposite.  In Connell, the agreement between a union and a general contractor with whom it did not maintain a CBA was illegal under § 8(e) because the

agreement required the contractor to deal only with union signatory subcontractors on *all of its jobs*.  421 U.S. at 619-21, 633, 635 (1975).[25]  In contrast, Local 7's job-by-job solicitations of work and offers of payments, as alleged by Plaintiffs, for literally dozens of individual projects, did not result in generalized agreements with non-signatory companies prohibiting them from working with non-union contractors on all future jobs.  Compl. ¶¶ 67-139.  Plaintiffs even allege that, on "many occasions", the secondary parties (fabricators or developers) were able to utilize credible threats that they were perfectly capable of retaining Plaintiffs or other non-union contractors, as a means of pressuring signatory contractors to lower their prices by obtaining more job targeting funds.  See Compl. ¶ 60.  Those bid-shopping tactics by fabricators, alleged by Plaintiffs, simply could not have been utilized if there were generalized agreements in place preventing the fabricators from retaining Plaintiffs.

**B.    No Other Conduct Alleged by Plaintiffs Violated the LMRA.**

1.  American Steel Erectors:  Plaintiff ASE has confirmed that job targeting comprises its only claims of union misconduct in this case.  See Pls.' Resp. to Def. Local 7's First Set of Interrogs., Answer to Interrog. 20 (identifying no conduct other than the job targeting, and directing that any further Answer should be obtained in depositions); ASE Dep. Tr. pp. 91-92 (acknowledging that apart from targeting jobs and subsidizing projects, there was nothing else that Local 7 did that caused it to participate in this lawsuit).

2.  Bedford Iron Works:  Plaintiff Bedford Iron Works' only allegation of union misconduct other than job targeting is the claim that Local 7 "regularly successfully stripped workers from Bedford Iron" on the Deerfield Academy job.  Compl. ¶ 151; see also supra at 7-8.

---

[25] It is not clear from the Complaint if Plaintiffs is alleging that Local 7 in fact entered into an exclusionary "hot cargo" agreements prohibited by § 8(e).  While § 8(e) makes such an agreement an unfair labor practice within the jurisdiction of the NLRB, the statute provides no private remedy for an § 8(e) violation in the absence of unlawful § 8(b)(4) conduct.  See 29 U.S.C. § 187 (providing for a private right of action for § 8(b)(4) claims only).

The alleged stripping of Bedford workers does not involve any scintilla of secondary pressure or colorable violation of § 8(B)(4)(ii)(A) or (B). The conduct was apparently directed at Bedford itself, not secondary or neutral employers. Even if the allegations were true, and even if there were evidence that Local 7 agents referred the Bedford employees for union work, such primary pressure does not colorably create a § 8(b)(4) violation.

  3. <u>Ajax Construction</u>: Plaintiff Ajax alleged that it lost the Cardi's Furniture and Archstone Apartment jobs due to some combination of target money and other "illegal pressure" on the fabricator. Compl. ¶¶ 91 & 123. The only other pressure specifically identified by Ajax, however, was "informational picketing."[26] Generic informational picketing, however, simply does not give rise to a § 8(b)(4)(A)(B) violation. Moreover, if the picketing was directed at Ajax itself, it constituted primary picketing, expressly permissible under the proviso to § 8(b)(4)(B). 29 U.S.C. § 158(b)(4)(B) ("provided, that nothing contained in this clause (B), shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing").[27]

  4. <u>American Aerial Services</u>: Beyond job targeting, American Aerial has referred to a few incidents of pressure allegedly related to Local 7. First, it claimed that Local 7 "encouraged" fabricator Canatal to use signatory contractors. That claim does not give rise to an LMRA violation. Approaches to secondary employers' managers to request or press them to cease doing business with a primary employer, or to alter their business practices with a primary, simply do not give rise to § 8(b)(4) violations in the absence of any "threats, coercion or restraint," as those terms are narrowly construed by the courts. <u>DeBartolo Corp.</u>, 485 U.S. at

---

[26] <u>See</u> Ajax Dep. Tr. pp. 125-27 (Ajax did not know the nature of the pressure allegedly put on the developer of the Cardi's Furniture project); <u>id.</u> pp. 129, 147-56 (the nature of the pressure on the Archstone project was "probably" "informational picketing" which Ajax acknolweged is not illegal; <u>see also</u> See Pls.' Resp. to Def. Local 7's First Set of Interrogs., Answer to Interrog. 20 (identifying no conduct other than the job targeting, and directing that any further Answer be obtained in depositions).

[27] Ajax has also contended that Local 7 "stripped" employees from the Plaintiff and apparently found work for them with signatory contractors. Local 7 incorporates by reference its arguments above regarding the stripping claims.

578; Servette, supra.  American Aerial also alluded to union members attempting to monitor a job site in New Hampshire.  Notably, American Aerial made clear it was not seeking damages for that incident.  AAS Dep. Tr. pp. 31, 44-45.  Even if surveillance of a job site were deemed "coercion or restraint", union conduct directed at American Aerial is directed against the primary employer, and does not colorably raise a claim of secondary boycott activity.  Finally, American Aerial alludes to its employee allegedly being run off the road by a member of Local 7.  AAS Dep. Tr. pp. 26, 30.  Not only is there no evidence that the member was an agent of Local 7, but there is no claim that the alleged conduct was directed at a secondary employer.

   5.  D.F.M. Industries.  In addition to job targeting, Plaintiff D.F.M. alleges that Local 7 engaged in surveillance of job sites and "sham picketing."  D.F.M. acknowledged in its deposition, however, that the monitoring was lawful and within the union's rights, and that in its view, all picketing is a "sham."  DFM Dep. Tr. pp. 164-66.  Pickets directed at a primary employer are lawful under the primary picketing proviso to § 8(b)(4), 29 U.S.C. § 158(b)(4), and there is no allegation that the picketing here was directed at any secondary.[28]  Finally, D.F.M. alleges that Local 7 engaged in secondary boycott conduct when it persuaded the fabricator or the general contractor to remove D.F.M. from the Fox 25 jobsite.  Even if Local 7's conduct violated 29 U.S.C. § 158(b)(4) (which it denies), D.F.M. cannot prevail on its claim here because it cannot show any injury in fact.  29 U.S.C. § 187 authorizes an award of damages only in the event of injury to business or property caused by the unlawful secondary activity.  See Teamsters, Local 20 v. Morton, 377 U.S. 252, 261 (1964).  Moreover, Plaintiff's claim of loss must be proximately caused by the secondary activity and its showing of damage must be proven, not speculative or conjectural.  Federal Prescription Serv. v. Amalgamated Meat Cutters,

---

[28]  D.F.M. has also claimed that Local 7 picketed its job to obtain recognition, with a picket line unlawfully lasting beyond 30 days.  See 29 U.S.C. §158(b)(7) (thirty (30)-day limits on recognitional picketing).  29 U.S.C. § 158(b)(7) does not give rise to a private right of action.  See 29 U.S.C. § 187.

527 F2d 269, 280 (8th Cir. 1976). [29]    On the Fox 25 job, while D.F.M. claims that it was

removed from the job, it has admitted that it returned about a week later to perform the work and

that it put its workers on another job in the interim.  DFM Dep. Tr. pp. 86, 190-91.  D.F.M. thus

suffered no business loss, and the secondary pressure, even if unlawful, produced no injury.[30]

## V.    **CONCLUSION**

For the foregoing reasons, Local 7 respectfully requests that summary judgment on all

counts be granted in its favor and that all claims in the case be dismissed with prejudice.

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

by its attorneys,

/s/Mickey Long                          /s/Paul F. Kelly
Mickey Long, Esq. (BBO #634388)         Paul F. Kelly, Esq. (BBO #267000)
193 Old Colony Avenue, Box E-1          Burton E. Rosenthal, Esq. (BBO #429220)
South Boston, MA 02127                  Indira Talwani, Esq. (BBO # 645577)
(617) 269-0229                          Stephanie R. Pratt, Esq. (BBO #655108)
mickeylong@gis.net                      SEGAL, ROITMAN & COLEMAN
                                        11 Beacon Street, Suite 500
                                        Boston, MA  02108
                                        (617) 742-0208
Dated:  August 31, 2006                 pkelly@segalroitman.com

---

[29]  D.F.M.could have avoided the injury requirement by seeking an administrative remedy, including potentially injunctive relief, see 29 U.S.C. § 160(l), at the NLRB.  It chose to pursue a private damage remedy under 29 U.S.C. § 187 instead, and accordingly, must demonstrate actual injury.

[30]  DFM also alleges that its equipment on the Fox 25 jobsite was damaged.  As to the damaged equipment there is no evidence or allegation that Local 7 was responsible for it.  See Feb. 6, 2006 Order at 4 ("The Complaint does not describe a violent act with any specificity or indicate whether a Local 7 member or official was involved.")  Even if it were shown to be the responsibility of Local 7, Plaintiff still cannot establish any claim for damages.  First, damage by Local 7 to Plaintiff's own equipment would be primary, not secondary, activity, and therefore outside of § 8(b)(4).  Moreover, DFM again can establish no actual damages.  See DFM Dep. Tr. pp. 87-88 ("We were asked to leave.  We left.  When we came back, we had some equipment that was damaged.  We told them, you better figure out who did this and sort out who is going to pay me for my stuff.  They did and we went back"); see also id. at 171 (DFM does "not recall" if it received compensation for the damaged equipment).

**CERTIFICATE OF SERVICE**

I hereby certify that this Amended Memorandum of Law In Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on August 31, 2006.

/s/ Indira Talwani
Indira Talwani, Esq.

41