# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 04-cv-12536-RGS ) |
| LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS. | ) ) ) ) ) |
| Defendant. | ) ) ) |

## PLAINTIFFS' MEMORANDUM IN RESPONSE AND IN OPPOSITION TO LOCAL 7's MOTION FOR SUMMARY JUDGMENT

### I.  SUMMARY OF ARGUMENT

<u>Antitrust – Defendants' Contentions</u>

Defendant makes the following contentions:

1.      The statutory exemption accorded organized labor shelters it from liability under the antitrust laws.

2.      The implied statutory exemption accorded organized labor shelters it from liability under the antitrust laws.

3.      If Local 7 is subject to the antitrust laws, plaintiff has not raised a material issue of fact which would preclude entry of summary judgment.

<u>Labor Law Violation – Defendants' Contentions</u>

Defendants make the contention that its job targeting program was consistent with the National Labor Relations Act and therefore it cannot be held to be violative of any provision of Section 8 (b)(4) or 8(e) of the Act.  29 U.S.C. §§ 158(B)(4) and 8(e).

*Plaintiffs' Response*:

Local 7 commenced a job targeting program in the 1990's.  The program, at its inception, was unilaterally established.  It thrived upon special payments by members dedicated to a

"Fund." Union employers applied to the Fund for subsidies based upon real or fanciful potential competition from non-union contractors. In making their application, they might identify who their anticipated competition was; and the number of hours of estimated work involved on the project. The union either agreed with the contractor to provide a subsidy or it would reject the application.

Subsidies were paid either to the requesting contractor, or directly to the owner, developer or general contractor on the particular project. If paid to the requesting contractor, it could not subcontract bargaining unit work, under the terms of its agreement with Local 7. If paid to the owner, developer or general contractor, it had to employ a Local 7 signatory contractor as a condition to receipt of the subsidy.

Targeting plans are not new as a tool of organized labor. What is different here is that this plan was, with the knowledge of both Local 7 and its signatory contractors, administered in a fashion that is inconsistent with State and Federal law, thereby exposing it to antitrust liability. In particular, funds were deducted from members' paychecks on federal projects, such as the Boston Central Artery and Harbor Tunnel project, and that conduct flatly violates the Davis Bacon Act. 40 U.S.C. § 276 *et seq*. Second, funds were deducted from members' paychecks on state and municipal projects and that conduct flatly violates the Prevailing Wage Laws of the State of Massachusetts. Third, these improperly collected funds were commingled with funds from private projects, and paid to Local 7 contractors and others, tainting the entire subsidy. Fourth, substantial subsidies were paid on prevailing wage jobs where the underlying predicate, *i.e.*, wage and fringe disparity, cannot, by definition, exist. Finally, payments to developers, owners, and general contractors cannot be justified under any view of the law.

In summary, while the targeting plan ***may*** have been unilaterally conceived, it required the active, concerted participation of contractors and others to make it work. Contractors had to make the improper deductions; the union approved such improper deductions; the parties had to work hand-in-glove to determine which jobs qualified for subsidy and which ones did not; and,

of course, the contractor or others had to receive and accept the subsidy, knowing full well its intent was to fence out non-union contractors.

## II.  Summary Judgment Standards

An order granting summary judgment may be entered only when the moving party bears the initial burden of producing evidence to support its claim and "pointing to an absence of evidence to support the nonmoving party's claim." *Nithin Parikh v. Franklin Medical Center*, 940 F. Supp. 395, 398 (D.C. Mass. 1996).  If the moving party meets this burden, the non-moving party must adduce evidence to demonstrate the existence of a material issue of fact.  Of course, the evidence is to be viewed in the light most favorable to the non-moving party.  *Ibid.* at 398.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

> In analyzing the evidence at the summary judgment stage, therefore "* * * plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. * * *."

*City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1405 (9th Cir. 1989); *Continental Ore. Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962).  In other words, the plaintiffs' evidence of an antitrust conspiracy, together with any reasonable inferences to be drawn therefrom, must be viewed in its totality to determine if there is a triable issue of fact.  *Beltz Travel Service, Inc., v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1366 (9th Cir. 1980).

In an antitrust-labor context, summary judgment is inappropriate with the evidence shoes that economic primary and secondary pressure has been applied by a union where it has sought out contractors to assign jobs to its signatory contractors.  A review of Ex. 13 shows target agreements were made with approximately 91 of the employer signators to the Local 7-BTEA Contract.  Ex. 10.  This evidence certainly "suggests" a concert of action that the can "reasonably infer" to preclude summary judgment.  *Altemose Const. Co. v. Building and Construction Trades Council*, 751 F.2d 653, 658 (3d Cir. 1985).

With these standards in mind, a review of the record evidence demonstrates that, at the very least, the issue of whether there is sufficient evidence of a cognizable antitrust or labor law violation is sharply disputed and must therefore be submitted to the trier of fact for resolution.

### III.  Factual Context

The case before the Court is presented by five small open shop contractors doing business in the structural steel erection industry.  Local 7 is a labor organization that represents workers in the structural steel erection industry for purposes of collective bargaining.  Local 7's signatory employers are competitors of the Plaintiffs.

Since 1993, Local 7 began a Job Target program whereby it would accumulate funds taken out of employee wages as dues on private and government prevailing wage projects, and return tens of millions of dollars of wage deductions back to the union signatory employers to be used to lower the price of their bids in the market.  The Union's Job Target program was not created via collective bargaining with the Building Trades Employer's Association ("BTEA").  Moreover, individual Job Target Contracts are entered into by Local 7 with signatory employers upon which the contractor agrees to maintain the wage rates and benefits set by the Union's collective bargaining agreement.  Ex. 12.

From December 1, 1999 through May 18, 2006, Local 7 allocated $16,162,134.20 in target money to its signatory employers to underbid the Plaintiffs.  With their agreement, the union sought their signatory contractors' assistance to drive Plaintiffs and other open shop contractors out of the structural steel market.  Local 7's purpose is to "provide the money to control the system."  Hurley 19 ll.5-6.

By its own admission here, Local 7 presents no evidence to dispute its 230 odd signators hold over 70% of the market and there are only about twenty non-signators of much smaller size then their union sector counterpart employers.  Br. at 2.  Moreover, Local 7 has demonstrated no evidence of organizational intent with regard to the nonunion sector.  D.F.M. 56 ll.6-14

The ability of Local 7 to target jobs that Plaintiffs are bidding on, and then with their signatory contractors to bi-laterally facilitate entry into exclusionary agreements with steel fabricators and general contractors as the evidence shows, have prevented Plaintiffs from fully participating throughout the marketplace, injured competition, and artificially raised consumer

prices.[1]

Plaintiffs require the protection of the Court in order to protect their business investments and the time and effort in bidding and ensuring a competitive market exists for their services. If Local 7's multi-million dollar target money collections and expenditures continue, they will prevent Plaintiffs from gaining further efficiencies in their delivery of services by expanding their volume, upon which Local 7 will have successfully established a union-only enclave—the very object it seeks and which the Complaint seeks to prevent.

## IV.  Argument

A.     The Davis-Bacon Act.

As this court knows, construction in Massachusetts has been dominated by federal and state projects, *e.g.*, the Boston Central Artery and Harbor Tunnel project (the "Big Dig"). The Harbor Clean up was a major project, funded by the federal government. It was, as are substantially all projects supported by federal funds, subject to the strictures of the Davis-Bacon Act. 40 U.S.C. § 276 et seq. This Act compels all tiers of contractors on subject projects to pay workers at a rate, wage and fringe, as determined by the Department of Labor. Failure to comply may and frequently does result in debarment together with collection proceedings. Thus, by definition all contractors bidding on a project must factor into their bids substantial equivalency of labor cost. If there is an exception, it is that non-union employers tend to have fewer or less expensive qualifying fringe benefits; make up this differential by supplemental wage payments; and therefore incur an enhanced payroll tax and Workers' Compensation expense. To overcome this differential they must be more efficient than their union competition.

In 1991 the U.S. Department of Labor, Wage Appeal Board held that it was

---

[1]General Contractor Clayco Construction informed James F. Stearns that they had arranged with the union to "have target money available for the job" Stearns 48 ll.12-23, which amounted to $365,125.00, Ex. 13, that James F. Stearns Co. successfully used to underbid Plaintiff Ajax Const. Local 7 applied pressure to fabricator Capone Iron Corporation to terminate Plaintiff D.F.M.'s written purchase order for $80,050.00 on October 8, 2004, Ex. 8, and award the job to Union signator Bel-Lin Corp. for $115,200.00; Bel-Lin Corp. 42 ll.17-20; Ex. 7, a $30 thousand dollar *increase*. Contrary to the Union's representation at page 3 of its Brief that "price is king," union target money and economic conspiracies with business, undermine a normally function competitive marketplace.

impermissible for an employer, on Davis-Bacon projects, to withhold monies from an employee's pay check to fund job targeting programs. *In the matter of Building and Construction Trades Unions Job Targeting Programs*, W.A.B. Case No. 9-92 (June 12, 1991). This decision was promptly endorsed by the two Circuit Courts. *Building & Construction Trades Department v. Reich*, 40 F.3d 275 (D.C. Cir. 1994); and *Electrical Workers Local 357 v. Brock*, 68 F.3d 1194 (9th Cir. 1995). These decisions rest on two key foundations: the impropriety of a return of a portion of a worker's wage to the employer; and the effect of targeting program was to artificially inflate computation of prevailing wages. There are no contrary determinations. Thus it must be considered, as a given, that such deductions are improper and, further, Local 7 does not deny that such deductions were made.

Not only do these decisions control interpretation of the Davis-Bacon Act, but they were also found dispositive under the National Labor Relations Act. Initially, in *Manno Electric, Inc*., 321 N.L.R.B. 278 (1996), enf. 127 F.3d 341 (5th Cir. 1997), the NLRB held that job targeting programs were not inconsistent with public policy; and were affirmatively protected by Section 7 of the NLRA (29 U.S.C. § 157) because the objective was to supplement "the wages of the employees of certain union employers so that they ***may bid on a parity*** with non union contractors whose pay scale is lower."

More recently the Board and the courts have recognized that job targeting programs, in their daily operation, as opposed to their initial construct, are not protected by the National Labor Relations Act. In *International Brotherhood of Electrical Workers, Local 48 (Kingston Constructors, Inc.)*, 322 N.L.R.B. 1492, the NLRB General Counsel charged that the union had violated sections 8(b)(1)(a) and (2) by causing a member to be discharged from employment because of failure to pay into the target fund for hours worked on a federal project. The NLRB held that requiring payment of target dues on Davis-Bacon jobs was "inimical to public policy." *Id.* at 1500, 1502.

The Court of Appeals for the District of Columbia carried the *Kingston* analysis one step further in *Can-Am Plumbing v. N.L.R.B*, 321 F.3d 145 (D.C. Cir. 2003). There, the plaintiff filed

a state court proceeding concerning deduction of target dues on state and federal jobs; it was held to be preempted by federal law; and the union sought recovery of its incurred fees under the *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983), doctrine and its progeny before the NLRB.  The NLRB sustained the charge on two grounds:  there was no record evidence that Can-Am worked on public jobs; and second, of the funds collected by the fund, only 3%, a *de minimis* amount, was attributable to public projects.

The D.C. Circuit dispatched the first argument, stating:

> "The Ninth Circuit, following suit in *IBEW v. Brock*, has also held that Davis-Bacon bars unions from using dues collected from wages on Davis-Bacon projects to benefit any contractor, not just the specific contractor from whom the wage rebate is derived.  68 F.3d at 1201.  The Board's observations that the Ascent project was not a Davis-Bacon job is, therefore, irrelevant."

It further rejected the *de minimis* finding, criticizing the Board for its superficial analysis; its failure to accord dignity to a statute it does not administer; and its failure to determine if a two to three percent (2% - 3%) margin, might provide a decisive bid margin.

As set forth, above, the Court of Appeals found the Davis-Bacon taint beyond the jurisdiction of the Board to regulate.[2]  The Court reversed and remanded the case back to the Board.[3]

The following principles may be distilled:

- It is unlawful, under both the NLRA and the Davis-Bacon Act to deduct target monies from an employee's paycheck.

- It is unlawful for the union to make payments to any contractor from and for an employer to accept the proceeds of these deductions.

- Wage equalization between union and non-union contractors is not required on Federal projects.

- Such deductions are inimical to public policy.

---

[2]These programs illegal distort and subvert the marketplace.  IBEW v. Brock, 68 F.3d at 1201.

[3]The Copeland Anti-Kickback Act, 8 U.S.C. § 875, and the Anti-Kickback Act, 41 U.S.C. § 51, both criminal statutes, were enacted to ensure that prevailing wages remain in the pockets of employees and no such money earned by employees was ever to return to the benefit of employers.

B.    Prevailing Wage Laws of the State of Massachusetts.

There have been numerous major projects in Massachusetts funded by state and local governmental authorities. The Big Dig is but one example. *See Utility Contractors Association of New England v. Commissioner of Mass. Dept. of Public Works*, 1996 WL 106983 (1996).

Many states have counterpart statutes to the Davis-Bacon Act. Massachusetts is among them. M.G.L. c. 149, §§ 26 *et seq*. This law requires the Commissioner to establish the prevailing wage rate, inclusive of fringe benefits. *Ibid.* at § 26. The rates established may not be less than those established in the relevant collective bargaining agreement. *See Felix A. Marino Co. v. Commissioner of Labor and Indus.*, 689 N.E.2d 495 (1998); *Commissioner of Labor and Industries v. Worcester Housing Authority*, 393 N.E.2d 944 (1979). Any employer who pays less than the amount required or who:

> "* * * take or receive for his own use or the use of any other person, as a rebate, refund or gratuity, or in any other guise, any part of portion of the wages, * * *"

violates the section and is subject to a civil citation; a stop work order; and treble damages. *Ibid.* at § 27. Further, any contractor who willfully violates the chapter is punishable by fine and imprisonment. A repeat offender may be imprisoned for more than two years. *Id* § 27C.

While the Courts of Massachusetts have not faced the issue here: may funds be deducted from state projects; be commingled with other private funds and funds extracted from employee prevailing wages; and paid out to participating contractors, it is highly probable that it would side with other courts which have declared such practices to be violative of the Act. *See Can-Am Plumbing*, *supra*, at 151. In *J.A. Croson v. J.A. Guy, Inc.*, 691 N.E.2d 655 (Ohio S.C. 1998), cited approvingly by the defendant, the court recognized that deduction of target monies on public projects violated its prevailing wage laws. Finally, the precise text of the Act leaves little doubt that this State cloned the prohibitions of the Davis-Bacon Act.

Plaintiff may urge that the NLRA trumps or preempts state law and therefore this court may not consider violation of Massachusetts law for any purpose.[4] Admittedly the *Croson* court

---

[4]While the state court litigation was pending against it, J.A. Guy, Inc. and the Union led unfair labor practice charges with the National Labor Relations Board that led to a hearing on whether the

reaches that conclusion in a case filed in state court, presenting only state law issues.  That Court gave inadequate weight to the fact that prevailing wage laws, like minimum wage laws, establish minimum requirements.  Nor will due respect to concepts of federalism countenance such brusque treatment.

For example, in *Metropolitan Life Insurance Co, v Massachusetts*, 471 U.S. 724 (1985), the state of Massachusetts established minimum mental health care benefits to insured beneficiaries.  It was urged that this legislation was preempted by the NLRA because it mandated a substantive term of a collective-bargaining agreement.  The Court stated there are two separate tests for NLRA preemption.  The court summarily rejected application of the *Garmon* analysis (conduct arguably protected or prohibited by the Act), *San Diego Building Trades Council v. Garmon*, 359 U.S. at 241-45, the hook upon which the Ohio Supreme Court improperly rested its decision.  The Supreme Court then turned its attention to the *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976) test:  Congressional intent that the conduct of the parties be unregulated by the states.  The court found that Congress's concern under the NLRA was with the process of determining terms and conditions of employment; and not with the particular substantive terms.  It went on to state:

> "The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment.
>
> "Accordingly, it never has been argued successfully that minimal labor standards

---

employer's lawsuit violated the Labor Act. On June 27, 2003, Chief NLRB Administrative Law Judge Robert A. Giannasi issued a decision recommending dismissal of the administrative complaint based on the D.C. Circuit's *Can-Am Plumbing* decision.. He found the employer's lawsuit *not* preempted by the Labor Act.  First, Judge Giannasi found that the J.A. Croson decision was of limited value because it predated the Board's decision in Kingston, supra, and as set forth in Can-Am Plumbing, both the federal and state governments share similar public policy concerns where wages are used for purposes "inimical to public policy." ALJD at 10. Consequently, the uniform federal scheme under the Davis-Bacon Act made the preemption inapplicable to similar state laws for the same reasons and so he recommended dismissal of the complaint.

As the case affects the situation at bar here, Judge Giannasi answered the question whether "job targeting deductions on state prevailing wage projects" should be "*unprotected, they are on federal projects*." ALJD at 10 ll. 38-40.  Here, Plaintiffs alleged that the job target funds are implemented and operated in violation of federal law and implicitly under state law. It is inconceivable that the Board could rule on remand that a state claim to stop collection and expenditure of money extracted in part from Davis-Bacon funds or on state prevailing wage projects is preempted.

imposed by other *federal* laws were not to apply to unionized employers and employees * * *. We see no reason to believe that for this purpose Congress intended state minimum labor standards to be treated differently from minimum federal standards."

Based upon this salient logic, it rejected the notion that the Massachusetts health care benefit law was preempted.

The same conclusion applies to state prevailing wage statutes. *See also Felix Marino, supra*. For example the Ninth Circuit held in *Chamber of Commerce of the United States v. Bragdon*, 64 F.3d 497, 502 (9th Cir. 1995):

"The federal prevailing wage statue enacted by the Davis-Bacon Act, 40 U.S.C. 276(a) et seq., has long been recognized as consistent with the NLRA. Similarly, state prevailing wage laws for public works projects, such as the California Prevailing Wage Statute, have also been recognized as not pre-empted because the State is acting as a proprietor and not a regulator."

*See also Associated Builders and Contrs. of S. Cal. v. Nunn*, 356 F.3d 979, 989 (9th Cir. 2004).

Finally, a fair reading of *Can Am, supra*, supports this conclusion. There the allegedly preempted laws included the state of California prevailing wage statute. The court did not carve out that body of law as preempted; and, in its admonition, upon remand to the Board, counseled that it take care to avoid leaving the plaintiff with no redress for state law prevailing wage violations. *Ibid.* at 154.

C.    Antitrust Exemptions.

Local 7 asserts it is protected by either or both of the statutory or implied exemptions accorded to labor under the antitrust laws. It is mistaken. As will be demonstrated, neither provide shelter from salutary reach of the antitrust laws.

In considering these issues, one or more of the following facts will be made:

- Employers impermissibly deducted target monies from employee wages on state and federal projects.

- Employers who are signatory to union agreements received monies from these deductions to support bidding against non-union contractors

- Employers received target monies on public works jobs where wage equalization was unnecessary.

•    Monies were paid to entities with which the union has no representational interest.

The parties agree in most respects as to the interpretation of the statutory exemption.  It is rather with the ultimate conclusion that the parties differ.

At the outset, it must be recalled that, as a general proposition, exemptions from the antitrust laws are always narrowly construed.  *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982); *Wiley, A Capture Theory of Antitrust Federalism*, 99 Harv. L. Rev. 713, n.1 (1986).  This principle of narrow construction applies with no less force to the labor exemptions.  *See* Morris, *The Developing Labor Law* at 1741-43 (3d ed. 1992), Durie & Lemley*, The Antitrust Liability of Labor Unions for Anticompetitive Litigation*, 80 Cal. L. Rev. 757, 782 (1992).  There are only two theories under which union activity has been sheltered from the free play of the antitrust laws, and each has been narrowly restricted to specific sets of facts.

1.    Statutory Exemption

The first theory is the so-called "statutory" labor exemption, which refers to specific laws enacted by Congress to expressly remove certain limited union activities from antitrust scrutiny.  Thus, Section 6 of the Clayton Act states that human labor "is not a commodity or article of commerce" and immunizes unilateral labor organization activities designed to carry out the "legitimate purposes of labor unions from claims under the antitrust laws."  15 U.S.C. § 17.  These protections were reaffirmed by the Norris-LaGuardia Act, which shield legitimate union activities conducted unilaterally in the pursuit of union goals.  29 U.S.C. §§ 101-115.

We commence with a given.  The exemption is not available if either of the following two elements is present:

•    Did the union combine with a non-labor group?

•    Did the union act in its legitimate self interest?

*United Mine Workers of American v. Pennington*, 381 U.S. 657, 662 (1965); *Allen Bradley Co. v. Local No. 3, IBEW*, 325 U.S. 796, 806-07 (1945); *United States v. Hutcheson*, 312 U.S. 219, 232 (1941); and *USS-Posco Industries v. Contra Costa County Building and Construction Trades Council*, 31 F.3d 800, 805 (9th Cir. 1994)  This test is stated in the

disjunctive.  Thus the presence of either element forecloses use of this exemption.

a.    Contract, Conspiracy, Concerted Action, or Combination.

The complaint alleges that Local 7 combined or conspired with non-labor groups in several ways.  First, the employer groups worked in concert with Local 7 to receive the largesse of the fund.  Employers had to request the funds; estimate the hours of work on the project; and, of course, accept the grant and apply the monies.  Second, these employer groups deducted, impermissibly, but with the knowledge and complicity of the union, wages earned on public projects.  Third, they accepted payments on projects where wage equality was mandated by law. Fourth, the impermissibly deducted funds were used to subsidize both public and private projects.  Finally, the union provided funds to developers, general contractors, and others to successfully induce them not to use plaintiffs and other non-union companies.

The questions are two fold: was the conduct of the union unilateral or in combination with non-labor groups and/or was this conduct in the legitimate self interest of the union?

Clearly the union employers constitute non-labor groups.  As the Court in *USS-Posco*, *supra*, noted competitors, suppliers and purchasers fit the definition as does an employer trade association.  *Ibid.* at 806-07.  *Altemose Const. Co. v. Building and Construction Trades Council*, 751 F.2d 653, 655 (3d Cir. 1985).

Section 1 of the Sherman Act interdicts combinations, conspiracies and contracts in unreasonable restraint of trade.  As will be explained, *infra*, it may not be assumed that these terms are synonymous.  A conspiracy is a conscious commitment by two or more entities to a common plan or scheme which unreasonably restrains trade.  *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1488 (9th Cir. 1991); *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 212 (3d Cir. 1992), *cert den.*, 507 U.S. 921 (1993).  It is not critical that the members of the conspiracy share a common motive.  A rational jury may infer

"* * *agreement with the objective from knowledge of the objective and action calculated to achieve the objective despite differing motives."  *Ibid.* at 212.

The existence of an antitrust combination or conspiracy, whether under Section 1 or Section 2 of the Sherman Act, can be shown by express agreement, but a formal contract is not

necessary. *United States v. General Motors Corp.*, 384 U.S. 127, 142-42 (1966) (explicit agreement is not a necessary part of a Sherman Act conspiracy). Rather it is sufficient that a "concert of action be contemplated and the defendants conform to the arrangement." *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 182 (2d Cir. 1970); *American Tobacco Co., v. United States*, 328 U.S. 781, 810 (1946). Such an understanding may be tacit and may arise without verbal communication. *Id.* at 809; *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965). If the defendants can be shown to have deliberately joined together to achieve a desired result, the existence of a conspiracy has been proven. *American Tobacco Co.*, 328 U.S. at 810; *United States v. Champion Int'l Corp.*, 557 F.2d 1270 (9th Cir. 1977).

As in conspiracy law generally, where several acts or transactions are alleged to constitute a single conspiracy, there need not be proof that each defendant must have participated in each transaction, nor is proof required that each defendant knew either the identity or function of all his alleged co-conspirators, or that all worked together consciously to achieve a desired end. *Esco Corp.*, 340 F.2d at 1006. Moreover, a single defendant who joins a continuing conspiracy after others have commenced it, or partially carried it out, cannot claim immunity either for his actions, or for those of others taking place before or after his active participation, as long as he remains an active participant. *Id*. Rather all conspirators are jointly liable for the acts of their co-conspirators. *Beltz Travel Services, Inc.*, 620 F.2d at 1367; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54.

In *JTC Petroleum Co. v. Piasa Motor Fuels*, 190 F.3d 775 (7th Cir. 1999), Judge Posner discussed the elements of a conspiracy. The complaint alleged that competitors of the plaintiff conspired with suppliers to cause the latter to boycott plaintiff. The court labeled the suppliers as the cat's paw and the competitors as the cat. The court reversed grant of summary judgment, stating that it was entirely plausible that the "cartelists" were paying the suppliers, in the form of higher profits earned, to exclude the plaintiff. That evidence was sufficient to ensnare the suppliers into the conspiracy.

Alliances between non-labor and labor suffice. *Bodine Produce v. United Farm Workers Org., Comm.*, 495 F2d 541, 557-58 (9th Cir. 1974). Certainly, the concerted activities of the signatory contractors and owners, developers and others in accepting subsidies in exchange for exclusion of open shop contractors, creates an alliance. At worst, it is a material question of fact.

      b.     Combination.

The Supreme Court has delineated a different definitional bench mark for a "combination." In *United States v. Parke, Davis and Co.*, 362 U.S. 29, 44 (1960), the defendant threatened wholesalers with termination unless they refused to do business with discounting retailers. The Court held that there were two forms of combination achieved: First, a combination between Parke, Davis and its wholesalers who threatened or terminated retailers. Second a combination between Parke, Davis and acquiescing retailers. The lesson of the case is that involuntary participation, even if coerced, will make an acquiescent party liable. *See also Calnetics Corp. v. Volkswagen of American*, 532 F.2d 674, 682 (9th Cir. 1976); and *City of Vernon v. Southern California Edison Company*, 955 F.2d 1361, 1371 (9th Cir. 1991).

The Court took this concept a step further in *Albrecht v. Herald Co.*, 390 U.S. 145 (1968). There the defendant was unhappy that its dealer was overcharging for delivered newspapers. After warning plaintiff, it advised of its intent to also deliver the papers. It engaged a sales circulation company to solicit plaintiff's customers; turned over the fruit of the solicitation to a different carrier, who understood he might have to return the route if plaintiff reduced his prices to those suggested. In finding against the Herald, the court stated: "That section covers combinations in addition to contracts and conspiracies, express or implied." While it was true the new carrier and the sales circulation company did not share the motive of the Herald, they knew its objective and materially aided in furthering it.

In *Bruce Drug, Inc. v. Hollister, Inc,* 688 F.2d 853, 859 (1st Cir. 1982), the First Circuit addressed demands by a drug manufacturer that its retail accounts not sell to a terminated retailer. The Court stated:

> "We can agree with the Court that the action which defendant took, with at times, the unwilling cooperation from dealers, to prevent Bruce from buying its goods,

was technically, concerted activity, within the definition of the Sherman Act***."

See also Home Placement Services, Inc. v. The Providence Journal, 682 F.2d 274, 279

(1st Cir. 1982).

Finally, in U.S. Information Systems v. IBEW Local 3, 2002 U.S. Dist. LEXIS 1038

(S.D.N.Y. 2002), the Court held that coercion of building owners, consultants and others to

exclude the plaintiff from the market adequately alleged a claim for relief.  Agreements with

consumers fall outside the proviso protection of section 8(e) of the NLRA, 29 U.S.C. § 158(e).

This is because the union does not seek to represent the employees of the consumer and therefore

the resulting boycott is unprotected.  Connell Construction v. Plumbers & Pipe Fitters Local 100,

420 U.S. 616 (1975).  See also Local 210, Laborers' Int'l Union of N.A. v. Labor relations Div.

Ass. Gen. Contractors of Am, 844 F.2d 69, 74, 79 (2d Cir. 1988), and Sheet Metal Div. of Capital

Dist. Sheet Metal Roofing and Air Conditioning Contractors Ass'n. v. Local 38, SMWIA, 208

F.3d 18 (2d Cir. 2000).

In conclusion, even if owners, developers, and other no signatories involuntarily accepted

the union only condition of Local 7, implemented through target dollars and/or the threat of job

disruption, a combination has been shown to exist.

   c.  Legitimate Self Interest.

Did the union act in its legitimate self interest?  Activities are deemed to be in the "self-

interest" of a labor organization only "if they bear a reasonable relationship to a legitimate union

interest."  Allied Int'l, Inc. v. International Longshoreman's Ass'n, 640 F.2d 1368, 1380 (1st Cir.

1981), aff'd, 456 U.S. 211 (1982).  In this regard, it has been held that activities which primarily

benefit employers in their efforts to eliminate their competitors are not "legitimate" at all.  See

Allen Bradley, 325 U.S. at 808-09 (union violates Sherman Act where its aids non-labor groups

in creating a business monopoly); Altemose, 751 F.2d at 658-59 (conspiracy between signatory

contractors and union to eliminate non-union competition is not in the union's legitimate self-

interest).  Here, the primary beneficiaries of the target program are signatory contractors, who are

able to underbid their more efficient non-union competitors through the use of the subsidy fund,

thereby garnering for themselves a monopolistic share of the market. As such the targeting program is not in the union's legitimate self-interest.

Further, it should be plain that the union, by aiding and abetting the unlawful deduction from wages of its members on public projects and then funneling the proceeds to contractors, developers, and general contractors is engaged in unlawful conduct, both civilly and criminally. In *United States v. Drivers, Chauffeurs, and Helpers Local No. 639, IBT*, 32 F. Supp. 598 (D.C. 1940), the court carefully parsed the language of Section 6 the Clayton Act, one of the piers upon which the exemption rests. It stated that exemption is conditioned upon "lawfully" carrying out a an union's "legitimate" objectives. It squarely held that the exemption is forfeited if the means deployed is unlawful. *Id.* at 598. *See also The Corporate Campaign-Labor's Ultimate Weapon or Suicide Bomb?*, N.C. Law Rev. 86, 118 (1986).

2.     Implied or Non-Statutory Immunity.

The non-statutory exemption has also been narrowly defined and expressly limited to certain types of union conduct not applicable here. In 1996, the Supreme Court explained that the non-statutory exemption applied "where needed to make the collective bargaining process work." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 234 (1996). The purpose of the exemption is to prevent intrusion upon the collective bargaining process. *U.S. Information Systems, Inc. v. IBEW*, Local 3, 2002 U.S. Dist. LEXIS 1038 (S.D.N.Y. 2002). Specifically, the non-statutory exemption has been held to apply only to the pursuit of legitimate goals through the collective bargaining process. *Connell Const. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 623-26 (1975). These legitimate goals are generally restricted to those issues which are mandatory subjects of collective bargaining, within the meaning of the National Labor Relations Act. *Meat Cutters v. Jewel Tea*, 381 U.S. 676 (1965); *Mackey v. NFL*, 543 F.2d 606, 614 (8th Cir. 1976). Even when these standards are met, if there is additional evidence of anticompetitive conduct, the mandatory terms of a collective bargaining agreement, such as an anti-subcontracting clause, are admissible in evidence to prove a violation of the Act. *Sun Land Nurseries, Inc. v Southern California District Council of Laborers*, 793 F.2d 1110 (9th Cir.

1986).  Undermining the legal minimum set forth in the Davis-Bacon Act is "not an appropriate subject of bargaining."  *Mathiowetz Constr. Co. v. Minn. Dept. of Transp.*, 137 F. Supp.2d 1144, 1147 (D. Minn. 2001).

Moreover, even where the challenged conduct is embodied in a collective bargaining agreement, the non-statutory exemption does not apply when the agreement has anticompetitive effects outside the bargaining relationship.  *Pennington*, 381 U.S. at 657; *Consol. Exp. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 516 (2d Cir. 1979), *rev'd on other grounds*, 448 U.S. 902 (1980).

The Court in *Connell, supra*, made it plain that the exemption was lost if the conduct resulted in a direct restraint upon the business market.  *See also Imperial Construction Management Corp., v. Laborers Int. Union of N.A., Local 96*, 818 F. Supp. 1179 (N.D. Ill. 1993).

Local 7 commences its defense with the notion that it acted unilaterally.  If that were true, then the non-statutory exemption is inapplicable and plaintiff's claims would founder on the sword of the statutory exemption.  As discussed, *supra*, application of the target program is dependent both upon the active participation of union signatory contractors and, where payment is directly made to or an agreement is made with third parties, upon their acquiescence in use of signatory contractors only.

Obviously the Union and BTEA included deduction of target dollars as part of the check-off system in their collective bargaining agreement.  The evidence shows that the market recovery provision was not negotiated.  Stearns 47 ll.7-14.

Facially there would be nothing wrong with that agreement.  And, that is not the restraint of which plaintiffs complain.  Rather, it is how those monies was thereafter administered, *i.e.*, deductions on public works, use on public works where, by definition wage and fringe equalization exists by law; exclusionary grants to entities with whom Local 7 has no representational interest; and use of this tainted war chest to subsidize capture of the business market.

Only one court has considered this precise issue.  In *Mathiowetz Construction Co. v. Minnesota Transportation*, 137 F. Supp. 2d 1144 (D.C. Minn. 2001), the Court squarely held, in

the face of allegation of violation of the Davis-Bacon Act that, the "non-statutory exemption" was lost. It distinguished the *Phoenix Electric, supra*; and *Local Union 257, Int'l Bhd. Of Elec. Workers v. Sebastian Electric*, 121 F.3d 1180, 1187 (8th Cir. 1997), cases, upon which Local 7 relies because neither involved violation of the prevailing wage laws. It found that the exemption was lost for two independent reasons: First, the result of the conduct was to reduce workers' wages beneath the statutory minimum; and second, it artificially inflated the regional prevailing wage rate. Standing is available when lost work is proved. *Mathiowetz*, 137 F. Supp.2d at 1149; *Mathiowetz*, 2002 U.S. Dist. LEXIS 3389 (D. Minn. 2002) ("hearsay to support" loss of bid from a market recovery payment in sufficient to confer standing where all bids were voided).[5]

In conclusion, Local 7 has forfeited the non statutory exemption. The restraint, by its own admission and by BTEA negotiator James Stearns is not part of, nor does it arise out of collective bargaining; second, it thrives on dollars impermissibly derived from public projects; payments to developers, etc. are not based upon a collective bargaining relationship; and, when the funds are utilized on public projects, that can only be justified as a direct assault on the business market, in contravention of the *Connell* teachings.

D.    There Are Material Issues of Fact Which Foreclose Grant of Summary Judgment.

Here Local 7 correctly assumes that this court will reject its claim of immunity, and thus addresses the merits of the claim. In some instances it sets up straw men and bats them down. In

---

[5]*Grinnell Corp. v Road Sprinklers Local 669*, 1997 WL 311498 (D. Md. 1997), found no violation of a market recovery plan where the union denied funds to the employer as part of its "lawful bargaining strategy." *Id*. at *14. Of course, *Grinnell* and all the cases cited by the union predate the NLRB's determination in *Kingston Constructors* and *Can-Am Plumbing* where job targeting plans polluted with prevailing wage contributions are not lawful. *See NLRB v. IBEW, Local 48*, 345 F.3d 1049 (9th Cir. 2003) (union's market recovery plan violated the Davis-Bacon Act). Finally, a union that mandates dues payments for non-chargeable expenses, as Local 7 has done here by taking dues tainted from Davis-Bacon projects and then limiting job target money in their contracts to only their Section 9(a) status employers. It commits an antitrust violations viv-a-vis its Section 8(f)) employers in the construction industry whose employees pay into the target fund, but the union will not provide the 8(f) employers the benefit of its use. *See National Constructors Association v. NECA*, 498 F.2d 510 (D. Md 1980), *aff'd* 678 F.2d 492, 501 (4th Cir. 1982), *pet. dismissed*, 463 U.S. 1233 (1983). *See also, NECA v. Howard P. Foley*, 498 F.2d 552 (D. Md. 1980).

others it inappropriately seeks to apply the teachings of *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993), a case which is palpably inapposite. Further it ignores its responsibility to present evidence to this court in support of many of its arguments, thus failing to shoulder the burden of a moving party under FRCP 56.

      1.      Claims that Plaintiffs do not assert.

Notwithstanding defendant's contrary assertions, Plaintiffs do ***not*** allege a violation of the Robinson-Patman Act; nor price fixing.  It does assert that, in combination with Local 7 contractors and other recipients of tainted target monies, that a vertical and horizontal conspiracy to boycott has taken place in contravention of Sections 1 and 2 of the Sherman Act.

Defendant facilely suggests that the market is open because plaintiffs could become union contractors.  It cites no authority for this extraordinary proposition, because there is none. One need not abandon their business principles to circumvent a restraint imposed by a cabal.

      2.      *Brooke Group* and its progeny.

*Brooke Group* is a Robinson-Patman case.  There two manufacturers collectively sharing less than 15% of the market, engaged in a price war over generic cigarettes.  Plaintiff's theory was that Brown and Williamson discounted its generic brands to force plaintiff to abandon that market.  It hoped that this would squelch the generic brand market and firm up prices in the branded market.  The Court, in recognition of the modest market shares possessed by the litigants, held that the plaintiff could not demonstrate injury to competition unless defendant's prices were beneath cost.  It stated that price reductions are good for the consumer; and that there was little or no risk of harm to competition unless prices of defendant were beneath cost and, once shed of competition by price predation, the discounter could, with relative impunity, recoup its losses by raising its prices to supra competitive levels.  This concept applies both to primary line claims under the Robinson-Patman Act and under Section 2 of the Sherman Act.

Local 7, as the moving party, has the burden of introducing evidence that the bids of its signatory members were above cost.  Its failure to do so compels rejection of its argument.

Second, Local 7 is careful to mask its definition of above-cost bidding.  Of course, it

could contend that its signatory contractors' bids or negotiated agreements were above cost, even without a subsidy. Such an articulation would undercut the very basis for grant of a subsidy. Most logically it argues, without any evidentiary support, that the bids or negotiated agreements were above cost only because of the subsidy. We will proceed based upon that assumption.

In *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1247 (9th Cir. 1982), the Ninth Circuit considered a subsidy case remarkably similar to the case at hand. Sierra Redi-Mix's losses were financed by a sister company. But for the financing, its costs exceeded revenue. The jury returned verdicts, under Section 1 and 2 of the Sherman Act. The Ninth Circuit affirmed the Section 2 verdict without discussing Section 1 issues. The court held that the:

> "* * * evidence clearly supports an inference that Sierra and CYR operated Cashway so that it could lure away D & S customers with more favorable prices and credit and outlast D & S's more limited cash reserves."

*Id.* at 1248.

In *Jiffy Lube Intl., Inc. v. Robert Lake*, 1982-83 Trade Cases ¶ 65,124 (D. Wy. 1982), the court denied enforcement of a contract, under both Sections 1 and 2, by which Jiffy agreed to subsidize half the incurred losses of defendant in pricing its services at a level calculated to drive competitors from the market.

This line of cases makes it certain that a subsidy cannot be factored into a determination of whether price is above or beneath cost. It is excluded from the calculation.

Third, the doctrine of *Brooke Group* does not extend to Section 1 cases. *Frinke-Parks Press, Inc. v. Ted Y. Fang*, 149 F. Supp. 2d 1175, 1182-83 (N.D. Cal. 2001). In that case Hearst Publications granted a subsidy to Fang as part of a plan to allocate markets. The court squarely held that a plaintiff, under Section 1, need not prove that the subsidy financed predatory conduct; nor was there a need to demonstrate the likelihood of recoupment.

Fourth, there is no principled argument in favor of application of *Brooke Group* to these facts. Its underlying thesis is to reward efficient producers engaged in fair competition, not to reward the recipient of third-party largesse. The Job Target subsidy constitutes a threat to the

efficient and creates a potential reward for the inefficient.

Furthermore, there is no justification for a program which awards subsidies on public works projects. By definition, each competitor has the same labor input cost per hour. Thus, the only conceivable justification for such subsidies, is that non-union workers are more efficient workers and the subsidy is necessary to counter same.

3.    Recoupment is inapplicable.

As previously discussed, *Brooke Group* is inapposite and there is thus no need for extended discussion of recoupment. Nonetheless it is appropriate to provide a terse rebuttal. Recoupment assumes a loss. The subsidy, however, has made the need to recoup unnecessary. So long as the union subsidies its signatory contractors, they will enjoy a profit. And as the subsidy and other coercive activities of the union drive open shop contractors from the market or restrict new entry, those profits will increase.

Local 7 urges that market structure and low barriers to entry will foreclose recoupment. While it takes shelter in an affidavit that reflects 150 contractors, its affidavit can be read to state that substantially all are union signatories. Further, numerosity, without more proves nothing. How many are mom-and-pop operations that feed on the margins of the market, with five or fewer employees? How many erect 20' by 20' shelters and nothing else? These critical questions are left open to speculation. Second, the barriers to entry are not limited to invested capital and procurement of skilled personnel, but must be measured against all of the tethers to fulsome market entry-the PLA's, union trust agreements, and, most importantly, the ongoing scepter or reality of targeting new market entrants.

If recoupment is relevant, it is inapplicable to the circumstances here and, additionally, defendant has failed to shoulder its burden to introduce probative evidence to demonstrate the absence of a material fact dispute.

4.    Relevance of exclusive or preclusive agreements.

Plaintiffs assert that they have been subjected to a group boycott. The union acts as the linchpin for its signatory members. Through use of tainted monies developers, general

contractors and others, together with the ever present threat of pickets, have been dissuaded from use of plaintiffs. And the union, by funding its signatories' projects, has acted as the cat's-paw to restrain competition by open shop contractors. Death by 1,000 knives is an apt descriptor. It is the cumulative impact of these restraints on competition, not any individual lost project that threatens competition.

As Local 7 admits, there have been and are a plethora of project labor agreements which exclude open shop contractors. Second, organized labor, in complicity with Taft-Hartley Trusts, has loaned money to private developers if, but only if open shop contractors are excluded. Superimposed onto this existing structure, is the targeting program foreclosing open shop competition.

The Court in *United Contractors Association*, *supra*, stated that in 1996 union contractors market share in the "Boston area" was 75%. It is expected that the evidence will demonstrate that it has grown since that time. In *Standard Oil of California v. United States*, 337 U.S. 293 (1949), the defendant precluded its dealers from utilizing split pumps, effectively creating a series of exclusive arrangements. Standard Oil defended, in part, on the basis that its market share (less than 20%) was so small, that the restraint could not harm competition. The Court rebuffed these arguments because competitors of Standard imposed identical restraints, thus constricting the market open to dealers. The lesson to be gleaned from this decision is that a court may not put blinders on and merely consider the impact of the challenged conduct, but must consider all restraints within the market to open competition.

The issue arises in several contexts: group boycott under Section 1; conspiracy to monopolize under Section 2; and monopolization by the union under Section 2. The project exclusions are one of the means by which these unlawful activities are accomplished. The seminal case invoking the group boycott concept is *Klor's, Inc. v. Broadway Hale*, 359 U.S. 207 (1959). There a group of horizontally aligned appliance manufacturers agreed with Broadway Hale to cut off supply to Klor's. The court held that a *per se* violation of the Sherman Act was shown, even though it was obvious that there could be no injury to the consumer arising

from the elimination of Klor's.  The *per se* rubric only applies if at least two horizontally aligned parties join in the conspiracy.  Otherwise the rule of reason applies.  *See also NYNEX Corp. v. Discon*, 528 U.S. 128 (1998).

This case was followed by *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing*, 472 U.S. 284 (1985).  There a cooperative, controlled by competitors, ousted Pacific from membership, thus depriving it of a very modest rebate, about 1%, of total sales.  The issue before the court was whether this activity warranted *per se* condemnation, thus foreclosing the need to prove the fact of injury to competition.  The court stated that cases where the *per se* approach was properly deployed reflected joint efforts to:

> "disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.  (Citations omitted.)  In these cases, the boycott often cut off access to a supply, facility or market necessary to enable the boycotted firm to compete (citations omitted.)  and frequently the boycotting firms possessed a dominant position in the relevant market.  (Citations omitted.)  In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing pro-competitive effects is remote."

Plaintiff relies upon *Sitkin Smelting & Refining Co v. FMC Corp.*, 575 F.2d 440 (3d Cir. 1978), to rebuff application of the per se test.  Sham bidding was involved, not between competitors but between the owner and a competitor of the plaintiff.

Given that the owner did not need to allow bidding on its project, the conspiracy was entirely vertical and the complaint was a non-starter.  As the Fifth Circuit correctly pointed out there was no horizontal collusion in *Sitkin*, and for that  reason alone the per se test was not applied.  *United States of America v. All Star Industries*, 962 F.2d 465 (5th Cir. 1992).

Here plaintiffs assert, in the alternative:

•   That there was a horizontal conspiracy among competing contractors, vertically instigated by Local 7.

•   That there was a rimless wheel conspiracy, with Local 7 as the hub and each signatory contractor utilizing target monies in their bids or negotiations as the spokes.

Local 7 seeks to obscure the thrust of plaintiff's complaint by characterizing its conduct as an adjunct of or akin to exclusive dealing. The prototypical exclusive dealing agreement is an arrangement between a buyer and seller to deal solely with each other, thereby depriving a competing seller of the opportunity to compete, in the short term, for sales. Clearly there can be benefits to the consumer that arise from such arrangements in the form of lesser prices. Where the arrangement is short term, the disfavored seller has an opportunity to compete again. Here the agreement is different. It is not just one seller that is disfavored, but an entire class of sellers, all open shop contractors. Here the agreement is not simply between the buyer and seller, but involves a third party that also possesses independent, coercive powers. Third, there is no indication that the program has a limited life expectancy, but will continue as an exclusionary force well into the future. And, finally, it is financed by tainted dollars.

Here, the "exclusive" arrangements are projects procured by signatory contractors because of target subsidies; the duration varies with the size of the projects but may be several months or several years. They are *de facto* exclusive in the sense that entry into the construction agreement forecloses that work to a plaintiff. They are explicitly exclusive because of the condition attached to receipt by owners, developer and others not to use open shop contractors. Do we contend that entry into a single agreement contravenes the antitrust laws? No, it is the cumulative impact upon a class of contractors. Thus, analysis of the individual contracts leads in the wrong direction, except in considering damages.

If this court concludes that the *per se* test of illegality accorded certain group boycotts is inapplicable, as it would be under the rim less wheel contention or that an analogy to exclusive dealing provides the correct analytical approach, then the rule of reason must be applied

In *National Collegiate Athletic Ass. v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984), the Supreme Court adopted a quick look approach to its rule of reason test because, (as) a matter of law, absence of proof of market power does not justify a naked restriction on price or output". *See also F.T.C v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986), and *California Dental Association v. Federal Trade Commission*, 526 U.S. 756 (1999). In the

latter case, the Court stated it applied if "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Ibid.* at 1613. *See also Chicago Professional Sport Limited Partnership v. National Basketball Assn.*, 961 F.2d 667, 674-76 (3d Cir. 1993).

The Court in *Indiana Federation of Dentists* explained that the purpose of market definition and market power is to determine whether an arrangement has the potential to adversely effect competition. Thus, proof of actual detrimental effects obviates the need to examine market power. In that case the court held that a concerted and effective effort to deprive consumers of information constituted a naked restraint even in the absence of proof of higher prices or the sale of higher priced services. Why because it was likely to "disrupt the proper functioning of the price-setting mechanisms of the market."

Plaintiffs contend, that if the *per se* test is not applied, that the quick look is applicable. Clearly the subsidy is likely to disrupt the proper functioning of the price-setting mechanism. As the Court in *Mathiowetz Construction*, *supra*, found, deductions from public works jobs, reduces union workers wages beneath the statutory minimum and second, it artificially inflates the regional prevailing wage, to the detriment of the consumer paying higher prices. Further, it has introduced artificiality into the process. A third party, not the bidder, determines the amount of the subsidy. Some may not seek a subsidy, knowing that there will be no non-union competition. Others will feign their presence. The bottom line is that the integrity of the bidding process is imperiled; which will adversely affect the consumer.

If it were assumed, arguendo, that a full blown rule of reason analysis must be made, this is neither the time nor the place to undertake it. Defendant has not challenged either the product or the geographic definitions alleged; it can not deny that its signatory contractors enjoy at least 75% of that market; and that its target program and related PLA and trust funded arrangement constitute effective barriers to market entry by open shop contractors. It is thus remitted to arguing that the size of the restraint imposed does not unreasonably impact the market place.

25

Of course, defendant has not introduced evidence to reflect the extent of the market impacted by their program, and thus provide the court only with argument, not with factual content to support their argument. In the context of a summary judgment motion rhetoric is not a surrogate for evidence. *Barry Wright v. ITT Grinnell*, 724 F.2d 227 (1st Cir. 1983) (evidence must be adduced of the severity of the exclusion, together with a proffer of justification for the conduct.)

In *The Stop and Shop Supermarket Co. v. Blue Cross and Blue Shield of Rhode Island*, 373 F.3d 57 (1st Cir. 2004), the Court discussed the rule of reason noting that contracts which lead or are likely to lead to a shortage of competitors, leaving the smaller remaining group better be able to conspire or otherwise misbehave without being disciplined, and that this violated the rule of reason.

The first step is to examine the magnitude of the restraint, "taking account of other existing foreclosures." *Ibid.* at 66. Generally foreclosure levels of less than thirty percent (30%) are unlikely to trigger concern. *Ibid.* at 68. *See also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984) (30%); *Applied Medical Resources Corp. v. Ethcon, Inc.*, 2006 U.S. Dist. LEXIS 12845 n.5 (C.D. Cal 2006). Further, where the defendant enjoys the power to deny their competitors access to the market, evidence that competitive activity has not actually declined is inconclusive. *Gamco v. Providence Fruit and Produce Bldg.*, 194 F.2d 484 (1st Cir. 1952). Where, as here, there are other tethers to open and free competition, those restraints must be factored into the equation in determining the degree of market foreclosure. Defendant as proffered no evidence to allow this court to assess the degree of foreclosure.

E.    <u>Price Fixing</u>.

Price fixing involves an express or tacit agreement between two or more parties to fix, reduce, increase or stabilize price. It is unnecessary, in order for such a claim to be actionable, for the precise rate or price to be agreed upon. Bid rigging includes arrangements which, among other things, affects the process of bidding. Plaintiffs have not, to date, asserted classical price

fixing allegations. They do assert, however, that the subsidy affects the process of bidding and is subject to condemnation under the quick look test.

The targeting program introduces an artificial and unpredictable factor into the bidding process. First, it is unknown to open shop contractors if a subsidy will be granted to union contractors. Thus, they can not rationally determine what would constitute a reasonable bid. Second, misinformation, given by union signatories to the union, may cause a subsidy to be granted when no open shop intends to bid, thus swelling the coffers of the successful bidder. Third the process is skewed by subsidies granted on public projects, where no justification exists. Fourth, it is common for general contractors to question bids of subcontractors if they appear significantly low, because it does not benefit the general to have a subcontractor fail in the midst of a project. And, of course, as applied, it underpays union employees and raises the prevailing wage.

The foregoing is the genesis of Plaintiffs' bid rigging contentions. As this Court stated in *Suzuki of West. Mass., Inc., v Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 49 (D. Mass. 2001), in connection with vertical restrictions, the complaint must allege "harm, not just to a single competitor, but to the competitive process, i.e., to competition itself." Here we know that targeting is aimed not at a single company, but at a class of efficient competitors. They are targeted because they are efficient. The means used directly affects the competitive process.

Defendant paints these allegations as price fixing and suggests that *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and *Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328 (1990), control. Both are inapposite. In Brunswick the plaintiff lamented that Brunswick had propped up a failing bowling alley, and the court held Brunswick's conduct had stimulated fair competition. In *Arco*, the plaintiff alleged that Arco had imposed a maximum resale price, well above average cost. Thus, it remained free to sell beneath the maximum and attract, through competitive pricing, additional business. Thus in both cases competition was stimulated, not harmed.

*U.S. Information Systems, Inc.*, *supra*, rejected the very argument presented by Local 7. Where, as here, plaintiffs would have been the lowest qualifying bidder on most projects but for the subsidy, standing exists. Contrary to Local 7's claim, Br. at 20, *Brooke Group* is not applicable. Moreover, a private right of action exists under the Davis-Bacon Act to remedy violations of the prevailing wage law. *McDaniel v. Univ. of Chicago*, 548 F.2d 689695. (7th Cir. 1977). Contrary to the Union's representation in footnote 16, the Supreme Court has recognized the efficacy of an implied right of action in the Davis-Bacon Act in the *McDaniel* decision in *Univsities Research Assn. v. Coutu*, 450 U.S. 754, 765 (1981). The Court observed that the question remains an open for it to decide in the future. 450 U.S. at 769.

The harm claimed by plaintiff corresponds to the rationale for finding a violation of the count. First, the subsidy was granted on prevailing wage jobs. The purpose was obviously to take this work; recognizing that Plaintiffs could obtain this work only by bidding beneath cost. The public consumer, generally compelled to accept the low bid, may be forfeiting quality, due to the subsidy and see the prevailing wage rate artificially increased for future jobs. And, the consumer may not be seeing any savings passed on, as well by the fabricator holding on to the profits. Paulding Aff. ¶ 31.

With respect to privately funded work, this purported justification for the subsidy was to subsidize the signatory contractors beneath cost bids, thus undercutting application of the *Arco* rationale.

F.    Defendant Is Not Entitled to Summary Judgment on the Section 2 Claims.

Plaintiff asserts two complementary claims under Section 2 of the Sherman Act. Monopolization or attempt to monopolize by the union and conspiracy to monopolize between the union and its signatory contractors. While defendant addresses the first two claims it does not address the conspiracy to monopolize claim. There should thus be no need to address it here.

a.    Monopoly by a union.

The definition of a monopolist is well established. It is the power to raise prices or exclude competition. As applied to business competitors, a market share of 50% to 70% can

occasionally, depending on other structural issues demonstrate market power.  A share in excess of 70% is usually strong evidence of monopoly power.  *Broadway Delivery v. United Parcel SVC*, 651 F.2d 122, 129 (2d Cir. 1981); *Picker Int'l, Inc. v. Leavitt*, 865 F. Supp. 951, 960 (D. Mass. 1994).  The concept of monopoly is not confined to business entities.

In *Wickham Contracting Co. v. The Board of Education of the City of New York*, 715 F.2d 21, 23 (2d Cir. 1982), the Court rejected a claim that a union could only be held liable if a conspiracy with a non-labor group were shown.  The court stated:  However, proof of such a conspiracy is unnecessary to make out a violation of Section 2 of the Sherman Act under *Connell*.  *Connell* itself involved no evidence of any conspiracy between the defendant union and non-union groups, as the Court explicitly pointed out.  421 U.S. at 625 n.2.  The gravamen of the antitrust violation was the union's forcing of Connell into the offending agreement, not a conspiracy with non-labor groups to injure Connell."

Clearly, a labor union is capable of being a monopolist through control of non labor entities.  Through the use of the threat, scepter or reality of job site disruption; its success in negotiating PLA's, and application of target monies it has the power to and is determined to exclude an entire class of contractors from the market.

Defendant's brief does not discuss this issue other than to obliquely mention its assumption that the focus is upon the employers, not upon itself.  It is clear, however, that Local 7 possesses the power to exclude competitors from the market place and that it has utilized exclusionary means to accomplish that objective.

b.     Conspiracy to monopolize.

Section 2 forbids conspiracies to monopolize.  The elements are concerted action, overt acts in furtherance, and specific intent to monopolize.  *Volvo N. Am. Corp. v. Mens Int'l Pro Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).  The courts have consistently held that competitors can combine or conspire to monopolize.  There is no requirement that a single competitor vanquish its rivals.  Conjoined efforts, even if not successful, are sufficient.

*American Tobacco Co., v. U.S.*, 147 F.2d 93, *aff'd*, 328 U.S. 781; *U.S. Patten*, 187 F. 664 (2d Cir. 1911); and *North Texas Producers Association v. Young*, 308 F.2d 235 (5th Cir. 1962).

In *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797 (1945), the Court, condemning an agreement between a union and local electrical equipment manufacturers and contractors in New York City under which contractors were obligated to purchase equipment for local signatory manufacturers, stated: "Quite obviously, this combination of businessmen, has violated both Sections 1 and 2 of the Sherman Act, unless its conduct is immunized by the participation of the union. For it is intended to and did restrain trade and monopolize the supply of electrical equipment in the New York City area to the exclusion of equipment manufactured and shipped from other states, and did also control its price and discriminate between its would-be customers." *See also Altemose Const. Co. v. Building and Const Trades Council*, 751 F.2d 653 (3d Cir. 1985).

In addition to proof of conspiracy, there must generally be evidence of a specific intent to monopolize, unless monopoly has already been achieved. Intent may be shown by direct evidence of the defendant's state of mind or my be inferred from conduct. *California Computer Products v. IBM Corp.*, 613 F.2d 727, 736-37 (9th Cir. 1979); *American Tobacco Co.*, 328 U.S. at 781. Proof of a combination or conspiracy to monopolize does not require proof of a particular level of market power nor "a dangerous probability of success" in the relevant market, because proof of the agreement to commit the illegal act and proof of an overt act establishes the violation. *American Tobacco Co.*, 328 U.S. at 789; *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926-27 (9th Cir. 1980). On the other hand, although not an essential element, proof of market power may help to draw the inference of specific intent from conduct. *Hunt-Wesson*, 627 F.2d at 926.

The Plaintiffs have adequately alleged conspiracy; Local 7 has adduced no evidence to contradict the allegations of the complaint, and this part of its motion must be denied.

       c.      Attempt to monopolize.

Defendant moves to dismiss Plaintiff's attempt to monopolize claim.  The elements are well known:  specific intent, anticompetitive conduct, and dangerous probability of success.  For purposes of its motion, it does not deny specific intent.  It may be urging conduct cannot be anticompetitive unless it meets the standards of Section 1.  That is simply not the law.  *LePage's, Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003), *cert den.*; *United States v. Dentsply Int't, Inc.*, 399 F.3d 181(3d Cir. 2005), *cert den.*, 2006 U.S. LEXIS 33 (2006) (failure to provide an unlawful exclusive dealing agreement under Section 1 did not preclude a finding that the identical conduct was unlawful under Section 2.)  Indeed exclusive or preclusive agreements, lawful under section 1, may constitute the predicate for a section two violation because behavior may become impermissibly exclusionary if practiced by an entity with market power.

Finally, defendant asserts that its 75% market share, together with the barriers to open entry it helped to erect, does not demonstrate dangerous probability of success.  Understandably, it cites no cases because the law is obviously to the contrary.  *See also Applied Med. Resources Corp. v Ethicon*, 2006 U.S. Dist. LEXIS, 12845 (C.D. Cal. 2006).  Material questions of fact abound whether the Union has engaged in an attempt to monopolize.

### IV.  THE FACTS SUPPORTING THE COUNT IV ALLEGATION OF AGREEMENTS IN VIOLATION OF SECTION 8(e) OF THE LABOR ACT ARE PROPERLY SUPPORTED

Count IV alleges that Local 7 has engaged in conduct in violation of Sections 8(b)(4)(ii)(A) and (B) of the Labor Act.  29 U.S.C. 158(b)(4)(ii)(A) & (B).  Along with Section 303 of the Act, 29 U.S.C. § 187, Congress provided a remedy for acts of picketing and other restraint and coercion against Plaintiffs and against other contractors to obtain agreements prohibited by §8(e) of the Labor Act, 29 U.S.C. § 158(e), and where an object is to cause Non-Labor businesses to change the way they do business with Plaintiffs or other Non-Local 7 Contractors or cease doing business with Plaintiffs and other Non-Local 7 Contractors and give the business instead to Local 7 Contractors.  Complaint ¶ 117.[6]

---

[6]"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of

In *Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975), the Supreme Court held that prehire agreements which limit subcontracting of construction work to only union subcontractors are not protected under Section 8 of the LMRA, and these are federal antitrust violations.  In the case at bar, Plaintiffs complain that Local 7 has employed these same techniques.  *Connell* cannot be read as suggesting that persons not parties to an agreement with the union are unprotected by the antitrust laws.  *Altemose*, 751 F.2d at 659.

Indeed, one of the major aims of Congress in passing the Landrum-Griffin amendments to the Taft-Hartley Act was to limit "top-down" organizing campaigns that forced employers to recognize a union regardless of the wishes of their employees.  *See* II *Legislative History of the LMRDA* 1175-76, 1191-92, 1523 (1959).  The Court in *Connell* recognized the potential for abuse if Section 8(e) of the LMRA were permitted and enforced through coercive tactics, regardless of the wishes of employees.  The Court stated:

> These careful limits on the economic pressure unions may use in aid of their organizational campaigns would be undermined seriously if the proviso to §8(e) were construed to allow unions to seek subcontracting agreements at large, from any general contractor vulnerable to picketing.  Absent a clear indication that Congress intended to leave such a glaring loophole in its restriction on "top-down" organizing...we think its [§8(e)] authorization extends only to agreements in the context of collective bargaining relationships and in light of Congressional references to the *Denver Building Trades* problem, possibly to common-situs relationships on particular jobsites as well.

421 U.S. at 633.

The "touchstone" of a Section 8(e) agreement or its maintenance is that it is addressed to the labor relations of the employer "vis-a-vis his own employees."  *National Woodwork Mfrs. Assn. v. NLRB*, 386 U.S. 612, 644-45 (1967).

And, with regard to prehire agreements permitted under Section 8(f) of the LMRA, It has been emphasized that "no element of coercion was to be admitted into the narrow exception

---

any other employer, or cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided*, That nothing in this subsection (e) [this subsection] shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work....:"

being established to the majority principle." *NLRB v. Iron Workers, Local 103*, 434 U.S. 335 349 n.10 (1978). An employer may not coerce its employees into a collective bargaining relationship, even for the purpose of avoiding economic injury, 29 U.S.C. §158(a)(1).

Hence, it is an unfair labor practice under Section 8(a)(4) of the LMRA for a labor union to engage in activities that induce "persons to refuse to perform any services where an object is to force one employer to cease doing business with another employer *to recognize a labor union* as the representative of his employees." *Texas Distrib., Inc. v. Local 100*, 598 F.2d 393, 398 (5th Cir. 1979) (emphasis added); *Berman Enter. V. Local 333, united Marine Div.*, 644 F.2d 930 (2d Cir. 1981). Since is admitted that Local 7 sought out and contacted fabricators in Canada and the U.S. to cease doing business with the Plaintiffs, Plaintiffs can easily show that Local 7's alleged interest in preserving work and maintaining working conditions was really calculated to satisfy other union objectives—to create an union-only enclave in the relevant market. *See National Woodwork Mfrs. Assn.*, 386 U.S. at 644-45. Hence, Plaintiffs can pursue their labor law claim. *See James Julian, Inc. v. Raytheon Co.*, 499 F. Supp. 949, 957 (D. Del. 1980).

In *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645 (1982), the Court confronted a situation in which a general contractor and union had entered into a collective bargaining agreement containing a subcontractors clause and the question was whether the union could picket to enforce the clause. In these limited circumstances, the Court held that the construction industry proviso to §8(e) shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective bargaining relationship. The "top down" organization (union pressure directed at the employer rather than the worker) that had been condemned in *Connell* was deemed tolerable if it flowed as a natural consequence from a voluntary collective bargaining agreement. However, *Woelke-Romero* clearly confirmed the *Connell* conclusion that "the proviso did not exempt subcontracting agreements that were not sought or obtained in the context of a collective bargaining relationship, even though they were covered by the plain language of the statute." 456 U.S. at 653.

However, despite the Defendant's attempt to force the facts at bar into the *Woelke-Romero* doctrine, the state of the record does not permit the conclusion that Defendant would be able, for example, to enter into a bargaining relationship with a fabricator such as Capone Iron or a general contractor such as Clayco (Jordan's Furniture), Columbia Construction (Brickworks), or Bond Brothers (Fox 25). Yet, that is what Local 7 accomplished.

The entire thrust of the Union's picketing and pressure of fabricators, owners, and general contractors and other non-union contractors was not to represent their employees, but, rather, to force non-union contractors off jobs, replace them with union contractors, and secure subcontracting agreements for all future projects or force the contractors out of business.

The instant case, unlike *Woelke-Romero*, obviously does not involve a traditional Section 9(a) collective bargaining relationship or picketing to obtain a subcontracting clause in a preexisting bargaining relationship. This case involves concerted, repeated, diverse and often violent efforts directed at the pure "top down" organization of stranger employers. It does not involve repeated home visits and phone calls or handbills designed to pressure third parties in a dispute with primary employers, such as Plaintiffs, as in *Storer Comm., Inc. v. National Assn. of Broadcast Employees and Technicians*, 854 F.2d 144, 146 (6th Cir. 1988).

Direct appeals to secondary employers who are customers or suppliers of the primary employer are not protected. *Int'l Union of Electrical Workers v. NLRB*, 366 U.S. 667 (1961). Work stoppages and requests to "cooperate" with the union directed at customers and employees are not protected. *NLRB v. Int'l Bhd. of Teamsters*, 298 F.2d 105 (2d Cir. 1967).

Vague threats of "trouble" or reprisals stated by its agents are sufficient to find a violation. *Abreen Corp. v. Laborers' Int'l Union*, 709 F.2d 748, 752, 756 (1st Cir. 1983) (site "would never finish nonunion"; Section 303 claim affirmed); *Wells v. NLRB*, 361 F.2d 737, 740 (6th Cir. 1966) (job will be stopped); *IBEW Local 5*, 164 N.L.R.B. 455 (1967) ("trouble"); *NLRB v. Carpenters*, 462 F.2d 1321 (9th Cir. 1972) (things would get "kind of rough").

The "publicity proviso" to Section 8(b)(4) exempts secondary boycotts intended to inform the public that the primary employer's product is distributed by the secondary employer. *Edward*

*J. De Bartolo Corp. v. NLRB*, 458 U.S. 568 (1988). The Complaint and Rule 56 Statement set forth some of the former (threats) and shows that the latter (noncoercive pressure) is not evidenced here.

Here, there is evidence of intimidation by Local 7 agents with the Plaintiffs and for these reasons, Plaintiffs have pled a valid secondary boycott action against Defendants.

As alleged in the Complaint, Complaint ¶¶ 57, 142, Defendant Local 7 has taken employee wages and illegally diverted it back to union signatory employers. Local 7 received money from employee wages earned on federal prevailing wage projects such as the Boston Central Artery and Harbor Tunnel project, Complaint ¶ 46, in direct contravention of Wage Appeal Board decisions under the Davis-Bacon Act. Its activity appears also to be a *prima facie* violation of Section 302(a) of the Labor Act, 29 U.S.C. § 186(a) (employers and unions are forbidden from transferring any thing of value between themselves) and a criminal act, 29 U.S.C. § 186(d).

Under the circumstances and facts set forth in the Complaint, the job targeting payments and funding strategy of Local 7 are neither protected under the Labor Act (or any other federal law) nor free from regulation of those activities under state law within the strong local interest and public policy exceptions set forth in *Garmon*. As such, the conduct of job target collection and disbursement employed by Local 7 is ***not*** regulated by the LMRA (*Can-Am Plumbing, Inc.*) and the use of those funds to tortiously interfere with the marketplace is therefore not preempted. *See Intercity Maintenance Co. v. Local 254, SEIU*, 62 F. Supp.2d 483, 500 (D. R.I. 1999).

     1.     Coercive Picketing, Threats, and Work Stoppages Not
             <u>Protected Activity under the Labor Act</u>.

Defendant claims that the allegations relating to picketing, work stoppages, slow downs, and sham picketing incorporated in the Plaintiffs' Section 303 claim amount to "garden variety" Section 8(b)(4)(I) activity. Mem. at. 18. Damage to property and violence are the surest ways to remove preemption in a given situation under the state's interest exemption in maintaining the peace. *Intercity Maintenance*, 62 F. Supp.2d at 501 These activities are alleged in Plaintiffs' Complaint ¶¶ 155 & 186 as "sham picketing." As alleged in Complaint ¶ 156, the union's

picketing with a secondary object is usually remedied/uncovered by referring to the Labor Board's *Moore Dry Dock* criteria.[7]  *See Helgesen v. Iron Workers, Local 498*, 548 F.2d 175, 182 (7th Cir. 1977).

Local 7 makes further arguments at 37-40 of its brief that its activities with regard to each Plaintiff, whether proper or a sham, is arguably not in violation of the LMRA.  The crux of Plaintiffs' complaint is the illegal use of job target funds to force Plaintiffs out of participation in the market.

      2.   <u>Stripping Employees from Plaintiffs Is Not Protected Activity</u>.

Local 7 also asserts that stripping of the employees of Plaintiffs is arguably protected or prohibited activity and therefore relief is preempted.  Br. at 38.

As the Complaint alleges, Local 7 works in concert with its signatory contractors to strip key employees of Plaintiffs to place them on staff with union contract signatory employers. Stripping will not work unless a signatory contractor will immediately employ the dislodged employee.  Thus, stripping requires the active participation of the union and its signatory employers.  As such, the Clayton Act exemption for unilateral conduct by unions is wholly inapplicable.  *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 808 (1945) (unions cannot engage in "employer-help"); *United Mine Workers v. Pennington*, 381 U.S. 657, 668 (1965).

In *Clinton Corn Processing Co.*, 194 N.L.R.B. 184, 185-86 (1971), the Board squarely held that inducing employees to quit is not protected activity under the Labor Act: "the Respondent barred Smith from its premises only because of his unprotected conduct inducing Respondent's employees to quit"....[this] "did not violate Section 8(a)(1) of the Act."  *Also Technicolor Gov't Serv., Inc.*, 276 N.L.R.B. 383, 389 & n.7 (1985) ("solicitation to quit[] would remove the Act's protection."); *Boeing Airplane Co. v. NLRB*, 238 F.2d 188, 194-95 (9th Cir.

---

[7]In <u>Sailors' Union of the Pacific (Moore Dry Dock)</u>, 92 N.L.R.B. 547 (1995), the Board set forth four criteria for finding violative picketing: whether the picketing is limited to when the primary employer is present, whether the primary employer is engaged in business on the site, whether the picketing occurs near the site, and whether the picketing discloses the dispute is only with the primary employer.

1956) (employee seeking to place other employees with work at competitors was unprotected activity).

Local 7's resort to arguing only a generalized argument regarding stripping, such as it was limited to primary activity and therefore not a violation is not supported by the evidence in dispute that the union had no organizational interest and therefore its activities directed at Plaintiffs was undertaken at the behest of non-labor entities.  The claim Local 7 makes on summary judgment is best summed up by its proposition that: "[e]ven if the allegations were true, and even if there were evidence that Local 7 agents referred the Bedford employees for union work, such primary pressure does not colorably create a § 8(b)(4) violation."  Br. at 38.

First, on summary judgment Local 7 as the moving party has the burden to make the showing.  Here, its claim is not presented with any evidence that Local 7 had any primary interest in Bedford, it visibly claims that the claims are true because it only suggest that they might not be true, the President of Bedford testified to the men and on the occasions stripping did occur. Bedford 83-84.  These same allegations equally apply to Plaintiff Ajax. Again, Local 7 does not proffer any evidence to the contrary regarding Ajax's stripping allegations.

Consequently, Plaintiffs' assertion that stripping is part of the Section 8(b)(4) claim—to which the Defendant Local 7 asserts the matter must be arguably prohibited by the labor law and therefore preempted reads too much into the allegations in the Complaint and testimony. Plaintiffs pled a course of conduct not protected by the federal antitrust and labor laws.  If stripping is not protected conduct under the Labor Law (because it is akin to an interference tort as the caselaw above shows) then an employer should be able to assert it as evidence of the conspiracy.

3.      Surveillance and Videotaping Jobsites in the Circumstances Alleged Is Not Protected Activity.

It is asserted at 39 that the monitoring by observers and videotaping Plaintiffs' employees to initiate sham complaints to federal and state authorities must cause an injury proximately caused by the secondary activity.

As set forth in paragraph 154 of the Complaint "Local 7 and its co-conspirators agreed to station observers with cameras and video recorders in an effort to induce contractors to cease doing business with the Plaintiffs.  Local 7 has also used this practice to initiate sham complaints to federal and state administrative authorities."

It would be very strange for this Court to suggest that the tactics here might be protected activity when the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961), held that if lobbying of government "is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor," it is not protected activity.  *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525-26 (2002) (disapproving Labor Board's jurisdiction to find an employer antitrust and labor lawsuit against a competitor's sham activities violative of the Labor Act).

Here, Local 7 does not dispute that D.F.M. incurred actual damage to its equipment at the Fox 25 site.  The claims here are that the activities against D.F.M. and the other Plaintiffs is not primary activity since the union did not have an organizational object.  Hence, the coercive activity against the Plaintiffs is secondary conduct.

What the President of D.F.M. called sham picketing was because Local 7 agents picketed D.F.M.'s work sites and would never seek to become the representative via a free election which D.F.M. had offered at all time to the Union.  It was incongruous for Local 7 to be picketing for community standards against D.F.M. while refusing to take any step to voluntarily seek representation rights from a majority of D.F.M.'s workers.

Genuine issues of material fact abound in this case.  Summary judgment is inappropriate in these circumstances.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court deny the Union's Motion for

Summary Judgment.

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC.

By their attorneys:

Carol Chandler (B.O. # 080660)
Geoffrey R. Bok (B.O. # 550851)
STONEMAN, CHANDLER & MILLER, LLP
99 High Street
Boston, Massachusetts 02110
(617) 542 – 6789

/s/ Michael E. Avakian
Michael E. Avakian, *pro hac vice*
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, Virginia 22151
(703) 321 - 9181

September 29, 2006