**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,          Plaintiffs, <br><br> v. <br><br> LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS. <br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. 04-cv-12536-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MOTION TO STRIKE AFFIDAVITS IN SUPPORT OF DEFENDANT**
**IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT**

Plaintiff American Steel Erectors moves this Court for an order striking, in part or in whole, the affidavits of John F. Hurley, James Coyle, Joseph W. Nigro, Jr., and Thomas J. Gunning, filed in support of Defendant Local 7's Amended Motion for Summary Judgment.

Under Fed. R. Civ. P. 56(e), affidavits in support of summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The affidavits submitted by Local 7 fail to meet this standard. None of the affidavits state that it is made on personal knowledge or that the affiant is competent to testify. Further, the vast majority of the allegations set forth in the affidavits are either not supported by personal knowledge or rely on inadmissible hearsay. For each of the reasons set forth below, the Court should strike all four affidavits submitted by Local 7, either in part or in whole.

    1.    <u>Affidavit of John F. Hurley</u>

Hurley's affidavit must be stricken in its entirety because the affidavit fails to

"affirmatively state" that Hurley is competent to testify to the matters set forth therein.  The absence of an affirmative showing of personal knowledge "vitiates the sufficiency" of an affidavit and "accordingly, summary disposition based thereon is improper."  *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992).  The affidavit is also inadequate under FRCP 56(e) because it is not taken under oath and fails to state that all matters set forth therein are true and correct.  *See, e.g., Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (court must disregard affidavit on summary judgment where affiant did not declare her statement to be true and correct and affidavit was unsworn).  For these reasons alone, Hurley's affidavit must be stricken.

Yet, Mr. Hurley at his deposition in this case which was taken six months after his Affidavit in Support of the Union's Motion for Summary Judgment was submitted to the Court, has confirmed that the statements were not based on personal knowledge.

In fact, Mr. Hurley has never owned a company or steel erection business.  Hurley Deposition at 125-26  (Transcript pages attached).  Neither did he refer to any documents as a foundation for his sweeping statements about the industry:

Q.    Now, in developing this document, did you refer to any other documents?
      Did you investigate or have other documents that you looked at?
A.    I don't remember.  I don't believe so.  I don't remember.

Hurley 130 ll. 7-11.

Of his affidavit, he had *never* seen the Exhibits attached as Tab pages 13-16 to the Affidavit submitted by the Defendant to the Court.  Hurley 126 ll.11-22. Of Tab A of the Affidavit, Mr. Hurley testified at his deposition he had never seen it before.  Hurley 213-14 l.5. Of Tab B in his Affidavit, Mr. Hurley testified: "I just had no particular knowledge of it myself." Hurley 207 l.23.

With respect to paragraph 9's claim just how steel erection contractors secure work, Mr.

2

Hurley testified that "I don't have any concrete examples....It's just all hearsay. That's what they tell me." Hurley 143 l.22-44 l.7.

Hurley's affidavit must also be stricken on the following particular grounds:

a.      Tab A:  This exhibit must be stricken because it is not authenticated and Hurley fails to state that he has personal knowledge about the creation or contents of the exhibit. Unauthenticated exhibits do not pass muster under FRCP 56(e). *See, e.g., Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994).

b.      Paragraph 8:  All but the first sentence must be stricken from this paragraph for lack of personal knowledge.  Hurley is not an employee or officer of a general contractor or a fabricator and he is not competent to testify about competition or practices by such entities.

c.      Paragraph 9:  All but the first sentence must be stricken from this paragraph for lack of personal knowledge.  Hurley does not state that he has personal knowledge about the facts contained in this paragraph, nor does he state the evidentiary basis of his "estimate" about the number of contractors who compete for steel erection work.  Again, Hurley is not an employee or officer of a general contractor or a fabricator and he is not competent to testify about competition or practices by such entities.

d.      Paragraph 10:  The first and second sentences of this paragraph must be stricken for lack of personal knowledge.

e.      Paragraph 11:  This paragraph must be stricken for lack of personal knowledge. Hurley does not state the basis for his assertions about Plaintiff's bids, the content of the PLAs or Plaintiff's "eligibility" under the PLAs.

f.      Paragraph 12.  Mr. Hurley retracted his Affidavit's statement that he encouraged non-union contractors to "bid[] on public projects."  At his deposition he agreed the "[t]hat sentence is probably poorly structured.  The intent was PLA projects," not public projects.

Hurley 169 ll.2-3

g.    Paragraph 17:  The third and fourth sentences of this paragraph must be stricken

for lack of personal knowledge.  Hurley does not state the basis of his personal knowledge about

"full employment" of Local 7 during the time periods when the Big Dig and Boston Harbor

projects were "active" and it is not clear what that basis could be after 2001 because Hurley has

held no position with Local 7 since that time.  Hurley also does not state the basis of his

knowledge that contractors were required to "employ many hundreds of iron workers from out of

state."

h.    Paragraphs 18 and 19:  Hurley does not specify the time period to which any of

the statements in these paragraphs refer.  To the extent that any of the statements in these

paragraphs refer to the time period before 1987 or after 2001, when Hurley was not an officer of

Local 7, they must be stricken for lack of personal knowledge and because they are inadmissible

hearsay.  *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 882 (E.D.N.Y. 2004) (hearsay

affidavit is "nullity" and is properly stricken).  Further, at his deposition, Mr. Hurley testified

that the term "jobs" in the first sentence of paragraph 19 is not to put an individual "to work.

What we're talking about individual jobs speaks to a project."  Hurley 176-77.

i.    Paragraph 20:  This paragraph must be stricken in its entirety for lack of personal

knowledge.  Regarding the key event at issue—the establishment of the job targeting

program—Hurley can state only that it occurred "before 1991."  He does not state what, if any,

involvement he had in the implementation of the program or how he has any personal knowledge

about the intended purposes of the program at the time of its implementation.  He does not even

allege that he was an officer at the time the program was implemented.  This court cannot

therefore presume or infer that Hurley had personal knowledge about the program.  *Compare*

*Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (personal knowledge

4

and competence to testify could be reasonably inferred from affiant's position as corporate officer).

Tab B: Hurley has never seen this Exhibit before as set forth above. This exhibit must be stricken because it is unauthenticated and it is inadmissible hearsay . Hurley does not state his personal knowledge about either of the documents attached as Tab B, nor does he explain how any of the documents would fall into any hearsay exception.

Paragraph 22: The first sentence must be stricken for lack of personal knowledge, particularly to the extent that Hurley is referring to any period before 1987, when he was not an elected officer of Local 7. The last sentence must also be stricken. Hurley does not clarify the time period to which he is referring. To the extent that he is purporting to make any statements about the period after 2001, such statements are not based on personal knowledge because after that time Hurley was no longer an officer of Local 7.

Paragraphs 24-26: Hurley again provides no specification whatsoever as to the time period to which these paragraphs refer. To the extent that any of the statements in these paragraphs refer to the time period before 1987 or after 2001, when Hurley was not an officer of Local 7, they must be stricken for lack of personal knowledge and because they are inadmissible hearsay. Moreover, even if Hurley is referring to a period in which he was a Local 7 officer, he makes no statement about what, if any, role he had in the administration of the job targeting program, the disbursement of target funds or the existence or non-existence of agreements with employers.

Paragraph 27: In addition to lack of personal knowledge for any period before 1987 or after 2001, the final two sentences regarding the practices of owners and developers must be stricken for lack of personal knowledge because Hurley is not and apparently has never been an owner or developer or signatory contractor and he cannot make representations about their

practices.

    2.    <u>Affidavit of James Coyle</u>

Coyle's affidavit must also be stricken in its entirety because it fails to "affirmatively state" that he is competent to testify to the matters set forth therein. The affidavit is also unsworn and fails to state that all matters set forth therein are true and correct. As a result, like Hurley's affidavit, Coyle's affidavit fails to meet the requirements of FRCP 56(e).

Coyle's affidavit must also be stricken on the following particular grounds:

    a.    Paragraphs 4-13: These paragraphs track paragraphs in Hurley's affidavit almost word-for-word. Like Hurley, Coyle makes no statements specifying the time period to which his very broad statements about Local 7's practices apply. To the extent that any of the statements in these paragraphs refer to the time period before 1997 or after 2005, when Coyle was not an officer of Local 7, they must be stricken for lack of personal knowledge and because they are inadmissible hearsay. In addition, even if the statements are purporting to apply to the time period during which Coyle was a Local 7 officer, Coyle makes no statement about what, if any, role he had in the administration of the job targeting program, the disbursement of target funds or the existence or non-existence of agreements with employers. For this additional reason, Coyle's affidavit must be stricken for lack of personal knowledge.

    b.    Paragraph 8: This paragraph is identical to paragraph 17 in Hurley's affidavit. The third and fourth sentences of this paragraph must be stricken for lack of personal knowledge. Coyle does not state the basis of his personal knowledge about "full employment" of Local 7 during the time periods when the Big Dig and Boston Harbor projects were "active." Coyle also does not state the basis of his personal knowledge that contractors were required to "employ many hundreds of iron workers from out of state."

    c.    Paragraph 12: This paragraph is also identical to paragraph 27 in Hurley's

affidavit.  In addition to lack of personal knowledge for any period before 1997 or after 2005, the

final two sentences regarding the practices of owners and developers must be stricken for lack of

personal knowledge because Coyle is not and apparently has never been an owner or developer

and cannot make representations about their practices.

   3. <u>Affidavit of Joseph W. Nigro, Jr.</u>

   Like the affidavits of Hurley and Coyle, Nigro's affidavit must be stricken in its entirety

because it fails to "affirmatively state" that Nigro is competent to testify to the matters set forth

therein.  The affidavit is also unsworn and fails to state that all matters set forth therein are true

and correct.  Nigro's affidavit must also be stricken on the following particular grounds:

   a. Paragraphs 7, 9, Tabs B-E:  Statements about the content of the PLAs are

inadmissible hearsay.  FRE 1002 ("To prove the content of a writing, . . . the original writing . . .

is required, except as otherwise provided in these rules or by Act of Congress.")  Further, while

Nigro attaches portions of the PLAs to which he is apparently referring, he fails to authenticate

these contracts.  Under FRCP 56(e), the exhibits are therefore inadmissible and cannot support

summary judgment.

   b. Paragraphs 10:  This paragraph must be stricken in its entirety because Nigro

states that it is only based on his "understanding" of the facts.  This statement is insufficient to

demonstrate personal knowledge.  *See, e.g., Steelman v. Carper*, 124 F. Supp. 2d 219, 228 (D.

Del. 2000) (affidavit insufficient where it is based on "personal awareness" rather than upon

personal knowledge); *Murphy v. Ford Motor Co.*, 170 F.R.D. 82, 84 (D. Mass. 1997) (affidavit

insufficient where it is based upon "information and belief" not personal knowledge).

   c. Paragraph 11:  Nigro's assertion that he is not "aware" of Plaintiff's activities

with respect to large public projects in the last ten years is also insufficient to demonstrate the

necessary personal knowledge.  *Steelman v. Carper*, 124 F. Supp. 2d 219, 228 (D. Del. 2000).

Nigro's statements about what Judge Garsch "noted" in the Big Dig litigation is also inadmissible hearsay.

        4.      <u>Affidavit of Thomas J. Gunning</u>.

Like each of the other affidavits submitted by Local 7, Gunning's affidavit must be stricken in its entirety because it fails to "affirmatively state" that Gunning is competent to testify to the matters set forth therein. The affidavit is also unsworn and fails to state that all matters set forth therein are true and correct. Gunning's affidavit must also be stricken on the following particular grounds:

        a.      Paragraph 4, Tab A: The exhibit attached as Tab A must be stricken because Gunning has failed to authenticate it and it is therefore inadmissible.

        b.      Paragraphs 5-7: Gunning does not state the basis of his personal knowledge for any of the statements set forth in these paragraphs. They must therefore be stricken in their entirety. According to paragraph 1 of his affidavit, Gunning has only been the Executive Director of BTEA for ten years. Before that, he was in a government relations position with BTEA, which presumably had no involvement at all with the job targeting program. In light of the assertions in the affidavit of John Hurley that the job targeting program was established "sometime before 1991," it seems evident that Gunning could have no personal knowledge about Local 7 or BTEA's involvement or intent during that process. In particular, Gunning could have no personal knowledge (and he proclaims none) to support the contention in Paragraph 5 that the targeting program was "arrived at by Local 7 on its own" before 1993. Similarly, Gunning could have no personal knowledge supporting the last two sentences of paragraph 7 about what was "understood" by BTEA and the union and about the purpose of the "articulation of the amounts" in the bargaining agreement.

In sum, Local 7's affidavits in support of its Amended Motion for Summary Judgment

fail to comply, either in part or in whole, with the standards set forth in FRCP 56(e). This Court

must therefore disregard the affidavits in its determination of Local 7's motion.

WHEREFORE, Plaintiffs respectfully request that their Motion to Strike the Affidavits of

Hurley, Coyle, Nigro and Gunning be granted.

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC.


By their attorneys:

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN,CHANDLER & MILLER, LLP
99 High Street
Boston, Massachusetts 02110
(617) 542 – 6789



/s/ Michael E. Avakian
Michael E. Avakian, *pro hac vice*
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, Virginia 22151
(703) 321 - 9181

September 29, 2006

**Jay Hurley**
**August 25, 2006**

1

Volume 1, Pages 1-232, Hurley Exhibits 1-11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS

 ORIGINAL

AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAY HURLEY

Friday, August 25, 2006, 9:40 a.m. to 4:47 p.m.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

2

DEPOSITION of JAY HURLEY

Friday, August 25, 2006, 9:40 a.m. to 4:47 p.m.

Offices of Stoneman, Chandler & Miller, LLP

99 High Street, Boston, Massachusetts 02110


PRESENT:

Michael E. Avakian, Esq.

Smetana & Avakian

    5211 Port Royal Road, Suite 103

    North Springfield, Virginia 22151

    703.321.9180          Fax 703.321.7342

    for the Plaintiffs


Burton E. Rosenthal, Esq.

Segal, Roitman & Coleman

    11 Beacon Street, Suite 500

    Boston, Massachusetts 02108

    617.742.0208          Fax 617.742.2187

    pkelly@segalroitman.com

    pfk425@yahoo.com

    brosenthal@segalroitman.com

    for the Defendants

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

Jay Hurley
**August 25, 2006**

125

1  gentleman, and my intention is not to put companies

2  out of business.  My intention is, the more the

3  merrier.  So, that's absurd.

4            I did tell him, though, we weren't going

5  to buy the business; because unions don't buy

6  companies, that I know of.

7     Q.  Do you know whether Mr. Evans told you that

8  he told Mr. Read that the union would put him out of

9  business?

10            MR. ROSENTHAL:  Whether Evans told Read

11  that Evans had said that to Read?

12            MR. AVAKIAN:  Correct.

13     A.  Again, if I thought somebody would say that

14  to somebody, I'd be upset.

15            But I think -- I think -- the

16  delegates to the District Council have enough

17  common sense not to utter words that are so

18  nonsensical, you know.

19     Q.  But you don't recall whether Mr. Evans ever

20  said something like that?

21     A.  I have no recollection of that whatsoever.

22     Q.  Now, Mr. Hurley, have you ever owned a

23  business at all?

24     A.  I don't think so.  No.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

126

1    Q.  Have you ever owned a steel-erection

2    company?

3    A.  No.

4    Q.  Or a welding company?

5    A.  No.

6           (Hurley Exhibit 11 marked for

7    identification)

8    Q.  Look over that document, please;

9    Exhibit 11.

10   A.  Okay.

11          Actually, there's an exhibit attached to

12   it.  I haven't seen this, but I've seen everything

13   up to Page 12.

14   Q.  So is it your testimony that Pages 13, 14,

15   15, 16 and 17 are documents that you haven't seen

16   before?

17   A.  Thirteen is just a cover sheet.

18          Fourteen, I don't ever remember seeing.

19          Fifteen is a cover sheet.

20          Sixteen is a letter from LeRoy Worley

21   dated 1992 that I've never seen.  That's a two-page

22   document.

23   Q.  Now, do you recall signing an affidavit in

24   this particular case, in the case of American Steel

130

1    question.

2                    MR. ROSENTHAL:  He can't answer to the

3    extent it involves interaction with counsel.

4       Q.  Other than counsel, did you work with

5    anybody else to develop this document?

6       A.  No.

7       Q.  Now, in developing this document, did you

8    refer to any other documents?  Did you investigate

9    or have other documents that you looked at?

10      A.  I don't remember.  I don't believe so.

11   I don't remember.

12                   MR. ROSENTHAL:  You can take whatever

13   time you need.

14                   THE WITNESS:  Okay; let me look at it,

15   then.

16                   MR. ROSENTHAL:  Can we take a break for

17   a minute so he can read it?  You've handed him a

18   long document.

19                   MR. AVAKIAN:  We can just be off the

20   record.

21                   [Pause]

22      A.  Your question is, so I understand it -- I

23   can kind of work through it quickly -- you want to

24   know what?

143

1    A.  Yes.

2    Q.  Which ones are they?

3    A.  All of them.

4    Q.  Now, if the businesses have different price

5  points or bid-dollar amounts, and one has a personal

6  relationship and is higher than another guy with a

7  lower bid, the guy with the personal relationship

8  is going to win?

9          MR. ROSENTHAL:  Object to form.

10    A.  It's conceivable.  It's a comfort factor in

11  this type of work, the ability to get the job done

12  on time.

13    Q.  Do you have any personal knowledge where

14  that type of event has occurred?

15          MR. ROSENTHAL:  The hypothetical event

16  you just described?

17          MR. AVAKIAN:  Yes.

18    A.  Which is?

19    Q.  Two bidders on a project, one with a

20  personal relationship that has a higher bid than

21  the other and wins the project.

22    A.  I don't have any concrete examples.

23          I have a lot of anecdotal evidence

24  thrashing through my head.  It's just a comfort

Jay Hurley
August 25, 2006

144

1   level, like I say.

2       Q.   Is that your gut feeling, that that's the

3   case?

4       A.   That's my experience.  I don't feel

5   comfortable testifying about the relationships

6   of other people.  It's just all hearsay.  That's

7   what they tell me.

8       Q.   Now, at the end of that sentence we've just

9   referred to it identifies And other factors.  What

10  are the other factors that you're referring to?

11      A.   Ability to get the work done.  Known work

12  force; particularly dependent on, like there's some

13  cases where we work for owners that really tend to

14  gravitate to contractors with like overly

15  strenuous safety programs.

16              So, a guy who has a great safety record

17  will certainly get an upper hand over a guy...

18              They don't want somebody on the job

19  that's going to leave them hanging.

20              There are just so many factors, so many

21  factors.  It's the same way your clients get their

22  work.  They build up a relationship with people.

23      Q.   All right.

24              Now, with regard to Paragraph 11, you

169

1    do a good job of that without me.

2              That sentence is probably poorly

3    structured.  The intent was PLA projects.

4        Q.  PLA projects; not regular or all public-

5    works projects?

6        A.  Actually, my second sentence, you can tell,

7    about working under union standards, I left the PLA

8    part out.

9        Q.  You were referring to PLA's, yes.

10       A.  I've read that three or four times and

11   never caught that.

12       Q.  I'm not going to use that statement against

13   you.

14              Now, I'm going to move on to

15   Paragraph 16.  Are you familiar with the concept

16   of stripping?  Have you ever heard that before?

17       A.  I've heard of it, yes.

18       Q.  And what do you understand that to be?

19       A.  Well, stripping is just offering union

20   membership to unorganized workers, in my mind.

21       Q.  Now, the first sentence in Paragraph 16

22   says From time to time Local 7 assisted nonunion

23   ironworkers who had been unsuccessful in organizing

24   nonunion employers in finding employment with Local

176

1   geez, you know, what we're about.

2           So it's a longwinded way of saying that

3   each job is a separate adventure.  It could be a job

4   here and a job right across the street; and you have

5   to put full effort into trying to get this one and

6   you have to put full effort into trying to get this

7   one, and then there's 20 other jobs around and you

8   have to put full effort into getting each one.

9           There's no tacit promise that if I give

10  you this job you get the next agreement.  There's no

11  successor agreements in our business.

12          It's like every job is a new adventure,

13  is the best way I can express it.

14      Q.  If I can make sure I understand your

15  answer, Local 7 agents approached the nonsignatory

16  erectors, fabricators and developers about obtaining

17  project-level work or work for an individual John

18  Jones?

19      A.  No.

20          MR. ROSENTHAL:  Object to the form.

21      A.  I just answered that.

22          You can construe that we're looking for

23  individual jobs to put this guy to work and that guy

24  to work.  What we're talking about individual jobs

177

```
 1   speaks to a project.

 2       Q.  Got it.

 3           Now, you indicate On many occasions.  Do

 4   you recall any occasions at all?

 5       A.  Every job I've seen in the last 14 years.

 6           MR. ROSENTHAL:  Are you finished?

 7       A.  Every job.  That's the point I'm trying to

 8   make.

 9           I got six jobs, and the seventh one is a

10   struggle to get a contractor, to get your members on

11   there.  You don't get any credit.  You get this one,

12   you get this one, you get this one, you get this

13   one, you get this one, you get this one.

14           If you lose this one, that's the only

15   thing your members will talk about; we lost that

16   job.  They don't talk about the five you won.

17       Q.  The one that you lost, does that mean it

18   went to a nonsignatory contractor?

19       A.  Yes.

20       Q.  So if I understand this first part

21   of Paragraph 17, then, it says that Local 7 agents

22   went and visited owners, fabricators and developers

23   to attempt to obtain agreement from them to use a

24   union signatory contractor?
```

207

1  referred to here as Exhibit B?

2      A.  Yes.

3      Q.  And what is the relationship?

4      A.  Local unions have the right to pass

5  any resolution they see fit.  In the end the

6  resolution has to pass muster from the Council

7  at the International, and be incorporated there.

8          So anything we do as a local union

9  eventually has to go to the International to be

10 reviewed by the general executive board, and only

11 when they approve it does it actually become

12 incorporated into our rules.

13     Q.  And does the local maintain records of

14 confirming items such as this?

15     A.  Yes.

16     Q.  And when you gave your affidavit and

17 referred to Tab B, do you know if you were familiar

18 with the local maintaining a record of this

19 document?

20     A.  Well, I don't remember being asked that.

21 Again, I can't speak for other people.  Paul is a

22 very efficient guy, and I'm sure he has it on file.

23 I just had no particular knowledge of it myself.

24     Q.  Paul DiPietro?

213

1   obviously there's a cost; there's an upgrade in

2   cost there.

3        Q.  Albeit not cheating, but still a cost?

4        A.  No.  It's not cheating.

5        Q.  Now, he made reference to a NECCO job where

6   there was a document that itself made some reference

7   to different union entities contributing some job-

8   targeting money.

9            It's my understanding you may have

10  suggested you had only limited knowledge of some

11  parts of this particular document.

12           Do you know with respect to that job

13  whether one or more than one local union had members

14  who worked on that job, or who were seeking to work

15  on that job?  Was it Local 7 alone, or was it other

16  locals?

17       A.  Ironworkers?

18       Q.  Yes; if you know.

19       A.  I don't know.  I don't know.

20       Q.  Now, could you read to yourself Paragraph 5

21  of the affidavit which is in front of you as Exhibit

22  11.  Tell me when you're done.

23       A.  Done.

24       Q.  And that refers to a Tab A.  I'm showing

Jay Hurley
**August 25, 2006**

214

1  you a document...

2     A.   The one I said I never saw before.

3     Q.   Yes.  Look at that paragraph and at Tab A.

4  Do you have any memory of having seen the document?

5     A.   I still don't.  I still don't.

6  I apologize.

7     Q.   Do you know how it relates to rates of

8  different locals at different times, if you take a

9  look at the rates?

10     A.   Oh, sure.  I can recognize what it is.

11  I just don't remember looking at it.

12     Q.   And you recognize it as being what?

13     A.   It would be the various rates in Boston.

14  Lawrence has a different rate.  Springfield has a

15  different rate.

16     Q.   And with respect to time periods?

17     A.   And it has effective dates from 1995, it

18  look like, or 1999.  It's really small.  Looks like

19  1999 up through 2006.  It also speaks to Worcester.

20  It also speaks to Rhode Island, New Hampshire,

21  Vermont, Maine, Springfield.

22     Q.   Thank you.

23          Now, Mr. Avakian asked you some

24  questions at different points in the deposition

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Motion for Enlargement of Time was served on the following counsel of record for Defendant Local 7 utilizing the Court's ECF filing system:

Paul F. Kelly, Esq.
Segal, Roitman & Coleman
11 Beacon Street, Suite 500
Boston, MA 02108


/s/ Michael E. Avakian
Michael E. Avakian