# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 04-cv-12536-RGS |
| LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS, *et al.,* | ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANT LOCAL 7'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS OF RECORD TO BE TRIED

Pursuant to Local Rule 56.1 of the Rules of the United States District Court for the District of Massachusetts, Plaintiffs hereby respond to the Defendant Local 7's Statement of Undisputed Material Facts in Support of Defendant Iron Workers Local 7's Amended Motion for Summary Judgment.

Plaintiffs dispute the unverified Defendant's facts accompanying Defendant's Motion for Summary Judgment. The material facts are in dispute as set forth in the Plaintiffs' Motion to Strike the Affidavits.

Further, Plaintiffs have attached Testimonial and Documentary Exhibits in support of this Counterstatement, and in particular show the attached Affidavits of Susan Beauregard and John Paulding in Documentary Exhibits 20 and 21, respectively.

Plaintiffs further respond to Defendant's Statement of Material Facts as follows:

1.      Deny.  Local 7's target program was to "provide the money to control the system."  Hurley 19 ll.5-6.  Local 7 business agents told signatory contractors that a purpose of

the job target program was to "help drive non-union steel erectors out of[]the] competitive

market." Beauregard Aff. ¶10.

    2.        Admit.

    3.        Admit.

    4.        Admit.

    5.        Admit.

    6.        Admit.

    7.        Deny.  Union and non-union steel erectors pay the same labor costs on state and

federal prevailing wage projects.  D.F.M. 37 (does "50/50, private to public work" and "bid it

accordingly;" Ajax 83 ("we're allowed to bid on prevailing wage projects because we can pay

our people the prevailing wage."); American Steel 140 (labor costs are lower "[o]n private

work."); Beauregard Aff.¶18 (union signatories have "little disadvantage on prevailing wage

jobs").y

    8.        Deny.  A job target contract does not reduce the wages and benefits of iron

workers under the applicable CBA.  Ex. 12.  "Job Targeting money does not reduce the costs" of

the union's CBA.  Brown (Local 7 30(b)(6) witness) 30 ll.14-18.  It shifts the signatory

employers profit from the contract into the target money payment.  Beauregard Aff. ¶ 16.

    9.        Admit.

    10.       Deny.  A job target contract does not reduce the wages and benefits of iron

workers under the applicable CBA.  Ex. 12.  "Job Targeting money does not reduce the costs" of

the union's CBA.  Brown (Local 7 30(b)(6) witness) 30 ll.14-18.  It shifts the signatory

employers profit from the contract into the target money payment.  Beauregard Aff. ¶ 16.

    11.       Deny.  The purpose of the Job Target payments was to lower the signatory

employers' costs.  Hurley 79 ll.10-12. The Target Fund "defrays" allegedly higher costs to

signatory contractors.  Answer to Interrogatory 22 (Ex. 18).  Without target money, signatory

erectors would not lower their bids to fabricators. HB Welding 92 ll.21-24.

11 [sic]   Deny.  D.F.M. 112 (Entry depends on the number of competent people

available to work).

12.    Deny.  The number of structural steel contractors identified in the Hurley

Affidavit is not based on personal knowledge and is subject to the accompanying Motion to

Strike Defendant's Affidavits.

13.    Deny.  Defendant does not identify which fabricators and general contractors

contract out steel erection work and that they work in the relevant market.  Ajax 33-34

(Company works for fabricators in and out of Canada, Connecticut, Massachusetts, New

Hampshire, New York and Vermont.).

14.    Deny.  The business of fabricators and general contractors is beyond the personal

knowledge of John Hurley in his affidavit as the information is not based on personal knowledge

of how fabricators and general contractors solicit and evaluate bids.  The Affidavit is subject to

the accompanying Motion to Strike Defendant's Affidavits.  Job Target Funds may result in

higher bid costs to the fabricator as in Bel-Lin Corp. obtaining the Brickworks contract at

$115,200.00 from fabricator Capone Iron Corporation, Bel-Lin Corp. 42 ll.17-20; Ex.

7(Belmonte Ex. 8), when Plaintiff D.F.M., Inc. had the lowest bid of $80,050.00 and had initially

received a purchase order from Capone Iron Corporation based on that bid on October 8, 2004.

Ex 8; Ex. 20 (Paulding Aff. ¶ 31) (full amount of target money given to steel erector was not

passed off to the fabricator or ultimate consumer).

15.    Deny.  Local 7 established a clear reputation for preventing non-union steel

erectors from obtaining work in downtown Boston and elsewhere in the relevant market.

Paulding Aff. ¶12.  Fabricators acquiesce in Local 7's promise of threats, intimidation, delays, and greater financial costs by not choosing non-union erectors at lower cost.  Paulding Aff. ¶ 21.

16.     Deny.  Steel erectors are not informed as to what projects they may be bidding are covered by a private or public PLA.  American Aerial Services 79 ll.12-13 ("I've never been told that a particular job is covered by a PLA.  No one has introduced that aspect into the bidding process with me."); 78 ll. 16-17 (it bids "prevailing wage jobs;") 72 ("I bid just about everything I uncover.") .

17.     Deny.  Fabricators do not issue bids with PLA specifications on them.  American Aerial Services 79 ll.12-13 ("I've never been told that a particular job is covered by a PLA.  No one has introduced that aspect into the bidding process with me."

18.     Admit.

19.     Deny.  The four Plaintiffs identified have experienced economic growth. Defendant does not define what threshold for gross income to have "substantially increased during the time period alleged in this Complaint" means.

20.     Deny.  Plaintiffs identified Superior Steel, Construction Welding Services, inc., B & B Welding, Inc., and FAMM Steel as businesses put out of business by Local 7's target program as Defendant admits..

21.     Deny.  Local 7 established the Job Target program to "provide the money to control the system."  Hurley 19 ll.5-6.  Local 7 provided target money on prevailing wage projects where the union's area standards were not at issue.  Hurley 76 ll.8-11.  Signatory contractors maintain at all time the union's area standard wages an benefits on private and public contracts and whenever they receive target money.

22.     Deny.  Local 7 agreed with the BTEA to engage in industry monitoring requirement against only non-union steel erectors.  Ex. 10 at 52 (Plaintiff' Ex. 1).

23.    Deny.  The Local 7 industry analyst monitors only non-union employers.  Wright 63 ll. 4-6.  Local 7 files false OSHA citations and uses the filings to falsely accuse employers.  ASE 150-51.  See e.g. American Steel Erectors, 339 N.L.R.B. 1315 (1993).

24.    Deny.  Local 7 agreed with the BTEA to engage in industry monitoring requirement against only non-union steel erectors.  Ex. 10 52.  The union industry analyst position performs the industry monitoring under CBA Addendum A, Ex. 10, and files regulatory complaints against non-union erectors..  Wright 61.  The Local 7 industry analyst does not monitor signatory employers.  Wright 63 ll. 4-6.

25.    Deny.  D.F.M. 101 ("[I]t affected 15 people for a month and a half."); 87 (equipment "was damaged on the job."); Paulding Aff ¶ 20 (steel beams "stolen and a Genie lift had been vandalized").

## COUNTERSTATEMENT OF MATERIAL ISSUES TO BE TRIED

1.    The Relevant Market for Structural Steel is "erecting of structural steel and steel on buildings and structures, erecting prestressed and precast concrete to produce structural elements, erecting metal building exteriors, erecting of metal rods, bars, rebar, mesh and cages to reinforce poured concrete, erecting structural steel trusses and joints, and welding work on construction projects encompassing eastern and central Massachusetts, Rhode Island, New Hampshire, and southern and central Maine contiguous to the City of Boston."  Complaint ¶ 15.  Non-New England Contractors participate in the Relevant Market described in the prior sentence by coming "in" to New England.  Hurley 224-25.  Defendant disagrees and contends that the relevant market is "world-wide."  Answer to Interrogatory 8 (attached).

2.    The portion of the Relevant Market dominated by union signatory contractors who only employ workers belonging to the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers (collectively referred to as Local 7), represents

greater than 70% of the dollar volume of available work.  Complaint ¶ 36.  Defendant Local 7

denies the allegation; it has never performed a study on this issue.  Brown 11 ll. 2-7.  Answer ¶

36.

      3.      Local 7 has 230 employer signatories to its CBA.

      4.      Whether Local 7 established the Job Target program to make signatory

contractors "more competitive."  DiPietro at 38.

      5.      Whether the Job Target program permitted any wage reductions by signatory

contractors from the Union's collective bargaining agreements or created a "two-tiered wage

system."  DiPietro at 38, 50.

      6.      Whether Defendants' Job Target program money reduces Plaintiffs' opportunity

to compete in the Relevant Market, when it assists signatory employers to compete financially

against nonunion employers.  DiPetro 192-93.  Funds are also used to "prevent non-Local 7

contractors from obtaining work."  Ex. 21 (Beauregard Aff ¶18).

      7.      Whether Defendant's Job Target program permits union signatory contractors to

submit bids below cost.

      8.      Whether Defendant's Job Target program drives the long-term average costs of

the non-signatory contracts upward with the intent of driving Plaintiffs out of the Relevant

Market.

      9.      Whether Defendants have effectively barred Plaintiffs and all other Non-Local 7

Contractors from any substantial work in Suffolk County and surrounding areas of the City of

Boston from fabricators because of Local 7's well-known "promise of 'problems' on a job."

Paulding Aff. ¶¶ 12, 28.

      10.      Whether a purpose of Local 7's Job Target program is to prevent non-union

contractors from obtaining work. Brown (30(b)(6) 18 ll. 2-17.

11.    Whether the oral agreements between signatory contracts and Local 7 to receive target money is a combination, agreement or conspiracy in restraint of trade.

12.    That Local 7 paid Target Money to owners, developers, steel fabricators and/or general contractors upon the condition that a signatory contractor with Local 7 be utilized to erect the structural steel.  Answer to Request for Admission No. 6 (Plaintiffs' Ex. 19).

13.    Whether one of the purposes for the Target Fund is to "defray" allegedly higher costs to signatory contractors since "nonunion contractors are likely to engage in greater regulatory cheating."  Answer to Interrogatory 22 (Ex. 18).

14.    Whether the written agreements between signatory contracts and Local 7 to receive target money is a combination, agreement or conspiracy in restraint of trade.

15.    Whether Local 7's Job Target program allocations to signatory employers in excess of $16,162,134.20 from December 1, 1999 to May 18, 2006, Ex. 13 (attached), result in lower than cost bids to steel fabricators and general contractors.

16.    Whether money was taken from the wages of signatory contractor employees on federal prevailing wage projects subject to the David-Bacon Act as dues and/or for market recovery and then remitted to the benefit of other signatory employers.  DiPietro at 68 ll.7-14.

17.    Whether money was taken from the wages of signatory contractor employees on state prevailing wage projects subject to Massachusetts law as dues and/or for market recovery and then remitted to the benefit of other signatory employers.

18.    Whether Local 7 established the Job Target program to "provide the money to control the system."  Hurley 19 ll.5-6.

19.    Whether Local 7 does not segregate out or maintain records of market recovery funds derived from worker wages on prevailing wage and private sector projects.  Hurley 31 ll.15-20.

20.     Whether Local 7 business agents told signatory contractors that a purpose of the job target program was to "help drive non-union steel erectors out of[]the] competitive market." Beauregard Aff. ¶10.

21.     Whether the Union issues target alerts through a "blast fax" notification system to signatory contractors when it is worried about a job going to a non-union/nonsignatory contractor. Hurley 40 ll. 14-15; 42 ll.1-6. Local 7 contractors may receive advance notice of the target fund amount prior to submitting bids. Beauregard Aff. ¶ 11.

22.     Whether Local 7's visit to fabricator Canatel Industries was to obtain a restrictive contracting agreement for union signatory contractors for Canatel Industries not to use nonunion erectors on prevailing wage projects . Hurley 64 ll.3-6; Ex. 1(Hurley Ex. 2i(DEF 02059)).

23.     Whether Local 7 provided job target money on projects to signatory contractors when no nonunion company would be bidding on a contract. Hurley 72 ll.20-24.

24.     Whether Local 7 provided target money on prevailing wage projects that upset regulatory standards. Hurley 76 ll.8-11.

25.     Whether Local 7 made payments with respect to a target agreement only after a contractor had made its weekly wage and benefits payments, Hurley 78; 187; Stearns 50-51 l.2, or after the job was complete. Bel-Lin Corp. 29 ll.13-19; 71 ll.14-15; HB Welding 36 ll.10-11. And whether the recipient target contractor reserved a portion of workers paycheck to eventually be reimbursed by job target funds later sent to the employer. Cf. Stearns 104 ll.11-15.

26.     Whether Target money would not be used to pay contractors as they proceeded on current projects. DiPietro 112 ll.8-16.

27.     Whether the purpose of the Job Target payments was to lower the signatory employers' costs. Hurley 79 ll.10-12.

28.     Whether a signatory employer can use target money to "go out and buy a truck, buy a Hummer, buy whatever else he needs in his business or whatever he wants to do with it." Brown 32 ll.14-18; Beauregard Aff. ¶17.  Whether Target money became the signatory contractor's profit.  Beauregard Aff. ¶16.

29.     Whether Local 7 established a target fund account for Construction Welding Services, Inc. ("CWS") from which two payments were made by Local 7 to the Laboure Center, South Boston, MA, as a donation by CWS to the Rebar and Welding Building Trades in 2002, all of which was unknown to CWS.  Beauregard Aff. ¶14 & Exhibit D.

30.     Whether Local 7 agreed with signatory contractor Capone Steel Corporation to turn the New England Confectionery Company project in Revere, MA from selection of a non-union erector to a signatory contractor.  Ex. 2 (Hurley Ex. 5).

31.     Whether Capco Steel Corporation and Local 7 negotiated the target fund payment on the NECCO project from $108,000 to $238,000.  Hurley 91 ll.6-7; Exs. 3 & 4 (Hurley Exs. 4 & 6).

32.     Whether Local 7 and signatory contractor Griffin Iron Works verbal agreement with Local 7, Local 15, Local 37, Local 424, and the Iron Workers District Council in 2002 to pay Griffin Iron Works $120,000 is a combination to remove AJAX from selection as the steel erector of a Cardi's Furniture store in North Attleboro, Massachusetts.  Ex. 5 & 6 (Hurley Ex. 8 & 9).  Local 7 approved this special project of the District Council.  DiPietro 117 ll.13-23.

33.     Whether Local 7 does not require signatory contractors to actually apply receipt of target money to lowering bid prices or the cost of the project to the fabricator.  Hurley 159 ll.16-19.  The target fund check can be applied by the employer to "anything," Hurley 187 l.23, for any purpose the company may have.  Stearns 52 ll.16-21.

34.     Whether Job target payments are put into the signatory contractors' general or regular checking account.  Bel-Lin Corp. 31 ll.5-8; Stearns 52 ll. 1-4; HB Welding 40 ll.4-15. And whether any money is disbursed back to any union employee.  Bel-Lin Corp. 31 ll.16-22.

35.     Whether Job target agreements are not negotiated with any employer association. Are job target agreements reached "job-by-job" with employers.  Hurley 161 ll. 3-8; 164 ll.1-3, 14-16.

36.     Whether a job target contract does not reduce the wages and benefits of iron workers under the applicable CBA.  Ex. 12 (Stearns Ex 19b).  "Job Targeting money does not reduce the costs" of the union's CBA.  Brown 30 ll.14-18; Beauregard Aff. ¶16.  Whether Local 7's separately executed Target Agreement is not a considered a collective bargaining agreement. Stearns 101 ll.2-17.

37.     Whether Local 7 seeks to obtain advance agreements from owners, developers, and fabricators to use only union signatory contracts on their projects.  Hurley 178-179 l.9; 192 ll.15-18; Paulding Aff. ¶30.

38.     Whether Target money may be used by a signatory employer to lower its bid price to a fabricator after learning that its initial bid was too high.  Bel-Lin Corp. 42; Stearns 52-53.  At other times, has target money been included in the original signatory contractor bid. Stearns 89 ll. 20-24.  Do signatory contractors then inform fabricators that they have received target money, Ex. 7, and submit new bids including a reduction based on Local 7 target funding called a "good guy discount."  Bel-Lin Corp. 41; Ex. 8.

39.     Whether Target money allows the signatory employer to reduce its bid and be more competitive to the fabricators or general contractors they bid to.  HB Welding 42.  Target money enabled HB Welding to take a Stop & Shop project in Halifax, MA project away from Plaintiff Ajax Construction.  Bacon Ex. 14.  Whether Target money allowed CWS to win almost every job it could bid on in the Boston area.  Beauregard Aff. ¶ 18.

40.    Whether a contractor will stick to its original bid price even if asked by a fabricator to lower it.  Bel-Lin Corp. 58-59 l.4.

41.    Whether on the Brickworks job, Bel-Lin Corp. was awarded the contract at $115,200.00 from fabricator Capone Iron Corporation.  Bel-Lin Corp. 42 ll.17-20; Belmonte Ex. 7.  Plaintiff D.F.M., Inc. had the lowest bid of $80,050.00 and had initially received a purchase order from Capone Iron Corporation based on that bid on October 8, 2004.  Ex.8.

42.    Whether on the HB Welding Stop & Shop project, target money at the rate of $29,830.00 "was key in the final negotiations with Stop & Shop.  Bacon Ex. 14.  The letter went out with the company's authorization.  HB Welding at 60 ll. 20-22.  And, whether without the target money, HB Welding would not have lowered its bid on the Stop & Shop project.  HB Welding 92-93 l.1.

43.    Whether signatory contractors tell Local 7 how much target money they need to win a project.  Bel-Lin Corp. 57 ll.1-3.

44.    Whether Local 7 has had collective bargaining agreements ("CBA") with the Building Trades Employer's Association that negotiated a Market Recovery Program.  For the years 1993-97, the CBA included a provision for an $.50 per hour deduction for a Market Recovery Program fee within the working dues deduction section of the document, page 14-15.  Ex. 9.  For the years 2000-06, the CBA included a provision for an $.85 per hour deduction for a Market Recovery Program fee within the working dues deduction section of the document, page 21.  Ex. 10.

45.    Whether the working dues provision of the CBA was not negotiated with the Local 7.  Stearns 47 ll.7-14.  Is the language only in the CBA so that employers can mechanically deduct money from workers paychecks.  Stearns 17 ll. 9-16.

46.     Whether the market recovery program is also called the target fund.  Stearns 16 ll.14-16, 21-22.

47.     Whether any employer participates in managing the market recovery program or sits on any fund involved with the market recovery program.  Stearns 16-17.  Is there is a formal document establishing, describing, or regulating the market recovery program.  Stearns 27; DiPietro 120 ll.15-21.  Whether Employers receive any accounting reports for amounts received or expended by Local 7 on the market recovery program.  Stearns 27 ll.19-23.

48.     Whether the market recovery program is run from the union hall by the business manager, business agents, and/or union financial secretary.  DiPietro 75, 84 ll.12-16.  There is no union document that shows who should be running the job target program.  DiPietro 76 ll.3-4.  Whether the Union solely determines the amount of target money to spend; and is the amount is not negotiated.  DiPietro 83 ll.16-19.

49.     Whether any union agents take notes or record their discussion and votes on why and to which signatory contractor to grant target money and how much to grant.  DiPietro 85 ll.14-16.

50.     Whether Target fund contracts are not presented to the union membership.  DiPetro 89-90 l.2.

51.     Whether the 2000-06 market recovery increase to $.85 per hour was not discussed by the employer association with the union because the money under the working dues deduction is solely in the Union's control.  Stearns 25 ll.5-16.  Whether it is only after the total dollar amount for working dues deduction is established, that the union provides the BTEA the breakout for how working dues amounts would be allocated.  Stearns 25 ll. 13-23.  And, does the Union decides how the working dues will be allocated to different categories, including job targeting.  DiPietro 61 l. 19.

52.     Whether only $.85 is deducted from employee wages under CBA on both prevailing wage and privately funded projects. DiPietro 68 ll.3-14.

53.     Whether between December 1, 1999 and May 18, 2006, Local 7 allocated $16,162,134.20 in target money for signatory contractors or more. Ex. 13. In 2001, Local 7 received $3,491,096 target money from contractors and paid out $793,375 DiPietro 94, 95 l.4.

54.     Whether in 2005, Local 7 spent over $3 million on job targeting as shown on page 6 line 50 (ASE 000189) and 21-35 of Plaintiffs' Exhibit 11. Local 7 has several million dollar target money CDs. DiPietro 149-50. Between 2000 and 2005, the target fund grew by about $5 million. DiPietro 150 ll.2-6.

55.     Whether payments to contractors were made by the Financial Secretary or Business Manager and co-signed by a Union business agent. The Financial Secretary or Business Manager has access to a stamp of the business agent's signature to co-sign checks. DiPietro 109. Whether it is only "Theoretically," that the target fund payments are ever verified by reporting the target fund payments for oversight to anyone. DiPietro 109-110 l.2.

56.     Whether Addendum A of Local 7's collective bargaining agreement with the Boston Trade Employer's Association for 2000-06 included a requirement that the Union monitor non-union steel erectors. Ex. 1 at 52. Does the union industry analyst position performs the industry monitoring under Addendum A and files regulatory complaints against non-union erectors.. Wright 61. The Local 7 industry analyst does not monitor signatory employers. Wright 63 ll. 4-6.

57.     Whether Target money can be used to pay a signatory employer for work hours, travel pay, equipment, DiPietro 80 ll.18-23, and crane rental hours. DiPietro 81 l.1.

58.     Why are not all Target fund agreements in writing. DiPietro 90 l.23.

59.    Whether Local 7 business agents seek to strip employees from the Plaintiffs to place in jobs with signatory contractors, Wright 102 ll.15-24, such as occurred at Bedford Ironworks.  Bedford 82-83.

60.    Whether Local 7 targeted a Jordan's Furniture Distribution Warehouse project in 2002.  Local 7 and James F. Stearns Company did not negotiate or sign a target agreement for the project.  Stearns 33 ll.14-23.  Plaintiff AJAX submitted a bid for building this project in Taunton, Massachusetts.  Complaint ¶ 119.

61.    Whether the general contractor Clack Construction informed James F. Stearns that they had arranged in advance with the union to "have target money available for the job." Stearns 48 ll.12-23.  Stearns knew about the availability of target money at all times, Stearns 56 ll.1-7, and used it to calculate its bids.  Stearns 91-92 l.5.  Whether Mr. James F. Stearns talked to Jay Hurley about target money and discussed no limit to the amount the Company could receive.  Stearns 49 ll.16-18.

62.    Whether Stearns submitted more than one bid to Clack.  Stearns 55 ll.16-22. Whether it's final bid price was $1,050,000.00.  Stearns 90 ll.1-3.

63.    Whether Local 7 budgeted $365,125.00 of target money for this project.  Ex. 13. James F. Stearns Company reports receipt of $410,108.00 of target money on this project.  Ex. 11.  It also received $50,000.00 from Iron Workers Local 37 for doing the project.  Whether this was only discussed over the telephone with Local 37 business agent Mike Regur.  Stearns 86 ll. 1-20.

64.    Whether on other projects such as the MITER Center, James F. Stearns Company lowered its price upon receipt of target money.  Stearns 64 ll.10-24.  Signatory contractors might also not lower their bids to fabricators based on the availability of target money.  BRI 59-60 l.10.

65.     Whether the fabricator might not pass any savings from the union contractors lower bid targeted price onto the consumer, *i.e.*, the owner, developer or general contractor. Paulding Aff. ¶ 31.

66.     Whether James F. Stearns Co worked on prevailing wage projects such as the Somerville Housing project and received target money.  Stearns 77 ll. 9-20.

67.     Whether Builders Resource, Inc. ("BRI") worked on approximately thirty state and prevailing wage projects.  Ex. 13 at 3-4. Whether BRI received a target grant of $120,000.00 in 2005 to erect the structural steel portion of the United States District Courthouse in Springfield,  Massachusetts for Canatel.  BRI 58 ll.11-12, 18.  Whether ths was a project covered by the Davis-Bacon Act.  BRI 58 ll. 20-22.  Copies of checks paid to BRI by Local 7 for the U.S. Courthouse in Springfield between January 17, 2006 and July 31, 2006, are in Ex. 16 (a)-(j).

68.     How many projects did Plaintiffs lose on prevailing and non-prevailing wage projects during the relevant period and in the relevant market.

69.     Whether it is well known by fabricators in the industry that projects in proximity to downtown Boston could not be completed using a non-union steel erector.  Paulding Aff. ¶12; D.F.M. 199 ll. 6-21.

70.     Whether at the Fox 25 Television Station addition in February 2003, Cape & Island Steel issued a contract to Plaintiff D.F.M. Industries.  Paulding Aff. ¶13.  Did Local 7 business agent Edwin Wright threatened to put Cape & Island Steel and D.F.M. out of business if D.F.M. was not removed.  Paulding Aff. ¶16.

71.     Did the Union strike and was D.F.M.'s equipment damaged by the union.  D.F.M. 87; Paulding ¶20.

72.    Did the general contractor on the Fox 25 project, Bond Brothers, reached agreement with Local 7 concerning D.F.M. and directed Cape & Island Steel to dismiss D.F.M. which it did.  Paulding Aff. ¶21.

73.    Whether in the bid process for private and prevailing wage jobs, Cape & Island Steel had been threatened with "promises" of picketing, coercion, intimidation, and potential destruction of property in Boston if a project was given to a non-union erector.  Paulding Aff. ¶27.

74.    Whether "promises" made by Local 7 business agents is well known in the industry to fabricators and general contractors so that it causes delays, increased costs, and property destruction.  Paulding Aff. ¶28.

75.    Whether Cape & Island Steel was approached by Local 7 business agents at the Silver Lake Regional High School, Martignettis Liquor Warehouse, Wellesley Library, N.E.C.C.O., Brown Elementary, the Science Building Woods Hole, Norwell Middle School, Yarmouth Police, and Stony Brook projects with "problems, Paulding Aff. ¶29, whereupon, Cape & Island Steel used a union contractor who the union would provide target money to. Paulding Aff. ¶30.

76.    Whether Local 7 intimidated American Aerial when four union business agents including Charles Wright surrounded its President James Read at the Riverfront project in Westbrook, Maine in the Spring 2004.  American Aerial 285-87.

77.    Whether Local 7 had any organizational interest in the Plaintiffs' employees when it refused to participate in a poll at D.F.M. and it refused to seek a secret ballot election for the employees of Plaintiffs at any time.  D.F.M. 56 ll.6-14 (company offered to set up a poll for the union); 158 (poll taken); 181-82 (poll conducted by neutral third party); Ex 22 (Notice of

Poll).  Between 1988 and 2003, Local 7 no elections had been held by the National Labor

Relations Board to certify the union as representative of employees.  DiPietro 176 ll.10-18.

78.    What are the Plaintiffs' market damages caused by Local 7's anti-competitive

activities.

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC.


By their attorneys:

Carol Chandler (B.O. # 080660)
Geoffrey R. Bok (B.O. # 550851)
STRONGMAN, CHANDLER & MILLER, LP
99 High Street
Boston, Massachusetts 02110
(617) 542 – 6789


/s/ Michael E. Avakian
Michael E. Avakian, *pro hac vice*
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, Virginia 22151
(703) 321 - 9181

September 29, 2006

## CERTIFICATE OF SERVICE

I hereby certify that DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT AND COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS, pursuant to Local Rule 5.4(c) via the Court's ECF system on this the 29th day of September 2006, to the counsel of record in the above styled case named below:

Paul F. Kelly
Segal Roitman & Coleman
11 Beacon Street, 5th Floor
Boston, MA


/s/ Michael E. Avakian
Michael E. Avakian

## INDEX TO APPENDIX

### TESTIMONY

EXHIBIT A    Excerpts from Deposition Transcript of Ajax Construction Company

EXHIBIT B    Excerpts from Deposition Transcript of American Aerial Services, Inc.

EXHIBIT C    Excerpts from Deposition Transcript of American Steel Erectors, Inc.

EXHIBIT D    Excerpts from Deposition Transcript of Bedford Ironworks

EXHIBIT E    Excerpts from Deposition Transcript of Bel-Lin Corp.

EXHIBIT F    Excerpts from Deposition Transcript of James Brown

EXHIBIT G    Excerpts from Deposition Transcript of Builders Resource, Inc.

EXHIBIT H    Excerpts from Deposition Transcript of D.F.M. Industries, Inc.

EXHIBIT I    Excerpts from Deposition Transcript of Frank DiPietro

EXHIBIT J    Excerpts from Deposition Transcript of HB Welding, Inc.

EXHIBIT K    Exhibit Excerpts from Deposition Transcript of John Hurley

EXHIBIT L    Exhibit Excerpts from Deposition Transcript of James F. Stearns Co.

EXHIBIT M    Excerpts from Deposition Transcript of Charles Wright

### DOCUMENT EXHIBITS

1.    Jay Hurley Letter Regarding Canatel, Ind.
2.    NECCO Fax
3.    NECCO Project Alert
4.    NECCO Target Fund Contract
5.    Hurley Ex 8
6.    Hurley Ex. 9
7.    Bel-Lin Ex. 7 (Local 7 Fax-Brickworks); Bel-Lin Ex. 8 (Bel-Lin Brickworks) bid
8.    DFM Bid Brickworks
9.    1993-97 union CBA
10.    200-06 union CBA
11.    Stearns Jordan's Furniture target fund payments.
12.    Stearns Target Fund Agreement
13.    Local 7 List of Target Projects
14.    HB Welding Letter concerning Jordan's Furniture
15.    Builders Resource Target Fund Contract for U.S. Courthouse, Springfield, MA

16.    Builders Resource Target Fund checks for the U.S. Courthouse project.
17.    Local 7 2005 LM-2 (US DOL)
18.    Local 7's Objections and Responses to Plaintiffs' First Set of Interrogatories.
19.    Local 7's Response to Plaintiffs' Request for Admissions.
20.    Affidavit of John Paulding
21.    Affidavit of Susan Beauregard
22.    Notice of D.F.M. Poll

EXHIBIT 1

On August 30th, Mike Durant and I drove up to Thetford Mines, Quebec, Canada for a meeting with Canatal's owner, Ralph Poulin. We were accompanied by Jacques Dubois, Business Manager from Local #711 Montreal and Jacques St. Onge, Local #711's Business Agent for the Quebec area. We had a very productive meeting, with the crux of the meeting focusing on the rampant cheating that still exists in the (prevailing wage jobs) steel erection industry, and the unwitting role that Mr. Poulin's company is paying by contracting jobs to these cheaters.

***We must look in the mirror, however.*** He is only receiving bids from the non-union companies on a lot of these rated projects in the suburbs. ***We cannot expect him to assist us in curbing this cheating if there are no alternative bidders (i.e. union companies who pay prevailing wages and benefits), as he has to get the steel up once he contracts a job.*** The job above is a classic example… a prevailing rate job with no union bidders. Mr. Poulin is sincerely concerned with the evidence we have uncovered. He wants to assist us, but I need your help. Please respond to as many PROJECT ALERT requests we forward to you as possible… as without your help the cheating will continue uninterrupted.

There's plenty of work now, but it will wind down and if these fabricators only know the non-union players, our job becomes ten-times tougher when we finally redevelop an interest in the suburban market.

Thank you,
Jay Hurley
Business Manager
Iron Workers Local #7

DEF 02059

EXHIBIT 2

BOB FOSTER

Re J C

617

422

7049

Leggett & Call

**CORPORATION**
**STREET**
**E, RI  02903**

**FAX:  401-861-1221**

~~SHEET~~

**DATE:** 9/4/01

**ATTENTION:** Jay Hurley    **FAX NO:** 617-268-7878

**FROM:** Mike Sr

**NO. OF PAGES INCLUDING COVER** one

**REMARKS:**

( NECO )

New England Confectionary Company
Revere, MA

Huge Job    2-3000 Tons

The Austin Company    **DEF 07165**

Contact  Clyde Ash  Manager of
Purchasing
816-941-2680

Jay- Please straighten out-
Wants to do Non-Union.

Mike

(Tony (town) Hagey)
Ber Lin - PAB

Supply + Exec  Bob Foster
617-402-7000) Leggat McCall Prop.

EXHIBIT
5
Hurley

(0.15 )Revere

EXHIBIT 3

# Local #7 Project Alert

Project: ***New England Confectionery Company (NECCO)***
Location: Revere, MA
G.C.: Austin Company
Type of work: Structural; misc. metals; etc.

Please contact Pat McDermott @ 1-800-730-4766 for further information that is pertinent to this project.

Thank you for your attention and assistance in this matter.

Jay Hurley
Business Manager

**CONFIDENTIAL**

*Pat – $4 p/h Target*
*($108,000 on a*
*27,000 Man/hour*
*JOB)*


EXHIBIT
4
Hurley

DEF 07166

EXHIBIT 4

# Local #7 Target Fund Contract #725
## (Page 1 of 1)

Local #7, through its Target Fund, is offering up to a maximum of two hundred and thirty eight thousand dollars ($238,000.00) reimbursement for the steel erection and related retrofit on the NECCO project.

***Said offer is based on the following conditions:***
Local #7 will reimburse Capco Steel ("**the contractor**"), a total of eight dollars and fifty cents ($8.50) per hour, up to a maximum of twenty eight thousand (28,000) hours, with a total maximum reimbursement of two hundred and thirty eight thousand dollars ($238,000.00). By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will not be reimbursed by Local 7's Target Fund. Furthermore, it is agreed that should the covered portion of this project require less than twenty eight thousand (28,000) hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, provided only if all of the applicable conditions contained herein were adhered to.

***It is expressly understood that this reimbursement is being offered, and will only be remitted to the contractor, after it has been clearly established by Local #7 that the following conditions were also met:***
A.  This agreement is signed by the contractor and the Local #7 Business Agent in whose geographic area the covered work is being performed.
B.  All wages and fringe benefits, as required by the currently existing Local #7/BTEA/AGC collective bargaining agreement, have been paid to every member working under this particular agreement, and all remittance reports that verify these payments are in order at the IWDCNE Fund Office.
C.  All hours and conditions are verifiable by the Local #7's *Steward's Report* and the Local #7's *Target Sheet*, both of which must be filled out, and remitted to Local #7 <u>weekly</u>, solely by the Business Agent's appointed steward for this job. Each remitted *Target Sheet* must signed by an authorized representative of the contractor.
D.  The contractor is not in arrears on the payment of wages and or fringe benefits for any present or previous project(s) within the confines of Local #7's geographic jurisdiction.
E.  The contractor acknowledges that it is a signed party to the Local #7/BTEA/AGC collective bargaining agreement under *Section 9a* of the *National Labor Relations Act*.
F.  Reimbursement is requested by the contractor to Financial Secretary Paul DiPietro (617-268-4777).

_____          _____
Pat McDermott -- BA Local #7                     Michael Caparco (contractor)

Date _____          Date 10/4/01

Received by FS/T Paul DiPietro (signature) _____ Date _____


EXHIBIT
6
Hurley

EXHIBIT 5

# Local No. 37 of the

### International Association of

## Bridge, Structural, Ornamental and Reinforcing Iron Workers



AFFILIATED WITH AFL-CIO

December 4, 2002

845 WATERMAN AVENUE
EAST PROVIDENCE
RHODE ISLAND 02914
(401) 438-1111
FAX # (401) 438-8965

Local 7 Iron Workers
Mr. Paul DiPietro, FST
PO Box 7
S. Boston, MA 02127-2457

Dear Paul:

Through a concentrated effort with the New England District Council and Griffin Iron Works, Cardi's Furniture's new store was turned around from a non-union project to a union project. A verbal agreement was made within the District Council to target this project as follows:

| Local 7 | 10,000.00 |
| Local 15 & 424 | 20,000.00 |
| Local 37 | 80,000.00 |
| District Council | 10,000.00 |

With the completion of over 50% of this project, I am writing to assure you that all the benefits thru W/E 12/1/2002 have been paid on this project. Your help in expediting payment for Griffin Iron Works will be greatly appreciated. Please make check payable directly to Griffin Iron Works.

Fraternally yours,

Dennis A. Carey,
Financial Secretary-Treasurer

DAC/cja

**EXHIBIT**
8
Hurley

DEF 00970



EXHIBIT 6

 **Griffin Iron Works Inc.**
14 Bullock Ave.
Barrington, RI 02806
1-401-247-0571

December 4, 2002

Local 7 Iron Workers
Mr. Paul DiPietro, FST
PO Box 7
S. Boston, MA 02127-2457

Dear Paul:

Through a concentrated effort with the New England District Council and Griffin Iron Works, Cardi's Furniture's new store was turned around from a non-union project to a union project. On May 9, 2002 Local 7, through Jim Coyle, agreed to pay $10,000.00 towards the New England District Council's effort to turn this project around.

A verbal agreement was made within the District Council to target this project as follows:

| | |
|---|---|
| Local 7 | 10,000.00 |
| Local 15 & 424 | 20,000.00 |
| Local 37 | 80,000.00 |
| District Council | 10,000.00 |

With the completion of over 50% of this project, I am requesting payment from Local 7 at this time. Your help in this matter is greatly appreciated.

Sincerely,

Patrick S.C. Griffin,
President

EXHIBIT
9
Hurley

DEF 00972

EXHIBIT 7

FROM CAPONE IRON CORPORATION (MON)NOV 22 2005 13:08/ST.13:08/NO. 6337473849 P 2

FINANCIAL SECRETARY-TREASURER / BUSINESS MANAGER
**JAMES M. COYLE**

BUSINESS AGENTS
**MICHAEL J. DURANT**
**PATRICK McDERMOTT**
**EDWIN WRIGHT**



Belmonte
EXHIBIT NO. 7
8/22/06   8.6

PRESIDENT
**JAMES P. BROWN**

BUSINESS AGENT / INDUSTRY ANALY
**NEIL CONLEY**
**CHARLES WRIGHT**
**FIORE GRASSETTI**

## INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

### *Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P. O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

# *****FAX COVER SHEET*****

### *Fax # 617-268-7878*
Facsimile Transmittal

**DATE:** _Nov 18 - 04_

**TO:** _Gary Capone_

**FROM:** _Ed Wright_

There will be a total of _____ pages to follow.

If there are any questions, or if you have any difficulty receiving this communication, please call 617-268-4777......Thank you!

**MESSAGE:** _Gary: Walter Belmonte will_
_Cut $9000 & Local 7 will Target_
_$12 per hr   1000 Hr. = $12000_
                                                      _9000_
                                                    _$21,000_

_This is Concession & Market Recovery_
_Please fax to Bob Larson_

_Ed Wright_

**CONFIDENTIAL**

**Bel Lin**
STEEL ERECTORS

Bel-Lin
Corporation

Walter Belmonte
President

28 Sept 04

Capone Iron Works

Re: Brickworks

Belmonte
EXHIBIT NO. 8
8/22/06 P.B.

Erect Buildings # 3 & 4 as per drawings

3-5-003 & 4-5-003 only (1st floor)

No permits
No details
Room for crane off load & shake out

Exclude details 4/5.010  5/5.010  4/5.011  9/5.012
4/5.010

Studs included

$136,000 ᶜᶜ

Thank you

−$21,000 ᶜᶜ
Good guy discount

$115,200 ᶜᶜ

6 Perley Evans Drive · Randolph, MA 02368                    (781) 986-7567

CONFIDENTIAL

EXHIBIT 8



**CAPONE IRON
CORPORATION**

20 Turcotte Memorial Drive, P.O. Box 706, Rowley MA 01969
P: 978-948-8000 • F: 978-948-8650

## INSTALLATION JOB ORDER 14800-03-04-136

P.D EXHIBIT 6
Pisani
7/6/06

| | |
|---|---|
| Subcontractor: | **DFM Industries** |
| Project Name: | **Brickworks – Cambridge, MA** |
| Project Number: | **100-04-136** |
| Architect: | **TKG Khalsa Design** |
| General Contractor: | **Columbia Construction Co.** |
| Contract Documents: | **3-S-001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012** |
| | **4-S-001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012** |
| | **ALL DRAWINGS DATED 12-12-2003** |
| | **Specification Sections: 05100, 05310, 05320** |

**Scope of Work:** Provide all labor including, but not limited to all necessary equipment and appurtenances for the unloading, shakeout, and complete installation of all ■ Structural Steel  ■ Joist & Deck ☐  Misc. Metals all in accordance with the highest and latest standards of the industry as established by all documents prepared and published by the American Institute of Steel Construction, American Welding Society, Steel Deck Institute, Steel Joist Institute, National Ornamental and Misc. Metals Association and OSHA.  In the event of conflicting standards, the highest standard shall prevail.

**Subcontract/Supply Sum:**  | $80,050.00 (eighty thousand fifty and 0/100 dollars) |

[X]  includes all sales, use, consumer and other similar taxes

[ ]  tax exempt

**Commencement Date:**

[ ]  upon notice to proceed by Contractor

[X]  | Approximately November 2004 |

**Completion Date:**

[ ]  in accordance with Contractor's Schedule

[X]  | Approximately January 2005, or per current contract schedule |

**Other Provisions:**

---

CAPONE IRON CORPORATION
**Contractor**

BY: _____

DATE: _____

DFM INDUSTRIES
**Subcontractor**

BY: _____

DATE: _____

**STEEL**

| | | |
|---|---|---|
| INSTALLATION JOB ORDER | DFM INDUSTRIES | 10/8/2004 |

· CE 000022

**CIC  CAPONE IRON CORPORATION**

20 Turcotte Memorial Drive, P.O. Box 706, Rowley MA 01969
P: 978-948-8000 • F: 978-948-8650

RECEIVED
10-15-04

# LETTER OF TRANSMITTAL

| DATE | JOB NO. |
|---|---|
| 10/08/04 | 100-04-136 |

ATTENTION
Glen Pisani

TO:  DFM INDUSTRIES
54 SOUTH STREET
SUITE ONE
WRENTHAM, MA 02093

RE:  Brickworks
Cambridge, MA

WE ARE SENDING YOU:     ■ Attached     ☐ Under Separate Cover Via _____

☐ Shop Drawings     ☐ Prints     ☐ Plans     ☐ Samples     ☐ Specifications
☐ Copy of Letter     ☐ Change Order     ☐ _____

| COPIES | DATE | NO | DESCRIPTION |
|---|---|---|---|
| 2 | 10/8/2004 | | Subcontract Packages |
| 1 | | | Installation Subcontractor Field Forms (w/instructions) |
| | | | |
| | | | |
| | | | |
| | | | |

☐ For Approval          ☐ Approved as Submitted     ☐ Resubmit _____ copies
■ For your use          ☐ Approved as noted          For Approval
                                                    ☐ Submit _____ copies for
☐ As requested          ☐ Returned for corrections       distribution
                                                    ☐ Return _____ corrected prints.
☐ For review & comment  ☐ _____

☐ FOR BIDS DUE _____          ☐ PRINTS RETURN AFTER LOAN TO US

☐ Drawings must be returned no later than _____ in order to meet project schedule

REMARKS:
Enclosed please find two original subcontract packages for the Brickworks project:

1. Please review and sign both packages and return them to Capone Iron Corporation.
2. Please make sure to initial all pages, including each item listed on the Subcontract Package cover page.
3. Please make sure to forward a Certificate of Insurance for this project, naming Capone Iron Corporation as additionally insured.
4. The Installation Subcontractor Field Forms package is FOR YOUR USE...PLEASE DO NOT RETURN.

Once we receive both signed packages and the certificate of insurance, we will return one fully executed package for your files.

Thank you
Addi

cc: _____

Signed _____ EO
Adelaide Guarracino, Assistant Vice President



If enclosures are not as noted, kindly notify us at once.

^SF 000020



**CAPONE IRON CORPORATION**

20 Turcotte Memorial Drive, P.O. Box 706, Rowley MA 01969
P: 978-948-8000 • F: 978-948-8650

## SUBCONTRACT PACKAGE

| | |
|---|---|
| Master Subcontract No: | 14800-03 |
| Erection Job Order No: | 14800-03-04-136 |

| | | | |
|---|---|---|---|
| TO: | DFM INDUSTRIES | DATE: | 10/8/2004 |
| | 54 SOUTH STREET, SUITE ONE | PROJECT: | Brickworks |
| | WRENTHAM, MA 02093 | | Cambridge, MA |
| ATT: | Glen Pisani | CIC JOB #: | 100-04-136 |
| | | CONTRACT AMOUNT: | $80,050.00 |

**INSTRUCTIONS: Please review the instructions below. Make sure to read and acknowledge each enclosure by initialing each Attachment, as well as the specified area below. RETURN THIS FORM WITH YOUR EXECUTED SUBCONTRACT PACKAGE.**

| | | Required | Enclosed | Acknowledge |
|---|---|---|---|---|
| 1. | Sign and initial both copies of the entire package attached and return them to Capone Iron Corporation. | YES | YES | G.P |
| 2. | Submit your Schedule of Values, using AIA format G703, with your executed subcontract packages. | YES | YES | G.P |
| 3. | Submit a Certificate of Insurance showing the limits stipulated in your Master Subcontract Agreement. | YES | NO | |
| 4. | Submit Performance & Payments Bonds with your exectued subcontract package. | N/A | N/A | |
| 5. | Submit your Applications for Payment, using ONLY AIA formats G702 and G703, by the 15th of each month, for the work projected to the end of that month for which you are billing. Applications for Payment received after the 15th will be processed with the FOLLOWING months requisitions. | YES | YES | G.P |
| 6. | Submit Partial Waivers of Lien with each monthly Application for Payment | YES | YES | G.P |
| 7. | Submit a Final Waiver of Lien with your final Application for Payment | YES | YES | G.P |
| 8. | Erector's Field Forms: Erector's Field Report, Additional Work Authorization. Complete and submit these forms in accordance with instructions provided. | YES | YES | G.P |
| 9. | Submit a Labor/Rate breakdown sheet with your executed subcontract package. | YES | YES | G.P |
| 10. | OCIP project: Complete the Enrollment Application and return it with your executed subcontract package. | N/A | N/A | |
| 11. | Prevailing Wage Project: Submit certified payroll reports WEEKLY on the forms provided. | N/A | N/A | |
| 12. | Safety Program: Please read and acknowledge the attached Safety Program. All policies and guidelines MUST be followed. Please initial each page and return it with your executed subcontract package. | N/A | N/A | |
| 13. | Safety Program: Please submit a copy of YOUR safety program with your executed subcontract package. | YES | ON FILE | ON FILE |
| 14. | Submit form W-9, Request for Taxpayer Identification Number, with your executed subcontract package. | YES | YES | G.P |

CAPONE IRON CORPORATION

By: _____

Title: _____

Date: _____

DFM INDUSTRIES

By: _____

Title: President

Date: _____



ASE 000021

EXHIBIT 9

EXHIBIT
2
Stearns



# 1993-1997 AGREEMENT

BETWEEN

## LOCAL UNION No. 7
### BOSTON, MASSACHUSETTS
of the
International Association of Bridge,
Structural and Ornamental Iron Workers

AND

### BUILDING TRADES
EMPLOYERS' ASSOCIATION
of BOSTON, and EASTERN
MASSACHUSETTS, Inc.

AND

### LABOR RELATIONS DIVISION
OF THE ASSOCIATED
GENERAL CONTRACTORS
of MASSACHUSETTS, Inc.



Contributions to said Fund shall commence when duly authorized by the Union. It is agreed the Union may transfer five cents (5¢) per hour from wages to this fund upon thirty (30) days written notice to the Associations.

It is understood by the parties to this Agreement that the Boston Ironworkers Legal Services Trust and Plan to be established shall (a) Conform to the requirements of Section 302 of the Labor Management Relations Act, as amended. (b) Allow the Employer to deduct said contributions as an ordinary and necessary business expense. (c) Not be used to provide legal services against the Union, the Associations, the Fund or the Employer (including representation in Unemployment and Workers' Compensation cases).

There shall be a total of six (6) Trustees to constitute the Board of Trustees to administer the Fund. Said Trustees to be appointed are as follows: Three (3) Trustees shall be appointed by the Union; one (1) Trustee shall be appointed by the Labor Relations Division of the Associated General Contractors of Massachusetts, Inc. (AGC); one (1) Trustee shall be appointed by the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. (BTEA); one (1) Trustee shall be appointed by the BTEA. Representatives on the Board of Trustees shall at all times be equally divided among Union and Associations. The appointing parties shall also have the power to remove their respective Trustees appointed by them and to fill vacancies on the Board of Trustees.

14

## Working Dues Deduction

SECTION 9. It is agreed that the Employer shall deduct the amount shown in Article V, Section 1. Wages—from net wages after taxes, for each and every hour paid to all employees covered by or receiving benefits provided for in this Agreement for all jobs falling within the jurisdiction of this Agreement. All such deductions shall be reported weekly. The form for this purpose is to be furnished by the Union.

It is agreed the Working Dues Deduction of one and one-half percent (1½%) of the total package plus 50¢ for a Market Recovery Program and 3¢ for the Political Action League will be withheld out of net pay for each and every hour paid effective 11/1/93.

It shall be the sole responsibility of the Union to procure, pursuant to the provisions of Section 302 (c) of the Labor-Management Relations Act of 1947, the signed individual authorization of every employee subject to this Agreement, both present and future, and furnish such original signed authorizations to the Employer to legally permit the Employer to make such payroll deductions from all employees covered by or receiving benefits provided for in this Agreement. It shall be the further responsibility of the Union to assume all legal costs, fees and damages which might arise relative to this practice. The Union shall indemnify and hold harmless the Employer from such actions.

Any Employer who fails to send the payment and the reports due under the Dues Deduction System as provided in this Article shall be considered in violation of this Agreement and subject to penalties outlined in Article VI.

See Reference B for details explaining contribution procedure.

15

EXHIBIT 10

# 2000 - 2006 AGREEMENT

BETWEEN

## LOCAL UNION NO. 7
## BOSTON, MASSACHUSETTS

OF THE

### INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

AND

## BUILDING TRADES EMPLOYERS' ASSOCIATION
OF **BOSTON AND EASTERN, MASSACHUSETTS, INC.**

AND

## LABOR RELATIONS DIVISION
OF THE **ASSOCIATED GENERAL CONTRACTORS**
OF **MASSACHUSETTS, INC.**

**Effective Date: September 16, 2000**
**Expires: September 15, 2006**

EXHIBIT

P - 1

DEF 00162

# Index

| Article | Recognition | Page |
|---|---|---|
| I | Craft Jurisdiction | 5 |
| II | Union Security Clause | 11 |
| III | Scope of Agreement | 12 |
| IV | Settlement of Disputes | 14 |
| V | Wage Rates | 15 |
| VI | Bonds | 24 |
| VII | Notification Clause | 30 |
| VIII | Strikes and Lockouts | 31 |
| IX | Saving Clause | 32 |
| X | Work Hours Per Day | 32 |
| XI | Safety Provisions | 38 |
| XII | Apprenticeship | 39 |
| XIII | Overtime | 42 |
| XIV | Travel and Subsistence | 44 |
| XV | Miscellaneous | 47 |
| XVI | Duration and Termination | 48 |
| | Addendum | 52 |
| | Reference A | 58 |
| | Reference B | 59 |
| | Benefit Programs | 62 |
| | Life Insurance | 63 |
| | Accident Benefit Fund | 67 |
| | Henry F. Hughes, Joseph Brown, Joseph Maloney and Local 7 Memorial Scholarship Fund | 71 |

3

DEF 00163

4

DEF 00164

## PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment or grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays, and expenses, and, so far as possible, to provide for labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages herein agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, the establishment of the necessary procedures by which these ends may be accomplished.

## ARTICLE I
### Craft Jurisdiction

Iron Workers Union Local 7 claims for its members all work including, but not limited to: the field fabrication, production, unloading, handling, re-handling, distribution, redistribution, stockpiling, loading, rigging, altering, alignig, assembing and disassembly, placing, setting, tying, welding, securing, grinding, burning or torch cutting, firewatching and preventing, general cleanup, drilling, installation, erection, construction and cleanup, whether permanent or temporary, of all structural iron, steel, ornamental lead, bronze, brass, copper, aluminum, glass, all ferrous and nonferrous metals and plastics; any and all types of precast, prestressed and poststressed concrete structures; agitators, air ducts, anchors, application of all sealants such as Thiokol, Neoprene and similar types used to seal metal surfaces; access door and frames; air conditioner cans; amusement equipment; anchors;

5

DEF 00165

Geodesic and other domes, decking, diagrams and oth
roofing systems; agents and ticket booths, aprons, aqu
ducts, atriums, awnings, acoustical elements, sound ba
riers, computer floors, bells, bank fixtures, barjoist, bla
furnaces, book stacks, buildings, boilers and stokers (se
tional water tubs, and tubular), boxes, bracing, bracket
all bridges, bridge rails, bridge viaducts, bucks, bul
heads, bumper and bumper post, bunkers, cableway
cable slots and cablewells, cages, caissons (building an
setting), canopies and unistrut canopies, car-dox an
carports and enclosures, cart lifts, car lift fronts, caps, ca
tiling, cat walks, chutes of all types, circuit breakers, clip
clocks, collars, column casings, column cladding, colun
covers, concentrators, counter supports, conservatorie
conveyors, coolers, coping corbels, corrugated sheetin
the including the applicable insulation; cranes (the u
loading, handling, distribution, redistribution, erection, i
stallation, handling, jumping, dismantling, pulling
replacement of wire, operating, signaling, and all asso
ated maintenance on all types of cranes in all forms
construction work); crushers, cupolas, curb guards, the
ter curtain and back stage lifts, curtains, curtain wa
window wall and substitute systems, stone curtainwa
dams (cofferdams), metal decking; roof decking (such
but not limited to "Cofar" and similar type materials,
well as "Trusdeck," Mahon "M" deck and other dual p
pose type roof deck), decorations and displays, disma
tling and loading out conveyors, aggregate plants, bat
plants, refrigeration plants, derricks including jumping a
servicing of hoisting equipment and personnel hois
directory boards, room dividers, docks and dock lev
ers, doors, metal or metal clad doors and frames; gla
doors, hangar doors, patio doors rolling doors, overhe
doors, sectional doors, rolling fire and iron doors, slid
doors, any and all maintenance on doors; fire doo

6

DEF 00166

rolling shutter doors, door plates; draft curtains; drapery track; domes, dowels, dredges, drums, duct and trench frames and plates, duct supports, dumb waiter enclosures and fronts, dumpers, duorails, drywall, metal trim; electrical supports, elevators, elevators cars, elevator fronts and enclosures, elevator dust covers and fascia; enamel tanks, enamel vats, ceramic, laminated spandrelite, entrances, erection of all steel towers, erection and dismantling of Monigan walking dragline, launchhammer bucket wheel excavator and other trenching equipment; signaling on highlines, whirley cranes and derricks, buck hoists, man hoists, operating fork lifts, material towers and scanning antennae; assembling and erection of offshore drilling platforms or similar installations; escalators escalator trim, approaches and subframing, expanded metals, expansion joints; expansion dams, extruded metals, erection, rigging or dismantling of all false work whether temporary or permanent; fascias, fascia soffits; fascia entrances and panels, fans and hot rooms, fencing of all types, fiberglass reinforced polymer (FRP) products or any other substituted materials and/or products which take the place of any work contained herein, fire equipment, breaks, stops and fire escapes, fins, flag poles, floor construction and flooring, floor plates, flumes, frames, frames in support of boilers, erection, rigging or dismantling of all framework, sheet metal on fence framework; highway metal plate guardrail; highway delineators and reflectors (metal or synthetic); guard cable; highway safety devices; fronts, fur and storage rooms, gates and collapsible gates, generators, grating, grillage and foundation work, grills, grill work, guards, guardrails, guides, greenhouses, guardhouses, gymnasium equipment, handrails (such as, but not limited to, aluminum, glass, steel, metal, wood, fiberglass reinforced polymer and pastic, as well as any conceivable combination thereof);

7

DEF 00167

hangers, hanging ceilings, hardware, and screens, ho
pers, hospital room t.v. supports and gas supports, h
rooms, inclines, iron doors, jail and cell work, jail cell bed
benches, bunks, chairs, tables, mirrors; jail cell acce
doors; joists (precast, prestressed and poststressed), t
erection and dismantling of all types of cranes includi
jib-cranes; kalomeined doors, kilns, laminated wo
structures, laser beams, lintels, load bearing elemen
(l.b.e.'s), lockers, locks and locksmithing, louvres, m
chinery (unloading, handling, layout, moving, riggin
hoisting, lowering and placing on foundations), mail a
trash chutes, making and installation of all articles ma
of wire and fibrous rope, marquees, material altered
field such as, but not limited to, framing, cutting, bendin
drilling, burning and welding by acetylene gas and
hand or electric machines; erection of all curtain w
window wall, glass, metal floor decking, metal forms a
falsework pertaining to concrete or steel constructi
metal furniture, metal strips or tight lacing for decorat
or protective purposes, metal windows and enclosur
miscellaneous metals, mixers, modular buildings of
materials, monorails, multi-plate, name plates and n
ing, nuclear reactors, electromagnetic shielding pla
and atomic vessels including all component parts, N
rooms; the plumbing, aligning and leveling of all materi
and equipment through the use of optical instrumen
operating devices, operating and dental room light equ
ment; oxygen and gas pipe supports, oven, pans, pa
devices and locks, panels (insulated and non-insulat
factory and field assembled), Q-panels; any type pa
pertaining to curtain wall whether it be stone aggreg
or precast; partitions, toilet partitions and supports, p
stocks, pile drivers, pin piles, pipe railing, pipe suppo
plaques; plastic and synthetic fences, platforms; pl
ground equipment; poles; post tensioning cables and

8

associated work; poster frames; porch supports; plates and plate pit liners, porcelain enameled panels, prefabricated and pre-engineered metal buildings, preglazed windows, storefront, and window walls; pulverizers, reinforcing steel, racks, railings (including pipe), railroad bridgework and maintenance, radiator enclosures, reservoirs, revolving doors, rigging (including shipyards, navy yards, vessels and government departments), rigging in connection with display shows, roofs, mansard roofs, space roof systems, rolling grills and shutters, rotors, safe deposit boxes, night depositories and drive-up equipment, safety devices, safes, sash, scaffolding, scenery equipment; sculptures and art objects; scum plates; sills and sill plates; seats; seating and plank seating; security doors; security door frames; shafting, sheet piling, shelving, shoring, sidewalk and vault lights, signs, signaling, rigging and hoisting involved with the use of helicopters; skate wheels; skip hoists, skylights, slope wall, smoke conveyors, smoke plates, space frames, solar energy panels, soldier piles, spandrels (metal, steel, and precast concrete), spillways, stacks, stacker cranes, stage equipment and counterweight system and rigging for asbestos curtain, stairways, including pre-engineered stairs; all types of stairs, stairing and steel supports; steel and fire proof curtains; storefronts and entrances; stators, stokers, storage racks used as an entricit part of a building, storage rooms, stoves, subways, sun shades, support brickwall and steel granite; swimming pool equipment ; switch gear, tables, towers, tanks, target ranges; target range baffles, booths and conveyors; temporary fencing ; thimbles; thresholds; tracks and guides, track frames; tramways, transformers, travelers, traveling sheaves, trellises; trim on vaults; turnstiles; trusses (including but not limited to steel, Howe and combination trusses), tunnels, turbines, all translucent and plastic material on

9

DEF 00169

steel frame construction, underpinning, vats, vault doors, vaults, ventilators, vertical hydraulic elevators, pressure vessels and vessels of all types, wire mesh, wire work; wall, stub, stud, wall tires; wainscoting; waste compactors; weather stripping; weather vanes, weirs and weir plates, welding machines, wheel guards, winches, windows, window cleaning equipment, window washing hooks, window and door screens and brackets, window stools, wickets, window washer track, x-ray equipment, x-ray support. Aligning, leveling and surveying in conjunction with steel or machinery erection. The unloading, distributing, stockpiling and handling of all materials coming under the jurisdiction claims of the Union. Ornamental lead shall consist of the distributing, erection, installation, removal, uncrating and recrating, unloading and reloading, relocation, repair, maintenance, layout, removal, replacement, handling, cutting, bending, rigging, jobsite fabrication, framing, drilling, fitting, burning, incidental building of scaffolding, welding by combination of various gases and electricity. All reinforcing work in connection with field fabrication, handling, racking, sorting, cutting, bending, layout, drilling, hoisting, placing, burning, welding, and tying of all material used to reinforce concrete including reinforcing rods on any structure whether on roads, bridges, or other use and construction shall be done by Iron Workers. Erection of steel towers, chutes and spouts for concrete where attached to towers and handling and fastening of cables and guys for same; unloading racking, sorting, cutting, bending, hoisting, placing and tying, burning and welding including stud welding of all iron steel and metal in reinforced concrete construction of all types of reinforcing rods and mesh for floor arches and the making of hoops and stirrups, metal forms and metal supports thereof; jacking of slip forms; G.F.R.C., Dryvit System and any other similarly constructed products which ultimately simulate finished concrete panels, including the

10

DEF 00170

securing by bolting and/or welding and the installation of steeltex, wire mesh or any substitute of any type when used for reinforced concrete construction. All layout work for the above regardless of equipment needed to perform operations; all work in connection with starting, stopping, operating, maintaining all equipment used in the performance of the above listed work; and all labor involved in water and wind testing of windows, curtain wall, metal panels or any other related materials.

Also, alteration, wrecking, dismantling and repair of all of the above, and all housemith work and submarine diving in connection with and field fabrication, production, unloading, handling, re-handling, stockpiling, layout, drilling, installation, erection and construction (whether permanent or temporary) in any off-site holding or lay down area regarding any of the above mentioned work. The above claims are subject to trade agreements and decisions of the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry of the Building and Construction Trades Department. The demolition of all of the above work shall be done by Iron Workers.

## ARTICLE II
### Union Security Clause

SECTION 1. All Employees who are members of the International Association of Bridge, Structural and Ornamental Iron Workers on the effective date of this Agreement shall be required to remain members of the Association as a condition of employment during the term of this Agreement. All Employees may be required to become and remain members of the Association as a condition of employment after the seventh (7th) day following the date of their employment, or the effective date of the Agreement, whichever is later.

11

DEF 00171

## ARTICLE III
### Scope of Agreement

SECTION 1. This Agreement contains all the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations, or agreements not herein contained except interpretations or decisions of the Board of Arbitration.

### Equal Employment Opportunity Clause

SECTION 2. The Employers and Union covered by this Agreement agree that there shall be no discriminatory practice prohibited by any applicable Federal or State law or regulation in connection with the referral of an Employee by the Union to the Employer.

No Iron Worker shall be discriminated against because of race, color, religion, sex, national origin, or age as required by law.

### Protection of Union Principles

SECTION 3. The removal of Journeymen Iron Workers and Apprentices from a job in order to render legal assistance to other Local Unions to protect the Union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and notice thereof is first given to the Employer involved.

### Compensation Insurance

SECTION 4. The Employer must at all times provide Workers' Compensation Insurance. Workers' Compensation Certificate (all operations coverage), with a ten-day cancellation clause, will be presented to the Union upon request.

12

DEF 00172

### Subcontractors

SECTION 5. The Employer agrees not to sub-contract or sublet any work to be performed on the job site covered by this Agreement to any person, firm or corporation which is not in contractual relationship with the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers and Local 7.

### Timely Notification

SECTION 6. Before any job begins the contractor agrees to give the Union Hall 24 hours notice. One of the purposes of this notice will be to give representatives of the union time to ascertain the current status of the contractor in question with our Fund office. The contractor further agrees that if they cease work entirely on any project, regardless of the reason, they will notify the Union Hall before any future work takes place on said project.

### Scope

SECTION 7. The failure of either the Employers or the Union timely to assert any right arising under language contained in this Agreement shall not be deemed a waiver of that language or of rights available from that language or either party's ability to use that language later, for example, under different or similiar circumstances or incidents. This Section 7 shall not apply to time factors in the arbitration clause.

13

DEF 00173

**ARTICLE IV**
**Settlement of Disputes**

SECTION 1. Any dispute as to the proper interpretation
of this Agreement, including just cause for discipline or
discharge, shall be handled in the first instance by a
representative of the Union and the Employer, and if they
fail to reach a settlement within five (5) days, it shall be
referred to a Board of Arbitration composed of one (1)
person appointed by each party, the two (2) so appointed
arbitrators to select a third member; in the event that the
two (2) appointed arbitrators are unable within two (2)
days to agree upon the third arbitrator, the grievance shall
be referred to the AAA (American Arbitration Association).
The decision of the Board of Arbitration shall be final and
binding upon both parties.

The Board of Arbitration shall have jurisdiction over all
questions involving the interpretation and application of
any section of this Agreement. It shall not, however, be
empowered to handle negotiations for a new Agreement,
changes in the wage scale, or jurisdictional disputes.

Each party shall individually pay the expenses of the
arbitrator it appoints and the two (2) parties shall jointly
share the expense of the third (3rd) arbitrator.

Section 2. Nothing contained in this Agreement shall
be construed as waiving or limiting in any way whatsoever
the rights of any member or a member's representative,
including the Union or trustee to any trust funds, to pursue
civilly or criminally all available remedies against an
employer who fails timely to pay wages or benefits, in-
cluding pursuing to the fullest extent lawful any remedy
provided under any federal or state statute or regulation
including provisions, if any, providing punitive damages,
attorney's fees and costs. In regards to remedying the

14

wage or benefit non-payment, neither the Union or any member or member-representative shall be bound by the arbitration clause in this Agreement or otherwise be required to arbitrate the issue of wage or benefit non-payment, and the Union or member may immediately seek remedy in any and all appropriate civil, criminal, or administrative fora.

## ARTICLE V

SECTION 1.              **Wage Rates**

**Journeyman**

| DATE | TOTAL | | |
|------|-------|--|--|
| 9-16-2000 | $40.28 | Lawrence Rate | $35.87 |
| 3-16-2001 | $41.08 | | $36.67 |
| 9-16-2001 | $41.88 | | $37.47 |
| 3-16-2002 | $42.73 | | $38.32 |
| 9-16-2002 | $43.73 | | $39.32 |
| 3-16-2003 | $44.68 | | $40.27 |
| 9-16-2003 | $45.63 | | $41.22 |
| 3-16-2004 | $46.58 | | $42.17 |

**Breakdown of Total Package (as of 9-16-2000)**

| JIW Wages | Boston $25.50 | Lawrence $21.09 |
|-----------|---------------|-----------------|
| Foreman | Boston $26.75 | Lawrence $22.34 |

Foreman shall earn $1.25 per hour over Journeyman wages. Beginning 9-16-02 Forman shall earn $2.00 per hour over Journeyman wages.

NOTE: Fringe benefits in Boston and Lawrence are identical.

Wage re-opener 9-16-2004, and contract expires 9-15-2006.

15

DEF 00175

**Employer's Contribution per hour as of 9-16-2000:**

| | |
|---|---|
| Pension Fund | $4.10 |
| Welfare Fund | $4.00 |
| Annuity Fund | $5.00 (Doubles for overtime hours) |
| Education Fund | $.35 |
| Building Fund | $.50 |
| Industry Fund | $.03 |
| Pens. Supplement | $.65 |
| Labor / Management Corporate Trust | $.15 |

**Employee's Contribution per hour**

(to be deducted by Employer)

| | |
|---|---|
| Vacation Fund | $2.00 |
| Dues Deduction | $1.76 |
| Political Action | $.03 |

**Future wage and/or benefit increases:**

| | |
|---|---|
| 3-16-2001 | $ .80 to be allocated |
| 9-16-2001 | $ .80 to be allocated |
| 3-16-2002 | $ .85 to be allocated |
| 9-16-2002 | $1.00 to be allocated |
| 3-16-2003 | $ .95 to be allocated |
| 9-16-2003 | $ .95 to be allocated |
| 3-16-2004 | $ .95 to be allocated |
| 9-16-2004 | Wage reopener, for wages and/or benefits only, from September 16, 20 until September 15, 2006. |

NOTE I. Foremen shall receive a minimum of $2.( over Journeyman rate as of 9-16-2002.

16

DEF 00176

NOTE 2. The Local Union shall have the option to divert monies from wages to any of the funds upon sixty (60) days prior written notification to the Associations signatory hereto. (Journeymen Iron Workers also include Finishers, Fence Erectors, Rodmen, Precast Concrete Erectors, Machinery Movers & Riggers, Curtain Wall and Metal Sash Erectors.)

SECTION 2. Each Employer shall pay to the Fund the amount set forth in Article V, Section 1. Wages for all hours paid to each of its employees covered by this Agreement to an Education Fund. The contributions of the Employers shall be used exclusively for the training and education of apprentices; and further educating journeymen Iron Workers' in their trade; the establishment and maintenance of an apprenticeship training school; to furnish and supply facilities, tools, equipment and textbooks and other materials and supplies for the training of apprentices. Any payment from the Fund shall be made only where the Local Unions involved have an approved and active apprenticeship training program and the Fund shall be administered by the Joint Apprentice Committee.

## Welfare Fund

SECTION 3. Each employer shall pay to the Fund the amount set forth in Article V, Section 1. Wages — for all hours paid to each of its employees covered by this Agreement to the Iron Workers District Council Health and Welfare Fund.

The contributions of the Employers shall be used, exclusively, to provide group life insurance, accidental death and dismemberment insurance, hospital expense insurance, surgical expense insurance, dental expense insurance and temporary disability benefits to eligible Employees and their families in such form and amount as

17

DEF 00177

the Trustees of the Welfare Fund may determine, and the organization and administration expense of the Welfare Fund.

The said Welfare Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union which Agreement and Declaration of Trust shall conform to all requirements of law. A Copy of said Agreement and Declaration of Trust together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

### Pension Fund

SECTION 4. Each Employer shall pay to the Fund the amount set forth in Article V, Section 1. Wages — for all hours paid to each of its employees covered by this Agreement to the Iron Workers District Council Health and Welfare Pension Fund. The contributions of the Employers shall be used, exclusively, to provide pension benefits to eligible Employees in such form and amount as the Trustees of the Pension Fund may determine, and the organization and administration expenses of the Pension Fund.

The said Pension Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A copy of said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

18

DEF 00178

**Pension Supplement Fund**

SECTION 5. Each Employer shall pay to the Fund the amount set forth in Article V, Section 1. Wages — for all hours paid to each of its employees covered by this Agreement to the Pension Supplement Fund.

The said Pension Supplement Fund shall be administered pursuant to an Agreement and Declaration of Trust Administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A copy of said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

**Annuity Fund**

SECTION 6. Each Employer shall pay to the Fund the amount set forth in Article V, Section 1. Wages - for all hours paid to each of its employees covered by this Agreement to the Annuity Fund Program. The contribution shall be double for each premium time hour the Ironworker employee is employed in accordance with this Agreement.

See Reference B for details explaining the contribution procedure.

The contributions of the Employers shall be used, exclusively, to provide annuity benefits to eligible Employees in such form and amount as the Trustees of the Annuity Fund may determine, and the organization and administration expenses of the Annuity Fund.

The said Annuity Fund shall be administered pur suant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A

19

DEF 00179

copy of the said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

## Vacation Fund

SECTION 7. Employer shall withhold from wages the amount set forth in Article V, Section 1. Wages — for all hours paid to an Ironworker employee in accordance with this Agreement and the Employer shall distribute Vacation Fund Stamps in lieu thereof to said employees with the employee wages on each pay day is due.

See Reference B for details explaining the contribution procedure.

## Legal Aid Fund

SECTION 8. The parties to this Agreement agree to form a jointly trusteed fund entitled Boston Iron Workers Legal Aid Fund pursuant to Section 302 of the National Labor Relations Act, as amended, to provide employees and their dependents with assistance in defraying the cost of legal counsel. Such Fund shall be established to collect and disburse monies for payment benefits to the employees covered by this Agreement. Such payments are to be made in accordance with the terms of the Trust Agreement hereinafter established.

Contributions to said Fund shall commence when duly authorized by the Union. It is agreed the Union may transfer five cents (.05) per hour from wages to this fund upon thirty (30) days written notice to the Associations.

It is understood by the parties to this Agreement that the Boston Ironworkers Legal Services Trust and Plan to be established shall (a) Conform to the requirements of Section 302 of the Labor Management Relations Act, as

20

DEF 00180

amended. (b) Allow the Employer to deduct said contributions as an ordinary and necessary business expense. (c) Not be used to provide legal services against the Union, the Associations, the Fund or the Employer (including repre sentation in Unemployment and Workers' Compensation cases).

There shall be a total of six (6) Trustees to constitute the Board of Trustees to administer the Fund. Said Trustees to be appointed are as follows: Three (3) Trustees shall be appointed by the Union; one (I) Trustee shall be appointed by the Labor Relations Division of the Associated General Contractors of Massachusetts, Inc. (AGC); one (1) Trustee shall be appointed by the Building Trades Employers' Assoctation of Boston and Eastern Massachusetts, Inc. (BTEA); one (I) Trustee shall be appointed by the Steel Erectors Associalion of the BTEA. Representatives on the Board of Trustees shall at all times be equally divided among Union and Associations. The appointing parties shall also have the power to remove their respective Trustees appointed by them and to fill vacancies on the Board of Trustees.

## Working Dues Deduction

SECTION 9. It is agreed that the Employer shall deduct the amount shown in Article V, Section 1. Wages–from net wages after taxes, for each and every hour paid to all employees covered by or receiving benefits provided for in this Agreement for all jobs falling within the jurisdiction of this Agreement. All such deductions shall be reported weekly. The form for this purpose is to be furnished by the Union.

It is agreed the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid.

21

DEF 00181

It shall be the sole responsibility of the Union to procure pursuant to the provisions of Section 302 (c) of the Labor-Management Relations Act of 1947, the signed individual authorization of every employee subject to this Agreement, both present and future, and furnish such original signed authorizations to the Employer to legally permit the Employer to make such payroll deductions from all employees covered by or receiving benefits provided for in this Agreement. It shall be the further responsibility of the Union to assume all legal costs, fees and damages which might arise relative to this practice. The Union shall indemnify and hold harmless the Employer from such actions.

Any Employer who fails to send the payment and the reports due under the Dues Deduction System as provided in this Article shall be considered in violation of this Agreement and subject to penalties outlined in Article VI

See Reference B for details explaining contribution procedure.

NOTE: As of September 16, 1997, representatives of labor management, and the Fund Administrator for the NEDCIW Fund Office were examining alternative methods to streamline the payments to our benefit funds. Any new methods will be outlined in detail, and forwarded to all signatory contractors in a timely manner, to minimize the effects of said changes, as well as to simplify future payments for all involved parties.

## Steel Erection and
## Ornamental Iron Industry Advancement Fund

SECTION 10. Each Employer shall pay to the fund the amount set forth in Article V, Section 1. Wages- for each hour paid to its employees covered by this agreement to the Steel Erection and Ornamental Iron Industry Advancement Fund.

22

DEF 00182

Each Employer subscribes to and agrees to be bound by the provisions of the Agreement and Declaration of Trust of the Steel Erection and Ornamental Iron Industry Advancement Fund as executed on the first day of October 1981, and as it may be amended from time to time.

This Trust, known as the Steel Erection Advancement Program, shall be referred to in this section as "the fund". The fund shall be administered solely and exclusively by trustees appointed pursuant to the provisions of the trust instrument.

The fund will be used by its trustees for the following express purposes: training, education, safety and accident prevention, public and industry relations, industry promotion, equal employment, market development, market research, business seminars, industry meetings, dissemination of technical data and research statistics, engaging in any proper activity which will increase the efficiency of the industry and its ability to serve the public, provide information services and for the mutual benefit of employers and their employees.

The fund shall not be used for any of the following expressly prohibited purposes: (a) Lobbying in support of anti-union legislation (b) Supporting litigation before a court or any administrative body against the union or any of its agents (c) Subsidizing contractors during a period or periods of work stoppages or strikes.

As a part of the administration of the fund, there shall be an annual audit of the fund by an independent, certified public accountant. A copy of the audit shall be made available to all parties signatory hereto.

In the event that the union has reasonable cause to believe that the fund is being used for any of the purposes prohibited above, the dispute shall be subject to the arbitration provisions of this agreement.

23

DEF 00183

SECTION II. One form, one prepaid stamp for all fund shall be implemented by the Union. This will consolidat all funds into one (1) check. The Prepaid Stamp Progra for all funds will be in effect as of April 1, 1992, which w be submitted for every hour paid for each employe working under the jurisdiction of Local 7. This syste replaces the previous system.

See Reference B for details explaining contributio procedure.

## ARTICLE VI
### Bonds

SECTION 1. Any Employer seeking to employ Iron Wor ers for a first time shall furnish and maintain a bond in t amount of $40,000 to the Ironworkers' District Council New England, Health and Welfare Office, to protect t above funds from financial losses. Details of said bo are set forth in the Agreement and Declaration of Tru together with any amendments thereto, and shall considered a part of this Agreement as though set fo herein at length. Employers who maintain a record prompt and proper payments to the Funded Programs a period of two (2) years will not be required to ren bond. Should any Employer fall in arrears, after droppi the bond, said Employer shall be required to reissue t bond for a two-year period as a condition of employme

If the employees are removed from the job by the uni to enforce such payments, the employees shall be p by the delinquent employer for all lost time at the strai time hourly rate.

SECTION 2. In order to protect the lien and bond rig upon the Union's demand, any employer shall within th regular working days submit to the Union a Remitta Report. A Remittance Report shall contain at least

24

DEF 00184

following information relative to covered work performed by that employer during the 30-day period preceding the Union's demand:

    i)  Name of each covered employee; and

    ii)  the number of hours the employer employed each covered employee; and

    iii)  the project(s) on which the covered employee performed labor; and

    iv)  the last date of employment each covered employee last performed labor on each project reported.

### Prompt Reporting Clause

When an Employee is ordered by the employer or his/her representative to report to work and, through no fault of the Employee is not put to work, weather permitting work, or employed for less than four (4) hours, the Employer shall pay the Employee four (4) hours pay at the applicable rate, provided the Employee remains on the job during the said four (4) hours. On jobs of more than four (4) hours duration, all Employees shall be paid for the actual hours worked. Employees who are sent from the Union Hall in the a.m. and report directly to the job, arriving at a reasonable time, dependent upon distance traveled, shall be paid from the starting time of that job. Employees failing to report directly to the job shall be paid from the time they arrive on the job.

### Election Day

SECTION 3. There shall be a two (2) hour allowance for presidential election only to qualified voters only for the purpose of voting at no loss of pay in all areas.

### Shipping - Employees

SECTION 4. Employees shipped to jobs or work out of the jurisdiction of the Local Union shall receive transpor-

25

DEF 00185

tation, traveling time and expenses, providing they remain on the job thirty (30) days or until the job is completed, if it requires less than thirty (30) days. Employees shipped to a job and not put to work weather permitting, or the job is not ready for them to go to work, shall be paid the regular wage rate for such time, or such Employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

### Work Notice

SECTION 5. No Employee shall be permitted to leave the employ of a contractor, without first notifying his Employer, before 4:30 p.m. so that schedule adjustments might be made, and replacements procured for the following day's operations, as well as notifying Local Union Hall by 8 a.m. on the following day.

### Coffee Period

SECTION 6. A coffee period of ten (10) minutes shall be permitted each morning and afternoon with the understanding that one (1) Ironworker from each gang shall be allowed to procure the refreshments and all other men shall not leave their place of work. The break period shall commence when the refreshments are brought to place of work.

### Pay Days

SECTION 7. The regular pay day shall be once a week on such day as agreed upon between the Employer and the Local Union and wages are to be paid in cash, check or other legal tender.

Employers may withhold where necessary a reasonable amount of wages due to enable them to prepare the payroll.

When Employees are laid off, or discharged, they shall be paid in full in cash, check or other legal tender on the

26

DEF 00186

job immediately, and if required to go to some other point or to the office of the Employer, the Employee shall be paid for the time required to go to such places. When Employees quit of their own accord, they shall wait until the regular pay day for the wages due them.

Any undue delay or loss of time caused the Employees through no fault of their own shall be paid for by the Employer causing such delay, at the regular straight time wages.

Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction, the purpose thereof, and net earnings.

If the regular pay day falls on a holiday, Employees are to be paid on the preceding day.

Employees are to be paid weekly, by noontime, in cash, on the job, during working hours. Payment may be made by check upon permit issued by the union. Such permit shall be withheld only for doubt of ability to pay wages.

Any employer who is not classified as a resident contractor shall make arrangements with a local bank in order for employees to cash pay checks.

Iron Workers shall not be required to punch a time clock for any General Contractor or Steel Erector.

### Shift Work

SECTION 8. When two (2) shifts are employed, each shift shall work seven and one-half (7-1/2) hours, for eight (8) hours' pay at regular time. With respect to the second shift, there will be a 10% differential added to the wages. When three shifts are employed, seven (7) hours shall constitute a day's work for each shift for which a regular wage of eight (8) hours shall be paid or a proportionate part thereof for time worked. For time work on the second shift, there shall be a 10% differential added to the wages.

27

DEF 00187

For work on the third shift, there will be a 15% differenti
added to the wages. When multiple shifts are worked o
Saturday, Sunday or recognized holidays, the followin
shall apply; when two (2) shifts are employed, each shi
shall work seven and one-half (7-1/2) hours for eight (
hours' pay at double the straight time rate of wages. Wi
respect to the second shift, there will be a 10% differenti
added to the wages. When three (3) shifts are employe
each shift shall work seven (7) hours for eight (8)hour
pay at double the straight time rate of wages or a propo
tionate part thereof for time worked. For work on th
second shift, there shall be a 10% differential added
the wages. For work on the third shift, there shall be
15% differential added to the wages. On all shift wo
performed on Saturday, Sunday or holiday, the overtim
rate of double time shall start with the beginning of th
first or "morning" shift. Not more than one (1) shift sha
be allowed on a job of less than five (5) days duratio
except in cases of an emergency, which shall be decide
by the General Executive Board. In localities where th
work is less than eight (8) hours per day, the hours o
shift work shall be shortened proportionately.

It is agreed that shift work is not a desirable practic
However, it is recognized that there will be times when
second and third shift may be required due to speci
circumstances. It is agreed that shift work conditions w
not be abused as an ongoing or regular industry practic
In the event of disagreement over a multi-shift operatio
it is agreed that the parties will push for speedy arbitratio
and it is expressly understood that no multi-shift operatio
shall commence until such time as a neutral arbitrat
rules that such special conditions do exist.

28

DEF 00188

**Odd Hour Shift Work**

SECTION 9. It is mutually agreed by both parties that when a first shift cannot be worked on a project or a clearly defined portion of the work cannot be performed during normal working hours, the Employer may start work at any hour of the day at straight time provided all the following provisions are adhered to:

a. Notification of the Business Agent in whose area the work is being performed.

b. For jobs started between 8:30 a.m. and 6:30 p.m. employees will work 7 1/2 (seven and one-half) hours for 8 (eight) hours pay with a 10% differential added to the wages.

c. For jobs started between 7:00 p.m. and 6:30 a.m. employees will work 7 1/2 (seven and one-half) hours for 8 (eight) hours pay with a 15% differential added to the wages.

d. The work is performed between 12:01 a.m. Monday and 11:59 p.m. Friday. Any other work will be paid at the established overtime rate and the differentials will not apply.

e. Coffee Break language will be adhered to as set forth in Article VI, Section 6. The time for a 30 minute lunch will be established at the beginning of the project and adhered to.

f. All overtime will be paid at the established rate including any Holidays as set forth in Article XIII.

g. Language does not apply to an employee who has worked the standard shift the same day.

29

DEF 00189

# ARTICLE VII
## Notification Clause

SECTION 1. It is mutually agreed that, prior to the start of any project, either party may call a meeting to discuss any concerns regarding the project. Concerns may include but are not limited to:

1. Work to be performed.
2. Manning Requirements.
3. Apprentice ratio to Journeymen.
4. The Business Agent's notification of his/her steward selection.

If, an impasse is reached over the Business Agent's selection of a steward it is mutually agreed that the dispute will be resolved through an expedited arbitration outlined as follows:

1. Within three (3) working days an impartial Arbitrator mutually agreed upon by both parties will be selected.
2. The case must be heard within two (2) working days after the selection of the Arbitrator.
3. A decision must be rendered prior to the start of the project in question.
4. The decision of the Arbitrator will be final and binding upon both parties.
5. The fee of the Arbitration Association and the cost of and the expenses of the Arbitrator, shall be borne by the losing party, or the Arbitrator may apportion, if the decision is a compromise, as designated by the Arbitrator.
6. The above procedure with respect to expedited arbitration will be used by the parties in the event there is a dispute in regard to the steward after the job commences.

30

DEF 00190

## ARTICLE VIII
### Strikes and Lockouts

SECTION 1. It is mutually agreed that there shall be no strikes authorized by the Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to arbitration, in accordance with Article IV, or failure on the part of either party to carry out the award of the Board of Arbitration.

Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however, it shall not be a violation of any provision of this agreement for any person covered by this agreement to refuse to cross or work behind the picket line of any affiliated Union which has been acquiesced to or authorized by the International of the Union, the Central Labor Council or Building and Construction Trades Council.

SECTION 2. The Union retains, however, the immediate and unconditional right to strike any employer who in violation of the Agreement fails timely to pay any wages or benefits or any portion of wages of benefits. Nothing contained in this Article VIII shall be deemed as limiting the Union's or any individual member's right to refrain from performing labor because the employer failed timely to pay wages or benefits owed for labor performed by any covered employee. The Union, however, will provide by fax, hand-delivery, or other reasonable means, to each project(s) general contractor or construction manager 72-hour written notice of the Union's intent to engage in such a Wage or Benefit non-Payment Strike.

31

DEF 00191

## ARTICLE IX
### Saving Clause

SECTION 1. Should any part of any provision herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation, the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

The remaining parts or provisions shall remain in full force or effect.

### Grievance Committee

SECTION 2. A joint committee shall be formulated, with an equal number of participants from Local No. 7 and the Employers to adjust items, that were agreed by mutual consent, arising at negotiation and that may arise prior to the termination date of this agreement.

### Business Representative

SECTION 3. The Union's Business Manager, Agents or their designee(s) acting on behalf of said Business Manager or Agent shall be permitted to access all jobs, but will in no way interfere with the progress of the work.

## ARTICLE X
### Work Hours Per Day

SECTION 1. Eight (8) hours shall constitute a day's work performed between the hours of 8 a.m. and 12 Noon and 12:30 p.m. to 4:30 p.m. on Monday through Friday.

32

DEF 00192

It is recognized that 8 a.m. is the regular starting time. It is further understood that upon proper notification to the business representative that the starting time may be advanced by the employer up to one (1) hour for the following reason: If the majority of the trades on that particular job are starting between the hours of 7 a.m. and 8 a.m.

It is further understood that any Ironworker employed by the employer on that particular project shall receive premium time if any other tradesman employed by the same employer on that particular project receives premium time for starting before 8 a.m.

If the Ironworkers on the job request a change in the starting time between 7 a.m. and 8 a.m., flexible starting time will be granted with the approval of the employer and the business representative.

### Job Steward

SECTION 2. There shall be a steward on each job who shall be furnished or appointed by the Business Agent. It is mutually agreed that any job which will employ more than three (3) Ironworkers at peak workforce the Business Agent will furnish or appoint a steward at his/her discretion. On jobs which will employ three (3) or less Ironworkers at peak workforce, the Business Agent agrees to appoint a steward from the Ironworkers employed on said project. The steward shall keep a record of the workers laid off or discharged; and take up all grievances on the job, and try to have the same adjusted, and in the event he/she cannot adjust them, He/she must promptly report that fact to the Business Representative, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work. The steward shall see that the provisions of these working

33

DEF 00193

rules are complied with and report to the Union the true conditions and facts. The steward shall promptly take care of injured workers and accompany them to their homes or to a hospital, as the case may require, without any loss of time and report the injury to the proper officers of the Union. A steward failing to fulfill his/her duties shall be subject to censure by this Union and also subject to a penalty upon conviction on charges provided for in the International Constitution. The Employer agrees that the job steward will not be discharged until the last Ironworker laid off, provided he/she is capable of performing the work in question.

## Tools

SECTION 3. The Employer shall grant Ironworkers reasonable time to pick up tools before quitting time.

Employees employed on ornamental work shall furnish for their own use all necessary hand tools to enable them to effectively install such work. Tools broken on the job shall be replaced by the Employer, such as drills, taps, hacksaw blades, etc. No Employee shall be held responsible for the loss of tools or equipment in his/her charge.

Employees working on other than finishing work shall furnish the necessary hand tools to perform specific job assignments.

The welding torch and chain falls are tools of the trade having jurisdiction over the work being performed. Craftsmen using these tools shall perform any of the work of the trade and shall work under the supervision of the craft foreman.

34

DEF 00194

## Foreman

SECTION 4. (a) When two (2) or more Ironworkers are employed, one shall be selected by the Employer to act as foreman and receive a foreman's wage of $2.00 per hour as of 9-16-2002 above the Journeyman wage, and the foreman is the only representative of the Employer who shall issue instructions to the work force.

(b) There shall be no restriction as to the employment of foremen or pushers. The Employer may employ on one piece of work as many foremen or pushers as in his/her judgment is necessary for the safe expeditious and economical handling of the same.

(c) Hereafter, Ironworkers commonly known as "pushers" shall be known as foremen; and Ironworkers known as foremen shall be classified as general foremen.

(d) All foremen and general foremen shall receive straight time, based on a forty (40) hour week, and all holidays observed as such.

(e) The Ironworker foreman shall not be liable for any acts during the course of this employment and arising out of his/her employment and the Employer shall hold said Ironworker foreman harmless from all claims whatsoever.

(f) The general foreman or foreman selected by the Employer shall have held membership in the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers for at least three (3) years prior to his/her selection.

35

DEF 00195

## Riveting Gangs

SECTION 5. Riveting gangs shall be composed of not less than four (4) Ironworkers at all times. The Employer may require heaters to have their fires going ready to furnish hot rivets at the regular starting time, but in such event, the heaters shall be paid double time for such time worked before the regular starting time.

When three (3) or more riveting gangs are employed on any job, a foreman shall be employed who will not be required to work in any riveting gang except where emergencies arise which will require the foreman to temporarily fill in the gang.

## Piecework

SECTION 6. It is agreed that the Employees will not contract, subcontract, work piecework or work for less than the scale of wages established by the Agreement. The Employers agree not to offer and/or to pay, and the Employees will not accept a bonus based on specific performance on any individual job.

## Clothing and Equipment

SECTION 7. (a) All Ironworkers are to wear hard hats at all times.

(b) All Ironworkers are to wear protective eyeglasses when project conditions dictate.

(c) All Ironworkers are to wear appropriate work shoes at all times.

(d) Ironworkers will at all times be properly dressed in keeping with project requirements.

36

DEF 00196

### Iron Workers Required
### On Guy and Stiff Leg Derricks

SECTION 8. No less than six (6) Ironworkers and a foreman shall be employed around any guy or stiff leg derrick used on steel erection, and on all mobile or power-operated rigs of any description no less than four (4) Ironworkers and a foreman shall be employed.

### Drinking Water and Clothes Room

SECTION 9. The Employer shall furnish suitable drinking water at all times and each job of sufficient size and length to justify same shall be provided with a shed or room for the Employees to change their clothes and keep their tools.

### Work Limitation

SECTION 10. There shall be no limitation placed on the amount of work to be performed by any Ironworker during working hours.

A physical examination shall not be required as a prerequisite for employment.

There shall be no limit on production by Ironworkers nor restrictions on the full use of tools or equipment. There shall be no restriction other than may be required by safety requirements on the number of Ironworkers assigned to any crew or to any service.

### Certified Welder Clause

SECTION 11. An Employee who is certified in a dangerous location or in any enclosed area, especially around tanks, or vessels, or apparatus of a similar nature, shall have an Ironworker working with him/her on these occasions.

37

DEF 00197

### Welders and Burners

SECTION 12. Any welder or burner, while working in a dangerous location or in any enclosed area, especially around tanks, or vessels, or apparatus of a similar nature, shall have an Iron Worker working with him/her on these occasions.

### Wind Clause

SECTION 13. When the hoisting engineer refuses to work the crane (all types of cranes) because of wind, the Employer shall provide work on the same job for the Ironworkers working on that crane or cranes, when and if there is work available at the discretion of the Employer.

### ARTICLE XI
### Safety Provisions and Safety Laws

SECTION 1. The Employer, Union and Employees shall abide by the Federal Williams-Steiger Occupational Safety and Health Act and other applicable safety regulations of Massachusetts.

### Planking Floors

Working floors upon which derricks set must be covered tight with suitable planking over the entire floor except where openings are left for ladders.

On buildings, bridges, or other structures erected or dismantled with mobile cranes, or by other methods, all upper areas where materials are landed for further handling shall be planked so as to provide safe working areas for the workers.

Planking, decking, or nets covering tight all openings shall be provided not more than two (2) floors or a maximum of thirty (30) feet beneath all points on all buildings, bridges and other structures while workers are working at such points.

38

DEF 00198

### Safety Nets

Protective nets must be used for the safety of the Ironworkers, where planks or decking is not feasible. If nets are used they must be suspended a safe distance above any structural members.

### Stiffening and Supporting Working Load Points

SECTION 2. Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial supports provided to safely sustain such added weight.

### Studs and Spirals

SECTION 7. It shall be mandatory for all Employers to have all shear connectors such as studs and/or spirals field erected and secured.

the event shear connectors are shop erected and secured, the shear connectors will be removed prior to field erection.

The above relative to shear connectors became effective as of January 1, 1963.

### ARTICLE XII
### Riding the Load or Load Falls

SECTION 3. No Employee shall be permitted to ride the load or load fall except in cases of inspection, and erection and dismantling of derricks.

### Slings

SECTION 4. Steel cable will be used instead of chains or hemp slings.

39

DEF 00199

## Protection of Signal Devices

SECTION 5. Proper practical, safe housing, casing or lube shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, directing work or operation of any various devices in connection with work done by Ironworkers.

## Elevator Shaft Protection

SECTION 6. No Ironworker will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above Ironworkers working shall be planked safe in all elevator shafts.

## Apprenticeship

SECTION 1. The parties signatory hereto agree to establish a Joint Apprenticeship Committee in accordance with the provisions of the "Iron Workers Apprenticeship and Training Standards," as contained in Section 1, Article XIII of the International Constitution. Said Committee shall formulate and operate an Apprenticeship Program in the local area in conformity with said standards.

(a) Apprentices shall be paid no less than the percentage of the journeymen rate as listed below.

Probationary Period shall be the first one thousand hours.

(b) When an Apprentice is found to be accepting more than his/her specified wage rate without the employer's willful intent, he/she shall be subject to Disciplinary Action by the Joint Apprentice Committee.

(c) Apprentices who receive credit for previous experience in the Trade shall be paid, upon entrance, the wage rate of the period to which such credit advances them.

40

DEF 00200

(d) Apprentices who complete last period and who fail to pass the required journemen examination may elect to serve another six months, for which they shall be paid the regular last period rate.

|  | *1st Year* |
| --- | --- |
| 1st period . . . . . . . . . . | 60% |
| 2nd period . . . . . . . . . . | 70% |
|  | *2nd Year* |
| 3rd period . . . . . . . . . . | 75% |
| 4th period . . . . . . . . . . | 80% |
|  | *3rd Year* |
| 5th period . . . . . | 85% |
| 6th period . . . . . . . . . . | 90% |

SECTION 2. Ratio of apprentices to journeymen. The apprentice to journeymen ratio will be as follows:

a) Any employer who employs members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers — Local #7 — shall employ apprentices on structural, reinforcing and rigging jobs at the ratio of not more than one (1) apprentice to every six (6) journeymen, and shall employ apprentices on ornamental jobs at the rate of not more than one (1) apprentice to every four (4) journeymen, based on the annual average employment of journeymen ironworkers by the particular employer. On the spinning of cables on suspension bridges, one (1) apprentice shall be permitted to each journeyman.

b) The above ratio shall be maintained, under normal operating procedures; however, for organizational purposes and in times of need; i.e. large construction projects, powerhouses, mining, oil and chemical, and other related energy jobs, or when there is an abundance of work, the ratio of apprentices may be altered from time to time at the discretion of the local union.

41

DEF 00201

## ARTICLE XIII
### Overtime

SECTION 1. Overtime to be worked on the ninth (9th) hour of the work day, during the regular work week, Monday through Friday, shall be paid at time and one-half (1-1/2) on all jobs bid after July 1, 1985. All hours worked before the regular starting time and after the ninth (9th) hour shall be paid at double time. Overtime work on Saturdays, Sundays and Holidays shall be paid at two (2) times the hourly rate. No work shall be performed on Labor Day except to save life or property.

It is agreed that overtime is undesirable and not in the best interests of the industry or the work force. Therefore, except in unusual circumstances, overtime will not be worked. Where unusual circumstances demand overtime, such overtime will be kept at a minimum.

### Holidays

SECTION 2. The following holidays shall be observed:

| | |
|---|---|
| New Year's Day | Labor Day |
| Washington's Birthday | Columbus Day |
| Patriots' Day | Veterans' Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

42

DEF 00202

When December 24th falls within the regular work week, the Employer shall cease operations at 12 noon on that day and each iron worker employed on that job who worked from 7 a.m. to 12 noon on December 24th shall receive a seventy-five dollar ($75.00) bonus payable at any time up to the date for the next regularly scheduled pay day. The payment of a December 24 bonus, if made to Foremen and General Foremen (optional with the employer), is in addition to and not in lieu of payment required under Article X, Section 4.

Should any of the foregoing holidays fall on Sunday, the following day, Monday shall be observed as the holiday in question.

### Religious Holidays

SECTION 3. The above are the only holidays recognized under the Agreement. Should any Employer observe any other holiday(s), or be required to observe any other holiday(s) by shutting down the job on said day(s), each Iron Worker employed on that job who cannot be employed elsewhere by the Employer on said day shall be paid eight (8) hours pay for that day.

43

DEF 00203

# ARTICLE XIV
## Travel and Subsistence

Section 1. The following list of cities and towns covered by the Agreement constitute the Territorial Jurisdiction of Local Union No. 7, Boston, Massachusetts.

| | | |
|---|---|---|
| Abington $7.00 | Chelsea | Hingham $5.00 |
| Arlington | Cohasset $5.00 | Holbrook $7.00 |
| Avon $7.00 | Concord $7.00 | Hull $5.00 |
| Bedford $5.00 | Dedham | Kingston $8.00 |
| Belmont | Dover $5.00 | Lexington |
| Beverly $7.00 | Duxbury $7.00 | Lincoln $5.00 |
| Boston | East Bridgewater $7.00 | Lynn |
| Boston Harbor Island $5.00 | Easton $7.00 | Lynnfield $5.00 |
| Braintree $5.00 | Everett | Malden |
| Bridgewater $7.00 | Foxboro $7.00 | Manchester $7.00 |
| Brockton $7.00 | Framingham $7.00 | Marblehead $5.00 |
| Brookline | Gloucester $11.00 | Marshfield $7.00 |
| Burlington $5.00 | Halifax $7.00 | Maynard $7.00 |
| Cambridge | Hanover $7.00 | Medfield $7.00 |
| Canton $5.00 | Hanson $7.00 | Medford |

44

## ARTICLE XV
### Miscellaneous

SECTION 1. Practices not a part of terms and conditions of collective bargaining agreements will not be recognized.

SECTION 2. Slowdowns and featherbedding practices will not be tolerated.

SECTION 3. There shall be no illegal strikes, work stoppages or lockouts.

SECTION 4. When a Local Union does not furnish qualified workers within forty-eight (48) hours (Saturdays, Sundays and Holidays excluded), the contractor shall be free to obtain workers from any source.

SECTION 5. The Union recognizes the threat of non-union competition and will do all possible to promote union construction, including holding prebid and/or pre-job conferences.

SECTION 6. The parties agree to establish a special joint committee, as soon as possible, to set guidelines for bidding work against non-union and open shop competition. Items to be considered by the committee shall include the following:

    a. Make-up time at straight time.

    b. Time and one-half (1-1/2) provisions for overtime work.

    c. Reduction and/or elimination of travel expenses.

    d. Reduction in manning requirements.

    e. Lower wage scale that would include no payments to the annuity fund.

    f. Four (4) ten (10) hour day provisions at the option of the employer.

47

DEF 00207

## Travel and Subsistence — Continued

Lawrence Area: Travel and Subsistence Rates (formerly Local #351)

No travel and Subsistence money paid; Lawrence:

**Area 1** — $2.00 per day
Methuen, N. Andover

**Area 2** — $3.00 per day
Andover, Collinsville, Dracut, Groveland, S. Groveland, Haverhill, Lowell, Tewksbury

**Area 3** — $5.00 per day
Billerica, N. Billerica, Boxford, Byfield, s. Byfield, Chelmsford, S. Chelmsford,
N. Chelmsford, Danvers, Dunstable, Georgetown, Merrimac, Merrimacport, Middleton.
West Newbury, N. Reading, Rowley, Topsfield, Tyngsboro, Wilmington, N. Wilmington

**Area 4** — $6.00 per day
Acton,N. Acton, W. Acton, Amesbury, Carlisle, Cushing, Forge Village, Graniteville, Groton, Ipswich
W. Groton, W. Gloucester, Hamilton, S. Hamilton, Littleton, Newbury, Newburyport, Pepperell,
Salisbury, Townsend, Wenham, Westford

**Area 5** — $7.00
Essex

(Figures above denote territory where travel subsistence is paid.)

46

DEF 00206

## Travel and Subsistence — continued

| | |
|---|---|
| Melrose | Newton |
| Millis $7.00 | Norfolk $7.00 |
| Milton | Norwell $7.00 |
| Nahant | Norwood $5.00 |
| Natick $7.00 | Peabody $5.00 |
| Needham | Pembroke $7.00 |
| Rockland $7.00 | Stoughton $7.00 |
| Rockport $11.00 | Sudbury $7.00 |
| Salem $5.00 | Swampscott |
| Saugus | Wakefield |
| Scituate $7.00 | Walpole $7.00 |
| Sharon $7.00 | Waltham |
| Sherborn $7.00 | Watertown |
| Somerville | Wayland $5.00 |
| Stoneham | Wellesley $5.00 |

| |
|---|
| Plymouth $11.00 |
| Plympton $7.00 |
| Quincy |
| Randolph $5.00 |
| Reading $5.00 |
| Revere |
| West Bridgewater $7.00 |
| Weston $5.00 |
| Westwood $5.00 |
| Weymouth $5.00 |
| Whitman $7.00 |
| Winchester |
| Winthrop |
| Woburn |

(Figures above denote territory where travel subsistence is paid.)

45

Any and all guidelines relating to this Section must be mutually agreed upon by the Employer and the Union. It is also agreed that any and all agreements made by this committee are not subject to the Grievance and Arbitration clause of this Agreement.

g. We agree to the following clause: With mutual consent of the employer and the Business Agent a job may be worked four (4) ten (10) hour days, Monday through Thursday at straight time, provided that a fifth day, if worked, shall be at least ten (10) hours long. Hours in excess of forty (40) within this ten (10) hour frame on Friday shall be paid at time and one-half (1-1/2) the basic wage rate. In the event there is a lost time day during the week due to inclement weather or a Local 7 Holiday then Friday may be worked as a make-up day at straight time. All workers on the project will be offered work.

SECTION 7. Addendum 'A' titled "Industry Monitoring & Analyzing Clause" attached hereto is hereby incorporated herein.

## ARTICLE XVI
### Duration and Termination

SECTION 1. The Agreement, with any amendments thereof made as provided for therein, shall remain in full force and effect until midnight of September 15, 2006 except that either party may on or before May 15, 2004 give notice in writing to the other party that it desires a change which may include the economic provisions of this agreement to be effective on or after September 16, 2004. In the event of such notice, the parties agree to meet on or before August 15, 2004 to discuss economic proposals which may be presented by either party. In the event that the parties cannot agree on the economic proposals

48

DEF 00208

presented within thirty (30) days of the first meeting, the economic proposals shall be submitted to final and binding arbitration pursuant to the voluntary labor rules of the American Arbitration Association.

The authority of the arbitrator shall not be limited to the positions of either party on any of the economic issues presented. Rather, the arbitrator shall be permitted to select either of the positions presented by the parties or to award a decision different from the positions of the parties; provided, however, that any award issued shall be comparable to wage increases agreed upon between employers and the other basic trade unions in the Boston area. It is mutually agreed that there shall be no strike authorized by the Union or no lockout authorized by the Employer during the wage re-opener negotiations or arbitration.

The cost or arbitration shall be borne equally by both parties. Any decision of the arbitrator shall be incorporated in this collective bargaining agreement and shall be effective on September 16, 2000 or as agreed to by the parties.

Section 2. The Agreement, with any amendments thereof, made as provided for herein, shall remain in force and effect until midnight September 15, 2006, and, unless written notice be given by either party to the other at least four (4) months prior to such date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the same manner, this Agreement, with any amendments thereof, shall remain in effect from year to year thereafter subject to termination at the expiration of any such contract year upon notice in writing given by either party to the other at least four (4) months prior to the expiration of such contract year. Any such notice as herein above provided for in this Article,

49

DEF 00209

whether specifying a desire to terminate or to change at the end of the current year, shall have the effect of terminating this Agreement at such time.

This Agreement is made and entered into on this sixteenth day of September 2000 by and between Local Union No. 7, Boston, Massachusetts of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO, Unincorporated, herein called the Union and the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc., and the Labor Relations Division of the Associated General Contractors of Massachusetts, Inc., on behalf of such members as may from time to time authorize the same to be done, and other employers who assent to its provisions by signature thereto, herein called the Employer. A current list of members of the Associations who have so authorized will be furnished the Union upon signing the Agreement. The Associations shall provide the Union with additions to lists during the term of this Agreement.

50

DEF 00210

IN WITNESS WHEREOF, the parties hereto have hereunto set their hand and seal this 16th day of September, 2000.

**For the Union, Local No.7**

CHARLES WRIGHT, *President*
JAY HURLEY, *Business Manager*
JAMES COYLE, *Business Agent*
EDWIN WRIGHT, *Business Agent*
PATRICK McDERMOTT, *Business Agent*
MICHAEL J. DURANT,
    *Business Agent/Industry Analyst*
RANDOLPH GREEN, *Chairman, Executive Board*
PAUL J. DiPIETRO, *Financial Secretary-Treasurer*
ROBERT BANKS, *Apprentice Coordinator*

**For the Employers:**

Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. (BTEA)
    THOMAS J. GUNNING, *Executive Director*

Labor Relations Division of Associated General Contractors of Massachusetts, Inc.
    DAVID P. POWELL, *Labor Relations Dept.*

**Committee Members For the Employers:**

Thomas J. Gunning

David P. Powell

Steven Marr

James Stearns IV

John D. Murphy Jr.

Usha Wood

Richard Long

James F. Grosso

Expires September 15, 2006
Boston Ironworkers

51

DEF 00211

**ADDENDUM A**

**INDUSTRY MONITORING**
**& ANALYZING CLAUSE**

DEFINITIONS:

The term "cheating" includes:

i) Non-payment or underreporting of workers compensation insurance premiums;

ii) non-compliance with federal, state, and local health, safety, labor and employment statutes, regulations, and taxes;

iii) construction contract procurement misrepresentations such as featherbedding and failure to abide by federal, state, and local procurement statutes and regulations;

iv) violation of environmental statutes and regulations;

v) violations of federal and state unfair and deceptive trade practices statutes and regulations; and

vi) any other meaning the parties, from time to time might mutually agree reflects their intent.

The term "participants" includes industry:

contractor organizations, contractors, employees, employers, workers, property owners and awarding authorities seeking to use or using industry participants, construction managers, general contractors, sub-contractors, independent contractors, architects, engineers, inspectors, clerks, human resources managers, insurance companies (workers compensation carrier, payment bonds, etc.), developers, financial institutions, attorneys, federal and state enforcement agencies (OSHA, US DOL, IRS, MA DOR, AG, DCAM, and etc.), labor organizations and etc.

52

DEF 00212

The term "industry" means the activity found within the Union's geographical area, and a reasonable extension thereof, by which participants provide or perform labor, employment, services, and contracting, or are affected or involved in any way whatsoever by said labor, employment, services, and contracting for work, as that term is described in the collective bargaining agreement ("CBA") pursuant to the "Jurisdiction" section or traditionally performed by the Union's members and Unit employees.

The term "integrity" includes honesty among industry competitors and participants, their adherence to laws and regulations, area standards, a favorable perception by general public of the industry and its participants, the overall absence of cheating, and improving the quality of professional competence and service our industry provides to the community.

## IT IS MUTUALLY AGREED THAT:

Industry monitoring and analyzing benefits Unit employees because it is directly related and absolutely necessary for the Union to maintain its existence and position as an effective bargaining agent of the employee unit and, as such, provides Contractors with labor stability; and

Industry monitoring and analyzing helps both the Union and the Contractors better to: negotiate, administer, and enforce their legal and contractual obligations; and helps the Union better to represent employees of the bargaining Unit while simultaneously, yet incidentally, helps each signatory employer competing with other signatory employers by providing, among other things, a more honest competitive environment.

And, by monitoring and analyzing the industry, both the Union and Contractors can better negotiate because such activity provides both groups with a more realistic view of

53

DEF 00213

the industry, particularly the inherently fierce competiti[on]
among industry participants; and Contractors desire th[at]
industry employers and employees achieve and mainta[in]
a comparable and competitive environment regard[ing]
compliance to laws and regulations, wages and oth[er]
terms and conditions existing in the industry; and

Industry monitoring and analyzing provides a direct ben[e-]
fit to Unit employees by, among other things, creating a fi[rst]
step to reestablishing optimal stability and integrity in t[he]
industry such that Unit employees can better gauge a[nd]
maintain present and future employment opportunities; a[nd]
Free market competition depends on industry participa[nts]
complying to laws and regulations governing the indus[try,]
and policing the industry reduces the burden on taxpaye[rs]
that such groups incur to curtail unfair, deceptive, dishone[st]
and illegal acts; and

Historically, monitoring and analyzing the industry h[as]
played an important and essential role and has tended [to]
tie Unit employees to the Union and provided work oppo[r-]
tunities for Unit employees consistent with CBAs. F[ur-]
ther, evidence and studies have shown that cheating h[as]
historically infested the industry. During the past t[wo]
decades cheating continued to infest it, and federal, sta[te]
and local public enforcement mechanisms have be[en]
unable adequately to curtail this infestation for reaso[ns]
that include a lack of funding and staffing; and

Cheating has had and continues to have adverse a[nd]
detrimental direct and indirect effects on the industry a[nd]
particularly on the Contractors' ability to employ U[nit]
employees; and

A continuing need exists to attract and maintain a hig[hly]
skilled labor supply that understands the importance of t[he]
industry's integrity and its effect on collective bargaining

54

DEF 00214

**THEREFORE,**

Both the Union and the Contractors shall use their best efforts to monitor and analyze the industry to determine industry practices, trends, and activities including:

a. Technological advances and more productive work practices;

b. legal and legislative initiatives that affect the industry;

c. rates and methods of pay;

d. perception of Unit employees by industry professionals and industry participants;

e. practices of and compliance, or non, of industry participants to laws and regulations applicable to the industry, its competitors, and participants; and

f. quality of labor and services provided by industry employees and other participants and the level of participants competence;

g. activities of industry participants directly affecting mandatory and permissive subjects of collective bargaining.

The Union should provide a report regarding its observations and findings resulting from this Clause to the Contractors at least annually at a meeting specifically scheduled for that purpose. The Contractors should similarly provide a report regarding their observations and findings at that annual meeting.

Where a majority of the Labor/Management Trustees through its various Labor/Management organizations deem wise, said organizations shall engage in, support, finance, or otherwise encourage, to the extent lawful, litigation of matters that affect in any way the concerns raised herein, and the Union shall similarly act, where lawful.

55

DEF 00215

Where it deems wise, the Union shall cause to b
disseminated to industry participants and others informa
tion sufficient to inform said persons about matters affec
ing them as related to the industry and cheating.

The Union shall exercise its best efforts to find skille
persons so as to ensure as best as reasonably practica
that:

a.   an adequate number of skilled craft-persons exis
      among whom Contractors might employ an
      whom the Union might refer; and

b.   persons, union represented or un-represente
      employed in the industry understand that cheatin
      exists in the industry and how integrity provide
      employment opportunities for them and Unit en
      ployees at improved safety, wages, and oth
      terms and conditions of employment and provid
      them mutual aid and protection.

The Union shall use its best efforts to determine the sk
level of participants engaged in the industry and to dete
mine the availability, or lack thereof, of a skilled labor an
contractor pool in which Unit employees might seek en
ployment under, or comparable to, the terms and cond
tions of the CBA.

Both the Union and Contractors shall seek to infor
where appropriate public entities about conditions in th
industry that affect them and the ability of Unit employe
to improve their terms and condition of employment a
engage in other mutual aid and protection and to aid sa
public bodies to best preserve and promote integrity in t
industry and to ensure honest, free market competiti
especially where it affects said public entities' role
drafters of industry enforcement and regulatory schem
or their role as market participants and entities th

56

DEF 00216

expend taxpayer funds and resources that ultimately result in Unit employee employment.

**NO POLITICS:**

Nothing in this Clause shall be interpreted or used as establishing or suggesting an opportunity to engage in any type of political activity or public relations whatsoever, including support of or opposition to particular candidates or political parties or legislative initiatives.

57

DEF 00217

**REFERENCE A**

Excerpt from Memorandum of Understanding between the Boston Ironworkers Local No.7 and the New England Associated Erectors, Inc. dated July 3, 1972.

Agreed by both parties as of April I, 1992:

Prepaid stamp for all benefits, this will consolidate all funds into one check. All monies owed by the Employer to the funds for past hours worked must be paid in full by February I, 1992. Any employer not paid in full will not be allowed the privilege of purchasing stamps, and will not be able to perform any work until paid.

All Employers who are currently on a monthly payment schedule will continue as agreed to; except that any check which is returned for insufficient funds, said Employer will automatically forfeit his payment agreement and full payment of monies owed must be paid before any work can resume.

58

DEF 00218

**REFERENCE B**
**Contractor Flow Chart**

1. Contractor must establish identity of employee per IRS code.

2. Contractor purchases stamps. Receives copy of form with stamp numbers on it.
   *If mailed — Certified, Return Receipt Requested.

3. Contractor distributes stamps to employees for hours paid.

4. Contractor lists beginning and ending stamp numbers for each denomination of each pay period.

5. Payroll summary returned to funds office eight (8) days following end of payroll period listing employees hours paid and Social Security Numbers.

59

DEF 00219

**Union Funds Flow Chart**

1. Union purchases stamps.

2. Union sells stamps to contractors.
   (a) Records contractor number.
   (b) Records stamp numbers and denominations.

3. Fund pays all administrative costs associated with stamp program.

4. Fund verifies redeemed stamps.

   *Fund will have a list of eligible employees' Social Security Numbers provided by Union. Credit will not be given for redeemed stamps until the employees identity and eligibility is verified by the business agents. If mistakes are made, contractor will be informed of corrections.

5. Fund credits employees with all benefit contributions and working dues assessments.
   (a) Employee is responsible for lost or stolen stamps.

6. (a) Pay issued bill.
   (b) Fund will record lost or stolen stamp numbers in computer, either from employee, if he/she has numbers, or from contractor who will have the numbers.
   (c) Contractor will not be responsible for replacing previously issued stamps.
   (d) The fund will give credit to employee one year from the date lost or stolen stamps are reported.

7. Contractor will not be held responsible for typographical or clerical errors. They will, however be expected to maintain accurate records of employee identities.

60

DEF 00220

## IMPORTANT

All benefits set forth in this booklet are available to members of Local Union No.7. But, as you will note in reading about them, continuous membership in good standing for specified periods is required in order to qualify for them.

The By-Laws of Local Union No. 7 describes membership in good standing as payment of membership dues within the month that they are due. For example, dues for January are due January 1st and must be paid prior to the 31st day of January.

Be sure your dues are paid on time, lest you unknowingly deprive yourself of any one of these benefits.

61

DEF 00221

# IRON WORKERS LOCAL 7
# BENEFIT PROGRAMS

To Our Members:

This book has been prepared primarily to bring to your attention details concerning the administration of a Union Group Life Insurance program which became effective November 1, 1967.

We decided to include in the same booklet, as a matter of general interest, the rules under which your Accident Benefit Fund is operated. In addition, a brief description of the "Henry F. Hughes, Joseph Brown, Joseph Maloney and Local 7 Memorial Scholarship Fund" is presented.

These programs, aside from the benefits achieved through collective bargaining, indicate the interest of your Union in promoting the economic security and financial stability of our members and their families. It is to your advantage to know about them and to understand the rules that determine whether or not you are entitled to participate in them.

We trust the information we are presenting herewith will be of interest to you and your families. If you have any questions about these programs or would like to discuss them personally, please do not hesitate to let us know.

OFFICERS OF
IRONWORKERS LOCAL UNION

62

DEF 00222

# LIFE INSURANCE

In the event of your death from any cause – on the job or off – while you are insured the applicable amount of insurance will be paid to the named beneficiary.

## BENEFICIARY

You may name anyone you wish as your beneficiary and you may change your beneficiary at any time by filling out the proper form.

## TOTAL AND PERMANENT DISABILITY

If prior to age 60, you become totally and permanently disabled, your insurance will continue without cost for a period of twelve (12) months. Proof of total and permanent disability must be presented within the twelve-month period and yearly thereafter to continue the insurance in force.

## CONVERSION PRIVILEGE FEATURE

If your life insurance terminates you may convert it to an individual policy of life insurance within thirty-one (31) days without medical examination. The amount of such policy shall not exceed the amount provided under the group plan. You may choose any type of individual policy then being written by the Union Labor Life Insurance Company except term insurance. The premium cost to you will be based upon your class of risk and your age at the time of conversion.

If you die within such 31-day period the Company will pay the same Life Insurance benefits as though you were still insured under the Group Policy.

63

DEF 00223

# ELIGIBILITY FOR
# INSURANCE BENEFITS

## PERSONS TO BE INSURED

### Class I - $1,000.00 Life Insurance Benefit

Each member who is in good standing in accordance with the By-Laws of Iron Workers Local Union No. 7 for the month of October, 1967, will be insured as of November 1, 1967. Insurance will be continued on each member if he maintains good standing.

### NEW MEMBERS

New members, including apprentices, shall be insured as of the first day of the month following acceptance of Application of Membership by the International Union. Continuation of insurance on new members will depend on their good standing in Local 7.

### TRANSFERRED MEMBERS

Transferred members will be insured as of the first day of the month following the month of their official transfer. Continuation of insurance on transferred members will depend on their good standing in Local 7.

64

DEF 00224

## ARMED SERVICES

An insured member entering the Armed Services after November 1, 1967 shall be terminated from insurance coverage on the date he enters military service. He shall be reinstated on the date he returns to active employment and is then in good standing, providing such return to active employment in the trade takes place within sixty (60) days of discharge.

An insured member who is in the Armed Services immediately prior to November 1, 1967, shall be insured on the date he returns to active employment in the trade and resumes full payment of dues, provided such return to active employment in the trade takes place within sixty (60) days of his discharge.

Continuation of insurance for members returning from the Armed Services will depend on their maintaining membership in good standing in Local 7 in accordance with requirements for eligibility of members.

## TERMINATION

Each member who fails to meet the requirements as to good standing shall not be insured beyond the last day of the month in which he/she fails to qualify as a member in good standing.

Expulsion, transfer of a member to another Local Union, taking a withdrawal card, or having membership revoked shall terminate his/her insurance benefit on the date he/she ceases to be a member of Local 7

## REINSTATEMENT

Any member whose insurance has been terminated in accordance with the requirements herein stated shall be reinstated for insurance benefits on the first day of the month in which he/she again becomes a member in good standing.

65

DEF 00225

## LOCAL 7 NOTICE OF
## THE TERM OF "MEMBERSHIP" DEFINED

The term "member" in any union security clause found in any applicable collective bargaining contract which the Union has with any employer does not mean actual membership. Your obligation of membership is limited to the payment of dues and fees. You have the right to be or remain a nonmember and nonmembers have the right to:

(1) Object to paying for union activities not germane to the Union's duties as bargaining agent and to obtain a reduction in fees for such activities. Germane activities are collective bargaining, contract administration, and grievance adjustment; and

(2) be given sufficient information to enable you to intelligently decide whether to object; and

(3) be apprised of any internal Union procedures for filing objections. Should you want to become a nonmember or object to paying full dues you must state so in writing only and cause the writing to be received by the Treasurer of the Union who's office is located at the Union's business office in South Boston.

66

DEF 00226

# ACCIDENT BENEFIT FUND

Since 1945, Local Union No.7 has been providing limited Accident Benefit to help compensate a member for time lost due to an Industrial Accident. This benefit is payable to a member on approval of the Executive Committee in accordance with rules set forth herein.

## RULES GOVERNING ACCIDENT BENEFITS
### I Eligibility

1. Members shall be eligible for Accident Benefits by the payment of full dues and assessments to Local No.7 for at least a period of six (6) months prior to injury.

2. A member must be in good standing at the time of the injury in order to receive Accident Benefits and must remain in good standing while receiving benefits.

3. A member shall not be considered in good standing who is more than one (1) month in arrears with dues and assessments. Dues and assessments for each calendar month will be payable on the first day of that month. Dues for the calendar month that retains good standing for a member must be in the hands of the Financial Secretary prior to the injury.

4. A member must report the injury for which he/she is seeking benefits to the Financial Secretary within fourteen (14) days of said injury and shall appear before the Accident Benefit Board at the first meeting following the injury and file claim or he/she shall forfeit all right to benefit. Hospitalized members may delegate another member to appear in his/her behalf.

67

DEF 00227

5. A member must be receiving weekly Workers' Compensation and show proof of same (compensation check) to the Financial Secretary, in person, weekly. Hospitalized members may delegate another person to appear in his/her behalf. Upon presenting weekly compensation check to the Financial Secretary, the injured member will immediately receive the weekly accident benefit due him/her to date.

6. When weekly compensation checks have been withheld by the Insurance Company and a lump sum payment has been made, it shall be the obligation of the member to show proof that said claim was paid as weekly compensation. A form for this purpose shall be provided by Local No. 7 to be filled out by the Insurance Company and the industrial Accident Board before benefits will be forthcoming.

7. No member shall be entitled to Accident Benefits while drawing his/her salary or wages from any employment.

8. Any member found working at the trade while receiving Accident Benefits shall be required to pay back said benefits and his/her name be stricken from the eligibility rolls for one (1) year after final remittance.

9. No member shall receive more than twelve (12) weeks accident benefit for any one accident.

10. No member shall entitled to more than twelve (12) weeks accident benefit in any consecutive twelve (12) month period, starting with the date of first payment.

68

DEF 00228

## II Benefits

1. Benefits shall be paid at the rate of ten dollars ($10.00) per day from the date of injury, not including Saturday and Sunday, and continuing until termination of weekly working compensation but not to exceed twelve (12) weeks for members with twelve (12) months tenure in Local 7. (This rate and number of weeks for which benefits are payable is subject to change by the Accident Benefit Board pursuant to the financial status of the Accident Benefit Fund. Said changes of benefit shall not alter status of members receiving benefits when changes are enacted.)

2. A member with less than twelve (12) months but more than six (6) months tenure shall be paid five dollars ($5.00) per day for the number of weeks that he has months in Local 7.

### RULES GOVERNING SUPPLEMENTAL ACCIDENT BENEFITS

A supplement to the existing Accident Benefit Fund will be established for the purpose of aiding members who have been on Workers' Compensation for a period of six months or more and who have previously qualified for accident benefits of Local 7. (See Local 7 By-Laws Article II, Section 7. for qualifying rules.) A further stipulation is that a member maintain good standing from the date of accident to the eligibility date of this supplemental payment (6 months). The amount of the payment will be $500. The funding will be provided by the revenues realized from the Industrial Fund.

69

DEF 00229

## RULES GOVERNING
## ACCIDENTAL DEATH BENEFITS

That an Accidental Death Benefit will be paid with th[e] understanding that the Accidental Death Benefit Fund w[ill] provide a standing benefit of $5,000 to the beneficiary [of] a deceased member who dies as the result of injurie[s] sustained while working under covered employment f[or] Local 7, any affiliate of the Ironworkers Internation[al] Union or any other approved employment authorized b[y] the Business Agents of Local 7. To qualify for this bene[fit] a member must be in good standing, as defined in th[e] International Constitution at the time of the accident. Th[e] funding will be provided by the revenues realized from th[e] Industrial Fund.

70

DEF 00230

# HENRY F. HUGHES, JOSEPH BROWN, JOSEPH MALONEY, AND LOCAL 7 MEMORIAL SCHOLARSHIP FUND

In memory of their outstanding contributions and achievements through their dedicated devotion, to the tasks confronting Local Union No.7 before and during their tenure as Business Agents, the Henry F. Hughes Scholarship Fund was proposed November 22, 1965 and was initiated by the members of Local Union No.7 in 1966; the Joseph Brown Scholarship Fund was proposed in 1987 and was initiated in 1988; the Joseph Maloney Scholarship and 6 Local 7 Memorial Scholarships were proposed and initiated in 1999.

This Fund, supported by dues of the membership, is intended to provide four-year and one year scholarship grants to sons and daughters of members.

The scholarship program is administered in conjunction with the AFL-CIO Scholarship Exam given in February.

Contact the Union Hall during November of an Applicants' Senior Year in high school for information regarding these scholarships.

71

DEF 00231

**ADDENDUMS**

**Please place on page 72 under addendums,** [text cut off]
**apologize for any inconvenience.**

*This text is to be read immediately following* [text cut off]
*last paragraph of Article I, and preceding Artic* [text cut off]
*on page 11 of this book.*

The Ironworker will maintain complete jurisdic [text cut off]
over the following: All forms of electric chain f [text cut off]
come-a-longs, Tug-a-hoist, all gas or electric hoi [text cut off]
any kind while being used for the prime purpos [text cut off]
setting steel or other material which falls under [text cut off]
jurisdiction of the Ironworker, which will include, [text cut off]
not limited to: Access Satellite Tower platforms, [text cut off]
and all Hydraulic Jacking devises, and the comp [text cut off]
maintenance and operation of all Welding Mach [text cut off]
(Gas and Electric) when used by the Ironworke [text cut off]
perform work which falls under the jurisdiction of [text cut off]
Iron Worker. When a Fork Lift is used to perform [text cut off]
which falls under the jurisdiction of the Ironwo [text cut off]
said Fork Lift will be manned and operated by [text cut off]
Ironworker.  **50**

72

DEF 00232



DEF 00233

EXHIBIT 11

Customer Receivables Inquiry
James F Stearns Co Inc
8/22/2006

JORDANS

Balance:                0.00

03-18TAR          LOCAL #7
                  195 OLD COLONY AVE
                  SOUTH BOSTON

| Invoice | Due Date | Ap. Date | Ap. Type | Reference | Amount | Inv. Balance |
|---|---|---|---|---|---|---|
| 749 | 3/1/2004 | 1/31/2004 | Invoice | JAN TARGET | 31,328.00 | 31,328.00 |
|  |  | 2/17/2004 | Payment | Check #1313 | -31,328.00 | 0.00 |
| 788 | 2/29/2004 | 2/29/2004 | Invoice | FEB TARGET $$ | 25,049.64 | 25,049.64 |
|  |  | 3/15/2004 | Payment | Check #1336 | -25,049.64 | 0.00 |
| 788A |  | 3/22/2004 | Invoice | MATCH PAYMENT $44,078.50 | 19,028.86 | 19,028.86 |
|  |  | 3/15/2004 | Payment | Check #1336 | -19,028.86 | 0.00 |
| 836 | 3/31/2004 | 3/22/2004 | Invoice | TARGET MONEY FOR MARCH | 35,392.00 | 35,392.00 |
|  |  | 3/31/2004 | Payment | Check #1336 | -35,392.00 | 0.00 |
| 836A | 4/30/2004 | 3/31/2004 | Invoice | TARGET MONEY FOR MARCH | 35,398.00 | 35,398.00 |
|  |  | 4/21/2004 | Payment | Check #1363 | -35,398.00 | 0.00 |
| 836B | 3/31/2004 | 3/31/2004 | Invoice | TARGET MONEY FOR MARCH | 26,439.00 | 26,439.00 |
|  |  | 4/21/2004 | Payment | Check #1363 | -26,439.00 | 0.00 |
| 836DEL | 3/31/2004 | 3/31/2004 | Invoice | REPOST IN MARCH | -35,392.00 | -35,392.00 |
|  |  | 4/12/2004 | Payment |  | 35,392.00 | 0.00 |
| 854 | 5/30/2004 | 4/30/2004 | Invoice | TARGET FOR APRIL 2004 | 27,367.50 | 27,367.50 |
|  |  | 5/21/2004 | Payment | Check #1391 | -27,367.50 | 0.00 |
| 854A | 5/21/2004 | 5/21/2004 | Invoice | W/E 5/4 & 5/11-DUPLICATE 3/16 | 47,058.50 | 47,058.50 |
|  |  | 5/21/2004 | Payment | Check #1391 | -47,058.50 | 0.00 |
| 881 |  | 4/12/2004 | Invoice |  | Unposted |  |
| 914 | 7/29/2004 | 6/29/2004 | Invoice | TARGET $$ JUNE/N. SAMPSON | 50,859.00 | 50,859.00 |
|  |  | 7/12/2004 | Payment | Check #1442 | -49,111.00 | 1,748.00 |
|  |  | 7/12/2004 | Payment | Check #1443 | -1,748.00 | 0.00 |
| 914REV | 7/29/2004 | 6/29/2004 | Invoice | DAY TRAVEL | 7.00 | 7.00 |
|  |  | 7/15/2004 | Credit | Transfer from ON ACCT | -7.00 | 0.00 |
| 915 | 6/29/2004 | 6/29/2004 | Invoice | TARGET FOR 6/8 TO 6/24/04 | 33,827.00 | 33,827.00 |
|  |  | 7/12/2004 | Payment | Check #1442 | -30,328.50 | 3,498.50 |
|  |  | 9/27/2004 | Payment | Check #1492 | -3,498.50 | 0.00 |
| 943 | 8/29/2004 | 7/30/2004 | Invoice | TARGET FUND FOR JULY04 | 20,694.00 | 20,694.00 |
|  |  | 9/27/2004 | Payment | Check #1492 | -20,543.50 | 150.50 |
|  |  | 3/17/2005 | Payment | Check #1680 | -150.50 | 0.00 |
| 963 | 9/26/2004 | 8/27/2004 | Invoice | TARGET FUND AUG 2004 | 1,881.50 | 1,881.50 |
|  |  | 3/17/2005 | Payment | Check #1680 | -1,881.50 | 0.00 |
| CK 1680 | 2/28/2005 | 2/28/2005 | Invoice | ADDED TIME AT JORDANS | 24,042.00 | 24,042.00 |
|  |  | 3/17/2005 | Payment | Check #1680 | -24,042.00 | 0.00 |
| ON ACCT |  |  | Invoice | Deposits | 0.00 | 0.00 |
|  |  | 7/12/2004 | Payment | Check #1443 | 0.00 | -7.00 |
|  |  | 7/15/2004 | Charge | Transfer to Invoice 914REV | 7.00 | 0.00 |

EXHIBIT 12

IRONWORKERS LOCAL 7

Sep 7 2001 14:20 P.01

BUSINESS MANAGER
JAY HURLEY

PRESIDENT
CHARLES WRIGHT

FINANCIAL SECRETARY-TREASURER
~ 'IL J. DiPIETRO

BUSINESS AGENTS
JAMES COYLE
EDWIN WRIGHT
PATRICK McDERMOTT

BUSINESS AGENT · INDUSTRY ANALYST
MICHAEL J. DURANT

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P. O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

Fax # 617-268-7878
Facsimile Transmittal

Date 9-7-01

To: Jim Stearns

To: Pat McD

FAXED 9/10/01

There will be a total of ___1___ pages to follow.

If there are any question, or if you have any difficulty receiving this communication, please call 617-268-4777......Thank you!

Message Sign + Fax Back

Local 7

Agreement

Chelsea
B&Girls
Club

Pat
Thanks

EXHIBIT
19
Stearns

## Local #7 Target Fund Contract #720
(Page 1 of 1)

Local #7, through its Target Fund, is offering up to a maximum of thirty-four thousand three hundred and thirty nine dollars ($34,339.00) reimbursement for the Steel Erection on the Chelsea Boy's & Girl's Club project in Chelsea, MA.

*Said offer is based on the following conditions:*
Local #7 will reimburse J. F. Stearns Co. ("the contractor"), a total of fourteen dollars and ninety three cents ($14.93) per hour, up to a maximum of two thousand three hundred (2300) hours, with a total maximum reimbursement of thirty-four thousand three hundred and thirty nine dollars ($34,339.00). By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will not be reimbursed by Local 7's Target Fund. Furthermore, it is agreed that should the covered portion of this project require less than two thousand three hundred (2300) hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, provided only if all of the applicable conditions contained herein were adhered to.

*It is expressly understood that this reimbursement is being offered, and will only be remitted to the contractor, after it has been clearly established by Local #7 that the following conditions were also met:*
A.  This agreement is signed by the contractor and the Local #7 Business Agent in whose geographic area the covered work is being performed.
B.  All wages and fringe benefits, as required by the currently existing Local #7/BTEA/AGC collective bargaining agreement, have been paid to every member working under this particular agreement, and all remittance reports that verify these payments are in order at the IWDCNE Fund Office.
C.  All hours and conditions are verifiable by the Local #7's *Steward's Report* and the Local #7's *Target Sheet*, both of which must be filled out, and remitted to Local #7 weekly, solely by the Business Agent's appointed steward for this job. Each remitted *Target Sheet* must signed by an authorized representative of the contractor.
D.  The contractor is not in arrears on the payment of wages and or fringe benefits for any present or previous project(s) within the confines of Local #7's geographic jurisdiction.
E.  The contractor acknowledges that it is a signed party to the Local #7/BTEA/AGC collective bargaining agreement under *Section 9a* of the *National Labor Relations Act.*
F.  Reimbursement is requested by the contractor to Financial Secretary Paul DiPietro (617-268-4777).

_____        _____
Pat McDermott - BA Local #7              James Ford Stearns IV (contractor)

Date _9-7-01_____                        Date _9/10/01_____


Received by FS/T Paul DiPietro (signature) _____ Date _____

EXHIBIT 13



EXHIBIT 13
Plaintiffs
8730100

**CONFIDENTIAL**

10:18 AM
05/18/06
Accrual Basis

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| A & D WELDING | | | | | | | | | |
| | Bill | 06/30/2002 | #788 | STRUCTURAL STEEL | | | Accounts Payable | 3,357.20 | 3,357.20 |
| | Bill | 01/13/2003 | #796 | STRUCTURAL STEEL | | | Accounts Payable | 13,250.00 | 16,607.20 |
| | Bill | 02/18/2003 | #796-A | STRUCTURAL STEEL, SUPPLEMENT | | | Accounts Payable | 3,850.00 | 20,457.20 |
| Total A & D WELDING | | | | | | | | 20,457.20 | 20,457.20 |
| A-J STEEL | | | | | | | | | |
| | Bill | 10/14/2004 | #844 | JF SELF STORAGE | | | Accounts Payable | 21,000.00 | 21,000.00 |
| | Bill | 11/09/2004 | #845 | DANA HALL | | | Accounts Payable | 20,000.00 | 41,000.00 |
| Total A-J STEEL | | | | | | | | 41,000.00 | 41,000.00 |
| ALL STATE STEEL | | | | | | | | | |
| | Bill | 05/01/2001 | | | MULLANEY SCHOOL | | | Accounts Payable | 0.00 | 0.00 |
| | Bill | 05/01/2001 | #715 | VOID STRUCTURAL STEEL | | | Accounts Payable | 2,206.94 | 2,206.94 |
| | Bill | 05/01/2001 | #715 | STRUCTURAL STEEL | | | Accounts Payable | 0.00 | 2,206.94 |
| | Bill | 06/13/2001 | #715 | VOID STRUCTURAL STEEL | | | Accounts Payable | 2,205.74 | 4,411.30 |
| | Bill | 03/14/2014 | #890 | HOME DEPOT | | | Accounts Payable | 4,780.25 | 9,191.55 |
| Total ALL STATE STEEL | | | | | | | | 9,191.56 | 9,191.56 |
| ALLSTATE | | | | | | | | | |
| | Bill | 06/30/2004 | #816 | | MARTIGNETTI CO | | Accounts Payable | 10,960.00 | 10,960.00 |
| Total ALLSTATE | | | | | | | | 10,960.00 | 10,960.00 |
| ATLANTIC BRIDGE-ENG | | | | | | | | | |
| | Bill | 07/16/2001 | SUPPLEMENT | GRANDFATHERED JOB | | | Accounts Payable | 18,784.54 | 18,784.54 |
| | Bill | 07/23/2001 | #716 | REHAB | WOBURN 93 PROJECT | | Accounts Payable | 11,966.30 | 30,693.84 |
| | Bill | 08/13/2002 | #777 | REHAB | CCI BRIDGE PROJECT | | Accounts Payable | 30,395.84 | 60,769.11 |
| | Bill | 08/13/2002 | #778 | MULTIPLE BRIDGES | CCI BRIDGE PROJECT | | Accounts Payable | 104,005.72 | 154,798.83 |
| | Bill | 08/13/2002 | #716-A | john martino pt4 | RTE 495 / MARSTON ST PROJECT | | Accounts Payable | 8,700.00 | 163,498.83 |
| | Bill | 03/14/2005 | #976 | Tyngsboro Merrimack River B&M Rail Bridge | ATLANTIC BRIDGE SUPPLEMENT | | Accounts Payable | 182,371.65 | 345,870.48 |
| | Bill | 03/04/2006 | #1018 | HP Bridge NOTE | CCI BRIDGE ENG INC | | Accounts Payable | 4,945.05 | 200,015.63 |
| Total ATLANTIC BRIDGE-ENG | | | | | | | | 200,015.63 | 200,015.63 |
| ATLANTIC COAST ORNA | | | | | | | | | |
| | Bill | 04/21/2000 | 0072 | STRUCTURAL | LEWIS SCHOOL, EVERETT | | Accounts Payable | 37,000.00 | 37,000.00 |
| | Bill | 06/20/2002 | 0074 | STAIRS | DOVER LOFTS PROJECTS | | Accounts Payable | 4,000.00 | 41,000.00 |
| Total ATLANTIC COAST ORNA | | | | | | | | 41,000.00 | 41,000.00 |
| ATLANTIC CONTRACTING | | | | | | | | | |
| | Bill | 12/31/2003 | #814 | | BAY PARK GARAGE | | Accounts Payable | 27,372.00 | 27,372.00 |
| Total ATLANTIC CONTRACTING | | | | | | | | 27,372.00 | 27,372.00 |
| ATLAS ENGINEERING | | | | | | | | | |
| | Bill | 02/03/2003 | #794-A | | MONROE PLACE QUINCY | | Accounts Payable | 2,331.64 | 2,331.64 |
| | Bill | 12/09/2003 | #857 | | QUINCY COLLEGE #2 | | Accounts Payable | 61,096.94 | 63,428.58 |
| | Bill | 12/09/2003 | #865 | | LYNN POLICE STATION | | Accounts Payable | 78,000.00 | 142,428.58 |
| | Bill | 03/12/2004 | #865 | | AMBROSE SCHOOL | | Accounts Payable | 20,000.00 | 162,428.58 |
| | Bill | 03/12/2004 | #865 | | AMBROSE SCHOOL | | Accounts Payable | 69,205.94 | 231,634.52 |
| | Bill | 07/02/2004 | #884 | | dm college | | Accounts Payable | 8,800.00 | 160,434.54 |
| | Bill | 07/22/2005 | #884-A | | AMBROSE ADDENDUM | | Accounts Payable | 179,148.84 | 178,148.84 |
| | Bill | 07/22/2005 | #963 | #963 Balchester School | Balchester School | | Accounts Payable | 39,125.00 | 217,270.84 |
| Total ATLAS ENGINEERING | | | | | | | | 217,270.84 | 217,270.84 |

**CONFIDENTIAL**



10:16 AM
05/18/06
Accrual Basis

**LOCAL 7 TARGET FUND**
**Expenses by Vendor Detail**
December 1, 1999 through May 18, 2006

CONFIDENTIAL

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **AZTEC STEEL** | | | | | | | | |
| Bill | 06/13/2002 | #762 | REBAR + FLEX-CORE | AVALON UPPER FALLS PROJECT | | Accounts Payable | 60,000.00 | 60,000.00 |
| Bill | 07/25/2002 | #773 | REBAR | STOP + SHOP WHITMAN | | Accounts Payable | 4,200.00 | 64,200.00 |
| Bill | 08/13/2002 | #775 | REBAR | SUDBURY DPW PROJECT | | Accounts Payable | 9,318.00 | 73,518.00 |
| Bill | 09/14/2002 | #775 | REBAR | BRIDGEWATER STATE COLLEGE G C | | Accounts Payable | 8,366.25 | 81,884.25 |
| Bill | 08/23/2002 | #771-2 | | S+S WHITMAN | | Accounts Payable | 1,193.13 | 83,077.38 |
| Bill | 01/17/2005 | #771-2 | | S+S WHITMAN | | Accounts Payable | 799.90 | 83,877.28 |
| Bill | 04/16/2003 | 172 | REBAR SUPPLEMENT #772 | S+S WHITMAN | | Accounts Payable | 938.76 | 84,816.04 |
| Bill | 04/24/2003 | #811 | REBAR SUPPLEMENT #772 | S+S WHITMAN | | Accounts Payable | 870.58 | 85,686.62 |
| Bill | 04/16/2003 | #836 | REBAR SUPPLEMENT #772 | S+S WHITMAN | | Accounts Payable | 5,310.00 | 90,996.62 |
| Bill | 09/18/2003 | #837 | REBAR SUPPLEMENT #772 | SILVER LAKE RFS SCHOOL | | Accounts Payable | 56,000.00 | 146,996.62 |
| Bill | 09/18/2003 | #838 | REBAR SUPPLEMENT #772 | MANCHESTER WASTE WATER | | Accounts Payable | 41,760.00 | 188,756.62 |
| Bill | | #860 | REBAR | SILVER LAKE RFS SCHOOL | | Accounts Payable | 500.00 | 189,256.62 |
| Bill | 02/13/2004 | #866 | REBAR | C.J. MULLARD APARTMENTS | | Accounts Payable | 38,500.00 | 227,756.62 |
| Bill | | #895 | | C V S Somerville | | Accounts Payable | 13,800.00 | 241,556.62 |
| Bill | | #896 | | AVALON UPPER FALLS | | Accounts Payable | 3,189.00 | 244,745.62 |
| Bill | | #896 | | EQUISERVE PARKING GARAGE | | Accounts Payable | 2,689.00 | 247,434.62 |
| Bill | 11/16/2004 | #896 | | Central Plaza | | Accounts Payable | 3,200.00 | 250,634.62 |
| Bill | 11/16/2004 | #898 | | MARTIGNETTIS | | Accounts Payable | 3,200.00 | 253,834.62 |
| Bill | 11/16/2004 | #896 | | GROVER PKG GARAGE | | Accounts Payable | 50,000.00 | 303,834.62 |
| Bill | 12/21/2004 | #897 | | MYSTIC CENTER | | Accounts Payable | 2,400.00 | 306,809.62 |
| Bill | 12/21/2004 | #898 | | BRICKWORKS | | Accounts Payable | 2,100.00 | 312,259.62 |
| Bill | | #601 | | PUBLIC STORAGE | | Accounts Payable | 21,000.00 | 313,369.62 |
| Bill | 07/07/2004 | #921 | | KINGSBURY MALL | | Accounts Payable | 16,800.00 | 334,369.62 |
| Bill | 11/16/2004 | #904 | | MANCHESTER PLACE | | Accounts Payable | 351,159.62 | 351,159.62 |
| Bill | 11/16/2004 | #904 | | MANCHESTER W W TREATMENT | | Accounts Payable | 70,000.00 | 421,159.62 |
| Bill | | #EBX-A | Union Station #022 | AZTEC STEEL | | Accounts Payable | 41,825.00 | 462,984.62 |
| Bill | 05/02/2006 | #1027 | Union County Bridge | Union Station | | Accounts Payable | 18,300.00 | 481,284.62 |
| **Total AZTEC STEEL** | | | | | | | 481,284.62 | 481,284.62 |
| **B+E CONSTRUCTION** | | | | | | | | |
| Bill | 02/02/2006 | 006C | TRAVEL | RTE 119 NASHUA RIVER BRIDGE | | Accounts Payable | 234.00 | 234.00 |
| **Total B+E CONSTRUCTION** | | | | | | | 234.00 | 234.00 |
| **Budd Brothers** | | | | | | | | |
| Bill | 03/25/2006 | #1012 | Fidelity Building #1012 | Fidelity Building | | Accounts Payable | 22,500.00 | 22,500.00 |
| Bill | 05/13/2006 | #1019 | U Mass, Lowell #1019 | U Mass, Lowell | | Accounts Payable | 4,460.00 | 26,960.00 |
| Bill | 05/13/2006 | #1028 | Bay State Rd. Apts #1026 | Bay State Rd. Apts | | Accounts Payable | 5,808.00 | 32,768.00 |
| **Total Budd Brothers** | | | | | | | 32,768.00 | 32,768.00 |
| **BART-LUND** | | | | | | | | |
| Bill | 09/18/2003 | #847 | retail and wire mesh | new eng bio-labs | | Accounts Payable | 24,300.00 | 24,300.00 |
| Bill | 09/18/2003 | #846 | retail and wire mesh | HOME DEPOT WALKERS BROOK | | Accounts Payable | 60,000.00 | 84,300.00 |
| Bill | 09/18/2003 | #848 | | ARCHSTONE APARTMENTS | | Accounts Payable | 18,000.00 | 102,300.00 |
| Bill | 04/22/2004 | #906 | retail and wire mesh | STOP + SHOP | | Accounts Payable | 26,342.00 | 128,642.00 |
| Bill | 07/01/2004 | #940 | | JOHNSON STREET BRIDGE | | Accounts Payable | 1,222.84 | 129,864.84 |
| Bill | 10/22/2004 | #948 | | JOHNSON STREET BRIDGE | | Accounts Payable | 1,222.84 | 131,177.68 |
| **Total BART-LUND** | | | | | | | 131,177.68 | 131,177.68 |
| **BEAR STEEL ERECTORS INC.** | | | | | | | | |
| Bill | 04/16/2006 | #1014 | | Chicopee Comp High School | | Accounts Payable | 16,890.00 | 16,890.00 |
| **Total BEAR STEEL ERECTORS INC.** | | | | | | | 16,890.00 | 16,890.00 |

CONFIDENTIAL

10:16 AM
05/18/06
Accrual Basis

CONFIDENTIAL

# LOCAL 7 TARGET FUND
## Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|------|------|-----|------|---------|-----|-------|--------|---------|
| **Total BEAM STEEL ERECTORS INC** | | | | | | | 16,886.00 | 16,886.00 |
| **BEL-LIN** | | | | | | | | |
| Bill | 12/29/1999 | 0060 | | CVS DORCHESTER | | Accounts Payable | 20,405.00 | 20,405.00 |
| Bill | 03/06/2001 | 0085 | | BRIGHTON HIGH SCH | | Accounts Payable | 11,050.00 | 31,455.00 |
| Bill | 09/07/2004 | 0523 | | HOLBROOK PUBLIC SAFETY BLDG | | Accounts Payable | 11,251.34 | 42,651.36 |
| Bill | 08/20/2004 | 0526 | | HOLBROOK PUBLIC SAFETY BLDG | | Accounts Payable | 53,902.72 | 53,902.72 |
| Bill | 01/13/2005 | 0907 | | BRICKWORKS | | Accounts Payable | 15,900.00 | 68,902.72 |
| Bill | 06/04/2005 | 967-A | Brickworks Addendum | BRICKWORKS | | Accounts Payable | 3,045.00 | 71,947.72 |
| **Total BEL-LIN** | | | | | | | 71,947.72 | 71,947.72 |
| **BOSTON STEEL** | | | | | | | | |
| Bill | 05/20/2002 | 755 | SPECIAL CONDITIONS | HARVARD HOUSING PROJECT | | Accounts Payable | 24,736.00 | 24,736.00 |
| **Total BOSTON STEEL** | | | | | | | 24,736.00 | 24,736.00 |
| **BOSTON STEEL CORP** | | | | | | | | |
| Bill | 05/01/2001 | # 112 | GRAND-FATHERED JOBS | GRAND-FATHERED JOBS | | Accounts Payable | 10,125.00 | 10,125.00 |
| Bill | 06/07/2001 | GR-2 | GRAND-FATHERED JOBS | GRAND-FATHERED JOBS #3 | | Accounts Payable | 3,437.73 | 13,562.61 |
| Bill | 06/07/2001 | VARIOUS | GRAND-FATHERED JOBS | GRAND-FATHERED JOBS #2 | | Accounts Payable | 11,996.27 | 25,258.98 |
| Bill | 11/02/2001 | | wk971-102461 | GRAND-FATHERED JOBS | | Accounts Payable | 10,619.44 | 35,878.34 |
| Bill | 01/26/2002 | | 1001-1001-011602 | GRAND-FATHERED JOBS | | Accounts Payable | 13,446.10 | 49,374.44 |
| Bill | 03/04/2002 | GRAND-6 | WE 2/20/02 | GRAND-FATHERED JOBS-B | | Accounts Payable | 5,287.31 | 54,661.75 |
| **Total BOSTON STEEL CORP** | | | | | | | 54,661.75 | 54,661.75 |
| **BUILDERS RESOURCE CORP.** | | | | | | | | |
| Bill | 02/14/2001 | 0085 | STONE-HAM CENTRAL SCHOOL | STONE-HAM CENTRAL SCHOOL | | Accounts Payable | 24,321.55 | 24,325.55 |
| Bill | 03/06/2001 | 0087 | BLDG. A | DLN COLLEGE BLDG. A | | Accounts Payable | 31,500.00 | 55,825.55 |
| Bill | 03/06/2001 | 0088 | BLDG. H1 | DLN COLLEGE BLDG. H1 | | Accounts Payable | 22,500.00 | 78,325.55 |
| Bill | 05/01/2001 | # 714 | STRUCTURAL STEEL | BRIDGE-WATER STATE COLLEGE | | Accounts Payable | 17,895.46 | 96,221.01 |
| Bill | 11/12/2001 | # 734 | STRUCTURAL STEEL | WELLESLEY LIBRARY PROJECT | | Accounts Payable | 27,290.00 | 123,510.00 |
| Bill | 11/12/2001 | # 735 | STRUCTURAL STEEL | WELLESLEY LIBRARY PROJECT | | Accounts Payable | 30,219.87 | 153,729.87 |
| Bill | 06/13/2002 | # 759 | STRUCTURAL STEEL | CHANDLER SCHOOL, DUXBURY | | Accounts Payable | 21,282.00 | 175,012.87 |
| Bill | 01/03/2003 | # 716 | STRUCTURAL STEEL | CENTER SCHOOL PROJECT | | Accounts Payable | 28,152.00 | 203,164.87 |
| Bill | 01/03/2003 | # 798 | STRUCTURAL STEEL | EGERLY EARLY CHILDHOOD CTR | | Accounts Payable | 28,723.58 | 232,488.45 |
| Bill | 12/06/2003 | # 862 | STRUCTURAL STEEL | BEDFORD PUBLIC WORKS | | Accounts Payable | 8,520.00 | 241,008.45 |
| **Total BUILDERS RESOURCE CORP.** | | | | | | | 241,008.45 | 241,008.45 |
| **BUILDERS RESOURCE INC.** | | | | | | | | |
| Bill | 06/20/2004 | # 912 | | N.E.C.C. | | Accounts Payable | 24,060.00 | 24,060.00 |
| Bill | 07/01/2004 | # 928 | | WESTFIELD STATE COLLEGE | | Accounts Payable | 6,000.00 | 30,060.00 |
| Bill | 07/10/2004 | # 911 | | ASHLAND HIGH SCHOOL | | Accounts Payable | 38,000.00 | 68,060.00 |
| Bill | 08/11/2004 | # 926 | | central place apts | | Accounts Payable | 66,600.00 | 134,660.00 |
| Bill | 08/11/2004 | # 929 | | WESTFIELD STATE COLLEGE | | Accounts Payable | 40,000.00 | 174,660.00 |
| Bill | 12/16/2004 | # 928 A | | westfield state college 2 | | Accounts Payable | 6,000.00 | 180,660.00 |
| Bill | 12/29/2004 | # 961 | | SILVER LAKE SCHOOL | | Accounts Payable | 96,660.00 | 277,320.00 |
| Bill | 12/29/2004 | # 962 | | WILLIAMS SCHOOL | | Accounts Payable | 51,186.00 | 328,506.00 |
| Bill | 12/29/2004 | # 963 | | HOLYOKE COMMUNITY COLLEGE | | Accounts Payable | 28,100.00 | 387,606.00 |
| Bill | 12/29/2004 | # 964 | | AUBURN HIGH SCHOOL | | Accounts Payable | 72,000.00 | 427,606.00 |
| Bill | 02/04/2005 | 929-A | | CENTRAL PLACE APARTMENTS | | Accounts Payable | 15,318.00 | 443,124.00 |
| Bill | 12/29/2004 | # 968 | | Oliver Ames School | | Accounts Payable | 76,555.00 | 519,679.00 |
| Bill | 03/19/2005 | # 973 | | MYSTIC CENTER PROJECT | | Accounts Payable | 228,540.00 | 748,219.00 |

CONFIDENTIAL

DEF 04719

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
December 1, 1999 through May 18, 2006

CONFIDENTIAL

CONFIDENTIAL

DEF 04720

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|

*Total BUILDERS RESOLUTE INC.* — 1,586,706.50 — 1,586,706.50

**CAPCO**

| Bill | 12/10/1999 | 0027-B | ADDITIONAL WORK-EXTENTION #0027-A | RIVERSIDE CENTER | | Accounts Payable | 21,790.00 | 21,790.00 |
| Bill | 10/24/2001 | #725 | STEEL ERECTION-RETROFIT | NECCO PROJECT REVERE | | Accounts Payable | 236,000.00 | 257,790.00 |
| Bill | 04/24/2003 | #718 | STRUCTURAL | WALKERS BROOK | | Accounts Payable | 178,750.00 | 436,530.00 |
| Bill | 06/03/2003 | #725-A | STRUCTURAL | REHAB | | Accounts Payable | 29,750.00 | 466,280.00 |
| Bill | 07/07/2003 | #725-A | REHAB | NECCO Revere | | Accounts Payable | 18,619.25 | 484,899.25 |
| Bill | 09/22/2003 | #832 | LAST SEGMENT | NECCO Revere | | Accounts Payable | 394,032.00 | 878,931.25 |
| Bill | 12/21/2003 | #852 | STRUCTURAL & PRECAST | HIGH POINT | | Accounts Payable | 45,000.00 | 923,931.25 |
| Bill | 11/25/2003 | #841 | | MIDDLESEX JAIL | | Accounts Payable | 32,000.00 | 955,931.25 |
| Bill | 03/15/2004 | #816-A | | RAYTHEON WALTHAM | | Accounts Payable | 32,000.00 | 987,931.25 |
| Bill | 03/15/2004 | #816-A | VOID | WALKERS BROOK 2 | | Accounts Payable | 101,000.00 | 1,066,931.25 |
| Bill | 05/16/2004 | 815-A | | WALKERS BROOK 2 | | Accounts Payable | 0.00 | 1,066,931.25 |
| Bill | 01/13/2005 | #965 | | INTERNATIONAL AIR | | Accounts Payable | 101,000.00 | 1,157,931.25 |
| Bill | 01/31/2006 | #966 | | STRYKER BIOTECH- | | Accounts Payable | 28,200.00 | 1,186,131.25 |
| Bill | 03/17/2006 | #1023 | Silver Lake School 2 | Silver Lake School 2 | | Accounts Payable | 92,000.00 | 1,278,131.25 |

*Total CAPCO* — 1,278,131.25 — 1,278,131.25

**COLLINS WELDING**

| Bill | 06/30/2002 | # 786 | SPECIAL NETS | | | Accounts Payable | 3,397.50 | 3,397.50 |
| Bill | 11/27/2002 | # 785 | MISC. METALS | | | Accounts Payable | 2,350.00 | 5,747.50 |

*Total COLLINS WELDING* — 5,747.50 — 5,747.50

**COLONIAL STEEL CORP**

| Bill | 08/03/2003 | 826 | STRUCTURAL STEEL | 101 HUNTINGTON AVE | | Accounts Payable | 12,210.00 | 12,210.00 |
| Bill | 11/25/2003 | 698-A | | OLD DANFORTH ST BRIDGE | | Accounts Payable | 1,752.00 | 13,962.00 |
| Bill | 04/21/2004 | # 904 | | OLD DANFORTH ST BRIDGE | | Accounts Payable | 21,300.00 | 35,262.00 |

*Total COLONIAL STEEL CORP* — 35,262.00 — 35,262.00

**Commodore Builders**

| Bill | 11/06/2005 | #996 | EZ Storage Project | EZ Storage Project | | Accounts Payable | 49,050.00 | 49,050.00 |

*Total Commodore Builders* — 49,050.00 — 49,050.00

**CONCRETE STRUCTURES INC.**

| Bill | 03/17/2000 | SPECIAL | H-W COVERAGE SALTS | CONCRETE STRUCTURES INC. | | Accounts Payable | 3,678.22 | 3,678.22 |

DEF 04721

16:16 AM
05/18/06
Accrual Basis

# LOCAL 7 TARGET FUND
## Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

CONFIDENTIAL

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **CONSTRUCTION MANAGEMENT** | | | | | | | | |
| **CONCRETE STRUCTURES INC** | | | | | | | | |
| Bill | 11/07/2000 | #718 | GRANDFATHER | BENEFITS - WAGES | | Accounts Payable | 75,000.00 | 76,678.22 |
| Bill | 10/01/2000 | #796 | | PRECAST ERECTION | | Accounts Payable | 8,500.00 | 85,178.22 |
| Bill | 10/01/2000 | #796 | | PRECAST ERECTION | | Accounts Payable | 6,875.00 | 92,053.22 |
| Bill | 10/22/2003 | #951 | | OVERLOOK RIDGE | | Accounts Payable | 20,000.00 | 112,053.22 |
| Bill | 04/21/2004 | #901 | | MARTIGNETTIS | | Accounts Payable | 2,100.00 | 114,153.22 |
| Bill | 04/22/2004 | #905 | | MITRE CENTER | | Accounts Payable | 15,150.00 | 129,303.22 |
| Bill | 06/29/2005 | #678 | Mystic Center Project | CONCRETE STRUCTURES INC | | Accounts Payable | 15,000.00 | 144,303.22 |
| **Total CONCRETE STRUCTURES INC** | | | | | | | 144,303.22 | 144,303.22 |
| **CWS** | | | | | | | | |
| Bill | 01/24/2001 | #SC-12 | SPECIAL REINFORCING | U MASS LOWELL PROJECT | | Accounts Payable | 10,554.00 | 10,554.00 |
| Bill | 03/20/2002 | #740 | STRUCTURAL STEEL | WEATHERBEE SCHOOL | | Accounts Payable | 28,224.00 | 38,808.00 |
| Bill | 11/07/2002 | #793 | STRUCTURAL STEEL | MEMORIAL SCHOOL, MEDFIELD | | Accounts Payable | 22,475.00 | 61,283.00 |
| Bill | 02/10/2003 | #740-A | STRUCTURAL STEEL | WEATHERBEE SCHOOL | | Accounts Payable | 2,848.96 | 64,131.96 |
| Bill | 04/20/2003 | #815 | STRUCTURAL STEEL - SUPPLEMENT | HANOVER WATER TREATMENT | | Accounts Payable | 11,410.00 | 75,541.96 |
| Bill | 11/20/2003 | #835 | STRUCTURAL | META ABBOWAY | | Accounts Payable | 40,000.00 | 115,541.96 |
| Bill | 12/05/2003 | #835 | | HARRINGTON ELEMENTARY | | Accounts Payable | 32,600.00 | 148,141.96 |
| Bill | 05/05/2004 | #655 | | H-ARRINGTON SCHOOL | | Accounts Payable | 30,000.00 | 178,141.96 |
| **Total CONSTRUCTION MANAGEMENT** | | | | | | | 178,141.96 | 178,141.96 |
| **D & A STEEL INC** | | | | | | | | |
| Bill | 07/30/2004 | #627 | | DEDHAM MIDDLE SCHOOL | | Accounts Payable | 18,750.00 | 18,750.00 |
| **Total D & A STEEL, INC** | | | | | | | 18,750.00 | 18,750.00 |
| **Total CWS** | | | | | | | | |
| **D.C. MONITORING FUND** | | | | | | | | |
| Bill | 03/06/2002 | #3702 | DONATION LABOURE CENTER | LABOURE PROJECT | | Accounts Payable | 16,296.00 | 16,296.00 |
| Bill | 07/30/2002 | #771 | STRUCTURAL STEEL | 405 COCHITUATE RD PROJECT | | Accounts Payable | 18,444.00 | 34,740.00 |
| Bill | 09/26/2002 | #783 | STRUCTURAL STEEL | CARROLL SCHOOL | | Accounts Payable | 31,205.01 | 65,945.01 |
| Bill | 10/29/2002 | #771-A | ADDITIONAL WORK | 405 COCHITUATE RD PROJECT | | Accounts Payable | 2,006.68 | 67,951.69 |
| Bill | 10/31/2002 | #790 | STRUCTURAL STEEL | JOHN ELIOT SCHOOL | | Accounts Payable | 30,900.00 | 98,851.69 |
| Bill | 11/27/2002 | #794 | VOID INSTALL SAFETY NETS | MUNROE PLACE PROJECT | | Accounts Payable | 0.00 | 98,851.69 |
| Bill | 03/14/2003 | 794 | INSTALL SAFETY NETS | MUNROE PLACE PROJECT | | Accounts Payable | 17,000.00 | 115,851.69 |
| **Total D.C. MONITORING FUND** | | | | | | | 115,851.69 | 115,851.69 |
| **D.C. MONITORING FUND** | | | | | | | | |
| Bill | 02/02/2000 | | PER CAPITA JANUARY-JUNE 2000 | DIST COUNC MONITORING FUND | | Accounts Payable | 37,384.10 | 37,384.10 |
| Bill | 02/02/2000 | #808 | SUPPLEMENT | SPECIAL ASSESSMENT-LEGAL | | Accounts Payable | 22,000.00 | 59,384.10 |
| Bill | 05/31/2000 | | PER CAPITA 1700-1200 | PER-CAPITA | | Accounts Payable | 67,344.10 | 126,728.20 |
| Bill | 07/13/2000 | | SPECIAL ASSESSMENT ATTORNEY FEES | PER-CAPITA | | Accounts Payable | 27,579.20 | 154,307.40 |
| Bill | 01/18/2001 | YR 2001 | YEAR 2001 | INDUSTRY | | Accounts Payable | | |
| Bill | 01/17/2002 | PER CAPITA | YEAR 2001 | D C MONITORING PER CAPITA 2002 | | Accounts Payable | | |
| Bill | 01/14/2003 | PER CAPITA | YEAR 2003 - 6 MONTHS | PER CAPITA - 2003 | | Accounts Payable | 90,000.00 | |
| Deposit | 04/30/2003 | Deposit | TARGET FUND CONTRIBUTIONS | CENTURY BANK MONEY MKT | | Accounts Payable | -265,549.60 | 242,844.20 |
| **Total D.C. MONITORING FUND** | | | | | | | 242,844.20 | 242,844.20 |
| **DOREL** | | | | | | | | |
| Bill | 11/21/2000 | SUPPLEMENT | ADDITIONAL WORK, JOB COMPLETED | REEBOK | | Accounts Payable | 7,149.19 | 7,149.19 |
| Bill | 02/10/2000 | #877 | STRUCTURAL STEEL | SILVER LAKE REGIONAL MIDDLE SCH | | Accounts Payable | 57,240.00 | 64,389.19 |
| Bill | 02/10/2004 | #877-A | | BROCK CREDIT UNION | | Accounts Payable | 25,527.00 | 89,916.19 |
| Bill | 07/06/2004 | #877-A | | BOGEN CREDIT UNION | | Accounts Payable | 20,370.00 | 110,286.19 |
| Bill | 07/06/2004 | #920 | | BOGEN CAMBRIDGE | | Accounts Payable | 24,000.00 | 134,286.19 |
| Bill | 07/15/2004 | #877-B | | BROCKTON CREDIT UNION EXT | | Accounts Payable | 20,370.00 | 154,656.19 |

CONFIDENTIAL

DEF 04722

10:16 AM
05/16/06
Accrual Basis

CONFIDENTIAL

**LOCAL 7 TARGET FUND**
**Expenses by Vendor Detail**
December 1, 1999 through May 18, 2005

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **DOREL** | | | | | | | | | |
| | Bill | 07/03/2001 | #711 | RESTORATION | BROCKTON CREDIT UNION EXT | | Accounts Payable | 25,000.00 | 179,656.19 |
| | Bill | 06/01/2004 | #825 | STRUCTURAL STEEL | WALDEN PLACE | | Accounts Payable | 79,275.00 | 258,856.19 |
| | Bill | 06/01/2004 | #826 | SUPPLEMENT | WILMINGTON "T" STATION | | Accounts Payable | 42,450.00 | 301,306.19 |
| | Bill | 11/14/2004 | #847 | | FARM HARVARD STREET | | Accounts Payable | 301,306.16 | 301,306.19 |
| **Total DOREL** | | | | | | | | 301,306.16 | 301,306.19 |
| **EDM** | | | | | | | | | |
| | Bill | 06/20/2002 | #757 | | EASTERN LUMBER PROJECT | | Accounts Payable | 564.46 | 564.46 |
| | Bill | 10/01/2002 | #785 | | WILMINGTON "T" STATION | | Accounts Payable | 10,931.90 | 10,942.28 |
| | Bill | 07/16/2003 | #787 | | SUPPLEMENT | | Accounts Payable | 4,905.08 | 15,847.36 |
| | Bill | 07/16/2005 | #PK7 | Fearboro Bridge $1 32 ph - $5 00 lc 3 1 d | Fearboro Bridge | | Accounts Payable | 18,861.64 | 18,861.64 |
| | Bill | 04/17/2006 | #1016 | 161 Bridge Greenfiled #1016 | 161 Bridge | | Accounts Payable | 936.00 | 19,767.04 |
| **Total EDM** | | | | | | | | 19,767.04 | 19,767.04 |
| **G.R.C. STEEL L.L.C.** | | | | | | | | | |
| | Bill | 04/21/2004 | #804 | | VENTURE TAPE | | Accounts Payable | 11,460.00 | 11,460.00 |
| | Bill | 06/29/2004 | #813 | | AMESBURY HIGH SCHOOL | | Accounts Payable | 6,120.00 | 17,580.00 |
| | Bill | 07/16/2004 | #906 | | VENTURE TAPE 2 | | Accounts Payable | 15,000.00 | 32,580.00 |
| **Total G.R.C. STEEL L.L.C** | | | | | | | | 32,580.00 | 32,580.00 |
| **GLOBAL ENGINEERING** | | | | | | | | | |
| | Bill | 12/02/2003 | #853 | MVP FORMS JOB | GLOBAL ENGINEERING | | Accounts Payable | 21,120.00 | 21,120.00 |
| | Bill | 12/02/2003 | #853-A | | TRINITY TERRACE | | Accounts Payable | 13,845.18 | 34,965.18 |
| **Total GLOBAL ENGINEERING** | | | | | | | | 34,965.18 | 34,965.18 |
| **GRIFFEN IRON WORKS** | | | | | | | | | |
| | Bill | 12/10/2002 | SPECIAL | I.W.O.C. OF N.E. SPECIAL PROJECT | CARD FURNITURE PROJECT | | Accounts Payable | 10,000.00 | 10,000.00 |
| **Total GRIFFEN IRON WORKS** | | | | | | | | 10,000.00 | 10,000.00 |
| **GRIFFEN STEEL** | | | | | | | | | |
| | Bill | 08/22/2004 | #837 | | WHITMAN HANSON SCHOOL | | Accounts Payable | 21,000.00 | 21,000.00 |
| **Total GRIFFEN STEEL** | | | | | | | | 21,000.00 | 21,000.00 |
| **H B WELDING** | | | | | | | | | |
| | Bill | 11/21/2001 | #737 | STRUCTURAL STEEL | LOWES PROJECT WOBURN | | Accounts Payable | 15,120.00 | 15,120.00 |
| | Bill | 03/26/2002 | #743 | STRUCTURAL STEEL | TARGET STORE KINGSTON | | Accounts Payable | 17,600.00 | 32,720.00 |
| | Bill | 06/13/2003 | #810 | STRUCTURAL STEEL | STOP & SHOP | | Accounts Payable | 3,028.00 | 35,748.00 |
| | Bill | 11/25/2003 | #819 | | STOP NSHOP PEMBROKE | | Accounts Payable | 3,023.00 | 38,773.00 |
| | Bill | 03/16/2004 | #896 | | PIER ONE IMPORTS | | Accounts Payable | 4,100.00 | 42,873.00 |
| | Bill | 04/12/2004 | #897 | | sax shop Gloucester | | Accounts Payable | 18,568.50 | 61,441.00 |
| | Bill | 06/01/2004 | #807 | | HUDSON STOP & SHOP | | Accounts Payable | 7,000.00 | 68,441.00 |
| | Bill | 07/16/2004 | #824 | | sto & Shop Halifax | | Accounts Payable | 28,830.00 | 97,271.00 |
| | Bill | 07/16/2004 | #823 | | STOP & SHOP Watertown | | Accounts Payable | 4,500.00 | 102,771.00 |
| | Bill | 02/04/2005 | #966 | | Bridgewater/Raynham High School | | Accounts Payable | 84,296.00 | 187,067.00 |
| | Bill | 01/17/2006 | #1004 | Reading High School #1004 | H B WELDING | | Accounts Payable | 6,300.00 | 193,367.00 |
| | Bill | 03/20/2006 | #1004-A | Reading HS #1004-A | Reading High School-A | | Accounts Payable | 25,000.00 | 218,367.00 |
| **Total H B WELDING** | | | | | | | | 218,367.00 | 218,367.00 |
| **HERITAGE IRON WORKS** | | | | | | | | | |
| | Bill | 02/28/2000 | 0007 | MSC. METALS | AMERN SCHOOL FOXBORO | | Accounts Payable | 3,750.00 | 3,750.00 |
| | Bill | 05/31/2001 | #710 | MSC. METALS | BELMONT WARREN SCHOOL | | Accounts Payable | 1,297.44 | 5,047.44 |
| | Bill | 05/31/2001 | #711 | MSC. METALS | NORWELL MIDDLE SCHOOL | | Accounts Payable | 90.64 | 5,138.08 |

CONFIDENTIAL

DEF 04723

10:16 AM
05/18/06
Accrual Basis

CONFIDENTIAL

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
#### December 1, 1999 through May 18, 2006

| | Type | Date | Num | Memo | Account | Clr | Splr | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **HERITAGE IRON WORKS** | | | | | | | | | |
| | Bil | 09/07/2000 | #710-A | MISC. METALS | BELMONT/WARREN SCHOOL | | Accounts Payable | 7,546.06 | 8,196.06 |
| | Bil | 09/07/2001 | #711-A | MISC. METALS | BELMONT/WARREN SCHOOL-4 | | Accounts Payable | 2,448.00 | 10,646.06 |
| **Total HERITAGE IRON WORKS** | | | | | | | | 10,646.06 | 10,646.06 |
| **In & Out Metals, Inc** | | | | | | | | | |
| | Bil | 05/06/2006 | #1030 | | 31 Germaine St | | Accounts Payable | 3,510.00 | 3,510.00 |
| **Total In & Out Metals, INC** | | | | | | | | 3,510.00 | 3,510.00 |
| **INTERSPEC CONSTRUCTION.** | | | | | | | | | |
| | Bil | 10/22/2001 | #729 | | VALLEY HOCKEY RINK MALDEN | | Accounts Payable | 8,100.00 | 8,100.00 |
| | Bil | 02/06/2004 | #875 | | BEDFORD PUB WORKS | | Accounts Payable | 10,850.00 | 18,950.00 |
| **Total INTERSPEC CONSTRUCTION.** | | | | | | | | 18,950.00 | 18,950.00 |
| **INTERSTATE STEEL** | | | | | | | | | |
| | Bil | 02/20/2000 | 0064 | | VETERAN SCHOOL SAUGUS | | Accounts Payable | 16,000.00 | 16,000.00 |
| | Bil | 10/22/2001 | #730 | STEEL ERECTION | ANDOVER SAFETY BUILDING | | Accounts Payable | 10,722.87 | 26,722.87 |
| | Bil | 04/17/2002 | #742 | STEEL ERECTION | SOUTH ST. ELEMENTARY SCHOOL | | Accounts Payable | 32,942.00 | 59,664.87 |
| | Bil | 04/15/2002 | #745 | STEEL ERECTION | WALTHAM MIDDLE SCHOOL | | Accounts Payable | 23,686.00 | 83,350.87 |
| | Bil | 06/05/2003 | #825 | STEEL ERECTION | ANDOVER PUBLIC SAFETY BLDG | | Accounts Payable | 17,015.00 | 100,365.87 |
| | Bil | 09/20/2003 | #825 A | STEEL ERECTION | ANDOVER PUBLIC SAFETY BLDG | | Accounts Payable | 7,141.20 | 107,507.07 |
| | Bil | 09/20/2003 | #843 | STEEL ERECTION | ANDOVER PUBLIC SAFETY BLDG | | Accounts Payable | 17,015.00 | 124,522.07 |
| | Bil | 09/20/2003 | #842 | STEEL ERECTION | ANDOVER PUBLIC SAFETY BLDG | | Accounts Payable | 7,141.20 | 131,663.27 |
| | Bil | 10/21/2003 | #825-B | | ARDISTONE PROPERTIES | | Accounts Payable | 36,000.00 | 167,663.27 |
| | Bil | 10/21/2003 | | | C V S SOMERVILLE | | Accounts Payable | 5,280.00 | 172,973.27 |
| | Bil | 10/21/2003 | | | SUF ANDOVER PUBLIC SAFETY | | Accounts Payable | 6,717.10 | 179,660.37 |
| | Bil | 03/12/2004 | #891 | | municipal service facility | | Accounts Payable | 4,600.00 | 184,260.37 |
| **Total INTERSTATE STEEL** | | | | | | | | 184,260.37 | 184,260.37 |
| **IFSWCH** | | | | | | | | | |
| | Bil | 08/17/2000 | 0077 | Reserve #code #1006 | Reserve Wood | | Accounts Payable | 11,720.00 | 11,720.00 |
| | Bil | 03/15/2004 | #870 | | 2006 CROWN COLONY | | Accounts Payable | 32,000.00 | 43,720.00 |
| | Bil | 04/23/2004 | #w2 | | NEW ENGLAND BIOLABS | | Accounts Payable | 25,250.00 | 68,970.00 |
| | Bil | 02/16/2006 | #1009 | | MITRE CENTER | | Accounts Payable | 15,000.00 | 83,970.00 |
| **Total IFSWCH** | | | | | | | | 83,970.00 | 83,970.00 |
| **INVDC OF N.E.L.M.C.T.** | | | | | | | | | |
| | Bil | 09/26/2000 | ADS-2001 | ADVERTISEMENTS | ADVERTISEMENTS | | Accounts Payable | 20,000.00 | 20,000.00 |
| | Bil | 10/04/2000 | WAGES IN WELD-LFM | LOST WAGES TO BE REIMBURSED | LOST WAGES ACCOUNT | | Accounts Payable | 75,000.00 | 95,000.00 |
| | Bil | 10/04/2000 | ADS-2001 | ORGANIZING ADS | ADVERTISEMENTS ORGANIZING | | Accounts Payable | 60,000.00 | 155,000.00 |
| | Bil | 06/07/2000 | PLAYOFF ADS | ORGANIZING ADS | PATRIOTS NETWORK ADS | | Accounts Payable | 25,000.00 | 185,000.00 |
| | Bil | 03/02/2002 | | ORGANIZING ADS | PATRIOTS NETWORK ADS | | Accounts Payable | 4,125.00 | 189,125.00 |
| | Bil | 01/21/2004 | PER CAPITA - 2003 | | PER CAPITA | | Accounts Payable | 60,000.00 | 249,125.00 |
| **Total INVDC OF N.E.L.M.C.T.** | | | | | | | | 249,125.00 | 249,125.00 |
| **J.STEEL INC.** | | | | | | | | | |
| | Bil | 12/01/1999 | 004-LD | | ADDITIONAL WORK-0.275 GROVE ST NEWTON RIVERSIDE CENTER | | Accounts Payable | 8,195.00 | 8,195.00 |
| | Bil | 12/01/1999 | 004-1-B | | ADDITIONAL WORK BEAL BLDG 90 SECOND ST WALTHAM CO-OP | | Accounts Payable | 2,462.50 | 10,657.50 |
| **Total J.STEEL INC.** | | | | | | | | 10,657.50 | 10,657.50 |
| **KEITH NEWTON** | | | | | | | | | |
| | Bil | 01/13/2000 | | ROSE STEEL BENEFITS WEEK 24/95-7/13/99 SAI KEITH NEWTON | | | | | 5,239.08 | 5,239.08 |

CONFIDENTIAL

CONFIDENTIAL

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
### December 1, 1999 through May 16, 2006

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| KEYSTONE ENGINEERING | Bill | 11/15/2002 | #796 | | MATEP PROJECT | | Accounts Payable | 7,500.00 | 7,500.00 |
| | Bill | 01/21/2003 | 796-J | | MATEP PROJECT | | Accounts Payable | -1,423.00 | 6,825.00 |
| | Bill | 06/05/2003 | #822 | structural steel | WORKERS PLACE Lawrence | | Accounts Payable | 3,340.94 | 12,265.94 |
| Total KEYSTONE ENGINEERING | | | | SUPPLEMENT TO 789 | | | | 12,265.94 | 12,265.94 |
| KOURY | Bill | 03/06/2000 | 0066 | S-S REVERE | REVERE STOP + SHOP | | Accounts Payable | 24,000.00 | 24,000.00 |
| | Bill | 03/15/2000 | 0066-A | S-S REVERE | REVERE STOP + SHOP | | Accounts Payable | 4,200.00 | 28,200.00 |
| | Bill | 11/24/2000 | SUPPLEMENT | S-S REVERE | S-S REVERE | | Accounts Payable | 5,245.00 | 33,445.00 |
| | Bill | 01/15/2001 | SC-11 | SPECIAL | LUCENT-TECHNOLOGIES-WESTFORD | | Accounts Payable | 28,114.90 | 61,559.90 |
| | Bill | 08/15/2002 | #778 | STRUCTURAL STEEL | STOP SHOP WALPOLE | | Accounts Payable | 23,100.00 | 84,659.90 |
| | Bill | 02/05/2003 | #805 | STRUCTURAL STEEL | STOP SHOP WHITMAN | | Accounts Payable | 27,100.00 | 111,659.90 |
| | Bill | 02/07/2003 | #807 | STRUCTURAL STEEL | HOME DEPOT Brockton | | Accounts Payable | 14,922.85 | 126,682.35 |
| | Bill | 04/02/2003 | #778-A | STRUCTURAL STEEL | HOME DEPOT Brockton | | Accounts Payable | 15,622.85 | 141,705.20 |
| | Bill | 04/02/2003 | #778-B | STRUCTURAL STEEL, SUPPLEMENT | HOME DEPOT Brockton | | Accounts Payable | 667.00 | 142,368.20 |
| | Bill | 05/05/2003 | #823 | STRUCTURAL STEEL | STOP +SHOP DANVERS | | Accounts Payable | 33,077.00 | 175,442.20 |
| | Bill | 07/10/2004 | #826 | STRUCTURAL STEEL | WHOLE FOODS | | Accounts Payable | 26,000.00 | 201,445.20 |
| | Bill | 06/30/2004 | #833 | | BEVERLY S&S | | Accounts Payable | 13,000.00 | 215,445.20 |
| Total KOURY | | | | | | | | 215,445.20 | 215,445.20 |
| LABOURE CENTER | Bill | 07/26/2002 | #769 | DONATION BLDG TRADES REHAB + WELDING LABOURE CENTER | | | Accounts Payable | 32,079.60 | 32,079.60 |
| Total LABOURE CENTER | | | | | | | | 32,079.60 | 32,079.60 |
| LEWIS STEEL | Bill | 06/26/2002 | #780 | STRUCTURAL STEEL | COSTCO PROJECT EVERETT | | Accounts Payable | 66,000.00 | 66,000.00 |
| Total LEWIS STEEL | | | | | | | | 66,000.00 | 66,000.00 |
| LOST WAGES MEMEBERS | Bill | 11/07/2000 | WAGES | | WAGES OWED MEMEBERS | | Accounts Payable | 100,000.00 | 100,000.00 |
| | Bill | 11/23/2000 | | | Uncategorized Expenses | | SOVEREIGN BANK TARGET CHECKING | -1,896.04 | 98,103.96 |
| | Deposit | 04/09/2002 | | LOST WAGES | Payroll Expenses | | SOVEREIGN BANK TARGET CHECKING | 27,260.98 | 97,260.98 |
| | Deposit | 03/20/2003 | | Deposit | WAGES OWED MEMEBERS | | Accounts Payable | 100,000.00 | 197,260.98 |
| Total LOST WAGES MEMEBERS. | | | | | | | | 197,260.98 | 197,260.98 |
| Luckern Steel Services | Bill | 01/01/2006 | #990 | Trolley Square Project # 990 | Trolley Square | | Accounts Payable | 13,200.00 | 13,200.00 |
| | Deposit | 01/01/2006 | #1000 | Clair Audi #1000 | Clair Audi | | Accounts Payable | 12,750.00 | 28,950.00 |
| | Bill | 02/06/2006 | #1000-A | Clair Audi Addendum 1000-A | Clair Audi Addendum | | Accounts Payable | 5,000.00 | 30,950.00 |
| Total Luckern Steel Services | | | | | | | | 30,950.00 | 30,950.00 |
| LUCKERN WELDING | Bill | 03/06/2000 | 0069 | HRS CRANE - TRAVEL | DITSON ELEMENTARY SCHOOL | | Accounts Payable | 42,547.00 | 42,547.00 |
| Total LUCKERN WELDING | | | | | | | | 42,547.00 | 42,547.00 |
| M&M Steel | Bill | 03/12/2006 | #970 | Extension | Beverly Hospital Garage | | Accounts Payable | 3,915.00 | 3,915.00 |
| | Bill | 09/14/2006 | #970 A | | Beverly Hospital Garage | | Accounts Payable | 1,740.00 | 5,655.00 |

CONFIDENTIAL

10:16 AM
05/18/06
Accrual Basis

# LOCAL 7 TARGET FUND
## Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

CONFIDENTIAL

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **M&M Steel** | | | | | | | | | |
| | Bill | 06/25/2005 | #695 | Sunray Corp. Project RGR0 | M&M Steel | | Accounts Payable | 5,825.00 | 11,180.00 |
| | Bill | 06/25/2005 | #691 | Sr Augustine parish Center RGR1 | M&M Steel | | Accounts Payable | 1,194.00 | 12,354.00 |
| **Total M&M Steel** | | | | | | | | 12,354.00 | 12,354.00 |
| **M.G. CONSTRUCTION** | | | | | | | | | |
| **Total M.G. CONSTRUCTION** | | | | | | | | | |
| **MacSteel** | | | | | | | | | |
| | Bill | 09/19/2002 | #770 | STRUCTURAL STEEL | BROWN ELEMENTARY SCHOOL | | Accounts Payable | 35,118.00 | 35,118.00 |
| **Total MacSteel** | | | | | | | | 35,118.00 | 35,118.00 |
| **MARR** | | | | | | | | | |
| | Bill | 03/16/2004 | #878 | | BEVERLY HOSPITAL | | Accounts Payable | 27,009.00 | 27,009.00 |
| **Total MARR** | | | | | | | | 27,009.00 | 27,009.00 |
| **MASS BUILT** | | | | | | | | | |
| | Bill | 01/11/2000 | 0065 | SPECIAL PROJECT-BENEFITS | PAUL MCLAUGHLIN YOUTH CENTER | | Accounts Payable | 18,862.86 | 18,862.86 |
| | Bill | 06/26/2000 | 0063-A | SPECIAL PROJECT-BENEFITS | PAUL MCLAUGHLIN YOUTH CENTER | | Accounts Payable | 6,542.48 | 25,405.34 |
| | Bill | 09/24/2005 | #991 | | MILL CREEK CONDOS | | Accounts Payable | 39,816.00 | 39,816.00 |
| | Bill | | | | MILL CREEK CONDOS | | Accounts Payable | 13,200.00 | 53,016.00 |
| | Bill | | | | TEN FEDERAL ST SALEM | | Accounts Payable | 45,753.00 | 98,769.00 |
| **Total MASS BUILT** | | | | | | | | 98,769.00 | 98,769.00 |
| **MASS. BLDG TRADES** | | | | | | | | | |
| | Bill | 06/02/2000 | | PR CAMPAIGN | PR CAMPAIGN | | Accounts Payable | 16,763.00 | 16,763.00 |
| **Total MASS. BLDG TRADES** | | | | | | | | 16,763.00 | 16,763.00 |
| **MAZA CONSTRUCTION** | | | | | | | | | |
| | Bill | 11/27/2002 | #796 | REBAR | HARVARD HOUSING PROJECT | | Accounts Payable | 1,578.42 | 1,578.42 |
| **Total MAZA CONSTRUCTION** | | | | | | | | 1,578.42 | 1,578.42 |
| **MC COURT CONSTRUCTION** | | | | | | | | | |
| | Bill | 11/02/2001 | #731 | CAT PLA | CENTRAL ARTERY PLA | | Accounts Payable | 2,242.98 | 2,242.98 |
| **Total MC COURT CONSTRUCTION** | | | | | | | | 2,242.98 | 2,242.98 |
| **MELO'S RODBUSTER** | | | | | | | | | |
| | Bill | 11/15/2003 | 661 | | LEXUS OF WATERTOWN | | Accounts Payable | 5,000.00 | 5,000.00 |
| | Bill | 11/15/2003 | #687 | | MELO'S RODBUSTERS - LINDEN POND | | Accounts Payable | 3,450.00 | 8,450.00 |
| | Bill | 12/06/2003 | #669 | | PICKERING WHARF | | Accounts Payable | 10,752.00 | 19,202.00 |
| | Bill | 12/06/2003 | #668 | | JORDAN HOSPITAL | | Accounts Payable | 965.00 | 20,167.00 |
| | Bill | 12/06/2003 | #667 | | LINDEN PONDS | | Accounts Payable | 8,280.00 | 28,447.00 |
| | Bill | 07/16/2004 | #625 | | WOBURN HIGH SCHOOL | | Accounts Payable | 30,000.00 | 58,447.00 |
| **Total MELO'S RODBUSTER** | | | | | | | | 58,447.00 | 58,447.00 |
| **MERRIMACK VALLEY STEEL** | | | | | | | | | |
| | Bill | 09/13/2002 | #761 | STRUCTURAL STEEL | GENETICS PROJECT | | Accounts Payable | 12,566.00 | 12,566.00 |
| **Total MERRIMACK VALLEY STEEL** | | | | | | | | 12,566.00 | 12,566.00 |
| **Meticulous Metals** | | | | | | | | | |
| | Bill | 11/30/2005 | #1002 | | E-Z Storage | | Accounts Payable | 5,775.00 | 5,775.00 |
| **Total Meticulous Metals** | | | | | | | | 5,775.00 | 5,775.00 |

CONFIDENTIAL

DEF 04725

10:16 AM
05/18/06
Accrual Basis

DEF 04726

# LOCAL 7 TARGET FUND
## Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

CONFIDENTIAL

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **Total Meticulous Metals** | | | | | | | 5,775.00 | 5,775.00 |
| **MCMETAL, INC.** | | | | | | | | |
| Bill | 02/25/2001 | #723 | SHUT DOWN L/AIRPORT PLA... | LOGAN AIRPORT PROJECT | | Accounts Payable | 578.74 | 578.74 |
| **Total MCMETAL, INC.** | | | | | | | 578.74 | 578.74 |
| **MONADNOCK ERECTORS** | | | | | | | | |
| Bill | 04/27/0000 | 0071 | STRUCTURAL | 610 LINCOLN ST. WALTHAM | | Accounts Payable | 5,200.00 | 5,200.00 |
| Bill | 06/26/2000 | 0074 | STRUCTURAL | LEXINGTON HIGH SCHOOL | | Accounts Payable | 7,750.00 | 12,950.00 |
| Bill | 11/07/2000 | 0078 | STRUCTURAL | DONATO CONST. N.E. | | Accounts Payable | 41,300.00 | 54,250.00 |
| Bill | 01/18/2000 | SPECIAL | SPECIAL WAGE RATE DIFFERENCE | N.E. SCHOOL SPECIAL | | Accounts Payable | 6,174.00 | 60,448.00 |
| Bill | 05/15/2001 | #707 | 2 PROJECTS | ANDOVER MIDDLE SCHOOL | | Accounts Payable | 50,424.00 | 110,923.00 |
| Bill | 05/15/2001 | #707-A | 2 PROJECTS | ANDOVER MIDDLE SCHOOL | | Accounts Payable | 28,640.00 | 139,568.00 |
| **Total MONADNOCK ERECTORS** | | | | | | | 139,568.00 | 139,568.00 |
| **N.E ORNAMENTAL METALS** | | | | | | | | |
| Bill | 11/23/2001 | #736 | STRUCTURAL STEEL | GREYSTONE ELEMENTARY SCHOOL | | Accounts Payable | 62,337.00 | 62,337.00 |
| Bill | 09/13/2002 | #750 | STRUCTURAL STEEL | ALDEN ELEMENTARY SCHOOL | | Accounts Payable | 28,760.00 | 91,097.00 |
| Bill | 06/27/0002 | #160-A | STRUCTURAL STEEL | ALDEN SCHOOL, SUPPLEMENT | | Accounts Payable | 5,616.95 | 96,713.95 |
| Bill | 01/15/2003 | #760-B | STRUCTURAL STEEL | ALDEN SCHOOL, SUPPLEMENT | | Accounts Payable | 699.35 | 97,412.94 |
| **Total N.E ORNAMENTAL METALS** | | | | | | | 97,412.94 | 97,412.94 |
| **NATIONAL STEEL INC.** | | | | | | | | |
| Bill | 03/25/2000 | CONTRACTS | SPECIAL CIRCUMSTANCES | MASS REPORT ANDOVER | | Accounts Payable | 18,000.00 | 18,000.00 |
| Bill | 06/26/2000 | #5-A | SUPPLEMENT | MASS REPORT ANDOVER | | Accounts Payable | 9,000.00 | 27,000.00 |
| Bill | 10/23/2000 | #5-B | SUPPLEMENT | NA REFUSE TECH ANDOVER | | Accounts Payable | 4,500.00 | 31,500.00 |
| **Total NATIONAL STEEL, INC.** | | | | | | | 31,500.00 | 31,500.00 |
| **NEW DURHAM STEEL** | | | | | | | | |
| Bill | 06/06/0000 | 0073 | STRUCTURAL | MASCONOMET H.S | | Accounts Payable | 44,745.00 | 44,745.00 |
| Bill | 07/13/2000 | 0075 | STRUCTURAL | ACTON ELEMENTARY SCHOOL | | Accounts Payable | 40,440.00 | 85,185.00 |
| Bill | 07/13/2000 | 0076 | STRUCTURAL | FORT BANKS ELEMENTARY SCHOOL | | Accounts Payable | 36,600.00 | 121,785.00 |
| Bill | 09/20/2000 | 0078 | STRUCTURAL | LITTLETON HIGH SCHOOL | | Accounts Payable | 43,500.00 | 165,285.00 |
| Bill | 12/14/2000 | 0090 | STRUCTURAL | WOBURN STOP + SHOP | | Accounts Payable | 36,000.00 | 201,285.00 |
| Bill | 01/15/2001 | #705 | STRUCTURAL | WOBURN STOP + SHOP | | Accounts Payable | 69,885.00 | 271,170.00 |
| Bill | 05/15/2001 | #706 | STRUCTURAL + PRECAST | RESIDENCES AT CHESTNUT HILL | | Accounts Payable | 18,000.00 | 289,170.00 |
| Bill | 05/15/2001 | #708 | STRUCTURAL | U MASS LOWELL PROJECT | | Accounts Payable | 18,315.00 | 326,285.00 |
| Bill | 05/21/2001 | #709 | STRUCTURAL | LOWES PROJECT BROCKTON | | Accounts Payable | 36,800.00 | 348,785.00 |
| Bill | 05/21/2001 | #713 | STRUCTURAL STEEL | LEDGEN PROJECT BILLERICA MA | | Accounts Payable | 23,500.00 | 372,275.00 |
| Bill | 09/26/2001 | #721 | STRUCTURAL STEEL | SHARROCK SCHOOL, WOBURN | | Accounts Payable | 23,400.00 | 372,275.00 |
| **Total NEW DURHAM STEEL** | | | | | | | 372,275.00 | 372,275.00 |
| **NEW ENGLAND ERECTORS** | | | | | | | | |
| Bill | 01/15/2001 | SPECIAL | SPECIAL CONDITIONS | WEST TERMINAL PROJECT | | Accounts Payable | 13,500.00 | 13,500.00 |
| Bill | 01/18/2001 | SPECIAL | SPECIAL CONDITIONS | SCIENCE BLDG. WOODS HOLE | | Accounts Payable | 7,500.00 | 21,000.00 |
| Bill | 03/01/2001 | GRANDFATHER | SPECIAL CONDITIONS | GRANDFATHERED JOBS | | Accounts Payable | 38,960.00 | 60,960.00 |
| Bill | 05/11/2001 | #7-01 | SPECIAL CONDITIONS | NORWELL MIDDLE SCHOOL | | Accounts Payable | 13,800.00 | 74,760.00 |
| Bill | 05/11/2001 | #7-02 | SPECIAL CONDITIONS | DONOVAN SCHOOL, SALEM | | Accounts Payable | 21,000.00 | 95,760.00 |
| Bill | 05/11/2001 | #7-03 | SPECIAL CONDITIONS | YARMOUTH POLICE STATION | | Accounts Payable | 74,760.00 | 100,560.00 |
| Bill | 05/11/2001 | #7-04 | SPECIAL CONDITIONS | EASTERN EDISON BROCKTON | | Accounts Payable | 4,800.00 | 100,920.00 |
| Bill | 05/11/2001 | #7-05 | SPECIAL CONDITIONS | MARBLEHEAD HIGH SCHOOL | | Accounts Payable | 360.00 | 108,640.00 |
| Bill | 10/22/2001 | #728 | SPECIAL CONDITIONS | MIDDLESEX COUNTY JAIL | | Accounts Payable | 7,720.00 | 112,032.00 |
| Bill | 11/26/2003 | 868 | TRAVEL PAY. | | | Accounts Payable | 3,392.00 | 112,032.00 |

CONFIDENTIAL

DEF 04727

10:16 AM
05/18/06
Accrual Basis

# CONFIDENTIAL

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
#### December 1, 1999 through May 18, 2006

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **NH STEEL ERECTORS** | | | | | | | | | |
| NEW ENGLAND ERECTORS | Bil | 09/28/2001 | # 729 | 2 SCHOOLS | | | Accounts Payable | 112,232.00 | 112,232.00 |
| Total NEW ENGLAND ERECTORS | | | | | | | | 112,232.00 | 112,232.00 |
| North American Steel | Bil | 06/09/2004 | #714 | | ACTON ELEMENTARY - LOPEZ SCHS | | Accounts Payable | 11,673.27 | 11,673.27 |
| | Bil | 06/09/2004 | #715 | | 20 WATERTOWN STREET-ARCH STONE | | Accounts Payable | 14,250.00 | 25,923.27 |
| | Bil | 06/09/2004 | #916 | | LONGFELLOW PLACE APARTMENTS | | Accounts Payable | 46,500.00 | 71,923.27 |
| | Bil | 06/09/2004 | #917 | | NEW LAWRENCE HIGH SCHOOL | | Accounts Payable | 14,608.00 | 86,531.27 |
| | Bil | 06/09/2004 | #917 | | WOBURN HIGH SCHOOL | | Accounts Payable | 9,188.00 | 95,719.27 |
| | Bil | 06/09/2004 | #918 | | BUILDING #1514 | | Accounts Payable | 4,740.00 | 100,459.27 |
| Total North American Steel | | | | | | | | 100,459.27 | 100,459.27 |
| **Total NH STEEL ERECTORS** | | | | | | | | 100,459.27 | 100,459.27 |
| **Northeast Steel Erec.** | Bil | 06/12/2004 | #910 | | T.J. MAX | | Accounts Payable | 14,682.00 | 14,682.00 |
| | Bil | 07/13/2004 | #910 | | T.J. MAX | | Accounts Payable | 14,682.00 | 29,364.00 |
| | Bil | 07/13/2004 | #972 | VOID | T.J. MAX | | Accounts Payable | 0.00 | 29,364.00 |
| | Bil | 03/02/2006 | #972 | | Cheesecake Factory | | Accounts Payable | 31,250.00 | 60,614.00 |
| | Bil | 12/28/2006 | #1035 | | TGI 200 Alewife | | Accounts Payable | 3,150.00 | 63,764.00 |
| **Total Northeast Steel Erec.** | | | | | | | | 63,764.00 | 63,764.00 |
| **Northeast Steel Inc.** | Bil | 07/18/2006 | #989 | | Bourne Mall Project | | Accounts Payable | 14,400.00 | 14,400.00 |
| | Bil | 10/12/2005 | #963 | | Charters Pierhouse Project | | Accounts Payable | 3,000.00 | 17,400.00 |
| | Bil | 10/15/2005 | #965 | | Mulligan Drive Charter School | | Accounts Payable | 7,500.00 | 24,900.00 |
| | Bil | 03/04/2006 | #1015 | LUSO Credit Union #015 | LUSO Credit Union | | Accounts Payable | 11,100.00 | 36,000.00 |
| **Total Northeast Steel Inc.** | | | | | | | | 36,000.00 | 36,000.00 |
| **Total North American Steel** | | | | | | | | | |
| **P & L PARIS** | Bil | 01/21/2003 | #933 | STRUCTURAL | LOEWS PROJECT | | Accounts Payable | 10,325.00 | 10,325.00 |
| | Bil | 04/22/2003 | #953-A | STRUCTURAL SUPPLEMENT | KINGSTON | | Accounts Payable | 2,450.00 | 12,775.00 |
| | Bil | 04/24/2003 | #953-A | STRUCTURAL SUPPLEMENT | KINGSTON | | Accounts Payable | 2,450.00 | 15,225.00 |
| | Bil | 06/13/2003 | #953 B | STRUCTURAL SUPPLEMENT | KINGSTON | | Accounts Payable | 4,107.00 | 19,332.00 |
| **Total P & L PARIS** | | | | | | | | 19,332.00 | 19,332.00 |
| **PATRIOT STEEL CORP.** | Bil | 12/14/2000 | 0081 | STRUCTURAL | OLIN COLLEGE | | Accounts Payable | 29,000.00 | 29,000.00 |
| | Bil | 12/14/2000 | 0082 | MISC. METALS | OLIN COLLEGE PROJECT | | Accounts Payable | 7,000.00 | 36,000.00 |
| | Bil | 01/16/2001 | 0083 | SPECIAL CIRCUMSTANCES TRAVEL | OLIN COLLEGE PROJECT/SPECIAL | | Accounts Payable | 10,000.00 | 46,000.00 |
| | Bil | 01/17/2002 | EXTENSION | STRUCTURAL EXTENSION | OLIN COLLEGE STRUCTURAL EXT | | Accounts Payable | 8,940.00 | 54,940.00 |
| | Bil | 07/07/2003 | #933 | STRUCTURAL EXTENSION | OLIN COLLEGE STRUCTURAL EXT | | Accounts Payable | 44,257.50 | 96,197.50 |
| | Bil | 11/25/2003 | #933 | STRUCTURAL EXTENSION | OLIN COLLEGE END | | Accounts Payable | 44,257.50 | 143,455.00 |
| **Total PATRIOT STEEL CORP.** | | | | | | | | 143,455.00 | 143,455.00 |
| **PERINI** | Bil | 12/03/1999 | | NOV. HRS 1999 WE 10/30/99-11/27/99 | LUCENT TECH | | Accounts Payable | 5,596.01 | 5,596.01 |
| | Bil | 01/03/2000 | | DEC. HRS 1999 WE12/04/99-12/29/99 | LUCENT TECH | | Accounts Payable | 3,116.29 | 8,712.30 |
| | Bil | 02/02/2000 | | JANUARY HRS WE1/01/2000-1/29/2000 | LUCENT TECH | | Accounts Payable | 3,298.17 | 12,010.47 |
| | Bil | 02/28/2000 | | FEBRUARY-MARCH HRS WE2/5/00-3/18/00 | LUCENT TECH | | Accounts Payable | 4,023.45 | 16,033.92 |

CONFIDENTIAL

DEF 04728

10:16 AM
05/18/06
Accrual Basis

**LOCAL 7 TARGET FUND**
**Expenses by Vendor Detail**
December 1, 1999 through May 18, 2006

CONFIDENTIAL

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **Total PERN** | | | | | | | | |
| Bill | 06/17/2000 | | APR'L HOURS W/E 3/25/00-4/29/00 | LUCENT TECH- | | Accounts Payable | 4,770.62 | 20,604.84 |
| Bill | 04/25/2000 | | MAY 1 HRS W/E6/5060/0-06/03/00 | LUCENT TECH- | | Accounts Payable | 3,513.31 | 24,318.15 |
| Bill | 07/13/2000 | | JUNE HRS W/E 6/10/00-7/8/00 | LUCENT TECH- | | Accounts Payable | 3,505.36 | 27,623.51 |
| Bill | 09/25/2000 | | JULY/AUGUST HRS W/E 6/10/00-7/8/00 | LUCENT TECH- | | Accounts Payable | 3,814.96 | 31,738.47 |
| Bill | 10/11/2000 | | AUGUST HRS W/E 9/23/00-09/00/00 | LUCENT TECH- | | Accounts Payable | 2,469.13 | 34,207.60 |
| Bill | 11/21/2000 | | AUGUST/SEPT 00 HRS W/E9/25/00-09/00/00 | LUCENT TECH- | | Accounts Payable | 3,759.20 | 37,966.80 |
| Bill | 11/21/2000 | | NOV/DEC 00 HRS W/E 11/18/00-12/16/00 | LUCENT TECH- | | Accounts Payable | 3,033.76 | 41,000.56 |
| Bill | 12/29/2000 | | DEC 00 HRS/ JAN 01HRS W/E 12/23/00-01/20/01 | LUCENT TECH- | | Accounts Payable | 2,560.00 | 43,557.00 |
| Bill | 01/24/2001 | | JAN 01 HRS /FEB 01 HRS W/E1/27/01-2/24/01 | LUCENT TECH- | | Accounts Payable | 2,314.27 | 45,895.84 |
| Bill | 03/06/2001 | | MARCH 01 HRS W/E 3/03/1-3/31/01 | LUCENT TECH- | | Accounts Payable | 2,176.00 | 48,071.84 |
| Bill | 03/21/2001 | | APR 01 HRS W/E 3/01/-3/01/01 | LUCENT TECH- | | Accounts Payable | 1,883.06 | 49,954.90 |
| Bill | 05/11/2001 | | MAY 01 HRS W/E 04/07/01-04/28/01 | LUCENT TECH- | | Accounts Payable | 3,714.24 | 53,669.14 |
| Bill | 05/18/2001 | | JUNE HRS W/E 6/01-5/26/01 | LUCENT TECH- | | Accounts Payable | 2,891.80 | 53,560.94 |
| Bill | 07/16/2001 | | JULY HRS W/E 6/30-6/30/01 | LUCENT TECH- | | Accounts Payable | 1,216.80 | 56,577.74 |
| Bill | 09/07/2001 | | JULY HRS W/E 7/7/01-8/4/01 | LUCENT TECH- | | Accounts Payable | 940.68 | 57,518.42 |
| Bill | 10/03/2001 | | AUGUST HRS W/E 9/12/01-9/10/01 | LUCENT TECH- | | Accounts Payable | 958.39 | 58,476.61 |
| Bill | 11/02/2001 | | SEPT + OCT HRS W/E 9/23/01-10/21/01 | LUCENT TECH- | | Accounts Payable | 2,396.22 | 60,862.03 |
| Bill | 01/11/2002 | | NOV / DEC 2001 HRS W/E 10/28/01-01/06/02 | LUCENT TECH- | | Accounts Payable | 1,434.00 | 62,906.21 |
| Bill | 03/05/2002 | | JAN - FEB HRS W/E 01/13/02 -02/10/02 | LUCENT TECH- | | Accounts Payable | 5,896.00 | 63,902.11 |
| Bill | 06/04/2002 | | FEB + MARCH HRS W/E 2/17/02-3/17/02 | LUCENT TECH- | | Accounts Payable | 1,915.07 | 65,847.41 |
| Bill | 06/04/2002 | | MARCH-APRIL HRS 2002 W/E 3/24/02-4/21/02 | LUCENT TECH- | | Accounts Payable | 968.30 | 65,622.06 |
| Bill | 06/04/2002 | | APR + MAY HRS W/E 4/28/02-5/26/02 | LUCENT TECH- | | Accounts Payable | 825.65 | 65,659.06 |
| Bill | 07/29/2002 | | JUNE + JULY HRS W/E 6/02/02- 7/7/02 | LUCENT TECH- | | Accounts Payable | 744.80 | 66,437.86 |
| Bill | 09/25/2002 | | JULY + AUGUST 02 HRS W/E 7/13/02-8/25/02 | LUCENT TECH- | | Accounts Payable | 1,362.20 | 67,800.06 |
| Bill | 09/30/2002 | | AUGUST - SEPT 02 HRS W/E 8/31/02- 9/01/02 | LUCENT TECH- | | Accounts Payable | 80.00 | 66,420.06 |
| **Total PHOENIX PERN** | | | | | | | 66,420.06 | 66,420.06 |
| **PHOENIX IRON WORKS** | | | | | | | | |
| Bill | 05/16/2001 | #708 | REINFORCING STEEL | U MASS LOWELL PROJECT | | Accounts Payable | 8,568.00 | 8,568.00 |
| Bill | 06/12/2002 | #753 | REINFORCING STEEL | BOXBOROUGH REGIONAL H S | | Accounts Payable | 14,320.00 | 22,888.00 |
| Bill | 06/25/2002 | #758 | REINFORCING STEEL | WESTFORD MIDDLE SCHOOL | | Accounts Payable | 1,728.00 | 24,616.00 |
| Bill | 06/26/2002 | #781 | REINFORCING STEEL | LINCOLN SUDBURY HIGH SCHOOL | | Accounts Payable | 45,828.00 | 70,444.00 |
| Bill | 01/21/2003 | #802 | REINFORCING STEEL | NEWTON SO.H HIGH SCHOOL | | Accounts Payable | 14,874.00 | 85,168.00 |
| Bill | 05/04/2002 | #846 | | CANTON HIGH SCHOOL | | Accounts Payable | 825.65 | 98,168.00 |
| Bill | 10/21/2003 | #831 | | WEYMOUTH HIGH SCHOOL | | Accounts Payable | 27,572.00 | 98,168.00 |
| Bill | 12/05/2003 | #963 | | PEPPERELL WAST WATER | | Accounts Payable | 12,866.00 | 124,528.00 |
| Bill | 04/21/2004 | #903 | | LAWRENCE HIGH | | Accounts Payable | 54,810.00 | 134,528.00 |
| **Total PHOENIX IRON WORKS** | | | | | | | 180,456.00 | 180,456.00 |
| **Prime Steel** | | | | | | | | |
| Bill | 12/28/2000 | 0084 | GRANDFATHERED JOB D.JONES | GRANDFATHERED | | Accounts Payable | 14,140.00 | 14,140.00 |
| Bill | 01/26/2001 | | STRUCTURAL | SHATTUCK ROAD PROJECT | | Accounts Payable | 32,000.00 | 22,888.00 |
| Bill | 01/26/2001 | | STRUCTURAL | QUINCY STOP+SHOP | | Accounts Payable | 24,616.00 | 24,616.00 |
| Bill | 07/18/2001 | #719 | STRUCTURAL | LEXGEN | | Accounts Payable | 8,235.00 | 54,365.00 |
| Bill | 08/05/2001 | #724 | STRUCTURAL | FOXBOROUGH STOP + SHOP | | Accounts Payable | 22,280.00 | 77,365.00 |
| Bill | 10/22/2001 | #727 | PRECAST ERECTION | WOBURN STOP+ SHOP PROJECT | | Accounts Payable | 14,640.00 | 91,900.00 |
| Bill | 10/22/2001 | #732 | FAMI-STEEL FABRICATION | WOBURN STOP+SHOP | | Accounts Payable | 8,000.00 | 100,605.00 |
| Bill | 11/06/2001 | #726 | STEEL ERECTION | WOBURN STOP+SHOP | | Accounts Payable | 21,115.00 | 122,020.00 |
| Bill | 11/21/2001 | #733 | PRECAST ERECTION | STOP + SHOP EVERETT/ CHELSEA | | Accounts Payable | 7,040.00 | 129,000.00 |
| Bill | 03/10/2003 | 806 | STEEL ERECTION | UNICORN PARK | | Accounts Payable | 120,000.00 | 120,000.00 |
| Bill | 11/25/2003 | 807 | STRUCTURAL | WALTHAM WOODS | | Accounts Payable | 54,400.00 | 183,400.00 |
| Bill | 11/25/2003 | 828 | STRUCTURAL | VILLAGE APT GARAGE | | Accounts Payable | 35,000.00 | 218,400.00 |
| Bill | 11/25/2003 | 855 | STRUCTURAL STEEL & PRECAST | WALTHAM HOSPITAL | | Accounts Payable | 22,320.00 | 240,780.00 |
| Bill | | | | HIGH POINT GARAGE | | Accounts Payable | 8,736.00 | 249,516.00 |

CONFIDENTIAL

10:15 AM
05/18/06
Accrual Basis

# LOCAL 7 TARGET FUND
## Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

**CONFIDENTIAL**

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **Total Prime Steel** | | | | | | | | |
| **PROM NOTE PAYMENT** | | | | | | | | |
| Bill | 12/05/2003 | #958 | Overbook Project #1003 | WATERTOWN LEXUS Prime Steel | | Accounts Payable | 21,666.00 | 271,146.00 |
| Bill | 01/17/2006 | #1003 | | WATERTOWN LEXUS | | Accounts Payable | 21,552.00 | 262,748.00 |
| **Total PROM NOTE PAYMENT** | | | | | | | | 292,748.00 |
| Deposit | 09/04/2003 | Deposit | Deposit | | | CENTURY BANK CHECKING ACCOUNT | -600.10 | -600.10 |
| **Total PROM NOTE PAYMENT** | | | | | | | -600.10 | -600.10 |
| **QUINN BROTHERS.** | | | | | | | | |
| Bill | 06/10/2002 | #764 | STRUCTURAL STEEL | BROCKTON SELF-HELP PROJECT | | Accounts Payable | 3,858.40 | 3,858.40 |
| **Total QUINN BROTHERS** | | | | | | | 3,858.40 | 3,858.40 |
| **RAD STEEL INC.** | | | | | | | | |
| Bill | 12/10/2001 | GRANDFATH | FOX 25 | FOX 25 PROJECT | | Accounts Payable | 10,000.00 | 10,000.00 |
| Bill | 05/01/2002 | GRAND. A | FOX 25 SUPPLEMENT | FOX 25 PROJECT | | Accounts Payable | 15,825.00 | 25,825.00 |
| **Total RAD STEEL INC** | | | | | | | 25,825.00 | 25,825.00 |
| **RED OAK CORP** | | | | | | | | |
| Bill | 02/02/2000 | 0065 | STRUCTURAL | JODREY FISH PIER GLOUCESTER | | Accounts Payable | 16,000.00 | 16,000.00 |
| Bill | 02/04/2000 | 0066 | SPECIAL CONDITIONS | LOEWS THEATER METHUEN | | Accounts Payable | 55,000.00 | 71,000.00 |
| Bill | 03/30/2000 | 0070 | | BRAINTREE MAYNOTT | | Accounts Payable | 10,576.94 | 81,576.94 |
| Bill | 08/17/2000 | LOST WAGES | SPECIAL CONDITIONS TO BE REIMBURSED | ALLSTON LIBRARY | | Accounts Payable | 1,899.04 | 83,475.98 |
| **Total RED OAK CORP** | | | | | | | 83,475.98 | 83,475.98 |
| **REGIS STEEL.** | | | | | | | | |
| Bill | 01/14/2003 | #800 | REBAR | WALTHAM WOODS | | Accounts Payable | 12,800.00 | 12,800.00 |
| Bill | 03/10/2003 | 800.A | REBAR | WALTHAM WOODS | | Accounts Payable | 4,400.00 | 17,200.00 |
| Bill | 03/10/2003 | | VOID REBAR | WALTHAM WOODS | | Accounts Payable | 0.00 | 17,200.00 |
| **Total REGIS STEEL.** | | | | | | | 17,200.00 | 17,200.00 |
| **Saugus Const.** | | | | | | | | |
| Bill | 02/09/2001 | GRANDFATH | GRANDFATHERED JOB | UNITED AIRLINES HANGER | | Accounts Payable | 20,078.70 | 20,078.70 |
| Bill | 03/31/2001 | RUBB BLDG | ADDITIONAL WORK | UNITED AIRLINES HANGER | | Accounts Payable | 1,458.60 | 21,537.30 |
| Bill | 03/26/2002 | #742 | STRUCTURAL STEEL | NORTH WASHINGTON ST BRIDGE | | Accounts Payable | 9,600.00 | 31,137.30 |
| Bill | 04/26/2002 | #750 | PRECAST ERECTION | GALLAGHER PARKING GARAGE | | Accounts Payable | 58,932.00 | 90,069.30 |
| Bill | 05/17/2002 | 750-A | TRAVEL SUPPLEMENT | CHARLES GALLAGHER GARAGE | | Accounts Payable | 1,950.00 | 92,019.30 |
| Bill | 05/02/2003 | #612 | structural | MBTA BRIDGE Carton | | Accounts Payable | 8,470.80 | 100,490.10 |
| Bill | 05/05/2003 | #617 | structural | UPPER CHARLES RIVER RESERVATION | | Accounts Payable | 8,960.00 | 109,450.10 |
| Bill | 06/05/2003 | #618 | structural | UPPER COUNTY BRIDGE Haverhill | | Accounts Payable | 266,250.00 | 369,700.10 |
| Bill | 09/18/2003 | #845 | structural | UPPER CHARLES RIVER RESERVATION | | Accounts Payable | 1,750.00 | 371,450.10 |
| Bill | 09/26/2003 | #844 | structural | SLICE GATE PHASE 3 | | Accounts Payable | 8,400.00 | 379,850.10 |
| Bill | 09/26/2003 | #843 | structural | CONCORD STREET BRIDGE | | Accounts Payable | 2,666.00 | 382,516.10 |
| Bill | 09/26/2003 | #841 | structural | LOWELL STREET BRIDGES | | Accounts Payable | 6,000.00 | 388,516.10 |
| Bill | 09/26/2003 | #840 | structural | GEORGETOWN NEW ACCESS ROAD | | Accounts Payable | 1,210.00 | 389,726.10 |
| Bill | 10/19/2004 | #943 | | WINTER STREET ROAD PROJECT | | Accounts Payable | 34,400.00 | 424,126.10 |
| Bill | 01/12/2006 | #941-A | Lowell St. Bridge #941-A addendum | Lowell St. Bridge | | Accounts Payable | 2,000.00 | 426,126.10 |
| **Total Saugus Const.** | | | | | | | 426,126.10 | 426,126.10 |
| **Seven Star Steel, Inc.** | | | | | | | | |
| Bill | 05/01/2006 | # 1026 | Brittany Place #1026 | Brittany Place | | Accounts Payable | 9,600.00 | 9,600.00 |
| **Total Seven Star Steel, Inc.** | | | | | | | 9,600.00 | 9,600.00 |
| **Total Seven Star Steel Inc.** | | | | | | | 9,600.00 | 9,600.00 |

**CONFIDENTIAL**

DEP 04730

10:16 AM
05/18/06
Accrual Basis

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

CONFIDENTIAL

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **SMITH GARY STEEL** | | | | | | | | | |
| | Bill | 04/07/2004 | # 895 | | SMITH GARY STEEL / NATIONAL GRID | | Accounts Payable | 26,125.00 | 26,125.00 |
| | Bill | 09/23/2004 | # 931 | | NATIONAL GRID | | Accounts Payable | 1,500.00 | 29,625.00 |
| **Total SMITH GARY STEEL** | | | | | | | | 29,625.00 | 29,625.00 |
| **SMITH STEEL** | | | | | | | | | |
| | Bill | 07/01/2004 | # 931 | | NATIONAL GRID | | Accounts Payable | 1,500.00 | 1,500.00 |
| **Total SMITH STEEL** | | | | | | | | 1,500.00 | 1,500.00 |
| **SOUTH SHORE REBAR** | | | | | | | | | |
| | Bill | 09/26/2001 | # 722 | SHUT DOWN AIRPORT PLA | LOGAN AIRPORT PROJECT | | Accounts Payable | 1,401.16 | 1,401.16 |
| **Total SOUTH SHORE REBAR** | | | | | | | | 1,401.16 | 1,401.16 |
| **SPRINGFIELD STEEL** | | | | | | | | | |
| | Bill | 09/13/2002 | # 774 | STRUCTURAL STEEL | SPRINGFIELD D STOP+ SHOP | | Accounts Payable | 11,830.00 | 11,830.00 |
| | Bill | 02/10/2005 | # 971 | | Mass Realty | | Accounts Payable | 8,000.00 | 19,830.00 |
| | Bill | 07/18/2005 | # 498 | | Westfield State Dorms | | Accounts Payable | 2,000.00 | 21,830.00 |
| **Total SPRINGFIELD STEEL** | | | | | | | | 21,830.00 | 21,830.00 |
| **STEARNS** | | | | | | | | | |
| | Bill | 09/10/2001 | # 720 | STRUCTURAL | CHELSEA BOYS + GIRLS CLUB | | Accounts Payable | 34,339.00 | 34,339.00 |
| | Bill | 02/13/2004 | # 862 | | MITRE CENTER | | Accounts Payable | 78,125.00 | 112,464.00 |
| | Bill | 02/13/2004 | # 862 | | MITRE CENTER | | Accounts Payable | 78,125.00 | 190,589.00 |
| | Bill | 02/13/2004 | # 851 | | JORDANS FURNITURE | | Accounts Payable | 365,125.00 | 555,714.00 |
| | Bill | 11/30/2004 | # 960 | | MYSTIC RIVER PROJECT | | Accounts Payable | 51,200.00 | 606,914.00 |
| **Total STEARNS** | | | | | | | | 606,914.00 | 606,914.00 |
| **STEEL CONNECTIONS** | | | | | | | | | |
| | Bill | 07/01/2004 | # 932 | | WASTE WATER TREATMENT PLANT | | Accounts Payable | 10,000.00 | 10,000.00 |
| | Bill | 09/24/2004 | # 932 | | WASTE WATER TREATMENT PLANT | | Accounts Payable | 7,198.00 | 17,198.00 |
| | Bill | 09/23/2004 | # 938 | | BILLERICA WASTEWATER | | Accounts Payable | 61,838.00 | 78,836.00 |
| | Bill | 01/13/2005 | # 938-A | | BILLERICA W W PLANT 2 | | Accounts Payable | 43,600.00 | 122,436.00 |
| **Total STEEL CONNECTIONS** | | | | | | | | 122,436.00 | 122,436.00 |
| **STRESSCON INC.** | | | | | | | | | |
| | Bill | 12/30/1999 | 0061 | | WYNDHAM HOTEL PROJECT | | Accounts Payable | 2,700.00 | 2,700.00 |
| | Bill | 06/11/2002 | # 766 | REBAR | I-495 PROJECT MARSTON ST | | Accounts Payable | 30,424.00 | 33,129.00 |
| **Total STRESSCON INC.** | | | | | | | | 33,129.00 | 33,129.00 |
| **STRUCTURES DEREK** | | | | | | | | | |
| | Bill | 02/13/2004 | # 863 | | LONGVIEW PLACE | | Accounts Payable | 324,000.00 | 324,000.00 |
| | Bill | 06/10/2004 | # 863-A | | LONGVIEW PLACE 2 | | Accounts Payable | 180,000.00 | 504,000.00 |
| **Total STRUCTURES DEREK** | | | | | | | | 504,000.00 | 504,000.00 |
| **STUDS AND STEEL** | | | | | | | | | |
| | Bill | 11/27/2002 | # 797 | STRUCTURAL STEEL | NEWBURY SAFETY COMPLEX | | Accounts Payable | 13,456.00 | 13,456.00 |
| **Total STUDS AND STEEL** | | | | | | | | 13,456.00 | 13,456.00 |
| **SULLIVAN STEEL** | | | | | | | | | |

CONFIDENTIAL

16:16 AM
05/18/06
Accrual Basis

CONFIDENTIAL

**LOCAL 7 TARGET FUND**
**Expenses by Vendor Detail**
December 1, 1999 through May 18, 2006

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **SUPERIOR STEEL, INC.** | | | | | | | | |
| Bil | 06/17/2002 | # 767 | REBAR INSTALLATION | WEATHERBEE SCHOOL | | Accounts Payable | 8,696.38 | 8,696.38 |
| Bil | 10/21/2003 | # 850 | | LONGVIEW PLACE | | Accounts Payable | 25,000.00 | 33,696.38 |
| Bil | 03/16/2004 | # 866 | | LONGVIEW PLACE 2 | | Accounts Payable | 28,500.00 | 62,696.38 |
| Bil | 04/17/2006 | # 1020 | 36 4 St | SUPERIOR STEEL INC | | Accounts Payable | 2,400.00 | 65,096.38 |
| Total SUPERIOR STEEL INC | | | | | | | 65,096.38 | 65,096.38 |
| **THREE BROTHERS IRON** | | | | | | | | |
| Bil | 07/30/2002 | # 773 | ROOF DECKING | WEATHERBEE SCHOOL | | Accounts Payable | 12,848.52 | 12,848.52 |
| Total THREE BROTHERS IRON | | | | | | | 12,848.52 | 12,848.52 |
| **UNCATEGORIZED EXPENSE** | | | | | | | | |
| Bil | 12/15/2000 | PRINTING | | ORGANIZING BROCHURE | | Accounts Payable | 2,010.75 | 2,010.75 |
| Bil | 01/29/2001 | MISC EXP | MFG EXPENSES ETC ORGANIZING | MISC EXPENSES | | Accounts Payable | 25,000.00 | 27,010.75 |
| Total UNCATEGORIZED EXPENSE | | | | | | | 27,010.75 | 27,010.75 |
| **UNERECTORS** | | | | | | | | |
| Bil | 10/31/2002 | # 791 | FINISH PANELS | TUNNEL COURTHOUSE STATION | | Accounts Payable | 150,000.00 | 150,000.00 |
| Bil | 12/11/2005 | # 1001 | Charles MGH #1001 | Charles MGH Station | | Accounts Payable | 24,000.00 | 174,000.00 |
| Bil | 01/27/2006 | # 1006 | Sam H,Field Corner/Shawmut Stations | Sam H Hall, Cor Shaw Sta | | Accounts Payable | 24,000.00 | 198,000.00 |
| Total UNERECTORS | | | | | | | 198,000.00 | 198,000.00 |
| **UNIVERSAL STEEL ERECTORS** | | | | | | | | |
| Bil | 05/20/2005 | #975 | Woburn | Kintse Woods Project | | Accounts Payable | 252,000.00 | 252,000.00 |
| Bil | 07/18/2005 | #792-C | Pleasant St, Apts #1007 | Brookby Village 3,4 | | Accounts Payable | 58,435.00 | 310,435.00 |
| Bil | 12/28/2005 | #1007 | | Pleasant St, Apts | | Accounts Payable | 35,000.00 | 345,435.00 |
| Total UNIVERSAL STEEL ERECTORS | | | | | | | 345,435.00 | 345,435.00 |
| **UNIVERSAL STEELERECTORS** | | | | | | | | |
| Bil | 06/13/2002 | # 798 | 3 JOB AGREEMENT FOR BENEFITS + TRAVEL | GRANDFATHERED JOBS | | Accounts Payable | 348,574.00 | 348,574.00 |
| Bil | 06/26/2002 | # 798-A | | GRANDFATHERED JOBS | | Accounts Payable | 33,982.20 | 383,566.20 |
| Bil | 11/07/2002 | # 762 | SUPPLEMENT | BROCKSBY VILLAGE 2.2 | | Accounts Payable | 36,435.00 | 419,981.20 |
| Bil | 02/05/2003 | # 806 | STRUCTURAL STEEL | BROCKSBY VILLAGE 2.2 | | Accounts Payable | 28,720.00 | 448,691.20 |
| Bil | 02/13/2003 | # 761 B | STRUCTURAL STEEL | NICHOLS VILLAGE, Groveland | | Accounts Payable | 2,082.86 | 451,774.06 |
| Bil | 02/13/2003 | # 761 B | SUPPLEMENT TO 761 | NICHOLS VILLAGE Groveland | | Accounts Payable | 2,082.86 | 453,856.92 |
| Bil | 06/12/2003 | #810 | SUPPLEMENT TO 761 | NICHOLS VILLAGE Groveland | | Accounts Payable | 44,250.00 | 498,106.92 |
| Bil | 06/12/2003 | #827 | | ALCOTT ELEM SCHOOL | | Accounts Payable | 25,000.00 | 523,106.92 |
| Bil | 07/21/2003 | 762-A | | CATHOLIC MEDICAL CENTER | | Accounts Payable | 42,435.00 | 565,541.92 |
| Bil | 07/21/2003 | 762-A | | BROCKSBY VILLAGE 2.2 | | Accounts Payable | 15,000.00 | 580,541.92 |
| Bil | 09/05/2003 | 813 | | 22 BEECHWOOD ST DORCHESTER | | Accounts Payable | 8,560.00 | 589,101.92 |
| Bil | 09/02/2003 | 813-A | | 22 BEECHWOOD ST | | Accounts Payable | 5,600.00 | 594,701.92 |
| Bil | 09/03/2003 | 813-A | | MORNINGSTAR BAPTIST CHURCH | | Accounts Payable | 14,680.70 | 609,382.62 |
| Bil | 10/21/2003 | 856 | | 22 BEECHWOOD ST | | Accounts Payable | 14,681.00 | 624,083.62 |
| Bil | 10/21/2003 | 810 | SUPPLEMENT | ALCOTT ELEM SCHOOL | | Accounts Payable | 44,250.00 | 668,333.62 |
| Bil | 11/25/2003 | 813-A | | ALCOTT ELEM SCHOOL | | Accounts Payable | 20,000.00 | 688,333.62 |
| Bil | 11/25/2003 | 792-B | | HARVARD ST PARK GARAGE | | Accounts Payable | 43,387.30 | 731,720.92 |
| Bil | 12/06/2003 | 864 | | BROCKSBY PHASE 22 | | Accounts Payable | 26,000.00 | 757,720.92 |
| Bil | 02/13/2004 | 792-A | | MART PARKING GARAGE | | Accounts Payable | 36,000.00 | 793,720.92 |
| Bil | 07/07/2004 | #879 | | HIGHLAND OVERLOCK | | Accounts Payable | 74,906.00 | 868,626.92 |
| Total UNIVERSAL STEEL ERECTORS | | | | | | | 868,626.92 | 868,626.92 |

CONFIDENTIAL

10:16 AM
05/18/06
Accrual Basis

**DEF 04732**

CONFIDENTIAL

CONFIDENTIAL

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
December 1, 1999 through May 18, 2006

| | Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Bill | 11/21/2004 | # 592-A | | highland overflow addendum | | Accounts Payable | 37,290.00 | 962,825.52 |
| | Bill | 11/21/2004 | # 599 | | MANCHESTER RESIDENCE | | Accounts Payable | 126,695.30 | 1,033,721.22 |
| | Bill | 11/21/2004 | # 792-B | | brooksby vlg 3.3 | | Accounts Payable | 58,425.00 | 1,092,146.22 |
| Total UNIVERSAL STEEL ERECTORS | | | | | | | | 1,092,146.22 | 1,092,146.22 |
| | | | | | | | | | |
| **VALLEY WELDING** | | | | | | | | | |
| | Bill | 09/26/2004 | # 539 | | BILLERICA PRISON | | Accounts Payable | 28,125.00 | 28,125.00 |
| Total VALLEY WELDING | | | | | | | | 28,125.00 | 28,125.00 |
| | | | | | | | | | |
| **VARIOUS CONTRACTORS** | | | | | | | | | |
| | Bill | 11/30/2001 | MULTI | | ROUTE 3 NORTH PROJECT | | Accounts Payable | 50,000.00 | 50,000.00 |
| | Bill | 07/30/2002 | EXTENTION | | ROUTE 3 NORTH PROJECT-A | | Accounts Payable | 500,000.00 | 550,000.00 |
| | Bill | 07/30/2002 | EXTENTION | | VARIOUS CONTRACTORS | | Accounts Payable | 100,000.00 | 650,000.00 |
| | Bill | 03/31/2004 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 50,000.00 | 700,000.00 |
| | Bill | 03/31/2004 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 200,000.00 | 900,000.00 |
| | Bill | 03/31/2004 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 100,000.00 | 1,000,000.00 |
| | Bill | 03/31/2004 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 100,000.00 | 1,100,000.00 |
| | Bill | 05/05/2004 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 50,000.00 | 1,150,000.00 |
| | Bill | 06/04/2006 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 250,000.00 | 1,400,000.00 |
| | Bill | 12/06/2005 | Extension | | McDermott Ventures | | Accounts Payable | 142,000.00 | 1,542,000.00 |
| | Bill | 12/06/2005 | Extension | | VARIOUS CONTRACTORS | | Accounts Payable | 100,000.00 | 1,542,000.00 |
| Total VARIOUS CONTRACTORS | | | | | | | | 1,542,000.00 | 1,542,000.00 |
| | | | | | | | | | |
| **WATER IRON WORKS INC.** | | | | | | | | | |
| | Bill | 03/06/2002 | #3702-A | DONATION | WEST END HOUSE BOYS-GIRLS CLUB | | Accounts Payable | 16,800.00 | 16,800.00 |
| Total WATER IRON WORKS INC. | | | | | | | | 16,800.00 | 16,800.00 |
| | | | | | | | | | |
| **WELD DESIGN** | | | | | | | | | |
| | Bill | 12/06/2003 | #664 | | WALKERS BROOKS | | Accounts Payable | 26,781.00 | 26,781.00 |
| | Bill | 02/04/2005 | #29-A | | Bilerica Prison | | Accounts Payable | 6,750.00 | 33,531.00 |
| Total WELD DESIGN | | | | | | | | 33,531.00 | 33,531.00 |
| | | | | | | | | | |
| **ZICHELLE STEEL ERECTORS.** | | | | | | | | | |
| | Bill | 03/26/2002 | # 741 | STRUCTURAL STEEL | GREYSTONE SCHOOL | | Accounts Payable | 15,336.00 | 15,336.00 |
| | Bill | 03/26/2002 | # 744 | STRUCTURAL STEEL | DUNSTABLE REGIONAL HIGH SCHOOL | | Accounts Payable | 51,750.00 | 67,086.00 |
| | Bill | 02/26/2002 | # 745 | STRUCTURAL STEEL | NORTH ANDOVER HIGH SCHOOL | | Accounts Payable | 189,608.00 | 256,694.00 |
| | Bill | 04/10/2002 | GRANDFATH | VARIOUS JOBS + H+W | GRANDFATHERED JOBS + H+W | | Accounts Payable | 57,187.50 | 313,881.50 |
| | Bill | 04/20/2002 | # 749 | STRUCTURAL STEEL | WILMINGTON MIDDLE SCHOOL | | Accounts Payable | 42,056.00 | 355,937.50 |
| | Bill | 04/20/2002 | # 752 | STRUCTURAL STEEL | STONEY BROOK MIDDLE SCHOOL | | Accounts Payable | 53,050.00 | 408,987.50 |
| | Bill | 04/30/2002 | # 754 | CRANE RENTAL | LEOMINSTER MIDDLE SCHOOL | | Accounts Payable | 32,400.00 | 441,451.50 |
| | Bill | 06/17/2002 | # 755 | STRUCTURAL STEEL | LINCOLN SUDBURY H.S. | | Accounts Payable | 227,800.00 | 666,291.50 |
| | Bill | 07/31/2002 | # 754 | STRUCTURAL STEEL | LEOMINSTER MIDDLE SCHOOL | | Accounts Payable | 32,400.00 | 701,661.50 |
| | Bill | 09/26/2002 | # 764 | STRUCTURAL STEEL | NEWTON SOUTH HIGH SCHOOL | | Accounts Payable | 49,600.00 | 751,261.50 |
| | Bill | 01/17/2003 | # 784 | STRUCTURAL STEEL | MEDFIELD HIGH SCHOOL | | Accounts Payable | 47,875.00 | 799,136.50 |
| | Bill | 01/17/2003 | # 801 | STRUCTURAL STEEL | KING PHILIP MIDDLE SCHOOL | | Accounts Payable | 51,000.00 | 850,156.50 |
| | Bill | 01/17/2003 | # 804 | STRUCTURAL STEEL | MARBLEHEAD MIDDLE SCHOOL | | Accounts Payable | 22,382.00 | 872,548.50 |
| | Bill | 04/02/2003 | # 752-A | STRUCTURAL STEEL SUPPLEMENT. | STONEY BROOK MIDDLE SCHOOL | | Accounts Payable | 475.00 | 873,023.50 |
| | Bill | 04/24/2003 | # 814 | STRUCTURAL STEEL | ROWLEY PUBLIC LIBRARY | | Accounts Payable | 3,528.00 | 876,551.50 |
| | Bill | 05/06/2003 | # 820 | STRUCTURAL STEEL, Avon | AVON MIDDLE SCHOOL | | Accounts Payable | 18,625.00 | 895,176.50 |
| | Bill | 06/05/2003 | # 621 | STRUCTURAL STEEL | WHITE ELEMENTARY SCHOOL | | Accounts Payable | 28,800.00 | 924,976.50 |
| | Bill | 11/25/2003 | # 634 | STRUCTURAL STEEL | MARION CAMPBELL ARTS | | Accounts Payable | 38,800.00 | 963,776.50 |
| | Bill | 04/21/2004 | # 871 | STRUCTURAL STEEL | lawrence high school | | Accounts Payable | 163,080.00 | 1,126,856.50 |

Page 16

10:16 AM
05/18/06
Accrual Basis

# CONFIDENTIAL

## LOCAL 7 TARGET FUND
### Expenses by Vendor Detail
### December 1, 1999 through May 18, 2006

| Type | Date | Num | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | ZICHELLE STEEL ERECTORS | | | | |
| Bill | 04/21/2004 | #876 | | KATHRYN STOKLOSA SCHOOL | | Accounts Payable | 48,900.00 | 1,115,756.50 |
| Bill | 04/21/2004 | #882 | | WOBURN HIGH SCHOOL | | Accounts Payable | 24,090.00 | 1,196,756.50 |
| Bill | 04/21/2004 | #883 | | DEDHAM MID. SCHOOL | | Accounts Payable | 61,400.00 | 1,251,196.50 |
| Bill | 08/31/2004 | #935 | | NEWBURY COURT | | Accounts Payable | 65,250.00 | 1,325,406.90 |
| Bill | 11/06/2004 | #945 | | WEST REVERE SCHOOL | | Accounts Payable | 64,424.00 | 1,390,030.90 |
| Bill | 11/06/2004 | #947 | | DANVERS MIDDLE SCHOOL | | Accounts Payable | 49,546.00 | 1,440,576.90 |
| Bill | 11/06/2004 | #948 | | WOBURN HIGH SCHOOL | | Accounts Payable | 49,000.00 | 1,489,576.90 |
| Bill | 11/14/2004 | #962 | | THOREAU SCHOOL | | Accounts Payable | 37,850.00 | 1,527,376.90 |
| Bill | 11/14/2004 | #963 | | ARSENAL CENTER FOR THE ARTS | | Accounts Payable | 8,000.00 | 1,535,378.50 |
| Bill | 07/16/2005 | #979 | 2.05 p.h. & 18 c. days | Swampscott High School | | Accounts Payable | 124,450.00 | 1,665,776.90 |
| Bill | 07/16/2005 | #982 | $2.00 p.h. & 20 c. days | Watertown Public Library | | Accounts Payable | 12,500.00 | 1,674,976.50 |
| Bill | 10/31/2005 | #996 | Melrose H.S. #996 | Melrose Middle School | | Accounts Payable | 158,000.00 | 1,830,976.50 |
| | | | | Total ZICHELLE STEEL ERECTORS | | | 1,830,976.50 | 1,830,976.50 |
| | | | **TOTAL** | | | | 16,182,134.20 | 16,182,134.20 |

# CONFIDENTIAL

EXHIBIT 14

**Steel Erectors**
**Stud Welding**
**Miscellaneous Metals**

117 Webster Street, Pawtucket, RI 02861-1017
Telephone 401-727-0323
Fax 401-724-6930



Bacon
EXHIBIT NO. 17
8/24/06

8/6/04

Dear Brother Iron Workers,

I am writing this letter to thank you for excellent work performed on the Stop & Shop project in Halifax, MA. As you may be aware through tough negotiations HB Welding, along with the leadership of Local 7 and help from the target fund, was awarded the steel erection package on this project. The job was to be Ajax's and we were able to take it away from them. The project had an estimated 1,500 manhours to complete. Through the hard work, skill and professionalism of the Iron Workers of both Locals 7 and 37 working together on this project, with no safety infractions, we were able to complete the project ahead of schedule and under budget.

The Target fund had played a key role in successfully procuring a contract on this project. $19.00 per hour from the fund was offered by the leadership and agreed upon which was key in the final negotiations with Stop & Shop. HB Welding is proud to say that the job was a success. That together as a team HB Welding the Iron Workers of Locals 7 and 37 were able to keep the man hours on the contract work down below the estimated 1,500 and were able to pick up some man hours on extras. We must as a team continue to fight the battle against the Open Shop Erectors. We will need to have the resources available to fight the Open Shop Erectors on many projects in the future. This is why HB Welding is offering to give back to the Target Fund $5.of the $19.which was agreed upon at the time of negotiations.

I believe we have built the foundation for a platform that works on this project. I believe if we follow this platform we as a team will be continually successful in the future. Thank you again.

Fraternally yours,

John Bacon

John Bacon

*An Equal Opportunity Employer M/F*

EXHIBIT 14



*HB Welding Inc.*

Steel Erectors
Stud Welding
Miscellaneous Metals

117 Webster Street, Pawtucket, RI 02861-1017
Telephone 401-727-0323
Fax 401-724-6930

*Bacon*

EXHIBIT NO. 17

8/24/06

8/6/04

Dear Brother Iron Workers,

I am writing this letter to thank you for excellent work performed on the Stop & Shop project in Halifax, MA.  As you may be aware through tough negotiations HB Welding, along with the leadership of Local 7 and help from the target fund, was awarded the steel erection package on this project. The job was to be Ajax's and we were able to take it away from them. The project had an estimated 1,500 manhours to complete. Through the hard work, skill and professionalism of the Iron Workers of both Locals 7 and 37 working together on this project, with no safety infractions, we were able to complete the project ahead of schedule and under budget.

The Target fund had played a key role in successfully procuring a contract on this project. $19.00 per hour from the fund was offered by the leadership and agreed upon which was key in the final negotiations with Stop & Shop. HB Welding is proud to say that the job was a success. That together as a team HB Welding the Iron Workers of Locals 7 and 37 were able to keep the man hours on the contract work down below the estimated 1,500 and were able to pick up some man hours on extras. We must as a team continue to fight the battle against the Open Shop Erectors. We will need to have the resources available to fight the Open Shop Erectors on many projects in the future. This is why HB Welding is offering to give back to the Target Fund $5.of the $19.which was agreed upon at the time of negotiations.

I believe we have built the foundation for a platform that works on this project. I believe if we follow this platform we as a team will be continually successful in the future. Thank you again.

Fraternally yours,

John Bacon

*An Equal Opportunity Employer M/F*

EXHIBIT 15

# Local #7 Target Fund Contract # 995



Local #7, through its Target Fund, is offering up to a maximum of one hundred twenty thousand dollars ($120,000.00) reimbursement for the structural steel portion on the Springfield Courthouse, Springfield, Mass.

*Said offer is based on the following conditions:*

Local # 7 will reimburse **Builders Resource Inc. (the contractor)**, a total of two dollars and twenty five cents ($.2.25) per hour, up to a maximum of twelve thousand (12,000) hours, for a possible total reimbursement of twenty-seven thousand dollars ($27,000.00). By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will not be reimbursed by local # 7's Target Fund.

Furthermore, it is agreed that should the covered portion of this project require less than twelve thousand (12,000) hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, only if all of the applicable conditions contained herein were adhered.

*Crane reimbursement:*

Local # 7 agrees to reimburse the contractor up to a maximum of ninety-three thousand dollars ($93,000.00) to assist in defraying crane rental costs. Said payment is based on ninety three (93) "crane days" at a cost of one thousand dollars ($1,000) per crane day, for a maximum of ninety-three (93) days.

It is also clearly understood and agreed, that crane days will be clearly defined for this agreement as the amount of days where the crane was utilized for the entire day, on the work covered under this agreement, by employees working under the collective bargaining agreement of Local # 7. Idle crane days, where the crane is on the job but not utilized, will not be counted or reimbursed. Partial days will be added cumulatively with eight (8) hours constituting a crane day (i.e. two days of using a crane for four hours each day will equal one crane day). It is also clearly understood and agreed that overtime hours are not added into any cumulative sum and no reimbursement will take place. Should this project require less than ninety-three (93) crane days to complete, the contractor will only be reimbursed for the actual amount of crane days that were needed, and then, provided only if all of the applicable conditions contained herein were adhered to.

*It is expressly understood that this reimbursement is being offered, and will only be remitted to the contractor, after it has been clearly established by Local #7 that the following conditions were also met:*

# BUILDERS RESOURCE INC.

Page 1 of 2

## ** STRUCTURAL STEEL BID PROPOSAL **

**Company:** Ocean Steel
**Attn:** Estimating
**From:** John Nirk
**Date:** 11-22-2004

| | |
|---|---|
| US Courthouse | $ 1,350,000.00 |
| Springfield, Ma | $ |
| | $ |

## Qualifications:

1. Bid based on a 40/hr workweek.
2. Price shown on this quote shall be valid for 60 days from bid date.
3. Labor Wage Designation: UNION.
4. Erection Scope of Work: Structural Steel, Metal Deck, Joist and Shear Studs.
5. Retainage of 5% total contract amount may be withheld
6. Retainage will be paid within 30 days after completion of our work.
7. Any back charges against B.R.I. must be either signed by our on-site Foreman or we must be notified by phone and a written copy of charges must be sent to our office as soon as the work is completed.
8. Adequate access inside the foundation & about the site for the work of our trade, Equipment, and a Truck Mounted Crane with adequate lay down & shakeout area for materials.
9. In the event of non-payment, we may suspend work and remove our forces and equipment from the project. Any and all cost including, attorney fees, lost profits and interest incurred by B.R.I. will be the responsibility of the contractor.
10. Project quoted as continuous (one crane trip) and the steel is to be sequenced according to access prior to start, and delivered in sequences ordered by B.R.I.
11. All structural steel is to be fabricated to the fullest extent possible by fabricator.
12. General Contractor is responsible for 24 hour security of Crane, Equipment, etc. (If required)
13. All work performed per A.I.S.C. code of standard practice, S.D.I. and S.J.I.
14. All welding performed per A.W.S D1.1
15. All safety per OSHA standard 1926 Sub-Part R (steel erection)
16. Double handling or storage of materials is not included in this estimate.
17. B.R.I. will not be responsible for Steel, Joist, Deck and or accessories that is moved or damaged by others.
18. Any extra cost, including waiting time for men and equipment due to faulty fabrication, late deliveries, shortages and / or missing Steel, Joist or Deck, is not included in this estimate.
19. T.C. Bolts required.
20. Hung Lentils are to be shipped in frame form and set and welded from Masons Staging at no cost to erector. U.N.O.
21. (2) Lines of Safety Cable at Metal Decked floors, Major Openings, and (1) line at FLAT Metal Roofs.
22. Safety Stantions supplied with pre-punched holes for safety cables by Fabricator.
23. Perimeter Columns shall have shop-punched holes for (2) lines of Safety Cable.
24. Clear and safe access inside existing building to do our work with Man Lifts, Fork Trucks Etc.
25. Any Demolition or Modification to Existing Steel by others.
26. Electrical Power and Hook-Ups supplied by G.C.
27. This Quote is not Valid if O.C.I.P. Insurance is Required ( Other Charges may apply) Any deduct given for O.C.I.P. insurance is a final credit and any other additional premiums will not be the responsibility of B.R.I.
28.

| | |
|---|---|
| Drawing Date: | 09-30-2004 |
| Drawing No.'s: | S-001 to S-004, S-101 to S-111, S201 to S204, S300 to S305, S310 to S312, |
| | S-401 to S403, Adden # 2&3 Spec 05120, 05121, 05300 |

# BUILDERS RESOURCE INC.

Page 2 of 2

## **STRUCTURAL STEEL BID PROPOSAL **

**Project:** US Courthouse Springfield

**Date:** 11-22-2004

# Exclusions:

1. All hoisting for other trades.
2. All Anchor Bolt and Field Surveys.
3. All Permits – Construction, Traffic, Fire…Etc.
4. All Traffic Control (Police and Fire details).
5. Layout of Control Lines and Benchmarks. (G.C. to provide benchmarks and grade lines wherever required).
6. Inspection, Testing of Steel and all Tools required for such testing.
7. Setting and installing of embedded items, Anchor Bolts, Leveling Plates and Nuts.
8. Manpower needed for Fire Watches.
9. Miscellaneous Metals, Metal Stairs and Handrails.
10. Light Gauged materials and all attaching.
11. Shoring and / or Demolition of any kind.
12. Loose Lentils and Masonry Ties.
13. Maintenance and removal of Safety Cables (cables and clamps to be removed and coiled by others for pickup).
14. Window Washing Davits.
15. Field installed Beam Penetrations and / or Notches.
16. Field Paint and / or Touchup Paint.
17. Grout, Skim Coating, Sealants and Caulking.
18. Removal of Debris from site. (We will place debris in dumpster or designated area on site provided by others).
19. Cutting of Roof Decking at Openings.
20. Protection of small-unframed openings.
21. Modifications to Roof Sump Pans for drains, other than installation.
22. Shear Studs on Bar Joist and removal of Ferrules from pour areas.
23. Rubber Closures, Acoustic Insulation and any other field installed insulation.
24. Concrete Core Drilling or cutting of any kind.
25. CMU Wall Retainer Details, Lenton Couplers & Dowels, Rebar, Lateral Support Angles, Seismic Clips of any kind,etc.
26. Snow and / or Ice Plowing, Shoveling or removal.
27. Existing conditions other than clearly shown on #S Drawings.
28. **ALLOWANCES @ S-001**
29. **PRECAST AND CONNECTIONS**
30. **BEAM PENETRATIONS**
31.

Note: Please fill out bottom portion and remit to Builders Resource Inc., at time of jobs award.
    This document is to be used as an exhibit in the contract between the Fabricator and Erector.

Date: _____

Company: _____

Authorized Signature of Acceptance: _____

Title: _____

# BUILDERS RESOURCE INC.

Page 1 of 2
## ** STRUCTURAL STEEL BID PROPOSAL **

| | |
|---|---|
| **Company:** | **Cives** |
| **Attn:** | **Estimating** |
| **From:** | **John Nirk** |
| **Date:** | **11-22-2004** |

| | | |
|---|---|---|
| **US Courthouse** | $ | **1,350,000.00** |
| **Springfield, Ma** | $ | |
| | $ | |

## Qualifications:

1. Bid based on a 40/hr workweek.
2. Price shown on this quote shall be valid for 60 days from bid date.
3. Labor Wage Designation: UNION.
4. Erection Scope of Work: Structural Steel, Metal Deck, Joist and Shear Studs.
5. Retainage of 5% total contract amount may be withheld
6. Retainage will be paid within 30 days after completion of our work.
7. Any back charges against B.R.I. must be either signed by our on-site Foreman or we must be notified by phone and a written copy of charges must be sent to our office as soon as the work is completed.
8. Adequate access inside the foundation & about the site for the work of our trade, Equipment, and a Truck Mounted Crane with adequate lay down & shakeout area for materials.
9. In the event of non-payment, we may suspend work and remove our forces and equipment from the project. Any and all cost including, attorney fees, lost profits and interest incurred by B.R.I. will be the responsibility of the contractor.
10. Project quoted as continuous (one crane trip) and the steel is to be sequenced according to access prior to start, and delivered in sequences ordered by B.R.I.
11. All structural steel is to be fabricated to the fullest extent possible by fabricator.
12. General Contractor is responsible for 24 hour security of Crane, Equipment, etc. (If required)
13. All work performed per A.I.S.C. code of standard practice, S.D.I. and S.J.I.
14. All welding performed per A.W.S D1.1
15. All safety per OSHA standard 1926 Sub-Part R (steel erection)
16. Double handling or storage of materials is not included in this estimate.
17. B.R.I. will not be responsible for Steel, Joist, Deck and or accessories that is moved or damaged by others.
18. Any extra cost, including waiting time for men and equipment due to faulty fabrication, late deliveries, shortages and / or missing Steel, Joist or Deck, is not included in this estimate.
19. T.C. Bolts required.
20. Hung Lentils are to be shipped in frame form and set and welded from Masons Staging at no cost to erector. U.N.O.
21. (2) Lines of Safety Cable at Metal Decked floors, Major Openings, and (1) line at FLAT Metal Roofs.
22. Safety Stantions supplied with pre-punched holes for safety cables by Fabricator.
23. Perimeter Columns shall have shop-punched holes for (2) lines of Safety Cable.
24. Clear and safe access inside existing building to do our work with Man Lifts, Fork Trucks Etc.
25. Any Demolition or Modification to Existing Steel by others.
26. Electrical Power and Hook-Ups supplied by G.C.
27. This Quote is not Valid if O.C.I.P. Insurance is Required ( Other Charges may apply) Any deduct given for O.C.I.P. insurance is a final credit and any other additional premiums will not be the responsibility of B.R.I.
28.

| | |
|---|---|
| Drawing Date: | 09-30-2004 |
| Drawing No.'s: | S-001 to S-004, S-101 to S-111, S201 to S204, S300 to S305, S310 to S312, |
| | S-401 to S403, Adden # 2&3 Spec 05120, 05121, 05300 |

# BUILDERS RESOURCE INC.

Page 2 of 2
## **STRUCTURAL STEEL BID PROPOSAL **

**Project:**  US Courthouse Springfield

**Date:**  11-22-2004

## Exclusions:

1. All hoisting for other trades.
2. All Anchor Bolt and Field Surveys.
3. All Permits – Construction, Traffic, Fire…Etc.
4. All Traffic Control (Police and Fire details).
5. Layout of Control Lines and Benchmarks. (G.C. to provide benchmarks and grade lines wherever required).
6. Inspection, Testing of Steel and all Tools required for such testing.
7. Setting and installing of embedded items, Anchor Bolts, Leveling Plates and Nuts.
8. Manpower needed for Fire Watches.
9. Miscellaneous Metals, Metal Stairs and Handrails.
10. Light Gauged materials and all attaching.
11. Shoring and / or Demolition of any kind.
12. Loose Lentils and Masonry Ties.
13. Maintenance and removal of Safety Cables (cables and clamps to be removed and coiled by others for pickup).
14. Window Washing Davits.
15. Field installed Beam Penetrations and / or Notches.
16. Field Paint and / or Touchup Paint.
17. Grout, Skim Coating, Sealants and Caulking.
18. Removal of Debris from site. (We will place debris in dumpster or designated area on site provided by others).
19. Cutting of Roof Decking at Openings.
20. Protection of small-unframed openings.
21. Modifications to Roof Sump Pans for drains, other than installation.
22. Shear Studs on Bar Joist and removal of Ferrules from pour areas.
23. Rubber Closures, Acoustic Insulation and any other field installed insulation.
24. Concrete Core Drilling or cutting of any kind.
25. CMU Wall Retainer Details, Lenton Couplers & Dowels, Rebar, Lateral Support Angles, Seismic Clips of any kind,etc.
26. Snow and / or Ice Plowing, Shoveling or removal.
27. Existing conditions other than clearly shown on #S Drawings.
28. **ALLOWANCES @ S-001**
29. **PRECAST AND CONNECTIONS**
30. **BEAM PENETRATIONS**
31.

Note: Please fill out bottom portion and remit to Builders Resource Inc., at time of jobs award.
This document is to be used as an exhibit in the contract between the Fabricator and Erector.

Date: _____

Company: _____

Authorized Signature of Acceptance: _____

Title: _____

# BUILDERS RESOURCE INC.

Page 1 of 2
## ** STRUCTURAL STEEL BID PROPOSAL **

| | |
|---|---|
| **Company:** | **Canatal** |
| **Attn:** | **Danny Lapoint** |
| **From:** | **John Nirk** |
| **Date:** | **02-22-2005** |

| | |
|---|---|
| **US Courthouse / Springfield, Ma** | **$ 870,000.00** |
| **Alt Add Approx 57 Pre-Cast Columns** | **$ 50,000.00** |
| | **$** |

## Qualifications:

1. Bid based on a 40/hr workweek.
2. Price shown on this quote shall be valid for 60 days from bid date.
3. Labor Wage Designation: UNION.
4. Erection Scope of Work: Structural Steel, Metal Deck, Joist and Shear Studs.
5. Retainage of 5% total contract amount may be withheld
6. Retainage will be paid within 30 days after completion of our work.
7. Any back charges against B.R.I. must be either signed by our on-site Foreman or we must be notified by phone and a written copy of charges must be sent to our office as soon as the work is completed.
8. Adequate access inside the foundation & about the site for the work of our trade, Equipment, and a Truck Mounted Crane with adequate lay down & shakeout area for materials.
9. In the event of non-payment, we may suspend work and remove our forces and equipment from the project. Any and all cost including, attorney fees, lost profits and interest incurred by B.R.I. will be the responsibility of the contractor.
10. Project quoted as continuous (one crane trip) and the steel is to be sequenced according to access prior to start, and delivered in sequences ordered by B.R.I.
11. All structural steel is to be fabricated to the fullest extent possible by fabricator.
12. General Contractor is responsible for 24 hour security of Crane, Equipment, etc. (If required)
13. All work performed per A.I.S.C. code of standard practice, S.D.I. and S.J.I.
14. All welding performed per A.W.S D1.1
15. All safety per OSHA standard 1926 Sub-Part R (steel erection)
16. Double handling or storage of materials is not included in this estimate.
17. B.R.I. will not be responsible for Steel, Joist, Deck and or accessories that is moved or damaged by others.
18. Any extra cost, including waiting time for men and equipment due to faulty fabrication, late deliveries, shortages and / or missing Steel, Joist or Deck, is not included in this estimate.
19. T.C. Bolts required.
20. Hung Lentils are to be shipped in frame form and set and welded from Masons Staging at no cost to erector. U.N.O.
21. (2) Lines of Safety Cable at Metal Decked floors, Major Openings, and (1) line at FLAT Metal Roofs.
22. Safety Stantions supplied with pre-punched holes for safety cables by Fabricator.
23. Perimeter Columns shall have shop-punched holes for (2) lines of Safety Cable.
24. Clear and safe access inside existing building to do our work with Man Lifts, Fork Trucks Etc.
25. Any Demolition or Modification to Existing Steel by others.
26. Electrical Power and Hook-Ups supplied by G.C.
27. This Quote is not Valid if O.C.I.P. Insurance is Required ( Other Charges may apply) Any deduct given for O.C.I.P. insurance is a final credit and any other additional premiums will not be the responsibility of B.R.I.
28.

| | |
|---|---|
| Drawing Date: | 09-30-2004 |
| Drawing No.'s: | S-001 to S-004, S-101 to S-111, S201 to S204, S300 to S305, S310 to S312, |
| | S-401 to S403, Adden # 2&3 Spec 05120, 05121, 05300 |

101 Nasonville Road, Nasonville, RI 02830  /  Phone: (401) 762-0262  /  Fax: (401) 762-0312  /  E-Mail: (BRIERECTORS@BRI.NECOXMAIL.COM)

# BUILDERS RESOURCE INC.

Page 2 of 2
## **STRUCTURAL STEEL BID PROPOSAL **

**Project:** US Courthouse Springfield

**Date:** 02-22-2005

## Exclusions:

1. All hoisting for other trades.
2. All Anchor Bolt and Field Surveys.
3. All Permits – Construction, Traffic, Fire…Etc.
4. All Traffic Control (Police and Fire details).
5. Layout of Control Lines and Benchmarks. (G.C. to provide benchmarks and grade lines wherever required).
6. Inspection, Testing of Steel and all Tools required for such testing.
7. Setting and installing of embedded items, Anchor Bolts, Leveling Plates and Nuts.
8. Manpower needed for Fire Watches.
9. Miscellaneous Metals, Metal Stairs and Handrails.
10. Light Gauged materials and all attaching.
11. Shoring and / or Demolition of any kind.
12. Loose Lentils and Masonry Ties.
13. Maintenance and removal of Safety Cables (cables and clamps to be removed and coiled by others for pickup).
14. Window Washing Davits.
15. Field installed Beam Penetrations and / or Notches.
16. Field Paint and / or Touchup Paint.
17. Grout, Skim Coating, Sealants and Caulking.
18. Removal of Debris from site. (We will place debris in dumpster or designated area on site provided by others).
19. Cutting of Roof Decking at Openings.
20. Protection of small-unframed openings.
21. Modifications to Roof Sump Pans for drains, other than installation.
22. Shear Studs on Bar Joist and removal of Ferrules from pour areas.
23. Rubber Closures, Acoustic Insulation and any other field installed insulation.
24. Concrete Core Drilling or cutting of any kind.
25. CMU Wall Retainer Details, Lenton Couplers & Dowels, Rebar, Lateral Support Angles, Seismic Clips of any kind,etc.
26. Snow and / or Ice Plowing, Shoveling or removal.
27. Existing conditions other than clearly shown on #S Drawings.
28. **ALLOWANCES @ S-001**
29. **PRECAST AND CONNECTIONS**
30. **BEAM PENETRATIONS**
31.

Note: Please fill out bottom portion and remit to Builders Resource Inc., at time of jobs award.
This document is to be used as an exhibit in the contract between the Fabricator and Erector.

Date: _____

Company: _____

Authorized Signature of Acceptance: _____

Title: _____

# BUILDERS RESOURCE INC.

Page 1 of 2
## ** STRUCTURAL STEEL BID PROPOSAL **

**Company:** Supermetal
**Attn:** Estimating
**From:** John Nirk
**Date:** 11-22-2004



| | | |
|---|---|---|
| US Courthouse | $ | 1,350,000.00 |
| Springfield, Ma | $ | |
| | $ | |

## Qualifications:

1. Bid based on a 40/hr workweek.
2. Price shown on this quote shall be valid for 60 days from bid date.
3. Labor Wage Designation: UNION.
4. Erection Scope of Work: Structural Steel, Metal Deck, Joist and Shear Studs.
5. Retainage of 5% total contract amount may be withheld
6. Retainage will be paid within 30 days after completion of our work.
7. Any back charges against B.R.I. must be either signed by our on-site Foreman or we must be notified by phone and a written copy of charges must be sent to our office as soon as the work is completed.
8. Adequate access inside the foundation & about the site for the work of our trade, Equipment, and a Truck Mounted Crane with adequate lay down & shakeout area for materials.
9. In the event of non-payment, we may suspend work and remove our forces and equipment from the project. Any and all cost including, attorney fees, lost profits and interest incurred by B.R.I. will be the responsibility of the contractor.
10. Project quoted as continuous (one crane trip) and the steel is to be sequenced according to access prior to start, and delivered in sequences ordered by B.R.I.
11. All structural steel is to be fabricated to the fullest extent possible by fabricator.
12. General Contractor is responsible for 24 hour security of Crane, Equipment, etc. (If required)
13. All work performed per A.I.S.C. code of standard practice, S.D.I. and S.J.I.
14. All welding performed per A.W.S D1.1
15. All safety per OSHA standard 1926 Sub-Part R (steel erection)
16. Double handling or storage of materials is not included in this estimate.
17. B.R.I. will not be responsible for Steel, Joist, Deck and or accessories that is moved or damaged by others.
18. Any extra cost, including waiting time for men and equipment due to faulty fabrication, late deliveries, shortages and / or missing Steel, Joist or Deck, is not included in this estimate.
19. T.C. Bolts required.
20. Hung Lentils are to be shipped in frame form and set and welded from Masons Staging at no cost to erector. U.N.O.
21. (2) Lines of Safety Cable at Metal Decked floors, Major Openings, and (1) line at FLAT Metal Roofs.
22. Safety Stantions supplied with pre-punched holes for safety cables by Fabricator.
23. Perimeter Columns shall have shop-punched holes for (2) lines of Safety Cable.
24. Clear and safe access inside existing building to do our work with Man Lifts, Fork Trucks Etc.
25. Any Demolition or Modification to Existing Steel by others.
26. Electrical Power and Hook-Ups supplied by G.C.
27. This Quote is not Valid if O.C.I.P. Insurance is Required ( Other Charges may apply) Any deduct given for O.C.I.P. insurance is a final credit and any other additional premiums will not be the responsibility of B.R.I.
28.

Drawing Date:  09-30-2004
Drawing No.'s:  S-001 to S-004, S-101 to S-111, S201 to S204, S300 to S305, S310 to S312,
S-401 to S403, Adden # 2&3 Spec 05120, 05121, 05300

101 Nasonville Road, Nasonville, RI 02830   /   Phone: (401) 762-0262   /   Fax: (401) 762-0312   /   E-Mail: (BRIERECTORS@BRI.NECOXMAIL.COM)

# BUILDERS RESOURCE INC.

Page 2 of 2
## **STRUCTURAL STEEL BID PROPOSAL **

**Project:** US Courthouse Springfield

**Date:** 11-22-2004

## Exclusions:

1. All hoisting for other trades.
2. All Anchor Bolt and Field Surveys.
3. All Permits – Construction, Traffic, Fire…Etc.
4. All Traffic Control (Police and Fire details).
5. Layout of Control Lines and Benchmarks. (G.C. to provide benchmarks and grade lines wherever required).
6. Inspection, Testing of Steel and all Tools required for such testing.
7. Setting and installing of embedded items, Anchor Bolts, Leveling Plates and Nuts.
8. Manpower needed for Fire Watches.
9. Miscellaneous Metals, Metal Stairs and Handrails.
10. Light Gauged materials and all attaching.
11. Shoring and / or Demolition of any kind.
12. Loose Lentils and Masonry Ties.
13. Maintenance and removal of Safety Cables (cables and clamps to be removed and coiled by others for pickup).
14. Window Washing Davits.
15. Field installed Beam Penetrations and / or Notches.
16. Field Paint and / or Touchup Paint.
17. Grout, Skim Coating, Sealants and Caulking.
18. Removal of Debris from site. (We will place debris in dumpster or designated area on site provided by others).
19. Cutting of Roof Decking at Openings.
20. Protection of small-unframed openings.
21. Modifications to Roof Sump Pans for drains, other than installation.
22. Shear Studs on Bar Joist and removal of Ferrules from pour areas.
23. Rubber Closures, Acoustic Insulation and any other field installed insulation.
24. Concrete Core Drilling or cutting of any kind.
25. CMU Wall Retainer Details, Lenton Couplers & Dowels, Rebar, Lateral Support Angles, Seismic Clips of any kind,etc.
26. Snow and / or Ice Plowing, Shoveling or removal.
27. Existing conditions other than clearly shown on #S Drawings.
28. **ALLOWANCES @ S-001**
29. **PRECAST AND CONNECTIONS**
30. **BEAM PENETRATIONS**
31.

Note: Please fill out bottom portion and remit to Builders Resource Inc., at time of jobs award.
This document is to be used as an exhibit in the contract between the Fabricator and Erector.

Date: _____

Company: _____

Authorized Signature of Acceptance: _____

Title: _____

EXHIBIT 16

FINANCIAL SECRETARY / TREASURER / BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT
PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI
THOMAS M. SHEA


EXHIBIT 12
B.R.I
9/20/05

### INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

## *Local 7*
A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

January 17, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job. The check is in the amount of $47,929.50 and is for 3302 hours. The check is for the weeks ending 10/29 thru 12/31/05.

Sincerely,

James P. Brown

Charles Wright
Agent/Industry Analyst

12(a)

**DEF 08747**

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA 02127

2178

5-7002-2110

PAY TO THE ORDER OF  Builders Resource, Inc

DATE 1-17-06

$ 47,929.50/100

DOLLARS

Springfield Court house
FOR W/E 10/29 Thru 12/31 hrs = 3302
C-days = 40.5
# 995

⑈00 2178⑈  ⑈2110 700 23⑈  ⑈ 1 0 500 690 2⑈

FINANCIAL SECRETARY-TREASURER/BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT
PAUL F. LYNCH

BUSINESS AGENT/INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI
THOMAS M. SHEA

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS



*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

January 23, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job.  The check is in the amount of $4,810.00 and is for 360 hours.  The check is for the week ending 1/7/06.

Sincerely,

James P. Brown
FST/Business Manager

Charles Wright
Business Agent/Industry Analyst

12 (1)

---

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA  02127

2182

DEF 08746      5-7002-2110

DATE 1-21-06

PAY TO THE ORDER OF  Builders Resource, Inc                    $ 4,810 00/100

The sum of U.A.I Garde                                    DOLLARS

Spring. C.H.  Mt. Washington Bank  MW
My Hometown Bank

FOR W/E  1-7-06 - hrs = 360 on pen.
C-lot = 4
# 995

⑈00218211⑈ ⑆211070023⑆ 1 0500690211⑈

James P. Brown
Charles Wright



FINANCIAL SECRETARY-TREASURER BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT
PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

## *Local 7*
### A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

February 6, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job.  The check is for 913.5 hours, 8.5 crane days and is in the amount of $10,555.38. The check is for the weeks ending 1/14/06 thru 1/21/06.

**Please note: This reflects discrepancy of 11 hours, 924.5 reported on Target and 913.5 reported on Benefit report.**

Sincerely,

12(c)

*James P Brown*                    *Charles H. Wright*

---

2201

**IRON WORKERS UNION LOCAL 7**
195 OLD COLONY AVE.
SOUTH BOSTON, MA 02127

DEF 08744          5-7002-2110

DATE  *2-6-06*

PAY TO THE ORDER OF  *Builders Resource, Inc.*          $ *10,555 38/xx*

*The sum of 10555 and 38*          DOLLARS

Mt. Washington Bank
My Hometown Bank

*Spring CH.*                    *James P Brown    Charles H. Wright*    MP

FOR *W/C - 1/14/06 - 1/21/06   hrs = 913.5*
*C - days = 8.5*
*#995*      ⑈00220⑈  ⑆21107002311⑆  05006902⑈

FINANCIAL SECRETARY/TREASURER/BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT
PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI



INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS



*Local 7*
A.F.L.-C.I.O.

195 OLD COLONY AVENUE  •  P.O. BOX 7  •  SOUTH BOSTON, MASSACHUSETTS 02127  •  617-268-4777  •  FAX 617-268-7878

February 28, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job.  The check is for 1361.5 hours, twelve crane days and is in the amount of $15,063.38. The check is for the week ending 1/20 thru 2/3/06.

Sincerely,

James P. Brown                                    Charles Wright

12(d)

---

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA  02127

DEF 08742          2214

5-7002-2110

DATE 2/28/06

PAY
TO THE
ORDER OF    *Builders Resource Inc + NEDC Funds*    $ 15,063.38

*Sum of TEDGY ....*                    DOLLARS

Washington Bank
MW
My Hometown Bank

FOR W/E 1/20 thru 2/3 - hrs = 1361.5
6 days = 12

James P Brown
Charles H Wright

# 995    ⑈002214⑈ ⑇211070023⑈ 1 05006902⑈

FINANCIAL SECRETARY / TREASURER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI





## INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

*Local 7*
A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

March 13, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job. The check is for 1681 hours, twelve and a half crane days and is in the amount of $16,282.25. The check is for the week ending 2/10 thru 2/24/06.

Sincerely,

James P. Brown

James P. Brown

Charles H. Wright

Charles Wright

12(e)

---

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA  02127

DEF 08740

2221

DATE 3/11/06    5-7002-2110

PAY TO THE ORDER OF  Builders Resource, Inc + NEDC Funds    $16,282.25

The sum of 1 6 2 8 2 and 25    DOLLARS

Springfield   My Washington Bank
My Hometown Bank

James P Brown
Charles H. Wright

FOR  W/E- 2/10 thru 2/24 hrs = 1681
                        C-days = 12.5

#995    ⑈002221⑈ ⑆211070023⑇ ⑈ 0500690 2⑈

FINANCIAL SECRETARY / TREASURER / BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI

## INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS



*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

March 24, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job. The check is for 627 hours, 4 crane days and is in the amount of $5,410.75. The check is for the week ending 3/3/06.

Sincerely,

James P. Brown
FST/Business Manager

Charles Wright
Business Agent/Industry Analyst

12(f)

---

DEF 08738

2 2 2 5

**IRON WORKERS UNION LOCAL 7**
195 OLD COLONY AVE.
SOUTH BOSTON, MA 02127

DATE 3/23/06

5-7002-2110

PAY TO THE ORDER OF *Builders Resource, Inc + NEDC Funds*    $ 5,410.75

The sum of 5U10and75    DOLLARS

Spring CH.    Mt. Washington Bank **MW**    My Hometown Bank

FOR W/E - 3/3 - Hrs = 627 - Days = 4

# 995    ⑈002225⑈ ⑆211070023⑆ 1 0500690 2⑈

FINANCIAL SECRETARY-TREASURER-BUSINESS MANAGER
JAMES P. BROWN

BUSINESS AGENTS
MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT
PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST
NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

March 27, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job.  The check is for 602 hours, 5 crane days and is in the amount of $6,345.50.  The check is for the week ending 3/11/06.

Sincerely,

*James P Brown*

James P. Brown

*Charles H. Wright*

12(6)

---

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA  02127

DEF 08736　2231

DATE 3/25/06　5-7002-2110

PAY TO THE ORDER OF _Builders Resource, Inc + NEDC Funds_　$ 6345 50

The sum of 6345 and 50　DOLLARS

_Springfield Courthouse_　MW
FOR _W/E-3/11 - hrs = 602-C-day-5_

_James P Brown_
_Charles H. Wright_

#995　⑈00223⑈ ⑆211070023⑆ 1 0500690 2⑈

FINANCIAL SECRETARY / TREASURER / BUSINESS MANAGER

JAMES P. BROWN

BUSINESS AGENTS

MICHAEL J. DURANT
PATRICK McDERMOTT
EDWIN WRIGHT

PRESIDENT

PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST

NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI
THOMAS M. SHEA

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

## *Local 7*

### A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

May 31, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job. The check is for 1225 hours and is in the amount of $2,756.25. The check is for the weeks ending 4/7 thru 4/29/06.

**Please note: This check is a joint check.**

Sincerely,

James P. Brown

Charles H. Wright

12(h)

---

**IRON WORKERS UNION LOCAL 7**
195 OLD COLONY AVE.
SOUTH BOSTON, MA 02127

**DEF 08732**

2265

5-7002-2110

DATE 5/27/06

PAY TO THE ORDER OF  Builders Resource Inc. + NEDC Funds   $ 2756.25

The sum of 2756 and 25                                   DOLLARS

Springfield C.H.    Mt. Washington Bank

James P. Brown
Charles H. Wright

FOR  W/E - 4/7 thru 4/29 hrs = 1225

#995    ⑂002265⑂ ⑈211070023⑈ ⑈ 050069021⑈

FINANCIAL SECRETARY-TREASURER/BUSINESS MANAGER                                                              PRESIDENT
JAMES P. BROWN                                                                                              PAUL F. LYNCH

BUSINESS AGENTS                                                                                             BUSINESS AGENT / INDUSTRY ANALYST
MICHAEL J. DURANT                                                                                          NEIL CONLEY
PATRICK McDERMOTT                                                                                          CHARLES WRIGHT
EDWIN WRIGHT                                                                                               FIORE GRASSETTI
                                                                                                           THOMAS M. SHEA

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS



*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

June 10, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse job. The check is for 368 hours and is in the amount of $828.00. The check is for the weeks ending 5/6 thru 5/13/06.

**Please note: This check is a joint check.**

Sincerely,

*James P Brown*

*Charles H. Wright*

12(i)

---

IRON WORKERS UNION LOCAL 7                                        DEF 08730              2271
195 OLD COLONY AVE.
SOUTH BOSTON, MA 02127

                                                      DATE 6/10/06          5-7002-2110

PAY
TO THE
ORDER OF  *Builders Resource Inc + NFDC Funds*   $ 828.00

The sum of 828 and

                                                                          DOLLARS

*Springfield CH*   Mt. Washington Bank  MW                     *James P Brown*
My Hometown Bank
FOR W/E -5/6 - 5/13  hrs = 368                    *Charles H. Wright*          MP

#995   ⑈00227⑈⑈ ⑆2110700023⑆ ⑈0500690 2⑈

FINANCIAL SECRETARY/TREASURER / BUSINESS MANAGER

JAMES P. BROWN

BUSINESS AGENTS

EDWIN WRIGHT
MICHAEL J. DURANT
PATRICK McDERMOTT

PAUL F. LYNCH

BUSINESS AGENT / INDUSTRY ANALYST

NEIL CONLEY
CHARLES WRIGHT
FIORE GRASSETTI - Springfield
KEVIN McKINNON - Worcester

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS





*Local 7*

A.F.L.-C.I.O.

195 OLD COLONY AVENUE  •  P.O. BOX 7  •  SOUTH BOSTON, MASSACHUSETTS 02127  •  617-268-4777  •  FAX 617-268-7878
84 HILLMAN STREET  •  SPRINGFIELD, MASSACHUSETTS 01103  •  413-735-1767  •  FAX 413-735-1769
6 WINTER STREET  •  WORCESTER, MASSACHUSETTS 01604  •  508-756-5216  •  FAX 508-754-3735

July 31, 2006

Builders Resource
101 Nasonville Rd
Nasonville, RI 02830

Enclosed please find a check from the Target program for the Springfield Courthouse
job. The check is for 1138 hours and is in the amount of $2,560.50. The check is for the
weeks ending 4/15, 5/19, 5/26 and 6/10/06.

**Please note: This check is a joint check.**

Sincerely,

*James P Brown*                              *Charles H. Wright*

12(J)

---

IRON WORKERS UNION LOCAL 7
195 OLD COLONY AVE.
SOUTH BOSTON, MA  02127

DEF 08728          2293

5-7002-2110

DATE  7/29/06

PAY TO THE ORDER OF  *Builders Resource Inc & NEA Funds*          $ 2,560.50

The sum of 2 5 6 0 and 5 0                                        DOLLARS

Spring C H      Mt. Washington Bank  MW  My Hometown Bank      *James P Brown*

FOR  W/E - 4/15 - 5/19 - 5/26 - 6/10                              *Charles H. Wright*

# 895                                                              H RS = 1138

⑈002293⑈ ⑆211070023⑆ ⑈ 0500690 2⑈

EXHIBIT 17

EXHIBIT

FORM LM-2 LABOR ORGANIZATION
ANNUAL REPORT

U.S. Department of Labor
Employment Standards
Administration
Office of Labor-Management
Standards
Washington, DC 20210

MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR
MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS
IN TRUSTEESHIP

Form Approved
Office of Management and
Budget
No. 1215-0188
Expires: 11-30-2006

This report is manadatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil
penalties as provided by 29 U.S.C. 439 or 440.

| READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT. | | | |
|---|---|---|---|
| For Official Use Only | 1. FILE NUMBER 033-092 | 2. PERIOD COVERED From 7/1/2004 Through 6/30/2005 | 3. (a) AMENDED - Is this an amended report: No (b) HARDSHIP - Filed under the hardship procedures: No (c) TERMINAL - This is a terminal report: No |

| 4. AFFILIATION OR ORGANIZATION NAME IRON WORKERS AFL-CIO | | 8. MAILING ADDRESS (Type or print in capital letters) | |
|---|---|---|---|
| 5. DESIGNATION (Local, Lodge, etc.) LOCAL UNION | 6. DESIGNATION NBR 7 | First Name JAMES | Last Name BROWN |
| 7. UNIT NAME (if any) | | P.O Box - Building and Room Number | |
| | | Number and Street 195 OLD COLONY AVENUE | |
| 9. Are your organization's records kept at its mailing address?   Yes | | City SOUTH BOSTON | |
| | | State MA | ZIP Code + 4 02127 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other
applicable penalties of law, that all of the information submitted in this report (including information contained in any
accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge
and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 26. SIGNED: Paul F Lynch | PRESIDENT | 27. SIGNED: James Brown | TREASURER |
|---|---|---|---|
| Date: Sep 27, 2005 | Contact Info: | Date: Sep 27, 2005 | Contact Info: |

Form LM-2 (Revised 2003)

ASE 000186

## ITEMS 10 THROUGH 21

10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries? — **No**

11. During the reporting period did the labor organization have a Political Action Committee (PAC) fund? — **Yes**

12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative? — **Yes**

13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.) — **No**

14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds? — **$300,000**

15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale? — **No**

16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period? — **No**

17. Did the labor organization have any contingent liabilities at the end of the reporting period? — **No**

18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions? — **No**

19. What is the date of the labor organization's next regular election of officers? — **06/2006**

Form LM-2 (Revised 2003)

20. How many members did the labor organization have at the end of the reporting period? — **2,980**

21. What ar the labor organization's rates of dues and fees?

| Rates of Dues and Fees | | | | | |
|---|---|---|---|---|---|
| Dues/Fees | Amount | | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | 34 | per | MONTH | | |
| (b) Working Dues/Fees | 1.84 | per | HOUR | | |
| (c) Initiation Fees | 100 | per | | | |
| (d) Transfer Fees | 50 | per | | | |
| (e) Work Permits | 5 | per | WEEK | | |

ASE 000187

## STATEMENT A - ASSETS AND LIABILITIES

FILE NUMBER: 033-092

| ASSETS | | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|---|
| **ASSETS** | 22. Cash | | $10,428,071 | $8,966,129 |
| | 23. Accounts Receivable | 1 | $51,937 | $16,931 |
| | 24. Loans Receivable | 2 | $0 | $0 |
| | 25. U.S. Treasury Securities | | $0 | $0 |
| | 26. Investments | 5 | $4,891,498 | $5,139,354 |
| | 27. Fixed Assets | 6 | $3,416,880 | $3,306,149 |
| | 28. Other Assets | 7 | $12,321 | $5,019 |
| | 29. TOTAL ASSETS | | $18,800,707 | $17,433,582 |

| LIABILITIES | | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|---|
| **LIABILITIES** | 30. Accounts Payable | 8 | $43,797 | $50,480 |
| | 31. Loans Payable | 9 | $0 | $0 |
| | 32. Mortgages Payable | | $0 | $0 |
| | 33. Other Liabilities | 10 | $245,473 | $320,773 |
| | 34. TOTAL LIABILITIES | | $289,270 | $371,253 |

| | | | |
|---|---|---|---|
| **35. NET ASSETS** | | $18,511,437 | $17,062,329 |

Form LM-2 (Revised 2003)

ASE 000188

## STATEMENT B - RECEIPTS AND DISBURSEMENTS

FILE NUMBER: 033-092

| CASH RECEIPTS | SCH | AMOUNT |
|---|---|---|
| 36. Dues and Agency Fees | | $1,090,860 |
| 37. Per Capita Tax | | $0 |
| 38. Fees, Fines, Assessments, Work Permits | | $4,092,447 |
| 39. Sale of Supplies | | $0 |
| 40. Interest | | $127,482 |
| 41. Dividends | | $164,700 |
| 42. Rents | | $11,077 |
| 43. Sale of Investments and Fixed Assets | 3 | $0 |
| 44. Loans Obtained | 9 | $0 |
| 45. Repayments of Loans Made | 2 | $0 |
| 46. On Behalf of Affiliates for Transmittal to Them | | $0 |
| 47. From Members for Disbursement on Their Behalf | | $100,356 |
| 48. Other Receipts | 14 | $126,656 |
| **49. TOTAL RECEIPTS** | | **$5,713,578** |

| CASH DISBURSEMENTS | SCH | AMOUNT |
|---|---|---|
| 50. Representational Activities | 15 | $3,755,940 |
| 51. Political Activities and Lobbying | 16 | $118,922 |
| 52. Contributions, Gifts, and Grants | 17 | $163,461 |
| 53. General Overhead | 18 | $228,783 |
| 54. Union Administration | 19 | $336,818 |
| 55. Benefits | 20 | $874,764 |
| 56. Per Capita Tax | | $1,234,359 |
| 57. Strike Benefits | | $0 |
| 58. Fees, Fines, Assessments, etc. | | $0 |
| 59. Supplies for Resale | | $0 |
| 60. Purchase of Investments and Fixed Assets | 4 | $263,216 |
| 61. Loans Made | 2 | $0 |
| 62. Repayment of Loans Obtained | 9 | $0 |
| 63. To Affiliates of Funds Collected on Their Behalf | | $0 |
| 64. On Behalf of Individual Members | | $104,595 |
| 65. Direct Taxes | | $94,662 |
| | | |
| 66. Subtotal | | $7,175,520 |
| 67. Withholding Taxes and Payroll Deductions | | |
| 67a. Total Withheld | $243,167 | |
| 67b. Less Total Disbursed | $243,167 | |
| 67c. Total Withheld But Not Disbursed | | $0 |
| **68. TOTAL DISBURSEMENTS** | | **$7,175,520** |

Form LM-2 (Revised 2003)

ASE 000189

## SCHEDULE 1 - ACCOUNTS RECEIVABLE AGING SCHEDULE

FILE NUMBER: 033-092

| Entity or Individual Name (A) | Total Account Receivable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Receivable (E) |
|---|---|---|---|---|
| Members | $15,476 | $0 | $0 | $0 |
| Contractors | $1,455 | $0 | $0 | $0 |
| Totals from all other accounts receivable | | | | $0 |
| **TOTALS** (Column (B) Total will be automatically entered in Item 23, Column (B)) | $16,931 | $0 | $0 | $0 |

Form LM-2 (Revised 2003)

ASE 000190

## SCHEDULE 2 - LOANS RECEIVABLE                    FILE NUMBER: 033-092

There was no data found for this schedule.

## SCHEDULE 3 - SALE OF INVESTMENTS AND FIXED ASSETS    FILE NUMBER: 033-092

There was no data found for this schedule.

## SCHEDULE 4 - PURCHASE OF INVESTMENTS AND FIXED ASSETS    FILE NUMBER: 033-092

| Description (if land or buildings, give location) (A) | Cost (B) | Book Value (C) | Cash Paid (D) |
|---|---|---|---|
| Furniture and Fixtures | $15,360 | $15,360 | $15,360 |
| Commonwealth Financial | $247,856 | $247,856 | $247,856 |
| Total of all lines | $263,216 | $263,216 | $263,216 |
|  | 14. Less Reinvestments |  | $0 |
| (Net Purchases total will automatically entered in Item 60) | 15. Net Purchases |  | $263,216 |

Form LM-2 (Revised 2003)

ASE 000191

## SCHEDULE 5 - INVESTMENTS

FILE NUMBER: 033-092

| Description (A) | Amount (B) |
|---|---|
| **Marketable Securities** | |
| 1. Total Cost | $4,520,000 |
| 2. Total Book Value | $5,139,354 |
| 3. List each marketable security which has a book value over $5000 and exceeds 5% of Line 2. | |
| ■ Commonwealth Financial | $5,139,354 |
| **Other Investments** | |
| 4. Total Cost | |
| 5. Total Book Value | |
| 6. List each other investment which has a book value over $5000, of Line 5. Also list each Trust which is an investment. | |
| **7. Total of Lines 2 and 5** (Total will be automatically entered in Item 26, Column(B)) | **$5,139,354** |

Form LM-2 (Revised 2003)

ASE 000192

## SCHEDULE 6 - FIXED ASSETS

FILE NUMBER: 033-092

| Description (A) | Cost or Other Basis (B) | Total Depreciation or Amount Expensed (C) | Book Value (D) | Value (E) |
|---|---|---|---|---|
| 1. 195 Old Colony Ave., South Boston, MA | $330,000 | | $330,000 | $330,000 |
| 3. 195 Old Colony Ave., South Boston, MA | $3,663,668 | $798,458 | $2,865,210 | $2,865,210 |
| 5. Automobiles and Other Vehicles | $0 | $0 | $0 | $0 |
| 6. Office Furniture and Equipment | $395,000 | $284,061 | $110,939 | $110,939 |
| 7. Other Fixed Assets | $0 | $0 | $0 | $0 |
| **8. Totals of Lines 1 through 7** (Column(D)) Total will be automatically entered in Item 27, Column(B)) | $4,388,668 | $1,082,519 | $3,306,149 | $3,306,149 |

Form LM-2 (Revised 2003)

ASE 000193

## SCHEDULE 7 - OTHER ASSETS

FILE NUMBER: 033-092

| Description (A) | Book Value (B) |
|---|---|
| Prepaid Insurance | $5,019 |
| **Total Other Assets** (Total will be automatically entered in Item 28, Column(B)) | $5,019 |

Form LM-2 (Revised 2003)

ASE 000194

## SCHEDULE 8 - ACCOUNTS PAYABLE AGING SCHEDULE

FILE NUMBER: 033-092

| Entity or Individual Name (A) | Total Account Payable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account (E) |
|---|---|---|---|---|
| Segal, Roitman & Co. | $300 | $0 | $0 | $0 |
| Nextel Communications | $1,758 | $0 | $0 | $0 |
| Capital Lease | $9,693 | $0 | $0 | $0 |
| Exxon Mobil | $1,740 | $0 | $0 | $0 |
| Per Capita Affiliates | $26,601 | $0 | $0 | $0 |
| Commonwealth of Massachusetts | $9,411 | $0 | $0 | $0 |
| Internal Revenue Service | $977 | $0 | $0 | $0 |
| Total from all other accounts payable | $0 | $0 | $0 | $0 |
| **Total Accounts Payable** (Column(B) Total will be automatically entered in Item 30, Column(D)) | $50,480 | $0 | $0 | $0 |

Form LM-2 (Revised 2003)

ASE 000195

## SCHEDULE 9 - LOANS PAYABLE                                    FILE NUMBER: 033-092

There was no data found for this schedule.

## SCHEDULE 10 - OTHER LIABILITIES                               FILE NUMBER: 033-092

| Description<br>(A) | Amount at End of<br>Period<br>(B) |
|---|---|
| Ipal | $5,804 |
| International Ironworkers | $65,695 |
| Members | $249,274 |
| **Total Other Liabilities** (Total will be automatically entered in Item 33, Column(D)) | **$320,773** |

Form LM-2 (Revised 2003)

ASE 000196

# SCHEDULE 11 - ALL OFFICERS AND DISBURSEMENTS TO OFFICERS

FILE NUMBER: 033-092

| (A) Name | (B) Title | (C) Status | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) thru (F) | (H) TOTAL |
|---|---|---|---|---|---|---|---|
| A Fiore    Grasetti B Business Agent C | | | $74,650 | $12,520 | $6,328 | $0 | $93,498 |
| I Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % Schedule 17 Contributions | 2 % Schedule 18 General Overhead | 2 % Schedule 19 Administration | 16 % |
| A Dennis    Legere B Examining Board N | | | $574 | $0 | $0 | $0 | $574 |
| I Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | % |
| A Michael    McDermott B Executive Board C | | | $14,608 | $1,914 | $0 | $0 | $16,522 |
| I Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | % |
| A Guy    McGuinn B Executive Board C | | | $1,754 | $0 | $0 | $0 | $1,754 |
| I Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | % |
| A Edwin    Wright B Business Agent C | | | $83,111 | $12,519 | $18,715 | $0 | $114,345 |
| I Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % Schedule 17 Contributions | 2 % Schedule 18 General Overhead | 2 % Schedule 19 Administration | 16 % |
| A James    Coyle B Bus Mgr/Fin Sec/Treasi P | | | $67,584 | $11,195 | $462 | $0 | $79,241 |
| I Schedule 15 | | Schedule 16 Political | Schedule 17 | Schedule 18 | Schedule 19 | |

CASE 000197    1/21/2005

| | Representational Activities | | Activities and Lobbying | | Contributions | | General Overhead | | Administration | |
|---|---|---|---|---|---|---|---|---|---|---|
| I | Representational Activities | 22 % | Activities and Lobbying | 10 % | Contributions | 3 % | General Overhead | 2 % | Administration | 63 % |
| A B C | Patrick McDermott<br>Business Agent | | | $74,606 | | $12,519 | | $18,609 | | $0 | $105,734 |
| I | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 2 % | Schedule 18 General Overhead | 2 % | Schedule 19 Administration | 16 % |
| A B C | William Babikian<br>Examining Board | | | $1,010 | | $0 | | $0 | | $0 | $1,010 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Kevin Collins<br>Trustee | | | $1,565 | | $0 | | $0 | | $0 | $1,565 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C N | James Brown<br>Bus Mgr/Fin Sec/Treasi | | | $63,680 | | $9,588 | | $19,432 | | $0 | $92,700 |
| I | Schedule 15 Representational Activities | 22 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 3 % | Schedule 18 General Overhead | 2 % | Schedule 19 Administration | 63 % |
| A B C | Robert Hinckley<br>Sgt at Arms | | | $2,438 | | $0 | | $0 | | $0 | $2,438 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Neil Conley<br>Industry Analyst | | | $74,728 | | $12,519 | | $18,504 | | $0 | $105,751 |
| I | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 2 % | Schedule 18 General Overhead | 2 % | Schedule 19 Administration | 16 % |
| A B C | Randolf Green, Jr.<br>Executive Board | | | $1,553 | | $0 | | $0 | | $0 | $1,553 |

| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | Paul   Lynch President N | | | $16,572 | $2,221 | | $71 | | $0 | $18,864 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Shawn   Nehiley Trustee | | | $1,501 | $0 | | $0 | | $0 | $1,501 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | John   Vaters, Jr. Trustee | | | $1,374 | $0 | | $0 | | $0 | $1,374 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Neal   McKelliga Apprentice Coordinator | | | $6,840 | $855 | | $0 | | $0 | $7,695 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | William   Hurley Conductor | | | $812 | $0 | | $0 | | $0 | $812 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | William   Mann, Jr. Executive Board | | | $7,591 | $909 | | $0 | | $0 | $8,500 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Joseph   Cook Recording Secretary | | | $2,125 | $0 | | $0 | | $0 | $2,125 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| C | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Charles Wright Industry Analyst | | | $74,791 | | $12,519 | | $18,458 | $0 | $105,768 |
| I | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 2 % | Schedule 18 General Overhead | 2 % | Schedule 19 Administration | 16 % |
| A B C | Stephen Williams Executive Board | | | $4,817 | | $486 | | $0 | $0 | $5,303 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | Michael Durant Business Agent | | | $77,483 | | $12,519 | | $18,450 | $0 | $108,452 |
| I | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 2 % | Schedule 18 General Overhead | 2 % | Schedule 19 Administration | 16 % |
| A B N | William Keegan, Jr. Vice President | | | $1,634 | | $0 | | $0 | $0 | $1,634 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |
| A B C | David Sullivan Examining Board | | | $1,822 | | $0 | | $0 | $0 | $1,822 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | % | Schedule 17 Contributions | % | Schedule 18 General Overhead | % | Schedule 19 Administration | % |

| | | | | | |
|---|---|---|---|---|---|
| Total Officer Disbursements | | $659,223 | $102,283 | $119,029 | $0 | $880,535 |
| Less Deductions | | | | | | $207,883 |
| Net Disbursements | | | | | | $672,652 |

Form LM-2 (Revised 2003)

ASE 000200

## SCHEDULE 12 - DISBURSEMENTS TO EMPLOYEES

FILE NUMBER: 033-092

| | (A) Name | (B) Title | (C) Other Payer | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) thru (F) | (H) TOTAL |
|---|---|---|---|---|---|---|---|---|
| A B C | Ellen Longton Bookkeeper None | | | $21,450 | $0 | $0 | $0 | $21,450 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | 100 % |
| A B C | Kimberly Rotondo Office Manager None | | | $59,606 | $0 | $0 | $0 | $59,606 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | 100 % |
| A B C | Jean Murphy Administrative Assistant None | | | $33,440 | $0 | $0 | $0 | $33,440 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | 100 % |
| A B C | Eleanor Catalano Bookkeeper None | | | $8,000 | $0 | $0 | $0 | $8,000 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | 100 % |
| A B C | Stacy Rotondo Bookkeeper None | | | $4,632 | $0 | $0 | $0 | $4,632 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | 100 % |
| | TOTALS RECEIVED BY EMPLOYEES MAKING LESS THAN $10000 | | | $0 | $0 | $0 | $0 | $0 |
| I | Schedule 15 Representational Activities | % | Schedule 16 Political Activities and Lobbying | % Schedule 17 Contributions | % Schedule 18 General Overhead | % Schedule 19 Administration | % |
| | **Total Employee Disbursements** | | | $127,128 | $0 | $0 | $0 | $127,128 |

| Less Deductions | | | | | $35,284 |
|---|---|---|---|---|---|
| Net Disbursements | | | | | $91,844 |

Form LM-2 (Revised 2003)

ASE 000202

## SCHEDULE 13 - MEMBERSHIP STATUS

FILE NUMBER: 033-092

| Category of Membership (A) | Number (B) | Voting Eligibility (C) |
|---|---|---|
| Members | 2,980 | Yes |
| Members | 2,980 | |
| Agency Fee Payers* | | |
| **Total Members/Fee Payers** | 2,980 | |
| *Agency Fee Payers are not considered members of the labor organization. | | |

Form LM-2 (Revised 2003)

## DETAILED SUMMARY PAGE - SCHEDULES 14 THROUGH 19

FILE NUMBER: 033-092

| SCHEDULE 14  OTHER RECEIPTS | |
|---|---|
| 1. Named Payer Itemized Receipts | $0 |
| 2. Named Payer Non-itemized Receipts | $126,656 |
| 3. All Other Receipts | |
| 4. Total Receipts | $126,656 |
| | |
| | |
| | |

| SCHEDULE 17  CONTRIBUTIONS, GIFTS & GRANTS | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $17,829 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $145,632 |
| 6. Total Disbursements | $163,461 |

| SCHEDULE 15  REPRESENTATIONAL ACTIVITIES | |
|---|---|
| 1. Named Payee Itemized Disbursements | $2,733,986 |
| 2. Named Payee Non-itemized Disbursements | $304,861 |
| 3. To Officers | $588,035 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $129,058 |
| 6. Total Disbursements | $3,755,940 |

| SCHEDULE 18  GENERAL OVERHEAD | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $127,957 |
| 3. To Officers | $16,110 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $84,716 |
| 6. Total Disbursements | $228,783 |

| SCHEDULE 16  POLITICAL ACTIVITIES AND LOBBYING | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $48,872 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $70,050 |
| 6. Total Disbursement | $118,922 |

| SCHEDULE 19  UNION ADMINISTRATION | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $209,690 |
| 4. To Employees | $127,128 |
| 5. All Other Disbursements | |
| 6. Total Disbursements | $336,818 |

Form LM-2 (Revised 2003)

ASE 000203

## SCHEDULE 14 - OTHER RECEIPTS

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| International Ironworkers | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $43,500 |
| 1750 New York Ave. | **Total of All Transactions** | | $43,500 |
| Washington DC 20006 | | | |
| Type or Classification (B) | | | |
| Death Benefit | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Commonwealth Financial | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $83,156 |
| Boston MA | **Total of All Transactions** | | $83,156 |
| Type or Classification (B) | | | |
| Gain on sale of securities | | | |

Form LM-2 (Revised 2003)

## SCHEDULE 15 - REPRESENTATIONAL ACTIVITIES

FILE NUMBER: 033-092

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Baystate Calendar | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $17,271 |
| 26 Cedar Point Circle Centerville MA 02632 | **Total of All Transactions** | | $17,271 |
| **Type or Classification (B)** | | | |
| Printer | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Kernwood Forbes Press, Inc. | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $12,072 |
| 121 Madison St. Malden MA 02148 | **Total of All Transactions** | | $12,072 |
| **Type or Classification (B)** | | | |
| Printer | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| McDermott Ventures | Contracting | 01/06/2005 | $25,000 |
| | Contracting | 02/04/2005 | $6,250 |
| 30 Rowes Wharf Boston MA 02110 | Contracting | 03/17/2005 | $6,250 |
| | Contracting | 04/12/2005 | $6,250 |
| | Contracting | 04/30/2005 | $6,250 |
| **Type or Classification (B)** | Contracting | 06/04/2005 | $6,250 |
| | Total Itemized Transactions | | $56,250 |
| Contractor | Total Non-Itemized Transactions | | |
| | **Total of All Transactions** | | $56,250 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Segal, Roitman & Coleman | Contracting | 02/04/2005 | $12,913 |
| | Contracting | 05/17/2005 | $69,143 |
| 11 Beacon Street Boston MA 02108 | Total Itemized Transactions | | $82,056 |
| | Total Non-Itemized Transactions | | $3,860 |
| | **Total of All Transactions** | | $85,916 |
| **Type or Classification (B)** | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Charles Fried | Contracting | 05/07/2005 | $9,750 |
| | Total Itemized Transactions | | $9,750 |
| 1525 Mass. Ave. Cambridge MA 02138 | Total Non-Itemized Transactions | | |
| | **Total of All Transactions** | | $9,750 |
| **Type or Classification (B)** | | | |

ASE 000205

| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Malden YMCA | Contracting | 12/14/2004 | $38,380 |
| | Total Itemized Transactions | | $38,380 |
| 83 Pleasant Street | Total Non-Itemized Transactions | | |
| Malden | **Total of All Transactions** | | $38,380 |
| MA | | | |
| 02148 | | | |
| Type or Classification (B) | | | |

| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| AJ Steele | Contracting | 02/05/2005 | $5,010 |
| | Total Itemized Transactions | | $5,010 |
| 98 Hubbard Road | Total Non-Itemized Transactions | | $15,540 |
| Berwick | **Total of All Transactions** | | $20,550 |
| ME | | | |
| 03901 | | | |
| Type or Classification (B) | | | |

| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Atlantic Bridge Eng. | Contracting | 07/09/2004 | $7,413 |
| | Contracting | 08/30/2004 | $11,111 |
| 191 Elm St. | Contracting | 12/14/2004 | $14,840 |
| Salisbury | Contracting | 02/07/2005 | $9,034 |
| MA | Contracting | 06/04/2005 | $10,641 |
| 01952 | Contracting | 06/25/2005 | $32,024 |
| Type or Classification (B) | Total Itemized Transactions | | $85,063 |
| Contractor | Total Non-Itemized Transactions | | $3,166 |
| | **Total of All Transactions** | | $88,229 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Atlas Engineering | Contracting | 07/01/2004 | $31,021 |
| | Contracting | 08/23/2004 | $6,311 |
| 126 Old Page St. | Contracting | 08/23/2004 | $27,704 |
| Stoughton | Total Itemized Transactions | | $65,036 |
| MA | Total Non-Itemized Transactions | | $4,906 |
| 02072 | **Total of All Transactions** | | $69,942 |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Aztec Steel | Contracting | 07/07/2004 | $7,879 |
| P.O. Box 206 | Contracting | 07/14/2004 | $9,753 |
| | Contracting | 07/14/2004 | $9,367 |
| Carver | Contracting | 08/10/2004 | $9,436 |
| MA | Contracting | 12/14/2004 | $9,926 |
| 02330 | Contracting | 12/14/2004 | $9,536 |
| Type or Classification (B) | Contracting | 12/14/2004 | $6,608 |
| Contractor | | | |

| | Contracting | 02/04/2005 | $10,880 |
| | Contracting | 03/12/2005 | $7,785 |
| | Contracting | 04/30/2005 | $6,505 |
| | Contracting | 06/04/2005 | $6,645 |
| | Total Itemized Transactions | | $94,320 |
| | Total Non-Itemized Transactions | | $30,470 |
| | **Total of All Transactions** | | **$124,790** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Bel-Lin<br><br>6 Perley Evans Dr.<br>Randolph<br>MA<br>02368 | Contracting | 08/23/2004 | $11,251 |
| | Contracting | 03/12/2005 | $12,015 |
| | Total Itemized Transactions | | $23,266 |
| | Total Non-Itemized Transactions | | $6,030 |
| | **Total of All Transactions** | | **$29,296** |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Bart-Lund | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $1,223 |
| | **Total of All Transactions** | | **$1,223** |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Builders Resource Inc.<br><br>101 Nasonville Road<br>Nasonville<br>RI<br>02830 | Contracting | 07/07/2004 | $10,050 |
| | Contracting | 07/13/2004 | $9,600 |
| | Contracting | 07/30/2004 | $18,000 |
| | Contracting | 08/11/2004 | $5,200 |
| | Contracting | 08/11/2004 | $19,323 |
| Type or Classification (B) | Contracting | 08/11/2004 | $22,000 |
| | Contracting | 09/21/2004 | $19,584 |
| Contractor | Contracting | 09/21/2004 | $7,200 |
| | Contracting | 10/12/2004 | $20,367 |
| | Contracting | 12/26/2004 | $7,326 |
| | Contracting | 12/29/2004 | $28,699 |
| | Contracting | 12/29/2004 | $29,594 |
| | Contracting | 12/29/2004 | $13,389 |
| | Contracting | 12/29/2004 | $15,318 |
| | Contracting | 12/31/2004 | $7,800 |
| | Contracting | 01/06/2005 | $14,216 |
| | Contracting | 02/03/2005 | $19,193 |
| | Contracting | 02/03/2005 | $7,526 |
| | Contracting | 02/03/2005 | $6,612 |
| | Contracting | 02/03/2005 | $8,608 |
| | Contracting | 03/25/2005 | $19,193 |
| | Contracting | 03/25/2005 | $18,426 |
| | Contracting | 03/25/2005 | $7,560 |

| | Contracting | 03/25/2005 | $7,104 |
|---|---|---|---|
| | Contracting | 05/15/2005 | $36,380 |
| | Contracting | 05/23/2005 | $13,681 |
| | Contracting | 05/23/2005 | $52,680 |
| | Contracting | 06/04/2005 | $8,623 |
| | Contracting | 06/04/2005 | $37,290 |
| | Total Itemized Transactions | | $490,542 |
| | Total Non-Itemized Transactions | | $17,583 |
| | **Total of All Transactions** | | **$508,125** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Capco | Contracting | 07/07/2004 | $7,283 |
| | Contracting | 07/07/2004 | $11,508 |
| 33 Acorn St. | Contracting | 07/07/2004 | $9,522 |
| Providence | Contracting | 07/08/2004 | $5,383 |
| RI | Contracting | 01/13/2005 | $88,116 |
| 02903 | Contracting | 01/13/2005 | $27,813 |
| Type or Classification (B) | Contracting | 03/23/2005 | $44,896 |
| Contractor | Total Itemized Transactions | | $194,521 |
| | Total Non-Itemized Transactions | | $4,251 |
| | **Total of All Transactions** | | **$198,772** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Colonial Steel Corp. | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $3,299 |
| | **Total of All Transactions** | | **$3,299** |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Concrete Structures, Inc. | Contracting | 07/08/2004 | $8,066 |
| | Total Itemized Transactions | | $8,066 |
| 769 Plain St. | Total Non-Itemized Transactions | | $900 |
| Marshfield | **Total of All Transactions** | | **$8,966** |
| MA | | | |
| 02050 | | | |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| D&A Steel Inc. | Contracting | 07/30/2004 | $6,280 |
| | Contracting | 12/14/2004 | $5,931 |
| 890 West St. | Total Itemized Transactions | | $12,211 |
| Attleboro | Total Non-Itemized Transactions | | $2,656 |
| MA | **Total of All Transactions** | | **$14,867** |
| 02703 | | | |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address | Purpose | Date | Amount |
|---|---|---|---|

| (A) | (C) | (D) | (E) |
|---|---|---|---|
| Dorel | Contracting | 07/05/2004 | $17,468 |
| | Contracting | 07/05/2004 | $22,155 |
| 33 Fayette St. | Contracting | 08/31/2004 | $69,780 |
| North Quincy | Contracting | 12/14/2004 | $16,215 |
| MA | Contracting | 12/14/2004 | $26,235 |
| 02171 | Contracting | 12/14/2004 | $9,420 |
| **Type or Classification** (B) | Total Itemized Transactions | | $161,273 |
| Contractor | Total Non-Itemized Transactions | | $960 |
| | **Total of All Transactions** | | **$162,233** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| G.R.C. Steel L.L.C. | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $8,919 |
| 153 West St. | **Total of All Transactions** | | **$8,919** |
| Whitman | | | |
| MA | | | |
| 02382 | | | |
| **Type or Classification** (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Griffin Steel | Contracting | 09/23/2004 | $21,000 |
| P.O. Box 132 | Total Itemized Transactions | | $21,000 |
| | Total Non-Itemized Transactions | | |
| Buzzards Bay | **Total of All Transactions** | | **$21,000** |
| MA | | | |
| 02532 | | | |
| **Type or Classification** (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| HB Welding | Contracting | 09/23/2004 | $20,230 |
| | Contracting | 02/04/2005 | $26,526 |
| 117 Webster St. | Contracting | 03/12/2005 | $10,068 |
| Pawtucket | Contracting | 04/30/2005 | $13,347 |
| RI | Contracting | 06/04/2005 | $23,901 |
| 02861 | Contracting | 06/25/2005 | $10,453 |
| **Type or Classification** (B) | Total Itemized Transactions | | $104,525 |
| Contractor | Total Non-Itemized Transactions | | $548 |
| | **Total of All Transactions** | | **$105,073** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Ipswich | Contracting | 07/08/2004 | $6,546 |
| | Total Itemized Transactions | | $6,546 |
| 420 Newburyport Tunrpike | Total Non-Itemized Transactions | | $14,400 |
| Rowley | **Total of All Transactions** | | **$20,946** |
| MA | | | |
| 01969 | | | |
| **Type or Classification** (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Koury | Contracting | 8/30/2004 | $25,000 |
| | Total Itemized Transactions | | $25,000 |
| 93 Gilbane St. | Total Non-Itemized Transactions | | $12,826 |
| Warwick | **Total of All Transactions** | | $37,826 |
| RI | | | |
| 02886 | | | |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| M&M Steel | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $5,582 |
| 8 Maryville Ln. | **Total of All Transactions** | | $5,582 |
| Peabody | | | |
| MA | | | |
| 01960 | | | |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Mass Built | Contracting | 12/14/2004 | $18,840 |
| | Contracting | 12/16/2004 | $20,976 |
| 33 Cliff St. | Contracting | 02/07/2005 | $8,412 |
| Lynn | Total Itemized Transactions | | $48,228 |
| MA | Total Non-Itemized Transactions | | $4,788 |
| 01905 | **Total of All Transactions** | | $53,016 |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Melo's Rodbuster | Contracting | 08/11/2004 | $11,662 |
| | Total Itemized Transactions | | $11,662 |
| 148 Sherman St. | Total Non-Itemized Transactions | | $2,810 |
| South Dartmouth | **Total of All Transactions** | | $14,472 |
| MA | | | |
| 02748 | | | |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| NH Steel Erectors | Contracting | 07/06/2004 | $12,860 |
| | Contracting | 07/06/2004 | $11,120 |
| 17 Lamy Dr. | Contracting | 08/30/2004 | $11,120 |
| Goffstown | Contracting | 10/15/2004 | $8,480 |
| NH | Contracting | 12/14/2004 | $6,240 |
| 03045 | Contracting | 01/09/2005 | $6,900 |
| Type or Classification (B) | Total Itemized Transactions | | $56,720 |
| | Total Non-Itemized Transactions | | $13,384 |
| Contractor | **Total of All Transactions** | | $70,104 |

| Name and Address | Purpose | Date | Amount |
|---|---|---|---|

| (A) | (C) | (D) | (E) |
|---|---|---|---|
| North American Steel | Contracting | 03/02/2005 | $18,340 |
|  | Contracting | 03/17/2005 | $6,350 |
| 1 Gwinnett Rd. | Total Itemized Transactions |  | $24,690 |
| Peabody | Total Non-Itemized Transactions |  |  |
| MA | **Total of All Transactions** |  | **$24,690** |
| 01960 |  |  |  |
| Type or Classification (B) |  |  |  |
| Contractor |  |  |  |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Northeast Steel Erectors | Contracting | 05/15/2005 | $5,650 |
|  | Total Itemized Transactions |  | $5,650 |
| 61 Brown St. | Total Non-Itemized Transactions |  |  |
| North Kingston | **Total of All Transactions** |  | **$5,650** |
| RI |  |  |  |
| 02852 |  |  |  |
| Type or Classification (B) |  |  |  |
| Contractor |  |  |  |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Phoenix Iron Works | Contracting | 12/14/2004 | $6,786 |
|  | Total Itemized Transactions |  | $6,786 |
| 197 Loudon Rd. | Total Non-Itemized Transactions |  | $12,331 |
| Concord | **Total of All Transactions** |  | **$19,117** |
| NH |  |  |  |
| 03301 |  |  |  |
| Type or Classification (B) |  |  |  |
| Contractor |  |  |  |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Saugus Construction | Contracting | 02/06/2005 | $7,337 |
|  | Total Itemized Transactions |  | $7,337 |
| 1 Farm Lane | Total Non-Itemized Transactions |  | $10,162 |
| Georgetown | **Total of All Transactions** |  | **$17,499** |
| MA |  |  |  |
| 01833 |  |  |  |
| Type or Classification (B) |  |  |  |
| Contractor |  |  |  |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Smith Gary Steel | Contracting | 08/23/2004 | $8,625 |
|  | Total Itemized Transactions |  | $8,625 |
| 46 Peter Salem Rd. | Total Non-Itemized Transactions |  | $1,625 |
| Leicester | **Total of All Transactions** |  | **$10,250** |
| MA |  |  |  |
| 01524 |  |  |  |
| Type or Classification (B) |  |  |  |
| Contractor |  |  |  |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Smth Steel | Total Itemized Transactions |  | $0 |

| | | | |
|---|---|---|---|
| | Total Non-Itemized Transactions | | $1,440 |
| | **Total of All Transactions** | | $1,440 |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Springfield Steel | Contracting | 03/19/2005 | $7,060 |
| | Total Itemized Transactions | | $7,060 |
| 232 Laconia St. Springfield MA 01129 | Total Non-Itemized Transactions | | |
| | **Total of All Transactions** | | $7,060 |
| Type or Classification (B) | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Stearns | Contracting | 07/08/2004 | $79,440 |
| | Contracting | 08/30/2004 | $24,042 |
| 35 Pond Park Road Hingham MA 02043 | Contracting | 03/12/2005 | $26,074 |
| | Contracting | 03/12/2005 | $9,599 |
| | Total Itemized Transactions | | $139,155 |
| Type or Classification (B) | Total Non-Itemized Transactions | | $5,585 |
| Contractor | **Total of All Transactions** | | $144,740 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Steel Connections | Contracting | 09/28/2004 | $13,411 |
| | Contracting | 12/14/2004 | $24,679 |
| 16 Robinson St. Webster MA 01570 | Contracting | 12/14/2004 | $11,698 |
| | Contracting | 12/14/2004 | $11,850 |
| | Contracting | 01/13/2005 | $14,602 |
| Type or Classification (B) | Total Itemized Transactions | | $76,240 |
| | Total Non-Itemized Transactions | | $8,169 |
| Contractor | **Total of All Transactions** | | $84,409 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Structures Derek | Contracting | 07/13/2004 | $40,422 |
| | Contracting | 07/28/2004 | $22,764 |
| 652 Ave. St. Marie Quebec | Contracting | 08/26/2004 | $29,082 |
| | Contracting | 12/14/2004 | $7,536 |
| Type or Classification (B) | Total Itemized Transactions | | $99,804 |
| | Total Non-Itemized Transactions | | |
| Contractor | **Total of All Transactions** | | $99,804 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Superior Steel Inc. P.O. Box 1090 | Contracting | 09/23/2004 | $7,464 |
| | Total Itemized Transactions | | $7,464 |
| | Total Non-Itemized Transactions | | $9,360 |
| Barnstable MA | **Total of All Transactions** | | $16,824 |

| 02630 | | | |
|---|---|---|---|
| **Type or Classification** **(B)** | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Unerectors | Contracting | 07/08/2004 | $6,746 |
| | Contracting | 12/16/2004 | $13,250 |
| 82 Crescent Ave. | Total Itemized Transactions | | $19,996 |
| Dorchester | Total Non-Itemized Transactions | | |
| MA | **Total of All Transactions** | | **$19,996** |
| 02125 | | | |
| **Type or Classification** **(B)** | | | |
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Universal Steel Erectors | Contracting | 05/15/2005 | $34,095 |
| | Contracting | 06/04/2005 | $25,568 |
| 149 Reservoir Dr. | Contracting | 06/25/2005 | $25,057 |
| Weare | Contracting | 07/07/2004 | $17,963 |
| NH | Contracting | 07/08/2004 | $11,205 |
| 03281 | Contracting | 08/30/2004 | $48,490 |
| **Type or Classification** **(B)** | Contracting | 08/30/2004 | $7,990 |
| Contractor | Contracting | 09/21/2004 | $18,080 |
| | Contracting | 11/01/2004 | $24,330 |
| | Contracting | 12/14/2004 | $9,810 |
| | Contracting | 12/14/2004 | $35,389 |
| | Contracting | 12/14/2004 | $34,245 |
| | Contracting | 12/16/2004 | $17,553 |
| | Total Itemized Transactions | | $309,775 |
| | Total Non-Itemized Transactions | | $11,441 |
| | **Total of All Transactions** | | **$321,216** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Universal Steel Erectors | Contracting | 12/16/2004 | $5,128 |
| | Contracting | 12/16/2004 | $20,305 |
| 149 Reservoir Dr. | Contracting | 01/31/2005 | $15,239 |
| Weare | Contracting | 01/31/2005 | $17,769 |
| NH | Contacting | 03/12/2005 | $15,909 |
| 03848 | Contracting | 05/15/2005 | $17,938 |
| **Type or Classification** **(B)** | Contracting | 06/25/2005 | $13,403 |
| Contractor | Total Itemized Transactions | | $105,691 |
| | Total Non-Itemized Transactions | | $7,760 |
| | **Total of All Transactions** | | **$113,451** |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Weld Design | Contracting | 07/07/2004 | $7,821 |
| | Contracting | 09/20/2004 | $6,937 |
| 169 R. Merrimack St. | Total Itemized Transactions | | $14,758 |
| Woburn | Total Non-Itemized Transactions | | $10,328 |
| MA | **Total of All Transactions** | | **$25,086** |
| 01801 | | | |

ASE 000213

| Type or Classification (B) | | | |
|---|---|---|---|
| Contractor | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Zichelle Steel Erectors | Contracting | 07/09/2004 | $24,532 |
| | Contracting | 07/09/2004 | $10,050 |
| 235 Viscoloid Ave. | Contracting | 07/09/2004 | $6,068 |
| Leominster | Contracting | 07/9/2004 | $23,601 |
| MA | Contracting | 07/09/2004 | $8,223 |
| 01453-0000 | Contracting | 09/21/2004 | $28,425 |
| Type or Classification (B) | Contracting | 09/21/2004 | $19,870 |
| | Contracting | 09/21/2004 | $6,636 |
| Contractor | Contracting | 12/14/2004 | $7,618 |
| | Contracting | 12/14/2004 | $14,195 |
| | Contracting | 12/14/2004 | $23,817 |
| | Contracting | 12/14/2004 | $10,002 |
| | Contracting | 12/14/2004 | $15,000 |
| | Contracting | 02/06/2005 | $20,176 |
| | Contracting | 02/06/2005 | $14,810 |
| | Contracting | 02/06/2005 | $17,496 |
| | Contracting | 02/06/2005 | $22,955 |
| | Contracting | 03/14/2005 | $10,158 |
| | Contracting | 03/14/2005 | $11,010 |
| | Contracting | 03/14/2005 | $6,888 |
| | Total Itemized Transactions | | $301,530 |
| | Total Non-Itemized Transactions | | $39,216 |
| | **Total of All Transactions** | | $340,746 |

Form LM-2 (Revised 2003)

ASE 000214

## SCHEDULE 16 - POLITICAL ACTIVITIES AND LOBBYING

FILE NUMBER 033-092

There was no data found for this schedule.

## SCHEDULE 17 - CONTRIBUTIONS, GIFTS & GRANTS

FILE NUMBER: 033-092

There was no data found for this schedule.

## SCHEDULE 18 - GENERAL OVERHEAD

FILE NUMBER: 033-092

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Verizon P.O. Box1 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $7,903 |
| Worcester MA 01654 | **Total of All Transactions** | | $7,903 |
| Type or Classification (B) | | | |
| Phone | | | |
| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
| AT & T P.O. Box 2969 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $9,983 |
| Omaha NE 68103 | **Total of All Transactions** | | $9,983 |
| Type or Classification (B) | | | |
| Phone | | | |
| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
| Nextel P.O. Box 17621 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $17,478 |
| Baltimore MD 21297 | **Total of All Transactions** | | $17,478 |
| Type or Classification (B) | | | |
| Phone | | | |
| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
| St. Paul Travelers Dept. CH 9072 | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $9,297 |
| Palatine IL 60055 | **Total of All Transactions** | | $9,297 |
| Type or Classification (B) | | | |
| Insurance | | | |
| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |

| Ironworkers JAC | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $69,596 |
| 195 Old Colony Ave.<br>So. Boston<br>MA<br>02127 | **Total of All Transactions** | | **$69,596** |
| Type or Classification<br>(B) | | | |
| Rent | | | |

| Name and Address<br>(A) | Purpose<br>(C) | Date<br>(D) | Amount<br>(E) |
|---|---|---|---|
| Green & Diminico, P.C. | Total Itemized Transactions | | $0 |
| | Total Non-Itemized Transactions | | $13,700 |
| 1775 Mass. Ave.<br>Lexington<br>MA<br>02420 | **Total of All Transactions** | | **$13,700** |
| Type or Classification<br>(B) | | | |
| Accounting | | | |

Form LM-2 (Revised 2003)

ASE 000216

## SCHEDULE 19 - UNION ADMINISTRATION

FILE NUMBER: 033-092

There was no data found for this schedule.

## SCHEDULE 20 - BENEFITS

FILE NUMBER: 033-092

| Description (A) | To Whom Paid (B) | Amount (C) |
|---|---|---|
| Group Insurance | Union | $38,143 |
| Death | Beneficiaries | $43,500 |
| Pension, Insurance, Annuity | Union | $578,173 |
| Sick and Accident | Members | $41,990 |
| Scholarship | Members | $49,000 |
| Education | Members | $9,002 |
| Deceased Member Expense | Beneficiaries | $5,888 |
| Christmas Party | Members | $11,568 |
| Miscellaneous Member Benefits | Members | $97,500 |
| **Total Benefits** | | $874,764 |

Form LM-2 (Revised 2003)

ASE 000217

ASE 000218

EXHIBIT 18

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

P.Q  EXHIBIT  31
Plaintiffs
8/30/06

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| LOCAL UNION NO. 7, INTERNATIONAL ) | Case No. 1:04-cv-12536-RGS |
| ASSOCIATION OF BRIDGE, ) | |
| STRUCTURAL, ORNAMENTAL & ) | |
| REINFORCING IRON WORKERS, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT IRON WORKERS, LOCAL 7 OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure Rule and Rule 33.1 of the Local Rules, Defendant Iron Workers Local 7 ("Local 7") makes the following Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to Defendant Iron Workers Local 7.

## DEFINITIONS

A. As used herein, the term "overly broad" means that the Interrogatory seeks information beyond the scope of the current litigation and not reasonably calculated to lead to the discovery of admissible evidence.

B. As used herein, the term "proprietary" means concerning or regarding any information in which Local 7 may have a legitimate interest, including but not limited to an economic interest, the protection from unauthorized use and disclosure of which is necessary in order to prevent the compromise of such an interest and/or to avoid jeopardizing Local 7's organizing position or its signatory contractor's bidding positions.

C. As used herein, the term "privileged" means that the information requested is subject to the attorney-client, the attorney work-product doctrine or any other recognized privilege.

## GENERAL OBJECTIONS

1. Local 7 objects to the definition of "Fund" or "Funds" presented in ¶1 of the "Definitions and Instructions" section of the Plaintiffs' First Set of Interrogatories because it is incomprehensible, ambiguous, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories using the following definition of "Fund" or "Funds": "Fund" or Funds" refer to the Trustees of the Iron Workers District Council of New England Pension, Health and Welfare, Annuity, Vacation and Education Funds, located at Dorchester, Massachusetts.

2. Local 7 objects to the definition of "Iron Workers District Council" presented in ¶3 of the "Definitions and Instructions" section of the Plaintiffs' First Set of Interrogatories because it is ambiguous, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence, and it seeks to impose discovery obligations beyond the scope of the discovery obligations imposed by the Federal Rules of Civil Procedure, the Local Rules, and other applicable law. Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories using the following definition of "Iron Workers District Council": "Iron Workers District Council" refers to the New England District Counsel of Iron Workers, but

2

not any of its current or former officers, agents, executives, and members, unless a specific request so specifies.

3. Local 7 objects to the definition of "Job Targeting" and "Market Recovery" presented in ¶13 of the "Definitions and Instructions" section of the Plaintiffs' Request because it is inaccurate, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories using the following definition of "Job Targeting": "'Job targeting' refers to a Local 7 program having the dual purpose of securing work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms concerning wages and benefits are an obstacle to competing against non-union competition and monitoring the structural steel erection industry to help eliminate regulatory cheating in the non-union sector of the industry, thereby creating a more level playing field for Local 7 signatory contractors."

4. Local 7 objects to the definition of "Target Fund" presented in ¶14 of the "Definitions and Instructions" section of the Plaintiffs' First Set of Interrogatories because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories using the following definition of "Target Fund": "'Target Fund' refers to the fund from which monies are used for job targeting, as defined in ¶3 of Local 7's General Objections to Plaintiffs' First Set of Interrogatories herein."

5.   Local 7 objects to the extent the Plaintiffs' use of the phrase of "Local 7" is ambiguous.  Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories by defining "Local 7" to mean Local 7, but not any of its current or former officers, agents, executives, and members, unless a specific request so specifies.

6.   Local 7 objects to Plaintiffs' reference to "Jay Hurley" as ambiguous.  Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has assumed in responding to these Interrogatories that the Plaintiffs mean John F. Hurley, the General Vice President of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO and the President of the New England District Counsel of Iron Workers, when they refer to "Jay Hurley."

7.   Local 7 objects to the extent the Plaintiffs' use of the phrase "third parties" is ambiguous.  Without waiving this objection, and in the interest of not delaying the discovery process, Local 7 has responded to Plaintiffs' First Set of Interrogatories by defining "Third party" to mean anyone who is not Local 7, an officer or member thereof, a named Plaintiff in the current matter, a current or former shareholder, officer of any of the named Plaintiffs, or a current employee of any of the named Plaintiffs.

8.   Local 7 objects to these Interrogatories to the extent they seek to impose obligations beyond the scope of the discovery obligations imposed by the Federal Rules of Civil Procedure, the Local Rules, and other applicable law.

9.   Local 7 objects to these Interrogatories to the extent that they seek information that may be responsive but is privileged, as defined above.

4

10. Local 7 objects to these Interrogatories to the extent that they seek confidential union information that is not relevant.

11. Local 7 objects to these Interrogatories to the extent that they seek confidential information and will provide such confidential information only under the provisions of the Confidentiality Order entered in this case.

12. Each of these General Objections is incorporated into each of the following Responses to Plaintiffs' First Set of Interrogatories.

## RESPONSES AND SPECIFIC OBJECTIONS TO INTERROGATORIES

1.     List the names and dates of all "Collective Bargaining Agreements" allegedly applicable to Defendant for the period of December 1, 1999 to the present.

Response to Interrogatory 1:

Defendant objects to this Interrogatory as ambiguous and overbroad and not reasonably calculated to lead to admissible evidence.  Without waiving said objections, Local 7 states that the answer to this interrogatory may be derived or ascertained in part from documents bate-stamped DEF 00064-DEF 0094, DEF 00095-00124, DEF 00125-00159, DEF 00160-00233, DEF 00234-00260, DEF 00261-00290, DEF 01631-01688, DEF 01989-02045, and DEF 08027-0870 produced by Local 7 in this litigation, and the burden of deriving or ascertaining the answer is substantially the same for Plaintiffs as for Defendant.  In addition, there may be employers bound by an agreement with the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers or who may have signed the document known as "Acceptance of Agreement and Declarations of Trust," who are also bound by one or more of the agreements set forth above.  There may also be

5

additional employers with whom Local 7 has had a single, job-site agreement during the period in question.

2.    Identify with specificity the contractors with which Defendant has or has had a collective bargaining relationship since December 1, 1999.

Response to Interrogatory 2:

Defendant objects to this Interrogatory as overbroad and not reasonably calculated to lead to admissible evidence. Without waiving said objection, Local 7 states that the answer to this interrogatory may be derived or ascertained from documents DEF 08119 – DEF 08188 produced by Defendant in this litigation, and the burden of deriving or ascertaining the answer is substantially the same for Plaintiffs as for Defendant. Local 7 states further that, in addition to the signatory contractors on said documents produced by Defendant, there may be other contractors who have signed an agreement with he International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers or who may have signed the document known as "Acceptance of Agreement and Declarations of Trust," who are by virtue of these agreements also bound by one or more of the agreements set forth above.

3.    Identify with specificity the names of any employer associations with which Defendant has entered into collective bargaining since December 1, 1999.

Response to Interrogatory 3:

Building Trades Employees' Association of Boston and Eastern Massachusetts; Western Massachusetts Erectors Association, Associated General Contractors, Inc.; Construction Industry of Western Massachusetts.

4.    State the basis for the Defendant's decision to initiate its Job Targeting and/or market recovery program.

Response to Interrogatory 4:

Sometime prior to 1991, Local 7 established a job targeting program, otherwise known as the Market Recovery Program. The purposes of the job targeting program were threefold: first, so that Local 7 would not have to enter into collective bargaining agreement with reduced wages and benefits; second, to secure work for Local 7 members in geographical areas where standard collective bargaining agreement terms with regard to wages and benefits appeared an obstacle to competing against non-union competition; and third, to monitor the steel erection industry, including to help eliminate extensive unlawful conduct in the industry. The job targeting program was funded out of the dues of Local 7 members.

In 1992, the membership of Local 7 considered whether it should reduce the wage rate when working in geographical areas where non-union competition was strongest. The membership rejected this idea. Instead, the membership voted to permanently fund the job targeting program with dues.

5.    Describe the process whereby Defendant receives Job Target or Market Recovery Money from employers and how Defendant receives, deposits, and accounts for the money so forwarded by said contributing employers or administrative Fund, including what financial institution and bank account numbers are applicable to such Fund.

Response to Interrogatory 5:

Local 7 objects that, with regard to the references to the Fund, the interrogatory is

ambiguous, overbroad and not reasonably calculated to lead to admissible evidence.

Without waiving said objection, Local 7 states that signatory employers deduct all

wage and benefit deductions authorized by Local 7 members from the employees' net

wages and forwarded these amounts to the Fund Office where they were deposited in

the Fund's clearing account at the Fund's bank. The Fund's bank then electronically

transfers these amounts to Local 7's account. Prior to May 1, 1995, target funds were

then forwarded from this account to the Target Fund Money Market Account.

Amounts are forwarded to the Target Fund Checking Account from the Money

Market Account as needed.  The amounts in the Target Fund Checking are accounted

for in Local 7's Quick Book accounting system.  Since May 1, 1995, the working

dues authorized by the members have been forwarded to, and remain in, Local 7's

clearing account.

6.       Identify each person who prepared or was consulted with regard to their

         Answers to these Interrogatories.

Response to Interrogatory 6:

       Local 7 objects to this interrogatory to the extent that it seeks information covered
by the attorney-client privilege and the attorney work-product doctrine. Without waiving
such objection, Local 7 identifies James P. Brown, Paul J. DiPietro, and James Coyle.

7.       Identify every person who you believe has knowledge or information relevant

         to the claims or defenses asserted in this action.

Response to Interrogatory 7:

Local 7 incorporates herein Defendant's Initial Disclosures, subparagraph A, served

April 12, 2006, and Defendant's First Supplement to its Initial Disclosures,

subparagraph A, served July 27, 2006. Local 7 identifies further Donald Morel,

Raymond Cilley, Glen Pisani, Michael P. Guillemette and James Read, whose

addresses are known to Plaintiff.

8.        Identify and state the basis for the "relevant market" that Defendant contends

          includes products and services and geographical limitations is relevant to this

          case.

Response to Interrogatory 8:

Local 7 objects that this Interrogatory is ambiguous. Local 7 objects further that a

full response to this Interrogatory requires expert testimony, and that such response

will be provided within the time frame for expert disclosures under Rule 26(a)(2).

Without waiving said objections, Local 7 states that for purposes of its summary

judgment motion only, Local 7 accepts Plaintiffs definition of the "relevant market"

set forth in ¶ 29 of the Complaint, and that in the event that this matter proceeds to

trial, Local 7 contends that the geographical limitations of the relevant market are

world-wide, with participants from China, the Netherlands, Canada and elsewhere.

Local 7 contends further Plaintiffs own testimony demonstrates the far broader

market, including (1) the participation in the market of erectors from as far away as

South Carolina; (2) the solicitation of bids from Plaintiffs by fabricators from both the

United States and Canada for projects in numerous different locations, including in

states other than those listed in the definition of relevant market provided by the

9

Plaintiffs; and (3) Plaintiffs' own participation in the market in areas including

Northern Maine, Western Massachusetts, Vermont, Connecticut and New York, not

listed in the definition of relevant market provided by the Plaintiffs.

9.    Identify the geographical limitations, if any, employed by Local 7's Target

Fund money.

Response to Interrogatory 9:

Local 7's Target Fund money is used throughout New England, where Local 7

members live and work.

10.    Identify the officers and agents of Defendant who also holds positions as a

trustee on any Fund jointly administered with any employer or employer

association or any other independent fund, the person's position, the name,

address, and telephone number of such Fund.

Response to Interrogatory 10:

Local 7 objects on the grounds that this information is not reasonably calculated to

lead to admissible evidence. Without waiving said objection, Local 7 states that the

Business Manager of Local 7 is a Trustee of the Health and Welfare Fund and the

Pension Fund, the Business Manager, the President and one Business Agent are

Trustees of the Joint Apprenticeship Training Committee, and the Business Manager

and all Business Agents are Trustees of the Annuity and Pension Supplement Funds.

11.    Identify any persons Defendant may call as expert witnesses that Defendant

intends to utilize at trial and/or to prepare an expert witness report or whom

10

Defendant has consulted with concerning its formulation of damages and methodology of finding damages.

Response to Interrogatory 11:

Local 7 has not yet determined the persons it may use at trial to present expert testimony and/or to prepare an expert witness report, but shall disclose the identities of such persons as required under Federal Rule of Civil Procedure 26(a)(2). Local 7 has not consulted any persons concerning its formulation of damages or methodology of finding damages.

12.    Identify and describe in detail each communication that you had with any employer of steel erection services since December 1, 1999, concerning the following matters:

    a.   evaluation of price for steel erection services, including but not limited to, similar prices, identical prices or different prices;

    b.   the purchasing practices of direct purchasers of steel erection services;

    c.   prices quoted or bid on steel erection services;

    d.   market or published price levels for steel erection services;

    e.   prices paid or to be paid for steel erection services;

    f.   terms or conditions of sale of steel erection services;

    g.   the relative merits of steel erection services;

    h.   evaluations of suppliers or potential suppliers of steel erection services'

    i.   any recommendations for action with respect to similar prices, identical prices, different prices, the purpose of certain prices or any purported anti-trust violation by any supplier of steel erection services.

Response to Interrogatory 12:

Defendant objects that the term "employer of steel erection services" is ambiguous, and that the interrogatory is overbroad, burdensome and not reasonably calculated to lead to admissible evidence. Defendant objects further that to the extent that such communications may have occurred as set forth in documents provided to, or made

available for review by, Plaintiffs, determining the facts underlying the possible

communication is equally burdensome to Defendant as to Plaintiffs. Without waiving

said objections, Defendant states that to the extent that Plaintiffs are using the term

"employer of steel erection services" to mean fabricators or general contractors who

award projects directly to erectors, Local 7 responds that generally, it does not have any

such communications.

13.    Identify the person or persons who prepared DEF 04717-33 in response to

Plaintiff's Request for Production of Documents, where it was prepared, and

what data or document system was used to prepare the response, and where

the information is maintained.

Response to Interrogatory 13:

The document DEF 04717-33 was printed in response to Plaintiff's Request for

Production of Documents by James Brown at Local 7's offices. The data or document

system used to prepare the response was EXCEL and Quickbooks. The information is

maintained on the hard drive of the computer system at Local 7 and is accessible only by

the Financial Secretary-Treasurer and his office staff. For the period from December 1,

1999, through the present, Local 7's Financial Secretary-Treasurers have been Paul

diPietro, James Coyle and James Brown.

14.    Identify the name, address, and telephone number of each entity or person

identified as "VARIOUS CONTRACTORS" ON DEF 04732 in response to

Plaintiff's Request for Production of Documents.

Response to Interrogatory 14:

Defendant objects to this interrogatory to the extent that it seeks information covered

by the attorney-client privilege and objects further to providing such information

regarding entities or persons identified as Various Contractors on DEF 04732 who are

not participants in the market for steel erection services, in that the information is not

reasonably calculated to lead to admissible evidence. Defendant states further that

the identity of the entities or persons identified as Various Contractors on DEF 04732

is not set forth in the Quick Books program, and that the identity of those entities who

are participants in the market for steel erection services can be ascertained through a

review of the documents provided to, or made available to the Plaintiffs, and the

burden of ascertaining that information is substantially the same for the Plaintiffs as

for the Defendant.

15.    Identify the name, address, and telephone number of each entity or person

    identified as "LOST WAGES MEMBERS" ON DEF 04724 in response to

    Plaintiff's Request for Production of Documents.

Response to Interrogatory 15:

Defendant objects that this interrogatory – which seeks the identification of payments

to individual iron workers who have not received wages from work performed –seeks

information not reasonably calculated to lead to admissible evidence. Defendant

states further that the identity of the entities or persons identified as LOST WAGE

MEMBERS on DEF 04724 is not set forth in the Quick Books program, and that the

identity of those individuals can be ascertained through a review of the documents

13

provided to, or made available to the Plaintiffs, and the burden of ascertaining that information is substantially the same for the Plaintiffs as for the Defendant.

16.    Identify the name, address, and telephone number of each entity or person identified as "LOST WAGE MEMBERS" ON DEF 04724 in response to Plaintiff's Request for Production of Documents.

Response to Interrogatory 16:

See response to Interrogatory 15.

17.    Identify all contractors that employed Defendant's members on any portion of the Boston Central Artery and Harbor Tunnel project ("Big Dig") under terms of any collective bargaining agreement or prehire agreement with Local 7.

Response to Interrogatory 17:

Defendant does not maintain this information on any regular basis. The contractors include Modern Continental, Iroquois Steel, Rescue Welding, Keystone Engineering, Aztec Steel, NB Johnson, Roscoe/Regis and various other contractors. Defendant respectfully suggests that a complete list can be obtained from the Massachusetts Turnpike Authority.

18.    State the basis for entering into each of the Job Target Agreements with each Employer listed on DEF 04717-33 in Response to Plaintiff Request for Production of Documents for each public works project.

Response to Interrogatory 18:

14

Local 7 entered into Job Target Agreements Employers on public works projects, including federal public works projects subject to prevailing wage regulations under the Davis-Bacon Act, in order to secure work for Local 7 members in geographical areas where Local 7's standard collective bargaining agreement terms (in particular, staffing levels, travel pay, wages (including wage increases provided for in the collective bargaining agreement, foremen's wages and wages determined by jurisdiction), benefits and training) or where potential regulatory cheating by non-signatory competition, including workers' compensation premium evasion scams such as those engaged in by Plaintiff Ajax Construction and Bedford Iron Works as shown on documents produced by the Defendant, appeared to be an obstacle to competing against non-union competition.

19.    For each project identified in response to Interrogatory 16 above, identify each non-union steel erector that Defendant knows submitted a bid on said project or the Defendant had information that a non-union steel erector would submit or did submit a bid on each said project, and include a) the name of the non-union steel erector, and b) the name, address, and telephone number of each person that provided information that a non-union steel erector was interested in bidding on said public works project.

Response to Interrogatory 19:

Local 7 has identified no projects in response to Interrogatory 16 above. Local 7 states further that in any event, Local 7 has no reliable information (other than information provided by Plaintiffs through discovery in the instant action) as to which, if any, non-union erectors submitted bids on any particular projects.

15

20.    Identify what the documents DEF 05468-5811 were taken from, the substance

of the material "REDACTED," where the documents referenced are located,

whose handwriting the documents produced are in, and when each such page

of documents was prepared.

<u>Response to Interrogatory 20</u>:

Documents DEF 05468-5811 are copies of pages of Local 7's official minutes. The

material redacted relates to the business of Local 7 that occurred at such meetings that

is unrelated to either the Target Fund or any matters raised in the Complaint. The

official minutes are located at Local 7's office. Local 7's practice is to have the

information on these pages copied into the official minutes on the day of (or within a

few days of the meeting in question). The handwriting belongs to Local 7's

Recording Secretaries as follows:

| Meeting Date | Bate-stamp number | Note Taker |
|---|---|---|
| May 27, 1992 | 05468-05474 | Neil B. Conley |
| June 24, 1992 | 05475-05482 | Neil B. Conley |
| July 14, 1992 | 05482-05485 | Neil B. Conley |
| July 29, 1992 | 05486 | Neil B. Conley |
| September 21, 1992 | 05487-05489 | Neil B. Conley |
| October 3, 1991 | 05490-05492 | Neil B. Conley |
| October 28, 1992 | 05492-05499 | Neil B. Conley |
| November 18, 1992 | 05500-05505 | Neil B. Conley |
| January 25, 1993 | 05506-05510 | Neil B. Conley |
| February 22, 1993 | 05511-05512 | Neil B. Conley |
| March 8, 1993 | 05513-05515 | Neil B. Conley |
| March 23, 1993 | 05516-05521 | Neil B. Conley |
| April 26, 1993 | 05522-05523 | Neil B. Conley |
| May 24, 1993 | 05524-05530 | Neil B. Conley |
| Approx. June 1993 | 05531-05533 | Neil B. Conley |
| July, 1993 | 05534-05537 | Neil B. Conley |
| September 22, 1993 | 05538-05542 | Neil B. Conley |
| November 17, 1993 | 05543-05547 | Neil B. Conley |
| December 23, 1993 | 05548-05551 | Neil B. Conley |
| March 21, 1994 | 05552-05553 | Neil B. Conley |

| | | |
|---|---|---|
| March 23, 1994 | 05554-05559 | Neil B. Conley |
| April 27, 1994 | 05560-05565 | Neil B. Conley |
| April 26, 1995 | 05566-05569 | Michael J. Durant |
| May 24, 1995 | 05570-05573 | Michael J. Durant |
| June 28, 1995 | 05574-05579 | Michael J. Durant |
| July 26, 1995 | 05580-05583 | Michael J. Durant |
| August 23, 1995 | 05584-05588 | Michael J. Durant |
| October 25, 1995 | 05589-05591 | Michael J. Durant |
| November 7, 1995 | 05592-05593 | Michael J. Durant |
| November 15, 1995 | 05594-05597 | Michael J. Durant |
| January 24, 1996 | 05598-05600 | Michael J. Durant |
| February 28, 1996 | 05601-05603 | Michael J. Durant |
| May 22, 1996 | 05604-05606 | Michael J. Durant |
| June 26, 1996 | 05607-05610 | Michael J. Durant |
| August 28, 1996 | 05611-05614 | Michael J. Durant |
| October 23, 1996 | 05615-05621 | unidentified |
| January 22, 1997 | 05622-05625 | Michael J. Durant |
| March 26, 1997 | 05626-05629 | Michael J. Durant |
| April 23, 1997 | 05630-05633 | Michael J. Durant |
| June 25, 1997 | 05634-05637 | Walter C. Jenkins |
| July 25, 1997 | 05638-05642 | Walter C. Jenkins |
| August 25, 1997 | 05643-05644 | Walter C. Jenkins |
| September 29, 1997 | 05645-05651 | Walter C. Jenkins |
| October 22, 1997 | 05652-05656 | Walter C. Jenkins |
| December 9, 1991 | 05657-05659 | Walter C. Jenkins |
| December 15, 1997 | 05660 | Walter C. Jenkins |
| January 13, 1998 | 05661-05663 | Walter C. Jenkins |
| January 18, 1998 | 05664-05670 | Walter C. Jenkins |
| January 26, 1998 | 05671-05672 | Walter C. Jenkins |
| February 23, 1998 | 05673 | Walter C. Jenkins |
| July 22, 1998 | 05674-05678 | Walter C. Jenkins |
| December 16, 1998 | 05679-05683 | Walter C. Jenkins |
| June 28, 2000 | 05684-05688 | Joseph Cook |
| January 24, 2001 | 05689-05693 | Joseph Cook |
| March 27, 2002 | 05694-05700 | Joseph Cook |
| November 20, 2002 | 05701-05707 | Joseph Cook |
| December 18, 2002 | 05708-05713 | Joseph Cook |
| January 22, 2003 | 05714-05722 | Joseph Cook |
| February 26, 2003 | 05723-05727 | Joseph Cook |
| July 23, 2003 | 05728-05735 | Joseph Cook |
| September 24, 2003 | 05736-05744 | Joseph Cook |
| December 17, 2003 | 05745-05757 | Joseph Cook |
| March 24, 2004 | 05758-05766 | Joseph Cook |
| April 28, 2004 | 05767-05773 | Joseph Cook |
| May 26, 2004 | 05774-05781 | Joseph Cook |
| August 25, 2004 | 05782-05791 | Joseph Cook |

| March 23, 2005 | 05793-05802 | Joseph Cook |
| July 27, 2005 | 05803-05811 | Joseph Cook |

21.     Describe the "new targeting program" identified on DEF 05793, when it was

implemented, how it is funded, what person or persons control it, and every

person to whom it has spent money on.

Response to Interrogatory 21:

The "new targeting program" was created by resolution at a Local 7 membership

meeting.  Since May 1, 2005, signatory employers have deducted working dues from

their employees' net wages.  These funds are forwarded by the employers to the Fund

Office and by the Fund Office to Local 7 as described in response to Interrogatory 5.

No monies have been spent from these funds.  Local 7's Business Manager /

Secretary-Treasurer controls this fund.

22.     State the basis for the claim made in Defendant's Statement of Undisputed

Facts that "Job targeting funds reduce the labor costs of Local 7 signatory

contractors on a particular job" in Document 47, pages 8 & 16, dated March

20, 2006, and identify which signatory contractors the claim is based upon.

Response to Interrogatory 22:

The labor costs for steel erectors are dependent on hourly costs (including wages,

benefits, training, workers compensation, and other factors) and the number of hours

of work required.  Labor costs for all signatory contractors are generally higher than

for non-signatory contractors because: (1) the wages and benefits required under the

collective bargaining agreement are generally higher than for non-signatory

contractors; (2) minimum staffing levels and travel pay are defined in part by the

18

collective bargaining agreement, whereas non-signatory contractors are not required

to meet these minimum staffing levels or pay travel pay; and (3) non-union

contractors are likely to engage in greater regulatory cheating. Job targeting funds

are awarded to signatory contractors on a project-by-project basis to defray these

higher costs.

23.    Identify any litigation in federal or state court which the Defendant has been

       involved from 1999 to the present.

Response to Interrogatory 23:

Local 7 objects that this interrogatory is overbroad and burdensome and not

reasonably calculated to lead to admissible evidence. Local 7 states further that this

information is a matter of public record and is accessible to Plaintiffs from the public

record.

24.    State the basis why Defendant provides job target and/or market recovery

       funds on federal public works projects subject to prevailing wage regulations

       under the Davis-Bacon Act.

Response to Interrogatory 24:

See response to Interrogatory 18.

25.    State the basis why Defendant requires that Job Target contracts require an

       acknowledgement by the contractor "that is a signed party to the Local

       #7/BTEA/AGC collective bargaining agreement *under Section 9A of the*

       *National Labor Relations Act.*" [Italics in original].

Response to Interrogatory 26:    It is Local 7's preference to award target funds to

contractors who are signatories to the Local #7/BTEA/AGC collective bargaining

agreement under Section 9A of the National Labor Relations Act, because it deems

9A agreements to be the sounder agreements under the National Labor Relations Act.

> LOCAL UNION NO.7, INTERNATIONAL
> ASSOCIATION OF BRIDGE,
> STRUCTURAL, ORNAMENTAL &
> REINFORCING IRON WORKERS
>
>
> Signed under pains and penalties of perjury
>
>
> James Brown
>
>
> As to Objections,
>
>
> By its attorneys,
>
> /s/Indira Talwani, Esq.
>
> Paul F. Kelly, Esq. (BBO #267000)
> Burton E. Rosenthal, Esq. (BBO #429220)
> Indira Talwani, Esq. (BBO # 645577)
> Stephanie R. Pratt, Esq. (BBO #655108)
> SEGAL, ROITMAN & COLEMAN
> 11 Beacon Street
> Boston, MA 02108
> (617) 742-0208
> pkelly@segalroitman.com
> brosenthal@segalroitman.com
> italwani@segalroitman.com
> spratt@segalroitman.com

Dated:  August 28, 2006

## CERTIFICATE OF SERVICE

I, Indira Talwani, Esquire, hereby certify that the foregoing Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to Defendant Iron Workers Local 7 has been served upon Plaintiffs' attorneys of record, Geoffrey R. Bok, Esq., 99 High Street, Boston, MA 02110, and Michael Avakian, Esq., 5211 Port Royal Road, Suite 103, Springfield, VA 22151, by first-class mail this 28th of August, 2006.

Indira Talwani, Esq.

L:\PKelly\4829 1W7\04528 ASE\Discovery\Request for Interrogs\Local 7's Response to Interrogs.doc

EXHIBIT 19

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

EXHIBIT 3

Plaintiffs

)
AMERICAN STEEL ERECTORS, INC., et al.  )
)
    Plaintiffs,             )
)
    v.                 )
)
LOCAL UNION NO. 7, INTERNATIONAL  )
ASSOCIATION OF BRIDGE,  )    Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL &  )
REINFORCING IRON WORKERS,  )
)
    Defendant.          )
)

## DEFENDANT IRON WORKERS, LOCAL 7 RESPONSE TO PLAINTIFFS' REQUEST FOR ADMISSIONS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure Rule and Rule 36.1 of the Local Rules, Defendant Iron Workers Local 7 ("Local 7") makes the following Objections and Responses to Plaintiffs' Request for Admissions to Defendant Iron Workers Local 7.

## DEFINITIONS

A.  As used herein, the term "overly broad" means that the request for admission asks for documents that are beyond the scope of the current litigation and not reasonably calculated to lead to the discovery of admissible evidence.

B.  As used herein, the term "proprietary" means concerning or regarding any information in which Local 7 may have a legitimate interest, including but not limited to an economic interest, the protection from unauthorized use and disclosure of which is

necessary in order to prevent the compromise of such an interest and/or to avoid

jeopardizing Local 7's organizing position or its signatory contractor's bidding positions.

C. As used herein, the term "privileged" means that the request for admission

seeks information subject to the attorney-client, the attorney work-product doctrine or

any other recognized privilege.

## GENERAL OBJECTIONS

1. Local 7 objects to the definition of "Job Targeting" and "Market Recovery"

presented in ¶1 of the "Definitions and Instructions" section of the Plaintiffs' Request

because it is inaccurate, overly broad, and not reasonably calculated to lead to the

discovery of admissible evidence. Without waiving this objection, and in the interest of

not delaying the discovery process, Local 7 has responded to Plaintiffs' Requests using the

following definition of "Job Targeting": "'Job targeting' refers to a Local 7 program

having the dual purpose of securing work for Local 7 members in geographical areas where

Local 7's standard collective bargaining agreement terms concerning wages and benefits

are an obstacle to competing against non-union competition and monitoring the structural

steel erection industry to help eliminate regulatory cheating in the non-union sector of the

industry, thereby creating a more level playing field for Local 7 signatory contractors."

2. Local 7 objects to the definition of "Target Fund" presented in ¶3 of the

"Definitions and Instructions" section of the Plaintiffs' Request because it is overly broad

and not reasonably calculated to lead to the discovery of admissible evidence. Without

waiving this objection, and in the interest of not delaying the discovery process, Local 7

has responded to Plaintiffs' Requests using the following definition of "Target Fund":

"'Target Fund' refers to the fund from which monies are used for job targeting, as defined in ¶1 of Local 7's General Objections to Plaintiffs' Request herein."

3.   Local 7 objects to these Requests to the extent they seek to impose obligations beyond the scope of the discovery obligations imposed by the Federal Rules of Civil Procedure, the Local Rules, and other applicable law.

4.   Local 7 objects to Plaintiffs' attempt to direct these Requests for Admissions at individuals who are not party to this litigation by virtue of its definition of the term "you." Local 7 has answered these Requests for Admissions on its own behalf only.

11. Each of these General Objections is incorporated into each of the following Responses to Plaintiffs' Request.

## OBJECTIONS AND RESPONSES

REQUEST FOR ADMISSION NO. 1. Do you admit that contractors with whom Defendant has Collective Bargaining Agreements perform over 70% of the dollar volume of work available in the Relevant Market defined in paragraph 29 of the Complaint?

Objection:  Local 7 objects on the ground that this request is ambiguous.

Response:  Local 7 is without sufficient knowledge to admit or deny this request.

REQUEST FOR ADMISSION NO. 2. Do you admit the Defendant has entered into Target Agreements with signatory contractors for a purpose to prevent non-signatory steel erection companies from obtaining contracts from steel fabricators?

Response:  Denied.

3

REQUEST FOR ADMISSION NO.3. Do you admit the Defendant has entered into

Target Agreements with signatory contractors for a purpose to prevent non-signatory

steel erection companies from obtaining contracts from General Contractors?

    <u>Response:</u> Denied.


REQUEST FOR ADMISSION NO.4. Do you admit that Defendant's Job Targeting

and/or market recovery program is funded through the Working Dues Deduction in its

Collective Bargaining Agreements?

    <u>Objection:</u> Ambiguous.

    <u>Response:</u> Admit that the target program is funded with dues only, and admit

further that Defendant's Collective Bargaining Agreements require, where appropriate,

that the employer deduct amounts authorized by Local 7's members and forwards such

deductions to Local 7. Denied as to all other facts or assumptions, including the

assumption that dues are collectively bargained.


REQUEST FOR ADMISSION NO.5. Do you admit that a signatory contractor's

remittance of Working Dues Deduction from employee wages to Defendant included

money from wages earned by employees on public works project subject to the Davis-

Bacon Act?

    <u>Objection:</u> Ambiguous.

    <u>Response:</u> Admit, only that dues are deducted from employee paychecks earned

while employed on projects governed by the Davis-Bacon Act, and further that

Defendant's Collective Bargaining Agreements require, where appropriate, that the

employer deduct amounts authorized by Local 7's members and forwards such

deductions to Local 7. Any other facts or assumptions, if any, are denied.


REQUEST FOR ADMISSION NO.6. Do you admit that Target Money was paid to

owners, developers, steel fabricators and/or general contractors by Local 7, or by any

jointly administered trust or other entity, upon the condition that a contractor signatory to

an agreement with Local 7 be utilized to erect structural steel?

    Objection: Ambiguous.

    Response: Admit that on two or three instances (out of over a thousand awards

of funds), non-profit or charitable organizations received donations from the Target

Program. Except as specifically admitted, Local 7 denies the request.


REQUEST FOR ADMISSION NO.7. Do you admit that the terms and conditions of

agreements between Local 7 and signatory companies in the industry are identical?

    Response: Denied.


REQUEST FOR ADMISSION NO.8. Do you admit that the Local 7 agreed with

signatory companies to picket non signatory companies?

    Response: Denied.


REQUEST FOR ADMISSION NO.9. Do you admit that Local 7 has told signatory

companies that it would impose identical terms and conditions in any Collective

Bargaining Agreement entered into with a competitor of them?

<u>Response:</u> Denied:

REQUEST FOR ADMISSION NO.10. Do you admit that Local 7 agreed with signatory contractors to seek to organize other companies which erect structural steel?

    <u>Response:</u> Denied.

REQUEST FOR ADMISSION NO.11. If you assume accuracy of paragraph 48 of the Complaint, do contractors signatory to agreements with Local 7 possess in excess of a 70% market share?

    <u>Objection:</u> Local 7 objects to this Request is as ambiguous and an improper and nonsensical Request for Admission in that the Request asks Local 7 to assume the same facts that the Requests asks Local 7 to admit.

    <u>Response:</u> Denied.

REQUEST FOR ADMISSION NO.12. Do you admit that Local 7 has stated it will close down American Steel Erectors, Inc., AJAX Construction Co., Inc., American Aerial Services, Inc., Bedford Ironworks, Inc., and D.F.M. Industries, Inc. because any of them is not signatory to a contract with Local 7?

    <u>Response:</u> Denied.

REQUEST FOR ADMISSION NO. 13. Do you admit informing general contractors, developers, steel fabricators and/or owners of the existence of an approved contractors list and/or list of "signatory Companies?"

6

Objection: Local 7 objects that this request is ambiguous and compound.

Response: Without waiving said objection, Local 7 admits that it has informed the public and others of the fact that it has collective bargaining agreements with employers.

REQUEST FOR ADMISSION NO.14. Do you admit to seeking to induce employees of any of the Plaintiffs to leave their job and become employed by a Local 7 signatory company?

Response: Denied, but Local 7 admits to educating some employees of Plaintiffs about the benefits working for employers, including Plaintiffs, but under a union contract. And, Local admits its agents seek to discuss wages, benefits and other terms and conditions of employment including but not limited to other mutual aid and protection with Plaintiffs' employees –though Plaintiffs often inhibit Local 7's ability to do so.

REQUEST FOR ADMISSION NO.15. Do you admit that stripped employees from Plaintiffs were dispatched by the union "out of order" under the dispatch rules of the union?

Response: Denied.

REQUEST FOR ADMISSIONS NO.16. Do you admit to obtaining assurance, from any contractor with whom you are signatory, to hire stripped employees?

Response: Denied.

7

REQUEST FOR ADMISSION NO. 17. Do you admit that the Local 7 Job Target Fund is not a "fund" within the meaning of 29 USC Section 186?

Response: Local 7 admits that the Local 7 Job Target Fund is not a fund under 29 U.S.C. § 186(c)(5).

REQUEST FOR ADMISSION NO. 18. Do you admit that the Local 7 contacted Capone Steel and obtained an agreement from Capone Iron Corporation to break its contract with D.F.M.> Industries, Inc. And give the structural steel erection work on the Brickworks project to Bel-Lin Corporation, a signatory contractor?

Response: Denied.

LOCAL UNION NO.7, INTERNATIONAL
ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL &
REINFORCING IRON WORKERS

By its attorneys,

/s/ Indira Talwani, Esq.

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

Dated: August 28, 2006.

8

I, Indira Talwani, hereby certify that the foregoing Defendant Iron Workers Local 7 Response to Plaintiffs' Request for Admissions has been served upon Plaintiffs' attorneys of record, Geoffrey R. Bok, Esq., 99 High Street, Boston, MA 02110, by hand-delivery, and Michael Avakian, Esq., 5211 Port Royal Road, Suite 103, Springfield, VA 22151, by first-class mail this 28th day of August, 2006.

Indira Talwani, Esq.

L:\PKelly\4829 IW7\04528 ASE\Discovery\Request for Admissions\Local 7's Response to Request for Admissions.doc

EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 04-cv-12536-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JOHN J. PAULDING

JOHN J. PAULDING, having been duly sworn states on personal knowledge the following:

1     I am President of C & I Steel, Inc. ("C & I").  C & I is a Massachusetts corporation with a principal office at 180 Airport Road, Hyannis, MA 02601.  C & I Steel, Inc. was formerly known as Cape & Island Steel, Inc.  The Company's principal office is at 180 Airport Road, Hyannis, MA 02601.

2.     I have been working in the steel industry for twenty years as a wholesaler and fabricator.  I have served on the Board of Directors for the New England Fabricator Associations,   C & I was a corporate member of the American Institute of Steel Construction.

3.     As a part of my professional associations, I have regularly had meetings and outside discussions to air issues relating to the steel fabrication and erection industries with other steel fabricators, steel erection companies, and

general contractors.

   4.    C & I is a steel fabricator.  A steel fabricator processes raw steel by shaping it and cutting it into lengths and dimensions set forth in detailed drawings provided by a steel draftsmen.  The draftsmen extracts detailed information from the specific projects of the design team architect and structural engineer.  The resulting plan results in the fabrication of steel which is known as structural steel.  Typically, structural steel is used as framing on buildings and structures, and in the erection of homes, metal buildings, office buildings, bridges, walkways, shopping plaza's, parking garages, and other large construction projects where steel provides a high strength capacity.  Steel is also shaped with prestressed and precast concrete.

   5.    C & I's geographical area of operation primarily includes the states of Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island.

   6.    C & I's business involved obtaining work through direct contracts with developers, architects, and general contractors.  On most occasions, these sources of work would request not only a price for the supplying of steel to specification, but also for the erection of the steel on their properties.  In these latter cases, C & I would solicit bids from steel erection companies in its geographical area.

   7.    C & I would solicit bids from steel erection companies by fax and telephone.  We would provide drawings to the steel erection companies and a date when the bid needed to be turned in.

2

8.    Based on the price received from the steel erection company, C & I would select the lowest bid based on its confidence in the steel erection company's prior performance, then submit a package price for the structural steel and the steel erection to the developer, architect, and general contractor.  It was not unusual for the developers, architects, and general contractors to request whether the price could be lowered and to provide proposed modifications to the original plans to save money.  When C & I would receive such requests for information, I or a member of C &I's team would contact the steel erection companies for a modified bid price and report the differential to the architect, developer, or general contractor.

9.    C & I's staff during this period included job superintendents, office clericals, and bid estimators.  It never employed workers in any trades, such as operators of heavy equipment or persons who erect or construct iron or steel.

10.    Over the course of the last twenty years, C & I had worked on thousands of projects in New England.  During this period it utilized both steel erection companies with employee representation by labor unions and companies that were open shop.

11.    The labor unions C & I had usual contact with during this period included Iron Workers Local 7 from Boston, MA and Iron Workers Local 57 from Providence, RI.

12.    It was well-known by fabricators in the industry that a project of any notoriety and especially in proximity to downtown Boston, MA could not be

accomplished with an open-shop steel erector.  Projects of this nature resulted in receipt of threats, the intimidation of the fabricators, architects, developers, and general contractors working on these projects, and the destruction of equipment left on-site.  C & I experienced these threats and disruptions of work on projects such as Fox 25 news and at the Weymouth Assisted Living project in Weymouth, Massachusetts.

13.    On February 10, 2003, C & I issued a purchase Order to D.F.M. Industries, Inc. ("D.F.M."), Wrentham, MA to supply all structural steel erection, joists, and decks for a project to build a Fox Television Station addition in Dedham, Massachusetts.  Exhibit A.  D.F.M. was the low bidder on three bids I obtained from open and union shop steel erection companies.  C & I was the steel fabricator.  Bond Brothers, Everett, MA was the general contractor.

14.    At approximately 11:00 a.m. on February 24, 2003, the day before construction was to begin, Local 7 business agent Edwin Wright contacted me by telephone.  I had met Mr. Wright on a previous occasion.  Mr. Wright told me that he was upset that C & I had subcontracted the structural steel erection to D.F.M., an open shop erector.  Mr. Wright had previously contacted C & I's project manager Jim Gage earlier in the morning.  Mr. Gage told me in the ordinary course of business that Mr. Wright had harassed him, demanded that D.F.M. be removed from this project, and threatened to force the walk out of all the trades on the site if D.F.M. remained on the job.

15.    I told Mr. Wright that D.F.M. had submitted a reasonably priced bid

4

and could perform the work on a tight schedule needed for the project.  As I talked, Mr. Wright became more irate and told me that "D.F.M. Erection" is one of the companies targeted by Local 7.  He went on to tell me that D.F.M. should not be there, that it should be removed from the project and that there would be a strike at the Fox 25 project if D.F.M. was not removed.

16.    Mr. Wright further told me that C & I had put union companies out of business the previous year, specifically Tom McGee of N.E. Erection.  Mr. Wright also threatened me that he would let the "Gorilla out of the cage" on both C & I and D.F.M. I asked him if he was threatening me and he stated that "you know exactly what I mean."  I understood Mr. Wright to mean that he would aggressively pursue C & I and/or its subcontractors to put us both out of business, just as he had claimed he did with Tom McGee at N.E. Erection, unless C & I dismissed D.F.M.

17.    I tried to calm Mr. Wright down.  I told him that C & I had contracted millions of dollars to union steel erectors in 2002 and hoped that this fact would cause him to retract his threat.  However, this fact further incited Mr. Wright.  He told me that union erectors had been hurt by C & I's subcontracting to D.F.M. and "this was a big mistake."

18.    Mr. Wright again told me that D.F.M. had been targeted by Local 7, D.F.M. should not be there, the Fox 25 project was a high profile project, Local 7 would be engaged in a continuous strike at the project site by, and Local 7 would induce other building trade union members to walk off the job.  I understood these

threats as coercion to force me into agreeing to break C & I's contract with D.F.M.

19.    On February 24, 2003, Local 7 set up a picket line at all entrances and exits from the Fox 25 site.

20.    On February 28, 2003, D.F.M. discovered that connection clips and bolts to hang steel beams it had installed had been stolen and a Genie lift had been vandalized.  I tried to get D.F.M. compensated for the damaged equipment by notifying the general contractor Bond Brothers, that since it had the responsibility to secure the property and clear all persons on the property, it must submit a police report.  C & I held Bond Brothers responsible for the financial damage and for the monetary value of the delay.

21.    Bond Brothers, however, directed C & I to make the union problem go away.  I had no choice but to comply with Bond Brothers' request. Subsequently, C & I through Jim Gage, informed D.F.M. that it would be terminated and C & I would not give the next phase of the job to D.F.M.  D.F.M. was removed from the job.  It was replaced by a union signatory contractor RAD Erectors, which the Union directed to me use and which I knew to have been previously cited by the Union as a noncompliant union contractor for its failure to pay union scale wages and benefits.

22.    RAD could not complete the job.  As a result, C & I was permitted to recall D.F.M. to finish the job.

23.    On several other jobs I have been approached by Local 7 business agents Pat McDermott and Michael Durrant to use only union signatory steel

erectors.  I met with them in 2003 at C & I's office in Hyannis, MA.  They wanted C & I to use only union steel erectors in the future.  We also discussed the union's target fund.

24.     During this meeting, the two men told me "we want it all."  If I worked with them, I could receive target money on the projects which I could use to lower my own bid prices to architects, developers or general contractors.

25.     On the Weymouth Assisted Living project, in Weymouth, Massachusetts, I was threatened by Mr. Edwin Wright for using a non-union erector in addition to using union erector Dorel Steel who was working too slow on the job.  I was told I could continue using the non-union contractor so long as I put four union men on the payroll, and Mr Wright would supply me the names afterward.  I refused to do so.

26.     C & I subcontractors received target fund money on many of its projects, including: Silver Lake Regional High School, Martignettis Liquor Warehouse, Wellesley Library, N.E.C.C.O., Brown Elementary, the Science Building Woods Hole, Norwell Middle School, Yarmouth Police, and Stony Brook projects, several of which were prevailing wage projects.

27.     I was told on these jobs by union agents, that unless the job was given to a union steel erector, there would be problems on the job such as picketing, coercion, intimidation, and potential destruction of property.  I was well aware of the destruction of property that could occur on job sites, such as by the destruction of Ajax Construction Company's cranes and equipment when doing

jobs in Boston.

28.    The promise of "problems" on the job delivered by Local 7 business agents to fabricators and general contractors is well known in the industry as a short-hand term for its causing project delays, increased financial costs, and property destruction if the project went to a non-union steel erector.

29.    On those projects listed above, I was approached by union business agents to give the work to a signatory contractor, either before or after a bid was in, and presented with the opportunity to experience "problems" or not by C & I's choice of steel erector.

30.    In each of these cases, I agreed with Local 7 to use a signatory contractor who would be provided target money to lower its cost.

31.    C & I's ultimate price to the developer or general contractor could be adjusted as C & I felt necessary.  The full amount of the target money given to the union signatory steel erector by Local 7 was not passed off to the consumer, general contractor or developer by C & I to lower C & I's bid.

Further affiant saith naught.

John J. Paulding

## COMMONWEALTH OF MASSACHUSETTS

County of Barnstable, ss

On this _29th_ day of September 2006, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, which was a Massachusetts Driver's License, to be the person whose name is signed on the preceding or attached document in my presence.

_____
Notary Public

My Commission expires: _8/17/2012_

KRISTEN MARIE REDDING
Notary Public
Commonwealth of Massachusetts
My Commission Expires August 17, 2012

9

EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,<br><br>              Plaintiffs,<br><br>              v.<br><br>LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS, *et al.,*<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)    Case No. 04-cv-12536-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>AFFIDAVIT OF SUSAN BEAUREGARD</u>

SUSAN D. BEAUREGARD, having been duly sworn states on personal knowledge the following:

1       That I have been president of Construction Welding Services Corp ("CWS") since 2001.  CWS is a Massachusetts corporation.

2.     The Company employed about approximately ninety-two (92) employees, including office, clerical, managerial, and supervisory employees.

3.     CWS had no other corporate officers and no other shareholder but myself.

4.     My job responsibilities as President of CWS included hiring and firing employees, hiring office staff and supervisors, estimating jobs, reviewing and issuing contract bids, approving payroll, granting pay increases, and establishing the company policies.  I trained the office staff and office messengers.  I hired the project managers. No other employee was authorized to undertake any of these functions.

5.     CWS's primary operating market was public steel erection jobs within the Boston vicinity on prevailing wage projects.  CWS's business model intended to reduce ongoing monthly overhead by not purchasing expensive equipment for steel erection,

such as cranes, but by leasing and renting equipment when needed to reduce these costs.

6.      CWS usually worked under a contract with a steel fabricator that had obtained the fabrication-erection package for a construction project from a general contractor, owner or developer.  The fabricator customers of CWS were Beauce Atlas in Canada, Lesfab Steel International, and Canatal Industries, Inc., Quebec, Canada, Mandate Erectors & Welding in New Brunswick, Canada, St. John, Ocean Steel Construction LTD, St. John, NB, Canada, Sturo Metal, Levis, Quebec, and Quinn Brothers, Essex, Massachusetts.

7.      The primary components of bids within the steel erection industry are labor costs and crane costs, which include the costs of the crane operator, oiler, cleaner, employee travel when out of the company's general area of operations, and administrative overhead.

8.      On March 21, 2001, CWS signed a document entitled Acceptance of Agreements and Declarations of Trusts Agreement ("Agreement") with Michael Durant, a business agent of Iron Workers Local 7 ("Union") without proof of employee support for the union.  Exhibit A.  I signed the agreement as President of CWS and not in my individual capacity.

9.      I have no direct knowledge of the cost structure of non-union steel erection companies in this industry.  I understand that they may sometimes pay their employees less than the Iron Worker contract rates.  This advantage could essentially be eliminated on prevailing wage jobs where the local Union rate was the prevailing wage rate under Massachusetts or federal law.

10.     After I signed the Union contract, I was approached by union business agents such as Edwin Wright.  Mr. Wright advised me that I could obtain job target

funds from the Union in order to obtain an advantage against other bidders, including non-union steel erectors.  The funds would allow CWS to submit lower bids on a project and help drive non-union steel erectors out of CWS's competitive market.

11.    CWS was informed that when it became a union contractor, it would be provided job target money on several jobs by Local 7 prior to bidding the work.  Each time I agreed to accept target money to bid on a job, I had to agree to separate terms for payment with Local 7.

12.    CWS received target money from Local 7 on several projects.  CWS received two payments totaling $20,450.68 and $2,006.68 for the 405 Cochituate Road project, $31,205.01 for the Carroll School project, $30,600.00 for the John Eliot School project, and $17,000.00 for the Munroe Place project.  I knew that there were non-union companies bidding on the 405 Cochituate Road project.

13.    CWS received a purchase order from York Steel, Inc., Canada (Ocean Steel & Construction), to erect all structural steel, deck, open rail steel for the Laboure Center, 371 West Fourth Street, South Boston, MA on June 28, 2001 for $120,600.00. CWS signed the agreement on August 15, 2001.  On this project CWS neither signed a job target contract with Local 7 nor received job target money from Local 7.

14.    Local 7's claim that CWS made a donation to the Rebar and Welding Building Trades at the Laboure Center on March 8, 2002 for $16,296.00 and on July 30, 2002 for $32,079.60 as shown in Exhibit B is not true.  The first time I saw this documentation was September 28, 2006.  I never received any such notification letters from Local 7 on or about March 8 and July 30, 2002.  I never discussed any such donations to the Laboure Center with any entity or with Paul DiPietro, Charles Wright or any other union business agent.

15.    While I do not recall how I learned about the targeted jobs in all cases, I

do recall both calling Local 7 on occasion regarding a particular job to find out if target funds were available for that job or being contacted by Local 7 via fax or telephone that a job had target funds available to use.  I do not know whether Target funds may have been offered to other union signatory contractors on the same projects I was bidding on.

16.    Once Local 7 decided to provide CWS with target funds on a particular project and after CWS won its bid, CWS and Local 7 would sign an agreement as to the terms of payment.  A copy of the Target Agreement for the John Eliot Elementary School project in Needham, Massachusetts is attached as Exhibit C.  The terms of the Target Agreements were essentially the same.  The Target Agreements only required CWS to do what was already set forth in the collective bargaining agreement—to pay union wages and benefits under the appropriate local union agreement.  This included the payment of weekly wages and bi-weekly benefits to trust funds.  The Target Agreement did not reduce any wages or benefits that CWS was required to pay its workers under the collective bargaining agreement or affect CWS's costs.  Essentially, the target fund money became CWS's profit on the job.

17.    Only after substantial completion of various stages of the project, would CWS request payment from Local 7 under the terms of the Target Agreement.  Local 7 would then issue a check to CWS that CWS would then deposit into its general operations account.  CWS was free to use the target money to pay any expenses of the business.  Local 7's check would be issued payment to CWS without any restriction on use of the money by CWS.  A copy of a John Elliot School target fund check is attached as Exhibit D.

18.    Edwin Wright contacted me on numerous occasions in 2001 and 2002 to tell me that Local 7 would provide CWS with target funds "in order to prevent non-Local 7 contractors from obtaining work."  It was clear to me that union signatory contractors

might have a competitive disadvantage on private jobs, but little disadvantage on

prevailing wage jobs.  This is why CWS was focused on prevailing wage type of work.

Obtaining target money from Local 7 would ensure that CWS could win about every

public sector contract we could bid on in the Boston area.

19.     On January 10, 2003, I directed the cessation of operations of CWS.

Notice of termination of operations was provided to Local 7 business agent Edwin

Wright.

Further Affiant saith naught.


_____
Susan D. Beauregard


Subscribed to and sworn before me this ___ day September, 2006.


_____
Notary Public

EXHIBIT 22

P.B. EXHIBIT 17

Pisani
7/6/06

# D.F.M. INDUSTRIES, INC.

Post Office Box 471 • Wrentham, MA 02093 • (508) 384-8194 •Fax • (508) 384-7028

## NOTICE TO EMPLOYEES

The International Association of Bridge, Structural Ornamental & Reinforcing Iron Workers, Local 37, AFL-CIO has asked D.F.M. Industries, Inc. to sign a contract to represent a majority of D.F.M Industries, Inc.'s ironworkers.

We will conduct a poll to see if D.F.M. Industries, Inc's employees would want to be represented by the Union.

On Thursday October 31, 2002, between 5:00 and 5:30 p.m., a secret ballot poll of D.F.M. Industries, Inc.'s workers will be taken under the supervision of a neutral third party.

All D.F.M. Industries, Inc. ironworker employees are hereby given assurances that their choice will be respected and that the Company will not engage in any reprisals against individual workers for having voted.

Glen D. Pisani

Glen Pisani
President

October 29, 2002

DEF 03252

Exhibit A

1

**VOLUME**: I
**PAGES**: 1-265
**EXHIBITS**: 27-58

COPY

2

3

UNITED STATES DISTRICT COURT

4

DISTRICT OF MASSACHUSETTS

5

Case No. 1:04-cv-12536-RGS

6

7
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

AMERICAN STEEL ERECTORS, INC.,      *
et als,                             *

8
           Plaintiffs,              *
                                    *

9
     vs.                            *
                                    *

10
LOCAL UNION NO. 7,                  *
INTERNATIONAL ASSOCIATION OF        *

11
BRIDGE STRUCTURAL, ORNAMENTAL &     *
REINFORCING IRONWORKERS,            *

12
           Defendants.              *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

13

14
        **DEPOSITION OF DONALD MOREL**, a witness
called on behalf of the Defendants, taken

15
pursuant to Rule 30(b)(6) of the Federal Rules
of Civil Procedure, before Darlene Caiazzo

16
Sousa, Registered Professional Reporter and
Notary Public in and for the Commonwealth of

17
Massachusetts, at the law offices of Segal,
Roitman & Coleman, 11 Beacon Street, Boston,

18
Massachusetts, on Tuesday, July 11, 2006,
commencing at 9:55 a.m.

19

20

21

22

23

24

PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts   02703
(508) 222-9403

```
 1    gets is the price that the fabricator gives; is
 2    that correct?
 3         A.    Yes.
 4         Q.    And the price that the fabricator
 5    gives includes the fabricator's own cost to
 6    fabricate the material and whatever number the
 7    fabricator puts in for erection costs.  Is that
 8    how it works?
 9         A.    Yes.
10         Q.    Now, does Ajax have fabricators that
11    are regular customers?
12         A.    Yes.
13         Q.    Can you tell me who those fabricators
14    are?
15         A.    There's some Canadians.  We work --
16    Ocean Steel, Canatal, Mandate, and some local
17    people like Bennington Ironworks in Vermont,
18    American Steel out of New Hampshire, Perfecto
19    out of Rhode Island, Boudreau Welding
20    occasionally out of Connecticut, Shepard Steel
21    out of Connecticut, United Steel from
22    Connecticut, Trimax out of Canada.  We used to
23    work for FAMM Steel a lot, but they are out of
24    business.
```

1      Q.    Where was FAMM Steel from?

2      A.    Rindge, New Hampshire, and also Cape

3   and Islands who are out of business.

4      Q.    Now, there are some names that I've

5   run across that you didn't mention so let me

6   ask you.  Capone, for example?

7      A.    Capone is another one.

8      Q.    Is that a regular customer?

9      A.    Yeah.  I was just -- I mean, there is

10  a lot of them.  We have lots of regular

11  customers.

12     Q.    I understand.

13     A.    We also have some brokers we work for

14  who are not fabricators, so these names --

15     Q.    Who are the brokers?

16     A.    Jay Steel, Northeast Steel.  We worked

17  in the past for Metro West.  I'm not sure where

18  they fit in, whether brokers or fabricate some

19  of their own things.

20     Q.    Now, the fabricators actually make the

21  steel that you subsequently pick and erect,

22  correct?

23     A.    They buy the steel.  They fabricate it

24  to size and specs, and they send it to the job

Exhibit B



VOLUME:  I
PAGES:   1-200
EXHIBITS 97-133

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,       *
                                      *
v.                                    *
                                      *
LOCAL UNION NO. 7, INTERNATIONAL      *
ASSOCIATION OF BRIDGE,                *
STRUCTURAL, ORNAMENTAL &              *
REINFORCING IRON WORKERS,             *
                    Defendant.        *
*****************************************

          30(B)(6) DEPOSITION OF AMERICAN AERIAL

SERVICES, INC., a witness called on behalf of the

Defendant, taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the

Commonwealth of Massachusetts at the law

offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Friday, July 14, 2006, commencing at 9:00 a.m.


PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts 02703
(508) 222-9403

1    A.    They don't note it for most cases.  We

2    receive an invitation and sometimes it will be

3    marked.  Well, actually, They will have a spot that

4    says union or non-union.  I take it as meaning, I'm

5    a non-union bidder to them.

6        Q.    You don't take that to mean that you

7    can't bid it, they just want to know?

8        A.    Right, what I am.

9        Q.    Do you know sometimes that a job is

10   prevailing wage before you bid it?

11       A.    We hope to know that before we bid it.

12       Q.    And that would hopefully be in the

13   invitations to bid or the initial information

14   provided to you by the fabricator?

15       A.    Yes.

16       Q.    And you bid prevailing wage jobs,

17   correct?

18       A.    Yes.

19       Q.    Have you ever bid a project labor

20   agreement job?

21       A.    Not that I know of.

22       Q.    And do you have an understanding as to

23   whether you are permitted to bid a project labor

24   agreement job?

1      A.    I believe the answer is, yes, we can bid

2    them.  I just don't know of any.

3      Q.    You've chosen, you can bid them and

4    you've chosen not to?

5      A.    That's incorrect.  I don't know.  I said

6    earlier, I don't know if I have bid jobs that have

7    had that opportunity.  I don't know whether they

8    have a labor agreement.

9      Q.    You just bid everything and if it

10   happened to have a project labor agreement, that

11   wouldn't stop you from bidding it?

12     A.    I've never been told that this is a PLA

13   on a particular job.  No one has introduced that

14   aspect into the bidding process with me.

15     Q.    So you have never, to your recollection,

16   learned of a project, and then learned that it was a

17   project labor agreement project?

18     A.    I can't think of instances to do with the

19   ironworkers, no, I can't.

20     Q.    Is it fair to say that there aren't many

21   project labor agreements in Maine?

22     A.    That's probably a very fair statement.

23     Q.    And it's probably fair to say there are

24   not too many project labor agreements, the same

```
 1          Q.     You just mentioned a Riverfront Project,
 2    where was the Riverfront Project?
 3          A.     In Westbrook, Maine.
 4          Q.     And when did that project take place?
 5          A.     I believe 2003.
 6          Q.     Now, what was the type of work to be done
 7    on the project?
 8          A.     It was a multi-story for steel erecting.
 9          Q.     Do you recall who the general contractor
10    or the fabricator was?
11          A.     The general contractor was Ledgewood.
12    The fabricator was Advance Resources and
13    Construction.
14          Q.     Can you describe where you were, what you
15    were doing there at the Riverfront Project?
16          A.     I spent a great deal of time on that
17    project.  It was my first significant project with
18    Ledgewood and my first project with Advance
19    Resources and Construction.
20          Q.     What time of year was that?
21          A.     It was the summertime.
22          Q.     And you said you saw Mr. Wright there on
23    that project?
24          A.     Yes.
```

1    Q.   Was he with anybody else?

2    A.   He was.  John Evans was there, but he

3    also had a gentleman from the Springfield local.  I

4    forget his name.  He was a very large fellow and

5    they had, I believe, one other guy there, but

6    Charlie, John, the guy from Springfield, and there

7    is another one, I believe.

8    Q.   When you say "Springfield," you mean

9    Springfield, Massachusetts?

10   A.   Yes.

11   Q.   And you said that one gentleman was

12   large?

13   A.   Yeah.

14   Q.   What do you mean by "large"?

15   A.   Muscular.

16   Q.   Tall?

17   A.   Probably, my height, but very robust and

18   muscular.

19   Q.   Okay.  Describe where you were on the

20   project when you were encountered by these 4

21   gentlemen?

22   A.   I was near a crane in what we call the

23   "laydown yard" for the steel.

24   Q.   Was this private property?

1        A.      It was.

2        Q.      And they approached you, is that correct?

3        A.      Yes.

4        Q.      And did all 4 of them talk to you at one

5    time, or is there one person that spoke?

6        A.      They sort of all surrounded me and came

7    in.  Basically, Charlie is doing the talking.

8        Q.      And how close was he when he was talking

9    to you?

10        A.      I would say they were all within a foot

11    and a half of me.

12        Q.      So they were close in and surrounded you?

13              MS. TALWANI:  I'm going to object.

14        Leading.

15              MR. AVAKIAN:  Well, this is cross.

16              MS. TALWANI:  It's actually redirect, and

17        I can object.  You can ask your question if

18        that's the way you want to present it to the

19        judge.  It's your witness.  I object.

20              MR. AVAKIAN:  I'll do it a different way.

21        Q.      Describe to me the proximity of Mr.

22    Wright and what he said to you?

23        A.      The individuals were a foot and a half

24    from me, to my front, and to my side an the steel

Exhibit C



VOLUME:   I
PAGES:   1-184
EXHIBITS:   59-96

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                   Plaintiffs,      *
                                    *
v.                                  *
                                    *
LOCAL UNION NO. 7, INTERNATIONAL    *
ASSOCIATION OF BRIDGE,              *
STRUCTURAL, ORNAMENTAL &            *
REINFORCING IRON WORKERS,           *
                   Defendant.       *
*****************************************

        30(b)(6) DEPOSITION OF AMERICAN STEEL

ERECTORS INC., a witness called on behalf of the

Defendants, taken pursuant to Rule 30(b)(6)

of the Federal Rules of Civil Procedure,

before Patricia Bowen, Professional Shorthand

Reporter and Notary Public in and for

the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Thursday, July 13, 2006, commencing at 9:52 a.m.


                PATRICIA BOWEN
               124 Downing Drive
          Attleboro, Massachusetts 02703
               (508) 222-9403

1    Isaacson?

2          A.    Right.

3          Q.    And it relates, does it not, to the

4    Catholic Medical Center Job?

5          A.    Yes.

6          Q.    Why did you write to Isaacson.

7          A.    Well, I believe he's the one that

8    provided that information.  We just set the record

9    straight.

10          Q.    He was not the successful fabricator on

11    the job, correct, or was he?

12          A.    No, he was not.

13          Q.    Canatal was?

14          A.    Correct.

15          Q.    So the reason for the letter was to

16    simply set the record straight with respect to

17    American Aerial's comp rates?

18          A.    It was more a misrepresentation of

19    American Steel Erectors, I believe.

20          Q.    With respect to, was it the OSHA

21    citations?

22          A.    OSHA citations, right.

23          Q.    And what was your understanding, that

24    somebody had misrepresented a number of OSHA

1    citations that you had been subject to?

2        A.    Yes.   It had occurred previously at a

3    public meeting with the Apprenticeship Board in New

4    Hampshire and a representative of the union came in

5    and made all kinds of allegations about American

6    Steel Erectors, about our safety record, and a good

7    amount of the information in the record was false.

8        Q.    And that was, when you say a union

9    representative, that was a union representative of

10   Local 474?

11       A.    Correct.

12       Q.    There was an NLRB proceeding related to

13   that, was there not?

14       A.    Not related to that particular public

15   meeting, no.   It was a different situation.

16       Q.    What was a different situation, the NLRB

17   proceeding?

18       A.    Yes.

19            MR. KELLY:   I'd ask that that letter be

20       marked as the next exhibit.

21            (Exhibit No. 89 marked.)

22       Q.    I'd like to direct your attention to the

23   allegations in Paragraph 80 and 81 which are on page

24   20 and 23, Mr. Cilley?

Exhibit D

VOLUME:  I
PAGES:  1-132
EXHIBITS:  18-26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No.  1:04-cv-12536-RGS

*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendant.         *
*****************************************

    30(b)(6) DEPOSITION OF BEDFORD IRONWORKS,

INC., a witness called on behalf of the Defendant,

taken pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Friday, July 7, 2006, commencing at 11:00 a.m.

            PATRICIA BOWEN
          124 Downing Drive
      Attleboro, Massachusetts 02703
            (508) 222-9403

---

APPEARANCES:

REPRESENTING THE PLAINTIFFS:

        SMETANA & AVAKIAN
        5211 Port Royal Road, Suite 610
        North Springfield, VA 22151
        (703) 321-9180
        BY:  MICHAEL E. AVAKIAN, ESQ.

REPRESENTING THE DEFENDANT:

        SEGAL, ROITMAN & COLEMAN
        11 Beacon Street, Suite 500
        Boston, MA 02108
        (617) 742-0208
        BY:  INDIRA TALWANI, ESQ.

ALSO PRESENT:
Paul F. Kelly, Esquire, Segal, Roitman & Coleman
James Read, American Ariel Services
Mike Guillemette, Bedford Ironworks Inc.

---

              I N D E X

WITNESS:   MICHAEL GUILLEMETTE

        DIRECT   CROSS   REDIRECT   RECROSS

Ms. Talwani  4

Mr. Avakian            125

No.    Exhibit                        PAGE

18  4/7/03 Bedford Proposal................  59

19  FAMM Steel Inc., Bid Calendar.........  96

20  11/7/02 Bedford Proposal.............. 106

21  Bedford Profit & Loss................. 108

22  1120S 2001 Tax Return................. 117

23  1120S 2002 Tax Return................. 117

24  1120S 2003 Tax Return................. 117

25  1120S 2004 Tax Return................. 117

26  1120S 2005 Tax Return................. 117

        (Exhibits retained by Ms. Talwani.)

---

            * * *

1          MICHAEL GUILLEMETTE, a witness called for

2    examination by counsel, having been

3    satisfactorily identified and duly sworn,

4    testified as follows:

5             * * *

6            DIRECT EXAMINATION

7    BY MS. TALWANI:

8        Q.    Can you state your name for the record,

9    please?

10       A.    Michael P. Guillemette.

11       Q.    Mr. Guillemette, have you ever had your

12   deposition taken before?

13       A.    I have had one taken before, but not on

14   this case.

15       Q.    What case was that?

16       A.    That was on an old lawsuit from my old

17   business.

18       Q.    And what was your old business?

19       A.    Advanced Welding and Steel Erectors.

20       Q.    And you also sat in for a part of

21   yesterday's deposition?

22       A.    Yes.

23       Q.    So you're aware I will be asking you a

82

1    A.    They usually get a week.

2    Q.    A year?

3    A.    Yeah.

4    Q.    How many guys do you have who have been

5 with you for more than a year, being presumptuous

6 and assuming they were all guys?

7    A.    Yeah. I think 4 of them anyway. No,

8 almost all, about 6 of them have been there.

9 Everybody has been with me more than a year except

10 the young kid that started a month ago, the 16, he's

11 the college kid. The rest have been with me over a

12 year.

13    Q.    I thought that you had said the people

14 who were making 18 and 19 have been there just about

15 a year?

16    A.    No. The rest of them have been there for

17 4 years, the whole time. The $16 an hour guy, like

18 I said, he is a college kid. The $12 guy is

19 brand-new. I'm sorry, the $18 guy, that's my

20 partner's son. He has just started again. So he's

21 been there a couple of months. Then the rest of

22 them have been there.

23    Q.    I'm sorry, you said you used to do

24 prevailing rate work, is that correct?

1    A.    Yes.

2    Q.    And as Bedford, you have done some

3 prevailing rate work?

4    A.    Just one little job that I can remember.

5    Q.    And for that job, what did you do?

6    A.    They made the prevailing wage, whatever

7 it was on the site at the time.

8    Q.    And that was all in wages, and there is

9 no benefits?

10    A.    Yes. As a matter of fact, you have

11 copies. I remember seeing them.

12    Q.    How much do you charge when you

13 subcontract for labor only?

14    A.    Depends. 50, 55 an hour, depends which

15 general, I mean, which fabricator, that I know is

16 going to try to cut me, or going to actually pay me.

17    Q.    Have you ever lost any employees to

18 stripping by the union?

19    A.    I'd say, yes.

20    Q.    And why would you say that?

21    A.    Because I had one guy, his name is Brian

22 Meu, M-E-U, something like that.

23    He called me one day and said, Mike, I'm going

24 to go to work for the local because I'm thinking of

83

1 my family, I want benefits and to make some money.

2    He went to work for them -- Well, he was

3 supposed to go to work for them the next week. He

4 was calling and calling. They pretty much ditched

5 him. They stripped him from me, and then never gave

6 him a job. He called me back, looking for his job,

7 and I had already replaced him.

8    Other guys might have left after they had been

9 talked to voluntarily. I don't have proof that they

10 were stripped. I knew they had been talked to.

11    Q.    And is it your view that there is

12 something improper either by the employer or the

13 union in that?

14    A.    I think it's improper when they have got

15 the job lined up from them and they give it to

16 somebody else where they have an agreement that the

17 union will take them if they get them. To me that

18 sounds improper. Any guy can quit, I understand

19 that, and go to work for anyone they want. But when

20 they were stripped by the union and given a job the

21 next day.

22    Q.    And did that happen with Brian Meu?

23    A.    It didn't with him, but it did with

24 Brandon Gould.

84

1    Q.    So there is another guy?

2    A.    And it happened with Roland Dube. I have

3 it on tape.

4    Q.    The second guy is Brandon?

5    A.    I'm sorry, it's Brandon Holler, excuse

6 me, Holler, H-O-L-L-E-R.

7    Q.    And the other guy you said was?

8    A.    Roland Dube?

9    Q.    And what happened with Brandon Holler?

10    A.    Apparently they must have been talking to

11 him on the side and offered him a job. He was

12 working right after that. You know, I didn't know

13 how it all happened originally until I saw it on the

14 video.

15    Q.    You saw a video of the union talking to

16 him?

17    A.    Yes.

18    Q.    And was there a tape?

19    A.    Yes.

20    Q.    And could you hear what was said?

21    A.    I could barely hear some of the stuff.

22 But he was there and he did quit after that.

23    Q.    So Brandon Holler talked to the union and

24 then quit?

Exhibit E

```
                              VOLUME:  I
                              PAGES:   1-76
                              EXHIBITS:  1-8
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
AMERICAN STEEL ERECTORS, INC.,et als. \*
                    Plaintiffs,         \*
                                        \*
v.                                      \*
                                        \*
LOCAL UNION NO. 7, INTERNATIONAL        \*
ASSOCIATION OF BRIDGE,                  \*
STRUCTURAL, ORNAMENTAL &                \*
REINFORCING IRON WORKERS,               \*
                    Defendant.          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

30(B)(6) DEPOSITION OF BEL-LIN CONSTRUCTION,

WALTER BELMONTE, a witness called on behalf of the

Defendant, taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the

Commonwealth of Massachusetts at the law

offices of Stoneman, Chandler & Miller, LLP

99 High Street, Boston, Massachusetts, on

Tuesday, August 22, 2006, commencing at 1:30 p.m.


```
              PATRICIA BOWEN
              124 Downing Drive
       Attleboro, Massachusetts 02703
              (508) 222-9403
```



1    wages?

2         A.     Weekly.

3         Q.     Do you recall how you submitted a request

4    for payment of the target money to the union?

5         A.     I believe there is a form that matched

6    the steward's reports.  So if there was number of

7    hours to make sure the benefits were all paid before

8    the union hall would release any money.  And I think

9    that's how it was done.

10        Q.     And do you recall, you paid your wages

11   every week?

12        A.     Yeah.

13        Q.     Did you make the request to Local 7 for

14   reimbursement?

15        A.     This job here, I would say, it looks

16   like, probably, I would have just waited until the

17   job was complete, and then how many man hours it

18   was, and show that I did pay "X" amount of man

19   hours, and then they would pay me.

20        Q.     Now, this particular contract which is

21   No. 967 indicates that you were going to get $15,000

22   dollars or $15 per man up to $15,000, is that your

23   understanding?

24        A.     That's what it says, yeah.

31

```
 1          Q.    Yeah.

 2          A.    It would go into Bel-Lin, I would assume.

 3          Q.    Did you put it in a special account?

 4          A.    No.

 5          Q.    Did it go into your general account?

 6          A.    It went into Bel-Lin account.

 7          Q.    A general Bel-Lin checking account?

 8          A.    Right, yes.

 9          Q.    I'll show you, I guess, we will mark

10    these as 3 and 4.

11                (Exhibit Nos. 3 and 4 marked.)

12          A.    (Witness reviewing document.)

13          Q.    Mr. Belmonte, have you taken a look at

14    those exhibits?

15          A.    Yeah.

16          Q.    Those appear to be -- Can you describe

17    what you see on those two exhibits?

18          A.    It looks like a check to Bel-Lin for

19    12,000 and 3,000.  15,000.

20          Q.    Okay.  Is it fair to say that these two

21    documents represent correspondence from Local 7 to

22    you indicating payments on the Brickworks Project

23    for $15,000?

24          A.    I'd say.
```

41

1      A.      Yup.

2      Q.      What is that?

3      A.      What it is, this is what I sent out to

4  Capone as a bid of 136.  And then after, maybe,

5  going through it, I just deduct the target money,

6  and took the deduction and came down to 115.

7      Q.      Okay, so let's see, 115.  The only date

8  on this document says 28 September, was this

9  language that you wrote on the top half of the page

10  of Exhibit No. 8 written at the same time as the

11  15,000.

12      A.      No.  It looks like it was sent out, then

13  changed.

14      Q.      So the change came at some later date?

15      A.      I would say so.

16      Q.      Where you "Xd" out the 136,000 and you

17  have circled the 115?

18      A.      Right.

19      Q.      Now, do you recall having a conversation

20  with anybody from Capone Ironworks after September

21  28th that led to you reduce your bid?

22      A.      I'm sure I talked to Bob Chipman.

23      Q.      Do you recall any specific conversation

24  that you had with him concerning your 136,000 bid?

1    A.    Telling me you are probably too high,

2    you've got to come down.

3    Q.    Do you remember who the general

4    contractor was?

5    A.    Columbia, I believe.

6    Q.    Did you talk to anyone at Columbia?

7    A.    No.

8    Q.    Now, after having submitted the 136,000

9    bid to Capone, did you, do you recall talking to any

10   person at Local 7 about your bid?

11   A.    I don't recall.  The only thing, looking

12   at this, I would say probably started with the 136,

13   went for the target money.  Usually, when I get

14   target money from the union hall, I'll deduct money

15   also.  And that's probably where I came up with the

16   number.

17   Q.    And you got that job with that number?

18   A.    I believe so.  That's what it looks like.

19   I'd have to look at my billing, but from what you're

20   showing me right here, they accepted for 115.  I

21   don't have anything.

22   Q.    Do you remember Bob Chipman discussing

23   with you any conversations he had or somebody else

24   from Capone with Local 7?

1    a fax cover sheet from Local 7.  Do you tell Local 7

2    how much money you need in order to win a project?

3        A.    Only if it's available to me.  Sometimes

4    it's not.  Sometimes I have no idea.

5        Q.    In this particular instance it looks like

6    Ed Wright is saying that we are going to give enough

7    money to Bel-Lin in order cut his price 21,000.

8            MR. KELLY:  Objection to the form, if

9        that's a question.

10            MR. AVAKIAN:  It's kind of a question,

11        but it's more of a prefatory question.

12        A.    I would have no idea what Eddie Wright

13    and Gary Capone talked about, anything to do with

14    that.

15        Q.    Okay.  Is it your understanding that, for

16    instance, on this Brickworks Project, if you did not

17    receive the target money that you would have not

18    have gotten the project?

19        A.    I don't know that.  Because like I said,

20    they don't always tell me the truth.  So when I give

21    them a number, and I tell them, this is what it is,

22    it's never right.  It's always too high.  No one has

23    ever told me to come up.

24        Q.    With respect to Capone in this particular

58

1    instance?

2        A.    Capone, I have done a lot of work for

3    Capone.  We have worked together.  They know me.  I

4    know them.  I don't think they are afraid of having

5    me on any of their jobs.  So they would probably

6    want to work to get me on their job.

7        Q.    Okay.  That's a fair statement.  I'm

8    asking you specifically, do you recall whether

9    Capone told you that you were too high, and you

10   needed to bring your price down?

11       A.    Absolutely.  I'm sure that's what they

12   said.

13       Q.    And you brought your price down?

14       A.    Yes.

15       Q.    And on other jobs, do you normally lower

16   your price, or did you stick with what you gave?

17       A.    It depends on how much the job is, how

18   big it is, where it is, how much it is.

19       Q.    Okay.  So there are a number of factors.

20       A.    If the job is two minutes from my house,

21   and I can be there, and I would like to do it

22   because of that, or if I call the union hall, and I

23   might say to them, set up a five man raising gang,

24   and if I go with a four man raising gang, because

1    the job is only good for two or three days erection,

2    or anything like that, the union hall might say,

3    that's fine, no problem.

4        It's not often that I do that because I usually

5    stick pretty much close to what it's supposed to be

6    because I don't like bending.  Then I might say, if

7    I go with a four man raising gang, I can take off 20

8    bucks.  So I'll call the guy up and say, hey, I can

9    take off $20.  Do I have the job?

10       And he'll say, yeah, okay, fine.

11       Q.    And how often does that happen?

12       A.    Every single time.  I have never been too

13   low.

14       Q.    I guess my question is:  Do you rebid

15   your bids on every project that you submit?

16       A.    I would say absolutely.  Like I say, I've

17   never said $100.

18       And they say, okay, fine, do the job.  That

19   never happened.

20       Q.    So it's your experience that whatever

21   your initial bid is, it's never your final bid?

22       A.    Even if they get it with my bids, it's

23   never final.

24       Q.    In what way?

Exhibit F

```
                          VOLUME:  I
                          PAGES:   1-50
                          EXHIBITS: 31-32
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,         *
                                        *
v.                                      *
                                        *
LOCAL UNION NO. 7, INTERNATIONAL        *
ASSOCIATION OF BRIDGE,                  *
STRUCTURAL, ORNAMENTAL &                *
REINFORCING IRON WORKERS,               *
                    Defendant.          *
*****************************************

        30(B)(6) DEPOSITION OF LOCAL 7, JAMES BROWN

a witness called on behalf of the Plaintiffs, taken

pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Stoneman, Chandler & Miller,

99 High Street, Boston, Massachusetts, on Wednesday,

August 30, 2006, commencing at 5:25 p.m.



                    PATRICIA BOWEN
                  124 Downing Drive
          Attleboro, Massachusetts 02703
                  (508) 222-9403



```
 1              MR. KELLY:  What was the question?

 2         Q.    If the job target monies are used in a

 3    bidding process where a nonunion contractor is also

 4    bidding, isn't it true that the use of the job

 5    target money, is a use and a purpose of the job

 6    target money to prevent the nonunion contractors

 7    from getting that job?

 8              MR. KELLY:  Objection.

 9         Q.    Not necessarily the only purpose, but it

10    is a purpose?

11         A.    I would say no.  I believe I've given you

12    that definition, and I believe, Paul, did too, the

13    main focus is putting our members to work.

14         Q.    To put your members to work would mean

15    taking work away from the workers of the nonunion

16    companies as well, wouldn't it?

17         A.    Not necessarily.  It could mean taking

18    work away from another signatory contractor who

19    didn't sharpen his pencil.  You can swing it any

20    which way you want.  But I can't state to you that

21    the reason for the target fund is to put our members

22    to work.

23         Q.    Now, the minutes of meetings are normally

24    approved at subsequent union meetings, aren't they?
```

```
1    particular job, end quote, in document 47, Pages 8

2    and 16, dated March 20, 2006, and identify which

3    signatory contractors the claim is based on?

4              MR. KELLY:  Was that the question?

5              MR. AVAKIAN:  That was the question.

6              MR. LONG:  I notice you're laughing about

7         it.

8         Q.    My question is:  When Local 7 provides

9    target money on a particular job, that target money,

10   isn't it true, does not reduce the labor costs of

11   the contractor, his labor cost are still the CBA

12   rates?

13        A.    I'm not understanding your question.

14        Q.    Isn't it true that job target money does

15   not reduce the hourly rates in the union's

16   collective bargaining agreement?

17        A.    Job targeting money does not reduce the

18   costs?

19        Q.    Any cost in the collective bargaining

20   agreement to the employer?

21        A.    I would beg to different.

22        Q.    Does the employer pay, that's receiving

23   target money, pay the union package at the time that

24   it's due.
```

1       A.      I don't agree with your summation on it.

2       Q.      Would you agree that the employer who has

3    received target money, can do whatever he wants with

4    that money when it reaches his bank account?

5       A.      As long as that contractor has met the

6    conditions of the contract, which he will use to

7    defray costs.

8       Q.      Is there any restrictions on the

9    contractors use of that money in your job target

10   agreements with him?

11      A.      Just repeat the question.

12              MR. KELLY:  You mean, after he gets it.

13      Q.      After he gets it.

14      A.      If he has met the conditions of the

15   contract, that check is generated.

16      Q.      And he can go out and buy a truck, buy a

17   Hummer, buy whatever else he needs in his business

18   or whatever he wants to do with it?

19      A.      I don't get involved with that.

20      Q.      Okay.  There is no restriction on the

21   employers use of that?

22      A.      As long as he has met his contract.

23      Q.      Okay.  So is my understanding correct,

24   that your assertion that labor costs are reduced,

Exhibit G

```
                        BRI.dep
                    PATRICIA BOWEN
                  124 Downing Drive
            Attleboro, Massachusetts 02703
                   (508) 222-9403
```

⬚

2

APPEARANCES:


REPRESENTING THE PLAINTIFFS:

        SMETANA & AVAKIAN
        5211 Port Royal Road, Suite 610
        North Springfield, VA 22151
        (703) 321-9180
        BY:  MICHAEL E. AVAKIAN, ESQ.


REPRESENTING THE DEFENDANTS:

        SEGAL, ROITMAN & COLEMAN
        11 Beacon Street, Suite 500
        Boston, MA 02108
        (617) 742-0208
        BY:  PAUL F. KELLY, ESQ.


REPRESENTING THE DEPONENT:

        THE MOUNTAIN STATES LAW GROUP
        P.O. Box 1459
        Framingham, MA 01701
        (508) 872-7116
        BY:  ROBERT N. MELTZER, ESQ.


ALSO PRESENT:
        Mickey Long, Esq.


                        Page 2

BRI.dep

19    with a fabricator.

20              MR. AVAKIAN:   Okay.   Let's mark this as

21        the next exhibit.

22              (Exhibit Nos. 11 and 12 marked.)

23        Q.    Mr. Cardon, do you recall bidding on a

24    project for the U.S. Courthouse in Springfield,


                                          58


1     Massachusetts?

2         A.    Vaguely, yes.

3         Q.    Okay.   And do you recall the type of work

4     that was to be done at the courthouse?

5         A.    Structural steel erection.

6         Q.    Was that a new courthouse that was going

7     up?

8         A.    Yes.

9         Q.    And did you eventually win the project?

10        A.    Yes.

11        Q.    Who was your fabricator?

12        A.    Canatal Steel.

13        Q.    Now, in the course of this project, do

14    you recall the fact that you had entered into a

                        Page 66

BRI.dep

15    target fund agreement with Local 7?

16        A.    Yeah, vaguely.

17        Q.    And is it on the top two pages of Exhibit

18    11, that was $120,000, is that right?

19        A.    Yup, I believe, yes.

20        Q.    The U.S. Courthouse was a Davis-Bacon

21    prevailing wage project, was it not?

22        A.    I'm not sure.  I would assume it must be,

23    but I'm not sure.

24        Q.    And do you recall receiving target fund

59

1    payments for this particular job?

2        A.    I don't recall them, no.

3        Q.    Now, there is multiple bid dates

4    apparently for the structural steel from November

5    22, 2004, and then February 22, 2005.  Do you recall

6    those bid dates?

7        A.    Not specifically, no.

8        Q.    Okay.  Now, with respect to the bid

9    projects that you bid out, the specifications, if

10    I'm looking at it, Exhibit No. 11, for each of the

11    fabricators that you bid to, were the same, isn't

Page 67

BRI.dep

12    that right?

13        A.    (Witness reviewing document.)  The

14    question again.

15        Q.    The specifications that you bid to were

16    the same on all the fabricators that you did bid to?

17        A.    Well, the fabricators would have sent a

18    copy of the specifications to me.  I don't have them

19    here, so I can't tell you if they were the same.  I

20    don't know if they all supplied the same specs.

21        Q.    It appears, the reason why I represented

22    that to you is, the drawing dates are the same and

23    the drawing numbers that each of the fabricators

24    provided to you were the same upon which to base



60



1    your bid?

2        A.    Yes.

3        Q.    And that's why I suggested that was the

4    case.  Now, with respect to all but the Canatal,

5    your bid was $1,350,000, is that right, so you bid

6    the same amount to each, to all three?

7        A.    I'd have to look at it.  (Witness

Page 68

BRI.dep

8     reviewing document.)

9           Q.    Is that your understanding?

10          A.    Yes.

11          Q.    Now, your bid, however, to Canatal was

12    significantly lower than the other bids, do you

13    recall the reason why?

14          A.    No.

15                MR. MELTZER:  Objection.  I'm going to

16          instruct him not to answer on that one.  As to

17          how he puts together a bid, we will not be

18          going into.

19                MR. AVAKIAN:  I'm just asking him, does

20          he recall any reason why it's different?

21                MR. MELTZER:  Whether he recalls it or

22          not, I think he was asked.  How that document

23          is put together, and how that number is put

24          together is information that we are not going

⬜

61

1           to be going into.

2                 MR. AVAKIAN:  Well, I'm not asking, I'm

3           not asking how he formulated it.  I'm asking

4           just a basic reason why there is a $400,000

Page 69

Exhibit H



VOLUME:  I
PAGES:  1-206
EXHIBITS:  1-17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*****************************************

AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendants.        *

*****************************************

30(b)(6) DEPOSITION OF D.F.M. INDUSTRIES,

INC., called on behalf of the Defendants,

taken pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Segal, Roitman & Coleman,

11 Beacon Street, Boston, Massachusetts, on

Thursday, July 6, 2006, commencing at 10:02 a.m.

PATRICIA BOWEN
124 Downing Drive
Attleboro, Massachusetts 02703
(508) 222-9403

```
 1         Q.    And what is the percentage, rough
 2   percentage of public versus private work?
 3         A.    The majority of the work we do is
 4   private.  I wouldn't know a percentage.  I know that
 5   we have done more, as of late, public work.  I
 6   really couldn't tell you the number that would mean
 7   anything because I haven't figured it out.  But I
 8   would say in the past 2 years we have probably done
 9   more public work than usual.  From the past 10
10   years, I would say the summertime, what we are into
11   right know, my workload would probably be 50/50,
12   private to public.
13         Q.    This summer?
14         A.    Yeah.
15         Q.    But that's a relatively large percentage
16   of public work than what has been your historical
17   percentage?
18         A.    Correct.
19         Q.    When you get the drawings or you get the
20   call from the fabricator, you know going into it
21   whether it's a public or a private job?
22         A.    Correct.
23         Q.    And you need to bid it accordingly?
24         A.    Exactly.
```

1    a job.  You don't have to work for me.

2         But I have made such a competitive situation

3    that the employees are very happy working for me.

4    And I get a lot of people wanting to come work for

5    me based on that knowledge, word-of-mouth.

6         Q.    Have you actually told people that if

7    they didn't like working for you, you would give

8    them a business agent?

9         A.    Yes.  I've told the union to give my

10   whole company the door.

11        I said, Come on in and organize D.F.M.  Here is

12   the door.  Come on in, set up a poll and do it.

13   Give them a vote.

14        They won't.

15        Q.    Have any of your employees taken you up

16   on the offer of talking to the business agent?

17        A.    No, I mean, they are on my jobs every

18   day.  My guys know them on a first name basis.

19        Q.    "They" being?

20        A.    The business agents.  If they wanted

21   to -- I had one kid leave.  He went to the union,

22   recently.

23        And good for you, Billy.  That was fine by me.

24   I hope it works out for you.  I have nothing against

87

```
1    can go back and you can finish.  We were removed
2    from the project for -- It was a long time ago,
3    about a week, maybe.  It was gone and something
4    happened somewhere that was all hammered out and
5    then we were invited back to the job.
6         Q.    So you actually finished the job?
7         A.    We finished the job, yes.
8         Q.    Was there another union contractor there
9    when you went back?
10        A.    They were.  We had some stuff that was
11   damaged on the job, and we filed a police report.
12   It was all playground stuff that we didn't even
13   pursue.  We just wanted to get off the job, finish
14   it, and be done with it.
15        Q.    Did you file a police report or did Bond
16   Brothers?
17        A.    No, we did.
18        Q.    Didn't you tell the general or Cape &
19   Island that you were going to get out of there until
20   they could sort this out?
21        A.    Yeah, well, that was said.  After -- We
22   were brought back.  We were asked to leave.  We
23   left.  When we came back, we had some equipment that
24   was damaged.  We told them, You better figure out
```

```
 1          Q.     And your contract on that job was with

 2    Metro West?

 3          A.     Correct.

 4          Q.     And Metro West is a frequent flyer or

 5    customer that you do a lot of business with?

 6          A.     Right.

 7          Q.     And you understood it wasn't Metro West's

 8    problem with you that caused you to get thrown off?

 9          A.     Right.  And that was a job that I wanted

10    to go after damages on.  And, you know, it affected

11    my schedule.  It affected 15 people for a month and

12    a half.  When I started to go after and pursue it, I

13    was given a carrot on a stick, kind of the promise

14    of other work.

15          Q.     From Alhborg, you mean?

16          A.     Yeah, indirectly, through Metro, through

17    Alhborg.

18          Q.     This is common, isn't it?

19          A.     Well, a carrot on a stick is common

20    everywhere.

21          Q.     I'll take care of you in the future?

22          A.     Yeah.  I'll take care of you in the

23    future, but it never happened.  I wound up finding

24    another job, and rather than wasting my time in
```

1      Q.    Could you get into that business with

2    $30,000?

3      A.    I wouldn't know.  I wouldn't know.

4      Q.    Is there, in your view, an ideal size for

5    a steel erector?

6      A.    No.

7      Q.    Can you -- one of these companies is a

8    fairly small company, one of your co-plaintiffs?

9      A.    There is all different size steel

10   erectors.  Some are larger than others.  Who are

11   you --

12     Q.    I guess, my question is:  Can you be a

13   steel erector and have 10 employees and do an

14   efficient job and a good job of being a steel

15   erector?

16     A.    Of course.  Sure you could.

17     Q.    And if you have 70 employees, as you do,

18   you can do the same thing?

19           MR. AVAKIAN:  Can we just go off the

20       record.  Answer the question.

21     A.    It's all your comfort level, your company

22   base.  If you have good employees, you can do more

23   work.  If you have competent people, you can do more

24   work.  If you have 10 guys and you have enough

159

```
 1        A.    Correct.
 2        Q.    That might mean that D.F.M. would sign a
 3   union contract?
 4        A.    I'm sure that's what he wanted me to do.
 5   I believe, I mentioned to him at that point in time
 6   to give my guys the vote.  That's what we did.  We
 7   did get a vote, or we kind of took our own poll
 8   amongst ourselves.
 9        Q.    When did you do that?
10        A.    Right after this job here, Wrentham
11   Elementary School.  Must have been in August or
12   September.
13        Q.    You had an in-house poll as to whether
14   the employees wanted to go union or not?
15        A.    Correct.
16        Q.    Did you?
17        A.    Yes.
18        Q.    How many employees did you have at the
19   time?
20        A.    I want to say 40.  Probably, it
21   references 40 in this, so at the time it must have
22   been 40.
23        Q.    In there?
24        A.    Well, not here, but describing D.F.M. in
```

1    in your memory as a bad job for D.F.M.?

2         A.    Just the police reports and picketing

3    problem.

4         Q.    But in terms of financial, you did all

5    right on the job?

6         A.    I'd say we didn't lose.  I remember the

7    losers.

8         Q.    That's what I meant.  You always remember

9    the losers, don't you?

10        A.    Yeah.

11        Q.    All right.  I think you talked earlier

12   about having a private poll for your employees.  And

13   I notice that somewhere there was a document that

14   documented that.  And I'm going to ask you if that's

15   what Exhibit 17 is?

16        A.    Yeah.  I believe there was one from Local

17   7 too, but this is what we did.

18        Q.    This refers to a poll being conducted by

19   a neutral third party?

20        A.    Yeah.  It was administered or watched by

21   the Chief of Police in Wrentham.  I wasn't present.

22   We had it set up in Spanish, so there wasn't any

23   confusion for any of our Spanish speaking employees.

24        Q.    Did you have a ballot?

```
 1          A.    Yeah.

 2          Q.    Did you?

 3          A.    Yeah.  We did one for 7 and one for 37.

 4    It was based on a case years ago that was done, and

 5    it was accepted, and we did the same.

 6          Q.    It had three choices on the ballot, 7,

 7    37, and D.F.M.?

 8          A.    We had, 7, 37.  Just two choices, two

 9    different ballot boxes, yes or no.

10          Q.    Did everybody vote in both of those?

11          A.    No.  You know what I did?

12          Q.    No, I don't.

13          A.    Let me tell you.  I didn't even let my

14    foremen vote.  Even though they don't have the

15    ability to fire or hire, I didn't want to taint it

16    at all.  I just took the core guys and said, here

17    you go, not even my highest end guys.  It would have

18    been even more skewed in my favor if it was, but

19    nonetheless.

20          Q.    How did you make out?

21          A.    Actually, Local 7 got 2 people to vote

22    for it.  Local 37 got no one to vote for it because

23    they can't stand the business agent down there.

24    They would rather work at Domino's.
```

```
 1    ever done it.  It's like taboo.

 2         Q.    Haven't you made it known that you're not

 3    interested in dealing with Boston?

 4         A.    To some degree.  It's a pain, traffic,

 5    parking, it's chaos.

 6         Q.    Right.  But it's not that the fabricators

 7    have said, We don't want you in Boston.  It's that

 8    you said, I don't want to bid there?

 9         A.    No.  I mean, it's my own personal -- I

10    would go where the work it.  If someone wanted to

11    give me an opportunity of doing a decent size job,

12    and I knew I could make some money on it, bring me

13    there.  If I told Ocean Steel that I wanted to bid

14    work in Downtown Boston, after they were done

15    laughing at me, they would say no.

16         Q.    They would say no?

17         A.    Yes.  They wouldn't want to jeopardize

18    relationships that they have in Boston.  They

19    wouldn't want to be known as the fabricator that

20    caved.  And then they would be blackballed.  That's

21    the taboo that's around it.  No one does.

22         Q.    Did Ocean Steel tell you that?

23         A.    Yeah, they did.

24         Q.    Who from Ocean Steel told you that?
```

Exhibit I

                                        VOLUME:    I
                                        PAGES:    1-207
                                        EXHIBITS:   4-30

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
                      Case No. 1:04-cv-12536-RGS


*****************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                        Plaintiffs,        *
                                           *
v.                                         *
                                           *
LOCAL UNION NO. 7, INTERNATIONAL           *
ASSOCIATION OF BRIDGE,                     *
STRUCTURAL, ORNAMENTAL &                   *
REINFORCING IRON WORKERS,                  *
                        Defendant.         *
*****************************************

              30(B)(6) DEPOSITION OF LOCAL 7, PAUL

DiPIETRO, a witness called on behalf of the

Plaintiffs, taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts at the law offices of

Stoneman, Chandler & Miller LLP, 99 High Street,

Boston, Massachusetts, on Wednesday, August 30,

2006, commencing at 9:30 a.m.


                      PATRICIA BOWEN
                    124 Downing Drive
              Attleboro, Massachusetts 02703
                      (508) 222-9403



1       A.    Yes.  The members voted to establish a

2  fund that would make us more competitive and to get

3  more jobs to keep the employment up.  They wanted to

4  establish a fund where it would make us more

5  competitive because we didn't really want to have a

6  two-tiered wage system.

7      We believed that all iron workers doing iron

8  work should be paid the same thing.  So they voted

9  to establish a fund to make us more competitive.

10      Q.    I would like to have this document marked

11  as Exhibit No. 6.

12            (Exhibit No. 6 marked.)

13      Q.    I'll show you a document.

14      A.    (Witness reviewing document.)  Early

15  '90's.

16      Q.    Mr. DiPietro, I'm showing you Plaintiffs'

17  Exhibit 6, which is bate stamp 00828 to 29, do you

18  recall that document?

19      A.    Yes, sir.

20      Q.    Okay.  And is that essentially what you

21  have just been describing to me?

22      A.    No.

23      Q.    What was that document, Plaintiffs' 6?

24      A.    That was a resolution document that was

1    A.    Just by what I've been told over the

2    years, what I read.

3    Q.    Now, you indicated that in the creation

4    of the job target program, that the union did not

5    want a two-tiered wage system.  What did you mean by

6    that?

7    A.    Well, the membership voted to establish

8    the target fund and make us more competitive.  And

9    all iron workers that work under our jurisdiction

10   would be paid the same thing whether they work on a

11   market recovery job or not.  The average iron worker

12   wouldn't know if he was on a targeted job or not,

13   most of them.

14   Q.    Okay.  Now, with respect to the

15   collective bargaining agreement, are you familiar

16   with a working dues assessment provision,

17   Plaintiffs' Exhibit 1.

18   A.    Yeah, during my tenure I would, yes.

19   Q.    In this Exhibit 1 it's on Page 21.  Are

20   you familiar with that?  Do you want to read the

21   first paragraph or two paragraphs?

22   A.    (Witness reviewing document.)  Up to and

23   including to when I was there, yes, that would be

24   correct.  I don't know after that.

1          is.

2          Q.     The amount is?

3          A.     Yes.

4          Q.     And then, so the amount of the increase

5    is in the CBA.  And the union decides how to split

6    up all that increase amongst various categories?

7          A.     The members decide.

8          Q.     The members decide?

9          A.     The member decide how the 55 cents will

10   be allocated.

11         Q.     Okay.  So it could be several different

12   categories.  It could be, we want all 55 cents to go

13   into pension?

14         A.     It could.

15         Q.     Or half into wages and half into the

16   annuity?

17         A.     Correct.

18         Q.     Or all into job targeting?

19         A.     Correct.

20         Q.     Okay.  I understand now.  With respect to

21   7A then, at this point in time, now, we have the

22   working dues deduction?

23         A.     Yes.

24         Q.     And that is showing what the rate is, the

1    when I was there until 2002.  I would assume the

2    wage sheets are correct.

3            Q.    Do you know whether the 85 cents amount

4    for job targeting has changed from 2004 to the

5    present?

6            A.    I have no knowledge of that, sir.

7            Q.    Now, with respect to the 85 cents that is

8    deducted from the wages of employees, does that

9    amount come from employee wages on prevailing wage

10   projects as well as on private sector projects?

11           A.    Employee wage deductions?

12           Q.    Yeah, does the 85 cents come from both

13   prevailing wage as well as private sector projects?

14           A.    During my tenure, yes.

15           Q.    And when the fund distributes money into

16   your clearing house account, the Dorchester fund

17   office sends money to your clearing house account,

18   and provides instructions to the bank, does a copy

19   of those instructions come to Local 7 as well?

20           A.    What do you mean, do we get a wire advice

21   that the money has been deposited?

22           Q.    Or the instructions that the fund office

23   provides to Mount Washington Bank saying, break this

24   lump sum into seven different accounts, this is how

1    be set aside for a project as target money?

2        A.    Well, no, not each individual person, no.

3        Q.    Do the BA's get together and take a vote?

4        A.    During my tenure, we used to have a

5    weekly meeting or biweekly meeting or monthly

6    meeting.  We would have a meeting whenever it was

7    called.

8        Q.    And who would call the meeting?

9        A.    The business manager.

10       Q.    Would the business manager have any role

11   to play with respect to the job targeting funds?

12       A.    Any role?

13       Q.    Yeah.

14       A.    It would probably be a collective

15   consensus, I would think, from the committee.

16       Q.    Now, is there a provision in the by-laws

17   or any resolution that Local 7 has that establishes

18   who plays a role in deciding whether target money is

19   to be applied against a particular project?

20       A.    I'm not following you there.

21       Q.    You indicated that the BA's and maybe

22   yourself and the business manager have weekly or

23   monthly meetings and come to a consensus about job

24   target program.  Is there any document that shows

1    that these categories of persons should have a role

2    in the union's job targeting program?

3        A.    I don't know.  I really don't know if

4    there is.

5        Q.    Okay.  Now, with respect to the outcome

6    of one of these meetings that you just described, a

7    consensus is reached, then what happens or what is

8    then done?

9        A.    Well, if there was an interest in

10   providing extra employment for our members on a

11   particular project, if we looked at a blast fax that

12   was sent out to the contractors saying, we might be

13   interested in a certain project.

14       Q.    At that point in time, does the union

15   communicate any information concerning how much

16   money it may be willing to apply to a targeted

17   project?

18       A.    It may vary.  It may vary.

19       Q.    Now, what would be the variance that you

20   are describing?

21       A.    The variance?

22       Q.    Yeah, and how that money would be --

23       A.    Sometimes a fax would be sent out stating

24   that if anybody is interested in bidding a certain

1    fund made payments based upon crane rental hours,

2    the number of hours of crane use?

3        A.    Hours.  It could break down into hours,

4    per day.

5        Q.    Has it also made payments based upon the

6    benefits that are required under the union contract?

7        A.    I'm not following you.

8        Q.    For instance, on the wage sheet in No. 7,

9    it could be based upon hours, when we are talking

10   about hours, is it hours worked in terms of -- Can

11   it be an overall amount of hours?  That's one way to

12   do it.  Or could it be, another way to put it is to

13   put -- In other words, put dollars payable to the

14   pension fund for hours?

15             MR. KELLY:  What was the question?

16       A.    Maybe, I'm not following you.

17       Q.    Maybe you don't understand my question.

18   The establishment of a rate for the target fund

19   could be based upon the number of hours worked,

20   correct?

21       A.    It could be based on that, yeah.

22       Q.    It could be based on that.  It also could

23   be based upon, or could it be based upon a sum

24   amount that is due on a project by the employer, for

1    after a blast fax is sent, and we get responses from

2    employers that a dollar amount is set.

3         Q.    Either is set then or it's set at another

4    point in time?

5         A.    It could vary.  It could be set at the

6    beginning, or we might, after we get the responses,

7    we might not even target it at all.

8         Q.    Now, the dollar amount though on a

9    project, how is that arrived?

10        A.    It would be based on funds.  Sometimes we

11   don't have the money to target.  Sometimes we do.

12   Sometimes we don't want to particularly target a

13   job, whatever.  Everything is based on putting the

14   members to work, and that's our sole basis of the

15   market recovery program.

16        Q.    Okay.  In the situation where there is a

17   dollar amount identified, is that negotiated at all

18   with an employer?

19        A.    No.

20        Q.    So that amount is set by the union?

21        A.    Absolutely.  I refer to the example of

22   the fox in the hen house there.

23        Q.    Okay.  Now, at times have employers

24   requested more money from the target fund?

85

```
1        A.    Yes.

2              MR. AVAKIAN:  Let's go off the record for

3        a minute.

4              (Off record discussion.)

5              (Exhibit Nos. 8, 9, 10, and 11 marked.)

6              (Carol Chandler from Stoneman, Chandler &

7              Miller enters the room.)

8   BY MR. AVAKIAN:

9        Q.    All right.  Let's go back on the record.

10  Mr. DiPietro, before I talk to you about the

11  documents we just reviewed.  We were discussing the

12  committee and its membership and the ascertainment

13  of amounts for job target money.  Does the committee

14  or somebody in this committee take notes of your

15  discussions and the vote?

16       A.    No.

17       Q.    Is it memorialized someplace of how much

18  target money would be applied to a particular

19  project by the committee?

20       A.    Are you talking about the end result?

21       Q.    The end result?

22       A.    Yeah.  It would be in the target fund

23  contract.

24       Q.    But at that point in time where the
```

```
 1        A.    No, sir.

 2        Q.    Does the committee or members of the

 3   committee negotiate with employers in the second

 4   situation we are talking about on the amount of job

 5   target money that should be applied to a project?

 6        A.    No.

 7        Q.    Now, in the situation where, in our

 8   second situation, is the amount of job target money

 9   that is determined by the union to be used on a

10   project, written done in any place?

11        A.    Is the amount?

12        Q.    Is the amount?

13        A.    Only after a target fund contract is

14   generated.

15        Q.    Okay.  From your earlier testimony, is it

16   target fund amount ever presented to the local

17   membership at a meeting?

18        A.    Yeah.

19        Q.    It is?

20        A.    Periodically, on the financial reports,

21   how much is spent.

22        Q.    But each, it's your testimony that each

23   target fund contract is not presented to the

24   membership, is that right?
```

```
1          A.    Individually?

2          Q.    Correct.

3          A.    No.

4          Q.    Now, Mr. DiPietro, you indicated the

5   existence of a target fund contract, correct?

6          A.    There is an existence of a target fund

7   contract?

8          Q.    The existence of target fund contracts.

9          A.    There are target fund contracts, yes.

10         Q.    Now, with respect to those contracts, are

11  they reached with signatory employers on all

12  situations?

13         A.    I'm not following you again.

14         Q.    Is a target fund contract a document that

15  is signed by the employer and the union, by the

16  employer that's going to receive the target fund

17  monies and Local 7?

18         A.    Yeah.

19         Q.    It is a document that is signed by both

20  the union and the employer in all cases?

21         A.    Pretty much.

22         Q.    And are you aware that in many --

23         A.    -- Occasionally, they may not be signed.

24         Q.    So you are aware of occasions where they
```

1    Q.    Exhibit No. 10 is the LM-2 for

2    essentially the same month periods, 2002 to 2003.

3    Do you recognize that as being an LM-2 of Local 7's?

4    A.    It looks like an LM-2 report, yeah.

5    Q.    And finally there is an LM-2 here which

6    is for the period, 2004 to 2005.  Do you recognize

7    that as a document submitted to the U.S. Department

8    of Labor by Local 7?

9    A.    That's a new format.  If you say so, it's

10   a new format.  I recognize these because I recognize

11   them.  If you say that is, I guess so.

12        MR. AVAKIAN:  Can we stipulate that is a

13        copy of an LM-2.  We have Mr. Brown here, so I

14        could get him to verify it as well.

15        MR. KELLY:  I'd be happy to stipulate

16        that it is at least a portion.  I don't know if

17        the whole thing is here or not.  That's the

18        '04, '05 LM-2 for Local 7.

19        MR. AVAKIAN:  Right.  I think we can take

20        our break at this point in time.

21             (Lunch break, 12:24 to 1:19.)

22   BY MR. AVAKIAN:

23        Q.    All set.  Back on the record.  Mr.

24   DiPietro, before we had our lunch break, I showed

```
 1    you several documents, Plaintiffs' 8 through 11, I

 2    believe.  With regard to Exhibit No. 8, this was an

 3    LM-2 that has your signature on it, correct?

 4         A.    Yes, sir.

 5         Q.    And in the course of preparing this LM-2,

 6    did you review the books and records of Local 7 in

 7    order to do so?

 8         A.    We supplied the documentation for this

 9    report, yes.  It was done by an independent auditor.

10    That's required.

11         Q.    And did you review with the auditor the

12    information that was set forth in the LM-2 report?

13         A.    I believe so, yeah.

14         Q.    Okay.  Now, with respect to the LM-2, the

15    information concerning the amount of money that was

16    received from contractors and paid to contractors on

17    target funds is reflected in here, is it not?

18         A.    Whatever is in the report.

19         Q.    I'd like to you show you Schedule 14 of

20    the receipt, page 12 of the Exhibit 8 LM-2?

21         A.    Okay.  (Witness reviewing document.)

22         Q.    Take a look at that?

23         A.    I guess, yeah.

24         Q.    So I just want to confirm, this 2000,
```

1    2001 LM-2 reflects, if I can read this correctly,

2    that the union received $3,491,096 from contractors

3    for the target fund?

4         A.    No.  I wouldn't think that would be the

5    target fund, probably in aggregate.

6         Q.    What else would be included and received

7    from contractors?

8         A.    What else would be received from

9    contractors?

10         Q.    Right.

11         A.    Nothing.  Just the word they used.

12         Q.    Well, there is this line, received from

13    contractors, do you know what it encompasses other

14    than job target money?

15              MR. LONG:  Excuse me.  Can I just see

16         what page you're on?

17              MR. KELLY:  Schedule 14.

18         A.    I don't know, whatever is on there.

19         Q.    Okay.  You don't know if there is

20    anything else included in that dollar amount?

21         A.    I can guess just by looking at that.  I

22    would think it's the aggregate of the payments from

23    the contractors, an aggregate.

24         Q.    Now, let's take a look at Schedule 15,

 1    Line 5.  It says contributions to?

 2            MR. KELLY:   That's 4.

 3        Q.    Line 4.  Payments to contractors, and it

 4    shows the amount $793,375.  What were those payments

 5    for?

 6        A.    I would assume that is for the target

 7    fund.

 8        Q.    So that payment, payments to contractors

 9    listed on Schedule 15 represents job target fund

10    payments?

11        A.    Yes.  I would guess that is correct.  I

12    can't be sure though.

13        Q.    But just so I understand correctly, that

14    differs from the Schedule 14, Line 4, which is

15    received contractors, includes, you think, an

16    aggregate of money including the market recovery

17    fund?

18        A.    I don't know.  To the best of my

19    recollection that goes back, yeah, I would have to

20    say to the best of my recollection, yeah.

21        Q.    Okay.  Now, I just want to look, I want

22    to look at the other remaining LM-2's for the same

23    type of information and get your understanding.

24    Exhibit 9, Schedule 15, there is a Line 6 that says

1    signature, yes.

2        Q.    And do you recall whether a person that

3    had the second signature capability was Charles

4    Wright?

5        A.    I believe, yes.

6        Q.    And did Mr. Wright provide you with a

7    stamp for signing his name?

8        A.    I believe sometimes, yeah, we used to use

9    a facsimile stamp.

10        Q.    And for these target fund agreements and

11    the checks that were issued, did you have custody of

12    Mr. Wright's stamp?

13        A.    Yes, I did.

14        Q.    And so when a payment request came to

15    you, and we haven't talked about it further than

16    that, did you use that stamp for Mr. Wright's

17    signature and you would sign the check yourself?

18        A.    Sometimes, yeah.

19        Q.    Now, we talked about the extensive

20    process before a check is sent and you talked about

21    the verification, process.  Who is doing that

22    verification yourself?

23        A.    Yes, sir.

24        Q.    So once you verify that, is there any

1    so much work has been performed on that job.

2        Q.    Okay.  Now, in the process, the extensive

3    process that you described, the payments to the

4    contractors would always occur after they had made

5    their payroll payments and deductions to the

6    individual members and to the fund, is that right?

7        A.    Verified, yes.

8        Q.    So the check that would be cut, would not

9    be used to pay for the current wages and benefits of

10   any members of the union, is that right?

11              MR. KELLY:  When you say "use," who are

12        you referring to?

13              MR. AVAKIAN:  Use by the contractor to

14        make payments as he was going on the current

15        projects.

16        A.    For the most part, no.  I believe there

17   were some instances where a contractor was

18   delinquent, and after the hours were verified, the

19   members voted to make the members whole so they

20   wouldn't be without their benefits.

21        Q.    Do you remember what occasion that might

22   have been?

23        A.    No.  It may have happened a few times.  I

24   don't recall right now.

117

```
1    agreement.  And if my memory serves me correctly, it
2    was 90 percent, so in order to make the membership
3    and the members that were working on that project
4    whole, the members would have voted to makeup the 10
5    percent.
6         Q.    Okay.
7         A.    You know, to the best of my
8    recollection -- it's going back.
9         Q.    Can you go to Page 6, under Griffin Iron
10   Works?
11        A.    Page 6, (Witness reviewing document.)
12   Griffin Iron Works, yes.
13        Q.    It's a Cardi Furniture Project, and it
14   says the number versus having a check number or some
15   sort of whatever it is.  It says, "special," and
16   then memo says, "IWDC of NE Special Project."  Do
17   you know what that is referring to?
18        A.    That actually is the end of my tenure
19   there.  I believe that it may have been or could
20   have been a joint effort by the New England District
21   Council, and Local 7 would have approved to make the
22   members whole to get the job, it would appear.
23        Q.    All right.  Turn to the next page, and it
24   has towards the bottom, "IWDC of NELMCT."  What is
```

1      A.    For their expenses and to do their

2    programs, help out with the industry monitoring,

3    whatever the members would want to have our industry

4    advanced, and that's what we used that for.

5      Q.    That is an additional use of the job

6    target fund?

7      A.    Industry monitoring, yeah, sure, safety,

8    anything like that, anything that's going to benefit

9    the members.

10      Q.    From my understanding your testimony,

11    there is no document which sets forth the job target

12    program or market recovery program, is that right?

13      A.    I'm not following your question there,

14    Mike.

15      Q.    There is no published document which sets

16    forth any rules and regulations of the market

17    recovery program, is that right?

18      A.    Any formal document?

19      Q.    Yes.

20      A.    To the best of my knowledge, not that I

21    know of, no.

22      Q.    So it's my understanding then that the

23    local union can use the money in that account for

24    any purpose that it chooses to, is that right?

149

1   fund CD for probably half a million.  That's the

2   interest.  CD No. 2, same thing, probably a longer

3   period of time, 6 months, a year, maybe.  I'm just

4   guessing at that.  And then we put a little bit of

5   money in this "I Income" to maximize our investment

6   for the membership.

7       Q.    So at the end of June, on June 30th,

8   2001, if you add up all this money, you had

9   $5,395,861.06 in there?

10      A.    That's correct, if my math is good.

11      Q.    And you're projecting now in 2001

12  spending a million dollars on target projects?

13      A.    Right.  We may or may not have made it to

14  that level, or maybe we spent more.  That was just

15  my budget.  That's what I told them we might be

16  doing, maybe.

17      Q.    Did you consult with the committee on

18  that million dollar amount?

19      A.    Oh, yeah.

20      Q.    Okay.  All right.  Now, in 2002 we have

21  several, a couple more CD's, from CD one to now we

22  are on CD's three and four?

23      A.    Yes.

24      Q.    Now, you have million dollar CD's?

1        A.    Isn't that good, huh?

2        Q.    Okay.  You understand between what

3    happened or might have happened between the years

4    2000 and 2002 that the amount of money in that fund

5    grew by about 5 million dollars?

6        A.    Sure.

7        Q.    What happened?

8        A.    The work load increased, and every member

9    voted to put 85 cents an hour into the target fund,

10   and our work opportunities grew.  Thank God.  And we

11   ended up accumulating a little bit of a nest egg

12   there.

13       Q.    Now, here you are projecting a budget of

14   one and a half million dollars for expenses?

15       A.    Yeah.  But we may or may not do, or we

16   may spend more.  Who knows.  That was just for

17   budgetary purposes.

18       Q.    I understand.  That is just the budget.

19   Moving up to 2003, now, you've lost CD's two and

20   three, but we now have more money in the bank in

21   total?

22       A.    Well, if you see here, we probably

23   transferred some of the money out of here.  We might

24   have put more money in the income.  It went from 2

1    all.   That's my job.

2        Q.    For purposes of this deposition, though,

3    have you, do you understand that there may be

4    contractors that have signed a union agreement to

5    abide by the union's collective bargaining

6    agreement, but it will only last for a period of

7    time, such as 3 years, and can be terminated by the

8    contractor after 3 years?

9        A.    I'm not aware of it.

10       Q.    Okay.   Are you aware of during the period

11   of time that you were financial secretary, that

12   whether or not the Local 7 had any elections held by

13   the National Labor Relations Board?

14       A.    Are you talking about -- I'm not familiar

15   with elections of the National Labor Relations.

16       Q.    Secret ballot elections to select Local 7

17   as a representative for employees?

18       A.    I'm not aware of that.

19       Q.    Are you aware that employers sign

20   contracts to establish, such as Atlantic Bridge,

21   from a particular point in time, they are now

22   signatory to the union contract?

23           MR. KELLY:   What's the question?

24       A.    I don't understand.

Exhibit J

```
                                    VOLUME:  I
                                    PAGES:  1-97
                                    EXHIBITS:  1-32

                 UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
                  Case No. 1:04-cv-12536-RGS


        ***************************************
        AMERICAN STEEL ERECTORS, INC.,et als. *
                         Plaintiffs,          *
                                              *
        v.                                    *
                                              *
        LOCAL UNION NO. 7, INTERNATIONAL      *
        ASSOCIATION OF BRIDGE,                *
        STRUCTURAL, ORNAMENTAL &              *
        REINFORCING IRON WORKERS,             *
                         Defendant.           *
        ***************************************
```

        30(B)(6) DEPOSITION OF HB WELDING, HELEN

BACON, a witness called on behalf of the Plaintiffs,

taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the

Commonwealth of Massachusetts at the

Holiday Inn Express, 707 Washington Street, North

Attleboro, Massachusetts, on Thursday, August 24,

2006, commencing at 1:30 p.m.


                        PATRICIA BOWEN
                       124 Downing Drive
                Attleboro, Massachusetts 02703
                        (508) 222-9403



36

 1    target fund agreement such as Exhibit No. 6, and

 2    then submit a new bid or new price to the

 3    fabricator?

 4         A.    Well, they would have submitted another

 5    price to the fabricator.  They would have.

 6         Q.    Based upon receiving the target funds?

 7         A.    Well, based upon, probably at the time,

 8    verbally receiving some target funds.

 9         Q.    Actually receiving dollars?

10         A.    No.  You don't receive dollars ahead of

11    time until you're all done the work.

12         Q.    So you might have had some sort of oral

13    understanding with the union based on target fund

14    money would be available, and based upon those

15    representations, you might have submitted a new bid?

16         A.    Yes.

17         Q.    And the paperwork for 6 could have

18    followed those discussions?

19         A.    Yes.

20              MR. AVAKIAN:  Let's go off the record for

21         a second.

22              (Exhibit Nos. 7 through 12 marked.)

23    BY MR. AVAKIAN:

24         Q.    Back on the record.  Ms. Bacon, I'm going

1     Q.    And when you got that check, what did you

2   do with it?

3     A.    What did I do with it?

4     Q.    What would you do with a check like

5   Exhibit 7?

6     A.    Put it in my checking account.

7     Q.    Your business checking account?

8     A.    Oh, yeah, I'm sorry, of course, my

9   business checking account.

10     Q.    So it went back into the company in a

11   general checking account of some sort?

12     A.    Yes.

13     Q.    For disbursement for whatever purpose you

14   wanted to use it for?

15     A.    That's correct.

16     Q.    I'm going to show you Exhibit No. 9, and

17   then I'll ask you, just read it over to yourself,

18   and then I'll ask you a question about it.

19     A.    (Witness reviewing document.)

20     Q.    Exhibit No. 9 is a letter from your

21   company to Ed Wright telling him that you've,

22   completed the negotiations for the erection of the

23   Lowes Home Improvement in Woburn.  Now, that is

24   November 15th, 2001.  Now, at this point in time,

```
1    that could have been a different person.  That could
2    have been Dimeo.  Whatever they would have said,
3    you're too high, can you do something?  So then when
4    we would have found out that there were target money
5    available, and they were going to give, it states,
6    $5.40 an hour.  We projected there was going to be
7    approximately 2,800 hours on that project.  So it
8    helped us because we knew that money was going to be
9    coming in.  If we got the target money, we would be
10   more competitive.  We could have reduced our bid to
11   whoever we bid to.
12       Q.    So knowing that you were going to get the
13   target money helped you reduce your price and it
14   made you more competitive?
15       A.    Yes.
16       Q.    Now, I'm going to show you what's been
17   marked Exhibit No. 12 and just take a look at that.
18            MR. LONG:  What was 12?
19            MR. AVAKIAN:  12.
20            MR. LONG:  Thank you.
21       Q.    Do you recognize what that document is?
22       A.    Yes.
23       Q.    What is that?
24       A.    That is an invoice for Local 7 for
```

```
 1          Q.    Now, at the time or looking at this

 2    letter, you never told him to retract it, is that

 3    right?

 4          A.    I think this letter went out, and I only

 5    found it in the files.

 6          Q.    Now, with regard to the following

 7    sentence, quote, we will need to have the resources

 8    available to fight the open-shop erectors in many

 9    projects in the future, end quote.  Do you have any

10    understanding of that, what that sentence means?

11                MR. CAMPBELL:  To the author?

12                MR. LONG:  Yeah, I'm going to object.

13                MR. AVAKIAN:  To the author or to the

14          company.  It came out of the company

15          letterhead.

16          A.    But I didn't write this letter.

17          Q.    I understand that.  But you have read it?

18          A.    I read it after the fact.  I didn't see

19    this letter go out.

20          Q.    But it did go out with authorization from

21    the company?

22          A.    Yes, it did.

23          Q.    So I'm just asking you if you understand

24    what that means, if it has any particular meaning as
```

1     this letter was distributed outside the office of HB

2     Welding?

3               MR. CAMPBELL:  Objection.

4               MR. LONG:  Objection.

5          A.    I'm not sure.

6          Q.    Now, did your son, John, tell you that he

7     provided this to somebody else?

8          A.    I stumbled on this letter when I was

9     going through my files.  I don't remember seeing

10    this letter before.

11         Q.    So he has never told you that he did not

12    send it to a company?

13         A.    Right.

14         Q.    Did not send it to a member of the union?

15         A.    No.

16         Q.    Or did not send it to a friend or an

17    acquaintance, is that correct?

18         A.    That's correct.

19         Q.    Okay, now, Mr. Long, also asked you some

20    questions about lowering your bid.  On the projects

21    that we have discussed here today, if you had not

22    received target money or the prospect of target

23    money, would you have lowered your bid to the

24    fabricator?

1          A.    No.

2                MR. CAMPBELL:  Objection.

3                MR. LONG:  I'm going to object too.

4          Q.    And isn't it correct that as a result of

5     the knowing that you were going to get target money

6     on the projects we discussed here this afternoon,

7     you actually did lower your bid to the fabricator?

8                MR. CAMPBELL:  Objection.

9                MR. LONG:  Objection.

10               MR. CAMPBELL:  Answer, if you can.

11         A.    I'm sorry, now.  You know what, I had it,

12    and I don't remember what you said, I'm sorry.

13         Q.    Okay, that's fine.  On these projects

14    that we have discussed here today, as a result of

15    knowing that target money was going to be made

16    available on these projects, you actually did lower

17    your bid price to the fabricator?

18         A.    That is correct.

19         Q.    Now, it's my understanding that as a

20    result of the cross, that upon you knowing that the

21    target money was going to be made available, you

22    then entered into an agreement, which are

23    represented by the target fund agreements that we

24    have seen here today to receive money from Local 7

Exhibit K

**Jay Hurley**
**August 25, 2006**

1

Volume 1, Pages 1-232, Hurley Exhibits 1-11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS

 ORIGINAL

AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAY HURLEY

Friday, August 25, 2006, 9:40 a.m. to 4:47 p.m.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

19

1   Local 7.  Did Local 7, to your knowledge, start to

2   have any role to play with job targeting?

3      A.  Yes.

4      Q.  And what was that?  What happened?

5      A.  They would provide the money to control the

6   system.

7      Q.  Now, when you say they would provide

8   money, when you were employed by Local 7, is it

9   your understanding that they had a bank account of

10  some sort for this purpose?

11     A.  When you say employed, I just want to make

12  sure it's clear.  Are we talking employed as a

13  part-time officer, or employed full time?

14     Q.  Both.

15     A.  I was peripherally aware of it until 1993,

16  and then I became significantly more mindful of it

17  from 1993 on.

18     Q.  So from 1993 on...

19     A.  June of 1993.

20     Q.  And do you recall whether Local 7 set up a

21  program during that period of time for job

22  targeting?

23     A.  Yes.

24     Q.  And can you describe what that program was?

Jay Hurley
**August 25, 2006**

40

1    A.  Yes.

2    Q.  Now, do all projects that they tell you are

3 coming up end up as project alerts?

4    A.  No.

5    Q.  How do you distinguish between the two,

6 whether to make a project alert or not?

7    A.  I use the BA's' familiarity with any

8 particular project.

9    Q.  Is there anything in particular that they

10 tell you that would cause you to issue an alert or

11 not to issue an alert?

12    A.  Sure.

13    Q.  And what would those be?

14    A.  Whether we're worried about losing the job

15 to nonsignatory contractors.

16    Q.  Now, when you say nonsignatory contractors,

17 who are you referring to?

18    A.  Contractors that don't have a contractual

19 relationship with the District Council.  No one

20 specifically.

21    Q.  To your knowledge, are there specific

22 contractors that have contracts with Local 7 and

23 any of the other locals in the District Council?

24    A.  Yes.

Jay Hurley
August 25, 2006

42

1    A.   Blast fax.

2    Q.   When you say blast fax, what are you

3    referring to?

4    A.   Multiple-destination facsimile.

5    Q.   Do you have a fax machine that has all the

6    fax numbers of the signatory contractors in it?

7              MR. ROSENTHAL:   Point in time, to be

8    clear?

9              MR. AVAKIAN:   I'm talking about Local 7.

10   A.   I'm testifying as the business manager

11   right now.   Yes.

12   Q.   So let's say you had a hundred fax numbers

13   inputted into the fax machine.

14             You take this, for instance, Exhibit

15   2-A, put it in the fax machine, hit the one button

16   and it just automatically...

17   A.   It goes into computer mode.

18   Q.   Now, after receiving, just generally, a

19   Local 7 project alert, did you actually get calls

20   from contractors?

21   A.   No.

22   Q.   Did any of your business agents report

23   back to you that then received calls back from

24   contractors concerning these projects?

**Jay Hurley**
**August 25, 2006**

72

1    been nonunion contractors bidding on the project?

2        A.   That would just be a given, in most cases;

3    not necessarily in all cases but in most cases.   In

4    most cases that would be a given.   There's in

5    reason, no other... Cancel that.

6        Q.   You had indicated that there might be a

7    situation where you might provide job-target money

8    to a project where there was no union contractor

9    bidding on it?

10               MR. ROSENTHAL:   Where there was no union

11   contractor?

12               MR. AVAKIAN:   Bidding on the project.

13       A.   I don't understand the question.   Who would

14   I give the money to?

15       Q.   The unionized contractor.

16               MR. ROSENTHAL:   I object to that.

17       A.   I didn't understand the question.

18       Q.   If you didn't understand the question.

19       A.   I didn't understand the question.

20       Q.   Based on your prior answer, is there a

21   situation where you might have provided job-target

22   money to a union employer where no nonunion company

23   was bidding on a project?

24       A.   Not to my knowledge.   No.

Jay Hurley
August 25, 2006

78

1   manager had provided the target money...

2      A.   Correct.

3      Q.   ... isn't it true that, let me back up.

4           On those particular projects where the

5   union provides target money to a company, isn't it

6   true that the payments that the union makes pursuant

7   to the targeted agreement go to the contractor after

8   he's made the payments?

9      A.   Are you speaking specifically the

10  prevailing-rate jobs, or all jobs?

11     Q.   Prevailing-rate jobs.

12     A.   To the best of my recollection, nothing

13  ever went to the contractor until all their

14  obligations were paid and certified.

15     Q.   And those checks...

16     A.   In either case.

17     Q.   In either case; and those payments that

18  went to the contractors went to the contractor in a

19  general way.

20           Do you know if you limited your checks

21  only to specific wages, or were they restricted

22  payments?

23           MR. ROSENTHAL:   Object to the form.

24     A.   Again, there's private work and prevailing-

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

**Jay Hurley**
**August 25, 2006**

91

1    A.   Only pertinent to what you provided me

2    today.   It's like it says here, $4 per hour.   Over

3    here it says the end result is this contract seems

4    to show that it went from the initial offering of $4

5    an hour up to $8.50 an hour.

6         So, I don't have any specific

7    recollection of how it got from here to here.

8    Q.   Now, let's take a look at the agreement

9    first.

10        The agreement doesn't specify any

11   specific application of an hourly rate, does it?

12   A.   Yes.

13   Q.   It does?

14   A.   Yes.

15   Q.   What does it specify?

16   A.   $8.50.

17   Q.   And that particular agreement that's

18   entered, would that have been done during the

19   time period that you were business manager?

20   A.   It would be very close to the end.

21   Q.   And do you recollect whether or not you

22   ever signed any target fund agreements or

23   contracts?

24   A.   I don't remember signing any.   I just don't

Jay Hurley
August 25, 2006

159

1  money in return as a benefit?

2          MR. ROSENTHAL:   Objection to form.

3      A.   I mean, the mechanism is there for them so

4  they know there's a funding mechanism.

5          If I say to them we'll reimburse you $4

6  an hour, the expectation on our part is they'll

7  reduce their price by $4 an hour.

8          But there's a lot of honor in that

9  system, and you have to hope they follow through on

10  it; because on the other end of it they're going to

11  get a $4 payment.

12          But there was always that area that was

13  unconquerable, which is the greed factor; which is,

14  if I say to you three or four months from now I'm

15  going to reimburse you $4 an hour, other than the

16  fact that you may lose your job, there's nothing

17  to guarantee me that that entire $4 per hour gets

18  returned to the owner or the fabricator or whoever

19  the middleman is.

20          It's a unilateral attempt to lower our

21  costs in areas without significantly lowering the

22  wages and benefits of the members.

23      Q.   The questions I have go to the fact that

24  both parties agree that the lower wages of the

161

1          I don't follow that.  I don't agree with

2   that proposition.

3      Q.  Did you negotiate with the employer

4   association on the purpose for the market-recovery

5   fund, or what that was?

6      A.  We never met with an association.  This was

7   done on a job-by-job basis.  Our contractors don't

8   trust each other.

9      Q.  I'm sorry; I'm talking about when you

10  negotiated this contract.

11     A.  When I negotiated this contract in 2000.

12     Q.  And we have language in here in 2000.

13     A.  This was already in here.  This language is

14  just passed on.

15          You showed me a paper earlier that

16  said that the thing was started in 1992.  This just

17  passes into subsequent editions.  This language has

18  been here.

19          You spoke earlier about the five-man

20  riveting gang, and there's also a seven-man derrick

21  crew.  I haven't even seen a seven-man derrick crew,

22  but we keep the language in there in case anybody

23  brings a derrick back.

24          This language just stays in there from

**Jay Hurley**
**August 25, 2006**

164

1  so they don't negotiate this.  They negotiated the

2  insertion of it, they agreed to the insertion of it;

3  but they don't negotiate it.

4         As you can see, our wages in 1992 pale

5  in comparison to our wages of 2006; so we've made

6  significant strides with the contractors on wages.

7  The 85 cents has stayed the same right through.

8  It's not negotiated with the contractors; it's

9  none of their business what we do.

10     Q.  So you don't recall, then, negotiating

11  this?

12     A.  Not at all.  If a contractor wanted to

13  discuss it or wanted to put more in or wanted to

14  take some out, I would say, with all due respect,

15  it's not your business; this is something that the

16  members vote on.

17         All I'm asking you to acquiesce to is

18  its insertion into the contract.  They don't care

19  what you do.

20     Q.  If that's the case, then why is the

21  language in there?  Why isn't the language 3

22  percent?

23     A.  Because we sign a lot of nonsignatory

24  companies that over time become signatories.  We

**Jay Hurley**
**August 25, 2006**

178

1        A.   For a particular job.

2        Q.   So the answer is yes?

3        A.   I don't know what the question is.

4        Q.   So your agents would visit the fabricators,

5    developers or owners, and even the nonsignatory

6    erectors, to seek an agreement from them to use

7    a union signatory contractor to do the work?

8        A.   No.

9        Q.   What part of that is wrong?

10       A.   It should be flipped on its head.  The

11   nonsignatory should be last, because that's the

12   last resort.

13            What I mean by that is we go after

14   a job, you go after a job; it's a competition.

15   American Steel and everyone else is in there

16   bidding the job.

17            And in the end, if American Steel gets

18   the job or if DFM gets the job, as a last resort, we

19   pay them a visit and say, Hey, what do you say, come

20   on, will ya?

21            So the nonunion erector, it's a whole

22   grouping; but probably, if I had to reword it, I'd

23   say And finally the nonunion erector.

24       Q.   So you would attempt to obtain an agreement

**Jay Hurley**
**August 25, 2006**

179

1  from the owners, developers or erectors to try to

2  get them to agree to use the union signatory

3  contractor on the job;

4                    and if that failed and the

5  nonsignatory got the job, then you'd go to them

6  to try to see if they would sign an agreement or

7  something like that?

8      A.   I don't know what else to say.

9                    It's a fair characterization; sure.

10     Q.   Do you remember personally going to any of

11  these fabricators, developers or owners other than

12  Canatel?

13     A.   Met with Canatel.

14                    I rarely talk to fabricators.  I believe

15  they're the scourge of the industry, so I avoid them

16  at all cost.

17                    They manipulate signatories and

18  nonsignatories.  I tend to avoid them at all costs,

19  if at all possible, for the most part.  It's just a

20  general rule I live by.

21                    Same with general contractors.  They

22  have an inherent vested interest to drive the cost

23  down, because they make more money.  That's just my

24  personal belief.

**Jay Hurley**
**August 25, 2006**

187

1    A.  The money was given to the contractors

2  after the work had been performed.

3         After the financial secretary/treasurer

4  had been convinced that all the wages and benefits

5  had been paid, then he would reimburse the

6  contractor the allotted money.

7    Q.  So after the wages and benefits had been

8  paid according to the union contract?

9    A.  According to the fund office.

10   Q.  And then the union would cut a check to the

11 employer for a specified amount, and he can use that

12 in any way he wants to; is that your understanding?

13   A.  Yes.  It's just semantics.

14        If there's a thousand hours on the job

15 and they give him $4 an hour and the job ultimately

16 works a thousand hours, he knows he's getting $4,000

17 back.  Where he apportions the money in the interim,

18 I have no idea; and I would imagine he didn't really

19 think about it.  He just knows that at the end of

20 this job, after I've met all my obligations, I'm

21 getting a $4,000 check.

22        So, you can say it can be applied to

23 wages or anything.  I think they just look at raw

24 costs, and I get a check back.  The incentive was to

**Jay Hurley**
**August 25, 2006**

192

1      A.   That was not my intent, so I can't succeed

2    at something I never attempted to do.

3              My job is not to drive -- you can

4    call it semantics -- I've not there to drive the

5    nonsignatory out.  I'm there to place the signatory

6    there.

7              So if you rephrase the question, I can

8    answer it; but the intent on my part was never to

9    drive anyone out.  I represent workers who work

10   for contractors.

11             And so in essence, through an arm's-

12   length extension, if I get the contractor on the

13   job, my members get on the job.  I don't care what

14   contractor it is.

15     Q.   So you attempted to get an agreement with

16   the GC's, developers and fabricators and owners to

17   use union signatory contractors on projects?

18     A.   Absolutely.

19     Q.   And in that discussion you never brought up

20   that you didn't want them to use nonsignatories?

21     A.   Never.

22     Q.   I just want to make sure.  You already said

23   that.

24     A.   No, absolutely not.

224

1              So they might be seminars, they might

2      be things like that, where you could use -- and this

3      is just conceivably; I don't know of any particular

4      instance -- where you could use the funds to pay for

5      that educational experience, you could use the funds

6      to pay for equipment to monitor things, stuff like

7      that.

8          Q.   But you have no knowledge of...

9          A.   Nothing specific.

10             The essence of the market-recovery

11     program is to lower costs and to raise workers'

12     wages and benefits.  That's the lion's share of it.

13             MR. AVAKIAN:   I have no other questions.

14             EXAMINATION

15     BY MR. ROSENTHAL:

16         Q.   Mr. Avakian made reference to something

17     about rings or areas.

18             In your experience, how far away are

19     some of the steel-erection companies based who bid

20     on work in the Greater Boston area?

21         A.   You want the furthest?

22         Q.   Yes.

23         A.   They're everywhere.  They come in from

24     anywhere and everywhere.

**Jay Hurley**
**August 25, 2006**

225

1          They come in from the six New England

2    states.   They come in from Canada.   They come in

3    from the Netherlands.

4          I have a 500,000-square-foot steel

5    greenhouse being erected up in Maine with a work

6    crew from the Netherlands.   I have a job being

7    erected with a work crew from China.

8      Q.   They come in and bid on work in the

9    District Council's area?

10     A.   They come in and bid on work in the

11   District Council's area.

12          They come up from the Carolinas, from

13   Florida, from the Midwest.

14     Q.   And when they come in, what resources do

15   they bring in in order to get the work done here?

16     A.   Oh, it's a wide range.   Some bring their

17   own crews.   Some bring their own crews.

18          Some come in and work in some type

19   of what I'll characterize as a joint venture, for

20   lack of a better phrase, with local contractors.

21          Some act as hiring halls, basically,

22   and send workers up and put a stiff attachment on

23   the costs of those workers to get skilled help.

24          It's a pretty sophisticated system

Exhibit L

1

Volume 1, Pages 1-110, Stearns Exhibits 1-20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS

 ORIGINAL

AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAMES F. STEARNS, IV

Tuesday, August 29, 2006, 10:11 a.m. to 1:48 p.m.

16

1    A.  Yes.

2    Q.  Let me just read that one section.

3          It says, It is agreed that the working-

4    dues deduction of one and one half percent (1 1/2

5    percent) of the total package plus 50 cents for a

6    market-recovery program and 3 cents for a political-

7    action league will be withheld out of net pay for

8    each and every hour paid effective 11/1/93.

9          With respect to that language,

10   Mr. Stearns, do you understand what the 50

11   cents for a market-recovery program deals

12   with?

13   A.  Yes.

14   Q.  I know what 50 cents is, but what is the

15   market-recovery program?

16   A.  It's the target fund.

17   Q.  Is that language that the employer

18   association set up?

19   A.  Absolutely not.

20   Q.  What is it, then?

21   A.  It's a target fund and a market-recovery

22   program.

23   Q.  Then who sponsored this market-recovery

24   program, or runs it?

James F. Stearns, IV
August 29, 2006

17

1      A.   Local 7.

2      Q.   Do you have any representation on that

3   fund?

4      A.   No.

5      Q.   Does any employer that you know sit on that

6   fund?

7      A.   No employers that I know of sit on that

8   fund.

9      Q.   Now, in this particular contract, if no

10  employer sits on the fund, why is there language

11  concerning the market-recovery plan in there?

12     A.   We have to basically agree that we'll

13  at least in our office mechanically, through the

14  checkbook, take out these amounts of money for them;

15  and those are the things we've agreed to take money

16  out for.

17     Q.   Is it your understanding, then, that the

18  market-recovery program is exclusively under the

19  control of the union?

20     A.   As far as I've ever known, it's very much

21  exclusively under the union's control, yes.

22     Q.   And with regard to the other language in

23  this paragraph I just quoted, which is the one-and-

24  a-half-percent amount and the three-cent amount, are

**James F. Stearns, IV**
**August 29, 2006**

25

1    agreed to.

2            The business agents take that monetary

3    package back to the membership with suggestions, and

4    then the membership votes on where the money is

5    allotted.

6            And then the reason I believe that would

7    be in here, I believe once in a long time these get

8    printed.  I don't know if it was a year or two.

9            MR. GROSSO:  I don't know.

10    A.   It was a long time.

11            But by the time this is actually redone

12    and everything, they'd know what those figures are.

13    Q.   So is it my understanding, then, that the

14    employer association and the union agree to a total

15    package, which would be wages, benefits, and other

16    terms and conditions of employment; and then the

17    union comes back and says vis-a-vis the working-

18    dues deduction, this is how it should be broken

19    out?

20    A.   At a later date, yes.

21    Q.   And are the breakouts like the 85 cents

22    ever discussed in terms of the amount?

23    A.   No.

24    Q.   So, has the employer association ever

27

1      A.   Right.

2      Q.   And in the last six years, or let's say

3   at any point in time, have you ever seen a document

4   entitled Job-Target Fund or Market-Recovery Program;

5   If you're interested in getting money, these are the

6   steps you go through in order to obtain it?

7      A.   I don't believe there is a document like

8   that.

9      Q.   Have you ever seen any program or any other

10  document which would describe how the market-

11  recovery program would work?

12     A.   The only thing that I know I've seen

13  is, I don't remember what it says, but on one job

14  we signed an agreement, I guess you'd call it a

15  targeting agreement, for a particular job.

16          There were forms that we would fill out

17  to then get paid target money; but that's all that

18  I've seen.

19     Q.   And with respect to the target or market-

20  recovery program, have you ever seen any accounting

21  of the money that was received and/or expended by

22  Local 7 for that program?

23     A.   No.

24     Q.   We were just talking about the program

33

1    for hours worked on the job.

2        Q.   And who offered that?

3        A.   On this particular job, I talked to two

4    people.  One was Mike Ruggieri, and the other was

5    Jay Hurley.

6        Q.   And do you recall where you talked to each

7    one of these gentlemen?

8        A.   I believe it was over the phone.

9        Q.   And do you recall what time frame it

10   was in?

11       A.   In the context of the job starting;

12   probably about six or seven months before the job

13   started, possibly.

14       Q.   Now, with respect to Jordan's Furniture, do

15   you recall negotiating an agreement or signing some

16   sort of agreement with Local 7 to receive target

17   money?

18       A.   We did not negotiate an agreement.  I don't

19   actually think we signed an agreement either.

20       Q.   Did you receive more than one payment from

21   Local 7 for job-target money on the Jordan's

22   Furniture job?

23       A.   Yes.

24       Q.   And how would you receive the payment?

47

1    understanding?

2        A.    Yes.

3        Q.    And during the process, do you recall how

4    many conversations you might have had with

5    Mr. Hagerman?

6        A.    There were quite a few.  I could not give

7    you an exact amount.

8        Q.    And during the course of your discussions

9    with him, did you discuss the price of the project?

10       A.    Yes.

11       Q.    And did you have discussions regarding the

12   bid price of the project?

13       A.    Yes.

14       Q.    And did you have a difference between your

15   opening bid and your final bid to the company?

16       A.    Yes.

17       Q.    Do you recall what that difference was?

18       A.    There were different variations; because

19   they actually at one point reduced the scope of the

20   work, the size of the building.  That was one thing.

21             And then, honestly, I'm not sure off the

22   top of my head what the differences were.

23       Q.    Now, at some point in time, did Mr.

24   Hagerman indicate that another company might be

James F. Stearns, IV
August 29, 2006

49

1    and I couldn't be exactly sure.

2        Q.  So after he indicated to you that target

3    money was available on the job, did you then enter

4    into discussions with the union to get target money?

5        A.  I asked them if there was target money

6    available.

7        Q.  Who did you talk to specifically, do you

8    recall?

9        A.  Jay Hurley.

10       Q.  And did Mr. Hurley tell you how much target

11   money was going to be available?

12       A.  He did, yes.

13       Q.  How much did he say?

14       A.  I don't remember, but it is on the records;

15   so much an hour.

16       Q.  Was there a top-end amount that was going

17   to be available?

18       A.  I don't remember a top end being discussed.

19       Q.  Do you recall how much per hour he thought

20   was going to be reimbursed to you?

21       A.  I don't recall as I sit here right now.

22       Q.  Now, with respect to H&B Welding, what do

23   you recall Mr. Hagerman discussing with you about

24   them?

50

1    A.  Not much, actually; just that they had been

2  in a position where they were going to get the job,

3  I believe.

4    Q.  And what caused them to lose the job and

5  you to get it?

6            MR. LONG:  Objection as to form.

7            MR. GROSSO:  You may answer.

8    A.  What happened, from my understanding, was,

9  the Jordan's job dragged out quite a while.

10            Between the time it was originally

11  bid and the time it was erected dragged on for, I

12  think, almost eight months; and by the time the job

13  was ready to erect, I believe from what I was told

14  H&B was not able to do the job because it had

15  landed some other work.

16    Q.  Now, do you recall when the Jordan's

17  Furniture job was completed?

18    A.  I think it was roughly two summers ago; I

19  believe.

20    Q.  2004?

21    A.  I think so.

22    Q.  Now, you submitted these requests for, I'll

23  call them, payment to Local 7, and these were done

24  at times after the employees got paid their wages;

**James F. Stearns, IV**
**August 29, 2006**

51

1    is that right?

2         A.    Yes.

3         Q.    Is my understanding correct that you paid

4    wages and benefits to employee on a weekly basis?

5         A.    Yes.

6         Q.    And after a period of time, and I believe

7    in some of these it would indicate:   for example,

8    Exhibit Number 8, which is a fax dated June 29,

9    2004, indicates that you asked for money to be

10   paid to your company for a period of time of

11   March 30 through June 11; is that right?

12        A.    That's for a particular individual; but

13   also between, actually, 5/25 and 6/22.

14        Q.    For the rest of the people?

15        A.    Yes.

16        Q.    So the individuals had already got paid

17   their wages and benefits, and then you asked for

18   reimbursement from the union on the target money;

19   and what did you do with the checks, then, that you

20   would then receive, such as the top of Exhibit

21   Number 16, from the union?

22        A.    Just deposit them.

23        Q.    And where would that money go, in terms of

24   an account within the company?

**James F. Stearns, IV**
**August 29, 2006**

52

1       A.   Just a regular checking account.

2       Q.   And would that money then be available for

3    any purpose that the company had?

4       A.   Yes.  It would be a general account.

5       Q.   Now, when you received these target-

6    money checks such as Exhibit 16 and so forth, and

7    the exhibits you've seen, do you allocate them to

8    any particular projects?

9       A.   It would show as a receipt of an invoice we

10   sent for target money on that project, if that's

11   what you mean.

12      Q.   So it would be reflective of the invoice

13   that you had sent out, so it may match any given

14   invoice; is that what you're saying?

15      A.   Yes.

16      Q.   Now, for instance, Check Number 12,

17   for $79,439.50, a check of that amount would go

18   into your general fund and general account, regular

19   checking account, and then be used for any purpose

20   that the company had; is that right?

21      A.   Yes.

22      Q.   Now, with respect to receiving the

23   target money on this Jordan's Furniture project,

24   did the receipt of the target money enable you to

**James F. Stearns, IV**
**August 29, 2006**

55

1        MR. AVAKIAN:  I'll represent to you that

2    I'll issue a subsequent subpoena;

3            and my understanding is that we can

4    agree in advance that if we want to take up any of

5    the specific mechanisms for formulating the bid they

6    would not be produced, but the bid price on all

7    these target jobs would be, and any of the

8    subsequent bids.

9        MR. LONG:  Just for the record,

10    we're going to object to any discovery being done

11    outside the current discovery calendar.  Perhaps

12    we'll discuss that with you off the record after

13    this deposition.

14        MR. AVAKIAN:  Okay.

15    BY MR. AVAKIAN:

16    Q.  Now, with respect to the bid on the

17    Jordan's Furniture project by J. F. Stearns, do

18    you recall how many bids you gave to Clayco

19    Construction?

20    A.  No.

21    Q.  But it was more than one bid?

22    A.  Yes.

23    Q.  And do you recall, between your first bid

24    and your final bid, whether the availability of the

**James F. Stearns, IV**
**August 29, 2006**

77

```
 1    doubt.   I'm not quite sure about that.

 2        Q.   You produced a copy of a check.

 3        A.   Oh, there's no copy of a check.

 4             MR. GROSSO:  No copy of that check.

 5        A.   Just a copy of the letter.

 6             You might have found me some money; I'll

 7    have to go find out.  But again, that is when we

 8    were doing a whole new system; so I'm not sure.

 9        Q.   Now, with respect to Somerville Housing, do

10    you recall that project?

11        A.   Yes.

12        Q.   And what type of project was that?

13        A.   That was the one where they were putting

14    the prefabricated units on the side of an existing

15    building.

16        Q.   Was that a private building, or public

17    sector?

18        A.   It was in the public sector.

19        Q.   Was that a prevailing-wage job?

20        A.   Yes.

21        Q.   Was that a state job?

22        A.   That I wouldn't know.

23        Q.   Who was the fabricator on the Somerville

24    Housing project?
```

**James F. Stearns, IV**
**August 29, 2006**

86

1              Do you recall whether or not on the

2    Jordan's Furniture project you received target

3    money from two local unions?

4         A.  Yes, we did.

5         Q.  Did you also receive target money from

6    Local 37?

7         A.  Yes.

8         Q.  Do you recall how much money you received

9    from them?

10        A.  I think that was a blanket $50,000.

11        Q.  Now, did you have meetings with somebody at

12   Local 37 regarding target money on the Jordan's

13   Furniture job?

14        A.  Not meetings, no.

15        Q.  How was the money arranged for?

16        A.  Just a discussion.

17        Q.  On the phone?

18        A.  Yes.

19        Q.  Now, who at Local 37 did you talk to?

20        A.  Mike Ruggieri.

21        Q.  Did he call you?

22        A.  I don't remember.

23        Q.  Do you recall whether they made a lump-sum

24   payment to your company?

James F. Stearns, IV
August 29, 2006

89

1    A.   Again, on this Jordan's Furniture job, just

2    the amount of money that was available for it.

3    Q.   Have you ever had any other conversations

4    with Mr. Hurley regarding target money on any of the

5    other projects that you may have bid on?

6    A.   I don't recall.

7    Q.   Have you gone to Local 7 and requested job-

8    target money independently of being approached by an

9    agent of Local 7?

10    A.   I haven't requested it, but I have asked if

11    a certain job was going to be targeted.

12    Q.   Which job or jobs are you referring to?

13    A.   I really don't remember, but I have asked

14    them.

15    Q.   Now, I believe your testimony was that

16    you would know that there was job-target money

17    available, at least sometimes, before you bid

18    on the job.

19    A.   Sometimes.

20    Q.   Now, when you receive notice that job-

21    target money is available, have you lowered your

22    bid price on the project commensurate with the

23    amount of money available?

24    A.   Yes.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

**James F. Stearns, IV**
**August 29, 2006**

90

1            MR. LONG:  Objection to form.  What do

2    you mean by commensurate?

3            MR. GROSSO:  He answered the question

4    already.

5            MR. AVAKIAN:  Yes.

6            MR. GROSSO:  Equal to.

7       Q.  With respect to the projects that you

8    have received job-target money on, would you have

9    lowered your price on, for example, the Jordan's

10   Furniture job by approximately $360,000 if you

11   had known that that money was not available?

12           MR. LONG:  Objection.

13      A.  Could you say that once more?  I'm sorry.

14      Q.  Sure.

15           On the Jordan's Furniture job, would

16   you in the normal course of being involved in a bid

17   process have lowered your bid price approximately

18   $365,000 independently of having received job-

19   target money?

20           MR. LONG:  Objection.

21      A.  Well, I can tell you we lowered it more

22   than that.  I don't know if that answered your

23   question or not.

24      Q.  I think I understand your answer.

**James F. Stearns, IV**
**August 29, 2006**

101

1    A.  Yes.

2    Q.  Now, in this document, isn't it true that

3  all signatories to the union utilize this one

4  agreement?

5    A.  Yes.

6    Q.  And any changes in the agreement

7  regarding wages, and terms and conditions of

8  employment, are engaged in under the auspices of

9  the BTEA and the AGC?

10    A.  Yes.

11    Q.  So in the Exhibit 17-B that we just

12  looked at, the job-target agreement that you signed,

13  that is not a collective bargaining agreement for

14  the purposes of setting any wages or benefits or

15  terms and conditions of employment, because you

16  can't individually do that?

17    A.  Right.

18        MR. AVAKIAN:  I don't have any other

19  questions.

20        MR. LONG:  I think you meant 19-B.

21        EXAMINATION

22  BY MR. LONG:

23    Q.  I'm going to take Exhibit 19-B and ask you

24  just to read the word to the right of the

James F. Stearns, IV
**August 29, 2006**

104

1   deposited into your general fund account, and

2   not specifically credited toward wages or given

3   directly back to employees as wages?

4           MR. LONG:  Objection as to form.

5       A.  I'm a little lost in your question.  I'm

6   sorry.

7       Q.  With respect to the job-target payments

8   that you received, my understanding is that the

9   money went into the general fund account.

10      A.  Yes.

11      Q.  From my understanding of your testimony,

12  you did not reserve a portion of somebody's paycheck

13  to be eventually reimbursed by job-target funds

14  later sent to you by the union?

15      A.  Correct.

16          MR. AVAKIAN:  I have no other questions.

17          MR. LONG:  Just one other question.

18          EXAMINATION

19  BY MR. LONG:

20      Q.  You testified about a general payroll

21  account.

22          Is it ever the case that Stearns would

23  take money from the general account and put it into

24  the payroll account?

Exhibit M

**Charles Wright**
**August 23, 2006**

1

    Volume 1, Pages 1-123, Plaintiffs' Exhibits 1-3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS



AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

            DEPOSITION of CHARLES WRIGHT

Wednesday, August 23, 2006, 9:44 a.m. to 2:01 p.m.

Charles Wright
August 23, 2006

61

1    Q.  And do you have an understanding whether

2  Addendum A sets forth an obligation by Local 7 to

3  monitor and analyze the industry?

4    A.  Will you repeat that?

5    Q.  I'll rephrase the question.

6        Is it your understanding that what

7  you do as an industry analyst is also part of the

8  union's obligation to engage in industry monitoring

9  under Addendum A?

10    A.  Yes.

11    Q.  Now, part of the question I have is, is it

12  your understanding that Addendum A applies to

13  nonsignatory employers, or does it apply to

14  signatory employers?

15    A.  What do you mean?

16    Q.  If you would agree, there is some language

17  about cheating in the addendum; is that right?  Do

18  you recall that?

19    A.  Yes.

20    Q.  And it indicates that one of the things the

21  union is supposed to do is to provide a report

22  regarding its observations and findings.

23        Have you ever provided such a report to

24  Local 7, or to an employer association?

62

1                    MR. LONG:   I'm going to object to the

2       form.  I'm not so sure that that's exactly what that

3       says.

4                    The document speaks for itself.

5            Q.  Let me refer to Page 55, which is

6       defendant's 00215.  There's a paragraph in here;

7       I'd better just read it for the record:

8                    The union should provide a report

9       regarding its observations and findings resulting

10      from this clause to the contractors at least

11      annually at a meeting specifically scheduled

12      for that purpose.

13                   As part of your job, have you ever seen

14      a report of that nature provided to a contractor

15      association?

16           A.  Not that I recall.

17           Q.  Have you ever heard of one being presented

18      to contractors annually?

19           A.  Not that I recall.

20           Q.  Is it your understanding that Addendum A

21      applies only to nonsignatory contractors for

22      investigation?

23           A.  Can you repeat that?

24           Q.  Is it your understanding that Addendum A

63

1   only applies to industry monitoring and analysis of

2   nonsignatory employers?

3       A.   Not by reading the CBA, the way it reads.

4       Q.   In your job, though, you have not monitored

5   the signatory employers?

6       A.   Not that I recall, no.

7       Q.   Do you know of any employees at Local 7

8   that have monitored the signatory employers

9   pursuant to this Addendum A?

10      A.   It gets back to where you're specifying

11  cheating.  What are you saying that the signatory

12  contractor would cheat?

13      Q.   Well, you had just said that you have not

14  looked at the signatory employers.

15      A.   No.

16      Q.   And I'm asking if it lists the signatory

17  employers, and you indicated, I think, that it did;

18  is that right?

19      A.   Yes.

20      Q.   And so I'm asking you, has anyone else that

21  you know of at Local 7 looked at that?

22      A.   Not that I know of.

23      Q.   Now, since you became an industry analyst

24  for Local 7 in 2001, I believe, have you found any

64

1  other cheating and stealing with employers other

2  than Advanced Welding and Ajax?

3      A.  Not that I recall.

4              There's a possibility; sorry.  There's

5  been some wage claims in the past.

6      Q.  What type of wage claims are you talking

7  about?

8      A.  Working on prevailing-wage jobs and not

9  paying the posted rate to the workers.

10     Q.  And do you have a recollection of having

11 heard about or having done something about wage

12 claims?

13     A.  I filed a few of them.

14     Q.  And when you say you filed, what are you

15 referring to?

16     A.  An employee has come to me, and I have

17 talked to them, asked what we could do to recoup his

18 money.

19     Q.  And do you recall, was it just one employee

20 you talked to?

21     A.  There was a couple.

22     Q.  Do you recall who they were employed by?

23     A.  Right now; I have one pending right now.

24     Q.  And who is that with?

56

```
 1    a job.  You don't have to work for me.

 2         But I have made such a competitive situation

 3    that the employees are very happy working for me.

 4    And I get a lot of people wanting to come work for

 5    me based on that knowledge, word-of-mouth.

 6         Q.    Have you actually told people that if

 7    they didn't like working for you, you would give

 8    them a business agent?

 9         A.    Yes.  I've told the union to give my

10    whole company the vote.

11         I said, Come on in and organize D.F.M.  Here is

12    the door.  Come on in, set up a poll and do it.

13    Give them a vote.

14         They won't.

15         Q.    Have any of your employees taken you up

16    on the offer of talking to the business agent?

17         A.    No, I mean, they are on my jobs every

18    day.  My guys know them on a first name basis.

19         Q.    "They" being?

20         A.    The business agents.  If they wanted

21    to -- I had one kid leave.  He went to the union,

22    recently.

23         And good for you, Billy.  That was fine by me.

24    I hope it works out for you.  I have nothing against
```

```
 1        A.    Correct.

 2        Q.    That might mean that D.F.M. would sign a

 3   union contract?

 4        A.    I'm sure that's what he wanted me to do.

 5   I believe, I mentioned to him at that point in time

 6   to give my guys the vote.  That's what we did.  We

 7   did get a vote, or we kind of took our own poll

 8   amongst ourselves.

 9        Q.    When did you do that?

10        A.    Right after this job here, Wrentham

11   Elementary School.  Must have been in August or

12   September.

13        Q.    You had an in-house poll as to whether

14   the employees wanted to go union or not?

15        A.    Correct.

16        Q.    Did you?

17        A.    Yes.

18        Q.    How many employees did you have at the

19   time?

20        A.    I want to say 40.  Probably, it

21   references 40 in this, so at the time it must have

22   been 40.

23        Q.    In there?

24        A.    Well, not here, but describing D.F.M. in
```

1    in your memory as a bad job for D.F.M.?

2        A.    Just the police reports and picketing

3    problem.

4        Q.    But in terms of financial, you did all

5    right on the job?

6        A.    I'd say we didn't lose.  I remember the

7    losers.

8        Q.    That's what I meant.  You always remember

9    the losers, don't you?

10       A.    Yeah.

11       Q.    All right.  I think you talked earlier

12   about having a private poll for your employees.  And

13   I notice that somewhere there was a document that

14   documented that.  And I'm going to ask you if that's

15   what Exhibit 17 is?

16       A.    Yeah.  I believe there was one from Local

17   7 too, but this is what we did.

18       Q.    This refers to a poll being conducted by

19   a neutral third party?

20       A.    Yeah.  It was administered or watched by

21   the Chief of Police in Wrentham.  I wasn't present.

22   We had it set up in Spanish, so there wasn't any

23   confusion for any of our Spanish speaking employees.

24       Q.    Did you have a ballot?

1        A.      Yeah.

2        Q.      Did you?

3        A.      Yeah.  We did one for 7 and one for 37.

4    It was based on a case years ago that was done, and

5    it was accepted, and we did the same.

6        Q.      It had three choices on the ballot, 7,

7    37, and D.F.M.?

8        A.      We had, 7, 37.  Just two choices, two

9    different ballot boxes, yes or no.

10       Q.      Did everybody vote in both of those?

11       A.      No.  You know what I did?

12       Q.      No, I don't.

13       A.      Let me tell you.  I didn't even let my

14   foremen vote.  Even though they don't have the

15   ability to fire or hire, I didn't want to taint it

16   at all.  I just took the core guys and said, here

17   you go, not even my highest end guys.  It would have

18   been even more skewed in my favor if it was, but

19   nonetheless.

20       Q.      How did you make out?

21       A.      Actually, Local 7 got 2 people to vote

22   for it.  Local 37 got no one to vote for it because

23   they can't stand the business agent down there.

24   They would rather work at Domino's.