# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

AMERICAN STEEL ERECTORS, INC., et al. )
 )
   Plaintiffs, )
 )
   v. )
 )
LOCAL UNION NO. 7, INTERNATIONAL )
ASSOCIATION OF BRIDGE, )  Case No. 1:04-cv-12536-RGS
STRUCTURAL, ORNAMENTAL & )
REINFORCING IRON WORKERS, )
 )
   Defendant. )
_____)

## REPLY BRIEF IN SUPPORT OF DEFENDANT
## IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

By its attorneys,

Paul F. Kelly, Esq. (BBO #267000)
Burton E. Rosenthal, Esq. (BBO #429220)
Indira Talwani, Esq. (BBO # 645577)
Stephanie R. Pratt, Esq. (BBO #655108)
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
(617) 742-0208
pkelly@segalroitman.com
brosenthal@segalroitman.com
italwani@segalroitman.com
spratt@segalroitman.com

Mickey Long, Esq. (BBO #634388)
193 Old Colony Avenue, Box E-1
South Boston, MA 02127
(617) 269-0229
mickeylong@gis.net

October 20, 2006

## TABLE OF CONTENTS

INTRODUCTION……………………………........ .............................................1

I. PLAINTIFFS HAVE EXPLICITLY AND IMPLICITLY CONCEDED

   MUCH OF THEIR ORIGINAL COMPLAINT ......................................1

   A. There are No Material Disputes of Fact................................................1

   B.  There Are also Some Common Understandings of the Applicable Law...........4

II. PLAINTIFFS' 'RIMLESS WHEEL CONSPIRACY' ARGUMENT DOES NOT

   SALVAGE THEIR CLAIM…………………………........................................4

   A.  The Labor Exemptions Fully Apply In an Alleged Rimless Wheel

   Conspiracy ............................................................................................5

   1. A Union Goal Of Monopolizing The Labor Market Is Not Improper..........5

   2. Defendant's Use of Target Monies is Protected by the

   Statutory Exemption………………………………………………...6

   B.  The 'Rimless Wheel' Theory Does Not Create a Per Se

   Antitrust Violation ................................................................................8

III. DAVIS-BACON CONTENTIONS DO NOT BREATHE LIFE

   INTO CLAIMS .........................................................................................9

   A.  The Agreement to Deduct Amounts from Employee

   Wages Is Protected by the Labor Exemption…………………………9

   B.  Plaintiffs Cannot Base Their Antitrust Claim on the Davis-Bacon

   Allegations………………………………………………………12

   C. Antitrust Violations Cannot Be Based on Boot-Strapped Claims…………13

IV. NEW PREVAILING WAGE ALLEGATIONS DO NOT

   SALVAGE CLAIM…………………………………………………………14

V. CONCLUSION………………………………………………………...15

## TABLE OF AUTHORITIES

*CASES*                                                                                    *Page*

<u>Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,</u>
    325 U.S. 797 (1945) ...................................................................... 6,7,8,9

<u>Altemose Const. Co. v. Building and Constr. Trades Council,</u>
751 F.2d 653 (3d Cir. 1985)…………………………........  ........................................6

<u>Apex Hosiery Co. v. Leader</u>, 310 U.S. 469 (1940) ...........................................6

<u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,</u>
    509 U.S. 209 (1993) ...................................................................4,13,14

<u>Brown v. Pro Football, Inc.,</u> 518 U.S. 250 (1996) .....................................11,14

<u>Burns v. State Police Ass'n of Mass.,</u> 230 F.3d 8 (1st Cir. 2000) ..................2

<u>Building and Constr. Trades Dep't v. Reich</u>, 40 F.3d 275 (D.C. Cir. 1994).  ............12

<u>Celotox Corp. v. Catrett</u>, 477 U.S. 317 (1986) ...........................................2,3

<u>Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100,</u>
451 U.S. 616 (1975)………………………………………………………….6,11

<u>Dickson v. Microsoft Corp.,</u> 309 F.3d 193 (4th Cir. 2002)..............................15

<u>Felix A. Marino v. Commissioner of Labor and Indus.,</u>
426 Mass. 458 (1998) ………………………….....................................................16

<u>H.A. Artists & Associates, Inc. v. Actors' Equity Assoc.,</u> 451 U.S. 704 (1981) .........5,6

<u>Hunt v. Crumboch</u>, 325 U.S. 821 (1945) ................................................. 14

<u>Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,</u> 457
U.S. 702 (1982).........................................................................................6

<u>Klor's, Inc. v. Broadway Hale Stores</u>, 359 U.S. 207 (1959) ..........................8,9

<u>Kotteakos v. United States</u>, 328 US 750 (1946) .........................................4,6

<u>Mackey v. National Football League,</u> 543 F.2d 606 (8th Cir. 1976).  ...............11,14,15

<u>Mathiowetz Constr. Co. v. Minnesota Transportation</u>, 137 F. Supp. 2d 1144
 (D.C. Minn. 2001)......................................................................10,11,12

<u>NYNEX v. Discon</u>, 525 U.S. 128 (1998) ....................................................9,12,14

<u>Phoenix Elec. Co. v. NECA</u>, 81 F. 3d 858 (9th Cir. 1996)...............................13

<u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657 (1965) ..................7,8,10,11

<u>United States v. Binghamton Constr. Co.</u>, 347 U.S. 171 (1954)  ..............12,13

<u>United States v. Hutcheson</u>, 312 U.S. 219 (1941).......................................8,9,12

**Ward v. Massachusetts Health Research Inst.**, 209 F.3d 29 (1st Cir. 2000).................2

# INTRODUCTION

Defendant Iron Workers Local 7 hereby submits this Reply to Plaintiffs' Opposition to Local 7's Amended Motion for Summary Judgment.[1]  The Complaint characterized Plaintiffs as "open shop contractors" with labor costs "almost always less expensive" than union contractors, who sought to compete based on lower labor costs, but were prevented from doing so by alleged "predatory pricing tactics" on the part of Local 7 and its co-conspirators.  Compl., ¶¶ 1, 36. Unable to find disputed material facts on this claim, Plaintiffs now claim "a rimless wheel conspiracy, with Local 7 at the hub and signatory contractors utilizing target monies as the spokes" lurking in the shadows of "shared objectives" between Local 7 and signatory contractors.  <u>See</u> Pls.' Opp'n at 12-13; <u>see</u> <u>also</u> <u>id.</u> at 23.  Ironically, Plaintiffs (whose competitive advantage on private projects derives from lower labor costs) attempt to anchor this antitrust claim on the federal Davis-Bacon Act and, in a newly introduced twist, on the Massachusetts prevailing wage law -- statutes enacted to protect wage rates of workers on publicly financed projects.  This desperate attempt to salvage their claims should be rejected.

The objective described by Plaintiffs – that the Union seeks to monopolize the labor (as opposed to the product) market – is simply not an unlawful goal.  The "rimless wheel" analysis only makes clearer the import of the labor exemption in this case and the futility of the antitrust claim.  Neither the Davis-Bacon Act nor the state prevailing wage law can resurrect this case.

## I.    PLAINTIFFS HAVE EXPLICITLY AND IMPLICITLY CONCEDED MUCH OF THEIR ORIGINAL COMPLAINT

### A. <u>There are No Material Disputes of Fact</u>

Following discovery, Plaintiffs are forced to concede that the targeting program "was not

---

[1] This Reply addresses Plaintiffs' antitrust claims, and not their claim under the Labor Management Relations Act ("LMRA").  Plaintiffs' Opposition as to LMRA restates the argument set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss.  Compare Pls.' Opp'n to Def.'s Am. Mtn. for Summ. J. ("Pls.' Opp.'n") at 31-38 with Pls.' Opp'n to Def.'s Mtn. to Dismiss, filed on March 14, 2005, docket No. 22, at 18-32.  As to this claim, Defendant relies on the Memorandum and Exhibits previously submitted in support of this Amended Motion for Summary Judgment, and on such argument as may be presented at hearing.

negotiated" with signatory employers.  They admit that Local 7 unilaterally established the program, that Local 7 members voted to pool portions of their own wages for the targeting funds and have the Building Trades Employers' Association ("BTEA") employers deduct dues for the fund from members' paychecks to be forwarded to Local 7, and that the moneys that are forwarded are from the members' after-tax wages.  Pls.' Opp'n at 17; Pls.' Resp. to Def.'s Stmt. Undisputed Facts ("Pls.' Resp."), ¶¶ 2-4.  Moreover, although Plaintiffs claim what they object to "is how those monies were thereafter administered" (Pls.' Opp'n at 17), they also necessarily concede that "Local 7 unilaterally administers the job targeting program."  Pls.' Resp., ¶ 5.

While Plaintiffs attempt to deny other material facts, the disputes are not genuine.   In opposing a supported motion for summary judgment, as is the case here, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  F.R.C.P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (when a motion is made and supported, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial); Ward v. Massachusetts Health Research Inst., 209 F.3d 29, 32 (1st Cir. 2000) (same);  Burns v. State Police Ass'n. of Mass., 230 F.3d 8, 9 (1st Cir. 2000) (same).  Plaintiffs' denials fail to meet this standard.

Local 7 demonstrated that it has no generalized agreements with fabricators, general contractors or other higher tiered companies not to do business with Plaintiffs or other non-union companies.   Def.'s Stmt. Undisputed Facts ("Def.'s Stmt."), ¶ 15 (and pleadings and deposition transcripts cited therein).    Although Plaintiffs deny Defendant's contention that it has no generalized Connell-type agreements with fabricators and general contractors whose employees are not represented by Local 7, they offer nothing that disputes the evidence that no such agreements exist.  See Pls.' Resp., ¶ 15.  Instead, they contend only that "Local 7 established a clear reputation for preventing non-union steel erectors from obtaining work in downtown

Boston and elsewhere in the relevant market" and that "[f]abricators acquiesce in Local 7's promise of threats, intimidation, delays, and greater financial costs by not choosing non-union erectors at lower costs." This specious claim may invite a dispute of fact, but not a material one, for even if proven, it would establish at most that Local 7 obtained work on a job-by-job basis, not by any generalized agreements not to do business with non-union contractors.

Plaintiffs also weakly deny that there are over 150 firms that do steel erection work in the alleged relevant market. See Pls.' Resp., ¶ 12. Beyond quibbling over exact numbers, it is undisputed that there are "a lot" of firms competing for steel erection work in the relevant market at all levels. See Def.'s Stmt., ¶ 12. The Complaint alone names approximately 23 general contractors and fabricators that do business in the alleged relevant market and approximately 18 contractors that do steel erection work in that same market. Compl., ¶¶ 2-8, 67-137). Moreover, Exhibit 13 (Local 7 List of Target Projects) to Plaintiffs' Appendix names approximately 95 Local 7 signatory contractors that do steel erection work in the relevant market.

Plaintiffs' sole rebuttal to the fact that there are few barriers to entry is the misleading assertion that "[e]ntry depends on the number of competent people available to work," citing deposition testimony of Plaintiff D.F.M. Pls.' Resp., ¶ 11[2]. The D.F.M. testimony, however, was *not about entry into the industry*, but rather about the "ideal size" for a steel erector. See D.F.M. Dep. Tr. at p. 112, attached to Pls.' App. at Tab H.

Finally, there remains no evidence of any "below-cost" pricing by Local 7 signatory contractors. See Def.'s Stmt., ¶ 11; see also Celotex, 477 U.S. at 325 (moving party may show the absence of an issue of material fact by showing an absence of evidence to support the nonmoving party's case). Plaintiffs assert that: "[t]he purpose of the Job Target payments was to lower the signatory employers' costs"; [t]he Target Fund 'defrays' allegedly higher costs to signatory contractors"; and "[w]ithout target money, signatory erectors would not lower their

bids to fabricators." Pls.' Resp., ¶ 11. None of these assertions, however, establish that signatory contractors priced below their own costs. They merely show that contractors lowered their prices on targeted jobs. Where a signatory contractor's labor costs have been reduced, its bid reflecting those reduced costs would not be below its costs -- whether the cost reductions are the result of Local 7's area-wide wage concessions at the bargaining table or the result of Local 7's award of target funds. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993).

### B.  There Are also Some Common Understandings of the Applicable Law

Plaintiffs' Opposition makes evident that at least in some regards, there is no meaningful dispute between the parties regarding the applicable law. First, as to the labor exemptions, Plaintiffs concede that if Defendant acted unilaterally, "Plaintiff[s'] claims would founder on the statutory exemption." Pls.' Opp'n at 17. Second, Plaintiffs abandon any claims of price-fixing or predatory pricing. Id. at 17, 26-27.[2]

## II.  PLAINTIFFS' 'RIMLESS WHEEL CONSPIRACY' ARGUMENT DOES NOT SALVAGE THEIR CLAIM

Having failed to discover evidence of the boycott and the anti-competitive agreements on which they based their Complaint, Plaintiffs now claim a "rimless wheel conspiracy, with Local 7 at the hub," and the union signatory contractors as possibly "involuntary" participants. Pls.' Opp'n at 15, 23. The rimless wheel theory is rooted in Kotteakos v. United States, 328 US 750 (1946).[3] Under any formulation, what makes a conspiracy a "rimless wheel conspiracy" is the

---

[2] Thusly, Defendant is not responding regarding an issue avoided, despite clear obligation prompted by Defendant's opening brief, that Plaintiff should demonstrate below-cost pricing and probability of recoupment for such a claim. Plaintiffs still complain, however, "that the subsidy affects the process of bidding," (Id. at 27); to the extent that Plaintiffs are attempting to sneak a pricing claim back in, the case law set forth in the opening brief remains applicable.

[3] Kotteakos involved a criminal conspiracy indictment under the National Housing Act, a common broker placed fraudulent loans for more than 30 borrowers. Each of the defendants dealt separately and independently with the common broker. The error considered by the Supreme Court was that the indictment charged a single conspiracy and the evidence showed several independent conspiracies. Under the Sherman Act, two circuits have rejected

absence of proof that the co-conspirators (i.e., the spokes) share a common agreement with each other.[4]  The "conspiracy" is between each individual participant and a common participant at the hub of the wheel.  The very articulation of "rimless wheel conspiracy" theory demonstrates both the strength of the labor exemption here and the weakness of Plaintiffs' antitrust claim.

### A.      The Labor Exemptions Fully Apply In an Alleged Rimless Wheel Conspiracy

#### 1.      A Union Goal Of Monopolizing The Labor Market Is Not Improper

Underlying Plaintiffs' rimless conspiracy claim is the notion that a union may not seek to monopolize a labor supply market.[5]   Plaintiffs arrive at this result by ignoring the difference between the steel erection market and the labor supply markets, and by attempting to write the labor exemptions, and their historical development, out of the law.

Plaintiffs begin with the premise that antitrust exemptions, including the labor exemptions are narrowly construed.  Pls.' Opp'n at 11; see also id. at 16.[6]  Plaintiffs are mistaken.   The labor exemptions, unlike narrow antitrust exemptions, are derived from the Clayton and Norris-La Guardia Acts, the latter of which "has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to

---

rimless wheel conspiracy claims.  Elder-Beerman Stores, Corp. v. Federated Dep't Stores, 459 F. 2d 138, 147 (6th Cir. 1972); Dickson v. Microsoft Corp., 309 F. 3d 193 (4th Cir. 2002).

[4] 309 F. 3d at 203 ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction").

[5] Plaintiffs use the *labor supply* market as a proxy for the steel erection market.  Thus, Plaintiffs allege that union contractors control 70% of the Relevant Market.  Compl., ¶ 44.  Defendant has established (and Plaintiffs do not dispute) that there is vigorous competition within the steel erection market.

[6] Plaintiffs' proffered authority for this premise is:  (1) a labor law treatise, which makes no such claim at all, and (2) a law review article that cites the general rule regarding antitrust exemptions, but does not explicitly claim, or offer any authority for, the proposition that the general rule applies in the labor context.  The only suggestion that the labor exemptions should be narrowly construed that Defendant has been able to locate is Judge Wald's *dissent* in Brown v. Pro-Football, 50 F.3d 1041, 1070-71 (D.C. Cir. 1995).  Not only was the dissent's view unaccepted by the other judges on the panel of her view, but the decision of the Supreme Court on certiorari affirming the majority's view in Brown v. Pro-Football, 518 U.S. 231 (1996), stands for the exact opposite proposition:  namely, that labor exemptions may be broadly, not narrowly, construed, and that they are not limited to specific sets of facts but instead must be understood in the context of the statutory schemes that they are attempting to conciliate.  The case law in this area teaches that the issues here are subtle, not formulaic, and that reflect the complex accommodation of competing goals, rather than a simple checklist.

interfere in labor disputes." See H.A. Artists & Associates, Inc. v. Actors' Equity Assoc., 451 U.S. 704, 714 (1981); see also Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 709-13 (1982).

Plaintiffs next contend that obtaining work for union members cannot be a legitimate goal for purposes of the labor exemptions because it "primarily benefits employers" by giving union contractors a "monopolistic share of the market." Pls.' Opp'n at 15. Plaintiffs' suggestion that broad unionization does not serve the union's own interest is counterintuitive, and the two cases cited by Plaintiffs for this proposition – Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 808-09 (1945) and Altemose Constr. Co. v. Building and Constr. Trades Council, 751 F.2d 653, 658-59 (3d Cir. 1985) – wrestle with the entirely different question of whether the union had joined an unlawful combination of employers.[7]

## 2. Defendant's Use of Target Monies is Protected by the Statutory Exemption

When a labor organization is at the hub of a rimless wheel conspiracy, the statutory exemption applies. By definition, the Union is not involved in a commercial conspiracy to restrain trade because there is no commercial conspiracy (hence, the "rimless" wheel). Without an unlawful business conspiracy, the theory cannot withstand the exemption.

---

[7] Plaintiffs' unsupported contention that a union's attempt to unionize the labor market in an industry is not a legitimate union goal, is also rebuffed by case law, history, and policy. See e.g. Apex Hosiery Co. v. Leader, 310 U.S. 469, 504, n. 24 (1940) ("Federal legislation aimed at protecting and favoring labor organizations and eliminating the competition of employers and employees based on labor conditions regarded as substandard, through the establishment of industry-wide standards both by collective bargaining and by legislation setting up minimum wage and hour standards, supports the conclusion that Congress does not regard the effects upon competition from such combinations and standards as against public policy or condemned by the Sherman Act"). Even in Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 625 (1975) where the union's methods removed its antitrust immunity, the Court acknowledged that the union's goal of "organizing as many subcontractors as possible" "was legal, even though a successful organizing campaign ultimately would reduce the competition that unionized employers face from nonunion firms." Plaintiffs' attempt to conflate the labor supply and product markets thus runs into the brick wall that is the labor exemption. 15 U.S.C. § 17 ("[t]he labor of a human being is not a commodity or article of commerce"). In short, Local 7 may attempt to monopolize the labor supply market without running afoul of the Sherman Act.

The rimless wheel conspiracy cases on which Plaintiffs rely do not address the labor exemption.  Labor exemption cases make clear that a rimless conspiracy with the Union at the hub will not suffice.  The statutory labor exemption makes no mention of combinations with employers, and the limitation on the statutory exemption where such combinations are present is derived from the Congressional intent "to outlaw business monopolies."  Allen Bradley, 325 U.S. at 811.  As the Court explained, "[a] business monopoly is no less such because a union participates, and such participation is a violation of the Act."  Id.  Thus, a union's participation in a business conspiracy is the heart of the antitrust problem and the basis for losing the labor exemption, not the union's supposed role as the "hub" where it has individual dealings with many employers, which facilitates competition with non-union companies but imposes no restraints on the business market.

The Supreme Court discussed, in United Mine Workers v. Pennington, 381 U.S. 657 (1965), two contrasting scenarios, one lawful and one not, by which a union might attempt to achieve its permissible goal of obtaining an industry-wide wage scale.  In the one scenario, a union may conclude a wage agreement with the multi-employer bargaining unit and then "may as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek the same wages from other employers."  Id. at 664.  The Court found it "beyond question" that the Union could do so without violating the antitrust laws, "even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union."  Id. at 665, n.2.[8]

The alleged conspiracy which Plaintiffs contend causes Local 7 to forfeit its exemption from the antitrust law here is no different than the first scenario approved by the Court in

_____

[8] On the other hand, "the union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units."  Id. at 665.  An important distinction between these two scenarios, according to the Court, was that in the one the union pursued its own policy, while in the other it "surrendered its freedom of action."  Id.

Pennington.  In both cases, while there is a limited agreement with the employer (in that case, a multi-employer wage agreement, and in the instant case, a multi-employer agreement to deduct dues), the real issue concerns the union's separate demands, offers or agreements with individual employers (in that case, the demand for the same wages made to other employers, and here, the union's offer of target funds to individual employers).  In both cases, these separate demands, offers or agreements are pursued unilaterally by the union, and can in no way be characterized as the union's surrendering of its independent action to any business conspiracy.  Thus, unlike Allen Bradley and Pennington, Plaintiffs' alleged "rimless wheel conspiracy" is predicated on the absence of any such unlawful business combination.

Nor can Plaintiffs' blithe characterization of the "spokes" of the rimless wheel as unlawful agreements survive scrutiny.  The separate agreements that Local 7 has consummated with its various signatories to provide subsidies on steel erection projects cannot be the basis of liability.  These subsidies are provided in the context of a collective bargaining relationship for the purpose of procuring work for union members and encouraging union contractors to pursue the work, functioning as rebates from a labor supplier to a customer for successfully bidding a particular job, and are clearly protected by the labor exemption.

**B.  The 'Rimless Wheel' Theory Does Not Create a *Per Se* Antitrust Violation**

The alleged "rimless wheel conspiracy" amounts to several vertical agreements between Local 7 and its contractors.  The *per se* rule that applies to group boycotts, see Klor's, Inc. v. Broadway Hale Stores, 359 U.S. 207 (1959), does not apply.[9]

In Nynex Corp. v. Discon, 525 U.S. 128 (1998) the Court refused to extend the group

---

[9] In Klor's, appliance manufacturers boycotted the plaintiff department store at the behest of its next door competitor.  The Supreme Court found that the allegations of a group boycott stated a *per se* claim under the Sherman Act.  Citing United States v. Hutcheson, 312 U.S. 219 (1941) and Allen Bradley, the Court stated that the Sherman Act "is aimed primarily at combinations having commercial objectives and is applied only to very limited extent to organizations, like labor organizations, which normally have other objectives."  359 U.S. at 214 n. 7.

boycott rationale of <u>Klor's</u> to a buyer's decision to buy from one seller rather than another. 525 U.S. at 132. Plaintiff <u>Discon</u> alleged that its customer had ceased making purchases from <u>Discon</u> and commenced purchasing from <u>Discon's</u> competitor "as part of an attempt to defraud local telephone service customers by hoodwinking regulators." 525 U.S. at 132. In rejecting the plaintiff's theory, the Supreme Court noted that the Sherman Act "prohibits only agreements that *unreasonably* restrain trade." <u>Id</u> at 133. The Court concluded that no *per se* rule applies and that the plaintiff must allege and prove harm, not just to a single competitor, but to the competitive process. <u>Id.</u> at 135. "To apply the *per se* rule here - where they buyer's decision though not made for competitive reasons, composes part of a regulatory fraud - would transform cases involving business behavior that is improper for various reasons, say, cases involving nepotism or personal pique, into treble damage anti-trust cases." <u>Id.</u> at 136-37.

### III.    DAVIS-BACON CONTENTIONS DO NOT BREATHE LIFE INTO CLAIMS

Plaintiffs contend that there is also a violation based on the deduction of target funds on Davis-Bacon Act jobs. Those allegations cannot resurrect the antitrust claim.

### A.    <u>The Agreement to Deduct Amounts from Employee Wages Is Protected by the Labor Exemptions</u>

Plaintiffs contend that the dues deduction provision is not protected by the statutory exemption on the ground that it was not unilateral because "the Union and the BTEA included deduction of target dollars as part of the check-off system in their [contract]." Pls.' Opp'n at 17. As Defendant's opening brief noted, however, if the mere remission of workers' dues to the union could eliminate the unilateral quality of Local 7's actions and, resultantly, the statutory exemption, then virtually any activity in which a union engages apparently "unilaterally," would no longer be considered unilateral where the dues that fund union conduct have been forwarded to it by the employer. <u>See</u> Def.'s Mtn. for Summ. J. at 15. Plaintiffs offer no response, and

nothing in the Supreme Court case law countenances such a hollowing out of the statutory exemption.

Assuming, arguendo, that the dues deduction provision of the collective bargaining agreement is considered an agreement between a union and non-labor groups, it would still clearly be protected by the non-statutory exemption.  Indeed, Plaintiffs acknowledge that "[f]acially there would be nothing wrong" with the forwarding of dues, and moreover, concede "that that is not the restraint of which plaintiffs complain."  Pls. Opp'n at 17.

Plaintiffs argue, however, that even though the agreement to forward dues is covered by the non-statutory exemption in general, since the forwarding of target monies could violate the Davis-Bacon Act if those dues left employees with wages below Davis-Bacon levels, the Union has lost its protection from antitrust scrutiny.  Their sole authority for this piggy-backing of claims is Mathiowetz Constr. Co. v. Minnesota Transportation, 137 F. Supp. 2d 1144 (D.C. Minn. 2001), a case Plaintiffs contend "squarely held, in the face of allegation of violation of the Davis-Bacon Act that, the 'non-statutory exemption' was lost."  Pls.' Opp'n at 17-18.  Plaintiffs overstate the finality of the court's view,[10] and Defendant respectfully suggests that the court's preliminary reasoning was mistaken.

The Mathiowetz court purported to apply a strict test for the non-statutory exemption, articulated in Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976).  Mathiowetz, 137 F. Supp. 2d at 1144.  The Mackey test, however, has not been adopted by the First Circuit,

---

[10] The court's decision was issued on a motion for a temporary restraining order, and was not a decision on the merits.  137 F. Supp. 2d at 1144.  Thus, the court did not state that the non-statutory exemption was lost, but that "there is a substantial likelihood that the non-statutory exemption will not apply . . . ."  Id. at 1148.  The court's language must also be considered dicta since the motion for a TRO was decided on other grounds.  Id. at 1149.  Moreover, since the court denied both the motion for a temporary restraining order (id. at 1151) and subsequently granted the union defendant's motion for summary judgment, dismissing both the Davis-Bacon Act and Sherman Antitrust Act claims (Mathiowetz Constr. Co. v. Minnesota Transportation, 2002 WL 334394, at *5 (D. Minn. 2002)), the court's initial view of the non-statutory exemption was never subjected to appellate review.  Notably, the Defendant has found no other cases adopting the Mathiowetz court's view on the non-statutory exemption.

has been called into question by other Circuits,[11] and in any event, may not survive the Supreme Court's decision in <u>Brown</u>, which articulated a much broader standard for the non-statutory exemption. <u>See</u> <u>Brown</u>, 518 U.S. at 250. Even assuming, <u>arguendo</u>, that the <u>Mackey</u> test is followed in this Circuit, the <u>Mathiowetz</u> court's application of the test was not correct. Most importantly, under <u>Mackey</u> itself, the test is not applied at all unless there is not just an agreement between unions and non-labor parties, but "an agreement in restraint of trade." <u>Mackey</u>, 543 F.2d at 614. Here, an agreement between contractors and the union to forward dues deducted from wages is no more an agreement in restraint of trade than an agreement between the union and the signatory contractors for automatic deposit of paychecks or biweekly payment of wages would be, or an agreement between the union and a bank for a line of credit. Accordingly, the agreement to deduct amounts from members' after-tax wages and forward these amounts to the union is exempt from anti-trust scrutiny, regardless of deduction results in the employees' losing wages due to them under the Davis-Bacon Act.[12]

**B.** <u>Plaintiffs Cannot Base Their Antitrust Claim on the Davis-Bacon Allegations</u>

---

[11] <u>See</u> <u>e.g.</u> <u>Clarett v. National Football League</u>, 369 F.3d 124, 131 (2d Cir. 2004), <u>cert.</u> <u>denied</u>, 125 S.Ct. 1728 (2005) ("We . . . have never regarded the Eighth Circuit's test in Mackey as defining the appropriate limits of the non-statutory exemption); <u>Local 210, Laborers' Int'l Union</u>, 844 F.2d at 80 n. 2 (declining to follow Mackey in favor of balancing test articulated in Jewel Tea ); <u>see also</u> United States Football League v. National Football <u>League, 842 F.2d 1335, 1372 (2d Cir. 1988)</u> (recognizing Mackey is "not consistent with court's decision in Wood v. National Basketball Ass'n "). <u>Brown v. Pro Football, Inc.</u>, 50 F.3d 1041, 1056 (D.C.Cir.1995), <u>aff'd</u>, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) ("[T]he nonstatutory labor exemption waives antitrust liability for restraints on competition imposed through the collective bargaining process, so long as such restraints operate primarily in a labor market characterized by collective bargaining."); <u>Mid-America Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council, 675 F.2d 881, 893 (7th Cir.1982)</u> ("[Non-statutory exemption applies where] restraint ⋯ alleged is not a 'direct restraint on the business market' but rather a direct restraint on the labor market, with only tangential effects on the business market."); <u>Consol. Express, Inc. v. N.Y. Shipping Ass'n</u>, 602 F.2d 494, 513 (3d Cir. 1979), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980)</u> ("The term nonstatutory exemption ⋯ is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market."). As the Second Circuit explained, the Eighth Circuit's assumption in Mackey that the Supreme Court's decisions in Connell, Jewel Tea, Pennington, and Allen Bradley dictate the appropriate boundaries of the non-statutory exemption for cases in which the only alleged anticompetitive effect of the challenged restraint is on a labor market organized around a collective bargaining relationship."

[12] The <u>Mathiowetz</u> court's contrary suggestion that some restraint of trade may eventually drive up the prevailing wage and thus affect competitors on whom the restraint is not imposed is not only pure speculation, but conflates the restraint supposedly at issue (the dues deduction) with the Union's unilateral use of the target fund.

Even if the dues deduction provision was not immune from antitrust scrutiny under the labor exemptions, the Davis-Bacon Act allegations add nothing here. As the Supreme Court has made clear, contractors do not have standing to bring suit under the Davis-Bacon Act. United States v. Binghamton Constr. Co., 347 U.S. 171 (1954).[13] Indeed, even the Mathiowetz court squarely held that construction contractor "lacks standing to assert a claim - even a claim for declaratory judgment - premised on the Davis Bacon Act." Mathiowetz Constr. Co. v. Minnesota Dep't of Transportation, 2002 WL 334394 (D. Minn. 2002) at 4.

Plaintiffs rely heavily on Building and Constr. Trades Dep't v. Reich, 40 F.3d 275 (D.C. Cir. 1994). Reich held that Job Targeting Program (JTP) payroll deductions were not "membership dues."[14] The case also affirmed the district court's reliance on Binghamton Constr. Co. to deny intervention status to the Associated Builders and Contractors (ABC), a non-union trade association. Reich, 40 F.3d at 1282-1283.

Six months later, the Department of Labor took a non-enforcement position with respect to the funding of Job Targeting Projects by dues payments where dues are deducted from employee wages and deposited in a general union fund and where union members contribute to a Job Targeting Fund through direct payments whether earmarked or not. See Ltr. from Maria Echaveste to Robert A. Georgine, President of the Building and Construction Trades Department, June 20, 1995, attached hereto as Exhibit A. The Local 7 Market Recovery Program was (and is) a co-mingled fund that supports a variety of union activities.

---

[13] Whether the Davis-Bacon Act creates an implied right of action for the benefit of workers who do not receive the proper wage rate, see Plaintiffs Opposition Memorandum at 28, is an issue not raised by these pleadings. Binghamton Constr. Co., 347 U.S. at 176-77 ("The language of the Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects").

[14] Union members may authorize the deduction of union dues from Davis-Bacon wages and contractors may remit such dues to unions, even though the wages are reduced thereby to below Davis Bacon rates. In Reich the court deferred to a DOL position that JTP deductions were different from "membership dues".

A fundamental prerequisite for a Davis-Bacon Act violation is a showing that some employer failed to pay the wage rate specified in the federally funded construction contract to some employee. The record is devoid of any showing that any contractor paid any employee less than the specified rate. See Phoenix Elec. Co. v. NECA, 81 F. 3d 858, 862 (9th Cir. 1996) ("there is no showing . . . that the wages ever dropped below the legal minimum"). Instead, Plaintiffs rely solely on the MRP provision in the collective bargaining agreement, a provision that was uniformly applied by all union signatory employers on all projects. Not a single contractor has been identified as having paid wages less than the Davis Bacon rate.

**C.** Antitrust Violations Cannot Be Based on Boot-Strapped Claims

Plaintiffs' effort to bootstrap the Davis-Bacon claims into an antitrust claim must fail. The antitrust laws, with their treble damages, do not permit a party to rely upon some other alleged illegality to anchor its antitrust claim in order to avoid a standing problem. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993). In NYNEX v. Discon, Inc., the Supreme Court rejected the "boycott" claim of a service provider who alleged it lost business "as part of an attempt to defraud local telephone service customers by hoodwinking regulators". 525 U.S. 128, 132 (1998). The Supreme Court noted that other laws provide remedies for practices "thought to be offensive to proper standards of business morality" and, citing Brooke Group Ltd., repeated the admonition that "an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws". Id. at 137. See Hunt v. Crumboch, 325 U.S. 821, 826 (1945) (Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce" nor does a union boycott of an employer violate the Sherman Act, even if accompanied by a violation of the duty of fair representation). Plaintiffs' claims must be evaluated under the standards established for antitrust claims against labor organizations. Their effort to cobble

together an antitrust claim from the post-discovery evidentiary scraps must fail.

## IV.    NEW PREVAILING WAGE ALLEGATIONS DO NOT SALVAGE CLAIM

Plaintiffs now contend that this action is really about the use of target funds on prevailing wage jobs in Massachusetts.[15]  Not only is this contention entirely new, but it is factually contrary to the Complaint.  A fair reading of the Complaint suggests that Plaintiffs avoided Massachusetts public works projects, (Compl., ¶ 46 (characterizing "federal and state government projects" as projects "which Plaintiffs were excluded from bidding on"), and that they seek to compete on jobs where the labor rate was variable.  Compl., ¶ 36.  The Complaint itself lists 29 projects on which Plaintiffs bid, and only one of these appears to be a project that might be covered by the Massachusetts prevailing wage.    Indeed, Plaintiffs offer only a misleading citation to support the claim that they seek work on public jobs at all.[16]

Plaintiffs' newly hatched theory that the use of target fund subsidies on Massachusetts public projects somehow restrains trade under the anti-trust laws necessarily fails, as the Complaint is devoid of any allegation concerning the relationship between such conduct and the Relevant Market and between the impact of target fund subsidies on public projects and competition.  In the absence of allegations concerning the market share and market impact of alleged co-conspirators, a competitor's anti-trust complaint is subject to dismissal.  <u>Dickson v.</u>

---

[15] Neither New Hampshire nor Maine has a prevailing wage law.

[16] Plaintiffs cite this testimony for the proposition that D.F.M.'s work is 50/50 private. Pls.' Resp., ¶ 7. D.F.M's president actually testified that the "majority" of work done by the company is private, that in the past 2 years the company had done more public work than usual, that "right now" the work is 50/50 private to public, but that that was a "relatively large percentage of public work" than DFM's historical percentage. DFM Dep. Tr. at 36 (Pl.App.,Exh. H).  In Plaintiffs' failed attempt to expand their new prevailing wage claim, they also assert that "[u]nion and non-union steel erectors pay the same labor costs on state and prevailing wage projects" and that "Job Targeting money does not reduce the costs of the union's CBA." Pls.' Resp., ¶¶ 7-9.  Plaintiffs rely, in large measure, in an alleged statement made by Local 7 officer James Brown that "'Job Targeting money does not reduce the costs' of the union's CBA" (<u>id.</u>), when, in fact, Jim Brown said the *exact opposite*. <u>See</u> Brown Dep. Tr. at p. 30 (attached hereto as Exhibit 2, as Plaintiffs' failed to include this page in their Appendix, despite having cited to it). As Hurley made clear in his deposition testimony, there are, in fact, certain labor costs, such as training costs, that are not factored into prevailing wage costs.  Hurley Dep. Tr. at 76-77, attached hereto as Exhibit 3 ("[T]here's always a delta that our contractors are obligated to, that a nonsignatory wouldn't be obligated to").

<u>Microsoft Corp.</u>, 309 F.3d 193 (4 Cir. 2002).

Nor is it even possible to conceive of what the prevailing wage allegations could add.  If the allegation is that these subsidies allow the signatory contractors to underbid non-union companies, the claim is simply a reformulation of the predatory pricing claims that fail as a matter of law.  <u>See</u> Def. Opening Mem. at 29-31 (and bidding cases cited therein).

If the allegation is that Plaintiffs may use the antitrust laws to enforce Massachusetts Prevailing Wage laws, Plaintiffs claim again fails.  Not only have Plaintiffs made no showing that any contractor has paid less than the required wage rate on any public project, but, as with the Davis-Bacon Act, the Massachusetts prevailing wage statute, G.L. c. 149 §§ 26-27 confers no enforcement right on contractors.  On its face, the statute gives enforcement authority only to aggrieved employees and the Attorney General.[17]  <u>Felix A. Marino v. Commissioner of Labor and Indus.</u>, 426 Mass. 458, 461 n.2 (1998) (Attorney General charged with enforcement).  Finally, again as with the Davis-Bacon charge, the Sherman Act simply does not provide a vehicle by which to enforce other laws.

## V.    CONCLUSION

For the foregoing reasons, Local 7 respectfully requests that summary judgment on all counts be granted in its favor and that all claims in the case be dismissed with prejudice.

---

[17] G.L. c. 149 § 27 provides, in part: "Any *employee* claiming to be aggrieved by a violation of this section may . . . after the filing of a complaint with the attorney general . . .  institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief and any damages incurred." (emphasis supplied).

Respectfully submitted,

LOCAL UNION NO. 7, INTERNATIONAL
ASSOCIATION OF BRIDGE, STRUCTURAL,
ORNAMENTAL & REINFORCING IRON
WORKERS

by its attorneys,

| | |
|---|---|
| /s/Mickey Long | /s/Paul F. Kelly |
| Mickey Long, Esq. (BBO #634388) | Paul F. Kelly, Esq. (BBO #267000) |
| 193 Old Colony Avenue, Box E-1 | Indira Talwani, Esq. (BBO # 645577) |
| South Boston, MA 02127 | SEGAL, ROITMAN & COLEMAN |
| (617) 269-0229 | 11 Beacon Street, Suite 500 |
| mickeylong@gis.net | Boston, MA  02108 |
| | (617) 742-0208 |
| Dated:  October 20, 2006 | pkelly@segalroitman.com |

### CERTIFICATE OF SERVICE

I hereby certify that this **Reply in Support of Defendant's Amended Motion for Summary Judgment** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 20 2006.

/s/ Indira Talwani
Indira Talwani, Esq.

# EXHIBIT 1



**U.S. Department of Labor**     Employment Standards Administration
Wage and Hour Division
Washington, D.C. 20210



JUN 20 1995

Robert A. Georgine
President
Building and Construction Trades
  Department, AFL-CIO
815 Sixteenth Street, N.W.
Suite 603
Washington, D.C.  20006-4189

Dear Mr. Georgine:

        This is in response to your request for a ruling that certain deductions for "regular membership dues" on Davis-Bacon projects, which ultimately may be used for a "job targeting" program, qualify as permissible deductions for "membership dues" within the meaning of the Department's regulations at 29 CFR 3.5(i).

        According to your letter, these dues are deposited in a general fund and used for the payment of authorized union expenses as obligations become due.  You further advise that a job targeting program is authorized through the adoption of a bylaw and/or membership resolution.  Funding decisions are made on a project-by project basis in a manner that does not formally or informally provide that any dues payment, or portion thereof, is earmarked for or dedicated to financing the job targeting program.  Nor is there any formula or mandate requiring that any specific project, class of projects, or number of projects be targeted.

        You state that this issue was not addressed in the Wage Appeals Board decision of June 13, 1991, and cite as support the dissenting opinion of Judge Edwards and remarks made by Department's Counsel at oral argument in the case of Building and Construction Trades Department, AFL-CIO v. Reich, 40 F.3d 1275 (D.C. Cir. 1994).  Although we do not agree completely with all the statements made by Department of Justice counsel at oral argument in response to a series of hypothetical questions, we agree that the methods of financing job targeting programs which were reviewed in the previous Administrator's ruling and Wage Appeals Board decision were different from that posed in your current request for a ruling.  We also acknowledge that whether the factual situation you raise would be a violation of the Regulations at 29 CFR Part 3 is a much closer question than that originally presented to the Administrator and the Board.

        After careful review of the Department's rulings and the regulatory and statutory language, we continue to be of the view that job targeting payments violate the Davis-Bacon Act prohibition against subsequent deduction or rebate, 40 U.S.C. 276a, as well as the

Department's regulations at 29 CFR Part 3, where the payments are made to contractors who currently work or in the recent past have worked on Davis-Bacon projects, and the payments are funded in whole or in part by deductions from wages of employees on Davis-Bacon projects. Such payments would be a violation even where they are made from general dues under the circumstances described in your letter.

On the other hand, we are also of the view that the Department's scarce resources to enforce the Act should not be utilized where the relationship between the Davis-Bacon deductions and the job targeting project is remote and investigation would be highly resource-intensive. Therefore, the Department will not take exception to the funding of job targeting projects by dues payments in the following two situations:

1.    Where dues are deducted from employees' wages and deposited in a general fund which may be utilized for a variety of purposes, union officers may exercise their discretion, from time-to-time, to utilize the dues for a job-targeting program. Such an exercise of discretion should be authorized pursuant to bylaws or membership resolution. There can be no formal or informal mandate that funds be spent on job-targeting or earmarking of funds for the job-targeting program, nor any formula or mandate requiring that any specific project, class of projects, or number of projects be targeted.

2.    Where there are no payroll deductions for dues and employees pay their union dues directly to the unions, the union may use the dues to fund a job-targeting program -- without regard to whether a portion of the dues is earmarked for job targeting.

Should you have any further questions with regard to this matter, please feel free to contact me.

Sincerely

Maria Echaveste
Administrator

2

# EXHIBIT 2

```
                              VOLUME:   I
                              PAGES:    1-50
                              EXHIBITS: 31-32
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendant.         *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        30(B)(6) DEPOSITION OF LOCAL 7, JAMES BROWN

a witness called on behalf of the Plaintiffs, taken

pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, before Patricia Bowen,

Professional Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts at

the law offices of Stoneman, Chandler & Miller,

99 High Street, Boston, Massachusetts, on Wednesday,

August 30, 2006, commencing at 5:25 p.m.


```
                    PATRICIA BOWEN
                   124 Downing Drive
             Attleboro, Massachusetts 02703
                    (508) 222-9403
```



1    particular job, end quote, in document 47, Pages 8

2    and 16, dated March 20, 2006, and identify which

3    signatory contractors the claim is based on?

4          MR. KELLY:  Was that the question?

5          MR. AVAKIAN:  That was the question.

6          MR. LONG:  I notice you're laughing about

7     it.

8          Q.    My question is:  When Local 7 provides

9     target money on a particular job, that target money,

10    isn't it true, does not reduce the labor costs of

11    the contractor, his labor cost are still the CBA

12    rates?

13         A.    I'm not understanding your question.

14         Q.    Isn't it true that job target money does

15    not reduce the hourly rates in the union's

16    collective bargaining agreement?

17         A.    Job targeting money does not reduce the

18    costs?

19         Q.    Any cost in the collective bargaining

20    agreement to the employer?

21         A.    I would beg to different.

22         Q.    Does the employer pay, that's receiving

23    target money, pay the union package at the time that

24    it's due.

# EXHIBIT 3

1

Volume 1, Pages 1-232, Hurley Exhibits 1-11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS

 COPY

AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAY HURLEY

Friday, August 25, 2006, 9:40 a.m. to 4:47 p.m.

**Jay Hurley**
**August 25, 2006**

76

1   indicated that you did do work here in downtown

2   Boston.

3                MR. ROSENTHAL:  Object to the form.

4   You made reference to downtown Boston, and then to

5   the Boston area.

6                If you look at the complaint, you can

7   see that even there there's a difference.

8        Q.  Now, during the period of time that you

9   were business manager, do you recall providing

10  target money on prevailing-wage jobs?

11       A.  It's a tricky answer.

12       Q.  Why is it tricky?

13       A.  Because we never lowered the prevailing

14  rate.

15                There's a thing in the industry.  In

16  their infinite wisdom, the government chooses to

17  exclude certain things from the prevailing-rate,

18  okay.  One of them is training.

19                So, we're in one of the most dangerous

20  businesses in the world; and they exclude training

21  funds and things of that nature.  They might exclude

22  promotional funds.

23                So there's always a delta that our

24  contractors are obligated to, that a nonsignatory

**Jay Hurley**
**August 25, 2006**

77

1    wouldn't be obligated to.

2           So the best example I can give you is,

3    the $40 an hour was the total union package.  The

4    rate on the job could be $38.75; so there would be

5    a $1.25 delta, which adds up significantly.

6           If it's a 10,000-man-hour job, you're

7    talking about in excess of $10,000 difference right

8    from Jump Street.  So in cases like that, we may

9    have targeted anything above the prevailing rate

10   up to, up to, the negotiated rate.

11          So we didn't target prevailing rate.

12   There's a rate called a posted rate; a posted rate.

13   And the posted rate invariably is lower than the

14   union rate.

15          Everyone assumes that the prevailing

16   rate is the union rate, and that's just not the

17   case.  The union rate includes things such as

18   training, like I said earlier.  I'm being

19   redundant.

20          So we would do the difference.  That

21   would be it.

22   Q.  Now, in terms of the differential between

23   the prevailing rate and the contract rate, which you

24   suggested that the union while you were business