# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN STEEL ERECTORS, INC., *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS.<br><br>       Defendant. | Case No. 04-cv-12536-RGS<br><br>LEAVE TO FILE GRANTED ON:<br>December 1, 2006 |

### PLAINTIFFS' SUR-RESPONSE BRIEF IN OPPOSITION TO DEFENDANT IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT

Plaintiffs American Steel Erectors, *et al.*, submit this Sur-Response limited to the issues raised in the Defendant's Reply Brief.

The issues which require further discussion are:

• Rim less wheel conspiracies; and

• Unlawful deduction and application of prevailing wage monies.

## I. RIM LESS WHEEL CONSPIRACIES

A.   <u>Allegations</u>:

Plaintiff has asserted several conspiracy theories:

• Agreement or combinations between the Union and fabricators; general contractors and owners. This is purely a series of vertical agreements between these employers and the union, through coercion or job-target fund payment, to exclude non-union contractors from the market place. Paulding Aff. ¶¶ 12-18, 27-32. Clearly these purely vertical agreements are judged under the rule of reason applicable to Section 1 of the Act. *Nynex Corp. v. Disco,* 525 U.S. 128 (1998). Additionally, they constitute a means by which the union, in concert with signatory employers, sought to boycott or exclude non-signatories from the market. Finally, even if no violation is proven under Section 1, such arrangements constitute significant building

blocks, under Section 2, of an attempt to monopolize and conspiracy to monopolize. *United States v. Dentaply Int'l*, 399 F.3d 181,187 (3[d] Cir. 2005), *cert den.* 126 S.Ct. 1023 (2006); *United States v. Microsoft,* 253 F.3d 34, 70 (D.C. Cir. 2001); *Globerson v. Comcast Corp.*, 2006 U.S. Dist. Lexis 62672 (E.D.Pa., 2006).

&bull;  A garden variety conspiracy to exclude non-union contractors from the marketplace which has both horizontal and vertical components. The participants are the union competitors of Plaintiffs, *inter se*, and the union. The proof is both the traditional application of antitrust standards and the rim less wheel approach. Where, as here, there is a horizontal component to the conspiracy, the *per se* test of illegality applies. *See Klor's v. Broadway Hale Stores*, 359 U.S. 207(1959); *M & H Tire Co, Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 978 (1st Cir. 1984).

  B. <u>Defendant Argues as Follows</u>:

&bull;  Plaintiffs have limited their theory to the rim less wheel theory;

&bull;  The rim less wheel theory is not actionable; and

&bull;  Thus the statutory immunity requiring a combination between management and labor is applicable.

  Defendant is wrong on a host of fronts:

&bull;  The statutory immunity from Clayton Act damage claims is narrowly circumscribed. See Ans. Br. p. 11. [1]

&bull;  Vertical conspiracies/combinations entered into with fabricators, developers and owners sufficiently prove a combination with non-labor groups.

&bull;  Plaintiff does not rely merely upon the rim less wheel theory to prove a vertical/horizontal conspiracy/combination among union contractors and with the union.

&bull;  The rim less wheel method of proof meets the requirements for an agreement between management and labor for two reasons. First, each vertical agreement qualifies.

---

[1] Defendant's reliance upon Norris-LaGuardia cases is inapposite, as it is addressed to jurisdiction to grant injunctive relief in labor disputes.

Second, the resulting vertical/horizontal combination/conspiracy equally qualifies.

•      The union assumes that if it is the instigator of the conspiracy, that the statutory immunity applies.  It cites *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) for this remarkable conclusion.  However, the *Pennington* Court made it clear that it was discussing unilateral conduct by the union, not conduct which required, as it does here, active participation by unionized employers.  Indeed, the union admits: "The separate agreements that Local 7 has consummated with its various signatories to provide subsidies on steel erection..."  Rep. Br. p. 8.

     C.    Rim Less Wheel

The rim less wheel conspiracy in civil litigation was first discussed by the 6th Circuit in *Elder-Beerman Stores, v. Federated Department Stores*, 459 F.2d 138 (6th Cir. 1972).  It was there alleged that 66 suppliers to the parties had colluded with the defendant to boycott plaintiff.  Plaintiff sought to introduce hearsay evidence of coercion applied to suppliers after showing coercion has to a handful.  The court held that to establish, from a series of vertical arrangements, a horizontal conspiracy (rim less wheel), the following evidence must be present:  (1) there was an overall unlawful plan or common design in existence; (2) that the participants know that others were involved; and (3) a showing that each member participated. *Id* at 146. [2] Defendant cites a Fourth Circuit case, *Dickson v. Microsoft Corp.,* 309 F.3d 193 (4th Cir. 2002) for the proposition that both the 6th and 8th Circuit decisions are incorrect.  It is apparent, however, that the Fourth Circuit did not understand its sister circuits' decisions, as was fully explicated in the vigorous dissent.  Neither court supported the concept that a horizontal conspiracy could be proven solely by reference to the spokes of a wheel terminating at the hub.  Rather the three key elements noted, *supra*, must coexist for the claim to constitute an actionable conspiracy.

Here, we know the following:

•      Many of the unionized employers were part of trade associations which agreed to

---

[2] The 8th Circuit in *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1279 (8th Cir. 1983), endorsed this mode of analysis.

check off all dues, including target dues, even though unlawfully derived, in part from public works projects.  Bacon Tr. 83-85. [3]

•    The unionized employers, based upon decisions of the D.C. and Ninth Circuit, knew that the deduction; and use, both on private works and public, was unlawful but all did it.

•    All unionized employers knew that if they did not seek target dollars, that they would likely lose bids to other unionized contractors who did.

•    All unionized employers knew that a purpose of the target program was to deprive non-union contractors of successful bids.  Indeed they could not profitably compete with nonunion companies without target dollars.  Bacon Ex. 21, Beauregard, ¶ 6.[4]  Thus the evidence shows the presence of all three elements necessary, under the *Elder-Beerman* case to proof of a conspiracy. [5]

D.    Classical Horizontal Conspiracy.

Finally, the reply does not address, and apparently leaves unanswered the basic assertion of a horizontal conspiracy.  The target process was initiated by the union.  Its business agents identified projects where non union contractors were going to bid.  It would also converse with other unions who are members of the Building Trades Council of Metropolitan Boston, to coordinate usages of target monies.  DiPietro Tr. 196-197.  The Union Business Agent/Industrial analyst  (Charles Wright) was charged with determining wages paid by non union contractors. The Union sent out, by "fax blast" an alert to all of its signatory contractors that they should contact the union to discuss bidding listed projects that likely would have non union contractors

---

[3] Transcripts and exhibits identified herein are attached hereto per name of the individual.

[4] As John Bacon wrote to the union, after Local 7 steel erector H B Welding, Inc. received a $19.00 per hour subsidy from the Union:
> "We must as a team continue to fight the battle against the Open Shop
> Erectors.  We will need to have the resources available to fight the Open
> Shop Erectors on many projects in the future"
Bacon Ex. 17.  *See also* Ex. K, Hurley Tr. 40, 72.

[5] In the dissent, Judge Gregory took the panel majority to task for its superficial reading of the *Elder-Beerman* decision.

bidding the work, DiPietro Tr. 76; Hurley Ex. 4, and met with fabricators.  Hurley Ex 3i. Tr. 40, 42; *see also* Cordon (BRI, Inc.) Tr. 89-90.  Those contractors responding would be each granted an identical subsidy if the successful bidder.  Additionally some of the contractors provided lists of jobs they planned to bid to the union.  Cordon Tr. 73-74.

Was there a common motive among the union contractors, shared by the union, to conspire against non-union contractors to exclude them from work opportunities?  Clearly the answer is yes.  Bacon Ex 17.[6]  Was there opportunity to conspire?  Most certainly at meeting of their trade associations, during social hours or while in labor negotiation sessions.

And, is there a consistency of the overt acts of each of the contractors with the others?  That is the very nature of unlawful deductions from employee wages; written applications for target funds (Pl. Ex. 19); execution of standard form target contracts (Pl. Ex. 19 at 2); and receipt and use of tainted dollars to preclude non-signatory contractors from successfully securing work.  In *Harlem River Consumers Cooperative v. Associated Grocers of Harlem*, 408 F. Supp, 1251 (S.D.N.Y 1976), the court held that the presence of these elements added up to sufficient evidence of a horizontal conspiracy, inspired by a vertically aligned third party.

### III.  DAVIS-BACON CONTENTIONS ARE PROBATIVE OF VIOLATION OF THE SHERMAN ACT.

Defendant asserts the following:

•        The agreement to deduct dues is protected under the statutory exemption to the antitrust laws;

•        That if it is not protected under the statutory exemption, it must be protected under the implied immunity;

•        That the *Mathiowetz* decision is contrary to Supreme Court and other circuit precedents; and

---

[6] *E.g.*, $108,000 subsidy on the New England Confectionery project, Hurley Ex. 4.  $365,000 subsidy on the Jordan's Furniture project.  J.F. Stearns Tr. 90 ll.15-23.  "The non-union companies" are the union steel erector competitors.  Helen Bacon, Tr. 80 l.14.  And, as the Union stated in its resolution establishing the job-target program: "The Target Fund has proven to be an effective tool for competing with the non-union * * *."  Plaintiffs' Ex.6, p. 2.

•    That plaintiff cannot rely upon violation of state and federal prevailing wage laws.

A.    <u>Agreement to Deduct/Statutory Exemption</u>.

Defendant is mistaken on a variety of fronts. First, any agreement, even if set forth in a labor contract, eliminates the statutory exemption. If there is shelter, it must come under the implied immunity.

Second, the combination which Plaintiffs allege is not confined to the typical dues deduction in ordinary contracts. Rather, here there is an unlawful deduction from public works projects; employers then petition the union to enter into an agreement to subsidize projects; and if agreement is reached, the employer then uses the proceeds to subsidize exclusion of non-union competition from the market place. As discussed in the answering brief and further elaborated, *supra*, this conduct suffices to constitute a combination between management and labor, and thus to preclude reliance upon the statutory exemption.

B.    <u>Implied Immunity</u>.

Plaintiffs rely upon *Machiowetz Const. Co. v. Minnesota Dep't of Transportation,* 202 WL 334394 (D. Minn. 2002), for the proposition that the conspiracy between the union and it union signatory contractors is not sheltered by the implied immunity. Defendant attacks the assertion by claiming that *Machiowetz* rests on *Mackay v. National Football League,* 543 F.2d 606 (8th Cir. 1976), and that the Supreme Court in *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996), undercut the holding and that Circuit Courts, such as the Second Circuit in *Claret v. NFL*, 369 F.3d 124 (2d Cir. 2004), cert. den., 125 S.Ct. 1728 (2005), have rejected it.

This attack is unwarranted. First, in *Brown,* the sole question was whether the owners of football league franchises could, once impasse had been reached in labor negotiations, implement their last best offer. Noting that the employers had complied with all labor laws; and that the market affected was solely that for labor, *not competition among employers,* the court held the exemption applied. Second, in *Claret*, the court rejected application of *Brown*, solely because the impact of the restraint was exclusively upon the labor market, not the business market. The court went on to state:

"Thus, we need not decide here whether the *Mackay* factors aptly characterize the limits of the exemption in cases in which employers use agreement with their unions to disadvantage their competitors in the product or business market, because our cases have counseled a decidedly different approach where, as here, the plaintiff complains of a restraint upon a unionized labor market."

A careful reading of *Brown* and *Claret* support and must assuredly does not detract from the court's decision in *Mathiowetz.*  The restraint here and in *Mathiowetz,* has a direct and necessary impact upon the "product or business" market.  It allows use of leveraged, unlawfully collected monies, to be used to exclude non-union competitors.  Nothing in either decision supports the notion that this is exempt activity.

## IV.  DAVIS BACON VIOLATION

Defendant asserts that it did not violate the Davis-Bacon Act, but if it did that plaintiff lacks standing to complain.

A.    There Is a Violation of the Davis Bacon Act.

Defendant cannot escape from the square holdings *Building and Constr. Trades Dept. v. Reich,* 40 F.3d 275 (D.C. Cir. 1994), and *Electrical Workers Local 357 v. Brock*, 68 F.3d 1194 (9th Cir. 1995), outlawing deduction from public works jobs and application of the proceeds to public works or other projects.  *See also Can-Am Plumbing v. NLRB*, 321 F.3d 145 (D.C. Cir. 2003).

Local 7 makes a parry that the Department of Labor, in limited circumstances will not enforce the law.  The Georgine letter assumes there is no separation of dues from the Employers' payments into various categories, a fact not in evidence here.  Indeed, the collective bargaining agreement lumps target dues into "working" dues.  DiPietro Tr. 52-53; Stearns Ex. 2.

The Union's bylaws separate dues by category.  Pl. Ex. 5, p. 31.  The members do not vote to approve discrete expenditures from the target fund, as they do for all other expenditures.  A union committee of business agents makes those decisions.  DiPietro Tr. 18-19, 21-22, 30.

Notwithstanding this parsing of the issue, the DOL said that it was still a violation, but that it would not, given its limited resources, pursue enforcement if officers of the union may utilize their discretion "from time to time, utilize the dues for a job-targeting program."  The

DOL Administrator stated this safe harbor from prosecution even though she found: "Such payments would be a violation even where they are made from general dues under the circumstances described in your letter." *See* Ex 1 p.2 to Defendant's Reply Brief.

Thus rather than to support Defendant, the DOL categorizes the conduct as unlawful. Even if it had not, there would be an issue of fact, whether each of the criteria for non-enforcement were met.

B.     Standing.

It is true that an employer lacks standing to sue the US Secretary of Labor for mis-setting prevailing wages under the Davis-Bacon Act. *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 175 (1954). Local 7 does not dispute that *McDaniel v. Univ. of Chicago*, 548 F.2d 689, 695. (7th Cir. 1977), provides a private right of action to remedy Davis-Bacon Act violations. Moreover, a plaintiff may seek a remedy under a different statute where, among other elements of the claim for relief, a violation of a different Act is established. The *Mathiowetz* Court was not deterred by this issue from considering relief. And, Defendant cites no cases to the contrary.

C.     Make Weight.

Defendant argues that no contractor has been identified who paid less than the prevailing rate. Of course, it is Defendant's burden to come forward with evidence that each employee were paid in accordance with the prevailing rate, *i.e.*, that the net amount paid, less the deduction, was more than the prevailing rate. The sole evidence was that before deduction of target dues, a contractor either met or exceeded the prevailing wage law. Cardon Tr. 55. It is thus fairly inferable that some employees received less than the prevailing wage once target dues are deducted. Second, the NLRB, the District of Columbia, and the Ninth Circuits have squarely held deductions from Davis Bacon Projects which end up, directly or indirectly, in the hands of unionized contractors, are inimical to public policy, even if it does not reduce wages beneath the prevailing rate. *IBEW, Local 48*, 322 N.L.R.B.1492 (2000) *enf'd.*, 345 F.3d 1049 (9th Cir. 2003). The basis for this conclusion is twofold: violation of the policy against reversion of wages to

contractors and artificial escalation of the prevailing wage. *Id.* 1056. The Union and the signatory employers have violated these salutary principles with the result that a tainted war chest has been established to facilitate elimination of non union competition from construction projects.

## V.  ANTITRUST VIOLATIONS CAN BE BASED, IN PART, ON VIOLATION OF  OTHER LAWS.

Defendant boldly states, as a categorical, that an antitrust case cannot be based upon violation of a different statute. Clearly that is not the case. *Connell Construction Co. v. Plumbers and Pipefitters, Local 100,* 421 U.S. 616 (1975), was based upon violation of Section 8(e) of the NLRA, 29 U.S.C. 158(e), given the exclusionary impact arising out of unlawful restraint on subcontracting. And, this court is familiar with garden variety assertions of patent invalidity giving rise to successful monopolization suits. The list could go on. The point is that where violation of one law facilitates commission of unreasonable restraints or monopolization, it is actionable. At best, the teachings of *Nynex* and *Brooke Group* are that torts which do not qualify as conspiracies and/or proven conspiracies and that do not have the requisite impact upon consumers, can not be the predicate for successful prosecution of an antitrust case. Here the unlawful deduction of dues from public works, combined with the coercion of builders and developers, more than adequately depict restraints on the market violative on the Act.

## VI. MASSACHUSETTS PREVAILING LAW

Discovery established that the Union customarily grants and Union employers accept target subsidies on state projects. It further reflects that target dues are deducted on these projects. Defendant does not deny that such conduct violates the law. Rather it asserts:

- •   It is not clear that all Plaintiffs seek this work;

- •   That predation does not exist, because the subsidy permits union contractors to bid over their costs; and

- •   That Plaintiffs lack standing to complain.

Other than the first bullet, these issues have been thoroughly discussed, supra, and no further discussion is warranted. As to the first bullet, it is clear that at least one Plaintiff, if not

more, actively seeks this work. Second, there is a question of fact whether the effect of this conduct by the union and its signatory contractors is to fence off an entire arena of competition, thus making it futile for non-signatories to expend their precious resources preparing a bid, since they must, of necessity, assume that all prevailing wage projects are going to be targeted.

## VII.  CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Defendants' motion for summary judgment should be denied.

Respectfully submitted,

AMERICAN STEEL ERECTORS, INC.,
AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC.,
BEDFORD IRONWORKS, INC.,
D.F.M. INDUSTRIES, INC.

By their attorneys:

Carol Chandler (BBO # 080660)
Geoffrey R. Bok (BBO # 550851)
STONEMAN,CHANDLER & MILLER, LLP
99 High Street
Boston, Massachusetts 02110
(617) 542–6789

/s/ Michael E. Avakian
Michael E. Avakian, *pro hac vice*
SMETANA & AVAKIAN
5211 Port Royal Road, Suite 103
Springfield, Virginia 22151
(703) 321-9181

December 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of PLAINTIFFS' PLAINTIFFS' SUR-RESPONSE BRIEF IN OPPOSITION TO DEFENDANT IRON WORKERS LOCAL 7'S AMENDED MOTION FOR SUMMARY JUDGMENT was served on the following counsel of record for Defendant Local 7 utilizing the Court's ECF filing system:

        Paul F. Kelly, Esq.
        Segal, Roitman & Coleman
        11 Beacon Street, Suite 500
        Boston, MA 02108


/s/ Michael E. Avakian
Michael E. Avakian

# HELEN BACON
# TRANSCRIPT & EXHIBITS

VOLUME: I
PAGES: 1-97
EXHIBITS: 1-32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendant.         *
*************************************

        30(B)(6) DEPOSITION OF HB WELDING, HELEN

BACON, a witness called on behalf of the Plaintiffs,

taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the

Commonwealth of Massachusetts at the

Holiday Inn Express, 707 Washington Street, North

Attleboro, Massachusetts, on Thursday, August 24,

2006, commencing at 1:30 p.m.

                    PATRICIA BOWEN
                   124 Downing Drive
            Attleboro, Massachusetts 02703
                   (508) 222-9403



1      A.     No.  I'm also on the committee for when

2    it's time for the iron workers to get a raise.  I'm

3    on that committee also, and we try to fight.

4      Q.     So you're on the negotiating committee?

5      A.     Yes.

6      Q.     Is this for?

7      A.     Local 37.  I'm not on any committee for

8    Local 7.  I am not.

9      Q.     Who do you understand are your

10   competitors in the market that you work in?

11     A.     Who do I understand that are my

12   competitors?

13     Q.     Yes.

14     A.     The nonunion companies.

15     Q.     They are the only ones?

16     A.     Well, I think so.  Well, actually, no.  I

17   could compete against Danny Koury which I know very

18   well.  I saw that kid grow up.  His sister is my

19   godchild.  His mother was my best friend.  She died

20   of cancer.  I know Danny very well.  He would be a

21   competitor.  Also Pat Griffin, who is probably going

22   to go out of business, this year, next year,

23   sometime soon.  Pat has gone through some terrible

24   personal --

```
 1    negotiating committee for Local 37, does Local 37

 2    have a target fund?

 3         A.    Yes.

 4         Q.    And what do you know about that target

 5    fund?

 6         A.    What do I know about it?

 7         Q.    Yeah.

 8         A.    Well, again, when we bid on a project, if

 9    the fabricator says, you're a little too high, we

10    will go to the BA, which is Mike Rogeri, and ask him

11    if there are any target funds available for that

12    project.

13         Q.    Is that based upon -- Let me go to your

14    duties on the negotiating committee.  Do you have a

15    title on the committee?

16         A.    No.

17         Q.    How many members are there?

18         A.    Well, there is about.  We are about six

19    maybe.

20         Q.    What companies are represented other than

21    yourself?

22         A.    Well, there is Alice from, oh, God -- I'm

23    getting tired.  Jac-Lyn Steel is the name of her

24    company, J-A-C.
```

1           MR. CAMPBELL:  Hyphen, L-Y-N.

2    A.    Thank you.  She's also on that.  I am.

3  Pat Griffin used to be, but he's not any more.  A

4  new member just came in is Steve Cardi Junior.  He

5  wasn't on last year, but he will be from now on

6  forward.  From CAPCO, it's John Casali from CAPCO.

7  Which committee are we talking about?

8    Q.    The negotiating committee?

9    A.    Leo Marshall from J.L. Marshall.  The

10  gentleman from AGC, do you know his name?  I know

11  his name.

12           MR. CAMPBELL:  Yeah, Eric.

13    A.    Eric Anderson.  Thank you.  He always

14  comes to the meetings.

15    Q.    Okay.  And in the course of your being on

16  negotiating committee, have you received, did the

17  committee agree to any request to have a job target

18  fund?

19    A.    That never came up.

20    Q.    Is there any provision in that contract

21  for job target funds?

22    A.    I don't think so.

23    Q.    Do you know how the local job target

24  funds are created?

1    A.    Well.  They are all created from the
2    men's -- They pay into this fund "X" amount of cents
3    per hour.
4    Q.    Is that as dues?
5    A.    Yes.
6    Q.    Have you ever --
7    A.    -- There is also a gentleman from Regis
8    Steel on that committee.
9    Q.    So it's a fairly large committee then?
10    A.    But not everybody shows up all the time
11    either.
12    Q.    Now, with respect to the projects that we
13    have talked about here today in which you received
14    target money on, is it fair to say that you would
15    not have received those projects, been awarded those
16    projects without the ability to reduce your price by
17    the amount of target fund money?
18    A.    More than likely.
19    Q.    When you say "more than likely"?
20    A.    Maybe we would have still got some of
21    them.  I don't know.  It depends if they give us the
22    job or not.
23    Q.    There are some letters in here where you
24    indicated to the union that it kept you competitive.

*HB Welding*

Steel Erectors
Stud Welding
Miscellaneous Metals

117 Webster Street, Pawtucket, RI 02861-1017
Telephone 401-727-0323
Fax 401-724-6930

> *Bacon*
>
> **EXHIBIT NO.** *17*
>
> *8/24/06*

8/6/04

Dear Brother Iron Workers,

I am writing this letter to thank you for excellent work performed on the Stop & Shop project in Halifax, MA. As you may be aware through tough negotiations HB Welding, along with the leadership of Local 7 and help from the target fund, was awarded the steel erection package on this project. The job was to be Ajax's and we were able to take it away from them. The project had an estimated 1,500 manhours to complete. Through the hard work, skill and professionalism of the Iron Workers of both Locals 7 and 37 working together on this project, with no safety infractions, we were able to complete the project ahead of schedule and under budget.

The Target fund had played a key role in successfully procuring a contract on this project. $19.00 per hour from the fund was offered by the leadership and agreed upon which was key in the final negotiations with Stop & Shop. HB Welding is proud to say that the job was a success. That together as a team HB Welding the Iron Workers of Locals 7 and 37 were able to keep the man hours on the contract work down below the estimated 1,500 and were able to pick up some man hours on extras. We must as a team continue to fight the battle against the Open Shop Erectors. We will need to have the resources available to fight the Open Shop Erectors on many projects in the future. This is why HB Welding is offering to give back to the Target Fund $5.of the $19.which was agreed upon at the time of negotiations.

I believe we have built the foundation for a platform that works on this project. I believe if we follow this platform we as a team will be continually successful in the future. Thank you again.

Fraternally yours,

*John Bacon*

John Bacon

*An Equal Opportunity Employer M/F*

FINANCIAL SECRETARY-TREASURER/BUSINESS MANAGER
**JAMES P. BROWN**
BUSINESS AGENTS
**MICHAEL J. DURANT**
**PATRICK McDERMOTT**
**EDWIN WRIGHT**



Bacon
EXHIBIT NO. 23
8/24/06  PS

PRESIDENT
**PAUL F. LYNCH**
BUSINESS AGENT / INDUSTR
**NEIL CONLEY**
**CHARLES WRIGHT**
**FIORE GRASSETTI**

## INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS

### *Local 7*
A.F.L.-C.I.O.

195 OLD COLONY AVENUE • P.O. BOX 7 • SOUTH BOSTON, MASSACHUSETTS 02127 • 617-268-4777 • FAX 617-268-7878

# *****FAX COVER SHEET*****

## *Fax # 617-268-7878*
Facsimile Transmittal

2/28/06
From Helen

**DATE:** FEB 28, 2006

**TO:** Helen OR JOHN

TO:

**FROM:** MIKE DURANT

There will be a total of _2_ pages to follow.

If there are any questions, or if you have any difficulty receiving this communication, please call 617-268-4777......Thank you!

**MESSAGE:** PLEASE SIGN THIS ORGINEL CONTRACT AND FAX BACK TO ME ALSO I HAVE ADJUSTED THIS TO ADD 4000 M/HR + 20 CRANE DAY'S AND A NEW CONTRACT WILL FOLLOW TO REFLECT THIS. ANY Q PLEASE CALL
                                        MIKE

# Local #7 Target Program Contract #1004

Local #7, through its Target Program, is offering up to a maximum of five thousand, three hundred dollars (5,300.00) reimbursement for the structural steel portion on the "**Reading High School**", Reading, MA

**+ Said offer is based on the following conditions:**

Local # 7 will reimburse **H.B. Welding, Inc. (the contractor)**, a total of three dollars ($3.00) per hour, up to a maximum of eight hundred (800) hours, for a possible total reimbursement of two thousand, four hundred dollars ($2,400.00). By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will <u>not</u> be reimbursed by local # 7s' Target Program.

Furthermore, it is agreed that should the covered portion of this project require less than eight hundred (800) hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, only if all of the applicable conditions contained herein were adhered to.

### Travel money reimbursement:

Local #7 agrees to reimburse the contractor up to five dollars ($5.00) per day per man, pursuant to **ARTICLE XIV; Section 1 (Travel and Subsistence)** of the Local # 7/ BTEA / AGC collective bargaining agreement for a possible maximum amount of five hundred dollars ($500.00) Monies will be paid at a rate of five dollars ($5.00) per day for a maximum of one hundred (100) days, for each individual working under the Local # 7 BTEA / AGC collective bargaining agreement and this particular agreement. The contractor expressly understands and agrees that any amount of travel days over the maximum amount as listed in this portion of the agreement is <u>not</u> reimbursable.

Furthermore, it is agreed that should the previously illustrated portion of this project require less than one hundred (100) travel day payments to complete, the contractor will only be reimbursed for the actual amount of travel days worked, and then, provided only if the applicable conditions contained herein were adhered to.

### Crane reimbursement:

Local # 7 agrees to reimburse the contractor up to a maximum of two thousand, four hundred dollars ($2400.00) to assist in defraying crane rental costs. Said payment is based four (4) "crane days" at a cost of six hundred dollars ($600.00) per crane day, for a maximum of four (4) days. It is also clearly understood and agreed, that crane days will be clearly defined for this agreement as the amount of days where the crane was utilized for the entire day, on the work covered under this agreement, by employees working under the collective bargaining agreement of Local # 7. Idle crane days, where the crane is on the job but not utilized, will not be counted or reimbursed. Partial days will be added cumulatively with eight (8) hours constituting a crane day (i.e. two days of using a crane for four hours each day will equal one crane day). It is also clearly understood and agreed that overtime hours are not added into any cumulative sum and no reimbursement will take place. Should this project require less than four (4) crane days to complete, the contractor will only be reimbursed for the actual amount of crane days that were needed, and then, provided only if all of the applicable conditions contained herein were adhered to. *The six hundred dollar ($600.00) crane per diem relates to a large or lattice boom type crane, i.e. 100-150 ton crane. Local # 7 pays four hundred ($400.00) crane per diem for smaller hydraulic type cranes, i.e. 40-50 ton cranes.*

*It is expressly understood that this reimbursement is being offered, and will only be remitted to the contractor, after it has been clearly established by Local #7 that the following conditions were also met:*

A. This agreement is signed by the contractor and the Local #7 Business Agent in whose geographic area the covered work is being performed.

B. All wages and fringe benefits, as required by the currently existing Local #7/BTEA/AGC collective bargaining agreement, have been paid to every member working under this particular agreement, and all remittance reports that verify these payments are in order at the IWDCNE Fund Office.

C. All hours and conditions are verifiable by the Local #7's *Steward's Report* and the Local #7's *Target Sheet*, both of which must be filled out, and remitted to the Local #7 <u>weekly</u>, solely by the Business Agent's appointed steward for this job. Each remitted *Target Sheet* must be signed by an authorized representative of the contractor.

D. The contractor is not in arrears on the payment of wages and or fringe benefits for any present or previous project(s) within the confines of Local #7's geographic jurisdiction.

E. The contractor acknowledges that it is a signed party to the Local #7/BTEA/AGC collective bargaining agreement under *Section 9a* of the *National Labor Relations Act.*

F. Reimbursement is requested by the contractor to Financial Secretary / Treasurer – Business Manager (617-268-4777).

_____
BA Local #7

_____ *H B Welding Arc* _____
contractor
*Helen Balon*

Date _____

Date __ *3/28/06* ____

Received by FS/T – BM _____ Date _____

# MARTIN J. CARDON
# TRANSCRIPT & EXHIBITS

```
                                    VOLUME:  I
                                    PAGES:  1-100
                                    EXHIBITS: 1-27
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS

*************************************
AMERICAN STEEL ERECTORS, INC.,et als. *
                    Plaintiffs,       *
                                      *
v.                                    *
                                      *
LOCAL UNION NO. 7, INTERNATIONAL      *
ASSOCIATION OF BRIDGE,                *
STRUCTURAL, ORNAMENTAL &              *
REINFORCING IRON WORKERS,             *
                    Defendant.        *
*************************************

DEPOSITION OF BUILDERS RESOURCE INC, MARTIN

J. CARDON, a witness called on behalf of the

Plaintiffs, taken pursuant to the

applicable Federal Rules of Civil Procedure,

before Patricia Bowen, Professional Shorthand

Reporter and Notary Public in and for

the Commonwealth of Massachusetts at

the law offices of Stoneman, Chandler & Miller,

99 High Street, Boston, Massachusetts, on

Tuesday, September 26, 2006, commencing at 1:00 p.m.


                    PATRICIA BOWEN
                    124 Downing Drive
            Attleboro, Massachusetts 02703
                    (508) 222-9403



55

1        A.        I'm not sure.

2        Q.        There is, I think, New England Community

3    College of Fine Arts and Tech. Building in

4    Haverhill, Massachusetts.  Do you recall that job?

5        A.        You know, I don't specifically remember

6    any of these jobs being prevailing wage or not, if

7    you're going to keep asking.  It has no bearing on

8    us, so I don't know.  We don't go looking for it.

9        Q.        Why?

10       A.        Because our rate of pay meets or exceeds

11   it, so we don't specifically look for it.

12       Q.        You say your rate of pay --

13       A.        -- We pay the same rate on all the jobs.

14   It's not like we have to do anything different, so I

15   don't recall.  We don't look for it.  I don't know.

16       Q.        Okay.  I was going through a list of jobs

17   that I understand that you received target money on.

18   And my question, if your rate doesn't make a

19   difference depending on whether it's prevailing wage

20   or not, why did you enter into an agreement with the

21   union to receive target money?

22            MR. MELTZER:  I'm going to object on that

23         one.  Again, you're getting into how the jobs

24         are bid.  I'm going to instruct him not to

1    to Building Resource Inc. and the other funds?

2         A.    No.

3         Q.    With respect to employers that are

4    signatory to contracts with Local 7, have you ever

5    gotten together in any meeting with those other

6    contractors?

7         A.    No.

8              MR. AVAKIAN:  Let me have this marked.

9              (Exhibit No. 13 marked.)

10        Q.    Mr. Cardon, you've got Exhibit 13 in your

11   hands.  Do you recognize that document?

12        A.    It looks vaguely familiar.

13        Q.    And what is that?

14        A.    I don't know.  It's a list of jobs.

15        Q.    Okay.  Is that a list of jobs that

16   someone in B.R.I. put together?

17        A.    I'm not sure if we put it together, no.

18        Q.    Do you know, there is some writing on the

19   bottom, the midsection of the document, it looks

20   like the word "Jean."  Do you know who Jean is?

21        A.    No.

22        Q.    Have you ever put a list of the projects

23   together and provided, that you were bidding on, and

24   provided them to Local 7?

```
 1        A.    It's possible.

 2        Q.    Is that what you have -- Is Exhibit 13 a

 3   list of jobs that you would be asking Local 7 for

 4   assistance on?

 5             MR. KELLY:  Objection to the form.

 6             MR. MELTZER:  Objection.  Answer if you

 7        understand the question.

 8        A.    No.  I wouldn't have been asking for

 9   assistance on that because I don't recall this

10   document.  This is the first time I've seen it.  I

11   just don't remember why.  This appears to be my

12   handwriting, but other than that, I don't remember

13   why.

14        Q.    The words "open" and "closed" is your

15   handwriting?

16        A.    Yes.

17        Q.    On the left, okay.  Is the word "Jean" in

18   your handwriting?

19        A.    No.

20             MR. AVAKIAN:  Mark that as the next

21        exhibit.

22             (Exhibit Nos. 14 and 15 marked.)

23        Q.    Mr. Cardon, you've got Exhibits 14 and 15

24   in your hand.  Can you tell me about the
```

1    testimony that the projects on which you received

2    target money have all been brought to your attention

3    by an agent of Local 7, is that right?

4            MR. MELTZER:  Objection.

5        A.    I never testified to that.

6        Q.    Okay.  Well, what is your understanding

7    of how you found out about the projects that would

8    be subject to or covered by a job targeting

9    agreement?

10       A.    By a project alert.  I believe we already

11   discussed that.

12       Q.    Right.  So that comes from Local 7, is

13   that right?

14       A.    Yeah.

15           MR. LONG:  I don't understand your

16       question.  Are you asking him how he found out

17       about the job or target?

18           MR. AVAKIAN:  About the targeting

19       available on a job from Local 7.

20           MR. LONG:  Okay.  That's what you are

21       asking?

22           MR. AVAKIAN:  That's what I was asking.

23       Q.    So you have received notice that a job

24   might get job target money by a project alert.

1    You've testified to that.  Have you received

2    notification by a business agent or representatives

3    of Local 7?

4            MR. KELLY:  Objection to the form.

5        A.    I'm sure that's happened, but it's not

6    generally how it's done.

7        Q.    Are there any other ways or mechanisms

8    that you understand that you might have received

9    notice that a project might get target money?

10       A.    No.

11       Q.    Now, you said it's generally not how it's

12   done.  So can you explain that process?

13       A.    The fax of a project alert.

14       Q.    And then what steps does B.R.I. take to

15   fulfill whatever it is that the project alert is

16   requesting, which eventually may lead to a job

17   target fund?

18            MR. MELTZER:  Again, I'll instruct him

19       not to provide any information in terms of what

20       happens internally.  You can answer the

21       question.

22       A.    I don't know how to answer it.

23       Q.    Well, let's take it apart a little bit.

24   After receiving a project alert, do you obtain

PAUL DIPIETRO
TRANSCRIPT & EXHIBITS

```
                                    VOLUME:  I
                                    PAGES:   1-207
                                    EXHIBITS:  4-30
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Case No. 1:04-cv-12536-RGS


```
*************************************
AMERICAN STEEL ERECTORS, INC.,et als.  *
                    Plaintiffs,        *
                                       *
v.                                     *
                                       *
LOCAL UNION NO. 7, INTERNATIONAL       *
ASSOCIATION OF BRIDGE,                 *
STRUCTURAL, ORNAMENTAL &               *
REINFORCING IRON WORKERS,              *
                    Defendant.         *
*************************************
```

30(B)(6) DEPOSITION OF LOCAL 7, PAUL

DiPIETRO, a witness called on behalf of the

Plaintiffs, taken pursuant to Rule 30(b)(6) of

the Federal Rules of Civil Procedure, before

Patricia Bowen, Professional Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts at the law offices of

Stoneman, Chandler & Miller LLP, 99 High Street,

Boston, Massachusetts, on Wednesday, August 30,

2006, commencing at 9:30 a.m.


```
                PATRICIA BOWEN
               124 Downing Drive
        Attleboro, Massachusetts 02703
               (508) 222-9403
```



18

```
1        A.    No.  I wouldn't have that authority just
2   to pay bills.  I paid bills where approved by the
3   membership.
4        Q.    Now, how would bills be approved by the
5   membership?
6        A.    They would be approved by the members at
7   the regular meeting.
8        Q.    Did any other person within Local 7 have
9   the authority to approve bills and submit them to
10  you for payment?
11       A.    I don't know what you mean by that.
12       Q.    For example, during the period of time
13  when you were financial secretary, Mr. Jay Hurley
14  was president of the union, for example, correct?
15       A.    At one time, I believe, he was president,
16  yes.
17       Q.    And when he was president, did he submit
18  any bills to you and say, please, pay these bills?
19       A.    No.
20       Q.    Could he authorize that?
21       A.    Every bill that gets paid, the members,
22  the membership authorizes to pay bills.  Nobody pays
23  bills on their own.  The members authorize.
24       Q.    Are there certain recurring bills that
```

```
1    are automatically paid by Local 7 such as mortgage

2    payments or rent payments?

3         A.    No.    Everything gets approved by the

4    members, and then it gets paid.

5         Q.    So at a monthly meeting, for example, the

6    electric bill comes due at the union hall, and it's

7    for $400, do you bring that up and say, we have to

8    pay $400 for electric?

9         A.    That gets read off and approved at the

10   regular meeting.   All expenditures get read off and

11   approved at the meetings.

12        Q.    Okay.   Did you also have any small value

13   cash fund that you used to pay small bills?

14        A.    We had a petty cash account that had

15   $100, and that would be kept as it was spent down,

16   would be reimbursed to the $100 from the general

17   account.   But we never used it, I never used it that

18   much during my term of elected office by the

19   membership.   Yeah, it was very seldom that I ever

20   used it.   I always preferred to use a check.

21        Q.    So during the course of your term, I

22   think I understand it correctly, the source of your

23   responsibilities came from the by-laws but also the

24   International Constitution?
```

 1          A.    Would you repeat the question?

 2          Q.    Sure.  During the course of the monthly

 3     meetings, would you present a list of invoices or

 4     bills to be voted upon by the membership?

 5          A.    Yes.

 6          Q.    And then would the membership vote yes or

 7     no on individual items or on a list of items?

 8          A.    No.  They would get read off, and they

 9     would approve them at the end.  If there was an

10     objection to a payment, it would be duly noted, and

11     whatnot.  But basically, if they approved the bills,

12     they would be paid.

13          Q.    You talked about day-to-day bills, were

14     there any other exceptional bills that were brought

15     up and not treated that same way that you just

16     described?

17          A.    I'm not understanding what you're saying.

18          Q.    For instance, in this case there are

19     allegations of target fund payments.  Those were

20     substantial checks.  And I'm sure you are familiar

21     with those.  Were those brought up individually at

22     the monthly meetings as well?

23          A.    No.

24          Q.    How were those handled?

1      A.     Those were presented and paid on a

2      day-to-day basis as they came in.

3      Q.     When you say "as they came in," what are

4      you referring to?

5      A.     Well, under the target fund, if there was

6      a payment to be made, after the process was

7      completed and everything balanced out, a payment

8      would be made.

9      Q.     Now, you indicated there was a process,

10     what is the process for making a payment?  First of

11     all, let me back up, and I will get to the target

12     fund in a moment.  One of the duties that you also

13     described was to collect dues, do you recall that?

14     A.     Yes.

15     Q.     And in your position, how did you collect

16     dues?

17     A.     Members could send in a dues payment by

18     mail which we would pick up and process, or they

19     could come to the union hall and make a payment

20     directly at the window, and the payments were

21     processed, the receipt was issued to the member,

22     mode of payment, check or cash, and then that would

23     be deposited.

24     Q.     Sure.  Did you also receive dues payments

1    strike or if the members approved, if we were on

2    strike, or if a member was incapacitated and the

3    members through resolution form approved an

4    expenditure, we would use that account.

5         I'm trying to think, target fund account.  To

6    the best of my knowledge, under my tenure, that's

7    the accounts that I can think of.

8         Q.    Now, with respect to the money that ends

9    up -- With respect to the money as it comes from the

10   fund office in Dorchester and it reaches Mount

11   Washington Bank into the clearing account, is my

12   understanding correct, that the fund then directs

13   the money to be flowing into each one of the

14   accounts that you described?

15        A.    Yeah.   When I was there, yes, that would

16   be correct to assume that.   Except for the

17   industrial fund account.   That was taken out of the

18   working dues, 9 cents an hour, authorized by the

19   membership.   That would go into that account.   We

20   would write a check from the general account to the

21   industrial fund account to get that money into that

22   account.

23        Q.    Okay.

24        A.    And that was for donations and tickets

```
 1        provision was changed.

 2             MR. AVAKIAN:  Okay.  I can go back

 3        through the initial disclosures and take a

 4        look, but this is from my understanding, I've

 5        got two contracts, one from '97 on, and then

 6        2000 to 2006 contract.  So if it was amended,

 7        at least, in the sequence of the initial

 8        disclosures, I didn't see any other contract or

 9        amendment.

10             MR. KELLY:  I think there is another one.

11             MR. AVAKIAN:  Okay.  From what I

12        understand, in this contract there could be a

13        reopener for wages and so forth and the rest of

14        the contract might stay the same?

15             MR. KELLY:  Mmm-hmm.

16             MR. AVAKIAN:  But I don't know.  Right

17        now, I'm talking about this one because that's

18        the only one I'm familiar with.

19             MR. KELLY:  And Mr. DiPietro is familiar

20        with this one.

21   BY MR. AVAKIAN:

22        Q.   Okay.  In this particular document, we

23   have the working dues assessment provision, and we

24   have the market recovery program identified in
```

1    there, is that correct?

2          MR. KELLY:  Do you want to read it out

3      loud.

4      A.    It is agreed that the working dues

5    deduction of 2 percent, 2 percent of the total

6    package plus 85 cents for market recovery program

7    and 3 cents for political action league would be

8    withheld out of net pay for each and every hour

9    paid.  During my tenure, I would say, that's

10   correct.

11     Q.    Okay.  Now, do you recall when the

12   language setting up a market recovery program in a

13   particular dollar amount might have first appeared?

14     A.    No.

15     Q.    It talks of a market recovery program.

16   Is that a program jointly run by the Employers

17   Association members that you negotiated with and the

18   union?

19     A.    No.  The market recovery program is run

20   strictly by Local 7.

21     Q.    Does it have any participation by any

22   employers that are members of one of the

23   associations that you bargain with?

24     A.    No, I would say, no.  I would equate that

```
 1    that these categories of persons should have a role

 2    in the union's job targeting program?

 3         A.    I don't know.  I really don't know if

 4    there is.

 5         Q.    Okay.  Now, with respect to the outcome

 6    of one of these meetings that you just described, a

 7    consensus is reached, then what happens or what is

 8    then done?

 9         A.    Well, if there was an interest in

10    providing extra employment for our members on a

11    particular project, if we looked at a blast fax that

12    was sent out to the contractors saying, we might be

13    interested in a certain project.

14         Q.    At that point in time, does the union

15    communicate any information concerning how much

16    money it may be willing to apply to a targeted

17    project?

18         A.    It may vary.  It may vary.

19         Q.    Now, what would be the variance that you

20    are describing?

21         A.    The variance?

22         Q.    Yeah, and how that money would be --

23         A.    Sometimes a fax would be sent out stating

24    that if anybody is interested in bidding a certain
```

1        A.      Yes.  That's Local 474.  I'm not sure.

2        Q.      Do you recall anything?

3        A.      Maine Medical Center.  I'm not even sure.

4    I don't recall.  If you showed me the contracts and

5    that stuff, I would be able to comment on it.

6        Q.      With respect to 496, do you recall any

7    specific contracts?

8        A.      I thought I just answered that.

9        Q.      Okay.  That was 496, How about 474?

10       A.      I thought I just answer that one too.

11       Q.      Okay.  I got it.  Now, did you ever

12   attend meetings with Building Trades Council of

13   Metropolitan Boston?

14       A.      Yeah.

15       Q.      Do you recall discussion of job targeting

16   coming up at the trades council meetings?

17       A.      I believe there may have been some

18   discussions, yeah.

19       Q.      What do you recall being discussed as the

20   subject matter of job target funds?

21       A.      The various projects, if anybody was

22   targeting them.

23       Q.      And do you recall anyone from the iron

24   workers union discussing projects that they

1    targeted?

2          A.    No.  I wouldn't be able to remember that.

3          Q.    Do you remember any projects that were

4    targeted or discussed at the Boston Trades

5    Metropolitan Council meetings?

6          A.    Specifically, no, I can't recall.

7                MR. AVAKIAN:  Okay.  Let's take a break,

8          and possibly we can conclude.

9                (Brief break.)

10               (Exhibit No. 30 marked.)

11   BY MR. AVAKIAN:

12         Q.    Okay.  Back on the record.  Mr. DiPietro,

13   you previously indicated that there were conditions

14   of cheating dealing with the nonunion contractors.

15   Do you recall that testimony?

16         A.    Yes, sir.

17         Q.    And that dealt with, I think, you

18   indicated workers' compensation and some other

19   issues that relate to it?

20         A.    Oh, yeah, many other issues.

21         Q.    Now, with respect to union contractors,

22   are they involved in cheating at all?

23         A.    Are they involved?

24         Q.    Yeah.

# JAY HURLEY
# TRANSCRIPT & EXHIBITS

1

Volume 1, Pages 1-232, Hurley Exhibits 1-11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS



AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAY HURLEY

Friday, August 25, 2006, 9:40 a.m. to 4:47 p.m.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

40

1      A.  Yes.

2      Q.  Now, do all projects that they tell you are

3   coming up end up as project alerts?

4      A.  No.

5      Q.  How do you distinguish between the two,

6   whether to make a project alert or not?

7      A.  I use the BA's' familiarity with any

8   particular project.

9      Q.  Is there anything in particular that they

10  tell you that would cause you to issue an alert or

11  not to issue an alert?

12     A.  Sure.

13     Q.  And what would those be?

14     A.  Whether we're worried about losing the job

15  to nonsignatory contractors.

16     Q.  Now, when you say nonsignatory contractors,

17  who are you referring to?

18     A.  Contractors that don't have a contractual

19  relationship with the District Council.  No one

20  specifically.

21     Q.  To your knowledge, are there specific

22  contractors that have contracts with Local 7 and

23  any of the other locals in the District Council?

24     A.  Yes.

72

1   been nonunion contractors bidding on the project?

2       A.   That would just be a given, in most cases;

3   not necessarily in all cases but in most cases.   In

4   most cases that would be a given.   There's in

5   reason, no other... Cancel that.

6       Q.   You had indicated that there might be a

7   situation where you might provide job-target money

8   to a project where there was no union contractor

9   bidding on it?

10              MR. ROSENTHAL:   Where there was no union

11  contractor?

12              MR. AVAKIAN:   Bidding on the project.

13      A.   I don't understand the question.   Who would

14  I give the money to?

15      Q.   The unionized contractor.

16              MR. ROSENTHAL:   I object to that.

17      A.   I didn't understand the question.

18      Q.   If you didn't understand the question.

19      A.   I didn't understand the question.

20      Q.   Based on your prior answer, is there a

21  situation where you might have provided job-target

22  money to a union employer where no nonunion company

23  was bidding on a project?

24      A.   Not to my knowledge.   No.

**Patricia Bowen, Professional Shorthand Reporters**
**508.222.9403**

On August 30th, Mike Durant and I drove up to Thetford Mines, Quebec, Canada for a meeting with Canatal's owner, Ralph Poulin. We were accompanied by Jacques Dubois, Business Manager from Local #711 Montreal and Jacques St. Onge, Local #711's Business Agent for the Quebec area. We had a very productive meeting, with the crux of the meeting focusing on the rampant cheating that still exists in the (prevailing wage jobs) steel erection industry, and the unwitting role that Mr. Poulin's company is paying by contracting jobs to these cheaters.

***We must look in the mirror, however.*** He is only receiving bids from the non-union companies on a lot of these rated projects in the suburbs. ***We cannot expect him to assist us in curbing this cheating if there are no alternative bidders (i.e. union companies who pay prevailing wages and benefits), as he has to get the steel up once he contracts a job.*** The job above is a classic example... a prevailing rate job with no union bidders. Mr. Poulin is sincerely concerned with the evidence we have uncovered. He wants to assist us, but I need your help. Please respond to as many PROJECT ALERT requests we forward to you as possible... as without your help the cheating will continue uninterrupted.

There's plenty of work now, but it will wind down and if these fabricators only know the non-union players, our job becomes ten-times tougher when we finally redevelop an interest in the suburban market.

Thank you,
Jay Hurley
Business Manager
Iron Workers Local #7

# Local #7 Project Alert

**Project: *New England Confectionery Company (NECCO)***
Location: Revere, MA
G.C.: Austin Company
Type of work: Structural; misc. metals; etc.

Please contact Pat McDermott @ 1-800-730-4766 for further information that is pertinent to this project.

Thank you for your attention and assistance in this matter.

Jay Hurley
Business Manager

**CONFIDENTIAL**

*Pat – #4 p/h Target ($108,000 on a 27,000 Man/hour JOB)*

EXHIBIT
4
Hurley

DEF 07166

JAMES F. STEARNS
TRANSCRIPT & EXHIBITS

1

Volume 1, Pages 1-110, Stearns Exhibits 1-20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:04-CV-12536-RGS

 ORIGINAL

AMERICAN STEEL ERECTORS, INC.

AJAX CONSTRUCTION COMPANY, INC.

AMERICAN AERIAL SERVICES, INC.

BEDFORD IRONWORKS, INC

DFM INDUSTRIES, INC

RONALD BEAUREGARD d/b/a INDEPENDENT WELDING

    Plaintiffs

    v.

LOCAL UNION NO. 7,

    INTERNATIONAL ASSOCIATION OF BRIDGE,

    STRUCTURAL, ORNAMENTAL & REINFORCING

    IRON WORKERS

CHARLES WRIGHT

STEEL ERECTION AND ORNAMENTAL IRON INDUSTRY

    ADVANCEMENT FUND

    Defendants

DEPOSITION of JAMES F. STEARNS, IV

Tuesday, August 29, 2006, 10:11 a.m. to 1:48 p.m.

James F. Stearns, IV
August 29, 2006

90

1            MR. LONG:  Objection to form.  What do

2    you mean by commensurate?

3            MR. GROSSO:  He answered the question

4    already.

5            MR. AVAKIAN:  Yes.

6            MR. GROSSO:  Equal to.

7    Q.  With respect to the projects that you

8    have received job-target money on, would you have

9    lowered your price on, for example, the Jordan's

10   Furniture job by approximately $360,000 if you

11   had known that that money was not available?

12           MR. LONG:  Objection.

13   A.  Could you say that once more?  I'm sorry.

14   Q.  Sure.

15           On the Jordan's Furniture job, would

16   you in the normal course of being involved in a bid

17   process have lowered your bid price approximately

18   $365,000 independently of having received job-

19   target money?

20           MR. LONG:  Objection.

21   A.  Well, I can tell you we lowered it more

22   than that.  I don't know if that answered your

23   question or not.

24   Q.  I think I understand your answer.

DEF 00095

# 1993-1997 AGREEMENT

BETWEEN

**LOCAL UNION No. 7**
**BOSTON, MASSACHUSETTS**

of the
International Association of Bridge,
Structural and Ornamental Iron Workers
AND

**BUILDING TRADES**
**EMPLOYERS' ASSOCIATION**
**of BOSTON, and EASTERN**
**MASSACHUSETTS, Inc.**

AND

**LABOR RELATIONS DIVISION**
**OF THE ASSOCIATED**
**GENERAL CONTRACTORS**
**of MASSACHUSETTS, Inc.**

EXHIBIT
2
Stearns

## Working Dues Deduction

SECTION 9. It is agreed that the Employer shall deduct the amount shown in Article V, Section 1. Wages—from net wages after taxes, for each and every hour paid to all employees covered by or receiving benefits provided for in this Agreement for all jobs falling within the jurisdiction of this Agreement. All such deductions shall be reported weekly. The form for this purpose is to be furnished by the Union.

It is agreed the Working Dues Deduction of one and one-half percent (1½%) of the total package plus 50¢ for a Market Recovery Program and 3¢ for the Political Action League willbe withheld out of net pay for each and every hour paid effective 11/1/93.

It shall be the sole responsibility of the Union to procure, pursuant to the provisions of Section 302 (c) of the Labor-Management Relations Act of 1947, the signed individual authorization of every employee subject to this Agreement, both present and future, and furnish such original signed authorizations to the Employer to legally permit the Employer to make such payroll deductions from all employees covered by or receiving benefits provided for in this Agreement. It shall be the further responsibility of the Union to assume all legal costs, fees and damages which might arise relative to this practice. The Union shall indemnify and hold harmless the Employer from such actions.

Any Employer who fails to send the payment and the reports due under the Dues Deduction System as provided in this Article shall be considered in violation of this Agreement and subject to penalties outlined in Article VI.

See Reference B for details explaining contribution procedure.

15

Contributions to said Fund shall commence when duly authorized by the Union. It is agreed the Union may transfer five cents (5¢) per hour from wages to this fund upon thirty (30) days written notice to the Associations.

It is understood by the parties to this Agreement that the Boston Ironworkers Legal Services Trust and Plan to be established shall (a) Conform to the requirements of Section 302 of the Labor Management Relations Act, as amended. (b) Allow the Employer to deduct said contributions as an ordinary and necessary business expense. (c) Not be used to provide legal services against the Union, the Associations, the Fund or the Employer (including representation in Unemployment and Workers' Compensation cases).

There shall be a total of six (6) Trustees to constitute the Board of Trustees to administer the Fund. Said Trustees to be appointed are as follows: Three (3) Trustees shall be appointed by the Union; one (1) Trustee shall be appointed by the Labor Relations Division of the Associated General Contractors of Massachusetts, Inc. (AGC); one (1) Trustee shall be appointed by the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. (BTEA); one (1) Trustee shall be appointed by the Steel Erectors Association of the BTEA. Representatives on the Board of Trustees shall at all times be equally divided among Union and Associations. The appointing parties shall also have the power to remove their respective Trustees appointed by them and to fill vacancies on the Board of Trustees.

14

PLAINTIFFS EXHIBITS

P.B EXHIBIT 5
Plaintiff
9/30/06



BY-LAWS

OF

LOCAL UNION NO. 7

BOSTON, MASSACHUSETTS

OF THE

INTERNATIONAL ASSOCIATION

OF BRIDGE, STRUCTURAL

ORNAMENTAL AND

REINFORCING IRON WORKERS

DEF 01689

(C) The eligibility requirements, the amounts of per diem payments and the frequency of such payments shall be established by the Executive Committee, providing however that no member shall be allowed to collect Strike Assistance Benefits if that worker is also receiving unemployment, disability, workers' compensation or pension benefits.

(D) All requests for donations from the Strike And Assistance Fund must be presented to the membership in the form of a resolution and shall be read at three (3) consecutive meetings of the Local Union. If the proposed resolution receives a majority vote of all members present at the third consecutive meeting, a copy of such resolution shall be forwarded to the General Secretary for presentation to the General Executive Board and shall not become effective unless or until approval of same has been received by the Local Union from the General Executive Board.

(E) Effective January 1, 1999, two cents (.02¢) per hour shall be diverted from the Strike And Assistance Fund into a Scholarship Fund.

**Section 14. Target Fund**

A Target Fund shall be permanently funded with a dues check off, eighty-five (85) cents per hour.

31

DEF 01721

### Section 15. New Building Fund

(A) A new building fund shall be established and hourly contributions, which shall be determined by the membership, shall be allocated to this fund for the purpose of funding a Local 7 Union and training-related facility. (B) An amount of contribution to this fund shall be designated by the membership as a portion of the wage increase scheduled to become effective on April 1, 1995.

### Section 16. Retirees Club

The membership of Local No. 7 shall fund the retirees Club with an annual stipend of twelve thousand dollars ($12,000.00) in order to assist them financially and make the Retirees Club a success.

### ARTICLE IX
### APPOINTMENT OF COMMITTEES

### Section 1.

(A) The President shall, in accordance with the provisions of Article XXVI, Section 2 of the International Constitution, appoint all Committees, and shall act as ex officio member of all such Committees.

(B) Special Committees shall consist of not less then three (3) members unless otherwise ordered by the Local Union.

(C) Any new expenditure, not commonly found in the monthly bills, over a thousand

32

DEF 01722

EXHIBIT 6
Plaintiffs
8/30/05

International Association of

# Bridge, Structural and Ornamental Iron Workers

**JAKE WEST**
GENERAL PRESIDENT

**JUEL D. DRAKE**
GENERAL PRESIDENT EMERITUS

**LeROY E. WORLEY**
GENERAL SECRETARY

**JAMES E. COLE**
GENERAL TREASURER

*APPROVED*

*NEIL*



Affiliated with AFL-CIO

SUITE 400
1750 NEW YORK AVE. N.W.
WASHINGTON, D.C. 20006
202 383-4800

April 21, 1992

Mr. Paul DiPietro, FST
Iron Workers Local Union No. 7
35 Travis Street, P.O. Box 210
Allston, MA 02134

Dear Sir and Brother:

Your letter of March 27, 1992 to which was attached copy of a Resolution presented to the membership of Local Union No. 7, Boston, Massachusetts, which Resolution amends Article VIII of the Local Union By-Laws by adding a new section, to be known as Section 14, Target Fund, which shall read as follows:

> "**Section 14. Target Fund.**
>
> A Target Fund shall be permanently funded with a dues check off."

has been presented to the General Executive Board for consideration and action thereon.

The General Executive Board noted this Resolution was acted upon and adopted by the membership of the local union in accordance with the provisions of the International Constitution and, after careful consideration and deliberation, has decided to approve the Resolution as set forth above.

Fraternally yours,

GENERAL EXECUTIVE BOARD

General Secretary

LEW:mo
cc:  General Organizer Joseph Quilty

DEF 00028

## RESOLUTION

Whereas:  The Target Fund has proven to be an effective tool
          for competing with the non-union; and

Whereas:  The Target Account need permanent funding to be
          effective;


Therefore Be It Resolved:  That a Target Fund be permanently
          funded with a dues check off.


Respectfully submitted,

Robert E. Banks
Book #867572

DEF 00029



RB EXHIBIT 9
Plaintiff's
8/30/06

# IRON WORKERS LOCAL 7-SPFLD JOB TARGET APPLICATION

1. All forms shall be completed and returned to our office prior to bid date or start of any work of any type on the mentioned project. Failure to comply will void this agreement.

2. Iron Workers Local 7- Spfld must be notified of job award to your company and start date, and also reserves the right to place the steward for record keeping purposes (ie. Weekly time sheets & steward reports) before job commences.

3. All benefits due Iron Workers employed on this project shall be paid in full prior to target assistance distribution. failure to comply with conditions will void this request.

4. The Collective Bargaining Agreement as negotiated for this area shall be recognized as written.

Requested by :

_SPRINGFIELD STEEL ERECTORS Inc_     _1-413-543-3274_
(Sub Contractor- Steel Erector- or Owner of Project)     Phone

_ARTHUR GONEAU V.P._     _1-413-543-1363_
(Name & Title of person making request)PLEASE PRINT     Fax

_9/28/04_
(Date of Request)

Are company work reports and payments current for Health, Welfare & Pension? ✓ yes ___ no

1. Identify of the project- location, scope of work, bid date. _PRIVATE_
_MEDIA REALTY - E. LONGMEADOW - JOIST - DECK_ Posted Rate= _NONE_
2. Amount of target assistance requested per hour: $ _20.00_ Total Requested $ _8,000.00_
(Amount)
3. Approximate number of man hours _400_     Approximate Crane Days _3_
4. Specific type of work, check what applies:
   Structural steel erection _✓_ Rebar_____ Precast_____ Misc. Steel_____
   Metal Building_____ Other(explain)_____
5. Identity of other Union Bidders if known:
   a. _____ b. _____
   c. _____ d. _____
6. Identity of non-union bidders if known:
   a. _____ b. _____
   c. _____ d. _____

Please call for any assistance (413-735-1767) or fax form if completed to (413-735-1769)

_ARTHUR GONEAU_     _#8,000.00_
submitted by (please print)     Amount Granted

_[signature]_ _9/28/04_     _J. Coyle_ _9/28/04_
Signature     Date     B.A. Signature     Date

CONFIDENTIAL
DEF 06277

# LOCAL # 7 Target Fund Contract # 971

**Local #7, through its TARGET FUND, is offering up to a maximum of eight thousand dollars ($8000.00) reimbursement for the structural steel erection performed by Ironworkers on the "Media Realty Project", East Longmeadow, MA**

*Said offer is based on the following conditions:*

Local 7 will reimburse Springfield Steel Erectors Inc. (the contractor) a total of twenty dollars ($20.00) per hour up to a maximum of four hundred (400) hours, for a possible total reimbursement of eight thousand dollars ($8000.00). By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will not be reimbursed by Local 7's Target Fund.

Furthermore, it is agreed that should the covered portion of this project require less than four hundred (400) hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, only if all of the applicable conditions contained herein were adhered to.

### Said offer is based on the following conditions:

A. This agreement is signed by the contractor and the Local #7 Business Agent in whose geographic area the covered work is being performed.

B. All wages and fringe benefits, as required by the currently existing Local #7/BTEA/AGC collective bargaining agreement, have been paid to every member working under this particular agreement, and all remittance reports that verify these payments are in order at the IWDCNE Fund Office.

C. All hours and conditions are verifiable by the Local #7's Steward's Report and the Local #7's Target Sheet, both of which must be filled out, and remitted to Local #7 weekly, solely by the Business Agent's appointed steward for this job. Each remitted Target Sheet must be signed by an authorized representative of the contractor.

D. The contractor is not in arrears on the payment of wages and or fringe benefits for any present or previous project(s) within the confines of Local #7's geographic jurisdiction.

E. The contractor acknowledges that it is a signed party to the Local #7/BTEA/AGC collective bargaining agreement under Section 9a of the National Labor Relations Act.

F. Reimbursement is requested by the contractor to FST/BM (817-266-4777).

_____    _____
BA Local #7                 contractor

Date 2-11-05               Date 2/11/05

Received by FST-BM _____    Date _____

**CONFIDENTIAL**
**DEF 06278**

## Privately Funded (non-prevailing rate) Jobs *ONLY*

Local #7, through its Target Fund, is offering up to a maximum of $ 8,000.00 reimbursement for the (type of work) STRUCTURAL on the STEEL ERECTION project (location) E. Long meadow REALTY

### *Said offer is based on the following conditions:*

Local #7 will reimburse Spfld Steel Erectors Inc ("the contractor"), a total of $ 20.00 per hour, up to a maximum of 400 hours with a total maximum reimbursement of $ 8,000.00. This money represents the difference between the legally posted rate for this project and the current collectively bargained rate between Local #7 and the contractor. By virtue of becoming signatory to this contract, the contractor expressly understands and agrees that any amount of hours worked over the maximum amount, as listed in this agreement, will not be reimbursed by Local 7's Target Fund. Furthermore, it is agreed that should the covered portion of this project require less than 400 hours to complete, the contractor will only be reimbursed for the actual amount of hours worked, and then, provided only that all of the applicable conditions contained herein were adhered to.

### *Travel money reimbursement:*

Local #7 agrees to reimburse the contractor up to $_____ , for travel money paid pursuant to *ARTICLE XIV; Section 1 (Travel and Subsistence)* of the Local #7/BTEA/AGC collective bargaining agreement. Monies will be paid at a rate of $_____ per day for a maximum of _____ days, for each individual working under the Local #7/BTEA/AGC collective bargaining agreement and this particular agreement. The contractor expressly understands and agrees that any amount of travel days over the maximum amount as listed in this portion of the agreement is not reimbursable. Furthermore, it is agreed that should the previously illustrated portion of this project require less than _____ travel day payments to complete, the contractor will only be reimbursed for the actual amount of travel days worked, and then, provided only if all of the applicable conditions contained herein were adhered to.

### *Crane reimbursement:*

**NOTE: No Crane reimbursement on <u>privately</u> funded work!**

### *Job trailer/change shack reimbursement:*

Local #7 agrees to reimburse the contractor up to $_____ towards the rental of a secure, heated, change shack/tool storage trailer – pursuant to *ARTICLE IX; Section 9 (Drinking water and clothes room)* of the Local #7/BTEA/AGC collective bargaining agreement.

<u>**ADD ON BOSTON RATE?**</u> **($4.41)** _____ *Check here*
*PLEASE NOTE*: Must be ok'd by Business Manager
We must have 100% plus employment to invoke this clause

**CONFIDENTIAL
DEF 06279**