UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12536-RGS

AMERICAN STEEL ERECTORS, INC. et al.

v.

LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION
OF BRIDGE, STRUCTURAL, ORNAMENTAL &
REINFORCING IRON WORKERS

MEMORANDUM AND ORDER ON
DEFENDANT LOCAL UNION NO. 7'S
MOTION FOR SUMMARY JUDGMENT

March 30, 2007

STEARNS, D.J.

On December 2, 2004, six nonunion steel erector companies – American Steel Erectors, Inc., Ajax Construction Company, Inc., American Aerial Services, Inc., Bedford Ironworks, Inc., D.F.M. Industries, Inc., and Ronald Beauregard d/b/a Independent Welding ("nonunion companies" or "plaintiffs") – brought this antitrust Complaint against Local Union No. 7 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Union" or "Local 7").[1]  Plaintiffs allege that Local 7 conspired with the Building Trades Employers' Association of Boston and Eastern Massachusetts ("BTEA"), and various named and unnamed unionized construction companies, to injure or destroy the business of steel erector companies that do not hire members of Local 7.

---

[1] Plaintiffs had also named as defendants Charles Wright, the Union's former President and current Business Agent and Analyst, and the Steel Erection and Ornamental Iron Industry Advancement Fund.  On March 29, 2005, plaintiffs voluntarily dismissed the Fund from the suit.  On June 10, 2005, the court allowed Wright's motion to dismiss.

At the heart of the alleged conspiracy is a Job Target Fund ("Fund") supported by dues paid by members of Local 7. Because of the labor-intensive nature of the construction industry, unionized employers are at a competitive disadvantage when bidding against "open shop" contractors on privately-funded projects. In the 1980's, unions representing the building and construction trades initiated a national program of funded job targeting to stanch the loss of jobs to nonunion shops. In the typical job targeting program, a union establishes a fund to which its members are required to contribute. The fund then offers to pay a subsidy to unionized employers bidding on projects "targeted" by the union. The subsidy is intended to make up the difference between a concessionary wage agreed to by the union and regular union scale. If the bid is successful, union workers on the job receive the union-scale wage, while the subsidized employer benefits from lower labor costs.[2] This is the model that Local 7 emulated in establishing the Fund. Plaintiffs recognize that the antitrust laws do not bar unions from offering incentives to employers to hire their members. Plaintiffs allege, however, that Local 7 goes a step further by administering the Fund "in a fashion that is inconsistent with State and Federal law, thereby exposing it[self] to antitrust liability." Plaintiffs' Opposition to Summary Judgment, at 2.

The Complaint alleges that the Union's activities relative to the Fund violate the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §§ 1 and 2 (Counts I, II, and III), and the

---

[2]See Herbert R. Northrup & Augustus T. White, Subsidizing Contractors to Gain Employment: Construction Union "Job Targeting", 17 Berkeley J. Emp. & Lab. L. 62, 71 (1996).

Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 187 (Count IV).[3] On August 1, 2006, the Union filed a motion for summary judgment, arguing that its activities with regard to the Fund are protected by both the statutory and the nonstatutory labor antitrust exemptions. The Union further contends that the claim under the LMRA fails because of plaintiffs' inability to show that the Fund subsidies paid to employers constitute "threat[s], coerc[ion], or restraint[s]" in pursuit of an unlawful objective. The court heard oral argument on the Union's motion on December 14, 2006.

### FACTUAL BACKGROUND

The material facts viewed in the light most favorable to plaintiffs are as follows. Local 7 represents iron workers employed by construction companies who are signatories to a master Collective Bargaining Agreement ("CBA") negotiated between the Union and the BTEA. The plaintiffs are six open shop contractors who compete with BTEA members for steel erection work.

In or around 1990, Local 7 established the Fund to make the hiring of its members more attractive in geographical areas where union-scale wages and benefits undercut the ability of BTEA contractors to compete. In 1992, the members of Local 7 voted to adopt a check-off system under which employers would deduct Fund contributions from their paychecks. On November 1, 1993, Local 7 and the BTEA agreed to incorporate the

---

[3] Plaintiffs also asserted state-law claims for tortious interference with advantageous contractual and economic relations (Counts V and VI), and violations of the Massachusetts Unfair Business Practices Act, G.L. c. 93A (Count VII). On February 6, 2006, the court dismissed the state-law claims as preempted by the LMRA.

check-off system into the CBA.[4] Under the CBA, a BTEA employer pays the worker's job targeting contribution directly to the Union, which deposits it into the Fund.[5] The Fund, in turn, distributes wage subsidies on a case-by-case basis to BTEA employers who successfully bid on targeted projects.

The largest Boston area construction projects employing structural steel workers are government-financed public works projects, including the "Big Dig," the Boston Harbor cleanup, and the renovation of the terminals and parking facilities at Logan Airport. Federally-funded construction projects are subject to the Davis-Bacon Act, 40 U.S.C. §§ 276a-276a-5.[6] The Davis-Bacon Act requires contractors working on construction projects financed in whole or in part with federal funds to pay workers no less than the wage that is determined by the Secretary of Labor "to be prevailing for the corresponding classes of laborers and mechanics on projects of a [similar] character."[7] 40 U.S.C. § 3142(b). The Act also bars the refunding of any portion of a worker's Davis-Bacon wages as a "kickback"

---

[4]Section 9 of the CBA states that "[i]t is agreed that the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid."

[5]There is no dispute that the Union has exclusive control over the money deposited into the Fund.

[6]The Act's provisions were recodified in 2002 as 40 U.S.C. §§ 3141-3144.

[7]The motives that led to the passage of the Davis-Bacon Act in 1931 were not entirely benign. The chief sponsor of the Act, Representative Robert L. Bacon of New York, introduced the antecedent of Davis-Bacon in 1927 with the stated purpose of preventing the loss of local unionized construction jobs to black workers migrating from the South. The Act has been the target of several repeal efforts and has been suspended on at least four occasions by four different Presidents during national emergencies.

to the employer, "regardless of any contractual relationship." 40 U.S.C. § 3142(c)(1).[8] Massachusetts has enacted a "Little Davis-Bacon Act" requiring that the "prevailing wage" be paid on state-subsidized construction projects. See G.L. c. 149, § 26.

## DISCUSSION

The parties agree as to the applicable law. "Labor exemption from antitrust laws stems from both congressional and judicial recognition of the need to ensure that organized labor is able to operate effectively without fear of antitrust liability."[9] Labor unions are excluded from the operation of the antitrust laws by both a statutory and a nonstatutory exemption. The statutory labor exemption is derived from §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52, and from the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115. See Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, 640 F.2d 1368, 1379 (1st Cir. 1981). The history of the exemption begins in 1914 with the passage of the Clayton Act. Section 6 of the Act declared that "[t]he labor of a human being is not a commodity or article of commerce . . . nor shall [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C. §17.[10] Since the enactment of § 6, "it would seem plain that

---

[8]Davis-Bacon is supplemented by the Copeland Anti-Kickback Act of 1934, 18 U.S.C. § 874, which makes it a federal crime for an employer "by force, intimidation, or threat . . . or by any other means whatsoever" to induce any employee into making a kickback.

[9]Michael Scheinkman, Running Out of Bounds: Over-Extending the Labor Antitrust Exemption in Clarett v. National Football League, 79 St. John's L. Rev. 733, 741 (2005).

[10]Congress passed the Clayton Act in response to the Supreme Court's decision in the Danbury Hatters' Case, Loewe v. Lawlor, 208 U.S. 274 (1908). In Loewe, the Court held that the actions of the United Hatters Union in publicizing a secondary boycott

restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act." Apex Hosiery Co. v. Leader, 310 U.S. 469, 503 (1940). In addition, the Clayton Act provides that no injunction shall issue "prohibit[ing] any person whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do . . . ." 29 U.S.C. § 52.

In 1932, Congress reaffirmed the statutory exemption in passing the Norris-LaGuardia Act. The Act repudiated the Supreme Court's holding in Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921), that the Clayton Act's labor antitrust exemption did not immunize unions engaged in "illegal" activity. In 1935, Congress strengthened the exemption further in passing the (Wagner-Connery) National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169. The NLRA was intended to redress the "inequality of bargaining power" between employees and employers that "tends to aggravate recurrent business depressions, by depressing wage rates . . . and by preventing the stabilization of competitive wage rates and working conditions . . . ." Id. § 151. The NLRA guarantees the right of workers to organize unions, to bargain collectively, and to engage in coercive

---

constituted an illegal restraint of trade under the Sherman Act. Compounding the injury, the Court held that individual members of the union could be held liable for treble damages under section 7 of the Sherman Act.

activity including strikes as a means of enforcing legitimate union demands.[11]

This succession of labor-friendly statutes led to tension between federal antitrust law, which seeks "to preserve business competition and to proscribe business monopolies," Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 809 (1945), and federal labor law, which sanctions the elimination of "competition which is based on differences in labor standards," Apex Hosiery Co., 310 U.S. at 503, in order "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining." Allen Bradley, 317 U.S. at 806. The Supreme Court in United States v. Hutcheson, 312 U.S. 219, 231 (1941), sought to reconcile these competing considerations by holding that the Sherman Act, § 20 of the Clayton Act, and the Norris-LaGuardia Act, should be read as a "harmonizing text" defining a comprehensive statutory labor exemption to the antitrust laws.

For the statutory labor exemption to apply, a union must act unilaterally in its own self-interest and not in combination with any non-labor party.[12] Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622-623 (1975). As the First Circuit has explained,

---

[11] In 1947, Congress enacted the Taft-Hartley Act, a package of amendments to the NLRA extending the Wagner-Connery Act prohibitions against unfair labor practices by employers to coercive union tactics such as jurisdictional strikes, secondary boycotts, and "common situs" picketing. The intent of the amendments was to redress a perceived imbalance of bargaining power between unions and employers and to crack down on corrupt practices by some labor leaders.

[12] The nonstatutory labor exemption protects unions from legal restraints that would otherwise inhibit the collective bargaining process. See Brown v. Pro Football, Inc., 518 U.S. 231, 237 (1996) (collective bargaining agreements almost by definition are "combinations in restraint of trade").

>   the Sherman Act does not proscribe concerted union activity "so long as [the] union acts in its self-interest and does not combine with non-labor groups." [Hutcheson, 312 U.S. at 232]. . . . While "the test to determine if a union's actions are in its 'self-interest' has not been precisely formulated," the principle . . . is that activities are in the self-interest of a labor organization "if they bear a reasonable relationship to a legitimate union interest." Adams, Ray & Rosenberg v. William Morris Agency, 411 F. Supp. 403, 410 (C.D. Cal.1976). In particular, the labor exemption has been applied when the union acts to protect the wages, hours of employment, or other working conditions of its member-employees, objectives that are at the heart of national labor policy.

Allied Int'l, 640 F.2d at 1380 (some citations omitted).

The Union argues forcefully that the Fund's purpose of promoting the hiring of Local 7 members is manifestly in the Union's self-interest. "The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern. . . . Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws." Intercont'l Container Transp. Corp. v. New York Shipping Ass'n, 426 F.2d 884, 887 (2d Cir. 1970). See also Manno Elec., Inc., 321 NLRB 278, 298 (1996) (use of a job targeting program to "maintain the union wage scale . . . and obtain work for its members" is a legitimate union interest), aff'd per curiam mem., 127 F.2d 34 (5th Cir. 1997) (Table).

Plaintiffs do not contest the proposition that job targeting serves a legitimate interest of the Union. Rather, plaintiffs contend that the check-off system, when it is applied to federally-funded projects, involves the Union in illegal activity. Plaintiffs insist that it cannot be in the Union's self-interest to unlawfully subvert the Davis-Bacon Act and other prevailing wage laws. Plaintiffs' argument is not a new one. It surfaced in 1988 in a petition brought by a contractors' association seeking a ruling from the Administrator of the

Department of Labor (DOL) Wage and Hour Division that job targeting programs violate the Copeland Anti-Kickback Act. The Copeland Act argument was rejected, but the Administrator agreed that the deduction of job targeting fund contributions from Davis-Bacon wages violates both the Davis-Bacon Act and the DOL prevailing wage regulations. The dispute percolated its way through the federal courts, culminating in a decision by the D.C. Circuit affirming the Administrator. See Bldg. and Constr. Trades Dep't. v. Reich, 40 F.3d 1275, 1283 (D.C. Cir. 1994). As plaintiffs point out, subsequent court decisions have adhered to the holding in Reich. See Int'l Bhd. of Elec. Workers, Local 357 v. Brock, 68 F.3d 1194, 1198 (9th Cir. 1995) (holding that the direct and voluntary payment of rebates of Davis-Bacon wages to a targeting fund is not permitted); Can-Am Plumbing v. NLRB, 321 F.3d 145, 152 (D.C. Cir. 2003) (affirming Board precedent holding that the deduction of job targeting fund contributions from Davis-Bacon wages is inimical to public policy).

Although plaintiffs devote a great deal of energy to their Davis-Bacon argument, it misses a fundamental point. Even assuming that plaintiffs have standing to object to a violation by the Union of the Davis-Bacon Act,[13] no cause of action under the Act is plead in the Complaint. Moreover, even if the check-off system violates Davis-Bacon (which

---

[13]Plaintiffs rely on McDaniel v. Univ. of Chicago, 548 F.2d 689, 695 (7th Cir. 1977), for the proposition that the Davis-Bacon Act creates a private right of action. The Union, relying on United States v. Binghamton Constr. Co., 347 U.S. 171, 176-177 (1954), insists that only the Secretary of Labor can enforce the wage provisions of the Act, and in the specific instance of the Union's job targeting program, has declined to do so. Given the court's decision to allow summary judgment for the Union, this is not a matter that need be resolved, although I would be inclined to think that if there is a Davis-Bacon private right of action, only an aggrieved union member would have standing to bring suit. Cf. NLRB v. Int'l Bhd. of Elec. Workers, Local 48 (Kingston Constr.), 345 F.3d 1049 (9th Cir. 2003). See also 64 Am. Jur. 2d Public Works and Contracts, § 222 (2007) ( warning practitioners that the Davis-Bacon Act does not as a rule confer a private right of action).

given the holding in Reich would appear to be the case), the Union's allegedly illegal conduct is irrelevant to an antitrust analysis. As the Supreme Court observed in Hutcheson, "[s]o long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U.S. at 232 (footnote omitted). In other words, the issue is not whether the Union's requirement that all members contribute to the Fund violates some law, but whether it violates the antitrust laws, which it does not.

With respect to the second prong of the statutory labor exemption, plaintiffs concede that the Fund was established by the unilateral action of the Union and not in combination with the BTEA. Plaintiffs argue, however, that because BTEA members are required by the master CBA to deduct contributions from workers' wages irrespective of their source, they are for all practical purposes the agents of the Union in a horizontal conspiracy to violate the Davis-Bacon Act. Assuming that this is true, and assuming that such a conspiracy would in fact violate the antitrust laws, a BTEA employer's ministerial act of deducting and mailing a worker's job targeting contribution to the Union is simply too slender a reed on which to rest the nullification of a century of congressional policy exempting unions from the sanctions of the antitrust laws.[14] Because the court agrees that

---

[14]As an alternative theory, plaintiffs allege that the Union is the instigator of a "rimless wheel conspiracy" with individual BTEA members. As plaintiffs envision it, the Union stands at the hub of a conspiratorial wheel with spokes radiating to the BTEA contractors on its perimeter. "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the

the Union's job targeting program is protected by the statutory labor exemption, the court will enter summary judgment in favor of the Union on Counts I, II, and III of the Complaint.[15]

Plaintiffs also allege that the Union's use of the Fund violates the LMRA, which prohibits a union from engaging in conduct designed to:

> threaten, coerce, or restrain any person engaged in commerce . . . where . . . [the] object thereof is –
>
> > (A) forcing or requiring any employer . . . to join any labor or employer organization . . . .
> > (B) forcing or requiring any person to . . . cease doing business with any other person . . . .

29 U.S.C. § 158(b)(4)(ii).

The Union argues that the decision taken through the Fund to grant or deny an employer subsidy does not constitute coercive conduct in the pursuit of an unlawful objective, as the LMRA requires. The court in Grinnell Corp. v. Road Sprinkler Fitters

---

defendants have no connection with one another, other than the common defendant's involvement in each transaction." Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002), citing Kotteakos v. United States, 328 U.S. 750, 755 (1946). While the imagery of a spoked but rimless wheel is quite vivid, the object of the alleged "rimless wheel" conspiracy is no different than that of the horizontal conspiracy, and therefore no more a violation of the antitrust laws, whatever other laws might be implicated.

[15]The Union argues that even if its conduct is not shielded by the statutory labor exemption, it falls within the nonstatutory exemption, which protects conduct conducive to the lawful functioning of the collective bargaining process. Brown, 518 U.S. at 236. The Union correctly points out that the plaintiffs' argument in opposition, which relies on Machiowetz Const. Co. v. Minn. Dep't of Transp., 2002 WL 334394 (D. Minn. Fed. 27, 2002), is somewhat shaky as Machiowetz relied on Mackey v. Nat'l Football League, 543 F.2d 606 (8th Cir. 1976), the holding of which the Supreme Court substantially undercut in Brown. See, e.g., Clarett v. Nat'l Football League, 369 F.3d 124, 133-134 & n.14 (2d Cir. 2004). Because the court agrees that the Union's activities with respect to the Fund are insulated from the antitrust laws by the statutory labor exemption, there is no need to decide definitively whether the nonstatutory exemption also applies (although the Union makes a persuasive case that it does).

Local Union No. 669, 1997 WL 311498, at *14 (D. Md. June 3, 1997), aff'd, 133 F.3d 914 (4th Cir. 1998) (Table), held in an analogous case that:

> the withdrawal of targeting did not constitute coercion but was a lawful bargaining strategy employed by the Union. Grinnell had been a principal user of targeting during the period of time when it had been permitted by the Union to participate in the program. The Union hoped that, by exercising its right to deny targeting to Grinnell, it could persuade this employer to accede to other demands which the Union was making during the bargaining sessions. Indeed, at one point during its negotiations with Grinnell, the Union even offered to reinstate targeting if Grinnell in turn would agree to certain of its other demands. When Grinnell decided not to accept these proposals, it remained excluded from targeting. In the absence of proof of coercion or threats, defendants' conduct did not constitute an unfair labor practice.

The same is true here. There is nothing in the record to support plaintiffs' assertion that the Union resorted to coercive restraints or tactics. The Union did no more than hold out the Fund as an incentive to employers to hire its members.[16] This is not an improper objective under the LMRA. Manno Elec., Inc., 321 NLRB at 298. Consequently, the Union's motion for summary judgment on Count IV will also be allowed.

## ORDER

For the foregoing reasons, Local 7's motion for summary judgment is <u>ALLOWED</u> as to all remaining counts of the Complaint. The Clerk will enter judgment for the Union and the case will be closed.

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[16] The court does not read the Complaint, despite its prolixity, to allege an alternative "cease doing business" violation of the LMRA.

UNITED STATES DISTRICT JUDGE