# United States Court of Appeals
## For the First Circuit

No. 07-1832

AMERICAN STEEL ERECTORS, INC., AJAX CONSTRUCTION CO.,
AMERICAN AERIAL SERVICES, INC., BEDFORD IRONWORKS, INC.,
AND D.F.M. INDUSTRIES, INC.,

Plaintiffs, Appellants,

v.

LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Circuit Judge,
Stahl and Siler,* Circuit Judges.

Michael E. Avakian with whom Smetana & Avakian, Carol
Chandler, Geoffrey R. Bok, Stoneman, Chandler & Miller LLP, Thomas
M. Triplett, and Schwabe Williamson & Wyatt, P.C. were on brief for
appellants.
Paul F. Kelly with whom Indira Talwani, Segal, Rottman &
Coleman, and Mickey Long, were on brief for appellees.
John C. Scully and W. James Young on brief for amicus curiae
National Right to Work Legal Defense Foundation, Inc.
Maurice Baskin and Venable LLP on brief for amicus curiae
Associated Builders and Contractors, Inc.

August 1, 2008

*Of the Sixth Circuit, sitting by designation.

**STAHL, Circuit Judge.**  Five non-union New England-based steel erectors--Aerial Services, Inc.; D.F.M. Industries, Inc.; American Steel Erectors, Inc.; Bedford Ironworks, Inc.; and Ajax Construction, Inc. ("Plaintiffs" or "non-union contractors")[1]-- brought suit against Local Union No. 7 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers ("Local 7" or "the Union")[2], an iron workers union that has a collective bargaining agreement ("CBA") with the Building Trades Employers' Association of Boston and Eastern Massachusetts ("BTEA").  Plaintiffs' complaint alleged that Local 7 conspired with the BTEA and assorted named and unnamed union contractors to shut non-union contractors out of the structural steel industry in the greater Boston area, in violation of federal antitrust and labor laws.  Plaintiffs also alleged various state torts and violation of the Massachusetts Fair Business Practices Act, G.L. c. 93A.  The district court dismissed the state law claims as pre-empted by federal labor law, and, in a subsequent order, granted

---

[1]A sixth plaintiff named on the complaint, Ronald Beauregard d/b/a/ Independent Welding, voluntarily withdrew from the case on February 13, 2006.

[2]Charles Wright, Local 7's former President and current business agent, and the Steel Erection and Ornamental Iron Industry Advancement Fund, were also originally named as defendants. Plaintiffs voluntarily dismissed the fund on March 29, 2005. Wright filed a motion to dismiss, which the district court granted on June 10, 2005, citing Montplaisir v. Leighton, 875 F.2d 1, 4 (1st Cir. 1989) ("The [Supreme] Court has long held that 'union agents' are not personally liable to third parties for acts performed on the union's behalf in the collective bargaining process.").  Plaintiffs do not appeal Wright's dismissal.

-2-

Local 7's motion for summary judgment on the federal claims. Plaintiffs now appeal both orders. We affirm the dismissal of the state law claims, but reverse the district court's grant of summary judgment on the federal labor and antitrust claims, and remand for further proceedings consistent with this opinion.

## I.  Background

We recite the facts in the light most favorable to Plaintiffs, the non-movants. Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 84 (1st Cir. 2008).

To understand the context from which Plaintiffs' allegations arise, some explication of the relevant industry is warranted.  The structural steel industry is comprised of steel fabricators, who manufacture steel products to meet design specifications, and steel erectors, who assemble the fabricated steel.  General contractors requiring structural steel work typically solicit bids for "fab and erect" packages.  The packages are submitted by fabricators, who solicit bids for the erection work from steel erectors.  In New England there are relatively few fabricators (around twenty) and many erectors (over 200).  As a result, the competition for erection subcontracts in the Boston area is fierce, and the general rule is that the lowest bidder will be awarded the erection contract.  That fierce competition gave rise to the instant dispute.

Local 7 negotiates collective bargaining agreements with contractors that employ iron workers in eastern Massachusetts, such as steel erection contractors. Among other things, employers who sign a CBA ("signatory contractors" or "union employers") agree to pay Local 7 workers a union scale wage. Plaintiffs have not entered into a CBA with Local 7.

Because of the labor-intensive nature of steel erection work, labor expenditures account for about half of the cost. Signatory contractors are obligated to pay laborers the minimum wage set by the CBA. Non-union contractors, such as Plaintiffs, are not bound to the CBA minimum wage and can negotiate their labor costs. As a result, non-union erectors are often able to submit lower bids for erection contracts.

The gravamen of Plaintiffs' complaint relates to a job targeting program, the Market Recovery Program ("MRP"), which Local 7 created to mitigate the disadvantage imposed on signatory contractors by union wages.[3] Under the MRP, Local 7 "targets" certain construction projects and offers a subsidy to signatory

---

[3] Job targeting programs have become increasingly common since the early 1980s, as the share of the construction workforce that is unionized experienced steep declines. In an attempt to protect their membership and aid union contractors in competing with open shop outfits, various unions across the country have established funds much like the MRP at issue here, which are financed by wage deductions and used to subsidize the bids of unionized contractors on targeted projects. See Herbert R. Northrup & Augustus T. White, Subsidizing Contractors to Gain Employment: Construction Union 'Job Targeting,' 17 Berkeley J. Emp. & Lab. L. 62, 64-68 (1996).

$-4-$

contractors bidding on the project. The subsidy is intended to offset the higher cost of union labor, thus enabling union employers to bid competitively against non-union contractors. When a signatory contractor is awarded the target project contract, Local 7 executes an agreement with the contractor detailing the terms and amount of the subsidy. The subsidy is taken from the target fund (the "Fund"), which is financed with sums withheld by union employers from Local 7 member paychecks. The job targeting program was first established by member vote, and it was incorporated into the Union by-laws in 1992.

In November 1993, Local 7 and the BTEA agreed to codify the method of Fund contributions in their CBA. Section 9 of the 2000-2006 CBA provides that "the Working Dues Deduction of two percent (2%) of the total package plus .85 for a Market Recovery Program and .03 for the Political Action League will be withheld out of net pay for each and every hour paid." The MRP monies are paid directly to Local 7, which deposits them into the Fund. The Fund then distributes wage subsidies on a case-by-case basis to BTEA employers who successfully bid on targeted projects.

The plaintiff steel erection contractors bid on many of the projects that Local 7 targeted. Plaintiffs allege a conspiracy between the Union and union employers to monopolize the structural steel industry in the Boston area and push non-union employers like Plaintiffs out of the market. To this end, Plaintiffs claim that

-5-

Local 7 used Fund subsidies and other tactics to ensure that contracts were awarded to signatory contractors, rather than Plaintiffs. Specifically, Plaintiffs assert that Local 7 used Fund subsidies to assist signatory employers in underbidding Plaintiffs on erection jobs.    Plaintiffs also claim that Local 7 used subsidies, threats, and picketing to pressure fabricators, developers, owners, and general contractors (none of which directly employ Local 7 workers) into breaching contracts with Plaintiffs and replacing them with signatory contractors.

As a result of Local 7's efforts, Plaintiffs argue that they were excluded from a large portion of the structural steel market in the greater Boston area. For example, on one project, Plaintiff D.F.M. submitted the lowest bid for the erection work to a fabricator and was awarded the subcontract. Subsequently, the fabricator breached its agreement with D.F.M. and gave the project to a signatory contractor, who was the beneficiary of a subsidy from Local 7.    In another instance, D.F.M. was awarded a steel erection contract for a new Fox25 TV station, but Local 7 picketed the job site until the fabricator breached its agreement with D.F.M. and hired a union contractor. Plaintiffs allege that, at that job site, equipment belonging to D.F.M. was vandalized and stolen after Local 7 began its picket. On yet another occasion, according to Plaintiffs, the erection work on a Stop & Shop was taken from Plaintiff Ajax due to a Fund subsidy. In addition, John

-6-

J. Paulding, the president of fabricator C&I Steel, Inc., ("C&I") submitted an affidavit averring that Local 7 agents had offered him Fund money if he agreed to "work" with them and that, on a number of projects, Local 7 threatened "problems" on the job if he did not hire a signatory contractor. Paulding contended that "problems" is well-known industry short-hand for project delays, increased financial costs, and property destruction.

On December 2, 2004, Plaintiffs filed a complaint against Local 7, its agent, Charles Wright, and the Steel Erection and Ornamental Iron Industry Advancement Fund, alleging violations of the Sherman Act and the Labor Management Relations Act ("LMRA"), as well as the commission of various state torts. In particular, Plaintiffs alleged a conspiracy between Local 7 and its signatory contractors to pressure fabricators to hire only union employers, through a combination of threats, disruptive behavior, and MRP subsidies, in violation of § 1 and § 2 of the Sherman Act.[4] Additionally, Plaintiffs argued that the MRP constituted an unlawful restraint on trade because the Fund was the recipient of deductions from paychecks of Local 7 members working on public

---

[4]Under § 1 of the Sherman Act, a "contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." 15 U.S.C. § 1. "The usual [§] 2 [Sherman Act] claim requires monopoly or near monopoly power in some market, and a wrongful exclusionary act designed to enhance such power in that market or to achieve an improper advantage in another market." Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 66 (1st Cir. 2005) (citing Town of Norwood v. New England Power Co., 202 F.3d 408, 420-21 (1st Cir. 2000)).

-7-

projects, and subsidies were paid to signatory contractors working on public projects, in violation of the Davis-Bacon Act and the Massachusetts prevailing wage law.[5] Plaintiffs also alleged that Local 7's conduct violated a provision of LMRA, 29 U.S.C. § 187(a) and (b), which prohibits unions from engaging in any unfair labor practices as defined by § 8(b)(4) of the National Labor Relations Act ("NLRA"). The state law claims included two counts of tortious interference with advantageous contractual and economic relations and one count of violation of the Massachusetts Fair Business Practices Act, G.L. c. 93A.

Defendants Local 7 and Charles Wright moved to dismiss the pendent state torts on February 1, 2005, arguing that the state claims were pre-empted by federal labor law. Plaintiffs countered

_____

[5]Federally-funded construction projects are subject to the Davis-Bacon Act, 40 U.S.C. §§ 3141-3144, which requires contractors working on federally-funded projects to pay workers no less than the prevailing wage, which is determined by the Secretary of Labor. See Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 480 F. Supp. 2d 471, 474 (D. Mass. 2007). The Act also prohibits employers from making any "subsequent deduction or rebate" from the paychecks of employees working on federally-funded projects, "regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers...." 40 U.S.C. § 3142(c)(1). The state of Massachusetts has enacted its own prevailing wage statute, known as a "Little Davis-Bacon Act," which requires contractors working on state-subsidized projects to pay no less than the Massachusetts prevailing wage. See G.L. c. 149, § 26. Plaintiffs' complaint does not allege a direct violation of either the state or federal Davis-Bacon Act; rather, their theory seems to be that by violating federal and state prevailing wage laws in its administration of the MRP, Local 7 has exposed itself to antitrust liability.

-8-

that the claims were exempt from federal pre-emption.  The district court found that Plaintiffs' allegations clearly fell within activity protected or prohibited by the NLRA because Plaintiffs had alleged that the same conduct violated both the NLRA and state tort laws.  The court held that Plaintiffs' allegations could not benefit from the relevant exceptions to pre-emption, as the factual allegations of the complaint did not implicate conduct so related to local responsibility that state regulation would be expected.  Rather, the court found that "[t]he gravamen of the Complaint is that Local 7 use[d] economic weapons to coerce nonunion employers into hiring union workers [which was] an allegation that [lay] at the heart of the regulatory province of the NLRB."  Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, No. Civ. A. 04-12536RGS, 2006 WL 300422 at *4 (D. Mass. Feb. 6, 2006). Accordingly, the district court dismissed the state claims as pre-empted by federal law.

Local 7 filed an Amended Motion for Summary Judgment on the remaining claims on August 1, 2006.  The district court issued a Memorandum and Order on March 30, 2007, finding that (1) the conduct of Local 7 in administering the MRP was sheltered from antitrust liability by the statutory labor exemption, and (2) the conduct of Local 7 in using Fund subsidies to encourage the use of

-9-

signatory contractors was not coercive conduct prohibited by the LMRA.

Plaintiffs now appeal the district court's dismissal of the state law claims and grant of summary judgment on the remaining counts.

## II. Discussion

We review the district court's grant of summary judgment de novo, with all reasonable inferences resolved in favor of the nonmoving party. Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005). Nonetheless, we must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)(citations omitted).

Local 7 has raised the statutory and nonstatutory exemptions from antitrust liability as affirmative defenses against Plaintiffs' Sherman Act claims, and thus would bear the burden at

-10-

trial of proving those defenses apply. To be entitled to summary judgment, the party with the burden of proof must provide evidence sufficient for the court to hold that no reasonable trier of fact could find other than in its favor. See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35-36 (1st Cir. 1998).

*A. Antitrust Liability*

We turn first to the district court's finding that Local 7's conduct is protected from antitrust liability by virtue of the statutory labor exemption.[6]

"[T]here is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment." H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n, 451 U.S. 704, 713 (1981). In an effort to balance these competing interests, Congress passed the Clayton Act and the Norris-LaGuardia Act, which immunize certain organized labor conduct from antitrust liability. See id. at 713-714; see also Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 621 (1975) ("The basic sources of organized labor's exemption from federal antitrust laws are [§§] 6 and 20 of the Clayton Act, ... 15 U.S.C. [§] 17 and 29 U.S.C. [§] 52, and the Norris-LaGuardia Act, ... 29 U.S.C. [§§] 104, 105, and

---

[6]We express no opinion regarding the substance of Plaintiffs' underlying antitrust claims.

113."). A review of Supreme Court jurisprudence on the dichotomy between federal labor and federal antitrust law renders it pellucid that antitrust laws must not be applied to vitiate congressional intent to permit organized labor activity; the Court has noted that "the [Sherman] Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives." Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n.7 (1959).

Nonetheless, unions, particularly when acting in concert with non-labor groups, are not given carte blanche to engage in anticompetitive activities. As the Supreme Court has explained, "[i]t would be a surprising thing if Congress, in order to prevent a misapplication of [antitrust] legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective." Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 325 U.S. 797, 809-810 (1945).

To balance the competing federal policies supporting organized labor on one hand and business competition on the other, two labor exemptions from the antitrust laws have been developed, one statutory and one nonstatutory. The Supreme Court articulated the statutory exemption in United States v. Hutcheson, 312 U.S. 219, 231 (1941), determining that the Sherman, Clayton, and

-12-

Norris-LaGuardia Acts must be read in harmony to effectuate Congress's intent to free organized labor from certain constraints imposed by the antitrust laws.   Reading the three statutes together, the Supreme Court held that union activity is exempt from antitrust liability "so long as [the] union acts in its self-interest and does not combine with non-labor groups." Hutcheson, 312 U.S. at 232.   Regarding the first prong of this "two-prong test," our court has stated that "activities are in the self-interest of a labor organization if they bear a reasonable relationship to a legitimate union interest." Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, 640 F.2d 1368, 1379 (1st Cir. 1981)(internal quotations omitted).   The union conduct at issue must satisfy both prongs of the Hutcheson test in order to qualify for the statutory exemption.   See USS-POSCO Industries v. Contra Costa County Bldg. & Constr. Trades Council, 31 F.3d 800, 807 (9th Cir. 1994)(citing H.A. Artists & Assocs., 451 U.S. at 704).

     It soon became apparent, however, that much legitimate collective bargaining activity, which Congress did not intend to be quelled by the lumbering behemoth of antitrust liability,[7] nevertheless fell outside the purview of the statutory exemption.

_____

   [7]Local 7, quite correctly, points out that antitrust suits ordinarily entail massive discovery and are expensive to defend. See, e.g., Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007)(raising the pleading requirements for an antitrust claim, in light of the "unusually high cost of discovery in antitrust cases").

Such activity was vulnerable to antitrust attack because it constituted a combination between labor unions and non-labor employers. Accordingly, the Supreme Court recognized "that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." Connell Constr. Co, 421 U.S. at 622. The nonstatutory exemption shields some restraints on competition imposed through the bargaining process, where the alleged anticompetitive conduct is anchored in the collective-bargaining process, concerns only the parties to the collective bargaining relationship, and relates to wages, hours, conditions of employment, or other mandatory subjects of collective bargaining. Brown v. Pro Football, Inc., 518 U.S. 231, 250 (1996); see also California ex rel. Lockyer v. Safeway, Inc., 371 F. Supp. 2d 1179, 1185 n. 5 (C.D. Cal. 2005).

The district court entered judgment for Local 7 on Plaintiffs' antitrust claims on the grounds that the Union's job-targeting program was protected by the statutory labor exemption. In reviewing this determination, we focus first on the

-14-

second part of the Hutcheson test: whether, in administering the MRP, Local 7 was acting in combination with a non-labor group.[8]

There is no serious dispute that Local 7, as an iron workers union, is a "labor group," and that the signatory contractors, as employers of the members of Local 7, are a "non-labor group."   See H. A. Artists & Assocs., Inc., 451 U.S. at 715-16, 717 n. 21 (stating that "[e]mployers almost always will be a 'nonlabor group'").   The only question remaining, then, in determining whether the disputed activity here fails the second prong of Hutcheson, is whether the MRP constitutes a "combination" between Local 7 and the signatory contractors.

Local 7 argues that the MRP is the brainchild of the Union alone, and was established and incorporated into the Union's by-laws over a year before the wage deduction provision was added to its CBA with the BTEA.   According to Local 7, only the Union determines which jobs to target, and sets the amount of the wage deductions and subsidies.   Plaintiffs concede that the MRP was established and administered unilaterally by the Union, but argue that it was funded by deductions from member paychecks pursuant to

---

[8]In arriving at its decision, the district court focused almost entirely upon the MRP alone. Thus, for the purpose of determining whether the statutory exemption applies, we need go no further; if the MRP alone cannot be afforded the protection of the statutory exemption, that settles the question.   We are aware, however, that Plaintiffs have alleged a smorgasbord of exclusionary conduct including, but not limited to, the MRP.   We will examine the other allegations and their impact upon any labor exemption available to Local 7 further below.

a CBA between the Union and signatory contractors. Additionally, Plaintiffs contend that Local 7 and signatory contractors collaborated in identifying target projects, and that Fund subsidies were doled out pursuant to ad-hoc agreements between the Union and the signatory contractor successful in its bid on a targeted project.

Upon examination of how the MRP operates, it is a thin fiction to pretend that the program does not represent a combination between labor and non-labor groups. The MRP may have been initially conceived by Local 7 alone, but the method and amount of wage deductions that entirely finance the Fund are written into the CBA between Local 7 and the BTEA; the agreement that $0.85/hr would be deducted from each employee's wages and earmarked for the "Market Recovery Program" is codified within the text of a negotiated CBA between the Union and a non-labor employers' group. A collective bargaining agreement is by definition a combination between a labor group and a non-labor group. Brown, 518 U.S. at 237. Additionally, funds were distributed to signatory contractors working on targeted projects pursuant to separate agreements between Local 7 and those contractors on a project-by-project basis. Thus with regard to both the input and output of its funds, the MRP could not operate except in tandem with signatory contractors. Furthermore, although Local 7 disputes this, there is evidence in the record from which

-16-

a rational fact-finder could reasonably infer that the Union and

signatory contractors worked together to identify and "win"

targeted projects away from non-union employers.[9]  Accordingly,

because the MRP was codified by and operated through agreements

between a labor group and a non-labor group, the statutory

exemption cannot apply.[10]  See Connell Constr. Co., 421 U.S. at 622

(statutory exemption does not apply to "concerted action or

agreements between unions and nonlabor parties"); see also Phoenix

Elec. Co. v. Nat'l Elec. Contractors Ass'n, 81 F.3d 858, 860 (9th

---

[9]For example, there is a letter in the record from Griffin
Iron Works, Inc., a signatory contractor, to Local 7, which states
that "[t]hrough a concentrated effort with the New England District
Council and Griffin Iron Works, Cardi's Furniture's new store was
turned around from a non-union project to a union project," and
notes that "Local 7 ... agreed to pay $10,000.00 towards the New
England District Council's effort to turn this project around."

[10]Local 7 misreads the law by muddling the question whether the
statutory exemption is applicable with cases where the nonstatutory
exemption was found inapplicable.  The Union cites to Allen
Bradley, 325 U.S. at 809, and Connell, 421 U.S. at 623-24, for the
proposition that "the test requires evidence of a restraint of
trade entered into by non-labor groups."  That is not the second
prong of the Hutcheson test for the statutory exemption, however;
rather, both of those cases dealt with the applicability of the
nonstatutory exemption.  The Court already having found therein a
combination between labor and non-labor that removed the disputed
activity from the protection of the statutory exemption, it was
left to decide only whether the combination was engaged in activity
permitted by federal labor policy favoring collective bargaining
(and thus protected by the nonstatutory exemption), or activity
that constituted an illegal restraint on trade (and thus
unprotected by the nonstatutory exemption).  It is disingenuous for
Local 7 to argue that the MRP has no impact on business competition
when its very purpose is to render union employers more
competitive.  Whether the Fund constitutes an illegal restraint on
competition is a question to be taken up under our discussion of
the nonstatutory exemption, infra.

-17-

Cir. 1996)(job targeting program established through collective bargaining between electrical workers union and signatory contractors association protected by nonstatutory exemption from antitrust laws); Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec., 121 F.3d 1180, 1186-87 (8th Cir. 1997)(same).[11]

        The fact of that combination takes the MRP out of the purview of the statutory exemption but does not necessarily render it vulnerable to antitrust liability.  The nonstatutory exemption was created for this express purpose; through it, courts recognized that in order "to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." Brown, 518 U.S. at 237.  Because the district court chose not to make a finding as to the applicability of the nonstatutory exemption to this case, it is left to us to determine whether Local 7 adduced sufficient evidence to prove its entitlement to that exemption or whether we must remand the question for further development of the record. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 173 (1st Cir. 1998)(holding that this court may affirm a grant of summary

─────────────

[11]Because the conduct at issue need fail only one prong of the Hutcheson test in order to remove it from the protection of the statutory exemption, we find it unnecessary to review the district court's determination that Local 7 was acting in its own legitimate self-interest.

-18-

judgment "on any independently sufficient ground made manifest by
the record").

The case for the applicability of the nonstatutory
exemption is strongest where the alleged restraint operates
primarily in the labor market and has only tangential effects on
the business market. Clarett v. Nat'l Football League, 369 F.3d
124, 134 n. 14 (2d Cir. 2004); see also California ex rel. Lockyer,
371 F. Supp. 2d at 1188 n.8. Conversely, the Supreme Court has
generally refused to exempt union-employer agreements "that were
alleged to have injured or eliminated a competitor in the
employer's business or product market ... in spite of any resulting
detriment to the labor policies favoring collective bargaining."
Clarett, 369 F.3d at 131-33 (providing overview of Supreme Court's
nonstatutory exemption jurisprudence). As the Court has explained,

> [t]he nonstatutory exemption has its source in
> the strong labor policy favoring the
> association of employees to eliminate
> competition over wages and working conditions
> .... Labor policy clearly does not require,
> however, that a union have freedom to impose
> direct restraints on competition among those
> who employ its members. Thus, while the
> statutory exemption allows unions to
> accomplish some restraints by acting
> unilaterally … the nonstatutory exemption
> offers no similar protection when a union and
> a nonlabor party agree to restrain competition
> in a business market.

Connell Constr. Co., 421 U.S. at 622-23 (internal citations
omitted). The Court most recently found the nonstatutory exemption
applicable where the disputed "conduct took place during and

-19-

immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship."  Brown, 518 U.S. at 250.

Other circuits have found that job targeting programs, similar in structure and implementation to the program at issue here, do fall within the bailiwick of the nonstatutory exemption. See Phoenix Elec. Co., 81 F.3d at 863 ("A subsidy program that targets some jobs for more competitive wage components of signatory union subcontractor bids, and does not bar nonunion bidders from bidding on the same jobs, is in harmony with the policies of both the labor and antitrust laws."); Local Union 257, 121 F.3d at 1186- 87 (holding that job targeting program was protected by nonstatutory exemption because "the Target Fund primarily affects only the parties to the collective bargaining relationship, [] the wage reimbursement arrangement at issue concerns a mandatory subject of collective bargaining (i.e., wages), and [] the arrangement is the product of bona fide arm's-length bargaining"). But Plaintiffs' allegations do not relate only to the MRP; rather, they paint the MRP as only one part--if the central part--of a wider conspiracy between Local 7, its signatory contractors, and the general contractors and steel fabricators from which they

-20-

solicit steel erection work, to shut open-shop outfits such as Plaintiffs out of the steel erection market in the greater Boston area. We must consider the entirety of the alleged activity when determining the applicability of the nonstatutory exemption, casting aside only those allegations that amount to no more than "conclusory allegations" or "unsupported speculation."   See Medina-Munoz, 896 F.2d at 8.[12]

We find there are sufficient genuinely disputed issues of material fact here to render summary judgment inappropriate. Plaintiffs have alleged concerted union-employer action that extended beyond merely the wage deduction provided for in the CBA and the job-by-job subsidy agreements, to collaboration in the identification and acquisition of target projects.  Local 7 has

_____

[12]In its order granting summary judgment to Local 7 on Plaintiffs' federal law claims, the district court appeared to almost entirely ignore these other allegations and focused solely on the MRP.  The court did state, within the discussion of Plaintiffs' LMRA claim, that "[t]here is nothing in the record to support plaintiffs' assertion that the Union resorted to coercive restraints or tactics," perhaps indicating that it was refusing to credit Plaintiffs' other allegations.  However, with only that cryptic remark to guide us, we remain somewhat mystified as to why the district court passed over these allegations entirely in its discussion of Plaintiffs' antitrust claims.   Whether we are entitled to credit these allegations is certainly material to our legal analysis: if Plaintiffs' allegations are taken as true, they would appear to nudge this case away from an allowable restraint arrived at through collective bargaining, as job targeting programs alone have been found to be, see, e.g., Local Union 257, 121 F.3d at 1186-87, and towards the type of illegal restraint on business competition considered verboten by the Supreme Court in cases such as United Mine Workers of America v. Pennington, 381 U.S. 657 (1965) and Connell.

-21-

steadfastly maintained, however, that target projects are
identified solely by the Union and then announced to signatory
contractors simultaneously via a "blast fax." Furthermore,
Plaintiffs have argued that signatory contractors and the
fabricators or general contractors who employ them are complicit in
the union's efforts to shut non-union employers out of the market,
pointing to evidence that fabricators broke contracts with non-
union employers and replaced them with union employers in response
to threats and/or monetary inducements by Local 7. The Union
counters that Plaintiffs have proffered no reliable evidence of
exclusionary agreements between Local 7 and fabricators or general
contractors, citing to deposition testimony by Plaintiffs'
representatives admitting no general or specific knowledge of any
such agreements. The district court did not squarely address these
disputes, and standing as we do one step removed from the record,
we are not in a position to resolve them. Accordingly, we reverse
the district court's grant of summary judgment to defendant Local
7 on Plaintiffs' antitrust claims. Cf. Ramirez-Carlo v. United
States, 496 F.3d 41, 46 (1st Cir. 2007)(grant of summary judgment
will be reversed if "the evidence on record is sufficiently
open-ended to permit a rational fact finder to resolve the
[liability] issue in favor of either side."). We remand for
further fact-finding with regard to the extent of the collaboration
between Local 7, signatory contractors, and the construction

-22-

companies that hire them, to determine whether Local 7 is protected from antitrust liability by the nonstatutory exemption.

We make one final observation regarding Plaintiffs' antitrust claims. Much argument has been devoted throughout this case to the question whether the MRP violates the Davis-Bacon Act and the comparable Massachusetts prevailing wage statute. It seems apparent from the record that the MRP is funded in part by deductions from union members working on Davis-Bacon projects, and that signatory contractors bidding on Davis-Bacon projects have availed themselves of subsidies from the Fund. Thus, the MRP may very well violate the Davis-Bacon Act; a string of recent circuit decisions seems to indicate as much. See generally Can-Am Plumbing, Inc. v. Nat'l Labor Relations Bd., 321 F.3d 145 (D.C. Cir. 2003); Int'l Bhd. of Elec. Workers v. Brock, 68 F.3d 1194 (9th Cir. 1995); Bldg. & Constr. Trades Dep't v. Reich, 40 F.3d 1275 (D.C. Cir. 1994). But Plaintiffs have alleged no cause of action under the Davis-Bacon Act, and, in any case, most likely would not have standing to do so. Cf. United States v. Binghamton Constr. Co., 347 U.S. 171, 177 (1954)("The language of the [Davis-Bacon] Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects.").

Plaintiffs, however, have made an acrobatic attempt to shoehorn a possible Davis-Bacon violation into their antitrust claims, arguing that Local 7's putative Davis-Bacon violation is relevant to the first prong of the Hutcheson analysis. Plaintiffs contend that the MRP could not be characterized as within the Union's legitimate self-interest if it were administered in violation of prevailing wage statutes. Because we need not address the first prong of Hutcheson, we do not reach this issue. We note that Reich and its progeny do not appear to stand for the proposition that a Davis-Bacon violation exposes an otherwise exempt job targeting program to antitrust liability. Nevertheless, it may be that it is not within the interest of federal labor policy to protect the unlawful provision of subsidies to signatory contractors on prevailing wage jobs.[13]

*B. LMRA Claim*

In addition to their antitrust claims, Plaintiffs allege a violation of § 303 of the LMRA, 29 U.S.C. § 187. "Section 303(a) [of the LMRA], 29 U.S.C. § 187(a), makes it unlawful for a labor organization to engage in conduct defined as an unfair labor

_____

[13]Because the district court issued its ruling on the antitrust claims solely on the basis of the statutory exemption, neither party on appeal has sufficiently raised or adequately briefed the question whether a Davis-Bacon violation could render union activity ineligible for the nonstatutory exemption. We thus decline to opine on that question at this time. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("[I]ssues adverted to in a perfunctory manner [on appeal], unaccompanied by some effort at developed argumentation, are deemed waived.").

practice under § 8(b)(4)of the NLRA." <u>Summit Valley Indus., Inc.</u> v. <u>Local 112, United Bhd. of Carpenters & Joiners of Am.</u>, 456 U.S. 717, 722 (1982). Under § 8(b)(4)(ii), it is an unfair labor practice for a union to threaten, coerce, or restrain an employer with an object of forcing the employer (A) to join any labor or employer organization or enter into an agreement prohibited by § 8(e) of the NLRA,[14] or (B) to cease doing business with another party. 29 U.S.C. § 158(b)(4)(ii)(A)&(B); <u>Intercity Maint. Co.</u> v. <u>Local 254, Serv. Employees Int'l Union</u>, 241 F.3d 82, 87 (1st Cir. 2001).

The district court refused to read Plaintiffs' complaint to allege a § 8(b)(4)(ii)(B) "cease doing business" violation. It seems to us that the complaint clearly does allege such a violation; Paragraph 177 of the complaint states:

> Since on or about July 1999 Local 7 has violated § 8(b)(4)(ii)(A) and (B) of the Labor Act, 29 U.S.C. §§ 158(b)(4)(ii)(A) & (B), by engaging in threats of picketing and other restraint and coercion against Plaintiffs and other contractors to obtain agreements prohibited by § 8(e) ... and where an object is to cause Non-Labor businesses to ... cease doing business with Plaintiffs.

---

[14]Section 8(e), 29 U.S.C. § 158(e), provides in relevant part: "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person ...."

-25-

However, Plaintiffs' arguments before the district court and on appeal focused almost entirely on unlawful § 8(e) agreements, which implies a violation of § 8(b)(4)(ii)(A) only. We recognize that the statute is not without its complexities. There is, however, a difference between a claim brought under § 8(b)(4)(ii)(A) and a claim brought under § 8(b)(4)(ii)(B), which is apparent from the plain language of the statute: a successful § 8(b)(4)(ii)(A) claim requires proof that a union is acting to coerce employers into an unlawful agreement to cease doing business with another party, while a successful § 8(b)(4)(ii)(B) claim requires proof that the union's coercive tactics are intended to force an employer to cease doing business with another party, regardless of any agreement.[15]

In their appellate papers, Plaintiffs somewhat confusingly assert that their § 8(b)(4)(ii)(B) claim was acknowledged by the district court, although that court plainly stated that it did "not read the Complaint, despite its prolixity,

---

[15]The unlawful agreements at issue, as defined by § 8(e) of the NLRA, are commonly referred to as "hot cargo agreements." The statute was intended to bar "an employer and union from entering into an agreement under which the employer ceases handling or otherwise dealing with the products of other employers." R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, 33 F.3d 145, 151 (2d Cir. 1994). Section 8(b)(4)(ii)(B), on the other hand, targets union activity such as strikes and secondary boycotts, where an object of such activity is to "'force or require [the striking workers'] employer or another person to cease doing business with a third party.'" Allied Int'l, 640 F.2d at 1374 (quoting Local 1976, United Bhd. of Carpenters v. N.L.R.B., 357 U.S. 93, 98 (1958)).

to allege an alternative 'cease doing business' violation of the
LMRA." Am. Steel Erectors, Inc., 480 F. Supp. 2d at 479 n. 16.
But then Plaintiffs themselves seem to ignore any § 8(b)(4)(ii)(B)
claim they may have had, characterizing the LMRA issue on appeal as
"[w]hether the district court erred in holding, as a matter of law,
that contract breaches and terminations obtained by Local 7 from
neutral fabricators and general contractors through threats,
coercion, and restraints were permissible under 29 U.S.C. §
158(e)." If Plaintiffs cannot sort out their allegations and
develop their arguments sufficiently, it is not for us to do so for
them; accordingly, we consider the § 8(b)(4)(ii)(B) issue waived.
See United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992)("[A]
party is not at liberty to articulate specific arguments for the
first time on appeal simply because the general issue was before
the district court."); see also Zannino, 895 F.2d at 17.

        We thus turn our attention to whether summary judgment
was warranted on Plaintiffs' § 8(b)(4)(ii)(A) claim, regarding
Local 7's alleged use of coercive tactics to pressure neutral
employers into unlawful § 8(e) agreements. The Supreme Court has
held that

> [T]he relevant inquiry under ... 8(e) is
> whether a union's activity is primary or
> secondary--that is, whether the union's
> efforts are directed at its own employer on a
> topic affecting employees' wages, hours, or
> working conditions that the employer can
> control, or, instead, are directed at
> affecting the business relations of neutral

-27-

> employers and are 'tactically calculated' to
> achieve union objectives outside the primary
> employer-employee relationship.

N.L.R.B. v. Int'l Longshoremen's Ass'n, 473 U.S. 61, 81 (1985).
However, an agreement between an employer and a union representing
that employer's employees is not prohibited by § 8(e), even if it
may impact the business of a secondary party, as long as the
union's objective is the preservation of work for those employees.
See Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 645-46
(1967)(agreement within negotiated CBA between carpenters' union
and general contractor providing that carpenters would not handle
prefabricated doors did not violate § 8(e), even though
manufacturer of prefabricated doors lost contractor's business as
a result).

        Plaintiffs contend Local 7 used coercive tactics--
including picketing, threats, and the lure of lucre--to pressure
fabricators and general contractors (i.e., "neutral employers" who
do not themselves hire Local 7 members or have a collective
bargaining relationship with Local 7) into agreements to hire only
union erectors. As evidence, Plaintiffs point to substantially the
same factual allegations underlying their antitrust claims,
discussed above. Therefore, the same factual disputes remain. For
example, Local 7 argues that there is no evidence the Union entered
into generalized agreements with fabricators for across-the-board
exclusion of all non-union employers from jobs in the relevant

-28-

market. This argument both mischaracterizes Plaintiffs' factual allegations and misapprehends the law. There is no requirement that an agreement need be of a generalized exclusionary nature to fall afoul of § 8(e); rather, the use of coercive measures by a union to pressure a single neutral employer into a single agreement to cease doing business with a single non-union employer, or the application of such measures on a project-by-project basis (both of which Plaintiffs have alleged), would suffice. See, e.g., N.L.R.B. v. Bangor Bldg. Trades Council, 278 F.2d 287, 289-90 (1st Cir. 1960)(union violated NLRA by picketing job site to pressure contractor not to use non-union subcontractor). It is also worth noting that the law does not require a written contract; the statute specifically references "any contract or agreement, express or implied." 29 U.S.C. § 158(e)(emphasis added).

In evaluating Plaintiffs' § 8(b)(4)(ii)(A) claim, the district court again focused only on the MRP and did not address Plaintiffs' other allegations. Viewing the facts in the light most favorable to Plaintiffs, as we must, we find that there are genuine issues of material fact with regard to the nature and extent of Local 7's allegedly coercive tactics, and whether Local 7 through use of those tactics pressured neutral employers into agreements to refrain from using non-union contractors in violation of § 8(e). We therefore reverse the district court's grant of summary judgment

to defendant Local 7 on Plaintiffs' LMRA claim, and remand for
further proceedings.

*C. State Law Claims*

We review de novo the district court's dismissal of
Plaintiffs' state law claims, accepting as true all well-pleaded
facts and drawing all reasonable inferences in Plaintiffs' favor.
See Santos-Rodriguez v. Doral Mortgage Corp., 485 F.3d 12, 15 (1st
Cir. 2007).

Federal law preempts state law (1) when Congress has
expressly so provided, (2) when Congress intends federal law to
"occupy the field" and (3) to the extent that state law conflicts
with any federal statute.   See Crosby v. Nat'l Foreign Trade
Council, 530 U.S. 363, 372-73 (2000)(internal citations omitted).

"[T]he NLRA itself contains no express pre-emption
provision," but "Congress implicitly mandated two types of pre-
emption as necessary to implement federal labor policy." Chamber
of Commerce of U.S. v. Brown, 128 S.Ct. 2408, 2412 (2008).   The
first, familiarly known as "Garmon pre-emption," prohibits states
from regulating activities that are arguably protected or
prohibited by § 7 and § 8 of the NLRA.[16]  See San Diego Bldg. Trades

---

[16]Section 7 of the NLRA protects employees' right "to
self-organization, to form, join, or assist labor organizations, to
bargain collectively through representatives of their own choosing,
and to engage in other concerted activities for the purpose of
collective bargaining or other mutual aid or protection."   29
U.S.C. § 157.   Section 8 prohibits employers and employees
respectively from engaging in certain "unfair labor practices."  29

-30-

Council v. Garmon, 359 U.S. 236, 244 (1959); see also Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224-25 (1993). The second, "Machinists pre-emption," is a recognition of Congress's intention to occupy the field of labor dispute regulation, prohibiting state regulation of areas outside the four corners of the NLRA if Congress intended them "to be controlled by the free play of economic forces." Machinists v. Wis. Employment Relations Comm'n, 427 U.S. 132, 140 (1976)(citation omitted).

There are three exceptions to federal labor law pre-emption. Tamburello v. Comm-Tract Corp., 67 F.3d 973, 977 (1st Cir. 1995). "The first is where Congress has expressly carved out an exception to the [National Labor Relations Board]'s primary jurisdiction." Id. Second, the NLRA does not pre-empt state law "when the regulated activity touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction,' courts 'could not infer that Congress had deprived the States of the power to act.'" Id. (citing Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 195 (1978)). And the final exception applies "if the regulated activity is merely a peripheral or collateral concern of the labor laws." Id.

---

U.S.C. § 158.

We agree with the district court's pre-emption analysis, and we need not rehash it here at length. See Talbott v. C.R. Bard, Inc., 63 F.3d 25, 30-31 (1st Cir. 1995)("where [a] district judge produces a well-reasoned opinion that reaches the correct result, a reviewing court should not write at length merely to put matters in its own words")(citing In re San Juan Dupont Plaza Hotel Fire Litig., 989 F.2d 36, 38 (1st Cir. 1993)). Plaintiffs' state law claims incorporate by reference all the factual allegations that form the basis for Plaintiffs' federal claims, and assert no others. Plaintiffs have thus effectively conceded that the same conduct that gives rise to their state claims is conduct "arguably protected or prohibited" by federal labor law; accordingly, Plaintiffs' state law claims are pre-empted as per Garmon.

There being no applicable express carve out from federal jurisdiction, Plaintiffs' state law claims could only be saved from pre-emption by the second or third exception delineated above. However, Plaintiffs have not pled allegations that sufficiently implicate interests "so deeply rooted in local feeling and responsibility" or of "peripheral or collateral concern" to federal labor laws so as to except them from federal pre-emption.[17]  Local

---

[17]Plaintiffs also argue that the district court's decision is inconsistent with case law finding no pre-emption of state prevailing wage statutes, but Plaintiffs' complaint asserted no claim under the Massachusetts prevailing wage statute and Plaintiffs did not directly advance that argument below in their opposition to defendants' motion to dismiss. We therefore will not consider it here. See McCoy v. Mass. Instit. of Tech., 950 F.2d

7's conduct may be prohibited rather than protected by the NLRA, but either way it is well within the regulatory purview of federal labor law rather than that of state police power. See Garmon, 359 U.S. at 244 ("When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [§] 7 of the [NLRA], or constitute an unfair labor practice under [§] 8, due regard for the federal enactment requires that state jurisdiction must yield. . . . Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations."). We affirm the district court's dismissal of Plaintiffs' state law claims as pre-empted by federal labor law.

## III. Conclusion

For the reasons stated above, we affirm the dismissal of Plaintiffs' state law claims, but reverse the district court's summary judgment order and remand for further proceedings consistent with this opinion. Each party should bear its own costs.

---

13, 22 (1st Cir. 1991)("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal.").