UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12536-RGS

AMERICAN STEEL ERECTORS, INC. et al.

v.

LOCAL UNION NO. 7, INTERNATIONAL ASSOCIATION
OF BRIDGE, STRUCTURAL, ORNAMENTAL &
REINFORCING IRON WORKERS

MEMORANDUM AND ORDER ON
DEFENDANT LOCAL UNION NO. 7'S
RENEWED MOTION FOR SUMMARY JUDGMENT

March 25, 2013

STEARNS, D.J.

Plaintiffs – five nonunion steel erectors – American Steel Erectors, Inc., Ajax

Construction Company, Inc., American Aerial Services, Inc., Bedford Ironworks, Inc.,

and D.F.M. Industries, Inc. – allege that defendant Local Union No. 7, International

Association of Bridge, Structural, Ornamental & Reinforcing Iron Works (Local 7)

conspired with the Building Trades Employers' Association of Boston and Eastern

Massachusetts (BTEA) and other unionized employers to monopolize the structural

steel erection industry in the greater Boston area through the use of a job targeting

program and coercive tactics in violation of federal antitrust and labor laws.  The labor

law claims having been resolved in plaintiffs' favor by a jury verdict, Local 7 now

moves for summary judgment on the antitrust claims.

BACKGROUND

Structural steel is the preferred framing material for the construction of multi-story buildings.

> The structural steel industry is comprised of steel fabricators, who manufacture steel products to meet design specifications, and steel erectors, who assemble the fabricated steel. General contractors requiring structural steel work typically solicit bids for "fab and erect" packages. The packages are submitted by fabricators, who solicit bids for the erection work from steel erectors. In New England there are relatively few fabricators (around twenty) and many erectors (over 200). As a result, the competition for erection subcontracts in the Boston area is fierce, and the general rule is that the lowest bidder will be awarded the erection contract.

*Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 72 (1st Cir. 2008) (*ASE*).

Local 7 represents steel erection workers in eastern Massachusetts. Local 7's job targeting program – the Market Recovery Program (MRP) – which is at the center of the current dispute, was established in or around 1990. The MRP is intended to enable unionized erectors to compete with their nonunion counterparts, who because of lower labor costs, typically have a built-in bidding advantage. The MRP subsidizes the bids of unionized contractors competing for jobs "targeted" by Local 7 by paying the difference between union scale wages and the less handsome wages earned by

nonunion workers.

The MRP is funded by union members' dues. The employer withholds the dues from the member's paycheck and pays them over to Local 7, which deposits them into the MRP fund. In 1993, Local 7 and the BTEA formally incorporated this check-off system into their master Collective Bargaining Agreement (CBA). The CBA provides that a signatory employer will make an MRP deduction of 2 percent plus 85 cents/hour from each member's weekly paycheck. The deduction obligation applies to all construction contracts for which Local 7 supplies unionized labor, including federally-funded projects subject to the "prevailing wage" provisions of the Davis-Bacon Act, 40 U.S.C. §§ 3141-3148.[1]

Plaintiffs allege that Local 7 used the MRP as a vehicle to effectuate a conspiracy with signatory contractors to freeze non-union contractors out of a significant portion of the Boston-area steel erection market, and more particularly, from

_____

[1] The Davis-Bacon Act requires contractors working on projects financed in whole or in part with federal funds to pay workers no less than the wage paid to "the corresponding classes of laborers and mechanics employed on the projects of a character similar to the contract work in the . . . State in which the work is to be performed." 40 U.S.C. § 3142(b). The Act also bars the "kickback" of any portion of a worker's Davis-Bacon wages, "regardless of any contractual relationship." 40 U.S.C. § 3142(c)(1).

the larger and more lucrative jobs.[2]  Plaintiffs claim that apart from the MRP, Local 7 engaged in coercive tactics, including threats of violence and secondary picketing, to pressure steel fabricators and others with control over job sites into breaching contracts with nonunion erectors and replacing them with unionized BTEA members.

In 2007, this court granted summary judgment to Local 7 on one aspect of the antitrust claims and on the labor law claims generally.  *See Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 480 F. Supp. 2d 471 (D. Mass. 2007).  As relevant to this opinion, this court found that plaintiffs' antitrust claims fell within the "comprehensive statutory labor exemption to the antitrust laws."[3]  *Id.* at 476-478, citing *United States v. Hutcheson*, 312 U.S. 219, 231-232 (1941) (labor activity is exempt from antitrust liability where a union acts unilaterally in its own self-interest and not in combination with a non-labor party).  Because this court found that the MRP fell within the statutory exemption, it did not consider Local 7's other grounds (the nonstatutory exemption and lack of

---

[2] Some 70 percent of the steel erection work in the Boston-area market has historically been performed by unionized contractors.

[3] The exemption of labor unions from the antitrust laws reflects both a congressional and a judicial recognition of the need to ensure that organized labor is able to operate as an effective monopoly without fear of becoming enmeshed in the antitrust laws.  *Id.* at 475.

substantive merit) for seeking summary judgment on the antitrust claims.

Plaintiffs appealed and the First Circuit reversed.  *See ASE*, 536 F.3d at 78-79. The Court found that because the effective operation of the MRP is dependent on the cooperation of the signatory employers (who collect the funds that are ultimately distributed to the unionized employer who successfully bids on a targeted job), the MRP failed the non-combination prong of the *Hutcheson* test.  *Id.* at 78.  The First Circuit left open the question of whether Local 7's conduct might be protected by the nonstatutory antitrust exemption.  *Id.* at 79-81.  Finally, the First Circuit, while agreeing with this court that plaintiffs' state law claims were preempted by federal law, reversed this court's summary judgment ruling for Local 7 as to the violation of section 8(b)(4)(ii)(A) of the National Labor Relations Act (specifically whether Local 7 had used coercive tactics to pressure neutral employers into entering unlawful section 8(e) agreements, as plaintiffs alleged).  *See id.* at 81-84; 29 U.S.C. § 158(b)(4)(ii)(A), (e).

In 2009, after remand, the labor law claims were tried to a jury resulting in a favorable verdict for plaintiffs.  The jury found that "plaintiffs [had] shown by a preponderance of the evidence that Local 7 threatened, coerced or restrained Cape & Island Steel (Fox 25), Capone Iron Works (Brickworks, Buildings 3 & 4), Famm Steel Inc (Cardi's Furniture), and [] Mandate Erectors (Archstone Apartments) into entering an explicit or implicit agreement with Local 7 to cease doing business with [plaintiffs]

5

D.F.M. Industries and [] Ajax Construction Company" and that "the coerced agreement(s) . . . were a proximate (substantial) cause of injury and damages to one or more of the plaintiffs."[4] Jury Verdict, Dkt # 151. The jury awarded Ajax $211,956.00 in damages, and D.F.M. $78,757.60. *Id.*[5]

The jury verdict left open the question of liability on the antitrust claims. After some further discovery, Local 7 renewed its motion for summary judgment on the grounds not previously considered by the court. The court heard oral argument on December 14, 2012.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material

---

[4] On these four projects, the jurors found that the fabricators had agreed under pressure from Local 7 to replace D.F.M. and Ajax with union erectors.

[5] In post-trial proceedings, the court denied Local 7's motion for judgment notwithstanding the verdict and motion for a new trial. *See* Dkt #s 172 & 179.

fact precluding the entry of judgment.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."   *Anderson*, 477 U.S. at 255.

### *The Nonstatutory Exemption*

The nonstatutory exemption might more accurately be described as a necessary exception to the statutory exemption.   If the statutory exemption were to be taken literally, it would outlaw collective bargaining agreements, which are "by definition a combination between a labor group and a non-labor group."   *ASE*, 536 F.3d at 78, citing *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996).  Thus, in order "'to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions.'" *ASE*, 536 F.3d at 79, quoting *Brown*, 518 U.S. at 237.   The judicially crafted nonstatutory exemption provides an aegis for "alleged anticompetitive conduct [that] is anchored in the collective-bargaining process, concerns only the parties to the collective bargaining relationship, and relates to wages, hours, conditions of employment, or other mandatory subjects of collective bargaining." *ASE*, 536 F.3d at 77.   Its applicability is "the strongest where the alleged restraint operates primarily in the labor market and has only tangential effects on the business market." *Id.* at 79.

Local 7 concedes (as it must) that the four agreements the jury found to constitute illegal section 8(e) agreements are not protected by the nonstatutory exemption.  It argues rather that the MRP, the vehicle by which plaintiffs contend Local 7 wields monopoly power, is exempt from the antitrust regime and its limits on collective action.  This is because the MRP is funded by workers' wages, a mandatory subject of collective bargaining, and is implemented through a union-administered agency the mechanics of which are a bargained-for component of the CBA.  Wage subsidies to winning bidders on targeted jobs are similarly distributed under the terms of arms-length agreements negotiated with BTEA signatory employers.  This logic aside, the strongest support for Local 7's argument is the First Circuit's acknowledgment that "other circuits have found that job targeting programs similar in structure and implementation to the [MRP] do fall within the bailiwick of the nonstatutory exemption."  *Id.* at 79-80 (citations omitted).

Not to be outdone, plaintiffs counter that this particular MRP is not protected by the nonstatutory exemption because the dues that support it were at least in part extracted from wages paid on Davis-Bacon projects in violation of the Act's anti-kickback provision.[6]  Although plaintiffs do not assert a claim under Davis-Bacon, they

---

[6] The First Circuit characterized plaintiffs' Davis-Bacon Act argument as "acrobatic . . . shoehorn[ing]." *Id.* at 81.  It nonetheless offered as an aside that the "MRP may very well violate the Davis-Bacon Act," *id*, although it agreed with this

argue that the nonstatutory exemption applies only to the pursuit of legitimate labor goals, of which violating the Davis-Bacon Act is not one. *See Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 623-626 (1975) (union restraint on subcontractor competition "that would not follow naturally from the elimination of competition over wages and working conditions . . . contravenes antitrust policies to a degree not justified by congressional labor policy"); *see also Int'l Bhd. of Elec. Workers, Local 48*, 332 NLRB 1492, 1500 (2000) (*Local 48*) ("[R]equiring the payment of MRP dues as a condition of employment on Davis-Bacon projects is inimical to public policy."); *Can-Am Plumbing, Inc. v. N.L.R.B.*, 321 F.3d 145, 153-154 (D.D.C. 2003) (reversing an NLRB ruling that union dues unlawfully withheld under Davis-Bacon did not fatally taint a union's job targeting program).

Local 7, in turn, distinguishes between union members making voluntary contributions to an MRP from Davis-Bacon and other earnings, and the involuntary "extraction" of such contributions, as was the case in *Local 48*.  In *J.A. Croson Co.*, 359 NLRB No. 2, 2012 WL 5246914 (Sept. 28, 2012), the National Labor Relations Board (NLRB) made the same distinction, finding that "union job targeting programs,

---

court that plaintiffs did not have the standing necessary to prosecute a Davis-Bacon claim.  In the end, the First Circuit opinion left open the question of whether a kickback violation under the Davis-Bacon Act might render otherwise legitimate union activity ineligible for antitrust protection. *Id.* at 81 n.13.

including those funded in part by voluntary deductions from the wages of union members employed on State-funded public works projects, are *clearly* protected under Section 7 of the [NRLA]."[7]   *Id.*, at *1.

> The job targeting program is effectively a union's agreement with an employer to accept a pay cut in order to avoid layoffs or expand job opportunities for represented employees – a bargain that surely lies at the heart of activity protected by Section 7 of the Act.  But in the construction industry, an employer often cannot guarantee that it can comply with its end of such a bargain because it must ordinarily bid for work through a competitive process.  A union might agree to a pay cut on some jobs in order to secure its members employment on others only to have the employer fail to obtain the work.  The job targeting program solves that unique problem by allowing the union to hold the wages donated by employees specifically for this purpose until the employer secures the additional work.  The strategy of job targeting to preserve and expand employment opportunities for represented employees thus plainly seeks to further legitimate goals under Section 7.  The Supreme Court has made clear that unions "may seek to increase the work of union subcontractors at the expense of nonunion subcontractors."  *See Connell,*[] 421 U.S. [at] 625 [].  "[T]he parties to this [job targeting] agreement undoubtedly wanted the union subcontractors to increase their work at the expense of nonunion subcontractors.  That of course is a legitimate goal of the union and its workers."  *Phoenix Elec*[.] *Co. v. Nat*['*l*] *Elec*[.] *Contractors Ass*['] *n.*, 81 F.3d 858, 863 (9th Cir. 1996).  Because job targeting constitutes protected activity, collective-bargaining agreements permitting voluntary deductions from wages to support job targeting, and employer and union conduct pursuant to those agreements, are likewise protected

---

[7] Section 7 of the NLRA "protects concerted employee activities engaged in 'for the purpose of collective bargaining or other mutual aid or protection.'  It is settled that these protections encompass employee attempts to improve terms and conditions of employment with their employer as well as attempts to otherwise improve their lot . . . through channels outside the immediate employee-employer relationship."  *Id.*, at *6 (internal quotation marks omitted).

by Section 7.

*Id.*, at *6.  As in *Croson*, there is no evidence in this case that the MRP dues were involuntarily collected from Local 7 members or that the creation of the MRP had not been ratified by Local 7's membership.

Plaintiffs challenge the viability of the *Croson* holding in light of *Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013).  In *Canning*, the District of Columbia Circuit Court of Appeals held that the NLRB decision was invalid because three members of the five-member board were appointed by President Obama in an allegedly unlawful exercise of the Recess Appointment Power granted by Article II, Section 2 of the Constitution.  *Id.* at 512-514.  Thus, according to the reasoning of the D.C. Circuit, the NLRB lacked the quorum of three board members required to issue legally binding decisions.[8]  *Id.* at 514.

Whether *Canning*'s analysis of the Recess Appointment Power will survive what seems inevitable Supreme Court review[9] does not resolve this dispute, even though this court finds the rationale of *Croson* to be compelling.  In its remand, the First Circuit

_____

[8] Plaintiffs point out that two of the NLRB members who participated in the 3-1 *Croson* decision were recess appointees.

[9] The Obama Administration has announced its intention to seek a grant of certiorari.  As the Court in *Canning* noted, the circuits are divided over the proper interpretation of the Recess Appointments Clause.  *See Canning*, 705 F.3d at 511.

directed this court to "consider the entirety of the alleged activity when determining the applicability the nonstatutory exemption." *ASE*, 536 F.3d at 80.  This directive makes it impossible to simply adopt Local 7's suggestion that the issue of the legality of the MRP be cabined off from the jury's finding that Local 7 entered into unlawful section 8(e) agreements with the four non-union fabricators with whom Local 7 had no bargaining relationship.  Because in these four instances, Local 7 stepped outside the collective bargaining process to combine with non-labor organizations to gain an unlawful competitive advantage for its members, it cannot claim the protections of the nonstatutory exemption.

*Antitrust Liability*

The conclusion that the nonstatutory exemption is inapplicable to the "entirety" of Local 7's conduct does not end the analysis.  *See Connell*, 421 U.S. at 637 (remanding for further findings as to whether a section 8(e) agreement could be held to constitute a restraint of trade within the meaning of the Sherman Act).  In seeking summary judgment, Local 7 argues that seen in the context of the whole, neither the four section 8(e) agreements or the MRP can be properly characterized as a group boycott or as conspiracy to monopolize under the Sherman Act.  Because the First Circuit "express[ed] no opinion regarding the substance of [p]laintiffs' underlying antitrust claims," *ASE*, 536 F.3d at 76 n.6, and the claims themselves are necessarily

12

broader in scope than the labor law violations, there is no ready detour around the labyrinth of antitrust law.

It is of critical significance that the section 8(e) agreements involved parties at distinctly different levels of the steel erection market – the union as a supplier of labor and the fabricators as jobbers subcontracted to the erectors – the agreements might, in the light most favorable to plaintiffs, be described as vertical exclusionary agreements.[10] On this issue at least, antitrust law is clear: vertical agreements are to be judged under the aptly termed "rule of reason." *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007); *Cont'l Television v. GTE Sylvania*, 433 U.S. 36, 59 (1977). The rule of reason (unlike the doctrine of per se illegality) looks to the entire economic context in which the allegedly exclusionary conduct took place, asking whether the restraint of trade at issue was unreasonable under the circumstances. *See Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918). A rule of reason analysis "requires a burdensome multi-part showing: that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits." *Stop & Shop Supermarket Co. v. Blue Cross*

---

[10] Local 7 doubts whether the exclusionary element can be said to be met at all as neither Local 7 nor the fabricators are in direct competition with the nonunion erectors.

*& Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).  To make out a claim of exclusive dealing under the rule of reason, plaintiffs are required to show that they were prohibited from competing in at least 30-40 percent of the relevant market (here the market for steel erection ).  Why 30 to 40 percent?  *See id.* at 68 ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.").  Even applying plaintiffs' more conservative definition of the geography of the relevant market (they would exclude Connecticut and New York), steel erection spending in the locally defined market has exceeded $200,000,000 each year since 1999.  Compl. ¶ 43.  The four section 8(e) agreements, which the jury found to be valued at something less than $300,000 *en toto*, constitute only a fraction of a percent of the defined market, nowhere near the percentage impact necessary to make out an exclusionary claim under the rule of reason.

Plaintiffs counter that the section 8(e) agreements that figure in this case more closely resemble the group boycott judged per se illegal in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959).  In *Klor's*, a group of horizontally aligned appliance manufacturers and distributors agreed with Broadway-Hale, a department store, to refuse to supply appliances to Klor's, a competitor retailer.  *Id.* at 209. Plaintiffs analogize the section 8(e) agreement to the facts in *Klor's* because the fabricators who were parties to the section 8(e) agreements – Capone Iron and Famm

Steel – were not free to switch suppliers, *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."), and instead "were bridled by the Union." Dkt # 194 at 13. Additionally, plaintiffs argue that the section 8(e) agreements were per se illegal because they involved joint efforts to strip nonunion erectors of existing job contracts. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing*, *Co.*, 472 U.S. 284, 294 (1985) ("Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.") (internal quotation marks and citations omitted).

At bottom, however, plaintiffs' per se argument collapses. The per se rule applies only in instances of horizontal, rather than vertical, market restraints. *See* Dkt # 194 at 13 ("The per se test applies if at least two horizontally aligned parties join in the conspiracy.").

> It is important to distinguish between "horizontal" restraints, [i].e. agreements between competitors at the same level of market structure, and "vertical" restraints, [i].e. combinations of persons at different levels of the market structure, such as manufacturers and distributors. *See United States v. Topco Associates*, 405 U.S. 596, 608 [] (1972). Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," *White Motor Co.*

> *v. United States*, 372 U.S. 253, 263 [] (1963); and, therefore, [p]er se
> violations of the Sherman Act.   On the other hand, while vertical
> restrictions may reduce intrabrand competition by limiting the number of
> sellers of a particular product, competing for a given group of buyers, they
> also promote interbrand competition by allowing a manufacturer to
> achieve certain efficiencies in the distribution of its products, *see Cont*['l
> *Television*], 433 U.S. at 54 []. They are, therefore, to be examined under
> the [r]ule of reason standard.

*Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978).   The four section

8(e) agreements at issue here are between Local 7, as a supplier of labor, and the

fabricators, as suppliers of steel.   These parties do not compete against one another and

occupy different tiers of the structural steel market.   Because there is no showing of a

horizontal restraint, a rule of reason analysis must govern.

Moreover, as the Supreme Court observed in *Nw. Wholesale*, a principal concern

in the per se cases is the "den[ial] of relationships the competitors need in the

competitive struggle."   472 U.S. at 294.   Indeed, "[t]oday that designation [of group

boycott or concerted refusal to deal] is principally reserved for cases in which

competitors agree with each other not to deal with a supplier or distributor if it

continues to serve a competitor whom they seek to injure."   *U.S. Healthcare, Inc. v.*

*Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir. 1993).   While in this case nonunion

erector plaintiffs D.F.M. and Ajax were ousted from four job sites after Local 7 brought

coercive pressure on the fabricators, they were not as a result shorn of the ability to

remain as competitors in the market.  There is no evidence that they were excluded from bidding on other jobs, or excluded from bidding on future jobs with the same fabricators.  To return to the *Klor's* analogy, the effects of the four section 8(e) agreements at issue are more akin to a situation in which a department store loses sales of appliances because of a competitor's louche sales tactics, rather than being shut off from all future purchases from an appliance manufacturer or wholesale distributor, and thus being driven out of the market altogether.

As a fallback, plaintiffs attempt the argument that the section 8(e) agreements cannot pass muster under the rule of reason.  According to plaintiffs, because 70 percent  of the steel erection work in the New England market is performed by BTEA erectors, Local 7 has significant market power that it uses to unfairly stifle competition. As an initial matter, it is unclear that Local 7 wields the pervasive market power that plaintiffs ascribe to it.  Under the Sherman Act, "[m]arket power is the ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 n.38 (1984). While Local 7's CBA increases the costs of labor for the typical BTEA signatory,[11] the hundred-plus BTEA erectors compete not only with non-signatory erectors, but also

---

[11] There may be something to Local 7's argument that because its members tend to be more experienced, they work more efficiently than the typical non-union worker, hence offsetting some of the impact of the wage differential.

with each other as jobs become available.  Because the bidding process is open, a winning BTEA erector has to underbid all competitors, including the nonunion erectors who are not constrained by CBA wage requirements.  That means that it must formulate its bid with either assurances of an MRP wage subsidy or by taking a corresponding cut in profits.  The end result to the consumer is the same, that is, the price of the winning bid is the lowest price, regardless of Local 7's CBA wages or its MRP subsidy.[12]

Plaintiffs correctly state that "proof of actual detrimental effects . . . can obviate the need for an inquiry into market power . . . ." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-461 (2009) (quotation marks and citation omitted).  In this regard, they rely on the jury's verdict as proof of harm.  However, plaintiffs confuse harm to individual competitors, as was caused by the section 8(e) agreements, with harm to competition in the market.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 n.14 (1984) ("We have also made clear that the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'") (citation omitted).

---

[12] Plaintiffs argue that the higher costs of the section 8(e) agreements are evidence that Local 7 had the power to impose higher prices on the market.  However, the evidence at trial showed that the section 8(e) agreements were achieved through coercive tactics and threats of violence.  The fact that Local 7 in these instances was forced to resort to illegality is more indicative of market weakness than an ability to dictate price by means of market dominance.

"Heavy-handed competitive tactics alone do not constitute an antitrust violation, however.  To survive defendants' motion for summary judgment, plaintiffs needed to demonstrate a genuine dispute as to whether defendants' actions caused an injury to *competition,* as distinguished from impact on themselves." *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 487 (1st Cir. 1994) (emphasis in original).  Here, the de minimis value of the section 8(e) agreements, when compared to the overall outlay in the steel erection market, cannot as a matter of law, be said to have negatively impacted competition in the market in any meaningful way.  D.F.M. and Ajax were injured instead by Local 7's "heavy-handed competitive tactics," and their injuries were fairly compensated by the jury's verdict on the labor law claims.

Plaintiffs also assert, again correctly, that the court must consider the anti-competitive effect of Local 7's conduct in the aggregate, rather than on an agreement-by-agreement basis.  However, it is necessary to assess the impact of each facet of Local 7's allegedly anticompetitive conduct to determine its aggregate effect.  In this regard, I will turn to the MRP, which in the eyes of plaintiffs, is the chief villain of the antitrust piece.

Local 7 contends that plaintiffs have failed show that the MRP is the product of an alleged conspiratorial agreement between Local 7 and the signatory erectors.

An antitrust conspiracy plaintiff with evidence showing nothing beyond

19

> parallel conduct is not entitled to a directed verdict, *see Theatre Enterprises,* [*Inc. v. Paramount Film Distributing Corp.*, 356 U.S. 537, 540 (1954)]; proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, *see Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752 [] (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, *see Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 [] (1986).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  Plaintiffs portray the alleged conspiracy as a wheel with Local 7 at the hub and the individual agreements with signatory erectors serving as the spokes.  In response, Local 7 makes the apt point that what is missing is a rim – that is, that the signatory erectors acted collusively in entering into the job targeting agreements, rather than engaging in independent, if parallel, conduct.  *See Kotteakos v. United States*, 328 U.S. 750 (1946).

Plaintiffs rely again on the jury verdict and counter that Local 7's conduct in wresting the section 8(e) agreements reflects a conspiratorial agreement with at least Bel-Lin Corp., the signatory erector that was the beneficiary of two of the section 8(e) agreements.  However, the agreement between Local 7 and Bel-Lin, in plaintiffs' model of the alleged conspiracy, is nothing more than a spoke in the wheel, from which a rim – a broader agreement among the signatory erectors – cannot be inferred.

Moreover, even assuming a rimmed wheel, plaintiffs have failed to produce evidence that the job targeting agreements with the signatory erectors had any unlawful

anticompetitive effect. Although the use of MRP funds lowered the signatories' costs on targeted jobs, the resulting lower bids were not unlawful because they have not been shown to have amounted to predatory pricing, that is, pricing "below an appropriate measure of [the signatory erectors'] costs."[13] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993);[14] *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (a vertical price-fixing agreement does not cause a competitor antitrust injury unless it results in predatory pricing).[15]

While the First Circuit noted that "[i]t is disingenuous for Local 7 to argue that

---

[13] Plaintiffs respond with the argument that Local 7 cannot point to any record evidence that the signatories' lower bids on targeted jobs were not predatory. This contention, however, stands the burden of proof on its head. Plaintiffs bear the ultimate burden of proving their claims, and on summary judgment must identify some evidence on which a jury could reasonably find in their favor on this point. *See Anderson*, 477 U.S. at 252. That they have not done.

[14] Local 7 also argues that there can be no predatory pricing where there is no "dangerous probability [] of recouping [the] investment in below-cost prices." *Id.* at 224. Such a probability does not exist in the structural steel industry because the competition is fierce, and the barrier to entry is very low.

[15] Plaintiffs also argue that a subsidy cannot be factored into the calculus of whether a price is above or below cost. However, in the cases they cite – *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245 (9th Cir. 1982), and *Jiffy Lube Int'l, Inc. v. Lake*, 1982 WL 1930 (D. Wyo. Oct. 1, 1982) – the subsidy was externally funded, and did not reduce the actual cost of the services provided. Here, however, MRP funds are collected from union erection workers who, in essence, agree to work at a lower wage. Thus seen, the MRP monies reflect an actual savings in the signatory's labor costs, a savings that accrues ultimately to the customer.

the MRP has *no* impact on business competition when its very purpose is to render union employers more competitive," *ASE*, 536 F.3d at 78 n.10, not every impact on competition has a distorting effect on the market.  As Local 7 points out, the MRP is pro- rather than anticompetitive.  By making it possible for signatories to structure their bids on targeted projects in the expectation of lower labor costs, the MRP promotes competition and lower prices.  Indeed, "[t]here is no indication . . . that [the MRP agreement] is, or ever was intended to be, a bar to competition by nonunion subcontractors," *Phoenix Elec.*, 81 F.3d at 863, who are not prevented by the MRP from entering bids on whatever jobs they choose.  In essence, the MRP is simply a mechanism by which union members agree to work for lower wages than the negotiated rates of the CBA to help their employers to become more competitive.  The court sees no principled distinction between a union worker's agreement to pay dues to the MRP to preserve his job and a nonunion worker's agreement to work for a lower wage to save hers.[16]

Because plaintiffs have failed to demonstrate an unlawful anticompetitive effect of any aspect of Local 7's accused conduct, summary judgment is warranted for Local

---

[16] Plaintiffs' more general "monopolization" claim fails because, as earlier explained, there is no evidence that Local 7, through the use of the MRP, has "the power to control prices or exclude competition" in the structural steel market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

7 on the antitrust claims.

ORDER

For the foregoing reasons, Local 7's renewed motion for summary judgment on the antitrust claims will be <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE